26-1314, 26-1628

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

SVITLANA DOE; MAKSYM DOE; MARIA DOE; ALEJANDRO DOE; ARMANDO DOE; ANA DOE; CARLOS DOE; OMAR DOE; SANDRA MCANANY; KYLE VARNER; WILHEN PIERRE VICTOR; HAITIAN BRIDGE ALLIANCE; ANDREA DOE; VALENTIN ROSALES TABARES; MARIM DOE; ADOLFO GONZALEZ, JR.; ALEKSANDRA DOE; TERESA DOE; ROSA DOE; MIGUEL DOE; LUCIA DOE; DANIEL DOE; GABRIELA DOE; NORMA LORENA DUS; DAVID DOE; FRANCISCA DOE; JOHN DOE; JOSE DOE; LUCIANA DOE,

*Plaintiffs-Appellees*,

v.

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; DAVID J. VENTURELLA, in the official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement[1]; RODNEY S. SCOTT, in the official capacity as Commissioner of U.S. Customs and Border Protection; DONALD J. TRUMP, in the official capacity as President of the United States,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts

**BRIEF OF DEFENDANTS-APPELLANTS**

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

SARAH WELCH
*Senior Counsel to the Assistant Attorney General*

ELISSA FUDIM
*Trial Attorney*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*
First Cir. Bar No. 1216699
U.S. Dep't of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
katherine.j.shinners@usdoj.gov

[1] Mr. Venturella's title is Senior Official Performing the Duties of the Director.

## TABLE OF CONTENTS


**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................1**

**INTRODUCTION.......................................................................................2**

**STATEMENT OF JURISDICTION..........................................................5**

**STATEMENT OF THE ISSUES...............................................................6**

**STATEMENT OF THE CASE..................................................................8**

**A. Statutory Background.........................................................8**

**B. Factual Background............................................................9**

**C. Procedural History.............................................................16**

**SCOPE AND STANDARD OF REVIEW ...............................................22**

**SUMMARY OF THE ARGUMENT .........................................................22**

**ARGUMENT..............................................................................................26**

**I. Plaintiffs Are Unlikely to Succeed On Their Challenge to a Discretionary Parole Termination Decision............................................27**

**A. Parole Terminations Are Not Judicially Reviewable.....................27**

1. The INA deprives the district court of jurisdiction..................27

2. The APA also forecloses review...........................................38

**B. The Parole Termination was Not Arbitrary and Capricious........40**

**C. Plaintiffs' Notice Claims Do Not Support the Relief Entered.......49**

**II. A Balancing of the Equities Does Not Favor the Entry of Injunctive Relief .............................................................................................52**

**CONCLUSION..........................................................................................55**

**CERTIFICATE OF COMPLIANCE ..................................................57**

**CERTIFICATE OF SERVICE ............................................................58**

## TABLE OF AUTHORITIES

## CASES

*Amanullah v. Nelson*,
811 F.2d 1 (1st Cir. 1987) ....................8

*Amgen Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ....................35

*Arizona v. United States*,
567 U.S. 387 (2012) ....................53

*Bernardo v. Johnson*,
814 F.3d 481 (1st Cir. 2016) ....................29

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ....................32

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024) .................... 31, 32

*Castaeneira v. Noem*,
138 F.4th 540 (D.C. Cir. 2025) ....................37

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) .................... 21, 22

*Cook Cnty., Illinois v. Wolf*,
962 F.3d 208 (7th Cir. 2020)....................26

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016) ....................32

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019) ....................35

*Department of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020) .................... 19, 40, 43, 45, 49

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ....................................................................................36

*Doe v. McAleenan*,
926 F.3d 910 (7th Cir. 2019)............................................................... 33, 34

*Doe v. Noem*,
No. 25-1384, 152 F.4th 272 (1st Cir. 2025).......................... 16, 20, 41, 42, 45, 49

*DraftKings Inc. v. Hermalyn*,
118 F.4th 416 (1st Cir. 2024) .............................................................. 48, 50

*FDA v. Wages and White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ....................................................................................42

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ....................................................................27

*Goya Foods, Inc. v. Wallack Mgmt. Co.*,
290 F.3d 63 (1st Cir.) ..................................................................................22

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020) ....................................................................................32

*Hassan v. Chertoff*,
593 F.3d 785 (9th Cir.), *cert. denied*, 561 U.S. 1007 (2010)...............................28

*Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co.*,
864 F.2d 927 (1st Cir. 1988)............................................................... 21, 52

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993) ..................................................................................53

*Karakenyan v. U.S. Citizenship & Immigr.*,
468 F. Supp. 3d 50 (D.D.C. 2020)...............................................................34

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013) ....................................................................................52

*Kreis v. Sec'y of Air Force*,
866 F.2d 1508 (D.C. Cir. 1989) ....................39

*Lane v. Hills*,
72 F.R.D. 158 (D.N.J. 1976), *aff'd*, 556 F.2d 567 (3d Cir. 1977) ....................51

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ....................39

*Lukac v. Mayorkas*,
No. 22-cv-7156, 2023 WL 3918967 (N.D. Ill. June 9, 2023) ....................35

*Marasco & Nesselbush, LLP v. Collins*,
6 F.4th 150 (1st Cir. 2021) ....................41

*Maryland v. King*,
567 U.S. 1301 (2012) ....................52

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................... 25, 36, 41, 42

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) .................... 30, 31, 32, 36

*Munaf v. Geren*,
553 U.S. 674 (2008) .................... 26, 27

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
100 F.4th 1 (1st Cir. 2024) ....................41

*New York v. McMahon*,
784 F. Supp. 3d 311 (D. Mass. 2025) ....................53

*Nken v. Holder*,
556 U.S. 418 (2009) .................... 26, 52

*Noem v. Doe*,
145 S. Ct. 1524 (2025) ....................55

*Nouritajer v. Jaddou*,
18 F.4th 85 (2d Cir. 2021)........................................................................ 33, 34

*Ottey v. Barr*,
965 F.3d 84 (2d Cir. 2020)..............................................................................34

*Patel v. Garland*,
596 U.S. 328 (2022) ............................................................................... 31, 32

*Penobscot Air Servs., Ltd. v. F.A.A.*,
164 F.3d 713 (1st Cir. 1999)...........................................................................41

*River St. Donuts, LLC v. Napolitano*,
558 F.3d 111 (1st Cir. 2009) ............................................................... 36, 41, 47

*Rivera v. Sessions*,
903 F.3d 147 (1st Cir. 2018)...........................................................................50

*Rosario-Urdaz v. Rivera-Hernandez*,
350 F.3d 219 (1st Cir. 2003)...........................................................................22

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000)...............................................................................50

*Ryan v. U.S. Immigr. & Customs Enf't*,
974 F.3d 9 (1st Cir. 2020)...............................................................................27

*Samirah v. O'Connell*,
335 F.3d 545 (7th Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004).......................28

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
699 F.3d 1 (1st Cir. 2012)...............................................................................27

*Smith v. Garland*,
103 F.4th 1244 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1059 (2025)..................36

*State v. U.S. Env't Prot. Agency*,
989 F.3d 874 (10th Cir. 2021)..........................................................................27

*Succar v. Ashcroft*,
394 F.3d 8 (1st Cir. 2005) ....................................................................................9

*Thomas v. Garland*,
25 F.4th 50 (1st Cir. 2022) ....................................................................................9

*Town of Castle Rock, Colorado v. Gonzales*,
545 U.S. 748 (2005) ............................................................................................50

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) ............................................................................................48

*U.S. Anesthesia Partners of Texas, P.A. v. U.S.P.H.S.*,
126 F.4th 1057 (5th Cir. 2025) ............................................................................36

*Webster v. Doe*,
486 U.S. 592 (1988) ....................................................................................... 39, 40

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................... 26, 54

*Yale New Haven Hosp. v. Becerra*,
56 F.4th 9 (2d Cir. 2022)......................................................................................36

**FEDERAL STATUTES**

5 U.S.C. § 701(a)(1).................................................................................................38

5 U.S.C. § 701(a)(2)...................................................................................... 5, 6, 24, 38

5 U.S.C. § 706(2) ............................................................................................... 6, 17

8 U.S.C. § 1153(a).....................................................................................................9

8 U.S.C. § 1182(d)(5)(A) ............................................................ 2, 8, 9, 23, 32, 39, 42

8 U.S.C. § 1252(a)(2)(B)(ii) .................................................... 4, 6, 19, 23, 24, 28, 32

8 U.S.C. § 1254a(b)(5)(A) ........................................................................................30

8 U.S.C. § 1255(a) .......... 9, 45

28 U.S.C. § 1292(a)(1) .......... 6

## FEDERAL REGULATIONS

8 C.F.R. § 212.5 .......... 9

8 C.F.R. § 212.5(e)(2)(i) .......... 18

## FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. App. P. 4(a)(1)(B) .......... 5

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. of Civ. P. 15(d) .......... 17

## MISCELLANEOUS

Executive Order 14165, *Securing Our Borders* .......... 3

U.S. Gov't Accountability Off., *DHS Identified Fraud Risks in Parole Processes for Noncitizens and Should Assess Lessons Learned (Dec. 11, 2025),* available at https://www.gao.gov/products/gao-26-107433 (last visited Sept. 8, 2026) .......... 48

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court entered preliminary relief that interferes with the Executive's immigration function and the President's policy priorities. Defendants-Appellants respectfully request oral argument on this appeal. Argument will aid the Court in resolving the important issues presented by this appeal.

## INTRODUCTION

In the decision below, the district court entered a preliminary, classwide order barring the government from effectuating a discretionary decision to terminate parole for thousands of aliens.

Under the Immigration and Nationality Act (INA), parole is meant to serve as a temporary release into the United States of an alien who arrives or is present in the United States and is not admissible. As a general matter, such an inadmissible alien is either promptly removed or detained pending removal proceedings (or proceedings regarding asylum or withholding of removal). *See* 8 U.S.C. § 1225(b)(1)(A)-(B), (b)(2)(A). The INA provides, however, that in limited circumstances the Secretary of Homeland Security (the Secretary) may parole such an alien—that is, allow him or her to temporarily proceed into the interior of the United States. *See* 8 U.S.C. § 1182(d)(5)(A). Specifically, the INA permits the Secretary, in his discretion, to grant parole to aliens "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," and to terminate that parole whenever "the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." 8 U.S.C. § 1182(d)(5)(A).

In 2007 and 2014, the U.S. Department of Homeland Security (DHS) created limited family-reunification parole (FRP) programs to permit certain Cubans and Haitians with approved family-based immigrant petitions to seek parole so as to

enter the United States while awaiting an available immigrant visa number. In 2023, DHS significantly expanded the programs, adding FRP programs for nationals of five more countries and relaxing the procedures for the existing Cuban and Haitian FRP programs. Under these "modernized" FRP programs, beneficiaries who were outside the United States could be considered for advance authorization to travel to the United States to seek a three-year period of parole.

Each of these FRP programs was said to provide a "significant public benefit" to the United States, with each of the modernized programs citing the same five reasons: promoting family unity; furthering foreign policy objectives by responding to the requests and interests of key foreign partners necessary to address migration issues; providing an alternative to irregular migration; reducing strain on DHS processing capacity along the southwest border; and aiding U.S. efforts to address economic insecurity in the sending countries through remittances. *See, e.g.*, App-0333 (Colombia).

On January 20, 2025, the President issued Executive Order 14165, "Securing Our Borders," which directed the Secretary to take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders." App-0859–0861.

On December 15, 2025, the Secretary of Homeland Security announced that DHS had independently evaluated the FRP programs and was terminating them

because they "do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes." A046. As part of that termination, the Secretary announced that existing parole periods granted under the FRP programs would terminate as of January 14, 2026 (absent a pending application for permanent resident status), unless the Secretary determined otherwise on a case-by-case basis. A044-45; A055.

The Secretary's discretionary termination of a discretionary benefit should have been the end of the matter. Congress reserved the parole termination decision exclusively to the opinion of the Secretary. Underscoring as much, Congress barred judicial review of discretionary decisions like the decision to end parole: "Notwithstanding any other provision of law . . . no court shall have jurisdiction to review . . . any other decision or action . . . the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). The parole power is just such a discretionary authority.

Despite this, the district court certified a class of all aliens in the United States who were paroled into the United States under the FRP programs, then halted the Secretary's termination of parole grants. The district court's rationale for disregarding Congress's clear jurisdictional bar—that Plaintiffs' claims were procedural in nature—is wrong and would contravene and nullify the jurisdiction-stripping statute. The statute does not permit a district court to review a discretionary

decision under the guise of reviewing the "procedures" by which the Secretary reached that decision.

In any event, the district court's evaluation of the merits likewise exceeded the limits of review under the Administrative Procedure Act (APA), both because the parole termination decision is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and because the district court far exceeded its role under the APA by re-weighing the factors considered by the Secretary.

The district court also erred in its balancing of the equitable injunctive-relief factors. A halt on parole termination irreparably harms the government. It effectively thwarts the Executive Branch's exercise of discretionary authority over a key aspect of the Nation's immigration and foreign policy. On the other side of the ledger, Plaintiffs cannot claim any cognizable irreparable harm; they accepted parole with full awareness that the benefit was temporary, discretionary, and terminable at any time.

## STATEMENT OF JURISDICTION

This is a consolidated brief for two appeals. The first appeal is from a January 25, 2026, interlocutory decision of the United States District Court for the District of Massachusetts granting a preliminary injunction and stay of the parole termination, A001, as to which Defendants-Appellants filed a timely notice of appeal on March 25, 2026, *see* App-0049; Fed. R. App. P. 4(a)(1)(B). The second appeal is

from a March 25, 2026, interlocutory order denying the government's motion to reconsider and dissolve the preliminary injunction, A060, as to which Defendants-Appellants filed a timely notice of appeal on May 26, 2026, *see* App-051. This Court has jurisdiction over both appeals under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

I. Did the district court err in concluding that the jurisdictional bar on judicial review of discretionary decisions in 8 U.S.C. § 1252(a)(2)(B)(ii) does not apply to the Secretary's discretionary decision to terminate family reunification parole grants in this case?

II. Did the district court err in concluding that the Secretary's substantive decision to terminate parole grants under the FRP programs was not "committed to agency discretion by law" under the APA, 5 U.S.C. § 701(a)(2), where the parole statute provides that the Secretary may do so when, "in [her] opinion," the purposes of parole have been served?

III. Assuming the district court had jurisdiction to reach the merits, did the district court err in determining that the Secretary's termination of parole grants under the FRP programs was arbitrary and capricious under the APA, 5 U.S.C. § 706(2), based on the weight the district court thought should be afforded to the parolees' reliance interests and the government's countervailing interests in ending FRP?

IV. Can the district court's findings regarding the insufficiency of notice of parole termination support a preliminary injunction or stay of the substantive parole termination decision?

V. Did the district court abuse its discretion in concluding that the balance of the equities favored granting a preliminary injunction, where the government and the public have a strong interest in the Executive Branch's performance of its immigration function in accordance with Presidential priorities, as compared to parole recipients' interest in an inherently temporary and discretionary benefit?

## STATEMENT OF THE CASE

### A. Statutory Background.

Parole is, by definition, temporary permission to proceed into the interior of the United States. Congress, in 8 U.S.C. § 1182(d)(5)(A), granted the Secretary of Homeland Security "remarkably broad" discretion with respect to parole. *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987).

That statute authorizes the Secretary, "in [her] discretion," to "parole" applicants for admission "temporarily under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). It further provides that parole may be terminated "when the purposes of such parole shall, *in the opinion of* the Secretary of Homeland Security, have been served." *Id.* (emphasis added). The provision states in full:

> The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5.

**B. Factual Background.**

DHS previously created limited FRP programs to permit certain aliens with approved family-based immigrant petitions to seek parole in order to enter the United States while awaiting an available immigrant visa number. Potentially eligible beneficiaries who must await an immigrant visa number included, for example, adult children of lawful permanent residents, married or adult children of U.S. citizens (USCs), or brothers or sisters of USCs. *See* 8 U.S.C. § 1153(a). A grant of parole allowed those beneficiaries to temporarily enter the United States, as well as to be potentially eligible for adjustment of status under 8 U.S.C. § 1255(a) once an immigrant visa number becomes available. *See* 8 U.S.C. § 1255(a). This meant they could potentially adjust status to that of a permanent resident from within the United States without having to remain or return abroad to seek an immigrant visa through consular processing (unless their parole expires and is not renewed prior to applying for adjustment of status). *See* 8 U.S.C. § 1255(a), (c)(2). However, those parolees who eventually apply for adjustment of status still must demonstrate eligibility for the benefit and that they warrant a favorable exercise of discretion. *See Thomas v. Garland*, 25 F.4th 50, 51–52 (1st Cir. 2022); *Succar v. Ashcroft*, 394 F.3d 8, 23 (1st Cir. 2005).

DHS first established an FRP program for Cuban nationals in 2007, and one

for Haitian nationals in 2014. *See* App-0404–0409; *see also* 79 Fed. Reg. 75579 (Dec. 18, 2014). Each of these two legacy programs cited, as a significant public benefit supporting the program, promoting orderly migration or discouraging irregular migration. *See* App-0406; App-0409. Each program is described as an exercise of discretionary parole authority. *See* App-0406; App-0409.

In 2023, DHS "modernized" these two legacy FRP programs and created new FRP programs for nationals from five more countries: Colombia, Ecuador, El Salvador, Guatemala, and Honduras. App-0330–0403. Under these new and modernized FRP programs, beneficiaries who were outside the United States could be considered by DHS, on a case-by-case basis, for advance authorization to travel to the United States to seek a temporary period of parole at a port of entry. *See id.* Each of the new FRP programs was said to provide a "significant public benefit" for the same five reasons: promoting family unity; furthering foreign policy objectives by responding to the requests and interests of key foreign partners necessary to address migration issues; providing an alternative to irregular migration; reducing strain on DHS processing capacity along the southwest border; and aiding U.S. efforts to address economic insecurity in the sending countries through remittances. *See* App-0333 (Columbia), App-0346 (Ecuador), App-0359 (Guatemala), App-0371 (Honduras), App-0383 (El Salvador).

On December 15, 2025, the Secretary announced that DHS had independently

evaluated the FRP programs and was terminating them because they "do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes." A046. As one aspect of that termination, the Secretary announced that existing parole periods granted under the FRP programs will terminate as of January 14, 2026, with two exceptions: (1) the alien filed an application for adjustment of status that is postmarked as of December 15, 2025, that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. A044–45, A055.

In the Federal Register notice of the FRP termination (FRP FRN), the Secretary provided the reasons for her discretionary termination decision. The Secretary first explained that Congress intended that DHS's parole authority be used in "specific instances" rather than "as a means of circumventing established immigration laws or processing times." A045.

The Secretary next addressed each of the goals of the various FRP programs. First, the Secretary acknowledged that the programs were created for the purpose of promoting family unity, but determined that national security and fraud concerns, as well as the current Administration's policy priorities, outweighed that interest. A046. Unlike with consular processing for a visa, under the modernized FRP programs there was no collection of biometrics or in-person interview abroad for the beneficiary, and only "minimal public safety and national security vetting of

potential beneficiaries" before issuing an advance travel authorization. A046-47. Accordingly, the programs created "security gaps not present in" consular processing and created an "untenable likelihood" of the entry of bad actors, "posing an unacceptable level of risk to the United States' national security and public safety." A046-47. The Secretary also addressed the risk of abuse and fraud where biometrics collection does not occur before arrival in the United States and where beneficiaries are from countries with weak civil registry systems. *See* A047. DHS "determined that the desire to reunite families" does not outweigh these weighty fraud, national security, and public safety concerns. *Id.*

Next, the Secretary addressed the goal of furthering prior Administrations' foreign policy objectives. She determined that those policy objectives did not align with those of the current Administration. This Administration is not pursuing the same regional migration management strategy but instead aims to reduce and deter unlawful immigration through other means. A047-049.

The Secretary then turned to key goals of each of the FRP programs: encouraging orderly entry and discouraging irregular migration, thereby reducing strain at the Southwest border. *See* A049, A051. The Secretary acknowledged that the FRP programs were not meant to, "on their own, substantially decrease the number of encounters along the southwest border" and recognized that some aliens may have pursued FRP rather than seeking to enter unlawfully. A049. But the

Secretary determined that the relatively small number of parolees as compared to the huge numbers of illegal entrants during the relevant period did not warrant maintaining this pathway. *See* A049, A051. As the Secretary observed, in the first five months of 2024, CBP encountered over 900,000 migrants and asylum seekers seeking to cross the Southwest border. A050. The majority hailed from just six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, four of which had dedicated FRP programs. *Id.* In fact, in 2024 alone, CBP encountered over 888,000 aliens from the seven FRP countries trying to cross the Southwest border. A049. The Secretary provided more examples of the programs' failures to produce a meaningful reduction in irregular migration. For example, CBP encounters with Haitians at the Southwest border increased year-by-year after the initiation of the modernized FRP program for Haiti. A050.

The Secretary reasoned that the FRP programs were not functioning as alternatives to irregular migration, given that the populations served by the programs "were often fundamentally different from those undertaking unlawful migration." A050. FRP beneficiaries had a lawful immigration pathway available and were unlikely to "risk compromising their eligibility by pursuing unlawful entry." *Id.* Further, other immigration enforcement policies had since been implemented, which serve to discourage visa-petition beneficiaries from undertaking the dangerous journey. *See* A050-051. In sum, "the FRP programs did not noticeably decrease

unlawful migration, or at the very least were not nearly as effective as other policies." A050.

Indeed, rather than reducing the strain on border resources, the programs led to "an increased strain on DHS personnel and resources" to process, review, and adjudicate parole requests. A051-052. They also have led to the presence of parolees who are eligible for certain Federal public benefits, expanding eligibility for such benefits and thus causing further domestic impact on resources. *See* A052.

The Secretary then determined that the final significant-public-benefit factor underlying the FRP programs—"addressing root causes of migration through economic stability and development supported by increased remittances," *e.g.*, App-0383 (El Salvador)—did not warrant continuing the programs. *See* A052-053. The idea was that FRP beneficiaries would be able to work while paroled in the United States, earning far more than they would in their home countries, and then be able to send money back to their families and communities. App-0386. Those remittances would "provide a crucial financial lifeline that enhances economic development and promotes economic stability" for the friends, family and community of the beneficiary, which was intended to "impact[] individual decisions on whether to leave the region," *id.*, thus decreasing unlawful migration from those seven countries. That did not occur. Indeed, the Secretary observed that because a relatively low percentage of invited petitioners decided to participate in the program, "the

volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries," and thus did not "address the root causes of migration." A052.

Overall, the Secretary concluded that the FRP programs did not meet their intended goals and also strained DHS resources and undermined public trust. A052.

The Secretary also acknowledged reliance interests of parolees and their supporters. As to current parolees, the Secretary noted that the assessment of their reliance interests must account for the fact that parole was always terminable at the Secretary's discretion at any time, and that their initial parole period was always time-limited. A056. She found that the government's strong interest in promptly returning parolees when the basis for their programmatic parole is no longer served outweighed any reliance interests. *See id.* The Secretary emphasized that allowing parolees' current period of parole to expire or providing a longer wind-down period would defeat the Administration's policy of restricting the use of parole grants in line with the statutory language, because it would "allow continued reliance on parole as a pathway to adjustment of status." *Id.* It would also countenance the aliens' continued presence in the United States despite the risk posed by the "insufficient vetting they received prior to entry." *Id.*

Any parolee whose parole would have terminated on January 14, 2026 (had the parole terminations not been enjoined) would have still been able to seek a new

period of parole by filing a Form I-131 and demonstrating urgent humanitarian reasons or significant public benefit based on his or her individual circumstances and that he or she merits a favorable exercise of discretion. A055.

The Secretary found that notice by publication in the Federal Register "satisfies the requirement that DHS provide written notice upon the termination of parole." A057. "Nevertheless," she explained, DHS would also provide "individual notice to each parolee" by mail (for legacy FRP parolees) or by electronic notice through a USCIS online account (for recipients of parole under the modernized FRP programs). *Id.*

### C. Procedural History.

Plaintiffs first filed this putative class action in February 2025, primarily challenging DHS's decision to pause and evaluate various humanitarian parole programs. Dist. Ct. Docket Nos. 1, 22; *see* App-0053. This procedurally complex case has already been on appeal once: On September 12, 2025, this Court vacated the district court's preliminary stay of the termination of the parole processes for Cubans, Haitians, Nicaraguans and Venezuelans (CHNV) as to a certified class of CHNV parole recipients. *Doe v. Noem*, No. 25-1384, 152 F.4th 272, 278–79 (1st Cir. 2025).

On December 29, 2025, Plaintiffs sought to amend their complaint for a third time to, *inter alia*, add new Plaintiffs to challenge the Secretary's December 14, 2025

termination of the FRP programs. App-0157–0302. Plaintiffs simultaneously filed motions asking the Court to certify a new class of parolees affected by the FRP termination and to grant a temporary restraining order, preliminary injunction, or Section 705 stay of the FRP termination to the extent it terminated existing parole grants and revoked existing employment authorization for parolees. App-0303–0307; Dist. Ct. Dkt. No. 219. Plaintiffs sought to expedite the briefing schedule on their various motions. Dist. Ct. Dkt. No. 221.

On January 9, 2026, the district court held a motion hearing. The same day, the court granted Plaintiffs leave to file a supplemented complaint under Federal Rule of Civil Procedure 15(d). App-0468–69. As relevant here, the supplemented complaint argues that the FRP termination is contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), *see* App-2393–2397, App-2398–2402; that the written notice of termination of existing parole grants did not comply with governing regulations, *see* App-2404–2406; that the FRP termination is *ultra vires* under a non-statutory claim for equitable relief, *see* App-2406; that the FRP termination violates the Due Process Clause, *see* App-2406–2407; and that the termination of existing parole grants should have undergone notice and comment rulemaking, *see* App-2407–2409.

On January 10, 2026, the district court certified a "subclass" of "[a]ll individuals who have received a grant of parole that is subject to the *Termination of*

*Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025), rescinding individual grants of parole on a categorical and *en masse* basis." App-0611–0612.

Also on January 10, 2026, the court granted an emergency 14-day temporary restraining order staying the FRP FRN "insofar as it revokes previously granted parole and work authorization issued to" FRP recipients. App-0617. The court based its emergency order on its preliminary conclusion that Defendants had not provided the required written notice of parole termination under 8 C.F.R. § 212.5(e)(2)(i) because, it opined, publication in the Federal Register could not qualify as written notice "to the alien" and because it was unclear whether compliant individualized notice had been or was being provided. *See* App-0615 (emphasis in original).

On January 24, 2026, the district court granted a preliminary injunction and stay of the FRP FRN "insofar as it revokes previously granted parole and work authorization issued to" FRP recipients. A001. The court first rejected Defendants' argument that it lacked jurisdiction to review Plaintiffs' challenge to a discretionary parole termination decision under 8 U.S.C. § 1252(a)(2)(B)(ii). A013-15. The court agreed with Defendants that parole termination decisions are specified by statute to be within DHS's discretion and thus fall within this judicial review bar. A013. However, the court reasoned that Section 1252(a)(2)(B)(ii) did not "divest courts of

jurisdiction to hear challenges to the procedures employed by the Secretary to reach such determinations." A013-14 (emphasis in original). The district court held that Plaintiffs' challenge to the "Secretary's reasoning" falls within this supposed exception, as do Plaintiffs' claims that the Secretary "exceeded her authority by failing to adhere to statutory requirements," that the notice to parolees was inadequate, and that notice-and-comment rulemaking was required before terminating parole. A014.

The district court similarly rejected Defendants' argument that the termination decision is "committed to agency discretion by law" and thus independently unreviewable under the APA. A015-16. The court held that the parole statute includes "meaningful standards" by which to evaluate the Secretary's exercise of discretion by requiring a determination that "the purposes of such parole . . . have been served," and that the parole notice regulations also limit the Secretary's discretion. A016. The district court also relied on the holding of *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), to find "further support for the view that Plaintiffs' challenge is reviewable." *See* A016.

The district court then turned to the merits of Plaintiffs' claims, determining that Plaintiffs had a likelihood of success on certain of their legal theories but not others. The court held that Plaintiffs were unlikely to succeed on their argument that the Secretary exceeded her statutory authority by failing to determine that the

"purpose" of the FRP programs (family reunification) had been "accomplished," A017, and that the Secretary's determination that family reunification no longer warranted the FRP recipients' presence in the United States was sufficient to satisfy the statute, A018 (citing *Doe*, 152 F.4th at 291). The district court also determined that the Secretary did not act arbitrarily by considering whether the FRP programs deterred irregular migration, because, contrary to Plaintiffs' claim, DHS relied on the deterrence of irregular migration as a factor warranting establishing the FRP programs. A019. The court also determined that Plaintiffs were unlikely to succeed on a claim that notice-and-comment rulemaking was required to categorically terminate parole. A028–30.

The court found that Plaintiffs were likely to succeed, however, on their claim that the Secretary engaged in arbitrary-and-capricious decisionmaking by failing to "adequately weigh" parolees' reliance interests, including by "overstat[ing] the agency's countervailing interests . . . regarding insufficient vetting and fraud." A018–27. The court also concluded that the notice to parolees of the termination of their parole grants was likely inadequate under the regulations and the Due Process Clause. A032–40.

Finally, the district court assessed the remaining preliminary-injunction factors and determined that the balance of the equities favored issuing preliminary relief with respect to the parole termination. A040–42.

After the district court issued the decision on review in this appeal, Defendants corrected the administrative record to add documents that were inadvertently excluded from the administrative record that had been compiled and filed with the Court on an expedited basis for purposes of addressing the motion for preliminary relief. App-2560-2725. Defendants asked the district court to reconsider its order and dissolve the preliminary injunction in light of this correction, as well as for other reasons. App-2726-2749. On March 25, 2026, the district court denied the motion to reconsider without prejudice, subject to resolution of Plaintiffs' motion for order to show cause concerning the compilation of the administrative record. A060-68. Defendants appealed from the March 25 Order to protect their appeal rights with respect to the appeal from the preliminary injunction, *see* App-0051, and this Court has consolidated the two appeals for purposes of briefing and oral argument.

## SCOPE AND STANDARD OF REVIEW

Courts of appeals review the grant of preliminary injunctive relief for abuse of discretion. *Charlesbank Equity Fund II v. Blinds To Go*, *Inc.*, 370 F.3d 151, 158 (1st Cir. 2004). "Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir. 1988). This Court must also review the district

court's "answers to abstract questions of law de novo." *Charlesbank Equity Fund II*, 370 F.3d at 158 (citing *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 71 (1st Cir.), *cert. denied,* 537 U.S. 974 (2002)). An error of law is always an abuse of discretion. *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003).

## SUMMARY OF THE ARGUMENT

The district court's order should be reversed for several reasons. At the outset, the district court erred in determining it could review and enter relief concerning the Secretary's discretionary decision to terminate family reunification parole. On the merits, in any event, Plaintiffs did not demonstrate a likelihood of success on their substantive APA claims because the decision to terminate parole was not arbitrary and capricious. To the extent Plaintiffs' claims of inadequate notice were reviewable, and assuming the district court's findings of inadequate notice were not erroneous (they were), any alleged notice inadequacy could not justify enjoining the substantive termination.

Even if Plaintiffs could possibly establish a likelihood of success on their claims, the district court abused its discretion in balancing the remaining preliminary-injunction factors. In sum, the district court lacked jurisdiction to enter its order and lacked the authority to usurp the Executive Branch's control of foreign policy and immigration.

**I.A.1** Congress forbids judicial review of decisions that are placed within the Secretary's discretion by statute. 8 U.S.C. § 1252(a)(2)(B)(ii). Parole terminations are one such class of decisions: Congress gave the Secretary authority to terminate parole grants when, "in [her] opinion," the purpose of parole has been served. 8 U.S.C. § 1182(d)(5)(A). That language is plainly discretionary, and the district court thus lacked authority to enjoin the government from terminating FRP grants.

The district court reasoned that the review bar does not apply here because Plaintiffs are challenging only the procedures the Secretary used to reach her decision to terminate parole, not the merits of the Secretary's decision. A013-14. That distinction is wrong as a matter of fact and law.

At the outset, Section 1252(a)(2)(B)(ii) does not make any distinction between procedural and substantive challenges. Instead, it provides that it applies to "any . . . action" by the Secretary the authority for which is said to be in her discretion. 8 U.S.C. § 1252(a)(2)(B)(ii). Allowing plaintiffs to obtain review of a discretionary decision by framing their claims as attacks on the procedures used to reach the decision would nullify the judicial-review bar.

But even if Section 1252(a)(2)(B)(ii) permitted challenges to procedures, it could only do so where the claim is a purely procedural claim that does not implicate the merits of the agency decision. Plaintiffs' arbitrary-and-capricious claim raises a substantive challenge to the merits of the Secretary's decision, not a procedural

challenge. The district court held that the Secretary's decision was arbitrary and capricious upon its own view that the Secretary "understated the reliance interests of FRP parolees," and "overstated countervailing concerns regarding insufficient vetting and fraud." A018-19. That is not a procedural violation; that is a simple disagreement with the merits of the Secretary's decision, which is prohibited by Section 1252(a)(2)(B)(ii).

**I.A.2.** Even if the INA's specific bar on review of discretionary decisions did not apply, Plaintiffs still cannot succeed on the merits because the APA does not permit review of actions and decisions (like the parole termination) that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The parole statute expressly commits the decision to the "opinion" of the Secretary as to whether the purposes of parole have been served and provides no manageable standards on which a court could base its review of that opinion. The APA thus independently forecloses the judicial review of the Secretary's parole-termination decision.

**I.B.** Even assuming the Secretary's decision were reviewable, the district court erred in finding the parole terminations arbitrary and capricious under the APA. The district court determined the parole termination decision was likely arbitrary and capricious based on the court's own assessment of the strength of the interests involved. The district court found that the Secretary "understated the reliance interests of FRP parolees," and "overstated countervailing concerns regarding

insufficient vetting and fraud." A019-20. This was error. Even assuming the Secretary had an obligation to consider parolee reliance interests before terminating parole (which the parole statue does not require), the district court overstepped its role under the APA by re-weighing the factors and "substitut[ing] its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Indeed, the Secretary did adequately consider and weigh parolee reliance interests against the government's countervailing interests, and her reasoning has a rational basis in the record. This is all that is required to withstand the APA's deferential arbitrary-and-capricious review.

**I.C.** Additionally, even assuming the district court correctly concluded the termination of parole unlawful for lack of proper or adequate notice under constitutional due process or governing regulations, that finding does not support the district court's preliminary injunction and stay of agency action. Any notice inadequacies identified can be remedied by providing new individualized notice of termination, and cannot form the basis for halting the substantive agency decision.

**II.** As for the non-merits injunction factors, the district court abused its discretion in finding that the balance of the equities favored Plaintiffs. The district court's order stymies the government's ability to terminate parole grants that the Secretary has determined undermine U.S. interests, and thus it inhibits the government's pursuit of its foreign policy goals. On the other side of the coin, while

Plaintiffs might have the desire to remain in the country, they cannot claim an interest in a privilege that was always stated to be temporary and always disclosed to be revocable.

## ARGUMENT

To award the "extraordinary and drastic remedy" of preliminary injunctive relief, *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008), the district court must find that the plaintiff "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These four factors likewise govern whether a court should issue an order staying agency action under section 705 of the APA, which is in substance and practical effect an injunction. *See State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021); *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

The district court erred and abused its discretion in enjoining and staying the Secretary's decision to terminate parole, because Plaintiffs did not meet their burden on any of the required elements.

## I. Plaintiffs Are Unlikely to Succeed On Their Challenge to a Discretionary Parole Termination Decision.

Plaintiffs' request for injunctive relief does not overcome even the first hurdle of showing likelihood of success on the merits, which is the "sine qua non" of preliminary injunctive relief. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Plaintiffs have not demonstrated a "strong likelihood that they will ultimately prevail," *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012), because the Secretary's decision terminating FRP parole is not reviewable and, even if reviewable, was reasonable and in accordance with the law.

### A. Parole Terminations Are Not Judicially Reviewable.

#### 1. The INA deprives the district court of jurisdiction.

The district court incorrectly asserted jurisdiction to review the Secretary's discretionary parole decisions. Plaintiffs cannot show a likelihood of success where the district court lacked jurisdiction over the underlying claim. *Munaf*, 553 U.S. at 690 (2008) (doubts about jurisdiction make success on the merits "more *unlikely* due to potential impediments to even reaching the merits"); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction."). And without jurisdiction over the underlying claim, the district court lacked authority to issue relief.

Section 1252(a)(2)(B)(ii) states that, with exceptions not relevant here, "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security." *Id.* The exercise of parole authority under Section 1182(d)(5)(A)—which permits the Secretary to terminate parole grants "when the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served," 8 U.S.C. § 1182(d)(5)(A) (emphasis added)—is just such a discretionary "decision or action," 8 U.S.C. § 1252(a)(2)(B)(ii). Section 1182(d)(5)(A) thus provides that the Secretary may terminate parole based solely on her own "opinion." 8 U.S.C. § 1182(d)(5)(A). That is about as discretionary a grant of authority as the statute books contain. Congress conclusively "specified" that the "authority" to terminate parole is within the Secretary's "discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). No more is needed to trigger Section 1252(a)(2)(B)(ii)'s jurisdictional bar.

The district court readily acknowledged that the INA reserves parole termination decisions to the Secretary's discretion. A013. Indeed, other courts have come to the same conclusion. *See*, *e.g.*, *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003) (authority to "grant or revoke" parole under Section 1182(d)(5)(A) is a matter of agency discretion barred from review by Section 1252(a)(2)(B)(ii)), *cert. denied*, 541 U.S. 1085 (2004); *Hassan v. Chertoff*, 593 F.3d 785, 789 (9th Cir.)

(per curiam) (similar), *cert. denied*, 561 U.S. 1007 (2010). Section 1252(a)(2)(B)(ii) thus, on its face, precludes review of Plaintiffs' challenges to the Secretary's decision to terminate parole, as memorialized in the March 25, 2025 Federal Register notice.

To circumvent the jurisdictional bar, the district court reframed the inquiry. The district court reasoned that Section 1182(d)(5) "does not explicitly state that the procedures employed by the Secretary are left entirely to her discretion," and that, in the court's view, all of Plaintiffs' claims were challenges to the "procedure, or lack thereof, relied upon to terminate Plaintiffs' grants of parole." A013–14. "[A]t issue," the court said, "is not whether the Secretary may exercise her discretion to terminate an individual's parole—she may—but rather whether the procedures adopted in this case for the exercise of such discretion are in accordance with law." A014.

This reframing was improper. The decision to terminate parole is unitarily precluded from review by Section 1252(a)(2)(B)(ii), regardless of the nature of Plaintiffs' challenge to that decision. This Court has never exempted "procedural challenges" from Section 1252(a)(2)(B)(ii)'s jurisdictional bar, and it should decline the invitation to parse Section 1252(a)(2)(B)(ii) in this manner. *See Bernardo v. Johnson*, 814 F.3d 481, 484-85, n.5 (1st Cir. 2016) (noting the question was not presently before the Court).

Section 1252(a)(2)(B)(ii)—which bars review of "any [] decision or action of [] the Secretary of Homeland Security the authority for which is specified under this

subchapter to be in [her] discretion"—makes no distinction between substantive and procedural challenges, focusing instead on the *decisions and actions* that the statute renders discretionary. Where a statute precludes review of a decision, the jurisdictional bar applies to all "steps" in the process of reaching that decision, thereby insulating procedural claims from review. *Mullin v. Doe*, 146 S. Ct. 2121, 2134 (2026) (*Doe (TPS)*). In *Doe (TPS)*, the Supreme Court rejected an argument that the jurisdictional bar in 8 U.S.C. § 1254a(b)(5)(A)—which allows "no judicial review of any determination . . . with respect to the . . . termination" of a Temporary Protected Status (TPS) designation, *id.*—"applies only to substantive claims, not those based on alleged procedural errors." *Doe (TPS)*, 146 S. Ct. at 2134-2135. The Court held "this argument finds no support in the language of [the statute] because a 'determination' may concern procedural or substantive questions." *Id*. at 2134. Section 1252(a)(2)(B)(ii), like Section 1254a(b)(5)(A), focuses on the *decisions and actions* of the Secretary, not the *manner* in which the Secretary makes decisions entrusted to her discretion, and certainly not the "procedures relied upon" to make that decision. A014. The point of Section 1252(a)(2)(B)(ii)'s judicial-review bar is to insulate the entire decisionmaking process from review, regardless of whether the reviewing court agrees with the decision. Endorsing the district court's application of Section 1252(a)(2)(B)(ii)'s judicial-review bar would render the bar largely nugatory and fly in the face of the Supreme Court's holding in *Doe (TPS)*. Indeed,

the Supreme Court has similarly rejected other attempts to narrow the scope of the decisions covered by Section 1252(a)(2)(B)'s judicial-review bars. *See Patel v. Garland*, 596 U.S. 328, 331, 337-344 (2022) (holding review bar covering "any judgment regarding the granting of relief" does not distinguish between discretionary and nondiscretionary judgments or between antecedent and ultimate judgments); *Bouarfa v. Mayorkas*, 604 U.S. 6, 16 (2024) (rejecting argument that other statutory provisions limited Secretary's discretion to revoke). This Court should follow the Supreme Court's lead and reject the district court's attempt to create an atextual exception from Section 1252(a)(2)(B)(ii)'s jurisdiction-stripping provisions.

The district court's reasoning would allow courts to invalidate the unreviewable discretionary decision by parsing through the process the Secretary employed to reach her "opinion." But "[i]n APA cases, an agency's subsidiary decisions merge into the final agency action . . . If the final agency action is unreviewable, then so too are subsidiary determinations. This important principle ensures that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering." *Doe (TPS)*, 146 S. Ct. at 2136. Under this framework, judicial review of discretionary decisions would become the rule, with plaintiffs simply framing their challenges to the decisions as challenges to the procedures employed.

But the jurisdictional bar is supposed to *foreclose* review of actions within the Secretary's discretion—not induce courts to review the lawfulness of those actions.

Nor does the presumption of reviewability justify the district court's rejection of the judicial-review bar. *See* A015. "[T]hat presumption may be overcome by specific language in a provision or evidence drawn from the statutory scheme as a whole." *Patel*, 596 U.S. at 347. The presumption especially lacks force here, where Section 1252(a)(2)(B)(ii) provides "clear and convincing evidence of congressional intent to preclude judicial review." *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020); *Doe (TPS)*, 146 S. Ct. at 2134. Congress clearly directed that "no court shall have jurisdiction to review" "any" decision or action that the INA specifies to be within the Secretary's discretion. 8 U.S.C. § 1252(a)(2)(B)(ii); *cf. Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273-274 (2016). And that jurisdictional bar applies "[n]otwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(B)(ii). "Because the statute is clear," there is "no reason to resort to the presumption of reviewability." *Bouarfa*, 604 U.S. at 19.

Moreover, the parole statute as a whole commits parole decisions to DHS's discretion: the Secretary may grant parole "in his discretion"—subject to certain conditions—and may terminate parole when "in his opinion" its purposes have been served. 8 U.S.C. § 1182(d)(5)(A); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) (evidence of congressional intent to preclude review may be found in

"specific language" in the statute or "inferences . . . drawn from the statutory scheme as a whole"). All the statutory evidence points against review.

But even if this Court were to adopt the view that Section 1252(a)(2)(B)(ii) does not limit a court's jurisdiction to review purely procedural questions, that carve-out would not apply here. Where the question before the Court is the merits of the decision, that challenge is substantive, and no matter the label, may not be recast as procedural to avoid the jurisdictional bar. *Nouritajer v. Jaddou*, 18 F.4th 85, 88 (2d Cir. 2021) ("[W]here . . . the gravamen of Plaintiffs' claims challenges the Secretary of Homeland Security's exercise of discretion in making a revocation decision, subject matter jurisdiction is lacking."); *Doe v. McAleenan*, 926 F.3d 910, 915 (7th Cir. 2019) (recognizing that "[c]ourts may review identifiable procedural rulings that don't implicate a petition's merits" but not challenges to "discretionary revocations on nominally 'procedural' grounds").

Plaintiffs' arbitrary-and-capricious claim clearly raises a substantive challenge to the merits of the Secretary's decision. Yet the district court disagreed, noting that Plaintiffs "challenge how the [Secretary's] decision was made and contend that the Secretary's reasoning was arbitrary and capricious because DHS failed to properly consider the purpose of the FRP programs, the reliance interests of Plaintiffs, and the alternatives available to the agency." A014. But these are not procedural challenges. They do not target an independent, freestanding procedural

obligation imposed by statute, precedential decision, or regulation. They instead attack the substantive reasons for the decision—the way the Secretary exercised her discretion and the weight she gave to different factors in reaching her "opinion." *See Nouritajer*, 18 F.4th at 89; *Ottey v. Barr*, 965 F.3d 84, 91–92 (2d Cir. 2020) ("Regardless of the rhetoric and labels used . . . , a challenge that merely quarrels over the correctness of the factual findings or justification for the discretionary choices is not reviewable.") (quotations and citations omitted); *McAleenan*, 926 F.3d at 915.

That Plaintiffs' arbitrary-and-capricious claim is substantive and not procedural is further evidenced by the relief Plaintiffs seek. *Nouritajer*, 18 F.4th at 89 (whether a challenge is procedural or goes to the merits may be apparent from the relief sought). Plaintiffs do not seek a purely procedural remedy for this claim, such as renewed individualized notice; they instead ask the Court to review "the Secretary's substantive revocation decision." *Nouritajer*, 18 F.4th at 89; *Karakenyan v. U.S. Citizenship & Immigr.*, 468 F. Supp. 3d 50, 57 (D.D.C. 2020) (challenge to EB-5 denial is not procedural where plaintiff does not seek a procedural remedy but rather a reweighing of the evidence and a different substantive outcome); Dist. Ct. Dkt. No. 218 at 15 (arguing that the Secretary "failed to engage in reasoned decisionmaking"). Even if APA arbitrary-and-capricious claims generally lead to a process-related remedy (such as a requirement for the agency to consider certain

factors on remand), this does not mean that such an APA claim is a "procedural" challenge. It still challenges the substantive agency decision.

If merely labeling an arbitrary-and-capricious claim as a procedural claim were sufficient to evade Section 1252(a)(2)(B)(ii), the judicial-review bar would be rendered a nullity, as virtually every discretionary immigration decision could be recast as a challenge to the "process" by which the agency reasoned its way to the outcome. As one district court has aptly explained:

> [T]here isn't much difference between challenging the decision itself and challenging how an agency got to the decision. After all, the end goal of challenging the process is to challenge the outcome of the process. That's the whole point. If courts could review the process of reaching the decision, that review might lead the agency to change its decision. But [the] statute prevents anyone from second-guessing the decision . . . . Allowing a challenge to the process is more than a foot in the door. It would create an opening that would blow a hole in statute.

*Lukac v. Mayorkas*, No. 22-cv-7156, 2023 WL 3918967, at *5 (N.D. Ill. June 9, 2023) (discussing Section 1252(a)(2)(B)(ii)'s application to 8 U.S.C. § 1154(a)(1)(A)(viii)(I)). This aligns with the longstanding view of various courts of appeals. *See DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019) (such review "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology"); *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) ("[I]f a no-review provision shields particular types of administrative action, a court may not inquire whether a

challenged agency decision is arbitrary, capricious, *or procedurally defective*."); *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 18 (2d Cir. 2022) (similar); *U.S. Anesthesia Partners of Texas, P.A. v. U.S.P.H.S.*, 126 F.4th 1057, 1063-64 & n.2 (5th Cir. 2025). And, as the Supreme Court recently observed, "[i]f the final agency action is unreviewable, then so too are subsidiary determinations" and actions. *Doe (TPS)*, 146 S. Ct. at 2136 (rejecting argument that judicial review bar did not encompass challenges to alleged procedural errors leading to Secretary's determination).

Here, in the guise of determining whether the Secretary's decisionmaking "procedures" were proper, the district court instead reweighed the factors the Secretary considered in reaching her "opinion," and impermissibly substituted its own judgment in place of the Secretary's. *See State Farm*, 463 U.S. at 43 (holding that under APA review, a court may not substitute its judgment for that of the agency); *Dep't of Commerce v. New York*, 588 U.S. 752, 777 (2019) (explaining that "second-guessing the Secretary's weighing of risks and benefits" amounts to substituting judgment or that of the agency); *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009) (same); *Smith v. Garland*, 103 F.4th 1244, 1253 (7th Cir. 2024) ("We cannot reweigh the agencies' own balancing of the evidence."), *cert. denied*, 145 S. Ct. 1059 (2025).

Further, although the district court claimed its arbitrary-and-capricious holding was limited to a determination that the Secretary did not follow procedures,

A014, it did not identify any specific statutory or regulatory procedures that the Secretary failed to abide by in reaching her decision. *See generally* A02-42. This claim is thus unlike the *Accardi* claim at issue in the case relied upon by the district court, *Castaeneira v. Noem*, 138 F.4th 540 (D.C. Cir. 2025) (cited at A014), in which the D.C. Circuit carved out from a judicial-review bar a claim that the agency failed to follow its own allegedly-binding procedures set forth in agency precedential decisions. Here, the district court's disagreement with the level of consideration or weight the Secretary afforded to different factors or interests does not amount to a procedural violation. It is a simple disagreement with the merits of Secretary's discretionary parole-termination decision, which is shielded from review. Section 1252(a)(2)(B)(ii) clearly divests courts of jurisdiction to second-guess this discretionary decision. By categorizing Plaintiffs' arbitrary-and-capricious claim challenging the Secretary's weighing of parolees' reliance interests against the government's national security and other concerns as a procedural claim, the district court impermissibly neutered Section 1252(a)(2)(B)(ii).

The district court also characterized as procedural Plaintiffs' notice-and-comment claim, their claim alleging the Secretary exceeded her statutory authority,[2] and their claim concerning insufficient notice of termination. A014. These claims

[2] Plaintiffs did not prevail upon their notice and comment claim or their claim that the Secretary exceeded her statutory authority and, as a result, those claims are not at issue in this appeal.

likewise attack, and seek relief from, the Secretary's substantive decision. But even assuming, *arguendo*, that these claims constitute reviewable procedural challenges, that would not confer jurisdiction over Plaintiffs' arbitrary-and-capricious claims. The presence of one potentially reviewable procedural claim does not permit judicial review of a separate claim that squarely challenges the Secretary's discretionary decision-making and is independently barred from review by the statute.

**2. The APA also forecloses review.**

The district court also improperly rejected the Government's argument that the parole termination was separately unreviewable under the APA, which does not permit review when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see* A015-16.[3]

Even without Section 1252(a)(2)(B)(ii)'s review bar, parole decisions are unreviewable because they are committed to agency discretion by law. Section 1182(d)(5)(A) commits parole decisions to agency discretion by bestowing the Secretary with the discretion to grant parole when she concludes that certain conditions are met and placing no limits on the Secretary's discretion to deny or terminate parole. Instead, the statute provides that the Secretary may end a parole

[3] The APA also precludes review where "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and Section 1252(a)(2)(B)(ii) is just such a statute.

grant whenever "the purposes of such parole shall, *in the opinion of the Secretary of Homeland Security*, have been served." 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

The statute provides no judicially manageable standards on which a court may base its review of that opinion. *See Lincoln v. Vigil*, 508 U.S. 182, 191–94 (1993); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (CIA director's authority to fire an employee "whenever [he] shall deem such termination necessary or advisable in the interests of the United States" was unreviewable); *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (statutes that turn on "an administrator's determination of the existence of [a] condition," as opposed to the objective existence of that condition, "exude deference[]" to that determination). The Secretary made just such a determination here. *See id.* The district court thus lacked authority to review it.

Nonetheless, the district court found that the statute itself provided a meaningful standard for review by requiring the Secretary make a finding that the purposes of parole have been served. A016. But the district court ignored the statutory language that it is the Secretary's "opinion" that the purposes of parole have been served, which means there is no basis whereby to judge that "opinion." *See Webster*, 486 U.S. at 600 (holding that Congress's use of the word "deems" in reference to agency director's required finding foreclosed the application of any meaningful judicial standard of review). Further, the Court preliminarily found that

the Secretary *did* make the requisite finding that the purposes of parole were served, *see* A017–18, which ends any possible inquiry permitted under this theory. The reasons behind that determination are certainly committed to the Secretary's "opinion" and discretion, and the district court's opinion included no reasoning to the contrary.

The district court's reliance on *DHS v. Regents of the University of California*, 591 U.S. 1 (2020) (at A016), likewise was misplaced. In *Regents*, unlike here, there was no specific statutory language that bestowed discretion over the decision at issue. Instead, the government argued that its decision to end Deferred Action for Childhood Arrivals (DACA) was unreviewable because DACA was a "non-enforcement" policy. 591 U.S. at 17–18. The Supreme Court rejected this characterization, calling DACA a "program for conferring affirmative immigration relief." *Id.* at 18. Here, in contrast, the government did not argue that the termination of FRP parole was a non-enforcement policy. Rather, judicial review is barred because, unlike the program in *Regents*, the INA expressly commits parole determinations to the Secretary's discretion by law. *See Webster*, 486 U.S. at 600 (no review where statute provided for terminations when relevant official "shall deem such termination necessary or advisable in the interests of the United States") (emphasis omitted).

**B. The Parole Termination was Not Arbitrary and Capricious.**

Even if the discretionary parole termination were somehow reviewable, the district court mis-applied the APA standard of review in concluding that Plaintiffs are likely to succeed on their substantive APA claim.

"The scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Under this "highly deferential" and "narrow" standard, *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 172 (1st Cir. 2021); *Doe*, 152 F.4th at 290, the agency need only show that it has "considered the relevant factors and articulated a rational connection between the facts found and the choice made," *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024). If the Court determines "the agency's decision is supported by a rational basis," it "must affirm." *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009).

In terminating the FRP programs, the Secretary considered the relevant factors and "articulate[d] a satisfactory explanation for [her] action." *Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 719 (1st Cir. 1999) (quoting *State Farm*, 463 U.S. at 43). The Secretary laid out in detail why the stated purposes of FRP were not being served and why the interests supporting termination of FRP—including terminating existing grants of parole—outweighed any interest in continuing FRP. Those

interests include avoiding risks to national security and public safety caused by the programs' insufficient vetting, reducing the impact on domestic resources caused by expanded eligibility for public benefits, and reducing reliance on categorical parole or parole as a pathway to adjustment of status in line with the President's immigration policies. *See supra* at 11-15; A056.

The district court found the Secretary's parole termination decision was nonetheless arbitrary and capricious because, in the court's view, the Secretary "improperly understated the reliance interests of FRP parolees" and "overstated countervailing concerns regarding insufficient vetting and fraud where these concerns were unsupported by the Administrative Record and the Federal Register Notice itself." A019-20. But the district court had no authority to reweigh these competing factors in the first instance. *State Farm,* 463 U.S. at 43; *Doe*, 152 F.4th at 290.

Assuming the Secretary was required to consider reliance interests because the FRP programs termination represented a change in policy or position, *see* A019; *see also, e.g.*, *Doe*, 152 F.4th at 289, "a belief about how an agency is likely to exercise its enforcement discretion is not a serious reliance interest." *FDA v. Wages and White Lion Invs., L.L.C.*, 604 U.S. 542, 585 (2025) (quotation marks and alteration omitted); *see also id.* ("Our prior change-in-position cases have set a much higher bar, requiring, for example, decades of . . . reliance on [an agency's] prior

policy." (quotation marks omitted)). Even so, the Secretary did consider putative reliance interests of parolees as part of her FRP termination decision. An entire section of the FRP FRN is dedicated to addressing putative reliance interests of both parolees and supporters. A053. But first, the Secretary caveated her discussion of reliance interests by noting that "the temporary and discretionary nature of parole indicates that reliance on the continued existence of the FRP programs would be unwarranted." *Id.* She further observed that the modernized FRP programs expressly advise the public that "[t]he Secretary retains the sole discretion to terminate this FRP process at any point," and that "DHS may terminate parole upon notice in its discretion at any time." *Id*. (quoting 88 Fed. Reg. at 43598; 88 Fed. Reg. at 54643, 88 Fed. Reg. at 43593). DHS had also advised the public that the modernized FRP programs were "not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal." A053 (quoting 88 Fed. Reg. at 43598–99; 88 Fed. Reg. at 54643). The Secretary was also clear that her "assessment of the reliance interests of FRP parolees" take "account" of "FRP parolees' knowledge at the outset that (1) the Secretary retained the discretion . . . to terminate any grants of parole at any time . . . and (2) the initial period of parole would be limited to a maximum of three years." A056; *see also* A054-55. In *Regents*, the Supreme Court acknowledged that "disclaimers" such as these "are surely pertinent in considering the strength of any reliance interests." *Regents*, 591 U.S. at

31. And yet, the district court did not give any significance to—nor even address—the fact that parolees' putative reliance interests were diminished because of the discretionary nature of parole and their advance notice that parole could be terminated at any time. *See* A20-23. That was error.

Moreover, and notwithstanding her caveat, the Secretary substantively addressed potential parolee and supporter reliance interests. She recognized "the costs incurred by some aliens who have been granted parole and moved to the United States. Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside." A056.

The district court held, however, that the Secretary was not explicit enough in her consideration of parolees' reliance interests. The district court found the Secretary's discussion of reliance interests was arbitrary and capricious because although the Secretary acknowledged that "[p]arolees will have departed their native country," A021, she did not specifically consider "what parolees gave up in their home countries," or "how feasible it would be for parolees to return to their home countries after selling their homes and belongings and giving up their jobs to move to the United States," A022. But there is no requirement that the Secretary address reliance interests at that level of granularity, particularly given parolees were always

on notice that they may have to return to their home countries—not only because their parole could be terminated, but also because adjustment of status is discretionary under 8 U.S.C. § 1255(a). FRP beneficiaries should not reasonably have counted on permanently residing in the United States—or at the very least they should have recognized the possibility that they would have to return to their home country. The Secretary was thus not required to specifically consider whether some parolees had prepared for a "permanent move" to the United States upon receiving travel authorization. A022. Further, the Secretary contemplated that parolees whose parole was to be terminated could still seek a new period of parole, on a case-by-case basis for urgent humanitarian reasons or significant public benefit, if they believed their individual circumstances warranted. *See* A046, A055.

The Secretary's consideration of reliance interests appropriately weighed the tempered expectations of parolees against the government's interests, including its interests in discontinuing the use of parole as a pathway to adjustment of status and realigning the use of parole authority to the original congressional intent, in reducing strain on DHS resources, and in mitigating the risk posed by the continued presence of parolees whose entrance to the United States was marked by insufficient vetting and introduced significant opportunities for fraud. A053, A056. That is all that was required. *See Regents*, 591 U.S. at 32-33. The Secretary's reasoning was not "so deficient" on this issue as to demonstrate likelihood of success. *See Doe*, 152 F.4th

at 290-91.

Not only did the district court take issue with the Secretary's consideration of reliance interests, it also found that the Secretary "overstated . . . DHS's purported concerns regarding insufficient vetting and fraud." A023. Here, the district court again held the Secretary to a far more searching standard than the APA requires. The Secretary concluded that FRP parole processing included "minimal public safety and national security vetting" and that this lack of vetting and guardrails "created an unacceptable level of risk of abuse and fraud" as well as an "untenable likelihood that malicious actors could enter the United States." A047; *see also* App-0887–0889, App-0899–0902, App-1327–1329, App-1340–1354; App-2602–2607, App-2705–2724. The Secretary articulated a rational connection between these facts and the decision to terminate parole.

Instead of evaluating the Secretary's reasoning on its own terms, however, the district court held that the Secretary needed "tangible evidence" of specific instances of "purported fraud by parolees whose parole is being terminated" to justify terminating existing parole grants on this ground. A027, A024. The district court's holding did not just ignore the various other reasons the Secretary gave for terminating parole, including but not limited to other national security and public safety concerns arising from insufficient vetting, *see* A047–53, A056; it also disregarded the APA standard, which requires only a "rational basis" for the agency's

conclusions. *See River St. Donuts*, 558 F.3d at 114. The district court's reasoning also effectively imposes a requirement on the discretionary termination of parole that does not exist. Section 1182(d)(5)(A) does not require that parolees must have engaged in fraud to justify termination of parole, only an "opinion" that the purposes of parole have been served.

It is true, as the district court noted, that the Secretary also cited an internal audit that demonstrated how the lack of vetting impacted the integrity of the FRP programs, because it revealed that over 700 requests to be a supporter were filed under the names of deceased individuals. A053. The district court correctly noted that the referenced audit did not appear in the administrative record that had been produced to the court on an expedited basis. A023. The omission of the referenced information was manifestly a process error in the compilation of the administrative record, *see* App-2559–2561; App-2570–2579,[4] but that is immaterial to this appeal. Even assuming the cited facts were not supported by any internal audit, the

[4] A public report by the Government Accountability Office in December 2025, contained this same information: "[FRP] invitations resulted in 728 supporter applications filed under the names of deceased individuals—of which USCIS confirmed half. [USCIS Fraud Detection and National Security Directorate] officials told us there may be reasons other than fraudulent activity why someone might apply under a deceased petitioner's name." U.S. Government Accountability Office, *Humanitarian Parole: DHS Identified Fraud Risks in Parole Processes for Noncitizens and Should Assess Lessons Learned* (Dec. 11, 2025), *available at* https://www.gao.gov/products/gao-26-107433.

remainder of the Secretary's reasoning and the record support the Secretary's conclusions that the FRP programs engendered a substantial risk of abuse and fraud and that the purposes of parole under the FRP programs had been served.

Finally, the district court held that the Secretary did not consider that the vetting concerns raised regarding the modernized programs did not apply to the legacy Cuban and Haitian FRP programs. A027. But the district court's reasoning again ignored the various other reasons the Secretary gave for ending FRP. In any event, even assuming the district court's concerns were valid, the remedy would not be to enjoin all parole terminations—at most, this would justify a preliminary injunction only as to a class of legacy FRP recipients who could possibly demonstrate an injury related to this alleged error. *See DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 423 (1st Cir. 2024) ("Judges must closely tailor injunctive relief to the specific harm alleged."); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought") (internal citations and quotations omitted).

In sum, the Secretary was entitled to terminate parole when in her "opinion," its purpose had been served. Relying upon this Court's decision in *Doe*, the district court acknowledged that a purpose may be served when "the executive branch determines . . . that achieving the [previously established] policy aim is no longer

possible or desired[.]" A018 (quoting *Doe*, 152 F.4th at 286). Because the Secretary explained that the prior Administration's policy aims underlying FRP parole are no longer desired—including that this Administration does not want to "allow continued reliance on parole as a pathway to adjustment of status," A056—and that FRP parole was not producing other desired ends, nothing more was required to terminate parole. And yet, the Secretary did do more. She considered the reliance interests of parolees and supporters, weighed those interests against the Administration's vetting and security concerns, as well as the Administration's preferences for managing immigration and establishing paths to permanent residence, and determined that on balance, those factors outweighed the tempered reliance interests of parolees. That was entirely proper. *Regents*, 591 U.S. at 32 ("DHS may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests."). Clearly, the district court disagreed with the weight the Secretary placed on the competing interests she considered, but that is not an appropriate basis for an arbitrary and capricious finding. *See Doe*, 152 F.4th 290.

**C. Plaintiffs' Notice Claims Do Not Support the Relief Entered.**

Notifying parolees of their parole termination through the Federal Register accords with agency regulations requiring "written notice" and does not implicate or contravene constitutional due process. Defendants disagree with the district court's

contrary findings, *see* A032-37, because class members lack any constitutionally-protected interests in discretionary parole[5] and DHS followed regulatory requirements with respect to notice of parole termination.[6]

Defendants do not, however, here challenge the merits of the district court's decision that Plaintiffs were likely to succeed on their claims of inadequate notice, whether on regulatory or due process grounds, as Defendants already represented that they would provide renewed individualized notice if the district court were to lift its stay of agency action. App-2272. Defendants instead contest the district court's remedy for that claimed violation.

Even assuming the district court were correct that notice was inadequate under either the Due Process Clause or the governing regulations, the court's notice findings cannot support an injunction of the FRP FRN's parole termination pending a decision on the merits of Plaintiffs' claims. A court must "tailor[ ] [an injunction] to the specific harm to be prevented." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000); *see also DraftKings Inc.*, 118 F.4th at 423

[5] *See, e.g.*, *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 756 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *Rivera v. Sessions*, 903 F.3d 147, 151 (1st Cir. 2018) (aliens lack protected interest in discretionary immigration relief or benefits).

[6] The district court noted that certain parolees did not receive individualized parole termination notices, A035, but the court's own temporary restraining order effectively halted the issuance of individual termination notices prior to the effective date of the terminations, *see* App-0613–0617.

("Judges must closely tailor injunctive relief to the specific harm alleged."). An appropriate final remedy for inadequate notice of the parole termination or revocation of employment authorization would be to remand to the agency to provide such notice. *See, e.g.*, *Lane v. Hills*, 72 F.R.D. 158, 161 (D.N.J. 1976), *aff'd*, 556 F.2d 567 (3d Cir. 1977) ("In cases where agency action is defective for procedural reasons, the appropriate remedy is to remand for further action with proper procedures so that the defect may be cured without automatically affecting the merits."). At this preliminary stage, an injunction premised on a lack of notice could at most have enjoined the terminations only until DHS remedied the putative notice defect. Indeed, because DHS represented to the district court that it would provide renewed, advanced, individualized notice to affected parolees should the court lift its order restraining the termination of parole grants, an injunction of the agency decision resting solely on these notice findings would be improper.[7]

[7] DHS had already transmitted individual notice to many parolees at the time the Court issued its temporary restraining order. App-2270–2271 (Kernochan Decl. ¶ 15). DHS told the district court that if the temporary restraining order were lifted, it would issue "new notices to all impacted FRP parolees providing notice that their parole will terminate 30 days from the date of the notice;" that the new notices will "provide that any associated [employment authorization documents] will be revoked no sooner than 30 days from the date of the notice, unless the FRP recipient submits countervailing evidence demonstrating their continued eligibility for parole-based employment authorization before that date;" and that such "notices will be transmitted electronically to parolees who were granted parole through an electronic application process, and sent in paper form to the current address of record to parolees who were granted parole by filing a paper request." App-2272 (Kernochan Decl. ¶¶ 22-23). In its preliminary-injunction order, the district court stated that the

## II. A Balancing of the Equities Does Not Favor the Entry of Injunctive Relief.

In balancing the equities and harms, the district court made a "serious mistake" by improperly discounting the strong governmental and public interest in effectuating the Administration's immigration policies and placing undue weight on parolees' interest in an inherently discretionary benefit that they were advised was subject to termination at any time. *See Indep. Oil & Chem. Workers of Quincy, Inc.*, 864 F.2d at 929 (district court abuses discretion when it makes a "serious mistake" in weighing the relevant factors).

Enjoining parole terminations on a class-wide basis imposes irreparable harm on the government and public, whose interests "merge" here, *Nken*, 556 U.S. at 435. The United States suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating the President's policies. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Those concerns escalate when, as here, the preliminary injunction would undermine the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, thereby engaging in "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). Moreover,

---

"parties are welcome to update the court as to any supplemental notice issued to parolees," A036, but did not explain how DHS could provide such supplemental notice to parolees while the court's injunction of the FRP FRN's parole terminations remained in place.

the Legislative Branch's prerogatives are injured as well where, as here, the temporary injunctive relief bypasses a judicial-review bar. The relief Plaintiffs seek would stymie the government's ability to terminate parole grants that the Secretary has determined undermine U.S. interests, raise national security concerns, and thus inhibit the government's pursuit of its foreign policy goals. Further, the Secretary explained that administering the parole programs, including the application and adjudication process for re-parole under the processes, consumes agency resources that this Administration has determined would be better focused elsewhere. A057. In this way, staying parole terminations improperly encroaches on the core Executive function of managing the immigration system. *See Arizona v. United States*, 567 U.S. 387, 394-396 (2012); *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government").

The district court acknowledged the government's weighty interests, agreeing that "the Secretary, and the Executive Branch more broadly, possess significant discretion in the administration of this country's immigration system." A040. The district court nonetheless all but dismissed those interests, suggesting that an injunction of the parole termination was necessary to protect the public interest that the "agencies abide by the federal laws that govern their existence and operations." A041 (quoting *New York v. McMahon*, 784 F. Supp. 3d 311, 372 (D. Mass. 2025)).

Yet the court pointed to no federal law the Secretary had not followed.[8] And, contrary to the district court's conclusions (at A041), the relief here does meaningfully encroach on the government's interests: A preliminary injunction forces DHS to individually terminate each grant of parole or render a new overarching parole termination decision, costing the agency time and resources and delaying DHS's ability to address the national security and public safety concerns that animated, in part, the Secretary's decisions to terminate parole grants.

On the flip side, Plaintiffs do not establish that they or the class are likely to suffer irreparable injury in the absence of temporary injunctive relief. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 22 (2008) ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."). Plaintiffs and class members are aware that parole is a discretionary benefit, terminable at any time—not least because former Secretary Mayorkas repeated that admonition when establishing and updating these parole programs. *See*, *e.g.*, App-0364. At no point was parole or re-parole guaranteed. *See, e.g.*, App-0364 (providing that all steps of the parole process were "entirely discretionary and not subject to appeal on any grounds"). Further, each of the new Plaintiffs and any member of the class they seek to represent may apply for another period of parole.

---

[8] Again, even assuming notice of parole termination was inadequate under DHS regulations and the Constitution, this would not justify an indefinite injunction of the substantive termination decision pending.

*See* A046 ("[T]he Secretary retains discretion to grant a new period of parole, also known as re-parole, to any alien who was paroled into the United States under the FRP programs . . . ."). And parolees whose parole terminates can still pursue a family-based immigrant visa from abroad. There was never any guarantee to any beneficiary of the FRP programs that he or she would ultimately be eligible for adjustment of status or warrant a favorable exercise of discretion. *See, e.g.*, App-0364. Finally, any class members whose adjustment applications have since been or will be denied lack any argument to remain in the United States.

Considering similar issues with respect to the balance of the equities, the Supreme Court stayed the district court's prior order staying CHNV parole terminations. *Noem v. Doe*, 145 S. Ct. 1524 (2025). According to the dissent, the Supreme Court "determined that the equity balance weighs in the Government's favor." *Id*. at 1528 (Jackson, J., dissenting). There is no meaningful distinction here that should lead to a different result.

## CONCLUSION

For these reasons, this Court should vacate the preliminary injunction and Section 705 stay.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

SARAH WELCH
Senior Counsel to the Assistant Attorney General

/s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
First Cir. Bar No. 1216699
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 598-8259
(202) 305-7000 (facsimile)
katherine.j.shinners@usdoj.gov

ELISSA FUDIM
*Trial Attorney*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,657 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in proportionally spaced Times New Roman 14-point font.

*s/ Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel

## CERTIFICATE OF SERVICE

I, Katherine J. Shinners, Senior Litigation Counsel, hereby certify that on October 2, 2026, I filed the foregoing Corrected brief through the CM/ECF system, which will provide electronic service to the registered participants as identified on the Notice of Electronic Filing (NEF).

*s/ Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel

# ADDENDUM

## TABLE OF CONTENTS


| Document | Page |
|---|---|
| Preliminary Injunction Order (Dist. Ct. Dkt. No. 257) | A001 |
| Memorandum & Order Granting Motion for Preliminary Injunction and/or Stay (Dist. Ct. Dkt. No. 258) | A002 |
| *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58,032 (Dec. 15, 2025) | A044 |
| Memorandum & Order Denying Motion for Reconsideration (Dist. Ct. Dkt. No. 288) | A060 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SVITLANA DOE, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 1:25-cv-10495-IT |
| KRISTI NOEM, et al., | * | |
| Defendants. | * | |

PRELIMINARY INJUNCTION

For the reasons set forth in the court's Memorandum and Order [Doc. No. 258], Plaintiffs' Motion for Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc. No. 216] is GRANTED as follows:

The Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025) is hereby preliminarily ENJOINED under Fed. R. Civ. P. 65 and STAYED pursuant to 5 U.S.C. § 705 insofar as it terminates previously granted parole and revokes work authorization issued to noncitizens paroled into the United States pursuant to the Family Reunification Parole Programs prior to the noncitizens' originally stated parole expiration dates.

IT IS SO ORDERED.

January 24, 2026

/s/ Indira Talwani
Indira Talwani
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SVITLANA DOE, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 1:25-cv-10495-IT |
| KRISTI NOEM, et al., | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

January 24, 2026

TALWANI, D.J.

This class action challenges steps taken by the Department of Homeland Security ("DHS") regarding humanitarian parole programs. Most recently, in December 2025, DHS terminated certain Family Reunification Parole programs and announced the termination of all unexpired initial grants of parole awarded under these programs, effective January 14, 2026. See Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025) [Doc. No. 216-1] (the "Federal Register Notice" or the "Notice"). On January 10, 2026, after Plaintiffs filed a Supplemented Second Amended Complaint [Doc. No. 239] and the court entered an Order Modifying Class Definition and Appointing Additional Named Plaintiffs [Doc. No. 241], this court granted an emergency fourteen-day stay of the Federal Register Notice insofar as it revokes previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to the relevant Family Reunification Parole programs. See Temporary Restraining Order [Doc. No. 243]. Now pending before this court is Plaintiffs' Motion for a Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc.

No. 216] seeking further preliminary relief or stay. For the reasons stated below, Plaintiffs' Motion is GRANTED.

## I. Background[1]

Under the Immigration and Nationality Act ("INA"), as amended:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).[2] Pursuant to this authority, DHS has established various parole programs granting temporary parole to noncitizen applicants who meet program requirements.

Four of these programs, referred to as the "CHNV Parole Programs," were addressed earlier in this litigation. As the First Circuit summarized,

> DHS under the Biden Administration announced a new parole process to address an increasingly high number of encounters with Venezuelan nationals at the southern border. . . . This new process allowed Venezuelan nationals to obtain advance authorization to "travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years."

Doe v. Noem, 152 F.4th 272, 279 (1st Cir. 2025) (quoting Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022)). The Venezuela parole program

---

[1] The court presumes familiarity with the factual background and procedural history of this litigation and incorporates by reference this court and the First Circuit's previous discussions of both. See Doe v. Noem, 784 F. Supp. 3d 437 (D. Mass. 2025), appeal dismissed per stipulation, Doe v. Noem, No. 25-1715 (1st Cir. Nov. 5, 2025); Doe v. Noem, 2025 WL 2201108 (D. Mass. Aug. 1, 2025); Doe v. Noem, 152 F.4th 272 (1st Cir. 2025). That background and the legal findings, as relevant here, are discussed further below.

[2] An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

specified that discretionary grants of parole would be for a temporary period of up to two years, during which time individuals could seek humanitarian relief or other benefits and receive work authorization. See, e.g., Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63508. "Modeled after the Venezuelan parole program, DHS launched similar programs for nationals of Cuba, Haiti, and Nicaragua in January 2023." Doe, 152 F.4th at 279–80 (citing Implementation of Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023)).

Like the CHNV Parole Programs, Family Reunification Parole processes also provide for humanitarian parole. They differ, however, in that the Family Reunification Parole processes are limited to applicants who are beneficiaries of a previously approved Form I-130 immigration petition filed by a U.S. citizen or lawful permanent resident. See, e.g., Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611, 43613 (July 10, 2023); see also Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58033. Parole also is only available under the Family Reunification Parole processes after the petitioning U.S. citizen or lawful permanent resident is invited by the United States government to apply for parole for their Form I-130 approved family member. See, e.g., Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43613; see also Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58033. Under these processes, the timing of such invitations is in the Secretary's discretion, based on multiple factors that could include the expected period of time until the beneficiary's immigrant visa becomes

available.[3] See Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43618. Thus, while CHNV Programs anticipated that parolees not granted asylum or other immigration benefits would need to leave the United States at the expiration of their authorized period of parole or be placed in removal proceedings after the period of parole expires, see, e.g., Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63508, the Family Reunification Parole processes anticipated that the process "will allow family members to reunite in the United States while they wait for their immigrant visas to become available." Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43611.

Nine Family Reunification Parole programs covering nationals of seven countries (the "FRP Programs") are at issue here. The first seven Programs are "for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole processes announced, or updated, by DHS in 2023[.]" Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58032.[4] The

---

[3] Immigrant visas for family-sponsored immigrant preference categories are numerically limited and the visas therefore are not necessarily available when the visa petition is approved. 8 U.S.C. § 1153.

[4] See Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43611; Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg. 54635 (Aug. 11, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 Fed. Reg. 54639 (Aug. 11, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023). The programs are referred to here and in the challenged Federal Register Notice as the "modernized FRP programs."

final two programs are older programs for noncitizens from Cuba and Haiti,[5] which were first implemented by U.S. Citizenship and Immigration Services ("USCIS") in 2007 and 2014, respectively.

## II. The Termination of the Family Reunification Parole programs

The Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025), announced that the "temporary parole period of aliens who have been paroled into the United States under the FRP programs, and whose initial period of parole has not already expired by January 14, 2026[,] will terminate on that date." Id.[6] The Federal Register Notice identified two exceptions where parole will not terminate on that date. First, parole will not terminate if a parolee has filed a Form I-485, Application to Register Permanent Residence or Adjust Status,[7] that has been postmarked or electronically filed by December 15, 2025, and that is still pending adjudication as of that date. Id. at 58032–33. Second, parole will not terminate on the announced termination date if the Secretary of Homeland Security "determines otherwise on a case-by-case

[5] See Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007); Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014). These programs are collectively referred to as the "legacy FRP programs."

[6] The Notice reported that since July 10, 2023, DHS granted parole to roughly 14,000 noncitizens through the modernized FRP programs, and that all of these parolees are within the initial three-year grant of parole. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58043. The Notice reported further that approximately 1,060 Cubans and 100 Haitians are in the United States with valid grants of parole under legacy programs, but did not identify how many of these parolees are within an initial three-year grant. Id.

[7] Generally, the Form I-485, Application to Register Permanent Residence or Adjust Status, may not be filed until an immigrant visa is immediately available to the applicant. See U.S. CITIZENSHIP AND IMMIGRATION SERVS., I-485 FORM (2025).

basis." Id. at 58033.[8]

The Federal Register Notice also stated that all parolees "without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date." Id. at 58033. The Federal Register Notice provided further that "[f]ollowing this termination, . . . DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States." Id. at 58043.

A. *Rationale for Termination*

The Federal Register Notice concluded that the FRP Programs no longer "serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes." Id. at 58034. The Notice stated that the Secretary found that these reasons together supported termination of the program. Id.

1. Purposes of the Programs

The Federal Register Notice acknowledged that DHS, when creating these parole processes, had found that the parole processes would provide a significant public benefit for the United States by

> (i) promoting family unity; (ii) furthering important foreign policy objectives; (iii) providing a lawful pathway and timely alternative to unlawful migration at the southwest land border; (iv) reducing strain on limited U.S. resources; and (v) addressing the root causes of migration through economic stability and development supported by increased remittances.

---

[8] The Federal Register Notice stated that parolees may apply for re-parole, which would be adjudicated and may be approved on a case-by-case basis, by filing Form I-131 and "must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole[.]" Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58043.

Id. The Federal Register Notice acknowledged further that the programs sought to promote family unity by providing a faster pathway for United States citizens and lawful permanent residents to reunite with family members while awaiting availability of their immigrant visas. Id. DHS acknowledged "that aliens paroled into the United States under the FRP programs may have been able to reunite with family members in the United States." Id.

DHS concluded, however, that "that national security and fraud concerns, and the current Administration's priorities outweigh[ed] those interests" and supported termination. Id. As to national security, the Federal Register Notice compared the FRP Programs' vetting process to that of individuals pursuing lawful permanent resident status through consular processing. Id. In the latter case, applicants' consular processing requires "an in-person interview outside the United States, and submission of various documents to establish the necessary family relationship with the petitioner[,]" while still outside of the United States. Id. The Federal Register Notice contrasted this process with that of the modernized FRP Programs, where beneficiaries would seek parole at a point of entry ("POE"), at which point, DHS asserted, they would undergo "minimal public safety and national security vetting[.]" Id. at 58035. The Federal Register Notice asserted that "biometrics were not submitted by each potential beneficiary until they arrived at the interior POE to seek parole," id., which prevented the U.S. government from conducting additional vetting of applicants prior to their arrival. Id. Based on this factor, alongside others listed in the Federal Register Notice, DHS concluded that the FRP Programs created "an unacceptable level of risk to the United States' national security and public safety." Id.

DHS similarly concluded that the programs "presented an unacceptable risk of abuse and fraud." Id. The Federal Register Notice pointed to a greater risk of fraud "[w]hen biometrics

collection and interviews do not occur prior to a beneficiary's arrival" in the United States, where sponsors could misrepresent family relationships and falsely claim a familial tie, and where beneficiaries from countries with "weak civil registry systems" could potentially submit fraudulent documents to support their claims. Id.

As to the Administration's priorities, DHS pointed to "current enforcement-based priorities, namely to better 'achieve the total and efficient enforcement, including through lawful incentives and detention capabilities' of U.S. immigration law," and concluded that "[t]he modernized FRP programs, initiatives of the prior administration, do not align with this Administration's emphasis on enforcing immigration law, deterring unlawful immigration, and eliminating fraud and abuse." Id. (quoting Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025))

The Federal Register Notice also concluded that the programs did not further the Administration's foreign policy objectives. Id. It explained that, given the Administration's "pivot to a foreign policy that prioritizes the United States' interests in reducing and deterring unlawful migration[,]" this Administration was pursuing a "regional migration management strategy" different from the prior administration. Id. at 58036. Accordingly, the Administration sought to focus on "other measures to deter and prevent the entry of illegal aliens into the United States." Id. at 58037.

The Federal Register Notice concluded further that the FRP Programs failed to accomplish their goal of discouraging unlawful migration because "the confirmed beneficiaries of the FRP programs constitute a tiny fraction of the total population of aliens from the seven FRP countries that unlawfully attempted to enter the country during this time period." Id. The Notice stated that DHS had found that roughly 16,100 noncitizens were granted parole under the

FRP Programs, while Customs and Border Patrol encountered over 888,000 noncitizens from FRP countries in FY2024. Id. DHS accordingly "determined that the FRP programs did not meaningfully reduce unlawful migration at the southwest border and are not needed to achieve that goal." Id. Instead, DHS determined that alternative policy actions, such as "increasing interior enforcement actions, ramping up removals, building physical barriers along the border, and deploying advanced surveillance technology[,]" represented "a more prudent approach" to addressing unlawful migration. Id.

DHS also determined that the FRP Programs' failure to reduce unlawful migration resulted in an increase to DHS workload without any offset. Id. at 58039. The Notice stated that DHS personnel were still required to invest resources in detention, monitoring, processing, and removal while also processing FRP applications. Id. Noting that noncitizens who would have otherwise sought lawful permanent resident status from the Department of State now applied for parole under FRP, DHS concluded that the FRP programs "shifted the strain from the Department of State to DHS personnel" and that the "reallocation of limited DHS personnel resources caused by the FRP programs is unsustainable." Id. at 58039–40.

The Federal Register Notice reported further that DHS found that FRP parolees did not meaningfully affect the economic conditions of their countries of origin. Id. at 58040. DHS originally intended that such beneficial effects would arise because parolees would earn higher wages working under lawful employment authorization and then send money home through remittances. Id. Analyzing the rates at which parolees participated in remittances, DHS determined that "any contribution FRP parolees may make to the remittance volumes in their home country is too small to substantially impact the overall economic stability of the country or address the root causes of migration." Id. DHS found that the United States was incapable of

bearing "sole responsibility for the development and economic stability of other nations" and stated that "U.S. immigration policy cannot serve as a surrogate for long-term development solutions in foreign countries." Id. at 58041.

2. Reliance Interests

The Federal Register Notice considered separately the reliance interest of prospective parolees and current parolees. Id. at 58041–45.

As to current FRP parolees, DHS "recognize[d] the costs incurred by some aliens who have been granted parole and moved to the United States." Id. at 58044. Indeed, as DHS acknowledged, "[p]arolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside." Id. DHS recognized that the termination of FRP parole grants would also affect parolees' employers, parolees' landlords, and businesses patronized by parolees. Id. Nonetheless, DHS stated, such reliance interests cannot outweigh "the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists." Id. Further, DHS declined to assign parolees' reliance interests significant weight due to the discretionary and term-limited nature of FRP. Id.

B. *Notice*

DHS published the Federal Register Notice on December 15, 2025—thirty days prior to the date for termination of existing grants of parole. Id. at 58032, 58044. The Federal Register Notice stated that after the January 14, 2025 termination, DHS "intend[ed] to promptly remove" FRP parolees from the United States, regardless of the term length of the parolee's grant. Id. at 58043. The Federal Register Notice asserted that its publication served as "constructive notice" to parolees of the suspension and termination of the FRP grants and that, in DHS's view,

"publication of this notice in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." Id. at 58045 (citing 44 U.S.C. § 1507). In addition, DHS stated its intent to "provide individual notice to each parolee through their USCIS online account." Id. For legacy parolees, who DHS acknowledged would not have an online account (a "myUSCIS account"), DHS committed to providing "personal, individual notice by mail." Id.

DHS reports that on January 5, 2026, USCIS sent 3,501 FRP parolees, including five FRP parolees who are Class Representatives, electronic notice of the January 14, 2026 parole termination via their myUSCIS accounts. See Kernochan Decl. ¶¶ 15, 17 [Doc. No. 250-1].[9] DHS reports that approximately 1,841 termination notices had been accessed by January 12, 2026, including by two of the Class Representatives. Id. ¶¶ 16–17. On January 10, 2026, DHS halted the issuance of electronic termination notices to 4,213 "modernized FRP parolees" in light of the court's TRO. Id. ¶ 16. As of January 15, 2026, DHS had not yet mailed notice to the 628 legacy parolees who are in their initial period of parole. Id. ¶¶ 18–19.

Defendants have represented to this court their intent, once this court's stay is lifted, "to issue new notices to all impacted FRP parolees providing notice that their parole will terminate 30 days from the date of the notice." Id. ¶ 22. The new notices "will also provide that any associated [employment authorization documents] will be revoked no sooner than 30 days from the date of the notice, unless the FRP recipient submits countervailing evidence demonstrating

[9] The notices stated that both parole and parole-based employment authorization would be terminated on January 14, 2026. Kernochan Decl. at ECF 7 [Doc. No. 250-1]. Defendants report that the notices "included a typo, indicating that the [employment authorization documents] would be revoked as of January 14, 2026, the date of parole termination, rather than January 20." Id. ¶ 20.

their continued eligibility for parole-based employment authorization before that date." Id. Defendants state further that "notices will be transmitted electronically to parolees who were granted parole through an electronic application process, and sent in paper form to the current address of record to parolees who were granted parole by filing a paper request." Id. ¶ 23.

### III. Jurisdiction

Defendants contend that 8 U.S.C. § 1252(a)(2)(B)(ii) bars the court from exercising jurisdiction here. Defs.' Opp'n 6 [Doc. No. 251] This argument is incorrect.

Section 1252(a)(2)(B)(ii) establishes that no court shall have jurisdiction to review:

> [A]ny . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii). Defendants point out that the decision whether to terminate FRP grants of parole is within the Secretary's discretion under 8 U.S.C. § 1182(d)(5)(A) and is therefore precluded from review by Section 1252(a)(2)(B)(ii). Defs.' Opp'n 6 [Doc. No. 251].

That position is not controversial: the parole statute, which is in the same subchapter, provides that an alien's parole may be terminated "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served[.]" 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Section 1252(a)(2)(B)(ii) applies to matters where discretion is conferred by statute on the Secretary, see Kucana v. Holder, 558 U.S. 233, 251–52 (2010) (emphasis added). Under 8 U.S.C. § 1182(d)(5)(A), Congress has placed, by statute, individual parole determinations, and the decision of whether to revoke such individual grants of parole, within the Secretary's discretion.

But there is a separate question as to whether Congress, by statute, also sought to divest courts of jurisdiction to hear challenges to the procedures employed by the Secretary to reach

such determinations. In short, at issue is not whether the Secretary may exercise her discretion to terminate an individual's parole—she may—but rather whether the procedures adopted in this case for the exercise of such discretion are in accordance with law. See, e.g. Castaneira v. Noem, 138 F.4th 540, 549 (D.C. Cir. 2025) ("In other words, the issue before us is whether 8 U.S.C. § 1154(a)(1)(A)(viii)(I), in granting USCIS 'sole and unreviewable discretion' to 'determine[ ] that the citizen poses no risk,' also affords the agency discretion to depart from its own binding regulations or precedents in making this determination. We hold that it does not."). The answer to that question is no.

Here, Plaintiffs seek to challenge the procedure, or lack thereof, relied upon to terminate Plaintiffs' grants of parole. Plaintiffs challenge how the decision was made and contend that the Secretary's reasoning was arbitrary and capricious because DHS failed to properly consider the purpose of the FRP programs, the reliance interests of Plaintiffs, and the alternatives available to the agency. Pls.' Mem. ISO Prelim. Inj. and/or Stay of En Masse Truncation of Family Reunification Parole 10–14 [Doc. No. 218] ("Pls.' Mem."). Relatedly, Plaintiffs allege that the Secretary exceeded her authority by failing to adhere to statutory requirements. Id. at 14–16. Plaintiffs also challenge how the decision was communicated, alleging that notice to parolees was deficient. Id. at 17–18. And finally, Plaintiffs challenge the approach taken to promulgate the decision itself, claiming that such a decision could only be issued following a notice-and-comment period. Id. at 18–19. None of these challenges go to the Secretary's ultimate decision to terminate parole. Instead, they speak to whether the steps taken to do so were proper.

The statute is silent on whether the procedures employed by Secretary to terminate grants of parole are likewise left to the discretion of the Secretary. In Kucana v. Holder, 558 U.S. 233 (2010), in considering whether Section 1252(a)(2)(B)(ii) barred judicial review of an

administrative determination, the Supreme Court emphasized "a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." Id. at 251. "When a statute is 'reasonably susceptible to divergent interpretation, [the Court] adopt[s] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." Id. (internal quotations omitted). Pursuant to Kucana, the First Circuit has further held that "a statutory provision must expressly and specifically vest discretion in the Attorney General (for example, by explicitly using the words 'in the discretion of the Attorney General') rather than simply leave to the executive branch certain decisions and determinations that happen to be discretionary in nature." Valerio-Ramirez v. Sessions, 882 F.3d 289, 294 (1st Cir. 2018). Here, where the statute does not explicitly state that the procedures employed by the Secretary are left entirely to her discretion, the court declines to adopt an interpretation would run counter to the presumption of reviewability. Accordingly, the court finds Section 1252(a)(2)(B)(ii) does not bar the court's jurisdiction.[10]

Defendants also briefly contend that even if § 1252(a)(2)(B)(ii) did not preclude review, review under the Administrative Procedures Act ("APA") is unavailable where "the parole termination decision is 'committed to agency discretion by law.'" Defs.' Opp'n 7 [Doc. No. 251] (quoting Webster v. Doe, 486 U.S. 592, 600 (1988)).

The APA "establishes a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action[,]'" but that presumption may rebutted, including by a showing

[10] Plaintiffs raise additional arguments in support of this court's jurisdiction. See Pls. Reply 6–9 [Doc. No. 253]. Where the court finds that it has jurisdiction, it need not reach these additional grounds at this time.

that the "agency action is committed to agency discretion by law." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16-17 (2020) (first alteration in original) (citations omitted). The Supreme Court has read this exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Dep't of Com. v. New York, 588 U.S. 752, 772 (2019) (quotation omitted).

Here, despite the broad discretion accorded to the Secretary, the parole statute does include meaningful standards for the Secretary's exercise of discretion both in granting parole—in that such grants must be made on a case-by-case basis for urgent humanitarian reasons or public benefit—and in terminating the grant of parole, by requiring a determination by the Secretary that "the purposes of such parole . . . have been served[.]" 8 U.S.C. § 1182(d)(5)(A). Moreover, the Secretary's own regulations import notice requirements which limit her discretion.

This court finds further support for the view that Plaintiffs' challenge to the Federal Register Notice is reviewable in the Supreme Court's decision in Department of Homeland Security v. Regents of the University of California, 591 U.S. 1 (2020). Rejecting the government's argument that decisions related to Deferred Action for Childhood Arrivals ("DACA") were committed to agency discretion by law, the Court determined that DACA was not an unreviewable non-enforcement policy, but was rather a program for conferring affirmative immigration relief, including the conferral of eligibility for work authorization and Social Security. Id. at 18–19. On that basis, the Court reasoned that "[t]he creation of that program—and its rescission—is an 'action [that] provides a focus for judicial review.'" Id. at 18 (second alteration in original) (quoting Heckler v. Chaney, 470 U.S. 821, 832 (1985)).

For these reasons, the court is not without jurisdiction over Plaintiffs' challenge to Defendants' *en masse* termination of existing grants of parole.

## IV. Standard of Review

A preliminary injunction is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig–Zayas, 445 F.3d 13, 17–18 (1st Cir.2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)).

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

## V. Likelihood of Success on the Merits

### A. *Exceeds Authority*

Plaintiffs argue that the Secretary's *en masse* termination of parole granted under the FRP Programs exceeded her statutory authority because she did not properly determine that the "purpose" of the FRP Programs (i.e. family reunification) had been accomplished. Pls.' Mem.

14–16 [Doc. No. 218]; see Doe, 152 F.4th at 286 ("Congress allows the Secretary to terminate parole 'when the purposes of such parole shall, in [her] opinion . . . have been served.'") (quoting 8 U.S.C. § 1182(d)(5)(A)). But the Secretary may also terminate parole, even if the purpose is not accomplished, "[o]nce the executive branch determines . . . that achieving the [previously established] policy aim is no longer possible or desired[.]" Doe, 152 F.4th at 286. Here, the Secretary determined that family reunification no longer warranted the FRP parolees' presence in the United States. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58034–35. For the purposes of the *ultra vires* inquiry, that determination is sufficient. See Doe, 152 F.4th at 291 (accepting "somewhat conclusory" statement in the CHNV parole termination notice). Accordingly, for the purposes of a motion for a preliminary injunction, Plaintiffs have not shown a substantial likelihood of success as to this claim.

B. *Arbitrary and Capricious*

"An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded 'an important aspect of the problem, offered an explanation that runs counter to the evidence,' or when a reasonable explanation for the agency's decision cannot be discerned." Gulluni v. Levy, 85 F.4th 76, 82 (1st Cir. 2023) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). "[A] court 'is not to substitute its judgment for that of the agency' but rather determine 'whether there has been a clear error of judgment.'" Id. (quoting Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)).

1. Rationale for Terminating the Parole of Parolees under the FRP Processes

Plaintiffs object that the Secretary "justified terminating the FRP processes using the same template and reasoning she applied to CHNV" when the FRP processes "differ so fundamentally" from the CHNV Programs. Pls.' Mem. 9 [Doc. No. 218]. They contend that the

Federal Register Notice fails to recognize that the FRP Programs, unlike the CHNV Programs, were not designed or intended to provide a deterrent to irregular migration but instead were directed at family reunification. Id. at 10. But as Defendants point out, deterring irregular migration was included as a factor (albeit a minor one) in the notices establishing the FRP Programs, and the Secretary was within her discretion in considering whether that purpose was served by the termination of the FRP Programs. Mem. in Opp'n to Pls.' Emergency Mot. for a TRO and/or Stay 11–12 [Doc. No. 233]; Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591, 43593 (Jul. 10, 2023).

2. Weighing of Reliance Interests

Plaintiffs also contend that the Secretary failed to adequately weigh Plaintiffs' reliance interests such that the termination of existing parole grants was arbitrary and capricious.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016). "[I]n explaining its changed position, an agency must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" Id. (quoting F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515(2009)). "The agency must 'assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.'" Am. Hosp. Ass'n v. Kennedy, No. 25-2236, 2026 WL 49499, at *3 (1st Cir. Jan. 7, 2026) (quoting DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020)).

The court agrees that Plaintiff has established a strong likelihood of success on this ground for two reasons. First, the Secretary improperly understated the reliance interests of FRP parolees. Second, the Secretary overstated countervailing concerns regarding insufficient vetting

and fraud where these concerns were unsupported by the Administrative Record and the Federal Register Notice itself.

a. Plaintiffs' Reliance Interests

Plaintiffs contend that the Secretary failed to adequately consider FRP parolees' reliance interests and accordingly did not engage in reasoned decisionmaking. Pls.' Mem. 12 [Doc. No. 218]. First, Plaintiffs highlight that the Secretary's "discussion of FRP reliance interests is nearly identical to what she said about CHNV" despite the significant differences between the two groups of parolees. Id. Specifically, Plaintiffs contend that the Secretary did not consider that every FRP parolee is a beneficiary of an I-130 petition, and as a result is on a path to becoming a lawful permanent resident once their priority date became current; that FRP parolees had close U.S. citizen and lawful permanent resident relatives in the United States; that these relatives were invited to participate in the program by the State Department; that FRP was meant to serve as a bridge for future adjustment of status; and that the purpose of the program was to promote family unity and that terminating parole would instead produce family separation. Id. at 13.

Defendants respond that the Secretary's use of similar language across the Federal Register Notices "does not mean she failed to consider" the FRP parolees' reliance interests. Defs.' Opp'n 10 [Doc. No. 251]. Further, Defendants contend that while some differences exist, "the reliance interests of CHNV parolees and beneficiaries and FRP parolees and beneficiaries are overall more similar than different." Id. And, to the extent that the two groups do differ, Defendants contend that the Secretary considered at least one difference, that the FRP supporters had received an invitation. Id.

The Federal Register Notice acknowledged that it was "announc[ing] a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate."

Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. The Notice recognized

> the costs incurred by some aliens who have been granted parole and moved to the United States. Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.

Id. at 58044. Still, the reliance interests of FRP Parolees are considerably more significant.

FRP Parolees have arrived in the United States after a long process, following all directives from USCIS, to obtain lawful permanent residence in this country. The process began when a United States citizen or Long-term Permanent Resident petitioner submitted a Form I-130 petition. It can take a year, often more, for an I-130 petition to be approved. David Doe Decl. ¶ 5 (I-130 submitted in October 2012, approved February 2020) [Doc. No. 214-2]; Francisca Doe Decl. ¶ 5 (I-130 approved after one year) [Doc. No. 214-3]; John Doe Decl. ¶ 6 (I-130 approved after one year) [Doc. No. 214-4]; Luciana Doe Decl. (I-130 approved after three years) [Doc. No. 214-6].

After this approval, an invitation from the United States government was sent to the U.S. Citizen or Lawful Permanent Resident petitioner who submitted the I-130 petition. This invitation allowed the petitioner to "file a request and initiate consideration" under the FRP Process. Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. at 43598. The time between the approval of an I-130 petition and the issuance of an invitation may also take years. David Doe Decl. ¶ 5–6 [Doc. No. 214-2] (over three years between approval of I-130 petition and issuance of invitation); Francisca Doe Decl. ¶¶ 6, 9 [Doc. No. 214-3] (I-130 petition approved in 2013, petitioner received invitation in 2023); John Doe Decl. ¶¶ 6, 10 [Doc.

No. 214-4] (nearly four years between approval and invitation); Jose Doe Decl. ¶¶ 6, 8 [Doc. No. 214-5] (ten years between approval and invitation).

Because the FRP Programs are designed for individuals who are in line to adjust to permanent lawful status, many parolees, upon receiving approval to travel to the United States and seek parole, prepare for a permanent move. See USCIS, FAMILY REUNIFICATION PAROLE PROCESSES – AFTER THE BENEFICIARY IS PAROLED INTO THE UNITED STATES ("We expect beneficiaries who are paroled into the United States under these processes to apply, when eligible, for a Green Card once their visa becomes available.") https://www.uscis.gov/FRP (last visited Jan. 24, 2026). This often means individuals have given up their entire lives in their home countries. Francisca Doe Decl. ¶10 [Doc. No. 214-3] ("We had to sell our car in Guatemala to be able to afford [the medical exams]. We also sold the rest of our property in Guatemala, like our house and the bookstore, to afford the move to the United States"); John Doe Decl. ¶ 11 [Doc. No. 214-4] ("I sold my vehicle and other belongings and ended the lease on my rented apartment"); Jose Doe Decl. ¶ 10 [Doc. No. 214-5] ("We sold everything we had to come to the United States through the FRP process."); Luciana Doe Decl. ¶ 8 [Doc. No. 214-6] ("I believed I was making a permanent move to the U.S.; I believed in good faith I would never return to Colombia. I sold my car, my apartment, and all of my possessions. I also left my university studies[.]").

The Federal Register Notice failed to acknowledge these reliance interests. The Notice did acknowledge that parolees have incurred costs moving to the U.S., and while they have lived in the U.S., but it did not consider what parolees gave up in their home countries after being invited by the United States to apply. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. Nor did the Notice consider how feasible it would be for parolees to return to

their home countries after selling their homes and belongings and giving up their jobs to move to the United States. See Luciana Doe Decl. ¶ 11 [Doc. No. 214-6] ("Returning would mean starting completely from scratch. I would not have a job to go back to, and I wouldn't be able to finish my degree, since enough time has passed that I would no longer be eligible to restart at the university where I left off; I would have to start over with my education.")

The Secretary could not provide a reasoned explanation of the agency's change in policy without acknowledging these interests. Accordingly, failure to do so was arbitrary and capricious.

b. Weighing the Countervailing Interests: Insufficient Vetting and Fraud

The Secretary's consideration of reliance interests was also arbitrary and capricious because it overstated the agency's countervailing interests, namely, DHS's purported concerns regarding insufficient vetting and fraud. These concerns were unsupported by the factual record and, as introduced in the Federal Register Notice, not relevant to the Secretary's decision to terminate grants of parole. Pls.' Reply 12–13 [Doc. No. 253]. Defendants contend that these factors were appropriately considered. Mem. in Opp'n to Pls.' Emergency Mot. for a TRO and/or Stay 14 [Doc. No. 233] ("First Opp'n").

As Defendants note, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotation omitted); First Opp'n 10–11 [Doc. No. 233]. DHS alleged numerous possible ways an applicant could fraudulently acquire a grant of parole. Yet, it provided no credible facts to suggest that fraud had actually occurred.

DHS justified terminating existing grants of parole on the ground that "allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or

insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety." Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58044; id. at 58035 (reporting that DHS concluded the "procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety"). Plaintiffs contend that "even if [the Secretary's] vetting theory had merit, the [Administrative Record] is completely devoid of information support it." Pls.' Reply 13 [Doc. No. 253]. Plaintiffs assert that "[t]here is no analysis of whether FRP parolees pose security risks, no comparison of vetting outcomes, no data whatsoever." Id. The court agrees.

As evidence of the purported fraud by parolees whose parole is being terminated, DHS cited "a recent internal audit [that] revealed that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half." Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. This audit also reportedly concluded that "the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for primary supporters, further compromising program integrity." Id. Defendants' administrative record, however, includes no such audit, nor any other information to suggest Defendants' fraud concerns are supported by the record. Moreover, even if 350 fraudulent Form I-134As were confirmed, there is no evidence in the record that any individuals who were awarded parole were associated in any way with those fraudulent applications.

Instead, while a supporter's confirmed Form I-134A would allow a beneficiary to submit additional information, including biographic and biometric information to USCIS, travel

approval still would not be granted until the beneficiary "passes all the requisite vetting." Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. at 43598. Accordingly, it is not possible to conclude from the one data point regarding I-134A Forms that any parolees fraudulently acquired parole.

The Federal Register Notice also asserted that, under the modernized program, DHS would only conduct "minimal public safety and national security vetting of [FRP] supporters based on biographic information" provided by the supporters on their Form I-134A. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58034–35. For example, DHS would verify that the supporter listed on the Form I-134A was the same person as the named petitioner on the Form I-130—the initial form submitted by the supporter—and that supporters were confirmed to be LPRs. Id. at 58035. Additionally, the notice suggested that U.S.-based petitioners *could* misrepresent or falsely claim familial ties, or that relationships might change between the time a form I-130 is filed and the grant of parole (e.g. where spouses decide to divorce). Id.

This suggestion of minimal supporter vetting ignores the extensive vetting of supporters by USCIS, as required under the FRP programs prior to the issuance of travel documents for the beneficiary. DHS fails to take into account as to USCIS's vetting: (1) the petitioner (a U.S. citizen or lawful permanent resident) had to initiate the visa process for their family member through a Form I-130; (2) only after USCIS approved that petition, and with consideration of numerous factors, including when an immigrant visa would be available, would an invitation be sent by USCIS to the petitioner; (3) the petitioner was required to then submit a Form I-134A and evidence establishing their income, assets, and family relations; and (4) USCIS would then conduct a background check on the petitioner before allowing the parole beneficiary to create an

online account so that USCIS could confirm the beneficiary's eligibility. See, e.g., Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. at 43598. The Federal Register Notice is silent as to this additional vetting of supporters.

As for the parole applicants themselves, the Federal Register Notice highlighted various factors that could increase the risk of fraud. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58035. First, it noted that DHS would not collect certain biometric data or conduct an interview before a beneficiary's arrival in the U.S. Id. The Notice further explained that adjudicators could also miss key indicators of fraud and that beneficiaries from countries with "weak civil registry systems" could submit fraudulent documents. Id. The Notice asserted that requiring interviews and "having in-country experts familiar with local documentation" could help prevent such instances of possible fraud. Id.

Plaintiffs suggest that the Secretary's security concerns with respect to insufficient vetting do not bear a rational relation to the termination of grants of parole. Pls.' Reply 13 [Doc. No. 253]. Specifically, Plaintiffs note that even if there were insufficient vetting concerns, this concern would have been salient when parole recipients first arrived 12 to 28 months ago. Id. Plaintiffs contend that now

> every class member has been interviewed in person (at least once), had their biometrics collected, undergone further vetting if they applied for other benefits (such as work authorization), and lived in the United States without incident. Secretary Noem offers no explanation for why the timing of their initial interview and biometrics collection—when they arrived at the port of entry rather than before—creates any ongoing security concern.

Id. (emphasis omitted).

The court agrees in part with Plaintiffs' argument. Plaintiffs are not challenging the termination of the FRP programs. Plaintiffs are challenging the termination of grants of parole held by individuals already in the United States. The Notice alleged various concerns

surrounding how beneficiaries may perpetuate fraud. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58035. It also presented possible solutions to these concerns, such as requiring applicants to interview and submit biometrics while abroad. Id. Yet, as noted, at no point did the Federal Register Notice or the Administrative Record suggest that fraud has occurred involving the affected parolees. That Plaintiffs have since been further vetted is not directly relevant. More relevant is that the Notice identified potential concerns with vetting generally and then relied on these concerns to look backwards and justify the termination of grants that have already been awarded, without ever presenting tangible evidence that individuals currently holding grants of parole were responsible for fraud. See Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58035.

Finally, the Secretary's security justification fails on another, related, ground. The Federal Register Notice specifies that the agency's national security concerns specifically apply to the modernized FRP programs. Id. ("Given these critical differences, the procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety."). At the same time, the Federal Register Notice acknowledged that "processing of applications that were pending under legacy CFRP continued according to the process established in December 2014." Id. at 58033 n.2. And the Notice reported "USCIS continued to interview pending legacy CFRP beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was paused." Id. at 58035 n.14.[11] Despite recognizing that the concerns raised regarding the modernized

[11] The Legacy Haitian Family Reunification Parole program also required interviews. See Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58035 ("In the legacy

programs did not apply to the legacy programs, the Federal Register Notice nonetheless announced termination for legacy parolees in their initial grant of parole. Id. at 58033.

In sum, Plaintiffs have demonstrated a strong likelihood that they will prevail on their claim that the termination of existing awards of parole was arbitrary and capricious because DHS both improperly weighed Plaintiffs' reliance interests and used unsupported allegations regarding insufficient vetting and fraud of current parolees as countervailing factors.

C. *Notice-and-Comment Rulemaking*

Plaintiffs argue further that the "mass truncation" of existing FRP grants was a legislative rule that required notice-and-comment rulemaking under the APA. Pls.' Mem. 18 [Doc. No. 218] (citing 5 U.S.C. § 553(b)).[12] They contend that, where the termination of existing FRP grants "binds both the agency and the public" and "impos[es] new obligations where none previously existed," the termination was necessarily a legislative rule for which DHS was required to undertake notice-and-comment rulemaking. Id. at 18–19. Defendants respond that the decision to terminate parole grants was not a rule, but a policy statement exempt from the notice-and-comment requirement, where it neither imposes any rights or obligations nor binds the agency in light of "the discretion the notice expressly preserves." Defs.' Opp'n 22–23 [Doc. No. 251].

As relevant here, "general statements of policy" are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Lincoln v. Vigil, 508 U.S. 182, 197 (1993) (quoting Chrysler Corp. v.

CFRP program and legacy HFRP program, interviews provided an opportunity to gather additional information about the beneficiary and identify any discrepancies between their application and their in-person statements, as well as to surface any other potential concerns through their testimony.").

[12] Plaintiffs do not argue that notice-and-comment rulemaking was required for the termination of the FRP processes themselves. Pls.' Mem. 19 n.23 [Doc. No. 218].

Brown, 441 U.S. 281, 302 n.31 (1979)) (emphases added). Whether an agency has issued a policy statement or a legislative rule is an inquiry "enshrouded in considerable smog." Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs, 552 F. Supp. 2d 97, 120 n.27 (D.N.H. 2008) (quoting Community Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987)); see Lincoln, 508 U.S. at 197 ("Whatever else may be considered a general statement of policy, the term surely includes an announcement . . . that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation." (cleaned up)). Nevertheless, a key distinction between the two is whether "an agency has issued a binding norm[.]" Wilderness Soc'y v. Norton, 484 F.3d 584, 595 (D.C. Cir. 2006); see Northwest Bypass Grp., 552 F. Supp. 2d at 120; Conservation L. Found. of New England, Inc. v. Harper, 587 F. Supp. 357, 368 (D. Mass. 1984) (documents issued by Department of Interior and Department of Agriculture not properly categorized as general policy statements where they may have "establish[ed] binding norms effectively supplanting administrative discretion"). A critical issue, then, is whether the statement has "genuinely left the agency and its decisionmakers free to exercise discretion." Northwest Bypass Grp., 552 F. Supp. 2d at 120 (quoting CropLife Am. v. EPA, 329 F.3d 876, 883 (D.C. Cir. 2003) (cleaned up)); see also Wilderness Soc'y, 484 F.3d at 595 (considering whether the action has binding effects on private parties or on the agency). Where the categorization of agency action as a legislative rule or policy statement largely turns on whether the agency action is binding or permits the exercise of discretion, see CropLife Am., 329 F.3d at 883 and General Elec. Co. v. EPA, 290 F.3d 377, 383–85 (D.C. Cir. 2002), the court focuses the inquiry there.

"[I]f a statement denies the decisionmaker discretion in the area of its coverage, so that [the agency] will automatically decline to entertain challenges to the statement's position, then

the statement is binding, and creates rights or obligations." General Elec. Co., 290 F.3d at 382 (quotation omitted). Here, the Federal Register Notice emphasizes the termination of all grants of parole under the FRP Programs. See, e.g., 90 Fed. Reg. at 58043 ("DHS has determined that . . . the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date."). Nonetheless, the Notice also explicitly references the Secretary's continuing discretion to determine "on a case-by-case basis" whether to keep an affected noncitizen's parole status in place. See id. ("There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I-485[13] before December 15, 2025 that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis."); see also id. at 58043 n.90 ("[A]liens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I-131"); id. at 58043 ("[W]ith respect to re-parole requests filed by aliens who were initially paroled under one of the FRP programs. . . . [t]he alien still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole[.]"); id. at 58047 ("As of the date of this notice Form I–131 may not be used to request an initial or new period of parole under one of the FRP programs, but it may be used by a previous FRP beneficiary to request a new period of parole, or re-parole, under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.").

[13] A Form I-485 is an Application to Register Permanent Residence or Adjust Status and is used to apply for lawful permanent residency (a "green card").

Accepting that discretionary review prior to *en masse* termination of FRP parole grants is in fact available as the Federal Register Notice asserts, the Federal Register Notice is a policy statement for purposes of notice-and-comment that does not interfere with, change, or augment the statutorily discretionary nature of the parole revocation. See Chrysler Corp., 441 U.S. at 302 (whether an agency rule is one "affecting individual rights and obligations" is "an important touchstone for distinguishing those rules that may be 'binding'"); see also CropLife Am., 329 F.3d at 883 ("little doubt" that an agency directive bound private parties and agency with the force of law where it "clearly establishe[d] a substantive rule declaring that third-party human studies are now deemed immaterial in" regulatory decision-making under two statutory schemes); General Elec. Co., 290 F.3d at 385 (an EPA guidance document "impose[d] binding obligations upon applicants to submit applications that conform to the Document and upon the Agency not to question an applicant's use of [a particular toxicity factor]"); Conservation L. Found., 567 F. Supp. at 367–68 (documents describing agencies' "departmental procedures for inventorying, selling or otherwise disposing of federal properties according to the Property Review Board's program" potentially binding where they may "effectively supplant[] administrative discretion" in this area of agency action).

In sum, the court finds that Plaintiffs have not demonstrated a substantial likelihood of success on their claim that notice-and-comment was required prior to the *en masse* termination of FRP parole grants.[14]

---

[14] The court notes, however, that, contrary to the assurances that a noncitizen's parole "will not terminate" if the Secretary exercises her discretion otherwise, and the further assurance that parolees may "continue to be able to apply for re-parole on a case-by-case basis by filing a Form I-131," the electronic notice sent on January 5, 2026, made no mention of this discretionary process. See Kernochan Decl. at ECF 7 [Doc. No. 250-1]. Instead, the notice is captioned "Termination of Parole" and states, without exception, that DHS "is terminating your parole by

D. *Notice*

Plaintiffs contend that DHS failed to give proper notice of termination, and that this failure violated both DHS regulation and constitutional due process requirements. Here, Plaintiffs have demonstrated a substantial likelihood of success on their claims.

1. DHS Regulations

Under DHS regulations, "[p]arole shall be automatically terminated without written notice" in two circumstances only: (1) upon the noncitizen's departure from the United States; and (2) at the expiration of the time for which parole was authorized. 8 C.F.R. § 212.5(e)(1). In all other circumstances, parole may only "be terminated upon written notice to the alien[.]" See 8 C.F.R. § 212.5(e)(2)(i). Defendants do not dispute that the "written notice" requirement applies here. See 90 Fed. Reg. at 58043 n.89 (citing 8 C.F.R. § 212.5(e)(2)).

a. Notice by Publication

Defendants contend that Federal Register publication serves as "constructive notice" to the parolees, sufficient for termination of their parole. 90 Fed. Reg. at 58045; Defs.' Opp'n 17–20 [Doc. No. 251]. But publication in the Federal Register does not directly communicate the grant termination to the parolee. And, contrary to Defendants' interpretation, the regulation does not allow for constructive notice.

Defendants rely on 44 U.S.C. § 1507, which states in part that filing of a document with the Office of the Federal Register, with a copy available for public inspection, "is sufficient to

---

issuing this Notice of Termination of Parole." Id. The electronic notice states further that "[y]our parole will terminate upon the earlier of (1) your original parole expiration date or (2) January 14, 2026." Id. (emphasis added). If DHS continues to use notices in this form, without reference to the purported re-parole process as an exception to the termination, Plaintiffs may renew their argument that notice-and-comment is required.

give notice of the contents of the document to a person subject to or affected by it." Id. However, that provision includes two significant caveats: (1) "[u]nless otherwise specifically provided by statute," and (2) "except in cases where notice by publication is insufficient in law." Id. The court finds that a plain reading of the pertinent DHS regulation renders the latter caveat applicable; notice by publication "is insufficient," id., where the law requires "written notice to" the parolee. 8 C.F.R. § 212.5(e)(2)(i).

Defendants cite inapposite caselaw in support of their assertion that notice by publication suffices in this case. See Defs.' Opp'n 18 [Doc. No. 233] (citing Bank of Com. v. Bd. of Governors of Fed. Reserve Sys., 513 F.2d 164 (10th Cir. 1975)). The Tenth Circuit found that bank charter applicants, who were not directly involved in the proceeding and claimed no direct deprivation of property, had notice via publication that a competitor's application was to be filed because, inter alia, the applicants were represented by competent counsel and knew that notices of such applications were published in the Federal Register. Id. at 167. Moreover, no applicable statute or regulation required notice to competitors, and instead, the Board's regulations required publication in the Federal Register. Id. at n.4. Notably, the court explicitly stated, "We do not say that notice by publication in the Federal Register would be sufficient in all cases." Id. at 167.

This court finds notice by publication insufficient here. Where a plain reading of 8 C.F.R. § 212.5(e)(2)(i) requires that DHS provide "written notice to" parolees whose grant is being terminated, those parolees are being deprived of far more than property, they are not sophisticated business entities, and they have no reason to anticipate that the parole termination would occur through the Federal Register, notice by publication cannot suffice. Accord Camp v. U.S. Bureau of Land Mgmt., 183 F.3d 1141, 1145 (9th Cir. 1999) (notice by publication was

"insufficient in law" because the BLM had an "independent legal duty" to provide personal notice to adjoining landowner of land exchange under federal regulations).

b. Individual Notices

In the Federal Register Notice, DHS described its intention to notify parolees in the modernized FRP Programs of the termination through their online myUSCIS accounts. 90 Fed. Reg. at 58045; Kernochan Decl. ¶ 12 [Doc. No. 250-1] (parolee applicants "were required to create a myUSCIS online account in order to participate in the [modernized] FRP process."). For the legacy FRP program parolees, DHS stated that it intended to notify that group by mail. 90 Fed. Reg. at 58045.

Although the Federal Register Notice was issued on December 15, 2025, giving a termination date of January 14, 2026, by the end of December, when Plaintiffs filed their emergency motion, no electronic or mail notice had yet issued to the parolees. See Kernochan Decl. ¶¶ 15–16, 18–19.

Instead, on January 5, 2026, after Plaintiffs sought emergency relief, DHS sent electronic notices to a portion of the affected parolees. Kernochan Decl. ¶ 15 [Doc. No. 250-1] ("Of the 7,776 FRP parolees who were identified to have their parole terminated under the terms of the Federal Register Notice, 3,501 terminations were pushed out to FRP parolees' myUSCIS accounts."). Accordingly, even at that late date, DHS sent emails to a little less than half of the affected parolees, "notifying them to check their case on their my USCIS account[;]" after logging onto their accounts, the parolees would be able to view the electronic termination notice. Id. at ¶ 14.

As noted above, the electronic notices announced a firm decision, effective just days away, and made no mention of the Secretary's discretionary review. Id. at ECF 7 (Electronic Termination Notice, dated Jan. 5, 2026). The electronic notices also informed the recipient FRP

parolees that their work authorizations would be revoked as of January 14, 2026, the same date as the effective FRP Programs termination. Id. DHS regulations require that beneficiaries receive fifteen days' notice prior to the revocation of their work authorization. 8 C.F.R. § 274a.14(b)(2). Pursuant to the January 5, 2026 electronic notices (which only a portion of parolees received), DHS only provided nine days' notice. See Kernochan Decl. at ECF 7 [Doc. No. 250-1] ("your unexpired parole-based employment authorization will be revoked as of January 14, 2026"). Thus, the affected parolees did not receive proper notice of the revocation of their work authorizations. See id.; 8 C.F.R. § 274a.14(b)(2).[15]

Roughly half of the affected parolees did not receive any type of actual notice, let alone the faulty January 5 electronic notice. DHS failed to send electronic notices to over four thousand FRP parolees who had online accounts. Id. ¶ 16. DHS also failed to mail written notices to the legacy FRP parolees, despite stating in the Federal Register Notice that such written notices would be mailed to them. Id. ¶ 18. In sum, DHS's attempt to comply with the regulation's "written notice" requirement failed. 8 C.F.R. § 212.5(e)(2)(i). Less than a quarter of the affected FRP parolees viewed any type of written notice, and those that did viewed a notice with faulty information, Kernochan Decl. ¶¶ 17, 20 [Doc. No. 250-1], in contravention of DHS's regulations, see 8 C.F.R. §§ 212.5(e)(2)(i); 274a.14(b)(2), and without notice of the discretionary re-parole specified in the Federal Register Notice. See 90 Fed. Reg. at 58043.

[15] DHS states that the January 14 date for the revocation of employment authorization was a "typo" and that DHS intended to list the date as January 20. Kernochan Decl. ¶ 20 [Doc. No. 250-1]. That assertion is not credible, as it would mean that DHS intended to terminate employment authorization based on parole status five days after parole had already expired, an untenable outcome.

Therefore, the court finds that Plaintiffs have a high likelihood of success on showing that Defendants did not provide the FRP parolees with written notice of the termination, as required by regulation. The court acknowledges that Defendants have represented that, should the court's stay be lifted, "USCIS intends to provide new individualized notice to affected parolees 30 days in advance of the termination of their parole grants, which should remedy the Court's concerns regarding notice." Defs.' Opp'n 2 [Doc. 251].[16] The parties are welcome to update the court as to any supplemental notice issued to the parolees. At present, the court finds that proper notice was not provided.

2. Due Process

Plaintiffs also are likely to prevail on their claim that Defendants' failure to provide written notice of the grant terminations violated the FRP parolees' due process rights. See A.A.R.P. v. Trump, 605 U.S. 91, 94 (2025) (the Fifth Amendment's Due Process Clause extends to all persons in the United States, regardless of status). When USCIS invited the FRP parolees to submit their I-130 Petitions and move to this country, and DHS granted them multi-year terms of parole, the parolees had reasonable expectations that they would be entitled to retain their

---

[16] The court notes that, contrary to Defendants' representation, the USCIS website currently includes no such assurance of a 30-day notice period. Referring to the court's Temporary Restraining Order [Doc. No. 243], a December 12, 2025 press release states:

> The stay will be in effect until Jan. 24, 2026, which means that the parole and corresponding employment authorization of those who are affected by the parole revocation will not terminate before Jan. 25, 2026. USCIS vehemently disagrees with and continues to contest the court's order but we will follow the terms of the order pending further actions by the court.

USCIS, DHS ENDS THE ABUSE OF THE HUMANITARIAN PAROLE PROCESS AND TERMINATES FAMILY REUNIFICATION PAROLE PROGRAMS, https://www.uscis.gov/newsroom/alerts/dhs-ends-the-abuse-of-the-humanitarian-parole-process-and-terminates-family-reunification-parole (last visited Jan. 24, 2026).

liberty pursuant to some additional quantum of process. See Perry v. Sindermann, 408 U.S. 593, 601–03 (1972) (finding reliance on governmental representations may establish a legitimate claim of entitlement to a constitutionally-protected interest).

Defendants maintain that notice by publication satisfies due process requirements, see Defs.' Opp'n 20–21 [Doc. No. 251], but the court finds it highly unlikely that any parolees were made aware of their grant terminations by a Federal Register Notice.[17]

Defendants cannot render the FRP parolees' presence in the United States unlawful without minimally informing the parolees of such a decision. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 318 (1950) (The Constitution requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action[.]"). Due process demands that DHS provide parolees with individualized and meaningful notice. See Morrissey v. Brewer, 408 U.S. 471, 481–82 (1972) (a parolee's "liberty is valuable and must be seen as within the protection of" due process). That notice is particularly critical here where Defendants defend the termination of existing grants of parole on the ground that exceptions to termination may be made in the Secretary's case-by-case discretion. See Defs.' Opp'n 23 [Doc. No. 251]; 90 Fed. Reg. at 58033. Also of crucial importance, Plaintiffs, in many cases, have waited for more than a decade for an immigrant visa, see Francisca Doe Decl. ¶ 7 [Doc. No. 214-3], and may forfeit that opportunity if they remain in this country after being stripped of their parole, and concomitant legal status, without notice. See supra Sections V.B.2.a ("Plaintiffs' Reliance Interests), infra VI ("Irreparable Harm").

---

[17] Cf. California ex rel. Lockyer v. F.E.R.C., 329 F.3d 700, 707–11 (9th Cir. 2003) (notice by publication sufficient for "a public utility that participates in a heavily regulated industry" and non-violative of 5th Amendment rights).

## VI. Irreparable Harm[18]

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005). "[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). "[T]he issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis omitted). And "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (emphasis omitted).

Here, Defendants contend that Plaintiffs have not established a likelihood of irreparable harm where Plaintiffs and the class "are aware that parole is a discretionary benefit, terminable at any time[,]" were "at no point" guaranteed parole or re-parole, and are not necessarily foreclosed from alternative paths to remaining in the country. Defs.' Opp'n 24–25 [Doc. No. 251]; see id. at 25 (arguing that litigants "may apply for another period of parole" or "pursue a family-based immigrant visa from abroad" and stating that "those parolees whose adjustment applications have been or will be denied . . . when the TRO expires[] lack any argument to remain in the United States").

[18] Defendants argue irreparable harm, balance of the equities, and the public interest together. See Defs.' Opp'n 23–25 [Doc. No. 251].

But Defendants do not meaningfully engage with the significant real-world harms identified by Plaintiffs. Centrally, Plaintiffs, many of whom left jobs or school and sold their homes, cars and other possessions, came to the United States to reunite with their family members, pursuant to a program to which the government invited them to apply. See Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58034, 58041–42. They are now faced with two injurious choices should the Secretary's Federal Register Notice take effect: (1) separate from those families, communities, and jobs, leave the United States, potentially abandon or moot their APA claims challenging the Notice, and return to countries in which they no longer have homes and jobs; or (2) remain in the United States, begin accruing unlawful presence here, and risk consequences ranging from detention and removal, forfeiture of their priority date for an immigrant visa, to multi-year bans[19] on readmission. See, e.g., David Doe Decl. ¶ 17 [Doc. No. 214-2] ("If we [Doe, his wife, and two sons] had to leave, I would have to give up my job, and we do not have jobs or possessions to return to in Ecuador, which will make it hard to ensure we can provide for our family consistently."); id. ("We would have to return to a situation in Ecuador that is not stable or safe for our family."); Francisca Doe Decl. ¶¶ 7, 16 [Doc. No. 214-3] (attesting to frequent gang threats faced by parolee and her children in their native country and stating that "going back would mean returning to the same economic hardships and threats to our safety that we had escaped before."); Jose Doe Decl. ¶ 18 [Doc. No. 214-5] ("We have nothing to go back to in Honduras. No car, no roof, no bed."). The harm

[19] See 8 U.S.C. § 1182(a)(9)(B)(i)(I) (noncitizens who voluntarily depart after accruing more than six months but less than one year of unlawful presence are barred from admission for three years); id. § 1182(a)(9)(B)(i)(II) (noncitizens who voluntarily depart or are removed after accruing one year or more of unlawful presence are barred from admission for ten years).

flowing to Plaintiffs is thus significant, immediate, and very likely impossible to rectify through final relief that may come at an indeterminate future point.

Accordingly, the court finds that Plaintiffs have sufficiently demonstrated that irreparable harm is likely to occur should the court deny Plaintiffs' Motion for preliminary relief [Doc. No. 216].

**VII. Balance of Equities and the Public Interest**

The balance of equities and public interest factors "'merge when the [g]overnment is the opposing party.'" Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)) (alteration in original).

Plaintiffs point to "the concrete and irreparable injury facing Plaintiffs and other FRP parolees, as well as their U.S. citizen and LPR families," described supra, as support for their position that the balance of equities and the public interest weigh in favor of preliminary injunctive relief. Pls.' Mem. 20 [Doc. No. 218]. Defendants assert, inter alia, that the nation "suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating the President's policies" and that preliminary injunctive relief would constitute "'unwarranted judicial interference in the conduct of foreign policy'" (quoting Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 116 (2013)); injure the "Legislative Branch's prerogatives" by "bypass[ing] a judicial-review bar"; "improperly encroach[] on the core Executive function of managing the immigration system"; and unnecessarily consume DHS resources with individual parole terminations while delaying the agency's "ability to address the national security and public safety concerns that animated, in part, the Secretary's decisions to terminate parole grants." Defs.' Opp'n 23–24 [Doc. No. 251].

The Secretary, and the Executive Branch more broadly, possess significant discretion in the administration of this country's immigration system. See Trump v. Hawaii, 585 U.S. 667,

702 (2018) ("[T]he admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (quotation omitted)). And, as Defendants rightly emphasize, the Secretary's discretion in the particular area of immigration law with which this case is concerned—the grant or termination of parole—is made plain in the statutory language. See 8 U.S.C. § 1182(d)(5). The court's order here does not restrain that discretion writ large—if the Secretary choses to prioritize "enforcement-based priorities" over reunification of law-abiding family members, that certainly falls within her discretion. But the court must also weigh the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." New York v. McMahon, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) (quoting League of Women Voters of the United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)).

The court further considers the limited nature of the relief contemplated in this order. Preliminary relief in this instance does not authorize the entry of any individual or class of individuals into the United States, compel the Secretary to alter criteria for the admission of individuals into the United States, or extend or re-issue the FRP grants of parole at issue. Instead, the court's order would only maintain the status quo: noncitizens living in the United States under FRP grants of parole that have not yet expired would continue to live in this country with legal status, just as they would have absent the Secretary's procedurally defective FRP Federal Register Notice. Nor does the court's order prohibit early termination of FRP grants of parole following an administrative process that fairly weighs reliance interests, avoids unsubstantiated fraud allegations, provides proper notice of changes, and allows time for the Secretary's discretionary review before such termination.

Accordingly, the court finds the balance of equities and public interest weigh in favor of preliminary relief.

## VIII. Defendants' Bond Request

Defendants request that, should the court grant "temporary injunctive relief," it should impose a bond on Plaintiffs pursuant to Federal Rule of Civil Procedure 65(c). Defs.' Opp'n 25 [Doc. No. 251].

Under Rule 65(c), the court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The First Circuit has noted the "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991).

The court considers the damages and costs Defendants would incur if they were wrongfully enjoined. Defendants indicate that "[a] stay by the district court would force DHS to individually terminate each grant of parole, costing the agency time and resources[.]" Defs.' Opp'n 24 [Doc. No. 251]. But Defendants do not state such costs with specificity and, in any event, the objection contradicts Defendants' repeated statements that the Secretary retains discretion as to individual parole decisions. Nor do Defendants explain what, if any, monetary damages they will sustain should it later be determined that the court erred in granting Plaintiffs' motion. See, e.g., Liu v. Noem, 780 F. Supp. 3d 386, 405 (D.N.H. 2025) (waiving bond requirement where defendants requested that plaintiff post bond but did not "request a specific amount," "explain any costs they will incur by complying with the preliminary injunction," or

describe "any damages they will have sustained" if the preliminary injunction was later found to be erroneous).

Where Defendants have not sufficiently demonstrated the loss they will purportedly incur, and where the court finds that the imposition of a bond would pose a substantial hardship and unduly burden Plaintiffs' ability to seek to enforce their procedural rights, the court waives the bond requirement under Rule 65(c). See Crowley v. Local No. 82, Furniture and Piano Moving, 679 F.2d 978, 1000 (1st Cir. 1982) ("[I]n non-commercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant[,]" and "[s]econd, in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right[.]").

## IX. Conclusion

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc. No. 216] is GRANTED as follows:

The Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025) is hereby preliminarily ENJOINED under Fed. R. Civ. P. 65 and STAYED pursuant to 5 U.S.C. § 705 insofar as it terminates previously granted parole and revokes work authorization issued to noncitizens paroled into the United States pursuant to the FRP Programs prior to the noncitizens' originally stated parole expiration dates.

IT IS SO ORDERED.

January 24, 2026

/s/ Indira Talwani
United States District Judge

national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3).[25] Accordingly, the termination of the Ethiopia Temporary Protected Status designation will be effective 60 days from this notice's publication date.[26]

DHS recognizes that Ethiopian Temporary Protected Status beneficiaries continue to be authorized to work during the 60-day transition period.[27] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain Employment Authorization Documents previously issued under the Temporary Protected Status designation of Ethiopia through February 13, 2026. Therefore, as proof of continued employment authorization through February 13, 2026, Temporary Protected Status beneficiaries can show their Employment Authorization Documents that have the notation A–12 or C–19 under Category and a ''Card Expires'' dates of June 12, 2024 and December 12, 2025.

The Secretary has considered putative reliance interests in the Ethiopia Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

**Notice of the Termination of the Temporary Protected Status Designation of Ethiopia**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Ethiopia; (b) whether permitting the nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) to remain temporarily in the United States is contrary to the national interest of the United States; (c) whether Ethiopia is experiencing ongoing armed conflict that poses a serious threat to the personal safety of Ethiopian nationals, and (d) whether extraordinary and temporary conditions in Ethiopia that prevent Ethiopian nationals from returning in safety continue to exist. Based on my review, I have determined that Ethiopia no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(A) or (C), 8 U.S.C. 1254a(b)(1)(A) or (C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Ethiopia for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on February 13, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov.*

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–22746 Filed 12–12–25; 8:45 am]

**BILLING CODE 9111–97–P**

[25] Whether to allow for an additional ''orderly departure'' period following a Temporary Protected Status designation termination (beyond the statutory minimum of 60 days) is an ''option'' left to the Secretary's unfettered discretion. INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Although DHS has allowed such extended periods for certain Temporary Protected Status terminations, *see, e.g., Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (6-month orderly transition period), certain other Temporary Protected Status designations were terminated without allowing for such transition periods, *see, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (same).

[26] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

[27] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2806–25]**

**RIN 1615–ZC12**

### Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (''DHS'') is terminating the categorical parole processes for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole processes announced, or updated, by DHS in 2023 (hereinafter referred to as ''modernized FRP programs''). DHS is also terminating the residual processing of legacy cases under the Cuban Family Reunification Parole program (''legacy CFRP'') and the Haitian Family Reunification Parole program (''legacy HFRP'') first implemented by USCIS in 2007 and 2014, respectively (collectively, the ''legacy FRP programs''). This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of all nine programs (hereinafter ''the FRP programs''), termination of parole for aliens paroled under the FRP programs, and revocation of employment authorization based on being an alien paroled under the FRP programs.

**DATES:** DHS is terminating the FRP programs as of December 15, 2025. The temporary parole period of aliens who have been paroled into the United States under the FRP programs, and whose initial period of parole has not already expired by January 14, 2026 will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485, Application to Register Permanent Residence or Adjust Status, that is postmarked or electronically filed as of December 15, 2025 that is still pending adjudication as of December

15, 2025; or (2) the Secretary of Homeland Security (''the Secretary'') determines otherwise on a case-by-case basis. Aliens without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS implemented updates to the modernized FRP programs.[1] The modernized FRP programs were available by invitation only to certain petitioners with approved Forms I–130, Petition for Alien Relative, filed on behalf of principal beneficiaries who were nationals of designated countries and their immediate family members. DHS also updated the legacy FRP programs to align with the procedures used for the modernized FRP programs.[2] Under the modernized FRP programs, qualified beneficiaries who were outside the United States could be considered, on a case-by-case basis, for advanced authorization to travel to the United States to seek a temporary period of parole for urgent humanitarian reasons or significant public benefit. Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); [3] Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).[4]

On January 20, 2025, President Trump issued Executive Order (''E.O.'') 14165, ''Securing Our Borders.'' [5] Section 2 of the E.O. establishes the policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the E.O. directs the Secretary of Homeland Security (''Secretary'') to, consistent with applicable law, take all appropriate action to ''[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders.'' [6]

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the FRP programs. Although DHS established the categorical program for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the seven categorical programs was very similar,[7] as is the rationale for terminating them. Therefore, DHS is announcing the termination of all seven modernized FRP programs, in addition to any continued processing under the legacy FRP programs, by publishing this single notice in the **Federal Register**. Consistent with the Secretary's statutory and regulatory authority, the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date, subject to certain exceptions.

## II. DHS Parole Authority

The Immigration and Nationality Act (''INA'') confers upon the Secretary the narrow discretionary authority to parole aliens into the United States ''temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' INA 212(d)(5)(A); 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(a), (c)–(e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien shall ''return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the legislative history of the parole statute supports the contention that Congress has sought to limit the use of the parole authority to specific instances rather than as a means of circumventing established immigration laws or processing times.[8]

[1] The five new categorical parole programs implemented in 2023 for Colombia, Ecuador, El Salvador, Guatemala, and Honduras, and the two existing programs for Cuba and Haiti that were updated in August 2023, all utilize the online Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, to initiate the process of being considered for parole by DHS. Collectively, these seven Form I–134A-reliant programs will be referred to as the ''modernized FRP programs.'' The FRP programs created in 2007, for Cuba, and 2014, for Haiti, utilized Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, to request parole from USCIS. Collectively, these Form I–131-reliant programs will be referred to as the ''legacy FRP programs.'' All nine programs combined, both modernized and legacy, are referred to as the ''FRP programs.''

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007); Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014). These programs were superseded by the modernized processes implemented on August 11, 2023. No new filings were accepted for these programs after August 11, 2023, except for certain add-on derivative beneficiaries of principal beneficiaries with a pending legacy CFRP application. However, processing of applications that were pending under legacy CFRP continued according to the process established in December 2014. *See* Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014). Requests for re-parole have continued to be processed under legacy HFRP.

[3] *See* 72 FR 65588 (legacy CFRP was originally established in 2007 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed for new filings in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[4] *See* 79 FR 75581 (legacy HFRP was originally established in 2014 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[5] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[6] *Id.*

[7] *Compare, e.g.,* 88 FR at 43593–43596, *with* 88 FR at 78765–78768, 72 FR at 65588, and 79 FR at 75582 (setting out the justifications for the parole programs for Colombia, Ecuador, Cuba, and Haiti, respectively).

[8] Parole was codified into immigration law in the 1952 INA. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, ''the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.'' *Leng May Ma v Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress. For example, the House Report for the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (''IIRIRA'') stated:

[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who

Continued

Under the law, the determination to parole an alien into the country should only be made on a discretionary, case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a U.S. port of entry (''POE'') is made by U.S. Customs and Border Protection (''CBP'') officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the FRP programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11); *see also* One Big Beautiful Bill Act, Public Law 119–21, secs. 100003(b), 100010(a), 139 Stat 72, 366, 372 (July 4, 2025) (8 U.S.C. 1803(b), 1809(a)) (prescribing fees and specific validity periods for parole-based EADs). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an applicant for admission. *See* INA 212(d)(5)(A), 1182(d)(5)(A); *see also* 8 CFR 1.2 (''An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked.''), 1001.1(q) (same).

## III. Rationale for Termination

When DHS established the FRP programs, DHS wrote that the programs would provide a significant public benefit for the United States by: (i) promoting family unity; (ii) furthering important foreign policy objectives; (iii) providing a lawful pathway and timely alternative to unlawful migration at the southwest land border; (iv) reducing strain on limited U.S. resources; and (v) addressing the root causes of migration through economic stability and development supported by increased remittances.[9]

For the reasons discussed below, DHS has determined that it is now appropriate to terminate the FRP programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes.[10] These reasons, independently and cumulatively, support termination of the FRP programs.[11]

Accordingly, the Secretary, in her discretion, is terminating the FRP programs. Consistent with her statutory authority, the Secretary retains discretion to grant a new period of parole, also known as re-parole, to any alien who was paroled into the United States under the FRP programs, temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

### *1. Promote Family Unity*

According to the notices that announced their creation, the FRP programs were designed to provide a faster pathway for U.S. citizens and lawful permanent residents (LPRs) to reunite with family members in the United States while awaiting availability of their immigrant visas. The notices justified the action by stating that nationals of those countries often face long waits for immigrant visas before they can travel to the United States and apply for admission.[12]

DHS acknowledges that aliens paroled into the United States under the FRP programs may have been able to reunite with family members in the United States. However, upon further review of the scope and impact of the FRP programs in their totality, and in line with Executive Orders issued by President Trump, DHS has determined that national security and fraud concerns, and the current Administration's priorities outweigh those interests and weigh in favor of terminating the programs.

The modernized FRP programs, based on their specific procedures, created security gaps not present in other paths for family members pursuing LPR status, such as through consular processing. Through consular processing, potential beneficiaries chose to remain outside the United States until their immigrant visa priority dates are current. Once a visa is available based on their priority date, the potential beneficiary completes consular processing with the Department of State (''State''), including submission of biometrics, an in-person interview outside the United States, and submission of various documents to establish the necessary family relationship with the petitioner before a visa is issued. The use of biometrics for background and security checks as part of consular processing allows for robust public safety and national security vetting of the potential beneficiary before travel to the United States on a commercial air carrier is authorized and completed.

In contrast, under the modernized FRP programs, potential beneficiaries would travel to the United States to seek parole at a POE, and if paroled, they could then apply to adjust status to that of an LPR once their immigrant visa priority dates became current. Under these programs, DHS conducted minimal public safety and national security vetting of the supporters based on biographic information the supporter

---

do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

*See* H.R. Rep. 104–469, pt. 1, at 140 (1996). In IIRIRA, Congress struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, ''for emergent reasons or for reasons deemed strictly in the public interest'' as grounds for granting parole into the United States and inserted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' Public Law 104–208, div. C, § 602(a). ''The legislative history indicates that this change was animated by concern that parole under [INA 212(d)(5)(A)] was being used by the executive to circumvent congressionally established immigration policy.'' *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[9] *See, e.g.,* 88 FR at 43593–96; *see also* 72 FR 65588 (The legacy CFRP initial implementation notice in 2007 relied on family unification, discouragement of unlawful migration, and furtherance of the U.S.-Cuba Migration Accords as justifications); 79 FR at 75582 (The legacy HFRP initial implementation notice in 2014 relied on family unification and reconstruction and development assistance for Haiti through remittances).

[10] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''[W]hen the purposes of such parole shall, in the opinion of the [Secretary of Homeland Security], have been served the alien shall forthwith return or be returned to the custody from which he was paroled. . . .'').

[11] The FRP programs were promulgated under the theory that they would, in general, provide a significant public benefit to the United States. *See, e.g.,* 88 FR at 43613 (''The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy . . .''). Although the Secretary retained the authority to parole eligible aliens on a case-by-case basis based on ''urgent humanitarian reasons,'' the driving impetus for the creation of the FRP programs or attendant grants of parole was the significant public benefit justification. But for the significant public benefit justification, DHS would not have established the FRP programs.

[12] *See e.g.,* 88 FR at 43593–94; *see also* 72 FR at 65588; 79 FR at 75582.

provided on the Form I–134A. For example, DHS only vetted to ensure that the supporter was the named petitioner on the Form I–130 for the principal beneficiary and that supporters that were LPRs had not lost their LPR status, in addition to TECS [13] checks. Additionally, DHS conducted minimal public safety and national security vetting of potential beneficiaries by only reviewing biographic information and photos that each beneficiary provided before being considered for an advance travel authorization (ATA). Moreover, biometrics were not submitted by each potential beneficiary until they arrived at the interior POE to seek parole from CBP. Therefore, additional vetting, that could otherwise be completed as part of consular processing before travel is authorized, did not occur prior to issuance of an ATA or before the potential beneficiary boarded a plane to travel to the United States. Many of the security screening systems used by the U.S. government to evaluate applicants for immigration benefits rely on biometrics. Since beneficiaries were not fingerprinted before arriving at a U.S. POE, these checks could not be conducted beforehand to thoroughly vet the alien. Furthermore, beneficiaries under the modernized FRP programs were not interviewed by USCIS, unlike beneficiaries of the legacy FRP programs. In the legacy CFRP program and legacy HFRP program, interviews provided an opportunity to gather additional information about the beneficiary and identify any discrepancies between their application and their in-person statements, as well as to surface any other potential concerns through their testimony. However, these programs were replaced by the modernized FRP programs for Cuba and Haiti for prospective beneficiaries in 2023.[14]

Given these critical differences, the procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety.

The FRP programs also presented an unacceptable risk of abuse and fraud. When biometrics collection and interviews do not occur prior to a beneficiary's arrival in the U.S., the risk of fraud increases. U.S.-based petitioners may misrepresent family relationships (*e.g.,* falsely claiming a familial tie) to facilitate the entry of unauthorized aliens. Moreover, reliance solely on an approved Form I–130 does not guarantee the ongoing legitimacy of a relationship, particularly in cases involving spouses where circumstances may have changed since the petition was filed. Even with an approved Form I–130, adjudicators may have missed key indicators of fraud, and adding another layer of scrutiny, such as an interview, can be valuable in verifying eligibility. Additionally, beneficiaries from countries with weak civil registry systems may submit fraudulent documents (such as birth certificates or other identity documents) to support their claims. Having in-country experts, such as consular officers familiar with local documentation, can be critical in identifying and preventing document fraud during the visa process. The process of interviewing beneficiaries overseas and collecting their biometrics plays a critical role in preventing fraud and abuse of the immigration system—steps that were entirely bypassed under the modernized FRP programs. Accordingly, the FRP programs' lack of procedural and vetting guardrails created an unacceptable level of risk of fraud and abuse.

DHS has determined that the desire to reunite families before their priority dates are current does not outweigh the U.S. government's responsibility to prevent fraud and abuse of these programs and to uphold national security and public safety for the American people.

Moreover, the FRP programs no longer accord with the Administration's current enforcement-based priorities, namely to better ''achieve the total and efficient enforcement, including through lawful incentives and detention capabilities'' of U.S. immigration law.[15] The modernized FRP programs, initiatives of the prior administration, do not align with this Administration's emphasis on enforcing immigration law, deterring unlawful immigration, and eliminating fraud and abuse. Indeed, E.O. 14165, ''Securing Our Borders,'' embodies the priorities of this Administration and makes clear that ''all future parole determinations fully comply with [the order to terminate all categorical parole programs] and with applicable law.'' [16]

*2. Further Important Foreign Policy Objectives*

One of the stated goals of the modernized FRP programs established in July 2023 was to promote the foreign policy objectives of the prior administration.[17] Indeed, DHS explained consistently in its notices promulgating the FRP programs that implementation would advance the foreign policy objectives of the then-current administration.[18]

Furthermore, DHS established the legacy CFRP Program in 2007, and modernized it in August 2023, in part to further enable the United States to meet its commitment to ensure the lawful migration of a minimum of 20,000 Cubans each year under the U.S.-Cuba Migration Accords.[19] DHS also established the legacy HFRP Program in 2014 to support ''U.S. goals for Haiti's long-term reconstruction and development,'' [20] and modernized it in August 2023, in part because ''[i]mproving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues.'' [21] The foreign policy objectives underlying the FRP programs, however, are not consistent with those of the current Administration and may be achieved through other means.[22]

E.O. 14150, ''America First Policy Directive to the Secretary of State'', clearly sets out the President's vision that ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' [23] E.O. 14159, ''Protecting the American People Against Invasion'' states that ''[i]t is the policy of the United States to faithfully execute the immigration laws against all

[13] TECS, not an acronym, is a data system and platform owned by U.S. Customs and Border Protection (CBP). See *DHS/CBP/PIA–021 TECS System: Platform* for more information, available at *https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform* (last updated Apr. 10, 2025).

[14] While legacy CFRP and legacy HFRP programs were replaced by the modernized FRP programs for Cuba and Haiti in 2023, USCIS continued to interview pending legacy CFRP beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was paused.

[15] *See* E.O. 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025); *see also FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (''[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.'').

[16] *See* E.O. 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[17] *See, e.g.,* 88 FR at 43594.

[18] *See, e.g., Id.* (''[T]he parole of noncitizens, on a case-by-case basis, under [the FRP program for Colombians] will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.'').

[19] 72 FR 65588; 88 FR at 54640.

[20] 79 FR at 75582.

[21] 88 FR at 54639.

[22] U.S. commitments under the Cuban Migration Accords, for example, may be met through immigrant visa processing.

[23] *See* 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.'' [24]

To reiterate, E.O. 14165, ''Securing Our Borders'' states that DHS shall ''terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders.'' [25] In the same E.O., the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southwest border of the United States and ensure that, pending section 240 removal proceedings, aliens described in INA 235(b)(2)(C), 8 U.S.C. 1225(b)(2)(C), are returned to the territories from which they came.

The President has pursued the cooperation of foreign partners on migration issues in other ways as well. For instance:

• On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[26]

• On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[27]

• On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to ''do what's right'' in regard to illegal migration.[28]

• Since February 1, 2025, President Trump has issued several tariff-related executive orders in connection with the situation at the southwest border.[29]

• On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, with the plan to repatriate them to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[30]

• On May 19, 2025, a Department of State spokesperson announced steps ''to impose visa restrictions on owners, executives, and senior officials of travel agencies based and operating in India for knowingly facilitating illegal immigration to the United States.'' [31]

• Secretary Rubio had calls with Mexican Foreign Secretary de la Fuente on March 31, 2025,[32] May 30, 2025 [33] and July 2, 2025,[34] during which they discussed efforts to secure the U.S.-Mexico border, dismantle cartels, stop the flow of illicit drugs, firearms, and illegal aliens.

Multiple agencies of the U.S. government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[35] consistent with Secretary of State Rubio's January 22, 2025, announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[36] In that announcement, the Department of State made clear that it ''will no longer undertake any activities that facilitate or encourage mass migration'' and that ''[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants.'' [37] Additionally, pursuant to his authority under INA 219, 8 U.S.C. 1189, Secretary of State Rubio designated the gang Mara Salvatrucha (active in El Salvador, Guatemala, and Honduras, among other countries), along with other cartels and gangs, as Foreign Terrorist Organizations.[38] On May 5, 2025, Secretary Rubio also designated two Haitian criminal organizations, Viv Ansanm and Gran Grif, as designated Foreign Terrorist Organizations under INA 219, 8 U.S.C. 1189.[39]

The actions set forth in this notice complement and underscore the Administration's pivot to a foreign policy that prioritizes the United States' interests in reducing and deterring unlawful immigration. Regardless of whether the prior Administration saw the FRP programs as a component of a regional migration management strategy, the current Administration is not

[24] 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[25] *See* 90 FR 8467, 8468 (Jan. 20, 2025) (published Jan. 30, 2025).

[26] The White House, ''Readout of President Donald J. Trump's Call with President Nayib Bukele'' (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/.*

[27] The White House, ''Statement From the Press Secretary'' (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/.*

[28] Meryl Sebastian, ''Trump Says India 'Will Do What's Right' on Illegal Immigration,'' BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo.*

[29] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at our Southern Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Out Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[30] *Panama Receives First US Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration.*

[31] U.S. Department of State, Press Releases: Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States, May 19, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/visa-restrictions-on-travel-agencies-facilitating-illegal-immigration-to-the-united-states/.*

[32] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, March 31, 2025, *https://www.state.gov/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/.*

[33] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, May 30, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente/.*

[34] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, July 2, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/.*

[35] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) (''President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country.''), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/;* U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) (''Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap.''), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/.*

[36] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025), *https://www.state.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.*

[37] *Id.*

[38] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generación, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025); *see also* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[39] Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 FR 19065 (May 5, 2025).

pursuing that strategy given it is no longer consistent with current Administration's priorities. Rather, as described above, the current Administration continues to focus its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States.

These measures will allow DHS to better ''achieve the total and efficient enforcement'' of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[40] In short, the continued implementation of the FRP programs does not accord with the President's stated priorities and foreign policy objectives.

*3. Provide a Lawful Pathway and Timely Alternative to Unlawful Migration*

DHS intended for the FRP programs to provide a lawful, safe, and orderly alternative to unlawful migration to the United States as part of a regional migration management strategy developed by the prior Administration.[41] Because the INA allocates a certain number of immigrant visas each year, beneficiaries of approved Form I–130 petitions often face years-long waits before a visa becomes available. The prior Administration claimed that the FRP programs were designed to discourage unlawful migration during this period by offering a faster, lawful pathway for U.S. citizens and LPRs to reunite with family members while awaiting availability of immigrant visas.[42] These programs were specifically aimed at nationals of countries who often face especially long wait times for immigrant visas.[43] DHS now finds, as explained below, that the FRP programs did not adequately realize the goal of discouraging unlawful migration, as the confirmed beneficiaries of the FRP programs constitute a tiny fraction of the total population of aliens from the seven FRP countries that unlawfully attempted to enter the country during this time period.[44] Since the implementation of the modernized FRP programs beginning in July 2023 and the modernization of the legacy FRP programs, approximately 16,100 aliens have been granted parole under the FRP programs.[45] In contrast, CBP encounters of aliens from the seven FRP countries at and between POEs on the U.S. southwest land border totaled over 888,000 in FY2024.[46]

DHS acknowledges that some aliens who have been paroled into the United States under the FRP programs may have otherwise sought to enter unlawfully along the southwest border. However, upon review and further consideration of the number of aliens that were determined to be eligible to participate in the programs, the relatively small number who actually chose to participate, and other more recent measures that have dramatically reduced southwest border encounters, DHS has ultimately determined that the FRP programs did not meaningfully reduce unlawful migration at the southwest border and are not needed to achieve that goal. DHS ultimately determined that policy actions such as increasing interior enforcement actions, ramping up removals, building physical barriers along the border, and deploying advanced surveillance technology represent a more prudent approach to the short and long-term challenges presented at the southwest border.

The FRP programs required that a petitioner with an approved Form I–130, Petition for Alien Relative, first receive an invitation to submit a request to be a supporter on behalf of the principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. Generally, invitations were issued based on operational capacity and the period of time until the principal beneficiary's immigrant visa was expected to become available, among other factors. Considering the limitation on the number of aliens who have family-sponsored immigrant visas that are expected to become available within any given period, the number of invitations sent was minimal compared to the flow of aliens coming from the countries for which an FRP program existed.[47] Even if every one of the approximately 36,000 petitioners invited to participate in the modernized FRP programs had filed a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of each eligible beneficiary of the approved Form I–130, and all such Form I–134A requests were confirmed and the beneficiaries granted advance travel authorization by DHS, the number of beneficiaries who could have been paroled into the United States would still account for a fraction of the approximately 890,000 aliens from the FRP program countries who were encountered by CBP in Fiscal Year (FY) 2024. DHS did not intend for the FRP programs to, on their own, substantially decrease the number of encounters along the southwest border. The FRP programs were just one part of the previous administration's broader strategy of expanding access to lawful pathways to aliens who may otherwise travel to the United States as part of the unlawful migration flows at the southwest border.[48] In practice, at the time DHS paused processing under the FRP programs in late January 2025,[49] the participation rate for petitioners who had been invited to these programs was approximately 30%.[50] Overall, other policy actions represent a more prudent and effective path to addressing unlawful immigration generally and especially at the southwest border.

The decision to terminate discretionary and temporary parole programs like the FRP programs is further informed by the actions of the prior administration, which found the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans [51]

---

[40] *See* 90 FR 8443 (Jan. 29, 2025).

[41] *See, e.g.,* 88 FR at 43595.

[42] *See, e.g.,* 88 FR 78762, 88 FR 43591, 72 FR 65588.

[43] *Id.; see also* 72 FR 65588; 79 FR 75581.

[44] As of Feb. 18, 2025, the overall responsiveness rate to invitations sent under the modernized FRP programs was approximately 30% based on an internal USCIS analysis. This means that 70% of petitioners who received FRP invitations did not opt to participate in FRP programs and did not file an I–134A as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[45] The information provided here is based on analysis of internal data from U.S CBP tracking aliens paroled under the FRP programs performed in June 2025. CBP shows 14,069 aliens paroled under FRP class of admission (COAs) (Colombian Family Reunification Parole (RCO), Cuban Family Reunification Parole (RCU), Ecuadorian Family Reunification Parole (RED), Guatemalan Family Reunification Parole (RGT), Honduran Family Reunification Parole (RHN), Haitian Family Reunification Parole (RHT), and El Salvadoran Family Reunification Parole (RSV)) as of January 20, 2025. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025. USCIS estimates there are 1,852 aliens with valid parole under the legacy CFRP program and 108 aliens with valid parole under the legacy HFRP program as of April 2, 2025. *See* USCIS analysis of legacy FRP filings as of Apr. 2, 2025 [OHSS tabs 10 & 11].

[46] *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025) (filtered by Region (Southwest Land Border) and Citizenship (Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras)).

[47] In FY2024, CBP encounters of unlawful aliens on the U.S. southwest land border from the seven FRP countries totaled 888,023. *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025).

[48] *See, e.g.,* 88 FR at 43593.

[49] Email from Jennifer Higgins, Acting Director, USCIS (Jan. 23, 2025).

[50] Responsiveness rate is based on internal USCIS analysis whereby a total of 35,666 FRP invitations were issued over the life of the modernized FRP programs, and of those, a total of 10,608 invitees filed requests as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[51] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR

Continued

(''CHNV parole programs'') and FRP programs, even when paired with the *Circumvention of Lawful Pathways* rule, to be insufficient to address very high levels of illegal immigration.[52] For example, following the implementation of the FRP programs and the *Circumvention of Lawful Pathways* rule, DHS and the Department of Justice (''DOJ'') promulgated the *Securing the Border* rule[53] as an emergency measure to address ongoing high levels of unlawful immigration between the southwest border POEs.[54] DHS and DOJ then explained that ''at current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle.''[55] This conclusion—that DHS's ability to swiftly impose consequences for unlawful immigration ''continue[d] to be overwhelmed''[56]—followed more than a year of the *Circumvention of Lawful Pathways* framework, nearly a year of the modernized FRP programs, and two years of the CHNV parole programs, with the implementation of each being justified as facilitating operational control of the southwest border of the United States by discouraging unlawful immigration. The promulgation of the *Securing the Border* interim final rule in June 2024 underscored the stark failure of categorical parole programs, like the FRP programs and CHNV parole programs, as well as the *Circumvention of Lawful Pathways* rule to deliver on their promises. These policies not only fell short of enhancing border security but also failed to curb the persistent surge of unlawful immigration along the southwest border.

The *Securing the Border* framework[57] and implementation of President Trump's subsequent policies have resulted in a dramatic reduction in unlawful migration to the U.S. southwest border. For example, encounters between southwest border POEs decreased from an average of about 4,910 per day in the six months prior to the *Securing the Border* interim final rule to an average of 1,880 per day between June and December 2024.[58] Moreover, southwest border encounters have declined even more dramatically since President Trump took office on January 20, 2025, and issued a series of proclamations and orders designed to address the urgent situation at our borders, including Proclamation 10888, *Guaranteeing the States Protection Against Invasion,* 90 FR 8333 (Jan. 20, 2025) (published Jan. 29, 2025). Indeed, in the 161 days from January 21 through June 30, 2025, encounters between POEs averaged fewer than 290 per day, down from over 1,600 per day in the last 161 days of the prior administration, while encounters at POEs averaged about 120 per day, down from over 1,580 per day.[59] Accordingly, even assuming the FRP programs had any impact on reducing unlawful migration, the FRP programs are no longer needed due to reduction in southwest border encounters as a result of other, more effective, policies.

Ultimately, the FRP programs failed in their stated intention to sufficiently deter unlawful migration. A July 2024 report found that, prior to the implementation of the *Securing the Border* framework, ''in the first five months of the year [2024], CBP agents encountered more than nine hundred thousand migrants and asylum seekers at the U.S.-Mexico border. The majority hailed from just six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, in descending order.''[60] Despite the categorical parole programs that the previous administration put in place, four out of six of the nationalities with the highest entry numbers in the first half of 2024 had a dedicated FRP program.[61] The modernized FRP program for Haiti was implemented on August 11, 2023. CBP data indicates that in FY2022, 53,910 Haitian nationals were encountered at the Southwest border, in FY2023, 76,130 and in FY2024, 88,673.[62] This year-on-year substantial increase in encounters of Haitian nationals at the Southwest border show that the modernized FRP program for Haiti failed to slow the increase in unlawful migration to the Southwest border. This data reflects that the FRP programs did not noticeably decrease unlawful migration, or at the very least were not nearly as effective as other policies implemented at the same time to reduce unlawful migration.

When the modernized FRP programs were established, they were promoted as timely alternatives to unlawful migration and as tools to address the root causes of migration. However, it was not adequately recognized that the populations served by these programs were often fundamentally different from those undertaking unlawful migration. FRP beneficiaries had approved I–130 petitions and U.S.-based supporters who were LPRs or U.S. citizens, and thus had a lawful immigration pathway available to them, even if it involved a significant wait. In contrast, aliens arriving at the southwest border may lack U.S. family ties or access to any lawful immigration channel. It is therefore unlikely that someone with an existing legal pathway would risk compromising their eligibility by pursuing unlawful entry. Economic migrants and asylum seekers, on the other hand, may resort to appearing at the border regardless, due to the absence of viable legal alternatives. Perhaps most significantly, although the previous administration argued that the FRP programs would decrease unlawful migration, there is no data to support this argument. For example, the FRP program for Ecuadorians was implemented on November 16, 2023. CBP data indicates that in FY2022, 24,060 Ecuadorian nationals were encountered at the

13611 (Mar. 25, 2025). *See also* ''CBP Released December 2024 Monthly Update'', *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update* (last modified Jan. 14, 2025) (providing that over 531,000 aliens were granted parole under the CHNV parole programs).

[52] *See* Circumvention of Lawful Pathways 88 FR 31314 (May 16, 2023).

[53] *See* Securing the Border, Interim Final Rule, 89 FR 48710 (June 7, 2024); Securing the Border, Final Rule, 89 FR 81156 (Oct. 7, 2024).

[54] ''On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens].'' 89 FR at 81157–58.

[55] 89 FR at 48714.

[56] 89 FR at 48715.

[57] On May 9, 2025, a district court vacated and set aside the *Securing the Border* rule's limitation on asylum eligibility and manifestation of fear requirement but allowed the rule's ''reasonable probability'' standard to remain in effect. *See Las Americas Immigr. Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC,—F. Supp. 3d—, 2025 WL 1403811, at *21 (D.D.C. May 9, 2025).

[58] OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2].

[59] OHSS analysis of May 2025 OHSS Persist Dataset and CBP data downloaded from UIP on July 2, 2025 [OHSS tab 1].

[60] Council on Foreign Relations, ''Why Six Countries Account for Most Migrants at the U.S.-Mexico Border'' July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

[61] It should be noted that Venezuela, one of the six highest entry populations by nationality mentioned, also had a parole program which is not addressed in this FRN. The Venezuelan parole program, largely premised on the same justifications as those contained in the FRP parole programs, has been terminated in another notice. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 (Mar. 25, 2025).

[62] CBP, ''Nationwide Encounters'' Filtered for Region: Southwest Land Border, Citizenship: Haiti, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

Southwest border, in FY2023, 116,229 and in FY2024 122,072.[63] Petitioners with an approved Form I–130 filed for an alien abroad were invited to submit Form I–134A which served as a declaration of financial support. Neither petitioners nor beneficiaries were asked through a form or an interview prior to applying for admission at a POE in the U.S. whether they had any intention of attempting entry to the U.S. unlawfully as an alternative to waiting for consular processing in their countries. DHS believes, based on available data, that the FRP programs had no meaningful deterrent effect on nationals from these countries considering travel to the Southwest border. The programs do not appear to have influenced the number of attempted entries in any meaningful way. Moreover, any limited impact they may have had on reducing unlawful border encounters falls far short when compared to the effectiveness of other enforcement-focused policies implemented by the current administration.

The Department has determined that terminating the FRP programs will allow the Administration to adopt and implement more prudent, durable, and appropriate strategies that will lead to a sustainable reduction of encounters at the southwest border. The Department's objective of breaking the vicious cycle of unlawful immigration supports termination of the FRP programs along with the implementation of enforcement-based actions that are consistent with the policy objectives outlined in the new presidential directives calling for enhanced border security beyond the 2024 *Securing the Border* framework.[64]

*4. Reduce Strain on Limited U.S. Resources*

The FRP programs were designed with the goal of easing pressure on DHS resources and personnel by lowering the number of encounters at the Southwest border enough to offset the added processing and administrative burden; but that outcome never materialized. Instead, the programs failed to reduce encounters at the Southwest border and only added to DHS' workload. There was no reduction in burden with regards to detention, monitoring, processing, and removal of aliens for DHS personnel and resources, and, at the same time, there was an increased burden in for both CBP and USCIS components who processed these applications from receipt of Form I–134A to arrival at a U.S. POE.

As discussed in the previous section of this notice, the number of aliens who chose to participate in the FRP programs and who otherwise would have chosen to unlawfully migrate as an alternative option is too uncertain or limited towards meaningfully realizing the original justifications for their implementation and the current Administration's shift in policy focus to deter unlawful migration and achieve operational control of the southwest border.[65]

After a thorough review assessing the costs of implementing these programs, preliminary findings show that the programs have not met their stated goal of burden-reduction. On the contrary, these programs have led to an increased strain on DHS personnel and resources to process, review, and adjudicate parole requests, especially when considering the programs did not meaningfully result in any reduction of encounters at or between POEs.[66] For USCIS, there have been approximately 35,700 Form I–134A filed with USCIS under the modernized FRP programs since July 2023, which includes approximately 420 pending review, 19,500 confirmed by USCIS, and 15,450 non-confirmed by USCIS.[67] It has required significant USCIS resources to administer these parole programs. CBP has also expended considerable resources implementing the FRP programs. Under the modernized FRP programs, CBP has received 16,976 advance travel authorization (ATA) requests, including 1,987 pending review or CBP One submission, 13,983 approved by CBP, 975 denied by CBP, and 31 that expired after being approved.[68]

Due to the originating location of beneficiaries of the FRP programs and available travel routes via commercial air, approximately 70% of beneficiaries of these programs who were issued an ATA flew to Florida POEs.[69] With the addition of three POEs in Texas and New York City, these POEs in just three states account for nearly 85% of all arrivals of FRP beneficiaries requesting parole.[70] Processing an alien requesting parole under the modernized FRP programs requires secondary processing and enrollment of biometrics, resulting in a more extensive interaction with the alien and prolonged time in CBP facilities.

Although DHS, under the previous administration, argued that aliens who had been paroled into the U.S. may have otherwise sought to enter unlawfully along the southwest border, there is little to no evidence to support this argument. DHS has no way of determining whether aliens paroled into the U.S. under the respective FRP programs might have otherwise attempted to enter unlawfully, as they were never asked this question at any point, either before or after the programs were implemented. Instead, these aliens with lawful pathways available to them likely would have remained overseas while waiting for an immigrant visa to become available and then would have completed consular processing so they could be admitted to the United States as an LPR. Aliens in this portion of the population would have been processed by the Department of State if they had gone through consular processing. Under the FRP programs, DHS reassigned personnel from other caseloads to work on processing Forms I–134A, requests for ATAs, and for parole processing at interior POEs. Therefore, the FRP programs not only shifted the strain from the Department of State to DHS personnel, they also increased the overall strain on DHS

[63] CBP, ''Nationwide Encounters'' Filtered for Region: Southwest Land Border, Citizenship: Ecuador, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[64] As explained above, southwest border encounters decreased following implementation of the *Securing the Border* framework and complementary actions, and border encounters decreased even more dramatically following implementation of President Trump's policies. Another example of President Trump's policy directives include the Presidential Proclamation ''Guaranteeing the States Protection Against Invasion'' which suspends entry of aliens across the southwest border, imposes restrictions on entry for aliens, and suspends and restricts entry for aliens posing public health, safety, or national security risks. *See* Guaranteeing the States Protection Against Invasion, 90 FR 8333 (Jan. 29, 2025).

[65] 90 FR 8467, Sec. 2(g).

[66] See discussion above concerning drops in southwest land border encounters from the months of December 2024 to June 2025. DHS has determined, based on the available evidence, that other enforcement-based policies, including the *Circumvention of Lawful Pathways* and *Securing the Border* rules, proved more effective at reducing southwest land borders. OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2]; OHSS analysis of May 2025 OHSS Persist Dataset [OHSS tab 1].

[67] Data pulled from internal DHS reports on parole processing [OHSS tab 12]. Further, ''Confirmed'' in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while ''non-confirmed'' meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[68] ATA request data is based on an internal USCIS analysis of information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 6].

[69] Data provided on arrivals at specific POE is based on an internal USCIS analysis of arrival information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 5, 7, 8, 9].

[70] *Id.*

resources because of the extra processing required under the programs combined with the little to no concomitant reduction of unlawful entries of nationals from the seven FRP countries.

The reallocation of limited DHS personnel resources caused by the FRP programs is unsustainable, especially given DHS' critical need to address border and interior enforcement and other Administration priorities. Implementation of these programs resulted in increased expenditure of DHS personnel and resources on administering the programs without any related burden reduction for processing, detention, monitoring, and removal of aliens unlawfully entering or present within the United States.

As previously noted, reports indicate that nationals of the countries eligible for the FRP programs have continued to migrate unlawfully at some of the highest rates among all nationalities. CBP personnel, in particular, experienced no relief. In contrast, the implementation of the FRP programs introduced additional demands on DHS, increasing workloads across multiple USCIS directorates including the Service Center Operations Directorate (SCOPS) and Field Operations Directorate (FOD).

The FRP programs have also resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a ''qualified alien.'' *See* 8 U.S.C. 1641(b)(4). Because DHS generally issued three-year periods of parole from the outset, FRP parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.,* 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all FRP parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see* 7 CFR 273.4(a)(6)(ii)(J), as might ''a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980),'' *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to ''lawfully residing'' children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[71] Overall, the domestic impact of the FRP programs counsel against their continued operation.

*5. Address the Root Causes of Migration Through Economic Stability and Development Supported by Increased Remittances*

Finally, DHS intended for the FRP programs to aid in encouraging development and addressing economic concerns in the eligible countries by increasing the flow of remittances to those countries.[72] Aliens paroled into the United States under the FRP programs are eligible for discretionary employment authorization, and aliens with employment authorization typically enjoy higher wages than those without employment authorization, allowing them the opportunity to send greater amounts of money back to their home country in the form of remittances.[73] However, upon review of the modernized FRP programs more than a year and a half[74] after they were made available, DHS has determined that a relatively low percentage of invited petitioners decided to participate in the programs. Because of the low acceptance rate of invited petitioners, the volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries. Consequently, the FRP programs fell short of addressing the underlying economic drivers of unlawful migration. The modernized FRP programs' failure to address the economic motivations behind illegal immigration weighs in favor of terminating the FRP programs.

In 2023 and 2024, the countries whose nationals were eligible for consideration for parole under the FRP programs had remittance volumes ranging from a low of $2.5 billion in Cuba to a high of $21.6 billion in Guatemala.[75] The remittance volumes referenced were not tied exclusively to aliens paroled into the United States under the FRP programs, that is, those remittances could have been sent from anyone in the United States, regardless of immigration status. From 2020 to 2023, remittance volumes in 6 of the 7 countries whose nationals were eligible for an FRP process grew between 8% and 43%.[76] Only Haiti experienced a lower growth rate at just 1%.[77] In 2023, remittances accounted for over 20% of the GDP of Guatemala, with similar increases noted in El Salvador (24.5%), and Honduras (28.0%).[78] Comparing the high volumes of remittances in each of the FRP countries to the small populations from each country that were invited to participate in the FRP programs and the even smaller populations that did participate, DHS has determined that any contribution FRP parolees may make to the remittance volumes in their home country is too small to substantially impact the overall economic stability of the country or address the root causes of migration.

The FRP programs failed in their intention of addressing the root causes of migration. A July 2024 report stated ''The Joe Biden administration has responded by designing policies to mitigate 'root causes' of migration and displacement, enacting temporary humanitarian protections for individuals from certain countries, while making it more difficult for migrants to apply for asylum in the United States. But push factors—including organized crime-fueled violence and extortion and a lack of economic opportunities—combined with the pull of a strong U.S. labor market, make it unlikely migration flows will decrease substantially in the near future.''[79] Due to the low numbers of participants in the FRP programs, it is also unlikely that the remittances provided by the FRP participant population would meaningfully impact migration flows. As previously stated, it is unlikely that someone with an existing legal pathway would risk

[71] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[72] *See, e.g.,* 88 FR at 43596.

[73] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that aliens without authorization to work earn less than those with employment authorization).

[74] The FRP process for Ecuadorians was established in November 2023 so has been available for approximately four fewer months. *See* 88 FR 78762.

[75] Family Remittances in 2024: Looking Ahead amid Possible Shifts in Flows, Table 2, The Dialogue: Leadership for the Americas (Aug. 6, 2024), *https://thedialogue.org/family-remittances-in-2024-looking-ahead-amid-possible-shifts-in-flows.*

[76] *Id.* at table 1 (The growth rates in each country were: Cuba—43%; Guatemala—15%; Honduras—14%; Ecuador—11%; Colombia—10%; and El Salvador—8%.).

[77] *Id.*

[78] Family Remittances to Latin America and the Caribbean 2023, Slide 6, The Dialogue: Leadership for the Americas (Sept. 9, 2023), *https://thedialogue.org/analysis/family-remittances-to-latin-america-and-the-caribbean-2023/.*

[79] Council on Foreign Relations, ''Why Six Countries Account for Most Migrants at the U.S.-Mexico Border'' July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

compromising their eligibility by pursuing unlawful entry to the United States. Economic migrants and asylum seekers, on the other hand, may resort to the border route regardless, due to the absence of viable legal alternatives and the push and pull factors that remain unaddressed by the FRP programs.

More broadly, the United States cannot bear sole responsibility for the development and economic stability of other nations. In line with the America First Policy Directive, the President instructed the Secretary of State to ''issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.'' [80] While strategic partnerships and targeted support can play a role, U.S. immigration policy cannot serve as a surrogate for long-term development solutions in foreign countries.

Lessons Learned

The FRP programs did not achieve their stated objectives. They failed to reduce unlawful migration or alleviate operational burdens on DHS—particularly CBP—and instead increased administrative strain across multiple USCIS directorates and CBP ports of entry. Moreover, the programs had no measurable effect on addressing root causes of migration and introduced additional vulnerabilities that actively undermined the integrity of the U.S. immigration system and posed risks to public safety and national security.

While the modernized FRP programs established a framework for vetting, the processes in place proved insufficient and introduced significant opportunities for fraud. For instance, a recent internal audit revealed that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half. Generally, if a Form I–130 petitioner dies after approval, the Form I–130 is automatically revoked.[81] Under program requirements, the individual submitting the request to be a supporter must be the same petitioner who filed the original family-based immigrant visa petition—the same petitioner to whom the Department of State issued the parole invitation. Additionally, the same internal audit concluded that the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for primary supporters, further compromising program integrity.

Taken together, these operational shortcomings, security vulnerabilities, and policy failures underscore that the FRP programs not only failed to meet their intended goals, but actively strained DHS resources and undermined public trust. For these reasons, termination of the FRP programs is a prudent course of action.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the FRP programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of parole indicates that reliance on the continued existence of the FRP programs would be unwarranted. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Further, the notices establishing the modernized FRP programs expressly advise the public that, ''[t]he Secretary retains the sole discretion to terminate this FRP process at any point'' [82] and that ''DHS may terminate parole upon notice in its discretion at any time.'' [83] The FRP programs were ''being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.'' [84]

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, and the additional notice provided in E.O. 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution. DHS recognizes that this notice announces a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate. To analyze the reliance interests of affected parties, DHS describes the main steps in the process below and analyzes the reliance interests of parties who have reached that point in the process.

### *1. Reliance Interests of Potential Supporters and Beneficiaries*

DHS first considered the potential reliance interests of those U.S.-based I–130 petitioners invited by DHS to participate in the FRP programs and who had intended to file or have filed a Form I–134A or Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, in support of a potential parolee.[85] In general, the costs associated with Form I–134A filings are minimal. While there is no fee for the petitioner to file a Form I–134A and there is no fee for a potential beneficiary to seek consideration under the FRP programs, petitioners who have already filed Form I–134A, or who have completed the Form I–134A in anticipation of filing, may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response.[86]

There are currently over 15,000 pending initial requests for parole under the legacy CFRP program at various stages of adjudication. There are no pending initial requests under the legacy HFRP program, so there are no reliance interests for potential petitioners or beneficiaries under that program. Petitioners under the legacy CFRP program were required to pay the filing fee for Form I–131, unless they were eligible for a fee waiver. For a Form I–131 filed before December 23, 2016, petitioners paid $360. For a Form I–131 filed after December 23, 2016, petitioners paid $575. For a Form I–131 filed after April 1, 2024, petitioners generally paid $630, although CFRP add-on derivatives were exempt from the fee.

At this early stage in the process, the costs incurred by a potential beneficiary in both the Form I–134A-based modernized FRP programs, as well as the Form I–131-based legacy CFRP program are minimal. In the Form I–134A-based process, once a petitioner's Form I–134A is confirmed, the potential beneficiary receives instructions to create an online account with myUSCIS, confirms biographic information in the online account, and attests to meeting the eligibility requirements, including the completion of a medical examination by a panel physician. Potential beneficiaries who received notification that the Form I–134A filed on their behalf was confirmed were instructed on next steps in the process,

[80] 90 FR 8337.

[81] *See generally* 8 CFR 205.1(a)(3)(i)(B) and (C). There are certain noted exceptions, such as INA 204(*l*) and humanitarian reinstatement of a revoked petition.

[82] *E.g.,* 88 FR at 43598; 88 FR at 54643.

[83] *E.g.,* 88 FR at 43593; *see also* 88 FR at 54643.

[84] *E.g.,* 88 FR at 43598–99; 88 FR at 54643.

[85] The information collection approval of Form I–134A has expired and it is no longer available for submission. DHS sent its most recent invitation for a petitioner to submit a Form I–134A on June 28, 2024, and has not accepted a request from a prospective supporter since January 28, 2025. Only 420 Forms I–134A are pending, and USCIS will send them each nonconfirmation notices.

[86] See SUPPORTING STATEMENT FOR Online Request to be a Supporter and Declaration of Financial Support, OMB Control No.: 1615–0157, COLLECTION INSTRUMENT(S): Form I–134A, page 10, question 12, *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202409-1615-006* (last visited Feb. 7, 2025).

including completion of the medical requirements. The medical examination required being cleared of any Class A medical conditions and receiving certain required vaccinations. Therefore, it is possible that a potential beneficiary took the time to complete the medical examination and receive the required vaccinations. After confirming biographic information and properly completing the medical examination, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. The alien was required to complete these steps prior to being considered for authorization to travel to the United States to seek parole. The total estimated time to complete the CBP One part of the ATA process was 10 minutes.[87]

In the Form I–131-based legacy process, the adjudication of the Form I–131 took place in two stages. First, a designated USCIS Service Center adjudicator would review the application package submitted by the petitioner and confirm that the petitioner had received a U.S. government invitation to apply to the legacy process, and that all documentary filing requirements were met. If the petitioner failed to submit the required evidence, adjudicators would issue a Request for Evidence to obtain the missing information. Unless a sufficient response was received, the filing would be denied. For cases where all required evidence was provided and eligibility was established, USCIS conditionally approved the Form I–131. There were no costs to the potential beneficiary during this first stage of the process. However, the second stage of the process required the potential beneficiary to report for an in-person interview at a USCIS office overseas, which could result in travel costs and medical exam costs. During this stage, USCIS would verify the identity and qualifying familial relationship between the petitioner and a potential beneficiary.

In general, the costs to petitioners and potential beneficiaries are not significant and pale in comparison to the U.S. government's sovereign interest in determining who may be paroled into the United States. DHS issued invitations as a use of administrative grace that could end at any time and made no assurances that each invitation would result in a grant of parole. DHS made no assurances that each Form I–134A would be processed, nor did DHS assure that each Form I–134A or Form I–131 would ultimately result in a grant of parole to a potential beneficiary. For petitioners/beneficiaries who received a conditional approval of Form I–131 from USCIS under the legacy CFRP program, the conditional approval made it clear that additional steps were required—including completion of a medical examination and in-person interview—before parole could be authorized.[88] Therefore, neither the petitioner nor the potential beneficiary has a significant reliance interest in continuation of the process at this stage. Any costs incurred by a potential beneficiary in the Form I–131 or Form I–134A-based process, both for completing the medical examination and for receiving the required vaccinations, can be impactful, depending on the country and the relative cost of these items compared to the average wage received by that country's population and the rate of unemployment in the country. However, both the costs of the vaccinations and the medical examination are offset by their attendant benefit to the beneficiary of identifying health issues that may have existed and preventing future illness. Once again, the interest of petitioners and potential beneficiaries in preserving the FRP programs is minimal compared to the U.S. government's interest in exercising its discretion to decide which programs to continue and which benefits to provide, based on the policy priorities of the current administration.

Accordingly, DHS will issue a notice of non-confirmation for all pending Forms I–134A. DHS will also rescind the confirmation of all Forms I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A. DHS also intends to issue denial notices for all conditionally approved Form I–131 under the legacy CFRP program that have not been issued a travel document. The Form I–131 filing fee will not be refunded as USCIS has already expended resources in partially completing their adjudication.

*2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Petitioners*

DHS has canceled all pending requests for advance authorization to travel to the United States to seek a discretionary grant of parole under the FRP programs.

DHS considered allowing any approved ATAs to remain in place until they were used or expired by their terms. However, DHS did not want aliens to fly to the United States at significant personal expense to seek parole under policies that DHS no longer supports or appear to encourage aliens to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. DHS wants to be as transparent as possible and not exacerbate the problems created by the FRP programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit, in the exercise of discretion. If parole is not granted, aliens may be removed to their home country at U.S. government expense or processed for another appropriate disposition under the INA.

In sum, the FRP programs have failed to achieve their stated objectives. They are inconsistent with the current Administration's enforcement priorities, do not advance current U.S. foreign policy goals, did not meaningfully reduce unlawful migration, did not alleviate the strain on DHS personnel and resources, nor address the root causes of migration through economic development. Instead, the programs imposed additional administrative burdens on DHS and introduced vulnerabilities that significantly undermined the integrity of the U.S. immigration system. While some petitioners and beneficiaries may have relied on the availability of FRP programs, those reliance interests are limited in scope and involved minimal financial or procedural burdens. Even if the reliance interests were greater, DHS has determined that the federal government's interest in controlling the circumstances under which foreign nationals may be paroled into the United States outweigh those interests. Accordingly, terminating the FRP programs is both lawful and reasonable.

**V. Effect of Termination on Current Parolees Under the FRP Programs and Corresponding Reliance Interests**

The notices establishing the FRP programs explain that parole is not an admission of the alien to the United

[87] *See* 88 FR 62810, 62812 (Sept. 13, 2023).

[88] *See* USCIS, ''The Cuban Family Reunification Parole Program,'' *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program* (''Process Steps'') (last updated Oct. 11, 2024).

States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the FRP programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, since July 10, 2023, approximately 14,000 aliens were granted parole into the United States pursuant to the modernized FRP programs. While some aliens in this population have subsequently pursued other lawful immigration statuses and benefits, all aliens within this population are still within the 3-year initial period of parole under the modernized FRP programs. Approximately 1,060 Cubans are currently in the United States with a valid period of parole under the legacy CFRP program. Approximately 100 Haitians are currently in the United States with a valid period of parole under the legacy HFRP program.

Parolees under the FRP programs may be able to seek an additional period(s) of parole (''re-parole'') by filing Form I–131, and demonstrating urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for re-parole. These cases and any such pending cases will be assessed on a case-by-case basis.

DHS has determined that as one aspect of the termination of the FRP programs, and consistent with the Secretary's statutory and regulatory authority,[89] the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485 before December 15, 2025 that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. The parole of an alien with a pending Form I–485 will remain valid until either the expiration date provided on the alien's Form I–94, Arrival/Departure Record, or the date a final adjudication of the Form I–485 is completed, whichever is sooner. If the Form I–485 is denied, the alien's parole period will be terminated as of the date of the denial and the alien is expected to depart the United States immediately if they have no other lawful basis for remaining. Pending Form I–131 requests for re-parole filed by aliens initially paroled under the FRP programs will be adjudicated and may be approved on a case-by-case basis.[90] Note that with respect to re-parole requests filed by aliens who were initially paroled under one of the FRP programs, facial eligibility under those programs does not entitle an alien to re-parole. The alien still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole, as required by section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A).

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action, consistent with law, against any alien at any time, including during the 30-day waiting period created by this notice. Once parole is terminated, and if no exception applies and no lawful immigration status, relief, classification, or protection is obtained, aliens must return to their home country to maintain their path to lawful immigration status or be removed from the United States subject to a final order of removal. Parolees without any other lawful basis to remain in the United States following the termination of the FRP programs should depart the United States before their parole termination date. As detailed below, aliens whose parole period is terminated are encouraged to submit their intent to depart through the CBP Home Mobile App. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home Mobile App. Aliens should visit *https://i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

DHS has recently announced a historic opportunity for aliens to receive both financial and travel assistance to facilitate travel back to their home country or another country in which they have lawful status through the CBP Home App. Once unlawful aliens submit their intent to depart through the CBP Home Mobile App and pass vetting, they will be deprioritized by ICE for enforcement action, detention and removal before their scheduled departure, as long as they demonstrate they are making meaningful strides in completing the departure.[91]

In implementing this approach, DHS intends to prioritize for removal those whose parole is terminated and who have not, prior to the publication of this notice, submitted an immigration benefit request to obtain a lawful basis to remain in the United States. Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS' institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer

[89] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States''); 8 CFR 212.5(e)(2) (''. . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph(a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien*[.].'' (emphasis added)).

[90] Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131. Aliens will not, however, be able to apply for re-parole under the legacy FRP programs.

[91] DHS, ''DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation'' May 5, 2025, *https://www.dhs.gov/news/2025/05/05/dhs-announces-historic-travel-assistance-and-stipend-voluntary-self-deportation.*

exists and thus DHS intends to revoke parole-based employment authorization consistent with the revocation on notice procedures. *See* 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and moved to the United States.[92] Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside. In addition, employers who employ parolees may incur costs related to lost productivity and finding new employees. Property owners who rent homes, condos, or apartments to parolees may lose steady rent payments. Retailers and restaurants in the communities the parolees have been living in will lose customers. Aliens paroled under the modernized FRP programs have been in the United States for as long as 20 months, while some aliens initially paroled under the legacy FRP programs and subsequently granted additional parole periods may have been in the United States for years.[93]

However, any assessment of the reliance interests of FRP parolees must account for FRP parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served; [94] and (2) the initial period of parole would be limited to a maximum of three years. These clear, limiting conditions of the FRP programs served to attenuate any long-term expectations and interests amongst FRP parolees. Accordingly, DHS has taken these limiting conditions, along with FRP parolees' knowledge of them, into consideration when weighing their reliance interests.[95]

To the extent that current parolees have obtained housing and employment authorization, or created new ties within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the University of California*.[96] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[97] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than most FRP parolees have been, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchasing of homes.[98] As the Court noted, these interests, though noteworthy, were not ''necessarily dispositive,'' and ''DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests.'' [99] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the FRP programs are far less than the population in *Regents*. Furthermore, as stated above, consideration of the reliance interests under the FRP programs must take into account the express, discretionary terms of the parole programs. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual FRP parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice and allowing the parole period of parolees with pending Forms I–485 to continue, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, the Department finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS considered several alternatives to termination of parole after a 30-day wind-down period, including, (1) allowing the current period of parole for each FRP beneficiary to expire and notifying the beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration; (2) allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available and the beneficiary may qualify to file Form I–485; and (3) announcing the termination of parole for each beneficiary following a wind down period of longer than 30 days from the date of publication of the termination notice. After due consideration, DHS has opted to not pursue these routes.

Option 1 would require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency. Staggered parole expirations could result in extended unauthorized stays and generate confusion among parolees due to differing timelines. Option 2 fails to meaningfully implement the policy shift outlined in this **Federal Register** notice, as it would allow continued reliance on parole as a pathway to adjustment of status—effectively maintaining the existing parole framework for current beneficiaries. Moreover, permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload borne by DHS and USCIS in processing these cases. Critically, both Option 1 and 2 dilute the intended impact of the policy change and fail to communicate the urgency of this administration's shift in direction. A protracted off-ramp could be perceived as a reluctance to fully enforce key policy priorities aimed at realigning parole authority with the original congressional intent. Moreover, allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety.

When determining whether to adopt the alternative of a longer than 30-day

[92] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'' (cleaned up)).

[93] As noted earlier in this section, there are approximately 100 aliens in this category.

[94] *See e.g.,* 88 FR at 43593; 88 FR at 54643; 88 FR at 54638; *see also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(e)(2)(i).

[95] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is ''unjustified in light of the express limitations'' in relevant immigration policy). Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131.

[96] *Id.*

[97] *Id.* at 31.

[98] *Id.*

[99] *Id.*

wind-down period, DHS determined such an alternative was not the best path forward. First, regardless of the wind-down period, parolees, their employers, their landlords, their friends, and their communities may incur costs. Given this reality, DHS decided to employ the path that will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs to issues deemed essential to securing our borders and protecting the American people against invasion. Accordingly, the Department has determined that a 30-day wind down period provides the affected parties sufficient notice while also preserving the Department's interest in promptly terminating attendant grants of parole for which the Department deems no longer provide significant public benefit to the United States. Accordingly, the Department is opting not to increase the wind-down period to more than 30 days.

### VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole.[100] For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs and the purposes of such parole therefore have been served. This constructive notice accordingly serves as written notice to FRP parolees. DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.[101]

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses. *See* 8 U.S.C. 1305; 8 CFR 265.1. Nevertheless, all FRP parolees under the modernized programs should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account.[102] For legacy FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account. This notice, and the individual notice through the USCIS online account or sent by mail, each independently constitute ''written notice to the alien'' under 8 CFR 212.5(e)(2)(i).

### VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A), *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.''[103] By terminating the FRP programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 43599—DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act (''APA'').[104]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the FRP programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary ''in [her] discretion.'' The FRP programs therefore were general statements of policy.

Because the FRP programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice-and-comment rulemaking requirements. Through the termination of the FRP programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[105] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation. *See* 5 U.S.C. 553(d)(2).

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves[106]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[107] Consistent with the Secretary of State's February 21, 2025, determination that ''all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]'' DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[108]

Moreover, although the APA does not require the agency to show that such procedures may result in ''definitely undesirable international consequences'' to invoke the foreign affairs exemption to notice-and-

[100] *See* 8 CFR 212.5(e)(2)(i) (''. . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien.* . . .'' (emphasis added)).

[101] *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) (''Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.'').

[102] *Cf., e.g.,* 8 CFR 103.2(b)(19)(ii)(B) (''For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . .'').

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] *Cf. Perez* v. *Mortgage Bankers Ass'n,* 575 U.S. 92, 101 (''Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.'').

[105] *See Encino Motorcars,* 579 U.S. at 221 (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.'').

[106] *See* 5 U.S.C. 553(a)(1); *see, e.g.,* 88 FR at 43599.

[107] *See Am. Ass'n of Exporters & Importers—Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions ''linked intimately with the Government's overall political agenda concerning relations with another country''); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive ''was implementing the President's foreign policy,'' the action ''fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA'').

[108] U.S. Department of State, Determination, *Foreign Affairs Function of the United States,* 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate categorical parole programs.

comment rulemaking, some courts have required such a showing,[109] and DHS can make one here. Delaying termination of the FRP programs to undertake rulemaking would undermine the U.S. government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in the notices implementing the modernized FRP programs, they were implemented as an integral part of negotiations with regional neighbors, including Colombia, Costa Rica, Ecuador, and Guatemala, to address unlawful migratory flows challenging immigration systems throughout the region.[110] For instance, in announcing the FRP program for Colombians, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United States.[111] DHS explained that ''the expansion of lawful pathways for aliens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of [Safe Mobility Offices or SMOs].''[112] DHS continued that ''[t]he success of SMOs and other new measures to reduce unlawful migration to the [southwest border] is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs.''[113] DHS noted that the U.S. government continued ''to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and [was] building goodwill and momentum to seek SMOs in still more countries in the region.''[114] When implementing changes to the FRP programs for Cubans and Haitians, DHS invoked the foreign affairs exemption on similar grounds.[115]

However, as discussed in this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the FRP programs was one part of a broader strategy to collaboratively manage unlawful migration with neighboring countries, the U.S. government is pursuing a range of other policy initiatives that would allow DHS to return or remove FRP program nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.[116]

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the FRP programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations and may result in an even greater number of FRP program nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.2 of this notice, with countries to accept the return of their nationals, including FRP program nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. 5 U.S.C. 553(b)(B), (d)(3). Any delay for such procedures would harm the U.S. government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the FRP programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border.[117] Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[118] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

For example, DHS would intend that the termination of the FRP programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new or modified reporting requirements they impose. The termination of the programs announced by this notice requires changes to the collections of information on Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records (OMB control number 1615–0013). Form I–131 will be revised in

---

[109] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[110] *See, e.g.,* 88 FR at 43594.

[111] *See, e.g.,* 88 FR at 43599.

[112] *Id.*

[113] *Id.* at 43600.

[114] *Id.*

[115] *See* 88 FR at 54643 (Cuba); 88 FR at 54639 (Haiti).

[116] DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries, *https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols* (updated Mar. 21, 2025).

[117] 5 U.S.C. 553(b)(B); 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754–55 (D.C. Cir. 2001) (''a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required''); *see also* Executive Order 14159, 90 FR 8443 (Jan. 29, 2025).

[118] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside ''only the offending parts of the rule.'' *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

connection with this notice by removing specific mention of the FRP programs. As of the date of this notice Form I–131 may not be used to request an initial or new period of parole under one of the FRP programs, but it may be used by a previous FRP beneficiary to request a new period of parole, or re-parole, under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–22744 Filed 12–12–25; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–HQ–ES–2025–0613; FXES111609M0000–256–FF09420000; OMB Control Number 1018–0194]**

### Agency Information Collection Activities; Approval Procedures for Incidental Harassment Authorizations of Marine Mammals

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), we, the U.S. Fish and Wildlife Service (Service), are proposing to renew an information collection without change.

**DATES:** Interested persons are invited to submit comments on or before February 13, 2026.

**ADDRESSES:** Send your comments on the information collection request (ICR) by one of the following methods (please reference 1018–0194 in the subject line of your comments):

- *Internet (preferred): https://www.regulations.gov.* Follow the instructions for submitting comments on Docket No. FWS–HQ–ES–2025–0613.
- *Email: Info_Coll@fws.gov.*
- *U.S. mail:* Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803.

**FOR FURTHER INFORMATION CONTACT:** Madonna L. Baucum, Service Information Collection Clearance Officer, by email at *Info_Coll@fws.gov,* or by telephone at (703) 468–8211. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act (PRA; 44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR 1320.8(d)(1), all information collections require approval under the PRA. We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are especially interested in public comment addressing the following:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.,* permitting electronic submission of response).

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972 (MMPA; 16 U.S.C. 1361 *et seq.*) authorizes the Secretary of the Interior (Secretary) to allow, upon request, the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specific geographic region for periods of not more than 1 year. The Service may authorize incidental take by harassment if statutory and regulatory procedures are followed and the Service finds: (i) take is of a small number of marine mammals of a species or stock, (ii) take will have a negligible impact on the species or stock, and (iii) take will not have an unmitigable adverse impact on the availability of the species or stock for taking for subsistence uses by Alaska Natives.

The term ''take'' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal. Harassment means any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild (the MMPA defines this as ''Level A harassment''), or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering (the MMPA defines this as ''Level B harassment'').

The terms ''negligible impact,'' ''small numbers,'' and ''unmitigable adverse impact'' are defined in 50 CFR 18.27 (*i.e.,* the Service's regulations governing small takes of marine mammals incidental to specified activities). ''Negligible impact'' is an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival. ''Unmitigable adverse impact'' means an impact resulting from the specified activity (1) that is likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by (i) causing the marine mammals to abandon or avoid hunting areas, (ii) directly displacing subsistence users, or (iii) placing physical barriers between the marine mammals and the subsistence hunters; and (2) that cannot be sufficiently mitigated by other measures to increase

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SVITLANA DOE, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 1:25-cv-10495-IT |
| MARKWAYNE MULLIN, et al.,[1] | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

March 25, 2026

TALWANI, D.J.

Pending before the court is Defendants' Motion for Reconsideration or Stay [Doc. No. 277]. Defendants ask the court to reconsider and dissolve the court's Preliminary Injunction [Doc. No. 257] preliminarily enjoining and staying Defendants' Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025) (the "Federal Register Notice") and to do so by today. Defendants request, in the alternative, a stay pending reconsideration and appeal. Also pending is Plaintiffs' Motion for an Order to Show Cause, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record [Doc. No. 283]. For the reasons below, the clerk shall set Plaintiffs' motion for a hearing. Defendants' motion is DENIED without prejudice to refile a motion to dissolve or modify the

[1] Secretary of the Department of Homeland Security Markwayne Mullin is substituted for former Secretary Kristi Noem as a Defendant in this litigation. See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

court's Preliminary Injunction [Doc. No. 257] based on the Corrected Certified Administrative Record [Doc. No. 276-1] if the court denies Plaintiffs' pending motion.

**I. Request for Reconsideration**

A. *Standard of Review*

"[A] district court has the inherent power to reconsider its interlocutory orders[.]" Fernandez-Vargas v. Pfizer, 522 F.3d 55, 61 n.2 (1st Cir. 2008). Reconsideration of a motion may be appropriate "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." U.S. v. Allen, 573 F.3d 42, 53 (1st Cir. 2009). A motion for reconsideration "is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006).

B. *Reconsideration Based on the "Corrected Administrative Record"*

Defendants assert that "in its haste to respond to the motion for a preliminary injunction" and related motions, the Department of Homeland Security ("DHS") "inadvertently omitted five documents" from the Administrative Record. Mem. ISO Mot. for Reconsideration 3 [Doc. No. 278]. Plaintiffs object to the court's consideration of these additional documents, see Motion for an Order to Show Cause, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record [Doc. No. 283], and argue further that, if considered, the additional documents support rather than undermine the preliminary injunction, see Pls.' Opp'n to Defs.' Mot. for Reconsideration 10 [Doc. No. 286].

The court begins with the procedural history. On Friday, December 12, 2025, Plaintiffs filed a Notice [Doc. No. 210] that the Federal Register Notice announcing the formal termination of family reunification parole programs had been released that day (to be published on Monday,

December 15, 2025). Id. Plaintiffs noted that they intended to challenge the Federal Register Notice and would be asking the court to rule on such challenges prior to the January 14, 2026 effective date for the termination of the programs. Id. at 1, 3. Accordingly, Defendants were on notice, as of December 12, 2025, that the Administrative Record would be needed on an expedited basis.

Plaintiffs filed their opening brief on December 29, 2025, before the Administrative Record was filed. Plaintiffs argued that the Secretary had "raised vague fraud concerns based on an unreleased, internal report[.]" Pls.' Mem. ISO Emergency Mot. for a TRO, Prelim. Inj. and/or Stay 7 [Doc. No. 218]. Defendants did not respond to this claim in their first opposition brief. See Defs.' Mem. in Opp'n to Pls.' Emergency Mot. for a TRO and/or Stay [Doc. No. 233].

At the January 9, 2026 TRO hearing, Defendants volunteered that they would be producing the administrative record by January 13, 2026. Hearing Tr. 37:7–37:10 [Doc. No. 244]. The court directed Defendants to do so by that date, and extended Defendants' deadline for their opposition to the motion for a preliminary injunction to January 15, 2026. Electronic Order [Doc. No. 242]. On January 13, 2026, Defendants produced the Administrative Record [Doc. Nos. 246-1, 246-2] with a Certification of Administrative Record [Doc. No. 246-1], in which the individual "responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communications intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security, and the maintenance of official Department records[,]" certified under penalty of perjury that the documents provided "constitute the nonprivileged documents and materials directly or indirectly considered by DHS and that these documents constitute the administrative record the agency considered in issuing the Federal Register Notice[.]" See id. ¶¶ 1–2.

Defendants' further opposition brief, filed two days after the Administrative Record was filed, was still silent as to Plaintiffs' argument concerning an unreleased, internal report. See Defs.' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. and/or Stay [Doc. No. 251].

On January 20, 2026, Plaintiffs noted in their reply brief that the Administrative Record contained no "recent internal audit." See Pls.' Reply Mem. ISO Mot. for a Prelim. Inj., TRO, and/or Stay 3 [Doc. No. 253] ("[E]ven though Secretary Noem twice referenced a 'recent internal audit' as allegedly raising fraud or security concerns about the FRP processes, that 'internal audit' is not in the AR[.]" (quoting Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041)).

On January 24, 2026, this court issued its Preliminary Injunction [Doc. No. 257] and Memorandum and Order [Doc. No. 258], see Doe v. Noem, No. 1:25-CV-10495-IT, 2026 WL 184883 (D. Mass. Jan. 25, 2026).[2] The court determined, inter alia, that Plaintiffs were likely to succeed on their claim that the Secretary's decision to terminate the FRP programs was arbitrary and capricious, relying in part on the court's finding that "[a]s evidence of the purported fraud by parolees whose parole is being terminated, DHS cited 'a recent internal audit'" but that the Administrative Record "include[d] no such audit[.]" Doe, 2026 WL 184883, at *12 (citing Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041).

On February 13, 2026, Defendants' counsel sought Plaintiff's stipulation to add material to the Administrative Record and Plaintiffs' counsel refused to stipulate. See Decl. of Esther Sung ¶ 4 ("Sung Decl.") [Doc. No. 284]; Sung Decl. Ex. 1 [Doc. No. 284-1] (February 13, 2026 email chain).

---

[2] The Memorandum and Order [Doc. No. 258] is published in Westlaw but the Preliminary Injunction [Doc. No. 257] is not. The court will cite the Westlaw publication for references to the Memorandum and Order but will use the docket cite for references to the Preliminary Injunction.

Three weeks later, Defendants filed, without seeking leave of court and without noting Plaintiffs' opposition, a Notice of Corrected Certified Administrative Record [Doc. No. 276] to "correct[] the certification and administrative record originally filed with the Court." Id. at 1. The accompanying certification offers little explanation, stating only: "[i]n our haste to provide the court with a complete administrative record in a timely manner, USCIS experts have determined that a few documents that were considered in the decision-making process were not included." Certification of Corrected Administrative Record ¶ 3 [Doc. No. 276-1].

Plaintiffs ask the court to strike Defendants' filing, arguing, inter alia, that the delay in bringing the documents to the court's attention raises "a serious question whether the purportedly 'corrected' administrative record represents 'the full administrative record that was before the Secretary at the time [s]he made h[er] decision[.]]'" Pls. Mem. ISO Mot. for Order to Show Cause or to Strike Supplementation of the Administrative Record 6 [Doc. No. 285] (citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419-20 (1971)).

In their opposition to Plaintiffs' motion, filed late yesterday afternoon, Defendants charge that Plaintiffs' concern is "disingenuous, as the omitted material was referenced and relied upon in the decisional document, and pre-date the decisional document." Defs.' Opp'n to Pls.' Mot. for an Order to Show Cause 2 [Doc. No. 287]. The Federal Register Notice at issue in the preliminary injunction described a "recent internal audit" as "revealing that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half." Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. The first of the new documents submitted by Defendants, identified as U.S. Citizenship and Immigr. Serv., Fraud Detection & Nat'l Sec. Directorate, *Brief Analysis of Family Reunification Parole Data* (Dec. 4, 2024), appears to be a report on an internal audit that does reference 700+ additional deceased petitioners[,] but the date of the report is unclear and is

certainly not December 4, 2025. See Certification of Corrected Administrative Record FRP-FRN-01574 [Doc. No. 276-1] (noting report was "[i]ssued December 4, 2024, but providing an "Update: Since completing the initial draft of this report on December 4, 2024"); id. at FRP-FRN-01581 (providing an "Update: January 23, 2025). Even more concerning, the Federal Register Notice asserted that "the same internal audit concluded that the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for primary supporters, further compromising program integrity." Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. On an initial review, the new internal audit document does not appear to contain this conclusion.

The court finds Plaintiffs' objections and concerns as to the compilation of the Administrative Record warrant further review. Accordingly, before the court considers modification or vacatur of the Preliminary Injunction, the court will resolve first whether the additional documents are part of the Administrative Record. Accordingly, reconsideration based on the new documents is DENIED without prejudice.

C. *Reconsideration Based on Alleged Legal Error*

Defendants' motion for reconsideration based on legal error does not satisfy the standard for reconsideration set forth above. Defendants point to no newly discovered evidence, no intervening change in the law, and no "manifest" error of law or clear injustice.

Instead, Defendants rehash their prior arguments, asserting that all of Plaintiffs' challenges improperly "attack, and seek relief from, the substantive decision" made by the Secretary. Mem. ISO Mot. for Reconsideration 9–10 [Doc. No. 278]. In doing so, Defendants ignore the nuances of the court's decision. For example, while the court determined that 8 U.S.C. § 1252(a)(2)(B)(ii) did not divest the court of jurisdiction to determine "whether the procedures adopted in this case for the exercise of [the Secretary's] discretion are in accordance with the

law" and whether "the steps taken" by the Secretary to terminate parole were proper, the court also acknowledged that it could not review final determinations of whether to revoke individual grants of parole, because those determinations were within the Secretary's discretion. Doe, 2026 WL 184883, at *7 (emphasis added); see also id. at *9 (finding for purposes of the motion for a preliminary injunction that Plaintiffs have not shown a substantial likelihood of success as to Plaintiffs' claims that the Secretary's en masse termination exceeded her statutory authority); id. at *10 (rejecting Plaintiffs' argument that Secretary failed to recognize FRP Programs were directed at family reunification, and finding that Secretary was within her discretion in considering whether the purpose of deterring irregular migration was served by the termination of the FRP programs where "deterring irregular migration was included as a factor (albeit a minor one) in the notices establishing the FRP Programs, and the Secretary was within her discretion in considering whether that purpose was served by the termination of the FRP Programs"); id. at *16 (finding for purposes of the motion for a preliminary injunction that Plaintiffs have not shown a substantial likelihood of success as to Plaintiffs' claims that notice-and-comment was required prior to the en masse termination of FRP parole grants).

In contrast, the court found a likelihood of success as to Plaintiffs' challenge that DHS failed to give proper notice of termination and that the failure violated DHS regulations and constitutional due process. Defendants offer no discussion whatsoever as to how Plaintiffs' notice challenge could possibly be a challenge to a "substantive decision" rather than a procedural one.

As to Plaintiffs' arbitrary and capricious challenge (where the court also found a likelihood of success on the merits), the dispute as to the proper administrative record underscores the problem with Defendants' arguments. The court found Plaintiffs' arbitrary and capricious claim likely to succeed not because the court disagreed with DHS's weighing of the

record or exercise of discretion, but because nothing in the record supported certain findings. See id. For example, in pointing to concerns about insufficient vetting and fraud, DHS relied on "a recent internal audit," id. at *12 (quoting Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041), that, as discussed above and as is now conceded by Defendants, was not part of the Administrative Record that the court reviewed, see Mem. ISO Mot. for Reconsideration 3 [Doc. No. 278]. Defendants' suggestion that the court is without jurisdiction to determine if there is any support in the Administrative Record for agency action runs counter to "the presumption favoring judicial review of administrative action." Kucana v. Holder, 558 U.S. 233, 251 (2010).

**II. Stay Request**

Defendants request that if the court does not dissolve its preliminary injunction, it should stay the order. The court declines to do so.

As set forth in the court's Memorandum and Order, the court found that Plaintiffs demonstrated a likelihood of success on the merits of both its notice claim and its arbitrary and capricious claim, that Plaintiffs faced irreparable harm, and that in light of the limited relief Plaintiffs sought, the balance of equities and the public interest weigh in favor of preliminary relief. See Doe, 2026 WL 184883. Nothing in Defendants' motion pushes that balance in Defendants' favor.

First, to the extent that the issues related to the Corrected Administrative Record are not yet resolved, Defendants' unexplained delay in raising the issue weighs strongly against staying the Preliminary Injunction while the court considers those late-raised issues.

Second, contrary to Defendants' assertions, a stay of this court's order would cause irreparable harm to Plaintiffs. The Federal Register Notice, published December 15, 2025, terminated parole recipients' grants of parole, effective January 14, 2026. See Termination of

Family Reunification Parole Processes, 90 Fed. Reg. at 58043. At that time, class members had the option to leave the United States in advance of termination or accrue unlawful presence in the country (which would negatively impact their years-long quests for immigrant-visas). See Doe, 2026 WL 184883, at *19. The court stayed that Federal Register Notice from going into effect. See id. If the court's order is now stayed, all class members presently in the country would immediately be out-of-lawful status, accruing unlawful presence without first being afforded notice and the opportunity to leave in advance of the termination of their parole.

**III. Conclusion**

For the foregoing reasons, the clerk shall set Plaintiffs' Motion for an Order to Show Cause, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record [Doc. No. 283] for a hearing. Defendants shall file an amended opposition, and declaration(s) as appropriate, to support their contention that the late-discovered documents were part of the record considered by DHS in issuing the December 15, 2025 Federal Register Notice. No later than one week after Defendants file their amended opposition, Plaintiffs may file a reply.

Defendants' Motion for Reconsideration or Stay [Doc. No. 277] is DENIED without prejudice to the filing of a motion to modify or terminate the injunction based on the Corrected Certified Administrative Record [Doc. No. 276-1], if Plaintiffs' pending motion is denied.

IT IS SO ORDERED.

March 25, 2026

/s/ Indira Talwani
United States District Judge