26-1314, 26-1628

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

SVITLANA DOE; MAKSYM DOE; MARIA DOE; ALEJANDRO DOE; ARMANDO DOE; ANA DOE; CARLOS DOE; OMAR DOE; SANDRA MCANANY; KYLE VARNER; WILHEN PIERRE VICTOR; HAITIAN BRIDGE ALLIANCE; ANDREA DOE; VALENTIN ROSALES TABARES; MARIM DOE; ADOLFO GONZALEZ, JR.; ALEKSANDRA DOE; TERESA DOE; ROSA DOE; MIGUEL DOE; LUCIA DOE; DANIEL DOE; GABRIELA DOE; NORMA LORENA DUS; DAVID DOE; FRANCISCA DOE; JOHN DOE; JOSE DOE; LUCIANA DOE,
*Plaintiffs-Appellees*,

v.

MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; DAVID J. VENTURELLA, in the official capacity as Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement[1]; RODNEY S. SCOTT, in the official capacity as Commissioner of U.S. Customs and Border Protection; JOSEPH B. EDLOW, in the official capacity as Director of U.S. Citizenship and Immigration Services; DONALD J. TRUMP, in the official capacity as President of the United States,
*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts

**JOINT APPENDIX**

DREW C. ENSIGN
*Deputy Assistant Attorney General*

SARAH WELCH
*Senior Counsel to the Assistant Attorney General*

ELISSA FUDIM
*Trial Attorney*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*
First Cir. Bar No. 1216699
U.S. Dep't of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
katherine.j.shinners@usdoj.gov

[1] Mr. Venturella's title is Senior Official Performing the Duties of the Director.

# APPENDIX
# TABLE OF CONTENTS


| **Document** | **Date Filed** | **Dist. Ct. Docket No.** | **Starting Page** |
|---|---|---|---|
| Docket | N/A | N/A | App-0001 |
| Notice of Appeal from Preliminary Injunction | Mar. 25, 2026 | 289 | App-0049 |
| Notice of Appeal from Order Denying Motion to Reconsider and Dissolve Preliminary Injunction | May 26, 2026 | 304 | App-0051 |
| Second Amended Complaint | Mar. 17, 2025 | 68 | App-0053 |
| Plaintiffs' Motion for Leave to File a Third Amended Complaint & Proposed Third Amended Complaint | Dec. 29, 2025 | 212 & 212-1 | App-0157 |
| Plaintiffs' Emergency Motion for a Temporary Restraining Order, Preliminary Injunction and/or Stay of *En Masse* Truncation of Family Reunification Parole | Dec. 29, 2025 | 216 | App-0303 |
| Index of Exhibits in Support of Plaintiffs' Emergency Motion | Dec. 29, 2025 | 218-1 | App-0308 |
| Department of Homeland Security, U.S. Citizenship and Immigration Services, *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025) | Dec. 29, 2025 | 216-1 | App-0310 |

| **Document** | **Date Filed** | **Dist. Ct. Docket No.** | **Starting Page** |
|---|---|---|---|
| Department of Homeland Security, U.S. Citizenship and Immigration Services, *Agency Info. Collection Activities; Application for Travel Doc. Removal of Instructions Regarding the Haitian Family Reunification Program and Filipino World War II Veteran Parole Program*, 85 Fed. Reg. 84362 (Dec. 28, 2020) | Dec. 29, 2025 | 216-2 | App-0326 |
| Department of Homeland Security, *Implementation of a Family Reunification Parole Process for Colombians*, 88 Fed. Reg. 43591 (July 10, 2023) | Mar. 17, 2025 | 24-26 | App-0330 |
| Department of Homeland Security, *Implementation of a Family Reunification Parole Process for Ecuadorians*, 88 Fed. Reg. 78762 (Nov. 16, 2023) | Mar. 17, 2025 | 24-27 | App-0342 |
| Department of Homeland Security, *Implementation of a Family Reunification Parole Process for Guatemalans*, 88 Fed. Reg. 43581 (July 10, 2023) | Mar. 17, 2025 | 24-28 | App-0356 |
| Department of Homeland Security, *Implementation of a Family Reunification Parole Process for Hondurans*, 88 Fed. Reg. 43601 (July 10, 2023) | Mar. 17, 2025 | 24-29 | App-0368 |
| Department of Homeland Security, *Implementation of a Family Reunification Parole Process for Salvadorans*, 88 Fed. Reg. 43611 (July 10, 2023) | Mar. 17, 2025 | 24-30 | App-0380 |

| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| Department of Homeland Security, *Implementation of Changes to the Haitian Family Reunification Parole Process*, 88 Fed. Reg. 54635 (Aug. 11, 2023) | Mar. 17, 2025 | 24-31 | App-0392 |
| Department of Homeland Security, *Implementation of Changes to the Cuban Family Reunification Parole Process*, 88 Fed. Reg. 54639 (Aug. 11, 2023) | Mar. 17, 2025 | 24-32 | App-0398 |
| Department of Homeland Security, U.S. Citizenship and Immigration Services, *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75581 (Dec. 18, 2014) | Mar. 17, 2025 | 24-33 | App-0404 |
| Department of Homeland Security, U.S. Citizenship and Immigration Services, *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65588 (Nov. 21, 2007) | Mar. 17, 2025 | 24-34 | App-0408 |
| Department of Homeland Security, *Termination of the Cuba, Haiti, Nicaragua, and Venezuela Parole Processes,* 90 Fed. Reg. 13611 (Mar. 15, 2025) | Mar. 27, 2025 | 71-1 | App-0410 |
| Declaration of David Doe (FRP parolee) | Dec. 29, 2025 | 214-2 | App-0423 |
| Declaration of Francisca Doe (FRP parolee) | Dec. 29, 2025 | 214-3 | App-0430 |
| Declaration of John Doe (FRP parolee) | Dec. 29, 2025 | 214-4 | App-0438 |
| Declaration of Jose Doe (FRP parolee) | Dec. 29, 2025 | 214-5 | App-0445 |
| Declaration of Luciana Doe (FRP parolee) | Dec. 29, 2025 | 214-6 | App-0453 |

| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| Declaration of Valentin Rosales Tabares (FRP sponsor) | Mar. 17, 2025 | 24-12 | App-0460 |
| Text Order Regarding Motion for Leave to File a Third Amended Complaint | Jan. 9, 2026 | 238 | App-0468 |
| Supplemented Second Amended Complaint | Jan. 9, 2026 | 239 | App-0471 |
| Order Modifying Class Definition and Appointing Additional Named Plaintiffs | Jan. 10, 2026 | 241 | App-0611 |
| Temporary Restraining Order | Jan. 10, 2026 | 243 | App-0613 |
| Transcript of January 9, 2026 hearing | Jan. 11, 2026 | 244 | App-0618 |
| Notice of Filing of Certified Administrative Record | Jan. 13, 2026 | 246 | App-0686 |
| Certified Administrative Record Part 1 | Jan. 13, 2026 | 246-1 | App-0689 |
| Certified Administrative Record Part 2 | Jan. 13, 2026 | 246-2 | App-2137 |
| Declaration of James Kernochan | Jan. 15, 2026 | 250-1 | App-2267 |
| Corrected Supplemented Second Amended Complaint | Jan. 23, 2026 | 255 | App-2274 |
| Corrected Supplemented Second Amended Complaint Redline | Jan. 23, 2026 | 255-1 | App-2414 |
| Notice of Supplemental Declaration | Mar. 6, 2026 | 275 | App-2553 |
| Defendants' Notice of Corrected Certified Administrative Record | Mar. 6, 2026 | 276 | App-2560 |
| Defendants' Correction to Administrative Record | Mar. 6, 2026 | 276-1 | App-2564 |
| Defendants' Motion for Reconsideration or Stay | Mar. 6, 2026 | 277 | App-2726 |
| Defendants' Memorandum of Law in Support of Defendants' Motion for Reconsideration or Stay | Mar. 6, 2026 | 278 | App-2729 |
| Plaintiffs' Opposition to Defendants' Motion for Reconsideration or Stay | Mar. 20, 2026 | 286 | App-2750 |
| Declaration of Nathaniel I. Stiefel | April 3, 2026 | 293 | App-2777 |

| Document | Date Filed | Dist. Ct. Docket No. | Starting Page |
|---|---|---|---|
| Defendants' Supplemental Opposition to Plaintiffs' Motion for an Order to Show Cause[1] | April 3, 2026 | 294 | App-2781 |
| Plaintiffs' Reply in Support of their Motion for an Order to Show Cause | April 10, 2026 | 296 | App-2802 |
| Defendants' Notice of Correction to Declaration | May 8, 2026 | 303 | App-2825 |
| Declaration of Nathaniel Stiefel | May 8, 2026 | 303-1 | App-2828 |
| Plaintiffs' Response to Defendants' Notice of Correction to Declaration | May 27, 2026 | 307 | App-2831 |

[1] Defendants-Appellants include this entry and the following entries, which post-date the decisions on appeal, at the request of Plaintiffs-Appellees.

APPEAL

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:25-cv-10495-IT

Doe et al v. Mullin et al
Assigned to: Judge Indira Talwani
Case in other court: USCA - First Circuit, 25-01384
USCA - First Circuit, 25-01715
USCA - First Circuit, 26-01314
USCA - First Circuit, 26-01628
Cause: 05:702 Administrative Procedure Act

Date Filed: 02/28/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 02/28/2025 | 1 | COMPLAINT *CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF* against Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello Filing fee: $ 405, receipt number AMADC-10866188 (Fee Status: Filing Fee paid), filed by KYLE VARNER, WILHEN PIERRE VICTOR, Haitian Bridge Alliance, SVITLANA DOE, MAKSYM DOE, MARIA DOE, ALEJANDRO DOE, ARMANDO DOE, ANA DOE, CARLOS DOE, OMAR DOE, SANDRA MCANANY. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Freedman, John) (Entered: 02/28/2025) |
| 02/28/2025 | 2 | MOTION for Leave to Appear Pro Hac Vice for admission of Esther H. Sung, Karen C. Tumlin, Hillary Li, Laura Flores-Perilla, Brandon Galli-Graves, Daniel B. Asimow Filing fee: $ 750, receipt number AMADC-10866190 by KYLE VARNER, WILHEN PIERRE VICTOR, Haitian Bridge Alliance, SVITLANA DOE, MAKSYM DOE, MARIA DOE, ALEJANDRO DOE, ARMANDO DOE, ANA DOE, CARLOS DOE, OMAR DOE, SANDRA MCANANY. (Attachments: # 1 Exhibit CERTIFICATE OF ESTHER H. SUNG IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 2 Exhibit CERTIFICATE OF KAREN C. TUMLIN IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 3 Exhibit CERTIFICATE OF HILLARY LI IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 4 Exhibit CERTIFICATE OF LAURA FLORES-PERILLA IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 5 Exhibit CERTIFICATE OF BRANDON GALLI-GRAVES IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE, # 6 Exhibit CERTIFICATE OF DANIEL B. ASIMOW IN SUPPORT OF MOTION FOR LEAVE TO APPEAR AND PRACTICE PRO HAC VICE) (Freedman, John) (Entered: 02/28/2025) |
| 03/03/2025 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge Indira Talwani assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Paul G. Levenson. (JAM) (Entered: 03/03/2025) |
| 03/03/2025 | 4 | Summons Issued as to Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (JAM) (Entered: 03/03/2025) |

| | | |
|---|---|---|
| 03/03/2025 | 7 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 2 Motion for Leave to Appear Pro Hac Vice Added Esther H. Sung, Karen C. Tumlin, Hillary Li, Laura Flores-Perilla, Brandon Galli-Graves, and Daniel B. Asimow.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 03/03/2025) |
| 03/03/2025 | 8 | Judge Indira Talwani: ORDER re 5 *Ex Parte* Motion to Proceed Under Pseudonym. See attached. (SEC) (Entered: 03/03/2025) |
| 03/10/2025 | 9 | AFFIDAVIT OF SERVICE Executed by Wilhen Pierre Victor, Carlos Doe, Maksym Doe, Svitlana Doe, Ana Doe, Maria Doe, Sandra McAnany, Haitian Bridge Alliance, Omar Doe, Alejandro Doe, Kyle Varner, Armando Doe. U.S. Attorney's Office for the District of Massachusetts served on 3/6/2025, answer due 5/5/2025. Acknowledgement filed by Wilhen Pierre Victor; Carlos Doe; Maksym Doe; Svitlana Doe; Ana Doe; Maria Doe; Sandra McAnany; Haitian Bridge Alliance; Omar Doe; Alejandro Doe; Kyle Varner; Armando Doe. (Freedman, John) Modified on 3/11/2025 to reflect correct answer due date (SEC). (Entered: 03/10/2025) |
| 03/10/2025 | 10 | NOTICE of Appearance by H. Tiffany Jang on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Jang, H.) (Entered: 03/10/2025) |
| 03/10/2025 | 11 | NOTICE of Appearance by John A. Freedman on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Freedman, John) (Entered: 03/10/2025) |
| 03/10/2025 | 12 | NOTICE of Appearance by Esther Sung on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Sung, Esther) (Entered: 03/10/2025) |
| 03/10/2025 | 13 | NOTICE of Appearance by Laura Flores-Perilla on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Flores-Perilla, Laura) (Entered: 03/10/2025) |
| 03/10/2025 | 14 | NOTICE of Appearance by Karen C. Tumlin on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Tumlin, Karen) (Entered: 03/10/2025) |
| 03/10/2025 | 15 | NOTICE of Appearance by Brandon Galli-Graves on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro |

| | | |
|---|---|---|
| | | Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Galli-Graves, Brandon) (Entered: 03/10/2025) |
| 03/12/2025 | 16 | NOTICE of Appearance by Daniel B Asimow on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Asimow, Daniel) (Entered: 03/12/2025) |
| 03/13/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Justin B. Cox Filing fee: $ 125, receipt number AMADC-10890788 by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Affidavit CERTIFICATE OF JUSTIN B. COX)(Freedman, John) (Entered: 03/13/2025) |
| 03/13/2025 | 18 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 17 Motion for Leave to Appear Pro Hac Vice Added Justin B. Cox.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SEC) (Entered: 03/13/2025) |
| 03/13/2025 | 19 | MOTION for Leave to File Excess Pages *[Expedited Relief Requested]* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/13/2025) |
| 03/14/2025 | 20 | Judge Indira Talwani: ELECTRONIC ORDER allowing Plaintiffs' Motion for Leave to Exceed Page Limit 19 . Plaintiffs' memorandum shall include a table of contents and table of authorities which need not be counted toward the 30-page limit. (SEC) (Entered: 03/14/2025) |
| 03/14/2025 | 21 | NOTICE of Appearance by Hillary Li on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Li, Hillary) (Entered: 03/14/2025) |
| 03/17/2025 | 22 | AMENDED COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, Todd Lyons, filed by Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany.(Freedman, John) (Entered: 03/17/2025) |
| 03/17/2025 | 23 | Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos |

| | | |
|---|---|---|
| | | Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/17/2025) |
| 03/17/2025 | 24 | EXHIBIT re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit 1 Declaration of Alejandro Doe, # 2 Exhibit 2 Declaration of Ana Doe, # 3 Exhibit 3 Declaration of Armando Doe, # 4 Exhibit 4 Declaration of Carlos Doe, # 5 Exhibit 5 Declaration of Maksym Doe, # 6 Exhibit 6 Declaration of Maria Doe, # 7 Exhibit 7 Declaration of Omar Doe, # 8 Exhibit 8 Declaration of Svitlana Doe, # 9 Exhibit 9 Declaration of Sandra McAnany, # 10 Exhibit 10 Declaration of Kyle Varner, # 11 Exhibit 11 Declaration of Wilhen Pierre Victor, # 12 Exhibit 12 Declaration of Valentin Rosales Tabares, # 13 Exhibit 13 Declaration of Adolfo Gonzalez Jr, # 14 Exhibit 14 Declaration of Marim Doe, # 15 Exhibit 15 Declaration of Teresa Doe, # 16 Exhibit 16 Declaration of Rosa Doe, # 17 Exhibit 17 Declaration of Aleksandra Doe, # 18 Exhibit 18 Aleksandra Doe Notice of Interview Cancellation by USCIS Redacted, # 19 Exhibit 19 Declaration of Andrea Doe, # 20 Exhibit 20 Fed Reg. Notice U4U April 27, 2022 - NC, # 21 Exhibit 21 Fed. Reg. Notice Venezuelan parole process Oct. 19, 2022 - NC, # 22 Exhibit 22 Fed. Reg. Notice Updates to Venezuelan parole process Jan 9, 2023 - NC, # 23 Exhibit 23 Fed. Reg. Notice re Cuban parole process Jan 9, 2023 NC, # 24 Exhibit 24 - Fed. Reg. Notice re Haitian parole process Jan 9, 2023 NC, # 25 Exhibit 25 Fed. Reg. Notice re Nicaraguan parole process Jan 9, 2023 NC, # 26 Exhibit 26 Fed. Reg. Notice re Colombian FRP NC, # 27 Exhibit 27 Fed. Reg. Notice re Ecuadorian FRP - NC, # 28 Exhibit 28 Fed. Reg. Notice re Guatemalan FRP NC, # 29 Exhibit 29 Fed. Reg. Notice re Honduran FRP NC, # 30 Exhibit 30 - Fed. Reg. Notice re Salvadoran FRP NC, # 31 Exhibit 31 - Fed. Reg. Notice re Change to Haitian FRP NC, # 32 Exhibit 32 - Fed. Reg. Notice re Change to Cuban FRP NC, # 33 Exhibit 33 - Fed. Reg. Notice re Haitian FRP NC, # 34 Exhibit 34 - Fed. Reg. Notice re Cuban FRP NC, # 35 Exhibit 35 - Fed. Reg. Notice re CAM NC, # 36 Exhibit 36 Sung Declaration, # 37 Exhibit 37 History of Parole Statute, # 38 Exhibit 38 CATO Inst. Categories of parole of INA, # 39 Exhibit 39 Decl of Yael Schacher, # 40 Exhibit 40 Decl of Eric Schwartz, # 41 Exhibit 41 Decl of Morton Halperin, # 42 Exhibit 42 Rogers Decl, # 43 Exhibit 43 2001-06-15 Bo Cooper INS Memo on Parole, # 44 Exhibit 44 Update on Form 1-134A USCIS, # 45 Exhibit 45 CBP Carrier Liaison Program notice of 1-24-25, # 46 Exhibit 46 USCIS Message to CHNV Parolee, # 47 Exhibit 47 USCIS Message to Ukrainian Parolee re: TPS, # 48 Exhibit 48 - USCIS Message to MPIP applicant, # 49 Exhibit 49 USCIS Message to U4U Parolee, # 50 Exhibit 50 Fee Schedule G-1055 USCIC)(Freedman, John) (Entered: 03/17/2025) |
| 03/18/2025 | 25 | MEMORANDUM in Support re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/18/2025) |
| 03/18/2025 | 26 | Judge Indira Talwani: ELECTRONIC ORDER entered: Under Fed.R.Civ.P. 65(a), the court "may issue a preliminary injunction only on notice to the adverse party." Plaintiffs' Emergency Motion for Preliminary Injunction 23 includes a certificate of service certifying that "this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)." As no attorney for Defendants has entered an appearance in this action, filing through ECF is |

| | | |
|---|---|---|
| | | insufficient to give Defendants notice of Plaintiffs' motion. Plaintiffs shall serve their motion 23 , supporting papers 24 , 25 , and this Order on Defendants pursuant to Fed.R.Civ.P. 5(a) and shall promptly file proof of such service with this court. Any opposition to Plaintiffs' request for emergency relief shall be filed no later than 72 hours from such service. A hearing shall be set by the clerk upon Plaintiffs' filing of proof of service. (SEC) (Entered: 03/18/2025) |
| 03/18/2025 | 27 | *NOTICE OF* Errata by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany to 24 Exhibit,,,,,,,,,,,,, *TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION*. (Attachments: # 1 Exhibit (Amended) Exhibit 19 to Plaintiffs' Motion for Preliminary Injunction) (Freedman, John) (Entered: 03/18/2025) |
| 03/18/2025 | 28 | AFFIDAVIT OF SERVICE Executed by Wilhen Pierre Victor, Marim Doe, Carlos Doe, Maksym Doe, Adolfo Gonzalez, Jr., Svitlana Doe, Ana Doe, Andrea Doe, Maria Doe, Sandra McAnany, Haitian Bridge Alliance, Omar Doe, Valentin Rosales Tabares, Alejandro Doe, Rosa Doe, Aleksandra Doe, Kyle Varner, Teresa Doe, Armando Doe. U.S. Attorney's Office for the District of Massachusetts served on 3/18/2025, answer due 4/8/2025. Acknowledgement filed by Wilhen Pierre Victor; Marim Doe; Carlos Doe; Maksym Doe; Adolfo Gonzalez, Jr.; Svitlana Doe; Ana Doe; Andrea Doe; Maria Doe; Sandra McAnany; Haitian Bridge Alliance; Omar Doe; Valentin Rosales Tabares; Alejandro Doe; Rosa Doe; Aleksandra Doe; Kyle Varner; Teresa Doe; Armando Doe. (Freedman, John) (Entered: 03/18/2025) |
| 03/19/2025 | 29 | ELECTRONIC NOTICE Setting Hearing on Motion 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* : Motion Hearing set for 3/24/2025 11:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani. (CAM) (Entered: 03/19/2025) |
| 03/19/2025 | 30 | NOTICE of Appearance by Joseph A. Darrow on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Darrow, Joseph) (Entered: 03/19/2025) |
| 03/19/2025 | 31 | Consent MOTION for Leave to File Excess Pages *In Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction* by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Attachments: # 1 Proposed Order)(Darrow, Joseph) (Entered: 03/19/2025) |
| 03/20/2025 | 32 | Judge Indira Talwani: ELECTRONIC ORDER allowing Defendants' Consent Motion for Leave to File Excess Pages 31 . Defendants are granted leave to file a memorandum in opposition to Plaintiffs' motion for preliminary injunction of up to 30 pages. The memorandum shall include a table of contents and table of authorities which need not be counted toward the 30-page limit. (SEC) (Entered: 03/20/2025) |
| 03/20/2025 | 33 | MOTION for Leave to Appear Pro Hac Vice for admission of Laura Shores, Anwen Hughes, Sarah Elnahal, Robert Stout Filing fee: $ 500, receipt number AMADC-10902779 by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit A - Certificate of Laura Shores, # 2 Exhibit B - Certificate of Anwen Hughes, # 3 Exhibit C - Certificate of Sarah Elnahal, # 4 Exhibit D - Certificate of Robert Stout)(Jang, H.) (Entered: 03/20/2025) |

| | | |
|---|---|---|
| 03/20/2025 | 34 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 33 Motion for Leave to Appear Pro Hac Vice Added Laura Shores, Anwen Hughes, Sarah Elnahal, and Robert Stout.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 03/20/2025) |
| 03/20/2025 | 35 | NOTICE of Appearance by Laura Scott Shores on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Shores, Laura) (Entered: 03/20/2025) |
| 03/20/2025 | 36 | NOTICE of Appearance by Elissa Fudim on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Fudim, Elissa) (Entered: 03/20/2025) |
| 03/21/2025 | 37 | Amicus Curiae APPEARANCE entered by Anagha Sundararajan on behalf of State of New York, et al.. (Sundararajan, Anagha) (Entered: 03/21/2025) |
| 03/21/2025 | 38 | Supplemental MOTION to Proceed under Pseudonym by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 39 | MEMORANDUM in Support re 38 Supplemental MOTION to Proceed under Pseudonym filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 40 | NOTICE of Appearance by Justin Cox on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Cox, Justin) (Entered: 03/21/2025) |
| 03/21/2025 | 41 | EXHIBIT re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action Index of Exhibits for Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction* by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Attachments: # 1 Exhibit Memorandum from Benjamine Huffman, # 2 Exhibit Email from Jennifer Higgins, # 3 Exhibit Memorandum from Andrew Davidson, # 4 Exhibit |

| | | |
|---|---|---|
| | | Declaration of Kika Scott, # 5 Exhibit USCIS Historic Processing Times)(Darrow, Joseph) (Entered: 03/21/2025) |
| 03/21/2025 | 42 | MEMORANDUM in Opposition re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Darrow, Joseph) (Entered: 03/21/2025) |
| 03/21/2025 | 43 | Judge Indira Talwani: ELECTRONIC ORDER: Upon consideration of the Plaintiffs' Supplemental Motion to Proceed Under Pseudonym 38 , pending further court order, (1) the new Doe Plaintiffs are granted leave to proceed in this matter under pseudonyms; and (2) all parties shall submit pleadings, briefing and evidence either (a) using the new Doe Plaintiffs' pseudonyms instead of their real names and other personally identifying information or (b) by redacting the new Doe Plaintiffs' names and other personally identifying information. Plaintiffs' request for a jointly-agreed upon protective order is denied without prejudice. Counsel for all parties shall comply with Local Rule 7.1(a)(2), which requires counsel to confer and attempt in good faith to resolve or narrow the issue before a motion is filed. Plaintiffs may refile their motion as: (a) a request for entry of a jointly-agreed protective order if an agreement is reached; or (b) a request for entry of Plaintiffs' proposed protective order if no agreement is reached. Either way, the motion shall include a proposed protective order. (SEC) (Entered: 03/21/2025) |
| 03/21/2025 | 44 | MOTION for Leave to File *Amicus Brief* by State of New York, et al.. (Attachments: # 1 Exhibit Proposed Memorandum of Amici States, # 2 Text of Proposed Order Proposed Order)(Sundararajan, Anagha) (Entered: 03/21/2025) |
| 03/21/2025 | 45 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *Regarding Federal Register Notice Terminating the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV)* (Attachments: # 1 Exhibit A)(Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 46 | MOTION to Certify Class by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit DECLARATION OF JOHN A. FREEDMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, # 3 Exhibit DECLARATION OF KAREN C. TUMLIN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, # 4 Exhibit DECLARATION OF ANWEN HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION)(Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 47 | MEMORANDUM in Support re 46 MOTION to Certify Class filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/21/2025) |
| 03/21/2025 | 48 | NOTICE of Appearance by Brian Ward on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Ward, Brian) (Entered: 03/21/2025) |
| 03/24/2025 | 49 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 44 MOTION for Leave to File Amicus Brief; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF |

| | | |
|---|---|---|
| | | Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 03/24/2025) |
| 03/24/2025 | 50 | AMICUS BRIEF filed by State of New York, et al. *Leave to file granted on March 24, 2025*. (Sundararajan, Anagha) (Entered: 03/24/2025) |
| 03/24/2025 | 51 | Amicus Curiae APPEARANCE entered by Anagha Sundararajan on behalf of State of New York, et al.. (Sundararajan, Anagha) (Entered: 03/24/2025) |
| 03/24/2025 | 62 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Motion Hearing held on 3/24/2025 re 23 Emergency MOTION for Preliminary Injunction *and Stay of Administrative Action* filed by Teresa Doe, Maria Doe, Kyle Varner, Armando Doe, Ana Doe, Alejandro Doe, Svitlana Doe, Adolfo Gonzalez, Jr., Andrea Doe, Omar Doe, Haitian Bridge Alliance, Marim Doe, Valentin Rosales Tabares, Maksym Doe, Aleksandra Doe, Sandra McAnany, Rosa Doe, Carlos Doe, Wilhen Pierre Victor. Case called. Court heard argument from counsel. Any motion for leave to file a 2nd amended complaint due 3/28/2025. Counsel shall confer and if possible, submit an agreed-upon schedule or a status report. Motion taken under advisement. Counsel to file an agreed-upon motion for protective order. Further hearing to be set for the morning of April 7, 2025.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Laura Flores-Perilla, Esther Sung, Karen C. Tumlin, Justin Cox, John A. Freedman, H. Tiffany Jang, Anwen Hughes (to file appearance), Brian Ward) (GAM) (Entered: 03/27/2025) |
| 03/25/2025 | 52 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephen J. Yanni Filing fee: $ 125, receipt number AMADC-10911426 by State of New York, et al.. (Attachments: # 1 Affidavit Affidavit of Stephen Yanni for Admission Pro Hac Vice)(Sundararajan, Anagha) (Entered: 03/25/2025) |
| 03/25/2025 | 53 | NOTICE of Appearance by Anwen Hughes on behalf of Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany (Hughes, Anwen) (Entered: 03/25/2025) |
| 03/26/2025 | 54 | Joint MOTION for Protective Order *Concerning Doe Plaintiffs' PII* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit A)(Freedman, John) (Entered: 03/26/2025) |
| 03/26/2025 | 55 | STATUS REPORT *(JOINT)* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/26/2025) |
| 03/26/2025 | 56 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 52 Motion for Leave to Appear Pro Hac Vice Added Stephen J. Yanni.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under** |

| | | |
|---|---|---|
| | | **ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SEC) (Entered: 03/26/2025) |
| 03/26/2025 | 57 | Judge Indira Talwani: ORDER entered granting 54 Motion for Protective Order. See attached Stipulated Protective Order Concerning Confidential Doe PII (Talwani, Indira) (Entered: 03/26/2025) |
| 03/26/2025 | 58 | Judge Indira Talwani: ELECTRONIC ORDER: the court has considered the Joint Status Report 55 and sets the following briefing schedule, which takes into account this court's trial schedule:1. The court anticipates addressing the pending Motion for Preliminary Injunction and Stay of Administrative Action 23 and Motion to Certify Class 46 , as currently filed (excluding consideration of claims relating to the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV program"), individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program). Defendants shall file their opposition to the Motion to Certify Class 46 as currently filed (excluding consideration of claims relating to the CHNV program, individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program), no later than April 4, 2025. The court will hold a hearing on both motions (excluding consideration of claims relating to the CHNV program, individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program) at 10:00 a.m. on April 7, 2025. 2. Plaintiffs shall promptly file their anticipated Motion to Amend the Complaint to address the issuance of the recently published Federal Register Notice, entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13,611 (March 25, 2025).3. Plaintiffs shall file their anticipated Supplemental Motion for Preliminary Injunction and Stay of Administrative Action and Supplemental Motion to Certify Class as to claims relating to the CHNV program, individuals paroled in pursuant to that program, or parole sponsorships pursuant to that program by March 27, 2025. Defendants shall file any oppositions to these supplemental motions no later than April 8, 2025. The clerk will set a hearing on these supplemental motions for April 10, 2025, at 3:00 p.m. (Talwani, Indira) (Entered: 03/26/2025) |
| 03/26/2025 | 59 | MOTION for Leave to File *Second Amended Complaint (Unopposed)* by Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit - Second Amended Complaint, # 2 Exhibit - Second Amended Complaint (Redline Copy))(Freedman, John) (Entered: 03/26/2025) |
| 03/26/2025 | 60 | MEMORANDUM in Support re 59 MOTION for Leave to File *Second Amended Complaint (Unopposed)* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/26/2025) |
| 03/27/2025 | 61 | Judge Indira Talwani: ELECTRONIC ORDER: Good cause shown, Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint 59 is GRANTED. |

| | | |
|---|---|---|
| | | Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 03/27/2025) |
| 03/27/2025 | 63 | ELECTRONIC NOTICE of Hearings (See Order at docket entry 58 re 55 ):<br><br>Hearing set for 4/7/2025 10:00 AM in Courtroom 9 (In person only) before Judge Indira Talwani.<br><br>Hearing set for 4/10/2025 03:00 PM in Courtroom 9 (In person only) before Judge Indira Talwani.<br><br>(GAM) Modified on 4/14/2025 to correct docket reference (GAM). (Entered: 03/27/2025) |
| 03/27/2025 | 64 | Supplemental MOTION *(Second Supplemental Motion to Proceed Under Pseudonym)* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Attachment A - Proposed Order, # 2 Attachment B - Federal Register Notice (90 FR 13611), # 3 Attachment C - Lucia Doe Decl., # 4 Attachment D - Miguel Doe Decl., # 5 Attachment E - Daniel Doe Decl., # 6 Attachment F - Gabriela Doe Decl.)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 65 | MEMORANDUM in Support re 64 Supplemental MOTION *(Second Supplemental Motion to Proceed Under Pseudonym)* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 66 | Transcript of Motion Hearing held on March 24, 2025, before Judge Indira Talwani. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 4/17/2025. Redacted Transcript Deadline set for 4/28/2025. Release of Transcript Restriction set for 6/25/2025. (DRK) (Entered: 03/27/2025) |
| 03/27/2025 | 67 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 03/27/2025) |
| 03/27/2025 | 68 | AMENDED COMPLAINT *SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF* against Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany.(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 69 | Judge Indira Talwani: ELECTRONIC ORDER: granting Plaintiffs' Second Supplemental Motion to Proceed under Pseudonym 64 . Plaintiffs seek "a supplement to the March 3, 2025 and March 21, 2025 Orders (Doc. Nos. 8 , 43 ) permitting certain plaintiffs to |

| | | |
|---|---|---|
| | | proceed in this litigation using pseudonyms to protect their identities from public disclosure." Pending further court order, (1) new Plaintiffs identified as Lucia Doe, Miguel Doe, Daniel Doe, and Gabriela Doe are granted leave to proceed in this matter under pseudonyms; and (2) all parties shall submit pleadings, briefing and evidence either (a) using the new Doe Plaintiffs' pseudonyms instead of their real names and other personally identifying information or (b) by redacting the new Doe Plaintiffs' names and other personally identifying information. The court orders further that the reference to "Doe Plaintiffs" in the Stipulated Protective Order Concerning Confidential Doe PII 57 includes the new Doe Plaintiffs. (SEC) (Entered: 03/27/2025) |
| 03/27/2025 | 70 | Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 71 | EXHIBIT re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE INDEX OF EXHIBITS* by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Exhibit 1: Federal Register Notice 90 FR 13611, # 2 Exhibit 2: Norma Lorena Dus Declaration, # 3 Exhibit 3: Haitian Bridge Alliance Declaration)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 72 | MEMORANDUM in Support re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 73 | Supplemental MOTION to Certify Class by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 03/27/2025) |
| 03/27/2025 | 74 | MEMORANDUM in Support re 73 Supplemental MOTION to Certify Class filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 03/27/2025) |
| 03/28/2025 | 75 | NOTICE of Appearance by Stephen J. Yanni on behalf of State of New York, et al. (Yanni, Stephen) (Entered: 03/28/2025) |

| | | |
|---|---|---|
| 03/31/2025 | 76 | NOTICE of Appearance by Katherine J. Shinners on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump (Shinners, Katherine) (Entered: 03/31/2025) |
| 04/01/2025 | 77 | MOTION for Order by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts.(Ward, Brian) Modified event type on 4/1/2025 (SEC). (Entered: 04/01/2025) |
| 04/01/2025 | 78 | Opposition re 77 MOTION for Order *to Provide Identifying Information for the Individual Plaintiffs* filed by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 04/01/2025) |
| 04/02/2025 | 79 | Judge Indira Talwani: MEMORANDUM AND ORDER entered.<br><br>For the foregoing reasons, Defendants' Motion for an Order to Provide Identifying Information for the Individual Plaintiffs [Doc. No. 77 ] is DENIED. No later than April 5, 2025, Plaintiffs shall disclose their identities to this court under seal to facilitate a recusal check.<br><br>**IT IS SO ORDERED.**(SEC) (Entered: 04/02/2025) |
| 04/02/2025 | 80 | MOTION FOR PUBLIC TELEPHONE ACCESS by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany. (Freedman, John) (Entered: 04/02/2025) |
| 04/03/2025 | 81 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany re 79 Memorandum & ORDER, *Notice of True Identities of Doe Plaintiffs* (Freedman, John) (Additional attachment(s) added on 4/3/2025: # 1 *SEALED* Exhibit A) (SEC). (Entered: 04/03/2025) |
| 04/04/2025 | 82 | Judge Indira Talwani: ELECTRONIC ORDER denying Plaintiffs' Motion for Telephone Access 80 . See Local Rule 83.3. (GAM) (Entered: 04/04/2025) |
| 04/04/2025 | 83 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *of Defendants' Actions regarding U4U* (Attachments: # 1 Exhibit A)(Sung, Esther) (Entered: 04/04/2025) |
| 04/04/2025 | 84 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *Notice of Supplemental Authority* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Sung, Esther) (Entered: 04/04/2025) |

| | | |
|---|---|---|
| 04/04/2025 | 85 | MEMORANDUM in Opposition re 46 MOTION to Certify Class filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. (Shinners, Katherine) (Entered: 04/04/2025) |
| 04/05/2025 | 86 | Response by Kristi Noem, Caleb Vitello, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts to 83 Notice (Other), *Response to Plaintiffs' Notice Of Defendants' Actions Regarding U4U*. (Darrow, Joseph) (Entered: 04/05/2025) |
| 04/06/2025 | 87 | Response by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts to 84 Notice (Other), *Response to Plaintiffs' Notice of Supplemental Authority*. (Darrow, Joseph) (Entered: 04/06/2025) |
| 04/07/2025 | 96 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Hearing held on 4/7/2025. Case called. Court heard argument from counsel. Hearing continued to 4/10/2025 at 03:00 PM in Courtroom 9 (In person only) before Judge Indira Talwani.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.) (Attorneys present: Justin Cox, Laura Flores-Perilla, John A. Freedman, Anwen Hughes, H. Tiffany Jang, Hillary Li, Esther Sung, Karen C. Tumlin, Brian Ward) (GAM) (Entered: 04/14/2025) |
| 04/08/2025 | 88 | EXHIBIT re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. (Attachments: # 1 Exhibit A - USCIS Notice of Termination)(Shinners, Katherine) (Entered: 04/08/2025) |
| 04/08/2025 | 89 | MEMORANDUM in Opposition re 70 Emergency MOTION for Preliminary Injunction *AND STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE* filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts. (Darrow, Joseph) (Entered: 04/08/2025) |
| 04/08/2025 | 90 | Opposition re 73 Supplemental MOTION to Certify Class filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. (Shinners, Katherine) (Entered: 04/08/2025) |
| 04/09/2025 | 91 | NOTICE of Appearance by Rayford A. Farquhar on behalf of Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts (Farquhar, Rayford) (Entered: 04/09/2025) |
| 04/10/2025 | 92 | Transcript of Hearing held on April 7, 2025, before Judge Indira Talwani. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 5/1/2025. Redacted Transcript Deadline set for 5/12/2025. Release of Transcript Restriction set for 7/9/2025. (DRK) (Entered: 04/10/2025) |
| 04/10/2025 | 93 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/10/2025) |
| 04/10/2025 | 94 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Hearing held on 4/10/2025. Court hears argument from the parties; Court takes the matter under advisement. (Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Freedman, Hughes, Sung, Jang, Li, Cox, Tumlin, Flores-Perilla for plaintiffs; |

| | | |
|---|---|---|
| | | Ward for defendants) (TRM) Modified on 4/13/2025, to correct judge's name (GAM). (Entered: 04/11/2025) |
| 04/13/2025 | 95 | NOTICE by Kyle Varner, Wilhen Pierre Victor, Haitian Bridge Alliance, Andrea Doe, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Svitlana Doe, Maksym Doe, Miguel Doe, Lucia Doe, Daniel Doe, Gabriela Doe, Norma Lorena Dus, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Sandra McAnany *of Defendants' Actions Regarding "Notice of Parole Termination" sent to Parolees & Non-Parolees* (Sung, Esther) (Entered: 04/13/2025) |
| 04/14/2025 | 97 | Judge Indira Talwani: ORDER entered granting 70 in part PLAINTIFFS' EMERGENCY MOTION FOR A STAY OF DHS'S EN MASSE TRUNCATION OF ALL VALID GRANTS OF CHNV PAROLE. The court grants emergency relief as follows: 1. The Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025), is hereby STAYED pending further court order insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV parole programs") prior to the noncitizen's originally stated parole end date. 2. All individualized notices sent to noncitizens from Cuba, Haiti, Nicaragua, and Venezuela via their USCIS online account notifying them that their parole is being revoked without case-by-case review pursuant to the Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025), are also STAYED pending further court order. See attached Memorandum and Order.(Talwani, Indira) (Entered: 04/14/2025) |
| 04/14/2025 | 98 | Judge Indira Talwani: ORDER entered granting in part 73 Motion to Certify Class. See attached Order Granting Class Certification. (Talwani, Indira) (Entered: 04/14/2025) |
| 04/17/2025 | 99 | Judge Indira Talwani: ELECTRONIC ORDER: Plaintiff has filed two notices regarding recent emails. See Notice 83 ; Notice 95 . The first notice reports that emails, dated April 3, 2025, with the subject line "Notice of Termination of Parole," were received by Plaintiff Maksym Doe and others who have been paroled into the United States pursuant to the Uniting for Ukraine ("U4U") program, directing them that their parole would terminate 7 days from the date of the notice. See [83-1]. Defendants responded that the emails referenced in that notice were sent in error and that "U4U parolees were not intended to receive this message." See Response 86 .<br><br>Plaintiffs' second notice reports that Defendants have continued sending the "Notice of Termination of Parole" email [83-1] to an unknown number of parolees, including paroles under the Operation Allies Welcome ("OAW") program. Defendants shall notify the court by 2 p.m. on April 18, 2025, whether emails entitled "Notice of Termination of Parole," have been sent en masse to parolees who entered the United States under any other programs identified in Plaintiffs' Second Amended Complaint 68 , including the OAW program, and, if so, whether those parolees also were not intended to receive this message. (SEC) (Entered: 04/17/2025) |
| 04/18/2025 | 100 | NOTICE OF APPEAL as to 97 Order on Motion for Preliminary Injunction,,,, 98 Order on Motion to Certify Class by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by** |

| | | |
|---|---|---|
| | | **visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 5/8/2025. (Shinners, Katherine) (Entered: 04/18/2025)** |
| 04/18/2025 | 101 | RESPONSE TO COURT ORDER by Kristi Noem, Caleb Vitello, Pete R. Flores, Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts re 99 Order,,,,, . (Darrow, Joseph) (Entered: 04/18/2025) |
| 04/18/2025 | 102 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 100 Notice of Appeal. (MAP) (Entered: 04/18/2025) |
| 04/18/2025 | 103 | USCA Case Number 25-1384 for 100 Notice of Appeal, filed by Caleb Vitello, Kristi Noem, Pete R. Flores, Kika Scott, Todd Lyons, Donald J. Trump. (MAP) (Entered: 04/18/2025) |
| 04/18/2025 | 104 | Transcript of Hearing held on April 10, 2025, before Judge Indira Talwani. COA Case No. 25-1384. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 5/9/2025. Redacted Transcript Deadline set for 5/19/2025. Release of Transcript Restriction set for 7/17/2025. (DRK) (Entered: 04/21/2025) |
| 04/18/2025 | 105 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 04/21/2025) |
| 05/09/2025 | 106 | STIPULATION *regarding Production of Administrative Record and Time for Defendants to Respond to Second Amended Complaint* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 05/09/2025) |

| | | |
|---|---|---|
| 05/28/2025 | 107 | Judge Indira Talwani: ORDER entered granting in part 23 PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND STAY OF ADMINISTRATIVE ACTION. The court grants emergency relief as follows: 1. The January 23, 2025 email from former Acting Director of the U.S. Citizenship and Immigration Services Jennifer B. Higgins is hereby STAYED pending further court order, insofar as it suspends adjudications of re-parole applications filed by individuals who received parole pursuant to the programs specified in that email and insofar as it suspends adjudications of applications for non-parole benefits filed by individuals who received parole pursuant to those same programs; 2. Any actions by Defendants suspending adjudications of initial parole and re-parole applications filed by individuals who are seeking or who have received parole pursuant to the Military Parole in Place (MPIP) program, as well as applications for other immigration benefits filed by individuals paroled through that program, are hereby STAYED pending further court order; 3. The February 14, 2025 memorandum by Acting Deputy Director of USCIS, Andrew Davidson, is hereby STAYED pending further court order, insofar as it suspends adjudications for immigration benefits applications filed by individuals who received parole through the Uniting for Ukraine (U4U) and Family Reunification Parole (FRP) programs, as well as through the parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the CHNV parole programs), and insofar as it directs agency staff that the administrative hold may only be lifted on a case-by-case basis even when aliens are members of a class that is subject to... [a] court order. See attached Memorandum and Order. (Talwani, Indira) (Entered: 05/28/2025) |
| 05/28/2025 | 108 | Judge Indira Talwani: ORDER entered granting in part 73 Motion to Certify Class. See attached Amended Order Granting Class Certification. The court's prior Order Granting Class Certification 98 is superseded by the attached Amended Order. (Talwani, Indira) (Entered: 05/28/2025) |
| 05/29/2025 | 109 | Consent MOTION for Extension of Time to June 30, 2025 to File Answer by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello.(Ward, Brian) (Entered: 05/29/2025) |
| 05/30/2025 | 110 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 109 Consent MOTION for Extension of Time to June 30, 2025 to File Answer. (SEC) (Entered: 05/30/2025) |
| 05/30/2025 | 111 | Judge Indira Talwani: ELECTRONIC ORDER **vacating** Order 110 allowing Consent Motion for Extension of Time 109 in light of the Supreme Court's grant of the application for a stay of this court's April 14, 2025 order. Defendants may refile their motion for an extension of time to file their responsive pleading after conferring with Plaintiffs' counsel. Any such motion shall include a Local Rule 7.1 certificate. (SEC) (Entered: 05/30/2025) |
| 05/30/2025 | 112 | MOTION for Leave to File Excess Pages *for Memorandum In Support of Motion to Dismiss* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Attachments: # 1 Text of Proposed Order)(Shinners, Katherine) (Entered: 05/30/2025) |
| 05/30/2025 | 113 | MOTION to Dismiss for Lack of Jurisdiction , MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM ( Responses due by 6/13/2025) by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Attachments: # 1 Text of Proposed Order)(Shinners, Katherine) (Entered: 05/30/2025) |
| 05/30/2025 | 114 | MEMORANDUM in Support re 113 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Shinners, Katherine) (Entered: 05/30/2025) |

| | | |
|---|---|---|
| 06/02/2025 | 115 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 112 MOTION for Leave to File Excess Pages *for Memorandum In Support of Motion to Dismiss*. (SEC) (Entered: 06/02/2025) |
| 06/05/2025 | 116 | MOTION for Order to Show Cause by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 06/05/2025) |
| 06/05/2025 | 117 | EXHIBIT re 116 MOTION for Order to Show Cause *(Index of Exhibits)* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit - 1, # 2 Exhibit - 2, # 3 Exhibit - 3, # 4 Exhibit - 4, # 5 Exhibit - 5, # 6 Exhibit - 6, # 7 Exhibit - 7, # 8 Exhibit - 8, # 9 Exhibit - 9, # 10 Exhibit - 10, # 11 Exhibit - 11)(Freedman, John) (Entered: 06/05/2025) |
| 06/05/2025 | 118 | MEMORANDUM in Support re 116 MOTION for Order to Show Cause filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 06/05/2025) |
| 06/06/2025 | 119 | Judge Indira Talwani: ELECTRONIC ORDER entered: On May 28, 2025, this court entered an Order 107 staying Defendants' actions suspending adjudications of applications for non-parole immigration benefits, initial parole, and re-parole as to individuals who received parole through certain parole programs. On June 5, 2025, Plaintiffs filed a Notice and Motion for an Order to Show Cause 116 informing the court that Plaintiffs' counsel have received multiple communications from class members reporting that the USCIS website messaging system is still stating that USCIS's "has placed an administrative hold on all benefit requests filed by aliens who are or were paroled into the United States under the UFU, CHNV, or FRP processes[,]" that USCIS "has placed an administrative hold" on all such requests "[d]ue to the Jan. 20, 2025 Executive Order[,]" and similar statements.<br><br>Defendants shall notify this court by 5:00 p.m. on June 9, 2025, of the steps they have taken to resume adjudicating requests for immigration benefits for the class members described in this court's Order Granting Class Certification 108 , as is required by this court's May 28, 2025 Order 107 . This report shall include details on USCIS's updates to its website virtual agent and other form communications regarding any ongoing suspension or resumption of adjudications. (SEC) (Entered: 06/06/2025) |
| 06/09/2025 | 120 | RESPONSE TO COURT ORDER by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello re 119 Order,,,,,, Set Deadlines,,,,, . (Attachments: # 1 Declaration of Kika Scott)(Shinners, Katherine) (Entered: 06/09/2025) |
| 06/10/2025 | 121 | Judge Indira Talwani: ELECTRONIC ORDER entered: On June 6, 2025, this court ordered Defendants to notify this court of the steps they have taken to resume adjudicating requests for immigration benefits for the class members described in this court's Order Granting Class Certification 108 , as required by this court's May 28, 2025 Order 107 . The court stated that the report must include details on USCIS's updates to its website virtual agent and other form communications regarding any ongoing suspension |

| | | |
|---|---|---|
| | | or resumption of adjudications.<br><br>Defendants' Response 120 stated that, as of June 9, 2025, "USCIS has lifted any hold on or suspension of the adjudication of (1) requests for re-parole and any associated benefits that may have been paused pursuant to the January 23, 2025 email from former Acting Director of U.S. Citizenship and Immigration Services, Jennifer B. Higgins; (2) requests for other immigration benefits filed by aliens who were paroled into the United States under the FRP and U4U programs as well as the CHNV parole programs, as set forth in the February 14, 2025 memorandum by former Acting Deputy Director of USCIS, Andrew Davidson, or in the Higgins email; and (3) any requests for Military Parole in Place and associated benefits (to the extent any individual case was held or suspended)." Defendants further stated that "[o]perational guidance, technical changes to USCIS systems, website virtual agent scripts, and other form communications necessary to execute [such actions] **will be implemented**." (Emphasis added).<br><br>No later than June 13, 2025, Defendants shall confirm that updates to Defendants' guidance, systems, website virtual agent scripts, and other form communications have been implemented. (SEC) (Entered: 06/10/2025) |
| 06/10/2025 | 122 | MOTION for Leave to Appear Pro Hac Vice for admission of Inyoung Hwang and Javier Ortega Alvarez Filing fee: $ 250, receipt number AMADC-11060413 by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit A) Certificate of Inyoung Hwang in Support of Motion to Appear and Practice Pro Hac Vice, # 2 Exhibit B) Certificate of Javier Ortega Alvarez in Support of Motion to Appear and Practice Pro Hac Vice)(Jang, H.) (Entered: 06/10/2025) |
| 06/11/2025 | 123 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 122 Motion for Leave to Appear Pro Hac Vice. Added Inyoung Hwang and Javier Ortega Alvarez.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 06/11/2025) |
| 06/13/2025 | 124 | RESPONSE TO COURT ORDER by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello re 121 Order,,,,,,, . (Attachments: # 1 Declaration of Kika Scott)(Shinners, Katherine) (Entered: 06/13/2025) |
| 06/13/2025 | 125 | MEMORANDUM in Opposition re 113 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge |

| | | |
|---|---|---|
| | | Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 06/13/2025) |
| 06/16/2025 | 126 | NOTICE of Appearance by Inyoung Hwang on behalf of Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor (Hwang, Inyoung) (Entered: 06/16/2025) |
| 06/16/2025 | 127 | Judge Indira Talwani: ELECTRONIC ORDER: On June 6, 2025, this court ordered Defendants to notify this court of the steps they have taken to resume adjudicating requests for immigration benefits for the class members described in this court's Order Granting Class Certification 108 , as required by this court's May 28, 2025 Order 107 . The order stated that the report "shall include details on USCIS's updates to its website virtual agent and other form communications regarding any ongoing suspension or resumption of adjudications." Id.<br><br>USCIS Acting Deputy Director Kika Scott stated in response, that, inter alia, on June 9, 2025, the Acting Director for USCIS issued a memorandum (the "Alfonso-Royals Memo") authorizing USCIS officers to resume adjudications and that "[o]perational guidance, technical changes to USCIS systems, website virtual agent scripts, and other form communications necessary to execute the Alfonso-Royals Memo **will be implemented**." Declaration of Kika Scott ¶ 8 [120-1] (Emphasis added). On June 10, 2025, the court ordered Defendants to confirm, no later than June 13, 2025, that those updates to Defendants' guidance, systems, website virtual agent scripts, and other form communications had been implemented.<br><br>On June 13, 2025, Acting Deputy Director Scott filed a further declaration stating that USCIS has updated the scripts used by USCIS's "website virtual agent" (Emma) as well as "the reference materials used by Contact Center agents to respond to customer inquiries received by phone or secure message online regarding the status of immigration benefit requests impacted by the May 28 court order and the Alfonso-Royals Memo," and further stating: "developers are working to prepare an estimate for completing work necessary to remove the tag from all existing cases, although the level of effort required may vary depending on the case management system used to process a particular type of benefit and the number of the specific type of immigration benefit requests that are on hold. **All processing holds rescinded under the Alfonso-Royals Memo will be removed from case management systems by June 19, 2025.**" Second Declaration of Kika Scott ¶¶ 6, 8 [124-1] (Emphasis added).<br><br>No later than June 19, 2025, Defendants shall confirm that all processing holds rescinded under the Alfonso-Royals Memo have been removed from case management systems. Defendants shall also confirm by that date that they have made all necessary updates to their guidance, systems, website virtual agent scripts, and other form communications for the processing holds to be lifted and for all applicants to be properly informed of the same.<br><br>(SEC) (Entered: 06/16/2025) |
| 06/16/2025 | 128 | MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit Certification & Index of CHNV |

| | | |
|---|---|---|
| | | termination AR, # 2 Exhibit USCIS, Ukraine & CHNV Parolee Immigrant Benefit Tracking: Cumulative Statistics (Feb. 9, 2025), # 3 Exhibit USCIS, Ukraine & CHNV Parolee Immigrant Benefit Tracking: Cumulative Statistics (Mar. 9, 2025), # 4 Exhibit DHS Off. of Homeland Sec. Stats., Data Table for CHNV Notice (Feb. 26, 2025) Tab labeled 77, # 5 Exhibit DHS, Decision Document, USCIS Notice: Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 21, 2025), # 6 Exhibit Memorandum from Graham Dudley, CBP Director, to File, Impact of the Parole Programs for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 14, 2025), # 7 Exhibit Memorandum from Ray Provencio, Acting Exec. Dir., CBP, To Exec. Dirs., Implementation of Active Executive Orders (Jan. 27, 2025), # 8 Exhibit Memorandum from Acting DHS Secy Huffman to Component Heads, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), # 9 Exhibit CBP, Carrier Liaison Program, Executive Order on Securing Our Borders (Jan. 22, 2025), # 10 Exhibit USCIS, Fraud Detection & Natl Sec. Directorate, I-134A Filing Trend Analysis (May 10, 2024), # 11 Exhibit USCIS, FAQs About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Oct. 4, 2024), # 12 Exhibit USCIS, Immigr. Recs. & Identity Servs. Directorate, Form I-134A - Reviewers Guide (Dec. 2, 2024), # 13 Exhibit USCIS, Immigr. Recs. & Identity Servs. Directorate, Form I-134A - Reviewers Guide (July 9, 2024), # 14 Exhibit Certification & Index of AR for Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266 (Jan. 9, 2023), # 15 Exhibit Certification & Index of AR for Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023), # 16 Exhibit Certification & Index of AR for Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023), # 17 Exhibit Certification & Index of AR for Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1,279 (Jan. 9, 2023), # 18 Exhibit Press Release, DHS Releases Statement on Major SCOTUS Victory for Trump Administration and the American People on Ending the CHNV Parole Program (May 30, 2025), www.dhs.gov/news/2025/05/30/dhs-releases-statement-major-scotus-victory-trump-administration-and-american, # 19 Exhibit USCIS, Litigation-Related Update: Supreme Court stay of CHNV Preliminary Injunction (June 6, 2025), www.uscis.gov/newsroom/alerts/litigation-related-update-supreme-court-stay-of-chnv-preliminary-injunction, # 20 Exhibit ress Release, DHS Issues Notices of Termination for the CHNV Parole Program, Encourages Parolees to Self-Deport Immediately (June 12, 2025), www.dhs.gov/news/2025/06/12/dhs-issues-notices-termination-chnv-parole-program-encourages-parolees-self-deport, # 21 Text of Proposed Order)(Cox, Justin) (Entered: 06/16/2025) |
| 06/16/2025 | 129 | MEMORANDUM in Support re 128 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Statement of Undisputed Facts, # 2 Index of Exhibits in Support of Plaintiffs' Motion for Partial Summary Judgment as to the Mass Truncation of CHNV Parole)(Cox, Justin) (Entered: 06/16/2025) |
| 06/18/2025 | 130 | MOTION for Extension of Time to June 20, 2025, to Respond to June 16 Order, ECF No. 127 by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello.(Ward, Brian) (Entered: 06/18/2025) |
| 06/18/2025 | 131 | Judge Indira Talwani: ELECTRONIC ORDER **granting** Defendant's unopposed Motion for One-Day Extension 130 . Defendant's time to comply with this court's order of June 16, 2025 127 is extended to June 20, 2025. (SEC) (Entered: 06/18/2025) |

| | | |
|---|---|---|
| 06/20/2025 | 132 | RESPONSE TO COURT ORDER by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello re 127 Order,,,,,,,,,, . (Attachments: # 1 Declaration of Kika Scott)(Shinners, Katherine) (Entered: 06/20/2025) |
| 06/24/2025 | 133 | Judge Indira Talwani: ELECTRONIC ORDER: On June 6, 2025, this court ordered Defendants to notify this court of the steps they have taken to resume adjudicating requests for immigration benefits for the class members described in this court's Order Granting Class Certification 108 , as required by this court's May 28, 2025 Order 107 . See Elec. Order 119 . The Order stated that the report "shall include details on USCIS's updates to its website virtual agent and other form communications regarding any ongoing suspension or resumption of adjudications." Id.<br><br>USCIS Acting Deputy Director Kika Scott stated in response, inter alia, that on June 9, 2025, the Acting Director for USCIS issued a memorandum (the "Alfonso-Royals Memo") authorizing USCIS officers to resume adjudications and that "[o]perational guidance, technical changes to USCIS systems, website virtual agent scripts, and other form communications necessary to execute the Alfonso-Royals Memo **will be implemented.**" Declaration of Kika Scott ¶ 8 [120-1] (Emphasis added). On June 10, 2025, the court ordered Defendants to confirm, no later than June 13, 2025, that those updates to Defendants' guidance, systems, website virtual agent scripts, and other form communications had been implemented. See Elec. Order 121 .<br><br>On June 13, 2025, Acting Deputy Director Scott filed a further declaration stating that USCIS had updated the scripts used by USCIS's "'website virtual agent' (Emma)" as well as "the reference materials used by Contact Center agents to respond to customer inquiries received by phone or secure message online regarding the status of immigration benefit requests impacted by the May 28 court order and the Alfonso-Royals Memo," and further stating: "developers are working to prepare an estimate for completing work necessary to remove the tag from all existing cases, although the level of effort required may vary depending on the case management system used to process a particular type of benefit and the number of the specific type of immigration benefit requests that are on hold. **All processing holds rescinded under the Alfonso-Royals Memo will be removed from case management systems by June 19, 2025.**" Second Declaration of Kika Scott ¶¶ 6, 8 [124-1] (Emphasis added).<br><br>On June 16, 2025, the court order Defendants to confirm, by June 19, 2025, that all processing holds rescinded under the Alfonso-Royals Memo have been removed from case management systems and to confirm that they have made all necessary updates to their guidance, systems, website virtual agent scripts, and other form communications for the processing holds to be lifted and for all applicants to be properly informed of the same. See Elec. Order 127 . The court granted an extension of Defendants' deadline to respond to June 20, 2025. See Elec. Order 131 .<br><br>On June 20, 2025, Acting Deputy Director Scott filed a further declaration stating that "[a]s of June 19, 2025, all processing holds rescinded under the Alfonso-Royals Memo have been lifted in USCIS systems." Third Declaration of Kika Scott ¶ 7 [132-1]. The declaration further stated: "Other implementation efforts are ongoing[,]" including that "[t]he USCIS adjudicative directorates... have begun developing guidance necessary for adjudicating each type of benefit request, which will be distributed as it is finalized. The guidance instructs adjudicators to resume processing of benefit requests that were previously on hold and on vetting procedures for cases in which fraud or national security risk indicators have been identified." Id. ¶ 8.<br><br>No later than June 30, 2025, Defendants shall confirm that the guidance for USCIS adjudicative directorates is complete and has been implemented, and shall confirm that |

| | | |
|---|---|---|
| | | Defendants have completed all other implementation efforts necessary for processing holds to be lifted and for all applicants to be properly informed of the same. (SEC) (Entered: 06/24/2025) |
| 06/26/2025 | 134 | MOTION for Leave to File *Reply in Support of Notice and Motion for Order to Show Cause* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit Proposed Reply in Support of Notice and Motion for Order to Show Cause, # 2 Exhibit Index of Exhibits and Exhibits, # 3 Text of Proposed Order Proposed Order)(Galli-Graves, Brandon) (Entered: 06/26/2025) |
| 06/26/2025 | 135 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 134 MOTION for Leave to File *Reply in Support of Notice and Motion for Order to Show Cause.* (SEC) (Entered: 06/26/2025) |
| 06/26/2025 | 136 | EXHIBIT re 116 MOTION for Order to Show Cause *Index of Exhibits for Plaintiffs' Reply in Support of Notice and Motion to Show Cause* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit USCIS Alfonso-Royals Memo dated June 9, 2025, # 2 Exhibit Declaration of Emily Martin, Paralegal, Justice Action Center, # 3 Exhibit USCIS Response to U4U Beneficiary dated June 23, 2025, # 4 Exhibit USCIS Response to U4U Beneficiary dated June 23, 2025, # 5 Exhibit Declaration of Aleksandra Doe, # 6 Exhibit Emails Between Aleksandra Doe and Congressman Liccardos Staff Member)(Galli-Graves, Brandon) (Entered: 06/26/2025) |
| 06/26/2025 | 137 | REPLY to Response to 116 MOTION for Order to Show Cause filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Galli-Graves, Brandon) (Entered: 06/26/2025) |
| 06/30/2025 | 138 | Judge Indira Talwani: ELECTRONIC ORDER entered: On May 28, 2025, this court entered an Order 107 staying Defendants' actions suspending adjudications of applications for non-parole immigration benefits, initial parole, and re-parole as to individuals who received parole through certain parole programs. On June 5, 2025, Plaintiffs filed a Notice and Motion for an Order to Show Cause 116 informing the court that Plaintiffs' counsel have received multiple communications from class members reporting that the USCIS website messaging system is still stating that USCIS "has placed an administrative hold on all benefit requests filed by aliens who are or were paroled into the United States under the UFU, CHNV, or FRP processes[,]" that USCIS "has placed an administrative hold" on all such requests "[d]ue to the Jan. 20, 2025 Executive Order[,]" and similar statements. That motion remains pending.<br><br>The court subsequently ordered Defendants to provide updates concerning, inter alia, the steps they have taken to resume adjudicating requests for immigration benefits, as required by this court. See Elec. Order 119 ; Elec. Order 121 ; Elec. Order 127 . Defendants have filed limited responses. See Response 120 ; Response 124 ; Response 132 . |

| | | |
|---|---|---|
| | | Most recently, this court ordered Defendants to confirm, no later than June 30, 2025, that the guidance for USCIS adjudicative directorates is complete and has been implemented, and to confirm that Defendants have completed all other implementation efforts necessary for processing holds to be lifted and for all applicants to be properly informed of the same. See Elec. Order 133 .<br><br>On June 26, 2025, Plaintiffs filed a Reply in Support of their Motion for an Order to Show Cause 137 contending that, despite this court's May 28, 2025 Order 107 staying the February 14 Davidson Memorandum, Defendants are continuing the suspension of adjudications for immigration benefits applications filed by individuals who received parole through the Uniting for Ukraine (U4U) and Family Reunification Parole (FRP) programs, as well as through the parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela (the CHNV parole programs), and that the *status quo ante* has not been restored. Specifically, Plaintiffs point to language in the Alfonso-Royals Memorandum stating that processing will only resume "once USCIS has completed the additional vetting required for the parolees individual request to identify any fraud, public safety, or national security concerns."<br><br>Defendants' response to the court's Order 133 due June 30, 2025, shall respond to the court's Order 133 and shall also respond to Plaintiffs' Reply 137 , including (1) notifying the court of the process Defendants are implementing for "complet[ing] the additional vetting required for... parolee's individual request[s]" (emphasis added); (2) explaining why, if directed at individuals rather than the categorical programs, the vetting is not occurring as part of the adjudication of the requests but is a prerequisite to adjudicating those requests; (3) notifying the court of how many individuals' "vetting" has been completed since the court's May 28, 2025 Order 107 ; and (4) providing a copy of the guidance for USCIS adjudicative directorates referenced above. In light of the additional information due, Defendants' time to respond is extended to July 1, 2025., (SEC) (Entered: 06/30/2025) |
| 07/01/2025 | 139 | RESPONSE TO COURT ORDER by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello re 133 Order,,,,,,,,,,,,,,, 138 Order,,,,,,,,,,,,, . (Attachments: # 1 Declaration of Kika Scott)(Shinners, Katherine) (Entered: 07/01/2025) |
| 07/07/2025 | 140 | MEMORANDUM in Opposition re 128 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* filed by Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 07/07/2025) |
| 07/07/2025 | 141 | Statement of Material Facts L.R. 56.1 re 128 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole (response to Plaintiffs' 56.1 Statement)* filed by Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 07/07/2025) |
| 07/09/2025 | 142 | NOTICE of Appearance by Rohan J. Samaraweera on behalf of Immigration Reform Law Institute (Samaraweera, Rohan) (Entered: 07/09/2025) |
| 07/09/2025 | 143 | Amended Statement of Material Facts L.R. 56.1 re 128 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole [CORRECTED Response to Plaintiffs' 56.1 Statmement, to replace Doc. No. 141]* filed by Pete R. Flores, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 07/09/2025) |
| 07/11/2025 | 144 | MOTION for Leave to Appear Pro Hac Vice for admission of Gabriel R. Canaan Filing fee: $ 125, receipt number AMADC-11118041 by Immigration Reform Law Institute. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Affidavit Certificate of Atty. G. Canaan)(Samaraweera, Rohan) (Entered: 07/11/2025) |
| 07/14/2025 | 145 | MOTION for Leave to File *Amicus Brief* by Immigration Reform Law Institute. (Attachments: # 1 Proposed Order on Motion for Leave to File Amicus Brief, # 2 Amicus Brief of Immigration Reform Law Institute)(Samaraweera, Rohan) Modified on 7/14/2025 (SEC). (Entered: 07/14/2025) |
| 07/14/2025 | 146 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 144 Motion for Leave to Appear Pro Hac Vice Added Gabriel R. Canaan.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SEC) (Entered: 07/14/2025) |
| 07/15/2025 | 147 | Judge Indira Talwani: ELECTRONIC ORDER **granting** 145 MOTION for Leave to File Amicus Brief by Immigration Reform Law Institute.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 07/15/2025) |
| 07/15/2025 | 148 | AMICUS BRIEF filed by Immigration Reform Law Institute *in Opposition to Plaintiffs Motion for Partial Summary Judgement (allowed by 7-15-2025 Order)*. (Samaraweera, Rohan) (Entered: 07/15/2025) |
| 07/15/2025 | 149 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by Immigration Reform Law Institute re 148 Amicus brief filed *Amended Certificate of Service for ECF Doc. 148 filed 7-15-2025*. (Samaraweera, Rohan) (Entered: 07/15/2025) |
| 07/18/2025 | 150 | Supplemental MOTION for Order to Show Cause *and for Additional Relief* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor.(Freedman, John) (Entered: 07/18/2025) |
| 07/18/2025 | 151 | EXHIBIT re 150 Supplemental MOTION for Order to Show Cause *and for Additional Relief* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit 1 - Declaration of Aleksandra Doe, # 2 Exhibit 2 - Aleksandra Doe's Emails, # 3 Exhibit 3 - Aleksandra Doe's Chat, # 4 Exhibit 4 - Redacted Declaration of Class Member, # 5 Exhibit 5 - Declaration of Emily Martin, # 6 Exhibit 6 - USCIS Response 5-6-25, # 7 Exhibit 7 - USCIS Response 6-11- |

| | | |
|---|---|---|
| | | 25, # 8 Exhibit 8 - USCIS Response 6-17-25, # 9 Exhibit 9 - USCIS Response 6-23-25, # 10 Exhibit 10 - USCIS Response 7-3-25, # 11 Exhibit 11 - Parties' Conferral Emails July 14-17 2025)(Freedman, John) (Entered: 07/18/2025) |
| 07/18/2025 | 152 | MEMORANDUM in Support re 150 Supplemental MOTION for Order to Show Cause *and for Additional Relief* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 07/18/2025) |
| 07/18/2025 | 153 | Statement of Material Facts L.R. 56.1 re 128 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole - Reply to Defs' Response* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit 21 to Pls.' Mot. for Partial SJ (Form I-134A of Ana Doe))(Cox, Justin) (Entered: 07/18/2025) |
| 07/18/2025 | 154 | REPLY to Response to 128 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 07/18/2025) |
| 07/21/2025 | 155 | Judge Indira Talwani: ELECTRONIC ORDER entered: On May 28, 2025, this court entered an Order 107 staying Defendants' actions suspending adjudications of applications for non-parole immigration benefits, initial parole, and re-parole as to individuals who received parole through certain parole programs. On June 5, 2025, Plaintiffs filed a Notice and Motion for an Order to Show Cause 116 informing the court that Plaintiffs' counsel have received multiple reports from class members that the USCIS website messaging system is still stating that USCIS "has placed an administrative hold on all benefit requests filed by aliens who are or were paroled into the United States under the U4U, CHNV, or FRP processes[,]" that USCIS "has placed an administrative hold" on all such requests "[d]ue to the Jan. 20, 2025 Executive Order[,]" and similar statements. See Pls.' Mem. 3-4 118 .<br><br>To properly consider that motion, which remains pending, the court has ordered Defendants to provide updates concerning, inter alia, the steps they have taken to resume adjudicating requests for immigration benefits, as required by this court. See Elec. Order 119 ; Elec. Order 121 ; Elec. Order 127 ; Elec. Order 138 . Defendants have filed limited responses. See Response 120 ; Response 124 ; Response 132 ; Response 139 .<br><br>On July 18, 2025, Plaintiffs filed a Supplemental Motion for Order to Show Cause and for Additional Relief 150 stating that, despite this court's May 28, 2025 Order 107 staying Defendants' suspension of adjudications, "processing of diversity visa applications of class members remains paused by Defendants' own public admission." Supp. Mot. 1 150 . Plaintiffs refer to a news article that states that Defendants represented, as recently as July 16, 2025, that adjudications of immigration benefit applications for U4U parole beneficiaries were on "administrative hold." See Mem. ISO Supp. Mot. 9 152 . The language of Defendants' reported statement mirrors the language of the Davidson |

| | | |
|---|---|---|
| | | Memorandum, which suspended benefits adjudications and which was stayed in relevant part by this court's May 28, 2025 Order 107 .<br><br>The Supplemental Motion further stated that Plaintiffs' counsel have "received multiple inquiries from class members indicating that, in the weeks since the Court issued its Orders, Defendants have not effectuated the Court's ruling, including with respect to the adjudication of diversity visa applications." Id.; see also Emily Martin Decl. ¶¶ 9-15 [151-5] (describing steps individuals have taken with respect to their diversity visa applications without successfully having their applications adjudicated). Plaintiffs state that the application status of one class member, Aleksandra Doe, changed after several months of inactivity only once Plaintiffs' counsel asked Defendants about her application, on July 15, 2025. See Mem. ISO Supp. Mot. 9 152 ; Tiffany Jang and Brian C. Ward Email Thread [151-11].<br><br>No later than July 28, 2025, Defendants shall file a response to Plaintiffs' Supplemental Motion 150 that includes: (1) details on the steps that Defendants have taken to resume processing of diversity visa applications in accordance with this court's May 28, 2025 Order 107 ; (2) notice to the court regarding how diversity visa lottery winner applications, filed by current and former U4U, CHNV, and FRP parolees, have been adjudicated to final agency action since this court's May 28, 2025 Order 107 went into effect; (3) a response to Plaintiffs' contentions that "the issuance of visas to recipients once selected [through the diversity visa lottery] is mandatory" and that "[s]elected recipients 'have a right to have their visa applications processed in accordance with the INA[,]'" Mem. ISO Supp. Mot. 4 152 (quoting P.K. v. Tillerson, 302 F. Supp. 3d 1, 9 (D.D.C. 2017)); and (4) an explanation as to whether an "administrative hold" remains in effect as to benefits applications, as reported in the news article referenced by Plaintiffs.<br><br>The clerk shall schedule a status conference to discuss Defendants' compliance with the court's May 28, 2025 Order 107 . (SEC) (Entered: 07/21/2025) |
| 07/21/2025 | 156 | ELECTRONIC NOTICE of Hearing. Status Conference set for 7/29/2025 02:30 PM in Courtroom 9 (Remote only) before Judge Indira Talwani.<br><br>This proceeding will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(GAM) (Entered: 07/21/2025) |
| 07/23/2025 | 157 | ELECTRONIC NOTICE OF RESCHEDULING: Status Conference set for 7/29/2025 RESET for 7/30/2025 11:00 AM in Courtroom 9 (Remote only) before Judge Indira Talwani.<br><br>This proceeding will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. |

| | | |
|---|---|---|
| | | Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(GAM) (Entered: 07/23/2025) |
| 07/28/2025 | 158 | NOTICE OF APPEAL as to 108 Order on Motion to Certify Class, 107 Order on Motion for Preliminary Injunction,,,,,,, by Todd Lyons, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 8/18/2025. (Fudim, Elissa) (Entered: 07/28/2025)** |
| 07/28/2025 | 159 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 158 Notice of Appeal. (MAP) (Entered: 07/28/2025) |
| 07/28/2025 | 160 | RESPONSE TO COURT ORDER by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello re 155 Order,,,,,,,,,,,,,,,, . (Attachments: # 1 Alfonso-Royals Declaration)(Ward, Brian) (Entered: 07/28/2025) |
| 07/29/2025 | 161 | USCA Case Number 25-1715 for 158 Notice of Appeal, filed by U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello, Kika Scott, Todd Lyons, Donald J. Trump. (MAP) (Entered: 07/29/2025) |
| 07/29/2025 | 162 | NOTICE of Appearance by Gabriel Canaan on behalf of Immigration Reform Law Institute (Canaan, Gabriel) (Entered: 07/29/2025) |
| 07/29/2025 | 163 | NOTICE of Withdrawal of Appearance by Elissa Fudim *of attorney Joseph Darrow (Elissa Fudim to remain on docket)* (Fudim, Elissa) (Entered: 07/29/2025) |
| 07/30/2025 | 164 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Status Conference held on 7/30/2025. Case called. Court had colloquy with counsel. Any further concerns of Plaintiffs' should first be conveyed to Defendants. Counsel may request a further conference with the Court by emailing the clerk.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.) (Attorneys present: Daniel B Asimow; Laura Flores-Perilla; Anwen Hughes; H. Tiffany Jang; Hillary Li; Inyoung Hwang; Laura Scott Shores; Esther Sung; Elissa Fudim; Katherine J. Shinners; Brian Ward) (GAM) (Entered: 07/30/2025) |
| 08/01/2025 | 165 | Judge Indira Talwani: MEMORANDUM AND ORDER entered. See attached.<br><br>In sum, the court finds that preliminary relief is not warranted as to Defendants' suspension of initial parole adjudications, where such relief is sought as to individuals not presently in the United States. Accordingly, Plaintiffs' Emergency Motion for Preliminary Injunction and Stay of Administrative Action [Doc. No. 23 ] is denied as to the remaining preliminary relief requested. |

| | | |
|---|---|---|
| | | **IT IS SO ORDERED.** (SEC) (Entered: 08/01/2025) |
| 08/08/2025 | 166 | NOTICE by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor *of Supplemental Authority and Defendants Report regarding Parole Grants to Former CHNV Parolees* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Flores-Perilla, Laura) (Entered: 08/08/2025) |
| 08/11/2025 | 167 | MOTION for Leave to Appear Pro Hac Vice for admission of Katie Weng Filing fee: $ 125, receipt number AMADC-11168602 by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit A)(Jang, H.) (Entered: 08/11/2025) |
| 08/11/2025 | 168 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 167 Motion for Leave to Appear Pro Hac Vice. Added Katie Weng.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SEC) (Entered: 08/11/2025) |
| 09/12/2025 | 169 | OPINION of USCA as to 100 Notice of Appeal, filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Kika Scott, Todd Lyons, Donald J. Trump. (MAP) (Entered: 09/12/2025) |
| 09/12/2025 | 170 | USCA Judgment as to 100 Notice of Appeal, filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Kika Scott, Todd Lyons, Donald J. Trump (MAP)<br><br>**The district court's order granting a stay of the termination notice is VACATED, and the matter is REMANDED**<br><br>(Entered: 09/12/2025) |
| 09/12/2025 | 171 | MOTION for Hearing *(Status Conference)* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order)(Flores-Perilla, Laura) (Entered: 09/12/2025) |
| 09/12/2025 | 172 | EXHIBIT re 171 MOTION for Hearing *(Status Conference) Index of Exhibits* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo |

| | | |
|---|---|---|
| | | Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit Declaration of Emily Martin, Paralegal, Justice Action Center, # 2 Exhibit Emails between Plaintiffs' Counsel and Defendants' Counsel, # 3 Exhibit USCIS Notice to Plaintiff Aleksandra Doe dated August 21, 2025, # 4 Exhibit USCIS' Response to Class Member 'D', # 5 Exhibit USCIS' Response to Class Member 'E', # 6 Exhibit USCIS' Response to Senator Durbin's Office Regarding Class Member 'G')(Flores-Perilla, Laura) (Entered: 09/12/2025) |
| 09/16/2025 | 173 | MEMORANDUM in Support re 150 Supplemental MOTION for Order to Show Cause *and for Additional Relief [Corrected]* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 09/16/2025) |
| 09/19/2025 | 174 | ADDENDUM re 171 MOTION for Hearing *(Status Conference)* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Li, Hillary) (Entered: 09/19/2025) |
| 09/19/2025 | 175 | EXHIBIT re 174 Addendum to Motion/Memorandum, by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Li, Hillary) (Entered: 09/19/2025) |
| 09/24/2025 | 176 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 171 MOTION for Hearing *(Status Conference)*. Status Conference set for 9/26/2025 12:15 PM in Courtroom 9 (Remote only) before Judge Indira Talwani.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact the session here.<br><br>(GAM) (Entered: 09/24/2025) |
| 09/25/2025 | 177 | MOTION to Appoint Counsel *for Certified Class* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order Proposed Order)(Li, Hillary) (Entered: 09/25/2025) |

| | | |
|---|---|---|
| 09/25/2025 | 178 | MEMORANDUM in Support re 177 MOTION to Appoint Counsel *for Certified Class* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Li, Hillary) (Entered: 09/25/2025) |
| 09/25/2025 | 179 | EXHIBIT re 171 MOTION for Hearing *(Status Conference) Exhibit in Support of Response to Motion* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Exhibit A - Alfonso-Royals Decl.)(Shinners, Katherine) (Entered: 09/25/2025) |
| 09/25/2025 | 180 | Opposition re 171 MOTION for Hearing *(Status Conference)* filed by Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Shinners, Katherine) (Entered: 09/25/2025) |
| 09/25/2025 | 181 | Judge Indira Talwani: ENDORSED ORDER entered **granting** 177 Plaintiff's Unopposed Motion for Certification of Additional Class Counsel. (CAM) (Entered: 09/26/2025) |
| 09/26/2025 | 182 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Status Conference held on 9/26/2025. Case called. Court had colloquy with counsel. The Govt shall provide an affidavit clarifying the applications that have been designated as "continued for further processing" and "remains pending." Counsel to confer with each other and submit a proposed schedule on potential discovery and on briefing on the outstanding motions.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.) (Attorneys present: Justin Cox, Laura Flores-Perilla, Brandon Galli-Graves, Hillary Li, Inyoung Sarah Hwang, Esther Sung, Karen C. Tumlin, Elissa Fudim, Katherine J. Shinners, Brian Ward) (GAM) (Entered: 09/30/2025) |
| 10/01/2025 | 183 | MOTION to Stay *in Light of Lapse in Appropriations* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Text of Proposed Order)(Shinners, Katherine) (Entered: 10/01/2025) |
| 10/03/2025 | 184 | Opposition re 183 MOTION to Stay *in Light of Lapse in Appropriations* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Hwang, Inyoung) (Entered: 10/03/2025) |
| 10/03/2025 | 185 | STATUS REPORT by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 10/03/2025) |
| 10/07/2025 | 186 | Transcript of Status Videoconference held on September 26, 2025, before Judge Indira Talwani. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 10/28/2025. Redacted Transcript Deadline set for 11/7/2025. Release of Transcript Restriction set for 1/5/2026. (DRK) (Entered: 10/07/2025) |

| | | |
|---|---|---|
| 10/07/2025 | 187 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 10/07/2025) |
| 10/09/2025 | 188 | Judge Indira Talwani: MEMORANDUM AND ORDER entered.<br><br>For the foregoing reasons, Defendants' Motion for Stay of Proceedings [Doc. No. 183 ] isDENIED.<br><br>**IT IS SO ORDERED.** (SEC) (Entered: 10/10/2025) |
| 10/10/2025 | 189 | EXHIBIT re 180 Opposition to Motion *pursuant to status conference* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Supplemental Alfonso-Royals Declaration)(Shinners, Katherine) (Entered: 10/10/2025) |
| 10/15/2025 | 190 | NOTICE of Withdrawal of Appearance by Brian Ward (Ward, Brian) (Entered: 10/15/2025) |
| 10/28/2025 | 191 | Judge Indira Talwani: ELECTRONIC ORDER: In light of the First Circuit's decision in Doe v. Noem, 152 F.4th 272 (1st Cir. 2025), the court directed the parties to confer and submit a proposed schedule for any additional briefing or re-briefing on Defendants' pending Motion to Dismiss 113 and Plaintiffs' pending Motion for Partial Summary Judgment 128 . See Transcript of Status Videoconference 186 ; Status Report 1 185 .<br><br>Plaintiffs request to re-brief their Motion for Partial Summary Judgment. Status Report 1 185 . Defendants oppose re-briefing and propose each side submit a supplemental brief of no more than five pages regarding the impact of the First Circuit decision on the pending motions. Id. at 1-2.<br><br>Where Defendants do not seek rebriefing on their motion to dismiss, and where the First Circuit did not address the jurisdictional issues raised by Defendants, the court treats the Motion to Dismiss 113 as fully briefed.<br><br>Plaintiffs' pending Motion for Partial Summary Judgment 128 is terminated. Plaintiffs may file a renewed motion for partial summary judgment no later than November 10, 2025. Defendants shall file their opposition to Plaintiffs' renewed motion for partial summary judgment no later than November 24, 2025. Plaintiffs shall file their reply in support of their renewed motion for partial summary judgment no later than December 8, 2025.<br><br>(SEC) (Entered: 10/28/2025) |
| 11/05/2025 | 192 | MOTION to Expedite *Discovery into Defendants' Compliance with the Court's May 28, 2025 Orders* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order) (Freedman, John) (Entered: 11/05/2025) |
| 11/05/2025 | 193 | MEMORANDUM in Support re 192 MOTION to Expedite *Discovery into Defendants' Compliance with the Court's May 28, 2025 Orders* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, |

| | | |
|---|---|---|
| | | Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit A)(Freedman, John) (Entered: 11/05/2025) |
| 11/05/2025 | 194 | USCA Judgment as to 158 Notice of Appeal, filed by U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello, Kika Scott, Todd Lyons, Donald J. Trump (MAP) (Entered: 11/06/2025) |
| 11/05/2025 | 195 | MANDATE of USCA as to 158 Notice of Appeal filed by U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello, Kika Scott, Todd Lyons, Donald J. Trump. Appeal 158 Terminated (MAP) (Entered: 11/06/2025) |
| 11/10/2025 | 196 | MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit Decl. of Blas Nuez-Neto, Assistant Secy of Homeland Security (June 20, 2023), # 2 Exhibit Supplemental Decl. of Blas Nuez-Neto, Assistant Secy of Homeland Security (Aug. 25, 2023), # 3 Text of Proposed Order)(Cox, Justin) (Entered: 11/10/2025) |
| 11/10/2025 | 197 | Statement of Material Facts L.R. 56.1 re 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit Index)(Cox, Justin) (Entered: 11/10/2025) |
| 11/10/2025 | 198 | MEMORANDUM in Support re 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 11/10/2025) |
| 11/19/2025 | 199 | EXHIBIT re 192 MOTION to Expedite *Discovery into Defendants' Compliance with the Court's May 28, 2025 Orders - Index and Exhibits in Opposition to Motion* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Exhibit 1 - Counsel Decl., # 2 Exhibit 2 - Alfonso-Royals Decl., # 3 Exhibit 3 - CAR Excerpts)(Shinners, Katherine) (Entered: 11/19/2025) |
| 11/19/2025 | 200 | MEMORANDUM in Opposition re 192 MOTION to Expedite *Discovery into Defendants' Compliance with the Court's May 28, 2025 Orders* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Shinners, Katherine) (Entered: 11/19/2025) |
| 11/21/2025 | 201 | Consent MOTION for Extension of Time to November 25, 2025 to File Response/Reply *to Plaintiffs' partial motion for summary judgment* by Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello.(Fudim, Elissa) (Entered: 11/21/2025) |
| 11/24/2025 | 202 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 201 Consent MOTION for Extension of Time to November 25, 2025 to File Response/Reply to Plaintiffs' partial motion for summary judgment. Response due 11/25/2025. (SEC) (Entered: 11/24/2025) |

| | | |
|---|---|---|
| 11/25/2025 | 203 | APPENDIX/EXHIBIT *(Administrative Record) filed in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Administrative Record Part 1, # 2 Administrative Record Part 2, # 3 Administrative Record Part 3, # 4 Administrative Record Part 4, # 5 Administrative Record Part 5, # 6 Administrative Record Part 6, # 7 Administrative Record Part 7, # 8 Administrative Record Part 8, # 9 Administrative Record Part 9, # 10 Administrative Record Part 10, # 11 Administrative Record Part 11, # 12 Administrative Record Part 12, # 13 Administrative Record Part 13)(Fudim, Elissa) (Entered: 11/25/2025) |
| 11/25/2025 | 204 | Statement of Material Facts L.R. 56.1 re 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole in response to Plaintiffs' 56.1 Statement* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 11/25/2025) |
| 11/25/2025 | 205 | MEMORANDUM in Opposition re 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Fudim, Elissa) (Entered: 11/25/2025) |
| 11/26/2025 | 206 | MANDATE of USCA as to 100 Notice of Appeal filed by Kristi Noem, Caleb Vitello, Pete R. Flores, Kika Scott, Todd Lyons, Donald J. Trump. Appeal 100 Terminated (MAP) (Entered: 11/26/2025) |
| 11/26/2025 | 207 | MOTION for Leave to File *a Reply in Support of Plaintiffs' Motion to Expedite Discovery into Defendants Compliance with the Courts May 28, 2025 Order* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit Proposed Reply, # 2 Text of Proposed Order)(Hwang, Inyoung) (Entered: 11/26/2025) |
| 12/08/2025 | 208 | Statement of Material Facts L.R. 56.1 re 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole (with Defendants' responses & Plaintiffs' replies)* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 12/08/2025) |
| 12/08/2025 | 209 | REPLY to Response to 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 12/08/2025) |
| 12/12/2025 | 210 | NOTICE by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor *of Defendants' Actions Terminating Family* |

| | | |
|---|---|---|
| | | *Reunification Parole and Suspending Adjudication of Immigration Benefits* (Galli-Graves, Brandon) (Entered: 12/12/2025) |
| 12/24/2025 | 211 | NOTICE by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor *of Upcoming Filings regarding the Termination of Family Reunification Parole and Suspension of Adjudication of Immigration Benefits* (Flores-Perilla, Laura) (Entered: 12/24/2025) |
| 12/29/2025 | 212 | MOTION for Leave to File *Third Amended Complaint* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit A - Proposed Third Amended Complaint, # 2 Exhibit B - Redline, # 3 Proposed Order)(Cox, Justin) (Entered: 12/29/2025) |
| 12/29/2025 | 213 | MEMORANDUM in Support re 212 MOTION for Leave to File *Third Amended Complaint* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 12/29/2025) |
| 12/29/2025 | 214 | Supplemental MOTION to Proceed Under Pseudonym by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, Gabriela Doe, Lucia Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor, David Doe, Francisca Doe, John Doe, Jose Doe, Luciana Doe. (Attachments: # 1 Exhibit FRP Termination FRN, # 2 Exhibit Declaration of David Doe, # 3 Exhibit Declaration of Francisca Doe, # 4 Exhibit Declaration of John Doe, # 5 Exhibit Declaration of Jose Doe, # 6 Exhibit Declaration of Luciana Doe, # 7 Text of Proposed Order)(Sung, Esther) (Entered: 12/29/2025) |
| 12/29/2025 | 215 | MEMORANDUM in Support re 214 Supplemental MOTION to Proceed Under Pseudonym filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Immigration Reform Law Institute, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Appendix of Exhibits)(Sung, Esther) (Entered: 12/29/2025) |
| 12/29/2025 | 216 | Emergency MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction , MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit FRP FRN (Dec. 15, 2025), # 2 FRN re Haitian FRP and FWVP (Dec. 28, 2020), # 3 Proposed Order)(Cox, Justin) (Entered: 12/29/2025) |

| | | |
|---|---|---|
| 12/29/2025 | 217 | NOTICE by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello re 212 MOTION for Leave to File *Third Amended Complaint* (Shinners, Katherine) (Entered: 12/29/2025) |
| 12/29/2025 | 218 | MEMORANDUM in Support re 216 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026* filed by Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Index of Exhibits in Support)(Cox, Justin) (Entered: 12/29/2025) |
| 12/29/2025 | 219 | MOTION to Modify Class Definition by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 12/29/2025) |
| 12/29/2025 | 220 | MEMORANDUM in Support re 219 MOTION to Modify Class Definition filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Freedman, John) (Entered: 12/29/2025) |
| 12/29/2025 | 221 | MOTION to Expedite *Briefing* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order)(Sung, Esther) (Entered: 12/29/2025) |
| 12/30/2025 | 222 | Judge Indira Talwani: ELECTRONIC ORDER Defendants shall file any response to Plaintiffs' Third Supplemental Motion to Proceed Under Pseudonym [ 214 ]; Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and/or Stay of En Masse Truncation of Family Reunification Parole [ 216 ]; and Motion to Modify Class Definition [ 219 ] no later than January 6, 2026. (SEC) (Entered: 12/30/2025) |
| 12/30/2025 | 223 | ELECTRONIC NOTICE Setting Hearing on Motions: 216 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026*, 212 MOTION for Leave to File *Third Amended Complaint*, 214 Supplemental MOTION to Proceed Under Pseudonym , 219 MOTION to Modify Class Definition , 221 MOTION to Expedite *Briefing*.<br><br>Motion Hearing set for 1/9/2025 11:30 AM in Courtroom 9 (In person only) before Judge Indira Talwani. (SEC) (Entered: 12/30/2025) |

| | | |
|---|---|---|
| 12/31/2025 | 224 | EXHIBIT *USCIS, Policy Memorandum: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, PM-602-0192 (Dec. 2, 2025)* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 12/31/2025) |
| 12/31/2025 | 225 | EXHIBIT *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorans, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 12/31/2025) |
| 12/31/2025 | 226 | Opposition re 212 MOTION for Leave to File *Third Amended Complaint* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 12/31/2025) |
| 12/31/2025 | 227 | Opposition re 221 MOTION to Expedite *Briefing* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 12/31/2025) |
| 01/02/2026 | 228 | ELECTRONIC NOTICE Resetting Hearing on Motion 216 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026*, 212 MOTION for Leave to File *Third Amended Complaint*, 214 Supplemental MOTION to Proceed Under Pseudonym , 219 MOTION to Modify Class Definition , 221 MOTION to Expedite *Briefing:*<br><br>Motion Hearing reset for 1/9/2026 11:30 AM in Courtroom 9 (In person only) before Judge Indira Talwani. (Hearing previously set had the incorrect year.) (GAM) (Entered: 01/02/2026) |
| 01/04/2026 | 229 | Judge Indira Talwani: ELECTRONIC ORDER entered. On December 30, 2025, the court granted Plaintiffs' Motion to Expedite [ 221 ] and directed Defendants to file any oppositions to Plaintiffs' Third Supplemental Motion to Proceed Under Pseudonym [ 214 ]; Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and/or Stay of En Masse Truncation of Family Reunification Parole [ 216 ]; and Motion to Modify Class Definition [ 219 ] no later than January 6, 2026. Elec. Order [ 222 ]. The court also set hearing on these motions and Plaintiffs' Motion for Leave to File a Third Amended Complaint [ 212 ] for January 9, 2026. Elec. Notice [ 223 ]; Elec. Notice [ 228 ] (correcting initial notice date). On December 31, 2025, Defendants filed their Opposition [ 227 ] to Plaintiffs' Motion to Expedite Briefing [ 221 ] and their Opposition [ 226 ] to Plaintiffs' Motion for Leave to File a Third Amended Complaint [ 212 ]. On review, the court modifies its Electronic Order [ 222 ] and Notice of Hearing [ 228 ] (correcting Notice of Hearing [ 223 ]) as follows:<br><br>1) The court anticipates resolving Plaintiffs' Motion for Leave to File a Third Amended Complaint [ 212 ] on the papers and without oral argument.<br><br>2) Defendants shall file any opposition to Plaintiffs' Third Supplemental Motion to Proceed Under Pseudonym [ 214 ] no later than January 6, 2026. The court anticipates resolving Plaintiffs' Third Supplemental Motion to Proceed Under Pseudonym [ 214 ] on the papers and without oral argument.<br><br>3) Defendants shall file any opposition to Plaintiffs' Emergency Motion for a Temporary Restraining Order and/or Emergency Stay of En Masse Truncation of Family Reunification Parole [ 216 ] and Motion to Modify Class Definition [ 219 ] for purposes |

| | | |
|---|---|---|
| | | of the request for emergency relief no later than January 6, 2026. Counsel should be prepared for argument regarding these emergency requests at the January 9, 2026 hearing.<br><br>4) Defendants shall file any opposition to Plaintiffs' Motion for a Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [ 216 ] and any further opposition to Plaintiffs' Motion to Modify Class Definition [ 219 ] no later than January 13, 2026, unless that date is further modified by the court at or after the January 9, 2026 hearing on the request for emergency relief. (Talwani, Indira) (Entered: 01/04/2026) |
| 01/05/2026 | 230 | Consent MOTION for Leave to File Excess Pages *in response to Plaintiffs' motion for a Temporary Restraining Order (Docs. No. 216, 218)* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Text of Proposed Order)(Fudim, Elissa) (Entered: 01/05/2026) |
| 01/05/2026 | 231 | Judge Indira Talwani: ELECTRONIC ORDER **granting** 230 Consent MOTION for Leave to File Excess Pages in Response to Plaintiffs' Motion for a Temporary Restraining Order.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 01/05/2026) |
| 01/06/2026 | 232 | Opposition re 214 Supplemental MOTION to Proceed Under Pseudonym filed by Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 01/06/2026) |
| 01/06/2026 | 233 | Opposition re 216 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026* filed by Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 01/06/2026) |
| 01/06/2026 | 234 | Opposition re 219 MOTION to Modify Class Definition filed by Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 01/06/2026) |
| 01/07/2026 | 235 | NOTICE of Appearance by Javier Ortega on behalf of Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor (Ortega, Javier) (Entered: 01/07/2026) |
| 01/07/2026 | 236 | NOTICE of Appearance by Kathleen Weng on behalf of Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor (Weng, Kathleen) (Entered: 01/07/2026) |
| 01/07/2026 | 237 | NOTICE of Appearance by Katie Rose Talley on behalf of Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of |

| | | |
|---|---|---|
| | | Massachusetts, Caleb Vitello (Talley, Katie) (Entered: 01/07/2026) |
| 01/09/2026 | 238 | Judge Indira Talwani: ELECTRONIC ORDER: Pending before the court is Plaintiffs' Motion for Leave to File a Third Amended Complaint [Doc. No. 212 ]. The motion is granted in part and remains under advisement in part as follows.<br><br>Plaintiffs are GRANTED leave to file a supplemental complaint pursuant to Fed. R. Civ. P. 15(d) to challenge actions taken by Defendants in December 2025 impacting individuals who have received humanitarian parole through humanitarian parole processes (the "December 2025 actions"). Specifically, Plaintiffs are granted leave to include in their supplemental complaint: the proposed additional named Plaintiffs who claim to be affected by the issuance of the Family Reunification Program Federal Register Notice ("FRP FRN") [Doc. No. 225 ]; any allegations relevant to either or both of the December 2025 actions; and Plaintiffs' proposed eighth claim for relief as it applies to the December 2025 actions only.<br><br>The supplemental complaint shall be drafted as a supplement to, and not a replacement for, the Second Amended Class Action Complaint for Declaratory and Injunctive Relief [Doc. No. 68 ]. Rather than amending allegations and renumbering paragraphs, Plaintiffs shall add new allegations in separate paragraphs, identified by the paragraph number immediately preceding the new material and letters of the alphabet. So, for example, should Plaintiffs seek to add two allegations regarding the December 2025 actions immediately after Paragraph 1, that those paragraphs would be numbered paragraphs 1A and 1B.<br><br>Plaintiffs' request for an amendment to include as part of its proposed eighth claim for relief alleging a failure to comply with APA notice-and-comment requirements the termination of grants of parole to class members under the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") parole programs and all prior actions suspending benefits adjudication, as alleged in the Second Amended Class Action Complaint [Doc. No. 68 ] remains pending and will be addressed together with or following Defendants' pending Motion to Dismiss [Doc. No. 113 ].<br><br>Defendants' answer or other responsive pleading shall be directed to the new allegations.<br><br>Memorandum to follow.<br><br>(SEC) (Entered: 01/09/2026) |
| 01/09/2026 | 239 | AMENDED COMPLAINT *Supplemented Second Amended Complaint* against All Defendants, filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor.(Cox, Justin) (Entered: 01/09/2026) |
| 01/09/2026 | 240 | Judge Indira Talwani: ORDER entered granting 214 Plaintiffs' Third Supplemental Motion to Proceed Under Pseudonym. See attached order. (Talwani, Indira) (Entered: 01/09/2026) |
| 01/09/2026 | 247 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Motion Hearing held on 1/9/2026 re 216 Emergency MOTION for Temporary Restraining Order Preliminary Injunction/to Stay; 219 MOTION to Modify Class Definition; 214 Supplemental MOTION to Proceed Under Pseudonym; and, 212 MOTION for Leave to File Third Amended Complaint. |

| | | |
|---|---|---|
| | | Case called. Court heard argument from counsel. Motions taken under advisement. Order to issue.<br><br>By 1/13/2026 Defendants shall produce the administrative record. By 1/15/2026 Defts shall file a response to Plaintiffs' Motion for a Preliminary Injunction 216 ; Plaintiffs may file a reply by 1/20/2026.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.)(Attorneys present: Justin Cox, Laura Flores-Perilla, Inyoung Hwang, Esther Sung, Karen C. Tumlin, Katie Weng, Katie Rose Talley) (GAM) (Entered: 01/13/2026) |
| 01/10/2026 | 241 | Judge Indira Talwani: ELECTRONIC ORDER: granting, pending further court order, Plaintiffs' Motion to Modify Class Definition [ 219 ]. The court finds, as to the prerequisites set forth in Fed. R. Civ. P. 23(a), that (1) the modified subclass is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the subclass and class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the subclass and class, and (4) the representative parties will fairly and adequately protect the interests of the class; and as to the types of class actions permitted under Fed. R. Civ. P. 23(b), that Defendants have "acted or refused to act on grounds that apply generally to the class[.]" See Fed. R. Civ. P. 23(b)(2). Memorandum to follow. (Talwani, Indira) (Entered: 01/10/2026) |
| 01/10/2026 | 242 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 216 Motion for Temporary Restraining Order; reserving ruling on 216 Motion for Preliminary Injunction Judge Indira Talwani: ORDER entered granting 216 Motion for TRO; reserving ruling on 216 Motion for Preliminary Injunction<br><br>Plaintiffs' Emergency Motion for a Temporary Restraining Order, Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc. No. 216] is GRANTED in part as follows. The court grants an emergency fourteen-day stay of the Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025), insofar as it revokes previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to the FRP programs prior to the noncitizens' originally stated parole end dates.<br><br>Defendants are directed to produce the administrative record by January 13, 2026, and to file any opposition to Plaintiffs' Motion for a Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc. No. 216] by January 15, 2026. Plaintiffs are directed to file any reply to Defendants' opposition by January 20, 2026.<br><br>Memorandum to follow.(Talwani, Indira) (Talwani, Indira) (Entered: 01/10/2026) |
| 01/10/2026 | 243 | Judge Indira Talwani: TEMPORARY RESTRAINING ORDER entered. See attached order (Talwani, Indira) (Entered: 01/10/2026) |
| 01/11/2026 | 244 | Transcript of Motion Hearing held on January 9, 2026, before Judge Indira Talwani. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 2/2/2026. Redacted Transcript Deadline set for 2/11/2026. Release of Transcript Restriction set for 4/13/2026. (DRK) (Entered: 01/12/2026) |
| 01/11/2026 | 245 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's |

| | | |
|---|---|---|
| | | Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 01/12/2026) |
| 01/13/2026 | 246 | NOTICE by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello *of Filing of Administrative Record* (Attachments: # 1 Certified Administrative Record Part 1, # 2 Certified Administrative Record Part 2)(Shinners, Katherine) (Entered: 01/13/2026) |
| 01/14/2026 | 248 | MOTION for Leave to File Excess Pages by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello.(Fudim, Elissa) (Entered: 01/14/2026) |
| 01/15/2026 | 249 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 248 MOTION for Leave to File Excess Pages.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 01/15/2026) |
| 01/15/2026 | 250 | DECLARATION re 216 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026 Declaration in Opposition to Motion* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Declaration of James Kernochan)(Shinners, Katherine) (Entered: 01/15/2026) |
| 01/15/2026 | 251 | MEMORANDUM in Opposition re 216 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026 (as to Motion for Preliminary Injunction)* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 01/15/2026) |
| 01/15/2026 | 252 | Second Opposition re 219 MOTION to Modify Class Definition *Further Opposition in Accordance With Doc. Nos. 229, 247* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Shinners, Katherine) (Entered: 01/15/2026) |
| 01/20/2026 | 253 | REPLY to Response to 216 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction MOTION to Stay *the FRP FRN as to current parolees before Jan. 14, 2026* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 01/20/2026) |
| 01/22/2026 | 254 | MOTION for Clarification re 238 Order,,,,,,,, *Regarding Defendants' Deadline to Respond to Supplemental Allegations (with incorporated memorandum of law)* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Text of Proposed Order) (Shinners, Katherine) (Entered: 01/22/2026) |
| 01/23/2026 | 255 | AMENDED COMPLAINT *[Corrected] Supplemented Second Amended Complaint* against All Defendants, filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo |

| | | |
|---|---|---|
| | | Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Redline showing corrected numbering on pp. 120-28 as compared to Doc. No. 239)(Cox, Justin) (Entered: 01/23/2026) |
| 01/23/2026 | 256 | RESPONSE to Motion re 254 MOTION for Clarification re 238 Order,,,,,,,, *Regarding Defendants' Deadline to Respond to Supplemental Allegations (with incorporated memorandum of law)* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit - meet & confer correspondence re Defs' Motion for Clarification (Doc. No. 254))(Cox, Justin) (Entered: 01/23/2026) |
| 01/24/2026 | 257 | Judge Indira Talwani: ORDER entered granting 216 Motion for Preliminary Injunction. See attached Preliminary Injunction. (Talwani, Indira) (Entered: 01/24/2026) |
| 01/25/2026 | 258 | Judge Indira Talwani: ORDER entered granting Plaintiffs' Motion for a Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [ 216 ]. See attached MEMORANDUM AND ORDER. (Talwani, Indira) (Entered: 01/25/2026) |
| 01/26/2026 | 259 | Judge Indira Talwani: ELECTRONIC ORDER granting Defendants' Motion for Clarification [ 254 ] of this court's Electronic Order [ 238 ]. Defendants' answer or other responsive pleading directed to Plaintiffs' new allegations in Plaintiffs' [Corrected] Supplemented Second Amended Complaint [ 255 ] shall be filed no later than January 30, 2026. (SEC) (Entered: 01/26/2026) |
| 01/26/2026 | 260 | Judge Indira Talwani: ELECTRONIC ORDER granting Plaintiffs' Motion for Leave to a Reply in Support of their Motion to Expedite Discovery [ 207 ].<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (SEC) (Entered: 01/26/2026) |
| 01/26/2026 | 261 | REPLY to Response to 192 MOTION to Expedite *Discovery into Defendants' Compliance with the Court's May 28, 2025 Orders [Leave to file granted on January 26, 2026]* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Hwang, Inyoung) (Entered: 01/26/2026) |
| 01/30/2026 | 262 | MOTION to Dismiss *Supplemented Complaint* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Attachments: # 1 Text of Proposed Order)(Fudim, Elissa) (Entered: 01/30/2026) |
| 01/30/2026 | 263 | MEMORANDUM in Support re 262 MOTION to Dismiss *Supplemented Complaint* filed by Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 01/30/2026) |
| 02/03/2026 | 264 | MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class*, MOTION to Stay *the Suspension Under 5 USC 705* ( Responses due by 2/17/2026) by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, |

| | | |
|---|---|---|
| | | Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit - USCIS Memo dated Jan. 1, 2026, # 2 Exhibit - 2d Decl. of Pl. Wilhen Pierre, # 3 Exhibit - 2d Decl. of Pl. Omar Doe, # 4 Exhibit - Decl. M. Otto-Jacobs, # 5 Exhibit - Decl. of Class Member A, # 6 Exhibit - Decl. of Class Member K, # 7 Exhibit - Decl. of Class Member L, # 8 Exhibit - Decl. of Class Member M, # 9 Exhibit - Decl. of Class Member N, # 10 Exhibit - 2d Decl. of G. Jozef for Pl. HBA)(Cox, Justin) (Entered: 02/03/2026) |
| 02/03/2026 | 265 | MEMORANDUM in Support re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Index of Exhibits in Support, # 2 Proposed Order)(Cox, Justin) (Entered: 02/03/2026) |
| 02/09/2026 | 266 | NOTICE by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* (Attachments: # 1 Administrative Record for December 2, 2025 USCIS Memo (Doc. No. 224))(Cox, Justin) (Entered: 02/09/2026) |
| 02/10/2026 | 267 | Notice of Supplemental Authorities re 192 MOTION to Expedite *Discovery into Defendants' Compliance with the Court's May 28, 2025 Orders* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Li, Hillary) (Entered: 02/10/2026) |
| 02/12/2026 | 268 | RESPONSE to Motion re 262 MOTION to Dismiss *Supplemented Complaint* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Cox, Justin) (Entered: 02/12/2026) |
| 02/13/2026 | 269 | MOTION for Leave to File Excess Pages *(unopposed)* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello.(Fudim, Elissa) (Entered: 02/13/2026) |
| 02/13/2026 | 270 | Notice of Supplemental Authorities re 192 MOTION to Expedite *Discovery into Defendants' Compliance with the Court's May 28, 2025 Orders - Reponse to Plaintiffs' Notice of Supplemental Authority 267* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Attachments: # 1 Affidavit Declaration of Lynn Q. Feldman)(Shinners, Katherine) (Entered: 02/13/2026) |
| 02/13/2026 | 271 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 269 Motion for Leave to Memorandum of up to 29 pages; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Talwani, Indira) (Entered: 02/13/2026) |

| | | |
|---|---|---|
| 02/17/2026 | 272 | MEMORANDUM in Opposition re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* filed by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 02/17/2026) |
| 02/20/2026 | 273 | Notice of Supplemental Authorities re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* (Attachments: # 1 Exhibit - Government's MTD in Fuenmayor)(Cox, Justin) (Entered: 02/20/2026) |
| 02/27/2026 | 274 | Notice of Supplemental Authorities re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* (Attachments: # 1 Exhibit - Varniab v. Edlow, # 2 Exhibit - Learning Resources, Inc. v. Trump)(Flores-Perilla, Laura) (Entered: 02/27/2026) |
| 03/06/2026 | 275 | DECLARATION *of J. Kernochan (supplemental)* by Pete R. Flores, Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 03/06/2026) |
| 03/06/2026 | 276 | NOTICE by Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello re 246 Notice (Other), (Attachments: # 1 Correction to Administrative Record)(Shinners, Katherine) (Entered: 03/06/2026) |
| 03/06/2026 | 277 | MOTION for Reconsideration *of Preliminary Injunction Order (Doc. No. 257)*, MOTION to Stay *Preliminary Injunction (Doc. No. 257) pending appeal* ( Responses due by 3/20/2026) by Pete R. Flores, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello.(Fudim, Elissa) (Entered: 03/06/2026) |
| 03/06/2026 | 278 | MEMORANDUM in Support re 277 MOTION for Reconsideration *of Preliminary Injunction Order (Doc. No. 257)* MOTION to Stay *Preliminary Injunction (Doc. No. 257) pending appeal* filed by Todd Lyons, Kristi Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 03/06/2026) |
| 03/09/2026 | 279 | MOTION to Withdraw as Attorney by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor.(Weng, Kathleen) (Entered: 03/09/2026) |
| 03/09/2026 | 280 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** [ 279 ] MOTION to Withdraw as Attorney. Attorney Kathleen Weng terminated. (SEC) (Entered: 03/09/2026) |

| | | |
|---|---|---|
| 03/11/2026 | 281 | Judge Indira Talwani: MEMORANDUM entered. See attached.<br><br>For the foregoing reasons, the court's Electronic Order [Doc. No. 238 ] granted Plaintiffs leave to file a supplemental complaint that would include "the proposed additional named Plaintiffs who claim to be affected by the issuance of the Family Reunification Program Federal Register Notice... [,] any allegations relevant to either or both of the December 2025 actions[,] and Plaintiffs' proposed eighth claim for relief as it applies to the December 2025 actions only." Id. The court also reaffirms its Order Modifying Class Definition and Appointing Additional Named Plaintiffs [Doc. No. 241 ] granting Plaintiff's Motion to Modify Class Definition [Doc. No. 219 ].<br><br>(SEC) (Entered: 03/11/2026) |
| 03/16/2026 | 282 | Notice of Supplemental Authorities re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* (Attachments: # 1 Exhibit Bowser v. Noem)(Hwang, Inyoung) (Entered: 03/16/2026) |
| 03/20/2026 | 283 | MOTION for Order to Show Cause *, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Text of Proposed Order)(Galli-Graves, Brandon) (Entered: 03/20/2026) |
| 03/20/2026 | 284 | DECLARATION re 283 MOTION for Order to Show Cause *, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record* by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Attachments: # 1 Exhibit)(Galli-Graves, Brandon) (Entered: 03/20/2026) |
| 03/20/2026 | 285 | MEMORANDUM in Support re 283 MOTION for Order to Show Cause *, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Galli-Graves, Brandon) (Entered: 03/20/2026) |
| 03/20/2026 | 286 | Opposition re 277 MOTION for Reconsideration *of Preliminary Injunction Order (Doc. No. 257)* MOTION to Stay *Preliminary Injunction (Doc. No. 257) pending appeal* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Flores-Perilla, Laura) (Entered: 03/20/2026) |
| 03/24/2026 | 287 | Opposition re 283 MOTION for Order to Show Cause *, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record* filed by Pete R. |

| | | |
|---|---|---|
| | | Flores, Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello. (Fudim, Elissa) (Entered: 03/24/2026) |
| 03/25/2026 | 288 | Judge Indira Talwani: MEMORANDUM AND ORDER entered. See attached.<br><br>For the foregoing reasons, the clerk shall set Plaintiffs' Motion for an Order to Show Cause, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record [Doc. No. 283 ] for a hearing. Defendants shall file an amended opposition, and declaration(s) as appropriate, to support their contention that the late-discovered documents were part of the record considered by DHS in issuing the December 15, 2025 Federal Register Notice. No later than one week after Defendants file their amended opposition, Plaintiffs may file a reply.<br><br>Defendants' Motion for Reconsideration or Stay [Doc. No. 277 ] is DENIED without prejudice to the filing of a motion to modify or terminate the injunction based on the Corrected Certified Administrative Record [Doc. No. 276 -1], if Plaintiffs' pending motion is denied.<br><br>**IT IS SO ORDERED.** (SEC) (Entered: 03/25/2026) |
| 03/25/2026 | 289 | NOTICE OF APPEAL as to 257 Order on Motion for Preliminary Injunction, 258 Memorandum & ORDER, by Pete R. Flores, Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, Caleb Vitello. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 4/14/2026. (Shinners, Katherine) (Entered: 03/25/2026)** |
| 03/25/2026 | 290 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 289 Notice of Appeal. (MAP) (Entered: 03/25/2026) |
| 03/26/2026 | 291 | USCA Case Number 26-1314 for 289 Notice of Appeal, filed by Kristi L. Noem, Caleb Vitello, Pete R. Flores, Kika Scott, Todd Lyons, Donald J. Trump. (MAP) (Entered: 03/26/2026) |
| 03/30/2026 | 292 | Judge Indira Talwani: ELECTRONIC ORDER: Denying Plaintiffs' Motion for an Order to Show Cause [ 116 ] and Supplemental Motion for Order to Show Cause and for Additional Relief [ 150 ] as superseded by Plaintiffs' Motion for Expedited Discovery into Defendants' Compliance with the Court's May 28, 2025, Orders [ 192 ] where the court intends to address the arguments and requests for relief raised in all three motions together. (SEC) (Entered: 03/30/2026) |
| 04/03/2026 | 293 | DECLARATION re 283 MOTION for Order to Show Cause *, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record Declaration in Opposition to Motion* by Pete R. Flores, Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Shinners, Katherine) (Entered: 04/03/2026) |
| 04/03/2026 | 294 | MEMORANDUM in Opposition re 283 MOTION for Order to Show Cause *, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record* filed by Pete R. Flores, Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, Caleb Vitello. (Shinners, Katherine) (Entered: 04/03/2026) |

| | | |
|---|---|---|
| 04/08/2026 | 295 | Notice of Supplemental Authorities re 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* (Attachments: # 1 Exhibit A)(Hwang, Inyoung) (Entered: 04/08/2026) |
| 04/10/2026 | 296 | REPLY to Response to 283 MOTION for Order to Show Cause *, or in the Alternative, to Strike Improper and Untimely Supplementation of the Administrative Record [Leave to file granted on March 25, 2026]* filed by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor. (Flores-Perilla, Laura) (Entered: 04/10/2026) |
| 04/14/2026 | 297 | NOTICE by Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello (Fudim, Elissa) (Entered: 04/14/2026) |
| 04/16/2026 | 298 | NOTICE of Change of Address or Firm Name by Daniel B Asimow *- New Address: ARNOLD & PORTER KAYE SCHOLER LLP Four Embarcadero Center, 14th Floor San Francisco, CA 94111-4164* (Asimow, Daniel) (Entered: 04/16/2026) |
| 04/20/2026 | 299 | *Response to Defendants' Notice Regarding the Lifting of Certain Holds* Response by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor to 297 Notice (Other) . (Hwang, Inyoung) (Entered: 04/20/2026) |
| 05/01/2026 | 300 | NOTICE of Forthcoming Correction to Declaration [Doc. No. 293 ] by Pete R. Flores, Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, Caleb Vitello re 293 Declaration, (Shinners, Katherine) Modified on 5/4/2026 (MAP). (Entered: 05/01/2026) |
| 05/05/2026 | 301 | Second Notice of Supplemental Authorities re 196 MOTION for Partial Summary Judgment *as to the Mass Truncation of CHNV Parole* (Attachments: # 1 Supplement - Excerpt of Transcript of *CHIRLA v. Noem* oral argument)(Cox, Justin) (Entered: 05/05/2026) |
| 05/06/2026 | 302 | Fourth Notice of Supplemental Authorities re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* (Attachments: # 1 Akmurat O. Doe v. Trump, No. 1:25-cv-13946-JEK, 2026 WL 1170971 (D. Mass. Apr. 30, 2026), # 2 Saghafi v. Edlow, No. GLR-26-100, 2026 WL 1127468 (D. Md. Apr. 24, 2026), # 3 Behdin v. Edlow, No. 26-cv-00566-SVK, 2026 WL 1031079 (N.D. Cal. Apr. 16, 2026), # 4 John Doe v. USCIS, No. 26 C 2389 (N.D. Ill. Mar. 26, 2026), # 5 Karimi v. Mullin, No. 5:26-CV-5049, 2026 WL 1103448 (W.D. Ark. Apr. 23, 2026))(Cox, Justin) (Entered: 05/06/2026) |
| 05/08/2026 | 303 | NOTICE OF CORRECTION to Declaration [ECF No. 293 ] by Pete R. Flores, Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, Caleb Vitell. (Attachments: # 1 Affidavit Decl. of N. Stiefel (May 8))(Shinners, Katherine)<br><br>**Modified on 5/10/2026 Correct Docket Text and CM/ECF Document Link (MAP).**<br><br>(Entered: 05/08/2026) |
| 05/26/2026 | 304 | NOTICE OF APPEAL as to 288 Memorandum & ORDER,,,, by Pete R. Flores, Todd Lyons, Kristi L. Noem, Kika Scott, Donald J. Trump, U.S. Attorney's Office for the |

| | | |
|---|---|---|
| | | District of Massachusetts, Caleb Vitello. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 6/15/2026. (Shinners, Katherine) (Entered: 05/26/2026)** |
| 05/27/2026 | 305 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 304 Notice of Appeal (MAP) (Entered: 05/27/2026) |
| 05/27/2026 | 306 | USCA Case Number 26-1628 for 304 Notice of Appeal, filed by Kristi L. Noem, U.S. Attorney's Office for the District of Massachusetts, Caleb Vitello, Pete R. Flores, Kika Scott, Todd Lyons, Donald J. Trump. (MAP) (Entered: 05/27/2026) |
| 05/27/2026 | 307 | Response by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor to 303 Errata, *Notice of Correction to Declaration [ECF No. 293]*. (Flores-Perilla, Laura) (Entered: 05/27/2026) |
| 06/12/2026 | 308 | Fifth Notice of Supplemental Authorities re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* (Attachments: # 1 Dorcas Int'l Inst. of Rhode Island v. USCIS, No. 26-cv-132-JJM-PAS, 2026 WL 1622708 (D.R.I. June 5, 2026))(Flores-Perilla, Laura) (Entered: 06/12/2026) |
| 07/10/2026 | 309 | Sixth Notice of Supplemental Authorities re 264 MOTION for Preliminary Injunction *of USCIS's Benefits Suspension (Doc. No. 224) as to the Certified Class* MOTION to Stay *the Suspension Under 5 USC 705* (Attachments: # 1 Exhibit Choupanzadeh v. Mullin, No. 26-cv-0277-SM-TSM, 2026 WL 1724398 (D.N.H. June 15, 2026), # 2 Exhibit Yazdan Pouri v. DHS, No. 26-cv-1339, 2026 WL 1508425 (D.D.C. May 30, 2026))(Li, Hillary) (Entered: 07/10/2026) |
| 07/27/2026 | 310 | MOTION to Withdraw as Attorney by Alejandro Doe, Aleksandra Doe, Ana Doe, Andrea Doe, Armando Doe, Carlos Doe, Daniel Doe, David Doe, Francisca Doe, Gabriela Doe, John Doe, Jose Doe, Lucia Doe, Luciana Doe, Maksym Doe, Maria Doe, Marim Doe, Miguel Doe, Omar Doe, Rosa Doe, Svitlana Doe, Teresa Doe, Norma Lorena Dus, Adolfo Gonzalez, Jr., Haitian Bridge Alliance, Sandra McAnany, Valentin Rosales Tabares, Kyle Varner, Wilhen Pierre Victor.(Hwang, Inyoung) (Entered: 07/27/2026) |
| 07/29/2026 | 311 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 310 Motion to Withdraw as Attorney. Attorney Inyoung Hwang terminated. (MAP) (Entered: 07/29/2026) |
| 08/10/2026 | 312 | MOTION to Withdraw as Attorney by State of New York, et al..(Yanni, Stephen) (Entered: 08/10/2026) |
| 08/11/2026 | 313 | Judge Indira Talwani: ELECTRONIC ORDER **allowing** 312 Motion to Withdraw as Attorney. Attorney Stephen J. Yanni terminated. (MAP) (Entered: 08/11/2026) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 08/27/2026 10:20:01 | | | |
| **PACER Login:** | kshinners | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10495-IT |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

Svitlana Doe, *et al.*,

Plaintiffs,

v.

Markwayne Mullin, in his official capacity as Sec'y of Homeland Security, *et al.*,[1]

Defendants.

Civil Action No. 1:25-cv-10495

**NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT**

Notice is hereby given that Defendants appeal to the United States Court of Appeals for the First Circuit from the Court's order granting a preliminary injunction and stay under 5 U.S.C. § 705 (Doc. No. 257) and the accompanying opinion (Doc. No. 258) entered in this action on January 24 and January 25, 2026.

Date: March 25, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW ENSIGN
Deputy Assistant Attorney General

/s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

[1] Secretary Mullin is automatically substituted for his predecessor, former Secretary of Homeland Security Kristi Noem, under Federal Rule of Civil Procedure 25(d).

ELISSA FUDIM
Trial Attorney

**CERTIFICATE OF SERVICE**

I, Katherine J. Shinners, hereby certify that on March 25, 2026, I filed this document through the ECF system, through which notice will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel
U.S. Department of Justice

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

Svitlana Doe, *et al.*,

Plaintiffs,

v.

Markwayne Mullin, in official capacity as Secretary of Homeland Security, *et al.*,

Defendants.

Civil Action No. 1:25-cv-10495-IT

**NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT**

Notice is hereby given that Defendants appeal to the United States Court of Appeals for the First Circuit from the Court's order entered in this action on March 25, 2026 (Doc. No. 288) denying without prejudice Defendants' motion to reconsider and to dissolve its January 24, 2026, preliminary injunction.

Date: May 26, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW ENSIGN
Deputy Assistant Attorney General

SAMUEL P. GO
Assistant Director

/s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259

Email: katherine.j.shinners@usdoj.gov

ELISSA FUDIM
Trial Attorney

**CERTIFICATE OF SERVICE**

I, Katherine J. Shinners, hereby certify that on May 26, 2026, I filed this document through the ECF system, through which notice will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel
U.S. Department of Justice

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE; MAKSYM DOE; MARIA DOE; ALEJANDRO DOE; ARMANDO DOE; ANA DOE; CARLOS DOE; MIGUEL DOE; ANDREA DOE; LUCIA DOE, DANIEL DOE; OMAR DOE; SANDRA MCANANY; KYLE VARNER; WILHEN PIERRE VICTOR; GABRIELA DOE; NORMA LORENA DUS; VALENTIN ROSALES TABARES; MARIM DOE; ADOLFO GONZALEZ, JR.; ALEKSANDRA DOE; TERESA DOE; ROSA DOE; and HAITIAN BRIDGE ALLIANCE,

Plaintiffs,

– *versus* –

KRISTI NOEM, in her official capacity as Secretary of Homeland Security; TODD M. LYONS, in his official capacity as the Acting Director of Immigration and Customs Enforcement; PETE R. FLORES, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; KIKA SCOTT, in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services; and DONALD J. TRUMP, in his official capacity as President of the United States,

Defendants.

**Civil Action No: 1:25-cv-10495-IT**

**Leave to File Granted – March 27, 2025**

# SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Ukrainians seeking safety from the Russian invasion of their country; Cubans, Haitians, Nicaraguans, and Venezuelans fleeing political instability, persecution, and environmental disasters; Afghans who assisted the United States government during its war in

Afghanistan; the family members of certain U.S. citizens and residents who have been deemed eligible for a visa but are simply waiting in their home countries, often for years, for one to become available for them; the undocumented family members of active and retired U.S. military servicemembers; and parents seeking to reunify with children from certain Central American countries after years of family separation are just a few of the populations that the United States has sought to aid in recent years by granting eligible individuals parole, on a case-by-case basis, so that they may enter or remain in the country for a temporary period of time and find safety and stability here.

2. The Trump administration, however, has sought not only to terminate those legal humanitarian pathways to the United States, but to block access to any other longer-term, more stable legal status for individuals granted humanitarian parole, so that these people have no options to remain here in safety, to continue contributing to their communities, and to remain with family members here in the United States.

3. This lawsuit challenges the steps the Trump administration has taken to radically limit what had up to this point been a broad power granted by Congress to allow the executive to respond to migration challenges, address global humanitarian crises, and further important foreign policy objectives in a flexible and adaptive way. It also challenges the Trump administration's dismantling of legally established and congressionally authorized pathways to the United States, including:

- Uniting for Ukraine ("U4U"), for Ukrainians displaced by the war with Russia;
- the processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), countries that have been ravaged by natural disasters and/or political strife;
- Operation Allies Welcome ("OAW"), for Afghans fleeing the newly resurgent Taliban;

- Family Reunification Parole ("FRP"), for nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras with approved family-based immigrant visa petitions;

- Military Parole in Place ("Military PIP"), so that U.S. military servicemembers may seek parole for their parents, children, and spouses, and need not worry about the immigration status of these close family members while serving their country; and

- The Central American Minors ("CAM") parole process, which reunites parents who are already in the United States with their children who remain behind.

4. In addition, this lawsuit challenges the Trump administration's attempts to block individuals paroled through these and other processes from seeking alternate legal statuses created and authorized by Congress.

5. On January 20, 2025—Inauguration Day—President Trump issued Executive Order 14165, entitled "Securing Our Borders," which directed the Secretary of Homeland Security to terminate all "categorical parole programs," explicitly referencing the CHNV parole processes.

6. Also on that day, Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" (the "January 20 Huffman memorandum") to the heads of Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), in which he authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute." Acting Secretary Huffman directed all DHS staff to implement the new agency policy under which this historically common use of the parole authority is unlawful.

7. On the basis of Acting Secretary Huffman's conclusion that parole programs are unlawful, DHS has stopped considering parole applications through these processes, as well as requests on behalf of people already here for re-parole or for parole-in-place through the Military Parole-in-Place process. In addition, on March 21, 2025, DHS made public a Federal Register

Notice entitled "Termination of Parole Processes: Cubans, Haitians, Nicaraguans, and Venezuelans," which was eventually published in the Federal Register on March 25, 2025 (the "March 25 FRN"), and "terminat[es] the categorical programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." The March 25 FRN further states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary."

8. Also based on Acting Secretary Huffman's erroneous legal conclusion, USCIS has also unlawfully suspended the adjudication of all requests for immigration benefits (including applications for work authorization as well as asylum, Temporary Protected Status ("TPS"), or other status adjustments) for individuals paroled through "categorical" humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

9. Weeks after this unlawful suspension was imposed, Acting Deputy Director of USCIS Andrew Davidson sought to justify it in a post-hoc February 14, 2025 memorandum (the "February 14 Davidson memorandum"), That memorandum justified the suspension as to the U4U, CHNV, and FRP processes based solely on the "potential" that the "vetting" that the beneficiaries of these parole processes underwent in connection with their parole applications was not identical to what was in effect on January 19, 2021—the last day of President Trump's first term. This so-called administrative pause may also apply, at a minimum, to the OAW and MPIP processes. There is no authority for this suspension, and it is contrary to the laws Congress enacted governing those immigration benefit applications, in addition to being arbitrary and capricious.

10. At the same time that it has terminated these humanitarian parole processes for their alleged illegality and suspended the ability of parolees to obtain forms of immigration relief to

which Congress has made them entitled, DHS has also taken aggressive action—challenged separately—to make it easier to deport individuals paroled through these processes as quickly as possible.

11. Such actions are not only illegal, but shockingly callous. Plaintiff Svitlana Doe[1] fled Ukraine following the Russian invasion and bombing of her town. Her son still requires speech therapy to overcome the horrors of war her family witnessed. Plaintiffs Maksym and Maria Doe likewise fled Ukraine, where Maksym heroically helped to rescue over 22,000 Ukrainians and provided humanitarian assistance to over half a million more. Plaintiffs Alejandro, Armando, Ana, and Carlos fled Nicaragua following the torture of a family member at the hands of the state and subsequent political persecution. Plaintiff Andrea Doe's husband, a political prisoner in Nicaragua, was brought to the United States *by* the United States government, which then asked him and others similarly situated to use the CHNV parole program to achieve reunification with the family members they had been forced to leave behind. Plaintiff Omar Doe—at great risk to himself and to his family—faithfully served alongside the U.S. military in Afghanistan for over eighteen years before being evacuated by the military following the country's fall to the Taliban. Plaintiff Valentin Rosales Tabares was on the cusp of reuniting with his daughter and granddaughter, who were approved for Cuban Family Reunification Parole but had not yet been given a travel date, when the Trump administration terminated the FRP process. Plaintiff Adolfo Gonzalez, Jr. has served this country honorably as a First Sergeant in the Army, and Marim Doe continues to serve his country in the Navy, but their MPIP applications for their loved ones are now indefinitely

[1] The Court has granted leave for Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Andrea Doe, Marim Doe, Aleksandra Doe, Teresa Doe, and Rosa Doe to proceed pseudonymously, and a motion for four other individual plaintiffs to similarly proceed will be filed imminently.

suspended. Plaintiff Teresa Doe's CAM parole has expired and she is now subject to removal because her application for re-parole is indefinitely suspended, and she fears being deported and removed from all her family. And Plaintiff Rosa Doe was about to reunite with her fourteen-year-old daughter and her father through the CAM parole process, but now does not know when she will see them again.

12. The individuals able to obtain parole through U4U, CHNV, OAW, FRP, and CAM trusted that the U.S. government would help protect them from harm. They waited—even amid active war and persecution—to enter the United States until they had a legal avenue to enter the country. And now CHNV parole beneficiaries have had their grants of parole and work authorization prematurely cut short. All humanitarian parole beneficiaries have been cut off from the immigration relief Congress made available to them. Defendants are treating similarly our Afghan allies who arrived through OAW and individuals closely related to members of our Armed Forces.

13. Individual Plaintiffs, including Putative Class Representatives on behalf of themselves and similarly situated persons, and Organizational Plaintiff Haitian Bridge Alliance ("HBA"), seek a declaration that humanitarian parole processes like U4U, CHNV, OAW, FRP, MPIP, and CAM are lawful; a preliminary and permanent injunction prohibiting DHS from continuing to apply its unlawful construction of the parole statute; a preliminary and permanent injunction prohibiting DHS from unlawfully and categorically revoking or otherwise placing conditions on grants of parole and work authorization to parole beneficiaries; and vacatur of agency actions taken pursuant to the agency's erroneous understanding of the law.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

15. Venue is proper in this District because Plaintiffs Svitlana Doe and Wilhen Pierre Victor reside in this District. *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

16. Plaintiff **Svitlana Doe** is a citizen of Ukraine. Svitlana fled Ukraine in November 2024 following Russia's unprovoked and unjustified invasion into the country. Svitlana is the mother to a young boy with celiac disease, for whom care was difficult in Ukraine even before the war, and close to impossible during wartime. Svitlana, her husband, and her young son narrowly escaped Ukraine in November 2024, and traveled to the United States pursuant to the U4U parole process. Svitlana currently lives in Dover, Massachusetts. She has a pending application for TPS filed in February 2025, which has been indefinitely stalled due to the administration's pause on processing immigration benefits applications for U4U parolees.

17. Plaintiff **Maksym Doe** is a Ukrainian national living in Brooklyn, New York, with his wife, Maria Doe. After fleeing Kharkiv on the day Russia invaded Ukraine, he and several partners founded a nonprofit organization in Ukraine that began coordinating volunteer efforts to evacuate people from the war-stricken eastern part of the country. They rescued over 22,000 people within the first six months of the war and since then have provided humanitarian assistance to over a half million Ukrainians. Maksym came to the United States through the U4U parole process in April 2023. He and his wife have applied for Temporary Protected Status ("TPS"), and he has also applied for re-parole in September 2024 because his current grant of U4U parole expires in April 2025. Processing these applications has been paused indefinitely due to the February 14 Davidson memo. If that pause remains in effect, Maksym's parole will expire, he will lose his work authorization and his ability to continue his humanitarian work for Ukrainians, and he will be displaced once again.

18. Plaintiff **Maria Doe** is a Ukrainian national who currently lives with her husband Maksym in Brooklyn, New York. She and Maksym Doe came to the United States through the U4U parole process with all their possessions packed into two suitcases. Maria was able to apply for U4U re-parole and was granted another two years of parole in January 2025, but she has also applied for Temporary Protected Status and is working with her employer to file an H-1B employment-based visa application soon. Not only will these applications not be processed due to the administration's indefinite hold on processing applications for immigration benefits for parole beneficiaries, but if her parole expires or the administration prematurely terminates it, she will once again be displaced.

19. Plaintiff **Alejandro Doe** is a citizen of Nicaragua. Alejandro is the brother of Ana Doe and Miguel Doe and currently lives in Gainesville, Georgia. Alejandro fled Nicaragua following the abduction and torture of his father by the Nicaraguan state. In July 2024, Alejandro entered the United States through the parole process for Nicaraguans, a component of the CHNV parole processes. He was sponsored by his cousin, Gabriela Doe. Due to the March 25 FRN, Alejandro's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely stalled due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

20. Plaintiff **Armando Doe** is a citizen of Nicaragua. Armando is married to Ana Doe and currently lives in Gainesville, Georgia. Armando fled Nicaragua due to increasing political repression and danger stemming from the disappearance of Ana's father by the Nicaraguan government and Armando's work at a digital media company dedicated to democratizing information and documenting government abuses. Armando entered the United States in February

2024, through the CHNV parole process for Nicaraguans. He was sponsored by his wife's cousin, Gabriela Doe. Due to the March 25 FRN, Armando's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

21. Plaintiff **Ana Doe** is a citizen of Nicaragua. Ana is married to Armando Doe and currently lives in Gainesville, Georgia. She is the sister of Alejandro Doe and Miguel Doe and cousin of Carlos Doe. Ana fled Nicaragua due to the increasing instability, political repression, and danger culminating in her father's capture and torture by the Nicaraguan government, as well as the danger her husband Armando faced working for a digital media company targeted by the Nicaraguan government for the information it published. Ana entered the United States and was granted parole through the CHNV parole process for Nicaraguans in February 2024. She was sponsored by her U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Ana's period of parole, and the associated work authorization, have been prematurely terminated. She also has a pending asylum application, as a derivative under her husband's pending asylum application, which is indefinitely on hold due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

22. Plaintiff **Carlos Doe** is a citizen of Nicaragua. He is the cousin of Ana Doe and Alejandro Doe, and he currently lives in Gainesville, Georgia. Carlos fled Nicaragua because of the political instability and the fact that the Nicaraguan government was actively persecuting him due to his involvement in protests against the government and was issuing death threats against him and his family. As a result, Carlos went into hiding, where he received more death threats, rendering it unsafe for him to remain in Nicaragua. Carlos entered the United States and was

granted parole through the CHNV parole process for Nicaraguans in May 2023. He was sponsored by a U.S. citizen family member. Due to the March 25 FRN, Carlos's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

23. Plaintiff **Miguel Doe** is a citizen of Nicaragua. He is the younger brother of Alejandro Doe and Ana Doe, and he currently lives in Gainesville, Georgia. Miguel came to the United States to find work so that he could better support himself and his family, including his mother, who he lived with and helped take care of back in Nicaragua. In his home country, it was difficult for Miguel to find stable work that paid decent wages. Miguel entered the United States and was granted parole through the CHNV parole process for Nicaraguans in July 2024. He was sponsored by his U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Miguel's period of parole, and the associated work authorization, have been prematurely terminated, and he will be vulnerable to imminent deportation in less than a month. The February 14 Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

24. Plaintiff **Andrea Doe** is a citizen of Nicaragua. She arrived in the United States in the summer of 2023 with her two young sons to reunite with her husband, Rafael Doe, a former political prisoner from Nicaragua who had been evacuated to the United States by the U.S. government in February of that year. Andrea Doe and the couple's two young sons joined Rafael in the United States through CHNV parole because the U.S. State Department was asking the evacuated Nicaraguans to use the CHNV parole program to seek reunification with the family members they had been forced to leave behind in Nicaragua. The whole family then applied for

asylum together. Their application for asylum has been pending with the Asylum Office since December 2023. If that application is not processed, Andrea Doe and the children will be left without protection against removal to Nicaragua. Andrea would be at risk of detention and of losing her children, and the family would face permanent separation, because the Nicaraguan government, upon expelling Rafael and the other passengers on the evacuation flight, stripped them of their Nicaraguan citizenship. Additionally, due to the March 25 FRN, Andrea's period of parole, and the associated work authorization, have been prematurely ended, putting her in an even more vulnerable position.

25. Plaintiff **Lucia Doe** is a citizen of Venezuela. She lives in St. Augustine, Florida, and she is the sister of Plaintiff Norma Lorena Dus ("Lorena"), who sponsored her to come to the United States on CHNV parole. Lucia left Venezuela because she and her family were experiencing extreme financial hardship there. Lucia's salary in Venezuela was not sufficient to provide for even basic needs like food, rent, and clothing. She entered the United States and was granted parole through the CHNV parole process for Venezuelans in July 2024. Due to the March 25 FRN, Lucia's period of parole, and the associated work authorization, have been prematurely terminated, and she will be vulnerable to imminent deportation in less than a month.

26. Plaintiff **Daniel Doe** is a citizen from Haiti currently living in Orlando, Florida. Daniel left Haiti because of the continuing danger and gang-led violence in Haiti, particularly in the neighborhoods where he lived. His wife and three-year-old daughter remain in Haiti, with pending CHNV sponsorship applications that will now never be processed. He entered the United States in February 2024 through the CHNV parole process for Haitians. Due to the March 25 FRN, Daniel's period of parole and work authorization have been prematurely terminated, and he will be at risk of being vulnerable to imminent deportation in less than a month. The February 14

Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

27. Plaintiff **Omar Doe** is an Afghan national living in Omaha, Nebraska. He worked for over eighteen years in different capacities with the U.S. military in Afghanistan, including as an interpreter. He and his wife and five children were evacuated to the United States as part of the U.S. military's withdrawal from Afghanistan in 2021. His application for a Special Immigrant Visa has been pending for almost three and a half years. Because his parole and his work authorization will expire in September 2025, he is also working on filing an asylum application with assistance from a nonprofit. But none of these applications will be adjudicated if the Trump administration's pause on the processing of immigration benefits continues, and Omar fears that he will lose his legal status and be vulnerable to deportation.

28. Plaintiff **Sandra McAnany** is a U.S. citizen who lives in La Crosse, Wisconsin. She is driven by her strong Christian faith to serve as the U.S.-based sponsor for seventeen individuals with active parole status through CHNV—fifteen from Venezuela and two from Nicaragua. They were all approved for two-year periods of parole, and most have applied for asylum based on the fears they have of returning to their countries of origin. Sandra has given much of her time, effort, and money over the last few years supporting her CHNV beneficiaries to safely travel to the United States, reunite with family members already in the country, and find work and settle into their communities. Sandra has four pending CHNV applications as well, for nationals from Cuba, that will now never be processed due to the administration's end to CHNV.

29. Plaintiff **Kyle Varner** is a U.S. citizen and physician who lives in Spokane, Washington. As a long-committed political activist deeply involved in liberal and libertarian movements in Venezuela, he is motivated by his strong moral and political convictions to sponsor

seventy-nine individuals through the CHNV parole processes, most of whom are nationals of Venezuela. Forty-three of his beneficiaries are currently in the United States, and at least twenty-nine have pending applications for asylum, TPS, or other immigration relief that are on pause due to the administration's policies. Over the last few years, Kyle has put immense amounts of time, energy, and money into ensuring that his beneficiaries have what they need, both to travel to the United States and to have a strong footing once they arrived. Kyle also has thirty-two pending CHNV sponsorship applications, including for a Cuban individual and a Nicaraguan individual, that will now never be processed due to the administration's end to CHNV.

30. Plaintiff **Wilhen Pierre Victor** is a U.S. citizen and healthcare worker who lives in Woburn, Massachusetts. She is the CHNV sponsor for her brother, his wife, and their three children, who are seven, thirteen, and sixteen years old. They arrived in the United States from Haiti in the summer of 2024 and were granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn. Wilhen's application to sponsor her brother for a green card has been pending since 2007, and he has been waiting since then to have another legal pathway to come to the United States. CHNV parole has allowed Wilhen to reunite with her brother for the first time in more than twenty years, and it has allowed Wilhen's brother to find a job for the first time in thirteen years. Wilhen also has two pending applications for CHNV sponsorship of her thirteen-year-old niece (her brother's child) and her fifty-year-old cousin, who experience ongoing threats of extreme violence in Haiti, that will now never be processed due to the administration's end to CHNV.

31. Plaintiff **Gabriela Doe** is a U.S. citizen and immigrant justice advocate who lives in Tacoma, Washington. She is cousin to Ana Doe, Armando Doe, Alejandro Doe, Carlos Doe, and Miguel Doe, and is the CHNV sponsor to all her cousins except Carlos Doe, who is sponsored

by another family member. The cousins Gabriela sponsored arrived in 2024 and were granted two-year periods of parole. Through the CHNV parole process, Gabriela was able to reunite with her five cousins, whose family faced political repression, danger, and persecution in Nicaragua. Because of the CHNV parole process for Nicaraguans, her cousins have been able to work and support themselves here in the United States and lead more stable, peaceful lives. Through the March 25 FRN, Gabriela's cousins' CHNV parole periods, and associated work authorizations, will prematurely end, subjecting their family to the possibility of separation again and causing Gabriela severe psychological distress knowing her cousins will be at risk of being vulnerable to imminent deportation in less than a month.

32. Plaintiff **Norma Lorena Dus ("Lorena")** is a U.S. citizen and immigrant justice advocate who lives in West Stockbridge, Massachusetts. She is the CHNV sponsor for her sister, Lucia Doe, who arrived in the United States from Venezuela in July 2024 and was granted a two-year period of parole. The CHNV parole process allowed Lorena and Lucia to reunite with all of their siblings for the first time in six years, and it has allowed Lucia, whose job back in Venezuela did not pay enough for her to cover even her basic needs, let alone the needs of their mother, to become self-sufficient and send money back to their parents as well. This has relieved the financial strain on Lorena and their other siblings, all of whom regularly send money back to their parents to help them survive in Venezuela. The administration's termination of CHNV parole and premature termination of Lucia's two-year grant of parole and associated work authorization will cause severe, unexpected financial burden for Lorena, as well as psychological distress due to her sister becoming vulnerable to imminent deportation.

33. Plaintiff **Valentin Rosales Tabares** is a U.S. legal permanent resident living in Portland, Oregon. In 2018, he submitted family-based immigrant visa petitions for his wife, son,

and daughter that were quickly approved. His wife and son were issued immigrant visas in 2022 and came to the United States that year to be reunited with him. However, his daughter and her daughter, Valentin's granddaughter, continued to await their immigrant visas in Cuba, where life was extremely difficult. When Valentin was invited by the Department of State to request Cuban Family Reunification Parole for his daughter in November 2024, he immediately submitted a request on her behalf. She was approved in December 2024, but she was not given a travel date before the Trump administration terminated the parole process. Valentin's application for his daughter is now indefinitely on pause. Valentin also applied to sponsor his son's wife and child through the CHNV parole process. Those applications remain pending indefinitely as well.

34. Plaintiff **Marim Doe** is a U.S. citizen and active-duty member of the U.S. Navy stationed at the U.S. military base in Goose Creek, South Carolina. Marim's father does not have legal status in the U.S., and one of the main reasons Marim joined the military was to help his father obtain legal status through the military parole-in-place process. He wants to provide his father with more job stability and retirement support as he gets older, as well as protection against immigration enforcement, the fear of which has plagued their family. In May 2024, Marim submitted a military parole-in-place application for his father. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

35. Plaintiff **Adolfo Gonzalez, Jr.** is a U.S. citizen and retired U.S. Army service member who served in the Army for over thirty years. He lives in Zapata, Texas with his wife and sixteen-year-old daughter. Adolfo's wife is a national of Mexico and does not have legal status in the United States, a fact that caused him constant anxiety and fear when he was in active duty and had to be away from home and apart from her and his daughter. In March 2024, Adolfo submitted an application for military parole-in-place for his wife so that she could have a path to permanent

residency and citizenship in the United States. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

36. Plaintiff **Aleksandra Doe** is a national of Ukraine living in San Jose, California with her husband and five-year-old son. They were granted parole through the Uniting for Ukraine parole process around April 2023. Her and her family's current authorized period of parole and associated employment authorization expires on March 29, 2025. She and her son have pending TPS applications, which she filed in December 2024. She and her family also have pending adjustment of status applications, which they were able to submit because they applied for the diversity visa lottery in October 2023 and were selected in May 2024 to move forward in the process for the Fiscal Year 2025 lottery. Aleksandra had an interview scheduled for her adjustment of status application in February 2025, but a few days before her appointment, she received a notice from USCIS notifying her that her interview had been cancelled. Because of the administration's suspension of adjudication of all immigration benefit applications for people like Aleksandra and her family, who came to the United States through U4U, Aleksandra's applications for TPS and adjustment of status are now indefinitely on hold.

37. Plaintiff **Teresa Doe** is a national of El Salvador who has lived in Las Vegas for the last eight years with her husband and four children, one of whom is a U.S. citizen and two who are lawful permanent residents. After many years of separation from her husband and three of her children, Teresa was finally able to travel to the United States and be reunited with them when her son was approved for the CAM parole process. The two of them came to the United States in 2017 and were granted parole for an initial period of two years. After that, Teresa has consistently applied for and received CAM re-parole, which has allowed her husband to work and support their family while she takes care of their children and grandchildren. Her current period of parole

expired on March 13, 2025, and her application for re-parole remains pending. Because of the administration's termination of CAM, this application is indefinitely on hold, and Teresa faces the possibility of being torn away from her family again.

38. Plaintiff **Rosa Doe** is a national of Honduras living in Austin, Texas with her four U.S. citizen daughters. Rosa has one other daughter who is fourteen years old living in Honduras, along with Rosa's father. Rosa came to the United States in 2013. She was trafficked into the United States and is the survivor of rape and other violence in Honduras. Rosa is a U-visa applicant with deferred status while her U-visa application remains pending. In June 2023, she filed an Affidavit of Relationship through the CAM parole process to reunite with her fourteen-year-old daughter and elderly parents. Sadly, Rosa's mother died in October 2024 before Rosa was able to see her again. Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. In November 2024, they both received conditional approval letters for their parole applications. Rosa was planning to purchase their flights to come to the United States in January 2025, but at this point Rosa was no longer able to get updates on their case to facilitate purchasing the tickets for her daughter and father. In early March 2025, Rosa was able to get in contact with the International Organization for Migration and was told that it would take more time for her daughter and father to be able to travel. However, because of the administration's termination of the CAM parole process, Rosa's daughter and father will not be able to travel to the United States, which would ensure Rosa's daughter's safety from the danger she faces in Honduras.

39. Plaintiff **Haitian Bridge Alliance ("HBA")** is a Haitian-led, Haitian Creole-speaking grassroots and community-based nonprofit organization incorporated in California. HBA was formed in early 2016 to meet the needs of an influx of Haitian and other Black migrants that came to the U.S.-Mexico border seeking humanitarian protection as conditions in their home

countries deteriorated. HBA's core organizational activities have included, since the inception of the CHNV parole process for Haiti, providing direct services and support to thousands of CHNV sponsors and parolees from Haiti. These services include legal consultations for CHNV parolees, assistance completing CHNV sponsorship applications, humanitarian and integration support, and other aid. Defendants' termination of the CHNV parole processes, premature termination of grants of CHNV parole, and suspension of processing immigration benefit applications filed by CHNV parolees have directly interfered with these core activities.

40. Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025. Until she was confirmed, Benjamine C. Huffman served as the Acting Secretary of Homeland Security from the time when President Trump appointed him to that position on January 20, 2025.

41. Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS. Prior to Mr. Lyons, Caleb Vitello was the Acting Secretary; he was appointed to that position by President Trump on January 20, 2025. Mr. Vitello was reportedly "reassigned" to a different role on or about February 21, 2025, due to President Trump's frustration that ICE had not arrested more immigrants in the first few weeks of his second term, but he apparently stayed in that role until Secretary Noem announced Mr. Lyons as the next Acting Director on March 9 .

42. Defendant Pete R. Flores is sued in his official capacity as the Acting Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS. Mr. Flores has been the Acting Commissioner of CBP since January 20, 2025, when he was appointed to that position by President Trump.

43. Defendant Kika Scott is sued in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS. According to USCIS's website, Ms. Scott has been in this position since February 9, even though it was previously and widely reported that Andrew Davidson, the Acting Deputy Director of USCIS, would become the Acting Director of USCIS on that same date via appointment by President Trump.

44. Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

## BACKGROUND

### <u>The Statutory Parole Authority</u>

45. Parole is a temporary form of permission for a noncitizen to be in the United States. Parole does not itself lead to any other form of immigration status, although while here on parole, nothing prevents parolees from applying for any other immigration status for which they are eligible. Many parole recipients have applied for asylum pursuant to 8 U.S.C. § 1158, temporary protected status pursuant to 8 U.S.C. § 1254a, or other forms of status adjustments. Under longstanding regulations, many parolees can apply for employment authorization.

46. Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5)(A), states that "the Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."

47. Congress has never defined "case-by-case," "urgent humanitarian reasons," or "significant public benefit," or delineated with further specificity the circumstances under which

the Executive may grant parole, apart from what is encompassed by the clause, "except as provided in subparagraph (B) or in section 1184(f) of this title," discussed more below.

48. The executive's authority to parole individuals into the country was originally codified in Section 212(d)(5) of the 1952 INA, which established that "[t]he Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States."

49. Congress did not define the terms "emergent" or "public interest" and did not modify the wording of the parole provision until 1980.

50. Between 1952 and 1980, lacking a permanent statutory provision specifically providing for the entry of refugees, the Executive frequently used the parole authority to facilitate the entry of refugees in a programmatic manner—i.e., by defining a group, typically by nationality plus additional factors, whose entry could be justified by emergent or public interest reasons – with applications of individuals therein considered on a case-by-case basis.

51. The first such use was in 1956, when President Dwight D. Eisenhower directed the Attorney General to parole into the country approximately 30,000 Hungarian refugees who had fled during that country's revolution.

52. There is no comprehensive accounting of "programmatic" or "categorical" uses of parole, but in the approximately seventy years since this original such use by the Eisenhower Administration, there have been at *least* another 125 categorical parole programs, usually with multiple parole programs operating at the same time throughout that period, and during every single Administration, including the first Trump Administration.

53. In 1980, Congress passed the Refugee Act, which established for the first time a specific, permanent legal process to admit people to the United States as refugees.

54. In passing the Refugee Act, and in recognition of the fact that refugees now had a unique legal pathway to the United States, Congress added a restriction to the parole authority, codified in subparagraph (B), 8 U.S.C. § 1182(d)(5)(B), prohibiting the Attorney General from paroling a refugee into the United States "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

55. The conference report adopted by both chambers accompanying the final legislation explained that § 1182(d)(5)(B) "does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees."

56. Similarly, since it was enacted, the federal officials exercising the parole authority have consistently interpreted § 1182(d)(5)(B)'s restriction as applying only to noncitizens who have already been determined by the U.S. government to be refugees.

57. Congress next amended the parole statute in 1990 to prohibit granting parole to noncitizens to perform certain work aboard a vessel or aircraft on an air carrier during a labor dispute where there is a strike or lockout unless the parole "is necessary to protect the national security of the United States." Pub. L. No. 101-649, § 202, 104 Stat. 4978, 5014 (1990) (codified at 8 U.S.C. § 1184(f)); *see also* 8 U.S.C. § 1182(d)(5)(A) (authorizing parole "except as provided . . . in section 1184(f) of this title.").

58. Congress last amended the parole authority in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").

59. IIRIRA made just one textual change to the parole statute, striking from § 1182(d)(5)(A) the language allowing the Attorney General to grant parole "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest" and replacing it with language allowing the Attorney General to grant parole "under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

60. In addition to that textual change to the parole statute, IIRIRA contained three other provisions related to exercises of the parole authority. In one, Congress required that the Attorney General annually report to the Judiciary Committee of each chamber the "number and categories of [noncitizens] paroled into the United States."

61. In another section of IIRIRA, Congress directed that parolees who had been in the United States at least a year and had not become lawful permanent residents must be counted against per-country numerical caps on family-sponsored immigration.

62. Finally, IIRIRA also directed the Attorney General to give green cards to Polish and Hungarian noncitizens who had been paroled into the United States through a categorical parole program that operated over a roughly two-year period ending at the end of 1991.

63. As Congress worked on the legislation that eventually became IIRIRA, the House Judiciary Committee criticized the "categorical" use of parole and asserted that such use of the parole authority was *ultra vires*. It therefore proposed to narrow the substantive grounds on which parole could be granted to specify that the only "humanitarian reason" that parole could be granted involved medical emergencies, and the only "public benefit" that would warrant parole involved assisting U.S. law enforcement.

64. Before the bill was brought to the House floor, however, the Judiciary Committee's language restricting parole was removed, and the legislation that ultimately was signed into law as IIRIRA left undefined the substantive criteria on which parole could be granted.

65. Since the 1996 passage of IIRIRA, both Republican and Democratic administrations have created and administered parole programs to allow the parole of individuals within broadly defined classes, for example:

- Cuban and Haitian beneficiaries of approved family-based immigration petitions awaiting visas (2007-17; 2021-present);
- Haitian children orphaned by the 2010 earthquake in that country (2010);
- Cuban medical professionals in third countries conscripted by the Cuban government (2006-2017);
- Chinese and Russian nationals seeking to visit the Commonwealth of the Northern Mariana Islands and Guam for business or pleasure (2009-19);
- family members of U.S. military service members (2013-present);
- minor children from El Salvador, Guatemala, and Honduras with family in the United States (2014-17; 2021-present); and
- family members of Filipino World War II veterans (2016-present).

66. Consistent with ratifying the view that categorical parole was authorized, both before and after the passage of IIRIRA—and in addition to in IIRIRA itself, as discussed above regarding Polish and Hungarian parolees—Congress has repeatedly passed legislation extending various benefits and services to individuals who obtained parole via a "categorical" parole process, in some cases making benefits available prospectively to individuals who would in the future be paroled pursuant to such processes. For instance, most recently, Congress enacted legislation extending resettlement support services (normally provided only to refugees) to Ukrainians paroled under U4U and Afghans paroled under OAW, for the duration of their period of parole and any re-parole.

67. The parole authority has enabled administrations to serve urgent humanitarian needs and advance the significant public benefit of promoting the national interest through achieving humanitarian, human rights, anti-trafficking, foreign policy, and regional security goals, among others.

**Uniting for Ukraine ("U4U")**

68. On February 24, 2022, Russia invaded Ukraine, beginning a war that continues to this day.

69. In the weeks following Russia's invasion, thousands of Ukrainians traveled to Mexico and presented themselves at U.S. ports of entry to request humanitarian protection, as is their right under international and U.S. law. *See, e.g.*, 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum . . . .").

70. At its peak, CBP encountered up to 1,300 Ukrainians per day along the southern border; that surge strained its operations and required diverting personnel to increase processing capacity.

71. Most Ukrainians who arrived at the southern border during this period—some 20,000 people—were paroled into the country, due at least in part to a lack of detention space. Most received an initial grant of one year of parole.

72. Every Administration, including the first Trump Administration, has used parole in this way to process applicants for admission, particularly when there is a lack of detention space.

73. In response to this surge of Ukrainians at the border and the accompanying strain on CBP, President Biden announced in March and April 2022 a variety of humanitarian commitments to the Ukrainian people, including establishing the Uniting for Ukraine parole

process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022). The Federal Register Notice for the U4U parole process cites destruction to civilian infrastructure, ongoing concerns about food security, a lack of medicine and health supplies, rampant sexual exploitation and abuse, continuing violence, and large-scale displacements of Ukrainians as reasons for the establishment of the parole process.

74. Uniting for Ukraine is a process by which Ukrainians who have a U.S.-based sponsor committed to providing for their financial support can apply to be considered, on a case-by-case basis, for a grant of parole, typically for two years.

75. U4U was created so that eligible Ukrainians could request consideration for parole without having to travel to Mexico and present at the southern border, which can be dangerous for the individuals and further strains CBP resources.

76. Permitting Ukrainians to apply in advance also benefitted the U.S. government by making it possible to conduct security checks on the individuals before they travel.

77. Uniting for Ukraine applicants who meet the eligibility requirements, pass security checks, and warrant a favorable exercise of discretion are granted authorization to travel directly (via flight) to the United States, where they are inspected and undergo further security checks before CBP makes the final determination of whether to grant parole.

78. There is no fee associated with initial applications for parole under Uniting for Ukraine, but applicants must comply with all pre-travel requirements—including public health requirements—at no cost to the United States and likewise must pay for and arrange their own travel.

79. Once approved to travel to the United States, prospective U4U parolees fly directly to an airport in the interior of the United States, which avoids the disorderly process at the border—

and concomitant impact on border communities and states—that was otherwise occurring because of Russia's invasion of Ukraine.

80. Like the U4U parolees, potential U4U sponsors undergo security checks; they also must prove their own lawful status and that they have sufficient financial resources to receive, maintain, and support the intended beneficiaries for the duration of their parole period.

81. In February 2024, USCIS announced the process by which U4U parolees could apply for re-parole, once they had less than six months left on their initial grant of parole. In addition to meeting other eligibility requirements, applicants for re-parole under U4U had to pay a fee or obtain a waiver of fees.

82. Per legislation enacted by Congress in May 2022 and April 2024, Ukrainians paroled into the United States between February 24, 2022, and September 30, 2024, are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program—the same services to which OAW parolees are entitled, as discussed below—for the duration of their period of parole and any re-parole.

83. From fiscal year 2022 to fiscal year 2023, the number of Ukrainians encountered by CBP at the southern border dropped *by more than ninety-nine percent*. There were even fewer encounters in fiscal year 2024 than in fiscal year 2023.

84. Most U4U parolees have claims to other forms of immigration relief that would permit them to stay in the United States permanently, including family-based immigration visas and TPS.

85. These paths to permanent immigration status for U4U parolees, however, generally take years to navigate due to how long it takes the Defendant agencies to process the immigration benefit applications.

86. Currently, Ukrainians who have continuously resided in the United States since August 16, 2023 (which would include some U4U parolees) are eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. TPS for Ukrainians is currently set to expire (if not extended) on October 20, 2026.

87. As of the third anniversary of Russia's invasion of Ukraine, approximately 7 million Ukrainians remain externally displaced. Approximately 200,000 of them are in United States by way of parole. Most Ukrainians here on parole had some preexisting tie to the United States (such as family), which is why they came here for refuge when they fled their home country.

**Parole Processes for Cuba, Haiti, Nicaragua, & Venezuela ("CHNV")**

88. Over the last several years, a significant number of Cubans, Haitians, Nicaraguans, and Venezuelans have been displaced due to natural disasters, economic hardship, and political strife.

89. Today, there are approximately eleven million displaced nationals of those four countries, most of them Venezuelan; twenty percent of Venezuela's population is displaced.

90. Due to events internal to each country, emigration from these four countries accelerated remarkably from 2020 to 2022.

91. Per its data, CBP encountered at the southern border fewer than 18,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2020.

92. Per its data, CBP encountered at the southern border more than 181,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2021.

93. Per its data, CBP encountered at the southern border more than 600,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2022—comprising more than forty percent of all migrants CBP encountered at the border that year.

94. The marked increase in the number of nationals of these four countries arriving at the southern border put considerable strain on CBP operations, causing it to divert resources and to provide sub-standard care to those migrants.

95. As with the Ukrainians coming to the southern border discussed above, many (if not most) of the Cubans, Haitians, Nicaraguans, and Venezuelans who came to the border during this period were paroled into the United States.

96. In October 2022, the Biden Administration created a parole process for Venezuelans. DHS, *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the success of the Venezuelan parole process, the Biden Administration expanded the parole process for Venezuelans, DHS, *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1279 (Jan. 9, 2023); and created similar parole processes for nationals of Cuba, Haiti, and Nicaragua, DHS, *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1266 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1243 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255 (Jan. 9, 2023).

97. These Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") parole processes were explicitly modeled on the Uniting for Ukraine parole process; like U4U, the rigorous application processes for CHNV parole required passing security checks, having a U.S.-based financial supporter with lawful status who has proven their ability to remain committed to providing for the parolee for the duration of their two-year period of parole, and meeting all pre-travel requirements. The travel itself must be at no cost to the United States.

98. DHS explained in creating the CHNV parole processes that the processes provide significant public benefits by improving vetting for national security and public safety, reducing

the strain on CBP resources and personnel, and minimizing the impact on the United States of irregular migration from these countries.

99. DHS also explained that the parole processes address urgent humanitarian concerns by offering a safe and legal pathway out of dangerous conditions in these four countries as an alternative to the perilous overland journey to the U.S. border.

100. The United States-Mexico border is the world's deadliest land migration route. According to the International Organization for Migration, more than 800 people died attempting to cross the U.S.-Mexico border in 2021; more than 750 in 2022; more than 730 in 2021; but fewer than 500 in 2024.

101. DHS also explained in creating the CHNV parole processes that they further important foreign policy objectives, including the collaborative management of migration in the hemisphere.

102. An important aspect of the CHNV parole processes is that Mexico agreed—for the first time ever—to accept the removal of Cubans, Haitians, Nicaraguans, and Venezuelans who do not follow the CHNV parole processes, which thereby makes them presumptively ineligible for asylum in the United States.

103. For years, the United States has had difficulty removing nationals of those four countries because of their home countries' refusals to accept the deportees.

104. As part of CHNV, Mexico agreed to accept up to 30,000 (combined) deported nationals of these countries each month.

105. The CHNV processes allowed up to 30,000 parolees from the four countries combined to come to the United States each month.

106. The demand for CHNV parole was extraordinary; USCIS received more than 1.5 million applications from potential sponsors in just the first three or four months that the processes were available.

107. Per legislation enacted by Congress, Cubans and Haitians paroled into the United States are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program.

108. Per the Cuban Adjustment Act, as amended, Cubans paroled into the United States can become lawful permanent residents after being in the country for a year.

109. Per a CBP statement on January 14, 2025, CBP encounters of CHNV nationals attempting to cross the southern border unlawfully were down ninety-one percent since the CHNV processes were created.

110. Similarly, following a bench trial, Judge Tipton of the Southern District of Texas held that the State of Texas did not have standing to challenge the CHNV processes because these processes led to a decrease in Texas's claimed injuries by reducing the overall number of migrants from these countries coming to Texas, which was the source of Texas's claimed injuries.

111. Most CHNV parolees have claims to immigration relief that would permit them to stay in the United States, including family-based immigration visas and asylum.

112. These paths to permanent immigration status for CHNV parolees, however, generally take years to navigate recently due to how long it takes the defendant agencies to process the immigration benefit applications.

113. For example, although Congress has directed DHS to issue final decisions on asylum claims within 180 days of receiving each application absent "exceptional circumstances,"

8 U.S.C. § 1158(d)(5)(iii), most asylum applicants are currently waiting years to get an initial decision.

114. Currently, Venezuelans who have continuously resided in the United States since July 31, 2024 (including some Venezuelans who received parole through CHNV) are eligible for TPS; approximately 33,600 CHNV parolees from Venezuela have been granted TPS.

115. On January 10, 2025, Secretary of Homeland Security Ali Mayorkas extended TPS for Venezuelans until October 2026, but on January 28, 2025, Secretary Noem purported to vacate that extension and then, on February 1, 2025, Secretary Noem decided to terminate one of the two TPS designations for Venezuelans. Secretary Noem's February 1 decision was based on her conclusion that the continued presence of the approximately 350,000 Venezuelans with TPS under that designation is contrary to the national interest of the United States. DHS, *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025). Secretary Noem's unprecedented vacatur of the TPS extension for Venezuelans is being separately litigated in multiple cases on the ground (among others) that the TPS statute does not authorize such actions.

116. Currently, Haitians who have continuously resided in the United States since June 3, 2024 (including some Haitians who received parole through CHNV) are eligible for TPS. In June 2024, Secretary Mayorkas extended TPS for Haitians until February 3, 2026, but on February 20, 2025, Secretary Noem again acted in an unprecedented fashion by purporting to reduce the time remaining for Haitian TPS by six months, such that it now expires on August 3, 2025. DHS, *Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti*, 90 Fed. Reg. 10511 (Feb. 24, 2025).

117. Approximately 600,000 Cubans, Haitians, Nicaraguans, and Venezuelans received parole through CHNV.

**Operation Allies Welcome ("OAW")**

118. Operation Allies Welcome grew out of the U.S. military's chaotic 2021 withdrawal from Afghanistan.

119. As Afghanistan's military and government quickly fell to the Taliban when the U.S. military withdrew, the U.S. government hastily evacuated approximately 124,000 people from Afghanistan, mostly on military cargo jets. Evacuees included U.S. citizens and lawful permanent residents, nationals of allied countries, and Afghans whose lives were at risk due to their service to the United States (such as interpreters).

120. After medical, security, and other screenings in third countries, approximately 75,000 Afghans were eventually brought to the United States on parole through OAW.

121. Most OAW parolees were (and remain) eligible for a congressionally-created Special Immigrant Visa ("SIV") based on having provided "faithful and valuable service" employed by or on behalf of the U.S. Government or the International Security Assistance Force or a successor mission in certain capacities in Afghanistan.

122. Many other OAW parolees are eligible for other forms of immigration relief—like family-based immigrant visas and asylum—that would likewise give them permanent lawful status in the United States.

123. These paths to permanent immigration status for OAW parolees, however, generally take years to navigate, due mostly to how long it takes the defendant agencies to process the immigration benefit applications. The federal government has been subject to a class-wide injunction against unreasonable delays in adjudicating Afghan SIV applications since early 2020

and a similar class-wide settlement agreement addressing the unreasonable delays in adjudicating asylum applications of Afghan OAW parolees since September 2023.

124. In September 2021, Congress enacted the Afghanistan Supplemental Appropriations Act, Public Law 117-43. Among other things, it instructed DHS to adjudicate asylum applications filed by OAW parolees expeditiously, and to issue final decisions within 150 days of receiving each application, absent "exceptional circumstances."

125. That Act also made OAW parolees—including those who had yet to be paroled—eligible for resettlement support services typically provided to refugees resettled in the United States through the U.S. Refugee Admissions Program until the later of March 31, 2023, and the end of their parole term. Those services include cash and medical assistance, employment preparation, job placement, and English language training. That Act also appropriated supplemental funds for USCIS and Health and Human Services to carry out these directives.

126. To date, approximately 20,000 OAW parolees have been granted asylum; fewer than 100 parolees' asylum applications have been denied.

127. Currently there are approximately 1,300 OAW parolees with pending asylum applications; on average, those applications have been pending for more than 600 days.

128. Afghans who have continuously resided in the United States since September 20, 2023 (including Afghans brought here through Operation Allies Welcome) are currently eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. Unless extended by the Secretary of Homeland Security, however, TPS for Afghans will expire on May 21, 2025.

129. In 2023, the federal government determined that "Afghans paroled under Operation Allies Welcome ("OAW"), or those paroled then subsequently granted Temporary Protected

Status ("TPS"), could request U.S. Government-supported family reunification support for their spouses and unmarried children under 21 years of age" who remain physically present in Afghanistan.

130. Afghans paroled through OAW were initially given two-year grants of parole. There was no formal application process for initial grants of parole through OAW, but in June of 2023, DHS announced a re-parole process for OAW parolees, under which they may apply for an extension of up to two years.

131. Globally, approximately 11 million Afghans are currently displaced due to the conditions in their home country, most of them in Iran (4.5 million) and Pakistan (3.1 million). Fewer than 50,000 Afghans are in the United States on current grants of parole by virtue of OAW.

**Family Reunification Parole ("FRP")**

132. Ever since the George W. Bush administration established a Cuban Family Reunification parole process in 2007, the United States has had country-specific family reunification parole processes that allow the beneficiaries of approved I-130 petitions for family-based immigrant visas to be paroled into the United States. The grant of parole allows these beneficiaries to reunite with their sponsoring family member in the United States while they wait for their immigrant visa to become available.

133. Under the family-based immigrant visa system that Congress has devised, a U.S. citizen or lawful permanent resident must first file a petition (Form I-130, "Petition for Alien Relative") to establish that they have a family relationship with a relative abroad that makes the relative eligible for a family-based immigrant visa. Once that petition is approved, the relative abroad must then apply for an immigrant visa—but because family-based visas are distributed to eligible applicants through a complex system of queues and country-specific caps, an intending

immigrant must wait in line—often for years, or even decades—before he or she may apply to receive it. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 48 (2014).

134. The family reunification parole processes allow a U.S. citizen or lawful permanent resident with an approved I-130 petition to sponsor their family member abroad for parole into the United States. Instead of having to wait abroad, often in precarious situations, for an immigrant visa to become available, a noncitizen family member who receives parole may reunite and be together with their sponsor in the safety of the United States while waiting for their immigrant visa to issue.

135. The Federal Register Notice for the original Cuban Family Reunification parole process explained that the process "serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States."

136. Since the creation of the Cuban Family Reunification parole process in 2007, the United States has subsequently adopted similar processes for nationals of Haiti (in 2014) and Colombia, El Salvador, Guatemala, Honduras, and Ecuador (in 2023). The processes for Cuba and Haiti were also modernized in 2023.

137. The Federal Register Notices for these more recently established family reunification parole processes each explain that these processes provide significant public benefits by promoting family reunification, a central purpose of the INA, and by deterring irregular migration, reducing strain on DHS resources at the border, addressing root causes of migration

through remittances sent by parolees and furthering important foreign policy goals in regional migration management.

138. For each of the Family Reunification parole processes, qualifying sponsors must first receive an invitation from the Department of State or USCIS before they can apply to sponsor their family member abroad. The sponsorship application requires U.S.-based sponsors to show that they can financially support their parole beneficiaries during their parole period.

139. If the sponsorship application is approved, the beneficiary will receive advance authorization to travel to the United States. The beneficiary must travel to the United States by commercial airline within 90 days of receiving their travel authorization. At the Port of Entry, CBP screens the beneficiary, including administering an additional fingerprint biometric vetting, and grants parole, if warranted, on a case-by-case basis.

140. Family Reunification Parole beneficiaries generally receive a three-year grant of parole and can request employment authorization while they wait for their immigrant visa to become available. When a visa does become available, they can file for adjustment of status to lawful permanent residence, although they must be independently eligible for adjustment of status; the grant of parole does not automatically qualify or otherwise indicate qualification for adjustment of status.

141. Reliable statistics regarding the number of individuals paroled through the Family Reunification Parole processes are not publicly available.

**Military Parole-in-Place ("MPIP")**

142. The Obama administration established a Military "Parole in Place" ("Military PIP") process through a USCIS Policy Memorandum that it adopted in late 2013 (the "2013 Memorandum") to formalize a practice initiated in 2007. Under the Military PIP process, active-duty military personnel, selected reserve members, and veterans can apply to sponsor for parole

their spouses, children, and parents who are already physically present in the United States without inspection or admission. The grant of "parole in place"—so named because the sponsored family members are already in the country—enables the immediate family members of U.S. military personnel to become eligible to adjust status in the United States and thus to become lawful U.S. permanent residents.

143. The first instance of granting military parole in place occurred in 2007, when after significant media coverage and public pressure, DHS Secretary Michael Chertoff ordered the parole in place of a military spouse who was facing deportation while her U.S. military husband was missing in action in Iraq.

144. Military families subsequently began to seek humanitarian parole under the INA's parole provision, but doing so was an *ad hoc* process, with no clear guidance from the military or from USCIS about how to apply, and adjudications were inconsistent. Parole was granted on a discretionary basis to military family members, but only in about one in every three cases. In a 2010 letter to DHS Secretary Janet Napolitano, a coalition of 18 Republican and Democratic Members of Congress urged the Secretary to "use all the power at your disposal" to "address the immigration needs of our soldiers," citing the example of a U.S. army lieutenant who refrained from volunteering for combat deployment for fear of losing his wife to deportation.

145. In establishing the Military Parole in Place process, the 2013 Memorandum's stated purpose was to "ensure consistent adjudication of parole requests" made by U.S. military service members.

146. The Memorandum noted that "[m]ilitary preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected

Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents, and children."

147. The Memorandum similarly noted that "our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them."

148. Noting that parole is one of the "discretionary tools" available to "minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents, and children of military members," the Memorandum amended the USCIS Adjudicator's Field Manual to advise that "parole in place would generally be an appropriate exercise of discretion" for the spouse, child, or parent of a U.S. military servicemember, because the fact that the intended parole beneficiary is an immediate family member of a servicemember "ordinarily weighs heavily in favor of parole in place."

149. Amid public reports in 2019 that the first Trump administration was considering eliminating the Military Parole in Place process, Congress included a provision in the National Defense Authorization Act of 2020 that expressed the sense of Congress that "parole reinforces the objective of military family unity" and expressly directed the Secretary of Homeland Security to "consider, on a case-by-case basis, whether granting [a request for parole-in-place by a member of the Armed forces] would enable military family unity that would constitute a significant public benefit."

150. Reliable statistics regarding the number of individuals who receive Military Parole in Place are not publicly available.

<u>**Central American Minors ("CAM")**</u>

151. CAM was created in 2014 to permit certain nationals of the Northern Triangle countries of El Salvador, Guatemala, and Honduras who are lawfully present in the United States to request that their children still in their home countries be considered for refugee status and humanitarian parole so that the families could be reunited.

152. CAM's creation was prompted by a surge in unaccompanied children from the Northern Triangle countries coming to the U.S.-Mexico border.

153. In addition to family reunification, the CAM program was intended to create a safe and lawful pathway toward family reunification to disincentive children making the overland journey to the southern border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the border create unique operational challenges for DHS.

154. In 2017-18, DHS under the first Trump Administration sought to terminate the parole portion of CAM based on its discretion. In a subsequent lawsuit, the district court held that DHS acted arbitrarily and capriciously in terminating CAM and mass rescinding 2,714 conditional grants of parole to individuals still in their home countries without considering their reliance interests.

155. In 2018, DHS ultimately agreed to finish processing those individuals' parole applications, which it has not yet completed.

156. DHS under President Biden restarted CAM in March 2021 and then expanded the eligibility criteria in June of that year, which were again adjusted in 2023.

157. CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

**Summary Termination of Humanitarian Parole Processes**

158. During the 2024 presidential campaign, Donald Trump frequently criticized the aforementioned parole processes, promising as early as November 2023 that he would end them on "day one" of his second term as President.

159. As a candidate and as the current President, Donald Trump has denigrated the CHNV parolees as "illegal," notwithstanding their lawful grants of parole.

160. On the day he was inaugurated—January 20, 2025—President Trump issued Executive Order 14165, entitled "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security to terminate all so-called "categorical parole programs," specifically naming "the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans'" as one the Secretary must terminate.

161. In another executive order signed that day—Executive Order 14159, entitled "Protecting the American People Against Invasion"—President Trump directed the Secretary of Homeland Security (among others) to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "[e]nsuring that the parole authority . . . is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole."

162. And in yet another order signed that day—Executive Order 14161, entitled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats"—President Trump ordered the Secretary of Homeland Security "to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible," which should be "consistent" with the "vetting

and screening standards" that were in effect on January 19, 2021—the last full day of President Trump's first term in office.

163. Also on January 20, 2025, then-Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" to the heads of ICE, CBP, and USCIS. Upon information and belief, this memorandum has not yet been made public.

164. In the January 20 Huffman memorandum, the acting secretary authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute."

165. Although fewer than 800 words, the January 20 Huffman memorandum contains multiple errors of law beyond its conclusion that "categorical parole programs" like U4U, CHNV, OAW, FRP, MPIP, and CAM are unlawful.

166. For example, in an attempt to equate lawfully present parolees with "illegal aliens," the memorandum claims that noncitizens who are paroled into the United States are "inadmissible aliens," have been "found inadmissible," and, after their parole has been terminated, "must be dealt with in the same manner as any other case for admission to the United States involving an alien found inadmissible."

167. But that contention—that parolees are necessarily inadmissible—is wrong. The parole statute allows inadmissible noncitizens to come to the United States, but a grant of parole does not require or necessarily involve a finding of inadmissibility.

168. The January 20 Huffman memorandum also erroneously describes the limitation on parole enacted as part of the Refugee Act, discussed *supra*, that is codified at 8 U.S.C. § 1182(d)(5)(B). The memorandum claims that the limitation in § 1182(d)(5)(B) means that "it is

generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad" as well as "aliens found to have prima facie asylum claims who are being allowed into the United States to await adjudication of those claims."

169. This interpretation departs from every prior Administration's understanding of § 1182(d)(5)(B), which is that it applies to noncitizens who already have been determined to be refugees pursuant to the procedures created by the Refugee Act—and *not* to those who merely have or could have claims to humanitarian relief.

170. This interpretation also departs from past practice. Prior to being paroled into the country, for example, a significant number of Afghan OAW parolees had pending applications for refugee status filed abroad. Parole was used because those applications would have taken years to be adjudicated.

171. Even more starkly, every Administration since at least the 1990s, including the first Trump Administration, has paroled noncitizens found to have prima facie asylum claims into the United States to await adjudication of those claims. The Supreme Court held that this is a permissible use of the parole statute in *Biden v. Texas*, 597 U.S. 785 (2022).

172. Acting Secretary Huffman's memorandum also misrepresents the statutory parole criteria by adding words that appear nowhere in the statute. Per the statute, parole can be granted "for urgent humanitarian reasons or significant public benefit," but the memorandum claims instead that parole must "either provide[] a significant public benefit to the American public or permit[] the United States to respond to an urgent humanitarian need."

173. The January 20 Huffman memorandum directed that "all future actions taken by DHS with regard to the exercise of the parole authority [be] consistent" with the interpretation of the statute laid out in his memorandum.

174. Acting Secretary Huffman ended his memorandum with a hedge, claiming that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

175. In asserting that he was "also implementing this policy as a matter of my discretion to deny parole in any circumstance," Acting Secretary Huffman's memorandum did not specify anything that he considered in arriving at the allegedly discretionary decision to impose the parole policy reflected in his memorandum.

176. The January 20 Huffman memorandum relied on an erroneous understanding of the parole statute regarding both what the statute authorizes and the nature of the Secretary of Homeland Security's discretionary authority thereunder.

177. Also on January 20, 2025, Acting Commissioner of CBP Pete Flores issued a memorandum (the "January 20 Flores memorandum") restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. The January 20 Flores memorandum expressly supersedes any prior conflicting guidance.

178. Later that same week, then-Acting Director of USCIS Jennifer Higgins issued a directive (the "January Higgins directive") prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the U4U, CHNV, OAW, or other named parole processes.

179. On January 24, 2025, CBP notified airlines of President Trump's executive order to "terminate all categorical parole programs that are contrary to the policies of the United States" and identified the "impacted programs" as "includ[ing]" U4U, CHNV, OAW, FRP, and CAM,

among others. CBP warned: "Carriers that transport aliens subject to the Presidential Executive Order may be subject to a carrier fine for each alien brought to the United States."

180. These actions taken by Defendants have, at a minimum, effectively terminated all humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM. Defendants base their actions to terminate these and other humanitarian parole processes, including by refusing to adjudicate pending applications for parole or re-parole through these processes, on their erroneous position that such humanitarian parole processes were and are unlawful.

181. On March 21, 2025, DHS subsequently made public a Federal Register Notice entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," which was officially published on March 25, 2025. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 11361 (Mar. 25, 2025). Like the January 20 Huffman Memo, the March 25 FRN asserts that "discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria." 90 Fed. Reg. at 13612. As of its date of publication on March 25, 2025, the March 25 FRN "terminat[es] the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." Id. at 13611.

182. The March 25 FRN also rescinds all grants of CHNV parole, stating that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." *Id.*

183. The March 25 FRN asserts that the Notice serves as "Constructive Notice" of the termination of the CHNV parole processes; "is legally sufficient notice to all interested or affected

persons regardless of actual knowledge or hardship resulting from ignorance;" and "satisfies the requirement that DHS provide written notice upon the termination of parole." Id. at 13620.

184. Like the January 20 Huffman Memo, the March 25 FRN contends that the CHNV parole processes allow "inadmissible" noncitizens into the United States, and that all individuals paroled into the United States under the CHNV parole processes are "inadmissible." 90 Fed. Reg. at 13611, 13612. But a grant of parole does not require or necessarily involve a finding of inadmissibility.

185. The March 25 FRN offers three main reasons justifying its termination of the CHNV parole processes and its termination of individual grants of parole: that the CHNV parole processes are unnecessary to achieve the current administration's border security goals, 90 Fed. Reg. at 13612; that the "domestic impact of the CHNV parole programs"—namely, "significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs"— "do not warrant continuing to operate these programs," id. at 13614-13615; and that the CHNV parole processes do not advance the current administration's foreign policy goals, *id*. at 13615.

186. The March 25 FRN further notes that "[e]xpedited removal is available only when an [individual] has not been continuously present in the United States" for at least two years. *Id*. at 13619. As a result, the March 25 FRN justifies the premature termination of individual grants of CHNV parole on the grounds that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal" instead of placing them in expedited removal proceedings.

187. The expedited removal statute, however, can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal, regardless of how long they have been in the United States. *Id.*

188. The March 25 FRN confirms Defendants' intent to terminate humanitarian parole processes for their alleged illegality and make it easier to deport individuals paroled through these processes as quickly as possible: it states that "[f]ollowing this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly [individuals] who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States." *Id*. at 13618. The March 25 FRN adds that "[t]o effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate." *Id*. at 13619.

**Summary Suspension of Adjudicating Parolees' Immigration Benefits Requests**

189. During the week of January 20, 2025, then-Acting Director of USCIS Jennifer Higgins prohibited USCIS staff from making any decisions on any request for any immigration benefit—e.g., for asylum, TPS, adjustment of status, a visa, work authorization, etc.—that would benefit individuals who received parole through any humanitarian parole process, such as U4U, CHNV, OAW, FRP, MPIP, CAM, or other named parole processes.

190. On February 14, 2025, Acting Deputy Director of USCIS Andrew Davidson issued a memorandum to various USCIS directorates and program offices directing them not to adjudicate immigration benefit requests filed by noncitizens who are or were paroled into the United States under U4U, CHNV, and FRP.

191. The Davidson memorandum was a post-hoc attempt to justify the suspension of benefits adjudication that had started weeks earlier.

192. Upon information and belief, the February 14 Davidson memorandum has not yet been made public. Media reporting on the memorandum explained that because paroled individuals are only given work authorization and deportation protections that typically last for two years, many such individuals apply for other immigration benefits, including TPS, asylum, and green cards—but under the February 14 Davidson memorandum, officials will no longer be able to process any applications for such programs or any other benefit, if such requests are filed by migrants who arrived in the United States under the parole processes at issue.

193. The February 14 Davidson memorandum asserted that the suspension of these individuals' benefits requests was based on Executive Order 14161 (discussed above) and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible or consistent with the vetting "baseline" in effect on the last full day of President Trump's first term, stating: "The procedures that the parolees under these categorical parole programs underwent *may* not constitute screening and vetting to the maximum degree possible or comport with the uniform baseline for screening and vetting standards and procedures that existed on January 19, 2021, both of which are required per EO 14161" (emphasis added).

194. The February 14 Davidson memorandum does not cite any statutory or regulatory authority for suspending adjudication of benefits applications, including benefits for which there is statutory authorization, including asylum (under 8 U.S.C. § 1158), TPS (under 8 U.S.C. § 1254a), other requests to adjust status (such as visas under 8 U.S.C. § 1201), or work authorization (such as under 8 C.F.R. § 274a.12).

195. The February 14 Davidson memorandum refers to alleged fraud in the CHNV parole processes that DHS detected, investigated, and, where problems were identified, corrected in the summer of 2024. Some of this claimed "fraud" was based solely on the fact that some sponsors, like Plaintiff Kyle Varner, felt compelled and were financially able to sponsor more than twenty beneficiaries—often based on the sponsors' sincerely held religious beliefs—which was entirely permissible under the rules of the process. What is more, this alleged "fraud" concerned solely the CHNV processes, yet the Davidson memo's suspension of benefits adjudications—like the January Higgins directive—was far broader than the CHNV processes, affecting other parole processes like U4U. Finally, and regardless, the Davidson memorandum's suspension of benefits adjudications was based only on Executive Order 14161 and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible.

196. As noted above, most individuals paroled into the United States via the U4U, CHNV, and OAW processes are eligible under statutory provisions enacted by Congress for other forms of immigration relief, including but not limited to TPS, asylum, and/or visas based on familial relationships. The INA, for example, makes clear that "*[a]ny* [individual] who is physically present in the United States . . . *irrespective of such [individual's] status*, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). Individuals paroled in through the family reunification processes are *all* eligible for family-based visas, because that was a requirement to apply for parole through those processes.

197. Yet, per the January Higgins directive and the February 14 Davidson memorandum, the parolees' applications for any of these benefits—all of which would preclude their removal—are now suspended, as are any of their applications for re-parole, employment authorization, and adjustment of status.

198. Meanwhile, at the same time that the Trump Administration has suspended the ability of these parolees to seek relief from deportation by affirmatively applying for benefits, it has aggressively (and unlawfully) expanded the ability of immigration officials to remove individuals paroled into the country through expedited removal—a shortcut deportation process with few procedural protections and even less judicial review. Those actions are challenged elsewhere but comprise part of the injury and irreparable harm threatening Plaintiffs and others similarly situated.

199. The February 14 Davidson memorandum states that if there is a "litigation need" to lift a suspension of benefits adjudication for individuals paroled through these processes, the suspension can only be lifted on a case-by-case basis with approval of the USCIS Director or Deputy Director, with a memo memorializing the lifting of the suspension as to that individual.

200. Remarkably, the February 14 Davidson memorandum states that these requirements for lifting the suspension apply even when a court issues an injunction or other order directing the lifting of the suspension on a class-wide basis.

**Defendants' Actions Cause Harm to Plaintiffs**

201. Defendants' termination of humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM, and Defendants' related suspension of processing of immigration benefit requests, have caused Plaintiffs substantial, concrete, particularized, and irreparable injury.

202. Plaintiff **Svitlana Doe** fled Ukraine following Russia's unprovoked and unjustified incursion into Ukraine. When war struck in 2022, Svitlana and her family lived in a city immediately outside of Kyiv, the capital of Ukraine, one of Russia's initial focal points for occupation. Bombs rained down and fighting broke out regularly in the streets directly outside her apartment. It was terrifying and unpredictable. Basic necessities like electricity and water soon became unavailable, and all flights out of the country were cancelled. Svitlana and her family

eventually fled the capital for another district further away from ground zero, where they remained for about a month and a half before returning to the capital.

203. Svitlana is the mother to a young son with celiac disease. After her son was born and began eating solid food, he became extremely sick with an undiagnosed condition. Even at one of the best hospitals in Ukraine, it took a long time to correctly diagnose her son's condition as celiac disease. It was extremely hard to provide for her son in Ukraine, even before the war. Her son was extremely sensitive—even minimal cross-contamination using the same utensil would make him dangerously ill. Svitlana had to shop around at tens of different grocery stores to find gluten-free products for her son, and when she could find them, they cost twice as much as glutenous products. People would often criticize Svitlana at grocery stores for not buying her son "normal" food. When the war began, it became even more difficult to take care of her son. Grocery prices skyrocketed, and non-glutenous products became all but impossible to find. In 2022, after the onset of the war, her son was hospitalized for a few weeks when he became extremely sick and his stomach swelled up dangerously from contact with gluten.

204. Before the war began, Svitlana never considered leaving Ukraine. She was satisfied with her life and career as a project manager for a large charity foundation doing work inside and outside of Ukraine. But amid her son's failing health and the regular shriek of air raid sirens which forced Svitlana and her family into the earthen basement of their son's school to take shelter from missile attacks, they decided they needed to flee the country. Svitlana began searching for help on the internet and social media. Eventually, she was put in touch with the executive director of a celiac disease research center in the United States. Doctors at the center began exploring Svitlana's son's condition and treating him from afar, and the executive director eventually volunteered to

assist Svitlana and her family through the Uniting for Ukraine parole process. Svitlana and her family received travel authorization in November 2022.

205. After the war began, men were generally not permitted to leave Ukraine due to the draft. However, officers often made exceptions for fathers seeking treatment for their disabled children, so Svitlana scrambled to assemble a comprehensive collection of her son's medical documentation, who had been officially diagnosed as having a temporary disability. The U.S. doctor working with Svitlana's son even wrote a letter documenting the medical need for treatment outside Ukraine. This was an extremely stressful time, since border officials maintained individual discretion and the family could not guarantee Svitlana's husband would be allowed to leave the country. Svitlana's husband and son left first to maximize the odds of remaining together, arriving in Poland in mid-November 2022. Svitlana followed the next day, and met her family in the capital of Poland, Warsaw. From there Svitlana and her family traveled to the United States, arriving on November 20, 2022, and living since their arrival in Dover, Massachusetts.

206. Since arriving, Svitlana's son has continued to receive treatment at the medical center specializing in celiac research. After about a year, his health began to improve dramatically, and he is now a healthy young boy, although he will require a strict diet and comprehensive annual checkups for the rest of his life. Svitlana has worked since receiving her work authorization around April 2022, and she enrolled as a student in community college studying child development. In 2024, Svitlana and her family were re-paroled under U4U, and her current parole status and work authorization is valid until November 18, 2026. Around the beginning of February 2025, Svitlana applied for Temporary Protected Status ("TPS").

207. If her TPS application is not adjudicated or even paused for too long, Svitlana will lose her only chance of being able to remain in safety in the U.S., especially if her parole is revoked

as the Trump administration has threatened. If either becomes unavailable to her, she will lose her work authorization, and therefore, her ability to provide for her family. She will not be able to pay her rent (around $2200 per month), purchase groceries (around $800 per month), or pay her family's bills, and her son would no longer be able to receive the treatment he needs to thrive, including weekly speech therapy and stability. Her family would be forced to leave the U.S., but there is nowhere else for her family to go—they cannot return to Ukraine in the middle of a continuing war, where Svitlana's husband would be forcefully recruited into the army upon return. Even if negotiations won out, there is no promise peace would last. And in any event, forests and seas surrounding many Ukrainian cities are now filled with mines and explosives, making travel within the country extremely dangerous. U4U and the availability of TPS have been lifelines for Svitlana and her family, and losing them would cost more than they can bear.

208. Plaintiffs **Maksym and Maria Doe** are a married couple and nationals of Ukraine. They were forced to flee their home in Kharkiv on the day that Russia invaded Ukraine and began bombing the city. Once they found safety, Maksym began looking for a way to do something for his fellow Ukrainians. He and several friends started by coordinating volunteer efforts to evacuate others from cities and towns on the front lines of the war; within six months, they had saved over 22,000 people from eastern Ukraine, solely through the efforts of approximately 200 unpaid volunteers. Eventually, Maksym and his partners formed a nonprofit organization and began raising funds, managing logistics, hiring professionals and converting volunteers into paid employees, and expanding their humanitarian aid operations. In the three years since Russia invaded Ukraine, the nonprofit has grown to a staff of over 100 employees and has assisted over a half million Ukrainians displaced and affected by the war.

209. Since the invasion, Maksym's work with his nonprofit has been his singular focus. Toward the end of 2022, he and Maria, as well as his partners in the nonprofit, discussed the possibility of Maksym and Maria moving to the United States to expand the nonprofit's work with other humanitarian aid organizations, to raise more funds, and to amplify their ability to provide aid to Ukrainians harmed by the war. Maksym came to the United States first in December 2022 on a visitor visa to research registering a nonprofit in the United States and to explore how to fundraise and collaborate with other humanitarian aid organizations. A generous family friend who has known Maksym and his sister since high school subsequently agreed to be their sponsor to apply for U4U parole. Maria joined Maksym in February 2023 through U4U parole; Maksym then left the United States for Mexico, where he also went through the U4U application process with the sponsorship of his family friend, and was able to return to the United States on U4U parole in April 2023. They received their employment authorization when they entered the United States on U4U parole.

210. After arriving in the United States with only two suitcases and Maria taking all the jobs she could find to earn money, including dog walking, Maria has since found a job as a quality assurance engineer with a tech start-up and recently got a promotion to a Project Management position. Maksym has continued his work with his nonprofit, and after two years of struggle and hard work in the United States, the couple started to feel like they could finally plan for their future. They applied for U4U re-parole and TPS; while Maria's re-parole application was granted in January 2025, Maksym's re-parole application remains pending, as well as both of their TPS applications.

211. As a result, it has been devastating for the couple to learn that that President Trump has terminated U4U and paused the processing of all immigration benefits applications of U4U

parolees. Maksym's U4U parole expires in April 2025; if his re-parole application or TPS application is not processed and granted by that time, he will lose his legal status and his work authorization. Maria plans on filing an application for an H-1B work visa with her employer soon, because an H-1B visa will help provide the couple with a more stable and predictable legal status, but it is unclear if that application will ever get processed. After working so hard to come to the United States legally, and after doing all they could to maintain their status to remain here legally so that they can continue working and supporting Maksym's humanitarian efforts in Ukraine, it feels like all the doors are being slammed in their faces. Maksym and Maria never thought that they would have to face the prospect of being displaced, yet again, from a democratic country like the United States.

212. Plaintiff **Alejandro Doe** fled Nicaragua because of increasing physical danger to his family and untenable economic conditions. In 2018, demonstrators in several Nicaraguan cities began protests against social security reforms decreed by President Daniel Ortega. The demonstrations were heavily oppressed, and government and pro-government militia and security forces used live ammunition on protestors resulting in hundreds of civilian deaths. Countless others were imprisoned.

213. Alejandro's father was among those imprisoned. While searching for his uncle, government actors abducted Alejandro's father from his grandmother's house where he lived, beating and violently interrogating him on the way to prison. Once there, guards physically and psychologically tortured him for three days, telling him that they would kill him and that he would never leave the prison. He was withheld food for most of the duration of his three-day imprisonment.

214. Although Alejandro's father was released, he was labeled an opponent of the regime, and Alejandro felt they had no choice but to leave the country for their safety. Alejandro's cousin, a U.S. citizen who lives in Washington, sponsored him and various other members of his family through the parole process for Nicaraguans. Alejandro received travel authorization on May 15, 2024, and arrived in the United States on July 29, 2024. Since arriving in the United States, Alejandro has lived in Gainesville, Georgia, and since receiving work authorization has worked producing marble bathroom panels. To ensure he would not lose his newfound safety, Alejandro filed an application for asylum (Form I-589) on January 21, 2025.

215. When Alejandro learned of the Trump administration's indefinite pause on processing applications for immigration relief filed by individuals who came to the U.S. through CHNV parole, it came as a gut punch, especially considering the U.S. government's recently announced plans to terminate CHNV parole. For years, the Nicaraguan government has considered individuals who apply for asylum in other countries to be political dissidents. What's more, the Parliament loyal to President Ortega recently legalized the banishment and denial of entry or exit to people deemed to be critics of Nicaragua, including Nicaraguan citizens. Alejandro is distraught about what will happen if he is deported and cannot reenter Nicaragua, or if the Nicaraguan government arrests, interrogates, or tortures him or his family upon return given his family's history of political persecution by the State. Asylum and parole were the only avenues that could keep Alejandro and his family safe. If he is no longer permitted to remain the U.S., he would be forced to look for alternative places to flee, because he cannot safely return to Nicaragua.

216. For Plaintiffs **Ana Doe** and **Armando Doe**, fleeing Nicaragua and obtaining parole through the CHNV parole processes was a matter of seeking stability and safety from the ongoing persecution and violence they faced in Nicaragua. Similar to Alejandro Doe's account, due to the

increasing political repression and systemic violence under the Ortega regime, Ana's family has been persecuted for their political ideologies and involvement in anti-government protests. In 2018, while the police were actively looking for Ana's uncle, they found and detained her father instead. Ana's father spent days in prison where he was interrogated and tortured. Although he was eventually released, Ana's entire family had become people of interest in the eyes of the government, and they remained vulnerable to future persecution and violence. In 2020, Armando worked at a digital media company that published information regarding the political situation in Nicaragua and government abuses in the country. Before his arrival at the company, the government found and detained some employees of the company because they were discovered to be assisting some people who had been protesting during a hunger strike. While these individuals were eventually released and fled the country for their safety, it was evident that the government was keeping a close eye on Armando's employer—labeling his employer as anti-government—and Armando's safety grew ever more precarious, despite the precautions he took.

217. The CHNV parole processes have provided Ana and Armando a safe pathway to escape the danger they faced in Nicaragua. Ana and Armando were sponsored by Ana's cousin, a U.S. citizen who lives in Washington state, and Ana and Armando subsequently received authorization to travel to the United States through the CHNV parole processes in December 2023. They both arrived in the United States and were granted two-year periods of parole in February 2024. Since then, Ana and Armando have created a home and community in Gainesville, Georgia, where they reside along with Alejandro Doe, Carlos Doe, and other members of their family. They have been welcomed by the local community in the Gainesville area. Since Ana and Armando received work authorization under CHNV parole, they have both been working full time. Ana works at a company that provides personal protective equipment, where she is responsible for

overseeing the company's inventory and supporting the company's warehouse. Armando works for a company installing machinery on trailers. Ana and Armando have been saving up money for their own futures while also supporting their family and loved ones who remain in Nicaragua. In January 2025, knowing that they needed to seek additional legal protection from the dangers and risks of persecution they face in Nicaragua, Ana and Armando applied for asylum.

218. The news about the Trump administration's halt on processing applications for immigration relief filed by individuals who came to the United States through the CHNV parole processes came as a shock to Ana and Armando. This pause means that their asylum applications could be delayed indefinitely or not adjudicated at all in their remaining authorized time in the United States. Since their parole was only for a two-year period, Ana's and Armando's ability to seek asylum was their only avenue to ensure they can continue living a life free from the fear of persecution and danger they face in Nicaragua because of their political and ideological beliefs. If their applications remain on hold and they are subsequently removed, both Ana and Armando face the risk of being returned to the very danger and instability they fled in Nicaragua. Alternatively—if they are removed from the United States and the Nicaraguan government does not allow them to re-enter the country—Ana and Armando would be rendered stateless. Their ability to obtain work authorization through the asylum application process is likewise vital for them to be able to continue working and providing for themselves and their families after their parole expires and while they await the adjudication of their asylum applications. Given these risks, this indefinite pause on processing these applications for immigration relief and the impending termination of the CHNV parole processes irreparably harms Ana and Armando and their family.

219. Plaintiff **Carlos Doe** also fled Nicaragua due to the political instability and direct persecution he and his family faced by the Nicaraguan government. In 2018, while he was a

university student, he became involved in protests against the government. Eventually, more protests broke out in his city, resulting in numerous assassinations and disappearances. Based on his involvement in these anti-government protests, the Nicaraguan government identified Carlos as a dissident and actively persecuted him and his father. Soldiers and police officers came to his family's home multiple times in search of Carlos and his father, making death threats against Carlos and his family. Given the danger and active persecution against Carlos and his father, they both decided to go into hiding. However, while in hiding, Carlos and his father continued to receive death threats, and at one point military soldiers came to Carlos's mother's house and told her they would imprison him and his father if they ever found them.

220. Once Carlos learned about the CHNV parole processes, this path became a way for him to safely flee the danger and persecution he faced in Nicaragua. Carlos was sponsored by a U.S. citizen family member, and in May 2023, he received travel authorization to come to the United States under the CHNV parole processes. Carlos arrived in the United States and was granted a two-year period of parole in June 2023. Since his arrival, Carlos has created a community for himself, comprised of friends and family (including Ana, Armando, and Alejandro). He has also made many connections and friendships through his work experiences. Currently, Carlos works as a welder and solderer at a manufacturing plant. His ability to work in the United States with authorization has enabled him to provide for himself, his mother and younger brother who remain in Nicaragua, and his sister who currently lives in Costa Rica. Due to the risks of persecution and danger he faces in Nicaragua, Carlos applied for asylum in January 2025.

221. After learning about the Trump administration's indefinite suspension of processing applications for immigration relief for individuals who entered the United States with CHNV parole, Carlos became very worried about how this pause will affect his ability to seek

asylum. Because his asylum application could be delayed indefinitely or not adjudicated at all, Carlos's only prospect of safety here in the United States beyond the end of his parole period has been stripped away from him, leaving him at risk of losing legal status or deportation back to Nicaragua where the government knows where he lives and has actively persecuted him. Moreover, obtaining work authorization through his asylum application is imperative for him to be able to support himself and his family in Nicaragua and Costa Rica, and this indefinite pause on the processing of his asylum application could render him without the ability to work, including once his parole expires or is terminated, which would harm both him and his family who rely on him.

222. Plaintiff **Miguel Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Miguel learned of the CHNV parole processes for Nicaraguans about a year before he arrived. He spent a while deciding whether he wanted to leave his home, including his mother, with whom he lived and whom he helped take care of. In Nicaragua, COVID-related challenges and changes to his university's programs and requirements made it difficult for Miguel to receive consistent university education and progress toward a degree. It was also challenging to find a stable job that would allow him to make enough money to support himself and help his mother. Miguel decided to leave his friends, family, and community in Nicaragua for the United States because he knew it was the best way to help his family and his own future. He saw the United States as a land of opportunity and the CHNV parole processes as a safe, legal pathway there. He was excited to work hard for two years, save up money, and improve his and his family's future.

223. In the United States, Miguel received work authorization in September 2024 and was able to quickly find work full-time producing marble panels. He has enjoyed his experience

in the United States thus far, working hard and spending time with family outside of his job. However, when he heard about the Trump administration's end to CHNV parole and the revocation of parole and work authorization for people like him, he felt scared and betrayed, and he became fearful of going outside in public given raids and deportations happening in his own town of Gainesville. Miguel has been in the United States for less than a year, and he was granted two years of parole when he entered. The inability to continue to work here for the remaining part of his parole period means that he will not be able to support himself or his mother as well, given his family's limited resources in Nicaragua. In less than a month, Miguel will be subject to imminent deportation, so he is forced to make decisions that will affect his and his family's lives and livelihoods on an extremely expedited timeline.

224. Additionally, Miguel is worried about what will happen to him and his family if he is deported or otherwise forced to return, given his family's history of political persecution there. When Miguel was a teenager, his family experienced persecution that forced them to flee Nicaragua. He is also aware that the Nicaraguan government treats parolees and people being sent back from the United States with increased scrutiny, and that his family could be subject to harm if they returned. The early termination of Miguel's parole, combined with the administration's suspension of processing immigration benefits for parolees, deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. His legal status, work authorization, and options for protections have been erased all at once.

225. Plaintiff **Andrea Doe** arrived in the United States in June 2023 with her two young children, Isaias and Francisco Doe, to reunite with her husband, Rafael Doe, a former political prisoner in Nicaragua. The family lives in Mount Airy, Maryland. Rafael Doe was part of a group of 222 Nicaraguan political prisoners and prisoners of conscience whom the government of Daniel

Ortega had abruptly released from prison on the condition that the United States government accept them. As many of these prisoners—Rafael Doe included—had been arbitrarily detained for very long periods, all had been exposed to harm amounting to torture, and many had pressing medical needs, the U.S. State Department agreed to evacuate them. The Nicaraguan government proceeded to strip the 222 passengers on this February 9, 2023 flight to the United States of their Nicaraguan citizenship, rendering most of them stateless.

226. Due to the extraordinary circumstances of their departure from Nicaragua, none of the 222 were able to leave Nicaragua with their family members unless they too had been imprisoned as part of this group. After paroling the passengers on the February 9 flight into the United States, the State Department asked those needing to reunite with their family members to use the CHNV parole process to bring them here. *See* U.S. Dep't of State, 222 Nicaraguan Political Prisoners Released, Enter U.S.—Frequently Asked Questions and Resources (https://www.state.gov/222-nicaraguan-political-prisoners-released-enter-u-s-frequently-asked-questions-and-resources/).

227. Reuniting his family was an urgent priority for Rafael Doe. He had been a political prisoner for over four years before being expelled from his own country. Not only was the continuing separation from his wife and two very young children humanly difficult for all of them, but the Nicaraguan government had been monitoring and harassing his wife, and Andrea Doe was afraid for her own safety and that of their children.

228. Since being reunited in the United States, the family has been doing well. The couple are working for the same company that had first hired Rafael, they have rented their own apartment, and their children have settled into their new school and made friends. The family has applied for asylum, with Rafael as the principal applicant, including Andrea and their sons Isaias

and Francisco in his application. The suspension of processing of that application prevents the whole family from achieving permanent safety in this country, and they have no other: stripped of his Nicaraguan citizenship, Rafael could not return to Nicaragua even if it were safe for him, which it is not. If Andrea and the children's parole were terminated and they could not get their asylum application processed, Andrea fears she would be detained in Nicaragua and that her children would be taken away from her.

229. Plaintiff **Lucia Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Back in Venezuela, Lucia lived with her mother and helped provide for her. Lucia holds a bachelor's degree in Christian Education from the Theological University of the Caribbean in Puerto Rico, and she worked at the Director of Children's Ministries at a local Christian church in Venezuela, but her salary was only around $60 a month, a very typical monthly salary where she lived. This was not nearly enough to cover her and her mom's most basic needs, including food, rent, and clothing, let alone the expensive medical care that her mom requires. Their basic expenses alone were around $500 a month. They were not able to survive on Lucia's income, so, like many other people who lived around them, they had to rely on financial support from family members living abroad. Lucia's siblings, including Plaintiff (and Lucia's CHNV sponsor) Lorena, sent money back to Venezuela regularly to help them get by.

230. When Lucia heard about the opportunity to come to the United States on CHNV parole, she knew she wanted to pursue the pathway so she could work and help their family in a more robust way. She came to St. Augustine, Florida, because, from a previous trip she made to Florida when she was studying in Puerto Rico, she had several friends living and working there. She knew it would be easier to find work and use public transportation there, as opposed to in rural

Massachusetts, where Lorena lives. Lucia received her work permit in August 2024, started working at a cleaning company, and has settled into the community in St. Augustine. She attends a local Christian evangelical church and hopes to get involved in their ministries.

231. The Trump administration's end to CHNV parole and the premature revocation of Lucia's parole and work authorization will force Lucia to, in a very short time, make many crucial decisions that will impact her own livelihood and that of her family members. If she is not able to stay in the United States for the two years that she was granted parole, she would be returning to Venezuela with very little savings, which would make her future here uncertain and create more of a financial burden for her siblings. She would not be able to provide the financial support that she planned for her mother, and she would face challenges finding a job in Venezuela, where is it very difficult to secure employment as someone older than 40 years old. Having to make these decisions rapidly or risk the threat of accruing unlawful presence that could prevent her from returning to the United States or deportation back to Venezuela, is causing Lucia a lot of anxiety.

232. The conditions in Venezuela also threaten Lucia's safety and stability. Without a job for potentially a lengthy period of time, and given inflation that has made necessities unaffordable for the majority of the population, Lucia would struggle even more than before to pay for her basic daily needs, let alone those of her parents. There are also frequent, mass internet and power blackouts, and basic services like water, gas to cook, and transportation are often unavailable for days. She will need to deal too with the constant concern of crime and violence. Lucia is especially scared of what could happen to her if she is forced to return to Venezuela, because she has heard that the Venezuelan government interrogates people who have sought parole in other countries, and military officials have forced people to pay money at the border to be

allowed in. She has heard of Venezuelan citizens having their passports confiscated, being imprisoned, and even being disappeared.

233. Plaintiff **Daniel Doe** is a Haitian national who was granted parole for two years through the CHNV Haitian parole process in February 2024. Daniel, his wife, and their three-year-old daughter faced imminent danger and risk of kidnapping from gangs in Haiti, in both neighborhoods where they lived. Daniel also worked as a court interpreter for foreigners, and occasionally as a general interpreter for the U.S. Embassy, the Haitian National Police, and the Catholic Relief Services. Daniel has been specifically targeted by the gangs, including being followed by gang members on motorcycles who have also ridden by his house. As a result, Daniel had to change the cars he drove to work, and the routes he took. Daniel's wife also received a warning that she and Daniel should "be careful," which they took as a warning that gangs were watching their movements, and that Daniel was a potential kidnapping target due to his work in Haiti.

234. These incidents drove Daniel and his wife to the decision to seek safety outside of Haiti. In early 2023, Daniel's father's friend offered to sponsor Daniel through the CHNV parole process for Haitians. Because his father's friend had already agreed to sponsor several other of his own family members, he could only financially afford to sponsor just one more person. He submitted his sponsorship application for Daniel in April 2023. Later that same year, because Daniel's other application was taking a long time to process, Daniel and his wife learned about Welcome.US and their matching process where they would match prospective CHNV beneficiaries with individuals who could serve as sponsors. Daniel and his family were matched with a sponsor through Welcome.US, who submitted their sponsorship application for Daniel, his wife, and their daughter in early January 2024. About a week after this application was submitted,

Case 1:25-cv-10495-IT Document 68 Filed 03/27/25 Page 65 of 104

Daniel received travel authorization to come to the United States through his father's friend's sponsorship application. Although it was extremely difficult, Daniel and his wife decided that Daniel should use this travel authorization to come to the United States on CHNV parole alone. Daniel's parole expires in February 2026, and his wife and daughter remain in Haiti with their pending application through the Welcome.US sponsor. In September 2024, Daniel was also granted TPS until February 2026, but due to the administration's recent termination of Haitian TPS, that status is also now only valid until August 2025.

235. Daniel received his work permit in March 2024. Although it required some adjusting to life in the United States, Daniel has been able to adapt and become part of the community in Orlando. He has joined a local Haitian church and is currently working as an English as a Secondary Language ("ESL") teacher at two different schools serving adult students who are immigrants or in the United States on a student visa. Daniel also supports the Haitian community by providing free online classes to Haitian immigrants who have recently arrived to the United States, teaching them about U.S. culture, teaching them English, and providing general updates on immigration policies affecting the Haitian immigrant population.

236. The Trump administration's end to CHNV parole and the premature revocation of Daniel's parole and work authorization will prevent him from being able to continue working, which is essential not only for him to support himself but also for him to be able to support his wife and daughter who remain in Haiti, as he is the main financial supporter for them. Daniel will also be at risk of imminent deportation back to a country where he faces increased risk of targeting by gangs, and the administration's suspension of processing immigration benefits for parolees deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. Moreover, with the CHNV parole processes terminated, the chance for

him to be reunited with his wife and daughter here in the United States through CHNV parole is lost.

237. Plaintiff **Omar Doe** is an Afghan national who faithfully and loyally served the U.S. military in Afghanistan for over eighteen years, despite threats and persecution from other Afghans, including his own family members, that forced him to relocate his wife and children from his home province. He built up good relationships with the soldiers he worked with, so when the U.S. military withdrew from Afghanistan in 2021, they brought Omar and his family with them. His departure from Afghanistan was chaotic—up until just two or three days before the collapse of the Afghan government, he was stationed with U.S. troops in Kandahar Province. They were relocated to the Kabul airport, and then suddenly, at 3 am in the morning, he was told that if he wanted to bring his family with him to the United States, they would need to come to the airport immediately. Omar called his father, who was able to bring his family to the airport at 6 am, but congestion and crowding at the airport was so dense that Omar's family was only able to reach him at 10 am. That brief interaction, when Omar received his family at the airport, was the last time Omar saw his father. He never got to say goodbye to his mother.

238. Upon arriving in the United States, Omar was registered by the troops he had worked with and given a work permit. He was told that he would receive a passport and a green card, and he was told not to worry about anything. Three and a half years later, however, he has yet to receive permanent legal status in the United States, which has been extremely traumatic and stressful for him and his wife. Although he is grateful that his family is safe here and that his children are in school, the lack of legal documentation has caused so much stress that he has lost all his hair, and he and his wife have both lost teeth. After so many years of service to the U.S. military, it is very frustrating to Omar that he still lacks permanent legal status.

239. Shortly after arriving in the United States, Omar applied for a Special Immigrant Visa ("SIV"), which are issued to, among others, Afghan nationals who provided faithful and valuable service to the U.S. government, and who endure serious threats because of that service. In addition, because his parole and work authorization will expire in September 2025, he is working with a nonprofit to file an asylum application, which will enable him to maintain his work authorization so that he can keep working to support his family until his SIV is granted. But the Trump administration's pause on the processing of immigration benefits means that these applications will not be adjudicated. This is especially hard for Omar to stomach, given all that he has done and sacrificed for the U.S. military over the course of most of his adult life. Going back to Afghanistan is not an option for him and his family after his service to the U.S. military, and he does not know what will happen to them if they are deported there. Omar had expected dignity from the government that he had served and that brought him to this country, but that has not happened for him.

240. Plaintiff **Sandra McAnany** is a U.S. citizen and sponsor for seventeen individuals who were approved to come to the United States and granted parole through CHNV. Fifteen of these beneficiaries who are currently in the United States are nationals of Venezuela, and two are nationals of Nicaragua. They all arrived in the United States between September and December 2023 and were approved for two-year parole periods and work authorization. To Sandra's knowledge, most have pending asylum applications that are now on hold due to the administration's suspension of processing immigration benefits requests for CHNV parolees. Sandra's beneficiaries include five sets of parents with young children, who were only able to reunite with family members in the United States because of the CHNV parole process, and six adults without children. They seek both stability with their families and safety from persecution

and violence in their countries of origin. One beneficiary is a mother of two young kids whose husband was diagnosed with cancer while she was in Venezuela, and her grant of CHNV parole allowed her to care for him while he went through treatment.

241. Sandra also has four CHNV applications, for nationals of Cuba, that remain pending. Due to the administration's termination of the CHNV parole process and end to processing new CHNV parole applications, these applications will now never be processed. Daily life in Cuba is extremely difficult for these beneficiaries, as they struggle under the government system there to make enough money to pay for food for themselves and their families. They sought to come to the United States through CHNV parole either to reunite with family or to earn money to support their families in Cuba, including for critical medical treatment. One of these Cuban beneficiaries has also lost jobs in Cuba for speaking out against the government and fears being arrested if he continues to speak out. He and other beneficiaries hope to experience the democracy and freedoms of the United States.

242. Sandra was driven to serve as a CHNV parole sponsor by her religious convictions, her experiences volunteering abroad in Central and South America, and her close connections with immigrant neighbors and friends in Wisconsin. As a Christian, she believes strongly in caring for others and supporting those in need, so sponsoring immigrants through CHNV parole allows her to live out her religious convictions in a meaningful way. In addition to putting considerable time and effort into completing the applications for her beneficiaries, Sandra has provided constant support, advice, and resources to them as they traveled to the United States and integrated into their communities. She provided travel guidance and support on job searches and enrollment in English classes, and one family lived with her in her home for over a year while the parent got a work permit and found a job. She helped pay for some of her beneficiaries' initial cell phone plans,

and she provided winter clothing or money to buy it for several families weathering a harsh winter for the first time.

243. Over the last couple years, Sandra has allocated large amounts of time, effort, and money into helping the people she sponsors establish safe and stable lives in the United States, and in growing those relationships, she has come to see many of them like family. The administration's premature termination of grants of CHNV parole and pause on processing her beneficiaries' asylum applications means that all the time and money she has invested could be lost. If her beneficiaries become vulnerable to deportation, Sandra fears the harm that will come to them if they are forced to return to their countries of origin, and she will lose relationships that are valuable to her as a meaningful way to live out her faith. She worries that she may never be able to see them again.

244. Plaintiff **Kyle Varner** has long been involved in supporting liberal and libertarian political movements in Venezuela, and he has done global health work at the Venezuelan border. Through his experiences, he has seen the challenges faced by people in poverty in the country. His personal and political convictions have led Kyle to serve as the U.S.-based sponsor for seventy-nine individuals through the CHNV parole processes, seventy-seven of whom are nationals of Venezuela. Of the forty-three of those individuals who are currently in the United States, at least thirty-one have pending applications for asylum, TPS, or other forms of immigration relief. The first of Kyle's beneficiaries arrived in the United States in November 2022. The people he has sponsored include a son who could only pay for his mother's life-saving cancer treatment because he got a job in the United States, and a mother and her young son who lived with Kyle's parents for eight months when they first arrived.

245. Kyle also has thirty-two other pending applications for CHNV sponsorship, including for one Cuban individual and one Nicaraguan individual. Due to the administration's termination of the CHNV parole processes and end to processing of new CHNV parole applications, these applications will now never be processed, and the beneficiaries are deprived of a legal pathway to the United States. In Venezuela, these beneficiaries will continue to struggle with low wages and extreme poverty, violence and crime, and government systems that are unable to support the country's residents.

246. Kyle has dedicated immense time, effort, and money into supporting the people he has sponsored. He spent hours submitting applications, and after people received approval to travel to the United States, he purchased plane tickets for most of them. After they arrived, he helped them find safe housing, including allowing many of them to live with him temporarily at first. He also co-signed leases and rented properties that he owns to many beneficiaries for reduced rates and under favorable terms. He purposefully kept some of his properties vacant when he was waiting for his CHNV sponsorship applications to be granted, which meant he missed out on leasing them to other renters. Kyle paid for most of his beneficiaries' work permit applications, helped them with job applications and enrollment in English classes, paid for cell phone SIM cards, and even taught a few how to drive. As a physician, he provided free medical care for minor health conditions and helped translate Spanish-language medical records from Venezuela.

247. When his beneficiaries were applying for asylum, TPS, and other forms of immigration relief, Kyle lent money to some to help pay for attorney fees, helped them compile documents, and otherwise provided resources that they needed to complete their applications. Kyle has invested significantly in all of his beneficiaries to assist them in settling into their communities in the United States so they can in turn support their families and other loved ones. The time and

money he has invested could be lost if his beneficiaries' applications for relief are not adjudicated. Additionally, if his beneficiaries lose their work authorization because of a change in their status, Kyle would need to put more time and resources into making sure they have everything they need to survive.

248. Plaintiff **Wilhen Pierre Victor** is the U.S.-based CHNV parole sponsor for seven of her family members from Haiti. Five of them—her brother, his wife, and their three children—were approved to travel to the United States in May 2024, and arrived between June and July 2024. They were all granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn, Massachusetts. Wilhen also has two pending CHNV sponsorship applications for her niece and cousin, both of whom are still in Haiti living under unstable political conditions and subject to the daily threat of violence. Wilhen's niece is thirteen years old and in Haiti without either of her parents. She is unable to attend school consistently because there is often gang violence, including gunfire, in the streets where she lives, which prevents her from going outside at all. Sometimes, she is unable to leave to go to school for up to a week. Wilhen's cousin, who is fifty years old, lives with the constant fear of kidnapping for ransom, especially if the gangs find out she has family in the United States. She has heard of people being kidnapped and murdered when they cannot produce large sums of money. There are often days when she cannot go outside even to run minor errands because of the fear of gang violence. Given the administration's end to processing new CHNV parole applications, Wilhen's applications to bring her niece and cousin to the United States will now never be processed. Because of this, Wilhen's niece and cousin continue to live in terror of the ongoing violence in Haiti, and they are unable to reunite with their family members in the United States.

249. Wilhen applied for a green card for her brother back in 2007, and they were still waiting for an interview with USCIS when the parole process for Haitians was announced in 2023. Wilhen sponsored him to come through CHNV parole because it provided a legal way for them to reunite in the United States and to bring Wilhen's family to a safer, more stable place while they continued to await adjudication of the green card application, which remains pending.

250. Back in Haiti, Wilhen's brother had been unable to find a job for thirteen years due to the lack of economic opportunities. His wife worked as a salesperson for a small business, but they relied on support from Wilhen and other family members to survive. Their children were not able to attend school consistently, and their family dealt with frequent reports of kidnappings, murders, and other violence. In the United States, Wilhen's brother has obtained work authorization and is working at a local nursing home. His kids are enrolled in school as well, and he and his wife are both taking English classes and attending their local church.

251. Being together as a family has been beneficial for Wilhen, her brother, and his entire family, and Wilhen has invested her time and energy into ensuring that they arrived safely and have had the resources to settle into their lives in the United States. When her brother and his family were approved to travel to the United States through the CHNV parole processes, Wilhen pooled money with other family members to pay for their plane tickets. She prepared her home for all five of them to stay with her. Once they arrived, she picked them up at the airport, where they were overjoyed to be reunited for the first time in more than twenty years. Wilhen then supported them all while her brother received his work permit and looked for work, and she helped him find his current job.

252. The administration's premature termination of grants of CHNV parole and pause on processing applications for immigration relief for individuals who came to the United States

under CHNV parole means that her brother's longstanding green card application could be delayed even further or not adjudicated at all, and that he could become vulnerable to deportation and lose out on the chance to apply for asylum as well. The years that Wilhen and her brother have spent waiting for it to be processed will be lost, and her brother and his family could be forced to return to a life in Haiti rife with instability and violence. Given the difficulty of finding a job in Haiti and the frequent violence Wilhen's family experienced there, the end to the CHNV parole processes and suspension of adjudication of immigration benefits causes direct harm to Wilhen and her loved ones.

253. Plaintiff **Gabriela Doe** is the U.S.-citizen CHNV parole sponsor to her cousins, who are Nicaraguan nationals—Ana Doe, Armando Doe (Ana's husband), Alejandro Doe, and Miguel Doe. Carlos Doe is also her cousin, but he was sponsored through CHNV by another family member. After her father passed away in June 2023 from cancer, her cousins were a great support for her during a difficult time. Thus, Gabriela wanted to help her cousins in any way she could and carry on the legacy of her father who was known for always taking care of his family. Knowing her cousins faced dangerous living conditions, violence, and persecution in Nicaragua, Gabriela offered to support her cousins through CHNV sponsorship. Gabriela submitted her sponsorship applications for her four cousins in 2023. All the cousins she sponsored arrived in the United States and were granted parole under CHNV at different points throughout 2024.

254. Since arriving to the United States, Gabriela's cousins have acclimated to life here in the United States and have become self-sufficient in supporting themselves since they secured work authorization. Gabriela has been able to reunite with them in Gainesville, Georgia where they currently live, and she feels proud of how well they are doing here in the United States and how well they have supported one another.

255. The Trump administration's termination of CHNV parole and the premature termination of all five of her cousins' grants of parole has left Gabriela feeling very scared and worried for her cousins. If their parole prematurely ends and they are left without status, they will be at risk of being removed back to Nicaragua, a country where they—and their entire family—face grave risks of danger and persecution by the Nicaraguan police and government because of their political ideologies. Her cousins will also be left without work authorization and the ability to support themselves and their other family members. Given that Gabriela has clinical depression and anxiety, the termination of her cousins' parole status and the impending effects that could have on them and their well-being would cause Gabriela severe psychological distress.

256. Plaintiff **Norma Lorena Dus ("Lorena")** is the U.S.-based CHNV parole sponsor for her sister, Plaintiff Lucia Doe. Lorena submitted the CHNV sponsorship application for Lucia in December 2022, and Lucia was approved to travel to the United States in May 2024. Lucia arrived in July 2024 and was granted a two-year period of parole, and she received her work permit a month or so later. Lorena paid for Lucia's plane ticket and her work application fee, and she sent money to help support her while she was waiting for her work authorization.

257. Once Lucia started working and was able to, she began sending money back to their parents in Venezuela, something Lorena and their other siblings who live abroad do consistently. Lucia came to the United States precisely because she sought the opportunity to work and earn wages that would allow her to support herself, help alleviate the financial burden on her siblings, and provide for their parents, including their mother, who has health conditions that require expensive doctor's visits, exams and labs, and medication. Their mother has to pay for her medical care out of pocket, but she receives a pension that is not even enough for a dozen eggs. Lorena and Lucia saw the CHNV parole process as a blessing for their entire family.

258. In addition to the economic opportunity, Lucia being in the United States has made it easier for their family to reunite. Last October, Lucia traveled to Massachusetts, and their mother and other siblings traveled in as well. For the first time in six years, all the siblings were together for a joyful reunion. As a U.S. citizen, it is difficult for Lorena to travel in and out of Venezuela, so having Lucia closer has allowed them to see each other more and strengthen their relationship.

259. The administration's termination of CHNV parole and the premature termination of Lucia's parole was devastating for both Lorena and Lucia. Lorena feels disappointed and hurt that the government would punish people like Lucia who applied from abroad, are supported by a sponsor, came through a legal pathway, and are working to support themselves and contribute to the economy. If Lucia is forced to return to Venezuela, Lorena will need to send more money back to her parents to help make up the difference, which will cause financial strain on her and require her to stretch financially and make more sacrifices to help them. Lorena is also already experiencing the emotional and psychological toll of her sister facing the possibility of imminent, sudden deportation, after having come to the United States with the permission of the government, and the decisions they have to make together as a family to try and keep her safe.

260. Plaintiff **Valentin Rosales Tabares** fled his birth country of Cuba for the United States in 2016 and received his green card in 2017. That same year, he was able to submit a family-based immigrant visa petition for his wife and son, who was less than 18 years old at the time, and another petition for his daughter. Both of these petitions were approved in May 2018. In 2022, Valentin was overjoyed that his wife and son received immigrant visas and were able to reunite with him in Portland, but his family remained separated: his daughter and her young daughter, Valentin's granddaughter, continue to this day to wait for their immigrant visas in Cuba. Valentin's son also had to leave his wife and young son behind in Cuba.

261. Valentin fears for the safety and stability of his family members still in Cuba every day. The living conditions in Cuba have been incredibly difficult for many years, and they continue to deteriorate. In Valentin's family's experience, there are often food, gas, and electricity shortages, including long periods of time where there is no electricity at all. There is very limited public transportation, so travel is nearly impossible. Cuba has also seen an increase in violence and crime, as well as retaliation from the government for speaking out. Valentin's daughter and granddaughter are afraid to leave their home even to get groceries, and other family members have suffered from incidents of theft that are on the rise.

262. When Valentin learned about the CHNV parole processes in February 2023, he applied to sponsor his son's wife and child for humanitarian parole. Those applications were never adjudicated and, due to the administration's termination of the CHNV parole processes, now never will be.

263. In November 2024, Valentin also learned that he had been invited by the Department of State to request Cuban Family Reunification Parole for his daughter, which would allow his daughter to come to the United States while she waited for her family-based immigrant visa to become available. Valentin quickly submitted the request for Family Reunification Parole in December 2024, and only a few days later, it was approved. He and his wife were excited that they would finally be reunited with their daughter and granddaughter after so many years, and they set about preparing for her travel. They paid for the medical exam that his daughter was required to do for the parole process, prepared a room in their home for their arrival, and purchased winter clothes and other items for them to feel welcome. However, as they waited eagerly for the issuance of a travel date for their daughter, it never came. In January 2025, Valentin received the news that the Family Reunification Parole process had been terminated. Now, he and his wife live in

uncertainty and fear about whether their daughter will be allowed to come to the United States at all through this parole process. All of the resources they put into planning for her arrival will be lost, and, far more devastatingly, their family will continue to be separated.

264. Plaintiff **Marim Doe** joined the Navy in January 2024. He is a student in the nuclear training program, through which he is learning to operate nuclear reactors on naval carriers and submarines. Before joining the Navy, Marim lived with his family in Texas. He has a close relationship with his family, including with his father, who does not have legal status in the United States. Marim has seen his father work hard to provide for their family his entire life, enduring much hardship and making many sacrifices so that his family can thrive. When Marim heard about the military parole-in-place process in high school, he decided to join the Navy after graduation so that he could continue his education, but also help his father obtain legal status.

265. Marim's application for military parole-in-place for his father has been pending since May 2024. A grant of parole would provide his father with more stability, particularly as he ages, both in terms of staying in the United States safely with his family and in terms of financial well-being. With parole, Marim's father would no longer fear being let go from his job if they found out he was undocumented, or being detained and subject to deportation by ICE.

266. The news that military parole-in-place was going to be paused was heartbreaking for Marim, his father, and their entire family. At a time when Marim should be focusing on the U.S. Navy's rigorous training program, Marim is distracted and worrying about the safety and wellbeing of his family. Marim is suffering extreme emotional distress from the possibility that his father could be deported, and that such an important benefit provided to servicemembers dedicating themselves to the U.S. military is being eliminated.

267. Plaintiff **Adolfo Gonzalez, Jr.** served in the U.S. Army as a First Sergeant for more than 30 years. In February 2025, he retired from active service and was honorably discharged. Adolfo and his wife have been together since 2017, and they have a sixteen-year-old daughter, who is Adolfo's wife's biological daughter but whom Adolfo recently legally adopted.

268. Adolfo's wife is undocumented, which has meant that their family has lived for many years with the fear that she could be detained or deported. When Adolfo had to be away from home with the Army, he was always anxious that something would happen to her. They learned of military parole-in-place through meeting with an immigration attorney, and it felt like a beacon of hope for them. They felt it was an incredible benefit for people who served the United States military. The application that Adolfo submitted for his wife has been pending since around March 2024.

269. In March 2025, Adolfo and his wife found out that military parole-in-place applications were no longer being processed by the U.S. government. The fact that their application has been paused indefinitely has caused him and their family immense anxiety and sadness. They worry constantly about their family being separated and their daughter losing her mother. Adolfo also feels let down by the government after serving the military honorably for more than three decades. Without military parole in place, Adolfo, along with his wife and daughter, will continue to suffer emotional distress from the prospect of their family being separated through detention or deportation.

270. Plaintiff **Aleksandra Doe**, along with her husband and five-year-old son, fled Ukraine through the U4U parole process to seek stability and safety following the Russian invasion of Ukraine in 2022. Life in Ukraine was extremely difficult for her and her family due to the war. Aleksandra would hear missiles flying over them every day. For days on end, Aleksandra and her

family would go without electricity in their home, which would lead to her son getting sick from the cold temperatures. The U4U parole process offered Aleksandra and her family an opportunity to escape the danger and instability they faced in Ukraine. In April 2023, Aleksandra and her family were granted parole under the U4U parole process. Aleksandra and her family eventually settled in San Jose, California, where her sister (who is also in the United States with U4U parole) lives.

271. Aleksandra and her family have settled into new lives here in the United States. Her husband works in construction, and her son is attending a transitional kindergarten school, where he is enjoying learning English and socializing with other children. Aleksandra and her family also greatly enjoy the area they live in and the local community.

272. In October 2023, Aleksandra and her family applied for the diversity visa lottery, and in May 2024, Aleksandra was notified that their applications were selected for further processing in the diversity visa program for Fiscal Year 2025. This was life-changing news for Aleksandra and her family, because if they were able to successfully move through the process and obtain green cards, they would be able to continue living in the United States, where they have established a stable life for themselves and their son, while also being able to visit their elderly and ailing relatives in Ukraine when necessary. Aleksandra and her family followed all of the required steps in the diversity visa process and spent upwards of $6,000 on all of the application fees and other expenses associated with the process, including the required medical examinations for each of them. They submitted their I-485 applications for adjustment of status in December 2024.

273. Aleksandra and her son also applied for TPS in December 2024 given the ongoing conflict and conditions that persist in their home country.

274. In January 2025, USCIS scheduled an interview for Aleksandra and her family on February 27, 2025, regarding their adjustment of status applications. However, a few days before the interview, on February 19, USCIS sent a notice to Aleksandra informing her that the interview had been cancelled, without any explanation as to why.

275. Now, Aleksandra and her family's parole will expire in less than two weeks, on March 29, 2025. If Aleksandra's TPS and adjustment of status applications are not adjudicated or are kept on hold for too much longer, she and her husband will lose their work authorization and ability to support themselves and their young son, and their entire family will lose the ability to remain safely in the United States. Without work authorization, her husband will likely lose his job at his construction company, leaving them without the ability to support themselves and pay for their basic living expenses. And if their adjustment interview and applications are indefinitely suspended, by September 2025, Aleksandra and her family will lose their once-in-a-lifetime opportunity to obtain a visa through the diversity visa lottery system and will have wasted the thousands of dollars they have invested in this process. Consequently, Aleksandra remains extremely afraid and anxious for herself, her husband, and her young son. The indefinite suspension of processing immigration benefit applications for U4U parolees is causing Aleksandra and her family tremendous emotional strain and distress.

276. Plaintiff **Teresa Doe** and her son reunited with her husband and three other children in the United States in 2017 through the CAM parole process. They had lived apart for many years until Teresa's husband was able to petition for their son to receive parole through CAM. When his petition was approved, Teresa was able to accompany him to the United States as an eligible family member.

277. Since they arrived in 2017, Teresa and her son were granted CAM re-parole for more than eight years, allowing them to settle into their community in Nevada and allowing Teresa to consistently care for her family. Teresa's husband works and provides the income for their family, while Teresa stays home and takes care of their children and house. She takes her youngest son, who is a U.S. citizen, to high school every day. During the week, she is also the caretaker for her two U.S. citizen granddaughters, who are 2.5 years old and 6 months old, while their parents work full-time. Being together again after so many years of separation has been beneficial for their family.

278. Teresa's most recent grant of CAM parole expired on March 13, 2025. She has a pending application for re-parole that has not yet been adjudicated, and she fears that due to the administration's termination of CAM and other parole processes, it never will be. The possibility of losing parole and being separated from her family again is devastating for Teresa. Her youngest son and grandchildren would have no one to take care of them, and Teresa would miss out on watching them grow up. She is also afraid of returning to El Salvador, given safety concerns and the political climate there. The termination of CAM is causing Teresa and her family more emotional distress with every passing day.

279. Plaintiff **Rosa Doe** escaped Honduras in 2013 after surviving rape and other violence. She was trafficked upon entering the United States. Rosa now lives in Austin, Texas with her four U.S. citizen daughters. She also has one fourteen-year-old daughter living in Honduras with Rosa's elderly father. Rosa applied for her daughter and mother through the CAM parole process in June 2023 in order to reunite with them after over a decade of being apart, and also for Rosa's daughter's safety. After Rosa's mother died in October 2024, Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. Rosa's daughter and father then

moved through the screening and multi-step process and were conditionally approved for CAM parole in November 2024. Rosa did not have enough money to pay for their travel in December 2024 due to having spent all her savings on her mother's medical care and funeral expenses. Rosa began planning for their arrival in late January of 2025. After January 20, 2025, Rosa was unable to reach the organization handling their applications, the International Organization for Migration, for an update on their case. Rosa went without answers regarding her daughter and father's CAM applications until early March 2025. At that time, she was informed that it would take additional time for her daughter and father to travel to the United States on parole. Around the same time, Rosa was informed about the government's plans to terminate the CAM parole process.

280. If the CAM parole process is terminated, Rosa fears her daughter and father will not be able to travel to the United States at all. With each day that passes without parole, Rosa's fourteen-year-old daughter remains in active danger from the same perpetrator who inflicted sexual violence and harm onto Rosa when she was fourteen years old. The termination of the CAM parole process is causing Rosa and her family serious anxiety and distress everyday Rosa's daughter remains in Honduras.

281. Plaintiff **Haitian Bridge Alliance ("HBA")** was founded for the purpose of assisting Haitian and other Black immigrants to acclimate to the United States and to promote their ability to navigate their new lives in the United States. HBA's core organizational activities have been to educate Black migrants about legal pathways and humanitarian protections and to provide them with legal services to access them. HBA has provided direct services to over 1,000 CHNV sponsors and parolees from Haiti.

282. Since January 2023, HBA has received over 3,000 urgent requests from potential Haitian parolee clients seeking sponsors to apply for the Haitian parole process and has conducted hundreds of consultations with Haitians wanting to apply for parole.

283. HBA has provided aid to individuals looking to sponsor Haitian migrants through the Haitian parole process by assisting these sponsors with the completion of their sponsorship applications (the Form I-134A) and ensuring they understand each aspect of the application. Between June 2023 and January 2024 alone, HBA staff spent over 500 hours on this work.

284. HBA has also partnered with Welcome.US—a national initiative that mobilizes and empowers Americans from across the country to welcome and support those seeking refuge here in the United States—to mobilize individuals eager to sponsor and help Haitians fleeing danger and seeking refuge in the United States through the Haitian parole process. Through HBA's partnership with Welcome.US, HBA registered over 140 Haitian parolee clients to help them get connected with potential sponsors and successfully matched 20 Haitian parolee clients with sponsors.

285. HBA has also provided integration services to Haitian parolees once they arrive, including with regards to housing and other basic needs, transportation, and education.

286. As a result of the overwhelming demand for assistance with the CHNV parole processes, HBA expanded their team in 2023 by hiring additional staff members to continue supporting this work for CHNV sponsors and parolees in connection to HBA's overall mission and services.

287. The Trump administration's termination of the CHNV parole processes, including stopping the processing of CHNV parole applications, and the administration's suspension of

processing immigration benefit applications filed by CHNV parolees directly and concretely impair HBA's core activities, and in multiple ways.

288. For one, the termination and suspensions waste the resources that HBA has already expended in helping potential sponsors and beneficiaries prepare and file applications for parole and, with regards to those who are already here, other immigration benefits.

289. In addition, the termination of parole for those Haitian parolees already here—which will also terminate their employment authorization—will require HBA to modify its approach to its core activities to meet the needs of those parolees, including their basic economic needs and their heightened legal needs.

290. The administration has terminated a legal pathway that is relied upon by many of HBA's clients and community members, and its actions directly interfere with HBA's humanitarian and legal support services being provided to CHNV sponsors and Haitian parolees. These needs have already increased, as the reporting of CHNV's termination by the Trump Administration has led to a rapid increase in the number of Haitians and others seeking assistance from HBA, be it legal and otherwise.

291. The termination and suspension and the new needs it has created has forced HBA to suspend indefinitely its plans to expand the affirmative legal services it could offer its clients, and it will require HBA to respond to any deportation defense needs of CHNV parolees if they lose their status, which would be work that is outside the normal realm of services it offers CHNV parolees. Rather than move forward with their previous plans, HBA now must change course to meet the more immediate humanitarian and legal needs of the community it serves.

292. Since the release of the March 25 FRN, HBA has been receiving increasing numbers of calls to their hotline from individuals with CHNV parole panicking about how the

March 25 FRN will affect them, including whether their parole has been or will be terminated, what will happen to their work authorization, and whether they could be targeted for expedited removal. HBA staff responding to these inquiries have had to rapidly analyze the FRN, its interaction with the administration's suspension of adjudication of immigration benefit requests for parolees, and each individual's particular circumstances in order to provide the most updated advice, legal and otherwise, to people impacted by the ever-changing landscape.

293. HBA's attorneys have also had to create and add new analysis and guidance about the March 25 FRN to an upcoming know-your-rights training, which will make it more difficult to address all the necessary information that the Haitian CHNV community needs in the time allotted. The Haitian CHNV community is understandably in crisis given the abrupt termination of the CHNV parole processes, the sudden and indefinite pause in the processing of additional immigration benefits, and now the high likelihood that Haitian CHNV parolees could be subjected to expedited removal in less than a month. The release of the March 25 FRN has only amplified the ongoing, direct, and substantial impact of the administration's termination of parole processes on HBA's core activities of providing affirmative services and legal education to CHNV parolees.

## CLASS ALLEGATIONS

294. Plaintiffs Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Miguel Doe, Lucia Doe, Daniel Doe, Omar Doe, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, Norma Lorena Dus, Valentin Rosales Tabaras, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, and Rosa Doe (the "Putative Class Representatives") bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and all similarly situated persons for whom the January 20 Huffman

memorandum, the February 14 Davidson memorandum, the March 25 FRN, and subsequent similar actions have halted the processing of their applications to sponsor parole beneficiaries and to seek additional immigration benefits and rescinded existing grants of parole. The Putative Class Representatives seek certification of a class (the "Plaintiff Class") consisting of:

295. All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to CHNV, U4U, OAW, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Sponsor Subclass");

296. All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the "Rescinded Parolee Subclass"); and

297. All individuals who have received humanitarian parole through the already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the "administrative hold" set out in the February 14 Davidson memorandum, the January Higgins Directive, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Immigration Benefits Subclass").

298. This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

299. The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The demand for to sponsor beneficiaries through the U4U, CHNV, FRP, MPIP, and CAM parole processes has been high; USCIS received over 120,000 sponsorship applications for U4U,

and more than 1.5 million sponsorship applications for CHNV parole, in just the first four or five months that the processes were made available. Although U4U has no monthly cap on the number of applications that can be granted, only a maximum of 30,000 CHNV applications can be granted each month, which is why USCIS eventually adopted a lottery system to process some CHNV applications, rather than processing them all on a first-come-first-served basis. Similarly, by the time the first Trump administration attempted to take steps to terminate the CAM process, over 12,000 people had applied for the program. And while reliable statistics regarding the number of applications for FRP and MPIP are not publicly available, the FRP process for Haiti alone issued over 12,000 invitations to eligible sponsors within two years, and it appears that USCIS had approved close to 4,000 MPIP applications within two years in the late 2000s. The number of beneficiaries of humanitarian parole processes is also high: Approximately 200,000 Ukrainians have entered the United States through the U4U parole process; approximately 600,000 nationals of Cuba, Haiti, Nicaragua, and Venezuela have entered the United States through the CHNV parole processes; and approximately 75,000 Afghans were brought to the United States through Operation Allies Welcome. The numbers of beneficiaries of FRP, MPIP, and CAM together also number in the many thousands. Although not all of these individuals are eligible for or have applied for additional immigration benefits, many thousands of them have already applied for asylum, TPS, and other status adjustments.

300. The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' interpretation of the INA's parole provision is lawful and supported by the text of the statute; whether the January 20 Huffman memorandum, the February 14 memorandum, the March 25 FRN, and other similar agency actions are not in accordance with law and/or with the agencies' own regulations; and whether the January 20 Huffman memorandum,

the February 14 memorandum, the March 25 FRN, and other similar agency actions violate Plaintiff Class members' rights under the APA.

301. The claims of the Plaintiff class members share common issues of fact, including, but not limited to: whether, in issuing and implementing the January 20 Huffman memo, the February 14 Davidson memorandum, and the March 25 FRN, Defendants acted contrary to law, or acted in an arbitrary and capricious manner by failing to consider important aspects of the problem they are addressing, or explained their decision counter to the evidence before them; whether Defendants quantified or considered harms that result from the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, and their implementation; and whether class members have suffered harm as a result of the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, and Defendants' actions taken to implement these memoranda.

302. Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff and satisfy Rule 23(a)(2).

303. The claims or defenses of the Putative Class Representatives are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Putative Class Representatives have been harmed by, among other things, Defendants' failure to abide by the plain text of the INA's parole provision, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems it is addressing. They have further been harmed by Defendants' failure adequately to explain their decision to issue the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, as well as Defendants' premising these

memoranda and their implementation on an erroneous interpretation of the INA's parole provision. Each of these actions, independently and collectively, have caused harm to the Putative Class Representatives and the Plaintiff Class members.

304. The Putative Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). The Putative Class Representatives will defend the rights of all proposed class members fairly and adequately and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Putative Class Representatives include experienced civil rights and immigration attorneys who are considered able practitioners in federal litigation, including constitutional and administrative law litigation. These attorneys should be appointed as class counsel.

305. The members of the proposed class are readily ascertainable through Defendants' records.

306. Through implementation and enforcement of the memoranda at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

307. Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

## FIRST CLAIM FOR RELIEF
## Violation of the Administrative Procedure Act (APA) – Contrary to Law
## (Termination of parole processes)
## (Against Defendants Noem, Lyons, Flores, and Davidson)

308. All foregoing allegations are repeated and realleged as though fully set forth herein.

309. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

310. As explained above, within days of President Trump taking office again, DHS stopped adjudicating any pending requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and stopped accepting new requests for parole or re-parole through them.

311. Plaintiffs refer to the actions in the preceding paragraph as "terminating" those processes, but that characterization is immaterial to the legal infirmities of the actions.

312. DHS has not informed the public that it has stopped adjudicating requests for parole and re-parole made through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM. USCIS did put on its website on January 28, 2025 that it has "paused" accepting new applications for parole through U4U, CHNV, and FRP "until we review all categorical parole processes as required by" the "Securing Our Borders" executive order.

313. DHS subsequently published a Federal Register Notice on March 21, 2025, which expressly "terminat[es]" the CHNV parole processes and states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date." 90 Fed. Reg. 13611.

314. DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes and to stop adjudicating any pending such requests constitutes final agency action, as do the discrete actions the agency Defendants took to implement this decision, including but not limited to the January Higgins directive and the March 25 FRN.

315. DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM; to stop adjudicating any pending such requests; and to "terminat[e]" the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, 90 Fed. Reg. 13611, was based in substantial part on an erroneous interpretation of the parole statute, 8 U.S.C. § 1182(d)(5), contained in the January 20, 2025, memorandum of the then-Acting Secretary Huffman.

316. DHS's early termination of all existing grants of parole was also based on an erroneous interpretation of the expedited removal statute, 8 U.S.C. § 1225(b). The March 25 FRN states that *the* reason DHS decided not to let CHNV parolees keep what is left on their existing two-year grants of parole is that once they are here for more than two years, they would be ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii). 90 Fed. Reg. at 13620. But CHNV parolees cannot be put in expedited removal under § 1225(b)(1)(A)(iii) regardless of how long they have been here, because the statute can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(A)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal under § 1225(b)(1)(A)(iii)(II).

317. Because of DHS's actions, parole and re-parole applications that have been filed are now pending indefinitely, which eliminates the right for beneficiaries to obtain parole and

holds legal consequences both for the applicants and their sponsors. For example, Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, and Valentin Rosales Tabares all have pending applications for individuals for whom CHNV parole is the only legal pathway available for them to seek safety and stability in the United States. For Wilhen, those individuals are family members of hers who deal with routine violence in Haiti; for Valentin, CHNV parole has enabled him to sponsor his daughter-in-law and granddaughter, so that they may reunite with his son and be together as a family again. The termination of the CHNV parole processes means that the beneficiaries of Plaintiffs McAnany, Varner, Victor, and Tabares have lost their opportunity to come to the United States and potentially seek further protection here. The termination of the FRP processes similarly and further harms Valentin Rosales Tabares, whose daughter and granddaughter have approved family-based immigrant visa petitions, but who have been waiting for years in Cuba for their visas to become available.

318. Humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and remain authorized by the statutory parole authority, codified at 8 U.S.C. § 1182(d)(5).

319. Defendants' legal conclusion regarding the scope of the parole authority and the legality of these specific parole processes is contrary to law.

320. Even Defendants' allegedly discretionary decisions are based on an erroneous understanding of their discretionary legal authority. For example, the January 20 Huffman memorandum's assertion that the Secretary of Homeland Security has absolute discretion to deny parole for any reason and in any circumstance is wrong; not only is the Secretary's exercise of that discretion subject to constitutional constraints and self-imposed regulatory constraints, it is also currently restricted by numerous injunctions and other court orders.

321. Defendants' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Contrary to Law & *Ultra Vires***
**(Suspension of benefits adjudication for parolees)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

322. All foregoing allegations are repeated and realleged as though fully set forth herein.

323. As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM.

324. USCIS did not seek to justify the suspension of the adjudication of benefits for individuals into the United States through one of these humanitarian parole processes until February 14, 2025, in the Davidson memorandum, which addressed only U4U, CHNV, and FRP.

325. DHS has not informed the public that it has suspended the adjudication of benefits for those who were paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

326. Defendants' suspension of benefits adjudication for parolees constituted final agency action, as did the discrete actions taken to implement it and on what it is based, including but not limited to the January 20 Huffman memorandum, the January Higgins directive, and the February 14 Davidson memorandum.

327. Defendants' suspension of the processing of immigration benefits for those paroled through an already established humanitarian parole process has clear legal consequences for many applicants, including because a suspension of an application for relief could leave an applicant

stranded without status in the United States. For example, Plaintiff Teresa Doe's parole and work authorization expired on March 13, 2025; Plaintiff Aleksandra Doe's parole and work authorization will expire imminently on March 29, 2025; Plaintiff Maksym Doe's U4U parole and work authorization will expire in April 2025. If Aleksandra Doe cannot move forward in the FY2025 Diversity Visa process or have her TPS application processed, and if Maksym Doe's pending applications for re-parole or TPS remain suspended and are not processed and granted soon, they will lose their legal status and his work authorization and become subject to deportation, just as Teresa Doe already has. Other Plaintiffs are similarly at risk of losing their status if this suspension continues.

328. Defendants' suspension of adjudicating applications that would benefit these parolees is in excess of their statutory authority and contrary to the statutory regime Congress created that give applicants the right to apply for immigration benefits to be adjudicated under the legal standards and through the process that Congress created. *See, e.g.*, 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1254a (TPS).

329. Defendants' blanket suspension of adjudicating applications that would benefit these parolees is also contrary to the parole statute, which requires that conditions for parole be "prescribe[d] only on a case by case basis." 8 U.S.C. § 1182(d)(5).

330. Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**
**(Termination of parole processes)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

331. All foregoing allegations are repeated and realleged as though fully set forth herein.

332. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

333. As detailed above, DHS has stopped adjudicating any pending requests for parole or re-parole through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; stopped accepting new requests for parole or re-parole through them; and issued the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations and doing so constitutes final agency action as also discussed above.

334. Defendants' decision to stop adjudicating pending requests for parole or re-parole through already established humanitarian parole processes, to stop accepting new requests for parole or re-parole through those processes, and to expressly terminate the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, was arbitrary and capricious, for failure to consider and reasonably explain its consideration of the many factors relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the parole statute makes relevant. In so doing, DHS failed to consider important aspects of the problem and also failed to meet the APA's requirement to reasonably explain important decisions like this one.

335. To the extent Defendants do offer some justifications for their actions, such as in the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, those justifications

were not offered contemporaneously with the termination itself and reveal a disconnect between the decision made and the rationale provided, and therefore do not provide a satisfactory explanation for Defendants' actions.

336. Even had the explanations in the Mar. 25 FRN been timely, they would still fail to satisfy Defendants' obligation to exercise the statutory parole authority reasonably and to reasonably explain their decisions after taking into account the relevant considerations. Among other defects, the Mar. 25 FRN failed to consider the purposes of the parole statute and the INA more generally; the current conditions in Cuba, Haiti, Nicaragua, and Venezuela; the combined effects on CHNV parolees, their families, and their communities of the various other actions Defendants have taken, including the other agency actions challenged here; the correct interpretation of the parole statute and the expedited removal statute, 8 U.S.C. § 1225(b); and available alternatives.

337. In imposing an erroneously narrow interpretation of the parole statute on agency personnel while also authorizing and directing them to terminate all previously established humanitarian parole processes, Acting Secretary Huffman claimed that, even if a court disagrees with his legal conclusion, "I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

338. Acting Secretary Huffman's claim that he would impose the same policy as a discretionary matter was a pretextual and/or contrived attempt to insulate his unlawful actions from judicial review.

339. In allegedly deciding to adopt the same policy as a matter of discretion, Acting Secretary Huffman failed to consider any factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and

potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the statute makes relevant. In so doing, he failed to consider important aspects of the problem.

340. DHS thus acted arbitrarily and capriciously in allegedly adopting, as a matter of discretion, its parole policy, and in taking all the aforementioned actions regarding specific parole processes and the individuals who have been paroled through them.

341. DHS' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**
**(Suspension of benefits adjudication for parolees)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

342. All foregoing allegations are repeated and realleged as though fully set forth herein.

343. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

344. As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, and doing so constitutes final agency action as also discussed above.

345. DHS's decision to suspend adjudication of these requests for benefits was arbitrary and capricious due to Defendants' failure to consider seemingly every factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on those directly affected and on their family members and communities; the impact of it on the United States'

foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or the criteria made relevant by the statutes governing the applications. In so doing, Defendants failed to consider important aspects of the problem.

346. In addition, DHS ignored and otherwise violated the APA reasonable explanation requirement.

347. DHS thus acted arbitrarily and capriciously in suspending the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

348. Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – *Accardi* Doctrine**
**(Failure to follow agency procedures)**
**(Against Defendants Noem, Lyons, Flores, and Davidson)**

349. All foregoing allegations are repeated and incorporated as though fully set forth herein.

350. Plaintiffs are entitled to written notice that their parole is being terminated before expiry of the authorized duration pursuant to 8 CFR § 212.5(e)(2)(i), which states that "parole shall be terminated upon written notice to the alien . . ." Plaintiffs are also entitled to written notice that their employment authorization is being terminated before the expiry of the authorized duration pursuant to 8 C.F.R. § 274a.14(b), which states that a "written notice of intent to revoke the employment authorization" must be served, and that the individual "will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence."

351. Defendants' actions will result in Plaintiffs being deprived of the written notice of termination they are entitled to because the March 25 FRN terminating parole processes for CHNV nationals, Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13,611 (Mar. 25, 2025), fails to provide written notice or set forth any procedure by which Defendants are provided with written notice of the premature termination of their parole. The March 25 FRN states that parolees under the CHNV parole processes will be notified that their parole is being terminated on April 24, 2025 through the March 25 FRN itself and notifications sent to the parolees' online USCIS accounts.

352. Publication of a FRN and/or electronic notification to online USCIS accounts do not qualify as "written notice" of termination.

353. Defendants' actions, as set forth above, violate agency procedures, including those found at 8 CFR § 212.5(e)(2)(i), which state that parolees are entitled to "written notice" of termination when parole is terminated before expiry of the authorized duration.

354. Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

355. Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

**SIXTH CLAIM FOR RELIEF**
**Non-Statutory Claim to Enjoin Unlawful Executive Action**
**(Termination of parole processes & suspension of benefits adjudication for parolees)**
**(All Defendants)**

356. All foregoing allegations are repeated and realleged as though fully set forth herein.

357. As discussed above, Defendants' decisions terminating humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and suspending benefits

adjudications for individuals paroled through those processes, are contrary to the INA and in excess of the legal authority granted Defendants.

358. Defendants' actions should therefore be declared unlawful and enjoined pursuant to this Court's inherent equitable authority.

**SEVENTH CLAIM FOR RELIEF**
**Due Process Clause of the Fifth Amendment to the U.S. Constitution**
**(Termination of parole processes & suspension of benefits adjudication for parolees)**
**(All Defendants)**

359. All foregoing allegations are repeated and realleged as though fully set forth herein.

360. Plaintiffs have a protected interest in applying for parole, re-parole, and other immigration benefits; and in any grant of parole, re-parole, and other immigration benefits.

361. Plaintiffs are entitled under the Due Process Clause of the Fifth Amendment to notice, an opportunity to be heard, and to have their claims adjudicated pursuant to the laws enacted by Congress.

362. Defendants' actions terminating the parole processes and suspending benefits adjudication violate Plaintiffs' right to due process in numerous ways by depriving them of a meaningful opportunity to establish—under lawful standards—their eligibility for parole, re-parole, other immigration benefits, and to the remainder of any grant of parole they have already received.

363. Defendants' termination of these parole processes and suspension of benefits adjudication must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue a preliminary injunction and/or a stay under 5 U.S.C. § 705 in order to restore the *status quo ante*, under which CHNV parole beneficiaries are entitled to enjoy the full duration of their already-issued grants of parole, and under which adjudications for requests for parole and/or re-parole under already established humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM, as well as other requests for immigration benefits for individuals paroled through such processes, all resume and continue in the ordinary course pursuant to the policies in effect prior to the January 20 Huffman memorandum.

2. Declare that humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and are in accordance with the statutory parole authority, 8 U.S.C. § 1182(d)(5);

3. Declare that Defendants' termination of already existing humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, arbitrary and capricious, and violated the constitutional guarantee of due process;

4. Declare that the March 25 FRN terminating parole and work authorization granted under the CHNV parole processes was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

5. Declare that Defendants' suspension of the adjudication of benefits applications for individuals paroled through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

6. Hold unlawful, set aside, and/or otherwise vacate Defendants' suspension of the adjudication of requests for parole and re-parole through established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; Defendants' suspension of the adjudication

of requests for immigration benefits for individuals paroled through such humanitarian parole processes; the January 20, 2025 Huffman memorandum; the January Higgins directive; the February 14, 2025 Davidson memorandum; and all DHS actions based thereon or implementing one thereof;

7. Enjoin Defendants from applying their erroneous interpretation of the parole statute to individuals paroled into the United States through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; and from suspending the adjudication of immigration benefits of individuals paroled through such processes;

8. Certify this case as a class action lawsuit, and appoint class counsel of record, as proposed herein;

9. Award Plaintiffs' counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

10. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: March 27, 2025

Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice* pending)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

*Attorneys for Plaintiffs*

Case 1:25-cv-10495-IT Document 68 Filed 03/27/25 Page 104 of 104

**CERTIFICATE OF SERVICE**

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 27, 2025

*/s/ John A. Freedman*
John A. Freedman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, et al.,

Plaintiffs,

*v.*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,

Defendants.

Civil Action No.: 1:25-cv-10495-IT

**PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT**

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs respectfully move this Court for leave to file a third amended complaint. Plaintiffs seek to add parties, allegations, and claims addressing Defendants' most recent agency actions which 1) suspend the adjudication of asylum applications and the processing of benefits requests for nationals of certain designated countries (including those from which class members hail), and 2) terminate family reunification parole processes for nationals of seven countries (Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras).[1]

On December 2, 2025, U.S. Citizenship and Immigration Services ("USCIS") issued a policy memorandum calling for an immediate hold on the processing of all asylum applications and the processing of benefit requests as to individuals born in or a national of one of 19 countries identified in a presidential proclamation executed on June 4, 2025 - Presidential Proclamation 10949. *See* USCIS, Policy Memorandum: "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk

[1] Plaintiffs also wish to substitute certain individual defendants named in their official capacity with other personnel given staffing changes at the relevant agencies. *See* Fed. R. Civ. P. 25(d).

Countries", PM-602-0192 (Dec. 2, 2025) ("Dec. 2 USCIS Memo"). The new agency directive imposes an indefinite hold on the processing of applications and calls for a "comprehensive re-review of [already] approved benefit requests". *Id*.

On December 15, 2025, the Department of Homeland Security ("DHS") published a Federal Register Notice calling for the termination of family reunification parole processes and, effective January 14, 2026, prematurely terminates valid grants of parole issued under nine family reunification parole processes to nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras and their immediate family members. *See* Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025) ("FRP FRN"). It likewise revokes work authorizations issued to these parolees. *Id*. The FRP FRN makes clear that DHS "intends to promptly remove" individuals who entered the country under any of the family reunification parole processes and "who stay in the United States beyond their parole termination date with no lawful basis to remain . . . ." *Id*. at 58043.

For the reasons stated in this Motion, the Memorandum of Law in Support of Plaintiffs' Motion for Leave to File a Third Amended Complaint, the proposed Third Amended Complaint filed as **Exhibit A**, and other evidence and arguments that may be submitted on this Motion, Plaintiffs respectfully request that the Court grant leave to amend the Second Amended Complaint (Doc. No. 68) so that Plaintiffs may address the Dec. 2 USCIS Memo and the FRP FRN.

Dated: December 29, 2025

Respectfully submitted,

/s/ *Esther H. Sung*
Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Inyoung Hwang (*pro hac vice*)
Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
121 W 36th Street
PMB 520
New York, NY 10018
Telephone: (212) 845-5200
HughesA@humanrightsfirst.org
HwangS@humanrightsfirst.org

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO#691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

*Counsel for Plaintiffs*

**CERTIFICATION PURSUANT TO LOCAL RULES 7.1(A)(2) and 26.2(C)**

Plaintiffs, through their counsel, conferred with Defendants' counsel pursuant to Local Rule 7.1(a)(2), and Defendants' counsel provided written confirmation that they oppose Plaintiffs' motion to file a Third Amended Complaint.

Dated: December 29, 2025

*/s/ Esther H. Sung*
Esther H. Sung

**CERTIFICATE OF SERVICE**

I, Esther H. Sung, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: December 29, 2025

*/s/ Esther H. Sung*
Esther H. Sung

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE; MAKSYM DOE; MARIA DOE; ALEJANDRO DOE; ARMANDO DOE; ANA DOE; CARLOS DOE; MIGUEL DOE; ANDREA DOE; LUCIA DOE; DANIEL DOE; OMAR DOE; SANDRA MCANANY; KYLE VARNER; WILHEN PIERRE VICTOR; GABRIELA DOE; NORMA LORENA DUS; VALENTIN ROSALES TABARES; MARIM DOE; ADOLFO GONZALEZ, JR.; ALEKSANDRA DOE; TERESA DOE; ROSA DOE; DAVID DOE; JOSE DOE; FRANCISCA DOE; LUCIANA DOE; JOHN DOE; and HAITIAN BRIDGE ALLIANCE,

Plaintiffs,

*– versus –*

KRISTI NOEM, in her official capacity as Secretary of Homeland Security; TODD M. LYONS, in his official capacity as the Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; JOSEPH B. EDLOW, in his official capacity as the Director of U.S. Citizenship and Immigration Services; and DONALD J. TRUMP, in his official capacity as President of the United States,

Defendants.

**Civil Action No: 1:25-cv-10495-IT**

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

**Page(s)**


INTRODUCTION .......... 1

JURISDICTION AND VENUE .......... 6

PARTIES .......... 6

BACKGROUND .......... 21

The Statutory Parole Authority .......... 21

Uniting for Ukraine ("U4U") .......... 26

Parole Processes for Cuba, Haiti, Nicaragua, & Venezuela ("CHNV") .......... 29

Operation Allies Welcome ("OAW") for Afghan Allies .......... 34

Family Reunification Parole ("FRP") for Colombian, Cuban, Ecuadorian, Guatemalan, Haitian, Honduran, and Salvadoran Beneficiaries of Approved I-130 Petitions .......... 36

Military Parole-in-Place ("MPIP") .......... 47

Central American Minors Parole ("CAM") .......... 49

Summary Termination of Humanitarian Parole Processes .......... 51

Formal Termination of CHNV Parole .......... 55

Formal Termination of Family Reunification Parole .......... 58

January/February 2025 Indefinite Suspensions of Adjudicating Parolees' Immigration Benefits Requests (Higgins Directive & Davidson Memorandum) .......... 62

December 2, 2025 Suspension of Adjudicating Parolees' Immigration Benefits Requests (Dec. 2 USCIS Memo)) .......... 65

Defendants' Actions Cause Harm to Plaintiffs .......... 67

CLASS ALLEGATIONS .......... 114

CLAIMS FOR RELIEF .......... 118

PRAYER FOR RELIEF .......... 135

CERTIFICATE OF SERVICE .......... 139

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Ukrainians seeking safety from the Russian invasion of their country; Cubans, Haitians, Nicaraguans, and Venezuelans fleeing political instability, persecution, and environmental disasters; Afghans who assisted the United States government during its war in Afghanistan; the family members of certain U.S. citizens and residents who have been deemed eligible for a visa but are simply waiting in their home countries, often for years, for one to become available for them; the undocumented family members of active and retired U.S. military servicemembers; and parents seeking to reunify with children from certain Central American countries after years of family separation are just a few of the populations that the United States has sought to aid in recent years by granting eligible individuals parole, on a case-by-case basis, so that they may enter or remain in the country for a temporary period of time and find safety and stability here.

2. The Trump administration, however, has sought not only to terminate those legal humanitarian pathways to the United States, but to block access to any other longer-term, more stable legal status for individuals granted humanitarian parole, so that these people have no options to remain here in safety, to continue contributing to their communities, and to remain with family members here in the United States.

3. This lawsuit challenges the steps the Trump administration has taken to radically limit what had up to this point been a broad power granted by Congress to allow the executive to respond to migration challenges, address global humanitarian crises, and further important foreign policy objectives in a flexible and adaptive way. It also challenges the Trump administration's

dismantling of legally established and congressionally authorized pathways to the United States, including:

- Uniting for Ukraine ("U4U"), for Ukrainians displaced by the war with Russia;
- the processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), countries that have been ravaged by natural disasters and/or political strife;
- Operation Allies Welcome ("OAW"), for Afghans fleeing the newly resurgent Taliban;
- Family Reunification Parole ("FRP"), for nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras with approved family-based immigrant visa petitions;
- Military Parole in Place ("Military PIP"), so that U.S. military servicemembers may seek parole for their parents, children, and spouses, and need not worry about the immigration status of these close family members while serving their country; and
- The Central American Minors ("CAM") parole process, which reunites parents who are already in the United States with their children who remain behind.

4. In addition, this lawsuit challenges the Trump administration's attempts to block individuals paroled through these and other processes from seeking alternate legal statuses created and authorized by Congress.

5. On January 20, 2025—Inauguration Day—President Trump issued Executive Order 14165, entitled "Securing Our Borders," which directed the Secretary of Homeland Security to terminate all "categorical parole programs," explicitly referencing the CHNV parole processes.

6. Also on that day, Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" (the "January 20 Huffman memorandum") to the heads of Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), in which he authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute." Acting Secretary Huffman

directed all DHS staff to implement the new agency policy under which this historically common use of the parole authority is unlawful.

7. On the basis of Acting Secretary Huffman's conclusion that parole programs are unlawful, DHS has stopped considering parole applications through these processes, as well as requests on behalf of people already here for re-parole or for parole-in-place through the Military Parole-in-Place process. In addition, on March 21, 2025, DHS made public a Federal Register Notice entitled "Termination of Parole Processes: Cubans, Haitians, Nicaraguans, and Venezuelans," which was eventually published in the Federal Register on March 25, 2025 (the "March 25 FRN"), and "terminat[es] the categorical programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." The March 25 FRN further states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary."

8. Also based on Acting Secretary Huffman's erroneous legal conclusion, USCIS has also unlawfully suspended the adjudication of all requests for immigration benefits (including applications for work authorization as well as asylum, Temporary Protected Status ("TPS"), or other status adjustments) for individuals paroled through "categorical" humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

9. Weeks after this unlawful suspension was imposed, Acting Deputy Director of USCIS Andrew Davidson sought to justify it in a post-hoc February 14, 2025 memorandum (the "February 14 Davidson memorandum"). That memorandum justified the suspension as to the U4U, CHNV, and FRP processes based solely on the "potential" that the "vetting" that the beneficiaries of these parole processes underwent in connection with their parole applications was

not identical to what was in effect on January 19, 2021—the last day of President Trump's first term. This so-called administrative pause may also apply, at a minimum, to the OAW and MPIP processes. There is no authority for this suspension, and it is contrary to the laws Congress enacted governing those immigration benefit applications, in addition to being arbitrary and capricious.

10. At the same time that it has terminated these humanitarian parole processes for their alleged illegality and suspended the ability of parolees to obtain forms of immigration relief to which Congress has made them entitled, DHS has also taken aggressive action—challenged separately—to make it easier to deport individuals paroled through these processes as quickly as possible.

11. Such actions are not only illegal, but shockingly callous. Plaintiff Svitlana Doe[1] fled Ukraine following the Russian invasion and bombing of her town. Her son still requires speech therapy to overcome the horrors of war her family witnessed. Plaintiffs Maksym and Maria Doe likewise fled Ukraine, where Maksym heroically helped to rescue over 22,000 Ukrainians and provided humanitarian assistance to over half a million more. Plaintiffs Alejandro, Armando, Ana, and Carlos fled Nicaragua following the torture of a family member at the hands of the state and subsequent political persecution. Plaintiff Andrea Doe's husband, a political prisoner in Nicaragua, was brought to the United States *by* the United States government, which then asked him and others similarly situated to use the CHNV parole program to achieve reunification with the family members they had been forced to leave behind. Plaintiff Omar Doe—at great risk to himself and

[1] The Court has granted leave for Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Miguel Doe, Andrea Doe, Lucia Doe, Daniel Doe, Omar Doe, Gabriela Doe, Marim Doe, Aleksandra Doe, Teresa Doe, and Rosa Doe to proceed pseudonymously, and a motion for David Doe, Jose Doe, John Doe, Francisca Doe, and Luciana Doe to similarly proceed pseudonymously will be filed contemporaneously with the motion for leave to file this Third Amended Complaint.

to his family—faithfully served alongside the U.S. military in Afghanistan for over eighteen years before being evacuated by the military following the country's fall to the Taliban. Plaintiff Valentin Rosales Tabares was on the cusp of reuniting with his daughter and granddaughter, who were approved for Cuban Family Reunification Parole but had not yet been given a travel date, when the Trump administration terminated the FRP process. Plaintiff Adolfo Gonzalez, Jr. has served this country honorably as a First Sergeant in the Army, and Marim Doe continues to serve his country in the Navy, but their MPIP applications for their loved ones are now indefinitely suspended. Plaintiff Teresa Doe's CAM parole has expired and she is now subject to removal because her application for re-parole is indefinitely suspended, and she fears being deported and removed from all her family. And Plaintiff Rosa Doe was about to reunite with her fourteen-year-old daughter and her father through the CAM parole process, but now does not know when she will see them again.

12. The individuals able to obtain parole through U4U, CHNV, OAW, FRP, and CAM trusted that the U.S. government would help protect them from harm. They waited—even amid active war and persecution—to enter the United States until they had a legal avenue to enter the country. And now CHNV and FRP parole beneficiaries have had their grants of parole and work authorization prematurely cut short. All humanitarian parole beneficiaries have been cut off from the immigration relief Congress made available to them. Defendants are treating similarly our Afghan allies who arrived through OAW and individuals closely related to members of our Armed Forces.

13. Individual Plaintiffs, including Putative Class Representatives on behalf of themselves and similarly situated persons, and Organizational Plaintiff Haitian Bridge Alliance ("HBA"), seek a declaration that humanitarian parole processes like U4U, CHNV, OAW, FRP,

MPIP, and CAM are lawful; a preliminary and permanent injunction prohibiting DHS from continuing to apply its unlawful construction of the parole statute; a preliminary and permanent injunction prohibiting DHS from unlawfully and categorically revoking or otherwise placing conditions on grants of parole and work authorization to parole beneficiaries; and vacatur of agency actions taken pursuant to the agency's erroneous understanding of the law.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

15. Venue is proper in this District because Plaintiffs Svitlana Doe, Francisca Doe, and Wilhen Pierre Victor reside in this District. *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

16. Plaintiff **Svitlana Doe** is a citizen of Ukraine. Svitlana fled Ukraine in November 2024 following Russia's unprovoked and unjustified invasion into the country. Svitlana is the mother to a young boy with celiac disease, for whom care was difficult in Ukraine even before the war, and close to impossible during wartime. Svitlana, her husband, and her young son narrowly escaped Ukraine in November 2024, and traveled to the United States pursuant to the U4U parole process. Svitlana currently lives in Dover, Massachusetts. She has a pending application for TPS filed in February 2025, which has been indefinitely stalled due to the administration's pause on processing immigration benefits applications for U4U parolees.

17. Plaintiff **Maksym Doe** is a Ukrainian national living in Brooklyn, New York, with his wife, Maria Doe. After fleeing Kharkiv on the day Russia invaded Ukraine, he and several partners founded a nonprofit organization in Ukraine that began coordinating volunteer efforts to evacuate people from the war-stricken eastern part of the country. They rescued over 22,000 people within the first six months of the war and since then have provided humanitarian assistance to over

a half million Ukrainians. Maksym came to the United States through the U4U parole process in April 2023. He and his wife have applied for Temporary Protected Status ("TPS"), and he has also applied for re-parole in September 2024 because his current grant of U4U parole expires in April 2025. Processing these applications has been paused indefinitely due to the February 14 Davidson memo. If that pause remains in effect, Maksym's parole will expire, he will lose his work authorization and his ability to continue his humanitarian work for Ukrainians, and he will be displaced once again.

18. Plaintiff **Maria Doe** is a Ukrainian national who currently lives with her husband Maksym in Brooklyn, New York. She and Maksym Doe came to the United States through the U4U parole process with all their possessions packed into two suitcases. Maria was able to apply for U4U re-parole and was granted another two years of parole in January 2025, but she has also applied for Temporary Protected Status and is working with her employer to file an H-1B employment-based visa application soon. Not only will these applications not be processed due to the administration's indefinite hold on processing applications for immigration benefits for parole beneficiaries, but if her parole expires or the administration prematurely terminates it, she will once again be displaced.

19. Plaintiff **Alejandro Doe** is a citizen of Nicaragua. Alejandro is the brother of Ana Doe and Miguel Doe and currently lives in Gainesville, Georgia. Alejandro fled Nicaragua following the abduction and torture of his father by the Nicaraguan state. In July 2024, Alejandro entered the United States through the parole process for Nicaraguans, a component of the CHNV parole processes. He was sponsored by his cousin, Gabriela Doe. Due to the March 25 FRN, Alejandro's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely stalled due

to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

20. Plaintiff **Armando Doe** is a citizen of Nicaragua. Armando is married to Ana Doe and currently lives in Gainesville, Georgia. Armando fled Nicaragua due to increasing political repression and danger stemming from the disappearance of Ana's father by the Nicaraguan government and Armando's work at a digital media company dedicated to democratizing information and documenting government abuses. Armando entered the United States in February 2024, through the CHNV parole process for Nicaraguans. He was sponsored by his wife's cousin, Gabriela Doe. Due to the March 25 FRN, Armando's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

21. Plaintiff **Ana Doe** is a citizen of Nicaragua. Ana is married to Armando Doe and currently lives in Gainesville, Georgia. She is the sister of Alejandro Doe and Miguel Doe and cousin of Carlos Doe. Ana fled Nicaragua due to the increasing instability, political repression, and danger culminating in her father's capture and torture by the Nicaraguan government, as well as the danger her husband Armando faced working for a digital media company targeted by the Nicaraguan government for the information it published. Ana entered the United States and was granted parole through the CHNV parole process for Nicaraguans in February 2024. She was sponsored by her U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Ana's period of parole, and the associated work authorization, have been prematurely terminated. She also has a pending asylum application, as a derivative under her husband's pending asylum application,

which is indefinitely on hold due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

22. Plaintiff **Carlos Doe** is a citizen of Nicaragua. He is the cousin of Ana Doe and Alejandro Doe, and he currently lives in Gainesville, Georgia. Carlos fled Nicaragua because of the political instability and the fact that the Nicaraguan government was actively persecuting him due to his involvement in protests against the government and was issuing death threats against him and his family. As a result, Carlos went into hiding, where he received more death threats, rendering it unsafe for him to remain in Nicaragua. Carlos entered the United States and was granted parole through the CHNV parole process for Nicaraguans in May 2023. He was sponsored by a U.S. citizen family member. Due to the March 25 FRN, Carlos's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

23. Plaintiff **Miguel Doe** is a citizen of Nicaragua. He is the younger brother of Alejandro Doe and Ana Doe, and he currently lives in Gainesville, Georgia. Miguel came to the United States to find work so that he could better support himself and his family, including his mother, who he lived with and helped take care of back in Nicaragua. In his home country, it was difficult for Miguel to find stable work that paid decent wages. Miguel entered the United States and was granted parole through the CHNV parole process for Nicaraguans in July 2024. He was sponsored by his U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Miguel's period of parole, and the associated work authorization, have been prematurely terminated, and he will be vulnerable to imminent deportation in less than a month. The February 14 Davidson memo

additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

24. Plaintiff **Andrea Doe** is a citizen of Nicaragua. She arrived in the United States in the summer of 2023 with her two young sons to reunite with her husband, Rafael Doe, a former political prisoner from Nicaragua who had been evacuated to the United States by the U.S. government in February of that year. Andrea Doe and the couple's two young sons joined Rafael in the United States through CHNV parole because the U.S. State Department was asking the evacuated Nicaraguans to use the CHNV parole program to seek reunification with the family members they had been forced to leave behind in Nicaragua. The whole family then applied for asylum together. Their application for asylum has been pending with the Asylum Office since December 2023. If that application is not processed, Andrea Doe and the children will be left without protection against removal to Nicaragua. Andrea would be at risk of detention and of losing her children, and the family would face permanent separation, because the Nicaraguan government, upon expelling Rafael and the other passengers on the evacuation flight, stripped them of their Nicaraguan citizenship. Additionally, due to the March 25 FRN, Andrea's period of parole, and the associated work authorization, have been prematurely ended, putting her in an even more vulnerable position.

25. Plaintiff **Lucia Doe** is a citizen of Venezuela. She lives in St. Augustine, Florida, and she is the sister of Plaintiff Norma Lorena Dus ("Lorena"), who sponsored her to come to the United States on CHNV parole. Lucia left Venezuela because she and her family were experiencing extreme financial hardship there. Lucia's salary in Venezuela was not sufficient to provide for even basic needs like food, rent, and clothing. She entered the United States and was granted parole through the CHNV parole process for Venezuelans in July 2024. Due to the March

25 FRN, Lucia's period of parole, and the associated work authorization, have been prematurely terminated, and she will be vulnerable to imminent deportation in less than a month.

26. Plaintiff **Daniel Doe** is a citizen from Haiti currently living in Orlando, Florida. Daniel left Haiti because of the continuing danger and gang-led violence in Haiti, particularly in the neighborhoods where he lived. His wife and three-year-old daughter remain in Haiti, with pending CHNV sponsorship applications that will now never be processed. He entered the United States in February 2024 through the CHNV parole process for Haitians. Due to the March 25 FRN, Daniel's period of parole and work authorization have been prematurely terminated, and he will be at risk of being vulnerable to imminent deportation in less than a month. The February 14 Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

27. Plaintiff **Omar Doe** is an Afghan national living in Omaha, Nebraska. He worked for over eighteen years in different capacities with the U.S. military in Afghanistan, including as an interpreter. He and his wife and five children were evacuated to the United States as part of the U.S. military's withdrawal from Afghanistan in 2021. His application for a Special Immigrant Visa has been pending for almost three and a half years. Because his parole and his work authorization will expire in September 2025, he is also working on filing an asylum application with assistance from a nonprofit. But none of these applications will be adjudicated if the Trump administration's pause on the processing of immigration benefits continues, and Omar fears that he will lose his legal status and be vulnerable to deportation.

28. Plaintiff **Sandra McAnany** is a U.S. citizen who lives in La Crosse, Wisconsin. She is driven by her strong Christian faith to serve as the U.S.-based sponsor for seventeen individuals with active parole status through CHNV—fifteen from Venezuela and two from

Nicaragua. They were all approved for two-year periods of parole, and most have applied for asylum based on the fears they have of returning to their countries of origin. Sandra has given much of her time, effort, and money over the last few years supporting her CHNV beneficiaries to safely travel to the United States, reunite with family members already in the country, and find work and settle into their communities. Sandra has four pending CHNV applications as well, for nationals from Cuba, that will now never be processed due to the administration's end to CHNV.

29. Plaintiff **Kyle Varner** is a U.S. citizen and physician who lives in Spokane, Washington. As a long-committed political activist deeply involved in liberal and libertarian movements in Venezuela, he is motivated by his strong moral and political convictions to sponsor seventy-nine individuals through the CHNV parole processes, most of whom are nationals of Venezuela. Forty-three of his beneficiaries are currently in the United States, and at least twenty-nine have pending applications for asylum, TPS, or other immigration relief that are on pause due to the administration's policies. Over the last few years, Kyle has put immense amounts of time, energy, and money into ensuring that his beneficiaries have what they need, both to travel to the United States and to have a strong footing once they arrived. Kyle also has thirty-two pending CHNV sponsorship applications, including for a Cuban individual and a Nicaraguan individual, that will now never be processed due to the administration's end to CHNV.

30. Plaintiff **Wilhen Pierre Victor** is a U.S. citizen and healthcare worker who lives in Woburn, Massachusetts. She is the CHNV sponsor for her brother, his wife, and their three children, who are seven, thirteen, and sixteen years old. They arrived in the United States from Haiti in the summer of 2024 and were granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn. Wilhen's application to sponsor her brother for a green card has been pending since 2007, and he has been waiting since then to have another legal

pathway to come to the United States. CHNV parole has allowed Wilhen to reunite with her brother for the first time in more than twenty years, and it has allowed Wilhen's brother to find a job for the first time in thirteen years. Wilhen also has two pending applications for CHNV sponsorship of her thirteen-year-old niece (her brother's child) and her fifty-year-old cousin, who experience ongoing threats of extreme violence in Haiti, that will now never be processed due to the administration's end to CHNV.

31. Plaintiff **Gabriela Doe** is a U.S. citizen and immigrant justice advocate who lives in Tacoma, Washington. She is cousin to Ana Doe, Armando Doe, Alejandro Doe, Carlos Doe, and Miguel Doe, and is the CHNV sponsor to all her cousins except Carlos Doe, who is sponsored by another family member. The cousins Gabriela sponsored arrived in 2024 and were granted two-year periods of parole. Through the CHNV parole process, Gabriela was able to reunite with her five cousins, whose family faced political repression, danger, and persecution in Nicaragua. Because of the CHNV parole process for Nicaraguans, her cousins have been able to work and support themselves here in the United States and lead more stable, peaceful lives. Through the March 25 FRN, Gabriela's cousins' CHNV parole periods, and associated work authorizations, will prematurely end, subjecting their family to the possibility of separation again and causing Gabriela severe psychological distress knowing her cousins will be at risk of being vulnerable to imminent deportation in less than a month.

32. Plaintiff **Norma Lorena Dus ("Lorena")** is a U.S. citizen and immigrant justice advocate who lives in West Stockbridge, Massachusetts. She is the CHNV sponsor for her sister, Lucia Doe, who arrived in the United States from Venezuela in July 2024 and was granted a two-year period of parole. The CHNV parole process allowed Lorena and Lucia to reunite with all of their siblings for the first time in six years, and it has allowed Lucia, whose job back in Venezuela

did not pay enough for her to cover even her basic needs, let alone the needs of their mother, to become self-sufficient and send money back to their parents as well. This has relieved the financial strain on Lorena and their other siblings, all of whom regularly send money back to their parents to help them survive in Venezuela. The administration's termination of CHNV parole and premature termination of Lucia's two-year grant of parole and associated work authorization will cause severe, unexpected financial burden for Lorena, as well as psychological distress due to her sister becoming vulnerable to imminent deportation.

33. Plaintiff **Valentin Rosales Tabares** is a U.S. legal permanent resident living in Portland, Oregon. In 2018, he submitted family-based immigrant visa petitions for his wife, son, and daughter that were quickly approved. His wife and son were issued immigrant visas in 2022 and came to the United States that year to be reunited with him. However, his daughter and her daughter, Valentin's granddaughter, continued to await their immigrant visas in Cuba, where life was extremely difficult. When Valentin was invited by the Department of State to request Cuban Family Reunification Parole for his daughter in November 2024, he immediately submitted a request on her behalf. She was approved in December 2024, but she was not given a travel date before the Trump administration terminated the parole process. Valentin's application for his daughter is now indefinitely on pause. Valentin also applied to sponsor his son's wife and child through the CHNV parole process. Those applications remain pending indefinitely as well.

34. Plaintiff **Marim Doe** is a U.S. citizen and active-duty member of the U.S. Navy stationed at the U.S. military base in Goose Creek, South Carolina. Marim's father does not have legal status in the U.S., and one of the main reasons Marim joined the military was to help his father obtain legal status through the military parole-in-place process. He wants to provide his father with more job stability and retirement support as he gets older, as well as protection against

immigration enforcement, the fear of which has plagued their family. In May 2024, Marim submitted a military parole-in-place application for his father. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

35. Plaintiff **Adolfo Gonzalez, Jr.** is a U.S. citizen and retired U.S. Army service member who served in the Army for over thirty years. He lives in Zapata, Texas with his wife and sixteen-year-old daughter. Adolfo's wife is a national of Mexico and does not have legal status in the United States, a fact that caused him constant anxiety and fear when he was in active duty and had to be away from home and apart from her and his daughter. In March 2024, Adolfo submitted an application for military parole-in-place for his wife so that she could have a path to permanent residency and citizenship in the United States. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

36. Plaintiff **Aleksandra Doe** is a national of Ukraine living in San Jose, California with her husband and five-year-old son. They were granted parole through the Uniting for Ukraine parole process around April 2023. Her and her family's current authorized period of parole and associated employment authorization expires on March 29, 2025. She and her son have pending TPS applications, which she filed in December 2024. She and her family also have pending adjustment of status applications, which they were able to submit because they applied for the diversity visa lottery in October 2023 and were selected in May 2024 to move forward in the process for the Fiscal Year 2025 lottery. Aleksandra had an interview scheduled for her adjustment of status application in February 2025, but a few days before her appointment, she received a notice from USCIS notifying her that her interview had been cancelled. Because of the administration's suspension of adjudication of all immigration benefit applications for people like Aleksandra and

her family, who came to the United States through U4U, Aleksandra's applications for TPS and adjustment of status are now indefinitely on hold.

37. Plaintiff **Teresa Doe** is a national of El Salvador who has lived in Las Vegas for the last eight years with her husband and four children, one of whom is a U.S. citizen and two who are lawful permanent residents. After many years of separation from her husband and three of her children, Teresa was finally able to travel to the United States and be reunited with them when her son was approved for the CAM parole process. The two of them came to the United States in 2017 and were granted parole for an initial period of two years. After that, Teresa has consistently applied for and received CAM re-parole, which has allowed her husband to work and support their family while she takes care of their children and grandchildren. Her current period of parole expired on March 13, 2025, and her application for re-parole remains pending. Because of the administration's termination of CAM, this application is indefinitely on hold, and Teresa faces the possibility of being torn away from her family again.

38. Plaintiff **Rosa Doe** is a national of Honduras living in Austin, Texas with her four U.S. citizen daughters. Rosa has one other daughter who is fourteen years old living in Honduras, along with Rosa's father. Rosa came to the United States in 2013. She was trafficked into the United States and is the survivor of rape and other violence in Honduras. Rosa is a U-visa applicant with deferred status while her U-visa application remains pending. In June 2023, she filed an Affidavit of Relationship through the CAM parole process to reunite with her fourteen-year-old daughter and elderly parents. Sadly, Rosa's mother died in October 2024 before Rosa was able to see her again. Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. In November 2024, they both received conditional approval letters for their parole applications. Rosa was planning to purchase their flights to come to the United States in January

2025, but at this point Rosa was no longer able to get updates on their case to facilitate purchasing the tickets for her daughter and father. In early March 2025, Rosa was able to get in contact with the International Organization for Migration and was told that it would take more time for her daughter and father to be able to travel. However, because of the administration's termination of the CAM parole process, Rosa's daughter and father will not be able to travel to the United States, which would ensure Rosa's daughter's safety from the danger she faces in Honduras.

39. Plaintiff **David Doe** is a national of Ecuador living and working in Arkansas with his wife and their two sons. David and his family were granted parole into the United States through the Family Reunification Parole process for Ecuadorians. David and his family are the beneficiaries of an I-130 family-based petition filed by David's father in October 2012 and approved in February 2020. David's father subsequently received an invitation from the U.S. government to sponsor David and his family for the FRP in November 2023. After completing all the forms and steps required by the government, David and his family were inspected and given a three-year grant of parole into the United States in July 2024. They have not filed their adjustment of status applications yet because their priority date is not current. Due to the FRP FRN, David and his family's parole – and his and his wife's work authorization – will be prematurely terminated on January 14, 2026.

40. Plaintiff **Jose Doe** is a national of Honduras living and working in Miami, Florida with his wife and two young children, both of whom are U.S. citizens. Jose and his family are the beneficiaries of an approved I-130 family-based petition filed by Jose's U.S. citizen father. In August 2023, his father received an invitation from the U.S. government for Jose and his wife to participate in the FRP process. After completing the required forms and steps for this process, Jose and his wife received travel authorization to come to the United States through the FRP process

and were given a three-year grant of parole in March 2024. Jose and his wife applied for and received their work permits shortly after arriving in the United States. Jose and his wife have not filed their adjustment of status (Form I-485) applications yet because their priority date is not "current" per the U.S. visa bulletin. Due to the FRP FRN, Jose and his wife's parole and work authorization will be prematurely terminated on January 14, 2026.

41. Plaintiff **Luciana Doe** is a national of Colombia who lives with her young daughter in Arlington, Texas, close to Luciana's Lawful Permanent Resident parents and U.S. citizen siblings. Luciana entered the United States through the FRP process for Colombians in February 2024, after the U.S. government invited Luciana's sister to apply to sponsor Luciana through the process. They were given a three-year period of parole. After over a decade of living apart, Luciana and her daughter joyfully reunited with their family in Arlington and have been thriving ever since. However, the government's announcement of the upcoming termination of FRP and accompanying revocations of current grants of parole threaten to throw their lives into chaos and force them to return to a country where they are not safe and have nothing remaining for them. Luciana has not yet filed her adjustment of status application because her priority date is not current. Due to the FRP FRN, Luciana's parole and work authorization will be prematurely truncated on January 14, 2026.

42. Plaintiff **Francisca Doe** is a national of Guatemala currently living in Lynn, Massachusetts with her husband and three children. Francisca Doe and her family were all given a three-year grant of parole under the FRP process for Guatemalans. They are the beneficiaries of an I-130 family-based visa petition that Francisca's mother, a U.S. citizen, filed in 2012, which was approved in 2013. Ten years later, in August 2023, Francisca's mother received an invitation to sponsor Francisca and her family for the FRP process. After completing all the required

paperwork and steps, Francisca and her family were approved to travel to the United States through the FRP process in June 2024. In August 2024, they arrived in the United States and were granted a three-year period of parole through August 2027. In December 2025, Francisca and her family's priority date on their visa applications became current. However, in the midst of preparing their adjustment of status (Form I-485) applications, the government announced their plans to terminate the FRP processes and individual grants of parole on January 14, 2026 unless individuals filed an adjustment of status application before December 15, 2025. Francisca and her family scrambled to complete and mail their adjustment of status applications on December 15. About a week later, Francisca received confirmation from USCIS that her I-485 applications were not accepted in time.

43. Plaintiff **John Doe** is a national of El Salvador currently living and working in Houston, Texas. John came to the U.S. through the FRP process for El Salvador via his father, a United States citizen, who filed an I-130 family-based petition for John that was approved in October 2019. In July 2023, John's father received an invitation from the U.S. government to sponsor John for the FRP process. After completing all required forms and procedures, John received travel authorization in January 2024. John arrived in the U.S. and was granted parole in March 2024 for a three-year period through March 2027. John has not filed his adjustment of status application yet because his priority date is not current. Due to the FRP FRN, John's parole and work authorization will be prematurely terminated on January 14, 2026.

44. Plaintiff **Haitian Bridge Alliance ("HBA")** is a Haitian-led, Haitian Creole-speaking grassroots and community-based nonprofit organization incorporated in California. HBA was formed in early 2016 to meet the needs of an influx of Haitian and other Black migrants that came to the U.S.-Mexico border seeking humanitarian protection as conditions in their home countries deteriorated. HBA's core organizational activities have included, since the inception of

the CHNV parole process for Haiti, providing direct services and support to thousands of CHNV sponsors and parolees from Haiti as well as some for FRP. These services include legal consultations for CHNV parolees, assistance completing CHNV sponsorship applications, humanitarian and integration support for parolees once they arrive, and other aid. Defendants' termination of the parole processes, premature termination of grants of parole, and suspension of processing immigration benefit applications filed by parolees have directly interfered with these core activities.

45. Defendant **Kristi Noem** is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025. Until she was confirmed, Benjamine C. Huffman served as the Acting Secretary of Homeland Security from the time when President Trump appointed him to that position on January 20, 2025.

46. Defendant **Todd M. Lyons** is sued in his official capacity as the Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS. Mr. Lyons has been in this role since approximately March 9, 2025.

47. Defendant **Rodney Scott** is sued in his official capacity as the Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS. Mr. Scott was narrowly confirmed for this position by the Senate in June 2025.

48. Defendant **Joseph B. Edlow** is sued in his official capacity as the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS. Mr. Edlow was narrowly confirmed for this position by the Senate in July 2025.

49. Defendants Noem, Lyons, Scott, and Edlow collectively are referred to below as the **Agency Defendants**.

50. Defendant **Donald J. Trump** is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

## BACKGROUND

### The Statutory Parole Authority

51. Parole is a temporary form of permission for a noncitizen to be in the United States. 8 U.S.C. § 1182(d)(5); *see also* 6 U.S.C. § 202(4) (provision of the Homeland Security Act referring to parole as a "form[ ] of permission . . . to enter the United States"). Parole does not itself lead to any other form of immigration status, although while here on parole, nothing prevents parolees from applying for any other immigration status for which they are eligible. Many parole recipients have applied for asylum pursuant to 8 U.S.C. § 1158, temporary protected status pursuant to 8 U.S.C. § 1254a, or other forms of status adjustments. Under longstanding regulations, many parolees can apply for employment authorization.

52. Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5)(A), states that "the Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."

53. Congress has never defined "case-by-case," "urgent humanitarian reasons," or "significant public benefit," or delineated with further specificity the circumstances under which the Executive may grant parole, apart from what is encompassed by the clause, "except as provided in subparagraph (B) or in section 1184(f) of this title," discussed more below.

54. The executive's authority to parole individuals into the country was originally codified in Section 212(d)(5) of the 1952 INA, which established that "[t]he Attorney General may

in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States."

55. Congress did not define the terms "emergent" or "public interest" and did not modify the wording of the parole provision until 1980.

56. Between 1952 and 1980, lacking a permanent statutory provision specifically providing for the entry of refugees, the Executive frequently used the parole authority to facilitate the entry of refugees in a programmatic manner—i.e., by defining a group, typically by nationality plus additional factors, whose entry could be justified by emergent or public interest reasons–with applications of individuals therein considered on a case-by-case basis.

57. The first such use was in 1956, when President Dwight D. Eisenhower directed the Attorney General to parole into the country approximately 30,000 Hungarian refugees who had fled during that country's revolution.

58. There is no comprehensive accounting of "programmatic" or "categorical" uses of parole, but in the approximately seventy years since this original such use by the Eisenhower Administration, there have been at *least* another 125 categorical parole programs, usually with multiple parole programs operating at the same time throughout that period, and during every single Administration, including the first Trump Administration.

59. In 1980, Congress passed the Refugee Act, which established for the first time a specific, permanent legal process to admit people to the United States as refugees.

60. In passing the Refugee Act, and in recognition of the fact that refugees now had a unique legal pathway to the United States, Congress added a restriction to the parole authority, codified in subparagraph (B), 8 U.S.C. § 1182(d)(5)(B), prohibiting the Attorney General from

paroling a refugee into the United States "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

61. The conference report adopted by both chambers accompanying the final legislation explained that § 1182(d)(5)(B) "does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees."

62. Similarly, since it was enacted, the federal officials exercising the parole authority have consistently interpreted § 1182(d)(5)(B)'s restriction as applying only to noncitizens who have already been determined by the U.S. government to be refugees.

63. Congress next amended the parole statute in 1990 to prohibit granting parole to noncitizens to perform certain work aboard a vessel or aircraft on an air carrier during a labor dispute where there is a strike or lockout unless the parole "is necessary to protect the national security of the United States." Pub. L. No. 101-649, § 202, 104 Stat. 4978, 5014 (1990) (codified at 8 U.S.C. § 1184(f)); *see also* 8 U.S.C. § 1182(d)(5)(A) (authorizing parole "except as provided . . . in section 1184(f) of this title.").

64. Congress last amended the parole authority in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").

65. IIRIRA made just one textual change to the parole statute, striking from § 1182(d)(5)(A) the language allowing the Attorney General to grant parole "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest" and replacing it with language allowing the Attorney General to grant parole "under such

conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

66. In addition to that textual change to the parole statute, IIRIRA contained three other provisions related to exercises of the parole authority. In one, Congress required that the Attorney General annually report to the Judiciary Committee of each chamber the "number and categories of [noncitizens] paroled into the United States."

67. In another section of IIRIRA, Congress directed that parolees who had been in the United States at least a year and had not become lawful permanent residents must be counted against per-country numerical caps on family-sponsored immigration.

68. Finally, IIRIRA also directed the Attorney General to give green cards to Polish and Hungarian noncitizens who had been paroled into the United States through a categorical parole program that operated over a roughly two-year period ending at the end of 1991.

69. As Congress worked on the legislation that eventually became IIRIRA, the House Judiciary Committee criticized the "categorical" use of parole and asserted that such use of the parole authority was *ultra vires*. It therefore proposed to narrow the substantive grounds on which parole could be granted to specify that the only "humanitarian reason" that parole could be granted involved medical emergencies, and the only "public benefit" that would warrant parole involved assisting U.S. law enforcement.

70. Before the bill was brought to the House floor, however, the Judiciary Committee's language restricting parole was removed, and the legislation that ultimately was signed into law as IIRIRA left undefined the substantive criteria on which parole could be granted.

71. Since the 1996 passage of IIRIRA, both Republican and Democratic administrations have created and administered parole programs to allow the parole of individuals within broadly defined classes, for example:

- Cuban and Haitian beneficiaries of approved family-based immigration petitions awaiting visas (2007-present);
- Haitian children orphaned by the 2010 earthquake in that country (2010);
- Cuban medical professionals in third countries conscripted by the Cuban government (2006-2017);
- Chinese and Russian nationals seeking to visit the Commonwealth of the Northern Mariana Islands and Guam for business or pleasure (2009-19);
- family members of U.S. military service members (2013-present);
- minor children from El Salvador, Guatemala, and Honduras with family in the United States (2014-17; 2021-present); and
- family members of Filipino World War II veterans (2016-present).

72. Consistent with ratifying the view that categorical parole was authorized, both before and after the passage of IIRIRA—and in addition to in IIRIRA itself, as discussed above regarding Polish and Hungarian parolees—Congress has repeatedly passed legislation extending various benefits and services to individuals who obtained parole via a "categorical" parole process, in some cases making benefits available prospectively to individuals who would in the future be paroled pursuant to such processes. For instance, most recently, Congress enacted legislation extending resettlement support services (normally provided only to refugees) to Ukrainians paroled under U4U and Afghans paroled under OAW, for the duration of their period of parole and any re-parole.

73. The parole authority has enabled administrations to serve urgent humanitarian needs and advance the significant public benefit of promoting the national interest through

achieving humanitarian, human rights, anti-trafficking, foreign policy, and regional security goals, among others.

**Uniting for Ukraine ("U4U")**

74. On February 24, 2022, Russia invaded Ukraine, beginning a war that continues to this day.

75. In the weeks following Russia's invasion, thousands of Ukrainians traveled to Mexico and presented themselves at U.S. ports of entry to request humanitarian protection, as is their right under international and U.S. law. *See, e.g.*, 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum . . . .").

76. At its peak, CBP encountered up to 1,300 Ukrainians per day along the southern border; that surge strained its operations and required diverting personnel to increase processing capacity.

77. Most Ukrainians who arrived at the southern border during this period—some 20,000 people—were paroled into the country, due at least in part to a lack of detention space. Most received an initial grant of one year of parole.

78. Every Administration, including the first Trump Administration, has used parole in this way to process applicants for admission, particularly when there is a lack of detention space.

79. In response to this surge of Ukrainians at the border and the accompanying strain on CBP, President Biden announced in March and April 2022 a variety of humanitarian commitments to the Ukrainian people, including establishing the Uniting for Ukraine parole process. *See Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25040 (Apr. 17, 2022). The Federal Register Notice for the U4U parole process cites destruction to civilian

infrastructure, ongoing concerns about food security, a lack of medicine and health supplies, rampant sexual exploitation and abuse, continuing violence, and large-scale displacements of Ukrainians as reasons for the establishment of the parole process.

80. Uniting for Ukraine is a process by which Ukrainians who have a U.S.-based sponsor committed to providing for their financial support can apply to be considered, on a case-by-case basis, for a grant of parole, typically for two years.

81. U4U was created so that eligible Ukrainians could request consideration for parole without having to travel to Mexico and present at the southern border, which can be dangerous for the individuals and further strains CBP resources.

82. Permitting Ukrainians to apply in advance also benefitted the U.S. government by making it possible to conduct security checks on the individuals before they travel.

83. Uniting for Ukraine applicants who meet the eligibility requirements, pass security checks, and warrant a favorable exercise of discretion are granted authorization to travel directly (via flight) to the United States, where they are inspected and undergo further security checks before CBP makes the final determination of whether to grant parole.

84. There is no fee associated with initial applications for parole under Uniting for Ukraine, but applicants must comply with all pre-travel requirements—including public health requirements—at no cost to the United States and likewise must pay for and arrange their own travel.

85. Once approved to travel to the United States, prospective U4U parolees fly directly to an airport in the interior of the United States, which avoids the disorderly process at the border—and concomitant impact on border communities and states—that was otherwise occurring because of Russia's invasion of Ukraine.

86. Like the U4U parolees, potential U4U sponsors undergo security checks; they also must prove their own lawful status and that they have sufficient financial resources to receive, maintain, and support the intended beneficiaries for the duration of their parole period.

87. In February 2024, USCIS announced the process by which U4U parolees could apply for re-parole, once they had less than six months left on their initial grant of parole. In addition to meeting other eligibility requirements, applicants for re-parole under U4U had to pay a fee or obtain a waiver of fees.

88. Per legislation enacted by Congress in May 2022 and April 2024, Ukrainians paroled into the United States between February 24, 2022, and September 30, 2024, are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program—the same services to which OAW parolees are entitled, as discussed below—for the duration of their period of parole and any re-parole.

89. From fiscal year 2022 to fiscal year 2023, the number of Ukrainians encountered by CBP at the southern border dropped *by more than ninety-nine percent*. There were even fewer encounters in fiscal year 2024 than in fiscal year 2023.

90. Most U4U parolees have claims to other forms of immigration relief that would permit them to stay in the United States permanently, including family-based immigration visas and TPS.

91. These paths to permanent immigration status for U4U parolees, however, generally take years to navigate due to how long it takes the Defendant agencies to process the immigration benefit applications.

92. Currently, Ukrainians who have continuously resided in the United States since August 16, 2023 (which would include some U4U parolees) are eligible for Temporary Protected

Status ("TPS"), which generally protects recipients from removal. TPS for Ukrainians is currently set to expire (if not extended) on October 20, 2026.

93. As of the third anniversary of Russia's invasion of Ukraine, approximately 7 million Ukrainians remain externally displaced. Approximately 240,000 of them have been paroled into the United States via U4U. Most Ukrainians here on parole had some preexisting tie to the United States (such as family), which is why they came here for refuge when they fled their home country.

**<u>Parole Processes for Cuba, Haiti, Nicaragua, & Venezuela ("CHNV")</u>**

94. Over the last several years, a significant number of Cubans, Haitians, Nicaraguans, and Venezuelans have been displaced due to natural disasters, economic hardship, and political strife.

95. Today, there are approximately eleven million displaced nationals of those four countries, most of them Venezuelan; twenty percent of Venezuela's population is displaced.

96. Due to events internal to each country, emigration from these four countries accelerated remarkably from 2020 to 2022.

97. Per its data, CBP encountered at the southern border fewer than 18,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2020.

98. Per its data, CBP encountered at the southern border more than 181,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2021.

99. Per its data, CBP encountered at the southern border more than 600,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2022—comprising more than forty percent of all migrants CBP encountered at the border that year.

100. The marked increase in the number of nationals of these four countries arriving at the southern border put considerable strain on CBP operations, causing it to divert resources and to provide sub-standard care to those migrants.

101. As with the Ukrainians coming to the southern border discussed above, many (if not most) of the Cubans, Haitians, Nicaraguans, and Venezuelans who came to the border during this period were paroled into the United States.

102. In October 2022, the Biden Administration created a parole process for Venezuelans. DHS, *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the success of the Venezuelan parole process, the Biden Administration expanded the parole process for Venezuelans, DHS, *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1279 (Jan. 9, 2023); and created similar parole processes for nationals of Cuba, Haiti, and Nicaragua, DHS, *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1266 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1243 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255 (Jan. 9, 2023).

103. These Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") parole processes were explicitly modeled on the Uniting for Ukraine parole process; like U4U, the rigorous application processes for CHNV parole required passing security checks, having a U.S.-based financial supporter with lawful status who has proven their ability to remain committed to providing for the parolee for the duration of their two-year period of parole, and meeting all pre-travel requirements. The travel itself must be at no cost to the United States.

104. DHS explained in creating the CHNV parole processes that the processes provide significant public benefits by improving vetting for national security and public safety, reducing

the strain on CBP resources and personnel, and minimizing the impact on the United States of irregular migration from these countries.

105. DHS also explained that the parole processes address urgent humanitarian concerns by offering a safe and legal pathway out of dangerous conditions in these four countries as an alternative to the perilous overland journey to the U.S. border.

106. The United States-Mexico border is the world's deadliest land migration route. According to the International Organization for Migration, more than 800 people died attempting to cross the U.S.-Mexico border in 2021; more than 750 in 2022; more than 730 in 2023; but fewer than 500 in 2024.

107. DHS also explained in creating the CHNV parole processes that they further important foreign policy objectives, including the collaborative management of migration in the hemisphere.

108. An important aspect of the CHNV parole processes is that Mexico agreed—for the first time ever—to accept the removal of Cubans, Haitians, Nicaraguans, and Venezuelans who do not follow the CHNV parole processes, which thereby makes them presumptively ineligible for asylum in the United States.

109. For years, the United States has had difficulty removing nationals of those four countries because of their home countries' refusals to accept the deportees.

110. As part of CHNV, Mexico agreed to accept up to 30,000 (combined) deported nationals of these countries each month.

111. The CHNV processes allowed up to 30,000 parolees from the four countries combined to come to the United States each month.

112. The demand for CHNV parole was extraordinary; USCIS received more than 1.5 million applications from potential sponsors in just the first three or four months that the processes were available.

113. Per legislation enacted by Congress, Cubans and Haitians paroled into the United States are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program.

114. Per the Cuban Adjustment Act, as amended, Cubans paroled into the United States can become lawful permanent residents after being in the country for a year.

115. Per a CBP statement on January 14, 2025, CBP encounters of CHNV nationals attempting to cross the southern border unlawfully were down ninety-one percent since the CHNV processes were created.

116. Similarly, following a bench trial, Judge Tipton of the Southern District of Texas held that the State of Texas did not have standing to challenge the CHNV processes because these processes led to a decrease in Texas's claimed injuries by reducing the overall number of migrants from these countries coming to Texas, which was the source of Texas's claimed injuries.

117. Most CHNV parolees have claims to immigration relief that would permit them to stay in the United States, including family-based immigration visas and asylum.

118. These paths to permanent immigration status for CHNV parolees, however, generally take years to navigate recently due to how long it takes the defendant agencies to process the immigration benefit applications.

119. For example, although Congress has directed DHS to issue final decisions on asylum claims within 180 days of receiving each application absent "exceptional circumstances,"

8 U.S.C. § 1158(d)(5)(iii), most asylum applicants are currently waiting years to get an initial decision.

120. Currently, Venezuelans who have continuously resided in the United States since July 31, 2024 (including some Venezuelans who received parole through CHNV) are eligible for TPS; approximately 33,600 CHNV parolees from Venezuela have been granted TPS.

121. On January 10, 2025, Secretary of Homeland Security Ali Mayorkas extended TPS for Venezuelans until October 2026, but on January 28, 2025, Secretary Noem purported to vacate that extension and then, on February 1, 2025, Secretary Noem decided to terminate one of the two TPS designations for Venezuelans. Secretary Noem's February 1 decision was based on her conclusion that the continued presence of the approximately 350,000 Venezuelans with TPS under that designation is contrary to the national interest of the United States. DHS, *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025). Secretary Noem's unprecedented vacatur of the TPS extension for Venezuelans is being separately litigated in multiple cases on the ground (among others) that the TPS statute does not authorize such actions.

122. Currently, Haitians who have continuously resided in the United States since June 3, 2024 (including some Haitians who received parole through CHNV) are eligible for TPS. In June 2024, Secretary Mayorkas extended TPS for Haitians until February 3, 2026, but on February 20, 2025, Secretary Noem again acted in an unprecedented fashion by purporting to reduce the time remaining for Haitian TPS by six months, such that it now expires on August 3, 2025. DHS, *Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti*, 90 Fed. Reg. 10511 (Feb. 24, 2025).

123. Approximately 532,000 Cubans, Haitians, Nicaraguans, and Venezuelans received parole through CHNV.

**Operation Allies Welcome ("OAW") for Afghan Allies**

124. Operation Allies Welcome grew out of the U.S. military's chaotic 2021 withdrawal from Afghanistan.

125. As Afghanistan's military and government quickly fell to the Taliban when the U.S. military withdrew, the U.S. government hastily evacuated approximately 124,000 people from Afghanistan, mostly on military cargo jets. Evacuees included U.S. citizens and lawful permanent residents, nationals of allied countries, and Afghans whose lives were at risk due to their service to the United States (such as interpreters).

126. After medical, security, and other screenings in third countries, approximately 75,000 Afghans were eventually brought to the United States on parole through OAW.

127. Most OAW parolees were (and remain) eligible for a congressionally-created Special Immigrant Visa ("SIV") based on having provided "faithful and valuable service" employed by or on behalf of the U.S. Government or the International Security Assistance Force or a successor mission in certain capacities in Afghanistan.

128. Many other OAW parolees are eligible for other forms of immigration relief—like family-based immigrant visas and asylum—that would likewise give them permanent lawful status in the United States.

129. These paths to permanent immigration status for OAW parolees, however, generally take years to navigate, due mostly to how long it takes the defendant agencies to process the immigration benefit applications. The federal government has been subject to a class-wide injunction against unreasonable delays in adjudicating Afghan SIV applications since early 2020

and a similar class-wide settlement agreement addressing the unreasonable delays in adjudicating asylum applications of Afghan OAW parolees since September 2023.

130. In September 2021, Congress enacted the Afghanistan Supplemental Appropriations Act, Public Law 117-43. Among other things, it instructed DHS to adjudicate asylum applications filed by OAW parolees expeditiously, and to issue final decisions within 150 days of receiving each application, absent "exceptional circumstances."

131. That Act also made OAW parolees—including those who had yet to be paroled—eligible for resettlement support services typically provided to refugees resettled in the United States through the U.S. Refugee Admissions Program until the later of March 31, 2023, and the end of their parole term. Those services include cash and medical assistance, employment preparation, job placement, and English language training. That Act also appropriated supplemental funds for USCIS and Health and Human Services to carry out these directives.

132. To date, approximately 20,000 OAW parolees have been granted asylum; fewer than 100 parolees' asylum applications have been denied.

133. Currently there are approximately 1,300 OAW parolees with pending asylum applications; on average, those applications have been pending for more than 600 days.

134. Afghans who have continuously resided in the United States since September 20, 2023 (including Afghans brought here through Operation Allies Welcome) are currently eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. Unless extended by the Secretary of Homeland Security, however, TPS for Afghans will expire on May 21, 2025.

135. In 2023, the federal government determined that "Afghans paroled under Operation Allies Welcome ("OAW"), or those paroled then subsequently granted Temporary Protected

Status ("TPS"), could request U.S. Government-supported family reunification support for their spouses and unmarried children under 21 years of age" who remain physically present in Afghanistan.

136. Afghans paroled through OAW were initially given two-year grants of parole. There was no formal application process for initial grants of parole through OAW, but in June of 2023, DHS announced a re-parole process for OAW parolees, under which they may apply for an extension of up to two years.

137. Globally, approximately 11 million Afghans are currently displaced due to the conditions in their home country, most of them in Iran (4.5 million) and Pakistan (3.1 million). Fewer than 50,000 Afghans are in the United States on current grants of parole by virtue of OAW.

**Family Reunification Parole for Colombian, Cuban, Ecuadorian, Guatemalan, Haitian, Honduran, and Salvadoran Beneficiaries of Approved I-130 Petitions ("FRP")**

138. Ever since the George W. Bush administration established a Cuban Family Reunification parole process in 2007, the United States has had country-specific family reunification parole processes that allow the beneficiaries of approved I-130 petitions for family-based immigrant visas to be paroled into the United States. The grant of parole allows these beneficiaries to reunite with their sponsoring family member in the United States while they wait for their immigrant visa to become available. Each of the processes has been justified on both statutory bases for parole: urgent humanitarian reasons and significant public benefits.

139. Under the family-based immigrant visa system that Congress has devised, a U.S. citizen or lawful permanent resident ("LPR") must first file a petition (Form I-130, "Petition for Alien Relative") to establish that they have a family relationship with a relative abroad that makes the relative eligible for a family-based immigrant visa. Once that petition is approved, the relative abroad can then apply for an immigrant visa—if one is available.

140. U.S. citizens can file petitions for immediate relatives (spouses, unmarried children under age 21, and parents of U.S. citizens who are themselves at least age 21) in unlimited numbers; visas for other relatives of U.S. citizens may be immediately available. Other relatives of U.S. citizens and all relatives of eligible LPRs are subject to a numerically limited system of tiered preference categories and country-specific caps.

141. Due to backlogged demand for the numerically limited visas, some prospective immigrants have to wait years after their I-130 petitions are approved for a visa to become available. Each such individual has a "priority date" (typically the date the I-130 petition was filed); they know their visa is available when it becomes "current" under the monthly State Department Visa Bulletin. Once their priority date is current, those abroad can go through consular processing to receive their visa and are then admitted to the United States as LPRs. Those already in the United States can apply to adjust to LPR status by filing a Form I-485.

142. The chart below shows the current visa backlogs for the seven FRP countries (based on the December 2025 State Department Visa Bulletin), in order of current implied estimated wait:

| Category | Description | Current Priority Date | Current Implied Estimated Wait[2] |
|---|---|---|---|
| F2A | Spouses and unmarried children under 21 of LPRs | Feb. 1, 2024 | 1.8 years |
| F1 | Unmarried adult (age 21 or older) children of U.S. citizens | Nov. 8, 2016 | 9.0 years |
| F2B | Unmarried adult (age 21 or older) children of LPRs | Dec. 1, 2016 | 9.0 years |
| F3 | Married children of U.S. citizens | Sept. 8, 2011 | 14.2 years |

[2] Implied wait times are only estimates because they measure current backlog depth (age of current priority dates), not how fast the dates advance, which varies month to month based on visa usage, demand, and per-country limits, and can even retrogress.

| | | | |
|---|---|---|---|
| F4 | Siblings of adult (age 21 or older) U.S. citizen | Jan. 8, 2008 | 17.8 years |

143. These implied wait times can be off wildly for a variety of factors; over the last twenty years, the implied estimated wait times for F1, F2B, F3, and F4 visas for the FRP countries have been systematically underestimated by two to nine years each.

144. Even when a priority date is "current," that indicates only that a visa number is available, and not actual processing capacity, which varies significantly by country and over time. Under normal conditions, it typically takes 12 to 18 months from a priority date being "current" to visa issuance.

145. The family reunification parole processes allow a U.S. citizen or lawful permanent resident with an approved I-130 petition to sponsor their family members who are abroad for parole into the United States for the last few years before their priority date is current. Instead of having to wait abroad, often in precarious situations, for an immigrant visa to become available, a noncitizen family member who receives parole may reunite and be together with their sponsor (the U.S. citizen or LPR I-130 petitioner) in the safety of the United States while waiting the last few years before their priority date becomes current.

146. The Federal Register Notice for the original ("legacy") Cuban Family Reunification Parole process explained that its "purpose is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration." *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65588 (Nov. 21, 2007). It also explained that the family reunification parole process would also provide a significant public benefit because it would "enable[] the United States to meet its commitments under the [U.S.-Cuba] Migration Accords," which had become more difficult when the Cuban

government put restrictions on prior "categorical" parole processes for Cubans that began in the 1990s. *See id.* (explaining that the Cuban government recently had blocked new registrations for the parole "lotteries" established by the U.S. government).

147. Starting in 2015, applicants to the Cuban Family Reunification Parole process have been required to pay a fee (or be eligible for and submit a fee waiver request). *Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program*, 79 Fed. Reg. 75579, 75581 (Dec. 18, 2014).

148. Under this "legacy" Cuban Family Reunification Parole process, beneficiaries were required to undergo an in-person interview. USCIS continued to interview pending legacy Cuban Family Reunification Parole beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was "paused" after President Trump's inauguration. 90 Fed. Reg. at 58035 n.14; *id.* at 58038 & n.49. At that time, there were more than 15,000 applications to the legacy Cuban Family Reunification Parole process pending.

149. In 2014, the United States created a similar family reunification process for Haitians. *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75581 (Dec. 18, 2014). The Federal Register Notice for this original ("legacy") Haitian Family Reunification Parole process explained that it "is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake." *Id.* at 75581. The notice explained that it would address urgent humanitarian conditions in Haiti while "promoting family unity," and additionally would provide "a significant public benefit by promoting safe, legal, and orderly migration into the United States." *Id.* at 75582.

150. Under this "legacy" Haitian Family Reunification Parole process, beneficiaries were required to undergo an in-person interview and could be paroled "up to approximately two years before their immigrant visas become available." 79 Fed. Reg. at 75581.

151. The United States adopted a similar parole process in 2016 to assist in the family reunification of Filipino veterans who fought for the United States during World War II. *Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 28097 (May 9, 2016).

152. In August 2019, USCIS under the first Trump Administration stated that it would be ending the Haitian Family Reunification Parole and the Filipino World War II Veterans Parole processes. USCIS stated that then-current parolees would be allowed to keep their grants of parole until expiration and that it would finish processing pending applications to completion.

153. Approximately fifteen months later, USCIS published a notice in the Federal Register requesting comments on proposed changes to Form I-131 (used to request parole), including by removing from it the ability to apply through the Haitian Family Reunification Parole and Filipino WWII Veterans Parole processes. 85 Fed. Reg. 84362 (Dec. 28, 2020). USCIS explained that publication of the revised form after close of the comment period would terminate those two family reunification parole processes because it "ha[d] determined that, as a matter of policy, the HRFP and FWVP programs do not meet DHS's obligation to narrowly exercise its parole authority." *Id.* at 84363.

154. The December 2020 notice of proposed termination of the Haitian Family Reunification Parole and Filipino WWII Veterans Parole processes reiterated that USCIS would permit existing parolees to keep their existing grants of parole and again committed to adjudicating all pending applications for the Haitian and Filipino processes until completion, including any

applications postmarked on or before the effective date of the new form, whenever it was finalized (it never was).

155. The December 2020 notice provided further that even after the proposed termination of the Haitian Family Reunification Parole and Filipino WWII Veterans Parole processes, USCIS would continue to adjudicate requests for re-parole under the same standards and terms of the terminated processes in light of the parolees' serious reliance interests. *Id.* ("USCIS will continue to adjudicate requests from current beneficiaries of the HFRP and FWVP programs who are already in the United States under the existing standards of those programs and who request a new period of parole."); *id*. at 84364 ("With respect to current HFRP and FWVP parolees, DHS acknowledges the reliance interest of those aliens who are not yet lawful permanent residents and will make a new period of parole under the criteria of these programs available to them, on a case-by-case basis, to ensure continued eligibility."); *id.* ("Given these reliance interests, DHS will accept requests for re-parole under the existing standards of the HFRP program."); *id.* at 84365 (same regarding FWVP).

156. President Biden was inaugurated less than a month after the December 2020 notice was published, and soon thereafter USCIS announced that it would not be terminating the Haitian Family Reunification Parole or Filipino WWII Veterans Parole processes after all.

157. Similar family reunification processes were created in 2023 for nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras. *Implementation of a Family Reunification Parole Process for Colombians*, 88 Fed. Reg. 43591 (July 10, 2023); *Implementation of a Family Reunification Parole Process for Ecuadorians*, 88 Fed. Reg. 78762 (Nov. 16, 2023); *Implementation of a Family Reunification Parole Process for Guatemalans*, 88 Fed. Reg. 43581 (July 10, 2023); *Implementation of a Family Reunification Parole Process for*

*Hondurans*, 88 Fed. Reg. 43601 (July 10, 2023); and *Implementation of a Family Reunification Parole Process for Salvadorans*, 88 Fed. Reg. 43611 (July 10, 2023).

158. The Federal Register Notices announcing the creation of these five family reunification parole processes each explain that the primary "significant public benefit" of each process is their promotion of family unity. *See* 88 Fed. Reg. at 78765 ("The case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite in the United States with their family members from Ecuador."); 88 Fed. Reg. at 43593-94 (Colombia); 88 Fed. Reg. at 43613-14 (El Salvador); 88 Fed. Reg. at 43583-84 (Guatemala); 88 Fed. Reg. at 43603-04 (Honduras).

159. These Notices identified four other ways that the 2023 FRP processes would provide significant public benefits. One, it would offer safe passage for I-130 beneficiaries who might otherwise feel compelled by difficult circumstances to undertake the dangerous, irregular journey to the U.S. border, by providing a "lawful and timely alternative." 88 Fed. Reg. at 78765. They explained:

> Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants. While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migration in the absence of an alternative near-term, path to come to the United States for family reunification.

(footnote omitted); *accord id.* at 43594 (Colombia); *id.* at 43614 (El Salvador); *id.* at 43604 (Honduras); *id.* at 43584 (Guatemala). Each Notice also explained the country-specific considerations: in Ecuador, rising violence and instability; in Colombia, economic insecurity, high levels of poverty, food insecurity affecting more than fifteen million people, and sexual and

gender-based violence; and in the "Northern Triangle" countries of El Salvador, Guatemala, and Honduras, long-standing political instability, insecurity, and climate change.

160. These five Notices next observed that, when used by beneficiaries who would otherwise attempt to migrate irregularly, the FRP processes result would reduce the strain on DHS resources, because the beneficiary going through the FRP process imposes significantly less of a burden on DHS than the beneficiary coming to the border, "thereby providing a significant public benefit." *See* 88 Fed. Reg. at 78767-78 (Ecuador); *id.* at 43596 (Colombia); *id.* at 43616 (El Salvador); *id.* at 43586 (Guatemala); *id.* at 43606 (Honduras).

161. The penultimate significant public benefit identified by these five Notices is that the parole of I-130 beneficiaries from these specific countries could help address the root causes (or "push factors") of migration from these countries through the remittances that they would send to their families in their home countries. Each FRN detailed the particular role and importance of remittances to each of the five countries. *See* 88 Fed. Reg. at 78768 (Ecuador); *id.* at 43595 (Colombia); *id.* at 43615 (El Salvador); *id.* at 43585 (Guatemala); *id.* at 43605 (Honduras).

162. The final significant public benefit identified by these five 2023 FRNs is that they would serve the United States foreign policy interests. *See* 88 Fed. Reg. at 78766 (Ecuador); *id.* at 43594-96 (Colombia); *id.* at 43614-16 (El Salvador); *id.* at 43584-86 (Guatemala); *id.* at 43604-06 (Honduras).

163. Also in 2023, the processes for Cuba and Haiti were "modernized." *Implementation of Changes to the Cuban Family Reunification Parole Process*, 88 Fed. Reg. 54639 (Aug. 11, 2023); *Implementation of Changes to the Haitian Family Reunification Parole Process*, 88 Fed. Reg. 54635 (Aug. 11, 2023). The Notices thereof explained that "[t]he Secretary has authorized these updates" to the processes "in light of technological advancements and process efficiencies

created since" each process was created, including with regards to vetting. 88 Fed. Reg. at 54639 (Cuba); *id.* at 54635 (Haiti).

164. For each of the Family Reunification parole processes (including the legacy Cuban and Haitian processes), qualifying sponsors must first receive an invitation from the State Department before they can apply to sponsor their family members abroad. By definition, and as described above, every sponsor has on file an I-130 petition that USCIS has approved. The State Department's invitation goes only to the I-130 petitioner, who may only sponsor for parole the beneficiary of an approved I-130, to include the beneficiary's spouse and unmarried children under age 21 (as derivative beneficiaries), if listed in the petition or added on later after the marriage or birth (as add-on derivative beneficiaries).

165. In deciding who to invite to apply for the 2023 FRP processes—and reflecting that a grant of parole would be a bridge to a green card—the federal government considered three criteria: "operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice." 88 Fed. Reg. at 78768 (Ecuador); *accord id.* at 43606 (Honduras); *id.* at 43586 (Guatemala); *id.* at 43616 (El Salvador); *id.* at 43596 (Colombia); *id.* at 54641 (Cuba); *id.* at 54637 (Haiti) ("USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I-130.").

166. There were no filing fees under the 2023 FRP processes, but beneficiaries were required to fly to an interior port of entry to be considered for an initial three-year grant of parole. If paroled, they can also request employment authorization.

167. The 2023 FRP processes also required sponsors to use the same Form I-134A used in the other two sponsor-based parole processes, CHNV and U4U parole processes. That sponsorship application requires U.S.-based sponsors to show that they can financially support their parole beneficiaries during their parole period.

168. Unlike the other sponsor-based parole processes, the FRP processes required beneficiaries to undergo a medical examination by a panel physician—that is, a doctor from a list chosen by the local U.S. embassy—prior to traveling to a port of entry, and at their own expense. The results of those medical examinations were uploaded and used for additional vetting. 90 Fed. Reg. at 58041-42.

169. If the sponsorship application is approved, the beneficiary will receive advance authorization to travel to the United States. The beneficiary must travel to the United States by commercial airline within 90 days of receiving their travel authorization. At the port of entry, CBP inspects and interviews the beneficiary, collects biometrics, conducts additional vetting, and grants parole, if warranted, on a case-by-case basis.

170. Re-parole has been available under the FRPs, including the "legacy" processes, and particularly when needed to provide a bridge to the filing of the adjustment of status application, and without requiring the parolees to re-prove that their unchanged circumstances meet the statutory parole standard.

171. Unlike other nationalities, the Cuban Adjustment Act of 1966 lets Cuban parolees file for adjustment of status to lawful permanent resident after being physically present in the United States for just one year, even if they do not meet the typical requirements for adjustment of status.

172. According to the December 15, 2025 Federal Register Notice terminating the FRP processes (the "FRP FRN," discussed more below), "a total of 35,666 FRP invitations were issued over the life of the modernized FRP programs," with the most recent invitation sent in June 2024. 90 Fed. Reg. at 58037 n.50. The FRP FRN does not provide per-country numbers regarding the modernized FRP processes, although it notes that DHS has that data. *See id.* at 58037 n.45.

173. Of the 35,666 U.S. citizens and LPRs with approved I-130 petitions who were invited to participate in the 2023 FRP processes, a total of 10,608 (about 30 percent) chose to do so prior to January 28, 2025, by filing a Form I-134A requesting that the beneficiary of their approved I-130 petition be considered for parole. *Id.* at 58037 & n.50. DHS has not accepted such requests since January 28, 2025. *Id.* at 58041 n.85; Doc. No. 24-44.

174. The 2023 FRP processes required applicants to file a separate I-134A for the principal beneficiary of their approved I-130 petition (e.g., the married child of a U.S. citizen) and each derivative spouse or child beneficiary (e.g., the children of that married child of the U.S. citizen). *See, e.g.*, 88 Fed. Reg. at 78768-69. In total, the 10,608 FRP sponsors filed approximately 35,700 Form I-134As, 90 Fed. Reg. at 58037 & n.50, 58039—an average of 3.3 forms each, meaning the typical FRP participants were family units rather than individuals.

175. Of those 35,700 I-134As for FRP parole filed since July 2023, approximately 19,500 were "confirmed," approximately 15,450 "non-confirmed," and approximately 420 were pending review as of December 15, 2025. *Id.* at 58039. The FRP FRN does not break down the non-confirmations by reason, but given the program requirements, the most common non-confirmations were likely that the U.S. citizen or LPR supporter could not prove that they would be able to financially support all of their principal and derivative beneficiaries over the full period

of their parole. *See id.* at 58039 n.67 & 58041. More generally, the FRP processes had stricter eligibility requirements than the other supporter-based parole processes.

176. Of the approximately 19,500 I-134As "confirmed" by USCIS, CBP received 16,976 requests for advance travel authorization ("ATA"). *Id.* at 58039. As of January 20, 2025, those ATA requests had resulted in CBP granting 14,069 noncitizens parole through the 2023 FRP processes (including the "modernized" processes for Cubans and Haitians). *Id.* at 58037 n.45.

177. The first parolee granted parole under the "modernized" FRP processes arrived in the United States in November 2023, and the most recent arrived in January 2025. As noted *supra*, each FRP parolee was granted a term of parole of approximately three years from their entry.

178. As of April 2, 2025, there were 1,852 Cubans and 108 Haitians with "valid parole" under their respective "legacy" parole processes. *Id.* The December 15, 2025 FRP FRN states that "currently" there are approximately 1,060 Cubans and 100 Haitians with active grants of parole under the "legacy" processes. *Id*. at 58043.

**<u>Military Parole-in-Place ("MPIP")</u>**

179. The Obama administration established a Military "Parole in Place" ("Military PIP") process through a USCIS Policy Memorandum that it adopted in late 2013 (the "2013 Memorandum") to formalize a practice initiated in 2007. Under the Military PIP process, active-duty military personnel, selected reserve members, and veterans can apply to sponsor for parole their spouses, children, and parents who are already physically present in the United States without inspection or admission. The grant of "parole in place"—so named because the sponsored family members are already in the country—enables the immediate family members of U.S. military personnel to become eligible to adjust status in the United States and thus to become lawful U.S. permanent residents.

180. The first instance of granting military parole in place occurred in 2007, when after significant media coverage and public pressure, DHS Secretary Michael Chertoff ordered the parole in place of a military spouse who was facing deportation while her U.S. military husband was missing in action in Iraq.

181. Military families subsequently began to seek humanitarian parole under the INA's parole provision, but doing so was an *ad hoc* process, with no clear guidance from the military or from USCIS about how to apply, and adjudications were inconsistent. Parole was granted on a discretionary basis to military family members, but only in about one in every three cases. In a 2010 letter to DHS Secretary Janet Napolitano, a coalition of 18 Republican and Democratic Members of Congress urged the Secretary to "use all the power at your disposal" to "address the immigration needs of our soldiers," citing the example of a U.S. army lieutenant who refrained from volunteering for combat deployment for fear of losing his wife to deportation.

182. In establishing the Military Parole in Place process, the 2013 Memorandum's stated purpose was to "ensure consistent adjudication of parole requests" made by U.S. military service members.

183. The Memorandum noted that "[m]ilitary preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents, and children."

184. The Memorandum similarly noted that "our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them."

185. Noting that parole is one of the "discretionary tools" available to "minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents, and children of military members," the Memorandum amended the USCIS Adjudicator's Field Manual to advise that "parole in place would generally be an appropriate exercise of discretion" for the spouse, child, or parent of a U.S. military servicemember, because the fact that the intended parole beneficiary is an immediate family member of a servicemember "ordinarily weighs heavily in favor of parole in place."

186. Amid public reports in 2019 that the first Trump administration was considering eliminating the Military Parole in Place process, Congress included a provision in the National Defense Authorization Act of 2020 that expressed the sense of Congress that "parole reinforces the objective of military family unity" and expressly directed the Secretary of Homeland Security to "consider, on a case-by-case basis, whether granting [a request for parole-in-place by a member of the Armed forces] would enable military family unity that would constitute a significant public benefit."

187. Reliable statistics regarding the number of individuals who receive Military Parole in Place are not publicly available.

**Central American Minors ("CAM")**

188. CAM was created in 2014 to permit certain nationals of the Northern Triangle countries of El Salvador, Guatemala, and Honduras who are lawfully present in the United States to request that their children still in their home countries be considered for refugee status and humanitarian parole so that the families could be reunited.

189. CAM's creation was prompted by a surge in unaccompanied children from the Northern Triangle countries coming to the U.S.-Mexico border.

190. In addition to family reunification, the CAM program was intended to create a safe and lawful pathway toward family reunification to disincentivize children from making the overland journey to the southern border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the border create unique operational challenges for DHS.

191. In 2017, DHS under the first Trump Administration gave notice that it was ending the CAM parole process. *Termination of the Central American Minors Parole Program*, 82 Fed. Reg. 38926, 38927 (Aug. 16, 2017) ("DHS is rescinding the discretionary CAM parole policy" as a "discretionary change in policy"). That same notice provided: "Although DHS is terminating the CAM Parole Program, individuals who have been paroled into the United States under the CAM Parole program [sic] will maintain parole until the expiration of that period of parole unless there are other grounds for termination of parole under DHS regulations at 8 C.F.R. § 212.5(e). CAM parolees already in the United States also may apply for re-parole." *Id.*

192. In a subsequent lawsuit, the district court held that DHS acted arbitrarily and capriciously in terminating CAM and mass rescinding 2,714 conditional grants of parole to potential beneficiaries who were still in their home countries without considering the relevant reliance interests. *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1089-91 (N.D. Cal. 2018); *S.A. v. Trump*, 2019 WL 990680, at *2, 13 (N.D. Cal. Mar. 1, 2019) (granting preliminary injunction).

193. In 2019, DHS settled that lawsuit and agreed to finish processing those individuals' parole applications until completion, and using the same criteria and policies in place pre-termination. *S.A. v. Trump*, 2019 WL 1593229, at *1 (N.D. Cal. Apr. 12, 2019 ("USCIS agrees to process the approximately 2700 individuals who were conditionally approved for parole prior to the CAM Parole program's termination and then issued rescission notices . . . . Specifically, USCIS

agrees that the conditionally approved beneficiaries shall be processed pursuant to the CAM policies, guidance, and practices in effect on January 1, 2017. . . . The Parties anticipate that as a result of this agreement, most conditionally approved beneficiaries will be paroled into the United States, so long as they and their U.S.-based parents continue to remain eligible, are able to pay the associated costs for medical exams and travel, and desire parole.”).

194. DHS under President Biden restarted CAM in March 2021 and then expanded the eligibility criteria in June of that year, which were again adjusted in 2023.

195. CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

**Summary Termination of Humanitarian Parole Processes**

196. During the 2024 presidential campaign, Donald Trump frequently criticized the aforementioned parole processes, promising as early as November 2023 that he would end them on “day one” of his second term as President.

197. As a candidate and as the current President, Donald Trump has denigrated the CHNV parolees as “illegal,” notwithstanding their lawful grants of parole.

198. On the day he was inaugurated—January 20, 2025—President Trump issued Executive Order 14165, entitled “Securing Our Borders,” that, among other things, directed the Secretary of Homeland Security to terminate all so-called “categorical parole programs,” specifically naming “the program known as the ‘Processes for Cubans, Haitians, Nicaraguans, and Venezuelans’” as one the Secretary must terminate.

199. In another executive order signed that day—Executive Order 14159, entitled “Protecting the American People Against Invasion”—President Trump directed the Secretary of Homeland Security (among others) to “rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States,” including

by "[e]nsuring that the parole authority . . . is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole."

200. And in yet another order signed that day—Executive Order 14161, entitled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats"—President Trump ordered the Secretary of Homeland Security "to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible," which should be "consistent" with the "vetting and screening standards" that were in effect on January 19, 2021—the last full day of President Trump's first term in office.

201. Also on January 20, 2025, then-Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" to the heads of ICE, CBP, and USCIS. Upon information and belief, this memorandum has not yet been made public.

202. In the January 20 Huffman memorandum, the acting secretary authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute."

203. Although fewer than 800 words, the January 20 Huffman memorandum contains multiple errors of law beyond its conclusion that "categorical parole programs" like U4U, CHNV, OAW, FRP, MPIP, and CAM are unlawful.

204. For example, in an attempt to equate lawfully present parolees with "illegal aliens," the memorandum claims that noncitizens who are paroled into the United States are "inadmissible

aliens," have been "found inadmissible," and, after their parole has been terminated, "must be dealt with in the same manner as any other case for admission to the United States involving an alien found inadmissible."

205. But that contention—that parolees are necessarily inadmissible—is wrong. The parole statute allows inadmissible noncitizens to come to the United States, but a grant of parole does not require or necessarily involve a finding of inadmissibility.

206. The January 20 Huffman memorandum also erroneously describes the limitation on parole enacted as part of the Refugee Act, discussed *supra*, that is codified at 8 U.S.C. § 1182(d)(5)(B). The memorandum claims that the limitation in § 1182(d)(5)(B) means that "it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad" as well as "aliens found to have prima facie asylum claims who are being allowed into the United States to await adjudication of those claims."

207. This interpretation departs from every prior Administration's understanding of § 1182(d)(5)(B), which is that it applies to noncitizens who already have been determined to be refugees pursuant to the procedures created by the Refugee Act—and *not* to those who merely have or could have claims to humanitarian relief.

208. This interpretation also departs from past practice. Prior to being paroled into the country, for example, a significant number of Afghan OAW parolees had pending applications for refugee status filed abroad. Parole was used because those applications would have taken years to be adjudicated.

209. Even more starkly, every Administration since at least the 1990s, including the first Trump Administration, has paroled noncitizens found to have prima facie asylum claims into the

United States to await adjudication of those claims. The Supreme Court held that this is a permissible use of the parole statute in *Biden v. Texas*, 597 U.S. 785 (2022).

210. Acting Secretary Huffman's memorandum also misrepresents the statutory parole criteria by adding words that appear nowhere in the statute. Per the statute, parole can be granted "for urgent humanitarian reasons or significant public benefit," but the memorandum claims instead that parole must "either provide[] a significant public benefit to the American public or permit[] the United States to respond to an urgent humanitarian need."

211. The January 20 Huffman memorandum directed that "all future actions taken by DHS with regard to the exercise of the parole authority [be] consistent" with the interpretation of the statute laid out in his memorandum.

212. Acting Secretary Huffman ended his memorandum with a hedge, claiming that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

213. In asserting that he was "also implementing this policy as a matter of my discretion to deny parole in any circumstance," Acting Secretary Huffman's memorandum did not specify anything that he considered in arriving at the allegedly discretionary decision to impose the parole policy reflected in his memorandum.

214. The January 20 Huffman memorandum relied on an erroneous understanding of the parole statute regarding both what the statute authorizes and the nature of the Secretary of Homeland Security's discretionary authority thereunder.

215. Also on January 20, 2025, Acting Commissioner of CBP Pete Flores issued a memorandum (the "January 20 Flores memorandum") restricting the CBP personnel authorized to

grant parole and requiring that each parole granted by any CBP official be reported to him and the Chief of Staff, along with a justification for the grant. The January 20 Flores memorandum expressly supersedes any prior conflicting guidance.

216. Later that same week, then-Acting Director of USCIS Jennifer Higgins issued a directive (the "January Higgins directive") prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the U4U, CHNV, OAW, or other named parole processes.

217. On January 24, 2025, CBP notified airlines of President Trump's executive order to "terminate all categorical parole programs that are contrary to the policies of the United States" and identified the "impacted programs" as "includ[ing]" U4U, CHNV, OAW, FRP, and CAM, among others. CBP warned: "Carriers that transport aliens subject to the Presidential Executive Order may be subject to a carrier fine for each alien brought to the United States."

218. These actions taken by Defendants have, at a minimum, effectively terminated all humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM. Defendants base their actions to terminate these and other humanitarian parole processes, including by refusing to adjudicate pending applications for parole or re-parole through these processes, on their erroneous position that such humanitarian parole processes were and are unlawful.

## Formal Termination of CHNV Parole

219. On March 21, 2025, DHS subsequently made public a Federal Register Notice entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," which was officially published on March 25, 2025. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 11361 (Mar. 25, 2025). Like the January 20 Huffman Memo, the March 25 FRN asserts that "discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly

applicable eligibility criteria." 90 Fed. Reg. at 13612. As of its date of publication on March 25, 2025, the March 25 FRN "terminat[es] the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." *Id.* at 13611.

220. The March 25 FRN also rescinds all grants of CHNV parole, stating that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." *Id.*

221. The March 25 FRN asserts that the Notice serves as "Constructive Notice" of the termination of the CHNV parole processes; "is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance;" and "satisfies the requirement that DHS provide written notice upon the termination of parole." Id. at 13620.

222. Like the January 20 Huffman Memo, the March 25 FRN contends that the CHNV parole processes allow "inadmissible" noncitizens into the United States, and that all individuals paroled into the United States under the CHNV parole processes are "inadmissible." 90 Fed. Reg. at 13611, 13612. But a grant of parole does not require or necessarily involve a finding of inadmissibility.

223. The March 25 FRN offers three main reasons justifying its termination of the CHNV parole processes and its termination of individual grants of parole: that the CHNV parole processes are unnecessary to achieve the current administration's border security goals, 90 Fed. Reg. at 13612; that the "domestic impact of the CHNV parole programs"—namely, "significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs"— "do not warrant continuing to

operate these programs," id. at 13614-13615; and that the CHNV parole processes do not advance the current administration's foreign policy goals, *id*. at 13615.

224. The March 25 FRN further notes that "[e]xpedited removal is available only when an [individual] has not been continuously present in the United States" for at least two years. *Id*. at 13619. As a result, the March 25 FRN justifies the premature termination of individual grants of CHNV parole on the grounds that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal" instead of placing them in expedited removal proceedings.

225. The expedited removal statute, however, can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal, regardless of how long they have been in the United States. *Id.*

226. The March 25 FRN confirms Defendants' intent to terminate humanitarian parole processes for their alleged illegality and make it easier to deport individuals paroled through these processes as quickly as possible: it states that "[f]ollowing this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly [individuals] who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States." *Id*. at 13618. The March 25 FRN adds that "[t]o effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate." *Id*. at 13619.

**Formal Termination of Family Reunification Parole ("FRP")**

227. On December 15, 2025, DHS published a Federal Register Notice entitled *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*. 90 Fed. Reg. 58032 (hereinafter, "FRP FRN"). DHS explained it was terminating the seven FRP processes (as well as the legacy Cuban and Haitian processes) at the direction of President Trump and because they are inconsistent with his "enforcement-based priorities."

228. By way of justification, the FRP FRN asserts that the FRP processes were intended to deter unlawful migration to the United States southwest border and justifies ending the processes because they were not sufficiently effective at achieving that objective.

229. The FRP FRN does not address any of the humanitarian considerations upon which DHS justified the creation of the various FRP processes and scarcely mentions family reunification; nor does it address the country conditions discussed in the various FRNs establishing and modifying the FRP processes for the seven different countries. Instead, the FRP FRN asserts in a footnote merely that "but for the significant public benefit justification, DHS would not have established the FRP programs." 90 Fed. Reg. at 58034 n.11.

230. In addition to terminating these processes prospectively, the FRP FRN announced that DHS would summarily deny all pending applications where the beneficiary had not yet come to a port of entry, no matter the stage of processing.

231. The FRP FRN states that DHS will summarily deny 420 pending Form I-134As (the very beginning of the process), all filed since President Trump re-took office in January 2025; approximately 2,000 cases where the beneficiary is only awaiting travel authorization (the very end of the process); and an unknown number of cases at other processing stages in between.

232. Among the applications that will not be adjudicated were approximately 15,000 parole requests under the "legacy" Cuban family reunification process, which dates to 2007. Unlike the other pending FRP applications, these 15,000 applications were accompanied by filing fees (or a valid fee waiver); those fees started at $360 and went up to $630, depending on the filing date. The FRP FRN states that these filing fees "will not be refunded as USCIS has already expended resources in partially completing their adjudication." 90 Fed. Reg. at 58042. These filing fees paid by Cuban American citizens and LPRs total several million dollars. Secretary Noem describes the reliance interests of the legacy Cuban sponsors are "minimal." *Id.* at 58041.

233. The FRP FRN also says DHS is cutting short the existing grants of parole for most FRP parolees who are already in the country. The FRN states that, "the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date." 90 Fed. Reg. at 58043.

234. According to the FRN, "[t]here are two circumstances" where an FRP parolee's grant of parole will not end on January 14, 2026. *Id.* One is if Secretary Noem "determines otherwise on a case-by-case basis." *Id.* The other is that FRP parolees who filed an adjustment of status application (Form I-485) "before December 15, 2025 that is still pending adjudication as of January 14, 2026" retain their original parole expiration date until it expires or their adjustment of status application is adjudicated, whichever is sooner. *Id.* A denial of their adjustment of status application immediately terminates their grant of parole and they are "expected to depart the United States immediately if they have no other lawful basis for remaining." *Id.*

235. With the exception of Cubans—who can apply to adjust status after one year of physical presence in the United States under the Cuban Adjustment Act—FRP parolees (like other

noncitizens) cannot apply to adjust status until their priority date is current and a visa is available for them. For this reason—and because FRP parolees were paroled into the country to wait here for their priority date to become current—the FRP FRN's exception for parolees with adjustment of status applications filed by December 15, 2025 will likely apply mostly to Cuban parolees who entered the United States before December 2024.

236. The FRP FRN also states that while pending re-parole requests filed by noncitizens paroled under one of the FRP programs will be adjudicated, "facial eligibility under those programs does not entitle [the noncitizen] to re-parole." 90 Fed. Reg. at 58043. "The [noncitizen] still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole." *Id.*

237. The FRP FRN does not acknowledge that in previous attempts to end family-based parole processes—including under President Trump—DHS had permitted existing parolees to keep existing grants of parole *and* could file for re-parole under the same criteria and standards applicable to their initial applications for re-parole, citing their significant reliance interests. *See supra* ¶¶ 152-55, 191.

238. In explaining why she made the decision notwithstanding the reliance interests of FRP parolees, Secretary Noem asserted that in light of the discretionary nature of parole, their reliance interests were "attenuate[d]," were "qualitatively less" than those considered in *DHS v. Regents of the University of California*, and thus "are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists." *Id.* at 58044.

239. In terms of third-party reliance interests, like those of employers and landlords, Secretary Noem dismissed those by stating that "even if DHS had allowed the grants of parole to

expire at the end of their designated terms, such third parties would have experienced the effects of such expiration." *Id.*

240. DHS considered and rejected three alternatives to *en masse* truncation of existing grants of FRP parolee: (1) letting current grants expire and notifying the beneficiary of the consequences of that expiration; (2) "allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available"; and (3) making the mass termination date later than January 14, 2026. 90 Fed. Reg. at 58044.

DHS rejected (1) because of the "significant administrative burden on the agency" and the possibility that it could "generate confusion among parolees." DHS rejected (2) because "permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload borne by DHS and USCIS in processing these cases." DHS rejected (3) because "the path" that "DHS decided to employ" instead "will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs to issues deemed essential to securing our borders and protecting the American people against invasion." *Id.* at 58045.

241. Secretary Noem said that once their parole ends, DHS "intends to promptly remove" the FRP parolees "who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States," and that these parolees "should depart the United States before their parole termination date" or "be removed from the United States subject to a final order of removal." *Id.* at 58043.

242. The FRP FRN asserts that it is "exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy." *Id.* at 58045. It

provides that "[b]y terminating the FRP programs . . . DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority." *Id.*

243. The FRP FRN asserts that its publication in the Federal Register serves as "Constructive Notice" of its contents that "is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Id.* at 58045.

244. The FRP FRN also purports to self-certify compliance with regulatory requirements. *Id.* ("This Federal Register notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole.").

245. The FRP FRN states that "constructive notice" is "the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses." *Id.*

246. The FRP FRN states that "[f]or legacy [Cuban and Haitian] FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account," and that for all others, USCIS will provide a notice to the "USCIS online account" that they "should have." *Id.*

**<u>January/February 2025 Indefinite Suspensions of Adjudicating Parolees' Immigration Benefits Requests (Higgins Directive & Davidson Memorandum)</u>**

247. During the week of January 20, 2025, then-Acting Director of USCIS Jennifer Higgins prohibited USCIS staff from making any decisions on any request for any immigration benefit—e.g., for asylum, TPS, adjustment of status, a visa, work authorization, etc.—that would benefit individuals who received parole through any humanitarian parole process, such as U4U, CHNV, OAW, FRP, MPIP, CAM, or other named parole processes.

248. On February 14, 2025, Acting Deputy Director of USCIS Andrew Davidson issued a memorandum to various USCIS directorates and program offices directing them not to adjudicate immigration benefit requests filed by noncitizens who are or were paroled into the United States under U4U, CHNV, and FRP.

249. The Davidson memorandum was a post-hoc attempt to justify the suspension of benefits adjudication that had started weeks earlier.

250. Upon information and belief, the February 14 Davidson memorandum has not yet been made public. Media reporting on the memorandum explained that because paroled individuals are only given work authorization and deportation protections that typically last for two years, many such individuals apply for other immigration benefits, including TPS, asylum, and green cards—but under the February 14 Davidson memorandum, officials will no longer be able to process any applications for such programs or any other benefit, if such requests are filed by migrants who arrived in the United States under the parole processes at issue.

251. The February 14 Davidson memorandum asserted that the suspension of these individuals' benefits requests was based on Executive Order 14161 (discussed above) and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible or consistent with the vetting "baseline" in effect on the last full day of President Trump's first term, stating: "The procedures that the parolees under these categorical parole programs underwent *may* not constitute screening and vetting to the maximum degree possible or comport with the uniform baseline for screening and vetting standards and procedures that existed on January 19, 2021, both of which are required per EO 14161" (emphasis added).

252. The February 14 Davidson memorandum does not cite any statutory or regulatory authority for suspending adjudication of benefits applications, including benefits for which there

is statutory authorization, including asylum (under 8 U.S.C. § 1158), TPS (under 8 U.S.C. § 1254a), other requests to adjust status (such as visas under 8 U.S.C. § 1201), or work authorization (such as under 8 C.F.R. § 274a.12).

253. The February 14 Davidson memorandum refers to alleged fraud in the CHNV parole processes that DHS detected, investigated, and, where problems were identified, corrected in the summer of 2024. Some of this claimed "fraud" was based solely on the fact that some sponsors, like Plaintiff Kyle Varner, felt compelled and were financially able to sponsor more than twenty beneficiaries—often based on the sponsors' sincerely held religious beliefs—which was entirely permissible under the rules of the process. What is more, this alleged "fraud" concerned solely the CHNV processes, yet the Davidson memo's suspension of benefits adjudications—like the January Higgins directive—was far broader than the CHNV processes, affecting other parole processes like U4U. Finally, and regardless, the Davidson memorandum's suspension of benefits adjudications was based only on Executive Order 14161 and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible.

254. As noted above, most individuals paroled into the United States via the U4U, CHNV, and OAW processes are eligible under statutory provisions enacted by Congress for other forms of immigration relief, including but not limited to TPS, asylum, and/or visas based on familial relationships. The INA, for example, makes clear that "*[a]ny* [individual] who is physically present in the United States . . . *irrespective of such [individual's] status*, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). Individuals paroled in through the family reunification processes are *all* eligible for family-based visas, because that was a requirement to apply for parole through those processes.

255. Yet, per the January Higgins directive and the February 14 Davidson memorandum, the parolees' applications for any of these benefits—all of which would preclude their removal—are now suspended, as are any of their applications for re-parole, employment authorization, and adjustment of status.

256. Meanwhile, at the same time that the Trump Administration has suspended the ability of these parolees to seek relief from deportation by affirmatively applying for benefits, it has aggressively (and unlawfully) expanded the ability of immigration officials to remove individuals paroled into the country through expedited removal—a shortcut deportation process with few procedural protections and even less judicial review. Those actions are challenged elsewhere but comprise part of the injury and irreparable harm threatening Plaintiffs and others similarly situated.

257. The February 14 Davidson memorandum states that if there is a "litigation need" to lift a suspension of benefits adjudication for individuals paroled through these processes, the suspension can only be lifted on a case-by-case basis with approval of the USCIS Director or Deputy Director, with a memo memorializing the lifting of the suspension as to that individual.

258. Remarkably, the February 14 Davidson memorandum states that these requirements for lifting the suspension apply even when a court issues an injunction or other order directing the lifting of the suspension on a class-wide basis.

**December 2, 2025 Suspension of Adjudicating Parolees' Immigration Benefits Requests (Dec. 2 USCIS Memo)**

259. On December 2, 2025, USCIS announced via a Policy Memorandum two new suspensions of pending immigration benefits requests, effective immediately. *See* USCIS, Policy Memorandum PM-602-0192 (Dec. 2, 2025) ("Dec. 2 USCIS Memo").

260. First, the Dec. 2 USCIS Memo directs agency personnel to immediately place a hold on *all* asylum and withholding of removal applications, regardless of the applicant's country of nationality, indefinitely suspending processing of those applications.

261. Second, it directs an immediate and indefinite hold on all pending "benefit requests" for nationals of the 19 countries listed in President Trump's June 4, 2025 entry ban proclamation, and regardless of when those individuals entered the United States. As relevant here, this benefit suspension applies to nationals of Afghanistan, Cuba, Haiti, and Venezuela. *See* Pres. Proc. 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 24,497. Unlike the June 4 entry ban, however, the Dec. 2 USCIS Memo (at n.3) applies to individuals born in one of the 19 countries but who is not a national of that country; and to individuals who have dual citizenship with a banned country and a non-banned country.

262. Agency regulations define "benefit request" as "any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit." 8 C.F.R. § 1.2. Thus, USCIS's immediate hold on all benefit requests for Afghans, Cubans, Haitians, and Venezuelans extends to every conceivable immigration application or request, including for employment authorization (or its renewal), for re-parole or advance parole, to adjust status to a legal permanent resident, and naturalization.

263. The Dec. 2 USCIS Memo, at n.2, states that "benefit request" does not include "USCIS screening activities" undertaken as a part of DHS's removal efforts, including to third countries.

264. In addition to the suspensions ordered, the Dec. 2 USCIS Memo directs agency personnel to conduct a "comprehensive re-review of approved benefit requests" for any individual

from the same list of 19 "high-risk countries" who entered the United States on or after January 20, 2021 (the day President Biden was inaugurated).

**Defendants' Actions Cause Harm to Plaintiffs**

265. Defendants' termination of humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM, and Defendants' related suspension of processing of immigration benefit requests, have caused Plaintiffs substantial, concrete, particularized, and irreparable injury.

266. Plaintiff **Svitlana Doe** fled Ukraine following Russia's unprovoked and unjustified incursion into Ukraine. When war struck in 2022, Svitlana and her family lived in a city immediately outside of Kyiv, the capital of Ukraine, one of Russia's initial focal points for occupation. Bombs rained down and fighting broke out regularly in the streets directly outside her apartment. It was terrifying and unpredictable. Basic necessities like electricity and water soon became unavailable, and all flights out of the country were cancelled. Svitlana and her family eventually fled the capital for another district further away from ground zero, where they remained for about a month and a half before returning to the capital.

267. Svitlana is the mother to a young son with celiac disease. After her son was born and began eating solid food, he became extremely sick with an undiagnosed condition. Even at one of the best hospitals in Ukraine, it took a long time to correctly diagnose her son's condition as celiac disease. It was extremely hard to provide for her son in Ukraine, even before the war. Her son was extremely sensitive—even minimal cross-contamination using the same utensil would make him dangerously ill. Svitlana had to shop around at tens of different grocery stores to find gluten-free products for her son, and when she could find them, they cost twice as much as glutenous products. People would often criticize Svitlana at grocery stores for not buying her son "normal" food. When the war began, it became even more difficult to take care of her son. Grocery prices skyrocketed, and non-glutenous products became all but impossible to find. In 2022, after

the onset of the war, her son was hospitalized for a few weeks when he became extremely sick and his stomach swelled up dangerously from contact with gluten.

268. Before the war began, Svitlana never considered leaving Ukraine. She was satisfied with her life and career as a project manager for a large charity foundation doing work inside and outside of Ukraine. But amid her son's failing health and the regular shriek of air raid sirens which forced Svitlana and her family into the earthen basement of their son's school to take shelter from missile attacks, they decided they needed to flee the country. Svitlana began searching for help on the internet and social media. Eventually, she was put in touch with the executive director of a celiac disease research center in the United States. Doctors at the center began exploring Svitlana's son's condition and treating him from afar, and the executive director eventually volunteered to assist Svitlana and her family through the Uniting for Ukraine parole process. Svitlana and her family received travel authorization in November 2022.

269. After the war began, men were generally not permitted to leave Ukraine due to the draft. However, officers often made exceptions for fathers seeking treatment for their disabled children, so Svitlana scrambled to assemble a comprehensive collection of her son's medical documentation, who had been officially diagnosed as having a temporary disability. The U.S. doctor working with Svitlana's son even wrote a letter documenting the medical need for treatment outside Ukraine. This was an extremely stressful time, since border officials maintained individual discretion and the family could not guarantee Svitlana's husband would be allowed to leave the country. Svitlana's husband and son left first to maximize the odds of remaining together, arriving in Poland in mid-November 2022. Svitlana followed the next day, and met her family in the capital of Poland, Warsaw. From there Svitlana and her family traveled to the United States, arriving on November 20, 2022, and living since their arrival in Dover, Massachusetts.

270. Since arriving, Svitlana's son has continued to receive treatment at the medical center specializing in celiac research. After about a year, his health began to improve dramatically, and he is now a healthy young boy, although he will require a strict diet and comprehensive annual checkups for the rest of his life. Svitlana has worked since receiving her work authorization around April 2022, and she enrolled as a student in community college studying child development. In 2024, Svitlana and her family were re-paroled under U4U, and her current parole status and work authorization is valid until November 18, 2026. Around the beginning of February 2025, Svitlana applied for Temporary Protected Status ("TPS").

271. If her TPS application is not adjudicated or even paused for too long, Svitlana will lose her only chance of being able to remain in safety in the U.S., especially if her parole is revoked as the Trump administration has threatened. If either becomes unavailable to her, she will lose her work authorization, and therefore, her ability to provide for her family. She will not be able to pay her rent (around $2200 per month), purchase groceries (around $800 per month), or pay her family's bills, and her son would no longer be able to receive the treatment he needs to thrive, including weekly speech therapy and stability. Her family would be forced to leave the U.S., but there is nowhere else for her family to go—they cannot return to Ukraine in the middle of a continuing war, where Svitlana's husband would be forcefully recruited into the army upon return. Even if negotiations won out, there is no promise peace would last. And in any event, forests and seas surrounding many Ukrainian cities are now filled with mines and explosives, making travel within the country extremely dangerous. U4U and the availability of TPS have been lifelines for Svitlana and her family, and losing them would cost more than they can bear.

272. Plaintiffs **Maksym and Maria Doe** are a married couple and nationals of Ukraine. They were forced to flee their home in Kharkiv on the day that Russia invaded Ukraine and began

bombing the city. Once they found safety, Maksym began looking for a way to do something for his fellow Ukrainians. He and several friends started by coordinating volunteer efforts to evacuate others from cities and towns on the front lines of the war; within six months, they had saved over 22,000 people from eastern Ukraine, solely through the efforts of approximately 200 unpaid volunteers. Eventually, Maksym and his partners formed a nonprofit organization and began raising funds, managing logistics, hiring professionals and converting volunteers into paid employees, and expanding their humanitarian aid operations. In the three years since Russia invaded Ukraine, the nonprofit has grown to a staff of over 100 employees and has assisted over a half million Ukrainians displaced and affected by the war.

273. Since the invasion, Maksym's work with his nonprofit has been his singular focus. Toward the end of 2022, he and Maria, as well as his partners in the nonprofit, discussed the possibility of Maksym and Maria moving to the United States to expand the nonprofit's work with other humanitarian aid organizations, to raise more funds, and to amplify their ability to provide aid to Ukrainians harmed by the war. Maksym came to the United States first in December 2022 on a visitor visa to research registering a nonprofit in the United States and to explore how to fundraise and collaborate with other humanitarian aid organizations. A generous family friend who has known Maksym and his sister since high school subsequently agreed to be their sponsor to apply for U4U parole. Maria joined Maksym in February 2023 through U4U parole; Maksym then left the United States for Mexico, where he also went through the U4U application process with the sponsorship of his family friend, and was able to return to the United States on U4U parole in April 2023. They received their employment authorization when they entered the United States on U4U parole.

274. After arriving in the United States with only two suitcases and Maria taking all the jobs she could find to earn money, including dog walking, Maria has since found a job as a quality assurance engineer with a tech start-up and recently got a promotion to a Project Management position. Maksym has continued his work with his nonprofit, and after two years of struggle and hard work in the United States, the couple started to feel like they could finally plan for their future. They applied for U4U re-parole and TPS; while Maria's re-parole application was granted in January 2025, Maksym's re-parole application remains pending, as well as both of their TPS applications.

275. As a result, it has been devastating for the couple to learn that that President Trump has terminated U4U and paused the processing of all immigration benefits applications of U4U parolees. Maksym's U4U parole expires in April 2025; if his re-parole application or TPS application is not processed and granted by that time, he will lose his legal status and his work authorization. Maria plans on filing an application for an H-1B work visa with her employer soon, because an H-1B visa will help provide the couple with a more stable and predictable legal status, but it is unclear if that application will ever get processed. After working so hard to come to the United States legally, and after doing all they could to maintain their status to remain here legally so that they can continue working and supporting Maksym's humanitarian efforts in Ukraine, it feels like all the doors are being slammed in their faces. Maksym and Maria never thought that they would have to face the prospect of being displaced, yet again, from a democratic country like the United States.

276. Plaintiff **Alejandro Doe** fled Nicaragua because of increasing physical danger to his family and untenable economic conditions. In 2018, demonstrators in several Nicaraguan cities began protests against social security reforms decreed by President Daniel Ortega. The

demonstrations were heavily oppressed, and government and pro-government militia and security forces used live ammunition on protestors resulting in hundreds of civilian deaths. Countless others were imprisoned.

277. Alejandro's father was among those imprisoned. While searching for his uncle, government actors abducted Alejandro's father from his grandmother's house where he lived, beating and violently interrogating him on the way to prison. Once there, guards physically and psychologically tortured him for three days, telling him that they would kill him and that he would never leave the prison. He was withheld food for most of the duration of his three-day imprisonment.

278. Although Alejandro's father was released, he was labeled an opponent of the regime, and Alejandro felt they had no choice but to leave the country for their safety. Alejandro's cousin, a U.S. citizen who lives in Washington, sponsored him and various other members of his family through the parole process for Nicaraguans. Alejandro received travel authorization on May 15, 2024, and arrived in the United States on July 29, 2024. Since arriving in the United States, Alejandro has lived in Gainesville, Georgia, and since receiving work authorization has worked producing marble bathroom panels. To ensure he would not lose his newfound safety, Alejandro filed an application for asylum (Form I-589) on January 21, 2025.

279. When Alejandro learned of the Trump administration's indefinite pause on processing applications for immigration relief filed by individuals who came to the U.S. through CHNV parole, it came as a gut punch, especially considering the U.S. government's recently announced plans to terminate CHNV parole. For years, the Nicaraguan government has considered individuals who apply for asylum in other countries to be political dissidents. What's more, the Parliament loyal to President Ortega recently legalized the banishment and denial of entry or exit

to people deemed to be critics of Nicaragua, including Nicaraguan citizens. Alejandro is distraught about what will happen if he is deported and cannot reenter Nicaragua, or if the Nicaraguan government arrests, interrogates, or tortures him or his family upon return given his family's history of political persecution by the State. Asylum and parole were the only avenues that could keep Alejandro and his family safe. If he is no longer permitted to remain the U.S., he would be forced to look for alternative places to flee, because he cannot safely return to Nicaragua.

280. For Plaintiffs **Ana Doe** and **Armando Doe**, fleeing Nicaragua and obtaining parole through the CHNV parole processes was a matter of seeking stability and safety from the ongoing persecution and violence they faced in Nicaragua. Similar to Alejandro Doe's account, due to the increasing political repression and systemic violence under the Ortega regime, Ana's family has been persecuted for their political ideologies and involvement in anti-government protests. In 2018, while the police were actively looking for Ana's uncle, they found and detained her father instead. Ana's father spent days in prison where he was interrogated and tortured. Although he was eventually released, Ana's entire family had become people of interest in the eyes of the government, and they remained vulnerable to future persecution and violence. In 2020, Armando worked at a digital media company that published information regarding the political situation in Nicaragua and government abuses in the country. Before his arrival at the company, the government found and detained some employees of the company because they were discovered to be assisting some people who had been protesting during a hunger strike. While these individuals were eventually released and fled the country for their safety, it was evident that the government was keeping a close eye on Armando's employer—labeling his employer as anti-government—and Armando's safety grew ever more precarious, despite the precautions he took.

281. The CHNV parole processes have provided Ana and Armando a safe pathway to escape the danger they faced in Nicaragua. Ana and Armando were sponsored by Ana's cousin, a U.S. citizen who lives in Washington state, and Ana and Armando subsequently received authorization to travel to the United States through the CHNV parole processes in December 2023. They both arrived in the United States and were granted two-year periods of parole in February 2024. Since then, Ana and Armando have created a home and community in Gainesville, Georgia, where they reside along with Alejandro Doe, Carlos Doe, and other members of their family. They have been welcomed by the local community in the Gainesville area. Since Ana and Armando received work authorization under CHNV parole, they have both been working full time. Ana works at a company that provides personal protective equipment, where she is responsible for overseeing the company's inventory and supporting the company's warehouse. Armando works for a company installing machinery on trailers. Ana and Armando have been saving up money for their own futures while also supporting their family and loved ones who remain in Nicaragua. In January 2025, knowing that they needed to seek additional legal protection from the dangers and risks of persecution they face in Nicaragua, Ana and Armando applied for asylum.

282. The news about the Trump administration's halt on processing applications for immigration relief filed by individuals who came to the United States through the CHNV parole processes came as a shock to Ana and Armando. This pause means that their asylum applications could be delayed indefinitely or not adjudicated at all in their remaining authorized time in the United States. Since their parole was only for a two-year period, Ana's and Armando's ability to seek asylum was their only avenue to ensure they can continue living a life free from the fear of persecution and danger they face in Nicaragua because of their political and ideological beliefs. If their applications remain on hold and they are subsequently removed, both Ana and Armando face

the risk of being returned to the very danger and instability they fled in Nicaragua. Alternatively—if they are removed from the United States and the Nicaraguan government does not allow them to re-enter the country—Ana and Armando would be rendered stateless. Their ability to obtain work authorization through the asylum application process is likewise vital for them to be able to continue working and providing for themselves and their families after their parole expires and while they await the adjudication of their asylum applications. Given these risks, this indefinite pause on processing these applications for immigration relief and the impending termination of the CHNV parole processes irreparably harms Ana and Armando and their family.

283. Plaintiff **Carlos Doe** also fled Nicaragua due to the political instability and direct persecution he and his family faced by the Nicaraguan government. In 2018, while he was a university student, he became involved in protests against the government. Eventually, more protests broke out in his city, resulting in numerous assassinations and disappearances. Based on his involvement in these anti-government protests, the Nicaraguan government identified Carlos as a dissident and actively persecuted him and his father. Soldiers and police officers came to his family's home multiple times in search of Carlos and his father, making death threats against Carlos and his family. Given the danger and active persecution against Carlos and his father, they both decided to go into hiding. However, while in hiding, Carlos and his father continued to receive death threats, and at one point military soldiers came to Carlos's mother's house and told her they would imprison him and his father if they ever found them.

284. Once Carlos learned about the CHNV parole processes, this path became a way for him to safely flee the danger and persecution he faced in Nicaragua. Carlos was sponsored by a U.S. citizen family member, and in May 2023, he received travel authorization to come to the United States under the CHNV parole processes. Carlos arrived in the United States and was

granted a two-year period of parole in June 2023. Since his arrival, Carlos has created a community for himself, comprised of friends and family (including Ana, Armando, and Alejandro). He has also made many connections and friendships through his work experiences. Currently, Carlos works as a welder and solderer at a manufacturing plant. His ability to work in the United States with authorization has enabled him to provide for himself, his mother and younger brother who remain in Nicaragua, and his sister who currently lives in Costa Rica. Due to the risks of persecution and danger he faces in Nicaragua, Carlos applied for asylum in January 2025.

285. After learning about the Trump administration's indefinite suspension of processing applications for immigration relief for individuals who entered the United States with CHNV parole, Carlos became very worried about how this pause will affect his ability to seek asylum. Because his asylum application could be delayed indefinitely or not adjudicated at all, Carlos's only prospect of safety here in the United States beyond the end of his parole period has been stripped away from him, leaving him at risk of losing legal status or deportation back to Nicaragua where the government knows where he lives and has actively persecuted him. Moreover, obtaining work authorization through his asylum application is imperative for him to be able to support himself and his family in Nicaragua and Costa Rica, and this indefinite pause on the processing of his asylum application could render him without the ability to work, including once his parole expires or is terminated, which would harm both him and his family who rely on him.

286. Plaintiff **Miguel Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Miguel learned of the CHNV parole processes for Nicaraguans about a year before he arrived. He spent a while deciding whether he wanted to leave his home, including his mother, with whom he lived and whom he

helped take care of. In Nicaragua, COVID-related challenges and changes to his university's programs and requirements made it difficult for Miguel to receive consistent university education and progress toward a degree. It was also challenging to find a stable job that would allow him to make enough money to support himself and help his mother. Miguel decided to leave his friends, family, and community in Nicaragua for the United States because he knew it was the best way to help his family and his own future. He saw the United States as a land of opportunity and the CHNV parole processes as a safe, legal pathway there. He was excited to work hard for two years, save up money, and improve his and his family's future.

287. In the United States, Miguel received work authorization in September 2024 and was able to quickly find work full-time producing marble panels. He has enjoyed his experience in the United States thus far, working hard and spending time with family outside of his job. However, when he heard about the Trump administration's end to CHNV parole and the revocation of parole and work authorization for people like him, he felt scared and betrayed, and he became fearful of going outside in public given raids and deportations happening in his own town of Gainesville. Miguel has been in the United States for less than a year, and he was granted two years of parole when he entered. The inability to continue to work here for the remaining part of his parole period means that he will not be able to support himself or his mother as well, given his family's limited resources in Nicaragua. In less than a month, Miguel will be subject to imminent deportation, so he is forced to make decisions that will affect his and his family's lives and livelihoods on an extremely expedited timeline.

288. Additionally, Miguel is worried about what will happen to him and his family if he is deported or otherwise forced to return, given his family's history of political persecution there. When Miguel was a teenager, his family experienced persecution that forced them to flee

Nicaragua. He is also aware that the Nicaraguan government treats parolees and people being sent back from the United States with increased scrutiny, and that his family could be subject to harm if they returned. The early termination of Miguel's parole, combined with the administration's suspension of processing immigration benefits for parolees, deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. His legal status, work authorization, and options for protections have been erased all at once.

289. Plaintiff **Andrea Doe** arrived in the United States in June 2023 with her two young children, Isaias and Francisco Doe, to reunite with her husband, Rafael Doe, a former political prisoner in Nicaragua. The family lives in Mount Airy, Maryland. Rafael Doe was part of a group of 222 Nicaraguan political prisoners and prisoners of conscience whom the government of Daniel Ortega had abruptly released from prison on the condition that the United States government accept them. As many of these prisoners—Rafael Doe included—had been arbitrarily detained for very long periods, all had been exposed to harm amounting to torture, and many had pressing medical needs, the U.S. State Department agreed to evacuate them. The Nicaraguan government proceeded to strip the 222 passengers on this February 9, 2023 flight to the United States of their Nicaraguan citizenship, rendering most of them stateless.

290. Due to the extraordinary circumstances of their departure from Nicaragua, none of the 222 were able to leave Nicaragua with their family members unless they too had been imprisoned as part of this group. After paroling the passengers on the February 9 flight into the United States, the State Department asked those needing to reunite with their family members to use the CHNV parole process to bring them here. *See* U.S. Dep't of State, 222 Nicaraguan Political Prisoners Released, Enter U.S.—Frequently Asked Questions and Resources

(https://www.state.gov/222-nicaraguan-political-prisoners-released-enter-u-s-frequently-asked-questions-and-resources/).

291. Reuniting his family was an urgent priority for Rafael Doe. He had been a political prisoner for over four years before being expelled from his own country. Not only was the continuing separation from his wife and two very young children humanly difficult for all of them, but the Nicaraguan government had been monitoring and harassing his wife, and Andrea Doe was afraid for her own safety and that of their children.

292. Since being reunited in the United States, the family has been doing well. The couple are working for the same company that had first hired Rafael, they have rented their own apartment, and their children have settled into their new school and made friends. The family has applied for asylum, with Rafael as the principal applicant, including Andrea and their sons Isaias and Francisco in his application. The suspension of processing of that application prevents the whole family from achieving permanent safety in this country, and they have no other: stripped of his Nicaraguan citizenship, Rafael could not return to Nicaragua even if it were safe for him, which it is not. If Andrea and the children's parole were terminated and they could not get their asylum application processed, Andrea fears she would be detained in Nicaragua and that her children would be taken away from her.

293. Plaintiff **Lucia Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Back in Venezuela, Lucia lived with her mother and helped provide for her. Lucia holds a bachelor's degree in Christian Education from the Theological University of the Caribbean in Puerto Rico, and she worked at the Director of Children's Ministries at a local Christian church in Venezuela, but her salary was only around $60 a month, a very typical monthly salary where she lived. This was not nearly enough to

cover her and her mom's most basic needs, including food, rent, and clothing, let alone the expensive medical care that her mom requires. Their basic expenses alone were around $500 a month. They were not able to survive on Lucia's income, so, like many other people who lived around them, they had to rely on financial support from family members living abroad. Lucia's siblings, including Plaintiff (and Lucia's CHNV sponsor) Lorena, sent money back to Venezuela regularly to help them get by.

294. When Lucia heard about the opportunity to come to the United States on CHNV parole, she knew she wanted to pursue the pathway so she could work and help their family in a more robust way. She came to St. Augustine, Florida, because, from a previous trip she made to Florida when she was studying in Puerto Rico, she had several friends living and working there. She knew it would be easier to find work and use public transportation there, as opposed to in rural Massachusetts, where Lorena lives. Lucia received her work permit in August 2024, started working at a cleaning company, and has settled into the community in St. Augustine. She attends a local Christian evangelical church and hopes to get involved in their ministries.

295. The Trump administration's end to CHNV parole and the premature revocation of Lucia's parole and work authorization will force Lucia to, in a very short time, make many crucial decisions that will impact her own livelihood and that of her family members. If she is not able to stay in the United States for the two years that she was granted parole, she would be returning to Venezuela with very little savings, which would make her future here uncertain and create more of a financial burden for her siblings. She would not be able to provide the financial support that she planned for her mother, and she would face challenges finding a job in Venezuela, where is it very difficult to secure employment as someone older than 40 years old. Having to make these

decisions rapidly or risk the threat of accruing unlawful presence that could prevent her from returning to the United States or deportation back to Venezuela, is causing Lucia a lot of anxiety.

296. The conditions in Venezuela also threaten Lucia's safety and stability. Without a job for potentially a lengthy period of time, and given inflation that has made necessities unaffordable for the majority of the population, Lucia would struggle even more than before to pay for her basic daily needs, let alone those of her parents. There are also frequent, mass internet and power blackouts, and basic services like water, gas to cook, and transportation are often unavailable for days. She will need to deal too with the constant concern of crime and violence. Lucia is especially scared of what could happen to her if she is forced to return to Venezuela, because she has heard that the Venezuelan government interrogates people who have sought parole in other countries, and military officials have forced people to pay money at the border to be allowed in. She has heard of Venezuelan citizens having their passports confiscated, being imprisoned, and even being disappeared.

297. Plaintiff **Daniel Doe** is a Haitian national who was granted parole for two years through the CHNV Haitian parole process in February 2024. Daniel, his wife, and their three-year-old daughter faced imminent danger and risk of kidnapping from gangs in Haiti, in both neighborhoods where they lived. Daniel also worked as a court interpreter for foreigners, and occasionally as a general interpreter for the U.S. Embassy, the Haitian National Police, and the Catholic Relief Services. Daniel has been specifically targeted by the gangs, including being followed by gang members on motorcycles who have also ridden by his house. As a result, Daniel had to change the cars he drove to work, and the routes he took. Daniel's wife also received a warning that she and Daniel should "be careful," which they took as a warning that gangs were

watching their movements, and that Daniel was a potential kidnapping target due to his work in Haiti.

298. These incidents drove Daniel and his wife to the decision to seek safety outside of Haiti. In early 2023, Daniel's father's friend offered to sponsor Daniel through the CHNV parole process for Haitians. Because his father's friend had already agreed to sponsor several other of his own family members, he could only financially afford to sponsor just one more person. He submitted his sponsorship application for Daniel in April 2023. Later that same year, because Daniel's other application was taking a long time to process, Daniel and his wife learned about Welcome.US and their matching process where they would match prospective CHNV beneficiaries with individuals who could serve as sponsors. Daniel and his family were matched with a sponsor through Welcome.US, who submitted their sponsorship application for Daniel, his wife, and their daughter in early January 2024. About a week after this application was submitted, Daniel received travel authorization to come to the United States through his father's friend's sponsorship application. Although it was extremely difficult, Daniel and his wife decided that Daniel should use this travel authorization to come to the United States on CHNV parole alone. Daniel's parole expires in February 2026, and his wife and daughter remain in Haiti with their pending application through the Welcome.US sponsor. In September 2024, Daniel was also granted TPS until February 2026, but due to the administration's recent termination of Haitian TPS, that status is also now only valid until August 2025.

299. Daniel received his work permit in March 2024. Although it required some adjusting to life in the United States, Daniel has been able to adapt and become part of the community in Orlando. He has joined a local Haitian church and is currently working as an English as a Secondary Language ("ESL") teacher at two different schools serving adult students who are

immigrants or in the United States on a student visa. Daniel also supports the Haitian community by providing free online classes to Haitian immigrants who have recently arrived to the United States, teaching them about U.S. culture, teaching them English, and providing general updates on immigration policies affecting the Haitian immigrant population.

300. The Trump administration's end to CHNV parole and the premature revocation of Daniel's parole and work authorization will prevent him from being able to continue working, which is essential not only for him to support himself but also for him to be able to support his wife and daughter who remain in Haiti, as he is the main financial supporter for them. Daniel will also be at risk of imminent deportation back to a country where he faces increased risk of targeting by gangs, and the administration's suspension of processing immigration benefits for parolees deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. Moreover, with the CHNV parole processes terminated, the chance for him to be reunited with his wife and daughter here in the United States through CHNV parole is lost.

301. Plaintiff **Omar Doe** is an Afghan national who faithfully and loyally served the U.S. military in Afghanistan for over eighteen years, despite threats and persecution from other Afghans, including his own family members, that forced him to relocate his wife and children from his home province. He built up good relationships with the soldiers he worked with, so when the U.S. military withdrew from Afghanistan in 2021, they brought Omar and his family with them. His departure from Afghanistan was chaotic—up until just two or three days before the collapse of the Afghan government, he was stationed with U.S. troops in Kandahar Province. They were relocated to the Kabul airport, and then suddenly, at 3 am in the morning, he was told that if he wanted to bring his family with him to the United States, they would need to come to the airport

immediately. Omar called his father, who was able to bring his family to the airport at 6 am, but congestion and crowding at the airport was so dense that Omar's family was only able to reach him at 10 am. That brief interaction, when Omar received his family at the airport, was the last time Omar saw his father. He never got to say goodbye to his mother.

302. Upon arriving in the United States, Omar was registered by the troops he had worked with and given a work permit. He was told that he would receive a passport and a green card, and he was told not to worry about anything. Three and a half years later, however, he has yet to receive permanent legal status in the United States, which has been extremely traumatic and stressful for him and his wife. Although he is grateful that his family is safe here and that his children are in school, the lack of legal documentation has caused so much stress that he has lost all his hair, and he and his wife have both lost teeth. After so many years of service to the U.S. military, it is very frustrating to Omar that he still lacks permanent legal status.

303. Shortly after arriving in the United States, Omar applied for a Special Immigrant Visa ("SIV"), which are issued to, among others, Afghan nationals who provided faithful and valuable service to the U.S. government, and who endure serious threats because of that service. In addition, because his parole and work authorization will expire in September 2025, he is working with a nonprofit to file an asylum application, which will enable him to maintain his work authorization so that he can keep working to support his family until his SIV is granted. But the Trump administration's pause on the processing of immigration benefits means that these applications will not be adjudicated. This is especially hard for Omar to stomach, given all that he has done and sacrificed for the U.S. military over the course of most of his adult life. Going back to Afghanistan is not an option for him and his family after his service to the U.S. military, and he does not know what will happen to them if they are deported there. Omar had expected dignity

from the government that he had served and that brought him to this country, but that has not happened for him.

304. Plaintiff **Sandra McAnany** is a U.S. citizen and sponsor for seventeen individuals who were approved to come to the United States and granted parole through CHNV. Fifteen of these beneficiaries who are currently in the United States are nationals of Venezuela, and two are nationals of Nicaragua. They all arrived in the United States between September and December 2023 and were approved for two-year parole periods and work authorization. To Sandra's knowledge, most have pending asylum applications that are now on hold due to the administration's suspension of processing immigration benefits requests for CHNV parolees. Sandra's beneficiaries include five sets of parents with young children, who were only able to reunite with family members in the United States because of the CHNV parole process, and six adults without children. They seek both stability with their families and safety from persecution and violence in their countries of origin. One beneficiary is a mother of two young kids whose husband was diagnosed with cancer while she was in Venezuela, and her grant of CHNV parole allowed her to care for him while he went through treatment.

305. Sandra also has four CHNV applications, for nationals of Cuba, that remain pending. Due to the administration's termination of the CHNV parole process and end to processing new CHNV parole applications, these applications will now never be processed. Daily life in Cuba is extremely difficult for these beneficiaries, as they struggle under the government system there to make enough money to pay for food for themselves and their families. They sought to come to the United States through CHNV parole either to reunite with family or to earn money to support their families in Cuba, including for critical medical treatment. One of these Cuban beneficiaries has also lost jobs in Cuba for speaking out against the government and fears being

arrested if he continues to speak out. He and other beneficiaries hope to experience the democracy and freedoms of the United States.

306. Sandra was driven to serve as a CHNV parole sponsor by her religious convictions, her experiences volunteering abroad in Central and South America, and her close connections with immigrant neighbors and friends in Wisconsin. As a Christian, she believes strongly in caring for others and supporting those in need, so sponsoring immigrants through CHNV parole allows her to live out her religious convictions in a meaningful way. In addition to putting considerable time and effort into completing the applications for her beneficiaries, Sandra has provided constant support, advice, and resources to them as they traveled to the United States and integrated into their communities. She provided travel guidance and support on job searches and enrollment in English classes, and one family lived with her in her home for over a year while the parent got a work permit and found a job. She helped pay for some of her beneficiaries' initial cell phone plans, and she provided winter clothing or money to buy it for several families weathering a harsh winter for the first time.

307. Over the last couple years, Sandra has allocated large amounts of time, effort, and money into helping the people she sponsors establish safe and stable lives in the United States, and in growing those relationships, she has come to see many of them like family. The administration's premature termination of grants of CHNV parole and pause on processing her beneficiaries' asylum applications means that all the time and money she has invested could be lost. If her beneficiaries become vulnerable to deportation, Sandra fears the harm that will come to them if they are forced to return to their countries of origin, and she will lose relationships that are valuable to her as a meaningful way to live out her faith. She worries that she may never be able to see them again.

308. Plaintiff **Kyle Varner** has long been involved in supporting liberal and libertarian political movements in Venezuela, and he has done global health work at the Venezuelan border. Through his experiences, he has seen the challenges faced by people in poverty in the country. His personal and political convictions have led Kyle to serve as the U.S.-based sponsor for seventy-nine individuals through the CHNV parole processes, seventy-seven of whom are nationals of Venezuela. Of the forty-three of those individuals who are currently in the United States, at least thirty-one have pending applications for asylum, TPS, or other forms of immigration relief. The first of Kyle's beneficiaries arrived in the United States in November 2022. The people he has sponsored include a son who could only pay for his mother's life-saving cancer treatment because he got a job in the United States, and a mother and her young son who lived with Kyle's parents for eight months when they first arrived.

309. Kyle also has thirty-two other pending applications for CHNV sponsorship, including for one Cuban individual and one Nicaraguan individual. Due to the administration's termination of the CHNV parole processes and end to processing of new CHNV parole applications, these applications will now never be processed, and the beneficiaries are deprived of a legal pathway to the United States. In Venezuela, these beneficiaries will continue to struggle with low wages and extreme poverty, violence and crime, and government systems that are unable to support the country's residents.

310. Kyle has dedicated immense time, effort, and money into supporting the people he has sponsored. He spent hours submitting applications, and after people received approval to travel to the United States, he purchased plane tickets for most of them. After they arrived, he helped them find safe housing, including allowing many of them to live with him temporarily at first. He also co-signed leases and rented properties that he owns to many beneficiaries for reduced rates

and under favorable terms. He purposefully kept some of his properties vacant when he was waiting for his CHNV sponsorship applications to be granted, which meant he missed out on leasing them to other renters. Kyle paid for most of his beneficiaries' work permit applications, helped them with job applications and enrollment in English classes, paid for cell phone SIM cards, and even taught a few how to drive. As a physician, he provided free medical care for minor health conditions and helped translate Spanish-language medical records from Venezuela.

311. When his beneficiaries were applying for asylum, TPS, and other forms of immigration relief, Kyle lent money to some to help pay for attorney fees, helped them compile documents, and otherwise provided resources that they needed to complete their applications. Kyle has invested significantly in all of his beneficiaries to assist them in settling into their communities in the United States so they can in turn support their families and other loved ones. The time and money he has invested could be lost if his beneficiaries' applications for relief are not adjudicated. Additionally, if his beneficiaries lose their work authorization because of a change in their status, Kyle would need to put more time and resources into making sure they have everything they need to survive.

312. Plaintiff **Wilhen Pierre Victor** is the U.S.-based CHNV parole sponsor for seven of her family members from Haiti. Five of them—her brother, his wife, and their three children—were approved to travel to the United States in May 2024, and arrived between June and July 2024. They were all granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn, Massachusetts. Wilhen also has two pending CHNV sponsorship applications for her niece and cousin, both of whom are still in Haiti living under unstable political conditions and subject to the daily threat of violence. Wilhen's niece is thirteen years old and in Haiti without either of her parents. She is unable to attend school consistently because there is often gang

violence, including gunfire, in the streets where she lives, which prevents her from going outside at all. Sometimes, she is unable to leave to go to school for up to a week. Wilhen's cousin, who is fifty years old, lives with the constant fear of kidnapping for ransom, especially if the gangs find out she has family in the United States. She has heard of people being kidnapped and murdered when they cannot produce large sums of money. There are often days when she cannot go outside even to run minor errands because of the fear of gang violence. Given the administration's end to processing new CHNV parole applications, Wilhen's applications to bring her niece and cousin to the United States will now never be processed. Because of this, Wilhen's niece and cousin continue to live in terror of the ongoing violence in Haiti, and they are unable to reunite with their family members in the United States.

313. Wilhen applied for a green card for her brother back in 2007, and they were still waiting for an interview with USCIS when the parole process for Haitians was announced in 2023. Wilhen sponsored him to come through CHNV parole because it provided a legal way for them to reunite in the United States and to bring Wilhen's family to a safer, more stable place while they continued to await adjudication of the green card application, which remains pending.

314. Back in Haiti, Wilhen's brother had been unable to find a job for thirteen years due to the lack of economic opportunities. His wife worked as a salesperson for a small business, but they relied on support from Wilhen and other family members to survive. Their children were not able to attend school consistently, and their family dealt with frequent reports of kidnappings, murders, and other violence. In the United States, Wilhen's brother has obtained work authorization and is working at a local nursing home. His kids are enrolled in school as well, and he and his wife are both taking English classes and attending their local church.

315. Being together as a family has been beneficial for Wilhen, her brother, and his entire family, and Wilhen has invested her time and energy into ensuring that they arrived safely and have had the resources to settle into their lives in the United States. When her brother and his family were approved to travel to the United States through the CHNV parole processes, Wilhen pooled money with other family members to pay for their plane tickets. She prepared her home for all five of them to stay with her. Once they arrived, she picked them up at the airport, where they were overjoyed to be reunited for the first time in more than twenty years. Wilhen then supported them all while her brother received his work permit and looked for work, and she helped him find his current job.

316. The administration's premature termination of grants of CHNV parole and pause on processing applications for immigration relief for individuals who came to the United States under CHNV parole means that her brother's longstanding green card application could be delayed even further or not adjudicated at all, and that he could become vulnerable to deportation and lose out on the chance to apply for asylum as well. The years that Wilhen and her brother have spent waiting for it to be processed will be lost, and her brother and his family could be forced to return to a life in Haiti rife with instability and violence. Given the difficulty of finding a job in Haiti and the frequent violence Wilhen's family experienced there, the end to the CHNV parole processes and suspension of adjudication of immigration benefits causes direct harm to Wilhen and her loved ones.

317. Plaintiff **Gabriela Doe** is the U.S.-citizen CHNV parole sponsor to her cousins, who are Nicaraguan nationals—Ana Doe, Armando Doe (Ana's husband), Alejandro Doe, and Miguel Doe. Carlos Doe is also her cousin, but he was sponsored through CHNV by another family member. After her father passed away in June 2023 from cancer, her cousins were a great support

for her during a difficult time. Thus, Gabriela wanted to help her cousins in any way she could and carry on the legacy of her father who was known for always taking care of his family. Knowing her cousins faced dangerous living conditions, violence, and persecution in Nicaragua, Gabriela offered to support her cousins through CHNV sponsorship. Gabriela submitted her sponsorship applications for her four cousins in 2023. All the cousins she sponsored arrived in the United States and were granted parole under CHNV at different points throughout 2024.

318. Since arriving to the United States, Gabriela's cousins have acclimated to life here in the United States and have become self-sufficient in supporting themselves since they secured work authorization. Gabriela has been able to reunite with them in Gainesville, Georgia where they currently live, and she feels proud of how well they are doing here in the United States and how well they have supported one another.

319. The Trump administration's termination of CHNV parole and the premature termination of all five of her cousins' grants of parole has left Gabriela feeling very scared and worried for her cousins. If their parole prematurely ends and they are left without status, they will be at risk of being removed back to Nicaragua, a country where they—and their entire family—face grave risks of danger and persecution by the Nicaraguan police and government because of their political ideologies. Her cousins will also be left without work authorization and the ability to support themselves and their other family members. Given that Gabriela has clinical depression and anxiety, the termination of her cousins' parole status and the impending effects that could have on them and their well-being would cause Gabriela severe psychological distress.

320. Plaintiff **Norma Lorena Dus ("Lorena")** is the U.S.-based CHNV parole sponsor for her sister, Plaintiff Lucia Doe. Lorena submitted the CHNV sponsorship application for Lucia in December 2022, and Lucia was approved to travel to the United States in May 2024. Lucia

arrived in July 2024 and was granted a two-year period of parole, and she received her work permit a month or so later. Lorena paid for Lucia's plane ticket and her work application fee, and she sent money to help support her while she was waiting for her work authorization.

321. Once Lucia started working and was able to, she began sending money back to their parents in Venezuela, something Lorena and their other siblings who live abroad do consistently. Lucia came to the United States precisely because she sought the opportunity to work and earn wages that would allow her to support herself, help alleviate the financial burden on her siblings, and provide for their parents, including their mother, who has health conditions that require expensive doctor's visits, exams and labs, and medication. Their mother has to pay for her medical care out of pocket, but she receives a pension that is not even enough for a dozen eggs. Lorena and Lucia saw the CHNV parole process as a blessing for their entire family.

322. In addition to the economic opportunity, Lucia being in the United States has made it easier for their family to reunite. Last October, Lucia traveled to Massachusetts, and their mother and other siblings traveled in as well. For the first time in six years, all the siblings were together for a joyful reunion. As a U.S. citizen, it is difficult for Lorena to travel in and out of Venezuela, so having Lucia closer has allowed them to see each other more and strengthen their relationship.

323. The administration's termination of CHNV parole and the premature termination of Lucia's parole was devastating for both Lorena and Lucia. Lorena feels disappointed and hurt that the government would punish people like Lucia who applied from abroad, are supported by a sponsor, came through a legal pathway, and are working to support themselves and contribute to the economy. If Lucia is forced to return to Venezuela, Lorena will need to send more money back to her parents to help make up the difference, which will cause financial strain on her and require her to stretch financially and make more sacrifices to help them. Lorena is also already

experiencing the emotional and psychological toll of her sister facing the possibility of imminent, sudden deportation, after having come to the United States with the permission of the government, and the decisions they have to make together as a family to try and keep her safe.

324. Plaintiff **Valentin Rosales Tabares** fled his birth country of Cuba for the United States in 2016 and received his green card in 2017. That same year, he was able to submit a family-based immigrant visa petition for his wife and son, who was less than 18 years old at the time, and another petition for his daughter. Both of these petitions were approved in May 2018. In 2022, Valentin was overjoyed that his wife and son received immigrant visas and were able to reunite with him in Portland, but his family remained separated: his daughter and her young daughter, Valentin's granddaughter, continue to this day to wait for their immigrant visas in Cuba. Valentin's son also had to leave his wife and young son behind in Cuba.

325. Valentin fears for the safety and stability of his family members still in Cuba every day. The living conditions in Cuba have been incredibly difficult for many years, and they continue to deteriorate. In Valentin's family's experience, there are often food, gas, and electricity shortages, including long periods of time where there is no electricity at all. There is very limited public transportation, so travel is nearly impossible. Cuba has also seen an increase in violence and crime, as well as retaliation from the government for speaking out. Valentin's daughter and granddaughter are afraid to leave their home even to get groceries, and other family members have suffered from incidents of theft that are on the rise.

326. When Valentin learned about the CHNV parole processes in February 2023, he applied to sponsor his son's wife and child for humanitarian parole. Those applications were never adjudicated and, due to the administration's termination of the CHNV parole processes, now never will be.

327. In November 2024, Valentin also learned that he had been invited by the Department of State to request Cuban Family Reunification Parole for his daughter, which would allow his daughter to come to the United States while she waited for her family-based immigrant visa to become available. Valentin quickly submitted the request for Family Reunification Parole in December 2024, and only a few days later, it was approved. He and his wife were excited that they would finally be reunited with their daughter and granddaughter after so many years, and they set about preparing for her travel. They paid for the medical exam that his daughter was required to do for the parole process, prepared a room in their home for their arrival, and purchased winter clothes and other items for them to feel welcome. However, as they waited eagerly for the issuance of a travel date for their daughter, it never came. In January 2025, Valentin received the news that the Family Reunification Parole process had been terminated. Now, he and his wife live in uncertainty and fear about whether their daughter will be allowed to come to the United States at all through this parole process. All of the resources they put into planning for her arrival will be lost, and, far more devastatingly, their family will continue to be separated.

328. Plaintiff **Marim Doe** joined the Navy in January 2024. He is a student in the nuclear training program, through which he is learning to operate nuclear reactors on naval carriers and submarines. Before joining the Navy, Marim lived with his family in Texas. He has a close relationship with his family, including with his father, who does not have legal status in the United States. Marim has seen his father work hard to provide for their family his entire life, enduring much hardship and making many sacrifices so that his family can thrive. When Marim heard about the military parole-in-place process in high school, he decided to join the Navy after graduation so that he could continue his education, but also help his father obtain legal status.

329. Marim's application for military parole-in-place for his father has been pending since May 2024. A grant of parole would provide his father with more stability, particularly as he ages, both in terms of staying in the United States safely with his family and in terms of financial well-being. With parole, Marim's father would no longer fear being let go from his job if they found out he was undocumented, or being detained and subject to deportation by ICE.

330. The news that military parole-in-place was going to be paused was heartbreaking for Marim, his father, and their entire family. At a time when Marim should be focusing on the U.S. Navy's rigorous training program, Marim is distracted and worrying about the safety and wellbeing of his family. Marim is suffering extreme emotional distress from the possibility that his father could be deported, and that such an important benefit provided to servicemembers dedicating themselves to the U.S. military is being eliminated.

331. Plaintiff **Adolfo Gonzalez, Jr.** served in the U.S. Army as a First Sergeant for more than 30 years. In February 2025, he retired from active service and was honorably discharged. Adolfo and his wife have been together since 2017, and they have a sixteen-year-old daughter, who is Adolfo's wife's biological daughter but whom Adolfo recently legally adopted.

332. Adolfo's wife is undocumented, which has meant that their family has lived for many years with the fear that she could be detained or deported. When Adolfo had to be away from home with the Army, he was always anxious that something would happen to her. They learned of military parole-in-place through meeting with an immigration attorney, and it felt like a beacon of hope for them. They felt it was an incredible benefit for people who served the United States military. The application that Adolfo submitted for his wife has been pending since around March 2024.

333. In March 2025, Adolfo and his wife found out that military parole-in-place applications were no longer being processed by the U.S. government. The fact that their application has been paused indefinitely has caused him and their family immense anxiety and sadness. They worry constantly about their family being separated and their daughter losing her mother. Adolfo also feels let down by the government after serving the military honorably for more than three decades. Without military parole in place, Adolfo, along with his wife and daughter, will continue to suffer emotional distress from the prospect of their family being separated through detention or deportation.

334. Plaintiff **Aleksandra Doe**, along with her husband and five-year-old son, fled Ukraine through the U4U parole process to seek stability and safety following the Russian invasion of Ukraine in 2022. Life in Ukraine was extremely difficult for her and her family due to the war. Aleksandra would hear missiles flying over them every day. For days on end, Aleksandra and her family would go without electricity in their home, which would lead to her son getting sick from the cold temperatures. The U4U parole process offered Aleksandra and her family an opportunity to escape the danger and instability they faced in Ukraine. In April 2023, Aleksandra and her family were granted parole under the U4U parole process. Aleksandra and her family eventually settled in San Jose, California, where her sister (who is also in the United States with U4U parole) lives.

335. Aleksandra and her family have settled into new lives here in the United States. Her husband works in construction, and her son is attending a transitional kindergarten school, where he is enjoying learning English and socializing with other children. Aleksandra and her family also greatly enjoy the area they live in and the local community.

336. In October 2023, Aleksandra and her family applied for the diversity visa lottery, and in May 2024, Aleksandra was notified that their applications were selected for further processing in the diversity visa program for Fiscal Year 2025. This was life-changing news for Aleksandra and her family, because if they were able to successfully move through the process and obtain green cards, they would be able to continue living in the United States, where they have established a stable life for themselves and their son, while also being able to visit their elderly and ailing relatives in Ukraine when necessary. Aleksandra and her family followed all of the required steps in the diversity visa process and spent upwards of $6,000 on all of the application fees and other expenses associated with the process, including the required medical examinations for each of them. They submitted their I-485 applications for adjustment of status in December 2024.

337. Aleksandra and her son also applied for TPS in December 2024 given the ongoing conflict and conditions that persist in their home country.

338. In January 2025, USCIS scheduled an interview for Aleksandra and her family on February 27, 2025, regarding their adjustment of status applications. However, a few days before the interview, on February 19, USCIS sent a notice to Aleksandra informing her that the interview had been cancelled, without any explanation as to why.

339. Now, Aleksandra and her family's parole will expire in less than two weeks, on March 29, 2025. If Aleksandra's TPS and adjustment of status applications are not adjudicated or are kept on hold for too much longer, she and her husband will lose their work authorization and ability to support themselves and their young son, and their entire family will lose the ability to remain safely in the United States. Without work authorization, her husband will likely lose his job at his construction company, leaving them without the ability to support themselves and pay

for their basic living expenses. And if their adjustment interview and applications are indefinitely suspended, by September 2025, Aleksandra and her family will lose their once-in-a-lifetime opportunity to obtain a visa through the diversity visa lottery system and will have wasted the thousands of dollars they have invested in this process. Consequently, Aleksandra remains extremely afraid and anxious for herself, her husband, and her young son. The indefinite suspension of processing immigration benefit applications for U4U parolees is causing Aleksandra and her family tremendous emotional strain and distress.

340. Plaintiff **Teresa Doe** and her son reunited with her husband and three other children in the United States in 2017 through the CAM parole process. They had lived apart for many years until Teresa's husband was able to petition for their son to receive parole through CAM. When his petition was approved, Teresa was able to accompany him to the United States as an eligible family member.

341. Since they arrived in 2017, Teresa and her son were granted CAM re-parole for more than eight years, allowing them to settle into their community in Nevada and allowing Teresa to consistently care for her family. Teresa's husband works and provides the income for their family, while Teresa stays home and takes care of their children and house. She takes her youngest son, who is a U.S. citizen, to high school every day. During the week, she is also the caretaker for her two U.S. citizen granddaughters, who are 2.5 years old and 6 months old, while their parents work full-time. Being together again after so many years of separation has been beneficial for their family.

342. Teresa's most recent grant of CAM parole expired on March 13, 2025. She has a pending application for re-parole that has not yet been adjudicated, and she fears that due to the administration's termination of CAM and other parole processes, it never will be. The possibility

of losing parole and being separated from her family again is devastating for Teresa. Her youngest son and grandchildren would have no one to take care of them, and Teresa would miss out on watching them grow up. She is also afraid of returning to El Salvador, given safety concerns and the political climate there. The termination of CAM is causing Teresa and her family more emotional distress with every passing day.

343. Plaintiff **Rosa Doe** escaped Honduras in 2013 after surviving rape and other violence. She was trafficked upon entering the United States. Rosa now lives in Austin, Texas with her four U.S. citizen daughters. She also has one fourteen-year-old daughter living in Honduras with Rosa's elderly father. Rosa applied for her daughter and mother through the CAM parole process in June 2023 in order to reunite with them after over a decade of being apart, and also for Rosa's daughter's safety. After Rosa's mother died in October 2024, Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. Rosa's daughter and father then moved through the screening and multi-step process and were conditionally approved for CAM parole in November 2024. Rosa did not have enough money to pay for their travel in December 2024 due to having spent all her savings on her mother's medical care and funeral expenses. Rosa began planning for their arrival in late January of 2025. After January 20, 2025, Rosa was unable to reach the organization handling their applications, the International Organization for Migration, for an update on their case. Rosa went without answers regarding her daughter and father's CAM applications until early March 2025. At that time, she was informed that it would take additional time for her daughter and father to travel to the United States on parole. Around the same time, Rosa was informed about the government's plans to terminate the CAM parole process.

344. If the CAM parole process is terminated, Rosa fears her daughter and father will not be able to travel to the United States at all. With each day that passes without parole, Rosa's

fourteen-year-old daughter remains in active danger from the same perpetrator who inflicted sexual violence and harm onto Rosa when she was fourteen years old. The termination of the CAM parole process is causing Rosa and her family serious anxiety and distress everyday Rosa's daughter remains in Honduras.

345. Plaintiff **Haitian Bridge Alliance ("HBA")** was founded for the purpose of assisting Haitian and other Black immigrants to acclimate to the United States and to promote their ability to navigate their new lives in the United States. HBA's core organizational activities have been to educate Black migrants about legal pathways and humanitarian protections and to provide them with legal services to access them. HBA has provided direct services to over 1,000 CHNV sponsors and parolees from Haiti.

346. Since January 2023, HBA has received over 3,000 urgent requests from potential Haitian parolee clients seeking sponsors to apply for the Haitian parole process and has conducted hundreds of consultations with Haitians wanting to apply for parole.

347. HBA has provided aid to individuals looking to sponsor Haitian migrants through the Haitian parole process by assisting these sponsors with the completion of their sponsorship applications (the Form I-134A) and ensuring they understand each aspect of the application. Between June 2023 and January 2024 alone, HBA staff spent over 500 hours on this work.

348. HBA has also partnered with Welcome.US—a national initiative that mobilizes and empowers Americans from across the country to welcome and support those seeking refuge here in the United States—to mobilize individuals eager to sponsor and help Haitians fleeing danger and seeking refuge in the United States through the Haitian parole process. Through HBA's partnership with Welcome.US, HBA registered over 140 Haitian parolee clients to help them get

connected with potential sponsors and successfully matched 20 Haitian parolee clients with sponsors.

349. HBA has also provided integration services to Haitian parolees once they arrive, including with regards to housing and other basic needs, transportation, and education.

350. As a result of the overwhelming demand for assistance with the CHNV parole processes, HBA expanded their team in 2023 by hiring additional staff members to continue supporting this work for CHNV sponsors and parolees in connection to HBA's overall mission and services.

351. The Trump administration's termination of the CHNV parole processes, including stopping the processing of CHNV parole applications, and the administration's suspension of processing immigration benefit applications filed by CHNV parolees directly and concretely impair HBA's core activities, and in multiple ways.

352. For one, the termination and suspensions waste the resources that HBA has already expended in helping potential sponsors and beneficiaries prepare and file applications for parole and, with regards to those who are already here, other immigration benefits.

353. In addition, the termination of parole for those Haitian parolees already here—which will also terminate their employment authorization—will require HBA to modify its approach to its core activities to meet the needs of those parolees, including their basic economic needs and their heightened legal needs.

354. The administration has terminated a legal pathway that is relied upon by many of HBA's clients and community members, and its actions directly interfere with HBA's humanitarian and legal support services being provided to CHNV sponsors and Haitian parolees. These needs have already increased, as the reporting of CHNV's termination by the Trump

Administration has led to a rapid increase in the number of Haitians and others seeking assistance from HBA, be it legal and otherwise.

355. The termination and suspension and the new needs it has created has forced HBA to suspend indefinitely its plans to expand the affirmative legal services it could offer its clients, and it will require HBA to respond to any deportation defense needs of CHNV parolees if they lose their status, which would be work that is outside the normal realm of services it offers CHNV parolees. Rather than move forward with their previous plans, HBA now must change course to meet the more immediate humanitarian and legal needs of the community it serves.

356. Since the release of the March 25 FRN, HBA has been receiving increasing numbers of calls to their hotline from individuals with CHNV parole panicking about how the March 25 FRN will affect them, including whether their parole has been or will be terminated, what will happen to their work authorization, and whether they could be targeted for expedited removal. HBA staff responding to these inquiries have had to rapidly analyze the FRN, its interaction with the administration's suspension of adjudication of immigration benefit requests for parolees, and each individual's particular circumstances in order to provide the most updated advice, legal and otherwise, to people impacted by the ever-changing landscape.

357. HBA's attorneys have also had to create and add new analysis and guidance about the March 25 FRN to an upcoming know-your-rights training, which will make it more difficult to address all the necessary information that the Haitian CHNV community needs in the time allotted. The Haitian CHNV community is understandably in crisis given the abrupt termination of the CHNV parole processes, the sudden and indefinite pause in the processing of additional immigration benefits, and now the high likelihood that Haitian CHNV parolees could be subjected to expedited removal in less than a month. The release of the March 25 FRN has only amplified

the ongoing, direct, and substantial impact of the administration's termination of parole processes on HBA's core activities of providing affirmative services and legal education to CHNV parolees.

358. Plaintiff **David Doe,** his wife, and their two sons, who are 14 and 11 years old, are beneficiaries of the FRP process for Ecuador. They live in Arkansas, where David works at a poultry plant and helps preach at two local Baptist churches, his wife cares for their children and home, and their sons enjoy attending a private Christian school. David's father, paternal grandmother, three aunts, one uncle, and several cousins are all U.S. citizens, and they all live in the United States. The FRP process has allowed David and his family to live in the United States while they wait for their visa to become available so they can apply for adjustment of status, a journey that began more than thirteen years ago. Back in October 2012, David's father filed an I-130 family-based petition to sponsor David and his family for an F3 immigrant visa. The priority date for their visa is October 6, 2012. The I-130 petition was approved in February 2020.

359. David and his family continued to wait in Ecuador for their visa to become available, but life there was not safe or secure for them or their children. There was a large presence of drug cartels, high levels of crime, and political instability. In November 2023, when they received an invitation from the U.S. government for David's father to sponsor him and his family for the FRP process, which would allow them to come to the United States while they waited for their visa, they were very excited. After waiting for so many years, they felt hope for the first time that they could move toward a new life in the United States and be closer to David's father and other family there. They hoped for stability for their kids, and more economic opportunities after David lost his job in Ecuador in February 2024. They are also deeply religious, and they felt strongly that God was calling them to the United States.

360. In February 2024, David's father submitted the Form I-134A to sponsor David and his family for the FRP process. After it was approved, David and his family completed the required medical exams and received the necessary vaccinations, which cost them approximately $1,800 for the four of them. They also completed paperwork and procedures for their dog, whom they brought with them to the United States. In May 2024, when they received their travel authorization, they began preparing to leave Ecuador, including by selling as many of their possessions as they could. They treated it like a permanent move, as they expected to be able to file their green card applications while they were in the U.S. In July 2024, David, his wife, and their sons were granted parole into the United States for a period of three years, through July 2027. David and his wife applied for and received their work permits shortly after, in August 2024. Their work authorization expires in July 2027 as well.

361. Life in the United States has provided David Doe and his family with a sense of peace and security, especially for his children, who are getting integrated at their school, learning English, and making good friends. David is proud of the life they have built, especially after patiently waiting for so many years to be able to come to the U.S. and following all of the rules and instructions from the government to get here.

362. The termination of current grants of FRP parole on January 14, 2026 is devastating to David and his family and will cause them immediate, concrete harm. While there is an exception for FRP beneficiaries who filed adjustment of status applications by December 15, David Doe and his family were not even eligible to file their application by that time, because the priority date for their family-based visa was not yet current. They are already experiencing serious emotional distress, fear, and uncertainty at the possibility that their parole will be terminated. If the government is able to end their parole on January 14, David Doe and his family will be forced to

uproot right as their lives were feeling more settled; sell their cars, furniture, and possessions, which would lose them money; and return to Ecuador, where it is not safe or stable for their family and where they would have to rebuild again. David would lose his job here and it would be difficult to ensure he can provide for their family. They would be separated from their family in the U.S., and David's sons would be torn from their school community and friends, and the only sense of normalcy they have known. When they felt so close to being able to apply to become permanent residents of the United States, the termination of their parole threatens to undo everything they have worked toward. Neither David nor his father have received any individualized notice that David's parole will be terminated on January 14, including in the mail or through David's MyUSCIS account.

363. Plaintiff **Jose Doe**, a national of Honduras, is living and working in Miami, Florida with his wife and two young children, ages five and ten-months, both of whom are U.S. citizens. Jose Doe and his wife are FRP beneficiaries. Jose's father, a U.S. citizen, filed an I-130 family-based petition for Jose in October 2012 to start the process for him to eventually immigrate to the United States and become a legal permanent resident. The priority date for Jose's visa application is October 3, 2012, and his current visa preference category is "F3," for married sons and daughters of U.S. citizens. The I-130 petition was approved in June 2013. Jose was not married and did not have any children at the time his father filed the I-130 petition.

364. Jose subsequently met his wife, and they got married in 2018. From 2018 to 2022, Jose and his wife lived in the United States under an exchange visitor visa, as Jose's wife had secured a job to teach at a school in North Carolina as part of an international teacher exchange program. Jose and his wife's first-born child was born in the United States during this period.

365. In August 2023, Jose's father received an invitation from the U.S. government for Jose and his wife to participate in the FRP process because of their approved I-130 petition. Jose and his wife eagerly accepted this invitation because life in Honduras was unstable and difficult for them and their family given the deteriorating economic and political situation in the country and their inability to sufficiently provide for their family financially given the economic insecurity and instability. Jose's father submitted the Form I-134A to sponsor Jose and his wife for the FRP process, and, after it was approved, Jose and his wife continued the process by completing all the requirements, like providing biographical information and completing background checks and medical exams. These medical exams cost Jose and his wife about $500 each.

366. In January 2024, Jose and his wife received travel authorization to come to the United States through the FRP process. In preparation for their move, they sold everything they owned because they treated the move as permanent, with the expectation and hope of being able to adjust their status in the United States. In March 2024, Jose and his wife arrived in the United States and were granted parole for a three-year period, until March 2027. Shortly after arriving, Jose and his wife applied for work authorization and subsequently received their work permits in April 2024. Their work authorization expires in March 2027 as well.

367. Jose and his family have established lives for themselves here in the United States. Jose works in maintenance for several Italian restaurants in the local area and other areas in Florida. Jose's wife is an elementary school teacher. Jose's family is part of a church community in their local area. Their son is currently in school, with the highest grades in his class. Jose and his family are now also reunited with Jose's family, as they live in the same city as Jose's father, brothers, and other extended family. Jose and his wife are in the process of applying for a loan to purchase a house and settle down as a family.

368. The government's announcement terminating the FRP processes and revoking grants of parole on January 14, 2026 unless a parolee has an adjustment of status (Form I-485) filed by December 15 destroyed Jose Doe and his family emotionally, and now he and his family as a result are experiencing emotional and psychological distress over what their future holds. Jose and his wife have not filed their adjustment of status applications yet because their priority date is not current based on the U.S. visa bulletin, which states that, as of December 2025, only people in the F3 visa category who have a priority date on or before July 22, 2012 can file for adjustment of status. If the government is permitted to prematurely truncate Jose and his wife's parole and related work authorization, Jose and his wife will suffer immediate and irreparable harm. They will lose their jobs and ability to work, be forced to break their apartment lease and abandon their plans to purchase a home in the United States. Their entire family will be uprooted from the lives they've established for themselves in the United States, separated once again from Jose's family here in the United States. Jose has not received any notice that his parole will be terminated on January 14, including in the mail or through his MyUSCIS account.

369. Plaintiff **Luciana Doe** and her daughter reunited with Luciana's mother and father, siblings, and other family in Arlington, Texas, through Family Reunification Parole after spending more than a decade apart. Luciana's mother, a U.S. lawful permanent resident, filed a Form I-130 for her in December 2017—the first step to help Luciana immigrate to the U.S. and apply for a green card. Because her parents are LPRs, Luciana will eventually be eligible to apply for a family-based visa in the F2B category for unmarried sons and daughters aged twenty-one and over of lawful permanent residents. However, because the backlog is extremely lengthy, she must wait until her priority date is current to apply for an adjustment of status to that of lawful permanent resident. Her priority date is December 1, 2017, and the latest Department of State visa

bulletin states that the Department is currently processing applications with a December 1, 2016 priority date.

370. In Colombia, Luciana lived alone with her young daughter and longed for a way to reunite with her family who has long lived in the United States. She continued waiting for an opportunity via an established legal pathway even after facing threats and serious danger to herself and her daughter. While living in Colombia, Luciana served as a legal witness to a crime resulting in the shooting of her friend. She took drastic measures to protect herself and her daughter afterwards, including selling her store, cutting her hair and changing her appearance, and moving away from her hometown for a time until one of the perpetrators of the crime was convicted and sentenced. However, the individual who shot her friend was released from prison after a brief incarceration, and Luciana remained in danger as he frequented the area where she lived. Still, Luciana continued to wait for a legal pathway to emigrate to the United States.

371. Such an opportunity finally arose in August 2023, when Luciana's U.S. citizen sister received an invitation from the U.S. government for Luciana to participate in the Family Reunification Parole process for Colombians, which allowed Luciana to be with her family in the United States while she continued to wait for her family-based visa to become available. After submitting extensive paperwork, sharing biographical information, completing a comprehensive and expensive medical examination, traveling to a U.S. port of entry, and undergoing additional screening and vetting by CBP at the port of entry, Luciana and her daughter were paroled into the U.S. pursuant to FRP around February 2024.

372. Understanding the purpose of FRP parole was to enable beneficiaries of approved I-130 applications to reunite with their sponsoring family members in the United States until they can file for adjustment of status, Luciana trusted in the U.S. government's invitation to begin a

new life here. She left everything behind in Colombia, which included selling her car, her apartment, and all her possessions, and leaving behind her university studies with less than two years remaining. Although it was a large sacrifice, she felt it was worth it to create a better life for herself and for her daughter, where her daughter could grow up around her family and achieve her dreams. Luciana and her daughter have made a life for themselves in the U.S. Luciana currently works at an airport car rental business, her daughter is thriving in school and has become proficient in English, and they spend regular quality time with their family in the U.S.

373. The government's announcement of termination of FRP parole and revocation of parole grants came as a crippling shock to Luciana. If the government is permitted to revoke her parole status, it will uproot her life, separate her from her family, and force her to restart with nothing in Colombia. Her daughter, who was two years old when she entered the U.S., has no memories of Colombia, and would likewise be separated from the family she has now grown up around and depends on for continuity, friendship, and care. The government's announcement is causing Luciana and her daughter tremendous stress, anxiety, and despair. Luciana has not received any notice that her parole will be terminated on January 14, including in the mail or through her MyUSCIS account.

374. Plaintiff **Francisca Doe**, her husband, and their three children—ages ranging from seven to fourteen years old—are beneficiaries of the FRP process for Guatemala living in Lynn, Massachusetts. In or around July 2012, Francisca's mother, a U.S. citizen, filed an I-130 family-based petition on Francisca and her family's behalf to sponsor them for an F3 immigrant visa. Their priority date for this application is July 12, 2012. In August 2013, Francisca's mother's I-130 petition was approved.

375. Francisca and her family waited for ten years in Guatemala for their priority date to become current to submit their adjustment of status applications to become green card holders, but life for them became increasingly more dangerous in 2023. Francisca's husband owned a bookstore in the area they lived in, which had a high presence of gangs and crime. These gangs would frequently threaten them to pay them money for Francisca's husband to be able to operate the store, threatening that something bad would happen to them and their children if they did not pay. As a result, life in Guatemala became very difficult for Francisca and her family. Her husband was not able to open the store regularly due to these gangs and thus lost income and business opportunities, impacting their ability to provide for their family.

376. In August 2023, Francisca's mother received an invitation from the U.S. government to sponsor Francisca and her family for the FRP process for Guatemalans. This opportunity came as an immense relief for Francisca and her family, as it was no longer safe for them to continue living in Guatemala due to the gang presence in their area. In or around March 2024, Francisca's mother filed the Form I-134A sponsorship application for the FRP process. After that was approved, Francisca and her family completed all of the subsequent steps for the process, like providing their biographical information, biometrics, and completing the necessary medical exams for each member of the family. The medical exams cost Francisca around $2,000 in total for the entire family. To pay for this, Francisca and her family sold their car.

377. In June 2024, Francisca and her family received travel authorization to come to the United States on parole. Francisca and her family treated the move as permanent because they were in the process of waiting for a family-based visa to become current so they could adjust their status in the United States and become legal permanent residents. In preparation for this move, Francisca and her family sold everything they owned, like their house and the family bookstore.

378. In August 2024, Francisca and her family arrived in the United States and were granted parole for three years, until August 2027. Soon after arriving, they also applied for work authorization and were approved in September 2024, until August 2027 as well. Francisca and her family lead a peaceful life in the United States, living in the same city as her mother and sister, both U.S. citizens. Francisca's husband works at a sausage factory, and Francisca is a stay-at-home mother for her three children. Francisca recently obtained an assistant license and is planning to become a daycare assistant for her sister's daycare once she is able to secure childcare for her children, including possibly at the daycare itself. Francisca's children have been attending and enjoying school and have been learning English at their school.

379. The news that individual grants of FRP parole would be terminated on January 14, 2026 came as a devastating shock to Francisca. Francisca and her family will suffer immediate and irreparable harm if their parole is prematurely terminated on January 14. While their visa priority date became current in December 2025 and they were able to file their adjustment of status applications on December 15, their applications were not accepted in time for the purposes of excepting them from the premature termination of their parole. Francisca and her family are left with a lot of uncertainty and worry about whether their parole will be terminated in January. Francisca has been experiencing anxiety and psychological distress as a result. If their parole is terminated, Francisca's husband will lose his job, and they will both lose the ability to work. They will be forced to uproot their lives, once again, and return to Guatemala, where they have no home to go to and where they face economic hardships and threats to their safety. Francisca and her family would be separated from her family here in the United States—her mother and sister and extended family—and Francisca's children would be ripped away from their school and life here

in the United States. Francisca has not received any notice that her parole will be terminated on January 14, including in the mail or through her MyUSCIS account.

380. Plaintiff **John Doe,** a national of El Salvador, is living and working in Houston, Texas. He resides with his father, who is a U.S. citizen, and his brother, who is a legal permanent resident. John is an FRP beneficiary sponsored by his father who filed an I-130 family-based petition for him in August 2018 to start the process for him to eventually emigrate to the U.S. and become a legal permanent resident. John's immigrant visa priority date is August 20, 2018, and his visa preference category is an "F1" visa for unmarried children of U.S. citizens who are 21 years of age or older. His I-130 petition was approved in October 2019.

381. In July 2023, John's father received an invitation from the U.S. government for John to participate in the FRP process because of the previously approved I-130 petition. John eagerly accepted the invitation because life in El Salvador was difficult for him due to economic insecurity and, as a gay man, the threat of violence and discrimination against LGBTQ+ people in a country with limited legal protections for sexual minorities. John's father submitted Form I-134A to sponsor John for the FRP process, and, after it was approved, John continued the process by completing all the requirements, including providing biographical information and undergoing background checks and medical exams. The medical exams cost him approximately $650.

382. In January 2024, John received travel authorization to come to the U.S. through the FRP process. In preparation for his move, he sold his vehicle and other belongings and ended the lease on his apartment, as he intended for the move to be permanent and to adjust his status while in the U.S. In March 2024, John arrived in the United States and was granted parole for a three-year period, until March 2027. Shortly after arriving, John applied for work authorization and

subsequently received his work permit in April 2024. His work authorization expires in March 2027 as well.

383. John has established a life for himself in the United States. He works as a Remittance Coordinator for a company that provides insurance services in the dental field, a position he started in May 2024. John worked for the same company in El Salvador starting in 2019 in an independent contractor role, but his employer offered him a full-time employee position in the United States that he would not have in El Salvador. Since starting his new role, John has been promoted, which allows him to work on more complicated cases and earn better pay. John has established himself financially with a car loan, credit cards, and bank accounts, and he is particularly proud of his high credit score that he worked hard to achieve. He has also established a 401(k) retirement account and has good health insurance benefits through his employer. John is now also reunited with his father and brother in Houston after years of separation.

384. The government's announcement terminating the FRP processes and revoking grants of parole on January 14, 2026 unless a parolee had an adjustment of status (Form I-485) filed by December 15 caused John to experience emotional and psychological distress at what his future holds. John has not filed his adjustment of status application yet because his priority date is not current based on the U.S. visa bulletin, which states that as of December 2025, only people in the F1 visa category who have a priority date on or before November 8, 2016 can file for adjustment of status now. If the government is permitted to prematurely truncate John's parole and related work authorization, John will suffer immediate and irreparable harm, as he will lose his job and ability to work, and he will be uprooted from the life he has established for himself in the United States, separated once again from his father and brother here in the United States. John's previous independent contractor position in El Salvador has been filled, and he would lose the

benefits of his promotion and full-time employee status. John would also lose his established financial stability, including his credit score, car, and all the professional progress he has made. John checks the visa bulletin once or twice every day hoping his priority date will become current, and he has not received any notice that his parole will be terminated, including in the mail or in his MyUSCIS account.

## CLASS ALLEGATIONS

385. Plaintiffs Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Miguel Doe, Lucia Doe, Daniel Doe, Omar Doe, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, Norma Lorena Dus, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, Rosa Doe, Francisca Doe, John Doe, Jose Doe, David Doe, and Luciana Doe (the "Putative Class Representatives") bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and all similarly situated persons for whom the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, the FRP FRN, the Dec. 2 USCIS Memo, and subsequent similar actions have halted the processing of their applications to sponsor parole beneficiaries and to seek additional immigration benefits and rescinded existing grants of parole. The Putative Class Representatives seek certification of a class (the "Plaintiff Class") consisting of:

386. All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to CHNV, U4U, OAW, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by

Defendants to pause or otherwise terminate the processing of such applications (the "Sponsor Subclass");

387. All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN, the FRP FRN, and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the "Rescinded Parolee Subclass"); and

388. All individuals who have received humanitarian parole through the already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the "administrative hold" set out in the February 14 Davidson memorandum, the January Higgins Directive, the Dec. 2 USCIS Memo, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Immigration Benefits Subclass").

389. This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

390. The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The demand for to sponsor beneficiaries through the U4U, CHNV, FRP, MPIP, and CAM parole processes has been high; USCIS received over 120,000 sponsorship applications for U4U, and more than 1.5 million sponsorship applications for CHNV parole, in just the first four or five months that the processes were made available. Although U4U has no monthly cap on the number of applications that can be granted, only a maximum of 30,000 CHNV applications can be granted each month, which is why USCIS eventually adopted a lottery system to process some CHNV applications, rather than processing them all on a first-come-first-served basis. Similarly, by the

time the first Trump administration attempted to take steps to terminate the CAM process, over 12,000 people had applied for the program. And while reliable statistics regarding the number of applications for MPIP are not publicly available, it appears that USCIS had approved close to 4,000 MPIP applications within two years in the late 2000s. The number of beneficiaries of humanitarian parole processes is also high: Approximately 200,000 Ukrainians have entered the United States through the U4U parole process; approximately 532,000 nationals of Cuba, Haiti, Nicaragua, and Venezuela have entered the United States through the CHNV parole processes; approximately 16,000 individuals have been paroled in since 2023 through the FRP processes; and approximately 75,000 Afghans were brought to the United States through Operation Allies Welcome. The numbers of beneficiaries of MPIP and CAM together also number in the many thousands. Although not all of these individuals are eligible for or have applied for additional immigration benefits, many thousands of them have already applied for asylum, TPS, and other status adjustments.

391. The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' interpretation of the INA's parole provision is lawful and supported by the text of the statute; whether the January 20 Huffman memorandum, the February 14 memorandum, the March 25 FRN, the FRP FRN, the Dec. 2 USCIS Memo, and other similar agency actions are not in accordance with law and/or with the agencies' own regulations; and whether the January 20 Huffman memorandum, the February 14 memorandum, the March 25 FRN, the FRP FRN, the Dec. 2 USCIS Memo, and other similar agency actions violate Plaintiff Class members' rights under the APA.

392. The claims of the Plaintiff class members share common issues of fact, including, but not limited to: whether, in issuing and implementing the January 20 Huffman memo, the

February 14 Davidson memorandum, and the March 25 FRN, the FRP FRN, and Dec. 2 USCIS Memo, Defendants acted contrary to law, or acted in an arbitrary and capricious manner by failing to consider important aspects of the problem they are addressing, or explained their decision counter to the evidence before them; whether Defendants quantified or considered harms that result from the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, the FRP FRN, the Dec. 2 USCIS Memo, and their implementation; and whether class members have suffered harm as a result of the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, the FRP FRN, the Dec. 2 USCIS Memo, and Defendants' actions taken to implement these memoranda.

393. Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff and satisfy Rule 23(a)(2).

394. The claims or defenses of the Putative Class Representatives are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Putative Class Representatives have been harmed by, among other things, Defendants' failure to abide by the plain text of the INA's parole provision, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems it is addressing. They have further been harmed by Defendants' failure adequately to explain their decision to issue the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, the FRP FRN, and the Dec. 2 USCIS Memo, as well as Defendants' premising these memoranda and their implementation on an erroneous interpretation of the INA's parole provision. Each of these actions, independently and collectively, have caused harm to the Putative Class Representatives and the Plaintiff Class members.

395. The Putative Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). The Putative Class Representatives will defend the rights of all proposed class members fairly and adequately and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Putative Class Representatives include experienced civil rights and immigration attorneys who are considered able practitioners in federal litigation, including constitutional and administrative law litigation. These attorneys should be appointed as class counsel.

396. The members of the proposed class are readily ascertainable through Defendants' records.

397. Through implementation and enforcement of the memoranda at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

398. Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

## FIRST CLAIM FOR RELIEF
## APA – Contrary to Law & *Ultra Vires*
## (Termination of parole processes)
## (Against Agency Defendants)

399. All foregoing allegations are repeated and realleged as though fully set forth herein.

400. Under the Administrative Procedure Act (APA), a reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to

constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

401. As explained above, within days of President Trump taking office again, DHS stopped adjudicating any pending requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and stopped accepting new requests for parole or re-parole through them.

402. Plaintiffs refer to the actions in the preceding paragraph as "terminating" those processes, but that characterization is immaterial to the legal infirmities of the actions.

403. DHS has not informed the public that it has stopped adjudicating requests for parole and re-parole made through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM. USCIS did put on its website on January 28, 2025 that it has "paused" accepting new applications for parole through U4U, CHNV, and FRP "until we review all categorical parole processes as required by" the "Securing Our Borders" executive order.

404. DHS subsequently published a Federal Register Notice on March 21, 2025, which expressly "terminat[es]" the CHNV parole processes and states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date." 90 Fed. Reg. 13611.

405. Then, on December 15, 2025, DHS published a Federal Register Notice that formally ended the Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans. FRP FRN, 90 Fed. Reg. 58032. That Notice also states that, absent an exception, "the parole of all [individuals] who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date." *Id.* at 58043.

406. The FRP FRN also stated that DHS would not refund the filing fees paid by approximately 15,000 pending applications to the Cuban Family Reunification Parole process even though it would not adjudicate those applications.

407. DHS's decisions to stop accepting new requests for parole or re-parole through named humanitarian parole processes and to stop adjudicating any pending such requests constitute final agency action, as do the discrete actions the agency Defendants took to implement this decision, including but not limited to the January Higgins directive, the March 25 FRN, and the FRP FRN.

408. DHS's decisions to stop accepting new requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM; to stop adjudicating any pending such requests; and to "terminat[e]" the CHNV and FRP parole processes, including by early termination of existing grants of parole and associated work authorizations, were based in substantial part on an erroneous interpretation of the parole statute, 8 U.S.C. § 1182(d)(5), contained in the January 20, 2025, memorandum of the then-Acting Secretary Huffman.

409. DHS's early termination of all existing grants of CHNV parole was also based on an erroneous interpretation of the expedited removal statute, 8 U.S.C. § 1225(b). The March 25 FRN states that *the* reason DHS decided not to let CHNV parolees keep what is left on their existing two-year grants of parole is that once they are here for more than two years, they would be ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(iii). 90 Fed. Reg. at 13620. But CHNV parolees cannot be put in expedited removal under § 1225(b)(1)(iii) regardless of how long they have been here, because the statute can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(iii)(II). By definition, all CHNV

parolees have been "paroled into the United States" and therefore may not be put through expedited removal under § 1225(b)(1)(iii)(II).

410. Because of DHS's actions, parole and re-parole applications that have been filed are now pending indefinitely, which eliminates the right for beneficiaries to obtain parole and holds legal consequences both for the applicants and their sponsors.

411. For example, Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, and Valentin Rosales Tabares all have pending applications for individuals for whom CHNV parole is the only legal pathway available for them to seek safety and stability in the United States. For Wilhen, those individuals are family members of hers who deal with routine violence in Haiti; for Valentin, CHNV parole has enabled him to sponsor his daughter-in-law and granddaughter, so that they may reunite with his son and be together as a family again. The termination of the CHNV parole processes means that the beneficiaries of Plaintiffs McAnany, Varner, Victor, and Tabares have lost their opportunity to come to the United States and potentially seek further protection here.

412. The termination of the FRP processes similarly and further harms Valentin Rosales Tabares, whose daughter and granddaughter have approved family-based immigrant visa petitions, but who have been waiting for years in Cuba for their visas to become available. It also harms Plaintiffs Francisca Doe, Luciana Doe, David Doe, John Doe and Jose Doe as detailed above.

413. Humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and remain authorized by the statutory parole authority, codified at 8 U.S.C. § 1182(d)(5).

414. Defendants' legal conclusion regarding the scope of the parole authority and the legality of these specific parole processes is contrary to law.

415. Defendants also failed to adhere to the procedure and substantive requirements of the parole statute itself. For example, in cutting short existing grants of CHNV and FRP parole, DHS did not determine that the purposes of the individuals' grants of parole had been served, as required by the parole statute. Nor did DHS terminate those grants of parole on a case-by-case basis, as also required by the parole statute.

416. Even Defendants' allegedly discretionary decisions are based on an erroneous understanding of their discretionary legal authority. For example, the January 20 Huffman memorandum's assertion that the Secretary of Homeland Security has absolute discretion to deny parole for any reason and in any circumstance is wrong; not only is the Secretary's exercise of that discretion subject to constitutional constraints and self-imposed regulatory constraints, it is also currently restricted by numerous injunctions and other court orders.

417. Defendants have no legal basis to retain filing fees paid by parole applicants whose applications Defendants have decided not to adjudicate as a matter of discretion, including those fees DHS said in the FRP FRN it would not refund to approximately 15,000 applicants to the Cuban Family Reunification Parole process.

418. Defendants' termination of these parole processes and all subsidiary decisions—including truncating existing grants of parole, refusing to adjudicate pending applications for parole and re-parole, and refusing to refund filing fees—must therefore be held unlawful, set aside, and/or otherwise vacated.

**SECOND CLAIM FOR RELIEF**
**APA – Contrary to Law & *Ultra Vires***
**(Various suspensions of benefits adjudication for parolees)**
**(Against Agency Defendants)**

419. All foregoing allegations are repeated and realleged as though fully set forth herein.

420. As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM.

421. USCIS did not seek to justify the suspension of the adjudication of benefits for individuals into the United States through one of these humanitarian parole processes until February 14, 2025, in the Davidson memorandum, which addressed only U4U, CHNV, and FRP.

422. Defendants took other actions later in 2025 that also suspended the adjudication of benefits applications for individuals paroled through the aforementioned processes, including the Dec. 2 USCIS Memo, which directed a suspension of asylum and withholding of removal processing (regardless of nationality) and of all processing for individuals who were born in or are nationals of 19 countries, including Afghanistan, Cuba, Haiti, and Venezuela.

423. When it has done so, DHS has generally not informed the public that it has suspended the adjudication of benefits for those who were paroled into the United States through these parole processes until well after the fact, if at all.

424. DHS has targeted and continues to target for removal (including expedited removal) the same parolees whose applications for immigration benefits it has stopped adjudicating.

425. Defendants' suspensions of benefits adjudication for parolees constituted final agency action, as did the discrete actions taken to implement it and on what it is based, including but not limited to the actions taken through the January 20 Huffman memorandum, the January Higgins directive, the February 14 Davidson memorandum, the Dec. 2 USCIS Memo.

426. Defendants' suspensions of the processing of immigration benefits for those paroled through an already established humanitarian parole process has clear legal consequences for many applicants, including because a suspension of an application for relief could leave an applicant stranded without employment authorization and/or legal status in the United States.

427. Defendants' processing suspensions are in excess of their legal authority and contrary to the statutory regime Congress created. By law, applicants have the right to apply for immigration benefits and for those applications to be adjudicated under the legal standards and through the process that Congress created. *See, e.g.*, 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1254a (TPS); 8 U.S.C. § 1255 (adjustment of status). Congress did not give Defendants the authority to stop processing those requests, to add requirements to the process or eligibility criteria, or to alter the applicable legal standards.

428. What is more, Defendants' various processing suspensions violate Congress's prohibition of discrimination in the issuance of immigrant visas, by treating immigrant visa applicants differently based on protected characteristics. 8 U.S.C. § 1152(a)(1)(A) ("Except as specifically provided in [four specified statutory provisions], *no person shall* receive any preference or priority or *be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence*.") (emphases added).

429. Defendants' blanket suspension of adjudicating applications that would benefit parolees is also contrary to the parole statute, which requires that "conditions" for parole be "prescribe[d] only on a case by case basis." 8 U.S.C. § 1182(d)(5)(A). A central purpose of the parole granted to Plaintiffs and class members was to facilitate their applying for other immigration benefits, including employment authorization and relief from removal. Defendants' suspensions alter that condition *en masse*, in violation of the statutory case-by-case requirement.

430. Defendants' suspensions of adjudicating applications that would benefit Plaintiffs and class members must therefore be held unlawful, set aside, and/or otherwise vacated.

**THIRD CLAIM FOR RELIEF**
**APA – Arbitrary and Capricious**
**(Termination of parole processes)**
**(Against Agency Defendants)**

431. All foregoing allegations are repeated and realleged as though fully set forth herein.

432. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

433. As detailed above, DHS has stopped adjudicating any pending requests for parole or re-parole through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; stopped accepting new requests for parole or re-parole through them; and issued the March 25 FRN and the FRP FRN expressly terminating the CHNV and FRP parole processes, including by early termination of existing grants of parole and associated work authorizations. All of these actions constitute final agency action as also discussed above.

434. Defendants' decision to stop adjudicating pending requests for parole or re-parole through already established humanitarian parole processes, to stop accepting new requests for parole or re-parole through those processes, and to expressly terminate the CHNV and FRP parole processes, including by early termination of existing grants of parole and associated work authorizations and the refusal to refund filing fees for pending applications that DHS will not adjudicate, were arbitrary and capricious, for failure to adequately consider and reasonably explain its consideration of the many factors relevant to that decision, including the facts and circumstances underlying the creation of those processes and the individual grants of parole thereunder; reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and potential sponsors, family members of current and potential parolees, and

their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the parole statute makes relevant. In so doing, DHS failed to consider important aspects of the problem and also failed to meet the APA's requirement to reasonably explain important decisions like these.

435. To the extent Defendants do offer some justifications for their actions, such as in the March 25 FRN and FRP FRN expressly terminating the CHNV and FRP parole processes, including by early termination of existing grants of parole and associated work authorizations, those justifications were not offered contemporaneously with the actual decisions and are pretextual.

436. Even had the explanations in the March 25 FRN and the FRP FRN been timely, they would still fail to satisfy Defendants' obligation to exercise the statutory parole authority reasonably and to reasonably explain their decisions after taking into account the relevant considerations. Among other defects, the two FRNs failed to consider the purposes of the parole statute and the INA more generally; the current conditions in Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela; the combined effects on CHNV and FRP parolees, their families, and their communities of the various other actions Defendants have taken, including the other agency actions challenged here; the correct interpretation of the parole statute and the expedited removal statute, 8 U.S.C. § 1225(b); available alternatives, including those within the ambit of existing policy; and reliance interests.

437. The two FRNs also reveal that DHS's decision to rely on constructive and/or electronic notice was based on speculation and did not consider the relevant factors, including alternatives.

438. DHS likewise failed to consider all relevant factors when it decided to keep the filing fees paid by applicants to the Cuban Family Reunification Parole process, even though the FRP FRN announces that DHS will not be adjudicating those applications. DHS also failed to reasonably explain this decision, which affected approximately 15,000 applicants who collectively paid millions of dollars.

439. In imposing an erroneously narrow interpretation of the parole statute on agency personnel while also authorizing and directing them to terminate all previously established humanitarian parole processes, Acting Secretary Huffman claimed in his January 20, 2025 memorandum that, even if a court disagrees with his legal conclusion, "I am also implementing this policy as a matter of my discretion to deny parole in any circumstance." Acting Secretary Huffman's claim that he would impose the same policy as a discretionary matter was a pretextual and/or contrived attempt to insulate his unlawful actions from judicial review.

440. In allegedly deciding to adopt the same policy as a matter of discretion, Acting Secretary Huffman failed to consider any factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the statute makes relevant. In so doing, he failed to consider important aspects of the problem.

441. DHS thus acted arbitrarily and capriciously in allegedly adopting, as a matter of discretion, its parole policy, and in taking all the aforementioned actions regarding specific parole processes and the individuals who have applied to and been paroled through them.

442. Defendants' termination of these parole processes and all subsidiary decisions—including truncating existing grants of parole, refusing to adjudicate pending applications for parole and re-parole, and refusing to refund filing fees—must therefore be held unlawful, set aside, and/or otherwise vacated.

**FOURTH CLAIM FOR RELIEF**
**APA – Arbitrary and Capricious**
**(Various suspensions of benefits adjudication for parolees)**
**(Against Agency Defendants)**

443. All foregoing allegations are repeated and realleged as though fully set forth herein.

444. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

445. As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, and doing so constitutes final agency action as also discussed above.

446. Defendants took other actions later in 2025 that also suspended the adjudication of benefits applications for individuals paroled through the aforementioned processes, including but not limited to: the February 14 Davidson memorandum; the July 21, 2025 suspension; and the actions announced in the Dec. 2 USCIS Memo.

447. When it has done so, DHS has generally not informed the public that it has suspended the adjudication of benefits for those who were paroled into the United States through these parole processes until well after the fact, if at all.

448. DHS has targeted for removal, including expedited removal, the same parolees whose applications for immigration benefits it has stopped adjudicating.

449. DHS's decisions to suspend adjudication of these requests for benefits were arbitrary and capricious due to Defendants' failure to consider seemingly every factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of them on those directly affected and on their family members and communities; the impact of them on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; the criteria made relevant by the statutes governing the applications; its own statutory authority; and the INA's prohibition on discrimination. In so doing, Defendants failed to consider important aspects of the problem.

450. In addition, DHS ignored and otherwise violated the APA reasonable explanation requirement.

451. DHS thus acted arbitrarily and capriciously in suspending the adjudication of applications for immigration benefits for individuals paroled into the United States through an established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

452. Defendants' suspensions of adjudicating applications that would benefit these individuals—including through the Higgins directive, the Feb. 14, 2025 Davidson memorandum, and the Dec. 2 USCIS Memo—must therefore be held unlawful, set aside, and/or otherwise vacated.

**FIFTH CLAIM FOR RELIEF**
**APA – *Accardi* Doctrine**
**(Failure to follow agency revocation procedures re: parole and EADs)**
**(Against Agency Defendants)**

453. All foregoing allegations are repeated and incorporated as though fully set forth herein.

454. Plaintiffs are entitled to written notice that their parole is being terminated before expiry of the authorized duration pursuant to DHS regulations, which states that "parole shall be terminated upon written notice to the alien . . . ." 8 C.F.R. § 212.5(e)(2)(i). That regulation identifies a single exception to "the written notice of termination required by § 212.5(e)(2)(i)," and it is wholly inapplicable here; in fact, it was last relevant in 1988. 8 C.F.R. § 212.5(e)(2)(ii) (generally prohibiting noncitizens paroled into the U.S. after the 1986 enactment of the Immigration Reform and Control Act (IRCA) from using that parole to adjust status under the 1986 legalization program—which closed in 1988—with violations of that prohibition resulting in automatic parole termination "without the written notice of termination required by § 212.5(e)(2)(i)."

455. Plaintiffs are also entitled to written notice that their employment authorization is being terminated before the expiry of the authorized duration pursuant to 8 C.F.R. § 274a.14(b), which states that a "written notice of intent to revoke the employment authorization" must be served, and that the individual "will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence."

456. Plaintiffs are also entitled to having any revocation of their parole or employment authorization be consistent with the substantive standards in the relevant agency regulations. For example, under the governing regulations, early termination of parole is only authorized "upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed . . . , neither humanitarian reasons nor public benefit warrants the continued presence of the [parolee] in the United States." 8 C.F.R. § 212.5(e)(2)(i).

457. Defendants' actions deprive individual parolees of the written notice of parole termination and the substantive regulatory standard to which they are entitled. The March 25 FRN

and the FRP FRN terminating parole processes for CHNV and FRP parolees fail to provide the required notices, to require others to provide the requisite notices, to apply the relevant substantive standard to revoke parole or employment authorization, or to require others to apply the correct substantive standards. Publication of a FRN and/or electronic notification to online USCIS accounts do not qualify as "written notice" of termination.

458. Defendants' actions, as set forth above, violate agency procedures and substantive legal standards, including those found at 8 C.F.R. §§ 212.5 and 274a.14.

459. Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

460. Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Defendants can of course change their regulations, but they must abide by them while they remain on the books.

**SIXTH CLAIM FOR RELIEF**
**Non-Statutory Claim to Enjoin Unlawful Executive Action**
**(Termination of parole processes & suspensions of benefits adjudication for parolees)**
**(Against All Defendants)**

461. All foregoing allegations are repeated and realleged as though fully set forth herein.

462. As discussed above, Defendants' decisions terminating humanitarian parole processes (and subsidiary actions like truncating parole and work authorization) including U4U, CHNV, OAW, FRP, MPIP, and CAM, and suspending benefits adjudications for individuals paroled through those processes, are contrary to the INA and in excess of the legal authority granted Defendants.

463. Defendants' actions should therefore be declared unlawful and enjoined pursuant to this Court's inherent equitable authority.

**SEVENTH CLAIM FOR RELIEF**
**Due Process Clause of the Fifth Amendment to the U.S. Constitution**
**(Termination of parole processes, suspensions of benefits adjudication for parolees)**
**(Against All Defendants)**

464. All foregoing allegations are repeated and realleged as though fully set forth herein.

465. Plaintiffs have a protected interest in applying for parole, re-parole, and other immigration benefits; in any grant of parole, re-parole, and other immigration benefits, including adjustment of status, TPS, asylum, and naturalization; in their requests being considered under lawful standards; and in the filings fees they paid to DHS along with their requests for immigration benefits.

466. Plaintiffs are entitled under the Due Process Clause of the Fifth Amendment to notice and an opportunity to be heard; to have their claims adjudicated pursuant to the laws enacted by Congress; and to not be deprived of their protected interest based on their immutable characteristics, such as country of origin or the historic fact that they were paroled into the country.

467. Defendants' actions terminating the parole processes (including all subsidiary decisions, including truncating parole and employment authorization, rescinding conditional approvals, and denying applications without consideration of their merits) and suspending benefits adjudication (including through the January 23, 2025 Higgins email, the February 14, 2025 Davidson Memorandum, and the Dec. 2, 2025 USCIS Memo) violate Plaintiffs' right to due process in numerous ways by depriving them of a meaningful opportunity to apply for and establish—under lawful standards—their eligibility for parole, re-parole, other immigration benefits, to the remainder of any grant of parole they have already received, and to the filing fees paid for applications that will not be adjudicated.

468. Defendants also violated Plaintiffs' right to due process by failing to provide them of adequate notice of Defendants' actions, even after Defendants have taken them, and notwithstanding that Defendants' actions impose serious legal consequences on Plaintiffs personally. By failing to give adequate notice, Defendants have deprived Plaintiffs of the opportunity to be heard regarding Defendants' actions. Defendants have also deprived Plaintiffs of opportunities to seek other forms of immigration relief and of other ways to avoid the trauma of arrest, detention, and removal, including expedited removal. Defendants' termination of these parole processes, their mass truncations of existing parole and employment authorization, their suspensions of benefits adjudication, and their failure to refund filing fees must therefore be held unlawful, set aside, otherwise vacated and/or enjoined as violative of the Fifth Amendment.

**EIGHTH CLAIM FOR RELIEF**
**APA – Notice and Comment**
**(Mass truncation of parole & suspensions of benefits adjudication)**
**(Against Agency Defendants)**

469. All foregoing allegations are repeated and realleged as though fully set forth herein.

470. Defendants' mass truncations of parole and employment authorization and their various suspensions of benefits adjudication for parolees and others are substantive rules subject to the notice-and-comment requirements of the APA. Under 5 U.S.C. § 553(b), before promulgating such a rule, an agency must publish notice in the Federal Register and provide interested persons an opportunity to participate through submission of written comments. Defendants failed to do so as to any of the agency actions challenged here.

471. Each of the aforementioned agency actions is a legislative rule, not an interpretive rule or policy statement exempt from § 553. A rule is legislative when it effects a change in existing law or policy or imposes new rights or obligations. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96-97 (2015). The mass truncations of existing grants of parole and employment authorization

fundamentally altered the legal status of individuals who had been paroled into the United States and were authorized by law to be here, imposing new obligations (to depart or face removal, including expedited removal) where none previously existed.

472. Mass truncation also has a binding effect on both agency personnel and affected individuals. DHS personnel are now required to treat the affected parolees as lacking authorization to remain in the United States. Affected parolees face immediate loss of work authorization, the accrual of unlawful presence, potential removal proceedings, and collateral legal consequences. Rules with such binding legal consequences require notice and comment. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979).

473. Defendants' suspensions of adjudicating pending applications for adjustment of status, naturalization, and other immigration benefits for parolees and other noncitizens also constitute legislative rules subject to notice-and-comment requirements. Each suspension operates as a binding norm that categorically denies an entire class of applicants access to congressionally authorized benefits, imposing new substantive burdens on that class. Congress established various forms of immigration relief and directed DHS to adjudicate requests for that relief. DHS has promulgated regulations providing additional specificity while also committing itself to adjudicating such requests in a particular way. Yet, per Defendants' suspensions—which fail to identify their own legal bases—agency personnel are prohibited from granting relief to a defined class of requestors, without regard to the merits of individual requests and existing law, effectively amending the regulatory framework governing eligibility for those benefits. Actions of this nature require notice and comment.

474. The INA grants the Secretary of Homeland Security some discretion in granting and terminating a noncitizen's parole and in administering the systems for immigration benefits

that Congress created. But where, as here, an agency exercises its discretion through generally applicable rules affecting entire classes of persons—rather than through individualized determinations—it must comply with § 553. *See Texas v. United States*, 809 F.3d 134, 171-78 (5th Cir. 2015) (DAPA), *aff'd by equally divided court*, 579 U.S. 547 (2016). This is so regardless of whether the agency's actions are substantively permissible.

475. Defendants cannot avoid notice-and-comment requirements by characterizing the challenged actions as general statements of policy. A policy statement merely advises the public of how an agency proposes to exercise discretionary power; it does not bind agency decisionmakers or create legal consequences.

476. Additionally, DHS has not offered an adequate justification for not using the required procedures.

477. Because Defendants failed to comply with the APA's procedural requirements, their actions were "without observance of procedure required by law" and therefore must be vacated. 5 U.S.C. § 706(2)(D).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue a preliminary injunction and/or a stay under 5 U.S.C. § 705 in order to restore the *status quo ante*, under which CHNV and FRP parole beneficiaries are entitled to enjoy the full duration of their already-issued grants of parole (and work authorization), and under which adjudications for requests for parole and/or re-parole under already established humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM, as well as other requests for immigration benefits for individuals paroled through such processes, all resume and continue in the ordinary course pursuant to the policies in effect prior to the January 20 Huffman memorandum.

2. Declare that humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and are in accordance with the statutory parole authority, 8 U.S.C. § 1182(d)(5);

3. Declare that Defendants' terminations of already existing humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM were contrary to law, arbitrary and capricious, and violated the constitutional guarantee of due process;

4. Declare that the March 25 FRN terminating parole and work authorization granted under the CHNV parole processes and the FRP FRN doing the same regarding the FRP parole processes were contrary to law, in excess of legal authority, arbitrary and capricious, failed to adhere to required processes, and violated the constitutional guarantee of due process;

5. Declare that Defendants' suspensions of the adjudication of benefits applications for individuals paroled through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were contrary to law, in excess of legal authority, arbitrary and capricious, failed to adhere to required processes, and violated the constitutional guarantee of due process;

6. Hold unlawful, set aside, and/or otherwise vacate Defendants' suspensions of the adjudication of requests for parole and re-parole through established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; Defendants' suspensions of the adjudication of requests for immigration benefits for individuals paroled through such humanitarian parole processes; the January 20, 2025 Huffman memorandum; the January Higgins directive; the February 14, 2025 Davidson memorandum; the Dec. 2 USCIS Memo, and all DHS actions based thereon or implementing one thereof;

7. Enjoin Defendants from applying their erroneous interpretation of the parole statute to individuals paroled into the United States through already established humanitarian parole

Case 1:25-cv-10495-IT Document 212-1 Filed 12/29/25 Page 139 of 141

processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; and from again suspending the adjudication of immigration benefits of individuals paroled through such processes;

8. Certify this case as a class action lawsuit, and appoint class counsel of record, as proposed herein;

9. Award Plaintiffs' counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

10. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: December 29, 2025

Respectfully submitted,

*/s/ John A. Freedman*
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice* pending)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice* pending)
Sarah Elnahal (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice* pending)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: December 29, 2025

*/s/ John A. Freedman*
John A. Freedman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.

Plaintiffs,

– *v.* –

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.

Defendants.

Civil Action No.: 1:25-cv-10495-IT

**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND/OR STAY OF *EN MASSE* TRUNCATION OF FAMILY REUNIFICATION PAROLE**

Plaintiffs respectfully move for a temporary restraining order, preliminary injunction, and a stay under 5 U.S.C. § 705 of Defendants' unlawful truncation of all remaining valid grants of humanitarian parole issued, on a case-by-case basis, to approximately 15,000 immigrants from seven Latin American countries (Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras) through various Family Reunification Parole processes (hereinafter, "FRP"). Absent relief, an estimated 10,000 to 12,000 of these individuals (more than a quarter of them children) will lose their legal status on January 14, 2026 pursuant to Secretary Noem's unlawful actions. These immigrants were paroled into the country while waiting the last few years until their green cards are available, and some are just weeks away. Many will not even learn they have been rendered unlawfully present.

These parolees all have, under existing law, a clear path to becoming lawful permanent residents (LPRs) based on approved family-based visa petitions filed by their U.S. citizen or LPR family members, and are merely waiting here for the last few years before their immigrant visa becomes available. Although in a temporary status, these parolees did not come temporarily; they

came to get a jumpstart on their new lives in the United States, typically bringing immediate family members with them (more than a quarter of FRP parolees are children). These future green card holders, moreover, were affirmatively invited to come by the United States government. They had been waiting abroad for their visa when the State Department affirmatively reached out to their sponsoring family members and invited them to apply to the FRP processes; without an invitation, there was no way to apply. Since they arrived, FRP parolees have gotten employment authorization documents (EADs), jobs, and enrolled their kids in school. Once their visa becomes available—FRP parolees received three-year grants of parole from when they entered, and none had more than five years to wait when their families were invited to apply to the FRP processes—the FRP parolees can file an application to adjust status to lawful permanent resident (a Form I-485). Cuban FRP parolees (only) do not even have to wait that long: they can apply to adjust status to LPR after just one year of physical presence in the United States, under the Cuban Adjustment Act. The FRP processes for Cuba and Haiti date to 2007 and 2014, respectively, and the others began in 2023.

Notwithstanding the foregoing, on December 15, 2025 the Department of Homeland Security published in the Federal Register notice of Secretary Noem's decision to end all of the family reunification parole processes, which had been suspended since January 2025. *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025) (the "FRP FRN"). Secretary Noem principally justified ending FRP due to its failure to reduce border encounters, a metric unrelated to the processes' stated purpose of expediting family reunification.

In addition to ending the processes prospectively, the FRP FRN announced that pending applications would be summarily denied without adjudication. Most relevant here, it also announced that existing grants of FRP parole will terminate on January 14, 2026, if they had not

expired already. According to the FRN, "[t]here are two circumstances" where an FRP parolee's grant of parole will not end on January 14, 2026. *Id.* One is if Secretary Noem "determines otherwise on a case-by-case basis." *Id.* The other is that FRP parolees who filed an adjustment of status application (Form I-485) "before December 15, 2025 that is still pending adjudication as of January 14, 2026" retain their original parole expiration date until it expires or their adjustment of status application is adjudicated, whichever is sooner. *Id.* A denial of their adjustment of status application immediately terminates their grant of parole and they are "expected to depart the United States immediately if they have no other lawful basis for remaining," as are the other FRP parolees whose parole will now end on January 14. Like with its termination of CHNV parole, DHS principally relies on "constructive" notice of its actions, meaning many FRP parolees will not even know that, come January 14, Immigration and Customs Enforcement and other federal officers will view them as unlawfully present and legitimate targets for arrest, detention, and removal, to say nothing of the possible collateral legal consequences on their future ability to become LPRs and U.S. citizens.

As shown in their accompanying memorandum of law, Plaintiffs are likely to succeed in proving that DHS fell well short of satisfying their most basic obligations under the APA, due process, the parole statute, and its own regulations. Absent preliminary relief from this Court, an unknown number of law-abiding future green card holders will be rendered unlawfully present and removable, and many of them won't even know. Plaintiffs respectfully request that, as soon as possible, the Court issue a temporary restraining order, preliminary injunction, and/or stay under 5 U.S.C. § 705 on behalf of a certified class so as to prevent Defendants' unnecessary, unlawful, and process-free revocation of their bridge to a green card.

**REQUEST FOR ORAL ARGUMENT**

To the extent that it would aid the Court in the expeditious resolution of this motion, Plaintiffs respectfully request an oral argument pursuant to Local Rule 7.1(d).

Dated: December 29, 2025

Respectfully submitted,

*/s/ Justin B. Cox*

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

*Attorneys for Plaintiffs*

**CERTIFICATE UNDER LOCAL RULE 7.1(a)(2)**

The plaintiffs, through their counsel, have conferred with the defendants' counsel pursuant to Local Rule 7.1(a)(2) regarding the subject matter of the instant motion, and the parties have not come to a resolution. Defendants' counsel stated that they will oppose this motion.

Dated: December 29, 2025

*/s/ Justin B. Cox*
Justin B. Cox

**CERTIFICATE OF SERVICE**

I, Justin B. Cox, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: December 29, 2025

*/s/ Justin B. Cox*
Justin B. Cox

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, *et al.*,

Plaintiffs,

– *versus* –

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

Defendants.

**Civil Action No.: 1:25-cv-10495-IT**

**INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND STAY OF DHS'S *EN MASSE* TRUNCATION OF ALL VALID GRANTS OF FAMILY REUNIFICATION PAROLE (Doc. No. 216)**

| Description | Doc. No. |
|---|---|
| *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025) | 216-1 |
| *Agency Information Collection Activities; Revision of a Currently Approved Collection: Application for Travel Document. Removal of Instructions Regarding the Haitian Family Reunification Program and Filipino World War II Veteran Parole Program*, 85 Fed. Reg. 84362 (Dec. 28, 2020) | 216-2 |
| Declaration of Plaintiff David Doe (FRP parolee) | 214-2 |
| Declaration of Plaintiff Francisca Doe (FRP parolee) | 214-3 |
| Declaration of Plaintiff John Doe (FRP parolee) | 214-4 |
| Declaration of Plaintiff Jose Doe (FRP parolee) | 214-5 |
| Declaration of Plaintiff Luciana Doe (FRP parolee) | 214-6 |
| Declaration of Plaintiff Valentin Rosales Tabares (FRP sponsor) | 24-12 |

| | |
|---|---|
| *Implementation of a Family Reunification Parole Process for Colombians*, 88 Fed. Reg. 43591 (July 10, 2023) | 24-26 |
| *Implementation of a Family Reunification Parole Process for Ecuadorians*, 88 Fed. Reg. 78762 (Nov. 16, 2023) | 24-27 |
| *Implementation of a Family Reunification Parole Process for Guatemalans*, 88 Fed. Reg. 43581 (July 10, 2023) | 24-28 |
| *Implementation of a Family Reunification Parole Process for Hondurans*, 88 Fed. Reg. 43601 (July 10, 2023) | 24-29 |
| *Implementation of a Family Reunification Parole Process for Salvadorans*, 88 Fed. Reg. 43611 (July 10, 2023) | 24-30 |
| *Implementation of Changes to the Haitian Family Reunification Parole Process*, 88 Fed. Reg. 54635 (Aug. 11, 2023) | 24-31 |
| *Implementation of Changes to the Cuban Family Reunification Parole Process*, 88 Fed. Reg. 54639 (Aug. 11, 2023) | 24-32 |
| *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75581 (Dec. 18, 2014) | 24-33 |
| *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65588 (Nov. 21, 2007) | 24-34 |
| *Termination of the Cuba, Haiti, Nicaragua, and Venezuela Parole Processes*, 90 Fed. Reg. 13611 (Mar. 15, 2025) | 71-1 |

national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3).[25] Accordingly, the termination of the Ethiopia Temporary Protected Status designation will be effective 60 days from this notice's publication date.[26]

DHS recognizes that Ethiopian Temporary Protected Status beneficiaries continue to be authorized to work during the 60-day transition period.[27] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain Employment Authorization Documents previously issued under the Temporary Protected Status designation of Ethiopia through February 13, 2026. Therefore, as proof of continued employment authorization through February 13, 2026, Temporary Protected Status beneficiaries can show their Employment Authorization Documents that have the notation A–12 or C–19 under Category and a ''Card Expires'' dates of June 12, 2024 and December 12, 2025.

The Secretary has considered putative reliance interests in the Ethiopia Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

**Notice of the Termination of the Temporary Protected Status Designation of Ethiopia**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Ethiopia; (b) whether permitting the nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) to remain temporarily in the United States is contrary to the national interest of the United States; (c) whether Ethiopia is experiencing ongoing armed conflict that poses a serious threat to the personal safety of Ethiopian nationals, and (d) whether extraordinary and temporary conditions in Ethiopia that prevent Ethiopian nationals from returning in safety continue to exist. Based on my review, I have determined that Ethiopia no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(A) or (C), 8 U.S.C. 1254a(b)(1)(A) or (C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Ethiopia for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on February 13, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov.*

**Kristi Noem,**
*Secretary of Homeland Security.*

[FR Doc. 2025–22746 Filed 12–12–25; 8:45 am]

BILLING CODE 9111–97–P

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2806–25]**

**RIN 1615–ZC12**

## Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (''DHS'') is terminating the categorical parole processes for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole processes announced, or updated, by DHS in 2023 (hereinafter referred to as ''modernized FRP programs''). DHS is also terminating the residual processing of legacy cases under the Cuban Family Reunification Parole program (''legacy CFRP'') and the Haitian Family Reunification Parole program (''legacy HFRP'') first implemented by USCIS in 2007 and 2014, respectively (collectively, the ''legacy FRP programs''). This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of all nine programs (hereinafter ''the FRP programs''), termination of parole for aliens paroled under the FRP programs, and revocation of employment authorization based on being an alien paroled under the FRP programs.

**DATES:** DHS is terminating the FRP programs as of December 15, 2025. The temporary parole period of aliens who have been paroled into the United States under the FRP programs, and whose initial period of parole has not already expired by January 14, 2026 will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485, Application to Register Permanent Residence or Adjust Status, that is postmarked or electronically filed as of December 15, 2025 that is still pending adjudication as of December

[25] Whether to allow for an additional ''orderly departure'' period following a Temporary Protected Status designation termination (beyond the statutory minimum of 60 days) is an ''option'' left to the Secretary's unfettered discretion. INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Although DHS has allowed such extended periods for certain Temporary Protected Status terminations, *see, e.g., Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (6-month orderly transition period), certain other Temporary Protected Status designations were terminated without allowing for such transition periods, *see, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (same).

[26] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

[27] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

15, 2025; or (2) the Secretary of Homeland Security ("the Secretary") determines otherwise on a case-by-case basis. Aliens without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS implemented updates to the modernized FRP programs.[1] The modernized FRP programs were available by invitation only to certain petitioners with approved Forms I–130, Petition for Alien Relative, filed on behalf of principal beneficiaries who were nationals of designated countries and their immediate family members. DHS also updated the legacy FRP programs to align with the procedures used for the modernized FRP programs.[2] Under the modernized FRP programs, qualified beneficiaries who were outside the United States could be considered, on a case-by-case basis, for advanced authorization to travel to the United States to seek a temporary period of parole for urgent humanitarian reasons or significant public benefit. Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023);[3] Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).[4]

On January 20, 2025, President Trump issued Executive Order ("E.O.") 14165, "Securing Our Borders."[5] Section 2 of the E.O. establishes the policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the E.O. directs the Secretary of Homeland Security ("Secretary") to, consistent with applicable law, take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders."[6]

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the FRP programs. Although DHS established the categorical program for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the seven categorical programs was very similar,[7] as is the rationale for terminating them. Therefore, DHS is announcing the termination of all seven modernized FRP programs, in addition to any continued processing under the legacy FRP programs, by publishing this single notice in the **Federal Register**. Consistent with the Secretary's statutory and regulatory authority, the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date, subject to certain exceptions.

## II. DHS Parole Authority

The Immigration and Nationality Act ("INA") confers upon the Secretary the narrow discretionary authority to parole aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A); 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(a), (c)–(e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien shall "return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the legislative history of the parole statute supports the contention that Congress has sought to limit the use of the parole authority to specific instances rather than as a means of circumventing established immigration laws or processing times.[8]

---

[1] The five new categorical parole programs implemented in 2023 for Colombia, Ecuador, El Salvador, Guatemala, and Honduras, and the two existing programs for Cuba and Haiti that were updated in August 2023, all utilize the online Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, to initiate the process of being considered for parole by DHS. Collectively, these seven Form I–134A-reliant programs will be referred to as the "modernized FRP programs." The FRP programs created in 2007, for Cuba, and 2014, for Haiti, utilized Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, to request parole from USCIS. Collectively, these Form I–131-reliant programs will be referred to as the "legacy FRP programs." All nine programs combined, both modernized and legacy, are referred to as the "FRP programs."

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007); Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014). These programs were superseded by the modernized processes implemented on August 11, 2023. No new filings were accepted for these programs after August 11, 2023, except for certain add-on derivative beneficiaries of principal beneficiaries with a pending legacy CFRP application. However, processing of applications that were pending under legacy CFRP continued according to the process established in December 2014. *See* Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014). Requests for re-parole have continued to be processed under legacy HFRP.

[3] *See* 72 FR 65588 (legacy CFRP was originally established in 2007 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed for new filings in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[4] *See* 79 FR 75581 (legacy HFRP was originally established in 2014 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[5] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[6] *Id.*

[7] *Compare, e.g.,* 88 FR at 43593–43596, *with* 88 FR at 78765–78768, 72 FR at 65588, and 79 FR at 75582 (setting out the justifications for the parole programs for Colombia, Ecuador, Cuba, and Haiti, respectively).

[8] Parole was codified into immigration law in the 1952 INA. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, "the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress. For example, the House Report for the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA") stated:

[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who

Continued

Under the law, the determination to parole an alien into the country should only be made on a discretionary, case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a U.S. port of entry (''POE'') is made by U.S. Customs and Border Protection (''CBP'') officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the FRP programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11); *see also* One Big Beautiful Bill Act, Public Law 119–21, secs. 100003(b), 100010(a), 139 Stat 72, 366, 372 (July 4, 2025) (8 U.S.C. 1803(b), 1809(a)) (prescribing fees and specific validity periods for parole-based EADs). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an applicant for admission. *See* INA 212(d)(5)(A), 1182(d)(5)(A); *see also* 8 CFR 1.2 (''An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked.''), 1001.1(q) (same).

## III. Rationale for Termination

When DHS established the FRP programs, DHS wrote that the programs would provide a significant public benefit for the United States by: (i) promoting family unity; (ii) furthering important foreign policy objectives; (iii) providing a lawful pathway and timely alternative to unlawful migration at the southwest land border; (iv) reducing strain on limited U.S. resources; and (v) addressing the root causes of migration through economic stability and development supported by increased remittances.[9]

For the reasons discussed below, DHS has determined that it is now appropriate to terminate the FRP programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes.[10] These reasons, independently and cumulatively, support termination of the FRP programs.[11]

Accordingly, the Secretary, in her discretion, is terminating the FRP programs. Consistent with her statutory authority, the Secretary retains discretion to grant a new period of parole, also known as re-parole, to any alien who was paroled into the United States under the FRP programs, temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

### 1. Promote Family Unity

According to the notices that announced their creation, the FRP programs were designed to provide a faster pathway for U.S. citizens and lawful permanent residents (LPRs) to reunite with family members in the United States while awaiting availability of their immigrant visas. The notices justified the action by stating that nationals of those countries often face long waits for immigrant visas before they can travel to the United States and apply for admission.[12]

DHS acknowledges that aliens paroled into the United States under the FRP programs may have been able to reunite with family members in the United States. However, upon further review of the scope and impact of the FRP programs in their totality, and in line with Executive Orders issued by President Trump, DHS has determined that national security and fraud concerns, and the current Administration's priorities outweigh those interests and weigh in favor of terminating the programs.

The modernized FRP programs, based on their specific procedures, created security gaps not present in other paths for family members pursuing LPR status, such as through consular processing. Through consular processing, potential beneficiaries chose to remain outside the United States until their immigrant visa priority dates are current. Once a visa is available based on their priority date, the potential beneficiary completes consular processing with the Department of State (''State''), including submission of biometrics, an in-person interview outside the United States, and submission of various documents to establish the necessary family relationship with the petitioner before a visa is issued. The use of biometrics for background and security checks as part of consular processing allows for robust public safety and national security vetting of the potential beneficiary before travel to the United States on a commercial air carrier is authorized and completed.

In contrast, under the modernized FRP programs, potential beneficiaries would travel to the United States to seek parole at a POE, and if paroled, they could then apply to adjust status to that of an LPR once their immigrant visa priority dates became current. Under these programs, DHS conducted minimal public safety and national security vetting of the supporters based on biographic information the supporter

do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

*See* H.R. Rep. 104–469, pt. 1, at 140 (1996). In IIRIRA, Congress struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, ''for emergent reasons or for reasons deemed strictly in the public interest'' as grounds for granting parole into the United States and inserted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' Public Law 104–208, div. C, § 602(a). ''The legislative history indicates that this change was animated by concern that parole under [INA 212(d)(5)(A)] was being used by the executive to circumvent congressionally established immigration policy.'' *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[9] *See, e.g.,* 88 FR at 43593–96; *see also* 72 FR 65588 (The legacy CFRP initial implementation notice in 2007 relied on family unification, discouragement of unlawful migration, and furtherance of the U.S.-Cuba Migration Accords as justifications); 79 FR at 75582 (The legacy HFRP initial implementation notice in 2014 relied on family unification and reconstruction and development assistance for Haiti through remittances).

[10] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''[W]hen the purposes of such parole shall, in the opinion of the [Secretary of Homeland Security], have been served the alien shall forthwith return or be returned to the custody from which he was paroled. . . .'').

[11] The FRP programs were promulgated under the theory that they would, in general, provide a significant public benefit to the United States. *See, e.g.,* 88 FR at 43613 (''The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy . . .''). Although the Secretary retained the authority to parole eligible aliens on a case-by-case basis based on ''urgent humanitarian reasons,'' the driving impetus for the creation of the FRP programs or attendant grants of parole was the significant public benefit justification. But for the significant public benefit justification, DHS would not have established the FRP programs.

[12] *See e.g.,* 88 FR at 43593–94; *see also* 72 FR at 65588; 79 FR at 75582.

provided on the Form I–134A. For example, DHS only vetted to ensure that the supporter was the named petitioner on the Form I–130 for the principal beneficiary and that supporters that were LPRs had not lost their LPR status, in addition to TECS [13] checks. Additionally, DHS conducted minimal public safety and national security vetting of potential beneficiaries by only reviewing biographic information and photos that each beneficiary provided before being considered for an advance travel authorization (ATA). Moreover, biometrics were not submitted by each potential beneficiary until they arrived at the interior POE to seek parole from CBP. Therefore, additional vetting, that could otherwise be completed as part of consular processing before travel is authorized, did not occur prior to issuance of an ATA or before the potential beneficiary boarded a plane to travel to the United States. Many of the security screening systems used by the U.S. government to evaluate applicants for immigration benefits rely on biometrics. Since beneficiaries were not fingerprinted before arriving at a U.S. POE, these checks could not be conducted beforehand to thoroughly vet the alien. Furthermore, beneficiaries under the modernized FRP programs were not interviewed by USCIS, unlike beneficiaries of the legacy FRP programs. In the legacy CFRP program and legacy HFRP program, interviews provided an opportunity to gather additional information about the beneficiary and identify any discrepancies between their application and their in-person statements, as well as to surface any other potential concerns through their testimony. However, these programs were replaced by the modernized FRP programs for Cuba and Haiti for prospective beneficiaries in 2023.[14]

Given these critical differences, the procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety.

The FRP programs also presented an unacceptable risk of abuse and fraud. When biometrics collection and interviews do not occur prior to a beneficiary's arrival in the U.S., the risk of fraud increases. U.S.-based petitioners may misrepresent family relationships (*e.g.,* falsely claiming a familial tie) to facilitate the entry of unauthorized aliens. Moreover, reliance solely on an approved Form I–130 does not guarantee the ongoing legitimacy of a relationship, particularly in cases involving spouses where circumstances may have changed since the petition was filed. Even with an approved Form I–130, adjudicators may have missed key indicators of fraud, and adding another layer of scrutiny, such as an interview, can be valuable in verifying eligibility. Additionally, beneficiaries from countries with weak civil registry systems may submit fraudulent documents (such as birth certificates or other identity documents) to support their claims. Having in-country experts, such as consular officers familiar with local documentation, can be critical in identifying and preventing document fraud during the visa process. The process of interviewing beneficiaries overseas and collecting their biometrics plays a critical role in preventing fraud and abuse of the immigration system—steps that were entirely bypassed under the modernized FRP programs. Accordingly, the FRP programs' lack of procedural and vetting guardrails created an unacceptable level of risk of fraud and abuse.

DHS has determined that the desire to reunite families before their priority dates are current does not outweigh the U.S. government's responsibility to prevent fraud and abuse of these programs and to uphold national security and public safety for the American people.

Moreover, the FRP programs no longer accord with the Administration's current enforcement-based priorities, namely to better ''achieve the total and efficient enforcement, including through lawful incentives and detention capabilities'' of U.S. immigration law.[15] The modernized FRP programs, initiatives of the prior administration, do not align with this Administration's emphasis on enforcing immigration law, deterring unlawful immigration, and eliminating fraud and abuse. Indeed, E.O. 14165, ''Securing Our Borders,'' embodies the priorities of this Administration and makes clear that ''all future parole determinations fully comply with [the order to terminate all categorical parole programs] and with applicable law.'' [16]

*2. Further Important Foreign Policy Objectives*

One of the stated goals of the modernized FRP programs established in July 2023 was to promote the foreign policy objectives of the prior administration.[17] Indeed, DHS explained consistently in its notices promulgating the FRP programs that implementation would advance the foreign policy objectives of the then-current administration.[18]

Furthermore, DHS established the legacy CFRP Program in 2007, and modernized it in August 2023, in part to further enable the United States to meet its commitment to ensure the lawful migration of a minimum of 20,000 Cubans each year under the U.S.-Cuba Migration Accords.[19] DHS also established the legacy HFRP Program in 2014 to support ''U.S. goals for Haiti's long-term reconstruction and development,'' [20] and modernized it in August 2023, in part because ''[i]mproving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues.'' [21] The foreign policy objectives underlying the FRP programs, however, are not consistent with those of the current Administration and may be achieved through other means.[22]

E.O. 14150, ''America First Policy Directive to the Secretary of State'', clearly sets out the President's vision that ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' [23] E.O. 14159, ''Protecting the American People Against Invasion'' states that ''[i]t is the policy of the United States to faithfully execute the immigration laws against all

[13] TECS, not an acronym, is a data system and platform owned by U.S. Customs and Border Protection (CBP). See *DHS/CBP/PIA–021 TECS System: Platform* for more information, available at *https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform* (last updated Apr. 10, 2025).

[14] While legacy CFRP and legacy HFRP programs were replaced by the modernized FRP programs for Cuba and Haiti in 2023, USCIS continued to interview pending legacy CFRP beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was paused.

[15] *See* E.O. 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025); *see also FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (''[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.'').

[16] *See* E.O. 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[17] *See, e.g.,* 88 FR at 43594.

[18] *See, e.g., Id.* (''[T]he parole of noncitizens, on a case-by-case basis, under [the FRP program for Colombians] will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.'').

[19] 72 FR 65588; 88 FR at 54640.

[20] 79 FR at 75582.

[21] 88 FR at 54639.

[22] U.S. commitments under the Cuban Migration Accords, for example, may be met through immigrant visa processing.

[23] *See* 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.'' [24]

To reiterate, E.O. 14165, ''Securing Our Borders'' states that DHS shall ''terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders.'' [25] In the same E.O., the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southwest border of the United States and ensure that, pending section 240 removal proceedings, aliens described in INA 235(b)(2)(C), 8 U.S.C. 1225(b)(2)(C), are returned to the territories from which they came.

The President has pursued the cooperation of foreign partners on migration issues in other ways as well. For instance:

- On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[26]
- On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[27]
- On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to ''do what's right'' in regard to illegal migration.[28]
- Since February 1, 2025, President Trump has issued several tariff-related executive orders in connection with the situation at the southwest border.[29]
- On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, with the plan to repatriate them to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[30]
- On May 19, 2025, a Department of State spokesperson announced steps ''to impose visa restrictions on owners, executives, and senior officials of travel agencies based and operating in India for knowingly facilitating illegal immigration to the United States.'' [31]
- Secretary Rubio had calls with Mexican Foreign Secretary de la Fuente on March 31, 2025,[32] May 30, 2025 [33] and July 2, 2025,[34] during which they discussed efforts to secure the U.S.-Mexico border, dismantle cartels, stop the flow of illicit drugs, firearms, and illegal aliens.

Multiple agencies of the U.S. government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[35] consistent with Secretary of State Rubio's January 22, 2025, announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[36] In that announcement, the Department of State made clear that it ''will no longer undertake any activities that facilitate or encourage mass migration'' and that ''[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants.'' [37] Additionally, pursuant to his authority under INA 219, 8 U.S.C. 1189, Secretary of State Rubio designated the gang Mara Salvatrucha (active in El Salvador, Guatemala, and Honduras, among other countries), along with other cartels and gangs, as Foreign Terrorist Organizations.[38] On May 5, 2025, Secretary Rubio also designated two Haitian criminal organizations, Viv Ansanm and Gran Grif, as designated Foreign Terrorist Organizations under INA 219, 8 U.S.C. 1189.[39]

The actions set forth in this notice complement and underscore the Administration's pivot to a foreign policy that prioritizes the United States' interests in reducing and deterring unlawful immigration. Regardless of whether the prior Administration saw the FRP programs as a component of a regional migration management strategy, the current Administration is not

[24] 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[25] *See* 90 FR 8467, 8468 (Jan. 20, 2025) (published Jan. 30, 2025).

[26] The White House, ''Readout of President Donald J. Trump's Call with President Nayib Bukele'' (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/*.

[27] The White House, ''Statement From the Press Secretary'' (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/*.

[28] Meryl Sebastian, ''Trump Says India 'Will Do What's Right' on Illegal Immigration,'' BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo*.

[29] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at our Southern Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Out Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[30] *Panama Receives First US Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration*.

[31] U.S. Department of State, Press Releases: Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States, May 19, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/visa-restrictions-on-travel-agencies-facilitating-illegal-immigration-to-the-united-states/*.

[32] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, March 31, 2025, *https://www.state.gov/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/*.

[33] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, May 30, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente/*.

[34] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, July 2, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/*.

[35] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) (''President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country.''), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/;* U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) (''Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap.''), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/*.

[36] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025), *https://www.state.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/*.

[37] *Id.*

[38] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generación, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025); *see also* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[39] Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 FR 19065 (May 5, 2025).

pursuing that strategy given it is no longer consistent with current Administration's priorities. Rather, as described above, the current Administration continues to focus its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States.

These measures will allow DHS to better ''achieve the total and efficient enforcement'' of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[40] In short, the continued implementation of the FRP programs does not accord with the President's stated priorities and foreign policy objectives.

*3. Provide a Lawful Pathway and Timely Alternative to Unlawful Migration*

DHS intended for the FRP programs to provide a lawful, safe, and orderly alternative to unlawful migration to the United States as part of a regional migration management strategy developed by the prior Administration.[41] Because the INA allocates a certain number of immigrant visas each year, beneficiaries of approved Form I–130 petitions often face years-long waits before a visa becomes available. The prior Administration claimed that the FRP programs were designed to discourage unlawful migration during this period by offering a faster, lawful pathway for U.S. citizens and LPRs to reunite with family members while awaiting availability of immigrant visas.[42] These programs were specifically aimed at nationals of countries who often face especially long wait times for immigrant visas.[43] DHS now finds, as explained below, that the FRP programs did not adequately realize the goal of discouraging unlawful migration, as the confirmed beneficiaries of the FRP programs constitute a tiny fraction of the total population of aliens from the seven FRP countries that unlawfully attempted to enter the country during this time period.[44] Since the implementation of the modernized FRP programs beginning in July 2023 and the modernization of the legacy FRP programs, approximately 16,100 aliens have been granted parole under the FRP programs.[45] In contrast, CBP encounters of aliens from the seven FRP countries at and between POEs on the U.S. southwest land border totaled over 888,000 in FY2024.[46]

DHS acknowledges that some aliens who have been paroled into the United States under the FRP programs may have otherwise sought to enter unlawfully along the southwest border. However, upon review and further consideration of the number of aliens that were determined to be eligible to participate in the programs, the relatively small number who actually chose to participate, and other more recent measures that have dramatically reduced southwest border encounters, DHS has ultimately determined that the FRP programs did not meaningfully reduce unlawful migration at the southwest border and are not needed to achieve that goal. DHS ultimately determined that policy actions such as increasing interior enforcement actions, ramping up removals, building physical barriers along the border, and deploying advanced surveillance technology represent a more prudent approach to the short and long-term challenges presented at the southwest border.

The FRP programs required that a petitioner with an approved Form I–130, Petition for Alien Relative, first receive an invitation to submit a request to be a supporter on behalf of the principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. Generally, invitations were issued based on operational capacity and the period of time until the principal beneficiary's immigrant visa was expected to become available, among other factors. Considering the limitation on the number of aliens who have family-sponsored immigrant visas that are expected to become available within any given period, the number of invitations sent was minimal compared to the flow of aliens coming from the countries for which an FRP program existed.[47] Even if every one of the approximately 36,000 petitioners invited to participate in the modernized FRP programs had filed a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of each eligible beneficiary of the approved Form I–130, and all such Form I–134A requests were confirmed and the beneficiaries granted advance travel authorization by DHS, the number of beneficiaries who could have been paroled into the United States would still account for a fraction of the approximately 890,000 aliens from the FRP program countries who were encountered by CBP in Fiscal Year (FY) 2024. DHS did not intend for the FRP programs to, on their own, substantially decrease the number of encounters along the southwest border. The FRP programs were just one part of the previous administration's broader strategy of expanding access to lawful pathways to aliens who may otherwise travel to the United States as part of the unlawful migration flows at the southwest border.[48] In practice, at the time DHS paused processing under the FRP programs in late January 2025,[49] the participation rate for petitioners who had been invited to these programs was approximately 30%.[50] Overall, other policy actions represent a more prudent and effective path to addressing unlawful immigration generally and especially at the southwest border.

The decision to terminate discretionary and temporary parole programs like the FRP programs is further informed by the actions of the prior administration, which found the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans[51]

[40] *See* 90 FR 8443 (Jan. 29, 2025).

[41] *See, e.g.,* 88 FR at 43595.

[42] *See, e.g.,* 88 FR 78762, 88 FR 43591, 72 FR 65588.

[43] *Id.; see also* 72 FR 65588; 79 FR 75581.

[44] As of Feb. 18, 2025, the overall responsiveness rate to invitations sent under the modernized FRP programs was approximately 30% based on an internal USCIS analysis. This means that 70% of petitioners who received FRP invitations did not opt to participate in FRP programs and did not file an I–134A as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[45] The information provided here is based on analysis of internal data from U.S CBP tracking aliens paroled under the FRP programs performed in June 2025. CBP shows 14,069 aliens paroled under FRP class of admission (COAs) (Colombian Family Reunification Parole (RCO), Cuban Family Reunification Parole (RCU), Ecuadorian Family Reunification Parole (RED), Guatemalan Family Reunification Parole (RGT), Honduran Family Reunification Parole (RHN), Haitian Family Reunification Parole (RHT), and El Salvadoran Family Reunification Parole (RSV)) as of January 20, 2025. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025. USCIS estimates there are 1,852 aliens with valid parole under the legacy CFRP program and 108 aliens with valid parole under the legacy HFRP program as of April 2, 2025. *See* USCIS analysis of legacy FRP filings as of Apr. 2, 2025 [OHSS tabs 10 & 11].

[46] *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025) (filtered by Region (Southwest Land Border) and Citizenship (Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras)).

[47] In FY2024, CBP encounters of unlawful aliens on the U.S. southwest land border from the seven FRP countries totaled 888,023. *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025).

[48] *See, e.g.,* 88 FR at 43593.

[49] Email from Jennifer Higgins, Acting Director, USCIS (Jan. 23, 2025).

[50] Responsiveness rate is based on internal USCIS analysis whereby a total of 35,666 FRP invitations were issued over the life of the modernized FRP programs, and of those, a total of 10,608 invitees filed requests as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[51] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR

Continued

("CHNV parole programs") and FRP programs, even when paired with the *Circumvention of Lawful Pathways* rule, to be insufficient to address very high levels of illegal immigration.[52] For example, following the implementation of the FRP programs and the *Circumvention of Lawful Pathways* rule, DHS and the Department of Justice ("DOJ") promulgated the *Securing the Border* rule [53] as an emergency measure to address ongoing high levels of unlawful immigration between the southwest border POEs.[54] DHS and DOJ then explained that "at current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle." [55] This conclusion—that DHS's ability to swiftly impose consequences for unlawful immigration "continue[d] to be overwhelmed" [56]—followed more than a year of the *Circumvention of Lawful Pathways* framework, nearly a year of the modernized FRP programs, and two years of the CHNV parole programs, with the implementation of each being justified as facilitating operational control of the southwest border of the United States by discouraging unlawful immigration. The promulgation of the *Securing the Border* interim final rule in June 2024 underscored the stark failure of categorical parole programs, like the FRP programs and CHNV parole programs, as well as the *Circumvention of Lawful Pathways* rule to deliver on their promises. These policies not only fell short of enhancing border security but also failed to curb the persistent surge of unlawful immigration along the southwest border.

The *Securing the Border* framework [57] and implementation of President Trump's subsequent policies have resulted in a dramatic reduction in unlawful migration to the U.S. southwest border. For example, encounters between southwest border POEs decreased from an average of about 4,910 per day in the six months prior to the *Securing the Border* interim final rule to an average of 1,880 per day between June and December 2024.[58] Moreover, southwest border encounters have declined even more dramatically since President Trump took office on January 20, 2025, and issued a series of proclamations and orders designed to address the urgent situation at our borders, including Proclamation 10888, *Guaranteeing the States Protection Against Invasion,* 90 FR 8333 (Jan. 20, 2025) (published Jan. 29, 2025). Indeed, in the 161 days from January 21 through June 30, 2025, encounters between POEs averaged fewer than 290 per day, down from over 1,600 per day in the last 161 days of the prior administration, while encounters at POEs averaged about 120 per day, down from over 1,580 per day.[59] Accordingly, even assuming the FRP programs had any impact on reducing unlawful migration, the FRP programs are no longer needed due to reduction in southwest border encounters as a result of other, more effective, policies.

Ultimately, the FRP programs failed in their stated intention to sufficiently deter unlawful migration. A July 2024 report found that, prior to the implementation of the *Securing the Border* framework, "in the first five months of the year [2024], CBP agents encountered more than nine hundred thousand migrants and asylum seekers at the U.S.-Mexico border. The majority hailed from just six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, in descending order." [60] Despite the categorical parole programs that the previous administration put in place, four out of six of the nationalities with the highest entry numbers in the first half of 2024 had a dedicated FRP program.[61] The modernized FRP program for Haiti was implemented on August 11, 2023. CBP data indicates that in FY2022, 53,910 Haitian nationals were encountered at the Southwest border, in FY2023, 76,130 and in FY2024, 88,673.[62] This year-on-year substantial increase in encounters of Haitian nationals at the Southwest border show that the modernized FRP program for Haiti failed to slow the increase in unlawful migration to the Southwest border. This data reflects that the FRP programs did not noticeably decrease unlawful migration, or at the very least were not nearly as effective as other policies implemented at the same time to reduce unlawful migration.

When the modernized FRP programs were established, they were promoted as timely alternatives to unlawful migration and as tools to address the root causes of migration. However, it was not adequately recognized that the populations served by these programs were often fundamentally different from those undertaking unlawful migration. FRP beneficiaries had approved I–130 petitions and U.S.-based supporters who were LPRs or U.S. citizens, and thus had a lawful immigration pathway available to them, even if it involved a significant wait. In contrast, aliens arriving at the southwest border may lack U.S. family ties or access to any lawful immigration channel. It is therefore unlikely that someone with an existing legal pathway would risk compromising their eligibility by pursuing unlawful entry. Economic migrants and asylum seekers, on the other hand, may resort to appearing at the border regardless, due to the absence of viable legal alternatives. Perhaps most significantly, although the previous administration argued that the FRP programs would decrease unlawful migration, there is no data to support this argument. For example, the FRP program for Ecuadorians was implemented on November 16, 2023. CBP data indicates that in FY2022, 24,060 Ecuadorian nationals were encountered at the

13611 (Mar. 25, 2025). *See also* "CBP Released December 2024 Monthly Update", *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update* (last modified Jan. 14, 2025) (providing that over 531,000 aliens were granted parole under the CHNV parole programs).

[52] *See* Circumvention of Lawful Pathways 88 FR 31314 (May 16, 2023).

[53] *See* Securing the Border, Interim Final Rule, 89 FR 48710 (June 7, 2024); Securing the Border, Final Rule, 89 FR 81156 (Oct. 7, 2024).

[54] "On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens]." 89 FR at 81157–58.

[55] 89 FR at 48714.

[56] 89 FR at 48715.

[57] On May 9, 2025, a district court vacated and set aside the *Securing the Border* rule's limitation on asylum eligibility and manifestation of fear requirement but allowed the rule's "reasonable probability" standard to remain in effect. *See Las Americas Immigr. Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC,—F. Supp. 3d—, 2025 WL 1403811, at *21 (D.D.C. May 9, 2025).

[58] OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2].

[59] OHSS analysis of May 2025 OHSS Persist Dataset and CBP data downloaded from UIP on July 2, 2025 [OHSS tab 1].

[60] Council on Foreign Relations, "Why Six Countries Account for Most Migrants at the U.S.-Mexico Border" July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

[61] It should be noted that Venezuela, one of the six highest entry populations by nationality mentioned, also had a parole program which is not addressed in this FRN. The Venezuelan parole program, largely premised on the same justifications as those contained in the FRP parole programs, has been terminated in another notice. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 (Mar. 25, 2025).

[62] CBP, "Nationwide Encounters" Filtered for Region: Southwest Land Border, Citizenship: Haiti, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

Southwest border, in FY2023, 116,229 and in FY2024 122,072.[63] Petitioners with an approved Form I–130 filed for an alien abroad were invited to submit Form I–134A which served as a declaration of financial support. Neither petitioners nor beneficiaries were asked through a form or an interview prior to applying for admission at a POE in the U.S. whether they had any intention of attempting entry to the U.S. unlawfully as an alternative to waiting for consular processing in their countries. DHS believes, based on available data, that the FRP programs had no meaningful deterrent effect on nationals from these countries considering travel to the Southwest border. The programs do not appear to have influenced the number of attempted entries in any meaningful way. Moreover, any limited impact they may have had on reducing unlawful border encounters falls far short when compared to the effectiveness of other enforcement-focused policies implemented by the current administration.

The Department has determined that terminating the FRP programs will allow the Administration to adopt and implement more prudent, durable, and appropriate strategies that will lead to a sustainable reduction of encounters at the southwest border. The Department's objective of breaking the vicious cycle of unlawful immigration supports termination of the FRP programs along with the implementation of enforcement-based actions that are consistent with the policy objectives outlined in the new presidential directives calling for enhanced border security beyond the 2024 *Securing the Border* framework.[64]

*4. Reduce Strain on Limited U.S. Resources*

The FRP programs were designed with the goal of easing pressure on DHS resources and personnel by lowering the number of encounters at the Southwest border enough to offset the added processing and administrative burden; but that outcome never materialized. Instead, the programs failed to reduce encounters at the Southwest border and only added to DHS' workload. There was no reduction in burden with regards to detention, monitoring, processing, and removal of aliens for DHS personnel and resources, and, at the same time, there was an increased burden in for both CBP and USCIS components who processed these applications from receipt of Form I–134A to arrival at a U.S. POE.

As discussed in the previous section of this notice, the number of aliens who chose to participate in the FRP programs and who otherwise would have chosen to unlawfully migrate as an alternative option is too uncertain or limited towards meaningfully realizing the original justifications for their implementation and the current Administration's shift in policy focus to deter unlawful migration and achieve operational control of the southwest border.[65]

After a thorough review assessing the costs of implementing these programs, preliminary findings show that the programs have not met their stated goal of burden-reduction. On the contrary, these programs have led to an increased strain on DHS personnel and resources to process, review, and adjudicate parole requests, especially when considering the programs did not meaningfully result in any reduction of encounters at or between POEs.[66] For USCIS, there have been approximately 35,700 Form I–134A filed with USCIS under the modernized FRP programs since July 2023, which includes approximately 420 pending review, 19,500 confirmed by USCIS, and 15,450 non-confirmed by USCIS.[67] It has required significant USCIS resources to administer these parole programs. CBP has also expended considerable resources implementing the FRP programs. Under the modernized FRP programs, CBP has received 16,976 advance travel authorization (ATA) requests, including 1,987 pending review or CBP One submission, 13,983 approved by CBP, 975 denied by CBP, and 31 that expired after being approved.[68]

Due to the originating location of beneficiaries of the FRP programs and available travel routes via commercial air, approximately 70% of beneficiaries of these programs who were issued an ATA flew to Florida POEs.[69] With the addition of three POEs in Texas and New York City, these POEs in just three states account for nearly 85% of all arrivals of FRP beneficiaries requesting parole.[70] Processing an alien requesting parole under the modernized FRP programs requires secondary processing and enrollment of biometrics, resulting in a more extensive interaction with the alien and prolonged time in CBP facilities.

Although DHS, under the previous administration, argued that aliens who had been paroled into the U.S. may have otherwise sought to enter unlawfully along the southwest border, there is little to no evidence to support this argument. DHS has no way of determining whether aliens paroled into the U.S. under the respective FRP programs might have otherwise attempted to enter unlawfully, as they were never asked this question at any point, either before or after the programs were implemented. Instead, these aliens with lawful pathways available to them likely would have remained overseas while waiting for an immigrant visa to become available and then would have completed consular processing so they could be admitted to the United States as an LPR. Aliens in this portion of the population would have been processed by the Department of State if they had gone through consular processing. Under the FRP programs, DHS reassigned personnel from other caseloads to work on processing Forms I–134A, requests for ATAs, and for parole processing at interior POEs. Therefore, the FRP programs not only shifted the strain from the Department of State to DHS personnel, they also increased the overall strain on DHS

[63] CBP, ''Nationwide Encounters'' Filtered for Region: Southwest Land Border, Citizenship: Ecuador, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[64] As explained above, southwest border encounters decreased following implementation of the *Securing the Border* framework and complementary actions, and border encounters decreased even more dramatically following implementation of President Trump's policies. Another example of President Trump's policy directives include the Presidential Proclamation ''Guaranteeing the States Protection Against Invasion'' which suspends entry of aliens across the southwest border, imposes restrictions on entry for aliens, and suspends and restricts entry for aliens posing public health, safety, or national security risks. *See* Guaranteeing the States Protection Against Invasion, 90 FR 8333 (Jan. 29, 2025).

[65] 90 FR 8467, Sec. 2(g).

[66] See discussion above concerning drops in southwest land border encounters from the months of December 2024 to June 2025. DHS has determined, based on the available evidence, that other enforcement-based policies, including the *Circumvention of Lawful Pathways* and *Securing the Border* rules, proved more effective at reducing southwest land borders. OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2]; OHSS analysis of May 2025 OHSS Persist Dataset [OHSS tab 1].

[67] Data pulled from internal DHS reports on parole processing [OHSS tab 12]. Further, ''Confirmed'' in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while ''non-confirmed'' meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[68] ATA request data is based on an internal USCIS analysis of information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 6].

[69] Data provided on arrivals at specific POE is based on an internal USCIS analysis of arrival information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 5, 7, 8, 9].

[70] *Id.*

resources because of the extra processing required under the programs combined with the little to no concomitant reduction of unlawful entries of nationals from the seven FRP countries.

The reallocation of limited DHS personnel resources caused by the FRP programs is unsustainable, especially given DHS' critical need to address border and interior enforcement and other Administration priorities. Implementation of these programs resulted in increased expenditure of DHS personnel and resources on administering the programs without any related burden reduction for processing, detention, monitoring, and removal of aliens unlawfully entering or present within the United States.

As previously noted, reports indicate that nationals of the countries eligible for the FRP programs have continued to migrate unlawfully at some of the highest rates among all nationalities. CBP personnel, in particular, experienced no relief. In contrast, the implementation of the FRP programs introduced additional demands on DHS, increasing workloads across multiple USCIS directorates including the Service Center Operations Directorate (SCOPS) and Field Operations Directorate (FOD).

The FRP programs have also resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a ''qualified alien.'' *See* 8 U.S.C. 1641(b)(4). Because DHS generally issued three-year periods of parole from the outset, FRP parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.,* 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all FRP parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see* 7 CFR 273.4(a)(6)(ii)(J), as might ''a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980),'' *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to ''lawfully residing'' children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[71] Overall, the domestic impact of the FRP programs counsel against their continued operation.

*5. Address the Root Causes of Migration Through Economic Stability and Development Supported by Increased Remittances*

Finally, DHS intended for the FRP programs to aid in encouraging development and addressing economic concerns in the eligible countries by increasing the flow of remittances to those countries.[72] Aliens paroled into the United States under the FRP programs are eligible for discretionary employment authorization, and aliens with employment authorization typically enjoy higher wages than those without employment authorization, allowing them the opportunity to send greater amounts of money back to their home country in the form of remittances.[73] However, upon review of the modernized FRP programs more than a year and a half[74] after they were made available, DHS has determined that a relatively low percentage of invited petitioners decided to participate in the programs. Because of the low acceptance rate of invited petitioners, the volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries. Consequently, the FRP programs fell short of addressing the underlying economic drivers of unlawful migration. The modernized FRP programs' failure to address the economic motivations behind illegal immigration weighs in favor of terminating the FRP programs.

In 2023 and 2024, the countries whose nationals were eligible for consideration for parole under the FRP programs had remittance volumes ranging from a low of $2.5 billion in Cuba to a high of $21.6 billion in Guatemala.[75] The remittance volumes referenced were not tied exclusively to aliens paroled into the United States under the FRP programs, that is, those remittances could have been sent from anyone in the United States, regardless of immigration status. From 2020 to 2023, remittance volumes in 6 of the 7 countries whose nationals were eligible for an FRP process grew between 8% and 43%.[76] Only Haiti experienced a lower growth rate at just 1%.[77] In 2023, remittances accounted for over 20% of the GDP of Guatemala, with similar increases noted in El Salvador (24.5%), and Honduras (28.0%).[78] Comparing the high volumes of remittances in each of the FRP countries to the small populations from each country that were invited to participate in the FRP programs and the even smaller populations that did participate, DHS has determined that any contribution FRP parolees may make to the remittance volumes in their home country is too small to substantially impact the overall economic stability of the country or address the root causes of migration.

The FRP programs failed in their intention of addressing the root causes of migration. A July 2024 report stated ''The Joe Biden administration has responded by designing policies to mitigate 'root causes' of migration and displacement, enacting temporary humanitarian protections for individuals from certain countries, while making it more difficult for migrants to apply for asylum in the United States. But push factors—including organized crime-fueled violence and extortion and a lack of economic opportunities—combined with the pull of a strong U.S. labor market, make it unlikely migration flows will decrease substantially in the near future.''[79] Due to the low numbers of participants in the FRP programs, it is also unlikely that the remittances provided by the FRP participant population would meaningfully impact migration flows. As previously stated, it is unlikely that someone with an existing legal pathway would risk

[71] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[72] *See, e.g.,* 88 FR at 43596.

[73] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that aliens without authorization to work earn less than those with employment authorization).

[74] The FRP process for Ecuadorians was established in November 2023 so has been available for approximately four fewer months. *See* 88 FR 78762.

[75] Family Remittances in 2024: Looking Ahead amid Possible Shifts in Flows, Table 2, The Dialogue: Leadership for the Americas (Aug. 6, 2024), *https://thedialogue.org/family-remittances-in-2024-looking-ahead-amid-possible-shifts-in-flows.*

[76] *Id.* at table 1 (The growth rates in each country were: Cuba—43%; Guatemala—15%; Honduras—14%; Ecuador—11%; Colombia—10%; and El Salvador—8%.).

[77] *Id.*

[78] Family Remittances to Latin America and the Caribbean 2023, Slide 6, The Dialogue: Leadership for the Americas (Sept. 9, 2023), *https://thedialogue.org/analysis/family-remittances-to-latin-america-and-the-caribbean-2023/.*

[79] Council on Foreign Relations, ''Why Six Countries Account for Most Migrants at the U.S.-Mexico Border'' July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

compromising their eligibility by pursuing unlawful entry to the United States. Economic migrants and asylum seekers, on the other hand, may resort to the border route regardless, due to the absence of viable legal alternatives and the push and pull factors that remain unaddressed by the FRP programs.

More broadly, the United States cannot bear sole responsibility for the development and economic stability of other nations. In line with the America First Policy Directive, the President instructed the Secretary of State to ''issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.'' [80] While strategic partnerships and targeted support can play a role, U.S. immigration policy cannot serve as a surrogate for long-term development solutions in foreign countries.

Lessons Learned

The FRP programs did not achieve their stated objectives. They failed to reduce unlawful migration or alleviate operational burdens on DHS—particularly CBP—and instead increased administrative strain across multiple USCIS directorates and CBP ports of entry. Moreover, the programs had no measurable effect on addressing root causes of migration and introduced additional vulnerabilities that actively undermined the integrity of the U.S. immigration system and posed risks to public safety and national security.

While the modernized FRP programs established a framework for vetting, the processes in place proved insufficient and introduced significant opportunities for fraud. For instance, a recent internal audit revealed that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half. Generally, if a Form I–130 petitioner dies after approval, the Form I–130 is automatically revoked.[81] Under program requirements, the individual submitting the request to be a supporter must be the same petitioner who filed the original family-based immigrant visa petition—the same petitioner to whom the Department of State issued the parole invitation. Additionally, the same internal audit concluded that the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for primary supporters, further compromising program integrity.

Taken together, these operational shortcomings, security vulnerabilities, and policy failures underscore that the FRP programs not only failed to meet their intended goals, but actively strained DHS resources and undermined public trust. For these reasons, termination of the FRP programs is a prudent course of action.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the FRP programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of parole indicates that reliance on the continued existence of the FRP programs would be unwarranted. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Further, the notices establishing the modernized FRP programs expressly advise the public that, ''[t]he Secretary retains the sole discretion to terminate this FRP process at any point'' [82] and that ''DHS may terminate parole upon notice in its discretion at any time.'' [83] The FRP programs were ''being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.'' [84]

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, and the additional notice provided in E.O. 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution. DHS recognizes that this notice announces a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate. To analyze the reliance interests of affected parties, DHS describes the main steps in the process below and analyzes the reliance interests of parties who have reached that point in the process.

### *1. Reliance Interests of Potential Supporters and Beneficiaries*

DHS first considered the potential reliance interests of those U.S.-based I–130 petitioners invited by DHS to participate in the FRP programs and who had intended to file or have filed a Form I–134A or Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, in support of a potential parolee.[85] In general, the costs associated with Form I–134A filings are minimal. While there is no fee for the petitioner to file a Form I–134A and there is no fee for a potential beneficiary to seek consideration under the FRP programs, petitioners who have already filed Form I–134A, or who have completed the Form I–134A in anticipation of filing, may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response.[86]

There are currently over 15,000 pending initial requests for parole under the legacy CFRP program at various stages of adjudication. There are no pending initial requests under the legacy HFRP program, so there are no reliance interests for potential petitioners or beneficiaries under that program. Petitioners under the legacy CFRP program were required to pay the filing fee for Form I–131, unless they were eligible for a fee waiver. For a Form I–131 filed before December 23, 2016, petitioners paid $360. For a Form I–131 filed after December 23, 2016, petitioners paid $575. For a Form I–131 filed after April 1, 2024, petitioners generally paid $630, although CFRP add-on derivatives were exempt from the fee.

At this early stage in the process, the costs incurred by a potential beneficiary in both the Form I–134A-based modernized FRP programs, as well as the Form I–131-based legacy CFRP program are minimal. In the Form I–134A-based process, once a petitioner's Form I–134A is confirmed, the potential beneficiary receives instructions to create an online account with myUSCIS, confirms biographic information in the online account, and attests to meeting the eligibility requirements, including the completion of a medical examination by a panel physician. Potential beneficiaries who received notification that the Form I–134A filed on their behalf was confirmed were instructed on next steps in the process,

[80] 90 FR 8337.

[81] *See generally* 8 CFR 205.1(a)(3)(i)(B) and (C). There are certain noted exceptions, such as INA 204(*l*) and humanitarian reinstatement of a revoked petition.

[82] *E.g.,* 88 FR at 43598; 88 FR at 54643.

[83] *E.g.,* 88 FR at 43593; *see also* 88 FR at 54643.

[84] *E.g.,* 88 FR at 43598–99; 88 FR at 54643.

[85] The information collection approval of Form I–134A has expired and it is no longer available for submission. DHS sent its most recent invitation for a petitioner to submit a Form I–134A on June 28, 2024, and has not accepted a request from a prospective supporter since January 28, 2025. Only 420 Forms I–134A are pending, and USCIS will send them each nonconfirmation notices.

[86] See SUPPORTING STATEMENT FOR Online Request to be a Supporter and Declaration of Financial Support, OMB Control No.: 1615–0157, COLLECTION INSTRUMENT(S): Form I–134A, page 10, question 12, *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202409-1615-006* (last visited Feb. 7, 2025).

including completion of the medical requirements. The medical examination required being cleared of any Class A medical conditions and receiving certain required vaccinations. Therefore, it is possible that a potential beneficiary took the time to complete the medical examination and receive the required vaccinations. After confirming biographic information and properly completing the medical examination, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. The alien was required to complete these steps prior to being considered for authorization to travel to the United States to seek parole. The total estimated time to complete the CBP One part of the ATA process was 10 minutes.[87]

In the Form I–131-based legacy process, the adjudication of the Form I–131 took place in two stages. First, a designated USCIS Service Center adjudicator would review the application package submitted by the petitioner and confirm that the petitioner had received a U.S. government invitation to apply to the legacy process, and that all documentary filing requirements were met. If the petitioner failed to submit the required evidence, adjudicators would issue a Request for Evidence to obtain the missing information. Unless a sufficient response was received, the filing would be denied. For cases where all required evidence was provided and eligibility was established, USCIS conditionally approved the Form I–131. There were no costs to the potential beneficiary during this first stage of the process. However, the second stage of the process required the potential beneficiary to report for an in-person interview at a USCIS office overseas, which could result in travel costs and medical exam costs. During this stage, USCIS would verify the identity and qualifying familial relationship between the petitioner and a potential beneficiary.

In general, the costs to petitioners and potential beneficiaries are not significant and pale in comparison to the U.S. government's sovereign interest in determining who may be paroled into the United States. DHS issued invitations as a use of administrative grace that could end at any time and made no assurances that each invitation would result in a grant of parole. DHS made no assurances that each Form I–134A would be processed, nor did DHS assure that each Form I–134A or Form I–131 would ultimately result in a grant of parole to a potential beneficiary. For petitioners/beneficiaries who received a conditional approval of Form I–131 from USCIS under the legacy CFRP program, the conditional approval made it clear that additional steps were required—including completion of a medical examination and in-person interview—before parole could be authorized.[88] Therefore, neither the petitioner nor the potential beneficiary has a significant reliance interest in continuation of the process at this stage. Any costs incurred by a potential beneficiary in the Form I–131 or Form I–134A-based process, both for completing the medical examination and for receiving the required vaccinations, can be impactful, depending on the country and the relative cost of these items compared to the average wage received by that country's population and the rate of unemployment in the country. However, both the costs of the vaccinations and the medical examination are offset by their attendant benefit to the beneficiary of identifying health issues that may have existed and preventing future illness. Once again, the interest of petitioners and potential beneficiaries in preserving the FRP programs is minimal compared to the U.S. government's interest in exercising its discretion to decide which programs to continue and which benefits to provide, based on the policy priorities of the current administration.

Accordingly, DHS will issue a notice of non-confirmation for all pending Forms I–134A. DHS will also rescind the confirmation of all Forms I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A. DHS also intends to issue denial notices for all conditionally approved Form I–131 under the legacy CFRP program that have not been issued a travel document. The Form I–131 filing fee will not be refunded as USCIS has already expended resources in partially completing their adjudication.

*2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Petitioners*

DHS has canceled all pending requests for advance authorization to travel to the United States to seek a discretionary grant of parole under the FRP programs.

DHS considered allowing any approved ATAs to remain in place until they were used or expired by their terms. However, DHS did not want aliens to fly to the United States at significant personal expense to seek parole under policies that DHS no longer supports or appear to encourage aliens to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. DHS wants to be as transparent as possible and not exacerbate the problems created by the FRP programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit, in the exercise of discretion. If parole is not granted, aliens may be removed to their home country at U.S. government expense or processed for another appropriate disposition under the INA.

In sum, the FRP programs have failed to achieve their stated objectives. They are inconsistent with the current Administration's enforcement priorities, do not advance current U.S. foreign policy goals, did not meaningfully reduce unlawful migration, did not alleviate the strain on DHS personnel and resources, nor address the root causes of migration through economic development. Instead, the programs imposed additional administrative burdens on DHS and introduced vulnerabilities that significantly undermined the integrity of the U.S. immigration system. While some petitioners and beneficiaries may have relied on the availability of FRP programs, those reliance interests are limited in scope and involved minimal financial or procedural burdens. Even if the reliance interests were greater, DHS has determined that the federal government's interest in controlling the circumstances under which foreign nationals may be paroled into the United States outweigh those interests. Accordingly, terminating the FRP programs is both lawful and reasonable.

**V. Effect of Termination on Current Parolees Under the FRP Programs and Corresponding Reliance Interests**

The notices establishing the FRP programs explain that parole is not an admission of the alien to the United

[87] *See* 88 FR 62810, 62812 (Sept. 13, 2023).

[88] *See* USCIS, ''The Cuban Family Reunification Parole Program,'' *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program* (''Process Steps'') (last updated Oct. 11, 2024).

States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the FRP programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, since July 10, 2023, approximately 14,000 aliens were granted parole into the United States pursuant to the modernized FRP programs. While some aliens in this population have subsequently pursued other lawful immigration statuses and benefits, all aliens within this population are still within the 3-year initial period of parole under the modernized FRP programs. Approximately 1,060 Cubans are currently in the United States with a valid period of parole under the legacy CFRP program. Approximately 100 Haitians are currently in the United States with a valid period of parole under the legacy HFRP program.

Parolees under the FRP programs may be able to seek an additional period(s) of parole (''re-parole'') by filing Form I–131, and demonstrating urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for re-parole. These cases and any such pending cases will be assessed on a case-by-case basis.

DHS has determined that as one aspect of the termination of the FRP programs, and consistent with the Secretary's statutory and regulatory authority,[89] the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485 before December 15, 2025 that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. The parole of an alien with a pending Form I–485 will remain valid until either the expiration date provided on the alien's Form I–94, Arrival/Departure Record, or the date a final adjudication of the Form I–485 is completed, whichever is sooner. If the Form I–485 is denied, the alien's parole period will be terminated as of the date of the denial and the alien is expected to depart the United States immediately if they have no other lawful basis for remaining. Pending Form I–131 requests for re-parole filed by aliens initially paroled under the FRP programs will be adjudicated and may be approved on a case-by-case basis.[90] Note that with respect to re-parole requests filed by aliens who were initially paroled under one of the FRP programs, facial eligibility under those programs does not entitle an alien to re-parole. The alien still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole, as required by section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A).

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action, consistent with law, against any alien at any time, including during the 30-day waiting period created by this notice. Once parole is terminated, and if no exception applies and no lawful immigration status, relief, classification, or protection is obtained, aliens must return to their home country to maintain their path to lawful immigration status or be removed from the United States subject to a final order of removal. Parolees without any other lawful basis to remain in the United States following the termination of the FRP programs should depart the United States before their parole termination date. As detailed below, aliens whose parole period is terminated are encouraged to submit their intent to depart through the CBP Home Mobile App. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home Mobile App. Aliens should visit *https://i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

DHS has recently announced a historic opportunity for aliens to receive both financial and travel assistance to facilitate travel back to their home country or another country in which they have lawful status through the CBP Home App. Once unlawful aliens submit their intent to depart through the CBP Home Mobile App and pass vetting, they will be deprioritized by ICE for enforcement action, detention and removal before their scheduled departure, as long as they demonstrate they are making meaningful strides in completing the departure.[91]

In implementing this approach, DHS intends to prioritize for removal those whose parole is terminated and who have not, prior to the publication of this notice, submitted an immigration benefit request to obtain a lawful basis to remain in the United States. Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS' institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer

[89] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States''); 8 CFR 212.5(e)(2) (''. . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph(a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien*[.].'' (emphasis added)).

[90] Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131. Aliens will not, however, be able to apply for re-parole under the legacy FRP programs.

[91] DHS, ''DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation'' May 5, 2025, *https://www.dhs.gov/news/2025/05/05/dhs-announces-historic-travel-assistance-and-stipend-voluntary-self-deportation.*

exists and thus DHS intends to revoke parole-based employment authorization consistent with the revocation on notice procedures. *See* 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and moved to the United States.[92] Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside. In addition, employers who employ parolees may incur costs related to lost productivity and finding new employees. Property owners who rent homes, condos, or apartments to parolees may lose steady rent payments. Retailers and restaurants in the communities the parolees have been living in will lose customers. Aliens paroled under the modernized FRP programs have been in the United States for as long as 20 months, while some aliens initially paroled under the legacy FRP programs and subsequently granted additional parole periods may have been in the United States for years.[93]

However, any assessment of the reliance interests of FRP parolees must account for FRP parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served; [94] and (2) the initial period of parole would be limited to a maximum of three years. These clear, limiting conditions of the FRP programs served to attenuate any long-term expectations and interests amongst FRP parolees. Accordingly, DHS has taken these limiting conditions, along with FRP parolees' knowledge of them, into consideration when weighing their reliance interests.[95]

To the extent that current parolees have obtained housing and employment authorization, or created new ties within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the University of California.*[96] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[97] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than most FRP parolees have been, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchasing of homes.[98] As the Court noted, these interests, though noteworthy, were not ''necessarily dispositive,'' and ''DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests.'' [99] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the FRP programs are far less than the population in *Regents.* Furthermore, as stated above, consideration of the reliance interests under the FRP programs must take into account the express, discretionary terms of the parole programs. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual FRP parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice and allowing the parole period of parolees with pending Forms I–485 to continue, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, the Department finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS considered several alternatives to termination of parole after a 30-day wind-down period, including, (1) allowing the current period of parole for each FRP beneficiary to expire and notifying the beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration; (2) allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available and the beneficiary may qualify to file Form I–485; and (3) announcing the termination of parole for each beneficiary following a wind down period of longer than 30 days from the date of publication of the termination notice. After due consideration, DHS has opted to not pursue these routes.

Option 1 would require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency. Staggered parole expirations could result in extended unauthorized stays and generate confusion among parolees due to differing timelines. Option 2 fails to meaningfully implement the policy shift outlined in this **Federal Register** notice, as it would allow continued reliance on parole as a pathway to adjustment of status—effectively maintaining the existing parole framework for current beneficiaries. Moreover, permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload borne by DHS and USCIS in processing these cases. Critically, both Option 1 and 2 dilute the intended impact of the policy change and fail to communicate the urgency of this administration's shift in direction. A protracted off-ramp could be perceived as a reluctance to fully enforce key policy priorities aimed at realigning parole authority with the original congressional intent. Moreover, allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety.

When determining whether to adopt the alternative of a longer than 30-day

[92] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'' (cleaned up)).

[93] As noted earlier in this section, there are approximately 100 aliens in this category.

[94] *See e.g.,* 88 FR at 43593; 88 FR at 54643; 88 FR at 54638; *see also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(e)(2)(i).

[95] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is ''unjustified in light of the express limitations'' in relevant immigration policy). Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131.

[96] *Id.*

[97] *Id.* at 31.

[98] *Id.*

[99] *Id.*

wind-down period, DHS determined such an alternative was not the best path forward. First, regardless of the wind-down period, parolees, their employers, their landlords, their friends, and their communities may incur costs. Given this reality, DHS decided to employ the path that will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs to issues deemed essential to securing our borders and protecting the American people against invasion. Accordingly, the Department has determined that a 30-day wind down period provides the affected parties sufficient notice while also preserving the Department's interest in promptly terminating attendant grants of parole for which the Department deems no longer provide significant public benefit to the United States. Accordingly, the Department is opting not to increase the wind-down period to more than 30 days.

### VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole.[100] For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs and the purposes of such parole therefore have been served. This constructive notice accordingly serves as written notice to FRP parolees. DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.[101]

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses. *See* 8 U.S.C. 1305; 8 CFR 265.1. Nevertheless, all FRP parolees under the modernized programs should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account.[102] For legacy FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account. This notice, and the individual notice through the USCIS online account or sent by mail, each independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

### VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A), *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [103] By terminating the FRP programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 43599—DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act ("APA").[104]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the FRP programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary "in [her] discretion." The FRP programs therefore were general statements of policy.

Because the FRP programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice-and-comment rulemaking requirements. Through the termination of the FRP programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[105] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation. *See* 5 U.S.C. 553(d)(2).

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves [106]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[107] Consistent with the Secretary of State's February 21, 2025, determination that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]" DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[108]

Moreover, although the APA does not require the agency to show that such procedures may result in "definitely undesirable international consequences" to invoke the foreign affairs exemption to notice-and-

---

[100] *See* 8 CFR 212.5(e)(2)(i) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien. . . .*" (emphasis added)).

[101] *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.").

[102] *Cf., e.g.,* 8 CFR 103.2(b)(19)(ii)(B) ("For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . .").

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] *Cf. Perez* v. *Mortgage Bankers Ass'n,* 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[105] *See Encino Motorcars,* 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[106] *See* 5 U.S.C. 553(a)(1); *see, e.g.,* 88 FR at 43599.

[107] *See Am. Ass'n of Exporters & Importers—Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

[108] U.S. Department of State, Determination, *Foreign Affairs Function of the United States,* 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate categorical parole programs.

comment rulemaking, some courts have required such a showing,[109] and DHS can make one here. Delaying termination of the FRP programs to undertake rulemaking would undermine the U.S. government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in the notices implementing the modernized FRP programs, they were implemented as an integral part of negotiations with regional neighbors, including Colombia, Costa Rica, Ecuador, and Guatemala, to address unlawful migratory flows challenging immigration systems throughout the region.[110] For instance, in announcing the FRP program for Colombians, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United States.[111] DHS explained that ''the expansion of lawful pathways for aliens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of [Safe Mobility Offices or SMOs].''[112] DHS continued that ''[t]he success of SMOs and other new measures to reduce unlawful migration to the [southwest border] is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs.''[113] DHS noted that the U.S. government continued ''to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and [was] building goodwill and momentum to seek SMOs in still more countries in the region.''[114] When implementing changes to the FRP programs for Cubans and Haitians, DHS invoked the foreign affairs exemption on similar grounds.[115]

However, as discussed in this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the FRP programs was one part of a broader strategy to collaboratively manage unlawful migration with neighboring countries, the U.S. government is pursuing a range of other policy initiatives that would allow DHS to return or remove FRP program nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.[116]

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the FRP programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations and may result in an even greater number of FRP program nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.2 of this notice, with countries to accept the return of their nationals, including FRP program nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. 5 U.S.C. 553(b)(B), (d)(3). Any delay for such procedures would harm the U.S. government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the FRP programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border.[117] Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[118] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

For example, DHS would intend that the termination of the FRP programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new or modified reporting requirements they impose. The termination of the programs announced by this notice requires changes to the collections of information on Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records (OMB control number 1615–0013). Form I–131 will be revised in

[109] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[110] *See, e.g.,* 88 FR at 43594.

[111] *See, e.g.,* 88 FR at 43599.

[112] *Id.*

[113] *Id.* at 43600.

[114] *Id.*

[115] *See* 88 FR at 54643 (Cuba); 88 FR at 54639 (Haiti).

[116] DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries, *https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols* (updated Mar. 21, 2025).

[117] 5 U.S.C. 553(b)(B); 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754–55 (D.C. Cir. 2001) (''a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required''); *see also* Executive Order 14159, 90 FR 8443 (Jan. 29, 2025).

[118] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside ''only the offending parts of the rule.'' *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

connection with this notice by removing specific mention of the FRP programs. As of the date of this notice Form I–131 may not be used to request an initial or new period of parole under one of the FRP programs, but it may be used by a previous FRP beneficiary to request a new period of parole, or re-parole, under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–22744 Filed 12–12–25; 8:45 am]

BILLING CODE 9111–97–P

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–HQ–ES–2025–0613; FXES111609M0000–256–FF09420000; OMB Control Number 1018–0194]**

### Agency Information Collection Activities; Approval Procedures for Incidental Harassment Authorizations of Marine Mammals

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), we, the U.S. Fish and Wildlife Service (Service), are proposing to renew an information collection without change.

**DATES:** Interested persons are invited to submit comments on or before February 13, 2026.

**ADDRESSES:** Send your comments on the information collection request (ICR) by one of the following methods (please reference 1018–0194 in the subject line of your comments):

- *Internet (preferred): https://www.regulations.gov.* Follow the instructions for submitting comments on Docket No. FWS–HQ–ES–2025–0613.
- *Email: Info_Coll@fws.gov.*
- *U.S. mail:* Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803.

**FOR FURTHER INFORMATION CONTACT:** Madonna L. Baucum, Service Information Collection Clearance Officer, by email at *Info_Coll@fws.gov,* or by telephone at (703) 468–8211. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act (PRA; 44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR 1320.8(d)(1), all information collections require approval under the PRA. We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are especially interested in public comment addressing the following:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.,* permitting electronic submission of response).

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972 (MMPA; 16 U.S.C. 1361 *et seq.*) authorizes the Secretary of the Interior (Secretary) to allow, upon request, the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specific geographic region for periods of not more than 1 year. The Service may authorize incidental take by harassment if statutory and regulatory procedures are followed and the Service finds: (i) take is of a small number of marine mammals of a species or stock, (ii) take will have a negligible impact on the species or stock, and (iii) take will not have an unmitigable adverse impact on the availability of the species or stock for taking for subsistence uses by Alaska Natives.

The term ''take'' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal. Harassment means any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild (the MMPA defines this as ''Level A harassment''), or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering (the MMPA defines this as ''Level B harassment'').

The terms ''negligible impact,'' ''small numbers,'' and ''unmitigable adverse impact'' are defined in 50 CFR 18.27 (*i.e.,* the Service's regulations governing small takes of marine mammals incidental to specified activities). ''Negligible impact'' is an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival. ''Unmitigable adverse impact'' means an impact resulting from the specified activity (1) that is likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by (i) causing the marine mammals to abandon or avoid hunting areas, (ii) directly displacing subsistence users, or (iii) placing physical barriers between the marine mammals and the subsistence hunters; and (2) that cannot be sufficiently mitigated by other measures to increase

| Community | Community map repository address |
|---|---|
| City of Rancho Palos Verdes | City Hall, 30940 Hawthorne Boulevard, Rancho Palos Verdes, CA 90275. |
| City of Redondo Beach | Planning Department, 531 North Gertruda Avenue, Redondo Beach, CA 90277. |
| City of Santa Monica | Department of Public Works, 1685 Main Street, Santa Monica, CA 90401. |
| City of Torrance | Community Development, 3031 Torrance Boulevard, Torrance, CA 90503. |
| Unincorporated Areas of Los Angeles County | Los Angeles County Watershed Management, 900 South Fremont Avenue, Alhambra, CA 91803. |
| **Gallatin County, Montana and Incorporated Areas<br>Docket No.: FEMA–B–1836** | |
| City of Bozeman | Stiff Professional Building, Engineering Department, 20 East Olive Street, 1st Floor, Bozeman, MT 59715. |
| Unincorporated Areas of Gallatin County | Gallatin County Courthouse, Planning Department, 311 West Main Street, Room 108, Bozeman, MT 59715. |

[FR Doc. 2020–28474 Filed 12–23–20; 8:45 am]

**BILLING CODE 9110–12–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[OMB Control Number 1615–0013]**

### Agency Information Collection Activities; Revision, of a Currently Approved Collection: Application for Travel Document. Removal of Instructions Regarding the Haitian Family Reunification Program and Filipino World War II Veteran Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 60-day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration

Services (USCIS) invites the general public and other Federal agencies to comment on this proposed revision of a currently approved collection of information. The revision is necessary to announce and implement a change in USCIS policy to terminate the Haitian Family Reunification Parole (HFRP) program and the Filipino World War II Veterans Parole (FWVP) program, to rescind the applicable policy statements, and to revise the Instructions for USCIS Form I–131, Application for Travel Document, to remove references to and provisions regarding those programs. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding these policy changes, the nature of the information collection, the categories of respondents, the estimated burden (*i.e.* the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments will be accepted for 60 days until February 26, 2021.

*Effective date of changes:* These changes will be effective as of the date the form is approved by OMB. Cases that have already been filed as of the effective date of the new form and policies will be processed to a decision.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0013 in the body of the letter, the agency name and Docket ID USCIS–2007–0045. Submit comments via the Federal eRulemaking Portal website at *https://www.regulations.gov* under e-Docket ID number USCIS–2007–0045. USCIS is limiting communications for this Notice as a result of USCIS' COVID–19 response actions.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, telephone number (240) 721–3000 (This is not a toll-free number. Comments are not accepted via telephone message). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *https://www.uscis.gov,* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**SUPPLEMENTARY INFORMATION:**

### I. Background:

Section 11 of Executive Order 13767 of January 25, 2017, ''Border Security and Immigration Enforcement Improvements, (Section 11) provides that ''[i]t is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens.'' Section 11(d) instructs DHS to ''take appropriate action to ensure that parole authority under section 212(d)(5) of the [Immigration and Nationality Act (''INA'')] (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an alien demonstrates an urgent humanitarian need or a significant public benefit derived from such parole.''

On February 20, 2017, then-Secretary of Homeland Security Kelly issued a memorandum entitled ''Implementing the President's Border Security and Immigration Enforcement Improvements Policies.'' In that memorandum, Secretary Kelly stated that ''[t]he statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. . . .[i]n my judgment, such authority should be exercised sparingly.'' Additionally, it stated that ''[t]he practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole

process, and created an incentive for illegal immigration.'' [1]

Accordingly, USCIS undertook a review of existing categorical parole programs. USCIS is announcing the termination of HFRP and FWVP programs and is revising the Instructions for Form I–131 to remove references to and provisions regarding those programs. USCIS is also revising the form to remove references to the Cuban Family Reunification Parole (CFRP) Program.

*A. HFRP*

DHS established the HFRP program in 2014 as an exercise of its discretionary parole authority to permit certain eligible Haitians in Haiti who are the beneficiaries of approved family-based immigrant petitions to join their family members in the United States for an initial period of three years while they wait for immigrant visas to become available. 79 FR 75581 (Dec. 18, 2014). Consistent with INA section 212(d)(5), 8 U.S.C. 1182(d)(5), the decision to parole a particular alien into the country was a case-by-case, discretionary determination.

*B. FWVP*

In 2016, USCIS determined that paroling qualified applicants under FWVP would generally yield a ''significant public benefit'' (recognizing sacrifices of Filipino World War II veterans). 81 FR 28907 (May 9, 2016). USCIS also determined that grants of parole under the FWVP program would often address urgent humanitarian concerns (recognizing the advanced age of these veterans and the need for care by their alien family members). *Id.* Consistent with section 212(d)(5), 8 U.S.C. 1182(d)(5), the decision to parole a particular alien was a case-by-case, discretionary determination.

*C. Explanation for Change*

For both the HFRP and FWVP programs, DHS broadly exercised its statutory parole authority for multiple members of a narrowly defined group. Notwithstanding the perceived benefits of these categorical parole programs when they were established, this Administration undertook a renewed analysis. Consistent with Secretary Kelly's February 20, 2017 implementing memorandum, USCIS has determined that, as a matter of policy, the HRFP and FWVP programs do not meet DHS's obligation to narrowly exercise its parole authority.

Therefore, DHS is now rescinding the determination that there is a presumption that there are significant public benefit or urgent humanitarian reasons for parole requests from new applicants who meet the specific criteria established under HFRP and FWVP programs. Accordingly, new applicants who meet the FWVP and HFRP criteria will no longer be presumed to have demonstrated that there are significant public benefit or urgent humanitarian reasons present in their case by virtue of meeting HFRP and FWVP criteria.

USCIS will continue to adjudicate requests from current beneficiaries of the HFRP and FWVP programs who are already in the United States under the existing standards of those programs and who request a new period of parole.

**II. Administrative Procedure Act (APA)**

*A. Discretionary Policy Statement*

USCIS established the HFRP and FWVP programs through policy statements announced by **Federal Register** notice (FRN). 81 FR 28907; 79 FR 75581. USCIS also revised the Instructions for Form I–131 to provide instructions and evidence requirements to implement the policies. USCIS did not change its regulations.

The HFRP and FWVP programs were established using DHS' discretionary parole authority found in INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), and 8 CFR 212.5(c)–(d). An alien does not have a right to parole and there is no obligation for DHS to grant parole. Parole is an exercise of the Secretary's discretionary authority to permit an alien to temporarily enter the United States for certain reasons on a case-by-case basis for urgent humanitarian reasons or for a significant public benefit. The APA exempts from its requirements for public notice and comment general statements of policy, ''issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. at 302, n. 31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30, n. 3 (1947))). The termination of the HFRP and FWVP programs does not change the statutory standard for parole, and parole will remain an avenue for DHS to authorize, in its discretion, for certain aliens to travel to the United States. Therefore, terminating the HFRP and FWVP programs is exempt from the notice and comment requirements of the APA as a general statement of policy advising the public prospectively of the manner in which USCIS will exercise a discretionary power. *Lincoln,* 508 U.S. at 197.

DHS has reviewed this policy change and determined that it would be highly unlikely to adversely affect the substantive rights of some of the affected parties. DHS understands that it must show that there are good reasons for the new policy and acknowledge its conscious change of course, and that reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy. *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502 (2009) (citing *Smiley* v. *Citibank (South Dakota), N. A.,* 517 U.S. 735, 742 (1996). Executive Order 13767 instructs DHS to take appropriate action to ensure that parole authority under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), is exercised only on a case by case basis in accordance with the plain language of the statute, and in all circumstances only when an alien demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole. DHS believes the existing broad presumption that there are significant public benefit or urgent humanitarian reasons to consider parole for new applicants who meet the specific pre-established criteria under the HFRP and FWVP programs is inconsistent with the Executive Order and Secretary Kelly's implementing guidance directing that the policy of DHS is to exercise its parole authority narrowly.

1. HFRP

The **Federal Register** notice establishing HFRP states, ''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development. Once paroled into the United States, HFRP Program beneficiaries will be eligible to apply for employment authorization, and those who are able to work may contribute to Haiti's post-earthquake reconstruction and development through remittances.'' 79 FR 75581.

DHS has determined Haiti has made significant progress recovering from the 2010 earthquake and subsequent effects. With U.S. and international support for recovery, reconstruction, and development programs, Haiti has achieved significant improvements in basic health indicators, agricultural production, and jobs creation, according to the U.S. Department of State. 98 percent of 1.5 million people displaced

[1] *https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.*

following the earthquake have been resettled as of 2020, according to the International Organization for Migration. In light of these determinations, DHS has determined that the HFRP program no longer serves a significant public benefit for new applicants.

2. FWVP

The **Federal Register** notice establishing FWVP states, ''Recognizing the contributions and sacrifices of Filipino veterans who fought for the United States during World War II and their families, USCIS has decided to implement the FWVP policy. In many cases, ''paroling these family members may also allow them to provide support and care for elderly veterans or their surviving spouse. . . . For certain Filipino American family members, this wait can exceed 20 years'' 81 FR 28097. Further, ''In light of the circumstances described above, among other considerations, USCIS believes that the parole of qualified applicants who establish on a case-by-case basis that they are eligible for consideration under this policy and merit a favorable exercise of discretion would generally yield a 'significant public benefit.' Additionally, considering the advanced age of World War II Filipino veterans and their spouses, and their increased need for care and companionship, grants of parole under the FWVP policy would often address urgent humanitarian concerns. In all cases, whether to parole a particular alien under this policy is a discretionary determination that will be made on a case-by-case basis.'' *Id.*

DHS has determined that the FWVP program is inconsistent with the policy decision to narrowly exercise DHS' parole authority in making determinations of significant public benefit. With regard to urgent humanitarian concerns, DHS has no data substantiating that the admission of participants in the FWVP program routinely addresses an urgent humanitarian concern. An eligible alien may request parole even if the veteran and spouse the alien is petitioning to support are both deceased. The parole of an alien may not actually be yielding any significant public or humanitarian benefit in such instances. For these reasons, DHS believes that new FWVP program applications are more appropriately adjudicated through an individual application instead of a categorical program with a presumption of a significant public benefit or urgent humanitarian concern.

*B. Reliance Interest*

DHS has taken into account serious reliance interests that may be engendered by the 2014 and 2016 HFRP and FWVP policies. With respect to initial and pending applicants, DHS has determined that potential applicants cannot reasonably be determined to have taken an action in detrimental reliance on DHS or USCIS continuing these programs. It is not reasonable that potential applications would make major changes in their lives or incur significant expenses in anticipation that DHS would continue these programs in perpetuity and that they would be able to apply and be approved. With respect to current HFRP and FWVP parolees, DHS acknowledges the reliance interest of those aliens who are not yet lawful permanent residents and will make a new period of parole under the criteria of these programs available to them, on a case-by-case basis, to ensure continued eligibility. Further discussion of these reliance interests follows.

1. Reliance Interest of HFRP Parolees

For HFRP, DHS has determined that any alien who has not yet applied for the HFRP program is unlikely to have incurred costs or been harmed based on relying on DHS continuing that policy because the petitioner must receive an invitation to apply, and USCIS has not issued any such invitations since 2016. Thus, although DHS is changing its past pattern and practice, the program has not been open for new applicants for four years, and a potential applicant will not be surprised by the change and will not have suffered harm as a result of acting in reliance on the continuation of the HFRP program. Haitian petitioners with an approved Form I–130 or their Haitian beneficiary relatives should not complete a Form I–131, incur expenses, and take actions in reliance on USCIS being able to process their application when they cannot do so on their own accord and without an invitation from USCIS. Nevertheless, DHS is formally announcing in this notice that the HFRP program will be terminated to provide advance notice to parties who may be affected. To the extent that an alien has a pending Form I–131 for HFRP as of the date of this notice, USCIS will process and adjudicate that request to completion. USCIS welcomes public comments on all of the effects of this change in policy.

With respect to granting a new parole period (''re-parole'') for HFRP beneficiaries already paroled into the United States, DHS acknowledges that a current beneficiary has significant reliance interest in the continuation of the program as they were when they were granted parole. A current parolee decided to accept the USCIS invitation to apply for parole and expend the time, effort, and expense to uproot his or her life and move to the United States as a parolee, instead of staying in Haiti and waiting for an immigrant visa to become available. When the program was established, USCIS informed HFRP beneficiaries that it was their responsibility to seek re-parole in the United States until eligible to adjust status and they should apply for re-parole at least 90 days before parole expires. USCIS informed approved HFRP beneficiaries that, if their immigrant visa is still unavailable at the time their parole expires, they must apply to USCIS for a new parole authorization and pay the required fee. Therefore, HFRP program beneficiaries are expected to apply for lawful permanent resident status as soon as their immigrant visa becomes available. The majority of HFRP beneficiaries will have an immigrant visa available at the time their parole expires. Given these reliance interests, DHS will accept requests for re-parole under the existing standards of the HFRP program.

2. Reliance Interest of FWVP Parolees

For FWVP, DHS has determined that an applicant who has not yet applied for the FWVP program is unlikely to have incurred costs or been harmed based on relying on DHS continuing that policy. To the extent that an alien is in the process of completing and filing a request, USCIS will provide two public notices of the impending form, policy and procedure change. Aliens who are currently in the process of completing their paperwork may also apply for the FWVP program until the date that it is terminated, which is when the Form I–131 changes go into effect. To the extent that applicants who are not yet working on, researching, and gathering necessary evidence for an application may no longer receive parole after this change, DHS believes the FWVP program is inconsistent with its narrower interpretation of the parole authority and the public policy goals supported by a narrow use of its parole authority (as described in Secretary Kelly's memorandum) justify and outweigh any minor reliance interests of those aliens who may have contemplated filing an application for FWVP but have not yet done so at the time the program is formally terminated. If an alien has an I –131 application for FWVP pending as of December 28, 2020, USCIS will process and adjudicate that request to completion. USCIS welcomes public

comments on all of the effects of this change in policy.

As for granting re-parole to FWVP beneficiaries already paroled initially into the United States, DHS acknowledges that a current beneficiary as well as U.S. citizen petitioners may have a significant reliance interest in the continuation of the program as it was when the alien was granted parole. A current parolee decided to avail himself or herself to the USCIS opportunity to apply for parole and expend the time, effort, and expense to uproot his or her life and move to the United States as a parolee, instead of staying in the Philippines and waiting for an immigrant visa to become available. The beneficiary (the Filipino war veteran or his or her spouse) may also have a reliance interest. The veteran or spouse may have paid the fees and expended other resources in contemplation of relatives coming to the United States to care for them, or may have forgone other living situations that were available to them if they did not have the care of the relative who had been able to join them in the US. When the program was established, USCIS informed FWVP parolees that it was their responsibility to seek re-parole in the United States until eligible to adjust status and they should apply for re-parole at least 90 days before parole expires. USCIS informed approved FWVP parolees that if their immigrant visa is still unavailable at the time their parole expires, they must apply to USCIS for a re-parole and pay the required fee. Therefore, FWVP program beneficiaries are expected to apply for lawful permanent resident status as soon as their immigrant visa becomes available.

Given these reliance interests, DHS will accept requests for re-parole under the existing standards of the FWVP program.

## Comments

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2007–0045 in the search box. All submissions will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *https://www.regulations.gov.*

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

## Overview of This Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Travel Document.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–131; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Certain aliens, principally permanent or conditional residents, refugees or asylees, applicants for adjustment of status, aliens in Temporary Protected Status (TPS), and aliens abroad seeking humanitarian parole who need to apply for a travel document to lawfully enter or reenter the United States. Eligible recipients of deferred action under childhood arrivals (DACA) may now request an advance parole documents based on humanitarian, educational and employment reasons. Lawful permanent residents may now file requests for travel permits (transportation letter or boarding foil).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–131 is 379,483 and the estimated hour burden per response is 1.9 hours; the estimated total number of respondents for biometrics processing is 75,100 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for passport-style photos is 325,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 971,385 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $111,568,002.

Dated: December 18, 2020.

**Joseph Edlow,**

*Deputy Director for Policy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2020–28475 Filed 12–23–20; 8:45 am]

BILLING CODE 9111–97–P

# DEPARTMENT OF THE INTERIOR

## National Park Service

**[NPS–WASO–CONC–30740; PPWOBSADC0, PPMVSCS1Y.Y00000]**

## Notice of Intent to Extend Concession Contracts and Award Temporary Concession Contracts

**AGENCY:** National Park Service, Interior.

**ACTION:** Public Notice.

**SUMMARY:** The National Park Service gives public notice that it proposes to extend each concession contract listed in the Table 1 below until the date shown in the ''Extension Expiration Date'' column or until the effective date of a new contract, whichever comes first. The National Park Service also gives public notice that it proposes to award the temporary concession contracts listed in Table 2 below.

**DATES:** The National Park Service intends that the concession contract extensions and temporary concession contracts will be effective on the dates shown in the ''Extension Effective Date'' and ''Effective Date'' columns, respectively.

**FOR FURTHER INFORMATION CONTACT:** Kurt Rausch, Program Chief, Commercial Services Program, National Park Service, 1849 C Street, NW, Mail Stop 2410, Washington, DC 20240; Telephone: 202–513–7156.

**SUPPLEMENTARY INFORMATION:** The concession contracts listed in Table 1

# EXHIBIT 26

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]**

**RIN 1615–ZB99**

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

*https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Colombians

As in the CFRP and HFRP processes, this FRP process for Colombians will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Colombia who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Colombian principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Colombians, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Colombia in the United

---

additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

States. Currently, nationals of Colombia with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

[26] For example, under the May 2023 Department of State Visa Bulletin, a Colombian married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Colombian married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### *C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2022 (FY22), migration from Colombia significantly increased, with border enforcement encounters at the SWB more than 20 times greater in FY22 than in the prior year (6,202 in FY21 compared to 125,172 in FY22).[44] Encounters in FY23, through April 2023, were already at more than 107,000.[45] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Colombia to the United States.[46]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[47] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Colombia and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

### *D. Reducing Strain on Limited U.S. Resources*

The increase in monthly encounters of Colombians, from approximately 7,500 per month in the first seven months of Fiscal Year (FY) 2022 to more than 15,300 per month in the first seven months of FY 2023 has contributed to the strain on DHS's reception and processing capacity at the SWB.[48] By establishing a lawful pathway for some of these migrants from Colombia, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[49] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[50]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated

---

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 8, 2023).

[45] *Id.*

[46] U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: Colombia (Apr. 2023) *https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/colombia/;* World Report 2023, Events of 2022 Colombia, Human Rights Watch (Jan. 2023) *https://www.hrw.org/world-report/2023/country-chapters/colombia;* ACAPS, Colombia Humanitarian overview: protection concerns and community protection responses (Nov. 17, 2022), *https://www.acaps.org/sites/acaps/files/products/files/20221117_acaps_colombia_analysis_hub_protection.pdf;* Reuters, More than 15 mln Colombians suffer food insecurity—UN (Feb. 16, 2023) *https://www.reuters.com/world/americas/more-than-15-mln-colombians-suffer-food-insecurity-un-2023-02-16/; see also* Paulina Villegas & Samantha Schmidt, *Two siblings tried reaching the U.S. by sea to reunite with their mother. Only one of them made it,* Wash. Post, Jan. 28. 2022, *https://www.washingtonpost.com/world/2022/01/28/siblings-bahamas-colombia/.*

[47] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[48] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 9, 2023).

[49] As of late May 2023, there are currently an estimated 17,400 Colombian nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Colombian nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[50] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

with irregular migration.[51] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[52] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[53] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic concerns in Colombia, which may be a factor driving the increasing numbers of Colombians crossing the Darién Gap.[54] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[55] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[56]

Additional remittances sent back to Colombia, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[57] Remittances from Colombian migrants already play an important role in the Colombian economy.[58] For the first nine months of 2022, remittances to Colombia increased 9 percent.[59] Additionally, Colombia receives the highest income from remittances in South America.[60] Overall, remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Colombia, potentially impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Colombian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[61] Form I–130 filed on behalf of a Colombian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Colombian principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Colombia (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United

[51] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[52] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[53] *Id.*

[54] The number of Colombians crossing from Colombia into Panama has increased from approximately 300 in January 2023 to over 1,600 in April 2023. Servicio Nacional de Migración de Panamá, Tránsito Irregular por Darién 2023 (last visited June 9, 2023), *https://www.migracion.gob.pa/images/img2023/pdf/IRREGULARES_%20POR_%20DARI%C3%89N_ABRIL_2023.pdf.*

[55] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550*/the-economic-and-fiscal-consequences-of-immigration; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[56] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[57] *See* Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf;* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020), *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[58] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[59] The World Bank, *Remittances Grow 5% in 2022, Despite Global Headwinds* (Nov. 30, 2022), *https://www.worldbank.org/en/news/press-release/2022/11/30/remittances-grow-5-percent-2022.*

[60] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[61] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child) [62] of an approved Form I–130, Petition for Alien Relative;

• be a national of Colombia or be a non-Colombian derivative beneficiary spouse or child [63] of a Colombian principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea [64] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[65]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Colombia. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[66]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[67] expedited removal proceedings,[68] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [69] or for an immigrant visa [70] as a result of entering without inspection and not having been admitted or paroled.[71]

### *C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online,

---

[62] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[63] Certain non-Colombians may use this process if they are a derivative beneficiary of a Colombian principal beneficiary and traveling with that Colombian beneficiary.

[64] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[65] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[66] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[67] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[68] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[69] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[70] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[71] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[72] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[73]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

[72] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[73] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[74]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Colombia still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Colombian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### *A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[75] *i.e.,* "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[76] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[77] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[78] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[79] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[80]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[81] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

[74] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[75] 5 U.S.C. 553(b)(A).

[76] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[77] 5 U.S.C. 553(a)(1).

[78] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[79] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[80] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[81] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways which will continue to remain a central topic of bilateral relations.[82] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[83] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[85] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[86]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[87] The goal is to prevent irregular migration to the United States or other places in the hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[88] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[89]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[90] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[91] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[92]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful

[82] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[83] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[84] *Id*

[85] *Id.*

[86] *Id.*

[87] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[88] *Id*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[91] *Id.*

[92] *Id.*

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]**

**RIN 1615–ZC02**

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

# EXHIBIT 27

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

## DEPARTMENT OF HOMELAND SECURITY

**[Docket No. CISA–2023–0012]**

## Notice of President's National Infrastructure Advisory Council Meeting

**AGENCY:** Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS).

**ACTION:** Notice of open *Federal Advisory Committee Act* (FACA) meeting; request for comments.

**SUMMARY:** CISA is publishing this notice to announce the following President's National Infrastructure Advisory Council (NIAC) meeting.

**DATES:** *Meeting Registration:* Registration is required to attend the meeting and must be received no later than 5 p.m. eastern standard time (EST) on December 6, 2023. For more information on how to participate, please contact *NIAC@cisa.dhs.gov.*

*Speaker Registration:* Registration to speak during the meeting's public comment period must be received no later than 5 p.m. EST on December 6, 2023.

*Written Comments:* Written comments must be received no later than 5 p.m. EST on December 6, 2023.

*Meeting Date:* The NIAC will meet on December 12, 2023, from 1 p.m. to 4 p.m. EST. The meeting may close early if the council has completed its business.

**ADDRESSES:** The National Infrastructure Advisory Council's open session will be held in-person at 1650 Pennsylvania Ave. NW, Washington, DC; however, members of the public may participate via teleconference only. Requests to participate will be accepted and processed in the order in which they are received. For access to the conference call bridge, information on services for individuals with disabilities, or to request special assistance, please email *NIAC@cisa.dhs.gov* by 5 p.m. EST on December 6, 2023. The NIAC is committed to ensuring all participants have equal access regardless of disability status. If you require a reasonable accommodation due to a disability to fully participate, please contact Celinda Moening at *NIAC@cisa.dhs.gov* as soon as possible.

*Comments:* The council will consider public comments on issues as listed in the **SUPPLEMENTARY INFORMATION** section below. Associated materials for potential discussions during the meeting will be available for review at *https://www.cisa.gov/niac* by December 5, 2023. Comments should be submitted by 5:00 p.m. EST on December 6, 2023 and must be identified by Docket Number CISA–2023–0012. Comments may be submitted by one of the following methods:

- *Federal eRulemaking Portal: www.regulations.gov.* Please follow the instructions for submitting written comments.
- *Email: NIAC@cisa.dhs.gov.* Include the Docket Number CISA–2023–0012 in the subject line of the email.

*Instructions:* All submissions received must include the words "Department of Homeland Security" and the Docket Number for this action. Comments received will be posted without alteration to *www.regulations.gov,* including any personal information provided. You may wish to read the Privacy & Security Notice which is available via a link on the homepage of *www.regulations.gov.*

*Docket:* For access to the docket and comments received by the National Infrastructure Advisory Council, please go to *www.regulations.gov* and enter docket number CISA–2023–0012.

A public comment period will take place from 2:30 p.m. to 2:40 p.m. Speakers who wish to participate in the public comment period must email *NIAC@cisa.dhs.gov* to register. Speakers should limit their comments to 3 minutes and will speak in order of registration. Please note that the public comment period may end before the time indicated, depending on the number of speakers who register to participate.

**FOR FURTHER INFORMATION CONTACT:** Celinda Moening, 571–532–4119, *NIAC@cisa.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The NIAC is established under section 10 of E.O. 13231 issued on October 16, 2001, as amended and continued under the authority of E.O. 14109, dated September 30, 2023. Notice of this meeting is given under the Federal Advisory Committee Act (FACA), 5 U.S.C. Ch. 10 (Pub. L. 117–286). The NIAC provides the President, through the Secretary of Homeland Security, advice on the security and resilience of the Nation's critical infrastructure sectors.

*Agenda:* The National Infrastructure Advisory Council will meet in an open session on Tuesday, December 12, 2023, from 1 p.m. to 4 p.m. EST to discuss NIAC activities. The open session will include: (1) a period for public comment; (2) a keynote address on critical infrastructure security and resilience; (3) a report to the Council from the NIAC's Electrification Subcommittee; (4) deliberation and vote on Electrification Subcommittee recommendations; and (5) Additional Topics Discussion.

Dated: November 13, 2023.

**Celinda E. Moening,**

*Alternate Designated Federal Officer, National Infrastructure Advisory Council, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–25348 Filed 11–15–23; 8:45 am]

**BILLING CODE 9110–9P–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2758–23; DHS Docket No. USCIS–2023–0014]**

**RIN 1615–ZC07**

## Implementation of a Family Reunification Parole Process for Ecuadorians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Ecuadorians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole (FRP) process for Ecuadorians. Under this process, certain Ecuadorian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Ecuador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and to reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a

Supporter and Declaration of Financial Support, for this process on November 16, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Ecuadorian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing an avenue for certain Ecuadorians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to collaboratively manage migration with its partners in the Western Hemisphere.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of noncitizens encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of access to lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. On October 12, 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[8] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[9] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, would be subject to expulsion or removal.[10] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the existing parole process for Venezuelans to allow for its continued operation.[11]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[12] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[13]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program [14] and

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order (E.O.) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021) *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2, 4.

[4] *See* National Security Council (NSC), *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[9] *See id.*

[10] *Id.*

[11] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[12] 88 FR 31314 (May 16, 2023).

[13] *See id.* at 31325.

[14] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. *See* U.S. Department of State, Restarting the Central American Minors Program, March 10, 2021, *https://www.state.gov/restarting-the-central-american-minors-program/* (last visited Aug. 3, 2023). In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). *See* U.S. Department. of State, Joint

Continued

expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[15] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for noncitizens in the region while enhancing worker protections.[16]

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to noncitizens who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Secretary of Homeland Security (the Secretary) has the discretionary authority under the Immigration and Nationality Act (INA) to parole an applicant for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [17] Parole is not an admission of the noncitizen to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[18] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[19] DHS may terminate parole upon notice in its discretion at any time.[20] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[21]

Past Secretaries have similarly exercised parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, Cuban Family Reunification Parole (CFRP) as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Forms I–130.[22] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[23] Similarly, in 2014, Haitian Family Reunification Parole (HFRP) was established, which allows USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[24] On July 10, 2023, DHS announced the implementation of four new FRP processes for certain nationals from Colombia, El Salvador, Guatemala, and Honduras, and their immediate family members, who have approved family-based petitions filed on their behalf by a U.S.C. or LPR.[25] On August 11, 2023, DHS announced updates to modernize the CFRP and HFRP processes by adopting the new, mostly

---

Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central America Minors Program, June 15, 2021, *https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/* (last visited Aug. 3, 2023). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[15] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration;* U.S Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[16] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were reserved for nationals of the NCA countries and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[17] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[18] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[19] *See* 8 CFR 212.5(c).

[20] *See* 8 CFR 212.5(e).

[21] *See* 8 CFR 274a.12(c)(11).

[22] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[23] *Id.*

[24] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

[25] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

online, processing steps implemented for the four new FRP processes.[26]

### III. The FRP Process for Ecuadorians

As in all other FRP processes, the FRP process for Ecuadorians will allow U.S.C. and LPR petitioners who have been invited to file a request and initiate this process for certain eligible family members to receive advance authorization to travel to the United States to seek parole at an interior POE (*i.e.,* an airport). Individuals who are eligible to be considered for parole under this process include nationals of Ecuador who are principal beneficiaries of approved Form I–130 family-based immigrant petitions, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. This process requires that the Form I–130 petitioner first receive an invitation to be able to initiate the process on behalf of the Form I–130 principal beneficiary and their immediate family members. As in other FRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If U.S. Customs and Border Protection (CBP) issues an advance authorization to travel to a beneficiary, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the other FRP processes. If paroled into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with all parole requests, under this FRP process for Ecuadorians, parole will be authorized only on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

### IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens who are beneficiaries of approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

#### *A. Promoting Family Unity*

The case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite in the United States with their family members from Ecuador. Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[27] While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to choose irregular migration in the absence of an alternative, near-term path to come to the United States for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the expeditious reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

---

[26] *See* Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).

[27] For example, under the October 2023 Department of State Visa Bulletin, an Ecuadorian unmarried son or daughter of a U.S.C.—F1 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 8 years ago. *See* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.* However, these dates are not predictive. Due to increases in volume of Form I–130 filings, an Ecuadorian unmarried son or daughter of a U.S.C. for whom a Form I–130 is filed today will likely have an even longer wait before an immigrant visa becomes available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[28] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[29] establishing SMOs in key locations throughout the Western Hemisphere,[30] joining Mexico to announce and develop a humanitarian plan on migration,[31] issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America,[32] and, most recently, announcing full support for an initiative that the Government of Mexico plans to start in southern Mexico to offer new refugee and labor pathways.[33] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively, at great financial, staffing, and domestic political costs, to: (1) create and expand access to lawful pathways in their respective countries, (2) increase enforcement measures along the migratory routes, and (3) introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Implementation of this FRP process is one response to such requests and, thereby, will build goodwill with regional partners and secure cooperation and strengthen bilateral relations in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger foreign policy objectives of this Administration and fits within a framework of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[34] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[35] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[36] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in Spring 2023 as the date on which the CDC Title 42 public health Order[37] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[38] For instance, on April 11, 2023, consistent with the spirit of the L.A. Declaration, in anticipation of the end of the Title 42 public health Order, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[39] Implementing this process fulfills one of the commitments the United States made with its regional partners to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [40]

The United States also continues to encourage regional governments to continue to expand lawful pathways for migrants, including providing legal status to migrants residing in their countries, as well as to establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[41] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.

[28] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[29] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[30] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/;* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/;* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[31] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[32] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[33] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/.*

[34] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[35] *Id.*

[36] *Id.*

[37] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[38] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing ''concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[39] *Trilateral Joint Statement,* Apr. 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[40] *See id.*

[41] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—U.S. Department of State (''Blinken-Mayorkas Joint Press Availability''), Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43]

Expanding cooperation with Ecuador can help achieve migration goals within Ecuador, regionally, and around the globe.[44] Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities,[45] providing life-saving assistance to Venezuelan and Colombian refugees and migrants within its borders, and strengthening its border security and controls.[46] Ecuador, along with Costa Rica, Belize, and Peru, is undertaking efforts to regularize migrants from Venezuela and Nicaragua.[47] Ecuador's program for Venezuelans in the country has provided an opportunity for stability and integration for more than 500,000 displaced Venezuelans.[48] Furthermore, establishing an FRP process for certain nationals of Ecuador furthers the USG's efforts to set up SMOs in Ecuador. As part of ongoing negotiations over the establishment of SMOs in Ecuador, the Government of Ecuador has repeatedly emphasized the critical importance of lawful pathways to the United States for nationals of Ecuador, including labor and family reunification pathways.[49] After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador to guide migrants and refugees towards lawful migration pathways.[50]

### *C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2023 (FY23), CBP encounters with Ecuadorians totaled 117,487 as compared to 24,936 encounters in FY22, a 371% increase.[51] In FY21, CBP encountered a total of 97,074 Ecuadorian nationals, and in all of FY20, CBP encountered 12,892 Ecuadorian nationals.[52] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Ecuador to the United States.[53]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[54] While beneficiaries of this FRP process will still need to wait to apply to become an LPR, it will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Ecuador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration.

### *D. Reducing Strain on Limited U.S. Resources*

Increases in irregular migration from Ecuador have strained DHS's reception and processing capacity at the SWB. From FY20 to FY23, encounters of Ecuadorians at the SWB totaled approximately 252,389.[55] By establishing a lawful pathway for some nationals of Ecuador and their immediate family members, on a case-by-case basis, to be paroled into the United States before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB. This would thereby provide a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of noncitizens to interior POEs.

Paroling noncitizens through this process will be significantly less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, preserving space and resources for managing irregular migration.

Furthermore, by establishing a meaningful, near-term lawful pathway that certain noncitizens, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to

---

[42] *See id.*

[43] *See id.*

[44] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf.*

[45] Ministry of Foreign Affairs of Ecuador, LISTA DE PAÍSES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023). Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan. The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.

[46] *Id.*

[47] *See supra* note 41.

[48] The White House, Readout of Los Angeles Declaration Implementation Launch, Sept. 27, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/27/readout-of-los-angeles-declaration-implementation-launch/.*

[49] *See, e.g.,* The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023. Gustavo Manrique: ''Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar'' (Gustavo Manrique: ''We are in dialogue with the U.S. so that migrants can have family reunification''), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[50] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[51] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

[52] *Id.*

[53] Genevieve Glatsky and José María León Cabrera, *Security is the Main Worry as Ecuador Votes on Sunday. Here's What to Know,* New York Times, Aug. 20, 2023, *https://www.nytimes.com/2023/08/20/world/americas/ecuador-election-assassination-explainer.html;* Genevieve Glatsky and José María León Cabrera, *How Narco Traffickers Unleashed Violence and Chaos in Ecuador,* New York Times, Aug 17, 2023, *https://www.nytimes.com/2023/08/17/world/americas/ecuador-drug-trafficking-election.html?searchResultPosition=16;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sep. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[54] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.*

[55] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

enter the United States irregularly, the process could redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the Northern Central America region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[56] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[57] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[58] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and non-governmental organizations along the SWB. Beneficiaries will be required to fly at their own expense to an interior POE, rather than arriving at the SWB and transiting through border communities. Beneficiaries will only be authorized to come to the United States if they have a U.S.-based supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries will also be immediately eligible to apply for employment authorization, enabling them to support themselves.

*E. Addressing Root Causes of Migration Through Remittances*

The case-by-case parole into the United States of noncitizens under this FRP process will also serve a significant public benefit by aiding U.S. efforts to address economic insecurity in Ecuador, which is a key factor that drives out-migration.[59] Unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that, if granted, they may maintain throughout the duration of their parole period, allowing them to support themselves and to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[60] Noncitizens with employment authorization also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[61]

Additional remittances sent back to Ecuador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[62] In total, remittances sent to Ecuador amounted to $603.97 million in 2021, a significant contribution to development in communities in Ecuador.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Ecuador, impacting individual decisions on whether to leave the country. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, noncitizens are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of an Ecuadorian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of an Ecuadorian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf

[56] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019), *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[57] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[58] *Id.*

[59] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sept. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[60] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[61] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[62] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf;* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[63] Statista, Personal remittances paid in Ecuador from 1999 to 2021, *https://www.statista.com/statistics/1390805/personal-remittances-paid-ecuador/#:~:text=The%20personal%20remittances%20paid%20in,have%20been%20subject%20to%20fluctuation* (last visited July 6, 2023). *See also* The World Bank, Data, GDP (current US$)—Ecuador, *https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?end=2021&locations=EC&start=2019* (last visited July 31, 2023), which indicates that the 2021 GDP for Ecuador was 106.17 billion US dollars.

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

of an Ecuadorian principal beneficiary of an approved Form I–130, and separate requests for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of their parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationships between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Ecuador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE under this process, a beneficiary must:

• Be outside the United States;
• Be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
• Be a national of Ecuador or be a non-Ecuadorian derivative beneficiary spouse or child [66] of an Ecuadorian principal beneficiary;
• Have a petitioning relative in the United States who received an invitation to initiate this FRP process on the beneficiary's behalf by filing a Form I–134A;
• Have a U.S.-based petitioning relative who filed a Form I–134A on the beneficiary's behalf that USCIS has vetted and confirmed;
• Have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
• Have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting by CBP prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting and collection of additional biometrics at the POE by CBP upon inspection, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary approvals of advance authorization to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary has:

• Crossed irregularly into the United States, between POEs, after November 16, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
• Been interdicted at sea [67] after November 16, 2023; or
• Been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on urgent humanitarian reasons or significant public benefit, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Ecuador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after November 16, 2023, rather than being considered for parole under this process, will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Ecuadorians may use this process if they are a derivative beneficiary of an Ecuadorian principal beneficiary and traveling with that Ecuadorian beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] INA secs. 275 and 276, 8 U.S.C. 1325 and 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c)(2), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

entering without inspection and not having been admitted or paroled.[74]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned from the original CFRP and HFRP programs and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except certain medical requirements, and the ultimate parole determination made in person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner be permitted to file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134a Online To Initiate This Process

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries may submit a Form I–134A for each beneficiary with USCIS through the USCIS online system to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, then the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, then the beneficiary named on the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through USCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole under this process and will be processed consistent with established policy and procedure. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis in the exercise of discretion for urgent humanitarian reasons or significant public benefit, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions of parole or other derogatory information emerges during the parole period.

### *D. Termination and No Private Rights*

As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This process is being implemented as a matter of the Secretary's discretion, and the Secretary retains the sole discretion to terminate this FRP process at any point. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, benefits, substantive or procedural, enforceable by any party in any matter, civil or criminal, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## VI. Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes or forms such as parole-related employment authorization applications. Beneficiaries who are paroled into the United States under this FRP process may have to wait before being authorized to work in the United States, depending on the amount of time it takes USCIS to process beneficiaries' requests for employment authorization.[77] However, the impact of that waiting period is to some extent mitigated by the requirements of this process. Beneficiaries may not be paroled under this process unless their Form I–130 petitioner has filed on their behalf to initiate the FRP process, requesting to be a supporter and declaring their ability to financially support the beneficiary. As noted above, the petitioner must provide evidence to demonstrate their ability to support the beneficiary or must include similar evidence establishing that with the help of a co-supporter, they have the financial means to support the beneficiary.

Although personnel and resources may be diverted from other similar processes and programs or for the adjudication of forms such as parole-related employment authorization applications, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure as resource limitations require. Therefore, for the processing of employment authorization applications, for example, the adjudication burden on USCIS can be controlled and limited as needed under this FRP process. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. As explained in detail above, DHS has determined that there are significant public benefits of the case-by-case parole of noncitizens under this process. DHS also recognizes there are costs that may be incurred, such as for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants). Ultimately, DHS has determined that the significant public benefits of the case-by-case parole of noncitizens under this FRP process to the United States, and to other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, justify the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence.[78]

Alternatively, as discussed below, a decision to forego establishing this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation from foreign partners with respect to removals and ensure continued collaboration on migration management. In addition, certain nationals of Ecuador still waiting for their immigrant visas to become available would remain separated from their family members for an extended period of time and could resort to irregular migration without this process. For any such Ecuadorian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of noncitizens living in the United States without authorization, unable to legally seek employment. The states in which they settle may be less likely to benefit from additional tax revenues and other positive economic contributions these noncitizens would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### *A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

[76] 8 CFR 274a.12(c)(11).

[77] USCIS, Check Case Processing Times, *https://egov.uscis.gov/processing-times/* (last visited Oct. 25, 2023). This website provides the approximate processing time a parolee can expect when filing Form I–765, Application for Employment Authorization.

[78] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

First, DHS is merely adopting a general statement of policy,[79] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [80] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

Second, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[81] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [82] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[83]

This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure our partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] Since the April 27, 2023 announcement,[85] the United States has engaged in ongoing negotiations to implement the announced initiatives in close coordination with regional partners including establishing SMOs in Colombia, Guatemala, and Costa Rica as part of its strategy to manage migration collaboratively in the Western Hemisphere.

As with the four recently implemented FRP processes and the modernization of the CFRP and HFRP processes, delaying issuance and implementation of this process to undertake rulemaking would complicate broader discussions and ongoing negotiations with key foreign partners about migration management. Ongoing negotiations with regional partners involve the implementation of a range of new measures, including establishing SMOs in key locations throughout the Western Hemisphere to manage and reduce irregular migration and improve qualified noncitizens' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including FRP processes that will benefit nationals in countries identified to host SMOs.

Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities. To that end, Ecuador unilaterally has taken two very critical actions to prevent certain nationalities from abusing Ecuador's visa regime to irregularly travel to the Western Hemisphere. Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan.[86] The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.[87] While Ecuador is taking this action unilaterally, representatives of the Government of Ecuador have emphasized the critical importance of availability of lawful pathways for Ecuadorian nationals, including labor pathways and processes for nationals of Ecuador to reunify with their family members in the United States.[88] Similarly, Foreign Minister Gustavo Manrique shared with local press that Ecuador is negotiating with the United States on hosting SMOs and noted their position on family reunification and labor pathways for Ecuadorians.[89] After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador.[90] In DHS's judgment, the delay associated with a public rulemaking process involving notice and comment and a delayed effective date would negatively impact ongoing efforts to operationalize SMOs in Ecuador to channel migrants to lawful pathways.

Such a delay would also be inconsistent with the dispatch with which DHS has appropriately implemented other FRP processes. Such processes support a series of efforts that the United States has been pursuing in the hemisphere to increase the availability of lawful pathways for migration and involve additional countries with destination pathways and as host countries for certain processing initiatives. The ability to implement such processes rapidly is critical for supporting the Administration's overall goals as part of these efforts, which include multi-faceted negotiations with a range of regional partners.

For instance, on May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that

[79] 5 U.S.C. 553(b)(A).

[80] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[81] 5 U.S.C. 553(a)(1).

[82] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[83] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[85] *Id.*

[86] Ministry of Foreign Affairs of Ecuador, LISTA DE PAÍSES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023).

[87] *Id.*

[88] The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023.

[89] Gustavo Manrique: ''Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar'' (Gustavo Manrique: ''We are in dialogue with the US so that migrants can have family reunification''), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[90] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, which will continue to remain a central topic of bilateral relations.[91] Specifically, the United States stated its intention to welcome as many as 100,000 noncitizens from El Salvador, Guatemala, and Honduras under the FRP processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success.[92] Mexico concurrently agreed to continue to implement the joint initiative whereby the United States provides a lawful pathway through parole for nationals of Cuba, Haiti, Nicaragua, and Venezuela, while Mexico would accept the return of certain third-country migrants on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.[93]

Similarly, on July 28, 2023, building on a series of successful lawful pathway initiatives the United States and the Government of Mexico agreed to launch last year,[94] the United States announced additional steps to expand access to safe, orderly, and lawful pathways for migration.[95] On July 28, the United States noted its full support to the Government of Mexico of efforts to establish international multipurpose space in Mexico to offer protection and labor pathways, including accepting refugee resettlement referrals to the U.S. Refugee Admissions Program from qualified noncitizens from Cuba, Haiti, Nicaragua, and Venezuela.[96] The United States and the Government of Mexico are working to implement this new commitment to expand access to lawful pathways. As stated in the **Federal Register** Notices implementing family reunification processes for certain nationals of Colombia,[97] El Salvador,[98] Guatemala,[99] and Honduras,[100] a delay in implementation of the U.S. commitment on family reunification pathways risks undermining Mexico's commitments, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[101] As the first step of a comprehensive program to manage irregular migration, both countries are implementing a six-month pilot phase of SMOs.[102] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[103] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[104]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[105] The Safe Mobility initiative launched in Colombia on June 28, 2023, with SMOs currently operational in three cities throughout the country. SMOs in Colombia serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[106] The U.S. government also reaffirmed its commitment to expand lawful pathways for Colombians with temporary work visas and expanded family reunification.[107]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, launched an exploratory six-month implementation of SMOs.[108] SMOs in Costa Rica serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[109] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[110]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate ongoing negotiations with the Government of Ecuador, specifically, and overall U.S. efforts to manage migration together with foreign partners. Because this FRP process is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining partner countries' multilateral and unilateral efforts, and in the case of Ecuador, putting at risk multiple efforts, including the United States' ability to continue SMO operations in Ecuador and Ecuador's willingness to unilaterally impose certain visa restrictions, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would

[91] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[92] *Id.*

[93] *Id.*

[94] *See* The White House, Remarks by President Biden and President López Obrador of Mexico Before Bilateral Meeting, July 12, 2022, *https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/12/remarks-by-president-biden-and-president-lopez-obrador-of-mexico-before-bilateral-meeting-2/*.

[95] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/*.

[96] *Id.*

[97] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023).

[98] *See* Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[99] *See* Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

[100] *See* Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[101] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[106] *Id.*

[107] *Id.*

[108] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[109] *Id.*

[110] *Id.*

Case: 26-1314 Case 1:25-cv-10495-IT Document: 24-21 Page: 327 Filed 03/17/25 Date Filed: 02/10/2026 Page 14 of 14 Entry ID: 6858896



adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals. In diplomatic engagements, regional partner countries have repeatedly requested additional lawful pathways in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. As encounters of Ecuadorians along the SWB have remained high compared to the same months last year, maintaining and expanding their cooperation on removals is necessary to effectively manage irregular migration. Demographics and dynamics are evolving and difficult to predict, requiring flexibility in the responses of all governments involved. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption here is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[111] DHS similarly invoked the foreign affairs exemption more recently in connection with the CHNV parole processes [112] and family reunification parole processes for certain nationals of Colombia, El Salvador, Guatemala, and Honduras announced on July 10, 2023.[113]

[111] *See* Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[112] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[113] *See* DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras, July 17, 2023, *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala;* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); and Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

### *B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Ecuadorians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143); the revision to the ATA collection will add Ecuador to the list of countries authorized to utilize ATA. USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization for OMB approval of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. USCIS and CBP will issue respective **Federal Register** notices seeking comment on these changes.[114]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–25313 Filed 11–15–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

[114] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7075–N–14]**

## 60-Day Notice of Proposed Information Collection: Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion OMB Control No.: 2528–0328

**AGENCY:** Office of Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* January 16, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal.

Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting, ''Currently under 60-day Review—Open for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Anna Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email; *Anna.P.Guido@hud.gov;* telephone (202) 402–5535 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

### A. Overview of Information Collection

*Title of Information Collection:* Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion.

*OMB Approval Number:* 2528–0328.

*Type of Request:* Extension of currently approved collection.

*Form Number:* N/A.

*Description of the need for the information and proposed use:* The Office of Policy Development and Research (PD&R), at the U.S. Department of Housing and Urban Development (HUD), is proposing this collection of information for the

# EXHIBIT 28

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

changes to their current operations and will remain in effect through July 31, 2024.

CDC has further determined that good cause exists for a one-year extension of the temporary suspension through July 31, 2024, to address public health concerns regarding importation of dogs infected with rabies. Moreover, in parallel to this notice announcing the extension of the temporary suspension, CDC is proposing a rule revising entry requirements to address these concerns regarding importation of rabid dogs and fraudulent vaccination documentation. The proposed rule outlines a framework and set of operations that would mitigate the need for further extensions of the temporary suspension, should these procedures be adopted. In consideration of both the anticipated needs for global rabies vaccine campaigns to return to pre-pandemic levels and to avoid disruption to importers' and the travel industry's operations, CDC has determined that a one-year extension of the temporary suspension through July 31, 2024, is required to protect the public's health and is therefore in the public's interest. In the absence of further extension of the temporary suspension, dog importation requirements would return to procedures that proved inadequate to prevent the import of rabid dogs into the United States. A one-year extension provides time for CDC to continue to build a robust dog importation system while global rabies vaccination efforts continue to rebound. It will also avoid potential public confusion regarding changing dog importation requirements and better address the needs of importers, the animal care and transport industry, and Federal partners who have indicated they would need time to adequately prepare for any changes to their current operations. The proposed rule published in parallel with this extension provides an opportunity for public comment and input on any new procedures.

This temporary suspension will enter into effect on August 1, 2023, and remain in effect through July 31, 2024, unless modified or rescinded by the CDC Director based on public health or other considerations.

**Kathryn Wolff,**

*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2023–14342 Filed 7–6–23; 4:15 pm]

**BILLING CODE 4163–18–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2751–23; DHS Docket No. USCIS–2023–0008]**

**RIN 1615–ZC01**

## Implementation of a Family Reunification Parole Process for Guatemalans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Guatemalans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Guatemalans. Under this process, certain Guatemalan principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Guatemala to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Guatemalan nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Guatemalans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Guatemalans

As in the CFRP and HFRP processes, this FRP process for Guatemalans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Guatemala who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Guatemalan principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Guatemalans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Guatemala in the United States. Currently, nationals of Guatemala with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26]

---

DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

[26] For example, under the May 2023 Department of State Visa Bulletin, a Guatemalan married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for

Continued

While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process

May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Guatemalan married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order'"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Guatemalans at the SWB increased by about 112 percent as compared to FY18, and 4.8 percent as compared to FY19, with encounters totaling approximately 283,000 in FY21 as compared to 133,200 and 270,100 in FY18 and FY19, respectively.[44] Encounters with Guatemalans dropped in FY22, but still remained high with 231,500 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Guatemalans accounting for approximately 11.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Guatemala, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Guatemala and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from Guatemala, has strained DHS's reception and processing capacity at the SWB.[49] By establishing a lawful pathway for some of these migrants from Guatemala, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] *See* Migration Policy Institute, Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story, (Oct. 2022) *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[50] As of late May 2023, there are currently an estimated 12,800 Guatemalan nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Guatemalan nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022)

Continued

irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Guatemala, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Guatemala, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Guatemala already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 12 percent of Gross Domestic Product (GDP) in Guatemala.[60] Remittances remained stable in 2019, at 13.8 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Guatemala specifically, remittances were equivalent to 18 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Guatemala, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Guatemalan principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Guatemalan principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Guatemalan principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Guatemala (or their immediate family member of any nationality) who is outside the United States and who may

*https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Guatemala, Apr. 29, 2022, *https://www.state.gov/wp-content/uploads/2022/08/ICS_WHA_Guatemala_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration*; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, U.S. Strategy for Engagement in Central America: Policy Issues for Congress (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—Guatemala (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=GT.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or USC), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child)[65] of an approved Form I–130, Petition for Alien Relative;
- be a national of Guatemala or be a non-Guatemalan derivative beneficiary spouse or child[66] of a Guatemalan principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea[67] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Guatemala. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status[72] or for an immigrant visa[73] as a result of entering without inspection and not having been admitted or paroled.[74]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process,

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Guatemalans may use this process if they are a derivative beneficiary of a Guatemalan principal beneficiary and traveling with that Guatemalan beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the USC or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the individual is a discretionary, case-by-case determination made by CBP at the time the individual arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Guatemala still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Guatemalan nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### *A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[87] *Id*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[94] *Id.*

[95] *Id.*

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]**

**RIN 1615–ZB99**

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued

# EXHIBIT 29

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

---

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]**

**RIN 1615–ZC02**

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America*.[4] This

---

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Hondurans

As in the CFRP and HFRP processes, this FRP process for Hondurans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Honduras who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Honduran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Hondurans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Honduras in the United States. Currently, nationals of Honduras with approved family-based petitions often wait many years before their immigrant visas can be issued and they

for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased

[26] For example, under the May 2023 Department of State Visa Bulletin, a Honduran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Honduran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing ''concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Hondurans at the SWB were 262 percent of the FY18 level and over 22 percent as compared to FY19, with encounters totaling approximately 319,200 in FY21 as compared to approximately 88,100 and 261,000 in FY18 and FY19, respectively.[44] Encounters of Hondurans dropped in FY22, but still remained high with about 212,900 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Hondurans accounting for approximately 11.4 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, gang violence, corruption, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Honduras, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Honduras and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from Honduras, has strained DHS's reception and processing capacity at the SWB. Between FY20 and May 2023, encounters of Hondurans at the SWB exceeded half a million.[49] By establishing a lawful pathway for some of these migrants from Honduras, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] CBP, Nationwide Encounters (last visited June 9, 2023); *https://www.cbp.gov/newsroom/stats/nationwide-encounters.* Total SWB encounters between FY20 and May 2023 sum to 662,470 as of date accessed.

[50] As of late May 2023, there are currently an estimated 10,700 Honduran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Honduran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Honduras, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Honduras, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Honduras already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 20 percent of Gross Domestic Product (GDP) in Honduras.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Honduras specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Honduras, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Honduran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Honduran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Honduran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Honduras, April 4, 2022, *https://www.state.gov/wp-content/uploads/2022/06/ICS_WHA_Honduras_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] USAID, Economic Analysis of the Honduras Remittances Ecosystem: An Assessment of the Role Remittances have on Financial Inclusion and Development Outcomes (2022) *https://pdf.usaid.gov/pdf_docs/PA00Z69J.pdf.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Honduras (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
- be a national of Honduras or be a non-Honduran derivative beneficiary spouse or child [66] of a Honduran principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process.

CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea [67] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Honduras. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Hondurans may use this process if they are a derivative beneficiary of a Honduran principal beneficiary and traveling with that Honduran beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP.All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**VI. Other Considerations in the Establishment of This FRP Process**

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case by case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Honduras still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Honduran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

**VII. Regulatory Requirements**

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[86] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration.* See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

BILLING CODE P

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]**

**RIN 1615–ZC00**

## Implementation of a Family Reunification Parole Process for Salvadorans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

# EXHIBIT 30

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

BILLING CODE P

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]**

**RIN 1615–ZC00**

## Implementation of a Family Reunification Parole Process for Salvadorans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

*of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022)

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Salvadorans

As in the CFRP and HFRP processes, this FRP process for Salvadorans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of El Salvador who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Salvadoran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Salvadorans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family

(authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

members from El Salvador in the United States. Currently, nationals of El Salvador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

[26] For example, under the May 2023 Department of State Visa Bulletin, a Salvadoran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Salvadoran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Salvadorans at the SWB increased by about 168 percent as compared to FY18, and about 7.0 percent as compared to FY19, with encounters totaling approximately 98,600 in FY21 as compared to 36,800 and 92,200 in FY18 and FY19, respectively.[44] In FY22, the encounters remained at the high levels of the previous fiscal year, with 97,000 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Salvadorans accounting for approximately 4.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including El Salvador, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of El Salvador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from El Salvador, has strained DHS's reception and processing capacity at the SWB. Between FY20 and April 2023, encounters of Salvadorans at the SWB totaled approximately a quarter million.[49] By establishing a lawful pathway for some of these migrants from El Salvador, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] CBP, Nationwide Encounters (last visited June 9, 2023) *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[50] As of late May 2023, there are currently an estimated 32,600 Salvadoran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Salvadoran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in El Salvador, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to El Salvador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including El Salvador already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to nearly 21 percent of Gross Domestic Product (GDP) in El Salvador.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In El Salvador specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in El Salvador, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Salvadoran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved [64] Form I–130 filed on behalf of a Salvadoran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Salvadoran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—El Salvador, Apr. 21, 2023, *https://www.state.gov/wp-content/uploads/2023/04/ICS_WHA_El-Salvador_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—El Salvador (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=SV.*

[62] *Id.; also see* Bloomberg Línea, *Remittances to Central America on Track to Break Records* (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of El Salvador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
- be a national of El Salvador or be a non-Salvadoran derivative beneficiary spouse or child [66] of a Salvadoran principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea [67] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in El Salvador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Salvadorans may use this process if they are a derivative beneficiary of a Salvadoran principal beneficiary and traveling with that Salvadoran beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP.All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the Poe

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**VI. Other Considerations in the Establishment of This FRP Process**

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of El Salvador still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Salvadoran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

**VII. Regulatory Requirements**

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/* the-economic-and-fiscal-consequences-of-immigration.

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Salvadorans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14475 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–R7–ES–2023–0008; FF07CAMM00–FX–ES111607MRG01]**

### Marine Mammals; Letters of Authorization To Take Pacific Walruses and Polar Bears in the Beaufort Sea, Alaska, in 2022

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of issuance.

**SUMMARY:** In accordance with the Marine Mammal Protection Act of 1972, as amended, the U.S. Fish and Wildlife Service issued letters of authorization (LOA) for the nonlethal take of polar bears and Pacific walruses incidental to oil and gas industry exploration, development, and production activities in the Beaufort Sea and the adjacent northern coast of Alaska in 2022. This notice announces the LOAs issued in calendar year 2022. The LOAs stipulate conditions and methods that minimize impacts to polar bears and Pacific walruses from these activities.

**ADDRESSES:** *Document availability:* You may view the letters of authorization at *https://www.regulations.gov* under Docket No. FWS–R7–ES–2023–0008, or you may request them from the contact in **FOR FURTHER INFORMATION CONTACT**.

**FOR FURTHER INFORMATION CONTACT:** Charles Hamilton, via U.S. mail at Marine Mammals Management, U.S. Fish and Wildlife Service, MS 341, 1011 East Tudor Road, Anchorage, AK 99503; by email at *R7mmmRegulatory@fws.gov,* or by telephone at 1–800–362–5148. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On August 5, 2021, the U.S. Fish and Wildlife Service (Service) published in the **Federal Register** a final rule (86 FR 42982) establishing regulations that allow us to authorize the nonlethal, incidental, unintentional take of small numbers of polar bears (*Ursus maritimus*) and Pacific walruses (*Odobenus rosmarus divergens*) during year-round oil and gas industry exploration, development, and production activities in the Beaufort Sea and adjacent northern coast of Alaska. These incidental take regulations are located in subpart J in part 18 of title 50 of the Code of Federal Regulations (CFR) and are effective through August 5, 2026. The rule prescribed a process under which we issue letters of authorization (LOA) to applicants conducting activities as described under the provisions of the regulations.

Each LOA stipulates conditions or methods that are specific to the activity and location. Holders of the LOAs must use methods and conduct activities in a manner that minimizes to the greatest extent practicable adverse impacts on Pacific walruses and polar bears and their habitat, and on the availability of these marine mammals for subsistence purposes. No intentional take or lethal incidental take is authorized under these regulations.

In accordance with section 101(a)(5)(A) of the Marine Mammal Protection Act (16 U.S.C. 1361 *et seq.*) and our regulations at 50 CFR part 18, subpart J, in 2022, we issued LOAs to the companies in the Beaufort Sea and adjacent northern coast of Alaska shown in the table. The Service includes in the table all LOAs issued in 2022.

# EXHIBIT 31

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Specialist, Marketing & Outreach, Federal Insurance, Federal Insurance and Mitigation Administration, 202–322–6215, *joshua.heath@fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** E.O. 12862 directs Federal Agencies to provide service to the public that matches or exceeds the best service available. Section 1(b) of E.O. 12862 requires government agencies to ''survey customers to determine the kind and quality of services they want.'' In addition, the Foundations for Evidence-Based Policymaking Act of 2018 (''Evidence Act'') enables agencies to collect and analyze data to use as evidence in policymaking, as well as assess the effectiveness and efficiency of current programs. To work continuously to ensure that our programs are effective and meet our customers' needs, FEMA seeks to obtain the Office of Management and Budget's (OMB) approval of a generic clearance to collect information through mixed methods (quantitative and qualitative) to improve marketing, outreach, and other promotional activities of services, programs, and opportunities offered by FEMA.

This proposed information collection previously published in the **Federal Register** on May 5, 2023, at 88 FR 29143 with a 60-day public comment period. No comments were received. The purpose of this notice is to notify the public that FEMA will submit the information collection abstracted below to the Office of Management and Budget for review and clearance.

## Collection of Information

*Title:* Generic Clearance for the Multi-Modal Mixed Methods Collection of Information to Inform Agency Marketing and Outreach.

*Type of Information Collection:* New information collection.

*OMB Number:* 1660–NW131.

*FEMA Forms:* Not applicable.

*Abstract:* In accordance with the Evidence Act, the collected information will equip FEMA with vital feedback from the general public and stakeholders that will allow for evidence-based improvements to FEMA's programs and services. FEMA will collect, analyze, and interpret information to identify strengths and weaknesses of programs based on current stakeholder experience and make improvements in the marketing and other promotional activities based on feedback.

*Affected Public:* Individuals and households, business or other for-profit, Federal Government, State, local or Tribal government, non-profit institutions.

*Estimated Number of Respondents:* 45,600.

*Estimated Number of Responses:* 45,600.

*Estimated Total Annual Burden Hours:* 7,861.

*Estimated Total Annual Respondent Cost:* $374,020.

*Estimated Respondents' Operation and Maintenance Costs:* $0.

*Estimated Respondents' Capital and Start-Up Costs:* $0.

*Estimated Total Annual Cost to the Federal Government:* $748,830.

## Comments

Comments may be submitted as indicated in the **ADDRESSES** caption above. Comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the Agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Millicent Brown Wilson,**

*Records Management Branch Chief, Office of the Chief Administrative Officer, Mission Support, Federal Emergency Management Agency, Department of Homeland Security.*

[FR Doc. 2023–17281 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–52–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2754–23; DHS Docket No. USCIS–2014–0013]**

**RIN 1615–ZC03**

## Implementation of Changes to the Haitian Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Haitian Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Haitian Family Reunification Parole (HFRP). HFRP provides a lawful, safe, and orderly pathway for certain Haitians to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to HFRP in light of technological advancements and process efficiencies created since the HFRP's inception in 2014. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In 2014, U.S. Citizenship and Immigration Services (USCIS) launched HFRP to expedite family reunification through lawful, safe, and orderly channels of migration to the United States, increase existing avenues for lawful migration from Haiti, and help Haiti in its recovery from the long-term impacts of the January 12, 2010 earthquake that devastated the country.[1] Under HFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Haiti who are the beneficiaries of an approved Form I–130, Petition for Alien Relative. Since it was established in 2014, HFRP has allowed certain beneficiaries of family-based immigrant petitions that were approved on or before December 18, 2014 to request a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available,

[1] *Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). Note that, consistent with other processes described in this notice, DHS now refers to HFRP as a process rather than a program.

rather than remain in Haiti awaiting availability of their immigrant visas.[2]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[3] If granted parole into the United States, HFRP parolees may apply for employment authorization while they wait for their immigrant visas to become available so they may apply to adjust to LPR status.[4]

As launched in 2014, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary. USCIS also required that USCIS officers interview beneficiaries in Port-au-Prince, Haiti, to verify their eligibility for HFRP. The National Visa Center (NVC) at the U.S. Department of State (State) first issued invitations to eligible petitioners to apply for HFRP in March 2015. Due to several factors, including anticipated policy changes,[5] a change in Administrations, the permanent closure of USCIS's field office in Port-au-Prince, Haiti, on December 20, 2019, extremely limited visa processing due to COVID–19,[6] and severe insecurity in the country,[7] new invitations to the HFRP process have not issued since June 2016 and interviews have not taken place since December 2019.

In the meantime, technology has evolved since the launch of HFRP in 2014. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for HFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to HFRP but that follow different procedures, which utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 HFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented family reunification parole (FRP) processes for certain Colombians,[8] Guatemalans,[9] Hondurans,[10] and Salvadorans[11] along these lines. DHS is now conforming the HFRP process to these recently announced processes.

## II. Modernized Process

### *A. Petitioners*

Invitations to participate in the HFRP process will continue to issue to certain petitioners who have an approved Form I–130 filed on behalf of a Haitian principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved[12] Form I–130 filed on behalf of a Haitian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's NVC as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Haitian principal beneficiary of an approved Form I–130 and how to file separate requests for any immediate family members[13] of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As

---

[2] *Id.; see also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.* To participate in HFRP, beneficiaries must have a petitioner who filed a Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary, and was invited to participate in the HFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's approved Form I–130 must be a Haitian national.

[3] *See Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). *See also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[4] 8 CFR 274a.12(c)(11).

[5] In August 2019, USCIS announced an intention to terminate HFRP, although USCIS never formally terminated the process. *See* USCIS to End Certain Categorical Parole Programs (Aug. 2, 2019), *https://www.uscis.gov/archive/uscis-to-end-certain-categorical-parole-programs.* In June 2022, USCIS reversed its 2019 announcement. *See also* The Haitian Family Reunification Parole (HFRP) Program: Alert (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[6] On March 19, 2020, the U.S. Embassy Port-au-Prince, Haiti, issued a Health Alert and suspended all non-emergency consular services. *See* Health Alert—U.S. Embassy Port-au-Prince, Haiti (March 19, 2020), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-january-8-2020-4-3-2-2-3-2-2-2-3-3-2-2-2-2-2-2-2-2-3-2-2-4-3-2-2-2-2-5-2-2-2/.*

[7] The assassination of Haiti's late President Jovenel Moïse exacerbated political and economic instability in Haiti, undermining state institutions and generating a power vacuum that has since been occupied by gangs. *See Implementation of a Parole Process for Haitians,* 88 FR 1243, 1246–47 (Jan. 9, 2023) (discussing conditions in Haiti). Due to the lawlessness in the country, the U.S. Embassy in Haiti temporarily suspended visa processing and continues to operate at a limited capacity. *See* Security Alert: U.S. Embassy Port-au-Prince, Haiti (Feb. 5, 2023), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-80.* To further complicate matters, on August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure. *See* UNICEF, Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families (Oct. 4, 2021), *https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti.*

[8] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[9] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

[10] *See Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[11] See *Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[12] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[13] Throughout this notice ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* the Immigration and Nationality Act (INA), sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child'' in general, as meaning ''an unmarried person under twenty-one years of age'').

part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

Previously, the HFRP process limited eligibility to Haitian principal beneficiaries of Forms I–130 and their immediate family members that were approved by USCIS on or before December 18, 2014 and for whom an immigrant visa was not currently available. The volume of invitations issued was limited based on operational capacity and other factors, as described above. The revised process is open to all Haitian principal beneficiaries of an approved Form I–130 and their immediate family members who have not yet received an immigrant visa regardless of the date on which USCIS approved the Form I–130. However, as mentioned above, the process will still be available on an invitation-only basis.

In addition, individuals whose immigrant visas were not available but were expected to become available within a specific time range were previously sent invitations to participate in the HFRP process. USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I–130.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (*e.g.,* international passport) to an interior POE.

In addition, as with the 2014 HFRP process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States.

Participation in this process is not limited to beneficiaries currently living in Haiti. However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Haitian nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[14] expedited removal proceedings,[15] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be, or may become, ineligible for adjustment of status [16] or for an immigrant visa [17] as a result of entering without inspection and not having been admitted or paroled.[18]

*C. Description of Updated Process for HFRP*

DHS announces these updates to the HFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since HFRP's inception in 2014. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated HFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this HFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S. citizen

---

[14] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[15] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[16] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[17] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

[18] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

(U.S.C.) or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[19]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[20]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[21]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and make the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this HFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2014 decision to implement this process remains unchanged and is severable from the

[19] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[20] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[21] 8 CFR 274a.12(c)(11).

procedural updates announced in this notice.

**III. Regulatory Requirements**

*A. Administrative Procedure Act*

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P ; 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release ''DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras'' (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

# EXHIBIT 32

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

procedural updates announced in this notice.

## III. Regulatory Requirements

### *A. Administrative Procedure Act*

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.''[23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice[24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

### *B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

BILLING CODE 9111–97–P ; 9111–14–P

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release ''DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras'' (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In 2007, U.S. Citizenship and Immigration Services (USCIS) launched CFRP in furtherance of the United States' commitment under the U.S.-Cuba Migration Accords [1] to direct Cuban migration into lawful, safe, and orderly channels and to continue regular review of the migration situation and proper implementation of the Accords.[2] Under CFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Cuba who are the beneficiaries of an approved Form I–130, Petition for Alien Relative.[3]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[4] If granted parole into the United States, CFRP parolees may apply for employment authorization while they wait to apply to adjust to LPR status.[5] Unlike parolees under similar family reunification parole (FRP) processes, CFRP beneficiaries may apply for adjustment one year after their parole into the United States under the Cuban Adjustment Act.[6] They do not need to wait for their immigrant visas to become available to apply for adjustment.[7]

Beneficiaries must have a petitioner who filed a Form I–130 on behalf of a principal beneficiary and has been invited to participate in the CFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's Form I–130 must be a Cuban national. Consistent with a **Federal Register** notice updating the CFRP process in 2014, beginning February 17, 2015, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary.[8] Also consistent with that notice, USCIS required that USCIS officers or U.S. Department of State (State) consular officers interview beneficiaries in Havana, Cuba, to verify their eligibility for the program.[9] If USCIS issued a travel document to a given beneficiary, that individual could then travel to the United States to seek parole.

In May 2022, the United States announced the resumption of CFRP operations following suspension of CFRP interviews in September 2017 [10] and closure of the USCIS Havana Field Office on December 10, 2018.[11] In August 2022, USCIS began mailing CFRP interview notices to petitioners with instructions for the beneficiary interview. On August 18, 2022, USCIS restarted interviews at the U.S. Embassy in Cuba. However, USCIS has had limited capacity to conduct interviews due to operational constraints in Cuba. Specifically, while both State and USCIS are working to fully resume operations in Havana, these efforts are taking time to fully realize, which is one reason DHS is implementing these operational changes. Furthermore, the economic and political crisis in Cuba, which has been marked by food shortages, rolling blackouts, and countrywide internet outages,[12] impacts the USG capacity to process parole requests in Cuba for Cuban nationals and their immediate family members [13] under CFRP.

In short, interview capacity limitations in Cuba, resource constraints within DHS and State, and the pending application caseload have made the process inefficient and inaccessible to many beneficiaries in Cuba. Many applications are pending, and no new invitations to access CFRP have been sent since August 23, 2016.

In the meantime, technology has evolved since the launch of the CFRP process in 2007. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for CFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to CFRP but that follow different procedures that utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 CFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented FRP processes for certain Colombians,[14] Guatemalans,[15]

---

[1] *See generally* U.S. Department of State archived website on Cuban migration, *https://1997-2001.state.gov/regions/wha/cuba/migration.html.* Under the Accords, the United States committed itself to total legal migration to the United States from Cuba of a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens (USCs). *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) as the U.S.-Cuba Migration Accords).

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 15, 2007). Note that, consistent with other processes described in this notice, DHS now refers to CFRP as a process rather than a program.

[3] *Id.; see also* USCIS, The Cuban Family Reunification Parole Program (Sept. 1, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program.*

[4] *Id.*

[5] *See* 8 CFR 274a.12(c)(11).

[6] *See* Public Law 89–732, 80 Stat. 1161 (Nov. 2, 1966), as amended (Immigration and Nationality Act (INA), sec. 245, Note 1, 8 U.S.C. 1255, Note 1).

[7] *Id.*

[8] *Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program,* 79 FR 75579 (Dec. 18, 2014).

[9] 79 FR 75581.

[10] *See* U.S. Department of State, Biden Administration Measures to Support the Cuban People (May 16, 2022), *https://www.state.gov/biden-administration-measures-to-support-the-cuban-people/. See also* U.S. Embassy in Cuba, USCIS Resumes Cuban Family Reunification Parole Program Operations (September 1, 2022), *https://cu.usembassy.gov/uscis-resumes-cuban-family-reunification-parole-program-operations/#:~:text=CFRP%20processing%20was%20suspended%20due,office%20in%20Havana%20in%202018.*

[11] *See* USCIS, USCIS Closes Havana Field Office on December 10, 2018 (December 10, 2018), *https://www.uscis.gov/archive/uscis-closes-havana-field-office-on-dec-10-2018.*

[12] New York Times, 'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future, Dec. 10, 2022, *https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html;* Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian blackouts. *https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/*; The Economist, Cuba is Facing Its Worst Shortage of Food Since the 1990s (July 1, 2021), *https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s.*

[13] Within this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child'', in general, as meaning ''an unmarried person under twenty-one years of age'').

[14] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[15] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

Hondurans,[16] and Salvadorans [17] along these lines. DHS is now conforming the CFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

As done under the 2007 process and the revised process in 2014, invitations to participate in the CFRP process will issue to certain petitioners who have an approved Form I–130 filed on behalf of a Cuban principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved [18] Form I–130 filed on behalf of a Cuban principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Cuban principal beneficiary of an approved Form I–130, and how to file separate requests for any immediate family members of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

The threshold eligibility criteria for participation in the CFRP continue to apply. Principal beneficiaries must be Cuban nationals who have a petitioner who has been invited to participate. However, DHS is implementing an update for the petitioner to initiate this process so the beneficiary can be considered for issuance of advance authorization to travel to the United States where the beneficiary can seek a discretionary grant of parole at an interior POE.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (*e.g.,* international passport) to an interior POE.

In addition, as with the 2007 process and the revised 2014 process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States. For consistency with other FRP processes, parole will generally be granted for a period of up to three years, rather than the two years under the previous CFRP process.

Participation in this process is not limited to beneficiaries currently living in Cuba.[19] However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Cuban nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[20] expedited removal proceedings,[21] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be or may become ineligible for adjustment of status [22] or for an immigrant visa [23] as a result of entering without inspection and not having been admitted or paroled.[24]

---

[16] *See Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[17] *See Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[18] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[19] DHS recognizes that permitting Cubans to be processed under the CFRP process when not physically present in Cuba means that not all Cubans who are paroled under the CFRP process would count towards the U.S. Government's annual obligation under the U.S.-Cuba Migration Accords.

[20] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[21] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[22] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[23] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[24] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

*C. Description of Updated Process for CFRP*

DHS announces these updates to the CFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since CFRP's inception in 2007. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated CFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this CFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[25]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[26]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and

[25] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[26] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[27]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this CFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2007 decision to implement this process remains unchanged and is severable from the procedural updates announced in this notice.

## III. Regulatory Requirements

*A. Administrative Procedure Act*

The changes to the CFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the CFRP process, and these updates to that process, constitute a general statement of policy,[28] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.''[29] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice[30] because it sets forth updates to how agencies will implement the CFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[31] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[32] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[33] Improving the efficiency and accessibility of CFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[34] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Cuban nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the CFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this CFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[35]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17376 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

[27] 8 CFR 274a.12(c)(11).

[28] 5 U.S.C. 553(b)(A).

[29] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[30] 5 U.S.C. 553(b)(A).

[31] 5 U.S.C. 553(a)(1).

[32] *See* footnotes 14, 15, 16, and 17; *see also* DHS press release ''DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras'' (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[33] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[34] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries.

[35] Per the normal clearance procedures at 5 CFR 1320.10(e).

# EXHIBIT 33

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

and file the Form I–131 in effect at the time of filing—and follow any additional instructions included in the program eligibility notice they receive from either USCIS or the NVC in submitting their application. A completed Form I–131 and fee or fee waiver request must be filed for each individual on whose behalf parole is being requested.

**III. Participation in the CFRP Program and Application Process**

USCIS offers participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries—including any eligible spouse and child accompanying or following-to-join the principal beneficiaries (*see* INA sec. 203(d), 8 U.S.C. 1153(d))—of an approved Form I–130, Petition for Alien Relative, but for whom an immigrant visa is not immediately available. Participation in the CFRP Program is voluntary.

Prior to the date of this notice, the NVC mailed written notice to eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 indicating their beneficiaries' eligibility to participate in the CFRP Program. The notice invited an interested petitioner to submit to the NVC a copy of their approved Form I–130 and other supporting documents to opt in to the CFRP Program and begin the process of requesting parole. No formal application form or fee was required to apply. As of the date of this notice, the NVC will no longer issue CFRP Program eligibility notices that do not require a form and fee to apply. Petitioners with CFRP Program eligibility notices dated prior to December 18, 2014 must submit to the NVC the complete required documentation to opt in to the CFRP Program prior to February 17, 2015 in order to be grandfathered and considered for processing without a form and fee.

On or after February 17, 2015, participation in the CFRP Program will be predicated on submission of a Form I–131 and the requisite fee(s) or request for fee waiver that has been approved by USCIS. A U.S.C. or LPR petitioner in the United States with an approved Form I–130 that was filed on behalf of a beneficiary relative residing in Cuba, for whom a visa is not anticipated to be available during the CFRP processing time, will receive a written invitation from the NVC regarding the beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131 and submit the required fee(s) or fee waiver request to apply for the program. USCIS will reject a request for parole under the CFRP Program submitted without the required form and fee(s) or a request for a fee waiver.

USCIS officers or Department of State consular officers will interview qualified beneficiaries in Havana to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to authorize parole under the CFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States and seek parole by U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family member. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident after he or she has been physically present in the United States for one year as provided by the Cuban Adjustment Act, Pub. L. 89–732, 80 Stat. 1161 (8 U.S.C. 1255 note), or once the beneficiary's visa becomes available, whichever comes first.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of the immigrant visa petitions filed on their behalf.

For eligible beneficiaries who are not "immediate relatives," if an immigrant visa becomes available while the Form I–131 is pending, the beneficiary will be able to proceed with the parole process to completion, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

**IV. Paperwork Reduction Act (PRA)**

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The Application for Travel Document, Form I–131, has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to the Form in connection with the CFRP Program and this notice; however, USCIS estimates that this notice will result in an annual average of 13,000–15,000 Form I–131 filings per year. The current OMB-approved estimate of the number of annual respondents filing a Form I–131 is 940,671. USCIS has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file for the CFRP Program will be covered within the 940,671 estimated. USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice. Therefore, USCIS is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the CFRP Program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29486 Filed 12–17–14; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2548–14; DHS Docket No. USCIS–2014–0013]**

### Implementation of Haitian Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Haitian Family Reunification Parole (HFRP) Program. Under this program, USCIS offers certain Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014 an opportunity to receive a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available, rather than remain in Haiti awaiting availability of their immigrant visas. The program is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake.

**DATES:**

- The HFRP Program will only be available to Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014.
- On or after February 2, 2015, the Department of State's National Visa Center (NVC) will begin sending to eligible petitioners written invitations to apply to the HFRP Program.

**FOR FURTHER INFORMATION CONTACT:** Maura Nicholson, Deputy Chief, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 3300, Washington, DC 20529, Telephone (202) 272–1892.

**SUPPLEMENTARY INFORMATION:**

## I. Background of the HFRP Program

The rebuilding and development of a safe and economically strong Haiti is a priority for the United States. While progress has been made since the 2010 earthquake that devastated parts of the country, Haiti continues to face significant development challenges. Reconstruction and development in Haiti will continue for many years.[1]

With the exception of ''immediate relatives'' of U.S. citizens (USCs) (*i.e.,* parent, spouse and unmarried child(ren) under 21 years of age), *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* INA secs. 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. These statutory limits have resulted in long waiting periods before family members remaining in Haiti may join the U.S.C. and lawful permanent resident (LPR) family members in the United States who petitioned for them.

Under the HFRP Program, USCIS will exercise its discretionary parole authority[2] to permit certain eligible Haitians in Haiti to join their family members in the United States up to approximately two years before their immigrant visas become available, thereby promoting family unity. By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development. Once paroled into the United States, HFRP Program beneficiaries will be eligible to apply for employment authorization, and those who are able to work may contribute to Haiti's post-earthquake reconstruction and development through remittances. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

## II. Participation in the HFRP Program and Application Process

USCIS offers participation in the HFRP Program to eligible Haitians: (1) In Haiti; (2) who are the beneficiaries (including any accompanying or following-to-join spouse and children[3]) of Forms I–130, Petition for Alien Relative, that were approved on or before the date of publication of this notice; (3) whose immigrant visas are not available, but are expected to become available within approximately 18 to 30 months; and (4) whose petitioning relatives in the United States have received a written invitation to apply for the HFRP Program on their behalf from the Department of State's National Visa Center (NVC).

The NVC will issue a written invitation to petitioners of approved Forms I–130 based upon the date when the immigrant visas for their beneficiary relatives are expected to become available. Each year the NVC will identify approved Forms I–130 whose filing dates (priority dates) are expected to become current in approximately the next 18 to 30 months, meaning that the immigrant visas for those cases are expected to become available within that timeframe. The NVC will prioritize the issuance of invitations to petitioners within that group, beginning with the oldest Form I–130 filing date and working forward to the most recent filing date. The number of HFRP Program invitations may be limited annually based on U.S. Government operational capacity in Haiti and the availability of U.S. Government resources to aid program beneficiaries. Initially, the U.S. Government will seek to interview approximately 5,000 HFRP Program beneficiaries in Haiti per year. Petitioners will be given a deadline by which they must apply to have their beneficiary relatives considered for parole under the program. Participation in the HFRP Program is voluntary.

On or after February 2, 2015, eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 filed on behalf of a beneficiary relative in Haiti for whom a visa is not available but expected to become available within approximately 18 to 30 months, will receive a written notice from the NVC regarding the beneficiary's eligibility to participate in the HFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request to apply for parole under the HFRP Program on behalf of each beneficiary. USCIS will reject a request for parole under the HFRP Program that is not submitted as instructed, without the required completed form, or without the fee(s) or a request for a fee waiver.

USCIS or Department of State consular officers will interview qualified beneficiaries in Port au Prince, Haiti, to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to grant parole under the HFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Haiti. These travel documents will enable the beneficiary to travel to the United States and seek parole from U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident once the beneficiary's immigrant visa becomes available.

Participation in the HFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of immigrant visa petitions filed on their behalf. If, however, an immigrant visa becomes available for a beneficiary who is not an ''immediate relative'' while the Form I–131 is pending, the beneficiary will still be able to complete the parole process, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees, but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

## III. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they

[1] *http://www.state.gov/s/hsc/factsheets/2014/219539.htm.*

[2] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for establishing conditions of parole and for terminating parole).

[3] *See* INA sec. 203(d), 8 U.S.C. 1153(d).

impose. The USCIS, Application for Travel Document, (Form I–131), has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to this form in connection with the implementation of the HFRP Program and this notice. USCIS estimates that the HFRP Program will result in an average of 5,000 Form I–131 filings per year. The current OMB-approved estimated number of annual respondents filing Form I–131 is 940,671. USCIS believes it has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file a HFRP Program-related request will be covered within the 940,671 estimated. Because USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice, it is publishing no notice under the PRA and making no revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the HFRP program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29533 Filed 12–17–14; 8:45 am]

BILLING CODE 9111–97–P

## DEPARTMENT OF THE INTERIOR

**[Docket No. ONRR–2014–0002; DS63610000 DR2PS0000.CH7000 145D0102R2]**

### Office of Natural Resources Revenue; Agency Information Collection Activities: Proposed Collection–United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection, Comment Request

**AGENCY:** Office of Natural Resources Revenue (ONRR), Interior.

**ACTION:** Notice of a new information collection.

**SUMMARY:** To comply with the Paperwork Reduction Act of 1995 (PRA), we are inviting comments on an information request that we will submit to the Office of Management and Budget (OMB) for review and approval. This Information Collection Request (ICR) covers the voluntary paperwork requirements for participation in the United States' implementation of the Extractive Industries Transparency Initiative (EITI). It encompasses upcoming requests that certain companies voluntarily provide information on the amount of revenue which they have paid to the Federal government for extracting Federally-owned natural resources.

**DATES:** Submit written comments on or before February 17, 2015.

**ADDRESSES:** You may submit comments on this ICR to ONRR by using one of the following three methods (please use ONRR 2014–0002 as an identifier in your comment):

1. Electronically, go to *http://www.regulations.gov.* In the entry titled ''Enter Keyword or ID,'' enter ONRR–2014–0002 and then click ''Search.'' Follow the instructions to submit public comments. ONRR will post all comments.

2. Mail comments to Mr. Luis Aguilar, Regulatory Specialist, ONRR, P.O. Box 25165, MS 61030A, Denver, Colorado 80225–0165.

3. Hand-carry or mail comments, using an overnight courier service, to ONRR. Our courier address is Building 85, Room A–614, Denver Federal Center, West 6th Ave. and Kipling St., Denver, Colorado 80225.

**FOR FURTHER INFORMATION CONTACT:** For questions on technical issues, contact Mr. Jon Swedin, Program Analyst, at (303) 231–3028, or email *Jonathan.Swedin@onrr.gov.* For other questions, contact Mr. Luis Aguilar, telephone (303) 231–3418, or email *Luis.Aguilar@onrr.gov.* You may also contact Mr. Aguilar to obtain copies, at no cost, of (1) the ICR, (2) any associated form, and (3) the regulations that require us to collect the information.

**SUPPLEMENTARY INFORMATION:**

*Title:* United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection.

*OMB Control Number:* 1012—0NEW.

*Bureau Form Number:* United States Extractive Industries Transparency Initiative (USEITI) Company Payment Reporting Template.

*Abstract:* The Secretary of the U.S. Department of the Interior is responsible for mineral resource development on Federal and Indian lands and the Outer Continental Shelf (OCS). Under various laws, the Secretary's responsibility is to manage mineral resources production on Federal and Indian lands and the OCS, collect the royalties and other mineral revenues due, and distribute the funds collected under those laws. ONRR performs the royalty management functions and assists the Secretary in carrying out the Department's responsibility. We have posted those laws pertaining to mineral leases on Federal and Indian lands and the OCS at *http://www.onrr.gov/Laws_R_D/PubLaws/default.htm.*

In September 2011, President Obama announced the U.S. commitment to domestic implementation of EITI, a key element of the President's Open Government Partnership commitments. President Obama appointed the Secretary of the Interior as the senior U.S. official to lead USEITI implementation. EITI is a voluntary global effort designed to strengthen transparency, accountability, and public trust for the revenues paid and received for a country's oil, gas, and mineral resources. The Administration renewed its commitment to implement EITI in the December 2013 U.S. Open Government National Action Plan. By signing onto the global EITI standard, the U.S. Government will help ensure that American taxpayers are receiving every dollar due for the extraction of these valuable public resources. The EITI Standard contains the set of requirements that countries need to meet in order to be recognized first as an EITI Candidate and, ultimately, an EITI-Compliant Country. In March 2014, the U.S. became the first G7 country to achieve Candidate Country status. When fully implemented, EITI will ensure more transparency in how the country's natural resources are governed and also will provide full disclosure of government revenues from its extractive sector.

The following laws and executive initiative are applicable to USEITI, including the Secretary's and ONRR's management of mineral resource production, revenue, and information disclosure obligations:

- U.S. Open Government National Action Plan
- Freedom of Information Act, as amended (5 U.S.C. 552)
- Outer Continental Shelf Lands Act, as amended (43 U.S.C. 1331–56b), including provisions of the Energy Policy Act of 2005 (42 U.S.C. 15801 *et seq.*)
- Federal Oil and Gas Royalty Management Act of 1982 as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (30 U.S.C. 1701–1759).
- Geothermal Steam Act of 1970 (30 U.S.C. 1001–28)
- Mineral Leasing Act (30 U.S.C. 181–287)
- Mineral Leasing Act for Acquired Lands (30 U.S.C. 351–60)

### General Information

International EITI requirements direct participating governments to publish annual reports to help citizens

# EXHIBIT 34

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

Doe et al. v. Noem et al., 1:25-cv-10495-IT (D. Mass.)

Dated: November 16, 2007.

**Richard A. Sloan,**

*Chief, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. E7–22771 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2426–07; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZA61**

## Cuban Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This Notice announces U.S. Citizenship and Immigration Services' Cuban Family Reunification Parole Program. Under this program, U.S. Citizenship and Immigration Services is offering beneficiaries of approved family-based immigrant visa petitions an opportunity to receive a discretionary grant of parole to come to the United States rather than remain in Cuba to apply for lawful permanent resident status. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.

**DATES:** This Notice is effective November 21, 2007.

**FOR FURTHER INFORMATION CONTACT:** Manpreet S. Dhanjal, Refugee Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 8th Floor, Washington, DC 20529, Telephone (202) 272–1613.

**SUPPLEMENTARY INFORMATION:**

### I. Background

In furtherance of the U.S.-Cuba Migration Accords, the United States endeavors to provide a minimum of 20,000 travel documents annually to aspiring Cuban emigrants. *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter ''Migration Accords'')). In so doing, the United States offers a safe, legal, and orderly means of coming to the United States. To date, the majority of travel documents issued under the Migration Accords fall into one of three programs: family-based immigrant visas; refugee resettlement; and parole under the Special Cuban Migration Program, also referred to as the Cuban Lottery. For information on the Cuban Lottery, see *http://havana.usinterestsection.gov/diversity_program.html.*

Two aspects of the existing array of migration programs limit the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to maritime crossings. First, with the exception of ''immediate relatives'' (*e.g.,* spouse, unmarried child) of U.S. citizens (USCs), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* Immigration and Nationality Act (INA) sections 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. The statutory caps have resulted in long waiting periods before family members remaining in Cuba may rejoin the USCs and lawful permanent residents (LPRs) residing in the United States who petitioned for them. Second, the United States has not been permitted to hold a new registration period since 1998 due to constraints placed on the Cuban Lottery program by the Cuban Government. This greatly reduces the pool of individuals to whom the United States may issue travel documents.

For these reasons, this Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords.

### II. The CFRP Program

Under the CFRP Program, USCIS may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole). Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

### III. Participation in the CFRP Program

USCIS will offer participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries (including any accompanying or following to join spouse and children (see INA section 203(d), 8 U.S.C. 1153(d)) of a properly filed Form I–130, ''Petition for Alien Relative,'' that has been approved, but for which an immigrant visa is not yet immediately available.

Under the CFRP Program, USCIS or the Department of State's National Visa Center (NVC) will mail written notice to U.S.-based USC and LPR petitioners whose Forms I–130 have been approved regarding their beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole. However, participation in the CFRP is voluntary. If USCIS exercises its discretion to grant parole, it will issue the necessary U.S. travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States to rejoin his or her family members.

Participation in the CFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). The extraordinary benefit of parole is not needed for these aliens, since they may seek visas for travel to the United States immediately upon the approval of Form I–130.

Additional information about the CFRP Program will be posted at *http://www.uscis.gov.*

Dated: November 15, 2007.

**Emilio T. Gonzalez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. E7–22679 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–5123–N–16]**

## Notice of Proposed Information Collection for Public Comment: Notice of Funding Availability for the Tribal Colleges and University Programs

**AGENCY:** Office of the Assistant Secretary for Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of

# EXHIBIT 1

to Plaintiffs' Emergency Motion for a Preliminary Injunction and Stay of DHS's *En Masse* Truncation of all Valid Grants of CHNV Parole

below in advance of the meeting. The open session will be videocast and can be accessed from the NIH Videocasting website (*http://videocast.nih.gov/*).

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Council of Councils.

*Date:* April 21, 2025.

*Open:* April 21, 2025, 10:00 a.m. to 12:15 p.m.

*Agenda:* Welcome and Opening Remarks; Announcements, and NIH Program Updates; Presentations; and Other Business of the Committee.

*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).

*Closed:* April 21, 2025, 12:15 p.m. to 01:15 p.m.

*Agenda:* Review of Grant Applications.

*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).

*Open:* April 21, 2025, 01:15 p.m. to 04:35 p.m.

*Agenda:* NIH Program Updates; Presentations; and Other Business of the Committee.

*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).

*Contact Person:* Franziska Grieder, D.V.M., Ph.D., Executive Secretary, Council of Councils, Director, Office of Research Infrastructure Programs, Division of Program Coordination, Planning, and Strategic Initiatives, Office of the Director, NIH, 6701 Democracy Boulevard, Room 948, Bethesda, MD 20892, *GriederF@mail.nih.gov*, 301–435–0744.

Any interested person may file written comments with the committee by forwarding the statement to the Contact Person listed on this notice. The statement should include the name, address, telephone number and when applicable, the business or professional affiliation of the interested person.

Information is also available on the Council of Council's home page at *http://dpcpsi.nih.gov/council/* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.14, Intramural Research Training Award; 93.22, Clinical Research Loan Repayment Program for Individuals from Disadvantaged Backgrounds; 93.232, Loan Repayment Program for Research Generally; 93.39, Academic Research Enhancement Award; 93.936, NIH Acquired Immunodeficiency Syndrome Research Loan Repayment Program; 93.187, Undergraduate Scholarship Program for Individuals from Disadvantaged Backgrounds, National Institutes of Health, HHS)

Dated: March 20, 2025.

**Bruce A. George,**

*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2025–05010 Filed 3–24–25; 8:45 am]

**BILLING CODE 4140–01–P**

## DEPARTMENT OF HOMELAND SECURITY

## Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (''DHS'') is terminating the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members (hereinafter referred to as ''CHNV parole programs'') that DHS announced in 2022 and 2023. This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of the CHNV parole programs and related employment authorization.

**DATES:** DHS is terminating the CHNV parole programs as of March 25, 2025. The temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary. Parolees without a lawful basis to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS has implemented programs through which inadmissible aliens who are citizens or nationals of designated countries, and their immediate family members, could request authorization to travel to the United States in order to be considered for parole into the country.[1] Under these categorical parole programs, potentially eligible beneficiaries were adjudicated on a case-by-case basis, for advance authorization to travel to a U.S. port of entry (''POE'') in the interior of the country to seek a discretionary grant of parole.

On January 20, 2025, President Trump issued Executive Order 14165, ''Securing Our Borders.''[2] Section 2 of the Order establishes a policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the Order directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to ''[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.' ''

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the CHNV parole programs. Although DHS established the categorical programs for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the four categorical programs was very similar,[3] and the rationale for termination is largely consistent for all four parole programs. Thus, DHS is announcing the termination of all four parole programs by publishing this single notice in the **Federal Register**.

## II. DHS Parole Authority

The Immigration and Nationality Act (''INA'') confers upon the Secretary of Homeland Security (''Secretary'') the narrow discretionary authority to parole inadmissible aliens into the United States ''temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[2] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[3] *Compare, e.g.,* 88 FR at 1260–63, *with* 88 FR at 1248–52 (setting out the justifications for the parole programs for Nicaragua and Haiti, respectively).

humanitarian reasons or significant public benefit.'' *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien is required to depart the United States ''or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the history of the parole authority supports the contention that discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria.[4] Under the law, the determination to parole an alien into the country should only be made on a case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a POE is made by U.S. Customs and Border Protection (''CBP'') officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the CHNV parole programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an arriving alien. *See* 8 CFR 1.2; *see also* INA 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B).

## III. Rationale for Initial Implementation

When DHS established the CHNV parole programs, DHS provided several justifications for their promulgation. *See, e.g.,* 88 FR at 1248–51 (Implementation of a Parole Process for Haitians). Overall, DHS stated that the programs would provide a significant public benefit for the United States and address the urgent humanitarian reasons underlying the high levels of migration from those countries.

With respect to the significant public benefit, DHS wrote that the CHNV parole programs would: (i) enhance border security by reducing illegal immigration between the POEs, (ii) minimize the domestic impact of high levels of illegal immigration by CHNV nationals, particularly in border communities; (iii) improve vetting for national security and public safety; (iv) reduce the strain on DHS personnel and resources; (v) disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

For the reasons discussed below, DHS has determined that it is now appropriate and necessary to terminate the CHNV parole programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals.[5] Regarding previous arguments or determinations that these programs were consistent with the requirement of ''urgent humanitarian reasons'' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances. These reasons, independently and cumulatively, support termination of the CHNV parole programs.

Accordingly, the Secretary, in her discretion, is terminating the CHNV parole programs. Consistent with her statutory authority, the Secretary retains discretion to continue to extend parole to any alien paroled under CHNV—temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

### *1. The CHNV Parole Programs Are Unnecessary To Achieve Border Security Goals*

From the announcement of the parole program for Venezuelans and their immediate family members on October 12, 2022, through the subsequent addition of the programs for Cubans, Haitians, Nicaraguans, and their immediate family members in January 2023, and until January 22, 2025, approximately 532,000 inadmissible aliens were granted advance authorization to travel to the United States and receive consideration for parole into the United States.[6]

One justification for these 532,000 discretionary paroles was to ''enhance border security'' at the southwest border of the United States.[7] DHS reasoned that by ''incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing

[4] Parole was codified into immigration law in the Immigration and Nationality Act of 1952. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, ''the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.'' *See Leng May Ma* v. *Barber*, 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress, which in 1996 wrote, ''[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.'' *See* H.R. Rep. 104–469, pt. 1, at 140 (1996). Furthermore, the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (''IIRIRA'') struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, ''for emergent reasons or for reasons deemed strictly in the public interest'' as grounds for granting parole into the United States and inserted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' *See* Public Law 104–208, div. C, § 602(a). ''The legislative history indicates that this change was animated by concern that parole under 8 U.S.C. 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy.'' *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[5] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''. . . when the purposes of such parole shall, in the opinion the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.'').

[6] Office of Homeland Security Statistics (''OHSS'') analysis of advanced travel authorizations data provided by CBP Passenger Systems Program Directorate and valid as of January 22, 2025. Beneficiary travel authorizations excluded expired applications. The Venezuelan program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023.

[7] *See, e.g.,* 88 FR at 1255 (''The [Nicaraguan] parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs.'').

consequences to irregular migration, . . . the new parole process will mitigate anticipated future surges'' of illegal immigration. *See, e.g.,* 88 FR at 1249 (Implementation of a Parole Process for Haitians). DHS pointed to past experience with rapidly increasing ''encounters of Guatemalan and Honduran nationals from January 2021 until August 2021'' along the southwest border, explaining that the resumption of repatriation flights to Guatemala and Honduras helped reduce the amount of illegal immigration but was insufficient to address the sheer numbers.[8] Accordingly, the CHNV parole programs contemplated enhancing border security by combining ''a consequence for [nationals seeking] to enter the United States [in an unlawful manner between POEs (*i.e.,* removal or return to a third country, such as Mexico), while introducing] an incentive to use [a] lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.'' [9]

Upon review, DHS concludes that this ''deterrent'' and ''incentive'' approach did not result in a sufficient and sustained improvement in border security, and has exacerbated challenges associated with interior enforcement of the immigration laws. Encounters of CHNV nationals, particularly at POEs, remained unacceptably high while the CHNV parole programs were in effect, and overall migration of CHNV nationals to the United States increased between October 12, 2022 and January 22, 2025. In addition, the CHNV parole programs have at best traded an unmanageable population of unlawful migration along the southwest border for the additional complication of a substantial population of aliens in the interior of the United States without a clear path to a durable status.

As an initial matter, DHS acknowledges that in establishing the CHNV parole programs, and in subsequent DHS evaluations of these programs, DHS focused, in part, on a goal of reducing encounters of CHNV nationals between POEs.[10] And it is true that there was a reduction in encounters of CHNV nationals between POEs from FY 2022 through FY 2024—from around 600,000 encounters in FY 2022 to 416,000 in FY 2023 and 183,000 in FY 2024.[11] But in implementing the CHNV parole programs, DHS also focused on the importance of reducing pressures at the southwest border generally. It was for this reason that the CHNV parole programs required, for instance, that CHNV nationals ''fly at their own expense to an interior [POE] rather than entering at a land POE'' [12] and rendered ineligible those CHNV nationals who irregularly entered the United States, Mexico, or Panama after the programs' announcement.[13]

Consistent with that focus and in light of the reality that DHS's border security mission involves activities at southwest border POEs as well, DHS has concluded that the present assessment of the efficacy of the CHNV parole programs should include encounters at such land POEs. If one includes encounters of CHNV nationals at POEs, the actual reduction in southwest border encounters of CHNV nationals is much more muted: encounters of CHNV nationals at and between southwest border POEs dropped from approximately 626,000 in FY 2022 only to 584,000 in FY 2023 and to 535,000 in FY 2024.[14] This is due to a significant increase in encounters of such aliens at southwest border POEs over that time period: from 26,250 in FY 2022 to 168,010 in FY 2023 and 352,790 in FY 2024.[15] The increase can be attributed to the use of the CBP One mobile application (''CBP One app'' or ''CBP One'') to schedule appointments at southwest border POEs,[16] which resulted in very high numbers of CHNV nationals placed into removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a, (''section 240 removal proceedings'') and released into U.S. border communities,[17] exacerbating the immigration court backlog and the poor incentives that the backlog creates.[18] Finally, it is important to emphasize that in addition to these southwest border encounters, DHS must also consider the 532,000 parolees who entered the United States under the CHNV parole programs.

The decision to terminate the discretionary and temporary parole programs is further informed by the actions of the prior administration, which found the CHNV parole programs, even when paired with the Circumvention of Lawful Pathways rule, to be insufficient to address very high levels of illegal immigration.[19] For example, DHS and the Department of Justice (DOJ) promulgated the Securing the Border framework [20] as an emergency measure to address ongoing high levels of unlawful immigration between southwest border POEs.[21] The Departments explained that ''at the current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle.'' [22] This conclusion—that DHS's ability to swiftly impose consequences for illegal immigration ''continue[d] to be overwhelmed'' [23]—followed nearly two years of the CHNV parole programs, whose chief justification had been facilitating operational control of the

[8] *See, e.g.,* 87 FR at 63509.

[9] *See, e.g.,* 87 FR at 63510.

[10] *See, e.g.,* 87 FR at 63507 (''The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.''); *see also* Circumvention of Lawful Pathways 88 FR 31314, 31317 (May 16, 2023) (noting that in the first weeks following implementation of the CHNV parole programs, encounters of CHNV nationals between POEs dropped significantly).

[11] OHSS analysis of January 2025 OHSS Persist Dataset.

[12] *See, e.g.,* 87 FR at 63507; *see also id.* at 63512 (explaining that by ''diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process,'' DHS could relieve pressure on border communities).

[13] *See, e.g.,* 87 FR at 63515.

[14] OHSS analysis of January 2025 OHSS Persist Dataset.

[15] OHSS analysis of January 2025 OHSS Persist Dataset.

[16] Section 7 of Executive Order 14165 also directed the Secretary to, consistent with applicable law, take all appropriate action to cease using the CBP One app. as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States. DHS has ceased the use of the CBP One app for this purpose. *See* CBP, Press Release, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025), *https://www.cbp.gov/newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app* (last updated Jan. 22, 2025).

[17] A total of 582,800 CHNV nationals with CBP One registration numbers were encountered at southwest border POEs from Jan. 1, 2023–Jan. 31, 2025, including 576,900 (99 percent) that were issued NTAs. OHSS analysis of January 2025 OHSS Persist Dataset.

[18] *See, e.g.,* Securing the Border, 89 FR 81156, 81181 (Oct. 7, 2024) (explaining that particularly in light of the immigration court backlog, ''releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal.'').

[19] 88 FR 31314 (May 16, 2023).

[20] *See* 89 FR 48710 (June 7, 2024) (interim final rule); 89 FR 81156 (Oct. 7, 2024) (final rule).

[21] ''On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens].'' *See* 89 FR at 81157–58.

[22] 89 FR at 48714.

[23] 89 FR at 48715.

southwest border of the United States. Promulgation of the Securing the Border interim final rule in June 2024 reflected the reality that the CHNV parole programs and Circumvention of Lawful Pathways rule did not sufficiently enhance border security.[24]

Finally, to whatever extent the CHNV parole programs could be characterized as reducing encounters of CHNV nationals at the southwest border from the very high levels that existed in late 2022, DHS does not believe that the programs are necessary to achieve such reductions at this time. In December 2022—the last full month prior to implementation of all four programs—the U.S. Border Patrol (USBP) encountered around 84,000 CHNV nationals at the southwest border.[25] That figure has been below 12,000 every month since January 2024, and below 6,000 every month since June 2024, when DHS and DOJ issued the Securing the Border rule.[26] In January 2025, even with the CHNV parole programs paused, USBP encountered around 3,400 CHNV nationals at the southwest border.[27] Whatever the need for these programs may have been in late 2022, the situation at the southwest border now, and the set of tools implemented by DHS to deter illegal immigration, are quite different.

Moreover, with the implementation of President Trump's policies beginning on January 20, 2025, border encounters generally have continued to drop notwithstanding the ongoing pause on these programs. Southwest border encounters between POEs fell from an average of about 1,180 aliens per day in the two-week period ending on January 20, 2025, to an average of about 640 per day in the two-week period from January 21 to February 3, 2025, and fell further to an average just under 260 per day in the two-week period from February 12, 2025 to February 25, 2025.[28] Over those same three time periods, southwest border releases from USBP custody fell from an average of about 240 per day to an average of about 50 per day and then an average of fewer than 5 per day.[29]

The need to break the ''vicious cycle'' of unlawful immigration supports this DHS action to terminate the CHNV parole programs in favor of new presidential directives that address the demand for enhanced border security beyond the 2024 Securing the Border framework.[30] Executive Order 14165, ''Securing Our Borders,'' [31] and Executive Order 14159, ''Protecting the American People Against Invasion,'' [32] exemplify more reasoned and realistic initiatives to control unlawful immigration at the southwest border of the United States.

*2. The Domestic Effects of Illegal Immigration Continued To Be Felt Throughout Implementation of the CHNV Parole Programs*

Although one goal of the CHNV parole programs was to ''help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB,'' the programs did not have this effect. As discussed in the preceding section, overall levels of CHNV migration at and between southwest border POEs did not fall dramatically year-over-year in FY 2023 and FY 2024. In addition, if one takes into account the 532,000 parolees who entered the United States at an interior POE, CHNV migration may have increased over the relevant time period. Recent policy interventions have proven more effective than the CHNV parole programs in addressing very high levels of illegal immigration.

Over the past few years, there has been extensive public discussion of the effects of high levels of illegal immigration and inadmissible aliens arriving in local communities. Although public accounts of these effects do not always distinguish between aliens strictly on the basis of how they entered the country or their status (*e.g.,* CHNV parolees; aliens whom DHS encountered at a southwest border POE placed in section 240 removal proceedings; and aliens present without admission or parole), localities nationwide have experienced the effects of very high levels of migration.[33] CHNV parolees and other recent arrivals have competed for limited resources such as housing, food, transportation, education, legal services, and public benefits.[34] Some localities experienced surges of CHNV parolees in particular.[35]

The domestic impact of the CHNV parole program was also felt at the Federal level in at least three ways. First, the CHNV parole programs resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a ''qualified alien.'' *See* 8 U.S.C. 1641(b)(4). Because DHS generally issued two-year periods of parole from the outset, CHNV parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.,* 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all CHNV parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see*

[24] DHS notes that on October 4, 2024, the prior administration announced that there would be no ''re-parole'' beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs. The decision of the prior administration to decline renewal or extension of the CHNV related parole coincided in large part with other actions of DHS to promulgate policies to reduce illegal immigration.

[25] OHSS analysis of January 2025 OHSS Persist Dataset.

[26] OHSS analysis of January 2025 OHSS Persist Dataset.

[27] OHSS analysis of January 2025 OHSS Persist Dataset.

[28] OHSS analysis of data downloaded from UIP February 25, 2025.

[29] OHSS analysis of data downloaded from UIP Feb. 25, 2025. DHS also notes that to whatever extent the incentives created by the parole programs for Cubans and Haitians deterred illegal immigration by sea—a particularly dangerous form of migration—the parole programs are not necessary for such deterrence and raise other issues, some of which are outlined in sections III.2–4 of this notice. DHS has adopted a more robust enforcement posture in general, and will monitor trends in maritime migration and respond as appropriate. Through early February 2025, DHS has yet to see a return to the very high levels of maritime migration observed in 2022.

[30] The streamlined procedures offered by the Securing the Border framework and complementary actions permitted DHS to more than triple the percentage of aliens processed for expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1), and decrease the number of aliens released by USBP pending immigration court proceedings by 89 percent, a number that has only improved further with the end of ''catch and release.'' Encounters and releases based on OHSS analysis of January 2025 OHSS Persist Dataset. Processed for ER based on OHSS analysis of September 2024 OHSS enforcement Lifecycle and CBP data downloaded from UIP ER Daily Report Data Dashboard as of February 4, 2025.

[31] 90 FR 8611 (Jan. 20, 2025).

[32] 90 FR 8443 (Jan. 20, 2025).

[33] *See, e.g.,* Adam Shaw, Fox News, *Biden Admin Faces Mounting Pressure to Dismantle Migrant Parole Program Amid 'Stress' on Small Towns* (Oct. 31, 2024), *https://www.foxnews.com/politics/biden-admin-faces-mounting-pressure-dismantle-migrant-parole-program-stress-small-towns;* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal,* Migration Policy Institute (Aug. 1, 2024), *https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.*

[34] *See* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal,* Migration Policy Institute (Aug. 1, 2024), *https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.*

[35] Nick Mordowanec, *Map Shows Hotspots for Migrants Flying Into U.S.,* Newsweek (May 1, 2024), *https://www.newsweek.com/migrants-dhs-flying-border-illegal-1896239.*

7 CFR 273.4(a)(6)(ii)(J), as might ''a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980),'' *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to ''lawfully residing'' children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[36]

Second, the CHNV parole programs have exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large. For example, the population of aliens paroled into the United States and who have filed an application for asylum contributes to an already taxed immigration system with historically high backlogs before USCIS and the Executive Office for Immigration Review (''EOIR'').[37] Many such parolees may not otherwise have come to the United States and have exacerbated such backlogs or are likely to eventually do so. U.S. Citizenship and Immigration Services (''USCIS'') recently reported that as of the end of December 2024, the USCIS asylum backlog had increased to over 1.4 million cases.[38] CHNV parolees account for approximately 75,000 affirmative asylum applications.[39] In addition, when a CHNV parolee's two-year parole period ends, if the CHNV parolee has no lawful basis to remain in the United States, DHS may place the alien in section 240 removal proceedings. But, due in part to the overwhelmed expedited removal system, EOIR's immigration court backlog has already been growing rapidly, and will be further strained by the initiation of additional removal proceedings for the CHNV parolee population once their parole period ends. The immigration court backlog increased by approximately 44 percent between the end of FY 2023 (2.5 million cases) and FY 2024 (3.6 million cases).[40]

Third, the CHNV parole programs had a disruptive impact for CBP operations at interior air POEs. A progressive increase in beneficiaries of the CHNV parole programs arriving at POEs with advance travel authorizations (''ATAs'') were ultimately not granted parole due to CBP's determination that the alien did not warrant a discretionary grant of parole, for instance due to evidence of fraud or confirmation that the alien was a citizen or resident of a non-CHNV country. As a result, CBP processed these aliens for another appropriate disposition under Title 8, including detention or referral into expedited removal proceedings or section 240 removal proceedings, as appropriate. This caused further processing delays and coordination with air carriers for return flights when appropriate, and further contributed to the immigration court backlog.

The overwhelmed immigration systems in particular may incentivize aliens to enter the United States, without regard to the strength of any potential claims for immigration status, as aliens who are subject to expedited removal may nevertheless be placed in section 240 removal proceedings when the system is strained beyond its processing capacity. As a result, many remain in the United States until their immigration benefit requests are adjudicated or their section 240 removal proceedings conclude and any resultant removal order is executed. Any further strain to the immigration systems resulting from aliens pursuing the CHNV parole programs exacerbates these detrimental incentives.

In short, the domestic impact of the CHNV parole programs do not warrant continuing to operate these programs. Implementation of these programs coincided with an overall increase in CHNV migration, significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs.

### *3. The CHNV Parole Programs Are Inconsistent With the Administration's Foreign Policy Goals*

One of the stated goals of the CHNV parole programs was to promote the foreign policy objectives of the prior administration. Indeed, DHS explained repeatedly in its notices promulgating the CHNV parole programs that their implementation would advance the foreign policy objectives of the then-current administration.[41] The foreign policy objectives underlying the CHNV parole programs, however, are not consistent with those of the current Administration.

Executive Order 14150, ''America First Policy Directive to the Secretary of State'' (Jan. 20, 2025) clearly sets out the President's vision that ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' [42] Executive Order 14159, ''Protecting the American People Against Invasion'' (Jan. 20, 2025) states that it is the policy of the United States to ''faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people.'' Further, it is the policy of the United States to achieve the ''total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.'' [43]

Whereas implementation of the CHNV parole programs was contingent upon the Government of Mexico (''GOM'') making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return, remove, or deter the illegal migration of CHNV nationals and other aliens. Section 13 of that Executive Order 14159 specifically addresses repatriation, and directs the Secretaries of State and Homeland Security to take all appropriate action to cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), and ensure that diplomatic efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States. Section 13 further directs the Secretaries to eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. The Order provides that any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out section 243(d) sanctions and shall also be considered regarding the issuance of

[36] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[37] *See* Holly Straut-Eppsteiner, Cong. Rsch. Serv. IN12492, FY2024 EOIR Immigration Court Data: Caseloads and the Pending Cases Backlog (2025); *see also* Elizabeth Jacobs, *Affirmative Asylum Backlog Exceeds One Million for the First Time* (Center for Immigration Studies) (July 26, 2024), *https://cis.org/Jacobs/Affirmative-Asylum-Backlog-Exceeds-One-Million-First-Time.*

[38] USCIS, Performance Data, Asylum Division Monthly Statistics Report (Dec. 2024), *https://www.uscis.gov/sites/default/files/document/data/asylumfiscalyear2025todatestats_241231.xlsx* (last visited Feb. 25, 2025).

[39] USCIS Office of Performance & Quality.

[40] EOIR, Executive Office for Immigration Review Adjudication Statistics (Jan. 16, 2025), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[41] *See e.g.,* 87 FR at 63516 (''the implementation of [the Venezuela process] will advance the Administration's foreign policy goals''); 88 FR at 1253 (''[the Haiti process] is fully aligned with larger and important foreign policy objectives of this Administration'').

[42] See Executive Order 14150, America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

[43] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

any other sanctions that may be available to the United States.

Further, as noted above, Executive Order 14165, ''Securing Our Borders'' states that DHS shall ''terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.' '' [44] In the same Order, the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending section 240 removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

The President has pursued the cooperation of foreign partners in other ways as well. For instance:

• On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[45]

• On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[46]

• On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to ''do what's right'' in regard to illegal migration.[47]

• Beginning on February 1, 2025, President Trump has issued a number of tariff-related executive orders in connection with the situation at the southern border.[48]

• On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, who will then be repatriated to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[49]

Multiple agencies of the U.S. Government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced multiple discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[50] consistent with Secretary of State Rubio's January 22, 2025 announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[51] In that announcement, the Department of State made clear that it ''will no longer undertake any activities that facilitate or encourage mass migration'' and that ''[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants.'' [52] Additionally, pursuant to his authority under section 219 of the INA, 8 U.S.C. 1189,[53] Secretary of State Rubio designated the Venezuelan gang, Tren de Aragua, along with other cartels and gangs, as Foreign Terrorist Organizations.[54]

In other words, in addition to directly fulfilling the President's directive to terminate the CHNV parole programs, this action complements and underscores the Administration's pivot to a foreign policy that prioritizes the United States' interests in a secure border. Regardless of whether the prior Administration saw the CHNV parole programs as a component of a regional migration management strategy, the current Administration is not pursuing that strategy. Rather, as described above, the current Administration has focused its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States and obtain complete operational control of our borders.

These measures will allow DHS to better ''achieve the total and efficient enforcement'' of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[55] In short, the continued implementation of the CHNV parole programs no longer accords with the President's stated priorities and foreign policy objectives.

### *4. Other Factors Do Not Counsel in Favor of Maintaining the Programs*

The other factors cited by DHS in promulgating the CHNV parole programs also do not counsel in favor of maintaining the programs. For instance:

• DHS predicted that by allowing DHS to vet aliens before they travel to the United States, the programs would enhance national security as compared to high levels of illegal immigration. But as discussed above, these programs are unnecessary to counter high levels of illegal immigration. In addition, and critically, such vetting is inherently limited and, as has been reported publicly, there were significant gaps in the vetting process. In response to these problems, the CHNV parole programs were paused briefly in July 2024 to evaluate the program vulnerabilities.[56]

---

[44] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[45] The White House, ''Readout of President Donald J. Trump's Call with President Nayib Bukele'' (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/.*

[46] The White House, ''Statement From the Press Secretary'' (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/.*

[47] Meryl Sebastian, *Trump Says India 'Will Do What's Right' on Illegal Immigration* BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo.*

[48] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[49] *Panama Receives First U.S. Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration.*

[50] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) (''President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country.''), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/;* U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) (''Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap.''), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/.*

[51] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025).

[52] *Id.*

[53] *See* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[54] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jallisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025).

[55] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[56] Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards,* Wash. Times (Aug. 2, 2024),

• DHS also initially reasoned that the CHNV parole programs would disincentivize a dangerous journey that puts aliens' lives and safety at risk and enriches smuggling networks. As noted above, however, although these programs were accompanied by a significant decrease in CHNV encounters between southwest border POEs, they were also accompanied by a significant increase in CHNV encounters at southwest land border POEs. This indicates that CHNV nationals continued to engage in dangerous migration to the southwest border, even if the overall level of migration to the southwest border dropped somewhat and CHNV aliens did not cross between POEs with the same frequency. And, as also noted above, the U.S. Government has implemented other policies that have more effectively deterred illegal immigration.

• Another stated goal of the CHNV parole programs was to reduce the burden on DHS personnel and resources that would otherwise be required for detention, monitoring, processing, and removal. However, as noted above, significant resource burdens persisted even after the programs' implementation, including with respect to encounters at and between POEs. Program implementation itself occupied significant resources. For instance, there have been approximately 2,970,000 Forms I–134 and I–134A filed with USCIS since October 2022,[57] which includes 2,140,000 pending review, 642,410 confirmed by USCIS, and 181,820 non-confirmed by USCIS.[58] Further, DHS needed additional resources to counter the fraud, national security concerns, and public safety concerns discussed above. In addition, due to the originating location of beneficiaries of the CHNV parole programs and available travel routes via commercial airlines, over 80 percent of the aliens who were issued an ATA under the CHNV parole programs flew to Florida POEs. The unexpected increase in approximately 25,000 inadmissible aliens per month resulted in CBP experiencing a decrease in enforcement operations and an increase in wait times, overtime expenditures, and other needs at Florida POEs. Processing an alien requesting parole under the CHNV parole programs requires secondary processing and enrollment of biometrics, resulting in a more extensive and prolonged time in CBP facilities.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the CHNV parole programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of the programs indicate that reliance on the continued existence of the CHNV parole programs would be unwarranted. The notices establishing the CHNV parole programs expressly advise the public that, ''[t]he Secretary retains the sole discretion to terminate the [Parole Program] . . . at any point'' [59] and that ''DHS may terminate parole in its discretion at any time.'' [60] The CHNV parole programs were ''being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.'' [61]

In addition, DHS observes that on October 4, 2024, the prior administration announced that there was no re-parole process under CHNV, informing participants that, ''if you have not sought a lawful status or period of authorized stay, you will need to leave the United States before your authorized parole period expires, or you may be placed in removal proceedings after your period of parole expires.'' [62] Finally, as noted above, Executive Order 14165 directs the Secretary to terminate the CHNV parole programs consistent with law.

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, that DHS made clear months ago that there would be no ''re-parole'' process under the CHNV parole programs, and the additional notice provided in Executive Order 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution.[63]

### *1. Reliance Interests of Potential Supporters and Beneficiaries*

DHS first considered the potential reliance interests of those U.S.-based supporters who had intended to file or have filed a Form I–134A in support of a potential parolee. In general, the costs associated with such filings are minimal. The potential supporter may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response, and a few potential supporters who submitted Form I–134A may have submitted their biometrics (photograph and fingerprints) at a USCIS Application Support Center for biometric screening and vetting by USCIS as part of the review of their Form I–134A.[64]

At this early stage in the process, the costs incurred by a potential beneficiary are also minimal. Once a supporter is confirmed, the potential beneficiary receives instructions to create a USCIS online account, confirm their biographic information in their online account, and attest to meeting the eligibility requirements, including public health requirements, and certain vaccination requirements. It is also possible that a beneficiary who has received instructions to create an online account may have obtained vaccinations in anticipation of the required attestation. After confirming their biographic information, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. CBP One was used to collect the beneficiary's biographic information and photo and was an additional step in the process prior to the alien being authorized to travel to the United States to seek parole. The total estimated time to complete the CBP One part of the

*https://www.washingtontimes.com/news/2024/aug/2/dhs-suspends-parole-program-amid-rampant-fraud/.*

[57] Under the parole program for Venezuelans, a U.S.-based supporter would initiate consideration for parole under the program by filing Form I–134, *Declaration of Financial Support* (Online), along with supporting evidence. 87 FR at 63515. In January 2023, when DHS expanded the programs to cover Cubans, Haitians, and Nicaraguans and their immediate family members as well, DHS announced that it would instead begin accepting the Form I–134A *Online Request to be a Supporter and Declaration of Financial Support,* along with supporting evidence, to initiate consideration for parole under all four programs. *See, e.g.,* 88 FR at 1279. Neither form could be filed on paper by mail and neither form required the payment of a fee.

[58] OHSS analysis of USCIS Form I–134/Form I–134A data as of January 22, 2025. The Venezuelan parole program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023. ''Confirmed'' in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while ''non-confirmed'' meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[59] *E.g.,* 88 FR at 1268 (Cuba).

[60] *E.g.,* 88 FR at 1272 (Cuba).

[61] *E.g.,* 88 FR at 1277 (Cuba).

[62] Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status For 530,000 Migrants Who Arrived Under Biden Program,* CBS News (Oct. 4, 2024), *https://www.cbsnews.com/news/venezuelans-legal-status-chnv-program/.*

[63] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Oct. 4, 2024), available at *https://web.archive.org/web/20250104043158/https:/www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[64] Biometrics submission is estimated to require 1.17 hours per respondent. 89 FR 104557 (Dec. 23, 2024).

ATA process was 10 minutes. *See* 88 FR 62810, 62812 (Sept. 13, 2023).

In general, these costs are not significant and pale in comparison to the U.S. Government's sovereign interest in determining who is paroled into the United States. DHS intends to issue a notice of non-confirmation for all remaining pending Forms I–134A. DHS will also rescind the confirmation of all Form I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A.

*2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Supporters*

A beneficiary with an approved ATA may travel to the United States to seek a discretionary grant of parole. Authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel, at no cost to the U.S. government, via commercial air to the United States.[65] DHS intends to cancel all pending applications for advance authorizations to travel to the United States to seek a discretionary grant of parole under the CHNV parole programs. There are no currently approved ATAs upon which an alien may travel under the CHNV parole programs.[66]

A beneficiary whose application for an ATA is cancelled may have, for example, provided notice to their landlord, sold property, and/or resigned from employment. In addition, a confirmed Form I–134A supporter may have incurred expenses, for example, to secure living quarters or furniture for the beneficiary in anticipation of their process being completed through parole into the United States.

DHS recognizes that the potential costs incurred by supporters and potential beneficiaries at this point could be viewed as significant. Nevertheless, as explained above, supporters and potential beneficiaries were apprised that DHS could terminate the programs at any point. Moreover, the notices for each parole program made it clear that the approval of an ATA or grant of parole at a POE was entirely discretionary. *See, e.g.,* 88 FR 1243, 1252 (noting that a potential beneficiary may be ''ineligible for advance authorization to travel to the United States as well as parole under this process'' for a range of reasons, including if the alien ''fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion''); 88 FR at 1253 (''Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the [aliens] is a discretionary determination made by CBP at the POE at the time the [alien] arrives at the interior POE''); 88 FR at 1253 (''[Aliens] who . . . otherwise do not warrant parole pursuant to [section 212(d)(5)(A) of the INA], and as a matter of discretion upon inspection, . . . may be referred to ICE for detention.''). While the termination of the CHNV parole programs as provided in this notice may result in costs incurred by both the supporter and potential beneficiary who have prepared to travel to the United States, those parties chose to incur such expenses knowing that completion of the process was never guaranteed by the terms of the program, and the termination of the programs was possible at any time. DHS has concluded that any such reliance interests are outweighed by other interests and policy concerns as explained in this notice.[67]

## V. Effect of Termination on Current Parolees Under the CHNV Parole Programs and Corresponding Reliance Interests

The notices establishing the CHNV parole programs explain that parole is not an admission of the alien to the United States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the CHNV parole programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, between October 19, 2022, and January 22, 2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant to the CHNV parole programs. DHS has determined that as one aspect of the termination of the CHNV parole programs, consistent with the Secretary's statutory and regulatory authority,[68] the parole of aliens who have been paroled into the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary.

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice. Parolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States

[65] Authorization to travel does not guarantee parole. Parole of the individual is a discretionary determination made by CBP when the individual arrives at the interior POE. *See, e.g.,* 88 FR 1255, 1264 (Jan. 9, 2023).

[66] OHSS analysis of advance travel authorization data provided by CBP PSPD and valid as of February 27, 2025.

[67] DHS has considered the alternative of allowing any approved ATAs to remain in place until they were used or expired by their terms. Even if there were currently approved ATAs, DHS would not pursue this route, because DHS would not wish to incentivize aliens flying to the United States to seek parole under policies that DHS no longer supports or appear to encourage them to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. Such an approach would risk exacerbating the problems created by the CHNV parole programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit. If parole is not granted, the alien may be returned to their home country at U.S. Government expense or processed for another appropriate disposition under the INA.

[68] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States''); 8 CFR 212.5(e)(2)(i) (''[U]pon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien.* . . .'' (emphasis added)).

before their parole termination date. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home mobile app. Aliens should visit *https://i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

In implementing this approach, DHS intends to prioritize for removal those who (1) have not, prior to the publication of this notice, properly filed an immigration benefit request, with appropriate fee (or fee waiver request, if available) to obtain a lawful basis to remain in the United States (*e.g.,* adjustment of status, asylum, Temporary Protected Status, or T or U nonimmigrant status) and (2) are not the beneficiary of an immigration benefit request properly filed by someone else on their behalf (*e.g.,* petition for alien relative, fiancé petition, petition for immigrant employee), with appropriate fee (or fee waiver request, if available). Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS's institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer exists and thus DHS intends to revoke parole-based employment authorization consistent with those revocation on notice procedures. 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and traveled to the United States.[69] Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.

However, any assessment of the reliance interests of CHNV parolees must account for CHNV parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served[70]; and that (2) the initial term of parole would be limited to a maximum of two years. These clear, limiting conditions of the parole programs served to attenuate any long-term expectations and interests amongst CHNV parolees. Accordingly, DHS has taken these limiting conditions, along with CHNV parolees' knowledge of them, into consideration when weighing their reliance interests.[71]

DHS has concluded that the potential reliance interests among aliens paroled into the United States under the CHNV parole programs do not outweigh the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists. To effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate. Expedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination. INA 235(b)(1)(iii)(II), 8 U.S.C. 1225(b)(1)(iii)(II); 8 CFR 235.3.[72] If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system discussed in Section III.1.

To the extent that current parolees have obtained housing and employment authorization, or created new ties within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the Univ. of Cal.*[73] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[74] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than two years, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchase of homes.[75] As the Court noted, these interests, though noteworthy, were not ''necessarily dispositive,'' and ''DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests.''[76] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the CHNV parole programs are far less than the population in *Regents.* Further, as stated above, the reliance interests under the CHNV parole programs must take into account the express, discretionary terms of the parole program. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual CHNV parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, DHS finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS has considered the alternative of permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in

---

[69] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'' (cleaned up)).

[70] As explained throughout this notice, the Secretary has determined that the purposes of parole under the CHNV programs have been served because, *inter alia,* the CHNV parole programs are unnecessary to achieve border security goals; the domestic impact of the CHNV parole programs was too great; and the programs are inconsistent with this Administration's foreign policy goals.

[71] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is ''unjustified in light of the express limitations'' in relevant immigration policy).

[72] *See* Designating Aliens for Expedited Removal, 90 FR 8139 (Jan. 24, 2025).

[73] 591 U.S. 1 (2020).

[74] *Id.* at 31.

[75] *Id.*

[76] *Id.*

the past done with some parole terminations. *See, e.g.,* 82 FR 38926, 38927 (Aug. 16, 2017). However, DHS has opted to not pursue this route. As explained above, this would essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States. Under this alternative, CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal. *See* INA 235(b)(1)(iii)(II), 8 U.S.C. 1235(b)(1)(iii)(II). As a result, the already overburdened immigration court system would be further taxed with adjudicating the section 240 removal proceedings for the pertinent CHNV beneficiary population, a result DHS finds unacceptable.

DHS has also considered the alternative of a longer than 30-day wind-down period. After due consideration, DHS has also decided not to pursue this option. As discussed above, DHS has a strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population to prevent further straining of the over-burdened immigration court system. Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal.[77] DHS has determined that a 30-day wind-down period provides affected parties sufficient notice while also preserving DHS's ability to enforce the law promptly against those CHNV parolees lacking a lawful basis to remain in the United States. Accordingly, DHS is opting not to increase the wind-down period to more than 30 days.

## VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the CHNV parole programs and satisfies the requirement that DHS provide written notice upon the termination of parole. *See* 8 CFR 212.5(e)(2)(i) ("... Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien.* . . ." (emphasis added)). For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served. This notice accordingly serves as written notice to CHNV parolees.

DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance. *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.").

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the size of the affected population and potential noncompliance with change-of-address reporting requirements. *See* 8 U.S.C. 1305; 8 CFR 265.1. Because all CHNV parolees should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account. *Cf., e.g.,* 8 CFR 103.2(b)(19)(ii)(B) ("For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . ."). This notice, and the individual notice through the USCIS online account, each independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

## VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A). *i.e.,* a "statement [ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)). By terminating the CHNV parole programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 1277—DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA).[78]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the CHNV parole programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary of Homeland Security "in [her] discretion." The CHNV parole programs therefore were general statements of policy.

Because the CHNV parole programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice and comment rulemaking requirements. Through the termination of the CHNV parole programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[79] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation.[80]

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves [81]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[82] Consistent

[77] According to OHSS analysis of data provided by USCIS, for each month from March 2025 through September 2026, there are thousands of CHNV parolees who will become ineligible for expedited removal upon the natural expiration of their two-year parole.

[78] *Cf. Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[79] *See Encino Motorcars,* 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[80] *See* 5 U.S.C. 553(d)(2).

[81] *See* 5 U.S.C. 553(a)(1); 88 FR at 1277; 88 FR at 1253; 88 FR at 1264; 87 FR at 63516 (as modified by 88 FR 1279).

[82] *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir.

with the Secretary of State's February 21, 2025 determination that ''all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]'' DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[83]

Moreover, although the APA does not require the agency to show that such procedures may result in ''definitely undesirable international consequences'' to invoke the foreign affairs exemption to notice-and-comment rulemaking, some courts have required such a showing,[84] and DHS can make one here. Delaying rescission of the CHNV parole programs to undertake rulemaking would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in Section III.3 of this notice, the CHNV parole programs were implemented as an integral part of negotiations with regional neighbors, including Mexico, to address unlawful migratory flows challenging immigration systems throughout the region. For instance, in announcing the Venezuela parole program, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United States.[85] DHS cautioned that it ''will not implement the new parole process without the ability to return Venezuelan nationals who enter [unlawfully] to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States [unlawfully] between POEs.'' DHS explained that ''initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.'' [86] DHS noted that the program was ''not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—[but] also fully aligned with larger and important foreign policy objectives of [the prior] Administration and fits within a web of carefully negotiated actions by multiple governments.'' [87] When implementing the Cuba, Haiti, and Nicaragua parole programs, DHS invoked the foreign affairs exemption on similar grounds.[88]

Yet, as also discussed in Section III.3 of this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the CHNV parole programs was contingent upon the GOM making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return or remove CHNV nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the CHNV parole programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations and may result in an even greater number of CHNV nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.3 of this notice, with countries to accept the removal of illegal aliens, including inadmissible CHNV nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. Any delay for such procedures would harm the U.S. Government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the CHNV parole programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border. Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.[89]

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[90] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

1980) (because an immigration directive ''was implementing the President's foreign policy,'' the action ''fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA'').

[83] U.S. Secretary of State, *Determination: Foreign Affairs Functions of the United States,* 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate the CHNV parole programs.

[84] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[85] *See* 87 FR at 63516.

[86] *Id.*

[87] *Id.*

[88] *See* 88 FR at 1277 (Cuba), 88 FR at 1253–54 (Haiti), 88 FR at 1265 (Nicaragua).

[89] *See* 5 U.S.C. 553(b)(B), 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754–55 (D.C. Cir. 2001) (''a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required''); *see also* Executive Order 14159, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[90] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside ''only the offending parts of the rule.'' *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

For example, DHS would intend that the termination of the CHNV parole programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

### IX. Paperwork Reduction Act (PRA)

This rule does not promulgate new or revise existing ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–05128 Filed 3–21–25; 4:15 pm]

BILLING CODE 9110–9M–P

---

## DEPARTMENT OF HOMELAND SECURITY

### Finding of Mass Influx of Aliens

On January 23, 2025, the Acting Secretary of Homeland Security issued a Finding of Mass Influx of Aliens. This finding went into effect immediately (on January 23, 2025) and remained in effect for 60 days (until March 23, 2025). The Acting Secretary's finding published in the **Federal Register** on January 29, 2025. *See* 90 FR 8,399. Upon review of the current situation at the border, I am extending that finding.

The Immigration and Nationality Act (INA), at 8 U.S.C. 1103(a), provides an expansive grant of authority, stating that in the event of a mass influx of aliens off the coast of the United States or a land border, the Secretary may authorize a State or local law enforcement officer, with the consent of the officer's superiors, to perform duties of immigration officers under the INA. In turn, section 65.83 of Title 28 of the Code of Federal Regulations allows the Secretary [1] to ''request assistance from a State or local government in the administration of the immigration laws of the United States'' under certain specified circumstances. Among those circumstances are when ''[t]he [Secretary] determines that there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality.'' 28 CFR 65.83(b).

In making such a determination, the Secretary may also determine that there is an ''immigration emergency.'' The regulations define an immigration emergency as ''an actual or imminent mass influx of aliens which either is of such magnitude or exhibits such other characteristics that effective administration of the immigration laws of the United States is beyond the existing capabilities of [the Department of Homeland Security (DHS)] in the affected area or areas.'' 28 CFR 65.83(d)(1) (using identical language as 8 U.S.C. 1103(a)(10)).

Such a determination is based on ''the factors set forth in the definitions contained in'' 28 CFR 65.81. Characteristics of an influx of aliens, other than magnitude, which may be considered in determining whether an immigration emergency exists include: the likelihood of continued growth in the magnitude of the influx; an apparent connection between the influx and increases in criminal activity; the actual or imminent imposition of unusual and overwhelming demands on law enforcement agencies; and other similar characteristics.

Upon review of the current data, I have determined that there continues to exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of all 50 States and that an actual or imminent mass influx of aliens is arriving at the southern border of the United States and presents urgent circumstances requiring a continued federal response. I make this finding for the reasons discussed below.

First, over the last four years, our southern border has been overrun. As noted in Proclamation 10,888, *Guaranteeing the States Protection Against Invasion,* ''[o]ver the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States.'').

Second, as of March 12, 2025, DHS estimates that there are likely approximately 20,000 aliens across the Southwest border waiting to illegally enter. While encounters along the southwest border declined in February 2025, historical trends over the past four years strongly indicate that without this finding, aliens are likely to resume crossing the border, and border crossing numbers are likely to rise again before DHS can gain operational control. It is precisely measures, such as this one, that have kept the numbers under control.

Third, as stated in the January 23, 2025 notice, when border crossing numbers are high, much detention capacity is required of U.S. Immigration and Customs Enforcement (ICE). Mandatory detention of aliens apprehended at the border serves important public safety and national security purposes. Aliens who have not completed this process have not been effectively vetted for criminality or national security threats. Current databases do not allow for comprehensive and rapid searching for foreign convictions or other public safety and national security risks. As a result, the fact that the numbers at the border are effectively forcing DHS to engage in catch-and-release practices is eliminating or thwarting legally mandated screenings and it is threatening public safety and national security. This does not account for so-called gotaways, of which there have been millions over the last four years, who are not screened in any manner. Without controls in place at the border to stem the influx, DHS loses its capacity to hold all aliens as required by the INA. 8 U.S.C. 1225(b). As of March 13, 2025, ICE has a detention population of 47,372, with a maximum capacity of 54,500. ICE's facilities are currently at nearly at 87% occupancy, and ICE's priority for detention space is removing aliens with criminal records, public safety risks, and national security risks. Should this finding not be extended, ICE would be hampered in this critical effort.

Fourth, an influx of aliens presents significant concerns with respect to increased criminal activity. Between FY 2017 and 2019, ICE removed 485,930 aliens with criminal convictions or pending criminal charges. However, between FY 2021 and FY 2023, ICE removed 158,931 aliens with criminal convictions or pending criminal charges. Assuming that the crime rate of foreign nationals has remained unchanged over the year, this 67% decrease (in removals) suggests that tens of thousands of criminal aliens remain in the United States. Where there is an increase in criminal aliens, there is

---

[1] Although the regulations reference the ''Attorney General,'' Congress has, since the publication of these regulations, transferred the authority and responsibility for administering and enforcing the immigration laws to the Secretary of Homeland Security. See Homeland Security Act of 2002 471, 6 U.S.C. 291 (abolishing the former Immigration and Naturalization Service); id. S 441, 6 U.S.C. 251 (transferring immigration enforcement functions from the Department of Justice to the Department of Homeland Security); Immigration and Nationality Act 103(a)(1), 8 U.S.C. 1103(a)(1) (''the Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens.'')

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, *et al.*,

*Plaintiffs,*

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

*Defendants.*

Case No.: 1:25-cv-10495-IT

**DECLARATION OF DAVID DOE**

I, David Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Quito, Ecuador in May 1974. I am a national of Ecuador.
2. I currently live in Arkansas. I have lived in Arkansas with my wife and our two sons—who are 14 and 11 years old—since August 2024. Before that, we lived in New Jersey with my father for the first month after we arrived in the United States through the Family Reunification Parole ("FRP") process for Ecuador. My paternal grandmother, three aunts, one uncle, and several cousins also live in the United States. All of them, along with my father, are U.S. citizens.
3. I am proud of the quiet, responsible life we have built in Arkansas. We have become a part of the community. I work as an operations associate at a poultry plant. When I started, I worked on the production line cutting up chicken, but I applied for a supervisory position after about a month, and I am now part of the management team. A friend of mine is the pastor of two Baptist churches in Arkansas that serve Hispanic congregations, and I frequently preach at his churches as well. I went to college for business in Ecuador, and I also have a master's degree in business from a Canadian

university as well as a degree in theology. Back in Ecuador, I worked in marketing, sales, and customer relations.

4. My wife takes care of our children and our home. In August of this year, our children started at a private Christian school. They are very happy there and feel integrated into their school. They are learning English, and they have made good friends with their classmates.

5. In October 2012, my father submitted a Form I-130 family petition to sponsor me and my family for a family-based immigrant visa. Because my father is a U.S. citizen, we qualify for an F3 immigrant visa. According to our paperwork, the "priority date" for our visa is October 6, 2012. In February 2020, my father's I-130 petition was approved.

6. In November, 2023, we received an official invitation from the government for my father to sponsor me and my family for the FRP process for Ecuador, based on his approved I-130 for us. We were very excited about the opportunity to go to the United States and be closer to my father and other family here, as we had seen on the news that President Biden had started the new process for people like us who were close to being able to file their I-485 adjustment of status applications. After waiting for over thirteen years since my father filed the I-130, we felt hope for the first time in many years that we would be able to move toward a new life in the United States, and we were so happy that we got our invitation on the first day that the program began.

7. Life in Ecuador did not feel safe or secure for our family, especially for our children, given the large presence of drug cartels, high levels of crime, and political instability including many assassinations and uprisings. For example, one time when I was leaving the bank, I had to request a police escort to my house because I saw men following me on

my way home. Another time, in 2019, during a protest that got out of control, we had to stay up all night and help protect our neighborhood from potential violence.

8. In deciding to come to the United States through FRP, we were hoping for stability for our kids. We wanted them to have better options than they had in Ecuador. Additionally, while I previously had a stable job in Ecuador, I lost that job in February 2024. This was another part of the motivation to go to the United States, to seek economic opportunities for our family. We are also very religious, and we felt strongly that God was calling us to come to the United States.

9. We understood the invitation to be a part of FRP to be an act of trust from the U.S. government, so we followed every instruction provided by the government carefully. In February 2024, my father submitted the I-134A, Online Request to be a Supporter and Declaration of Financial Support. He submitted this himself, with my help. An attorney did not submit it for him. He had to complete a financial sponsor form indicating that he could provide financial support to us after we arrived if necessary, and because he is retired and did not meet the necessary income level to support a family of four, one of my childhood best friends who lives in Arkansas agreed to join our application as a co-sponsor. We also put significant time into filling out a lengthy form for each person in our family, providing detailed information on me, my wife, and our two kids. In February 2024, the application was approved.

10. We then completed the medical exams and got the vaccinations required for each member of our family. In total, the medical exams and vaccinations cost approximately $1,800 for the four of us, which is a significant expense for our family. We also had to complete

paperwork and procedures for our dog, whom we brought with us to the United States, including obtaining a blood sample to confirm that she did not have rabies.

11. We received our travel authorization in May 2024. To prepare to leave Ecuador for at least three years—and hopefully longer, as we expected to be able to file our green card applications—we rented out our home and sold as many of our possessions as we could. We treated it like a permanent move, so we prepared to leave my wife's family and my brother for a long while as well, as they still live in Ecuador. The four of us came to the United States with only five suitcases, our dog, and a lot of dreams for our life in our new country.

12. We were inspected and granted parole into the United States in July 2024. We were granted a three-year period of parole through July 2027. My wife and I applied for work authorization the day after we arrived, and we received our work permits in August 2024. Our work permits are also set to expire in July 2027.

13. Being in the United States gives me and my family a renewed sense of peace and security, because we see better opportunities here for our future. It feels like a big accomplishment because our journey here started back in 2012 when my father submitted his I-130, and we have been waiting and working toward our green cards – and eventually, hopefully, U.S. citizenship – for so long.

14. I first heard the announcement that the government was ending the FRP processes and terminating current grants of parole on the evening of December 13, 2025, from my friend who called us and asked if we had heard about the news. I then went to the United States Citizenship and Immigration Services ("USCIS") website and saw the information there. I keep my contact information current with USCIS, and I check the MyUSCIS

portal regularly—and I have continued to do so since December 15, 2025. I have not received any emails, notices, or other communications directly from USCIS about the announcement. My father also keeps his contact information, including his physical address, current with USCIS, and he has not received any such notices or communications either.

15. I was shocked and devastated to find out that the government would be terminating all existing grants of parole for FRP beneficiaries like us on January 14, 2026. It feels like we left a country that did not feel secure only to now be in a country that does not feel secure for us either. I saw that there was an exception for individuals who had filed I-485 adjustment of status applications as of December 15, 2025, but we have not filed our I-485 adjustment of status applications, because our priority date is not current. I have been anxiously checking the Department of State visa bulletin every month to see if our priority date would become current and we could submit our applications, but as of the December 2025 visa bulletin, the State Department was only accepting adjustment of status applications for family-based visa applications in the "F3 family visa preference category" (for the married sons and daughters of U.S. citizens) with a priority date of July 22, 2012 or earlier. As our priority date is October 6, 2012, it feels like we are so close, but the State Department's priority date for F3 adjustment of status applications has not moved from July 22, 2012 since January 2025. We do not have any pending applications for other immigration benefits.

16. The possibility of our parole being terminated so soon, and the possibility of having to return to Ecuador, especially on such a short timeline, have caused me and my family serious emotional distress, fear, and uncertainty. Our children are sad and anxious about

having to leave their school and friends behind, as well as the only sense of normalcy that they have known. They just said good-bye to their friends for the holiday break, which for them felt like saying good-bye forever. I am very concerned that when January comes, they might actually have to say good-bye to their school friends forever.

17. My wife and I are bewildered and upset as well because we were just feeling more settled into our lives here when, all of a sudden, it feels like our wings have been clipped. We built our lives here with very little, since we sold most of our things when we left Ecuador. We bought two cars, furniture for our home, and more here. If we have to sell those quickly, we will lose money on everything. If we had to leave, I would have to give up my job, and we do not have jobs or possessions to return to in Ecuador, which will make it hard to ensure we can provide for our family consistently. We would have to return to a situation in Ecuador that is not stable or safe for our family. We are also now accustomed to the food, the culture, and the language here. We would also be separated from our family in the United States, including my father, which would be difficult for us. Our family would experience significant financial and emotional hardship if our parole is revoked.

18. The possibility of losing our parole and uprooting our family yet again is one of the most difficult things we have faced, particularly since we were so close to being able to apply for green cards and potentially become permanent residents of the United States. We have been patiently waiting for over thirteen years for our opportunity to come to the United States and apply for legal permanent residency. We followed the rules and instructions from the government every step of the way, and the revocation of our parole now threatens to undo everything we have worked toward.

19. I am willing to serve as a class representative on behalf of those who are similarly situated to me. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the sudden termination of our parole status.

20. I fear using my real name in this lawsuit and making it publicly known that I am participating in a lawsuit against the U.S. government, because I fear that I could be retaliated against by the government through deportation or a negative impact on my and my family's ability to apply for adjustment of status or other immigration benefits in the future. I fear that the government will see my participation as an uprising or insurrection and will target me for immigration enforcement or prevent me from obtaining a green card. If I am not permitted to use a pseudonym in this lawsuit, I will likely decide not to participate, as I cannot put myself and my family at risk of harm.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Russellville, Arkansas on December 23, 2025.

[redacted]

David Doe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, *et al.*,

*Plaintiffs,*

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

*Defendants.*

Case No.: 1:25-cv-10495-IT

**DECLARATION OF FRANCISCA DOE**

I, Francisca Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in San Marcos, Guatemala in August 1986. I am a national of Guatemala.
2. I currently live in Lynn, Massachusetts. I have lived here since August 2024, when I arrived here with my family through the Family Reunification Parole ("FRP") process for Guatemalans.
3. I'm currently living with my husband and three young children, whose ages range from seven to fourteen years old.
4. While it took some time to adapt, we have enjoyed living in this area since arriving in the United States. My mom and sister, who are both U.S. citizens, also live in Lynn, so it is nice to be living so close to my family. My husband works full-time at a sausage factory, and I am currently a stay-at-home mother taking care of our home and our three children. I recently obtained my license to become an assistant, and I plan to work as a daycare assistant at my sister's daycare business in the area once I am able to secure childcare for my children, including possibly from the daycare itself. There, I will be responsible for supporting teachers and other staff in the supervision and caretaking of children at

daycare, recordkeeping and administrative duties, and collaborating with teachers and parents. All my children are in school now and have really been enjoying it and learning a lot about so many different things, including learning English. In our free time, we enjoy going out to the local park where our children love to play soccer together.

5. In or around July 2012, my mother submitted an I-130 family petition to sponsor me, my husband, and our children and start the process for us to eventually immigrate to the United States in the hopes of one day obtaining a green card. Because my mother is a U.S. citizen, we qualified for an immigrant visa in the "F3" visa preference category, for the married sons and daughters of U.S. citizens.

6. According to our paperwork, the "priority date" for our visa is July 12, 2012. In August 2013, my mother's I-130 petition was approved.

7. We waited in Guatemala for over ten years for our priority date to become current so we could file our green card applications, but in 2023, life became increasingly worse for us in Guatemala. Our neighborhood was considered a "red zone," meaning there were high levels of gang activity and crime in the area. My husband owned a bookstore in the area, and gangs would frequently try to force us to pay them money to be able to continue to operate the store. They would make threats against us to pay them, including saying that something bad would happen to us and our children. Sometimes when these gangs would make these threats, they would identify our children by their names, which was terrifying for us. This made life in Guatemala very stressful for us and made it very difficult for my husband to be able to run his bookstore and provide for our family because he could not open the bookstore regularly enough and would lose opportunities for income or to expand his clientele.

8. Additionally, while we were living in Guatemala and waiting for our priority date to become current, we were far away from my mother and sister, who were in the United States. During this time, we would not see each other too often, which also made life in Guatemala difficult with everything that was going in due to the gang activity in our neighborhood.

9. In August 2023, my mother received an invitation from the U.S. government for us to participate in the FRP process for Guatemalans because we had an approved I-130 petition. When we heard about this option, we were very relieved. It was not safe for us to continue living in Guatemala due to the gangs in our neighborhood and their constant threats of us, so we accepted this invitation and completed all the required steps for the FRP process.

10. In or around March 2024, my mother submitted the I-134A application, the FRP sponsorship form, which the government requires to be considered for the FRP process. An attorney did not submit the application for her. Later on, after the I-134A was approved, we received an email from U.S. Citizenship and Immigration Services ("USCIS") to continue the process. We completed all the necessary steps, including providing our names and biographical information, completing biometrics and other background checks, and completing medical exams for each member of our family. These medical exams for all five of us cost a lot of money, more than $2,000 collectively. We had to sell our car in Guatemala to be able to afford them all. We also sold the rest of our property in Guatemala, like our house and the bookstore, to afford the move to the United States. Coming to the United States felt permanent to us because we were on the path to

adjusting our status, so selling all our belongings and property was all worth it to be able to go to the United States.

11. In June 2024, we were approved to travel to the United States, and in August 2024, we arrived in the United States, went through additional screening, and were granted parole. We were granted a three-year period of parole through August 2027. Shortly after arriving in the United States, we applied for work authorization and were approved in September 2024. Our work authorization also expires in August 2027.

12. We have been on the path to obtaining a green card for more than thirteen years and being able to continue this process from within the United States, close to my mother and sister and in a safe place, means everything to me. Knowing we are eligible for green cards to become legal permanent residents and eventually U.S. citizens one day brings me peace because this will provide us with more stability and security and more opportunities to provide for our family financially. It also allows us to provide more opportunities for our children and their futures.

13. On December 12, 2025, I heard from Facebook about the announcement that the federal government was ending the FRP programs and would be ending grants of FRP parole for beneficiaries like us in a little over a month unless we had an adjustment of status application filed by December 15. I immediately went to search on USCIS's website for more information about this and confirmed it was true. I have not received any notification from the government, either online or by mail, telling me our parole would be ending in January 2026 unless we had an adjustment of status application pending by December 15. I keep my address current with the government and regularly check my USCIS account.

14. When I heard about the possibility of our parole being terminated, I instantly became worried and scared for my family. It was devastating to think that our lives could be upended very soon, especially for my children who are happy in school and thriving.

15. I quickly reached out to our immigration attorney to see what we could do. The priority date listed on the U.S. visa bulletin at the time of this declaration is July 22, 2012. We had already been in the process of collecting the necessary documents and information for our I-485 applications for adjustment of status, but this announcement sped everything up for us. I did not think we would be able to do it in such a short time, but our attorney worked over the weekend to get all our documents in order, and we met with them that weekend to review the paperwork. Our attorney submitted our I-485 applications on Monday, December 15, 2025, through the mail, but we recently received confirmation that it was not accepted in time by USCIS.

16. This situation has caused me a lot of anxiety and psychological distress. I am scared thinking about what we will do if our parole is terminated. If our parole status is revoked, I will no longer be eligible to work, and my husband will lose his job and no longer be able to provide for our family. We would be forced to pull our children out of school in the middle of the year, which would be a major disruption for them. And we have nothing left to go back to in Guatemala. The gang presence in the area where we used to live in Guatemala has not improved, so going back would mean returning to the same economic hardships and threats to our safety that we had escaped before. If we had to go back to Guatemala because our parole is revoked, we would also be separated from my family here in the United States—my mother and sister and their families—which would be devastating for them and me.

17. Maintaining my parole status is critical for my family's ability to remain safely in the United States, where we can work and provide for our family and where my children can learn and grow in school in a stable environment and close to their grandmother and aunt and other family members.

18. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

19. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone who is in my situation because we are all harmed by the sudden termination of our parole status.

20. I fear using my real name in this lawsuit and making it publicly known that I am participating in a lawsuit against the U.S. government, because I fear that I could be retaliated against by the government through deportation or a negative impact on my and my family's adjustment of status applications. I also fear that if my real name were used publicly in this lawsuit, other members of my family, like my three young children, could be identified and vulnerable to any retaliation by the government or by the public. Lastly, I fear that if my real name were used in this lawsuit, gangs in Guatemala could learn about this and my family's involvement, and if we had to return, we could be targeted by these same groups again and even robbed. If I cannot use a pseudonym in this lawsuit, I will likely decide not to participate, as I cannot risk my safety and that of my family.

Case 1:25-cv-10495-IT Document 214-3 Filed 12/29/25 Page 7 of 8

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Lynn, Massachusetts on 12/27/2025.

[redacted]

Francisca Doe

**CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION**

I, Cyndy Miguel, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that the declaration has been provided to Francisca Doe in Spanish and that she affirmed that it is true and correct.

Executed: 12/27/2025

/s/ Cyndy Miguel
Cyndy Miguel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SVITLANA DOE, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>*Defendants.* | Case No.: 1:25-cv-10495-IT |

**DECLARATION OF JOHN DOE**

I, John Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Santa Ana, El Salvador, in July 1993. I am a national of El Salvador.
2. I currently live in Houston, Texas, where I have been since March 2024, when I was granted parole into the United States through the Family Reunification Parole ("FRP") process for El Salvador.
3. I live with my father, his wife, and my younger brother in Houston. My father is a U.S. citizen. He has lived in the United States since 2003 and became a naturalized citizen in 2017. My younger brother is a lawful permanent resident who came to the United States in October 2021.
4. I work as a Remittance Coordinator at a company that provides insurance services in the dental field. I started this position in May 2024. I actually worked for the same company in El Salvador starting in 2019, doing similar work but in an independent contractor role. When my employer learned about my opportunity to come to the United States, they told me that they wanted me to keep working with them, but in a different role. Now I work as a full-time employee at a role that I cannot have in El Salvador. Since starting in my new

role here, I have been promoted, which means I can now work on more complicated cases and earn better pay.

5. In El Salvador, I graduated from high school and then attended University from 2013 to 2016, where I studied marketing for three years before I had to leave to work to support myself and to help provide financial support to my mother. Since arriving in the United States, I obtained my driver's license and have settled into my community. I am a social person, so it has been pretty easy for me to get to know people. In my free time, I love to stay active, and I go to the gym a lot. On the weekends, I spend time with my friends and family.

6. My father filed a family-based immigrant visa petition for me (Form I-130, Petition for Alien Relative) in August 2018. The petition was approved in October 2019, and my immigrant visa priority date is August 20, 2018. The approved I-130 petition enables me to apply for an F1 visa for unmarried children of U.S. citizens who are 21 years of age or older once my priority date becomes current. The priority date listed in the December 2025 visa bulletin for F1 family-based visas is November 8, 2016.

7. I have not yet filed a Form I-485, Application to Register Permanent Residence or Adjust Status, because my priority date is not yet current.

8. I decided to come to the United States through the FRP process ever since my father started the process for his own U.S. citizenship. I had heard about the FRP process for El Salvador, but when my father finally received the invitation to sponsor me for parole, I wasn't sure that it was real. It felt like a door to a better, safer future was finally opening after years of patient waiting.

9. My motivation for wanting to come to the U.S. is for both professional and personal stability. In El Salvador, the salary I received as an independent contractor is much lower than in the United States, even though prices and daily expenses are about the same. Additionally, as a gay man, one of the reasons that I came to the United States was to find safety and legal protection. There is more violence against LGBTQ+ people than here and fewer legal protections against discrimination. The years of waiting for the opportunity to emigrate were difficult, especially being separated from my father and brother who have been in the U.S.
10. Around July 2023, my father received an invitation from USCIS to start the FRP process. Shortly after, my father submitted a sponsorship request for me to be considered for the FRP process (Form I-134A). I received travel authorization in January 2024.
11. To prepare for my travel to the United States, I had to take several steps while in El Salvador. I had to gather various documents, such as paperwork to show that I have no criminal history. I paid for and underwent medical examinations required by the embassy, spending approximately $650. Since I had plans to move to the U.S. permanently, I sold my vehicle and other belongings and ended the lease on my rented apartment.
12. I arrived in the United States in March 2024, and I was granted parole through the FRP process for El Salvador on the same day I arrived. I flew directly into Houston, where eventually my passport was inspected by immigration officers and the officers interviewed me, asking about my father and my plans in the U.S. They ultimately exercised their discretion to grant me parole.

13. My parole is currently set to expire on March 2027. I applied for work authorization as soon as I arrived (in March 2024) and received my Employment Authorization Document (EAD) in April 2024. It is also set to expire in March 2027.

14. I seized upon the opportunity to seek parole based on my father's approved family-based petition for me because I felt it made sense to start building what I could in the United States early, while I waited for my priority date to become current to apply for my visa.

15. Since arriving in the United States, I have worked hard to build a stable and productive life. I've been fortunate to have a great work opportunity with my employer, and I love being around my friends and family. I have established myself financially: I have a car loan, credit cards, and bank accounts. I am particularly proud of my credit score—it is high, and I worked hard to achieve that. Through my employer, I established a 401(k)-retirement account, and I have good health insurance benefits.

16. I want to make sure I can adjust my status as soon as possible, so I check the visa bulletin once or twice every day to check if my priority date is current, and I am signed up for all USCIS notices because I don't want to miss anything.

17. I learned about the termination of the FRP parole processes on December 12, 2025, the day the government made the announcement. When I heard the news and found out that the government would terminate current grants of parole on January 14, 2026, if you did not have a pending adjustment of status application on file by December 15, I felt enormous stress and uncertainty. It has been extremely difficult to process the prospect of having to leave so abruptly. At first, I found myself breaking down crying multiple times a day. I feel like I have accomplished so much with my life here, and to know that this program would be terminated in just thirty days felt so overwhelming. I do not know how

to handle losing everything that I have been building here for this life that I am very proud of.

18. I have followed all of the rules and instructions from the U.S. government to be able to come to this country, and I have done everything legally. I had never even entered the United States before, not even as a tourist. I came here with the understanding that, because I did everything legally, I could build a future for myself. I counted on having a future here, and I worked hard to build a new life for myself here. I never imagined this could change suddenly, and I could lose it all, particularly not when the government itself invited me into the country for this period.

19. Since learning of this policy change, I haven't been able to do much to prepare, as it is unclear to me what I need to do. I still have not received any notice of this termination in the mail or in my MyUSCIS account. I want to prepare for the potential impact of this policy change, but the short timeframe makes it impossible to pay off my car loan or resolve other financial obligations before termination. I have spoken with an immigration lawyer to discuss my options; however, they were unable to provide guidance due to recent policy changes.

20. If the FRP processes and my parole are terminated on January 14, 2026, it will cause both me and my family significant harm. The parole process wasn't free; I had to pay for my medical examinations, paperwork, and travel costs. My flight alone cost approximately $500. I spent years not being able to see my father and brother here in the U.S., and to now face another separation from them, while losing everything I've worked so hard for here, would be devastating. My credit score would be wrecked. I would be returning to El Salvador and starting from scratch: having to look for a new place to live, a job, a car,

new possessions, everything. I am experiencing extreme fear, uncertainty, and anxiety about this change. The stress has been overwhelming.

21. I assume I would still eventually be able to apply for adjustment of status, but then I would have to start from zero once again when I'm able to return to the United States. This feels profoundly unfair and very daunting. If I had to move back to El Salvador, I would lose my job here, and I would not have my previous job waiting for me in El Salvador. They have filled my previous role there, and it's a third-party contractor role, not the full-time employee role that I have here. I would also lose the benefit of my promotion, which I worked very hard to obtain. All of the professional progress that I have made would be lost.

22. Maintaining my parole status is critical for my ability to remain in the United States with my family while continuing to work and build the stable life that I have established. The FRP process allowed me to reunite with my father and brother after years of separation and to pursue career opportunities while waiting for my visa to become current.

23. I am willing to serve as a class representative on behalf of those who are similarly situated to me. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the sudden termination of our parole status.

24. I am afraid to use my real name in this lawsuit. I am aware of news reports showing that this administration does not like immigrants, and of increasing immigration enforcement, including against parolees like me. I'm also aware of instances where the government has tried to revoke visas for people who hold views contrary to the administration. I want to

protect myself as much as possible against government retaliation. I don't want to risk having my adjustment of status application terminated or denied because I chose to stand up for my rights and the rights of others in my situation. I fear retaliation that could jeopardize my immigration case and my future in the United States. If I am not permitted to use a pseudonym in this lawsuit, I will likely decide not to participate, as I cannot put myself at risk of harm.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Houston, Texas on December 24, 2025

[redacted]

John Doe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, *et al.*,

*Plaintiffs,*

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

*Defendants.*

Case No.: 1:25-cv-10495-IT

**DECLARATION OF JOSE DOE**

I, Jose Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Santa Rosa de Copan, Honduras, in April 1988. I am a national of Honduras.
2. I currently live in Miami, Florida. I have lived in Miami for almost two years, since March 2024 when I arrived here through the Family Reunification Parole ("FRP") process for Hondurans with my wife and son.
3. I am currently living with my wife and two young children. Our eldest son is five years old, and we have a 10-month-old daughter. Our children are both United States citizens.
4. We have adapted well to our life here in the United States. I am currently a maintenance worker for several Italian restaurants located in Miami and other areas of Florida, where I do repairs, installations, and other maintenance work. But I have dreams of one day becoming a journalist. To start that process, this month I signed up to take an English class so I can improve my English. My wife is a teacher at an elementary school in the area and is beloved at her school as not only a teacher but a leader in her department. We are members of a local church, where I serve every week by helping community

members and with church services. My son is currently in school and is doing very well. He has the highest grades in his class right now, and he loves to go to school and learn and be with his friends.

5. We are also very close to members of my family here in Miami, like my father—who is a U.S. citizen—my brothers, and more extended family. While we were living in Honduras, we did not get to see or communicate with each other very often, so now that we all live in the same city it is so great. Now, we are always spending time with one another, and my children are forming bonds and new memories with my family.

6. In October 2012, my father submitted a family petition, the I-130, to sponsor me for permanent residency. I was not married and did not have children at the time. We qualify for an F3 immigrant visa because my father is a U.S. citizen. The priority date for the paperwork is October 3, 2012. My father's I-130 petition was approved in June 2013.

7. In 2018, I married my wife. She had recently secured a job here in the United States as an international teacher in an exchange program that partners with schools across the United States to bring more international teachers into classrooms. She applied for an exchange visitor visa and was granted that visa to come to the United States and teach at a school in North Carolina. We arrived in the United States with this visa in 2018 and remained in the United States for four years, until 2022, when the visa expired and we returned to Honduras. Our son was born in the United States during this time.

8. In August 2023, my father received an invitation from the U.S. government for me and my family to participate in the FRP process for Hondurans based on our approved I-130 petition. My wife and I leapt at the chance to be considered for this process, to be able to fulfill our dreams for our careers and a better life for our growing family. In Honduras,

we faced a worsening political and economic situation which made life very unstable for us; it is very difficult to secure employment there that allows us to support our family. In Honduras, I would work very long hours for very little pay, which would be insufficient to support our family given the high cost of living there. So, we felt we would have better, more stable, economic opportunities here in the United States.

9. My father submitted all the paperwork for the application, the Form I-134A, to sponsor us for the FRP process. An attorney did not submit the application for him. Once his application was approved, we were directed to continue the process by completing several more requirements, like confirming our biographical information, submitting passport photos, and completing medical exams. The medical exams were costly, at around $500 each for me and my wife.

10. In January 2024, we received travel authorization to come to the United States through the FRP process. We sold everything we had to be able to come to the United States on FRP, because we saw this as a permanent move since we were on a path to obtaining legal permanent residency in the United States.

11. In March 2024, we arrived in the United States. We underwent additional screening when we arrived at the airport, and that same day we were granted parole for a three-year period, until March 2027. Shortly after coming to the United States on parole, we applied for work authorization and received it in April 2024. Our work authorization expires in March 2027 as well.

12. We have not applied for any other immigration benefit apart from beginning the family-based process, which we began over thirteen years ago. Overall, it is a blessing to be able to be here in the United States, close to my family with stable work and housing, while

we wait for the priority date on my father's petition to become current so we can apply for our green cards. This will allow us to continue providing our children with a stable and peaceful life filled with many opportunities.

13. On December 12, 2025, I learned through social media about the announcement that the federal government was terminating the FRP programs and would be ending grants of FRP for people like me and my family on January 14, 2026, unless we had an adjustment of status application filed by December 15. This day changed our lives. We have been destroyed emotionally since hearing this news. My wife and I are worried sick about the possibility of our parole being terminated and having to return to Honduras with our two young children. My children would not be able to have a stable life in Honduras given the current state of the country, and we cannot sleep or eat these days knowing this might happen. Our family would be torn apart if we lost our parole and had to go back to Honduras, as we would be separated from our other family members who are here in Miami, like my father and brothers. My children would lose the ability to continue connecting with their grandfather and uncles and forming special memories and bonds with them.

14. We have not submitted our adjustment of status applications yet because our priority date is not current. According to the U.S. visa bulletin, people in our visa preference category can file for adjustment of status now if their priority date is on or before July 22, 2012. My priority date is just a few months after that date, on October 3, 2012. It feels like we are very close to being able to apply, but the U.S. visa bulletin's priority date for the F3 preference category has not moved from July 22, 2012 since the beginning of this year. I

check this information regularly for any movement closer to our priority date, but I have not seen any such movement yet.

15. If our parole status is revoked, my wife and I will no longer be able to work and provide for our family, and we will lose our jobs, putting our family's livelihood at risk. We have living expenses to pay for, like rent and a car, and we could not afford these necessities if we lost our ability to work. If we had to return to Honduras, we would be forced to break our apartment lease, and we would lose our deposit and the money we will put down for the month of January. We are also in the process of applying for a loan to buy a house, and we will have to abandon these plans if we must go back to Honduras.

16. My wife and I also would no longer be able to pursue our passions and careers here in the United States. If we lost our parole and had to go back to Honduras, we would be subjecting our children to a harder and less stable life in Honduras. We would have to take my son out of school here in the United States. This hurts me greatly. Every morning, my son prepares his backpack for school because he loves school so much and looks forward to it every day. He is doing so well in school and has made many new friends, so I cannot imagine having to tell him he can no longer go to school because we must leave the United States. His sixth birthday is coming up next month in January, and we were planning to celebrate his birthday by taking a road trip to Orlando. Now, if our parole ends, we will no longer be able to do this. I cannot imagine bringing back my infant daughter to Honduras either, as I had hoped she would be able to grow up here in the United States with many doors and opportunities open for her.

17. My father, brothers, and extended family have also been a major support for my family here, as they helped us get on our feet when we first came to the United States and have

always been a great source of comfort and love for us. We are all in a lot of emotional and psychological distress at the prospect of our family being torn apart and separated, again, after we have been reunited through this parole process.

18. We have nothing to go back to in Honduras. No car, no roof, no bed. We sold everything to come here to the United States, expecting and hoping that we would be able to adjust our status and become legal permanent residents. We established roots for ourselves here in the United States, and uprooting our lives again to go back to Honduras where we have nothing would be an extreme hardship. It is not fair that we followed every step to be considered for and granted parole under this program—after being invited by the U.S. government—only to now have everything taken away from us. And it is especially confusing because I have not received any message from the government, in my online USCIS account or through the mail, about this announcement. I have kept my address current with the government and regularly check my online USCIS account.

19. Keeping our parole status is critical for my family's ability to remain in the United States, where we can work and provide our children with stability and opportunities, and where we can remain close to our other family members.

20. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

21. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the sudden termination of our parole status.

22. I fear using my real name in this lawsuit. I fear that if I used my real name in this lawsuit, the government could target me and my family and retaliate against us by denying us the opportunity to adjust our status or targeting us for deportation. Also, I am the only person in my family participating in this lawsuit, and I fear that if my real name is disclosed, other members of my family, like my wife and young children, could be connected to me and this lawsuit and identified, exposing them to retaliation by the government. If I am not permitted to use a pseudonym in this lawsuit, I will likely decide not to continue participating. I cannot put my safety or my family's safety in jeopardy.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Miami, Florida on 12/26/2025.

[redacted]

Jose Doe

**CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION**

I, Liliana Ramirez, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that the declaration has been provided to Jose Doe in Spanish and that he affirmed that it is true and correct.

Executed: 12/26/2025

/s/ Liliana Ramirez
Liliana Ramirez

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, *et al.*,

*Plaintiffs,*

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,

*Defendants.*

Case No.: 1:25-cv-10495-IT

**DECLARATION OF LUCIANA DOE**

I, Luciana Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Bucaramanga, Colombia, in March 1996. I am a national of Colombia.
2. I currently live in Arlington, Texas, with my four-year-old daughter. We have lived here since we entered the United States in February 2024. Many of my immediate family members also live in Arlington, Texas, and have resided in the United States for over a decade. My mother and father are lawful permanent residents ("LPRs"), and my sister and brother are both U.S. citizens.
3. I entered the United States through the Family Reunification Parole ("FRP") parole process for Colombians. My mother sponsored me for Colombian FRP through a process that began almost ten years ago, in December 2017, when she filed a Form I-130—the first step to help me immigrate to the U.S. and apply for a green card. Because my parents are LPRs, I will eventually be eligible to apply for a family-based visa in the F2B category for unmarried sons and daughters aged twenty-one and over of lawful permanent residents. However, because only a limited number of that type of visa is available each year and the number of interested applicants far outstrips the number of

visas available annually, there is a very protracted backlog. The I-130 application my mother filed on my behalf was approved in December 2020, but that approval is just the start. I now must wait until my priority date is current to apply for an adjustment of status to that of lawful permanent resident. My priority date is December 1, 2017. The latest Department of State visa bulletin I checked states that they are currently processing applications with a December 1, 2016 priority date.

4. In Colombia, I lived alone with my daughter. I longed for a way to reunite with my family who has long lived in the United States, but I wanted to do so via an established legal pathway, even when my daughter and I faced significant danger in Colombia. While living in Colombia, I was a legal witness to a crime resulting in the shooting of a friend of mine. After the incident, the individuals who perpetrated the crime began targeting and threatening me, and I eventually had to take drastic measures to protect myself and my daughter. I sold the small store I operated, changed my phone number, cut my hair and changed my appearance, and moved to another city closer to the capital. I did not feel safe enough to return to my hometown until I received confirmation that one of the individuals involved in the crime was convicted and sentenced to a prison term.

5. Finally, an opportunity to reunite with my family presented itself in August 2023, when my sister received an invitation from the U.S. government for me to participate in the FRP process for Colombians, allowing me to be with my family in the United States while I continue to wait for a visa to become available. After receiving this invitation, my sister immediately filed a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, where she provided detailed information regarding her

income, assets, and her ability to financially provide for me in the United States if necessary.

6. In order to be considered for the FRP process, I was required to share biographical information with USCIS and to complete a comprehensive and expensive medical examination, which included getting blood work done, receiving chest x-rays to check for tuberculosis, and receiving vaccinations. I had to travel nine hours by car to my country's capital for the medical examination, as there were not facilities nearer to me that met the U.S. government's requirements. It was a very large expense—I paid around $1600 USD—but I felt that it was a critical investment in my and my daughter's futures.

7. In December 2023, USCIS granted me travel authorization to present myself at a port of entry to the United States and undergo additional screening and vetting by Customs and Border Protection ("CBP") to be considered for a grant of parole. However, since my daughter did not receive her travel authorization until February 2024, we waited until then to travel together. My daughter was two years old when we entered the United States.

8. Trusting in the United States government's invitation to begin a new life here, I left everything behind in Colombia. I understood that the purpose of family reunification parole was to enable the beneficiaries of approved I-130 applications to reunite with their sponsoring family members here in the U.S. while they wait for their priority date to become current. So, when I applied and was approved for FRP, I believed I was making a permanent move to the U.S.; I believed in good faith I would never return to Colombia. I sold my car, my apartment, and all of my possessions. I also left my university studies with less than two years remaining, giving up on a degree in veterinary technology that I

was pursuing. Although veterinary technology is my career passion and it was a large sacrifice, I wanted a better life for my daughter—I wanted her to grow up around her grandparents, aunts and uncles, and cousins, somewhere she could accomplish her own dreams. I likewise yearned for the familial connection long missing in my life.

9. When we arrived in the United States, I felt peace—after over a decade of living alone with my daughter in Colombia, I wasn't going to be by myself anymore. Eager to begin establishing our new life, I soon began work after receiving my work authorization. Good work is much easier to find here than in Colombia, and I was offered an opportunity to work at a dog boarding and daycare center. I was very happy to find this job, as it was related to what I had been studying in Colombia. Although I enjoyed the work, I left after about one year because the hours were too long and required me to spend too much time away from my daughter. Since then, I have worked in a car rental business at the airport.

10. In the time my daughter and I have been in the United States, we have made a life for ourselves here, and we are doing well financially. I rent an apartment for me and my daughter, I received my U.S. driver's license and bought a car, and I have purchased all new possessions. I worked hard to provide these things for my family since we came to the United States with very few physical belongings. My daughter attends school here and has adapted to life in the United States—she has become proficient in English, and she considers the U.S. her home. And my family and I are finally together again: every Friday night my brother makes dinner for our entire family—all eighteen of us—and we enjoy one another's company. My sister and I are particularly close, and our children are the same age and very close friends. I have other friends from Colombia here in the U.S.

as well, and I have been able to visit and spend time with them. My time in this country has been beautiful, and I have accomplished a lot.

11. I was at work on December 12, 2025, when a friend messaged me explaining that the government announced it was terminating FRP and revoking current grants of parole. Although I was aware of the previous termination of CHNV parole, it still came as a shock. I became very depressed and experienced severe anxiety in the subsequent days. I usually try to consume good news as much as possible, but I could not avoid this new terrible reality. I have tried to remain positive and think pragmatically about my and my daughter's options, but it is hard because I have nowhere else to go—I gave up everything in Colombia. Returning would mean starting completely from scratch. I would not have a job to go back to, and I wouldn't be able to finish my degree, since enough time has passed that I would no longer be eligible to restart at the university where I left off; I would have to start over with my education. I have no immediate family in Colombia; they are all here, and leaving would mean once again severing the ties that I waited so long to reunite. I have been forced to have difficult and emotional conversations with my young daughter, who has no memory of Colombia and for whom life consists entirely of the world we have constructed here in Texas. When I bring up the possibility of us having to leave our home here, she cries and tells me that she doesn't want to go—that if we have to go "on vacation," she will refuse to come with me and will stay with her cousin, my sister's child, here in Texas. Seeing her reaction crushes me.

12. The government's recent action feels supremely unfair. I waited years to reunite with my family because I wanted to do things the proper way—through a legal immigration avenue—even when my daughter and I faced serious danger in Colombia. I followed

every step and complied with every requirement the U.S. government asked of me, and yet it now threatens to upend my life and force me to make life-altering decisions—on a very short timeline—for myself, my daughter, and my other family members. This is unjust.

13. Since hearing the news of the FRP termination, I have been seeking legal assistance to determine whether there are any legal options for me to remain in the United States until my priority date for my family-based visa becomes current. However, I am not yet able to submit an adjustment of status application because my priority date is not current.

14. I am filled with fear, but I hold on to hope that somehow we may be protected. Maintaining my parole status and continuing with my family-based visa application is critical for me, my family, and the community we are a part of. I am participating in this lawsuit so that I, along with other individuals who are in the same position, may have a chance at remaining in this country where we have built lives at the invitation of the U.S. government.

15. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

16. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the abrupt termination of FRP parole.

17. I fear having my real name become public in this lawsuit. I fear that if the U.S. government knows that I am participating, it will retaliate against me and my family by targeting us for immigration enforcement, notwithstanding our status, or by denying my

forthcoming family-based visa application. Given the contentious nature of public debates on immigration, I also fear harassment or danger from members of the public, especially in ways that could implicate my young daughter. I also fear that if I use my real name, the individuals who targeted me as a witness to their crime could find me and target me once again, especially if I end up having to return to Colombia. Shortly before I left for the U.S., the individual who shot my friend was released from prison, and I saw and only narrowly avoided him in my hometown after his release.

18. If I am not permitted to use a pseudonym in this lawsuit, I will likely decide not to participate. I cannot risk my and my family's safety, nor our long-term ability to reside in the United States.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Arlington, Texas, on December 28, 2025.

[redacted]

[redacted]

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Liliana Ramirez, certify that I am fluent in Spanish and English, that I am competent to interpret between these languages, and that I translated the foregoing between English and Spanish accurately. I further certify that the declaration has been provided to Luciana Doe in Spanish and that she affirmed that it is true and correct.

Executed: March 27, 2023__

/s/ Liliana Ramirez__

Liliana Ramirez

# EXHIBIT 12

to Plaintiffs' Motion for a Preliminary Injunction
and a Stay Under 5 U.S.C. § 705

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>Plaintiffs,<br><br>*– versus –*<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,<br><br>Defendants. | **Civil Action No.: 1:25-cv-10495-IT** |

## DECLARATION OF VALENTIN ROSALES TABARES

I, Valentin Rosales Tabares, upon my personal knowledge, hereby declare as follows:

1. I was born in Granma, Cuba in 1967. I am a national of Cuba.
2. I currently live in Portland, Oregon. I have lived in Portland since I fled Cuba and arrived in the United States in 2016. I became a legal permanent resident the next year, around April 2017.
3. In 2017 I submitted family-based immigrant visa petitions (Form I-130) to United States Citizenship and Immigration Services ("USCIS") on behalf of my wife, my son, and my daughter. At the time, my son was not yet 18 years old, so he was included in the petition that I filed for my wife. My daughter was over 18 years old, so the petition I filed on her behalf was different. All of the petitions were approved in May 2018.
4. Due to the COVID-19 pandemic, U.S. Consular visa processing was delayed, and my wife and son were not issued immigrant visas until 2022. My son was over 18 years old by the time, but due to the delay caused by COVID-19, USCIS allowed him to process with my wife based on his age when the original application was filed.

5. Since my daughter was over 18 years old, her immigrant visa processing time was longer. She was not in a priority category due to her age and there are very few visas available each year for people in this category. I cannot remember the original priority date that I was given for her immigrant visa.

6. I was very happy when my wife and son joined me in Portland in 2022, but it was also very difficult for our family to be separated. My daughter and her six-year-old daughter, my granddaughter, remained in Cuba awaiting news about their immigrant visas. My son also left his wife and young son behind in Cuba. We miss being with our family members and we are also incredibly worried about their safety and security due to the many problems in Cuba.

7. Cuba has experienced sociopolitical and economic hardship for many years. Each day the situation gets worse. Many people cannot find enough food to feed their families, and if they do have food, there is often no gas or electricity for cooking. There are often long periods, ranging from eight hours to several days, where there is no electricity at all. There is almost no public transportation, which makes travel almost impossible. For the few buses that do run, there is often a shortage of gasoline. This capacity shortage means that buses are often crammed full of people, with some people even riding on top, carrying upwards of 100 passengers.

8. Cuba has also seen an increase in violence and political repression as the situation on the island has deteriorated. Many people are afraid to answer their telephones in public because there have been incidents of people being robbed of their phones at knife point. Looters enter people's homes all the time and just take what they want. The police do

nothing. If anyone dares to speak out about the situation, it is assumed that they are protesting against the government, and they will be arrested and disappeared.

9. I fear for my family's safety every day. For this reason, when we learned about the parole program for Cubans, Haitians, Nicaraguans and Venezuelans, in February 2023 I decided to apply for humanitarian parole for my son's family - my daughter-in-law and my grandson. These humanitarian parole applications remain pending.

10. Around the beginning of November 2024 my immigration attorney contacted me and let me know that I had received an invitation to file a petition for my daughter for advance travel authorization and Family Reunification parole. I understood that this Family Reunification Parole would allow my daughter to come to the United States before her immigrant visa priority date and be reunited with us while she waited for her visa to become available.

11. My wife and I were very excited at the possibility of having our daughter and our granddaughter here in Portland with us. We submitted the request for Family Reunification Parole on December 18, 2024, and a few days later received a notification that our daughter had been approved. We were overjoyed.

12. After my daughter was approved in December 2024, she received instructions for steps she needed to complete in order to be given a travel date. My daughter scheduled her medical exam for the first available date, which was January 17, 2025. The medical exam was very expensive, and it is only valid for six months. It cost around 33,000 Cuban pesos which is equivalent to around $300 U.S. dollars. I paid for my daughter's medical exam because she could not afford to pay for it.

13. During this time, my wife and I made many arrangements for the arrival of our daughter and granddaughter. We prepared a room in our home where they would be comfortable. We purchased winter gear, clothes and coats for them since they would be arriving during the winter months in Portland. We also bought many things for our six-year-old granddaughter to make her feel welcome in her new home with us.

14. My family and I waited eagerly for news about our daughter's parole travel date, but it never came. I knew that the new president might make changes to the Family Reunification Parole process, but I didn't expect the changes to happen as soon as he took office.

15. In late January 2025, I called the USCIS office many times to ask for updates on my daughter's travel date. When I called USCIS on January 25, 2025, the USCIS official that I spoke to told me that the parole process had been stopped.

16. I felt so bad when I heard this news. My wife and I thought that our daughter would be here with us soon and that we were just waiting on the travel date. We became very nervous and afraid because our daughter's situation was now in limbo and we didn't know what to do or how to help get her to safety. USCIS could not give us any additional information about what would happen next with our daughter's travel date, and they directed us to contact the Department of State's National Visa Center. We could only contact the National Visa Center by email, and since we don't speak English, we had to pay someone else to assist us with these communications. Our emails to the National Visa Center have gone unanswered.

17. My wife and I are very upset and frustrated because we don't know what to do or what the next steps in the process will be. Aside from missing our daughter and our

granddaughter terribly and wanting them to be reunited with us, we are also very worried about their safety. The home where our daughter and granddaughter live has bars on the windows for safety, and they are afraid to leave their home. In order to minimize risks of violence, my wife purchases food remotely from a Cuban grocery store near our daughter's home and has the groceries delivered to her. A few weeks ago, our daughter asked us to help her purchase security cameras for her home because incidents of theft are on the rise. We also just learned that my wife's mother had her gas tank and valve stolen, and my brother-in-law had one of his horses stolen. No one can live like this; everything is a problem.

18. My wife and I know people in Cuba who were in the same process of waiting for an immigrant visa. They could not handle living like this anymore and risked their lives to flee to the U.S. border with Mexico with young children in tow. There are so many people with stories like ours.

19. We are sick with stress and anxiety. My wife is very nervous that the Family Reunification Parole process has ended, and that we've lost our chance to have our daughter close to us. We don't sleep. We are awake all-night thinking about all of the terrible possibilities of what could happen to our daughter and granddaughter.

20. If the Family Reunification Parole process is paused indefinitely it could be months or years before our daughter and granddaughter are able to safely leave Cuba. There are also many economic implications. We provide financial assistance to our daughter and granddaughter because we love them very much, but it is also a sacrifice for us, and if they cannot come to the United States, we will have to continue to provide food and financial assistance. Providing for them would be so much easier if they were here in the

United States with us. Since our daughter's Family Reunification Parole medical exam will expire in July 2025, we will also lose the money that I spent on that step of the process.

21. I am participating in this lawsuit so that I, along with other individuals who are in the same position, can have our beneficiaries take full advantage of their parole and travel authorization, as they should be allowed to do.

22. I am willing to serve as a class representative on behalf of those who are similarly situated to me.

23. I know that if the class is certified, I will be representing more than just myself in this case. I have spoken with the lawyers who represent me about what being a class representative means. I want to help everyone in my situation because we are all harmed by the revocation of parole.

24. I am scared for my daughter and granddaughter to remain in Cuba. It is critical that my daughter and granddaughter be allowed to come to the United States on Family Reunification Parole so that they can securely wait out the time remaining until their immigrant visas become available.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Portland, Oregon on March 14, 2025

______________________________

Valentin Rosales Tabares

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Emily Martin, certify that I am fluent in English and Spanish, that I am competent to interpret between these languages, and that I transcribed the foregoing between English and Spanish accurately. I further certify that I provided a translation of the foregoing to Valentin Rosales Tabares in Spanish and that he affirmed that it is true and correct.

Executed: 3/17/2025

Emily Martin

**From:** ECFnotice@mad.uscourts.gov
**To:** CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:25-cv-10495-IT Doe et al v. Noem et al Order
**Date:** Friday, January 9, 2026 4:45:05 PM

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Massachusetts**

## Notice of Electronic Filing

The following transaction was entered on 1/9/2026 at 4:44 PM EST and filed on 1/9/2026
**Case Name:** Doe et al v. Noem et al
**Case Number:** 1:25-cv-10495-IT
**Filer:**
**Document Number:** 238(No document attached)

**Docket Text:**
**Judge Indira Talwani: ELECTRONIC ORDER: Pending before the court is Plaintiffs' Motion for Leave to File a Third Amended Complaint [Doc. No. [212]]. The motion is granted in part and remains under advisement in part as follows.**

**Plaintiffs are GRANTED leave to file a supplemental complaint pursuant to Fed. R. Civ. P. 15(d) to challenge actions taken by Defendants in December 2025 impacting individuals who have received humanitarian parole through humanitarian parole processes (the "December 2025 actions"). Specifically, Plaintiffs are granted leave to include in their supplemental complaint: the proposed additional named Plaintiffs who claim to be affected by the issuance of the Family Reunification Program Federal Register Notice ("FRP FRN") [Doc. No. [225]]; any allegations relevant to either or both of the December 2025 actions; and Plaintiffs' proposed eighth claim for relief as it applies to the December 2025 actions only.**

**The supplemental complaint shall be drafted as a supplement to, and not a replacement for, the Second Amended Class Action Complaint for Declaratory and Injunctive Relief [Doc. No. [68]]. Rather than amending allegations and renumbering paragraphs, Plaintiffs shall add new allegations in separate paragraphs, identified by the paragraph number immediately preceding the new material and letters of the alphabet. So, for example, should Plaintiffs seek to add two allegations regarding the December 2025 actions immediately after**

**Paragraph 1, that those paragraphs would be numbered paragraphs 1A and 1B.**

**Plaintiffs' request for an amendment to include as part of its proposed eighth claim for relief alleging a failure to comply with APA notice-and-comment requirements the termination of grants of parole to class members under the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") parole programs and all prior actions suspending benefits adjudication, as alleged in the Second Amended Class Action Complaint [Doc. No. [68]] remains pending and will be addressed together with or following Defendants' pending Motion to Dismiss [Doc. No. [113]].**

**Defendants' answer or other responsive pleading shall be directed to the new allegations.**

**Memorandum to follow.**

**(SEC)**

**1:25-cv-10495-IT Notice has been electronically mailed to:**

Rayford A. Farquhar rayford.farquhar@usdoj.gov, caseview.ecf@usdoj.gov, olivia.padden@usdoj.gov, usama.ecf@usdoj.gov

John A. Freedman John.Freedman@aporter.com, MAODMA@arnoldporter.com, ecf-37bd4ad14f33@ecf.pacerpro.com, edocketscalendaring@arnoldporter.com, maodocketing@arnoldporter.com

Rohan J. Samaraweera Samaraweera-Law@comcast.net

Katherine J. Shinners katherine.j.shinners@usdoj.gov

Anagha Sundararajan anagha.sundararajan@ag.ny.gov, nyoag.nycpdf@ag.ny.gov

H. Tiffany Jang Tiffany.Jang@arnoldporter.com, edocketscalendaring@arnoldporter.com, maodma@arnoldporter.com, tiffany-jang-8157@ecf.pacerpro.com

Laura Flores-Perilla laura.flores-perilla@justiceactioncenter.org, 8447189420@filings.docketbird.com

Karen C. Tumlin karen.tumlin@justiceactioncenter.org

Brandon Galli-Graves brandon.galli-graves@justiceactioncenter.org

Esther Sung esther.sung@justiceactioncenter.org, 6563629420@filings.docketbird.com

Daniel B Asimow Daniel.Asimow@arnoldporter.com, ecf3eb494aea9d7@ecf.pacerpro.com, edocketscalendaring@arnoldporter.com, maodma@arnoldporter.com

Hillary Li hillary.li@justiceactioncenter.org

Justin Cox justin@jcoxconsulting.org

Elissa Fudim elissa.p.fudim@usdoj.gov

Anwen Hughes HughesA@humanrightsfirst.org

Stephen J. Yanni stephen.yanni@ag.ny.gov

Inyoung Hwang HwangS@humanrightsfirst.org

Gabriel Canaan gcanaan@irli.org

Javier Ortega joalvarez1361@gmail.com, MAOPacerPros@arnoldporter.com, edocketscalendaring@arnoldporter.com, maodma@arnoldporter.com, maodocketing@arnoldporter.com

Kathleen Weng katie.weng@arnoldporter.com, MAOPacerPros@arnoldporter.com, edocketscalendaring@arnoldporter.com, maodma@arnoldporter.com, maodocketing@arnoldporter.com

Katie Rose Talley katie.rose.talley@usdoj.gov

**1:25-cv-10495-IT Notice will not be electronically mailed to:**

Laura Scott Shores
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave NW
Washington, DC 20001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SVITLANA DOE, *et al.*,<br><br>Plaintiffs,<br><br>– *versus* –<br><br>KRISTI NOEM, *et al.*,<br><br>Defendants. | **Civil Action No: 1:25-cv-10495-IT** |

**SUPPLEMENTED SECOND AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Ukrainians seeking safety from the Russian invasion of their country; Cubans, Haitians, Nicaraguans, and Venezuelans fleeing political instability, persecution, and environmental disasters; Afghans who assisted the United States government during its war in Afghanistan; the family members of certain U.S. citizens and residents who have been deemed eligible for a visa but are simply waiting in their home countries, often for years, for one to become available for them; the undocumented family members of active and retired U.S. military servicemembers; and parents seeking to reunify with children from certain Central American countries after years of family separation are just a few of the populations that the United States has sought to aid in recent years by granting eligible individuals parole, on a case-by-case basis, so that they may enter or remain in the country for a temporary period of time and find safety and stability here.

2. The Trump administration, however, has sought not only to terminate those legal humanitarian pathways to the United States, but to block access to any other longer-term, more stable legal status for individuals granted humanitarian parole, so that these people have no options to remain here in safety, to continue contributing to their communities, and to remain with family members here in the United States.

3. This lawsuit challenges the steps the Trump administration has taken to radically limit what had up to this point been a broad power granted by Congress to allow the executive to respond to migration challenges, address global humanitarian crises, and further important foreign policy objectives in a flexible and adaptive way. It also challenges the Trump administration's dismantling of legally established and congressionally authorized pathways to the United States, including:

- Uniting for Ukraine ("U4U"), for Ukrainians displaced by the war with Russia;
- the processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), countries that have been ravaged by natural disasters and/or political strife;
- Operation Allies Welcome ("OAW"), for Afghans fleeing the newly resurgent Taliban;
- Family Reunification Parole ("FRP"), for nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras with approved family-based immigrant visa petitions;
- Military Parole in Place ("Military PIP"), so that U.S. military servicemembers may seek parole for their parents, children, and spouses, and need not worry about the immigration status of these close family members while serving their country; and
- The Central American Minors ("CAM") parole process, which reunites parents who are already in the United States with their children who remain behind.

4. In addition, this lawsuit challenges the Trump administration's attempts to block individuals paroled through these and other processes from seeking alternate legal statuses created and authorized by Congress.

5. On January 20, 2025—Inauguration Day—President Trump issued Executive Order 14165, entitled "Securing Our Borders," which directed the Secretary of Homeland Security to terminate all "categorical parole programs," explicitly referencing the CHNV parole processes.

6. Also on that day, Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" (the "January 20 Huffman memorandum") to the heads of Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), in which he authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute." Acting Secretary Huffman directed all DHS staff to implement the new agency policy under which this historically common use of the parole authority is unlawful.

7. On the basis of Acting Secretary Huffman's conclusion that parole programs are unlawful, DHS has stopped considering parole applications through these processes, as well as requests on behalf of people already here for re-parole or for parole-in-place through the Military Parole-in-Place process. In addition, on March 21, 2025, DHS made public a Federal Register Notice entitled "Termination of Parole Processes: Cubans, Haitians, Nicaraguans, and Venezuelans," which was eventually published in the Federal Register on March 25, 2025 (the "March 25 FRN"), and "terminat[es] the categorical programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." The March 25 FRN further states that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary."

8. Also based on Acting Secretary Huffman's erroneous legal conclusion, USCIS has also unlawfully suspended the adjudication of all requests for immigration benefits (including applications for work authorization as well as asylum, Temporary Protected Status ("TPS"), or other status adjustments) for individuals paroled through "categorical" humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

9. Weeks after this unlawful suspension was imposed, Acting Deputy Director of USCIS Andrew Davidson sought to justify it in a post-hoc February 14, 2025 memorandum (the "February 14 Davidson memorandum"), That memorandum justified the suspension as to the U4U, CHNV, and FRP processes based solely on the "potential" that the "vetting" that the beneficiaries of these parole processes underwent in connection with their parole applications was not identical to what was in effect on January 19, 2021—the last day of President Trump's first term. This so-called administrative pause may also apply, at a minimum, to the OAW and MPIP processes. There is no authority for this suspension, and it is contrary to the laws Congress enacted governing those immigration benefit applications, in addition to being arbitrary and capricious.

10. At the same time that it has terminated these humanitarian parole processes for their alleged illegality and suspended the ability of parolees to obtain forms of immigration relief to which Congress has made them entitled, DHS has also taken aggressive action—challenged separately—to make it easier to deport individuals paroled through these processes as quickly as possible.

11. Such actions are not only illegal, but shockingly callous. Plaintiff Svitlana Doe[1] fled Ukraine following the Russian invasion and bombing of her town. Her son still requires speech

[1] The Court has granted leave for Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Omar Doe, Andrea Doe, Marim Doe, Aleksandra Doe,

therapy to overcome the horrors of war her family witnessed. Plaintiffs Maksym and Maria Doe likewise fled Ukraine, where Maksym heroically helped to rescue over 22,000 Ukrainians and provided humanitarian assistance to over half a million more. Plaintiffs Alejandro, Armando, Ana, and Carlos fled Nicaragua following the torture of a family member at the hands of the state and subsequent political persecution. Plaintiff Andrea Doe's husband, a political prisoner in Nicaragua, was brought to the United States *by* the United States government, which then asked him and others similarly situated to use the CHNV parole program to achieve reunification with the family members they had been forced to leave behind. Plaintiff Omar Doe—at great risk to himself and to his family—faithfully served alongside the U.S. military in Afghanistan for over eighteen years before being evacuated by the military following the country's fall to the Taliban. Plaintiff Valentin Rosales Tabares was on the cusp of reuniting with his daughter and granddaughter, who were approved for Cuban Family Reunification Parole but had not yet been given a travel date, when the Trump administration terminated the FRP process. Plaintiff Adolfo Gonzalez, Jr. has served this country honorably as a First Sergeant in the Army, and Marim Doe continues to serve his country in the Navy, but their MPIP applications for their loved ones are now indefinitely suspended. Plaintiff Teresa Doe's CAM parole has expired and she is now subject to removal because her application for re-parole is indefinitely suspended, and she fears being deported and removed from all her family. And Plaintiff Rosa Doe was about to reunite with her fourteen-year-old daughter and her father through the CAM parole process, but now does not know when she will see them again.

Teresa Doe, and Rosa Doe to proceed pseudonymously, and a motion for four other individual plaintiffs to similarly proceed will be filed imminently.

12. The individuals able to obtain parole through U4U, CHNV, OAW, FRP, and CAM trusted that the U.S. government would help protect them from harm. They waited—even amid active war and persecution—to enter the United States until they had a legal avenue to enter the country. And now CHNV parole beneficiaries have had their grants of parole and work authorization prematurely cut short. All humanitarian parole beneficiaries have been cut off from the immigration relief Congress made available to them. Defendants are treating similarly our Afghan allies who arrived through OAW and individuals closely related to members of our Armed Forces.

a. FRP parole beneficiaries also face premature termination of their grants of parole and work authorization as a result of Defendants' latest actions.

13. Individual Plaintiffs, including Putative Class Representatives on behalf of themselves and similarly situated persons, and Organizational Plaintiff Haitian Bridge Alliance ("HBA"), seek a declaration that humanitarian parole processes like U4U, CHNV, OAW, FRP, MPIP, and CAM are lawful; a preliminary and permanent injunction prohibiting DHS from continuing to apply its unlawful construction of the parole statute; a preliminary and permanent injunction prohibiting DHS from unlawfully and categorically revoking or otherwise placing conditions on grants of parole and work authorization to parole beneficiaries; and vacatur of agency actions taken pursuant to the agency's erroneous understanding of the law.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

15. Venue is proper in this District because Plaintiffs Svitlana Doe and Wilhen Pierre Victor reside in this District. *See* 28 U.S.C. § 1391(e)(1).

a. Plaintiff Francisca Doe also resides in this District.

## PARTIES

16. Plaintiff **Svitlana Doe** is a citizen of Ukraine. Svitlana fled Ukraine in November 2024 following Russia's unprovoked and unjustified invasion into the country. Svitlana is the mother to a young boy with celiac disease, for whom care was difficult in Ukraine even before the war, and close to impossible during wartime. Svitlana, her husband, and her young son narrowly escaped Ukraine in November 2024, and traveled to the United States pursuant to the U4U parole process. Svitlana currently lives in Dover, Massachusetts. She has a pending application for TPS filed in February 2025, which has been indefinitely stalled due to the administration's pause on processing immigration benefits applications for U4U parolees.

17. Plaintiff **Maksym Doe** is a Ukrainian national living in Brooklyn, New York, with his wife, Maria Doe. After fleeing Kharkiv on the day Russia invaded Ukraine, he and several partners founded a nonprofit organization in Ukraine that began coordinating volunteer efforts to evacuate people from the war-stricken eastern part of the country. They rescued over 22,000 people within the first six months of the war and since then have provided humanitarian assistance to over a half million Ukrainians. Maksym came to the United States through the U4U parole process in April 2023. He and his wife have applied for Temporary Protected Status ("TPS"), and he has also applied for re-parole in September 2024 because his current grant of U4U parole expires in April 2025. Processing these applications has been paused indefinitely due to the February 14 Davidson memo. If that pause remains in effect, Maksym's parole will expire, he will lose his work authorization and his ability to continue his humanitarian work for Ukrainians, and he will be displaced once again.

18. Plaintiff **Maria Doe** is a Ukrainian national who currently lives with her husband Maksym in Brooklyn, New York. She and Maksym Doe came to the United States through the U4U parole process with all their possessions packed into two suitcases. Maria was able to apply

for U4U re-parole and was granted another two years of parole in January 2025, but she has also applied for Temporary Protected Status and is working with her employer to file an H-1B employment-based visa application soon. Not only will these applications not be processed due to the administration's indefinite hold on processing applications for immigration benefits for parole beneficiaries, but if her parole expires or the administration prematurely terminates it, she will once again be displaced.

19. Plaintiff **Alejandro Doe** is a citizen of Nicaragua. Alejandro is the brother of Ana Doe and Miguel Doe and currently lives in Gainesville, Georgia. Alejandro fled Nicaragua following the abduction and torture of his father by the Nicaraguan state. In July 2024, Alejandro entered the United States through the parole process for Nicaraguans, a component of the CHNV parole processes. He was sponsored by his cousin, Gabriela Doe. Due to the March 25 FRN, Alejandro's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum, which has been indefinitely stalled due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

20. Plaintiff **Armando Doe** is a citizen of Nicaragua. Armando is married to Ana Doe and currently lives in Gainesville, Georgia. Armando fled Nicaragua due to increasing political repression and danger stemming from the disappearance of Ana's father by the Nicaraguan government and Armando's work at a digital media company dedicated to democratizing information and documenting government abuses. Armando entered the United States in February 2024, through the CHNV parole process for Nicaraguans. He was sponsored by his wife's cousin, Gabriela Doe. Due to the March 25 FRN, Armando's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending application for asylum,

which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

21. Plaintiff **Ana Doe** is a citizen of Nicaragua. Ana is married to Armando Doe and currently lives in Gainesville, Georgia. She is the sister of Alejandro Doe and Miguel Doe and cousin of Carlos Doe. Ana fled Nicaragua due to the increasing instability, political repression, and danger culminating in her father's capture and torture by the Nicaraguan government, as well as the danger her husband Armando faced working for a digital media company targeted by the Nicaraguan government for the information it published. Ana entered the United States and was granted parole through the CHNV parole process for Nicaraguans in February 2024. She was sponsored by her U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Ana's period of parole, and the associated work authorization, have been prematurely terminated. She also has a pending asylum application, as a derivative under her husband's pending asylum application, which is indefinitely on hold due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

22. Plaintiff **Carlos Doe** is a citizen of Nicaragua. He is the cousin of Ana Doe and Alejandro Doe, and he currently lives in Gainesville, Georgia. Carlos fled Nicaragua because of the political instability and the fact that the Nicaraguan government was actively persecuting him due to his involvement in protests against the government and was issuing death threats against him and his family. As a result, Carlos went into hiding, where he received more death threats, rendering it unsafe for him to remain in Nicaragua. Carlos entered the United States and was granted parole through the CHNV parole process for Nicaraguans in May 2023. He was sponsored by a U.S. citizen family member. Due to the March 25 FRN, Carlos's period of parole, and the associated work authorization, have been prematurely terminated. He also has a pending

application for asylum, which has been indefinitely held up due to the Trump administration's pause on processing immigration benefits applications for CHNV parolees.

23. Plaintiff **Miguel Doe** is a citizen of Nicaragua. He is the younger brother of Alejandro Doe and Ana Doe, and he currently lives in Gainesville, Georgia. Miguel came to the United States to find work so that he could better support himself and his family, including his mother, who he lived with and helped take care of back in Nicaragua. In his home country, it was difficult for Miguel to find stable work that paid decent wages. Miguel entered the United States and was granted parole through the CHNV parole process for Nicaraguans in July 2024. He was sponsored by his U.S. citizen cousin, Gabriela Doe. Due to the March 25 FRN, Miguel's period of parole, and the associated work authorization, have been prematurely terminated, and he will be vulnerable to imminent deportation in less than a month. The February 14 Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

24. Plaintiff **Andrea Doe** is a citizen of Nicaragua. She arrived in the United States in the summer of 2023 with her two young sons to reunite with her husband, Rafael Doe, a former political prisoner from Nicaragua who had been evacuated to the United States by the U.S. government in February of that year. Andrea Doe and the couple's two young sons joined Rafael in the United States through CHNV parole because the U.S. State Department was asking the evacuated Nicaraguans to use the CHNV parole program to seek reunification with the family members they had been forced to leave behind in Nicaragua. The whole family then applied for asylum together. Their application for asylum has been pending with the Asylum Office since December 2023. If that application is not processed, Andrea Doe and the children will be left without protection against removal to Nicaragua. Andrea would be at risk of detention and of

losing her children, and the family would face permanent separation, because the Nicaraguan government, upon expelling Rafael and the other passengers on the evacuation flight, stripped them of their Nicaraguan citizenship. Additionally, due to the March 25 FRN, Andrea's period of parole, and the associated work authorization, have been prematurely ended, putting her in an even more vulnerable position.

25. Plaintiff **Lucia Doe** is a citizen of Venezuela. She lives in St. Augustine, Florida, and she is the sister of Plaintiff Norma Lorena Dus ("Lorena"), who sponsored her to come to the United States on CHNV parole. Lucia left Venezuela because she and her family were experiencing extreme financial hardship there. Lucia's salary in Venezuela was not sufficient to provide for even basic needs like food, rent, and clothing. She entered the United States and was granted parole through the CHNV parole process for Venezuelans in July 2024. Due to the March 25 FRN, Lucia's period of parole, and the associated work authorization, have been prematurely terminated, and she will be vulnerable to imminent deportation in less than a month.

26. Plaintiff **Daniel Doe** is a citizen from Haiti currently living in Orlando, Florida. Daniel left Haiti because of the continuing danger and gang-led violence in Haiti, particularly in the neighborhoods where he lived. His wife and three-year-old daughter remain in Haiti, with pending CHNV sponsorship applications that will now never be processed. He entered the United States in February 2024 through the CHNV parole process for Haitians. Due to the March 25 FRN, Daniel's period of parole and work authorization have been prematurely terminated, and he will be at risk of being vulnerable to imminent deportation in less than a month. The February 14 Davidson memo additionally deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible.

27. Plaintiff **Omar Doe** is an Afghan national living in Omaha, Nebraska. He worked for over eighteen years in different capacities with the U.S. military in Afghanistan, including as an interpreter. He and his wife and five children were evacuated to the United States as part of the U.S. military's withdrawal from Afghanistan in 2021. His application for a Special Immigrant Visa has been pending for almost three and a half years. Because his parole and his work authorization will expire in September 2025, he is also working on filing an asylum application with assistance from a nonprofit. But none of these applications will be adjudicated if the Trump administration's pause on the processing of immigration benefits continues, and Omar fears that he will lose his legal status and be vulnerable to deportation.

28. Plaintiff **Sandra McAnany** is a U.S. citizen who lives in La Crosse, Wisconsin. She is driven by her strong Christian faith to serve as the U.S.-based sponsor for seventeen individuals with active parole status through CHNV—fifteen from Venezuela and two from Nicaragua. They were all approved for two-year periods of parole, and most have applied for asylum based on the fears they have of returning to their countries of origin. Sandra has given much of her time, effort, and money over the last few years supporting her CHNV beneficiaries to safely travel to the United States, reunite with family members already in the country, and find work and settle into their communities. Sandra has four pending CHNV applications as well, for nationals from Cuba, that will now never be processed due to the administration's end to CHNV.

29. Plaintiff **Kyle Varner** is a U.S. citizen and physician who lives in Spokane, Washington. As a long-committed political activist deeply involved in liberal and libertarian movements in Venezuela, he is motivated by his strong moral and political convictions to sponsor seventy-nine individuals through the CHNV parole processes, most of whom are nationals of Venezuela. Forty-three of his beneficiaries are currently in the United States, and at least twenty-

nine have pending applications for asylum, TPS, or other immigration relief that are on pause due to the administration's policies. Over the last few years, Kyle has put immense amounts of time, energy, and money into ensuring that his beneficiaries have what they need, both to travel to the United States and to have a strong footing once they arrived. Kyle also has thirty-two pending CHNV sponsorship applications, including for a Cuban individual and a Nicaraguan individual, that will now never be processed due to the administration's end to CHNV.

30. Plaintiff **Wilhen Pierre Victor** is a U.S. citizen and healthcare worker who lives in Woburn, Massachusetts. She is the CHNV sponsor for her brother, his wife, and their three children, who are seven, thirteen, and sixteen years old. They arrived in the United States from Haiti in the summer of 2024 and were granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn. Wilhen's application to sponsor her brother for a green card has been pending since 2007, and he has been waiting since then to have another legal pathway to come to the United States. CHNV parole has allowed Wilhen to reunite with her brother for the first time in more than twenty years, and it has allowed Wilhen's brother to find a job for the first time in thirteen years. Wilhen also has two pending applications for CHNV sponsorship of her thirteen-year-old niece (her brother's child) and her fifty-year-old cousin, who experience ongoing threats of extreme violence in Haiti, that will now never be processed due to the administration's end to CHNV.

31. Plaintiff **Gabriela Doe** is a U.S. citizen and immigrant justice advocate who lives in Tacoma, Washington. She is cousin to Ana Doe, Armando Doe, Alejandro Doe, Carlos Doe, and Miguel Doe, and is the CHNV sponsor to all her cousins except Carlos Doe, who is sponsored by another family member. The cousins Gabriela sponsored arrived in 2024 and were granted two-year periods of parole. Through the CHNV parole process, Gabriela was able to reunite with her

five cousins, whose family faced political repression, danger, and persecution in Nicaragua. Because of the CHNV parole process for Nicaraguans, her cousins have been able to work and support themselves here in the United States and lead more stable, peaceful lives. Through the March 25 FRN, Gabriela's cousins' CHNV parole periods, and associated work authorizations, will prematurely end, subjecting their family to the possibility of separation again and causing Gabriela severe psychological distress knowing her cousins will be at risk of being vulnerable to imminent deportation in less than a month.

32. Plaintiff **Norma Lorena Dus ("Lorena")** is a U.S. citizen and immigrant justice advocate who lives in West Stockbridge, Massachusetts. She is the CHNV sponsor for her sister, Lucia Doe, who arrived in the United States from Venezuela in July 2024 and was granted a two-year period of parole. The CHNV parole process allowed Lorena and Lucia to reunite with all of their siblings for the first time in six years, and it has allowed Lucia, whose job back in Venezuela did not pay enough for her to cover even her basic needs, let alone the needs of their mother, to become self-sufficient and send money back to their parents as well. This has relieved the financial strain on Lorena and their other siblings, all of whom regularly send money back to their parents to help them survive in Venezuela. The administration's termination of CHNV parole and premature termination of Lucia's two-year grant of parole and associated work authorization will cause severe, unexpected financial burden for Lorena, as well as psychological distress due to her sister becoming vulnerable to imminent deportation.

33. Plaintiff **Valentin Rosales Tabares** is a U.S. legal permanent resident living in Portland, Oregon. In 2018, he submitted family-based immigrant visa petitions for his wife, son, and daughter that were quickly approved. His wife and son were issued immigrant visas in 2022 and came to the United States that year to be reunited with him. However, his daughter and her

daughter, Valentin's granddaughter, continued to await their immigrant visas in Cuba, where life was extremely difficult. When Valentin was invited by the Department of State to request Cuban Family Reunification Parole for his daughter in November 2024, he immediately submitted a request on her behalf. She was approved in December 2024, but she was not given a travel date before the Trump administration terminated the parole process. Valentin's application for his daughter is now indefinitely on pause. Valentin also applied to sponsor his son's wife and child through the CHNV parole process. Those applications remain pending indefinitely as well.

34. Plaintiff **Marim Doe** is a U.S. citizen and active-duty member of the U.S. Navy stationed at the U.S. military base in Goose Creek, South Carolina. Marim's father does not have legal status in the U.S., and one of the main reasons Marim joined the military was to help his father obtain legal status through the military parole-in-place process. He wants to provide his father with more job stability and retirement support as he gets older, as well as protection against immigration enforcement, the fear of which has plagued their family. In May 2024, Marim submitted a military parole-in-place application for his father. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

35. Plaintiff **Adolfo Gonzalez, Jr.** is a U.S. citizen and retired U.S. Army service member who served in the Army for over thirty years. He lives in Zapata, Texas with his wife and sixteen-year-old daughter. Adolfo's wife is a national of Mexico and does not have legal status in the United States, a fact that caused him constant anxiety and fear when he was in active duty and had to be away from home and apart from her and his daughter. In March 2024, Adolfo submitted an application for military parole-in-place for his wife so that she could have a path to permanent residency and citizenship in the United States. It is currently paused indefinitely due to the administration's end to the humanitarian parole processes.

36. Plaintiff **Aleksandra Doe** is a national of Ukraine living in San Jose, California with her husband and five-year-old son. They were granted parole through the Uniting for Ukraine parole process around April 2023. Her and her family's current authorized period of parole and associated employment authorization expires on March 29, 2025. She and her son have pending TPS applications, which she filed in December 2024. She and her family also have pending adjustment of status applications, which they were able to submit because they applied for the diversity visa lottery in October 2023 and were selected in May 2024 to move forward in the process for the Fiscal Year 2025 lottery. Aleksandra had an interview scheduled for her adjustment of status application in February 2025, but a few days before her appointment, she received a notice from USCIS notifying her that her interview had been cancelled. Because of the administration's suspension of adjudication of all immigration benefit applications for people like Aleksandra and her family, who came to the United States through U4U, Aleksandra's applications for TPS and adjustment of status are now indefinitely on hold.

37. Plaintiff **Teresa Doe** is a national of El Salvador who has lived in Las Vegas for the last eight years with her husband and four children, one of whom is a U.S. citizen and two who are lawful permanent residents. After many years of separation from her husband and three of her children, Teresa was finally able to travel to the United States and be reunited with them when her son was approved for the CAM parole process. The two of them came to the United States in 2017 and were granted parole for an initial period of two years. After that, Teresa has consistently applied for and received CAM re-parole, which has allowed her husband to work and support their family while she takes care of their children and grandchildren. Her current period of parole expired on March 13, 2025, and her application for re-parole remains pending. Because of the

administration's termination of CAM, this application is indefinitely on hold, and Teresa faces the possibility of being torn away from her family again.

38. Plaintiff **Rosa Doe** is a national of Honduras living in Austin, Texas with her four U.S. citizen daughters. Rosa has one other daughter who is fourteen years old living in Honduras, along with Rosa's father. Rosa came to the United States in 2013. She was trafficked into the United States and is the survivor of rape and other violence in Honduras. Rosa is a U-visa applicant with deferred status while her U-visa application remains pending. In June 2023, she filed an Affidavit of Relationship through the CAM parole process to reunite with her fourteen-year-old daughter and elderly parents. Sadly, Rosa's mother died in October 2024 before Rosa was able to see her again. Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. In November 2024, they both received conditional approval letters for their parole applications. Rosa was planning to purchase their flights to come to the United States in January 2025, but at this point Rosa was no longer able to get updates on their case to facilitate purchasing the tickets for her daughter and father. In early March 2025, Rosa was able to get in contact with the International Organization for Migration and was told that it would take more time for her daughter and father to be able to travel. However, because of the administration's termination of the CAM parole process, Rosa's daughter and father will not be able to travel to the United States, which would ensure Rosa's daughter's safety from the danger she faces in Honduras.

a. Plaintiff **David Doe** is a national of Ecuador living and working in Arkansas with his wife and their two sons. David and his family were granted parole into the United States through the Family Reunification Parole process for Ecuadorians. David and his family are the beneficiaries of an I-130 family-based petition filed by David's father in October 2012 and approved in February 2020. David's father subsequently received an invitation from the U.S.

government to sponsor David and his family for the FRP in November 2023. After completing all the forms and steps required by the government, David and his family were inspected and given a three-year grant of parole into the United States in July 2024. They have not filed their adjustment of status applications yet because their priority date is not current. Due to the FRP FRN, David and his family's parole – and his and his wife's work authorization – will be prematurely terminated on January 14, 2026.

b. Plaintiff **Jose Doe** is a national of Honduras living and working in Miami, Florida with his wife and two young children, both of whom are U.S. citizens. Jose and his family are the beneficiaries of an approved I-130 family-based petition filed by Jose's U.S. citizen father. In August 2023, his father received an invitation from the U.S. government for Jose and his wife to participate in the FRP process. After completing the required forms and steps for this process, Jose and his wife received travel authorization to come to the United States through the FRP process and were given a three-year grant of parole in March 2024. Jose and his wife applied for and received their work permits shortly after arriving in the United States. Jose and his wife have not filed their adjustment of status (Form I-485) applications yet because their priority date is not "current" per the U.S. visa bulletin. Due to the FRP FRN, Jose and his wife's parole and work authorization will be prematurely terminated on January 14, 2026.

c. Plaintiff **Luciana Doe** is a national of Colombia who lives with her young daughter in Arlington, Texas, close to Luciana's Lawful Permanent Resident parents and U.S. citizen siblings. Luciana entered the United States through the FRP process for Colombians in February 2024, after the U.S. government invited Luciana's sister to apply to sponsor Luciana through the process. They were given a three-year period of parole. After over a decade of living apart, Luciana and her daughter joyfully reunited with their family in Arlington and have been

thriving ever since. However, the government's announcement of the upcoming termination of FRP and accompanying revocations of current grants of parole threaten to throw their lives into chaos and force them to return to a country where they are not safe and have nothing remaining for them. Luciana has not yet filed her adjustment of status application because her priority date is not current. Due to the FRP FRN, Luciana's parole and work authorization will be prematurely truncated on January 14, 2026.

d. Plaintiff **Francisca Doe** is a national of Guatemala currently living in Lynn, Massachusetts, with her husband and three children. Francisca Doe and her family were all given a three-year grant of parole under the FRP process for Guatemalans. They are the beneficiaries of an I-130 family-based visa petition that Francisca's mother, a U.S. citizen, filed in 2012, which was approved in 2013. Ten years later, in August 2023, Francisca's mother received an invitation to sponsor Francisca and her family for the FRP process. After completing all the required paperwork and steps, Francisca and her family were approved to travel to the United States through the FRP process in June 2024. In August 2024, they arrived in the United States and were granted a three-year period of parole through August 2027. In December 2025, Francisca and her family's priority date on their visa applications became current. However, in the midst of preparing their adjustment of status (Form I-485) applications, the government announced their plans to terminate the FRP processes and individual grants of parole on January 14, 2026 unless individuals filed an adjustment of status application before December 15, 2025. Francisca and her family scrambled to complete and mail their adjustment of status applications on December 15. About a week later, Francisca received confirmation from USCIS that her I-485 applications were not accepted in time.

e. Plaintiff **John Doe** is a national of El Salvador currently living and working in Houston, Texas. John came to the U.S. through the FRP process for El Salvador via his father, a United States citizen, who filed an I-130 family-based petition for John that was approved in October 2019. In July 2023, John's father received an invitation from the U.S. government to sponsor John for the FRP process. After completing all required forms and procedures, John received travel authorization in January 2024. John arrived in the U.S. and was granted parole in March 2024 for a three-year period through March 2027. John has not filed his adjustment of status application yet because his priority date is not current. Due to the FRP FRN, John's parole and work authorization will be prematurely terminated on January 14, 2026.

39. Plaintiff **Haitian Bridge Alliance ("HBA")** is a Haitian-led, Haitian Creole-speaking grassroots and community-based nonprofit organization incorporated in California. HBA was formed in early 2016 to meet the needs of an influx of Haitian and other Black migrants that came to the U.S.-Mexico border seeking humanitarian protection as conditions in their home countries deteriorated. HBA's core organizational activities have included, since the inception of the CHNV parole process for Haiti, providing direct services and support to thousands of CHNV sponsors and parolees from Haiti. These services include legal consultations for CHNV parolees, assistance completing CHNV sponsorship applications, humanitarian and integration support, and other aid. Defendants' termination of the CHNV parole processes, premature termination of grants of CHNV parole, and suspension of processing immigration benefit applications filed by CHNV parolees have directly interfered with these core activities.

a. HBA provides direct services and support to FRP sponsors and parolees from Haiti. Defendants' termination of the FRP processes, premature termination of grants of FRP parole, and

suspension of processing immigration benefit applications filed by Haitian FRP parolees have directly interfered with these core activities.

40. Defendant Kristi Noem is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"), a position to which she was confirmed by the Senate on January 25, 2025. Until she was confirmed, Benjamine C. Huffman served as the Acting Secretary of Homeland Security from the time when President Trump appointed him to that position on January 20, 2025.

41. Defendant Todd M. Lyons is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement ("ICE"), a component agency of DHS. Prior to Mr. Lyons, Caleb Vitello was the Acting Secretary; he was appointed to that position by President Trump on January 20, 2025. Mr. Vitello was reportedly "reassigned" to a different role on or about February 21, 2025, due to President Trump's frustration that ICE had not arrested more immigrants in the first few weeks of his second term, but he apparently stayed in that role until Secretary Noem announced Mr. Lyons as the next Acting Director on March 9.

a. Defendant Lyons' new title is Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement ("ICE").

42. Defendant Pete R. Flores is sued in his official capacity as the Acting Commissioner of Customs and Border Protection ("CBP"), a component agency of DHS. Mr. Flores has been the Acting Commissioner of CBP since January 20, 2025, when he was appointed to that position by President Trump.

a. Defendant Flores was replaced by Defendant **Rodney Scott**, sued in his official capacity as the Commissioner of Customs and Border Protection ("CBP").

43. Defendant Kika Scott is sued in her official capacity as the Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services ("USCIS"), a component agency of DHS. According to USCIS's website, Ms. Scott has been in this position since February 9, even though it was previously and widely reported that Andrew Davidson, the Acting Deputy Director of USCIS, would become the Acting Director of USCIS on that same date via appointment by President Trump.

a. Defendant Scott was replaced by Defendant **Joseph B. Edlow**, sued in his official capacity as the Director of U.S. Citizenship and Immigration Services ("USCIS").

44. Defendant Donald J. Trump is sued in his official capacity as the President of the United States. He was inaugurated on January 20, 2025.

## BACKGROUND

### The Statutory Parole Authority

45. Parole is a temporary form of permission for a noncitizen to be in the United States. Parole does not itself lead to any other form of immigration status, although while here on parole, nothing prevents parolees from applying for any other immigration status for which they are eligible. Many parole recipients have applied for asylum pursuant to 8 U.S.C. § 1158, temporary protected status pursuant to 8 U.S.C. § 1254a, or other forms of status adjustments. Under longstanding regulations, many parolees can apply for employment authorization.

46. Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5)(A), states that "the Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."

47. Congress has never defined "case-by-case," "urgent humanitarian reasons," or "significant public benefit," or delineated with further specificity the circumstances under which the Executive may grant parole, apart from what is encompassed by the clause, "except as provided in subparagraph (B) or in section 1184(f) of this title," discussed more below.

48. The executive's authority to parole individuals into the country was originally codified in Section 212(d)(5) of the 1952 INA, which established that "[t]he Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States."

49. Congress did not define the terms "emergent" or "public interest" and did not modify the wording of the parole provision until 1980.

50. Between 1952 and 1980, lacking a permanent statutory provision specifically providing for the entry of refugees, the Executive frequently used the parole authority to facilitate the entry of refugees in a programmatic manner—i.e., by defining a group, typically by nationality plus additional factors, whose entry could be justified by emergent or public interest reasons – with applications of individuals therein considered on a case-by-case basis.

51. The first such use was in 1956, when President Dwight D. Eisenhower directed the Attorney General to parole into the country approximately 30,000 Hungarian refugees who had fled during that country's revolution.

52. There is no comprehensive accounting of "programmatic" or "categorical" uses of parole, but in the approximately seventy years since this original such use by the Eisenhower Administration, there have been at *least* another 125 categorical parole programs, usually with

multiple parole programs operating at the same time throughout that period, and during every single Administration, including the first Trump Administration.

53. In 1980, Congress passed the Refugee Act, which established for the first time a specific, permanent legal process to admit people to the United States as refugees.

54. In passing the Refugee Act, and in recognition of the fact that refugees now had a unique legal pathway to the United States, Congress added a restriction to the parole authority, codified in subparagraph (B), 8 U.S.C. § 1182(d)(5)(B), prohibiting the Attorney General from paroling a refugee into the United States "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

55. The conference report adopted by both chambers accompanying the final legislation explained that § 1182(d)(5)(B) "does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees."

56. Similarly, since it was enacted, the federal officials exercising the parole authority have consistently interpreted § 1182(d)(5)(B)'s restriction as applying only to noncitizens who have already been determined by the U.S. government to be refugees.

57. Congress next amended the parole statute in 1990 to prohibit granting parole to noncitizens to perform certain work aboard a vessel or aircraft on an air carrier during a labor dispute where there is a strike or lockout unless the parole "is necessary to protect the national security of the United States." Pub. L. No. 101-649, § 202, 104 Stat. 4978, 5014 (1990) (codified at 8 U.S.C. § 1184(f)); *see also* 8 U.S.C. § 1182(d)(5)(A) (authorizing parole "except as provided . . . in section 1184(f) of this title.").

58. Congress last amended the parole authority in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").

59. IIRIRA made just one textual change to the parole statute, striking from § 1182(d)(5)(A) the language allowing the Attorney General to grant parole "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest" and replacing it with language allowing the Attorney General to grant parole "under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

60. In addition to that textual change to the parole statute, IIRIRA contained three other provisions related to exercises of the parole authority. In one, Congress required that the Attorney General annually report to the Judiciary Committee of each chamber the "number and categories of [noncitizens] paroled into the United States."

61. In another section of IIRIRA, Congress directed that parolees who had been in the United States at least a year and had not become lawful permanent residents must be counted against per-country numerical caps on family-sponsored immigration.

62. Finally, IIRIRA also directed the Attorney General to give green cards to Polish and Hungarian noncitizens who had been paroled into the United States through a categorical parole program that operated over a roughly two-year period ending at the end of 1991.

63. As Congress worked on the legislation that eventually became IIRIRA, the House Judiciary Committee criticized the "categorical" use of parole and asserted that such use of the parole authority was *ultra vires*. It therefore proposed to narrow the substantive grounds on which parole could be granted to specify that the only "humanitarian reason" that parole could be granted

involved medical emergencies, and the only "public benefit" that would warrant parole involved assisting U.S. law enforcement.

64. Before the bill was brought to the House floor, however, the Judiciary Committee's language restricting parole was removed, and the legislation that ultimately was signed into law as IIRIRA left undefined the substantive criteria on which parole could be granted.

65. Since the 1996 passage of IIRIRA, both Republican and Democratic administrations have created and administered parole programs to allow the parole of individuals within broadly defined classes, for example:

- Cuban and Haitian beneficiaries of approved family-based immigration petitions awaiting visas (2007-17; 2021-present);
- Haitian children orphaned by the 2010 earthquake in that country (2010);
- Cuban medical professionals in third countries conscripted by the Cuban government (2006-2017);
- Chinese and Russian nationals seeking to visit the Commonwealth of the Northern Mariana Islands and Guam for business or pleasure (2009-19);
- family members of U.S. military service members (2013-present);
- minor children from El Salvador, Guatemala, and Honduras with family in the United States (2014-17; 2021-present); and
- family members of Filipino World War II veterans (2016-present).

66. Consistent with ratifying the view that categorical parole was authorized, both before and after the passage of IIRIRA—and in addition to in IIRIRA itself, as discussed above regarding Polish and Hungarian parolees—Congress has repeatedly passed legislation extending various benefits and services to individuals who obtained parole via a "categorical" parole process, in some cases making benefits available prospectively to individuals who would in the future be paroled pursuant to such processes. For instance, most recently, Congress enacted legislation extending resettlement support services (normally provided only to refugees) to Ukrainians

paroled under U4U and Afghans paroled under OAW, for the duration of their period of parole and any re-parole.

67. The parole authority has enabled administrations to serve urgent humanitarian needs and advance the significant public benefit of promoting the national interest through achieving humanitarian, human rights, anti-trafficking, foreign policy, and regional security goals, among others.

**Uniting for Ukraine ("U4U")**

68. On February 24, 2022, Russia invaded Ukraine, beginning a war that continues to this day.

69. In the weeks following Russia's invasion, thousands of Ukrainians traveled to Mexico and presented themselves at U.S. ports of entry to request humanitarian protection, as is their right under international and U.S. law. *See, e.g.*, 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum . . . .").

70. At its peak, CBP encountered up to 1,300 Ukrainians per day along the southern border; that surge strained its operations and required diverting personnel to increase processing capacity.

71. Most Ukrainians who arrived at the southern border during this period—some 20,000 people—were paroled into the country, due at least in part to a lack of detention space. Most received an initial grant of one year of parole.

72. Every Administration, including the first Trump Administration, has used parole in this way to process applicants for admission, particularly when there is a lack of detention space.

73. In response to this surge of Ukrainians at the border and the accompanying strain on CBP, President Biden announced in March and April 2022 a variety of humanitarian commitments to the Ukrainian people, including establishing the Uniting for Ukraine parole process. *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 17, 2022). The Federal Register Notice for the U4U parole process cites destruction to civilian infrastructure, ongoing concerns about food security, a lack of medicine and health supplies, rampant sexual exploitation and abuse, continuing violence, and large-scale displacements of Ukrainians as reasons for the establishment of the parole process.

74. Uniting for Ukraine is a process by which Ukrainians who have a U.S.-based sponsor committed to providing for their financial support can apply to be considered, on a case-by-case basis, for a grant of parole, typically for two years.

75. U4U was created so that eligible Ukrainians could request consideration for parole without having to travel to Mexico and present at the southern border, which can be dangerous for the individuals and further strains CBP resources.

76. Permitting Ukrainians to apply in advance also benefitted the U.S. government by making it possible to conduct security checks on the individuals before they travel.

77. Uniting for Ukraine applicants who meet the eligibility requirements, pass security checks, and warrant a favorable exercise of discretion are granted authorization to travel directly (via flight) to the United States, where they are inspected and undergo further security checks before CBP makes the final determination of whether to grant parole.

78. There is no fee associated with initial applications for parole under Uniting for Ukraine, but applicants must comply with all pre-travel requirements—including public health

requirements—at no cost to the United States and likewise must pay for and arrange their own travel.

79. Once approved to travel to the United States, prospective U4U parolees fly directly to an airport in the interior of the United States, which avoids the disorderly process at the border—and concomitant impact on border communities and states—that was otherwise occurring because of Russia's invasion of Ukraine.

80. Like the U4U parolees, potential U4U sponsors undergo security checks; they also must prove their own lawful status and that they have sufficient financial resources to receive, maintain, and support the intended beneficiaries for the duration of their parole period.

81. In February 2024, USCIS announced the process by which U4U parolees could apply for re-parole, once they had less than six months left on their initial grant of parole. In addition to meeting other eligibility requirements, applicants for re-parole under U4U had to pay a fee or obtain a waiver of fees.

82. Per legislation enacted by Congress in May 2022 and April 2024, Ukrainians paroled into the United States between February 24, 2022, and September 30, 2024, are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program—the same services to which OAW parolees are entitled, as discussed below—for the duration of their period of parole and any re-parole.

83. From fiscal year 2022 to fiscal year 2023, the number of Ukrainians encountered by CBP at the southern border dropped *by more than ninety-nine percent*. There were even fewer encounters in fiscal year 2024 than in fiscal year 2023.

84. Most U4U parolees have claims to other forms of immigration relief that would permit them to stay in the United States permanently, including family-based immigration visas and TPS.

85. These paths to permanent immigration status for U4U parolees, however, generally take years to navigate due to how long it takes the Defendant agencies to process the immigration benefit applications.

86. Currently, Ukrainians who have continuously resided in the United States since August 16, 2023 (which would include some U4U parolees) are eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. TPS for Ukrainians is currently set to expire (if not extended) on October 20, 2026.

87. As of the third anniversary of Russia's invasion of Ukraine, approximately 7 million Ukrainians remain externally displaced. Approximately 200,000 of them are in United States by way of parole. Most Ukrainians here on parole had some preexisting tie to the United States (such as family), which is why they came here for refuge when they fled their home country.

**Parole Processes for Cuba, Haiti, Nicaragua, & Venezuela ("CHNV")**

88. Over the last several years, a significant number of Cubans, Haitians, Nicaraguans, and Venezuelans have been displaced due to natural disasters, economic hardship, and political strife.

89. Today, there are approximately eleven million displaced nationals of those four countries, most of them Venezuelan; twenty percent of Venezuela's population is displaced.

90. Due to events internal to each country, emigration from these four countries accelerated remarkably from 2020 to 2022.

91. Per its data, CBP encountered at the southern border fewer than 18,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2020.

92. Per its data, CBP encountered at the southern border more than 181,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2021.

93. Per its data, CBP encountered at the southern border more than 600,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela combined in fiscal year 2022—comprising more than forty percent of all migrants CBP encountered at the border that year.

94. The marked increase in the number of nationals of these four countries arriving at the southern border put considerable strain on CBP operations, causing it to divert resources and to provide sub-standard care to those migrants.

95. As with the Ukrainians coming to the southern border discussed above, many (if not most) of the Cubans, Haitians, Nicaraguans, and Venezuelans who came to the border during this period were paroled into the United States.

96. In October 2022, the Biden Administration created a parole process for Venezuelans. DHS, *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507 (Oct. 19, 2022). Approximately two months later, and in light of the success of the Venezuelan parole process, the Biden Administration expanded the parole process for Venezuelans, DHS, *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1279 (Jan. 9, 2023); and created similar parole processes for nationals of Cuba, Haiti, and Nicaragua, DHS, *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1266 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1243 (Jan. 9, 2023); DHS, *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255 (Jan. 9, 2023).

97. These Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") parole processes were explicitly modeled on the Uniting for Ukraine parole process; like U4U, the rigorous application processes for CHNV parole required passing security checks, having a U.S.-based

financial supporter with lawful status who has proven their ability to remain committed to providing for the parolee for the duration of their two-year period of parole, and meeting all pre-travel requirements. The travel itself must be at no cost to the United States.

98. DHS explained in creating the CHNV parole processes that the processes provide significant public benefits by improving vetting for national security and public safety, reducing the strain on CBP resources and personnel, and minimizing the impact on the United States of irregular migration from these countries.

99. DHS also explained that the parole processes address urgent humanitarian concerns by offering a safe and legal pathway out of dangerous conditions in these four countries as an alternative to the perilous overland journey to the U.S. border.

100. The United States-Mexico border is the world's deadliest land migration route. According to the International Organization for Migration, more than 800 people died attempting to cross the U.S.-Mexico border in 2021; more than 750 in 2022; more than 730 in 2021; but fewer than 500 in 2024.

101. DHS also explained in creating the CHNV parole processes that they further important foreign policy objectives, including the collaborative management of migration in the hemisphere.

102. An important aspect of the CHNV parole processes is that Mexico agreed—for the first time ever—to accept the removal of Cubans, Haitians, Nicaraguans, and Venezuelans who do not follow the CHNV parole processes, which thereby makes them presumptively ineligible for asylum in the United States.

103. For years, the United States has had difficulty removing nationals of those four countries because of their home countries' refusals to accept the deportees.

104. As part of CHNV, Mexico agreed to accept up to 30,000 (combined) deported nationals of these countries each month.

105. The CHNV processes allowed up to 30,000 parolees from the four countries combined to come to the United States each month.

106. The demand for CHNV parole was extraordinary; USCIS received more than 1.5 million applications from potential sponsors in just the first three or four months that the processes were available.

107. Per legislation enacted by Congress, Cubans and Haitians paroled into the United States are entitled to resettlement support services provided to refugees brought to the United States through the U.S. Refugee Admissions Program.

108. Per the Cuban Adjustment Act, as amended, Cubans paroled into the United States can become lawful permanent residents after being in the country for a year.

109. Per a CBP statement on January 14, 2025, CBP encounters of CHNV nationals attempting to cross the southern border unlawfully were down ninety-one percent since the CHNV processes were created.

110. Similarly, following a bench trial, Judge Tipton of the Southern District of Texas held that the State of Texas did not have standing to challenge the CHNV processes because these processes led to a decrease in Texas's claimed injuries by reducing the overall number of migrants from these countries coming to Texas, which was the source of Texas's claimed injuries.

111. Most CHNV parolees have claims to immigration relief that would permit them to stay in the United States, including family-based immigration visas and asylum.

112. These paths to permanent immigration status for CHNV parolees, however, generally take years to navigate recently due to how long it takes the defendant agencies to process the immigration benefit applications.

113. For example, although Congress has directed DHS to issue final decisions on asylum claims within 180 days of receiving each application absent "exceptional circumstances," 8 U.S.C. § 1158(d)(5)(iii), most asylum applicants are currently waiting years to get an initial decision.

114. Currently, Venezuelans who have continuously resided in the United States since July 31, 2024 (including some Venezuelans who received parole through CHNV) are eligible for TPS; approximately 33,600 CHNV parolees from Venezuela have been granted TPS.

115. On January 10, 2025, Secretary of Homeland Security Ali Mayorkas extended TPS for Venezuelans until October 2026, but on January 28, 2025, Secretary Noem purported to vacate that extension and then, on February 1, 2025, Secretary Noem decided to terminate one of the two TPS designations for Venezuelans. Secretary Noem's February 1 decision was based on her conclusion that the continued presence of the approximately 350,000 Venezuelans with TPS under that designation is contrary to the national interest of the United States. DHS, *Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status*, 90 Fed. Reg. 9040 (Feb. 5, 2025). Secretary Noem's unprecedented vacatur of the TPS extension for Venezuelans is being separately litigated in multiple cases on the ground (among others) that the TPS statute does not authorize such actions.

116. Currently, Haitians who have continuously resided in the United States since June 3, 2024 (including some Haitians who received parole through CHNV) are eligible for TPS. In June 2024, Secretary Mayorkas extended TPS for Haitians until February 3, 2026, but on February

20, 2025, Secretary Noem again acted in an unprecedented fashion by purporting to reduce the time remaining for Haitian TPS by six months, such that it now expires on August 3, 2025. DHS, *Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti*, 90 Fed. Reg. 10511 (Feb. 24, 2025).

117. Approximately 600,000 Cubans, Haitians, Nicaraguans, and Venezuelans received parole through CHNV.

**Operation Allies Welcome ("OAW")**

118. Operation Allies Welcome grew out of the U.S. military's chaotic 2021 withdrawal from Afghanistan.

119. As Afghanistan's military and government quickly fell to the Taliban when the U.S. military withdrew, the U.S. government hastily evacuated approximately 124,000 people from Afghanistan, mostly on military cargo jets. Evacuees included U.S. citizens and lawful permanent residents, nationals of allied countries, and Afghans whose lives were at risk due to their service to the United States (such as interpreters).

120. After medical, security, and other screenings in third countries, approximately 75,000 Afghans were eventually brought to the United States on parole through OAW.

121. Most OAW parolees were (and remain) eligible for a congressionally-created Special Immigrant Visa ("SIV") based on having provided "faithful and valuable service" employed by or on behalf of the U.S. Government or the International Security Assistance Force or a successor mission in certain capacities in Afghanistan.

122. Many other OAW parolees are eligible for other forms of immigration relief—like family-based immigrant visas and asylum—that would likewise give them permanent lawful status in the United States.

123. These paths to permanent immigration status for OAW parolees, however, generally take years to navigate, due mostly to how long it takes the defendant agencies to process the immigration benefit applications. The federal government has been subject to a class-wide injunction against unreasonable delays in adjudicating Afghan SIV applications since early 2020 and a similar class-wide settlement agreement addressing the unreasonable delays in adjudicating asylum applications of Afghan OAW parolees since September 2023.

124. In September 2021, Congress enacted the Afghanistan Supplemental Appropriations Act, Public Law 117-43. Among other things, it instructed DHS to adjudicate asylum applications filed by OAW parolees expeditiously, and to issue final decisions within 150 days of receiving each application, absent "exceptional circumstances."

125. That Act also made OAW parolees—including those who had yet to be paroled—eligible for resettlement support services typically provided to refugees resettled in the United States through the U.S. Refugee Admissions Program until the later of March 31, 2023, and the end of their parole term. Those services include cash and medical assistance, employment preparation, job placement, and English language training. That Act also appropriated supplemental funds for USCIS and Health and Human Services to carry out these directives.

126. To date, approximately 20,000 OAW parolees have been granted asylum; fewer than 100 parolees' asylum applications have been denied.

127. Currently there are approximately 1,300 OAW parolees with pending asylum applications; on average, those applications have been pending for more than 600 days.

128. Afghans who have continuously resided in the United States since September 20, 2023 (including Afghans brought here through Operation Allies Welcome) are currently eligible for Temporary Protected Status ("TPS"), which generally protects recipients from removal. Unless

extended by the Secretary of Homeland Security, however, TPS for Afghans will expire on May 21, 2025.

129. In 2023, the federal government determined that "Afghans paroled under Operation Allies Welcome ("OAW"), or those paroled then subsequently granted Temporary Protected Status ("TPS"), could request U.S. Government-supported family reunification support for their spouses and unmarried children under 21 years of age" who remain physically present in Afghanistan.

130. Afghans paroled through OAW were initially given two-year grants of parole. There was no formal application process for initial grants of parole through OAW, but in June of 2023, DHS announced a re-parole process for OAW parolees, under which they may apply for an extension of up to two years.

131. Globally, approximately 11 million Afghans are currently displaced due to the conditions in their home country, most of them in Iran (4.5 million) and Pakistan (3.1 million). Fewer than 50,000 Afghans are in the United States on current grants of parole by virtue of OAW.

**Family Reunification Parole ("FRP")**

132. Ever since the George W. Bush administration established a Cuban Family Reunification parole process in 2007, the United States has had country-specific family reunification parole processes that allow the beneficiaries of approved I-130 petitions for family-based immigrant visas to be paroled into the United States. The grant of parole allows these beneficiaries to reunite with their sponsoring family member in the United States while they wait for their immigrant visa to become available.

a. Each of the processes has been justified on both statutory bases for parole: urgent humanitarian reasons and significant public benefits.

133. Under the family-based immigrant visa system that Congress has devised, a U.S. citizen or lawful permanent resident must first file a petition (Form I-130, "Petition for Alien Relative") to establish that they have a family relationship with a relative abroad that makes the relative eligible for a family-based immigrant visa. Once that petition is approved, the relative abroad must then apply for an immigrant visa—but because family-based visas are distributed to eligible applicants through a complex system of queues and country-specific caps, an intending immigrant must wait in line—often for years, or even decades—before he or she may apply to receive it. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 48 (2014).

a. U.S. citizens can file petitions for immediate relatives (spouses, unmarried children under age 21, and parents of U.S. citizens who are themselves at least age 21) in unlimited numbers; visas for other relatives of U.S. citizens may be immediately available. Other relatives of U.S. citizens and all relatives of eligible LPRs are subject to a numerically limited system of tiered preference categories and country-specific caps.

b. Due to backlogged demand for the numerically limited visas, some prospective immigrants have to wait years after their I-130 petitions are approved for a visa to become available. Each such individual has a "priority date" (typically the date the I-130 petition was filed); they know their visa is available when it becomes "current" under the monthly State Department Visa Bulletin. Once their priority date is current, those abroad can go through consular processing to receive their visa and are then admitted to the United States as LPRs. Those already in the United States can apply to adjust to LPR status by filing a Form I-485.

c. The chart below shows the current visa backlogs for the seven FRP countries (based on the December 2025 State Department Visa Bulletin), in order of current implied estimated wait:

| Category | Description | Current Priority Date | Current Implied Estimated Wait |
|---|---|---|---|
| F2A | Spouses and unmarried children under 21 of LPRs | Feb. 1, 2024 | 1.8 years |
| F1 | Unmarried adult (age 21 or older) children of U.S. citizens | Nov. 8, 2016 | 9.0 years |
| F2B | Unmarried adult (age 21 or older) children of LPRs | Dec. 1, 2016 | 9.0 years |
| F3 | Married children of U.S. citizens | Sept. 8, 2011 | 14.2 years |
| F4 | Siblings of adult (age 21 or older) U.S. citizen | Jan. 8, 2008 | 17.8 years |

d. These implied wait times can be off wildly for a variety of factors; over the last twenty years, the implied estimated wait times for F1, F2B, F3, and F4 visas for the FRP countries have been systematically underestimated by two to nine years each.

e. Even when a priority date is "current," that indicates only that a visa number is available, and not actual processing capacity, which varies significantly by country and over time. Under normal conditions, it typically takes 12 to 18 months from a priority date being "current" to visa issuance.

134. The family reunification parole processes allow a U.S. citizen or lawful permanent resident with an approved I-130 petition to sponsor their family member abroad for parole into the United States. Instead of having to wait abroad, often in precarious situations, for an immigrant visa to become available, a noncitizen family member who receives parole may reunite and be together with their sponsor in the safety of the United States while waiting for their immigrant visa to issue.

135. The Federal Register Notice for the original Cuban Family Reunification parole process explained that the process "serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts

to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States."

a. The Federal Register Notice for the original ("legacy") Cuban FRP process explained its "purpose is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration." Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007).

b. Starting in 2015, applicants to the Cuban Family Reunification Parole process have been required to pay a fee (or be eligible for and submit a fee waiver request). Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 Fed. Reg. 75579, 75581 (Dec. 18, 2014).

c. Under this "legacy" Cuban Family Reunification Parole process, beneficiaries were required to undergo an in-person interview. USCIS continued to interview pending legacy Cuban Family Reunification Parole beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was "paused" after President Trump's inauguration. 90 Fed. Reg. at 58035 n.14; id. at 58038 & n.49. At that time, there were more than 15,000 applications to the legacy Cuban Family Reunification Parole process pending.

136. Since the creation of the Cuban Family Reunification parole process in 2007, the United States has subsequently adopted similar processes for nationals of Haiti (in 2014) and Colombia, El Salvador, Guatemala, Honduras, and Ecuador (in 2023). The processes for Cuba and Haiti were also modernized in 2023.

a. The Federal Register Notice for this original ("legacy") Haitian Family Reunification Parole process explained that it "is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for

legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake." Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014). The notice explained that it would address urgent humanitarian conditions in Haiti while "promoting family unity," and additionally would provide "a significant public benefit by promoting safe, legal, and orderly migration into the United States." *Id.* at 75582.

b. Under this "legacy" Haitian Family Reunification Parole process, beneficiaries were required to undergo an in-person interview and could be paroled "up to approximately two years before their immigrant visas become available." 79 Fed. Reg. at 75581.

c. The United States adopted a similar parole process in 2016 to assist in the family reunification of Filipino veterans who fought for the United States during World War II. Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28097 (May 9, 2016).

d. In August 2019, USCIS under the first Trump Administration stated that it would be ending the Haitian Family Reunification Parole and the Filipino World War II Veterans Parole processes. USCIS stated that then-current parolees would be allowed to keep their grants of parole until expiration and that it would finish processing pending applications to completion.

e. Approximately fifteen months later, USCIS published a notice in the Federal Register requesting comments on proposed changes to Form I-131 (used to request parole), including by removing from it the ability to apply through the Haitian Family Reunification Parole and Filipino WWII Veterans Parole processes. 85 Fed. Reg. 84362 (Dec. 28, 2020). USCIS explained that publication of the revised form after close of the comment period would terminate those two family reunification parole processes because it "ha[d] determined that, as a matter of

policy, the HRFP and FWVP programs do not meet DHS's obligation to narrowly exercise its parole authority." *Id.* at 84363.

f. The December 2020 notice of proposed termination of the Haitian Family Reunification Parole and Filipino WWII Veterans Parole processes reiterated that USCIS would permit existing parolees to keep their existing grants of parole and again committed to adjudicating all pending applications for the Haitian and Filipino processes until completion, including any applications postmarked on or before the effective date of the new form, whenever it was finalized (it never was).

g. The December 2020 notice provided further that even after the proposed termination of the Haitian Family Reunification Parole and Filipino WWII Veterans Parole processes, USCIS would continue to adjudicate requests for re-parole under the same standards and terms of the terminated processes in light of the parolees' serious reliance interests. *Id.* ("USCIS will continue to adjudicate requests from current beneficiaries of the HFRP and FWVP programs who are already in the United States under the existing standards of those programs and who request a new period of parole."); *id.* at 84364 ("With respect to current HFRP and FWVP parolees, DHS acknowledges the reliance interest of those aliens who are not yet lawful permanent residents and will make a new period of parole under the criteria of these programs available to them, on a case-by-case basis, to ensure continued eligibility."); *id.* ("Given these reliance interests, DHS will accept requests for re-parole under the existing standards of the HFRP program."); *id.* at 84365 (same regarding FWVP).

h. President Biden was inaugurated less than a month after the December 2020 notice was published, and soon thereafter USCIS announced that it would not be terminating the Haitian Family Reunification Parole or Filipino WWII Veterans Parole processes after all.

i. Similar family reunification processes were created in 2023 for nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras. Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023); and Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (July 10, 2023).

137. The Federal Register Notices for these more recently established family reunification parole processes each explain that these processes provide significant public benefits by promoting family reunification, a central purpose of the INA, and by deterring irregular migration, reducing strain on DHS resources at the border, addressing root causes of migration through remittances sent by parolees and furthering important foreign policy goals in regional migration management.

a. The FRNs announcing the 2023 FRP processes each explain the primary" significant public benefit" of each process is their promotion of family unity. See 88 Fed. Reg. at 78765 ("The case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite in the United States with their family members from Ecuador."); 88 Fed. Reg. at 43593-94 (Colombia); 88 Fed. Reg. at 43613-14 (El Salvador); 88 Fed. Reg. at 43583-84 (Guatemala); 88 Fed. Reg. at 43603-04 (Honduras).

b. These Notices identified four other ways the 2023 FRP processes would provide significant benefits. One, it would offer safe passage for I-130 beneficiaries who might otherwise

feel compelled by difficult circumstances to undertake the dangerous, irregular journey to the U.S. border, by providing a "lawful and timely alternative." 88 Fed. Reg.at 78765. They explained:

> Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants. While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migration in the absence of an alternative near-term, path to come to the United States for family reunification.

(footnote omitted); accord *id.* at 43594 (Colombia); *id.* at 43614 (El Salvador); *id.* at 43604 (Honduras); *id.* at 43584 (Guatemala). Each Notice also explained the country-specific considerations: in Ecuador, rising violence and instability; in Colombia, economic insecurity, high levels of poverty, food insecurity affecting more than fifteen million people, and sexual and gender-based violence; and in the "Northern Triangle" countries of El Salvador, Guatemala, and Honduras, long-standing political instability, insecurity, and climate change.

c. These five Notices next observed that, when used by beneficiaries who would otherwise attempt to migrate irregularly, the FRP processes result would reduce the strain on DHS resources because the beneficiary going through the FRP process

d. imposes significantly less of a burden on DHS than the beneficiary coming to the border, "thereby providing a significant public benefit." See 88 Fed. Reg. at 78767-78 (Ecuador); id. at 43596 (Colombia); id. at 43616 (El Salvador); id. at 43586 (Guatemala); id. at 43606 (Honduras).

e. The penultimate significant public benefit identified by these five Notices is that the parole of I-130 beneficiaries from these specific countries could help address the root causes (or "push factors") of migration from these countries through the remittances that they would send to their families in their home countries. Each FRN detailed the particular role and importance of

remittances to each of the five countries. *See* 88 Fed. Reg. at 78768 (Ecuador); *id*. at 43595 (Colombia); *id*. at 43615 (El Salvador); *id*. at 43585 (Guatemala); *id*. at 43605 (Honduras).

f. The final significant public benefit identified by these five 2023 FRNs is that they would serve the United States foreign policy interests. See 88 Fed. Reg. at 78766 (Ecuador); *id*. at 43594-96 (Colombia); *id*. at 43614-16 (El Salvador); *id*. at 43584-86 (Guatemala); *id*. at 43604-06 (Honduras).

g. Also in 2023, the processes for Cuba and Haiti were "modernized." Implementation of Changes to the Cuban Family Reunification Parole Process, 88 Fed. Reg. 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg. 54635 (Aug. 11, 2023). The Notices thereof explained that "[t]he Secretary has authorized these updates" to the processes "in light of technological advancements and process efficiencies created since" each process was created, including with regards to vetting. 88 Fed. Reg. at 54639 (Cuba); *id*. at 54635 (Haiti).

138. For each of the Family Reunification parole processes, qualifying sponsors must first receive an invitation from the Department of State or USCIS before they can apply to sponsor their family member abroad. The sponsorship application requires U.S.-based sponsors to show that they can financially support their parole beneficiaries during their parole period.

a. By definition, and as described above, every sponsor has on file an I-130 petition that USCIS has approved. The State Department's invitation goes only to the I-130 petitioner, who may only sponsor for parole the beneficiary of an approved I-130, to include the beneficiary's spouse and unmarried children under age 21 (as derivative beneficiaries), if listed in the petition or added on later after the marriage or birth (as add-on derivative beneficiaries).

b. In deciding who to invite to apply for the 2023 FRP processes—and reflecting that a grant of parole would be a bridge to a green card—the federal government considered three criteria: "operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice." 88 Fed. Reg. at 78768 (Ecuador); *accord id.* at 43606 (Honduras); *id*. at 43586 (Guatemala); *id*. at 43616 (El Salvador); *id*. at 43596 (Colombia); *id*. at 54641 (Cuba); *id*. at 54637 (Haiti) ("USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I-130.").

c. There were no filing fees under the 2023 FRP processes, but beneficiaries were required to fly to an interior port of entry to be considered for an initial three-year grant of parole. If paroled, they can also request employment authorization.

d. The 2023 FRP processes also required sponsors to use the same Form I-134A used in the other two sponsor-based parole processes, CHNV and U4U parole processes.

e. Unlike the other sponsor-based parole processes, the FRP processes required beneficiaries to undergo a medical examination by a panel physician—that is, a doctor from a list chosen by the local U.S. embassy—prior to traveling to a port of entry, and at their own expense. The results of those medical examinations were uploaded and used for additional vetting. 90 Fed. Reg. at 58041-42.

139. If the sponsorship application is approved, the beneficiary will receive advance authorization to travel to the United States. The beneficiary must travel to the United States by commercial airline within 90 days of receiving their travel authorization. At the Port of Entry, CBP

screens the beneficiary, including administering an additional fingerprint biometric vetting, and grants parole, if warranted, on a case-by-case basis.

140. Family Reunification Parole beneficiaries generally receive a three-year grant of parole and can request employment authorization while they wait for their immigrant visa to become available. When a visa does become available, they can file for adjustment of status to lawful permanent residence, although they must be independently eligible for adjustment of status; the grant of parole does not automatically qualify or otherwise indicate qualification for adjustment of status.

a. Re-parole has been available under the FRPs, including the "legacy" processes, and particularly when needed to provide a bridge to the filing of the adjustment of status application, and without requiring the parolees to re-prove that their unchanged circumstances meet the statutory parole standard.

b. Unlike other nationalities, the Cuban Adjustment Act of 1966 lets Cuban parolees file for adjustment of status to lawful permanent resident after being physically present in the United States for just one year, even if they do not meet the typical requirements for adjustment of status.

141. Reliable statistics regarding the number of individuals paroled through the Family Reunification Parole processes are not publicly available.

a. According to the December 15, 2025 Federal Register Notice terminating the FRP processes (the "FRP FRN," discussed more below), "a total of 35,666 FRP invitations were issued over the life of the modernized FRP programs," with the most recent invitation sent in June 2024. 90 Fed. Reg. at 58037 n.50. The FRP FRN does not provide per-country numbers regarding the modernized FRP processes, although it notes that DHS has that data. *See id*. at 58037 n.45.

b. Of the 35,666 U.S. citizens and LPRs with approved I-130 petitions who were invited to participate in the 2023 FRP processes, a total of 10,608 (about 30 percent) chose to do so prior to January 28, 2025, by filing a Form I-134A requesting that the beneficiary of their approved I-130 petition be considered for parole. *Id.* at 58037 & n.50. DHS has not accepted such requests since January 28, 2025. *Id.* at 58041 n.85; Doc. No. 24-44.

c. The 2023 FRP processes required applicants to file a separate I-134A for the principal beneficiary of their approved I-130 petition (e.g., the married child of a U.S. citizen) and each derivative spouse or child beneficiary (e.g., the children of that married child of the U.S. citizen). *See, e.g.*, 88 Fed. Reg. at 78768-69. In total, the 10,608 FRP sponsors filed approximately 35,700 Form I-134As, 90 Fed. Reg. at 58037 & n.50, 58039—an average of 3.3 forms each, meaning the typical FRP participants were family units rather than individuals.

d. Of those 35,700 I-134As for FRP parole filed since July 2023, approximately 19,500 were "confirmed," approximately 15,450 "non-confirmed," and approximately 420 were pending review as of December 15, 2025. *Id.* at 58039. The FRP FRN does not break down the non-confirmations by reason, but given the program requirements, the most common non-confirmations were likely that the U.S. citizen or LPR supporter could not prove that they would be able to financially support all of their principal and derivative beneficiaries over the full period of their parole. *See id.* at 58039 n.67 & 58041. More generally, the FRP processes had stricter eligibility requirements than the other supporter-based parole processes.

e. Of the approximately 19,500 I-134As "confirmed" by USCIS, CBP received 16,976 requests for advance travel authorization ("ATA"). *Id.* at 58039. As of January 20, 2025, those ATA requests had resulted in CBP granting 14,069 noncitizens parole through the 2023 FRP processes (including the "modernized" processes for Cubans and Haitians). *Id.* at 58037 n.45.

f. The first parolee granted parole under the "modernized" FRP processes arrived in the United States in November 2023, and the most recent arrived in January 2025. As noted *supra*, each FRP parolee was granted a term of parole of approximately three years from their entry.

g. As of April 2, 2025, there were 1,852 Cubans and 108 Haitians with "valid parole" under their respective "legacy" parole processes. *Id*. The December 15, 2025 FRP FRN states that "currently" there are approximately 1,060 Cubans and 100 Haitians with active grants of parole under the "legacy" processes. *Id*. at 58043.

**Military Parole-in-Place ("MPIP")**

142. The Obama administration established a Military "Parole in Place" ("Military PIP") process through a USCIS Policy Memorandum that it adopted in late 2013 (the "2013 Memorandum") to formalize a practice initiated in 2007. Under the Military PIP process, active-duty military personnel, selected reserve members, and veterans can apply to sponsor for parole their spouses, children, and parents who are already physically present in the United States without inspection or admission. The grant of "parole in place"—so named because the sponsored family members are already in the country—enables the immediate family members of U.S. military personnel to become eligible to adjust status in the United States and thus to become lawful U.S. permanent residents.

143. The first instance of granting military parole in place occurred in 2007, when after significant media coverage and public pressure, DHS Secretary Michael Chertoff ordered the parole in place of a military spouse who was facing deportation while her U.S. military husband was missing in action in Iraq.

144. Military families subsequently began to seek humanitarian parole under the INA's parole provision, but doing so was an *ad hoc* process, with no clear guidance from the military or from USCIS about how to apply, and adjudications were inconsistent. Parole was granted on a

discretionary basis to military family members, but only in about one in every three cases. In a 2010 letter to DHS Secretary Janet Napolitano, a coalition of 18 Republican and Democratic Members of Congress urged the Secretary to "use all the power at your disposal" to "address the immigration needs of our soldiers," citing the example of a U.S. army lieutenant who refrained from volunteering for combat deployment for fear of losing his wife to deportation.

145. In establishing the Military Parole in Place process, the 2013 Memorandum's stated purpose was to "ensure consistent adjudication of parole requests" made by U.S. military service members.

146. The Memorandum noted that "[m]ilitary preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents, and children."

147. The Memorandum similarly noted that "our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them."

148. Noting that parole is one of the "discretionary tools" available to "minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents, and children of military members," the Memorandum amended the USCIS Adjudicator's Field Manual to advise that "parole in place would generally be an appropriate exercise of discretion" for the spouse, child, or parent of a U.S. military servicemember, because the fact that the intended parole beneficiary is an immediate family member of a servicemember "ordinarily weighs heavily in favor of parole in place."

149. Amid public reports in 2019 that the first Trump administration was considering eliminating the Military Parole in Place process, Congress included a provision in the National Defense Authorization Act of 2020 that expressed the sense of Congress that "parole reinforces the objective of military family unity" and expressly directed the Secretary of Homeland Security to "consider, on a case-by-case basis, whether granting [a request for parole-in-place by a member of the Armed forces] would enable military family unity that would constitute a significant public benefit."

150. Reliable statistics regarding the number of individuals who receive Military Parole in Place are not publicly available.

**Central American Minors ("CAM")**

151. CAM was created in 2014 to permit certain nationals of the Northern Triangle countries of El Salvador, Guatemala, and Honduras who are lawfully present in the United States to request that their children still in their home countries be considered for refugee status and humanitarian parole so that the families could be reunited.

152. CAM's creation was prompted by a surge in unaccompanied children from the Northern Triangle countries coming to the U.S.-Mexico border.

153. In addition to family reunification, the CAM program was intended to create a safe and lawful pathway toward family reunification to disincentive children making the overland journey to the southern border. In addition to being dangerous and potentially enriching smugglers, unaccompanied children presenting at the border create unique operational challenges for DHS.

154. In 2017-18, DHS under the first Trump Administration sought to terminate the parole portion of CAM based on its discretion. In a subsequent lawsuit, the district court held that DHS acted arbitrarily and capriciously in terminating CAM and mass rescinding 2,714 conditional

grants of parole to individuals still in their home countries without considering their reliance interests.

155. In 2018, DHS ultimately agreed to finish processing those individuals' parole applications, which it has not yet completed.

156. DHS under President Biden restarted CAM in March 2021 and then expanded the eligibility criteria in June of that year, which were again adjusted in 2023.

157. CAM parolees in the United States have been able to apply for and receive re-parole when their initial grants of parole expired.

**Summary Termination of Humanitarian Parole Processes**

158. During the 2024 presidential campaign, Donald Trump frequently criticized the aforementioned parole processes, promising as early as November 2023 that he would end them on "day one" of his second term as President.

159. As a candidate and as the current President, Donald Trump has denigrated the CHNV parolees as "illegal," notwithstanding their lawful grants of parole.

160. On the day he was inaugurated—January 20, 2025—President Trump issued Executive Order 14165, entitled "Securing Our Borders," that, among other things, directed the Secretary of Homeland Security to terminate all so-called "categorical parole programs," specifically naming "the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans'" as one the Secretary must terminate.

161. In another executive order signed that day—Executive Order 14159, entitled "Protecting the American People Against Invasion"—President Trump directed the Secretary of Homeland Security (among others) to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "[e]nsuring that the parole authority . . . is exercised only on a case-by-case basis in

accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole."

162. And in yet another order signed that day—Executive Order 14161, entitled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats"—President Trump ordered the Secretary of Homeland Security "to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible," which should be "consistent" with the "vetting and screening standards" that were in effect on January 19, 2021—the last full day of President Trump's first term in office.

163. Also on January 20, 2025, then-Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum entitled "Exercising Appropriate Discretion Under Parole Authority" to the heads of ICE, CBP, and USCIS. Upon information and belief, this memorandum has not yet been made public.

164. In the January 20 Huffman memorandum, the acting secretary authorized pausing and terminating "categorical parole programs" because, in his view, they are "blatantly inconsistent with the statute."

165. Although fewer than 800 words, the January 20 Huffman memorandum contains multiple errors of law beyond its conclusion that "categorical parole programs" like U4U, CHNV, OAW, FRP, MPIP, and CAM are unlawful.

166. For example, in an attempt to equate lawfully present parolees with "illegal aliens," the memorandum claims that noncitizens who are paroled into the United States are "inadmissible aliens," have been "found inadmissible," and, after their parole has been terminated, "must be dealt

with in the same manner as any other case for admission to the United States involving an alien found inadmissible."

167. But that contention—that parolees are necessarily inadmissible—is wrong. The parole statute allows inadmissible noncitizens to come to the United States, but a grant of parole does not require or necessarily involve a finding of inadmissibility.

168. The January 20 Huffman memorandum also erroneously describes the limitation on parole enacted as part of the Refugee Act, discussed *supra*, that is codified at 8 U.S.C. § 1182(d)(5)(B). The memorandum claims that the limitation in § 1182(d)(5)(B) means that "it is generally unlawful to parole into the United States aliens with pending applications for refugee status filed abroad" as well as "aliens found to have prima facie asylum claims who are being allowed into the United States to await adjudication of those claims."

169. This interpretation departs from every prior Administration's understanding of § 1182(d)(5)(B), which is that it applies to noncitizens who already have been determined to be refugees pursuant to the procedures created by the Refugee Act—and *not* to those who merely have or could have claims to humanitarian relief.

170. This interpretation also departs from past practice. Prior to being paroled into the country, for example, a significant number of Afghan OAW parolees had pending applications for refugee status filed abroad. Parole was used because those applications would have taken years to be adjudicated.

171. Even more starkly, every Administration since at least the 1990s, including the first Trump Administration, has paroled noncitizens found to have prima facie asylum claims into the United States to await adjudication of those claims. The Supreme Court held that this is a permissible use of the parole statute in *Biden v. Texas*, 597 U.S. 785 (2022).

172. Acting Secretary Huffman's memorandum also misrepresents the statutory parole criteria by adding words that appear nowhere in the statute. Per the statute, parole can be granted "for urgent humanitarian reasons or significant public benefit," but the memorandum claims instead that parole must "either provide[] a significant public benefit to the American public or permit[] the United States to respond to an urgent humanitarian need."

173. The January 20 Huffman memorandum directed that "all future actions taken by DHS with regard to the exercise of the parole authority [be] consistent" with the interpretation of the statute laid out in his memorandum.

174. Acting Secretary Huffman ended his memorandum with a hedge, claiming that "should any court disagree with the interpretation of the parole statute articulated in this memorandum, I clarify that I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

175. In asserting that he was "also implementing this policy as a matter of my discretion to deny parole in any circumstance," Acting Secretary Huffman's memorandum did not specify anything that he considered in arriving at the allegedly discretionary decision to impose the parole policy reflected in his memorandum.

176. The January 20 Huffman memorandum relied on an erroneous understanding of the parole statute regarding both what the statute authorizes and the nature of the Secretary of Homeland Security's discretionary authority thereunder.

177. Also on January 20, 2025, Acting Commissioner of CBP Pete Flores issued a memorandum (the "January 20 Flores memorandum") restricting the CBP personnel authorized to grant parole and requiring that each parole granted by any CBP official be reported to him and the

Chief of Staff, along with a justification for the grant. The January 20 Flores memorandum expressly supersedes any prior conflicting guidance.

178. Later that same week, then-Acting Director of USCIS Jennifer Higgins issued a directive (the "January Higgins directive") prohibiting USCIS staff from making any further decisions on any request for, among other things, parole or re-parole made through the U4U, CHNV, OAW, or other named parole processes.

179. On January 24, 2025, CBP notified airlines of President Trump's executive order to "terminate all categorical parole programs that are contrary to the policies of the United States" and identified the "impacted programs" as "includ[ing]" U4U, CHNV, OAW, FRP, and CAM, among others. CBP warned: "Carriers that transport aliens subject to the Presidential Executive Order may be subject to a carrier fine for each alien brought to the United States."

180. These actions taken by Defendants have, at a minimum, effectively terminated all humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM. Defendants base their actions to terminate these and other humanitarian parole processes, including by refusing to adjudicate pending applications for parole or re-parole through these processes, on their erroneous position that such humanitarian parole processes were and are unlawful.

181. On March 21, 2025, DHS subsequently made public a Federal Register Notice entitled "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," which was officially published on March 25, 2025. Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 11361 (Mar. 25, 2025). Like the January 20 Huffman Memo, the March 25 FRN asserts that "discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria." 90 Fed. Reg. at 13612. As of its date of publication on March 25,

2025, the March 25 FRN "terminat[es] the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members." *Id.* at 13611.

182. The March 25 FRN also rescinds all grants of CHNV parole, stating that "[t]he temporary parole period of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary." *Id.*

183. The March 25 FRN asserts that the Notice serves as "Constructive Notice" of the termination of the CHNV parole processes; "is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance;" and "satisfies the requirement that DHS provide written notice upon the termination of parole." *Id.* at 13620.

184. Like the January 20 Huffman Memo, the March 25 FRN contends that the CHNV parole processes allow "inadmissible" noncitizens into the United States, and that all individuals paroled into the United States under the CHNV parole processes are "inadmissible." 90 Fed. Reg. at 13611, 13612. But a grant of parole does not require or necessarily involve a finding of inadmissibility.

185. The March 25 FRN offers three main reasons justifying its termination of the CHNV parole processes and its termination of individual grants of parole: that the CHNV parole processes are unnecessary to achieve the current administration's border security goals, 90 Fed. Reg. at 13612; that the "domestic impact of the CHNV parole programs"—namely, "significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs"— "do not warrant continuing to operate these programs," *id.* at 13614-13615; and that the CHNV parole processes do not advance the current administration's foreign policy goals, *id.* at 13615.

186. The March 25 FRN further notes that "[e]xpedited removal is available only when an [individual] has not been continuously present in the United States" for at least two years. *Id.* at 13619. As a result, the March 25 FRN justifies the premature termination of individual grants of CHNV parole on the grounds that "[i]f DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal" instead of placing them in expedited removal proceedings.

187. The expedited removal statute, however, can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal, regardless of how long they have been in the United States. *Id.*

188. The March 25 FRN confirms Defendants' intent to terminate humanitarian parole processes for their alleged illegality and make it easier to deport individuals paroled through these processes as quickly as possible: it states that "[f]ollowing this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly [individuals] who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States." *Id.* at 13618. The March 25 FRN adds that "[t]o effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate." *Id.* at 13619.

a. On December 15, 2025, DHS published a Federal Register Notice entitled Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans. 90 Fed. Reg. 58032 (hereinafter, "FRP

FRN"). DHS explained it was terminating the seven FRP processes (as well as the legacy Cuban and Haitian processes) at the direction of President Trump and because they are inconsistent with his "enforcement-based priorities."

b. By way of justification, the FRP FRN asserts that the FRP processes were intended to deter unlawful migration to the United States southwest border and justifies ending the processes because they were not sufficiently effective at achieving that objective.

c. The FRP FRN does not address any of the humanitarian considerations upon which DHS justified the creation of the various FRP processes and scarcely mentions family reunification; nor does it address the country conditions discussed in the various FRNs establishing and modifying the FRP processes for the seven different countries. Instead, the FRP FRN asserts in a footnote merely that "but for the significant public benefit justification, DHS would not have established the FRP programs." 90 Fed. Reg. at 58034 n.11.

d. In addition to terminating these processes prospectively, the FRP FRN announced that DHS would summarily deny all pending applications where the beneficiary had not yet come to a port of entry, no matter the stage of processing.

e. The FRP FRN states that DHS will summarily deny 420 pending Form I-134As (the very beginning of the process), all filed since President Trump re-took office in January 2025; approximately 2,000 cases where the beneficiary is only awaiting travel authorization (the very end of the process); and an unknown number of cases at other processing stages in between.

f. Among the applications that will not be adjudicated were approximately 15,000 parole requests under the "legacy" Cuban family reunification process, which dates to 2007. Unlike the other pending FRP applications, these 15,000 applications were accompanied by filing fees (or a valid fee waiver); those fees started at $360 and went up to $630, depending on the filing

date. The FRP FRN states that these filing fees "will not be refunded as USCIS has already expended resources in partially completing their adjudication." 90 Fed. Reg. at 58042. These filing fees paid by Cuban American citizens and LPRs total several million dollars. Secretary Noem describes the reliance interests of the legacy Cuban sponsors are "minimal." *Id.* at 58041.

g. The FRP FRN also says DHS is cutting short the existing grants of parole for most FRP parolees who are already in the country. The FRN states that, "the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date." 90 Fed. Reg. at 58043.

h. According to the FRN, "[t]here are two circumstances" where an FRP parolee's grant of parole will not end on January 14, 2026. *Id.* One is if Secretary Noem "determines otherwise on a case-by-case basis." *Id.* The other is that FRP parolees who filed an adjustment of status application (Form I-485) "before December 15, 2025 that is still pending adjudication as of January 14, 2026" retain their original parole expiration date until it expires or their adjustment of status application is adjudicated, whichever is sooner. *Id.* A denial of their adjustment of status application immediately terminates their grant of parole and they are "expected to depart the United States immediately if they have no other lawful basis for remaining." *Id.*

i. With the exception of Cubans—who can apply to adjust status after one year of physical presence in the United States under the Cuban Adjustment Act—FRP parolees (like other noncitizens) cannot apply to adjust status until their priority date is current and a visa is available for them. For this reason—and because FRP parolees were paroled into the country to wait here for their priority date to become current—the FRP FRN's exception for parolees with adjustment

of status applications filed by December 15, 2025 will likely apply mostly to Cuban parolees who entered the United States before December 2024.

j. The FRP FRN also states that while pending re-parole requests filed by noncitizens paroled under one of the FRP programs will be adjudicated, "facial eligibility under those programs does not entitle [the noncitizen] to re-parole." 90 Fed. Reg. at 58043. "The [noncitizen] still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole." *Id.*

k. The FRP FRN does not acknowledge that in previous attempts to end family-based parole processes—including under President Trump—DHS had permitted existing parolees to keep existing grants of parole and could file for re-parole under the same criteria and standards applicable to their initial applications for re-parole, citing their significant reliance interests.

l. In explaining why she made the decision notwithstanding the reliance interests of FRP parolees, Secretary Noem asserted that in light of the discretionary nature of parole, their reliance interests were "attenuate[d]," were "qualitatively less" than those considered in DHS v. Regents of the University of California, and thus "are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists." *Id.* at 58044.

m. In terms of third-party reliance interests, like those of employers and landlords, Secretary Noem dismissed those by stating that "even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration." *Id.*

n. DHS considered and rejected three alternatives to en masse truncation of existing grants of FRP parolee: (1) letting current grants expire and notifying the beneficiary of the

consequences of that expiration; (2) "allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available"; and (3) making the mass termination date later than January 14, 2026. 90 Fed. Reg. at 58044.

o. DHS rejected (1) because of the "significant administrative burden on the agency" and the possibility that it could "generate confusion among parolees." DHS rejected (2) because "permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload borne by DHS and USCIS in processing these cases." DHS rejected (3) because "the path" that "DHS decided to employ" instead "will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs to issues deemed essential to securing our borders and protecting the American people against invasion." *Id*. at 58045.

p. Secretary Noem said that once their parole ends, DHS "intends to promptly remove" the FRP parolees "who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States," and that these parolees "should depart the United States before their parole termination date" or "be removed from the United States subject to a final order of removal." *Id*. at 58043.

q. The FRP FRN asserts that it is "exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy." *Id*. at 58045. It provides that "[b]y terminating the FRP programs . . . DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority." *Id*.

r. The FRP FRN asserts that its publication in the Federal Register serves as "Constructive Notice" of its contents that "is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Id*. at 58045.

s. The FRP FRN also purports to self-certify compliance with regulatory requirements. *Id*. ("This Federal Register notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole.").

t. The FRP FRN states that "constructive notice" is "the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses." *Id*.

u. The FRP FRN states that "[f]or legacy [Cuban and Haitian] FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account," and that for all others, USCIS will provide a notice to the "USCIS online account" that they "should have." *Id*.

**<u>Summary Suspension of Adjudicating Parolees' Immigration Benefits Requests</u>**

189. During the week of January 20, 2025, then-Acting Director of USCIS Jennifer Higgins prohibited USCIS staff from making any decisions on any request for any immigration benefit—e.g., for asylum, TPS, adjustment of status, a visa, work authorization, etc.—that would benefit individuals who received parole through any humanitarian parole process, such as U4U, CHNV, OAW, FRP, MPIP, CAM, or other named parole processes.

190. On February 14, 2025, Acting Deputy Director of USCIS Andrew Davidson issued a memorandum to various USCIS directorates and program offices directing them not to adjudicate immigration benefit requests filed by noncitizens who are or were paroled into the United States under U4U, CHNV, and FRP.

191. The Davidson memorandum was a post-hoc attempt to justify the suspension of benefits adjudication that had started weeks earlier.

192. Upon information and belief, the February 14 Davidson memorandum has not yet been made public. Media reporting on the memorandum explained that because paroled individuals are only given work authorization and deportation protections that typically last for two years, many such individuals apply for other immigration benefits, including TPS, asylum, and green cards—but under the February 14 Davidson memorandum, officials will no longer be able to process any applications for such programs or any other benefit, if such requests are filed by migrants who arrived in the United States under the parole processes at issue.

193. The February 14 Davidson memorandum asserted that the suspension of these individuals' benefits requests was based on Executive Order 14161 (discussed above) and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible or consistent with the vetting "baseline" in effect on the last full day of President Trump's first term, stating: "The procedures that the parolees under these categorical parole programs underwent *may* not constitute screening and vetting to the maximum degree possible or comport with the uniform baseline for screening and vetting standards and procedures that existed on January 19, 2021, both of which are required per EO 14161" (emphasis added).

194. The February 14 Davidson memorandum does not cite any statutory or regulatory authority for suspending adjudication of benefits applications, including benefits for which there is statutory authorization, including asylum (under 8 U.S.C. § 1158), TPS (under 8 U.S.C. § 1254a), other requests to adjust status (such as visas under 8 U.S.C. § 1201), or work authorization (such as under 8 C.F.R. § 274a.12).

195. The February 14 Davidson memorandum refers to alleged fraud in the CHNV parole processes that DHS detected, investigated, and, where problems were identified, corrected in the summer of 2024. Some of this claimed "fraud" was based solely on the fact that some

sponsors, like Plaintiff Kyle Varner, felt compelled and were financially able to sponsor more than twenty beneficiaries—often based on the sponsors' sincerely held religious beliefs—which was entirely permissible under the rules of the process. What is more, this alleged "fraud" concerned solely the CHNV processes, yet the Davidson memo's suspension of benefits adjudications—like the January Higgins directive—was far broader than the CHNV processes, affecting other parole processes like U4U. Finally, and regardless, the Davidson memorandum's suspension of benefits adjudications was based only on Executive Order 14161 and the possibility that individuals paroled through these specific processes were not vetted to the "maximum" extent possible.

196. As noted above, most individuals paroled into the United States via the U4U, CHNV, and OAW processes are eligible under statutory provisions enacted by Congress for other forms of immigration relief, including but not limited to TPS, asylum, and/or visas based on familial relationships. The INA, for example, makes clear that "*[a]ny* [individual] who is physically present in the United States . . . *irrespective of such [individual's] status*, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). Individuals paroled in through the family reunification processes are *all* eligible for family-based visas, because that was a requirement to apply for parole through those processes.

197. Yet, per the January Higgins directive and the February 14 Davidson memorandum, the parolees' applications for any of these benefits—all of which would preclude their removal—are now suspended, as are any of their applications for re-parole, employment authorization, and adjustment of status.

198. Meanwhile, at the same time that the Trump Administration has suspended the ability of these parolees to seek relief from deportation by affirmatively applying for benefits, it has aggressively (and unlawfully) expanded the ability of immigration officials to remove

individuals paroled into the country through expedited removal—a shortcut deportation process with few procedural protections and even less judicial review. Those actions are challenged elsewhere but comprise part of the injury and irreparable harm threatening Plaintiffs and others similarly situated.

199. The February 14 Davidson memorandum states that if there is a "litigation need" to lift a suspension of benefits adjudication for individuals paroled through these processes, the suspension can only be lifted on a case-by-case basis with approval of the USCIS Director or Deputy Director, with a memo memorializing the lifting of the suspension as to that individual.

200. Remarkably, the February 14 Davidson memorandum states that these requirements for lifting the suspension apply even when a court issues an injunction or other order directing the lifting of the suspension on a class-wide basis.

a. On December 2, 2025, USCIS announced via a Policy Memorandum two new suspensions of pending immigration benefits requests, effective immediately. See USCIS, Policy Memorandum PM-602-0192 (Dec. 2, 2025) ("Dec. 2 USCIS Memo").

b. First, the Dec. 2 USCIS Memo directs agency personnel to immediately place a hold on all asylum and withholding of removal applications, regardless of the applicant's country of nationality, indefinitely suspending processing of those applications.

c. Second, it directs an immediate and indefinite hold on all pending "benefit requests" for nationals of the 19 countries listed in President Trump's June 4, 2025 entry ban proclamation, regardless of when those individuals entered the United States. As relevant here, this benefit suspension applies to nationals of Afghanistan, Cuba, Haiti, and Venezuela. See Pres. Proc. 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24,497. Unlike the

June 4 entry ban, however, the Dec. 2 USCIS Memo (at n.3) applies to individuals born in one of the 19 countries but who is not a national of that country; and to individuals who have dual citizenship with a banned country and a non-banned country.

d. Agency regulations define "benefit request" as "any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit." 8 C.F.R. § 1.2. Thus, USCIS's immediate hold on all benefit requests for Afghans, Cubans, Haitians, and Venezuelans extends to every conceivable immigration application or request, including for employment authorization (or its renewal), for re-parole or advance parole, to adjust status to a legal permanent resident, and naturalization.

e. The Dec. 2 USCIS Memo, at n.2, states that "benefit request" does not include "USCIS screening activities" undertaken as a part of DHS's removal efforts, including to third countries.

f. In addition to the suspensions ordered, the Dec. 2 USCIS Memo directs agency personnel to conduct a "comprehensive re-review of approved benefit requests" for any individual from the same list of 19 "high-risk countries" who entered the United States on or after January 20, 2021 (the day President Biden was inaugurated).

**Defendants' Actions Cause Harm to Plaintiffs**

201. Defendants' termination of humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM, and Defendants' related suspension of processing of immigration benefit requests, have caused Plaintiffs substantial, concrete, particularized, and irreparable injury.

202. Plaintiff **Svitlana Doe** fled Ukraine following Russia's unprovoked and unjustified incursion into Ukraine. When war struck in 2022, Svitlana and her family lived in a city immediately outside of Kyiv, the capital of Ukraine, one of Russia's initial focal points for occupation. Bombs rained down and fighting broke out regularly in the streets directly outside her

apartment. It was terrifying and unpredictable. Basic necessities like electricity and water soon became unavailable, and all flights out of the country were cancelled. Svitlana and her family eventually fled the capital for another district further away from ground zero, where they remained for about a month and a half before returning to the capital.

203. Svitlana is the mother to a young son with celiac disease. After her son was born and began eating solid food, he became extremely sick with an undiagnosed condition. Even at one of the best hospitals in Ukraine, it took a long time to correctly diagnose her son's condition as celiac disease. It was extremely hard to provide for her son in Ukraine, even before the war. Her son was extremely sensitive—even minimal cross-contamination using the same utensil would make him dangerously ill. Svitlana had to shop around at tens of different grocery stores to find gluten-free products for her son, and when she could find them, they cost twice as much as glutenous products. People would often criticize Svitlana at grocery stores for not buying her son "normal" food. When the war began, it became even more difficult to take care of her son. Grocery prices skyrocketed, and non-glutenous products became all but impossible to find. In 2022, after the onset of the war, her son was hospitalized for a few weeks when he became extremely sick and his stomach swelled up dangerously from contact with gluten.

204. Before the war began, Svitlana never considered leaving Ukraine. She was satisfied with her life and career as a project manager for a large charity foundation doing work inside and outside of Ukraine. But amid her son's failing health and the regular shriek of air raid sirens which forced Svitlana and her family into the earthen basement of their son's school to take shelter from missile attacks, they decided they needed to flee the country. Svitlana began searching for help on the internet and social media. Eventually, she was put in touch with the executive director of a celiac disease research center in the United States. Doctors at the center began exploring Svitlana's

son's condition and treating him from afar, and the executive director eventually volunteered to assist Svitlana and her family through the Uniting for Ukraine parole process. Svitlana and her family received travel authorization in November 2022.

205. After the war began, men were generally not permitted to leave Ukraine due to the draft. However, officers often made exceptions for fathers seeking treatment for their disabled children, so Svitlana scrambled to assemble a comprehensive collection of her son's medical documentation, who had been officially diagnosed as having a temporary disability. The U.S. doctor working with Svitlana's son even wrote a letter documenting the medical need for treatment outside Ukraine. This was an extremely stressful time, since border officials maintained individual discretion and the family could not guarantee Svitlana's husband would be allowed to leave the country. Svitlana's husband and son left first to maximize the odds of remaining together, arriving in Poland in mid-November 2022. Svitlana followed the next day, and met her family in the capital of Poland, Warsaw. From there Svitlana and her family traveled to the United States, arriving on November 20, 2022, and living since their arrival in Dover, Massachusetts.

206. Since arriving, Svitlana's son has continued to receive treatment at the medical center specializing in celiac research. After about a year, his health began to improve dramatically, and he is now a healthy young boy, although he will require a strict diet and comprehensive annual checkups for the rest of his life. Svitlana has worked since receiving her work authorization around April 2022, and she enrolled as a student in community college studying child development. In 2024, Svitlana and her family were re-paroled under U4U, and her current parole status and work authorization is valid until November 18, 2026. Around the beginning of February 2025, Svitlana applied for Temporary Protected Status ("TPS").

207. If her TPS application is not adjudicated or even paused for too long, Svitlana will lose her only chance of being able to remain in safety in the U.S., especially if her parole is revoked as the Trump administration has threatened. If either becomes unavailable to her, she will lose her work authorization, and therefore, her ability to provide for her family. She will not be able to pay her rent (around $2200 per month), purchase groceries (around $800 per month), or pay her family's bills, and her son would no longer be able to receive the treatment he needs to thrive, including weekly speech therapy and stability. Her family would be forced to leave the U.S., but there is nowhere else for her family to go—they cannot return to Ukraine in the middle of a continuing war, where Svitlana's husband would be forcefully recruited into the army upon return. Even if negotiations won out, there is no promise peace would last. And in any event, forests and seas surrounding many Ukrainian cities are now filled with mines and explosives, making travel within the country extremely dangerous. U4U and the availability of TPS have been lifelines for Svitlana and her family, and losing them would cost more than they can bear.

208. Plaintiffs **Maksym and Maria Doe** are a married couple and nationals of Ukraine. They were forced to flee their home in Kharkiv on the day that Russia invaded Ukraine and began bombing the city. Once they found safety, Maksym began looking for a way to do something for his fellow Ukrainians. He and several friends started by coordinating volunteer efforts to evacuate others from cities and towns on the front lines of the war; within six months, they had saved over 22,000 people from eastern Ukraine, solely through the efforts of approximately 200 unpaid volunteers. Eventually, Maksym and his partners formed a nonprofit organization and began raising funds, managing logistics, hiring professionals and converting volunteers into paid employees, and expanding their humanitarian aid operations. In the three years since Russia

invaded Ukraine, the nonprofit has grown to a staff of over 100 employees and has assisted over a half million Ukrainians displaced and affected by the war.

209. Since the invasion, Maksym's work with his nonprofit has been his singular focus. Toward the end of 2022, he and Maria, as well as his partners in the nonprofit, discussed the possibility of Maksym and Maria moving to the United States to expand the nonprofit's work with other humanitarian aid organizations, to raise more funds, and to amplify their ability to provide aid to Ukrainians harmed by the war. Maksym came to the United States first in December 2022 on a visitor visa to research registering a nonprofit in the United States and to explore how to fundraise and collaborate with other humanitarian aid organizations. A generous family friend who has known Maksym and his sister since high school subsequently agreed to be their sponsor to apply for U4U parole. Maria joined Maksym in February 2023 through U4U parole; Maksym then left the United States for Mexico, where he also went through the U4U application process with the sponsorship of his family friend, and was able to return to the United States on U4U parole in April 2023. They received their employment authorization when they entered the United States on U4U parole.

210. After arriving in the United States with only two suitcases and Maria taking all the jobs she could find to earn money, including dog walking, Maria has since found a job as a quality assurance engineer with a tech start-up and recently got a promotion to a Project Management position. Maksym has continued his work with his nonprofit, and after two years of struggle and hard work in the United States, the couple started to feel like they could finally plan for their future. They applied for U4U re-parole and TPS; while Maria's re-parole application was granted in January 2025, Maksym's re-parole application remains pending, as well as both of their TPS applications.

211. As a result, it has been devastating for the couple to learn that that President Trump has terminated U4U and paused the processing of all immigration benefits applications of U4U parolees. Maksym's U4U parole expires in April 2025; if his re-parole application or TPS application is not processed and granted by that time, he will lose his legal status and his work authorization. Maria plans on filing an application for an H-1B work visa with her employer soon, because an H-1B visa will help provide the couple with a more stable and predictable legal status, but it is unclear if that application will ever get processed. After working so hard to come to the United States legally, and after doing all they could to maintain their status to remain here legally so that they can continue working and supporting Maksym's humanitarian efforts in Ukraine, it feels like all the doors are being slammed in their faces. Maksym and Maria never thought that they would have to face the prospect of being displaced, yet again, from a democratic country like the United States.

212. Plaintiff **Alejandro Doe** fled Nicaragua because of increasing physical danger to his family and untenable economic conditions. In 2018, demonstrators in several Nicaraguan cities began protests against social security reforms decreed by President Daniel Ortega. The demonstrations were heavily oppressed, and government and pro-government militia and security forces used live ammunition on protestors resulting in hundreds of civilian deaths. Countless others were imprisoned.

213. Alejandro's father was among those imprisoned. While searching for his uncle, government actors abducted Alejandro's father from his grandmother's house where he lived, beating and violently interrogating him on the way to prison. Once there, guards physically and psychologically tortured him for three days, telling him that they would kill him and that he would

never leave the prison. He was withheld food for most of the duration of his three-day imprisonment.

214. Although Alejandro's father was released, he was labeled an opponent of the regime, and Alejandro felt they had no choice but to leave the country for their safety. Alejandro's cousin, a U.S. citizen who lives in Washington, sponsored him and various other members of his family through the parole process for Nicaraguans. Alejandro received travel authorization on May 15, 2024, and arrived in the United States on July 29, 2024. Since arriving in the United States, Alejandro has lived in Gainesville, Georgia, and since receiving work authorization has worked producing marble bathroom panels. To ensure he would not lose his newfound safety, Alejandro filed an application for asylum (Form I-589) on January 21, 2025.

215. When Alejandro learned of the Trump administration's indefinite pause on processing applications for immigration relief filed by individuals who came to the U.S. through CHNV parole, it came as a gut punch, especially considering the U.S. government's recently announced plans to terminate CHNV parole. For years, the Nicaraguan government has considered individuals who apply for asylum in other countries to be political dissidents. What's more, the Parliament loyal to President Ortega recently legalized the banishment and denial of entry or exit to people deemed to be critics of Nicaragua, including Nicaraguan citizens. Alejandro is distraught about what will happen if he is deported and cannot reenter Nicaragua, or if the Nicaraguan government arrests, interrogates, or tortures him or his family upon return given his family's history of political persecution by the State. Asylum and parole were the only avenues that could keep Alejandro and his family safe. If he is no longer permitted to remain the U.S., he would be forced to look for alternative places to flee, because he cannot safely return to Nicaragua.

216. For Plaintiffs **Ana Doe** and **Armando Doe**, fleeing Nicaragua and obtaining parole through the CHNV parole processes was a matter of seeking stability and safety from the ongoing persecution and violence they faced in Nicaragua. Similar to Alejandro Doe's account, due to the increasing political repression and systemic violence under the Ortega regime, Ana's family has been persecuted for their political ideologies and involvement in anti-government protests. In 2018, while the police were actively looking for Ana's uncle, they found and detained her father instead. Ana's father spent days in prison where he was interrogated and tortured. Although he was eventually released, Ana's entire family had become people of interest in the eyes of the government, and they remained vulnerable to future persecution and violence. In 2020, Armando worked at a digital media company that published information regarding the political situation in Nicaragua and government abuses in the country. Before his arrival at the company, the government found and detained some employees of the company because they were discovered to be assisting some people who had been protesting during a hunger strike. While these individuals were eventually released and fled the country for their safety, it was evident that the government was keeping a close eye on Armando's employer—labeling his employer as anti-government—and Armando's safety grew ever more precarious, despite the precautions he took.

217. The CHNV parole processes have provided Ana and Armando a safe pathway to escape the danger they faced in Nicaragua. Ana and Armando were sponsored by Ana's cousin, a U.S. citizen who lives in Washington state, and Ana and Armando subsequently received authorization to travel to the United States through the CHNV parole processes in December 2023. They both arrived in the United States and were granted two-year periods of parole in February 2024. Since then, Ana and Armando have created a home and community in Gainesville, Georgia, where they reside along with Alejandro Doe, Carlos Doe, and other members of their family. They

have been welcomed by the local community in the Gainesville area. Since Ana and Armando received work authorization under CHNV parole, they have both been working full time. Ana works at a company that provides personal protective equipment, where she is responsible for overseeing the company's inventory and supporting the company's warehouse. Armando works for a company installing machinery on trailers. Ana and Armando have been saving up money for their own futures while also supporting their family and loved ones who remain in Nicaragua. In January 2025, knowing that they needed to seek additional legal protection from the dangers and risks of persecution they face in Nicaragua, Ana and Armando applied for asylum.

218. The news about the Trump administration's halt on processing applications for immigration relief filed by individuals who came to the United States through the CHNV parole processes came as a shock to Ana and Armando. This pause means that their asylum applications could be delayed indefinitely or not adjudicated at all in their remaining authorized time in the United States. Since their parole was only for a two-year period, Ana's and Armando's ability to seek asylum was their only avenue to ensure they can continue living a life free from the fear of persecution and danger they face in Nicaragua because of their political and ideological beliefs. If their applications remain on hold and they are subsequently removed, both Ana and Armando face the risk of being returned to the very danger and instability they fled in Nicaragua. Alternatively—if they are removed from the United States and the Nicaraguan government does not allow them to re-enter the country—Ana and Armando would be rendered stateless. Their ability to obtain work authorization through the asylum application process is likewise vital for them to be able to continue working and providing for themselves and their families after their parole expires and while they await the adjudication of their asylum applications. Given these risks, this indefinite

pause on processing these applications for immigration relief and the impending termination of the CHNV parole processes irreparably harms Ana and Armando and their family.

219. Plaintiff **Carlos Doe** also fled Nicaragua due to the political instability and direct persecution he and his family faced by the Nicaraguan government. In 2018, while he was a university student, he became involved in protests against the government. Eventually, more protests broke out in his city, resulting in numerous assassinations and disappearances. Based on his involvement in these anti-government protests, the Nicaraguan government identified Carlos as a dissident and actively persecuted him and his father. Soldiers and police officers came to his family's home multiple times in search of Carlos and his father, making death threats against Carlos and his family. Given the danger and active persecution against Carlos and his father, they both decided to go into hiding. However, while in hiding, Carlos and his father continued to receive death threats, and at one point military soldiers came to Carlos's mother's house and told her they would imprison him and his father if they ever found them.

220. Once Carlos learned about the CHNV parole processes, this path became a way for him to safely flee the danger and persecution he faced in Nicaragua. Carlos was sponsored by a U.S. citizen family member, and in May 2023, he received travel authorization to come to the United States under the CHNV parole processes. Carlos arrived in the United States and was granted a two-year period of parole in June 2023. Since his arrival, Carlos has created a community for himself, comprised of friends and family (including Ana, Armando, and Alejandro). He has also made many connections and friendships through his work experiences. Currently, Carlos works as a welder and solderer at a manufacturing plant. His ability to work in the United States with authorization has enabled him to provide for himself, his mother and younger brother who

remain in Nicaragua, and his sister who currently lives in Costa Rica. Due to the risks of persecution and danger he faces in Nicaragua, Carlos applied for asylum in January 2025.

221. After learning about the Trump administration's indefinite suspension of processing applications for immigration relief for individuals who entered the United States with CHNV parole, Carlos became very worried about how this pause will affect his ability to seek asylum. Because his asylum application could be delayed indefinitely or not adjudicated at all, Carlos's only prospect of safety here in the United States beyond the end of his parole period has been stripped away from him, leaving him at risk of losing legal status or deportation back to Nicaragua where the government knows where he lives and has actively persecuted him. Moreover, obtaining work authorization through his asylum application is imperative for him to be able to support himself and his family in Nicaragua and Costa Rica, and this indefinite pause on the processing of his asylum application could render him without the ability to work, including once his parole expires or is terminated, which would harm both him and his family who rely on him.

222. Plaintiff **Miguel Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Miguel learned of the CHNV parole processes for Nicaraguans about a year before he arrived. He spent a while deciding whether he wanted to leave his home, including his mother, with whom he lived and whom he helped take care of. In Nicaragua, COVID-related challenges and changes to his university's programs and requirements made it difficult for Miguel to receive consistent university education and progress toward a degree. It was also challenging to find a stable job that would allow him to make enough money to support himself and help his mother. Miguel decided to leave his friends, family, and community in Nicaragua for the United States because he knew it was the best way to

help his family and his own future. He saw the United States as a land of opportunity and the CHNV parole processes as a safe, legal pathway there. He was excited to work hard for two years, save up money, and improve his and his family's future.

223. In the United States, Miguel received work authorization in September 2024 and was able to quickly find work full-time producing marble panels. He has enjoyed his experience in the United States thus far, working hard and spending time with family outside of his job. However, when he heard about the Trump administration's end to CHNV parole and the revocation of parole and work authorization for people like him, he felt scared and betrayed, and he became fearful of going outside in public given raids and deportations happening in his own town of Gainesville. Miguel has been in the United States for less than a year, and he was granted two years of parole when he entered. The inability to continue to work here for the remaining part of his parole period means that he will not be able to support himself or his mother as well, given his family's limited resources in Nicaragua. In less than a month, Miguel will be subject to imminent deportation, so he is forced to make decisions that will affect his and his family's lives and livelihoods on an extremely expedited timeline.

224. Additionally, Miguel is worried about what will happen to him and his family if he is deported or otherwise forced to return, given his family's history of political persecution there. When Miguel was a teenager, his family experienced persecution that forced them to flee Nicaragua. He is also aware that the Nicaraguan government treats parolees and people being sent back from the United States with increased scrutiny, and that his family could be subject to harm if they returned. The early termination of Miguel's parole, combined with the administration's suspension of processing immigration benefits for parolees, deprives him of the opportunity to

have adjudicated an application for asylum and any other relief for which he is eligible. His legal status, work authorization, and options for protections have been erased all at once.

225. Plaintiff **Andrea Doe** arrived in the United States in June 2023 with her two young children, Isaias and Francisco Doe, to reunite with her husband, Rafael Doe, a former political prisoner in Nicaragua. The family lives in Mount Airy, Maryland. Rafael Doe was part of a group of 222 Nicaraguan political prisoners and prisoners of conscience whom the government of Daniel Ortega had abruptly released from prison on the condition that the United States government accept them. As many of these prisoners—Rafael Doe included—had been arbitrarily detained for very long periods, all had been exposed to harm amounting to torture, and many had pressing medical needs, the U.S. State Department agreed to evacuate them. The Nicaraguan government proceeded to strip the 222 passengers on this February 9, 2023 flight to the United States of their Nicaraguan citizenship, rendering most of them stateless.

226. Due to the extraordinary circumstances of their departure from Nicaragua, none of the 222 were able to leave Nicaragua with their family members unless they too had been imprisoned as part of this group. After paroling the passengers on the February 9 flight into the United States, the State Department asked those needing to reunite with their family members to use the CHNV parole process to bring them here. *See* U.S. Dep't of State, 222 Nicaraguan Political Prisoners Released, Enter U.S.—Frequently Asked Questions and Resources (https://www.state.gov/222-nicaraguan-political-prisoners-released-enter-u-s-frequently-asked-questions-and-resources/).

227. Reuniting his family was an urgent priority for Rafael Doe. He had been a political prisoner for over four years before being expelled from his own country. Not only was the continuing separation from his wife and two very young children humanly difficult for all of them,

but the Nicaraguan government had been monitoring and harassing his wife, and Andrea Doe was afraid for her own safety and that of their children.

228. Since being reunited in the United States, the family has been doing well. The couple are working for the same company that had first hired Rafael, they have rented their own apartment, and their children have settled into their new school and made friends. The family has applied for asylum, with Rafael as the principal applicant, including Andrea and their sons Isaias and Francisco in his application. The suspension of processing of that application prevents the whole family from achieving permanent safety in this country, and they have no other: stripped of his Nicaraguan citizenship, Rafael could not return to Nicaragua even if it were safe for him, which it is not. If Andrea and the children's parole were terminated and they could not get their asylum application processed, Andrea fears she would be detained in Nicaragua and that her children would be taken away from her.

229. Plaintiff **Lucia Doe** was granted travel authorization in May 2024, arrived in the United States in July 2024, and was granted a two-year period of parole. Back in Venezuela, Lucia lived with her mother and helped provide for her. Lucia holds a bachelor's degree in Christian Education from the Theological University of the Caribbean in Puerto Rico, and she worked at the Director of Children's Ministries at a local Christian church in Venezuela, but her salary was only around $60 a month, a very typical monthly salary where she lived. This was not nearly enough to cover her and her mom's most basic needs, including food, rent, and clothing, let alone the expensive medical care that her mom requires. Their basic expenses alone were around $500 a month. They were not able to survive on Lucia's income, so, like many other people who lived around them, they had to rely on financial support from family members living abroad. Lucia's

siblings, including Plaintiff (and Lucia's CHNV sponsor) Lorena, sent money back to Venezuela regularly to help them get by.

230. When Lucia heard about the opportunity to come to the United States on CHNV parole, she knew she wanted to pursue the pathway so she could work and help their family in a more robust way. She came to St. Augustine, Florida, because, from a previous trip she made to Florida when she was studying in Puerto Rico, she had several friends living and working there. She knew it would be easier to find work and use public transportation there, as opposed to in rural Massachusetts, where Lorena lives. Lucia received her work permit in August 2024, started working at a cleaning company, and has settled into the community in St. Augustine. She attends a local Christian evangelical church and hopes to get involved in their ministries.

231. The Trump administration's end to CHNV parole and the premature revocation of Lucia's parole and work authorization will force Lucia to, in a very short time, make many crucial decisions that will impact her own livelihood and that of her family members. If she is not able to stay in the United States for the two years that she was granted parole, she would be returning to Venezuela with very little savings, which would make her future here uncertain and create more of a financial burden for her siblings. She would not be able to provide the financial support that she planned for her mother, and she would face challenges finding a job in Venezuela, where is it very difficult to secure employment as someone older than 40 years old. Having to make these decisions rapidly or risk the threat of accruing unlawful presence that could prevent her from returning to the United States or deportation back to Venezuela, is causing Lucia a lot of anxiety.

232. The conditions in Venezuela also threaten Lucia's safety and stability. Without a job for potentially a lengthy period of time, and given inflation that has made necessities unaffordable for the majority of the population, Lucia would struggle even more than before to

pay for her basic daily needs, let alone those of her parents. There are also frequent, mass internet and power blackouts, and basic services like water, gas to cook, and transportation are often unavailable for days. She will need to deal too with the constant concern of crime and violence. Lucia is especially scared of what could happen to her if she is forced to return to Venezuela, because she has heard that the Venezuelan government interrogates people who have sought parole in other countries, and military officials have forced people to pay money at the border to be allowed in. She has heard of Venezuelan citizens having their passports confiscated, being imprisoned, and even being disappeared.

233. Plaintiff **Daniel Doe** is a Haitian national who was granted parole for two years through the CHNV Haitian parole process in February 2024. Daniel, his wife, and their three-year-old daughter faced imminent danger and risk of kidnapping from gangs in Haiti, in both neighborhoods where they lived. Daniel also worked as a court interpreter for foreigners, and occasionally as a general interpreter for the U.S. Embassy, the Haitian National Police, and the Catholic Relief Services. Daniel has been specifically targeted by the gangs, including being followed by gang members on motorcycles who have also ridden by his house. As a result, Daniel had to change the cars he drove to work, and the routes he took. Daniel's wife also received a warning that she and Daniel should "be careful," which they took as a warning that gangs were watching their movements, and that Daniel was a potential kidnapping target due to his work in Haiti.

234. These incidents drove Daniel and his wife to the decision to seek safety outside of Haiti. In early 2023, Daniel's father's friend offered to sponsor Daniel through the CHNV parole process for Haitians. Because his father's friend had already agreed to sponsor several other of his own family members, he could only financially afford to sponsor just one more person. He

submitted his sponsorship application for Daniel in April 2023. Later that same year, because Daniel's other application was taking a long time to process, Daniel and his wife learned about Welcome.US and their matching process where they would match prospective CHNV beneficiaries with individuals who could serve as sponsors. Daniel and his family were matched with a sponsor through Welcome.US, who submitted their sponsorship application for Daniel, his wife, and their daughter in early January 2024. About a week after this application was submitted, Daniel received travel authorization to come to the United States through his father's friend's sponsorship application. Although it was extremely difficult, Daniel and his wife decided that Daniel should use this travel authorization to come to the United States on CHNV parole alone. Daniel's parole expires in February 2026, and his wife and daughter remain in Haiti with their pending application through the Welcome.US sponsor. In September 2024, Daniel was also granted TPS until February 2026, but due to the administration's recent termination of Haitian TPS, that status is also now only valid until August 2025.

235. Daniel received his work permit in March 2024. Although it required some adjusting to life in the United States, Daniel has been able to adapt and become part of the community in Orlando. He has joined a local Haitian church and is currently working as an English as a Secondary Language ("ESL") teacher at two different schools serving adult students who are immigrants or in the United States on a student visa. Daniel also supports the Haitian community by providing free online classes to Haitian immigrants who have recently arrived to the United States, teaching them about U.S. culture, teaching them English, and providing general updates on immigration policies affecting the Haitian immigrant population.

236. The Trump administration's end to CHNV parole and the premature revocation of Daniel's parole and work authorization will prevent him from being able to continue working,

which is essential not only for him to support himself but also for him to be able to support his wife and daughter who remain in Haiti, as he is the main financial supporter for them. Daniel will also be at risk of imminent deportation back to a country where he faces increased risk of targeting by gangs, and the administration's suspension of processing immigration benefits for parolees deprives him of the opportunity to have adjudicated an application for asylum and any other relief for which he is eligible. Moreover, with the CHNV parole processes terminated, the chance for him to be reunited with his wife and daughter here in the United States through CHNV parole is lost.

237. Plaintiff **Omar Doe** is an Afghan national who faithfully and loyally served the U.S. military in Afghanistan for over eighteen years, despite threats and persecution from other Afghans, including his own family members, that forced him to relocate his wife and children from his home province. He built up good relationships with the soldiers he worked with, so when the U.S. military withdrew from Afghanistan in 2021, they brought Omar and his family with them. His departure from Afghanistan was chaotic—up until just two or three days before the collapse of the Afghan government, he was stationed with U.S. troops in Kandahar Province. They were relocated to the Kabul airport, and then suddenly, at 3 am in the morning, he was told that if he wanted to bring his family with him to the United States, they would need to come to the airport immediately. Omar called his father, who was able to bring his family to the airport at 6 am, but congestion and crowding at the airport was so dense that Omar's family was only able to reach him at 10 am. That brief interaction, when Omar received his family at the airport, was the last time Omar saw his father. He never got to say goodbye to his mother.

238. Upon arriving in the United States, Omar was registered by the troops he had worked with and given a work permit. He was told that he would receive a passport and a green

card, and he was told not to worry about anything. Three and a half years later, however, he has yet to receive permanent legal status in the United States, which has been extremely traumatic and stressful for him and his wife. Although he is grateful that his family is safe here and that his children are in school, the lack of legal documentation has caused so much stress that he has lost all his hair, and he and his wife have both lost teeth. After so many years of service to the U.S. military, it is very frustrating to Omar that he still lacks permanent legal status.

239. Shortly after arriving in the United States, Omar applied for a Special Immigrant Visa ("SIV"), which are issued to, among others, Afghan nationals who provided faithful and valuable service to the U.S. government, and who endure serious threats because of that service. In addition, because his parole and work authorization will expire in September 2025, he is working with a nonprofit to file an asylum application, which will enable him to maintain his work authorization so that he can keep working to support his family until his SIV is granted. But the Trump administration's pause on the processing of immigration benefits means that these applications will not be adjudicated. This is especially hard for Omar to stomach, given all that he has done and sacrificed for the U.S. military over the course of most of his adult life. Going back to Afghanistan is not an option for him and his family after his service to the U.S. military, and he does not know what will happen to them if they are deported there. Omar had expected dignity from the government that he had served and that brought him to this country, but that has not happened for him.

240. Plaintiff **Sandra McAnany** is a U.S. citizen and sponsor for seventeen individuals who were approved to come to the United States and granted parole through CHNV. Fifteen of these beneficiaries who are currently in the United States are nationals of Venezuela, and two are nationals of Nicaragua. They all arrived in the United States between September and December

2023 and were approved for two-year parole periods and work authorization. To Sandra's knowledge, most have pending asylum applications that are now on hold due to the administration's suspension of processing immigration benefits requests for CHNV parolees. Sandra's beneficiaries include five sets of parents with young children, who were only able to reunite with family members in the United States because of the CHNV parole process, and six adults without children. They seek both stability with their families and safety from persecution and violence in their countries of origin. One beneficiary is a mother of two young kids whose husband was diagnosed with cancer while she was in Venezuela, and her grant of CHNV parole allowed her to care for him while he went through treatment.

241. Sandra also has four CHNV applications, for nationals of Cuba, that remain pending. Due to the administration's termination of the CHNV parole process and end to processing new CHNV parole applications, these applications will now never be processed. Daily life in Cuba is extremely difficult for these beneficiaries, as they struggle under the government system there to make enough money to pay for food for themselves and their families. They sought to come to the United States through CHNV parole either to reunite with family or to earn money to support their families in Cuba, including for critical medical treatment. One of these Cuban beneficiaries has also lost jobs in Cuba for speaking out against the government and fears being arrested if he continues to speak out. He and other beneficiaries hope to experience the democracy and freedoms of the United States.

242. Sandra was driven to serve as a CHNV parole sponsor by her religious convictions, her experiences volunteering abroad in Central and South America, and her close connections with immigrant neighbors and friends in Wisconsin. As a Christian, she believes strongly in caring for others and supporting those in need, so sponsoring immigrants through CHNV parole allows her

to live out her religious convictions in a meaningful way. In addition to putting considerable time and effort into completing the applications for her beneficiaries, Sandra has provided constant support, advice, and resources to them as they traveled to the United States and integrated into their communities. She provided travel guidance and support on job searches and enrollment in English classes, and one family lived with her in her home for over a year while the parent got a work permit and found a job. She helped pay for some of her beneficiaries' initial cell phone plans, and she provided winter clothing or money to buy it for several families weathering a harsh winter for the first time.

243. Over the last couple years, Sandra has allocated large amounts of time, effort, and money into helping the people she sponsors establish safe and stable lives in the United States, and in growing those relationships, she has come to see many of them like family. The administration's premature termination of grants of CHNV parole and pause on processing her beneficiaries' asylum applications means that all the time and money she has invested could be lost. If her beneficiaries become vulnerable to deportation, Sandra fears the harm that will come to them if they are forced to return to their countries of origin, and she will lose relationships that are valuable to her as a meaningful way to live out her faith. She worries that she may never be able to see them again.

244. Plaintiff **Kyle Varner** has long been involved in supporting liberal and libertarian political movements in Venezuela, and he has done global health work at the Venezuelan border. Through his experiences, he has seen the challenges faced by people in poverty in the country. His personal and political convictions have led Kyle to serve as the U.S.-based sponsor for seventy-nine individuals through the CHNV parole processes, seventy-seven of whom are nationals of Venezuela. Of the forty-three of those individuals who are currently in the United States, at least

thirty-one have pending applications for asylum, TPS, or other forms of immigration relief. The first of Kyle's beneficiaries arrived in the United States in November 2022. The people he has sponsored include a son who could only pay for his mother's life-saving cancer treatment because he got a job in the United States, and a mother and her young son who lived with Kyle's parents for eight months when they first arrived.

245. Kyle also has thirty-two other pending applications for CHNV sponsorship, including for one Cuban individual and one Nicaraguan individual. Due to the administration's termination of the CHNV parole processes and end to processing of new CHNV parole applications, these applications will now never be processed, and the beneficiaries are deprived of a legal pathway to the United States. In Venezuela, these beneficiaries will continue to struggle with low wages and extreme poverty, violence and crime, and government systems that are unable to support the country's residents.

246. Kyle has dedicated immense time, effort, and money into supporting the people he has sponsored. He spent hours submitting applications, and after people received approval to travel to the United States, he purchased plane tickets for most of them. After they arrived, he helped them find safe housing, including allowing many of them to live with him temporarily at first. He also co-signed leases and rented properties that he owns to many beneficiaries for reduced rates and under favorable terms. He purposefully kept some of his properties vacant when he was waiting for his CHNV sponsorship applications to be granted, which meant he missed out on leasing them to other renters. Kyle paid for most of his beneficiaries' work permit applications, helped them with job applications and enrollment in English classes, paid for cell phone SIM cards, and even taught a few how to drive. As a physician, he provided free medical care for minor health conditions and helped translate Spanish-language medical records from Venezuela.

247. When his beneficiaries were applying for asylum, TPS, and other forms of immigration relief, Kyle lent money to some to help pay for attorney fees, helped them compile documents, and otherwise provided resources that they needed to complete their applications. Kyle has invested significantly in all of his beneficiaries to assist them in settling into their communities in the United States so they can in turn support their families and other loved ones. The time and money he has invested could be lost if his beneficiaries' applications for relief are not adjudicated. Additionally, if his beneficiaries lose their work authorization because of a change in their status, Kyle would need to put more time and resources into making sure they have everything they need to survive.

248. Plaintiff **Wilhen Pierre Victor** is the U.S.-based CHNV parole sponsor for seven of her family members from Haiti. Five of them—her brother, his wife, and their three children—were approved to travel to the United States in May 2024, and arrived between June and July 2024. They were all granted two-year periods of parole, and they all live with Wilhen and her two children in Woburn, Massachusetts. Wilhen also has two pending CHNV sponsorship applications for her niece and cousin, both of whom are still in Haiti living under unstable political conditions and subject to the daily threat of violence. Wilhen's niece is thirteen years old and in Haiti without either of her parents. She is unable to attend school consistently because there is often gang violence, including gunfire, in the streets where she lives, which prevents her from going outside at all. Sometimes, she is unable to leave to go to school for up to a week. Wilhen's cousin, who is fifty years old, lives with the constant fear of kidnapping for ransom, especially if the gangs find out she has family in the United States. She has heard of people being kidnapped and murdered when they cannot produce large sums of money. There are often days when she cannot go outside even to run minor errands because of the fear of gang violence. Given the administration's end to

processing new CHNV parole applications, Wilhen's applications to bring her niece and cousin to the United States will now never be processed. Because of this, Wilhen's niece and cousin continue to live in terror of the ongoing violence in Haiti, and they are unable to reunite with their family members in the United States.

249. Wilhen applied for a green card for her brother back in 2007, and they were still waiting for an interview with USCIS when the parole process for Haitians was announced in 2023. Wilhen sponsored him to come through CHNV parole because it provided a legal way for them to reunite in the United States and to bring Wilhen's family to a safer, more stable place while they continued to await adjudication of the green card application, which remains pending.

250. Back in Haiti, Wilhen's brother had been unable to find a job for thirteen years due to the lack of economic opportunities. His wife worked as a salesperson for a small business, but they relied on support from Wilhen and other family members to survive. Their children were not able to attend school consistently, and their family dealt with frequent reports of kidnappings, murders, and other violence. In the United States, Wilhen's brother has obtained work authorization and is working at a local nursing home. His kids are enrolled in school as well, and he and his wife are both taking English classes and attending their local church.

251. Being together as a family has been beneficial for Wilhen, her brother, and his entire family, and Wilhen has invested her time and energy into ensuring that they arrived safely and have had the resources to settle into their lives in the United States. When her brother and his family were approved to travel to the United States through the CHNV parole processes, Wilhen pooled money with other family members to pay for their plane tickets. She prepared her home for all five of them to stay with her. Once they arrived, she picked them up at the airport, where they were overjoyed to be reunited for the first time in more than twenty years. Wilhen then supported

them all while her brother received his work permit and looked for work, and she helped him find his current job.

252. The administration's premature termination of grants of CHNV parole and pause on processing applications for immigration relief for individuals who came to the United States under CHNV parole means that her brother's longstanding green card application could be delayed even further or not adjudicated at all, and that he could become vulnerable to deportation and lose out on the chance to apply for asylum as well. The years that Wilhen and her brother have spent waiting for it to be processed will be lost, and her brother and his family could be forced to return to a life in Haiti rife with instability and violence. Given the difficulty of finding a job in Haiti and the frequent violence Wilhen's family experienced there, the end to the CHNV parole processes and suspension of adjudication of immigration benefits causes direct harm to Wilhen and her loved ones.

253. Plaintiff **Gabriela Doe** is the U.S.-citizen CHNV parole sponsor to her cousins, who are Nicaraguan nationals—Ana Doe, Armando Doe (Ana's husband), Alejandro Doe, and Miguel Doe. Carlos Doe is also her cousin, but he was sponsored through CHNV by another family member. After her father passed away in June 2023 from cancer, her cousins were a great support for her during a difficult time. Thus, Gabriela wanted to help her cousins in any way she could and carry on the legacy of her father who was known for always taking care of his family. Knowing her cousins faced dangerous living conditions, violence, and persecution in Nicaragua, Gabriela offered to support her cousins through CHNV sponsorship. Gabriela submitted her sponsorship applications for her four cousins in 2023. All the cousins she sponsored arrived in the United States and were granted parole under CHNV at different points throughout 2024.

254. Since arriving to the United States, Gabriela's cousins have acclimated to life here in the United States and have become self-sufficient in supporting themselves since they secured work authorization. Gabriela has been able to reunite with them in Gainesville, Georgia where they currently live, and she feels proud of how well they are doing here in the United States and how well they have supported one another.

255. The Trump administration's termination of CHNV parole and the premature termination of all five of her cousins' grants of parole has left Gabriela feeling very scared and worried for her cousins. If their parole prematurely ends and they are left without status, they will be at risk of being removed back to Nicaragua, a country where they—and their entire family—face grave risks of danger and persecution by the Nicaraguan police and government because of their political ideologies. Her cousins will also be left without work authorization and the ability to support themselves and their other family members. Given that Gabriela has clinical depression and anxiety, the termination of her cousins' parole status and the impending effects that could have on them and their well-being would cause Gabriela severe psychological distress.

256. Plaintiff **Norma Lorena Dus ("Lorena")** is the U.S.-based CHNV parole sponsor for her sister, Plaintiff Lucia Doe. Lorena submitted the CHNV sponsorship application for Lucia in December 2022, and Lucia was approved to travel to the United States in May 2024. Lucia arrived in July 2024 and was granted a two-year period of parole, and she received her work permit a month or so later. Lorena paid for Lucia's plane ticket and her work application fee, and she sent money to help support her while she was waiting for her work authorization.

257. Once Lucia started working and was able to, she began sending money back to their parents in Venezuela, something Lorena and their other siblings who live abroad do consistently. Lucia came to the United States precisely because she sought the opportunity to work and earn

wages that would allow her to support herself, help alleviate the financial burden on her siblings, and provide for their parents, including their mother, who has health conditions that require expensive doctor's visits, exams and labs, and medication. Their mother has to pay for her medical care out of pocket, but she receives a pension that is not even enough for a dozen eggs. Lorena and Lucia saw the CHNV parole process as a blessing for their entire family.

258. In addition to the economic opportunity, Lucia being in the United States has made it easier for their family to reunite. Last October, Lucia traveled to Massachusetts, and their mother and other siblings traveled in as well. For the first time in six years, all the siblings were together for a joyful reunion. As a U.S. citizen, it is difficult for Lorena to travel in and out of Venezuela, so having Lucia closer has allowed them to see each other more and strengthen their relationship.

259. The administration's termination of CHNV parole and the premature termination of Lucia's parole was devastating for both Lorena and Lucia. Lorena feels disappointed and hurt that the government would punish people like Lucia who applied from abroad, are supported by a sponsor, came through a legal pathway, and are working to support themselves and contribute to the economy. If Lucia is forced to return to Venezuela, Lorena will need to send more money back to her parents to help make up the difference, which will cause financial strain on her and require her to stretch financially and make more sacrifices to help them. Lorena is also already experiencing the emotional and psychological toll of her sister facing the possibility of imminent, sudden deportation, after having come to the United States with the permission of the government, and the decisions they have to make together as a family to try and keep her safe.

260. Plaintiff **Valentin Rosales Tabares** fled his birth country of Cuba for the United States in 2016 and received his green card in 2017. That same year, he was able to submit a family-based immigrant visa petition for his wife and son, who was less than 18 years old at the time, and

another petition for his daughter. Both of these petitions were approved in May 2018. In 2022, Valentin was overjoyed that his wife and son received immigrant visas and were able to reunite with him in Portland, but his family remained separated: his daughter and her young daughter, Valentin's granddaughter, continue to this day to wait for their immigrant visas in Cuba. Valentin's son also had to leave his wife and young son behind in Cuba.

261. Valentin fears for the safety and stability of his family members still in Cuba every day. The living conditions in Cuba have been incredibly difficult for many years, and they continue to deteriorate. In Valentin's family's experience, there are often food, gas, and electricity shortages, including long periods of time where there is no electricity at all. There is very limited public transportation, so travel is nearly impossible. Cuba has also seen an increase in violence and crime, as well as retaliation from the government for speaking out. Valentin's daughter and granddaughter are afraid to leave their home even to get groceries, and other family members have suffered from incidents of theft that are on the rise.

262. When Valentin learned about the CHNV parole processes in February 2023, he applied to sponsor his son's wife and child for humanitarian parole. Those applications were never adjudicated and, due to the administration's termination of the CHNV parole processes, now never will be.

263. In November 2024, Valentin also learned that he had been invited by the Department of State to request Cuban Family Reunification Parole for his daughter, which would allow his daughter to come to the United States while she waited for her family-based immigrant visa to become available. Valentin quickly submitted the request for Family Reunification Parole in December 2024, and only a few days later, it was approved. He and his wife were excited that they would finally be reunited with their daughter and granddaughter after so many years, and they

set about preparing for her travel. They paid for the medical exam that his daughter was required to do for the parole process, prepared a room in their home for their arrival, and purchased winter clothes and other items for them to feel welcome. However, as they waited eagerly for the issuance of a travel date for their daughter, it never came. In January 2025, Valentin received the news that the Family Reunification Parole process had been terminated. Now, he and his wife live in uncertainty and fear about whether their daughter will be allowed to come to the United States at all through this parole process. All of the resources they put into planning for her arrival will be lost, and, far more devastatingly, their family will continue to be separated.

264. Plaintiff **Marim Doe** joined the Navy in January 2024. He is a student in the nuclear training program, through which he is learning to operate nuclear reactors on naval carriers and submarines. Before joining the Navy, Marim lived with his family in Texas. He has a close relationship with his family, including with his father, who does not have legal status in the United States. Marim has seen his father work hard to provide for their family his entire life, enduring much hardship and making many sacrifices so that his family can thrive. When Marim heard about the military parole-in-place process in high school, he decided to join the Navy after graduation so that he could continue his education, but also help his father obtain legal status.

265. Marim's application for military parole-in-place for his father has been pending since May 2024. A grant of parole would provide his father with more stability, particularly as he ages, both in terms of staying in the United States safely with his family and in terms of financial well-being. With parole, Marim's father would no longer fear being let go from his job if they found out he was undocumented, or being detained and subject to deportation by ICE.

266. The news that military parole-in-place was going to be paused was heartbreaking for Marim, his father, and their entire family. At a time when Marim should be focusing on the

U.S. Navy's rigorous training program, Marim is distracted and worrying about the safety and wellbeing of his family. Marim is suffering extreme emotional distress from the possibility that his father could be deported, and that such an important benefit provided to servicemembers dedicating themselves to the U.S. military is being eliminated.

267. Plaintiff **Adolfo Gonzalez, Jr.** served in the U.S. Army as a First Sergeant for more than 30 years. In February 2025, he retired from active service and was honorably discharged. Adolfo and his wife have been together since 2017, and they have a sixteen-year-old daughter, who is Adolfo's wife's biological daughter but whom Adolfo recently legally adopted.

268. Adolfo's wife is undocumented, which has meant that their family has lived for many years with the fear that she could be detained or deported. When Adolfo had to be away from home with the Army, he was always anxious that something would happen to her. They learned of military parole-in-place through meeting with an immigration attorney, and it felt like a beacon of hope for them. They felt it was an incredible benefit for people who served the United States military. The application that Adolfo submitted for his wife has been pending since around March 2024.

269. In March 2025, Adolfo and his wife found out that military parole-in-place applications were no longer being processed by the U.S. government. The fact that their application has been paused indefinitely has caused him and their family immense anxiety and sadness. They worry constantly about their family being separated and their daughter losing her mother. Adolfo also feels let down by the government after serving the military honorably for more than three decades. Without military parole in place, Adolfo, along with his wife and daughter, will continue to suffer emotional distress from the prospect of their family being separated through detention or deportation.

270. Plaintiff **Aleksandra Doe**, along with her husband and five-year-old son, fled Ukraine through the U4U parole process to seek stability and safety following the Russian invasion of Ukraine in 2022. Life in Ukraine was extremely difficult for her and her family due to the war. Aleksandra would hear missiles flying over them every day. For days on end, Aleksandra and her family would go without electricity in their home, which would lead to her son getting sick from the cold temperatures. The U4U parole process offered Aleksandra and her family an opportunity to escape the danger and instability they faced in Ukraine. In April 2023, Aleksandra and her family were granted parole under the U4U parole process. Aleksandra and her family eventually settled in San Jose, California, where her sister (who is also in the United States with U4U parole) lives.

271. Aleksandra and her family have settled into new lives here in the United States. Her husband works in construction, and her son is attending a transitional kindergarten school, where he is enjoying learning English and socializing with other children. Aleksandra and her family also greatly enjoy the area they live in and the local community.

272. In October 2023, Aleksandra and her family applied for the diversity visa lottery, and in May 2024, Aleksandra was notified that their applications were selected for further processing in the diversity visa program for Fiscal Year 2025. This was life-changing news for Aleksandra and her family, because if they were able to successfully move through the process and obtain green cards, they would be able to continue living in the United States, where they have established a stable life for themselves and their son, while also being able to visit their elderly and ailing relatives in Ukraine when necessary. Aleksandra and her family followed all of the required steps in the diversity visa process and spent upwards of $6,000 on all of the application fees and other expenses associated with the process, including the required medical examinations

for each of them. They submitted their I-485 applications for adjustment of status in December 2024.

273. Aleksandra and her son also applied for TPS in December 2024 given the ongoing conflict and conditions that persist in their home country.

274. In January 2025, USCIS scheduled an interview for Aleksandra and her family on February 27, 2025, regarding their adjustment of status applications. However, a few days before the interview, on February 19, USCIS sent a notice to Aleksandra informing her that the interview had been cancelled, without any explanation as to why.

275. Now, Aleksandra and her family's parole will expire in less than two weeks, on March 29, 2025. If Aleksandra's TPS and adjustment of status applications are not adjudicated or are kept on hold for too much longer, she and her husband will lose their work authorization and ability to support themselves and their young son, and their entire family will lose the ability to remain safely in the United States. Without work authorization, her husband will likely lose his job at his construction company, leaving them without the ability to support themselves and pay for their basic living expenses. And if their adjustment interview and applications are indefinitely suspended, by September 2025, Aleksandra and her family will lose their once-in-a-lifetime opportunity to obtain a visa through the diversity visa lottery system and will have wasted the thousands of dollars they have invested in this process. Consequently, Aleksandra remains extremely afraid and anxious for herself, her husband, and her young son. The indefinite suspension of processing immigration benefit applications for U4U parolees is causing Aleksandra and her family tremendous emotional strain and distress.

276. Plaintiff **Teresa Doe** and her son reunited with her husband and three other children in the United States in 2017 through the CAM parole process. They had lived apart for many years

until Teresa's husband was able to petition for their son to receive parole through CAM. When his petition was approved, Teresa was able to accompany him to the United States as an eligible family member.

277. Since they arrived in 2017, Teresa and her son were granted CAM re-parole for more than eight years, allowing them to settle into their community in Nevada and allowing Teresa to consistently care for her family. Teresa's husband works and provides the income for their family, while Teresa stays home and takes care of their children and house. She takes her youngest son, who is a U.S. citizen, to high school every day. During the week, she is also the caretaker for her two U.S. citizen granddaughters, who are 2.5 years old and 6 months old, while their parents work full-time. Being together again after so many years of separation has been beneficial for their family.

278. Teresa's most recent grant of CAM parole expired on March 13, 2025. She has a pending application for re-parole that has not yet been adjudicated, and she fears that due to the administration's termination of CAM and other parole processes, it never will be. The possibility of losing parole and being separated from her family again is devastating for Teresa. Her youngest son and grandchildren would have no one to take care of them, and Teresa would miss out on watching them grow up. She is also afraid of returning to El Salvador, given safety concerns and the political climate there. The termination of CAM is causing Teresa and her family more emotional distress with every passing day.

279. Plaintiff **Rosa Doe** escaped Honduras in 2013 after surviving rape and other violence. She was trafficked upon entering the United States. Rosa now lives in Austin, Texas with her four U.S. citizen daughters. She also has one fourteen-year-old daughter living in Honduras with Rosa's elderly father. Rosa applied for her daughter and mother through the CAM parole

process in June 2023 in order to reunite with them after over a decade of being apart, and also for Rosa's daughter's safety. After Rosa's mother died in October 2024, Rosa's daughter and father, her daughter's legal guardian, continued to pursue CAM parole. Rosa's daughter and father then moved through the screening and multi-step process and were conditionally approved for CAM parole in November 2024. Rosa did not have enough money to pay for their travel in December 2024 due to having spent all her savings on her mother's medical care and funeral expenses. Rosa began planning for their arrival in late January of 2025. After January 20, 2025, Rosa was unable to reach the organization handling their applications, the International Organization for Migration, for an update on their case. Rosa went without answers regarding her daughter and father's CAM applications until early March 2025. At that time, she was informed that it would take additional time for her daughter and father to travel to the United States on parole. Around the same time, Rosa was informed about the government's plans to terminate the CAM parole process.

280. If the CAM parole process is terminated, Rosa fears her daughter and father will not be able to travel to the United States at all. With each day that passes without parole, Rosa's fourteen-year-old daughter remains in active danger from the same perpetrator who inflicted sexual violence and harm onto Rosa when she was fourteen years old. The termination of the CAM parole process is causing Rosa and her family serious anxiety and distress everyday Rosa's daughter remains in Honduras.

281. Plaintiff **Haitian Bridge Alliance ("HBA")** was founded for the purpose of assisting Haitian and other Black immigrants to acclimate to the United States and to promote their ability to navigate their new lives in the United States. HBA's core organizational activities have been to educate Black migrants about legal pathways and humanitarian protections and to provide

them with legal services to access them. HBA has provided direct services to over 1,000 CHNV sponsors and parolees from Haiti.

282. Since January 2023, HBA has received over 3,000 urgent requests from potential Haitian parolee clients seeking sponsors to apply for the Haitian parole process and has conducted hundreds of consultations with Haitians wanting to apply for parole.

283. HBA has provided aid to individuals looking to sponsor Haitian migrants through the Haitian parole process by assisting these sponsors with the completion of their sponsorship applications (the Form I-134A) and ensuring they understand each aspect of the application. Between June 2023 and January 2024 alone, HBA staff spent over 500 hours on this work.

284. HBA has also partnered with Welcome.US—a national initiative that mobilizes and empowers Americans from across the country to welcome and support those seeking refuge here in the United States—to mobilize individuals eager to sponsor and help Haitians fleeing danger and seeking refuge in the United States through the Haitian parole process. Through HBA's partnership with Welcome.US, HBA registered over 140 Haitian parolee clients to help them get connected with potential sponsors and successfully matched 20 Haitian parolee clients with sponsors.

285. HBA has also provided integration services to Haitian parolees once they arrive, including with regards to housing and other basic needs, transportation, and education.

286. As a result of the overwhelming demand for assistance with the CHNV parole processes, HBA expanded their team in 2023 by hiring additional staff members to continue supporting this work for CHNV sponsors and parolees in connection to HBA's overall mission and services.

287. The Trump administration's termination of the CHNV parole processes, including stopping the processing of CHNV parole applications, and the administration's suspension of processing immigration benefit applications filed by CHNV parolees directly and concretely impair HBA's core activities, and in multiple ways.

288. For one, the termination and suspensions waste the resources that HBA has already expended in helping potential sponsors and beneficiaries prepare and file applications for parole and, with regards to those who are already here, other immigration benefits.

289. In addition, the termination of parole for those Haitian parolees already here—which will also terminate their employment authorization—will require HBA to modify its approach to its core activities to meet the needs of those parolees, including their basic economic needs and their heightened legal needs.

290. The administration has terminated a legal pathway that is relied upon by many of HBA's clients and community members, and its actions directly interfere with HBA's humanitarian and legal support services being provided to CHNV sponsors and Haitian parolees. These needs have already increased, as the reporting of CHNV's termination by the Trump Administration has led to a rapid increase in the number of Haitians and others seeking assistance from HBA, be it legal and otherwise.

291. The termination and suspension and the new needs it has created has forced HBA to suspend indefinitely its plans to expand the affirmative legal services it could offer its clients, and it will require HBA to respond to any deportation defense needs of CHNV parolees if they lose their status, which would be work that is outside the normal realm of services it offers CHNV parolees. Rather than move forward with their previous plans, HBA now must change course to meet the more immediate humanitarian and legal needs of the community it serves.

292. Since the release of the March 25 FRN, HBA has been receiving increasing numbers of calls to their hotline from individuals with CHNV parole panicking about how the March 25 FRN will affect them, including whether their parole has been or will be terminated, what will happen to their work authorization, and whether they could be targeted for expedited removal. HBA staff responding to these inquiries have had to rapidly analyze the FRN, its interaction with the administration's suspension of adjudication of immigration benefit requests for parolees, and each individual's particular circumstances in order to provide the most updated advice, legal and otherwise, to people impacted by the ever-changing landscape.

293. HBA's attorneys have also had to create and add new analysis and guidance about the March 25 FRN to an upcoming know-your-rights training, which will make it more difficult to address all the necessary information that the Haitian CHNV community needs in the time allotted. The Haitian CHNV community is understandably in crisis given the abrupt termination of the CHNV parole processes, the sudden and indefinite pause in the processing of additional immigration benefits, and now the high likelihood that Haitian CHNV parolees could be subjected to expedited removal in less than a month. The release of the March 25 FRN has only amplified the ongoing, direct, and substantial impact of the administration's termination of parole processes on HBA's core activities of providing affirmative services and legal education to CHNV parolees.

a. Plaintiff **David Do**e, his wife, and their two sons, who are 14 and 11 years old, are beneficiaries of the FRP process for Ecuador. They live in Arkansas, where David works at a poultry plant and helps preach at two local Baptist churches, his wife cares for their children and home, and their sons enjoy attending a private Christian school. David's father, paternal grandmother, three aunts, one uncle, and several cousins are all U.S. citizens, and they all live in the United States. The FRP process has allowed David and his family to live in the United States

while they wait for their visa to become available so they can apply for adjustment of status, a journey that began more than thirteen years ago. Back in October 2012, David's father filed an I-130 family-based petition to sponsor David and his family for an F3 immigrant visa. The priority date for their visa is October 6, 2012. The I-130 petition was approved in February 2020.

b. David and his family continued to wait in Ecuador for their visa to become available, but life there was not safe or secure for them or their children. There was a large presence of drug cartels, high levels of crime, and political instability. In November 2023, when they received an invitation from the U.S. government for David's father to sponsor him and his family for the FRP process, which would allow them to come to the United States while they waited for their visa, they were very excited. After waiting for so many years, they felt hope for the first time that they could move toward a new life in the United States and be closer to David's father and other family there. They hoped for stability for their kids, and more economic opportunities after David lost his job in Ecuador in February 2024. They are also deeply religious, and they felt strongly that God was calling them to the United States.

c. In February 2024, David's father submitted the Form I-134A to sponsor David and his family for the FRP process. After it was approved, David and his family completed the required medical exams and received the necessary vaccinations, which cost them approximately $1,800 for the four of them. They also completed paperwork and procedures for their dog, whom they brought with them to the United States. In May 2024, when they received their travel authorization, they began preparing to leave Ecuador, including by selling as many of their possessions as they could. They treated it like a permanent move, as they expected to be able to file their green card applications while they were in the U.S. In July 2024, David, his wife, and their sons were granted parole into the United States for a period of three years, through July 2027. David and his wife

applied for and received their work permits shortly after, in August 2024. Their work authorization expires in July 2027 as well.

d. Life in the United States has provided David Doe and his family with a sense of peace and security, especially for his children, who are getting integrated at their school, learning English, and making good friends. David is proud of the life they have built, especially after patiently waiting for so many years to be able to come to the U.S. and following all of the rules and instructions from the government to get here.

e. The termination of current grants of FRP parole on January 14, 2026 is devastating to David and his family and will cause them immediate, concrete harm. While there is an exception for FRP beneficiaries who filed adjustment of status applications by December 15, David Doe and his family were not even eligible to file their application by that time, because the priority date for their family-based visa was not yet current. They are already experiencing serious emotional distress, fear, and uncertainty at the possibility that their parole will be terminated. If the government is able to end their parole on January 14, David Doe and his family will be forced to uproot right as their lives were feeling more settled; sell their cars, furniture, and possessions, which would lose them money; and return to Ecuador, where it is not safe or stable for their family and where they would have to rebuild again. David would lose his job here and it would be difficult to ensure he can provide for their family. They would be separated from their family in the U.S., and David's sons would be torn from their school community and friends, and the only sense of normalcy they have known. When they felt so close to being able to apply to become permanent residents of the United States, the termination of their parole threatens to undo everything they have worked toward. Neither David nor his father have received any individualized notice that

David's parole will be terminated on January 14, including in the mail or through David's MyUSCIS account.

f. Plaintiff **Jose Doe**, a national of Honduras, is living and working in Miami, Florida with his wife and two young children, ages five and ten-months, both of whom are U.S. citizens. Jose Doe and his wife are FRP beneficiaries. Jose's father, a U.S. citizen, filed an I-130 family-based petition for Jose in October 2012 to start the process for him to eventually immigrate to the United States and become a legal permanent resident. The priority date for Jose's visa application is October 3, 2012, and his current visa preference category is "F3," for married sons and daughters of U.S. citizens. The I-130 petition was approved in June 2013. Jose was not married and did not have any children at the time his father filed the I-130 petition.

g. Jose subsequently met his wife, and they got married in 2018. From 2018 to 2022, Jose and his wife lived in the United States under an exchange visitor visa, as Jose's wife had secured a job to teach at a school in North Carolina as part of an international teacher exchange program. Jose and his wife's first-born child was born in the United States during this period.

h. In August 2023, Jose's father received an invitation from the U.S. government for Jose and his wife to participate in the FRP process because of their approved I-130 petition. Jose and his wife eagerly accepted this invitation. Honduras's deteriorating economic and political situation made life unstable and difficult, preventing them from adequately providing for their family. Jose's father submitted the Form I-134A to sponsor Jose and his wife for the FRP process, and, after it was approved, Jose and his wife continued the process by completing all the requirements, like providing biographical information and completing background checks and medical exams. These medical exams cost Jose and his wife about $500 each.

i. In January 2024, Jose and his wife received travel authorization to come to the United States through the FRP process. In preparation for their move, they sold everything they owned because they treated the move as permanent, with the expectation and hope of being able to adjust their status in the United States. In March 2024, Jose and his wife arrived in the United States and were granted parole for a three-year period, until March 2027. Shortly after arriving, Jose and his wife applied for work authorization and subsequently received their work permits in April 2024. Their work authorization expires in March 2027 as well.

j. Jose and his family have established lives for themselves here in the United States. Jose works in maintenance for several Italian restaurants in the local area and other areas in Florida. Jose's wife is an elementary school teacher. Jose's family is part of a church community in their local area. Their son is currently in school, with the highest grades in his class. Jose and his family are now also reunited with Jose's family, as they live in the same city as Jose's father, brothers, and other extended family. Jose and his wife are in the process of applying for a loan to purchase a house and settle down as a family.

k. The government's announcement terminating the FRP processes and revoking grants of parole on January 14, 2026 unless a parolee has an adjustment of status (Form I-485) filed by December 15 destroyed Jose Doe and his family emotionally, and now he and his family as a result are experiencing emotional and psychological distress over what their future holds. Jose and his wife have not filed their adjustment of status applications yet because their priority date is not current based on the U.S. visa bulletin, which states that, as of December 2025, only people in the F3 visa category who have a priority date on or before July 22, 2012 can file for adjustment of status. If the government is permitted to prematurely truncate Jose and his wife's parole and related work authorization, Jose and his wife will suffer immediate and

irreparable harm. They will lose their jobs and ability to work, be forced to break their apartment lease and abandon their plans to purchase a home in the United States. Their entire family will be uprooted from the lives they've established for themselves in the United States, separated once again from Jose's family here in the United States. Jose has not received any notice that his parole will be terminated on January 14, including in the mail or through his MyUSCIS account.

l. Plaintiff **Luciana Doe** and her daughter reunited with Luciana's mother and father, siblings, and other family in Arlington, Texas, through Family Reunification Parole after spending more than a decade apart. Luciana's mother, a U.S. lawful permanent resident, filed a Form I-130 for her in December 2017—the first step to help Luciana immigrate to the U.S. and apply for a green card. Because her parents are LPRs, Luciana will eventually be eligible to apply for a family-based visa in the F2B category for unmarried sons and daughters aged twenty-one and over of lawful permanent residents. However, because the backlog is extremely lengthy, she must wait until her priority date is current to apply for an adjustment of status to that of lawful permanent resident. Her priority date is December 1, 2017, and the latest Department of State visa bulletin states that the Department is currently processing applications with a December 1, 2016 priority date.

m. In Colombia, Luciana lived alone with her young daughter and longed for a way to reunite with her family who has long lived in the United States. She continued waiting for an opportunity via an established legal pathway even after facing threats and serious danger to herself and her daughter. While living in Colombia, Luciana served as a legal witness to a crime resulting in the shooting of her friend. She took drastic measures to protect herself and her daughter afterwards, including selling her store, cutting her hair and changing her appearance, and moving away from her hometown for a time until one of the perpetrators of the crime was

convicted and sentenced. However, the individual who shot her friend was released from prison after a brief incarceration, and Luciana remained in danger as he frequented the area where she lived. Still, Luciana continued to wait for a legal pathway to emigrate to the United States.

n. Such an opportunity finally arose in August 2023, when Luciana's U.S. citizen sister received an invitation from the U.S. government for Luciana to participate in the Family Reunification Parole process for Colombians, which allowed Luciana to be with her family in the United States while she continued to wait for her family-based visa to become available. After submitting extensive paperwork, sharing biographical information, completing a comprehensive and expensive medical examination, traveling to a U.S. port of entry, and undergoing additional screening and vetting by CBP at the port of entry, Luciana and her daughter were paroled into the U.S. pursuant to FRP around February 2024.

o. Understanding the purpose of FRP parole was to enable beneficiaries of approved I-130 applications to reunite with their sponsoring family members in the United States until they can file for adjustment of status, Luciana trusted in the U.S. government's invitation to begin a new life here. She left everything behind in Colombia, which included selling her car, her apartment, and all her possessions, and leaving behind her university studies with less than two years remaining. Although it was a large sacrifice, she felt it was worth it to create a better life for herself and for her daughter, where her daughter could grow up around her family and achieve her dreams. Luciana and her daughter have made a life for themselves in the U.S. Luciana currently works at an airport car rental business, her daughter is thriving in school and has become proficient in English, and they spend regular quality time with their family in the U.S.

p. The government's announcement of termination of FRP parole and revocation of parole grants came as a crippling shock to Luciana. If the government is permitted to revoke her

parole status, it will uproot her life, separate her from her family, and force her to restart with nothing in Colombia. Her daughter, who was two years old when she entered the U.S., has no memories of Colombia, and would likewise be separated from the family she has now grown up around and depends on for continuity, friendship, and care. The government's announcement is causing Luciana and her daughter tremendous stress, anxiety, and despair. Luciana has not received any notice that her parole will be terminated on January 14, including in the mail or through her MyUSCIS account.

q. Plaintiff **Francisca Doe**, her husband, and their three children—ages ranging from seven to fourteen years old—are beneficiaries of the FRP process for Guatemala living in Lynn, Massachusetts. In or around July 2012, Francisca's mother, a U.S. citizen, filed an I-130 family-based petition on Francisca and her family's behalf to sponsor them for an F3 immigrant visa. Their priority date for this application is July 12, 2012. In August 2013, Francisca's mother's I-130 petition was approved.

r. Francisca and her family waited for ten years in Guatemala for their priority date to become current to submit their adjustment of status applications to become green card holders, but life for them became increasingly more dangerous in 2023. Francisca's husband owned a bookstore in the area they lived in, which had a high presence of gangs and crime. These gangs would frequently threaten them to pay them money for Francisca's husband to be able to operate the store, threatening that something bad would happen to them and their children if they did not pay. As a result, life in Guatemala became very difficult for Francisca and her family. Her husband was not able to open the store regularly due to these gangs and thus lost income and business opportunities, impacting their ability to provide for their family.

s. In August 2023, Francisca's mother received an invitation from the U.S. government to sponsor Francisca and her family for the FRP process for Guatemalans. This opportunity came as an immense relief for Francisca and her family, as it was no longer safe for them to continue living in Guatemala due to the gang presence in their area. In or around March 2024, Francisca's mother filed the Form I-134A sponsorship application for the FRP process. After that was approved, Francisca and her family completed all of the subsequent steps for the process, like providing their biographical information, biometrics, and completing the necessary medical exams for each member of the family. The medical exams cost Francisca around $2,000 in total for the entire family. To pay for this, Francisca and her family sold their car.

t. In June 2024, Francisca and her family received travel authorization to come to the United States on parole. Francisca and her family treated the move as permanent because they were in the process of waiting for a family-based visa to become current so they could adjust their status in the United States and become legal permanent residents. In preparation for this move, Francisca and her family sold everything they owned, like their house and the family bookstore.

u. In August 2024, Francisca and her family arrived in the United States and were granted parole for three years, until August 2027. Soon after arriving, they also applied for work authorization and were approved in September 2024, until August 2027 as well. Francisca and her family lead a peaceful life in the United States, living in the same city as her mother and sister, both U.S. citizens. Francisca's husband works at a sausage factory, and Francisca is a stay-at-home mother for her three children. Francisca recently obtained an assistant license and is planning to become a daycare assistant for her sister's daycare once she is able to secure childcare for her children, including possibly at the daycare itself. Francisca's children have been attending and enjoying school and have been learning English at their school.

v. The news that individual grants of FRP parole would be terminated on January 14, 2026 came as a devastating shock to Francisca. Francisca and her family will suffer immediate and irreparable harm if their parole is prematurely terminated on January 14. While their visa priority date became current in December 2025 and they were able to file their adjustment of status applications on December 15, their applications were not accepted in time for the purposes of excepting them from the premature termination of their parole. Francisca and her family are left with a lot of uncertainty and worry about whether their parole will be terminated in January. Francisca has been experiencing anxiety and psychological distress as a result. If their parole is terminated, Francisca's husband will lose his job, and they will both lose the ability to work. They will be forced to uproot their lives, once again, and return to Guatemala, where they have no home to go to and where they face economic hardships and threats to their safety. Francisca and her family would be separated from her family here in the United States—her mother and sister and extended family—and Francisca's children would be ripped away from their school and life here in the United States. Francisca has not received any notice that her parole will be terminated on January 14, including in the mail or through her MyUSCIS account.

w. Plaintiff **John Doe**, a national of El Salvador, is living and working in Houston, Texas. He resides with his father, who is a U.S. citizen, and his brother, who is a legal permanent resident. John is an FRP beneficiary sponsored by his father who filed an I-130 family-based petition for him in August 2018 to start the process for him to eventually emigrate to the U.S. and become a legal permanent resident. John's immigrant visa priority date is August 20, 2018, and his visa preference category is an "F1" visa for unmarried children of U.S. citizens who are 21 years of age or older. His I-130 petition was approved in October 2019.

Case 1:25-cv-10495-IT Document 239 Filed 11/03/2026 Page 113 of 140

x. In July 2023, John's father received an invitation from the U.S. government for John to participate in the FRP process because of the previously approved I-130 petition. John eagerly accepted the invitation because life in El Salvador was difficult for him due to economic insecurity and, as a gay man, the threat of violence and discrimination against LGBTQ+ people in a country with limited legal protections for sexual minorities. John's father submitted Form I-134A to sponsor John for the FRP process, and, after it was approved, John continued the process by completing all the requirements, including providing biographical information and undergoing background checks and medical exams. The medical exams cost him approximately $650.

y. In January 2024, John received travel authorization to come to the U.S. through the FRP process. In preparation for his move, he sold his vehicle and other belongings and ended the lease on his apartment, as he intended for the move to be permanent and to adjust his status while in the U.S. In March 2024, John arrived in the United States and was granted parole for a three-year period, until March 2027. Shortly after arriving, John applied for work authorization and subsequently received his work permit in April 2024. His work authorization expires in March 2027 as well.

z. John has established a life for himself in the United States. He works as a Remittance Coordinator for a company that provides insurance services in the dental field, a position he started in May 2024. John worked for the same company in El Salvador starting in 2019 in an independent contractor role, but his employer offered him a full-time employee position in the United States that he would not have in El Salvador. Since starting his new role, John has been promoted, which allows him to work on more complicated cases and earn better pay. John has established himself financially with a car loan, credit cards, and bank accounts, and he is

particularly proud of his high credit score that he worked hard to achieve. He has also established a 401(k) retirement account and has good health insurance benefits through his employer. John is now also reunited with his father and brother in Houston after years of separation.

aa. The government's announcement terminating the FRP processes and revoking grants of parole on January 14, 2026 unless a parolee had an adjustment of status (Form I-485) filed by December 15 caused John to experience emotional and psychological distress at what his future holds. John has not filed his adjustment of status application yet because his priority date is not current based on the U.S. visa bulletin, which states that as of December 2025, only people in the F1 visa category who have a priority date on or before November 8, 2016 can file for adjustment of status now. If the government is permitted to prematurely truncate John's parole and related work authorization, John will suffer immediate and irreparable harm, as he will lose his job and ability to work, and he will be uprooted from the life he has established for himself in the United States, separated once again from his father and brother here in the United States. John's previous independent contractor position in El Salvador has been filled, and he would lose the benefits of his promotion and full-time employee status. John would also lose his established financial stability, including his credit score, car, and all the professional progress he has made. John checks the visa bulletin once or twice every day, hoping his priority date will become current, and he has not received any notice that his parole will be terminated, including in the mail or in his MyUSCIS account.

---

## CLASS ALLEGATIONS

---

294. Plaintiffs Svitlana Doe, Maksym Doe, Maria Doe, Alejandro Doe, Armando Doe, Ana Doe, Carlos Doe, Miguel Doe, Lucia Doe, Daniel Doe, Omar Doe, Kyle Varner, Wilhen Pierre Victor, Gabriela Doe, Norma Lorena Dus, Valentin Rosales Tabares, Marim Doe, Adolfo Gonzalez, Jr., Aleksandra Doe, Teresa Doe, and Rosa Doe (the "Putative Class Representatives") bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and all similarly situated persons for whom the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, and subsequent similar actions have halted the processing of their applications to sponsor parole beneficiaries and to seek additional immigration benefits and rescinded existing grants of parole. The Putative Class Representatives seek certification of a class (the "Plaintiff Class") consisting of:

295. All individuals with pending applications to sponsor a beneficiary for any humanitarian parole process, including but not limited to CHNV, U4U, OAW, FRP, MPIP, and CAM, which applications are subject to the January 20 Huffman memo and subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Sponsor Subclass");

296. All individuals who have received parole through humanitarian parole processes, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, which parole is subject to the March 25 FRN and subsequent similar actions by Defendants to rescind individual grants of parole on a categorical and *en masse* basis (the "Rescinded Parolee Subclass"); and

a. All individuals who have received parole through humanitarian parole processes, which parole is subject to the FRP FRN.

297. All individuals who have received humanitarian parole through the already established humanitarian parole processes, such as the U4U, CHNV, OAW, FRP, MPIP, and CAM

parole processes, with any pending applications for any additional immigration benefit, which applications are subject to the "administrative hold" set out in the February 14 Davidson memorandum, the January Higgins Directive, and other subsequent actions by Defendants to pause or otherwise terminate the processing of such applications (the "Immigration Benefits Subclass").

a. All individuals who have received humanitarian parole through the already established humanitarian parole processes, which applications are subject to the Dec. 2 USCIS Memo.

298. This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

299. The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The demand for to sponsor beneficiaries through the U4U, CHNV, FRP, MPIP, and CAM parole processes has been high; USCIS received over 120,000 sponsorship applications for U4U, and more than 1.5 million sponsorship applications for CHNV parole, in just the first four or five months that the processes were made available. Although U4U has no monthly cap on the number of applications that can be granted, only a maximum of 30,000 CHNV applications can be granted each month, which is why USCIS eventually adopted a lottery system to process some CHNV applications, rather than processing them all on a first-come-first-served basis. Similarly, by the time the first Trump administration attempted to take steps to terminate the CAM process, over 12,000 people had applied for the program. And while reliable statistics regarding the number of applications for FRP and MPIP are not publicly available, the FRP process for Haiti alone issued over 12,000 invitations to eligible sponsors within two years, and it appears that USCIS had approved close to 4,000 MPIP applications within two years in the late 2000s. The number of beneficiaries of humanitarian parole processes is also high: Approximately 200,000 Ukrainians have entered the United States through the U4U parole process; approximately 600,000 nationals

of Cuba, Haiti, Nicaragua, and Venezuela have entered the United States through the CHNV parole processes; and approximately 75,000 Afghans were brought to the United States through Operation Allies Welcome. The numbers of beneficiaries of FRP, MPIP, and CAM together also number in the many thousands. Although not all of these individuals are eligible for or have applied for additional immigration benefits, many thousands of them have already applied for asylum, TPS, and other status adjustments.

a. Approximately 16,000 individuals have been paroled in since 2023 through the FRP processes.

300. The claims of the Plaintiff Class members share common issues of law, including whether the Defendants' interpretation of the INA's parole provision is lawful and supported by the text of the statute; whether the January 20 Huffman memorandum, the February 14 memorandum, the March 25 FRN, and other similar agency actions are not in accordance with law and/or with the agencies' own regulations; and whether the January 20 Huffman memorandum, the February 14 memorandum, the March 25 FRN, and other similar agency actions violate Plaintiff Class members' rights under the APA.

a. The claims of the Plaintiff Class members share common issues of law, including whether the FRP FRN and the Dec. 2 USCIS Memo are not in accordance with law and/or with the agencies' own regulations and/or violate Plaintiff Class members' rights under the APA.

301. The claims of the Plaintiff class members share common issues of fact, including, but not limited to: whether, in issuing and implementing the January 20 Huffman memo, the February 14 Davidson memorandum, and the March 25 FRN, Defendants acted contrary to law, or acted in an arbitrary and capricious manner by failing to consider important aspects of the problem they are addressing, or explained their decision counter to the evidence before them;

whether Defendants quantified or considered harms that result from the January 20 Huffman memorandum, the February 14 Davidson memorandum, the March 25 FRN, and their implementation; and whether class members have suffered harm as a result of the January 20 Huffman memorandum, the February 14 Davidson memorandum, and the March 25 FRN, and Defendants' actions taken to implement these memoranda.

a. The claims of the Plaintiff class members share common issues of fact, including, but not limited to: whether in issuing and implementing the FRP FRN, and Dec. 2 USCIS Memo, Defendants acted contrary to law, or acted in an arbitrary and capricious manner by failing to consider important aspects of the problem they are addressing, or explained their decision counter to the evidence before them; whether Defendants quantified or considered harms that result from the FRP FRN and the Dec. 2 USCIS Memo and their implementation; and whether class members have suffered harm as a result of the FRP FRN, the Dec. 2 USCIS Memo, and Defendants' actions taken to implement these actions.

302. Because the claims of the Plaintiff Class members share common issues of law and fact, they will not require individualized determinations of the circumstances to any plaintiff and satisfy Rule 23(a)(2).

303. The claims or defenses of the Putative Class Representatives are typical of the claims or defenses of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, the Putative Class Representatives have been harmed by, among other things, Defendants' failure to abide by the plain text of the INA's parole provision, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems it is addressing. They have further been harmed by Defendants' failure adequately to explain their decision to issue the January 20 Huffman memorandum, the February

14 Davidson memorandum, and the March 25 FRN, as well as Defendants' premising these memoranda and their implementation on an erroneous interpretation of the INA's parole provision. Each of these actions, independently and collectively, have caused harm to the Putative Class Representatives and the Plaintiff Class members.

a. They have further been harmed in the same ways by Defendants' issuance of the FRP FRN and the Dec. 2 USCIS Memo.

304. The Putative Class Representatives will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). The Putative Class Representatives will defend the rights of all proposed class members fairly and adequately and have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Putative Class Representatives include experienced civil rights and immigration attorneys who are considered able practitioners in federal litigation, including constitutional and administrative law litigation. These attorneys should be appointed as class counsel.

305. The members of the proposed class are readily ascertainable through Defendants' records.

306. Through implementation and enforcement of the memoranda at the center of the Plaintiff Class's allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final equitable and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

307. Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards

of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act (APA) – Contrary to Law**
**(Termination of parole processes)**
**(Against Defendants Noem, Lyons, Scott, and Edlow)**

a. All foregoing allegations are repeated and realleged as though fully set forth herein.

308. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

309. As explained above, within days of President Trump taking office again, DHS stopped adjudicating any pending requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and stopped accepting new requests for parole or re-parole through them.

310. Plaintiffs refer to the actions in the preceding paragraph as "terminating" those processes, but that characterization is immaterial to the legal infirmities of the actions.

311. DHS has not informed the public that it has stopped adjudicating requests for parole and re-parole made through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM. USCIS did put on its website on January 28, 2025 that it has "paused" accepting new applications for parole through U4U, CHNV, and FRP "until we review all categorical parole processes as required by" the "Securing Our Borders" executive order.

312. DHS subsequently published a Federal Register Notice on March 21, 2025, which expressly "terminat[es]" the CHNV parole processes and states that "[t]he temporary parole period

of [individuals] in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date." 90 Fed. Reg. 13611.

a. Then, on December 15, 2025, DHS published a Federal Register Notice that formally ended the Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans. FRP FRN, 90 Fed. Reg. 58032. That Notice also states that, absent an exception, "the parole of all [individuals] who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date." *Id.* at 58043.

b. The FRP FRN also stated that DHS would not refund the filing fees paid by approximately 15,000 pending applications to the Cuban Family Reunification Parole process even though it would not adjudicate those applications.

313. DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes and to stop adjudicating any pending such requests constitutes final agency action, as do the discrete actions the agency Defendants took to implement this decision, including but not limited to the January Higgins directive and the March 25 FRN.

a. The FRP FRN is yet another such example.

314. DHS's decision to stop accepting new requests for parole or re-parole through named humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM; to stop adjudicating any pending such requests; and to "terminat[e]" the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, 90 Fed. Reg. 13611, was based in substantial part on an erroneous interpretation of the parole statute, 8 U.S.C. § 1182(d)(5), contained in the January 20, 2025, memorandum of the then-Acting Secretary Huffman.

a. The FRP FRN is yet another such example.

315. DHS's early termination of all existing grants of parole was also based on an erroneous interpretation of the expedited removal statute, 8 U.S.C. § 1225(b). The March 25 FRN states that *the* reason DHS decided not to let CHNV parolees keep what is left on their existing two-year grants of parole is that once they are here for more than two years, they would be ineligible for expedited removal under 8 U.S.C. § 1225(b)(1)(iii). 90 Fed. Reg. at 13620. But CHNV parolees cannot be put in expedited removal under § 1225(b)(1)(iii) regardless of how long they have been here, because the statute can only be applied to a noncitizen "who has not been admitted or paroled into the United States." 8 U.S.C. § 1225(b)(1)(iii)(II). By definition, all CHNV parolees have been "paroled into the United States" and therefore may not be put through expedited removal under § 1225(b)(1)(iii)(II).

316. Because of DHS's actions, parole and re-parole applications that have been filed are now pending indefinitely, which eliminates the right for beneficiaries to obtain parole and holds legal consequences both for the applicants and their sponsors. For example, Plaintiffs Sandra McAnany, Kyle Varner, Wilhen Pierre Victor, and Valentin Rosales Tabares all have pending applications for individuals for whom CHNV parole is the only legal pathway available for them to seek safety and stability in the United States. For Wilhen, those individuals are family members of hers who deal with routine violence in Haiti; for Valentin, CHNV parole has enabled him to sponsor his daughter-in-law and granddaughter, so that they may reunite with his son and be together as a family again. The termination of the CHNV parole processes means that the beneficiaries of Plaintiffs McAnany, Varner, Victor, and Tabares have lost their opportunity to come to the United States and potentially seek further protection here. The termination of the FRP processes similarly and further harms Valentin Rosales Tabares, whose daughter and

granddaughter have approved family-based immigrant visa petitions, but who have been waiting for years in Cuba for their visas to become available.

a. The termination of the FRP processes also harms Plaintiffs Francisca Doe, Luciana Doe, David Doe, John Doe and Jose Doe as detailed above.

317. Humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and remain authorized by the statutory parole authority, codified at 8 U.S.C. § 1182(d)(5).

318. Defendants' legal conclusion regarding the scope of the parole authority and the legality of these specific parole processes is contrary to law.

a. Defendants also failed to adhere to the procedure and substantive requirements of the parole statute itself. For example, in cutting short existing grants of FRP parole, DHS did not determine that the purposes of the individuals' grants of parole had been served, as required by the parole statute. Nor did DHS terminate those grants of parole on a case-by-case basis, as also required by the parole statute.

319. Even Defendants' allegedly discretionary decisions are based on an erroneous understanding of their discretionary legal authority. For example, the January 20 Huffman memorandum's assertion that the Secretary of Homeland Security has absolute discretion to deny parole for any reason and in any circumstance is wrong; not only is the Secretary's exercise of that discretion subject to constitutional constraints and self-imposed regulatory constraints, it is also currently restricted by numerous injunctions and other court orders.

a. Defendants have no legal basis to retain filing fees paid by parole applicants whose applications Defendants have decided not to adjudicate as a matter of discretion, including those fees DHS said in the FRP FRN it would not refund to approximately 15,000 applicants to the Cuban Family Reunification Parole process.

320. Defendants' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

a. All subsidiary decisions—including truncating existing grants of parole, refusing to adjudicate pending applications for parole and re-parole, and refusing to refund filing fees—should likewise be held unlawful, set aside, and/or otherwise vacated.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Contrary to Law & *Ultra Vires***
**(Suspension of benefits adjudication for parolees)**
**(Against Defendants Noem, Lyons, Scott, and Edlow)**

321. All foregoing allegations are repeated and realleged as though fully set forth herein.

322. As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM.

323. USCIS did not seek to justify the suspension of the adjudication of benefits for individuals into the United States through one of these humanitarian parole processes until February 14, 2025, in the Davidson memorandum, which addressed only U4U, CHNV, and FRP.

a. Defendants took other actions later in 2025 that also suspended the adjudication of benefits applications for individuals paroled through the aforementioned processes, including the Dec. 2 USCIS Memo, which directed a suspension of asylum and withholding of removal processing (regardless of nationality) and of all processing for individuals who were born in or are nationals of 19 countries, including Afghanistan, Cuba, Haiti, and Venezuela.

324. DHS has not informed the public that it has suspended the adjudication of benefits for those who were paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

a. DHS has targeted and continues to target for removal (including expedited removal) the same parolees whose applications for immigration benefits it has stopped adjudicating.

325. Defendants' suspension of benefits adjudication for parolees constituted final agency action, as did the discrete actions taken to implement it and on what it is based, including but not limited to the January 20 Huffman memorandum, the January Higgins directive, and the February 14 Davidson memorandum.

a. As did the Dec. 2 USCIS Memo.

326. Defendants' suspension of the processing of immigration benefits for those paroled through an already established humanitarian parole process has clear legal consequences for many applicants, including because a suspension of an application for relief could leave an applicant stranded without status in the United States. For example, Plaintiff Teresa Doe's parole and work authorization expired on March 13, 2025; Plaintiff Aleksandra Doe's parole and work authorization will expire imminently on March 29, 2025; Plaintiff Maksym Doe's U4U parole and work authorization will expire in April 2025. If Aleksandra Doe cannot move forward in the FY2025 Diversity Visa process or have her TPS application processed, and if Maksym Doe's pending applications for re-parole or TPS remain suspended and are not processed and granted soon, they will lose their legal status and his work authorization and become subject to deportation, just as Teresa Doe already has. Other Plaintiffs are similarly at risk of losing their status if this suspension continues.

327. Defendants' suspension of adjudicating applications that would benefit these parolees is in excess of their statutory authority and contrary to the statutory regime Congress created that give applicants the right to apply for immigration benefits to be adjudicated under the legal standards and through the process that Congress created. *See, e.g.*, 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1254a (TPS).

328. Defendants' blanket suspension of adjudicating applications that would benefit these parolees is also contrary to the parole statute, which requires that conditions for parole be "prescribe[d] only on a case by case basis." 8 U.S.C. § 1182(d)(5).

a. A central purpose of the parole granted to Plaintiffs and class members was to facilitate their applying for other immigration benefits, including employment authorization and relief from removal. Defendants' suspensions alter that condition en masse, in violation of the statutory case-by-case requirement.

b. What is more, Defendants' December 2, 2025 processing suspensions violate Congress's prohibition of discrimination in the issuance of immigrant visas, by treating immigrant visa applicants differently based on protected characteristics. 8 U.S.C. § 1152(a)(1)(A) ("Except as specifically provided in [four specified statutory provisions], no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.") (emphases added).

329. Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**
**(Termination of parole processes)**
**(Against Defendants Noem, Lyons, Scott, and Edlow)**

330. All foregoing allegations are repeated and realleged as though fully set forth herein.

331. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

332. As detailed above, DHS has stopped adjudicating any pending requests for parole or re-parole through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; stopped accepting new requests for parole or re-parole through them; and issued the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations and doing so constitutes final agency action as also discussed above.

333. Defendants' decision to stop adjudicating pending requests for parole or re-parole through already established humanitarian parole processes, to stop accepting new requests for parole or re-parole through those processes, and to expressly terminate the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, was arbitrary and capricious, for failure to consider and reasonably explain its consideration of the many factors relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or even the criteria that the parole statute makes relevant. In so doing, DHS failed to consider important aspects of the problem and also failed to meet the APA's requirement to reasonably explain important decisions like this one.

a. Defendants' decisions to terminate the FRP parole processes, and the refusal to refund filing fees for pending applications that DHS will not adjudicate, were also arbitrary and capricious for the same reasons and because in doing so Defendants failed to consider the facts

and circumstances underlying the creation of those processes and the individual grants of parole thereunder.

334. To the extent Defendants do offer some justifications for their actions, such as in the March 25 FRN expressly terminating the CHNV parole processes, including by early termination of existing grants of parole and associated work authorizations, those justifications were not offered contemporaneously with the termination itself and reveal a disconnect between the decision made and the rationale provided, and therefore do not provide a satisfactory explanation for Defendants' actions.

335. Even had the explanations in the Mar. 25 FRN been timely, they would still fail to satisfy Defendants' obligation to exercise the statutory parole authority reasonably and to reasonably explain their decisions after taking into account the relevant considerations. Among other defects, the Mar. 25 FRN failed to consider the purposes of the parole statute and the INA more generally; the current conditions in Cuba, Haiti, Nicaragua, and Venezuela; the combined effects on CHNV parolees, their families, and their communities of the various other actions Defendants have taken, including the other agency actions challenged here; the correct interpretation of the parole statute and the expedited removal statute, 8 U.S.C. § 1225(b); and available alternatives.

336. Even had the explanations in the FRP FRN been timely, they would still fail to satisfy Defendants' obligation to exercise the statutory parole authority reasonably and to reasonably explain their decisions after taking into account the relevant considerations. Among other defects, the FRP FRN failed to consider the purposes of the parole statute and the INA more generally; the current conditions in, Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, Honduras; the combined effects on FRP parolees their families, and their communities of the

various other actions Defendants have taken, including the other agency actions challenged here, available alternatives., including those within the ambit of existing policy; and reliance interests.

a. The two FRNs also reveal that DHS's decision to rely on constructive and/or electronic notice was based on speculation and did not consider the relevant factors, including alternatives.

b. DHS likewise failed to consider all relevant factors when it decided to keep the filing fees paid by applicants to the Cuban Family Reunification Parole process, even though the FRP FRN announces that DHS will not be adjudicating those applications. DHS also failed to reasonably explain this decision, which affected approximately 15,000 applicants who collectively paid millions of dollars.

337. In imposing an erroneously narrow interpretation of the parole statute on agency personnel while also authorizing and directing them to terminate all previously established humanitarian parole processes, Acting Secretary Huffman claimed that, even if a court disagrees with his legal conclusion, "I am also implementing this policy as a matter of my discretion to deny parole in any circumstance."

338. Acting Secretary Huffman's claim that he would impose the same policy as a discretionary matter was a pretextual and/or contrived attempt to insulate his unlawful actions from judicial review.

339. In allegedly deciding to adopt the same policy as a matter of discretion, Acting Secretary Huffman failed to consider any factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on current and potential parolees, current and potential sponsors, family members of current and potential parolees, and their communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited

to management of migration flows at the southern border; or even the criteria that the statute makes relevant. In so doing, he failed to consider important aspects of the problem.

340. DHS thus acted arbitrarily and capriciously in allegedly adopting, as a matter of discretion, its parole policy, and in taking all the aforementioned actions regarding specific parole processes and the individuals who have been paroled through them.

341. DHS' termination of these parole processes must therefore be held unlawful, set aside, and/or otherwise vacated.

a. All subsidiary decisions Defendants took—including truncating existing grants of parole, refusing to adjudicate pending applications for parole and re-parole, and refusing to refund filing fees—must likewise be held unlawful, set aside, and/or otherwise vacated.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**
**(Suspension of benefits adjudication for parolees)**
**(Against Defendants Noem, Lyons, Scott, and Edlow)**

342. All foregoing allegations are repeated and realleged as though fully set forth herein.

343. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

344. As explained above, the week that President Trump was inaugurated, USCIS imposed an indefinite suspension on the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process, including but not limited to U4U, CHNV, OAW, FRP, MPIP, and CAM, and doing so constitutes final agency action as also discussed above.

a. Defendants took other actions later in 2025 that also suspended the adjudication of benefits applications for individuals paroled through the aforementioned processes, including but

not limited to: the February 14 Davidson memorandum and the actions announced in the Dec. 2 USCIS Memo.

b. When it has done so, DHS has generally not informed the public that it has suspended the adjudication of benefits for those who were paroled into the United States through these parole processes until well after the fact, if at all.

c. DHS has targeted for removal, including expedited removal, the same parolees whose applications for immigration benefits it has stopped adjudicating.

345. DHS's decision to suspend adjudication of these requests for benefits was arbitrary and capricious due to Defendants' failure to consider seemingly every factor relevant to that decision, including reasonable alternatives; reliance interests; the impact of it on those directly affected and on their family members and communities; the impact of it on the United States' foreign and domestic policy objectives, including but not limited to management of migration flows at the southern border; or the criteria made relevant by the statutes governing the applications. In so doing, Defendants failed to consider important aspects of the problem.

346. In addition, DHS ignored and otherwise violated the APA reasonable explanation requirement.

347. DHS thus acted arbitrarily and capriciously in suspending the adjudication of any application for an immigration benefit that was either filed by or would benefit an individual paroled into the United States through an already established humanitarian parole process such as U4U, CHNV, OAW, FRP, MPIP, and CAM.

a. This includes through the Dec. 2 USCIS Memo.

348. Defendants' suspension of adjudicating applications that would benefit these individuals must therefore be held unlawful, set aside, and/or otherwise vacated.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act – *Accardi* Doctrine**
**(Failure to follow agency procedures)**
**(Against Defendants Noem, Lyons, Scott, and Edlow)**

349. All foregoing allegations are repeated and incorporated as though fully set forth herein.

350. Plaintiffs are entitled to written notice that their parole is being terminated before expiry of the authorized duration pursuant to 8 CFR § 212.5(e)(2)(i), which states that "parole shall be terminated upon written notice to the alien . . . " Plaintiffs are also entitled to written notice that their employment authorization is being terminated before the expiry of the authorized duration pursuant to 8 C.F.R. § 274a.14(b), which states that a "written notice of intent to revoke the employment authorization" must be served, and that the individual "will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence."

351. Defendants' actions will result in Plaintiffs being deprived of the written notice of termination they are entitled to because the March 25 FRN terminating parole processes for CHNV nationals, Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 11361 (Mar. 25, 2025), fails to provide written notice or set forth any procedure by which Defendants are provided with written notice of the premature termination of their parole. The March 25 FRN states that parolees under the CHNV parole processes will be notified that their parole is being terminated on April 24, 2025 through the March 25 FRN itself and notifications sent to the parolees' online USCIS accounts.

a. This includes the FRP FRN, which also deprives FRP parolees with the notice and 15 days to respond to Defendants' notice of intent to revoke employment authorization, in violation of regulation.

352. Publication of a FRN and/or electronic notification to online USCIS accounts do not qualify as "written notice" of termination.

353. Defendants' actions, as set forth above, violate agency procedures, including those found at 8 CFR § 212.5(e)(2)(i), which state that parolees are entitled to "written notice" of termination when parole is terminated before expiry of the authorized duration.

354. Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

355. Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

**SIXTH CLAIM FOR RELIEF**
**Non-Statutory Claim to Enjoin Unlawful Executive Action**
**(Termination of parole processes & suspension of benefits adjudication for parolees)**
**(All Defendants)**

356. All foregoing allegations are repeated and realleged as though fully set forth herein.

357. As discussed above, Defendants' decisions terminating humanitarian parole processes, including U4U, CHNV, OAW, FRP, MPIP, and CAM, and suspending benefits adjudications for individuals paroled through those processes, are contrary to the INA and in excess of the legal authority granted Defendants.

358. Defendants' actions should therefore be declared unlawful and enjoined pursuant to this Court's inherent equitable authority.

**SEVENTH CLAIM FOR RELIEF**
**Due Process Clause of the Fifth Amendment to the U.S. Constitution**
**(Termination of parole processes & suspension of benefits adjudication for parolees)**
**(All Defendants)**

359. All foregoing allegations are repeated and realleged as though fully set forth herein.

360. Plaintiffs have a protected interest in applying for parole, re-parole, and other immigration benefits; and in any grant of parole, re-parole, and other immigration benefits.

361. Plaintiffs are entitled under the Due Process Clause of the Fifth Amendment to notice, an opportunity to be heard, and to have their claims adjudicated pursuant to the laws enacted by Congress.

362. Defendants' actions terminating the parole processes and suspending benefits adjudication violate Plaintiffs' right to due process in numerous ways by depriving them of a meaningful opportunity to establish—under lawful standards—their eligibility for parole, re-parole, other immigration benefits, and to the remainder of any grant of parole they have already received.

363. Defendants' termination of these parole processes and suspension of benefits adjudication must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment.

**EIGHTH CLAIM FOR RELIEF**
**APA – Notice and Comment**
**(December 2025 Mass truncation of FRP parole & suspensions of benefits adjudication)**
**(Against Defendants Noem, Lyons, Scott, and Edlow)**

a. All foregoing allegations are repeated and realleged as though fully set forth herein.

b. Defendants' mass truncations of FRP parole and employment authorization and their suspension of benefit adjudications via the Dec. 2 USCIS Memo are substantive rules subject to the notice-and-comment requirements of the APA. Under 5 U.S.C. § 553(b), before promulgating such a rule, an agency must publish notice in the Federal Register and provide interested persons an opportunity to participate through submission of written comments. Defendants failed to do so as to any of the December 2025 agency actions challenged here.

c. Each of the aforementioned agency actions is a legislative rule, not an interpretive rule or policy statement exempt from § 553. A rule is legislative when it effects a change in existing law or policy or imposes new rights or obligations. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96-97 (2015). The mass truncations of existing grants of FRP parole and employment authorization fundamentally altered the legal status of individuals who had been paroled into the United States and were authorized by law to be here, imposing new obligations (to depart or face removal, including expedited removal) where none previously existed.

d. Mass truncation also has a binding effect on both agency personnel and affected individuals. DHS personnel are now required to treat the affected parolees as lacking authorization to remain in the United States. Affected parolees face immediate loss of work authorization, the accrual of unlawful presence, potential removal proceedings, and collateral legal consequences. Rules with such binding legal consequences require notice and comment. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979).

e. Defendants' suspension of adjudicating pending applications for adjustment of status, naturalization, and other immigration benefits for parolees and other noncitizens also constitute legislative rules subject to notice-and-comment requirements. The suspensions called for in the Dec. 2 USCIS Memo operate as a binding norm that categorically denies an entire class of applicants access to congressionally authorized benefits, imposing new substantive burdens on that class. Congress established various forms of immigration relief and directed DHS to adjudicate requests for that relief. DHS has promulgated regulations providing additional specificity while also committing itself to adjudicating such requests in a particular way. Yet, per Defendants' suspensions—which fail to identify their own legal bases—agency personnel are prohibited from granting relief to a defined class of requestors, without regard to the merits of

individual requests and existing law, effectively amending the regulatory framework governing eligibility for those benefits. Actions of this nature require notice and comment.

f. The INA grants the Secretary of Homeland Security some discretion in granting and terminating a noncitizen's parole and in administering the systems for immigration benefits that Congress created. But where, as here, an agency exercises its discretion through generally applicable rules affecting entire classes of persons—rather than through individualized determinations—it must comply with § 553. *See Texas v. United States*, 809 F.3d 134, 171-78 (5th Cir. 2015) (DAPA), *aff'd by equally divided court*, 579 U.S. 547 (2016). This is so regardless of whether the agency's actions are substantively permissible.

g. Defendants cannot avoid notice-and-comment requirements by characterizing the challenged actions as general statements of policy. A policy statement merely advises the public of how an agency proposes to exercise discretionary power; it does not bind agency decisionmakers or create legal consequences.

h. Additionally, DHS has not offered an adequate justification for not using the required procedures.

i. Because Defendants failed to comply with the APA's procedural requirements, their actions were "without observance of procedure required by law" and therefore must be vacated. 5 U.S.C. § 706(2)(D).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue a preliminary injunction and/or a stay under 5 U.S.C. § 705 in order to restore the *status quo ante*, under which CHNV parole beneficiaries are entitled to enjoy the full duration of their already-issued grants of parole, and under which adjudications for requests for parole and/or re-parole under already established humanitarian parole processes, such as U4U, CHNV,

OAW, FRP, MPIP, and CAM, as well as other requests for immigration benefits for individuals paroled through such processes, all resume and continue in the ordinary course pursuant to the policies in effect prior to the January 20 Huffman memorandum.

2. Declare that humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM were and are in accordance with the statutory parole authority, 8 U.S.C. § 1182(d)(5);

3. Declare that Defendants' termination of already existing humanitarian parole processes, such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, arbitrary and capricious, and violated the constitutional guarantee of due process;

4. Declare that the March 25 FRN terminating parole and work authorization granted under the CHNV parole processes was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

a. Declare the same as to the FRP FRN for the same reasons, and including because Defendants termination of the FRP parole processes failed to adhere to the required processes.

5. Declare that Defendants' suspension of the adjudication of benefits applications for individuals paroled through humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM was contrary to law, in excess of legal authority, arbitrary and capricious, and violated the constitutional guarantee of due process;

6. Hold unlawful, set aside, and/or otherwise vacate Defendants' suspension of the adjudication of requests for parole and re-parole through established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; Defendants' suspension of the adjudication of requests for immigration benefits for individuals paroled through such humanitarian parole processes; the January 20, 2025 Huffman memorandum; the January Higgins directive; the

February 14, 2025 Davidson memorandum; and all DHS actions based thereon or implementing one thereof;

a. Hold unlawful, set aside, and/or otherwise vacate the Dec. 2 USCIS Memo.

7. Enjoin Defendants from applying their erroneous interpretation of the parole statute to individuals paroled into the United States through already established humanitarian parole processes such as U4U, CHNV, OAW, FRP, MPIP, and CAM; and from suspending the adjudication of immigration benefits of individuals paroled through such processes;

8. Certify this case as a class action lawsuit, and appoint class counsel of record, as proposed herein;

9. Award Plaintiffs' counsel attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

10. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: January 9, 2026

Respectfully submitted,

/s/ John A. Freedman
John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice* pending)
Katie Weng (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

Robert Stout (*pro hac vice* pending)
Sarah Elnahal (*pro hac vice* pending)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice* pending)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, John A. Freedman, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: January 9, 2026

*/s/ John A. Freedman*
John A. Freedman

Document: 00118385451 Page: 617 Date Filed: 01/10/2026

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,

Defendants.

Civil Action No. 1:25-cv-10495-IT

ORDER MODIFYING CLASS DEFINITION AND APPOINTING ADDITIONAL NAMED PLAINTIFFS

January 10, 2026

TALWANI, D.J.

The Amended Order Granting Class Certification [Doc. No. 108] is modified to add the following subclass:

> All individuals who have received a grant of parole that is subject to the *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025), rescinding individual grants of parole on a categorical and *en masse* basis.

The court appoints additional named Plaintiffs John Doe, David Doe, Jose Doe, Francisca Doe, and Luciana Doe, together with previously appointed named Plaintiffs Armando Doe, Ana Doe, Carlos Doe, Andrea Doe, Lucia Doe, Miguel Doe, Daniel Doe, Svitlana Doe, Maksym Doe, Maria Doe, Alexandra Doe, Teresa Doe, Adolfo Gonzales, Jr., Marim Doe, and Omar Doe as Class Representatives for the certified class, as modified.[1]

---

[1] The Doe Plaintiffs are proceeding here under pseudonyms pursuant to the parties' Stipulated Protective Order Concerning Confidential Doe PII [Doc. No. 57] and this court's Order [Doc.

Previously appointed counsel, see Amended Order Granting Class Certification [Doc. No. 108]; Order for Certification of Additional Class Counsel [Doc. No. 181], shall continue as class counsel for the certified class, as modified.

This order "may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C).

IT IS SO ORDERED.

January 10, 2026

/s/ Indira Talwani
United States District Judge

---

No. 240] granting Plaintiffs' Third Supplemental Motion to Proceed Under Pseudonym [Doc. No. 214].

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SVITLANA DOE, et al., | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 1:25-cv-10495-IT |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al., | * | |
| Defendants. | * | |

TEMPORARY RESTRAINING ORDER

January 10, 2026

TALWANI, D.J.

Pending before the court is Plaintiffs' Emergency Motion for a Temporary Restraining Order, Preliminary Injunction and/or Stay of *En Masse* Truncation of Family Reunification Parole [Doc. No. 216]. Plaintiffs seek, on an emergency basis, a stay of the *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025) ("the Federal Register Notice"), insofar as it revokes previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to various Family Reunification Parole processes (the "FRP parole programs") prior to the noncitizens' originally stated parole end dates. For the reasons set forth below, the court grants an emergency fourteen-day stay and sets an expedited briefing schedule as to the request for a longer stay and/or preliminary injunction.

In evaluating a motion for a temporary restraining order, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig–Zayas, 445 F.3d 13, 17–18 (1st Cir.2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)); see also Bourgoin v. Sebelius, 928 F.Supp.2d 258, 267 (D. Me. 2013) (standard for issuing TRO is "the same as for a preliminary injunction").

The Federal Register Notice, issued by the Department of Homeland Security ("DHS") on December 15, 2026, announced that the "temporary parole period of aliens who have been paroled into the United States under [nine Family Reunification Parole ("FRP")] programs, and whose initial period of parole has not already expired by January 14, 2026[,] will terminate on that date[,]" unless the Secretary of Homeland Security determines otherwise on a case-by-case basis. 90 Fed. Reg. 58032–33.[1] The Federal Register Notice provides further that noncitizens "without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date." Id. at 58033. It also warns that, following the January 14, 2026 termination, "DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States." Id. at 58043.

The Federal Register Notice acknowledges parolees' right to written notice of the termination. Id. at 58043 n.89; id. at 58045 n.100 (noting that when DHS finds that certain conditions are met, "parole shall be terminated upon written notice to the alien") (quoting and

---

[1] The Federal Register Notice does not explain how or through what process the Secretary will make that determination prior to the January 14 terminations. The Federal Register Notice also excluded from termination parolees who have filed a Form I-485, Application to Register Permanent Residence or Adjust Status, that has had been postmarked or electronically filed by December 15, 2025, and that is still pending adjudication as of that date. 90 Fed. Reg. 58032–33.

adding emphasis to 8 C.F.R. § 212.5 (e)(2)(i)). DHS asserts that "[t]his Federal Register notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole." Id. at 58045.

DHS is mistaken. "Written notice" not only has a plain meaning, but the regulation explicitly requires that written notice must be provided "to the alien[.]" 8 C.F.R. § 212.5 (e)(2)(i).[2] This instruction indicates that the notice must be directly communicated to the parolee. Publication of the Federal Register Notice does not satisfy this requirement.

The parties dispute whether DHS has provided other written notice. The Federal Register Notice opined that "all FRP parolees under the modernized programs should have a USCIS online account" and that "DHS will . . . provide individual notice to each parolee through their USCIS online account." 90 Fed. Reg. 58045 (emphasis added).[3] But nothing in the record before the court suggests that most, let alone all, parolees do in fact have such accounts or when notice via such accounts was provided to the parolees. Plaintiffs' counsel reported at the TRO hearing on January 9, 2026, that class members who reported receiving electronic notice had received such notice weeks after the Federal Register Notice issued. Nor is it clear that notice through USCIS's online accounts would be sufficient to meet the regulation's written notice requirement for unrepresented parolees, where the regulation referenced in the Federal Register Notice, see id. at 58045 n.102, provides for electronic notice only for represented parties. 8 C.F.R. § 103.2(b)(19)(ii)(B).

---

[2] An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

[3] The "modernized programs" are FRP programs for noncitizens from Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras announced or updated in 2023. 90 Fed. Reg. 58032.

Defendants also maintain that, "[f]or legacy FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account." 90 Fed. Reg. at 58045 (emphasis added).[4] Again, nothing in the record suggests that any mailings have yet occurred. David Doe Decl. ¶ 14 [Doc. No. 214-2] ("I keep my contact information current with USCIS, and I check the MyUSCIS portal regularly—and I have continued to do so since Dec. 15, 2025. I have not received any emails, notices, or other communications directly from USCIS about the announcement."); Francisca Doe Decl. ¶ 13 [Doc. No. 214-3] ("I have not received any notification from the government, either online or by mail, telling me our parole would be ending in January 2026[.]"); John Doe Decl. ¶ 19 [Doc. No. 214-4] ("I still have not received any notice of this termination in the mail or in my MyUSCIS account."); Jose Doe Decl. ¶ 18 [214-5] ("I have not received any message from the government, in my online USCIS account or through the mail, about this announcement.").

Based on a preliminary review of the issue for purposes of a temporary restraining order, the court finds that Plaintiffs have a substantial likelihood of success on their argument that the Defendants failed to provide proper notice of DHS's decision to revoke grants of parole under the FRP program in contravention of DHS's own regulation, the Administrative Procedure Act, 5 U.S.C. § 706 (2)(D), and the Due Process Clause of the United States Constitution.

Plaintiffs indicate that revocation of parole will pose irreparable harm to Plaintiffs and the members of the putative class, requiring them to leave the country or risk accruing unlawful presence and thus threatening any future possibility of becoming lawful permanent residents and United States citizens. Mem. ISO Emergency Motion for a TRO 19–20 [Doc. No. 218]. This

[4] The legacy programs are the Cuban Family Reunification Parole program and the Haitian Family Reunification Parole program. Id. at 58032.

harm is compounded by the absence of notice of the revocation. Id. at 20. Plaintiffs have shown irreparable harm for the purposes of a temporary emergency stay.

Balancing the parties' interests, the court finds a grant of an emergency stay is warranted. While Plaintiffs and class members risk accruing unlawful presence should the revocation take place on January 14, 2026, Defendants' harms will be minimal during the pendency of the two-week stay.

For the foregoing reasons, Plaintiffs' Emergency Motion for A Temporary Restraining Order, Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc. No. 216] is GRANTED in part as follows. The court grants an emergency fourteen-day stay of the *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025) insofar as it revokes previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to the FRP programs prior to the noncitizens' originally stated parole end dates.

Defendants are directed to produce the administrative record by January 13, 2026, and to file any opposition to Plaintiffs' Motion for a Preliminary Injunction and/or Stay of *En Masse* Truncation of Family Reunification Parole [Doc. No. 216] by January 15, 2026. Plaintiffs are directed to file any reply to Defendants' opposition by January 20, 2026.

IT IS SO ORDERED.

January 10, 2026

/s/ Indira Talwani
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SVITLANA DOE, et al.,

Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, et al.,

Defendants.

Civil Action No. 1:25-cv-10495-IT

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

MOTION HEARING

Friday, January 9, 2026
11:34 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

LAW OFFICE OF JUSTIN B. COX
BY: JUSTIN B. COX
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

JUSTICE ACTION CENTER
BY: KAREN C. TUMLIN
LAURA FLORES-PERILLA
ESTHER SUNG
PO Box 27280
Los Angeles, CA 90027
(323) 316-0944
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
esther.sung@justiceactioncenter.org

ARNOLD & PORTER KAYE SCHOLER LLP
BY: KATHLEEN WENG
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
katie.weng@arnoldporter.com

HUMAN RIGHTS FIRST
BY: INYOUNG SARAH HWANG
121 West 36th Street
PMB 520
New York, NY 10018
(212) 845-5200
hwangs@humanrightsfirst.org

On behalf of the Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
BY: KATIE ROSE TALLEY
950 Pennsylvania Avenue NW
Washington, DC 20530
(210) 837-1204
katie.rose.talley@usdoj.gov

**P R O C E E D I N G S**

(In open court at 11:34 a.m.)

THE DEPUTY CLERK: United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 25-cv-10495, Doe, et al., v. Noem, et al. Will counsel please identify themselves for the record.

MR. COX: Good morning, Your Honor. Justin Cox for the plaintiffs.

THE COURT: Good morning.

MS. TUMLIN: Good morning, Your Honor. Karen Tumlin for the plaintiffs.

THE COURT: Good morning.

MS. WENG: Good morning, Your Honor. Katie Weng for the plaintiffs.

THE COURT: Good morning.

MS. FLORES-PERILLA: Good morning, Your Honor. Laura Flores-Perilla for the plaintiffs.

THE COURT: Good morning.

MS. TALLEY: Good morning, Your Honor. Katie Rose Talley for the United States.

THE COURT: Good morning.

We have a few more here on the plaintiffs' side?

MS. HWANG: Yes. Good morning, Your Honor. Inyoung Hwang for plaintiffs.

THE COURT: Good morning.

MS. SUNG: Good morning, Your Honor. Esther Sung for the plaintiffs.

THE COURT: Good morning.

So I had hoped to get something out in writing on the motions that I indicated I didn't think I needed oral argument on, but it's not out yet. So let me tell you what I'm doing there, and then we can proceed with the argument on the two motions that I had indicated I wanted to hear from you on.

On the motion to proceed pseudonymously, the prior order on the other plaintiffs seemed to me had resolved things in a way that both sides' current papers may not have completely reflected. So I want to make sure that we're all on the same page here.

With the individuals who have identified themselves as named plaintiffs in the prior go-rounds, we have a protective order in place. And under that protective order, the attorneys for the defendants and people who need to know about those identities for purposes of this litigation aren't -- the names aren't being kept secret from them.

Is that correct?

MR. COX: I -- yes, Your Honor, with the exception, I believe, of one individual Your Honor wrote separately with regards to that one individual, who had not wanted to share

their name.

THE COURT: Okay. And with regard to the new names, plaintiffs are not proposing that the name be kept secret from defendants' counsel or people who need to know, only that it's only being used in the same way as the people covered by the protective order, correct?

MR. COX: Yes, Your Honor. That's correct.

THE COURT: Because your order just said it would be shared with the Court. But to be clear, if the protective order is in place, it would be shared with defense counsel, correct?

MR. COX: Yes, Your Honor. We're willing to share it under the protective order.

THE COURT: Okay. And for -- Ms. Talley, I don't think you were on the papers when it was originally -- the protective order wasn't signed; and your opposition, essentially, says, "Well, you just signed off on this, Judge, without our having a chance to oppose it." But it was sort of fleshed out in that way.

And I want to make sure that you're understanding this is not to preclude the government from having -- nobody is suggesting there's secret litigants against the government. This is simply a question of keeping these names out of the public and out of the other portions of the government that aren't directly involved in this litigation.

MS. TALLEY: I -- yes, Your Honor. I do want to be clear, though, we haven't received any of these new names of the proposed new putative class members currently. And we understand that the protective order covers plaintiffs. Currently, they're not yet plaintiffs in this case.

THE COURT: But their proposal -- the motion that they have filed says we would do this and have the same protective order in place.

MS. TALLEY: We had some concerns about the language Your Honor has already noted that mentioned just the Court and not the defendants.

THE COURT: Okay. So with those clarifications, I'm allowing the order, and I will get the paperwork filed today. But along the same lines as all but the one individual plaintiff from before, that -- the names are shared with counsel and as specifically limited there, but on the public docket will be allowed to proceed as Doe defendants. Okay. So that's one.

Two is the amendment, the motion to amend. And I am allowing supplementation rather than amendment. And to the extent there is amendment that you're looking for, which I think in -- as I could read it, the only amendment that was truly amendment rather than supplementation is a notice and comment claim for the original classes.

That issue, the notice and comment claim as to the

original classes, remains pending. And I will address it after -- with or after the pending motion to dismiss.

As to the supplementation, I think it's a clean Rule 15(d). You have -- and it's, I understand, the government's argument that the named plaintiffs aren't in this group; but the classes represented by the named plaintiffs, which include all the individuals who received humanitarian parole who have pending applications for various different things is -- it's an overlap of those same classes to say, well, those people are -- should all bring their own actions separately, and there's no efficiency in that. So I'm going to allow the supplementation to add the claims relating to the December actions.

I would like you to proceed in the following way: I would like -- and, again, I will hopefully at some point this afternoon still get in a written order on the docket. But what I am envisioning is a filing that is a supplemental pleading. I don't -- you can give me a whole caption that looks like your proposed caption here, but except that it will be called a supplemental pleading. But I don't want you to relist all of the paragraphs, and I don't want you to renumber the paragraphs, because we're not redoing things.

What I want you to do is when you get to a paragraph -- I think the first one I identified was paragraph 12, where you say what happened there also is

happening to these people, drop a 12(a) and add whatever your allegation is about the -- what happened in December, et cetera.

So we keep the original numbering of the original second amended complaint. We add the subsequent events, and you can add a notice and comment claim as to the subsequent events, but not as to the others for now. So that's how that's proceeding.

So with that, we have pending the motion for class certification, modification of the class and for a TRO, recognizing that I've given additional briefing as needed towards a PI. So if you would like to start wherever you want on that.

MR. COX: Okay. Thank you, Your Honor.

And we want to say thank you as well for scheduling this, the hearing as quickly as the Court did. We know the Court is very busy, and we appreciate the Court's time.

We are here today seeking a temporary restraining order and/or preliminary injunction in advance of Wednesday of next week when approximately 10,000 immigrants who are here on parole by virtue of the family reunification parole processes will lose their status all at once, and many of them without even knowing it.

As we have set out in our brief, we believe that the Secretary committed a number of legal errors in issuing

this decision. I think the one that is probably the cleanest at this point, to go right to it, is the Secretary's treatment of reliance interests and the alternatives that she allegedly considered.

The Federal Register notice says that the Secretary considered three discrete alternatives. The -- and here's where we think she really -- it's clear that she was -- well, three alternatives.

The first alternative she considered was to let the grants expire naturally, as the agency has typically done in the past when sunsetting programs. But rather than simply letting them sunset, she considered letting them sunset and doing affirmative outreach to each of the parolees in order to tell them that they need to either adjust status or leave.

As the Court may recall for CHNV, the Secretary simply considered letting the grants of parole expire, full stop. Here she, for whatever reason, for no apparent reason, did not consider that alternative.

And here we think that that is sufficient in and of itself under *Regents* to hold that she -- that we are likely to prevail on our arbitrary and capricious claim. *Regents* said the failure to consider an obvious alternative is reason alone to find a decision to be arbitrary and capricious.

And here, the other alternatives as well illustrate --

THE COURT: So in the prior issue in the CHNV case, when the only alternative considered was letting the grants of parole expire and she rejected that, that alternative, was that addressed in the First Circuit decision?

MR. COX: The First Circuit addressed -- so the reason that she gave in the first one was the expedited removal rationale. That was the rationale given both to override reliance interest and the two alternatives considered there.

And the First Circuit said that -- the First Circuit did not decide whether or not she was correct in her construing of the expedited removal statute. They said that each side presented plausible interpretations of the statute and that, therefore, plaintiffs had not carried their burden.

THE COURT: So why do I worry about that issue now?

MR. COX: The expedited removal rationale, you don't worry about. The -- it is interesting, of course, that they decided not to rely on the expedited removal rationale, likely because they recognize the legal error. And so they had to come up with some other reason in order to --

THE COURT: Okay. But you're saying -- okay. Go on. I'm sorry.

MR. COX: So the first time they said we're not going to let them lapse because of expedited removal. We

want to put as many through as possible. And so this time, they didn't even consider the same alternative. They said we could let them lapse and reach out and tell everyone that we're going to -- you know, what they have to do. But then that was rejected because it was too administratively burdensome.

And that doesn't make a whole lot of sense, Your Honor. It doesn't make sense that they wouldn't simply consider the alternative of letting the grants expire naturally, which has been the agency's practice previously until CHNV. And so that failure to consider that alternative by itself is enough to -- to justify vacating the FRN and holding that we are likely to succeed.

And here the -- and the government's defense of this in their brief is to simply say that there is no meaningful difference between simply letting them expire and simply letting them expire and telling everyone the consequences. They say that's the -- that there's no meaningful difference.

We think that's a farce, Your Honor, because the reason that this alternative was rejected this time was because of the administrative burden imposed by the part that they added to this alternative, right? There's no -- if they had simply considered letting them expire, then their justification for rejecting this alternative would have been

gone too, which was that it's too burdensome to reach out and tell everyone that they cut short their parole, which doesn't make any sense.

And the other -- the other alternatives --

THE COURT: Okay. Let me make sure I understand this. What you're saying is they -- there is one alternative, which is just let things expire. That alternative isn't listed in the Federal Register notice.

MR. COX: They did not consider it.

THE COURT: Instead, what is given as an alternative that was considered is just letting them expire and telling people that they were going to just let it expire?

MR. COX: Yes, Your Honor.

THE COURT: And that, because of the telling people, it would be an administrative burden. And what you're saying is that they just created this administrative burden so they had something to say, and they have no rationale for why they can't just let it expire?

MR. COX: Right.

THE COURT: Okay.

MR. COX: It was never considered.

THE COURT: What's your answer to that?

MS. TALLEY: Yes, Your Honor.

So we stand by our position in the brief, which is

that there is no meaningful difference between allowing parole to expire under the current period and allowing parole to expire under the current people and providing notice of that.

THE COURT: Except that you've said that the reason you couldn't do the choice is that it would be burdensome to give notice. And so if you don't have the -- so there is a distinction, the distinction being the exact one you're saying is the burden.

MS. TALLEY: Well, that was not the only reason given by the Secretary, Your Honor.

THE COURT: Okay.

MS. TALLEY: The additional reason was that when you allow various grants of parole to expire under the current windows for each of those various grants, there's a burden of ongoing monitoring. That ongoing monitoring is the same whether you're required to give notice or not because the agencies are still charged with ensuring that people leave the country once the term of their lawful presence expires and they're no longer lawfully present in the country.

When you have a uniform --

THE COURT: Well, the monitoring part, I hear what you're saying. But what you just segued into is saying the burden of having to have them leave, because by accelerating

the leave date, all you've done is increased the burden to right -- to the present. I don't really understand.

MS. TALLEY: Yes, Your Honor. We think the difference is that now what the Secretary has done is set a uniform date of expiration. So there is no longer individualized monitoring for the various dates for various parolees because they all have the same termination date for the grant of parole. That reduces the administrative burden because they are no longer tracking a variety of thousands of different termination dates for parole. It's the same date.

And at that point, everyone that previously had a grant of parole now has that grant expired. And that does reduce the administrative burden on the agency for monitoring.

THE COURT: Why isn't that true? It allows them to just go into the community and arrest everybody --

MR. COX: Two things.

THE COURT: -- a lot less burdensome.

MR. COX: One, it doesn't matter. What matters for arbitrary and capricious purposes is they didn't consider an alternative that was obvious, and they don't have an answer to that, which is simply letting them expire.

THE COURT: No, she's saying they did consider it because --

MR. COX: That's not what the Federal Register

notice says. The Federal Register -- sorry. Excuse me, Your Honor.

THE COURT: She's saying that there's the interest in having everybody expire at the same time is there in the Federal Register notice. Is that wrong?

MR. COX: That's not what it says, Your Honor. Your Honor, it says that there -- it could -- I think there's some reference to confusion amongst the parolees as to what their -- what their date might be, their termination date, which also doesn't make sense since they currently have a piece of paper that says their expiration date and now they -- and now that's wrong.

So it's -- it's -- you know, it's post hoc reasoning. It's not what's in here. And it's not the -- and if that was -- it's also not mentioned in the prior Federal Register notice about CHNV. This idea of ongoing monitoring is -- it's just not reflected in the record, Your Honor.

THE COURT: Okay.

MR. COX: And with regards to the other alternatives, and this is sort of writ large part of the problem here, is that Secretary Noem also said that she rejected the -- a longer -- a longer wind-down period because, regardless, their parole is going to end some time, and that's going to cause injuries regardless, which also doesn't make sense.

But it's the same thing that was said in the CHNV context, but what's different here is that the family reunification parolees are future LPRs and citizens. They're here waiting for their green card.

And so when they came here on a temporary status, they did not come here temporarily. They came here to immigrate. They sold their possessions at home. They moved here. They brought their kids. Their kids are in school.

And the idea is not -- has never been that they're going to leave at the end of this parole period. The idea is that they are going to wait until they can adjust status and get the green card that they're eligible for under federal law.

THE COURT: So are you saying that for this group of people, putting aside what has just happened now in December -- because you previously argued to me that with regard to people who were eligible for re-parole or who were eligible for adjustment of status while they were here on parole, the clock was ticking. And so it was important to keep pushing with those other opportunities.

You're not saying that the clock isn't ticking with these people, that the parole status has an end date?

MR. COX: I'm not sure I understand the question, Your Honor.

THE COURT: Well, you're just saying right now they

didn't come here under a grant of limited duration. They came here with the expectation that they would get to stay here eventually. But at the same time, you have previously been arguing to me that on all of these parole -- humanitarian parole grants, there's a clock running. And you've been concerned that --

MR. COX: Yes, Your Honor.

THE COURT: -- all of the applications for adjustment of status or for other benefits, et cetera, have been -- are being slow-walked.

MR. COX: Yes, Your Honor.

THE COURT: And you have argued that since there's a finite time, it matters.

MR. COX: Yes, Your Honor.

THE COURT: Are you saying this group of people doesn't have a finite time?

MR. COX: They have a current grant of parole of a particular duration. That is absolutely true. And when they -- when they are eligible to file an application for adjustment of status, they can do that, and their parole continues.

And the program is always run such that they could -- they can seek re-parole if they need it; but, typically, most typically, the State Department would not invite anyone to apply to this program. This program, unlike

the others, is invitation only. The State Department would not invite someone to participate unless they just had a few years left before they're eligible to adjust status.

And so the idea is you come in, you wait your last few years before you can adjust, and then we can accelerate family reunification, give you a jump-start on your new life in the United States.

THE COURT: Okay.

MR. COX: It is true that when their parole runs out, they will be removable; but, historically, they've always been able to --

THE COURT: They're eligible for re-parole?

MR. COX: Yes, Your Honor. And the programs have re-parole, and -- but they, typically, the State Department wouldn't invite anybody who would need more than one re-parole.

THE COURT: Okay. What's your answer to that?

MS. TALLEY: Yes, Your Honor.

So plaintiffs are taking issue with the rejected alternative of giving more than 30 days' notice of termination. And the issue that they take is not that more time than that was needed for notice. It's that notice never would have been proper because termination is not proper. That is demonstrably not true for multiple reasons.

First, the INA, the statute, parole statute itself,

makes it clear that parole can be terminated at any point for a reason in the Secretary's opinion, that purposes are not being served, at her sole discretion.

Second, these notices for these programs, the original notices when the programs were created, explicitly and expressly say that the parole is not a guarantee of adjustment of status. You are not guaranteed, and the INA makes this clear as well. By getting parole, you're not guaranteed you will also get adjustment of status or a green card.

And the program notices originally made it clear that parole could be terminated at any time, not just at the initial window that was given. They make it clear that you may apply for re-parole, but they are not guaranteed to receive re-parole.

So recipients have always been on notice that parole is not the same as being guaranteed adjustment of status. That's true under the statute that Congress enacted. That's true under the notices as originally promulgated in the register. And that has always been the communication. You're not guaranteed adjustment of status simply because you are given parole for a period of time.

It was also made clear over and over that parole could be terminated before that time and that re-parole was not guaranteed. And so the idea that the Secretary could

never terminate these parole grants or that re-parole must be given is contrary to the statutory scheme. It's contrary to these notices of the programs originally themselves.

And in addition to explaining the reason that counsel mentioned for why she rejected a longer notice period than 30 days, she also explained that the 30-day notice period best balanced the interest of providing people with awareness and the interest of the agency in moving quickly to reallocate their resources from this program to other programs that more effectively accomplish the immigration policy goals of the political branches. So that is a separate interest that supports using a 30-day notice period and rejecting the alternative of a longer notice period.

I mean, what counsel is offering are simply disagreements with the reasoning that the Secretary gave. But she did give reasons. And, again, she's not even required to give reasons because this decision to terminate, like the decision to grant parole, is entirely discretionary and thus not subject to review in the first instance.

THE COURT: Let me pivot here to your point about giving notice. I've been struggling to understand your argument of how you've given notice, so maybe you can elaborate.

MS. TALLEY: Are you referring to the plaintiffs' argument that the procedural or regulatory requirements for

how notice were given were not met, Your Honor?

THE COURT: Both procedural and -- it's ultimately due process and procedure both, procedural arguments. But tell me -- I'm stuck on the facts, unfortunately -- a terrible place to be.

MS. TALLEY: Well, let me see if I can clarify.

THE COURT: At least the facts as you want to give them to me. So let me get the facts as you want to give them to me, which is what notice are you saying happened here?

MS. TALLEY: We're saying that the notice in the Federal Register provides for three different types of notice. There's first the notice of publication of the termination in the Federal Register itself.

THE COURT: Okay.

MS. TALLEY: So that's the first type of notice. And then there are two individualized types of notices --

THE COURT: Tell me about those.

MS. TALLEY: -- that vary based on which program you're in. So for the modernized programs, as we've been calling them, those individuals are given notifications through myUSCIS --

THE COURT: Okay.

MS. TALLEY: -- which --

THE COURT: Now, what do I have in the record that would support your sentence in your brief that everyone is

getting notice -- everyone has an email that way and has agreed to get notice that way?

MS. TALLEY: Well, I'll point you to the public record, Your Honor, which is what is contained in the federal registry notice about --

THE COURT: The Federal Register notice says you are going to give notice to people this way or that way.

MS. TALLEY: Yes, Your Honor.

THE COURT: Your brief says everybody -- I don't think the Federal Register notice says that every applicant is getting email notice through USCIS, does it? Does it say that?

MS. TALLEY: It says that every applicant was required at the time that they applied for parole to create these myUSCIS accounts.

THE COURT: Okay. So where do I find -- other than the federal -- so are you saying to me that if they say in the Federal Register a fact is true, I should take that fact? Because I'm just trying to find anywhere else that says anybody who is in these modern programs was required to have an email address.

MS. TALLEY: Well, Your Honor, as you know, we don't yet have the administrative record given that -- the quick time of the briefing. We anticipate that we should be able to have that by the --

THE COURT: Give me a clue where it is. I mean, I would think you could say to me, look, here's the application form. It says on the face of it you have to have an email or you can't apply from another country or from this country or wherever.

I'm -- give me some clue where that is, because the only thing I could find is the reg you cite, and the reg you cite has two subheadings. And you only talk about the text in the one, but you don't talk about what the two subheadings are.

The first subheading is unrepresented people, and that says written notice only. And the second subheading says -- sorry -- the first is unrepresented; second is represented. And the represented, that has the part that you quoted.

So I have a regulation which says the people who have email access, email notice is sufficient, are the people who are represented by counsel, which is kind of the way we function here, right?

You have CM/ECF. You can't practice here without getting a CM/ECF account. If you keep trying to file things here as an attorney, Ms. Marchione will give you a very, very hard time. You have to get that account here. You have to get registered. You get email, and that's all we do. We do not send you hard copy.

If you are pro se, the default is you get written notice. You have to get special permission to get electronic notice. So that seems really obvious to me as a way to proceed, and that's exactly what the reg says. And so I'm trying to figure out what it is where you have that people have notice by email as a required part of this process.

MS. TALLEY: I think there are two responses to that, Your Honor. First, the regulation does say that when you're dealing with somebody who has counsel, you provide USCIS notifications to both counsel and to the applicant, which makes sense if you're represented by counsel. Your counsel should also get the notice.

And then unlike ECF --

THE COURT: So you're saying in that case, the person will get a hard copy plus their lawyers get an email?

MS. TALLEY: No. This is for electronic notification through US -- the USCIS portal, and it says that that -- that should include the attorney and the applicant.

THE COURT: Okay.

MS. TALLEY: And then additionally, unlike, you know, ECF, the applicants are instructed to create these myUSCIS accounts. So it's not something only an attorney or representative could access.

THE COURT: But so are you saying -- is creating an account the first step in applying for parole under one of

these programs?

MS. TALLEY: That, I'm not aware of, Your Honor, but I will say that we will -- we are happy to supplement when we produce the administrative record, which, like I indicated, should be able to be produced by the 13th with additional information about precisely how the creation of these accounts proceeds.

It does say in the register that creation of these accounts is required by the applicants. But the federal registry notice also says that that's why -- that it is providing not just individualized notifications through myUSCIS and through written format for legacies, but it is also providing public notice through the publication in the federal registry. So you have a double layer of notice here.

THE COURT: Okay. And when the Federal Register says that notice will be given, when did that -- does -- has that happened?

MS. TALLEY: That, I am not sure of, Your Honor. We can verify with the client and provide an answer to the Court.

But I think, ultimately, for the legal question about notice here, whether or not an individualized notice has gone out is legally irrelevant because the regulation ultimately requires notice to the individuals, written notice. It does not specify that that notice be actual

notice versus constructive.

THE COURT: Wait, wait, wait, wait. Wait, wait, wait, wait.

Are you saying that written notice under our laws in this country means that you put something in the Federal Register?

MS. TALLEY: It can be constructive notice, Your Honor. The --

THE COURT: Wait, wait, wait. Written notice -- I just want to get you to be clear, because, you know, I'm -- we're courts of general jurisdiction, right? So this comes here, and you use your brain from what you think happens and all of the other things in the world. And I've never seen something where it says you have to have written notice and to say written notice is good enough if it's in the Federal Register. That's really what you're saying?

MS. TALLEY: We are saying that if you look at the requirements of the regulation here, which is simply a requirement for written notice, that other regulations have specified a method of notification. This one does not. It does not specify actual versus constructive notice.

THE COURT: But -- wait, wait. Written notice is written notice. I don't understand what's not -- that's the specific. If it says notice, you could say to me I don't know if that's actual or constructive. But if it says

written notice, why isn't that specifying the word "written"?

MS. TALLEY: We think, Your Honor, and we've cited authorities in our brief to this effect, that the term used by the regulation can be understood to include public notice, public written notice.

THE COURT: The term "written notice" can mean the Federal Register?

MS. TALLEY: Publication of a notice in the register, yes, Your Honor. We argue that that alone is sufficient here, but --

THE COURT: Okay. Assuming I reject that, let's move to the next one.

MS. TALLEY: Sure. Even if Your Honor were to think that publication in the Federal Register was not sufficient written notice, as we've stated here, there are provisions for individualized notice for both sets of the parolees.

THE COURT: But you've given me a date of -- here's my -- here's the frustration here and, frankly, you know, we're -- this applies also to whatever it is the plaintiffs are asking me to do here: I have a group of people who have followed the law, who -- unlike the group of people who we're hearing about all the time who are here illegally, I have a group of people here, as I did with the CHNV people. I have a group of people who followed the law.

Now, I understand that people in the President's party have said, oh, no they didn't follow the law, because it was a law that was enacted under President Biden; and, therefore, it wasn't really the law.

But putting that argument in the political world aside, the group of people we were dealing with under the CHNV program and under this program are the people who are following the law.

So you now say we're canceling the program effective January 13th; and if you're here after January 13th, you're no longer following the law. You're now here illegally. And you say we're going to give you 30 days notice, but we don't know when or how that 30 days is actually -- whether the notice has actually gone out yet. We don't know. And yet by -- on your requesting that I deny this, as of January 14th, these people are here illegally.

Now, for the plaintiff, on the other hand, if I say as I did with the CHNV people, let's just put a hold there, I may be right, I may be wrong, in doing something. When the government came in and asked me for a hold because there was a government shutdown, you always said, "Hey, please don't make our brief due now. Give us whatever the length of the shutdown is, and then if we have five days left after that, have our things due five days later."

When I issued an order staying the making people

illegal in the CHNV context and that was then stayed by the Supreme Court, we end up with a circumstance that there were 500,000 people who were trying to follow the law who, all of a sudden, by the Supreme Court's order, were now here illegally.

So my problem here is that you're saying we've given them 30 days notice, but we don't know when that 30 days is going to actually happen. Oh, we'll let you know on the 13th whether we gave 30 days notice prior to the 14th; and you're saying, give us a stay here, and if I overread what the Supreme Court will accept of your arguments, we're stuck with a bunch of people who are trying really hard to follow the law who are stuck in an illegal status.

It seems to me that if people gave a -- whatever -- about following the law, there would be an effort to make sure this happens in a regular fashion.

So I need to know when those people got notice, whatever notice you think -- I understand you think putting something in the Federal Register is sufficient to alert people. I don't think that satisfies written notice. So my question to you is: If you want people to be here illegally as of the 15th, what was the day you gave them notice?

MS. TALLEY: Your Honor, we can provide additional information by your deadline for supplemental briefing, which is before the 14th.

THE COURT: I need that deadline sooner than that because I need to get something out one way or another before the 14th. And if you want to agree to extend that deadline to 30 days after written notice was provided to people, we'd have a different conversation here. But you're -- I don't think you're telling me that on December 15th that written notice went out, and the Federal Register said it will. So I don't think it meant it was going out that same afternoon.

MS. TALLEY: Your Honor, that information I do not have in my possession right now. We stand by our argument that it did not need individualized notice. I understand Your Honor's rejecting that argument. We think that is sufficient alone.

And I do want to just respond to the notion that -- that something unlawful is going on by just reminding the Court that the purpose of the parole and the parole statute itself and the original notices creating these programs all state that parole can be terminated at any time. And that is what is being done here. There's nothing unlawful about that. In fact, that is inherent in the nature of parole itself.

THE COURT: So let's put aside for a moment -- and let's put aside for a moment the notion that -- that -- plaintiffs' notion that you can't end things. Okay? Let's say I agree with you that the government has the right to end

these programs.

Then our question is: Do you have the right to end things in a way that is contrary to regulations or constitutional due process issues? That's going to be, I think, the million-dollar question here.

And for plaintiffs' counsel, I understand you feel very strongly that they shouldn't be allowed to end these programs. I'm not sure I disagree with you, but it does seem to be that the Supreme Court disagrees with you. And we're not -- there's not really a whole lot of value of putting people in illegal status. That's not what I want to be doing here.

What I'm trying to do is to recognize that we have a group of people in this country -- it's what this case involves -- a group of people in this country who have been trying to follow our laws. That's who we have in front of us. And it seems to me that they're entitled to the respect of this country to say, yes, and we also will follow our laws. That's what the case is about.

So when did they give notice is a huge question. And if you want to wait to tell me till the last possible day, then that's where I'm stuck with and I have to work along those lines. It would do you better to give me the information as soon as you have it.

MS. TALLEY: I will do my best, Your Honor, in

interfacing with the clients to get you the most updated and accurate information in response to that question.

I do want to briefly address the constitutional notice --

THE COURT: Yes.

MS. TALLEY: -- point that you raised, and our response to that is simply that there is no procedural due process claim available when there is not a protected interest at stake.

THE COURT: You gave me the citation that works against you. You gave me a Supreme Court case that says -- cites another case that spends five pages, the difference between an initial grant of parole and a revocation of parole. They're in the criminal context, but it seems to be the same thing, so that in an initial grant of parole, the Supreme Court says, it's your discretion.

When you revoke that parole, there's a certain process. It doesn't mean you can't do it, but there's due process. And that's the case you cited to me. Do you have any better authority than that?

MS. TALLEY: The only proc- -- the process that is required in the statute is that the Secretary make a determination in her opinion that the purposes, the statutory purposes of parole, are no longer served. That process was followed, Your Honor. The Secretary made that determination.

She explained at painstakingly length --

THE COURT: So then the Federal Register says that individuals can make -- essentially argue their individual exception, right? There's language there. You've quoted it to me of the person can -- this is a blanket thing, but that does not foreclose somebody explaining why they should be individually entitled to it, right?

MS. TALLEY: That refers back to the INA actually, Your Honor. So the INA notices or indicates that the Secretary always retains her discretion to decide that an individual might be eligible, for instance, for re-parole. And so nothing about the notice abridges that grant of discretion to the Secretary.

THE COURT: And you have cited that not for the point of saying, oh, we're not abridging any of our discretion, but you have cited that to point out that this is not as draconian as the plaintiffs are saying because people can make their individual pitch.

And my question to you is: When? When does somebody -- somebody is given -- supposedly given notice. That's part of their due process. Not only does the statute say they need written notice, but as part of their due process, they're given notice. Then what? What does the notice say?

MS. TALLEY: Your Honor, the proposed class members

are free to file an application for re-parole at any time.

In fact, I think one of the proposed class representatives indicated that she had filed at least an application for adjustment of status. And so filings are able to continue. They're able to be made ongoing. Nothing prevents anyone -- and I think the federal registry notice was clear on this point, nothing prevents any current beneficiary from filing anything right now.

THE COURT: But they're filing it, but it won't be heard before the 14th.

I mean, what I -- I understand. I -- you know, I certainly understand why plaintiffs feel like they came here. They made all these plans of being here, and they thought they were going to be here for a very long time. And I understand your position that, well, we can change that. I get that.

But I have a group of people here who are trying to follow the law. And I'm saying to you we also -- we, America, the United States -- also needs to. And part of that is the Constitution says there has to be process, and the statute says there has to be notice.

So one question is: What is the notice that you're giving? Is -- the notice is saying, "It's done. You're out"? Or does the notice say, "And if you want to appeal, file it within three days"?

MS. TALLEY: So there is no appeal of a termination decision, Your Honor. And I don't know the specific language of the myUSCIS notices or if the written notice is sent to legacy parolees. I don't know the specific language included in those individualized notices.

Our position remains that we have certified the notice requirements under the law in multiple ways, both by the federal registry notice and by these individualized notices. But I understand if Your Honor disagrees with that.

We also want to just -- I think it's important to get back on the record our threshold objection to even reaching these arguments, which is that there is a jurisdictional bar to review in the INA in Section 1252(a) that precludes review of any decision that -- any discretionary decision made by the executive branch.

And then when you look at the parole provision in the statute, 1182(d)(5)(A), it is explicit that this is a discretionary decision.

THE COURT: No disagreement that the actual decision of which of these individuals can stay or can't stay is not in front of me. No question about that.

The question is: What process do you have to or not have to give? That's the question. And I think for that, I do have jurisdiction. I understand you have an argument here, and I do understand it. I will point out that

the First Circuit didn't reach that.

MS. TALLEY: That's correct, Your Honor. We do want to preserve that argument for the record --

THE COURT: Fair enough.

MS. TALLEY: -- if Your Honor rejects it.

THE COURT: Fair enough.

Okay. You're going to get me the administrative record, you think, by the 13th?

MS. TALLEY: That -- that is the representation I have from the client.

THE COURT: Okay.

MR. COX: Your Honor, I can shed a little bit of light on your questions regarding notice.

So we asked our clients to check their myUSCIS accounts in order to see if they received any of these, and at least a couple of our clients have this week. They received them this week.

And the notice just says not a word about the opportunity to request parole via the other -- any other process. It says it's time to leave; and if you don't, we're going to come after you.

It also says that they intend to revoke employment authorization. There's a regulation that requires 15 days notice and an opportunity for the individual to provide countervailing evidence. Obviously, a notice that was sent

this week is not going to give those 15 days that that regulation requires.

We have no -- we do not know whether the mailed notices have been mailed. We don't even know how many people are in the legacy program. They are differently situated in some ways. All of them were interviewed abroad before they came. And some of them have been here for some time. The Haitians in particular have been here for a while, it seems.

The -- and I just wanted to observe, too, the Secretary never explained why she didn't consider the alternative of simply mailing everyone the notice. The mailing addresses are the only thing that are legally required, that immigrants are required to keep up to date with the government. They never considered mailing something to everyone. And they, obviously, can do it, because they're doing it with the legacy parolees.

And I wanted to emphasize, too, how much this -- how much getting notice here matters because of the potential accrual of unlawful presence. So these individuals are -- all of them are beneficiaries of an approved I-130. So every single person has an approved I-130 that they are a beneficiary of, and they're merely waiting for the priority date to become current.

But if they are removed in the interim or if they accrue a certain amount of unlawful presence, then that

triggers a bar of their reentry. And so the government, having invited these people to apply on the basis of this approved I-130 petition, is now laying traps in between those same people and getting the green card that they are waiting for, because if -- if they don't know or if they are not able to leave on a week's notice or whatever it is, then consequences start.

And that's incredibly inequitable and does not seem to be something that the Secretary grappled with whatsoever. She simply painted these parolees with the same brush that she painted the CHNV parolees, says they're all the same.

The government doubles down on that in their brief, saying that the parolees are more alike than they are different; but the only thing that is similar is parole, is the parole status. But for them, as I mentioned, the status is temporary, but they are not here temporarily. At least that was not the idea, and that was not the understanding they had when they were invited in.

And on the jurisdictional point, the 1252, I know Your Honor knows this, but, of course, it doesn't apply to constitutional claims. It doesn't apply to statutory violations. It doesn't apply to regulatory violations. It only applies to --

THE COURT: So tell me what -- I'm not sure how much you fleshed out your due process requirement, but I do

note that that was the specific argument that the First Circuit dropped a footnote saying we express no opinion on this as well.

MR. COX: Yes, Your Honor.

THE COURT: So tell me what process you think is due. Is it simply notice, or is it anything beyond notice?

MR. COX: Well, we would think that, at bare minimum, you need to give people notice of and an opportunity to seek other relief, like, some kind of reasonable amount of time. You need to give them an opportunity to explain why their continued presence is -- you know, meets the regulatory standard or the statutory standard of it does provide a significant benefit or serves a humanitarian purpose.

THE COURT: Is that -- is that really the -- where do I get that from?

MR. COX: The regulation, 8 CFR 212.5(e) says -- sets out the -- it's the regulation for how parole can be terminated on notice, which is what this situation is. So that's the legal standard that is applicable, that the agency applies.

And so individuals who are subject to this determination of, you know, we have decided that your continued presence no longer serves us, you need to tell them that in advance and give them an opportunity to explain why that's not the case.

THE COURT: So is it fair to say that, on the CHNV, when I reached the conclusion that a group, that they couldn't be terminated en masse, that was rejected by the First Circuit, but it was rejected only insofar as it was an interpretation of that statute rather than any opining on the validity of the due process claim.

Is that a fair --

MR. COX: Oh, absolutely, Your Honor. The First Circuit was incredibly clear that they were only deciding the very narrow things that they discussed and specifically not the due process claim.

And on the -- and even on the case-by-case statutory argument, the only thing that they decided is that the phrase "case-by-case" does not apply to terminations. That's -- they didn't reach anything else concerning the statute. And I think that was -- and they said explicitly that they were trying to be as narrow as possible.

THE COURT: Any disagreement, not as to the what the outcome is, but as to the what the First Circuit did or didn't hold?

MS. TALLEY: We agree that the First Circuit clearly said that the statute is construed to permit group terminations, that it doesn't require a case-by-case termination of parole.

The First Circuit indicated it was not reaching

constitutional questions. But I also think it's important to note that it did not suggest that the statute was unconstitutional for allowing terminations that are not on a case-by-case basis and that, insofar as I've seen in the briefing from plaintiffs, they have no authority cited that supports their suggestion of what is required for notice on a constitutional level as opposed to and distinct from what is required by regulations and other federal laws.

And if Your Honor would like additional or supplemental briefing on the constitutional process point, we'd be happy to provide that.

THE COURT: Well, doesn't it get wrapped up some together that it becomes -- when you have promised a procedure, it becomes a constitutional matter what procedure is followed, right? You can't say, on the one hand, here's your procedure, and we're not going to give it to you now if there is a constitutional basis for being entitled to process, right?

So your point earlier is you're not entitled to any process; and I said, well, I think that's distinguished between coming into the country and being kicked out of the country, that those are two different process points for purposes of constitutional law. But if you are -- if I'm right that you are entitled to some process, isn't it correct that, in trying to figure out what that process is, one of

the ways to figure it out is what is the procedure that has been set out?

MS. TALLEY: It may be a consideration, Your Honor, but for reasons we've already discussed, we think that any regulatory requirement is fully satisfied here. And we do dispute whether or not -- whether the Constitution itself requires notice in this instance when you have a purely discretionary grant that is -- it is an act of grace, and it is not a permanent benefit.

THE COURT: Here's the problem. I mean, you're saying that that and we're sort of in the middle of a law book. But you have someone walking down the street. They came here with the permission of our country. They're walking through the street with the permission of our country.

We have a constitutional system that says we don't just detain and arrest those people and hold them, so -- and I think everyone agrees. So you have to first say their status is no longer valid, and then you can pick them up.

And so if they don't have notice that their status is not valid, is that really just, oh, that's some small little thing? That doesn't seem to you a constitutional concern?

MS. TALLEY: Well, we think it's important, Your Honor -- this was -- this was something indicated at

length in the federal registry notice as well, that when a recipient receives parole, they are told, both in explicit terms under the statute and, in this case, in the notices that created these programs, that that grant of parole could be revoked at any time.

THE COURT: But although it may be revoked at any time, you have to have notice.

I mean, it can't be that our Constitution allows a police state where people are just picked up and then they are subsequently made illegal.

MS. TALLEY: We --

THE COURT: We take action against people who have done something that makes them not entitled to the privileges here. And you can say we want to terminate those privileges. But to say we terminate those privileges, but we don't tell you that you are terminated; and when you walk out of your apartment building, you have to be afraid?

MS. TALLEY: Well, Your Honor, the government told the world that it was terminating --

THE COURT: But it didn't tell these people.

MS. TALLEY: They're -- the Federal Register notice is public information that is open and available to everyone. In our view, that satisfies our requirement to give notice.

So we're not contending that we can terminate without -- we're contending that we terminated with notice

here. I want to be clear we think that we have given notice. Our arguments in our brief outline why that is for multiple reasons; and the federal registry notice explained why, in the Secretary's judgment, she had given not just one form of notice, but multiple forms of notice and the Secretary's opinion, above and beyond what the regulation required.

THE COURT: No. All you have said so far is you have given one form of notice, and you intend to give other forms of notice. You haven't actually said --

MS. TALLEY: At the time of publication, yes, Your Honor.

THE COURT: Or sitting here today, standing here today. They've said this is what they've received, but you haven't said anything about what has actually occurred as to --

MS. TALLEY: Other than the Federal Register notice --

THE COURT: Other than the Federal Register notice.

Anything else for today?

MR. COX: A couple quick things, Your Honor. We -- we do think -- I just want to say our notice and comment claim, we think that is a strong one, and we think the government's brief actually makes it stronger and demonstrates why it's a strong claim.

You know, the defendants argue that the Secretary

can announce generally applicable guidelines without going through notice and comment. Fair enough, but that's not what this was. This was not a generally applicable guideline. This was cutting short 10,000 people, 10,000 individuals' grants of parole. Rulemaking --

THE COURT: Let me ask you this question.

MR. COX: Yes, Your Honor.

THE COURT: If the Federal Register notice had said nothing about people who are already here --

MR. COX: Uh-huh.

THE COURT: -- if all the Federal Register notice had said was we don't want to do these programs anymore, they are shut down for anyone about to come here, did that require notice and comment?

MR. COX: No, Your Honor.

THE COURT: Okay.

MR. COX: The other thing I wanted to mention, Your Honor, is this is about the balance of equities.

The government's arguments here are -- virtually all of them in this context assume that they are right on the law. The government has yet to articulate why, if they are not right on the law, the balance of equities tips in their favor.

And in that regard, Your Honor, I would note that about 30 percent of the family reunification parolees are

children, people who were brought here by their parents and are enrolled in school.

We are in the middle of the school year. I have an eight-year-old, I can't possibly imagine having to pull her out of school in these kinds of circumstances. And it's outrageous that the government has not grappled with this fact and considered what this is going to do.

And in that regard, Your Honor, I know we've asked the Court to move quickly; but, you know, we've been contacted by class members who have tickets, refundable tickets they bought to leave this weekend because they -- they're so -- they don't want to mess up the possibility of getting a green card. And so those who are aware of it are trying to do what they can, but it's going to inflict tremendous trauma. And there's simply no reason for this.

And so we submit that the balance of equities would certainly tip very strongly in plaintiffs' favor.

MS. TALLEY: Just a quick response to the remaining points brought up by plaintiffs' counsel.

First, on notice and comment, parole is not an entitlement to remain in the United States. The First Circuit said so. The INA says so. The program notices that created these programs say so. And so loss of a discretionary status and benefit is not tantamount to a new legal obligation such that this is rulemaking that would

require notice and comment.

Any legal consequences flow indirectly from the statute itself that states what happens when the discretionary grant of parole is terminated. So this is not a new burden, a new legal obligation. It predated the creation of these programs. It was noted in the creation of these programs. There's no new rulemaking here that would require notice and comment.

And then moving to the reliance interest that were raised by plaintiff, I want to be clear that the Secretary in the federal registry notice, considered these reliance interests at length, explained countervailing government interests that, in her opinion, outweighed the reliance interests considered so that the issue is not -- all that was required from the Secretary is to consider these reliance interests and then provide reasons why she rejected them.

That's what she's done. If that's even required, she's satisfied that box. She's checked that list. And so what plaintiffs are really saying is that they disagree with the way she weighed the relevant interests here.

But the Court and plaintiffs are not free to rejudge or make the calculus themselves. The INA devotes that decision solely to the discretion of the Secretary. So she's considered the relevant interests. She's explained why she's rejecting them, as most important.

And when it comes to the balance of the equities, I think it's important to look back to the First Circuit opinion here, which in the context of the CHNV parolee programs noted that, in the Circuit's view, there might be some very significant harms on the plaintiffs' side of the calculus for those programs; but it said that what was particularly important was the plaintiffs likely -- did not have a likelihood to succeed on the merits of their claims.

And so that itself outweighed the interest of the emergency relief there. And so simply saying that there might be some harms does not end the question for preliminary relief.

THE COURT: I think we all understand under our preliminary injunction standard. So, obviously, if they don't have a likelihood of success on the merits, that ends the question. If they do have a likelihood of success on the merits, they also have to show the harm. And they have said here's this harm.

And I think his response to -- his contention here is your only answer to the harm that they're saying is you're right on the merits. So putting aside the "you're right on the merits," because you're right, if you're right on the merits, I don't even get there; but if they succeed in convincing me on the merits, they also have to convince me on the harm.

And I guess the question is: Is there any answer to that on the harm or are you resting on the substantial -- no substantial likelihood of success on the merits?

MS. TALLEY: No, that is an independent point I wanted to make sure Your Honor --

THE COURT: Okay. So what is the harm? Assuming that they're right, and in nine months, when I finally get to deciding the case on the merits, I say, yep, I thought you were going to be right, and now you're right, assuming all of that, their point would be, "But, look, we've been harmed in between by all of this." And what's your answer to that that --

MS. TALLEY: Yes, Your Honor.

THE COURT: -- assuming for a minute that they might be right?

MS. TALLEY: Yes, Your Honor. And that brings me to the harms that the government is suffering, and those are of an irreparable nature as well.

So the Secretary made findings or determinations that are not challenged that the parolees that are here were insufficiently vetted, and the executive branch has made a determination that that poses a national security risk.

THE COURT: Will something about that be in the administrative record?

MS. TALLEY: It is in the federal registry notice.

That's explained at length by the Secretary in the published notice as part of the reason for her decision. That's part of the reason why she's decided that other interests don't outweigh the government interest here. That's a significant harm in the government's book that's irreparable if the government is prevented from carrying out terminations that are lawfully given in -- to the executive branch's discretion.

Another harm mentioned by the Secretary in the federal registry notice is that it is the judgment of the executive branch that the resources required by this program from an already strapped agency is diverting resources from more effective programs.

THE COURT: Which is the agency that's strapped?

MS. TALLEY: The -- the agencies involved here. You have DHS. You have USCIS. You have Customs and --

THE COURT: Maybe I misread, but I thought we just had the largest increase ever in the Big Beautiful Bill to fund this. Where's the strapped?

MS. TALLEY: Your Honor, we also had an unprecedented historical wave of migration --

THE COURT: Not in the last year. We have the lowest migration in the last year. What is the -- are you --

MS. TALLEY: Since the --

THE COURT: I'm sorry; you can give me the national

security argument. I hear your national security argument. But if you start talking about poverty of the Department of Homeland Security, can you say these things with a straight face?

MS. TALLEY: Your Honor, I -- I am reciting to you the determinations that are made by the executive branch. The determinations made by the Secretary that were explained in the notice were that this program takes resources. It indisputably takes resources.

THE COURT: Certainly. It takes resources. Yep.

MS. TALLEY: And that those resources could be better funneled to programs that the executive branch --

THE COURT: How can you say that when you aren't using all of the resources you already have? You can't figure out how to spend it fast enough.

MS. TALLEY: Your Honor, there are limited personnel and limited agency resources to deploy towards implementing various immigration efforts and border security efforts.

The Secretary has made a determination that the agency resources put towards this program would be better served, better serve the country's immigration policies by being diverted towards other programs. The statute -- Congress has allowed the Secretary the discretion, the full discretion, to make that calculus.

THE COURT: Absolutely. Right now she has discretion to make decisions, but you're asking me to weigh the equities. And I think, when I weigh the equities, I have to be able to understand that that is a meaningful harm that the one side or the other might suffer.

I absolutely recognize that you get to say that there are these things, and I have to take them into account. But when I'm trying to weigh how worried I am about this happening or that happening, I don't have any reason to think that -- it -- absolutely, policy choice. They have the choice not to spend the money there. But in terms of the harm while this is being litigated, which is all that we're talking about here, that's less persuasive.

Let's talk about the national security issue for a minute. And on that one, I've got to turn to the plaintiffs. They get to make the national security call.

MR. COX: Absolutely, Your Honor, they do. But they do have to provide some sort of reasonable explanation and a connection.

And the problem here is that the only explanation that's in the Federal Register notice, it says that some of these -- some parolees received insufficient vetting because they didn't -- they weren't interviewed in person before they arrived.

The -- there are numerous problems with that. One,

the legacy programs did have in-person interviews, and the legacy Cuba program was interviewing people as recently as January of 2025. The Federal Register notice itself says that.

The -- and, of course, then the program was suspended, and so nothing has happened since then. But that -- there are a bunch of folks here who were interviewed. So their sole rationale about national security isn't even applicable to the whole group.

Beyond that, the folks who are here were interviewed once they arrived to the United States. Their biometrics were collected, they were interviewed by CBP, and they were given parole. And so -- and so this sort of --

THE COURT: Now, there was -- with the CHNV issue, there were issues that had been raised by Congress, I believe, and concerns about some vetting problems. Any such matters relating to these family reunification programs?

MR. COX: The only -- the only indicator -- the only thing that has been identified, to my knowledge, regarding the family reunification processes is that the State Department invited some folk -- people to apply who had died because, you know, an I-130 petition gets approved. Someone may have to wait 15 to 20 years. And some -- I think they said something like 700 people had died.

THE COURT: By the time they got -- their number

came up.

MR. COX: And then they said that the second step in the process is where USCIS confirms, like, receives information from the -- from the sponsor. And about half of them, apparently, were confirmed by USCIS. So there -- I don't know how --

THE COURT: I don't know what that means.

MR. COX: It means that they, basically, just -- it's Step 2 of 7.

THE COURT: The sponsor said that dead people were alive?

MR. COX: I think -- so there's the GAO report that we cite in the motion for -- regarding class. So it explains that some people, like, their family received it and didn't know that the sponsor for this process had to be the I-130 petitioner, it had to be the same person.

And so some people, apparently, filed it and/or, like, reached out to USCIS, the GAO report says this, that they reached out and there was confusion. So this is the only thing that has ever come out.

Notably, as I said, that's Step 2 of 7. There is zero information that anyone got past Step 2. There is no -- and I'm sure that it would be in the Federal Register notice if anyone in that category had actually made it into the country. And it doesn't say that. So --

THE COURT: So there's no suggestion that anybody who has been -- because I'm only dealing with people who are here.

MR. COX: Yes, Your Honor.

THE COURT: I'm not dealing with anyone who is trying to come in. So the people who are here, is there anything in the record of any suggestion of any fraud or national security issue relating to the people who are here?

MR. COX: None, Your Honor. And a lot of that has to do with the system design. It's a far narrower process than all of the others. You -- it's invitation only, which takes away a lot of the opportunities. There wasn't a lottery like there was in CHNV, which provided an incentive.

THE COURT: Do I have how large a program we're talking about? I know with the CHNV we're talking about 500,000. What are we talking about here?

MR. COX: So the Federal Register notice states that, under the modernized processes, 14,069 people were granted parole. And then it says that -- that current -- and all of them -- because FRP parole was typically for three years. So all of them would -- are within the three years. Then it says that there were approximately 1,060 legacy Cubans and approximately 100 legacy Haitians.

Because of the exception for individuals who had filed for adjustment of status, you know, it's not the full

number; but we estimate at around 10 to 12,000. The government's brief similarly references the number 10,000, approximately 10,000. So that's -- that's sort of -- we think it's in that ballpark.

THE COURT: Okay. And one last question I have just about the certification: The original modified order for class certification from May was appealed and then the appeal was --

MR. COX: Dismissed.

THE COURT: Dismissed. What's that about?

MR. COX: It was dismissed the day their brief was due or just before.

THE COURT: Okay. So at this point, I have -- I mean, we're -- everyone is sort of treating this as if we just have the named plaintiffs. I have a certified class that, despite the opportunity for interlocutory appeal, there is no -- there was no appeal that remained, and the class -- that is the class. These are my class representatives as it stands.

MS. TALLEY: Your Honor, if I may just briefly --

THE COURT: Sure.

MS. TALLEY: -- add some clarity to the points about national security that were raised.

THE COURT: Yeah.

MS. TALLEY: I think particularly helpful in terms

of looking at the reasons that were offered in the federal registry notice, if you go to page 58035, a lot of the reasons are contained there.

And one of the reasons was provided by plaintiffs' counsel, which is that interviews did not happen for many of these individuals while they were still abroad at the consulate level with individuals who are versed in the countries that these individuals are coming from.

The Secretary noted that one problem with that is that those interviewers have expertise that would allow them to know, for instance, if the particular public records systems in those countries are weak and more susceptible to fraudulent uses.

Additionally, it's about the timing of collection of biometric information to verify data about the applicants. Because that did not happen for many of them in advance before they came to the country, that truncated the time to be able to verify certain aspects of the applicants.

There are other concerns that are listed in the federal registry, but it is the Secretary's prerogative to, using the information that the executive branch has, make the determination that these insufficient vetting processes have created national security risks that are untenable, and that's what she did.

MR. COX: One more remark on that, Your Honor. The

reason that DHS stopped requiring interviews in country, that was a decision of DHS.

THE COURT: Yes. But I don't get to --

MR. COX: Right.

THE COURT: I don't get to say, well, they made that decision, so now they have to live by it. They get to make those decisions.

MR. COX: Of course. I note there's no disagreement here. The point I'm trying to make is that these individuals went through a process that DHS said we are not going to require these in-person interviews --

THE COURT: Right. But you --

MR. COX: -- and then it's being held against them, like --

THE COURT: It's not that it's being held against them. It's that the government gets to decide what the security level is that they need to do.

I mean, you know -- I don't know how many of you remember; there used to be a time when you would go through the security at the airport, and you didn't have to take your shoes off. And then -- yeah, you're young.

And then we had Mr. Reid, who was the shoe bomber. And then all of a sudden, because one person had done that, we look backwards and we said, oh, we shouldn't have been letting people go through with their shoes. And so then for

20-however-many years, we have now been having to take off our shoes.

And then, recently, there's sort of a recognition, well, actually, I think our X-ray machines are good enough now. Something has changed. Maybe you don't have to take off your shoes. They get to make those decisions.

MR. COX: I agree, Your Honor. The only point I'm trying to make is that -- and even in this example Your Honor is giving, we're talking prospectively. We're not saying everyone who came through without taking their shoes off now loses something. It's -- the point I'm trying to make is that --

THE COURT: But it isn't -- you're suggesting that there is a bargain that was made and you can't change the bargain. And that's not the framework here.

MR. COX: I understand, Your Honor. I'm not saying that we can't change the bargain. I'm saying you have to grapple with the reliance interest, what this means to people, how this would affect people. And you have to give real reasons.

THE COURT: I have to -- no, I have to grapple with the reliance issues, absolutely. I have to take them at face value that those are their reasons.

MS. TALLEY: If I may add just one point to that, Your Honor, there is a section in the federal registry notice

that is entitled "Lessons Learned," and that is because the administration is able now, with the benefit of hindsight, to say these processes were insufficient. They have created present national security concerns.

And because this is entirely an act of grace and parole is completely discretionary and people were told from the outset it could be revoked, they're able to do that based on information they have now.

THE COURT: You had me with you for part of that, and then you went a little bit further.

I think they get to -- absolutely, they get to say we're reconsidering what is or what isn't appropriate for our national security. That is not for me to argue with. They get to say that.

Having done that, you can say I had a reliance interest of being here in the United States; but you don't get to say, I had a reliance interest that they aren't going to screen me. I mean, that's not a reliance issue. That's just sort of how they make their things.

Now you're here. You have a reliance issue. If, for example, somebody had snuck through who was a bad person, you don't get to say, "Well, but I relied on getting through security."

MR. COX: Of course, Your Honor. And if they had -- if there was any sort of individualized analysis here

or anything beyond sort of a broad-brush stereotype of -- that doesn't even apply to everyone in the group by its own terms, then maybe we would be arguing differently.

THE COURT: I think the problem is you're putting these things as they're sort of equations. I think there are different interests on both sides, and they don't directly speak to each other. So I have to see what the government's interests are, and I have to credit what they're saying in this regard. I don't get to say, well, hmm, there could be a better way to do it. That's not for me.

MR. COX: Understood, Your Honor. We're --

THE COURT: You can say this is how we relied on it, and I get to consider what that means and whether that reliance interest means something here.

I think you're very hard-pressed at the end of the day to say they don't get to end the program. I don't think you get there. But I think the government is hard-pressed to say that we take people who are law abiding and who have been trying to comply with our laws and we, all of a sudden, say to them the laws -- we don't have a responsibility under these laws to also provide -- to follow them.

And I hear that you think that a Federal Register notice is good enough. I don't think it is.

I'm going to, obviously, spend some more time on this this afternoon. I am anticipating issuing something

along these lines, which is to restrain -- to -- a TRO tied to the date of written notice.

I think what -- I think that is really as far as I can go right now on finding, on what the record is that I have in front of me, but that that will give us a little breathing space when you get your motion.

That's not a -- I can only put that into effect for two weeks, so it's really not until, like, 30 days after notice; but for two weeks, as a TRO, that will allow me to take what you're giving me on getting the administrative record and try to really wrestle with these, these issues.

So that is sort of what I'm anticipating doing. We will see as I sort of struggle will you writing it. Sometimes things come out in the wash.

MR. COX: Thank you, Your Honor.

If I may, could plaintiffs have an opportunity to respond to the government's filing on the 13th?

THE COURT: It's -- probably would be helpful for me.

MR. COX: Thank you, Your Honor.

THE COURT: I -- today is the -- I don't want to leave this in limbo. And so your -- the government is going to respond -- I think I will do this. I also -- I don't do myself any favors to have things written when people don't have time to do their writing.

Assuming -- I will put this in by the end of the day as I sort of figure out my way. Assuming I put a TRO in place for two weeks, I will have the government's response, instead of being due on the 13th, I will give them until the 15th; and I will give you until the 20th. If you can get it in earlier than that, that would be better, too; but that way, I can make sure I've resolved things before the TRO expires. But I'm giving you a tentative schedule. As I work my way through things this afternoon, it may change.

While I have you here -- oh, I will get out the motion on supplementing. I need you to get any supplementation in before we wrestle for real with the PI; that they have made the argument that there's no complaint to be issuing this PI on. It's a fair argument, once we've done this on an expedited basis, so I think the -- can you get that in by Monday?

MR. COX: Yes, Your Honor.

THE COURT: So then you're responding to the second amended complaint with a supplementation rather than a third amended complaint.

MS. TALLEY: Yes. Thank you, Your Honor.

THE COURT: And I am anticipating modifying, once you get that in, then granting the motion for amending the class certification, pending further order, because I think they are entitled to who those people are. So I will sign

the order allowing them to proceed without their names being publicized, but the government does get to know who we're talking about.

MS. TALLEY: And can I just note on the point of class certification, Your Honor, it's difficult for us to be able to fully flesh out commonality, typicality, standing --

THE COURT: Exactly.

MS. TALLEY: -- without having identity of the people that we're talking about.

THE COURT: Exactly. And the reason I'm doing it this way is not to curtail your opportunity to make those arguments. It's because I have an issue of some urgency in front of me. So I'm making my best legal findings on the information in front of me.

If it turns out that it's wrong class certification can always be modified throughout the life of a class action. And so if it turns out that we need to reconsider it, you certainly are welcome to bring that motion. But at this point, I am going to, essentially, proceed in these steps. I will allow today the motion to file a supplemental complaint and to proceed with the pseudonyms.

And then I will -- once you file that, I anticipate allowing the motion for class certification subject to further order, as the government has an opportunity to determine whether there is, in fact, some problem with these

people or not as representatives.

And then I will put in place -- and maybe I need to wait until those things are there before I can actually issue a TRO. So --

MR. COX: I was going to ask about that, Your Honor.

THE COURT: -- it may not come out till Monday.

MR. COX: If we can get the supplement in today --

THE COURT: That would be better for me.

MR. COX: Okay. Because we do think it would be quite viable to get -- today versus Monday would make, I think, a big difference.

THE COURT: Well, if you can get it in today, that would be better. And, really, all I'm asking you to do is to --

MR. COX: Change --

THE COURT: -- limit your changes to the changes relevant to things that happened in December.

MR. COX: Okay.

THE COURT: And put them in as new paragraph sub (a), sub (b), sub (c), rather than redoing the whole complaint. Skip all your -- trying to get nicer headings and things like that. We really don't need to be doing that right now. And then go ahead and file that.

MR. COX: Very well. Thank you, Your Honor.

THE COURT: Thank you. I appreciate everybody's work on this over the holidays and on this tight schedule.

THE DEPUTY CLERK: We are in recess.

(Court in recess at 1:00 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 11th day of January, 2026.

/s/ Robert W. Paschal

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, et al.,

Plaintiffs,

v.

Case No. 1:25-cv-10495-IT

KRISTI NOEM, in her official capacity
as Secretary of Homeland Security;
et. al,

Defendants.

---

## DEFENDANTS' NOTICE OF FILING OF ADMINISTRATIVE RECORD

In accordance with the deadlines set forth in the Court's Temporary Restraining Order entered January 10, 2026 (Doc. No. 243), Defendants are producing the attached Certified Administrative Record for the agency action at issue, *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025), by filing it on the docket.[1]

Date: January 13, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

---

[1] To the extent post-decisional facts regarding provision of individual notice are relevant to the pending Motion for Preliminary Injunction (Doc. No. 218), those facts will be provided along with Defendants' Opposition to that Motion.

DREW C. ENSIGN
*Deputy Assistant Attorney General*

/s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-8259
katherine.j.shinners@usdoj.gov

ELISSA P. FUDIM
*Trial Attorney*

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2026, I electronically filed the notice of filing and the administrative record with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record.

*/s/ Katherine J. Shinners*
Katherine J. Shinners
Senior Litigation Counsel
United States Department of Justice
Civil Division

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

SVITLANA DOE, *et. al*.,

Plaintiff,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et. al*.,

Defendants.

Civil Action No. 1:25-cv-10495-IT

**CERTIFICATION OF ADMINISTRATIVE RECORD**

## CERTIFICATION

I, Juliana Blackwell, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am employed with the U.S. Department of Homeland Security ("DHS"), as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communications intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security, and the maintenance of official Department records. I have held this position since August 2019.

2. I certify that, to the best of my knowledge, information, and belief, the documents listed in the accompanying Index and annexed hereto constitute the nonprivileged documents and materials directly or indirectly considered by DHS and that these documents constitute the administrative record the agency considered in issuing the Federal Register Notice entitled *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

Executed on: January 13, 2026

JULIANA J BLACKWELL Digitally signed by JULIANA J BLACKWELL Date: 2026.01.13 09:08:07 -05'00'

Juliana Blackwell

Deputy Executive Secretary

**Certified Administrative Record**

*Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025)

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-00001 | Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 FR 58032 (CIS No. 2806-25, RIN 1615-ZC12) |
| FRP-FRN-00017 | Decision Document, USCIS Notice: Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans |
| FRP-FRN-00018 | Certain DHS Immigration Fees Required by HR-1 Fiscal Year 2026 Adjustments for Inflation, 90 FR 52085 |
| FRP-FRN-00021 | Circumvention of Lawful Pathways, 88 FR 31314 |
| FRP-FRN-00160 | Cuban Family Reunification Parole Program, 72 FR 65588 |
| FRP-FRN-00161 | Designating Aliens for Expedited Removal, 90 FR 8139 |
| FRP-FRN-00163 | Determination: Foreign Affairs Functions of the United States, 90 FR 12200 |
| FRP-FRN-00164 | E.O. 14150, America First Policy Directive to the Secretary of State, 90 FR 8337 |
| FRP-FRN-00165 | E.O.14165, Securing Our Borders, 90 FR 8467 |
| FRP-FRN-00168 | E.O. 14194, Imposing Duties to Address the Situation at our Southern Border, 90 FR 9117 |
| FRP-FRN-00172 | E.O. 14159, Protecting the American People Against Invasion, 90 FR 8443 |
| FRP-FRN-00178 | E.O. 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 |
| FRP-FRN-00180 | E.O. 14227, Amendment to Duties to Address the Situation at Out Southern Border, 90 FR 11371 |
| FRP-FRN-00182 | EOP, E.O. 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 |
| FRP-FRN-00184 | Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generación, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 |
| FRP-FRN-00185 | Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 FR 19065 |
| FRP-FRN-00186 | Immigration Parole Fee Required by HR-1 Reconciliation Bill, 90 FR 48317 |
| FRP-FRN-00188 | Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 |
| FRP-FRN-00199 | Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 |

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-00212 | Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 |
| FRP-FRN-00223 | Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 |
| FRP-FRN-00233 | Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 |
| FRP-FRN-00245 | Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 |
| FRP-FRN-00250 | Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 |
| FRP-FRN-00255 | Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 |
| FRP-FRN-00258 | Inflation Adjustment to HR-1 Immigration Fees, 90 FR 52693 |
| FRP-FRN-00261 | Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 |
| FRP-FRN-00264 | Proclamation 10773 of June 3, 2024, Securing the Border, 89 FR 48487 |
| FRP-FRN-00271 | Proclamation 10817 of September 27, 2024, Amending Proclamation 10773, 89 FR 80351 |
| FRP-FRN-00274 | Securing the Border, 89 FR 48710 |
| FRP-FRN-00337 | Securing the Border, 89 FR 81156 |
| FRP-FRN-00467 | Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 |
| FRP-FRN-00479 | USCIS Immigration Fees Required by HR-1 Reconciliation Bill, 90 FR 34511 |
| FRP-FRN-00485 | CBP, DHS, CBP Releases December 2024 Monthly Update |
| FRP-FRN-00497 | CBP, DHS, Nationwide Encounters Filtered for Region-Southwest Land Border, Citizenship-Haiti |
| FRP-FRN-00506 | CBP, DHS, Nationwide Encounters, Filtered for Region - Southwest Land Border, Citizenship - Ecuador |
| FRP-FRN-00512 | CBP, DHS, Nationwide Encounters |
| FRP-FRN-00520 | CBP, DHS, Nationwide Encounters |
| FRP-FRN-00523 | CBP, DHS, U.S. CBP Nationwide Encounters, filtered by Region (Southwest Land Border) and Citizenship (Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras) |
| FRP-FRN-00532 | DHS, DHS CBP PIA – 021 TECS System-Platform |
| FRP-FRN-00533 | DHS, DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation |
| FRP-FRN-00534 | DHS, DHS CBP PIA-021 TECS System, Platform - August 2016 - Appendix Update - April 2022 |

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-00588 | DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries |
| FRP-FRN-00589 | DHS, Nat'l Environmental Protection Act, Memo for Record for Categorical Excluded Actions, FRP |
| FRP-FRN-00605 | DHS, System of Records Notices (SORNs) _ Homeland Security |
| FRP-FRN-00618 | OHSS, DHS, Lawful Pathways and Processes Report |
| FRP-FRN-00632 | USCIS, DHS, Jan. 23, 2025 Acting Director Higgins, Securing Our Borders EO and Parole Processing Email |
| FRP-FRN-00633 | USCIS, DHS, Supp. Statement for Online Request to be a Supporter and Declaration of Financial Support, OMB Control No. 1615-0157, Form I-134A, page 10, question 12 |
| FRP-FRN-00646 | USCIS, DHS, The Cuban Family Reunification Parole Program, (Process Steps) |
| FRP-FRN-00663 | Cong. Rsch. Serv., Straut-Eppsteiner, H., FY2024 EOIR Immigration Court Data, Caseloads and the Pending Cases Backlog |
| FRP-FRN-00667 | Congress, H.R. Rep. 104-469, pt. 1, at 140 |
| FRP-FRN-01217 | DOS, Dispatch Magazine (1995), U.S.-Cuba Joint Communique on Migration, Article 5 |
| FRP-FRN-01220 | DOS, Migration and Refugees, Joint Statement Between the United States and Cuba |
| FRP-FRN-01231 | DOS, Press Release, Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente |
| FRP-FRN-01233 | DOS, Press Release, Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente |
| FRP-FRN-01235 | DOS, Press Release, Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente |
| FRP-FRN-01237 | DOS, Press Releases, Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States |
| FRP-FRN-01239 | DOS, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State |
| FRP-FRN-01243 | DOS, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele |
| FRP-FRN-01247 | DOS, Secretary Rubio's Meeting with Panamanian President Mulino |
| FRP-FRN-01250 | EOP, Office of the Press Secretary, Joint Statement |
| FRP-FRN-01251 | EOP, Readout of President Donald J. Trump's Call with President Nayib Bukele |
| FRP-FRN-01254 | EOP, Statement From the Press Secretary |
| FRP-FRN-01258 | Council on Foreign Relations, Why Six Countries Account for Most Migrants at the U.S.-Mexico Border |
| FRP-FRN-01290 | George J. Borjas, The Earnings of Undocumented Immigrants, National Bureau of Economic Research |

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-01333 | Meryl Sebastian, Trump Says India 'Will Do What's Right' on Illegal Immigration, BBC News |
| FRP-FRN-01337 | Panama Receives First US Deportation Flight Under Trump Administration, The Tico Times |
| FRP-FRN-01341 | The Dialogue, Family Remittances in 2024 Looking Ahead amid Possible Shifts in Flows |
| FRP-FRN-01354 | The Dialogue, Family Remittances to Latin America and the Caribbean 2023, Slide 6, Leadership for the Americas |
| FRP-FRN-01397 | The Dialogue, Orozco, M., Future Flows of Family Remittances to Latin America and the Caribbean |
| FRP-FRN-01484 | OHSS, DHS, OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2] |
| FRP-FRN-01485 | OHSS, DHS, OHSS analysis of May 2025 OHSS Persist Dataset [OHSS tab 1] |
| FRP-FRN-01486 | USCIS, DHS, Data pulled from internal DHS reports on parole processing [OHSS tab 12] |
| FRP-FRN-01487 | USCIS, DHS, USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 5, 7, 8, 9] |
| FRP-FRN-01527 | USCIS, DHS, USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 6] |
| FRP-FRN-01570 | USCIS, DHS, USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3] |
| FRP-FRN-01571 | USCIS, DHS, USCIS analysis of legacy FRP filings as of Apr. 2, 2025 [OHSS tabs 10 & 11] |

national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3).[25] Accordingly, the termination of the Ethiopia Temporary Protected Status designation will be effective 60 days from this notice's publication date.[26]

DHS recognizes that Ethiopian Temporary Protected Status beneficiaries continue to be authorized to work during the 60-day transition period.[27] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain Employment Authorization Documents previously issued under the Temporary Protected Status designation of Ethiopia through February 13, 2026. Therefore, as proof of continued employment authorization through February 13, 2026, Temporary Protected Status beneficiaries can show their Employment Authorization Documents that have the notation A–12 or C–19 under Category and a "Card Expires" dates of June 12, 2024 and December 12, 2025.

The Secretary has considered putative reliance interests in the Ethiopia Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

**Notice of the Termination of the Temporary Protected Status Designation of Ethiopia**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Ethiopia; (b) whether permitting the nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) to remain temporarily in the United States is contrary to the national interest of the United States; (c) whether Ethiopia is experiencing ongoing armed conflict that poses a serious threat to the personal safety of Ethiopian nationals, and (d) whether extraordinary and temporary conditions in Ethiopia that prevent Ethiopian nationals from returning in safety continue to exist. Based on my review, I have determined that Ethiopia no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(A) or (C), 8 U.S.C. 1254a(b)(1)(A) or (C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Ethiopia for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on February 13, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov*.

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–22746 Filed 12–12–25; 8:45 am]

BILLING CODE 9111–97–P

---

[25] Whether to allow for an additional "orderly departure" period following a Temporary Protected Status designation termination (beyond the statutory minimum of 60 days) is an "option" left to the Secretary's unfettered discretion. INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Although DHS has allowed such extended periods for certain Temporary Protected Status terminations, *see, e.g., Termination of the Designation of Sudan for Temporary Protected Status*, 82 FR 47228 (Oct. 11, 2017) (12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation*, 68 FR 52407 (Sept. 3, 2003) (6-month orderly transition period), certain other Temporary Protected Status designations were terminated without allowing for such transition periods, *see, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program*, 68 FR 3896 (Jan. 27, 2003) (no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 FR 7582 (Feb. 8, 1993) (same).

[26] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

[27] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2806–25]**

**RIN 1615–ZC12**

### Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security ("DHS") is terminating the categorical parole processes for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole processes announced, or updated, by DHS in 2023 (hereinafter referred to as "modernized FRP programs"). DHS is also terminating the residual processing of legacy cases under the Cuban Family Reunification Parole program ("legacy CFRP") and the Haitian Family Reunification Parole program ("legacy HFRP") first implemented by USCIS in 2007 and 2014, respectively (collectively, the "legacy FRP programs"). This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of all nine programs (hereinafter "the FRP programs"), termination of parole for aliens paroled under the FRP programs, and revocation of employment authorization based on being an alien paroled under the FRP programs.

**DATES:** DHS is terminating the FRP programs as of December 15, 2025. The temporary parole period of aliens who have been paroled into the United States under the FRP programs, and whose initial period of parole has not already expired by January 14, 2026 will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485, Application to Register Permanent Residence or Adjust Status, that is postmarked or electronically filed as of December 15, 2025 that is still pending adjudication as of December

15, 2025; or (2) the Secretary of Homeland Security ("the Secretary") determines otherwise on a case-by-case basis. Aliens without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS implemented updates to the modernized FRP programs.[1] The modernized FRP programs were available by invitation only to certain petitioners with approved Forms I–130, Petition for Alien Relative, filed on behalf of principal beneficiaries who were nationals of designated countries and their immediate family members. DHS also updated the legacy FRP programs to align with the procedures used for the modernized FRP programs.[2] Under the modernized FRP programs, qualified beneficiaries who were outside the United States could be considered, on a case-by-case basis, for advanced authorization to travel to the United States to seek a temporary period of parole for urgent humanitarian reasons or significant public benefit. Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023);[3] Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).[4]

On January 20, 2025, President Trump issued Executive Order ("E.O.") 14165, "Securing Our Borders."[5] Section 2 of the E.O. establishes the policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the E.O. directs the Secretary of Homeland Security ("Secretary") to, consistent with applicable law, take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders."[6]

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the FRP programs. Although DHS established the categorical program for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the seven categorical programs was very similar,[7] as is the rationale for terminating them. Therefore, DHS is announcing the termination of all seven modernized FRP programs, in addition to any continued processing under the legacy FRP programs, by publishing this single notice in the **Federal Register**. Consistent with the Secretary's statutory and regulatory authority, the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date, subject to certain exceptions.

## II. DHS Parole Authority

The Immigration and Nationality Act ("INA") confers upon the Secretary the narrow discretionary authority to parole aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A); 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(a), (c)–(e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien shall "return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the legislative history of the parole statute supports the contention that Congress has sought to limit the use of the parole authority to specific instances rather than as a means of circumventing established immigration laws or processing times.[8]

---

[1] The five new categorical parole programs implemented in 2023 for Colombia, Ecuador, El Salvador, Guatemala, and Honduras, and the two existing programs for Cuba and Haiti that were updated in August 2023, all utilize the online Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, to initiate the process of being considered for parole by DHS. Collectively, these seven Form I–134A-reliant programs will be referred to as the "modernized FRP programs." The FRP programs created in 2007, for Cuba, and 2014, for Haiti, utilized Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, to request parole from USCIS. Collectively, these Form I–131-reliant programs will be referred to as the "legacy FRP programs." All nine programs combined, both modernized and legacy, are referred to as the "FRP programs."

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007); Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014). These programs were superseded by the modernized processes implemented on August 11, 2023. No new filings were accepted for these programs after August 11, 2023, except for certain add-on derivative beneficiaries of principal beneficiaries with a pending legacy CFRP application. However, processing of applications that were pending under legacy CFRP continued according to the process established in December 2014. *See* Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014). Requests for re-parole have continued to be processed under legacy HFRP.

[3] *See* 72 FR 65588 (legacy CFRP was originally established in 2007 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed for new filings in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[4] *See* 79 FR 75581 (legacy HFRP was originally established in 2014 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[5] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[6] *Id.*

[7] *Compare, e.g.,* 88 FR at 43593–43596, *with* 88 FR at 78765–78768, 72 FR at 65588, and 79 FR at 75582 (setting out the justifications for the parole programs for Colombia, Ecuador, Cuba, and Haiti, respectively).

[8] Parole was codified into immigration law in the 1952 INA. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, "the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress. For example, the House Report for the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA") stated:

[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who

Continued

Under the law, the determination to parole an alien into the country should only be made on a discretionary, case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a U.S. port of entry (''POE'') is made by U.S. Customs and Border Protection (''CBP'') officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the FRP programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11); *see also* One Big Beautiful Bill Act, Public Law 119–21, secs. 100003(b), 100010(a), 139 Stat 72, 366, 372 (July 4, 2025) (8 U.S.C. 1803(b), 1809(a)) (prescribing fees and specific validity periods for parole-based EADs). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an applicant for admission. *See* INA 212(d)(5)(A), 1182(d)(5)(A); *see also* 8 CFR 1.2 (''An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked.''), 1001.1(q) (same).

## III. Rationale for Termination

When DHS established the FRP programs, DHS wrote that the programs would provide a significant public benefit for the United States by: (i) promoting family unity; (ii) furthering important foreign policy objectives; (iii) providing a lawful pathway and timely alternative to unlawful migration at the southwest land border; (iv) reducing strain on limited U.S. resources; and (v) addressing the root causes of migration through economic stability and development supported by increased remittances.[9]

For the reasons discussed below, DHS has determined that it is now appropriate to terminate the FRP programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes.[10] These reasons, independently and cumulatively, support termination of the FRP programs.[11]

Accordingly, the Secretary, in her discretion, is terminating the FRP programs. Consistent with her statutory authority, the Secretary retains discretion to grant a new period of parole, also known as re-parole, to any alien who was paroled into the United States under the FRP programs, temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

### 1. Promote Family Unity

According to the notices that announced their creation, the FRP programs were designed to provide a faster pathway for U.S. citizens and lawful permanent residents (LPRs) to reunite with family members in the United States while awaiting availability of their immigrant visas. The notices justified the action by stating that nationals of those countries often face long waits for immigrant visas before they can travel to the United States and apply for admission.[12]

DHS acknowledges that aliens paroled into the United States under the FRP programs may have been able to reunite with family members in the United States. However, upon further review of the scope and impact of the FRP programs in their totality, and in line with Executive Orders issued by President Trump, DHS has determined that national security and fraud concerns, and the current Administration's priorities outweigh those interests and weigh in favor of terminating the programs.

The modernized FRP programs, based on their specific procedures, created security gaps not present in other paths for family members pursuing LPR status, such as through consular processing. Through consular processing, potential beneficiaries chose to remain outside the United States until their immigrant visa priority dates are current. Once a visa is available based on their priority date, the potential beneficiary completes consular processing with the Department of State (''State''), including submission of biometrics, an in-person interview outside the United States, and submission of various documents to establish the necessary family relationship with the petitioner before a visa is issued. The use of biometrics for background and security checks as part of consular processing allows for robust public safety and national security vetting of the potential beneficiary before travel to the United States on a commercial air carrier is authorized and completed.

In contrast, under the modernized FRP programs, potential beneficiaries would travel to the United States to seek parole at a POE, and if paroled, they could then apply to adjust status to that of an LPR once their immigrant visa priority dates became current. Under these programs, DHS conducted minimal public safety and national security vetting of the supporters based on biographic information the supporter

---

do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

*See* H.R. Rep. 104–469, pt. 1, at 140 (1996). In IIRIRA, Congress struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, ''for emergent reasons or for reasons deemed strictly in the public interest'' as grounds for granting parole into the United States and inserted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' Public Law 104–208, div. C, § 602(a). ''The legislative history indicates that this change was animated by concern that parole under [INA 212(d)(5)(A)] was being used by the executive to circumvent congressionally established immigration policy.'' *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[9] *See, e.g.,* 88 FR at 43593–96; *see also* 72 FR 65588 (The legacy CFRP initial implementation notice in 2007 relied on family unification, discouragement of unlawful migration, and furtherance of the U.S.-Cuba Migration Accords as justifications); 79 FR at 75582 (The legacy HFRP initial implementation notice in 2014 relied on family unification and reconstruction and development assistance for Haiti through remittances).

[10] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''[W]hen the purposes of such parole shall, in the opinion of the [Secretary of Homeland Security], have been served the alien shall forthwith return or be returned to the custody from which he was paroled. . . .'').

[11] The FRP programs were promulgated under the theory that they would, in general, provide a significant public benefit to the United States. *See, e.g.,* 88 FR at 43613 (''The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy . . .''). Although the Secretary retained the authority to parole eligible aliens on a case-by-case basis based on ''urgent humanitarian reasons,'' the driving impetus for the creation of the FRP programs or attendant grants of parole was the significant public benefit justification. But for the significant public benefit justification, DHS would not have established the FRP programs.

[12] *See e.g.,* 88 FR at 43593–94; *see also* 72 FR at 65588; 79 FR at 75582.

provided on the Form I–134A. For example, DHS only vetted to ensure that the supporter was the named petitioner on the Form I–130 for the principal beneficiary and that supporters that were LPRs had not lost their LPR status, in addition to TECS [13] checks. Additionally, DHS conducted minimal public safety and national security vetting of potential beneficiaries by only reviewing biographic information and photos that each beneficiary provided before being considered for an advance travel authorization (ATA). Moreover, biometrics were not submitted by each potential beneficiary until they arrived at the interior POE to seek parole from CBP. Therefore, additional vetting, that could otherwise be completed as part of consular processing before travel is authorized, did not occur prior to issuance of an ATA or before the potential beneficiary boarded a plane to travel to the United States. Many of the security screening systems used by the U.S. government to evaluate applicants for immigration benefits rely on biometrics. Since beneficiaries were not fingerprinted before arriving at a U.S. POE, these checks could not be conducted beforehand to thoroughly vet the alien. Furthermore, beneficiaries under the modernized FRP programs were not interviewed by USCIS, unlike beneficiaries of the legacy FRP programs. In the legacy CFRP program and legacy HFRP program, interviews provided an opportunity to gather additional information about the beneficiary and identify any discrepancies between their application and their in-person statements, as well as to surface any other potential concerns through their testimony. However, these programs were replaced by the modernized FRP programs for Cuba and Haiti for prospective beneficiaries in 2023.[14]

Given these critical differences, the procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety.

The FRP programs also presented an unacceptable risk of abuse and fraud. When biometrics collection and interviews do not occur prior to a beneficiary's arrival in the U.S., the risk of fraud increases. U.S.-based petitioners may misrepresent family relationships (*e.g.,* falsely claiming a familial tie) to facilitate the entry of unauthorized aliens. Moreover, reliance solely on an approved Form I–130 does not guarantee the ongoing legitimacy of a relationship, particularly in cases involving spouses where circumstances may have changed since the petition was filed. Even with an approved Form I–130, adjudicators may have missed key indicators of fraud, and adding another layer of scrutiny, such as an interview, can be valuable in verifying eligibility. Additionally, beneficiaries from countries with weak civil registry systems may submit fraudulent documents (such as birth certificates or other identity documents) to support their claims. Having in-country experts, such as consular officers familiar with local documentation, can be critical in identifying and preventing document fraud during the visa process. The process of interviewing beneficiaries overseas and collecting their biometrics plays a critical role in preventing fraud and abuse of the immigration system—steps that were entirely bypassed under the modernized FRP programs. Accordingly, the FRP programs' lack of procedural and vetting guardrails created an unacceptable level of risk of fraud and abuse.

DHS has determined that the desire to reunite families before their priority dates are current does not outweigh the U.S. government's responsibility to prevent fraud and abuse of these programs and to uphold national security and public safety for the American people.

Moreover, the FRP programs no longer accord with the Administration's current enforcement-based priorities, namely to better ''achieve the total and efficient enforcement, including through lawful incentives and detention capabilities'' of U.S. immigration law.[15] The modernized FRP programs, initiatives of the prior administration, do not align with this Administration's emphasis on enforcing immigration law, deterring unlawful immigration, and eliminating fraud and abuse. Indeed, E.O. 14165, ''Securing Our Borders,'' embodies the priorities of this Administration and makes clear that ''all future parole determinations fully comply with [the order to terminate all categorical parole programs] and with applicable law.'' [16]

*2. Further Important Foreign Policy Objectives*

One of the stated goals of the modernized FRP programs established in July 2023 was to promote the foreign policy objectives of the prior administration.[17] Indeed, DHS explained consistently in its notices promulgating the FRP programs that implementation would advance the foreign policy objectives of the then-current administration.[18]

Furthermore, DHS established the legacy CFRP Program in 2007, and modernized it in August 2023, in part to further enable the United States to meet its commitment to ensure the lawful migration of a minimum of 20,000 Cubans each year under the U.S.-Cuba Migration Accords.[19] DHS also established the legacy HFRP Program in 2014 to support ''U.S. goals for Haiti's long-term reconstruction and development,'' [20] and modernized it in August 2023, in part because ''[i]mproving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues.'' [21] The foreign policy objectives underlying the FRP programs, however, are not consistent with those of the current Administration and may be achieved through other means.[22]

E.O. 14150, ''America First Policy Directive to the Secretary of State'', clearly sets out the President's vision that ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' [23] E.O. 14159, ''Protecting the American People Against Invasion'' states that ''[i]t is the policy of the United States to faithfully execute the immigration laws against all

[13] TECS, not an acronym, is a data system and platform owned by U.S. Customs and Border Protection (CBP). See *DHS/CBP/PIA–021 TECS System: Platform* for more information, available at *https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform* (last updated Apr. 10, 2025).

[14] While legacy CFRP and legacy HFRP programs were replaced by the modernized FRP programs for Cuba and Haiti in 2023, USCIS continued to interview pending legacy CFRP beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was paused.

[15] *See* E.O. 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025); *see also FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (''[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.'').

[16] *See* E.O. 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[17] *See, e.g.,* 88 FR at 43594.

[18] *See, e.g., Id.* (''[T]he parole of noncitizens, on a case-by-case basis, under [the FRP program for Colombians] will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.'').

[19] 72 FR 65588; 88 FR at 54640.

[20] 79 FR at 75582.

[21] 88 FR at 54639.

[22] U.S. commitments under the Cuban Migration Accords, for example, may be met through immigrant visa processing.

[23] *See* 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.'' [24]

To reiterate, E.O. 14165, ''Securing Our Borders'' states that DHS shall ''terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders.'' [25] In the same E.O., the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southwest border of the United States and ensure that, pending section 240 removal proceedings, aliens described in INA 235(b)(2)(C), 8 U.S.C. 1225(b)(2)(C), are returned to the territories from which they came.

The President has pursued the cooperation of foreign partners on migration issues in other ways as well. For instance:

- On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[26]
- On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[27]
- On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to ''do what's right'' in regard to illegal migration.[28]
- Since February 1, 2025, President Trump has issued several tariff-related executive orders in connection with the situation at the southwest border.[29]
- On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, with the plan to repatriate them to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[30]
- On May 19, 2025, a Department of State spokesperson announced steps ''to impose visa restrictions on owners, executives, and senior officials of travel agencies based and operating in India for knowingly facilitating illegal immigration to the United States.'' [31]
- Secretary Rubio had calls with Mexican Foreign Secretary de la Fuente on March 31, 2025,[32] May 30, 2025 [33] and July 2, 2025,[34] during which they discussed efforts to secure the U.S.-Mexico border, dismantle cartels, stop the flow of illicit drugs, firearms, and illegal aliens.

Multiple agencies of the U.S. government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[35] consistent with Secretary of State Rubio's January 22, 2025, announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[36] In that announcement, the Department of State made clear that it ''will no longer undertake any activities that facilitate or encourage mass migration'' and that ''[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants.'' [37] Additionally, pursuant to his authority under INA 219, 8 U.S.C. 1189, Secretary of State Rubio designated the gang Mara Salvatrucha (active in El Salvador, Guatemala, and Honduras, among other countries), along with other cartels and gangs, as Foreign Terrorist Organizations.[38] On May 5, 2025, Secretary Rubio also designated two Haitian criminal organizations, Viv Ansanm and Gran Grif, as designated Foreign Terrorist Organizations under INA 219, 8 U.S.C. 1189.[39]

The actions set forth in this notice complement and underscore the Administration's pivot to a foreign policy that prioritizes the United States' interests in reducing and deterring unlawful immigration. Regardless of whether the prior Administration saw the FRP programs as a component of a regional migration management strategy, the current Administration is not

[24] 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[25] *See* 90 FR 8467, 8468 (Jan. 20, 2025) (published Jan. 30, 2025).

[26] The White House, ''Readout of President Donald J. Trump's Call with President Nayib Bukele'' (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/.*

[27] The White House, ''Statement From the Press Secretary'' (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/.*

[28] Meryl Sebastian, ''Trump Says India 'Will Do What's Right' on Illegal Immigration,'' BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo.*

[29] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at our Southern Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Out Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[30] *Panama Receives First US Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration.*

[31] U.S. Department of State, Press Releases: Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States, May 19, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/visa-restrictions-on-travel-agencies-facilitating-illegal-immigration-to-the-united-states/.*

[32] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, March 31, 2025, *https://www.state.gov/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/.*

[33] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, May 30, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente/.*

[34] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, July 2, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/.*

[35] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) (''President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country.''), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/;* U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) (''Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap.''), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/.*

[36] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025), *https://www.state.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.*

[37] *Id.*

[38] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generación, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025); *see also* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[39] Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 FR 19065 (May 5, 2025).

pursuing that strategy given it is no longer consistent with current Administration's priorities. Rather, as described above, the current Administration continues to focus its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States.

These measures will allow DHS to better ''achieve the total and efficient enforcement'' of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[40] In short, the continued implementation of the FRP programs does not accord with the President's stated priorities and foreign policy objectives.

*3. Provide a Lawful Pathway and Timely Alternative to Unlawful Migration*

DHS intended for the FRP programs to provide a lawful, safe, and orderly alternative to unlawful migration to the United States as part of a regional migration management strategy developed by the prior Administration.[41] Because the INA allocates a certain number of immigrant visas each year, beneficiaries of approved Form I–130 petitions often face years-long waits before a visa becomes available. The prior Administration claimed that the FRP programs were designed to discourage unlawful migration during this period by offering a faster, lawful pathway for U.S. citizens and LPRs to reunite with family members while awaiting availability of immigrant visas.[42] These programs were specifically aimed at nationals of countries who often face especially long wait times for immigrant visas.[43] DHS now finds, as explained below, that the FRP programs did not adequately realize the goal of discouraging unlawful migration, as the confirmed beneficiaries of the FRP programs constitute a tiny fraction of the total population of aliens from the seven FRP countries that unlawfully attempted to enter the country during this time period.[44] Since the implementation of the modernized FRP programs beginning in July 2023 and the modernization of the legacy FRP programs, approximately 16,100 aliens have been granted parole under the FRP programs.[45] In contrast, CBP encounters of aliens from the seven FRP countries at and between POEs on the U.S. southwest land border totaled over 888,000 in FY2024.[46]

DHS acknowledges that some aliens who have been paroled into the United States under the FRP programs may have otherwise sought to enter unlawfully along the southwest border. However, upon review and further consideration of the number of aliens that were determined to be eligible to participate in the programs, the relatively small number who actually chose to participate, and other more recent measures that have dramatically reduced southwest border encounters, DHS has ultimately determined that the FRP programs did not meaningfully reduce unlawful migration at the southwest border and are not needed to achieve that goal. DHS ultimately determined that policy actions such as increasing interior enforcement actions, ramping up removals, building physical barriers along the border, and deploying advanced surveillance technology represent a more prudent approach to the short and long-term challenges presented at the southwest border.

The FRP programs required that a petitioner with an approved Form I–130, Petition for Alien Relative, first receive an invitation to submit a request to be a supporter on behalf of the principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. Generally, invitations were issued based on operational capacity and the period of time until the principal beneficiary's immigrant visa was expected to become available, among other factors. Considering the limitation on the number of aliens who have family-sponsored immigrant visas that are expected to become available within any given period, the number of invitations sent was minimal compared to the flow of aliens coming from the countries for which an FRP program existed.[47] Even if every one of the approximately 36,000 petitioners invited to participate in the modernized FRP programs had filed a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of each eligible beneficiary of the approved Form I–130, and all such Form I–134A requests were confirmed and the beneficiaries granted advance travel authorization by DHS, the number of beneficiaries who could have been paroled into the United States would still account for a fraction of the approximately 890,000 aliens from the FRP program countries who were encountered by CBP in Fiscal Year (FY) 2024. DHS did not intend for the FRP programs to, on their own, substantially decrease the number of encounters along the southwest border. The FRP programs were just one part of the previous administration's broader strategy of expanding access to lawful pathways to aliens who may otherwise travel to the United States as part of the unlawful migration flows at the southwest border.[48] In practice, at the time DHS paused processing under the FRP programs in late January 2025,[49] the participation rate for petitioners who had been invited to these programs was approximately 30%.[50] Overall, other policy actions represent a more prudent and effective path to addressing unlawful immigration generally and especially at the southwest border.

The decision to terminate discretionary and temporary parole programs like the FRP programs is further informed by the actions of the prior administration, which found the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans [51]

[40] *See* 90 FR 8443 (Jan. 29, 2025).

[41] *See, e.g.,* 88 FR at 43595.

[42] *See, e.g.,* 88 FR 78762, 88 FR 43591, 72 FR 65588.

[43] *Id.; see also* 72 FR 65588; 79 FR 75581.

[44] As of Feb. 18, 2025, the overall responsiveness rate to invitations sent under the modernized FRP programs was approximately 30% based on an internal USCIS analysis. This means that 70% of petitioners who received FRP invitations did not opt to participate in FRP programs and did not file an I–134A as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[45] The information provided here is based on analysis of internal data from U.S CBP tracking aliens paroled under the FRP programs performed in June 2025. CBP shows 14,069 aliens paroled under FRP class of admission (COAs) (Colombian Family Reunification Parole (RCO), Cuban Family Reunification Parole (RCU), Ecuadorian Family Reunification Parole (RED), Guatemalan Family Reunification Parole (RGT), Honduran Family Reunification Parole (RHN), Haitian Family Reunification Parole (RHT), and El Salvadoran Family Reunification Parole (RSV)) as of January 20, 2025. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025. USCIS estimates there are 1,852 aliens with valid parole under the legacy CFRP program and 108 aliens with valid parole under the legacy HFRP program as of April 2, 2025. *See* USCIS analysis of legacy FRP filings as of Apr. 2, 2025 [OHSS tabs 10 & 11].

[46] *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025) (filtered by Region (Southwest Land Border) and Citizenship (Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras)).

[47] In FY2024, CBP encounters of unlawful aliens on the U.S. southwest land border from the seven FRP countries totaled 888,023. *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025).

[48] *See, e.g.,* 88 FR at 43593.

[49] Email from Jennifer Higgins, Acting Director, USCIS (Jan. 23, 2025).

[50] Responsiveness rate is based on internal USCIS analysis whereby a total of 35,666 FRP invitations were issued over the life of the modernized FRP programs, and of those, a total of 10,608 invitees filed requests as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[51] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR

Continued

(''CHNV parole programs'') and FRP programs, even when paired with the *Circumvention of Lawful Pathways* rule, to be insufficient to address very high levels of illegal immigration.[52] For example, following the implementation of the FRP programs and the *Circumvention of Lawful Pathways* rule, DHS and the Department of Justice (''DOJ'') promulgated the *Securing the Border* rule [53] as an emergency measure to address ongoing high levels of unlawful immigration between the southwest border POEs.[54] DHS and DOJ then explained that ''at current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle.'' [55] This conclusion—that DHS's ability to swiftly impose consequences for unlawful immigration ''continue[d] to be overwhelmed'' [56]—followed more than a year of the *Circumvention of Lawful Pathways* framework, nearly a year of the modernized FRP programs, and two years of the CHNV parole programs, with the implementation of each being justified as facilitating operational control of the southwest border of the United States by discouraging unlawful immigration. The promulgation of the *Securing the Border* interim final rule in June 2024 underscored the stark failure of categorical parole programs, like the FRP programs and CHNV parole programs, as well as the *Circumvention of Lawful Pathways* rule to deliver on their promises. These policies not only fell short of enhancing border security but also failed to curb the persistent surge of unlawful immigration along the southwest border.

The *Securing the Border* framework [57] and implementation of President Trump's subsequent policies have resulted in a dramatic reduction in unlawful migration to the U.S. southwest border. For example, encounters between southwest border POEs decreased from an average of about 4,910 per day in the six months prior to the *Securing the Border* interim final rule to an average of 1,880 per day between June and December 2024.[58] Moreover, southwest border encounters have declined even more dramatically since President Trump took office on January 20, 2025, and issued a series of proclamations and orders designed to address the urgent situation at our borders, including Proclamation 10888, *Guaranteeing the States Protection Against Invasion,* 90 FR 8333 (Jan. 20, 2025) (published Jan. 29, 2025). Indeed, in the 161 days from January 21 through June 30, 2025, encounters between POEs averaged fewer than 290 per day, down from over 1,600 per day in the last 161 days of the prior administration, while encounters at POEs averaged about 120 per day, down from over 1,580 per day.[59] Accordingly, even assuming the FRP programs had any impact on reducing unlawful migration, the FRP programs are no longer needed due to reduction in southwest border encounters as a result of other, more effective, policies.

Ultimately, the FRP programs failed in their stated intention to sufficiently deter unlawful migration. A July 2024 report found that, prior to the implementation of the *Securing the Border* framework, ''in the first five months of the year [2024], CBP agents encountered more than nine hundred thousand migrants and asylum seekers at the U.S.-Mexico border. The majority hailed from just six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, in descending order.'' [60] Despite the categorical parole programs that the previous administration put in place, four out of six of the nationalities with the highest entry numbers in the first half of 2024 had a dedicated FRP program.[61] The modernized FRP program for Haiti was implemented on August 11, 2023. CBP data indicates that in FY2022, 53,910 Haitian nationals were encountered at the Southwest border, in FY2023, 76,130 and in FY2024, 88,673.[62] This year-on-year substantial increase in encounters of Haitian nationals at the Southwest border show that the modernized FRP program for Haiti failed to slow the increase in unlawful migration to the Southwest border. This data reflects that the FRP programs did not noticeably decrease unlawful migration, or at the very least were not nearly as effective as other policies implemented at the same time to reduce unlawful migration.

When the modernized FRP programs were established, they were promoted as timely alternatives to unlawful migration and as tools to address the root causes of migration. However, it was not adequately recognized that the populations served by these programs were often fundamentally different from those undertaking unlawful migration. FRP beneficiaries had approved I–130 petitions and U.S.-based supporters who were LPRs or U.S. citizens, and thus had a lawful immigration pathway available to them, even if it involved a significant wait. In contrast, aliens arriving at the southwest border may lack U.S. family ties or access to any lawful immigration channel. It is therefore unlikely that someone with an existing legal pathway would risk compromising their eligibility by pursuing unlawful entry. Economic migrants and asylum seekers, on the other hand, may resort to appearing at the border regardless, due to the absence of viable legal alternatives. Perhaps most significantly, although the previous administration argued that the FRP programs would decrease unlawful migration, there is no data to support this argument. For example, the FRP program for Ecuadorians was implemented on November 16, 2023. CBP data indicates that in FY2022, 24,060 Ecuadorian nationals were encountered at the

13611 (Mar. 25, 2025). *See also* ''CBP Released December 2024 Monthly Update'', *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update* (last modified Jan. 14, 2025) (providing that over 531,000 aliens were granted parole under the CHNV parole programs).

[52] *See* Circumvention of Lawful Pathways 88 FR 31314 (May 16, 2023).

[53] *See* Securing the Border, Interim Final Rule, 89 FR 48710 (June 7, 2024); Securing the Border, Final Rule, 89 FR 81156 (Oct. 7, 2024).

[54] ''On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens].'' 89 FR at 81157–58.

[55] 89 FR at 48714.

[56] 89 FR at 48715.

[57] On May 9, 2025, a district court vacated and set aside the *Securing the Border* rule's limitation on asylum eligibility and manifestation of fear requirement but allowed the rule's ''reasonable probability'' standard to remain in effect. *See Las Americas Immigr. Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC,—F. Supp. 3d—, 2025 WL 1403811, at *21 (D.D.C. May 9, 2025).

[58] OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2].

[59] OHSS analysis of May 2025 OHSS Persist Dataset and CBP data downloaded from UIP on July 2, 2025 [OHSS tab 1].

[60] Council on Foreign Relations, ''Why Six Countries Account for Most Migrants at the U.S.-Mexico Border'' July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

[61] It should be noted that Venezuela, one of the six highest entry populations by nationality mentioned, also had a parole program which is not addressed in this FRN. The Venezuelan parole program, largely premised on the same justifications as those contained in the FRP parole programs, has been terminated in another notice. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 (Mar. 25, 2025).

[62] CBP, ''Nationwide Encounters'' Filtered for Region: Southwest Land Border, Citizenship: Haiti, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

Southwest border, in FY2023, 116,229 and in FY2024 122,072.[63] Petitioners with an approved Form I–130 filed for an alien abroad were invited to submit Form I–134A which served as a declaration of financial support. Neither petitioners nor beneficiaries were asked through a form or an interview prior to applying for admission at a POE in the U.S. whether they had any intention of attempting entry to the U.S. unlawfully as an alternative to waiting for consular processing in their countries. DHS believes, based on available data, that the FRP programs had no meaningful deterrent effect on nationals from these countries considering travel to the Southwest border. The programs do not appear to have influenced the number of attempted entries in any meaningful way. Moreover, any limited impact they may have had on reducing unlawful border encounters falls far short when compared to the effectiveness of other enforcement-focused policies implemented by the current administration.

The Department has determined that terminating the FRP programs will allow the Administration to adopt and implement more prudent, durable, and appropriate strategies that will lead to a sustainable reduction of encounters at the southwest border. The Department's objective of breaking the vicious cycle of unlawful immigration supports termination of the FRP programs along with the implementation of enforcement-based actions that are consistent with the policy objectives outlined in the new presidential directives calling for enhanced border security beyond the 2024 *Securing the Border* framework.[64]

*4. Reduce Strain on Limited U.S. Resources*

The FRP programs were designed with the goal of easing pressure on DHS resources and personnel by lowering the number of encounters at the Southwest border enough to offset the added processing and administrative burden; but that outcome never materialized. Instead, the programs failed to reduce encounters at the Southwest border and only added to DHS' workload. There was no reduction in burden with regards to detention, monitoring, processing, and removal of aliens for DHS personnel and resources, and, at the same time, there was an increased burden in for both CBP and USCIS components who processed these applications from receipt of Form I–134A to arrival at a U.S. POE.

As discussed in the previous section of this notice, the number of aliens who chose to participate in the FRP programs and who otherwise would have chosen to unlawfully migrate as an alternative option is too uncertain or limited towards meaningfully realizing the original justifications for their implementation and the current Administration's shift in policy focus to deter unlawful migration and achieve operational control of the southwest border.[65]

After a thorough review assessing the costs of implementing these programs, preliminary findings show that the programs have not met their stated goal of burden-reduction. On the contrary, these programs have led to an increased strain on DHS personnel and resources to process, review, and adjudicate parole requests, especially when considering the programs did not meaningfully result in any reduction of encounters at or between POEs.[66] For USCIS, there have been approximately 35,700 Form I–134A filed with USCIS under the modernized FRP programs since July 2023, which includes approximately 420 pending review, 19,500 confirmed by USCIS, and 15,450 non-confirmed by USCIS.[67] It has required significant USCIS resources to administer these parole programs. CBP has also expended considerable resources implementing the FRP programs. Under the modernized FRP programs, CBP has received 16,976 advance travel authorization (ATA) requests, including 1,987 pending review or CBP One submission, 13,983 approved by CBP, 975 denied by CBP, and 31 that expired after being approved.[68]

Due to the originating location of beneficiaries of the FRP programs and available travel routes via commercial air, approximately 70% of beneficiaries of these programs who were issued an ATA flew to Florida POEs.[69] With the addition of three POEs in Texas and New York City, these POEs in just three states account for nearly 85% of all arrivals of FRP beneficiaries requesting parole.[70] Processing an alien requesting parole under the modernized FRP programs requires secondary processing and enrollment of biometrics, resulting in a more extensive interaction with the alien and prolonged time in CBP facilities.

Although DHS, under the previous administration, argued that aliens who had been paroled into the U.S. may have otherwise sought to enter unlawfully along the southwest border, there is little to no evidence to support this argument. DHS has no way of determining whether aliens paroled into the U.S. under the respective FRP programs might have otherwise attempted to enter unlawfully, as they were never asked this question at any point, either before or after the programs were implemented. Instead, these aliens with lawful pathways available to them likely would have remained overseas while waiting for an immigrant visa to become available and then would have completed consular processing so they could be admitted to the United States as an LPR. Aliens in this portion of the population would have been processed by the Department of State if they had gone through consular processing. Under the FRP programs, DHS reassigned personnel from other caseloads to work on processing Forms I–134A, requests for ATAs, and for parole processing at interior POEs. Therefore, the FRP programs not only shifted the strain from the Department of State to DHS personnel, they also increased the overall strain on DHS

[63] CBP, ''Nationwide Encounters'' Filtered for Region: Southwest Land Border, Citizenship: Ecuador, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[64] As explained above, southwest border encounters decreased following implementation of the *Securing the Border* framework and complementary actions, and border encounters decreased even more dramatically following implementation of President Trump's policies. Another example of President Trump's policy directives include the Presidential Proclamation ''Guaranteeing the States Protection Against Invasion'' which suspends entry of aliens across the southwest border, imposes restrictions on entry for aliens, and suspends and restricts entry for aliens posing public health, safety, or national security risks. *See* Guaranteeing the States Protection Against Invasion, 90 FR 8333 (Jan. 29, 2025).

[65] 90 FR 8467, Sec. 2(g).

[66] See discussion above concerning drops in southwest land border encounters from the months of December 2024 to June 2025. DHS has determined, based on the available evidence, that other enforcement-based policies, including the *Circumvention of Lawful Pathways* and *Securing the Border* rules, proved more effective at reducing southwest land borders. OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2]; OHSS analysis of May 2025 OHSS Persist Dataset [OHSS tab 1].

[67] Data pulled from internal DHS reports on parole processing [OHSS tab 12]. Further, ''Confirmed'' in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while ''non-confirmed'' meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[68] ATA request data is based on an internal USCIS analysis of information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 6].

[69] Data provided on arrivals at specific POE is based on an internal USCIS analysis of arrival information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 5, 7, 8, 9].

[70] *Id.*

resources because of the extra processing required under the programs combined with the little to no concomitant reduction of unlawful entries of nationals from the seven FRP countries.

The reallocation of limited DHS personnel resources caused by the FRP programs is unsustainable, especially given DHS' critical need to address border and interior enforcement and other Administration priorities. Implementation of these programs resulted in increased expenditure of DHS personnel and resources on administering the programs without any related burden reduction for processing, detention, monitoring, and removal of aliens unlawfully entering or present within the United States.

As previously noted, reports indicate that nationals of the countries eligible for the FRP programs have continued to migrate unlawfully at some of the highest rates among all nationalities. CBP personnel, in particular, experienced no relief. In contrast, the implementation of the FRP programs introduced additional demands on DHS, increasing workloads across multiple USCIS directorates including the Service Center Operations Directorate (SCOPS) and Field Operations Directorate (FOD).

The FRP programs have also resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a ''qualified alien.'' *See* 8 U.S.C. 1641(b)(4). Because DHS generally issued three-year periods of parole from the outset, FRP parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.,* 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all FRP parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see* 7 CFR 273.4(a)(6)(ii)(J), as might ''a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980),'' *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to ''lawfully residing'' children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[71] Overall, the domestic impact of the FRP programs counsel against their continued operation.

*5. Address the Root Causes of Migration Through Economic Stability and Development Supported by Increased Remittances*

Finally, DHS intended for the FRP programs to aid in encouraging development and addressing economic concerns in the eligible countries by increasing the flow of remittances to those countries.[72] Aliens paroled into the United States under the FRP programs are eligible for discretionary employment authorization, and aliens with employment authorization typically enjoy higher wages than those without employment authorization, allowing them the opportunity to send greater amounts of money back to their home country in the form of remittances.[73] However, upon review of the modernized FRP programs more than a year and a half[74] after they were made available, DHS has determined that a relatively low percentage of invited petitioners decided to participate in the programs. Because of the low acceptance rate of invited petitioners, the volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries. Consequently, the FRP programs fell short of addressing the underlying economic drivers of unlawful migration. The modernized FRP programs' failure to address the economic motivations behind illegal immigration weighs in favor of terminating the FRP programs.

In 2023 and 2024, the countries whose nationals were eligible for consideration for parole under the FRP programs had remittance volumes ranging from a low of $2.5 billion in Cuba to a high of $21.6 billion in Guatemala.[75] The remittance volumes referenced were not tied exclusively to aliens paroled into the United States under the FRP programs, that is, those remittances could have been sent from anyone in the United States, regardless of immigration status. From 2020 to 2023, remittance volumes in 6 of the 7 countries whose nationals were eligible for an FRP process grew between 8% and 43%.[76] Only Haiti experienced a lower growth rate at just 1%.[77] In 2023, remittances accounted for over 20% of the GDP of Guatemala, with similar increases noted in El Salvador (24.5%), and Honduras (28.0%).[78] Comparing the high volumes of remittances in each of the FRP countries to the small populations from each country that were invited to participate in the FRP programs and the even smaller populations that did participate, DHS has determined that any contribution FRP parolees may make to the remittance volumes in their home country is too small to substantially impact the overall economic stability of the country or address the root causes of migration.

The FRP programs failed in their intention of addressing the root causes of migration. A July 2024 report stated ''The Joe Biden administration has responded by designing policies to mitigate 'root causes' of migration and displacement, enacting temporary humanitarian protections for individuals from certain countries, while making it more difficult for migrants to apply for asylum in the United States. But push factors—including organized crime-fueled violence and extortion and a lack of economic opportunities—combined with the pull of a strong U.S. labor market, make it unlikely migration flows will decrease substantially in the near future.''[79] Due to the low numbers of participants in the FRP programs, it is also unlikely that the remittances provided by the FRP participant population would meaningfully impact migration flows. As previously stated, it is unlikely that someone with an existing legal pathway would risk

[71] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[72] *See, e.g.,* 88 FR at 43596.

[73] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that aliens without authorization to work earn less than those with employment authorization).

[74] The FRP process for Ecuadorians was established in November 2023 so has been available for approximately four fewer months. *See* 88 FR 78762.

[75] Family Remittances in 2024: Looking Ahead amid Possible Shifts in Flows, Table 2, The Dialogue: Leadership for the Americas (Aug. 6, 2024), *https://thedialogue.org/family-remittances-in-2024-looking-ahead-amid-possible-shifts-in-flows.*

[76] *Id.* at table 1 (The growth rates in each country were: Cuba—43%; Guatemala—15%; Honduras—14%; Ecuador—11%; Colombia—10%; and El Salvador—8%.).

[77] *Id.*

[78] Family Remittances to Latin America and the Caribbean 2023, Slide 6, The Dialogue: Leadership for the Americas (Sept. 9, 2023), *https://thedialogue.org/analysis/family-remittances-to-latin-america-and-the-caribbean-2023/.*

[79] Council on Foreign Relations, ''Why Six Countries Account for Most Migrants at the U.S.-Mexico Border'' July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

compromising their eligibility by pursuing unlawful entry to the United States. Economic migrants and asylum seekers, on the other hand, may resort to the border route regardless, due to the absence of viable legal alternatives and the push and pull factors that remain unaddressed by the FRP programs.

More broadly, the United States cannot bear sole responsibility for the development and economic stability of other nations. In line with the America First Policy Directive, the President instructed the Secretary of State to ''issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.'' [80] While strategic partnerships and targeted support can play a role, U.S. immigration policy cannot serve as a surrogate for long-term development solutions in foreign countries.

Lessons Learned

The FRP programs did not achieve their stated objectives. They failed to reduce unlawful migration or alleviate operational burdens on DHS—particularly CBP—and instead increased administrative strain across multiple USCIS directorates and CBP ports of entry. Moreover, the programs had no measurable effect on addressing root causes of migration and introduced additional vulnerabilities that actively undermined the integrity of the U.S. immigration system and posed risks to public safety and national security.

While the modernized FRP programs established a framework for vetting, the processes in place proved insufficient and introduced significant opportunities for fraud. For instance, a recent internal audit revealed that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half. Generally, if a Form I–130 petitioner dies after approval, the Form I–130 is automatically revoked.[81] Under program requirements, the individual submitting the request to be a supporter must be the same petitioner who filed the original family-based immigrant visa petition—the same petitioner to whom the Department of State issued the parole invitation. Additionally, the same internal audit concluded that the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for primary supporters, further compromising program integrity.

Taken together, these operational shortcomings, security vulnerabilities, and policy failures underscore that the FRP programs not only failed to meet their intended goals, but actively strained DHS resources and undermined public trust. For these reasons, termination of the FRP programs is a prudent course of action.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the FRP programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of parole indicates that reliance on the continued existence of the FRP programs would be unwarranted. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Further, the notices establishing the modernized FRP programs expressly advise the public that, ''[t]he Secretary retains the sole discretion to terminate this FRP process at any point'' [82] and that ''DHS may terminate parole upon notice in its discretion at any time.'' [83] The FRP programs were ''being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.'' [84]

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, and the additional notice provided in E.O. 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution. DHS recognizes that this notice announces a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate. To analyze the reliance interests of affected parties, DHS describes the main steps in the process below and analyzes the reliance interests of parties who have reached that point in the process.

### *1. Reliance Interests of Potential Supporters and Beneficiaries*

DHS first considered the potential reliance interests of those U.S.-based I–130 petitioners invited by DHS to participate in the FRP programs and who had intended to file or have filed a Form I–134A or Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, in support of a potential parolee.[85] In general, the costs associated with Form I–134A filings are minimal. While there is no fee for the petitioner to file a Form I–134A and there is no fee for a potential beneficiary to seek consideration under the FRP programs, petitioners who have already filed Form I–134A, or who have completed the Form I–134A in anticipation of filing, may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response.[86]

There are currently over 15,000 pending initial requests for parole under the legacy CFRP program at various stages of adjudication. There are no pending initial requests under the legacy HFRP program, so there are no reliance interests for potential petitioners or beneficiaries under that program. Petitioners under the legacy CFRP program were required to pay the filing fee for Form I–131, unless they were eligible for a fee waiver. For a Form I–131 filed before December 23, 2016, petitioners paid $360. For a Form I–131 filed after December 23, 2016, petitioners paid $575. For a Form I–131 filed after April 1, 2024, petitioners generally paid $630, although CFRP add-on derivatives were exempt from the fee.

At this early stage in the process, the costs incurred by a potential beneficiary in both the Form I–134A-based modernized FRP programs, as well as the Form I–131-based legacy CFRP program are minimal. In the Form I–134A-based process, once a petitioner's Form I–134A is confirmed, the potential beneficiary receives instructions to create an online account with myUSCIS, confirms biographic information in the online account, and attests to meeting the eligibility requirements, including the completion of a medical examination by a panel physician. Potential beneficiaries who received notification that the Form I–134A filed on their behalf was confirmed were instructed on next steps in the process,

[80] 90 FR 8337.

[81] *See generally* 8 CFR 205.1(a)(3)(i)(B) and (C). There are certain noted exceptions, such as INA 204(*l*) and humanitarian reinstatement of a revoked petition.

[82] *E.g.,* 88 FR at 43598; 88 FR at 54643.

[83] *E.g.,* 88 FR at 43593; *see also* 88 FR at 54643.

[84] *E.g.,* 88 FR at 43598–99; 88 FR at 54643.

[85] The information collection approval of Form I–134A has expired and it is no longer available for submission. DHS sent its most recent invitation for a petitioner to submit a Form I–134A on June 28, 2024, and has not accepted a request from a prospective supporter since January 28, 2025. Only 420 Forms I–134A are pending, and USCIS will send them each nonconfirmation notices.

[86] See SUPPORTING STATEMENT FOR Online Request to be a Supporter and Declaration of Financial Support, OMB Control No.: 1615–0157, COLLECTION INSTRUMENT(S): Form I–134A, page 10, question 12, *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202409-1615-006* (last visited Feb. 7, 2025).

including completion of the medical requirements. The medical examination required being cleared of any Class A medical conditions and receiving certain required vaccinations. Therefore, it is possible that a potential beneficiary took the time to complete the medical examination and receive the required vaccinations. After confirming biographic information and properly completing the medical examination, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. The alien was required to complete these steps prior to being considered for authorization to travel to the United States to seek parole. The total estimated time to complete the CBP One part of the ATA process was 10 minutes.[87]

In the Form I–131-based legacy process, the adjudication of the Form I–131 took place in two stages. First, a designated USCIS Service Center adjudicator would review the application package submitted by the petitioner and confirm that the petitioner had received a U.S. government invitation to apply to the legacy process, and that all documentary filing requirements were met. If the petitioner failed to submit the required evidence, adjudicators would issue a Request for Evidence to obtain the missing information. Unless a sufficient response was received, the filing would be denied. For cases where all required evidence was provided and eligibility was established, USCIS conditionally approved the Form I–131. There were no costs to the potential beneficiary during this first stage of the process. However, the second stage of the process required the potential beneficiary to report for an in-person interview at a USCIS office overseas, which could result in travel costs and medical exam costs. During this stage, USCIS would verify the identity and qualifying familial relationship between the petitioner and a potential beneficiary.

In general, the costs to petitioners and potential beneficiaries are not significant and pale in comparison to the U.S. government's sovereign interest in determining who may be paroled into the United States. DHS issued invitations as a use of administrative grace that could end at any time and made no assurances that each invitation would result in a grant of parole. DHS made no assurances that each Form I–134A would be processed, nor did DHS assure that each Form I–134A or Form I–131 would ultimately result in a grant of parole to a potential beneficiary. For petitioners/beneficiaries who received a conditional approval of Form I–131 from USCIS under the legacy CFRP program, the conditional approval made it clear that additional steps were required—including completion of a medical examination and in-person interview—before parole could be authorized.[88] Therefore, neither the petitioner nor the potential beneficiary has a significant reliance interest in continuation of the process at this stage. Any costs incurred by a potential beneficiary in the Form I–131 or Form I–134A-based process, both for completing the medical examination and for receiving the required vaccinations, can be impactful, depending on the country and the relative cost of these items compared to the average wage received by that country's population and the rate of unemployment in the country. However, both the costs of the vaccinations and the medical examination are offset by their attendant benefit to the beneficiary of identifying health issues that may have existed and preventing future illness. Once again, the interest of petitioners and potential beneficiaries in preserving the FRP programs is minimal compared to the U.S. government's interest in exercising its discretion to decide which programs to continue and which benefits to provide, based on the policy priorities of the current administration.

Accordingly, DHS will issue a notice of non-confirmation for all pending Forms I–134A. DHS will also rescind the confirmation of all Forms I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A. DHS also intends to issue denial notices for all conditionally approved Form I–131 under the legacy CFRP program that have not been issued a travel document. The Form I–131 filing fee will not be refunded as USCIS has already expended resources in partially completing their adjudication.

*2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Petitioners*

DHS has canceled all pending requests for advance authorization to travel to the United States to seek a discretionary grant of parole under the FRP programs.

DHS considered allowing any approved ATAs to remain in place until they were used or expired by their terms. However, DHS did not want aliens to fly to the United States at significant personal expense to seek parole under policies that DHS no longer supports or appear to encourage aliens to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. DHS wants to be as transparent as possible and not exacerbate the problems created by the FRP programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit, in the exercise of discretion. If parole is not granted, aliens may be removed to their home country at U.S. government expense or processed for another appropriate disposition under the INA.

In sum, the FRP programs have failed to achieve their stated objectives. They are inconsistent with the current Administration's enforcement priorities, do not advance current U.S. foreign policy goals, did not meaningfully reduce unlawful migration, did not alleviate the strain on DHS personnel and resources, nor address the root causes of migration through economic development. Instead, the programs imposed additional administrative burdens on DHS and introduced vulnerabilities that significantly undermined the integrity of the U.S. immigration system. While some petitioners and beneficiaries may have relied on the availability of FRP programs, those reliance interests are limited in scope and involved minimal financial or procedural burdens. Even if the reliance interests were greater, DHS has determined that the federal government's interest in controlling the circumstances under which foreign nationals may be paroled into the United States outweigh those interests. Accordingly, terminating the FRP programs is both lawful and reasonable.

**V. Effect of Termination on Current Parolees Under the FRP Programs and Corresponding Reliance Interests**

The notices establishing the FRP programs explain that parole is not an admission of the alien to the United

[87] *See* 88 FR 62810, 62812 (Sept. 13, 2023).

[88] *See* USCIS, ''The Cuban Family Reunification Parole Program,'' *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program* (''Process Steps'') (last updated Oct. 11, 2024).

States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the FRP programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, since July 10, 2023, approximately 14,000 aliens were granted parole into the United States pursuant to the modernized FRP programs. While some aliens in this population have subsequently pursued other lawful immigration statuses and benefits, all aliens within this population are still within the 3-year initial period of parole under the modernized FRP programs. Approximately 1,060 Cubans are currently in the United States with a valid period of parole under the legacy CFRP program. Approximately 100 Haitians are currently in the United States with a valid period of parole under the legacy HFRP program.

Parolees under the FRP programs may be able to seek an additional period(s) of parole (''re-parole'') by filing Form I–131, and demonstrating urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for re-parole. These cases and any such pending cases will be assessed on a case-by-case basis.

DHS has determined that as one aspect of the termination of the FRP programs, and consistent with the Secretary's statutory and regulatory authority,[89] the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485 before December 15, 2025 that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. The parole of an alien with a pending Form I–485 will remain valid until either the expiration date provided on the alien's Form I–94, Arrival/Departure Record, or the date a final adjudication of the Form I–485 is completed, whichever is sooner. If the Form I–485 is denied, the alien's parole period will be terminated as of the date of the denial and the alien is expected to depart the United States immediately if they have no other lawful basis for remaining. Pending Form I–131 requests for re-parole filed by aliens initially paroled under the FRP programs will be adjudicated and may be approved on a case-by-case basis.[90] Note that with respect to re-parole requests filed by aliens who were initially paroled under one of the FRP programs, facial eligibility under those programs does not entitle an alien to re-parole. The alien still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole, as required by section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A).

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action, consistent with law, against any alien at any time, including during the 30-day waiting period created by this notice. Once parole is terminated, and if no exception applies and no lawful immigration status, relief, classification, or protection is obtained, aliens must return to their home country to maintain their path to lawful immigration status or be removed from the United States subject to a final order of removal. Parolees without any other lawful basis to remain in the United States following the termination of the FRP programs should depart the United States before their parole termination date. As detailed below, aliens whose parole period is terminated are encouraged to submit their intent to depart through the CBP Home Mobile App. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home Mobile App. Aliens should visit *https://i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

DHS has recently announced a historic opportunity for aliens to receive both financial and travel assistance to facilitate travel back to their home country or another country in which they have lawful status through the CBP Home App. Once unlawful aliens submit their intent to depart through the CBP Home Mobile App and pass vetting, they will be deprioritized by ICE for enforcement action, detention and removal before their scheduled departure, as long as they demonstrate they are making meaningful strides in completing the departure.[91]

In implementing this approach, DHS intends to prioritize for removal those whose parole is terminated and who have not, prior to the publication of this notice, submitted an immigration benefit request to obtain a lawful basis to remain in the United States. Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS' institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer

[89] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States''); 8 CFR 212.5(e)(2) (''. . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph(a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien*[.].'' (emphasis added)).

[90] Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131. Aliens will not, however, be able to apply for re-parole under the legacy FRP programs.

[91] DHS, ''DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation'' May 5, 2025, *https://www.dhs.gov/news/2025/05/05/dhs-announces-historic-travel-assistance-and-stipend-voluntary-self-deportation.*

exists and thus DHS intends to revoke parole-based employment authorization consistent with the revocation on notice procedures. *See* 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and moved to the United States.[92] Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside. In addition, employers who employ parolees may incur costs related to lost productivity and finding new employees. Property owners who rent homes, condos, or apartments to parolees may lose steady rent payments. Retailers and restaurants in the communities the parolees have been living in will lose customers. Aliens paroled under the modernized FRP programs have been in the United States for as long as 20 months, while some aliens initially paroled under the legacy FRP programs and subsequently granted additional parole periods may have been in the United States for years.[93]

However, any assessment of the reliance interests of FRP parolees must account for FRP parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served;[94] and (2) the initial period of parole would be limited to a maximum of three years. These clear, limiting conditions of the FRP programs served to attenuate any long-term expectations and interests amongst FRP parolees. Accordingly, DHS has taken these limiting conditions, along with FRP parolees' knowledge of them, into consideration when weighing their reliance interests.[95]

To the extent that current parolees have obtained housing and employment authorization, or created new ties within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the University of California*.[96] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[97] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than most FRP parolees have been, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchasing of homes.[98] As the Court noted, these interests, though noteworthy, were not ''necessarily dispositive,'' and ''DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests.''[99] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the FRP programs are far less than the population in *Regents.* Furthermore, as stated above, consideration of the reliance interests under the FRP programs must take into account the express, discretionary terms of the parole programs. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual FRP parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice and allowing the parole period of parolees with pending Forms I–485 to continue, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, the Department finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS considered several alternatives to termination of parole after a 30-day wind-down period, including, (1) allowing the current period of parole for each FRP beneficiary to expire and notifying the beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration; (2) allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available and the beneficiary may qualify to file Form I–485; and (3) announcing the termination of parole for each beneficiary following a wind down period of longer than 30 days from the date of publication of the termination notice. After due consideration, DHS has opted to not pursue these routes.

Option 1 would require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency. Staggered parole expirations could result in extended unauthorized stays and generate confusion among parolees due to differing timelines. Option 2 fails to meaningfully implement the policy shift outlined in this **Federal Register** notice, as it would allow continued reliance on parole as a pathway to adjustment of status—effectively maintaining the existing parole framework for current beneficiaries. Moreover, permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload borne by DHS and USCIS in processing these cases. Critically, both Option 1 and 2 dilute the intended impact of the policy change and fail to communicate the urgency of this administration's shift in direction. A protracted off-ramp could be perceived as a reluctance to fully enforce key policy priorities aimed at realigning parole authority with the original congressional intent. Moreover, allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety.

When determining whether to adopt the alternative of a longer than 30-day

---

[92] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'' (cleaned up)).

[93] As noted earlier in this section, there are approximately 100 aliens in this category.

[94] *See e.g.,* 88 FR at 43593; 88 FR at 54643; 88 FR at 54638; *see also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(e)(2)(i).

[95] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is ''unjustified in light of the express limitations'' in relevant immigration policy). Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131.

[96] *Id.*

[97] *Id.* at 31.

[98] *Id.*

[99] *Id.*

wind-down period, DHS determined such an alternative was not the best path forward. First, regardless of the wind-down period, parolees, their employers, their landlords, their friends, and their communities may incur costs. Given this reality, DHS decided to employ the path that will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs to issues deemed essential to securing our borders and protecting the American people against invasion. Accordingly, the Department has determined that a 30-day wind down period provides the affected parties sufficient notice while also preserving the Department's interest in promptly terminating attendant grants of parole for which the Department deems no longer provide significant public benefit to the United States. Accordingly, the Department is opting not to increase the wind-down period to more than 30 days.

## VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole.[100] For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs and the purposes of such parole therefore have been served. This constructive notice accordingly serves as written notice to FRP parolees. DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.[101]

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses. *See* 8 U.S.C. 1305; 8 CFR 265.1. Nevertheless, all FRP parolees under the modernized programs should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account.[102] For legacy FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account. This notice, and the individual notice through the USCIS online account or sent by mail, each independently constitute ''written notice to the alien'' under 8 CFR 212.5(e)(2)(i).

## VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A), *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [103] By terminating the FRP programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 43599—DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act (''APA'').[104]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the FRP programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary ''in [her] discretion.'' The FRP programs therefore were general statements of policy.

Because the FRP programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice-and-comment rulemaking requirements. Through the termination of the FRP programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[105] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation. *See* 5 U.S.C. 553(d)(2).

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves [106]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[107] Consistent with the Secretary of State's February 21, 2025, determination that ''all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]'' DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[108]

Moreover, although the APA does not require the agency to show that such procedures may result in ''definitely undesirable international consequences'' to invoke the foreign affairs exemption to notice-and-

[100] *See* 8 CFR 212.5(e)(2)(i) (''. . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien. . . .*'' (emphasis added)).

[101] *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) (''Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.'').

[102] *Cf., e.g.,* 8 CFR 103.2(b)(19)(ii)(B) (''For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . .'').

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] *Cf. Perez* v. *Mortgage Bankers Ass'n,* 575 U.S. 92, 101 (''Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.'').

[105] *See Encino Motorcars,* 579 U.S. at 221 (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.'').

[106] *See* 5 U.S.C. 553(a)(1); *see, e.g.,* 88 FR at 43599.

[107] *See Am. Ass'n of Exporters & Importers—Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions ''linked intimately with the Government's overall political agenda concerning relations with another country''); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive ''was implementing the President's foreign policy,'' the action ''fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA'').

[108] U.S. Department of State, Determination, *Foreign Affairs Function of the United States,* 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate categorical parole programs.

comment rulemaking, some courts have required such a showing,[109] and DHS can make one here. Delaying termination of the FRP programs to undertake rulemaking would undermine the U.S. government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in the notices implementing the modernized FRP programs, they were implemented as an integral part of negotiations with regional neighbors, including Colombia, Costa Rica, Ecuador, and Guatemala, to address unlawful migratory flows challenging immigration systems throughout the region.[110] For instance, in announcing the FRP program for Colombians, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United States.[111] DHS explained that ''the expansion of lawful pathways for aliens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of [Safe Mobility Offices or SMOs].'' [112] DHS continued that ''[t]he success of SMOs and other new measures to reduce unlawful migration to the [southwest border] is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs.'' [113] DHS noted that the U.S. government continued ''to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and [was] building goodwill and momentum to seek SMOs in still more countries in the region.'' [114] When implementing changes to the FRP programs for Cubans and Haitians, DHS invoked the foreign affairs exemption on similar grounds.[115]

However, as discussed in this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the FRP programs was one part of a broader strategy to collaboratively manage unlawful migration with neighboring countries, the U.S. government is pursuing a range of other policy initiatives that would allow DHS to return or remove FRP program nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.[116]

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the FRP programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations and may result in an even greater number of FRP program nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.2 of this notice, with countries to accept the return of their nationals, including FRP program nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. 5 U.S.C. 553(b)(B), (d)(3). Any delay for such procedures would harm the U.S. government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the FRP programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border.[117] Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[118] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

For example, DHS would intend that the termination of the FRP programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new or modified reporting requirements they impose. The termination of the programs announced by this notice requires changes to the collections of information on Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records (OMB control number 1615–0013). Form I–131 will be revised in

[109] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[110] *See, e.g.,* 88 FR at 43594.

[111] *See, e.g.,* 88 FR at 43599.

[112] *Id.*

[113] *Id.* at 43600.

[114] *Id.*

[115] *See* 88 FR at 54643 (Cuba); 88 FR at 54639 (Haiti).

[116] DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries, *https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols* (updated Mar. 21, 2025).

[117] 5 U.S.C. 553(b)(B); 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754–55 (D.C. Cir. 2001) (''a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required''); *see also* Executive Order 14159, 90 FR 8443 (Jan. 29, 2025).

[118] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside ''only the offending parts of the rule.'' *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

connection with this notice by removing specific mention of the FRP programs. As of the date of this notice Form I–131 may not be used to request an initial or new period of parole under one of the FRP programs, but it may be used by a previous FRP beneficiary to request a new period of parole, or re-parole, under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–22744 Filed 12–12–25; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–HQ–ES–2025–0613; FXES111609M0000–256–FF09420000; OMB Control Number 1018–0194]**

### Agency Information Collection Activities; Approval Procedures for Incidental Harassment Authorizations of Marine Mammals

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), we, the U.S. Fish and Wildlife Service (Service), are proposing to renew an information collection without change.

**DATES:** Interested persons are invited to submit comments on or before February 13, 2026.

**ADDRESSES:** Send your comments on the information collection request (ICR) by one of the following methods (please reference 1018–0194 in the subject line of your comments):

- *Internet (preferred): https://www.regulations.gov.* Follow the instructions for submitting comments on Docket No. FWS–HQ–ES–2025–0613.
- *Email: Info_Coll@fws.gov.*
- *U.S. mail:* Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803.

**FOR FURTHER INFORMATION CONTACT:** Madonna L. Baucum, Service Information Collection Clearance Officer, by email at *Info_Coll@fws.gov,* or by telephone at (703) 468–8211. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act (PRA; 44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR 1320.8(d)(1), all information collections require approval under the PRA. We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are especially interested in public comment addressing the following:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.,* permitting electronic submission of response).

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972 (MMPA; 16 U.S.C. 1361 *et seq.*) authorizes the Secretary of the Interior (Secretary) to allow, upon request, the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specific geographic region for periods of not more than 1 year. The Service may authorize incidental take by harassment if statutory and regulatory procedures are followed and the Service finds: (i) take is of a small number of marine mammals of a species or stock, (ii) take will have a negligible impact on the species or stock, and (iii) take will not have an unmitigable adverse impact on the availability of the species or stock for taking for subsistence uses by Alaska Natives.

The term ''take'' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal. Harassment means any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild (the MMPA defines this as ''Level A harassment''), or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering (the MMPA defines this as ''Level B harassment'').

The terms ''negligible impact,'' ''small numbers,'' and ''unmitigable adverse impact'' are defined in 50 CFR 18.27 (*i.e.,* the Service's regulations governing small takes of marine mammals incidental to specified activities). ''Negligible impact'' is an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival. ''Unmitigable adverse impact'' means an impact resulting from the specified activity (1) that is likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by (i) causing the marine mammals to abandon or avoid hunting areas, (ii) directly displacing subsistence users, or (iii) placing physical barriers between the marine mammals and the subsistence hunters; and (2) that cannot be sufficiently mitigated by other measures to increase

Decision Document

**USCIS Notice ("Notice"): Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans**

12-3-25 Approve the Notice: (1) Approve publication in the *Federal Register* and (2) Direct ESEC to electronically sign the Notice with the *Federal Register* signature card.

[redacted]

____________________ Date.

## Signing Authority

Rodney S. Scott, Commissioner, having reviewed and approved this document, has delegated the authority to electronically sign this document to the Director (or Acting Director, if applicable) of the Regulations and Disclosure Law Division of U.S. Customs and Border Protection, for purposes of publication in the **Federal Register**.

**Robert F. Altneu,**

*Director, Regulations & Disclosure Law Division, Regulations & Rulings, Office of Trade, U.S. Customs and Border Protection.*

[FR Doc. 2025–20270 Filed 11–18–25; 8:45 am]

BILLING CODE 9111–14–P

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

## Certain DHS Immigration Fees Required by HR–1: Fiscal Year 2026 Adjustments for Inflation

**AGENCY:** U.S. Customs and Border Protection, DHS.

**ACTION:** Notice of inflationary fee adjustment.

**SUMMARY:** The Department of Homeland Security (DHS) is announcing Fiscal Year (FY) 2026 inflationary adjustments to certain immigration-related fees required by the One Big Beautiful Bill Act (HR–1). HR–1 requires that DHS annually adjust certain immigration-related fees for inflation. This notice sets the inflation-adjusted FY 2026 fee amounts for the following immigration fees required by HR–1: the fee for enrollment in the Electronic Visa Update System (EVUS), the Electronic System for Travel Authorization (ESTA) fee, and the fee for an alien paroled into the United States. In accordance with HR–1, the existing fee for Form I–94 Arrival/Departure Record applications will not change for FY 2026.

**DATES:**

*HR–1 Parole Fee:* U.S. Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and U.S. Immigration and Customs Enforcement (ICE) will begin assessing the FY 2026 amount for the HR–1 parole fee described in this notice on January 1, 2026.

*HR–1 I–94, ESTA, and EVUS Fees:* CBP will begin assessing the FY 2026 amounts for the HR–1 I–94, ESTA, and EVUS fees described in this notice on January 1, 2026.

**FOR FURTHER INFORMATION CONTACT:**

*For questions regarding the HR–1 parole fee, by component:*

*CBP:* Office of Field Operations, U.S. Customs and Border Protection, Department of Homeland Security, 1300 Pennsylvania Avenue NW, Suite 1500N, Washington, DC 20229, email address: *parolenotification@cbp.dhs.gov.*

*USCIS:* Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746, telephone (240) 721–3000 (not a toll-free number).

*ICE:* Office of Regulatory Affairs and Policy, U.S. Immigration and Customs Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536; telephone (202) 732–6960 (not a toll-free number).

*For questions regarding the HR–1 I–94, ESTA, and EVUS fees:*

Melanie Mataxas, Director, Electronic Systems Travel Authorization, Office of Field Operations, U.S. Customs and Border Protection, at 202–325–1372 or at *melanie.d.mataxas@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background and Legal Authority

On July 4, 2025, the President signed into law the One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (HR–1). HR–1 was a comprehensive legislative package that changed many laws and added new laws that touch many areas of the United States Government. Among those changes, the law established new immigration fees and increased existing fees for certain immigration-related actions. The statute established minimum fees for Fiscal Year (FY) 2025 and required annual adjustments to the fees in subsequent fiscal years based on the Consumer Price Index for All Urban Consumers (CPI–U).[1]

Among other immigration fees specified in HR–1, the Secretary of Homeland Security must require the payment of a fee by any alien who is paroled into the United States, unless an exception in Public Law 119–21 section 100004(b) applies (the HR–1 parole fee). *See* Public Law 119–21 sec. 100004. Several Department of Homeland Security (DHS) components, including U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and U.S. Customs and Border Protection (CBP), have responsibilities for assessing and collecting the HR–1 parole fee. DHS published a joint notice in the **Federal Register** on October 16, 2025, announcing the implementation of the HR–1 parole fee and the FY 2025 rate for the HR–1 parole fee.[2]

CBP also administers several other fees specified in HR–1,[3] including requiring fees for submitting an application for a CBP Form I–94 Arrival/Departure Record, for using the Electronic System for Travel Authorization (ESTA) and receiving ESTA travel authorizations, and for enrolling in the Electronic Visa Update System (EVUS). *See* Public Law 119–21 secs. 100008, 100014, 100015. CBP announced the implementation of these fees, including the initial FY 2025 rates for these fees, through a notice published in the **Federal Register** on August 28, 2025, and began assessing and requiring those fees on September 30, 2025.[4]

## II. FY 2026 Inflation Adjustments to Certain Immigration Fees Required by HR–1

In accordance with HR–1, most immigration-related fees required by HR–1 are subject to annual inflation adjustments. This notice states the FY 2026 rates for the HR–1 parole, I–94, ESTA, and EVUS fees (collectively, the HR–1 fees).

Generally, HR–1 requires the multiplication of an HR–1 fee or a portion of an HR–1 fee from the prior FY by the percentage, if any, by which the CPI–U for the month of July preceding the date on which the adjustment takes effect exceeds the CPI–U for the July of the preceding calendar year (the inflation adjustment). In July 2024, the CPI–U was 314.540, and in July 2025, the CPI–U was 323.048. Therefore, between July 2024 and July 2025, the CPI–U increased by 2.70 percent.[5] To determine the total HR–1 fee for each FY, the inflation adjustment is then added to the HR–1 fee or portion of the HR–1 fee used in the calculation of the inflation adjustment, pursuant to the statutorily prescribed formula. The specifics of the statutory inflation adjustment formulas differ for each HR–1 fee. The following table provides a summary of the inflation-adjusted FY 2026 HR–1 fees described in this notice

[1] *See* Public Law 119–21 secs. 100004(d), 100008(b)(2), 100014(3), 100015(b)(2), codified as 8 U.S.C. 1804(d), 8 U.S.C. 1807(b)(2), 8 U.S.C. 1187(h)(3)(B)(iv), and 8 U.S.C. 1813(b)(2).

[2] 90 FR 48317 (Oct. 16, 2025).

[3] The Secretary of Homeland Security has delegated the authority to enforce and administer the immigration laws to the Commissioner of U.S. Customs and Border Protection. *See* DHS Delegation No. 07010.3, Delegation of Authority to the Commissioner of U.S. Customs and Border Protection, (Rev. No. 03.2, Incorporating Change 2) at II.B.1 (Dec. 11, 2024).

[4] 90 FR 42025 (Aug. 28, 2025).

[5] Bureau of Labor Statistics, Consumer Price Index—July 2025, August 12, 2025, *https://www.bls.gov/news.release/archives/cpi_08122025.htm* (last visited Oct. 21, 2025).

and the following subsections further detail the HR–1 inflation adjustment requirements.

CERTAIN FY 2026 FEES, AS REQUIRED BY HR–1

| HR–1, Public Law 119–21 (139 Stat. 72) section | Action | Total FY 2025 fee (existing fee) | FY 2026 inflation adjustment | Total FY 2026 fee (revised fee) |
|---|---|---|---|---|
| 100004 | Parole into the United States | $1,000 | +$20 | $1,020 |
| 100008 | Application for CBP Form I–94 at land border ports of entry | 30 | [6] +0 | [7] 30 |
| 100014 | ESTA authorization | 40 | +0.27 | [8] 40.27 |
| 100015 | EVUS enrollment | 30 | +0.75 | 30.75 |

*A. DHS HR–1 Parole Fee*

Pursuant to HR–1, the Secretary of Homeland Security must require the payment of a fee by any alien who is paroled into the United States, unless an exception in Public Law 119–21 section 100004(b) applies. *See* Public Law 119–21 sec. 100004 (8 U.S.C. 1804). Specifically, this fee is required each time an alien is granted parole under sec. 212(d)(5)(A) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5)(A), including initial parole from outside the United States, parole in place, re-parole, or parole from DHS custody. *See* 90 FR 48317, 48318.

During FY 2026 and each subsequent FY, DHS is required to adjust the HR–1 parole fee for inflation. *See* Public Law 119–21 sec. 100004(d). This notice announces the FY 2026 inflation-adjusted HR–1 parole fee for all DHS components, including ICE, USCIS, and CBP.

Pursuant to HR–1, DHS is required to adjust the HR–1 parole fee by adding an inflation adjustment amount, rounded to the next lowest multiple of $10, to the amount of the fee for the most recently concluded fiscal year. *Id.* For FY 2025, HR–1 set an initial minimum fee amount of $1,000. *See* Public Law 119–21 sec. 100004(c). The FY 2026 inflation adjustment amount is $27.05 rounded to the next lowest multiple of $10, which is $20.

Accordingly, the inflation-adjusted HR–1 parole fee for FY 2026 will be $1,020 ($1,000 + $20). The HR–1 parole fee will not be assessed if the alien establishes, to the satisfaction of DHS, on an individual, case-by-case basis, that the circumstances of the alien's parole align with at least 1 of the 10 exceptions found in HR–1. *See* Public Law 119–21 sec. 100004(b). The operative event that triggers the statutory obligation to pay the HR–1 parole fee is the actual grant and effectuation of parole at or into the United States—not the filing of an application or request. Thus, unless statutorily excepted, the FY 2026 inflation-adjusted HR–1 parole fee will be collected from any alien who is granted parole on or after January 1, 2026, regardless of when the underlying application or request was submitted.

The $1,020 HR–1 parole fee is required in addition to any other fee authorized by law. *See* Public Law 119–21 sec. 100004(a).

*B. CBP Form I–94 Arrival/Departure Record*

CBP issues an electronic CBP Form I–94 Arrival/Departure Record to all arriving aliens who are legally required to submit that form (unless otherwise exempted). *See* parts 1.4 and 235.1(h) of title 8 of the Code of Federal Regulations (8 CFR 1.4, 235.1(h)). CBP Form I–94 serves as evidence of the terms of the alien's admission or parole and is generally issued at the time the alien is admitted or paroled at a U.S. port of entry. *See* 8 CFR 235.1(h). Aliens arriving at a land border port of entry who are legally required to submit a CBP Form I–94 must apply for that form.

Pursuant to HR–1, the Secretary of Homeland Security must require the payment of a fee for any alien who submits an application for a Form I–94 Arrival/Departure Record (the HR–1 I–94 fee). *See* Public Law 119–21 sec. 100008 (8 U.S.C. 1807). For FY 2025, the statute set an initial minimum fee amount of $24. *See* Public Law 119–21 sec. 100008(b)(1).

During FY 2026 and each subsequent FY, CBP is required to adjust the HR–1 I–94 fee for inflation. *See* Public Law 119–21 sec. 100008(b)(2). The statutory formula requires adding an inflation adjustment amount, rounded down to the nearest dollar, to the amount of the fee required under Public Law 119–21 sec. 100008(b) for the most recently concluded fiscal year. *Id.* For FY 2026, the inflation adjustment required by Public Law 119–21 sec. 100008(b)(2)(B) is $0.65 rounded down to the nearest dollar, which is $0. Thus, the HR–1 I–94 fee for FY 2026 will remain at $24 ($24 + $0).

The HR–1 I–94 fee is required in addition to any other fee authorized by law. *See* Public Law 119–21 sec. 100008(a). Currently, CBP imposes a $6 fee for aliens who are legally required to be issued, or request to be issued, CBP Form I–94 and who intend to arrive at a land border port of entry. *See* 8 CFR 103.7(d)(4), 235.1(h)(1), and 286.9(b)(1). Accordingly, the total fee to apply for a CBP Form I–94 at a land border port of entry for FY 2026 will continue to be $30, consisting of the $6 land border fee and the $24 HR–1 fee. CBP will not assess a fee for aliens arriving at an air or sea port of entry because such aliens are not required to submit an application for a CBP Form I–94.

*C. Electronic System for Travel Authorization (ESTA)*

ESTA is the online system through which aliens intending to enter the United States under the Visa Waiver Program (VWP) must obtain an electronic travel authorization in advance of travel to the United States.[9] Each alien intending to travel by air, sea, or land to the United States under the VWP must receive a travel authorization via ESTA prior to travel. *See* INA sec. 217 (8 U.S.C. 1187) and 8 CFR part 217. Prior to the enactment of HR–1, CBP required a fee of $21 for each

[6] Section II.B. explains the inflation adjustment formula for the HR–1 I–94 fee and details why, upon applying the inflation adjustment formula and rounding down to the nearest dollar, the fee amount will not increase in FY 2026.

[7] This $30 total includes the $6 land border fee. Payment of the $6 land border fee is required pursuant to 8 CFR 103.7(d)(4), 235.1(h)(1), and 286.9(b)(1), and is not a fee that is required by HR–1.

[8] Section II.C. explains the inflation adjustment formula found in Public Law 119–21 sec. 100014(3) (8 U.S.C. 1187(h)(3)(B)(iv)) and the resulting FY 2026 ESTA fee calculations for CBP processing of ESTA applications and travel authorizations.

[9] For additional information on the Visa Waiver Program, see 8 U.S.C. 1187 and 8 CFR part 217.

ESTA authorization. Section 100014 of Public Law 119–21 amended section 217(h)(3)(B) of the INA (8 U.S.C. 1187(h)(3)(B)) to increase the fee for ESTA authorizations to $40 in FY 2025.

The FY 2025 ESTA authorization fee of $40, as required by HR–1, is the sum of three fees, including: $17 per travel authorization as provided for in 8 U.S.C. 1187(h)(3)(B)(i)(I), $10 as provided for in 8 U.S.C. 1187(h)(3)(B)(i)(II) to ensure recovery of the full costs of providing and administering the ESTA System, and $13 per travel authorization as provided for in 8 U.S.C. 1187(h)(3)(B)(i)(III). The 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee is required for all applications, regardless of authorization or denial; thus, in the event the ESTA application is denied, HR–1 set a $10 fee for FY 2025. *See* 8 U.S.C. 1187(h)(3)(B).

During FY 2026 and each subsequent FY, CBP is required to adjust the 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee for inflation. *See* 8 U.S.C. 1187(h)(3)(B)(iv). Under HR–1, the adjusted 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee is calculated by adding the amount required under 8 U.S.C. 1187(h)(3)(B)(i)(II) for the previous FY to the inflation adjustment amount. *See* 8 U.S.C. 1187(h)(3)(B)(iv). For FY 2025, the amount required under 8 U.S.C. 1187(h)(3)(B)(i)(II) was $10. The inflation adjustment for FY 2026 is $0.27. HR–1 does not direct CBP to round the HR–1 ESTA inflation adjustment. Thus, for FY 2026, the 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee will be $10.27 ($10 + $0.27).

As noted previously, the 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee is one of three fees that, when combined, comprise the total ESTA authorization fee for each FY. This notice does not alter the $17 or $13 fees required under 8 U.S.C. 1187(h)(3)(B)(i)(I) and 8 U.S.C. 1187(h)(3)(B)(i)(III), respectively. Thus, as required by HR–1, the inflation-adjusted FY 2026 ESTA fee will be $40.27 ($17 + $10.27 + $13) per travel authorization. In the event the ESTA application is denied, the FY 2026 fee is $10.27 to ensure recovery of the costs of providing and administering the ESTA System.

*D. Electronic Visa Update System (EVUS)*

EVUS is an online system currently used by nationals of the People's Republic of China (PRC) holding a 10-year B–1, B–2, or B–1/B–2 (visitor) visa to provide required information to DHS prior to travel to the United States. *See* 8 CFR part 215, subpart B.[10] PRC nationals with an approved U.S.-issued visa of a designated category must enroll in EVUS and provide or update personal and travel information to receive a determination of travel eligibility. *See* 8 CFR 215.24.

Pursuant to HR–1, the Secretary of Homeland Security must require the payment of a fee by any alien enrolling in EVUS. Public Law 119–21 sec. 100015 (8 U.S.C. 1813). The alien must pay the fee at the time of enrollment. *Id.* For FY 2025, the statute set a minimum fee amount of $30. *See* Public Law 119–21 sec. 100015(b)(1).

During FY 2026 and each subsequent FY, CBP is required to adjust the HR–1 EVUS fee for inflation. *See* Public Law 119–21 sec. 100015(b)(2). The statutory formula requires adding an inflation adjustment amount, rounded down to the next lowest multiple of $0.25, to the amount of the fee required under Public Law 119–21 sec. 100015(b) for the most recently concluded fiscal year. *Id.* For FY 2026, the inflation adjustment under Public Law 119–21 sec. 100015(b)(2)(B) is $0.81 rounded down to the next lowest multiple of $0.25, which is $0.75. Thus, the inflation-adjusted HR–1 EVUS fee for FY 2026 is $30.75 ($30 + $0.75).

This $30.75 HR–1 EVUS fee is required in addition to any other fee applicable by law. *See* Public Law 119–21 sec. 100015(a).

**Kristi L. Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–20304 Filed 11–18–25; 8:45 am]

BILLING CODE 9111–14–P

[10] In a **Federal Register** notice published on October 20, 2016 (81 FR 72600), DHS identified the PRC as an EVUS country and designated B–1, B–2, and B–1/B–2 visas issued without restriction for the maximum validity period and contained in a passport issued by the PRC as designated visa categories for purposes of EVUS.

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

## Accreditation and Approval of Camin Cargo Control, Inc. (Tampa, FL) as a Commercial Gauger and Laboratory

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Notice of accreditation and approval of Camin Cargo Control, Inc. (Tampa, FL), as a commercial gauger and laboratory.

**SUMMARY:** Notice is hereby given, pursuant to CBP regulations, that Camin Cargo Control, Inc. (Tampa, FL), has been approved to gauge petroleum and certain petroleum products and accredited to test petroleum and certain petroleum products for customs purposes for the next three years as of August 22, 2024.

**DATES:** Camin Cargo Control, Inc. (Tampa, FL) was approved and accredited as a commercial gauger and laboratory as of August 22, 2024. The next triennial inspection date will be scheduled for August 2027.

**FOR FURTHER INFORMATION CONTACT:** Robert P. Munivez, Laboratories and Scientific Services, U.S. Customs and Border Protection, 4150 Interwood South Parkway, Houston, TX 77032, tel. 281–560–2900.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given pursuant to 19 CFR 151.12 and 19 CFR 151.13, that Camin Cargo Control, Inc., 8402 Laurel Fair Circle, Suite 110, Tampa, FL 33610, has been approved to gauge petroleum and certain petroleum products and accredited to test petroleum and certain petroleum products for customs purposes, in accordance with the provisions of 19 CFR 151.12 and 19 CFR 151.13.

Camin Cargo Control, Inc. (Tampa, FL) is approved for the following gauging procedures for petroleum and certain petroleum products from the American Petroleum Institute (API):

| API chapter | Title |
|---|---|
| 3 | Tank Gauging. |
| 7 | Temperature Determination. |
| 8 | Sampling. |
| 12 | Calculation of Petroleum Quantities. |
| 17 | Marine Measurement. |

Camin Cargo Control, Inc. (Tampa, FL), is accredited for the following laboratory analysis procedures and methods for petroleum and certain petroleum products set forth by the U.S. Customs and Border Protection Laboratory Methods (CBPL) and American Society for Testing and Materials (ASTM):

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**[CIS No. 2744–23; Docket No: USCIS 2022–0016]**

**RIN 1615–AC83**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

**[A.G. Order No. 5660–2023]**

**RIN 1125–AB26**

## Circumvention of Lawful Pathways

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule; request for comments on expanded applicability in maritime context.

**SUMMARY:** The Department of Homeland Security (''DHS'') and the Department of Justice (''DOJ'') are issuing a final rule in anticipation of a potential surge of migration at the southwest border (''SWB'') of the United States following the termination of the Centers for Disease Control and Prevention's (''CDC'') public health Order. The rule encourages migrants to avail themselves of lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel, thereby reducing reliance on human smuggling networks that exploit migrants for financial gain. The rule does so by introducing a rebuttable presumption of asylum ineligibility for certain noncitizens who neither avail themselves of a lawful, safe, and orderly pathway to the United States nor seek asylum or other protection in a country through which they travel. In the absence of such a measure, which would apply only to those who enter at the southwest land border or adjacent coastal borders during a limited, specified date range, the number of migrants expected to travel without authorization to the United States would be expected to increase significantly, to a level that risks undermining the Departments' continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system, in the face of exceptionally challenging circumstances. Coupled with an expansion of lawful, safe, and orderly pathways into the United States, the Departments expect the rule to lead to a reduction in the number of migrants who seek to cross the SWB without authorization to enter, thereby reducing the reliance by migrants on dangerous human smuggling networks, protecting against extreme overcrowding in border facilities, and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. In addition, the Departments are requesting comment on whether applicability of the rebuttable presumption should be extended to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at a maritime border.

**DATES:**

*Effective date:* This rule is effective on May 11, 2023.

*Comment period for solicited comments:* Comments on expanded applicability in maritime context identified in Section V of this preamble must be submitted on or before June 15, 2023. The electronic Federal Docket Management System will accept comments before midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket:* To view comments on the proposed rule that preceded this rule, search for docket number USCIS 2022–0016 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

*Comment period for solicited additional comments:* You may submit comments on the specific issue identified in Section V of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov,* to DHS Docket Number USCIS 2022–0016. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs or USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 (not a toll-free call) for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For Executive Office for Immigration Review (''EOIR''):* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

Interested persons are invited to submit comments on the specific issue identified in Section V of this preamble by submitting relevant written data, views, or arguments. To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than those listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must submit it to DHS Docket Number USCIS 2022–0016. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

## II. Executive Summary

### *A. Purpose of Action*

Economic and political instability around the world is fueling the highest

levels of migration since World War II, including in the Western Hemisphere. Analysis by the DHS Office of Immigration Statistics (''OIS'') found that even while CDC's Title 42 public health Order [1] has been in place, encounters at our SWB [2]—referring to the number of times U.S. officials encounter noncitizens [3] attempting to cross the SWB of the United States without authorization to do so—reached an all-time high in 2022, driven in large part by an unprecedented exodus of migrants at different times from countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela.[4] The U.S. Border Patrol (''USBP'') completed 221,710 encounters between ports of entry in December 2022, second only to May 2022 (224,371 encounters) for the most monthly encounters since at least Fiscal Year (''FY'') 2000 (the period for which detailed records are available), and very likely the most ever.[5] Daily encounters between Ports of Entry (''POEs'') averaged 7,152 for December 2022 and exceeded 8,000 per day 11 times during the month, as compared to average daily encounters of 1,977 for all of 2000–2019 and average daily encounters of 1,265 in the immediate pre-pandemic period, 2014–2019.[6] Smuggling networks enable and exploit this unprecedented movement of people, putting migrants' lives at risk for smugglers' financial gain.[7] Meanwhile, the current asylum system—in which a high number of migrants are initially determined eligible to pursue their claims, even though most ultimately are not granted asylum in the subsequent EOIR removal proceedings [8]—has contributed to a growing backlog of cases awaiting review by asylum officers (''AOs'') and immigration judges (''IJs''). The practical result of this growing backlog is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[9] As the demographics of border encounters have shifted in recent years to include larger numbers of non-Mexicans—who are far more likely to assert asylum claims—and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[10]

While the CDC's Title 42 public health Order has been in effect, migrants who do not have proper travel documents have generally not been processed into the United States; they instead have been expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in Title 8 of the United States Code, which includes the Immigration and Nationality Act (''INA'' or ''the Act''). When the Order is lifted, however, the United States Government will process all migrants into the United States under Title 8 authorities, as required by statute. At that time, the number of migrants seeking to cross the SWB without authorization is expected to increase significantly, unless other policy changes are made. Such challenges were evident in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[11] Leading up to the expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[12] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. In the weeks between the November 2022 announcement that the Title 42 public health Order would be lifted, and the December 19, 2022, stay order that kept the Title 42 public health Order in place, encounter rates jumped from an average of just under 7,700 per week (early November) to nearly 8,800 per

[1] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[2] United States Government sources refer to the U.S. border with Mexico by various terms, including ''SWB,'' ''the southern border,'' ''U.S.-Mexico border,'' or ''the land border with Mexico.'' In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. The ''southern border'' is both a land and maritime border extending from beyond California to the west to beyond Florida to the east. This rule applies along the entirety of the U.S. land border with Mexico, referred to in the regulatory text as the ''southwest land border,'' but the Departments use different terms in the preamble to describe the border. This is in large part to reflect the source material supporting the rule, but the Departments believe that the factual circumstances described in the preamble call for applying the rule across the entirety of the U.S. land border with Mexico, referred to throughout as the ''SWB.'' As discussed in greater detail below, the Departments believe that the factual circumstances described in this preamble call for applying the rule to coastal borders adjacent to that land border as well; accordingly, this final rule applies to those who enter the United States from Mexico, whether at the southwest land border or adjacent coastal borders.

[3] For purposes of this discussion, the Departments use the term ''noncitizen'' to be synonymous with the term ''alien'' as it is used in the Immigration and Nationality Act. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr,* 140 S. Ct. 1442, 1446 n.2 (2020).

[4] OIS analysis of OIS Persist Dataset based on data through March 31, 2023; OIS analysis of historic U.S. Border Patrol data.

[5] OIS analysis of OIS Production data based on data through March 31, 2023.

[6] OIS analysis of OIS Production data for fiscal year (''FY'') 2000–March 2023 and OIS Yearbook data for FY 1925–FY 1999. As discussed further below, daily encounters between ports of entry fell sharply in January 2023 following the launch of the Cuba, Haiti, and Nicaragua parole processes, and daily encounters between ports of entry at the SWB averaged just over 5,200 a day the 30 days ending April 10, 2023. OIS analysis of Unified Immigration Portal (UIP) data pulled on April 13, 2023.

[7] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* N.Y. Times, July 25, 2022, *https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.*

[8] *See* EOIR, Executive Office for Immigration Review Adjudication Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 16, 2023), *https://www.justice.gov/eoir/page/file/1062976/download.* The EOIR adjudication outcome statistics report on the total number of cases originating with credible fear claims resolved on any ground in a FY, without regard to whether an asylum claim was adjudicated. The asylum grant rate is a percentage of that total number of cases.

[9] OIS analysis of EOIR data as of March 31, 2023.

[10] For noncitizens encountered at the SWB in FY 2014–FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to U.S. Citizenship and Immigration Services for adjudication, compared to nearly 57 percent of people from Northern Central America (*i.e.,* El Salvador, Guatemala, and Honduras), and just over 90 percent of all other nationalities. OIS analysis of Enforcement Lifecycle data as of December 31, 2022. Of note, according to OIS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at the SWB. Both trends accelerated in the 2010s, as non-Mexicans became the majority of border encounters, and they have accelerated further since FY 2021, as people from countries other than Mexico and Northern Central America now account for the largest numbers of border encounters.

[11] *See Huisha-Huisha* v. *Mayorkas,* No. 21–100, 2022 WL 16948610 (D.D.C. Nov. 15, 2022), *cert. and stay granted, Arizona* v. *Mayorkas,* 143 S. Ct. 478 (2022).

[12] *See, e.g.,* Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why,* L.A. Times, Dec. 23, 2022, *https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion.*

week (mid-December), a change not predicted by normal seasonal effects.[13]

While a number of factors make it particularly difficult to precisely project the numbers of migrants who would seek to cross the SWB without authorization or present at a U.S. POE without documents sufficient for admission after the lifting of the Title 42 public health Order, DHS encounter projections and planning models from early April suggest that encounters could rise to 11,000 per day, absent policy changes and absent a viable mechanism for removing Cuban, Haitian, Nicaraguan, and Venezuelan (''CHNV'') nationals who do not have a valid protection claim.[14] As discussed in greater detail below, data indicate that recently announced enforcement processes, as applied to CHNV nationals, which couple new parole processes with prompt returns of those who attempt to cross the SWB without utilizing these processes, are effectively deterring irregular migration[15] from those countries to the United States, thus yielding a substantial decrease in encounter numbers for nationals of CHNV countries.[16]

However, DHS will no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order, which means that an important disincentive associated with the parole processes would no longer be present. In addition, there are a number of factors that could contribute to these gains being erased after the lifting of the Title 42 public health Order, including the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere, the unprecedented recent growth in migration from countries of origin not previously typical, the already large number of migrants in proximity to the SWB, and the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order on the movement of migrants. Thus, the high end of the estimated encounter rate remains a possibility for which the Departments need to prepare. In the absence of the policy changes included in the rule, most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future despite the fact that many of them will not ultimately be granted asylum,[17] a scenario that would likely incentivize an increasing number of migrants to the United States and further increase the likelihood of sustained, high encounter rates.

A sustained, high encounter rate risks overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered. This would put an enormous strain on already strained resources, risk overcrowding in already crowded USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are subject to exploitation and risks to their lives by the networks that support their movements north.

In response to this urgent and extreme situation, the Departments are issuing a rule that—

- incentivizes migrants to use lawful, safe, and orderly means for noncitizens to enter the United States to seek asylum and other forms of protection;
- provides core protections for noncitizens who would be threatened with persecution or torture in other countries; and
- builds upon ongoing efforts to share the responsibility of providing asylum and other forms of protection to eligible migrants with the United States' regional partners.

At the same time, the rule addresses the reality of unprecedented migratory flows, the systemic costs those flows impose on the immigration system, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. Specifically, this rule establishes a presumptive condition on asylum eligibility for certain noncitizens who fail to take advantage of the existing and expanded lawful pathways[18] to enter the United States, including the opportunity to schedule a time and place to present at a POE, and thus seek asylum or other forms of protection in a lawful, safe, and orderly manner, or to seek asylum or other protection in one of the countries through which they travel on their way to the United States.

This effort draws, in part, on lessons learned from the successful Venezuela parole process,[19] as well as the similar processes for Cubans, Haitians, and Nicaraguans,[20] under which DHS

[13] Month over month change from November to December for all of FY 2013–FY2022 averaged negative 2 percent. OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[14] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023. The complexity of international migration limits the Department's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift from Mexico and Northern Central America to new countries of origin, discussed further below), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors.

OIS leads an interagency SWB Encounter Projections Working Group that generates encounter projections every two to four weeks, with ongoing refinements to the model based on feedback from the working group and model diagnostics. The enterprise encounter projection utilizes a mixed method blended model that combines a Bayesian structural time series statistical model produced by OIS with subject matter expert input to account for real-time policy developments and pending litigation, among other factors, that are not captured by the statistical model. The blended model is run through a standard statistical process (Monte Carlo simulations) to generate 68 percent and 95 percent confidence intervals for each of 33 separate demographic groupings. In light of the greater-than-usual uncertainty at the current time, the Departments' planning models are designed to prepare the Departments for all reasonably likely eventualities, and therefore focus on the upper bounds of the blended model's 68 and 95 percent confidence intervals. As noted in Section IV.B.2 of this preamble, in the current context, the Departments must focus their planning efforts on the high and moderately high planning models rather than plan to an optimistic scenario that could leave enforcement efforts badly under-resourced and harm efforts to provide a safe and orderly process.

[15] In this preamble, ''irregular migration'' refers to the movement of people into another country without authorization.

[16] In the week prior to the announcement of the parole processes (ending October 12, 2022, for Venezuela and January 6, 2023, for Cuba, Haiti, and Nicaragua), the daily average of CHNV encounters was nearly 2,000 between POEs. A month after the parole announcements, daily encounters of CHNV nationals averaged just under 300 encounters. In the most recent seven days ending April 10, 2023, CHNV daily encounters averaged 195. OIS analysis of OIS Persist dataset based on data through March 31, 2023, and OIS analysis of CBP UIP data downloaded April 13, 2023.

[17] See Section III.C of the preamble to the notice of proposed rulemaking, Circumvention of Lawful Pathways, 88 FR 11704, at 11715–11716 (Feb. 23, 2023). Overall, 63 percent of non-Mexicans placed in expedited removal from 2014–2019 made fear claims, and 85 percent of those claiming fear (54 percent of all those placed in expedited removal) established fear or were otherwise placed in section 240 removal proceedings as a result of their fear claim. These rates are likely to be higher after May 11, 2023, because of the growing prevalence of extra-regional nationals (*i.e.,* noncitizens not from Mexico or Northern Central America), who are more likely than those from Northern Central American countries to make fear claims and to establish fear. OIS analysis of OIS Enforcement Lifecycle data based on data through February 28, 2023.

[18] The terms ''lawful pathways'' and ''lawful, safe, and orderly pathways,'' as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner and seek asylum and other forms of protection as described in this rule.

[19] *See* DHS, Press Release, *DHS Announces New Migration Enforcement Process for Venezuelans* (Oct. 12, 2022), *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans; see also* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[20] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and*

coupled a mechanism for noncitizens from these countries to seek entry into the United States in a lawful, safe, and orderly manner, with the imposition of new consequences for those who cross the border without authorization to do so—namely returns to Mexico.[21] Prior to the implementation of these processes, the Government of Mexico had not been willing to accept the return of such nationals; the Government of Mexico's independent decision to allow such returns was predicated, in primary part, on the implementation of these processes.

A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.[22] U.S. Customs and Border Protection (''CBP'') encountered an average of 106 Venezuelans between POEs per day in March 2023, about one-tenth the number of encounters prior to the announcement of the parole process.[23] Similarly, the number of Cuban, Haitian, and Nicaraguan (''CHN'') nationals encountered between POEs dropped significantly in the wake of the introduction of the new processes, which coupled a lawful, safe, and orderly way for such nationals to seek parole in the United States with consequences (in the form of prompt returns to Mexico) for those who crossed the SWB without authorization. Between the announcement of these processes on January 5, 2023, and January 21, 2023, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.[24] CHN encounters between POEs continued to decline to an average of fewer than 17 per day in March 2023.[25] DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.[26]

This rule, which draws on these successful processes, and which will apply only to those who enter during a limited, specified date range at the southwest land border or adjacent coastal borders, will discourage irregular migration by encouraging migrants to use lawful, safe, and orderly pathways and allowing for swift returns of migrants who bypass such pathways, even after the termination of the Title 42 public health Order. It responds to the expected increase of migrants seeking to cross the SWB following the termination of the Title 42 public health Order that would occur in the absence of a policy shift by encouraging reliance on lawful, safe, and orderly pathways, thereby shifting the incentives that otherwise encourage migrants to make a dangerous journey to the SWB. It is also responsive to the requests of foreign partners that have lauded the sharp reductions in irregular migration associated with the aforementioned process for Venezuelans and have urged that the United States continue and build on this kind of approach, which couples processes for individuals to travel directly to the United States with consequences at the land border for those who do not avail themselves of these processes. The United States has, as noted above, already extended this model to Cuba, Haiti, and Nicaragua, and the Government of Mexico and the United States recently announced a set of additional measures on migration, including the United States' continued commitment to welcoming CHNV nationals under these parole processes and Mexico's commitment to continue to accept back migrants on humanitarian grounds after May 11, 2023.[27] The Departments assess that continuing to implement and build on this approach is critical to the United States' ongoing engagements with regional partners, in particular the Government of Mexico, regarding migration management in the region.[28]

Consonant with these efforts, over the past two years, the United States has taken significant steps to expand safe and orderly options for migrants to lawfully enter the United States. The United States has, for example, increased and will continue to increase—

- refugee processing in the Western Hemisphere;
- country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit on a case-by-case basis; and
- opportunities to lawfully enter the United States for the purpose of seasonal employment.

In addition, once the Title 42 public health Order is terminated, the United States will expand implementation of the CBP One™ mobile application (''CBP One app''),[29] an innovative mechanism for noncitizens to schedule a time to arrive at POEs along the SWB, to allow an increasing number of migrants who may wish to claim asylum to request an available time and location to present and be inspected and processed at certain POEs, in accordance with operational limitations at each POE.[30] Use of this app keeps

*Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[21] While the Title 42 public health Order has been in place, those returns have been made under Title 42. As noted below, after the Title 42 public health Order is lifted, affected noncitizens may instead be subject to return or removal to Mexico under Title 8. *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* [hereinafter The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023)]; Government of Mexico, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published.*

[22] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[23] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[24] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[25] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[26] In December 2022, prior to the announcement of the CHN parole processes, the OIS Enterprise Encounter Projection predicted 273,000 total encounters of CHNV nationals in January through March 2023, a projection equivalent to 265,000 unique encounters given CHNV repeat encounter rates. During that same period, following the enactment of the CHN parole processes, unique SWB encounters (excluding scheduled arrivals via the CBP One app) of CHNV nationals was 20,204–245,000 fewer unique encounters than had been predicted. By comparison, a total of 61,967 CHNV nationals entered the United States pursuant to the CHNV parole processes during the same period. OIS analysis of OIS Persist Dataset based on data through March 31, 2023, and of CBP OFO CHNV Advance Travel Authorization reports.

[27] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023).

[28] *See also* The White House, *Joint Statement by President Biden and Prime Minister Trudeau* (Mar. 24, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/24/joint-statement-by-president-biden-and-prime-minister-trudeau/* (reaffirming commitment of United States and Canada to a collaborative regional approach to migration centered on expanding legal pathways and humane border management, including deterrence of irregular migration).

[29] The Departments note that unless otherwise specified, references to the CBP One app refer to usage of the CBP One tool, which can be accessed via the smartphone application. Although there is a desktop version of the CBP One app, it does not currently allow users to submit their information in advance. CBP is developing the capability to use the desktop version for this purpose.

[30] As of January 12, 2023, this mechanism is currently available for noncitizens seeking to cross SWB land POEs to request a humanitarian exception from the Title 42 public health Order. *See* CBP, *Fact Sheet: Using CBP One™ to Schedule an Appointment* (last modified Jan. 12, 2023), *https://www.cbp.gov/document/fact-sheets/cbp-one-fact-sheet-english.* Once the Title 42 public health Order is terminated, and the POEs open to all migrants who wish to seek entry into the United States, this mechanism will be broadly available to migrants in central and northern Mexico, allowing them to

Continued

migrants from having to wait in long lines of unknown duration at the POEs, and enables the POEs to manage the flows in a safe and efficient manner, consistent with their footprint and operational capacity, which vary substantially across the SWB. Once present in the United States, those who use this mechanism can make claims for asylum and other forms of protection and are exempted from this rule's rebuttable presumption on asylum eligibility. They are vetted and screened, and assuming no public safety or national security concerns, may be eligible to apply for employment authorization as they await resolution of their cases.[31]

Moreover, on April 27, 2023, DHS and the Department of State announced several new measures to further reduce irregular migration across the Western Hemisphere, significantly expand lawful pathways for protection, and facilitate the safe, orderly, and humane processing of migrants.[32] These new measures include—

• creating family reunification parole processes for El Salvador, Guatemala, Honduras, and Colombia, as well as modernizing the longstanding Haitian Family Reunification Parole process and the Cuban Family Reunification Parole process;

• committing to referring for resettlement thousands of additional refugees per month from the Western Hemisphere, with the goal of doubling the number of refugees the United States committed to welcome as part of the Los Angeles Declaration on Migration and Protection (''L.A. Declaration'');

• establishing regional processing centers in key locations throughout the Western Hemisphere to reduce irregular migration;

• launching an aggressive anti-smuggling campaign targeting criminal networks in the Darién Gap and combating smuggler misinformation;

• surging AOs to complete credible fear interviews at the SWB more quickly; and

• ramping up coordination between state and local officials and other federal agencies to provide resources, technical assistance, and support.[33]

These measures will be implemented in close coordination with regional partners, including the governments of Mexico, Canada, Colombia, and Guatemala, as well as the government of Spain.[34]

Available pathways provide lawful, safe, and orderly mechanisms for migrants to enter the United States and make their protection claims. Consistent with the CHNV processes, this rule also imposes consequences on certain noncitizens who fail to avail themselves of the range of lawful, safe, and orderly means for entering the United States and seeking protection in the United States or elsewhere. Specifically, this rule establishes a rebuttable presumption that certain noncitizens who enter the United States without documents sufficient for lawful admission are ineligible for asylum, if they traveled through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, unless they were provided appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process; presented at a POE at a pre-scheduled time or demonstrate that the mechanism for scheduling was not possible to access or use due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or sought asylum or other protection in a country through which they traveled and received a final decision denying that application. Unaccompanied children (''UC'') are excepted from this presumption.[35] This presumption may be rebutted, and would necessarily be rebutted if, at the time of entry, the noncitizen or a member of the noncitizen's family with whom they are travelling had an acute medical emergency, faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder,[36] or satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11(a). The presumption also may be rebutted in other exceptionally compelling circumstances.

The rebuttable presumption is a ''condition[ ]'' on asylum eligibility, INA 208(b)(2)(C) and (d)(5)(B), 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), that applies in affirmative and defensive asylum application merits adjudications, as well as during credible fear screenings. Individuals who are subject to and do not rebut the presumption remain eligible for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (''CAT'').[37]

With the ability to schedule a time and place to arrive at POEs and the availability of other orderly and lawful pathways, this system is designed to (1) protect against an unmanageable flow of migrants arriving at the SWB; (2) further ongoing efforts to share the responsibility of providing asylum and other forms of protection with the United States' regional partners; (3) ensure that those with valid asylum claims have an opportunity to seek protection, whether in the United States or elsewhere; (4) enable the Departments to continue administering the immigration laws fairly and effectively; and (5) reduce the role of exploitative transnational criminal organizations and smugglers.

The rule applies to noncitizens who enter the United States without authorization from Mexico at the southwest land border or adjacent coastal borders on or after the date of termination of the Title 42 public health Order and before a specified date, 24 months from the rule's effective date. However, the rule will continue to apply to such noncitizens who entered the United States during the 24-month time frame in their Title 8 proceedings and in any subsequent asylum applications, except for those applications filed after the two-year period by those who entered the United

request an available time and location to present and be inspected and processed at certain POEs.

[31] Under current employment authorization regulations, there is no waiting period before a noncitizen parolee in this circumstance may apply for employment authorization, except where the noncitizen is in expedited removal proceedings, including after a positive credible fear determination, and paroled from custody. *See* 8 CFR 274a.12(c)(11), 235.3(b)(2)(iii), (b)(4)(ii).

[32] *See* DHS, Fact Sheet, *U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration* [hereinafter DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023)].

[33] *See id.*

[34] *See id.; see also* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023) (committing to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration).

[35] The term ''unaccompanied child'' as used in this rule is the same as ''unaccompanied alien child,'' which is defined at 6 U.S.C. 279(g)(2) to mean ''a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.''

[36] The term ''imminent'' refers to the immediacy of the threat; it makes clear that the threat cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer poses an immediate threat. The term ''extreme'' refers to the seriousness of the threat; the threat needs to be sufficiently grave, such as a threat of rape, kidnapping, torture, or murder, to trigger this ground for rebuttal.

[37] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85, 114.

States as minors and who apply as principal applicants. The Departments intend that the rule will be subject to review to determine whether the entry dates provided in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i) should be extended, modified, or remain as provided in the rule.

*B. Effective Date*

Issuance of this rule is justified in light of the migration patterns witnessed in recent months, and the concern about the possibility of a surge in irregular migration upon, or in anticipation of, the lifting of the Title 42 public health Order. The Departments seek to underscore that migrants will not be able to cross the border without authorization to enter without consequence upon the eventual lifting of the Order. Under this rule, the Departments will use their Title 8 authorities to process, detain, and remove, as appropriate, those who enter the United States from Mexico at the southwest land border or adjacent coastal borders without authorization and do not have a valid protection claim.

The Departments are issuing this rule without the 30-day delayed effective date typically required by the Administrative Procedure Act (''APA'') [38] because the Departments have determined that it is necessary to implement the rule when the Title 42 public health Order is lifted. The lifting of the Order could occur as a result of several different litigation and policy developments, including the vacatur of the preliminary injunction entered in *Louisiana* v. *CDC,* 603 F. Supp. 3d 406 (W.D. La. 2022), *appeal pending,* No. 22–30303 (5th Cir. June 15, 2022); the lifting of the stay entered by the Supreme Court in *Arizona* v. *Mayorkas,* 143 S. Ct. 478 (2022); or ''the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency,'' Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 FR 42828, 42829 (Aug. 5, 2021). The expiration of the declaration by the Secretary of Health and Human Services (''HHS'') that COVID–19 constitutes a public health emergency is expected to occur on May 11, 2023, in light of the recent announcement that ''[a]t present, the Administration's plan is to extend'' the public health emergency to May 11 and then allow it to expire ''on that date.'' [39] The Departments have thus sought to move as expeditiously as possible, while also allowing sufficient time for public comment.

*C. Changes From Proposed Rule to Final Rule*

On February 23, 2023, the Departments issued a notice of proposed rulemaking (''NPRM'' or ''proposed rule'') [40] in anticipation of a potential surge of migration at the SWB following the eventual termination of the CDC's public health Order. Following careful consideration of public comments received, the Departments have made modifications to the regulatory text proposed in the NPRM, as described below. The rationale for the proposed rule and the reasoning provided in the proposed rule preamble remain valid, except as distinguished in this regulatory preamble.

1. Removing Provisions Implementing the Proclamation Bar IFR and the TCT Bar Final Rule

Consistent with the proposed rule, Circumvention of Lawful Pathways, 88 FR 11704, 11727–28 (Feb. 23, 2023), the Departments have added amendatory instructions to remove provisions enacted to implement the bars to asylum eligibility established in an interim final rule (''IFR'') entitled, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) (''Proclamation Bar IFR''), and a final rule entitled, Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) (''TCT Bar Final Rule'').[41]

To remove the provisions enacted to implement the Proclamation Bar IFR and TCT Bar Final Rule, the Departments have made the following changes:

- removed and reserved paragraphs 8 CFR 208.13(c)(3) and 1208.13(c)(3), which previously included the requirements for the Proclamation Bar IFR's applicability;
- removed and reserved paragraphs 8 CFR 208.13(c)(4) and 1208.13(c)(4), which previously included the requirements for the TCT Bar Final Rule's applicability;
- removed and reserved paragraphs 8 CFR 208.13(c)(5) and 1208.13(c)(5), which provided that determinations made with regard to whether an applicant met one of the exceptions to the TCT Bar Final Rule would not bind Federal departments or agencies with respect to certain later adjudications;
- amended 8 CFR 208.30(e)(5) to remove paragraphs (ii) and (iii), which regard application during credible fear of the Proclamation Bar IFR and TCT Bar Final Rule, respectively;
- removed reference to 8 CFR 208.30(e)(5)(ii) through (iv) from what was previously (i) and redesignated (i) as (e)(5);
- amended 8 CFR 1003.42(d) to remove paragraphs (1) and (2) and redesignated paragraph (3) as (d) because paragraphs (d)(1) and (2) provided the standard of review for Proclamation Bar and TCT Bar determinations made during credible fear screenings; and
- removed and reserved 8 CFR 1208.30(g)(1), which provided instructions to IJs regarding the application of the Proclamation Bar and the TCT Bar during credible fear reviews.

2. Applicability of Rebuttable Presumption After the Two-Year Period

The rule applies to certain noncitizens who enter during the two-year period in any asylum application they submit, regardless of when the application is filed or if the noncitizen makes subsequent entries. *See* 8 CFR 208.13(f) (''For applications filed by aliens who entered the United States between May 11, 2023, and May 11, 2025, also refer to the provisions on asylum eligibility described in § 208.33.''); 8 CFR 1208.13(f) (same); 8 CFR 208.33(a)(1), 1208.33(a)(1) (providing that the rebuttable presumption applies to noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission between the effective date and a date 24-months later and after the end of implementation of the Title 42 public health Order with certain exceptions).

[38] *See* 5 U.S.C. 553(d). The Departments further address this requirement in Section VI.A of this preamble.

[39] Office of Mgmt. & Budget, Exec. Office of the President, Statement of Administration Policy (Jan. 30, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf; see also* HHS, *Fact Sheet: COVID–19 Public Health Emergency Transition Roadmap* (Feb. 9, 2023), *https://www.hhs.gov/about/news/2023/02/09/fact-sheet-covid-19-public-health-emergency-transition-roadmap.html* (''Based on current COVID–19 trends, the Department of Health and Human Services (HHS) is planning for the federal Public Health Emergency (PHE) for COVID–19, declared under Section 319 of the Public Health Service (PHS) Act, to expire at the end of the day on May 11, 2023.'').

[40] 88 FR 11704.

[41] The TCT Bar Final Rule amended an earlier IFR on the same topic. *See* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019). The IFR was vacated prior to the issuance of the TCT Bar Final Rule. Additionally, where the Departments refer to the ''Proclamation Bar'' or ''TCT Bar'' without including ''IFR'' or ''Final Rule,'' the Departments are referring to the bars as applied and not to the rulemaking documents that implemented them.

To remove any potential ambiguity regarding the ongoing applicability of the lawful pathways rebuttable presumption, the final rule makes the presumption's ongoing applicability explicit in 8 CFR 208.33(c)(1) and 1208.33(d)(1) by stating that the lawful pathways condition on eligibility shall apply to ''any asylum application'' that is filed by a covered noncitizen ''regardless of when the application is filed and adjudicated.''

The Departments have exempted from this ongoing application of the rebuttable presumption certain noncitizens who enter the United States during the two-year period while under the age of 18 and who later seek asylum as principal applicants after the two-year period. In the NPRM, the Departments requested comment on ''[w]hether any further regulatory provisions should be added or amended to address the application of the rebuttable presumption in adjudications that take place after the rule's sunset date.'' 88 FR at 11708. After reviewing comments raising concerns about the impact of the rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents, the Departments have decided to adopt a provision excepting such children from the rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognize that children who enter with their families are generally traveling due to their parents' decision-making. Exempting children from the rebuttable presumption entirely would mean, under the rule, that all family units that include minor children would also be exempted, which could incentivize families who otherwise would not make the dangerous journey to do so. And if the rule were amended to only exempt the child, it could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening as they would not be subject to the rebuttable presumption but their parents could be.

Although accompanied children remain subject to the rebuttable presumption generally, the Departments have determined that the presumption should not apply to them in any application for asylum they file after the two-year period, but only if they apply as a principal (as opposed to a derivative) applicant. The Departments believe this exception to the general applicability provision balances the interest in ensuring the rebuttable presumption has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the rebuttable presumption, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to all children after the two-year period, even if they applied only as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the two-year period expires, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the presumption entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exemption, in light of the urgent need to disincentivize a further surge in irregular migration.

3. Expansion of Applicability to Adjacent Coastal Borders

As proposed in the NPRM, the rule would apply to certain noncitizens who enter the United States at the SWB—that is, ''along the entirety of the U.S. land border with Mexico.'' 88 FR at 11704 n.1. The Departments received comments that applying the rule only to those who enter the United States from Mexico across the U.S.-Mexico land border would inadvertently incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making a hazardous attempt to reach the United States by sea. In this final rule, the Departments have decided to modify 8 CFR 208.33(a)(1) and 8 CFR 1208.33(a)(1) to provide that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States from Mexico at ''adjacent coastal borders.'' The term ''adjacent coastal borders'' refers to any coastal border at or near the U.S.-Mexico border. This modification therefore means that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States at such a border after traveling from Mexico and who have circumvented the U.S.-Mexico land border.

This modification mirrors the geographic reach of the CDC's Title 42 public health Order, which likewise applied—as relevant here—to certain covered noncitizens traveling from Mexico who would otherwise be introduced into a congregate setting ''at or near the U.S. land and adjacent coastal borders.'' *See* 86 FR at 42841. Because the Title 42 public health Order did not define the phrase ''adjacent coastal borders,'' its meaning was developed during the public health Order's implementation. Specifically, as implemented by CBP, the term ''adjacent coastal borders'' was interpreted to apply to the same population as the Amended CDC Order issued in May 2020, which first introduced the concept of ''coastal'' application. The Amended Order applied to ''persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal POE or Border Patrol station at or near the U.S. border with Canada or Mexico, subject to exceptions.''[42] With regard to persons traveling from Mexico, in line with the interpretation above, CBP implemented the Title 42 public health Order as covering any coastal border adjacent to the U.S.-Mexico border reached by an individual traveling from Mexico and landing within the United States having circumvented the U.S.-Mexico land border. Applying the same geographic reach that has been applied by CBP for the past three years to this rule will avoid the risk that smugglers would exploit what could be perceived as a new ''loophole'' following the lifting of the Title 42 public health Order to persuade migrants to make a perilous crossing to the United States from Mexico by sea. In DHS's experience, that risk may well materialize, as smugglers routinely prey on migrants using perceived changes in U.S. immigration law.[43] Any such campaign by smugglers to persuade more migrants to circumvent the land border would result in life-threatening risks for migrants and DHS personnel, given the elevated danger associated with maritime crossings. As just one example of how dangerous such attempts can be, the Departments note that in March 2023, two suspected human smuggling boats from Mexico capsized and eight

[42] *See* Amendment and Extension of Order Under Sections 362 and 365 of the Public Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020); CBP, CBP COVID–19 Response: Suspension of Entries and Imports Concept of Operations 1–3 (May 20, 2020), *https://www.cbp.gov/document/foia-record/title-42*.

[43] *See* Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media* (''A review of social media groups and pages identified by migrants showed . . . dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules, and baseless rumors about changes to immigration law.'').

people died off the coast near San Diego, California.[44] This incident, as well as the increases in maritime migration over the past few years, as discussed further in Section V of this preamble, and commenters' concerns that the NPRM would have encouraged migration by sea, as discussed further in Section IV.B.8.i of this preamble, have led the Departments to extend the rebuttable presumption to the adjacent coastal borders. Specifically, in the interest of ensuring that this rule is not used to encourage intending migrants to undertake attempts that could end in similar tragedies, the Departments believe it is important that the text of 8 CFR 208.33(a)(1) and 8 CFR 1208.33(a)(1) make clear that the rule's presumption applies equally to noncitizens who arrive from Mexico on coasts adjacent to the southwest land border.

4. Clarification of Meaning of ''Final Decision''

As was proposed in the NPRM, the rule excepts from the rebuttable presumption noncitizens who sought asylum or other protection in another country through which they traveled and received a ''final decision'' denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments have amended this paragraph to further define what constitutes a ''final decision'' for the purposes of this exception. With this change, the final rule specifies that a ''final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim.'' *Id.* The provision further states that a ''final decision does not include a determination by a foreign government that the noncitizen abandoned the claim.'' *Id.* The Departments have made this change in response to comments, as discussed below, and to provide clarity that a noncitizen must in fact pursue the claim since a denial based on abandonment would be insufficient.

[44] *See* Karen Kucher et al., *8 Reported Dead After 2 Suspected Smuggling Boats Crash at Black's Beach in San Diego,* L.A. Times, Mar. 12, 2023, *https://www.latimes.com/california/story/2023-03-12/8-reported-dead-after-2-suspected-smuggling-boats-crash-at-blacks-beach-in-san-diego;* Wendy Fry, *An Endless Fight: As Border Infrastructure on Land Improves, Smugglers Take to the Water,* San Diego Tribune, Nov. 6, 2019, *https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-11-06/an-endless-fight-as-border-infrastructure-on-land-improves-smugglers-take-to-the-water.*

5. Exception for Unaccompanied Children

The NPRM provided that ''[u]naccompanied alien children, as defined in 6 U.S.C. 279(g)(2), are not subject to paragraph (a)(1) of this section.'' *See* 88 FR at 11750–51 (proposed 8 CFR 208.33(b), 1208.33(b)). The Departments have modified the proposed language to explicitly state that this exception applies to noncitizens who were UCs at the time of entry.[45] 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i).

This added language makes clear that the UC exception aligns with other exceptions in this rule, which are based upon conditions at the time of a noncitizen's presentation at a POE, *see* 8 CFR 208.33(a)(2), 1208.33(a)(2), and more closely aligns the regulatory text with the Departments' stated purpose in the NPRM that ''unaccompanied children would be categorically excepted from the rebuttable presumption,'' 88 FR at 11724.

6. Expansion of Family Unity Provision

The NPRM provided that where a principal applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. *See* 88 FR at 11752 (proposed 8 CFR 1208.33(d)). Commenters raised concerns that excluding asylum applicants who travel without their families may inadvertently incentivize families to engage in irregular migration together so as not to risk that the principal applicant would be prevented from later applying for their family members to join them. This could involve making a dangerous journey with vulnerable family members, such as children. Accordingly, as discussed in Section IV.E.7.ii of this preamble, in response to these comments, the Departments have expanded the provision to also cover principal asylum applicants who have a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A). *See* 8 CFR 1208.33(c).

[45] Numerous commenters recognized that the NPRM proposed an exception for UCs, but did not indicate a clear understanding of whether this exception applied to those who were UCs at the time of entry or at the time of adjudication.

7. Other Changes

In addition to the changes this final rule makes to the NPRM detailed above, this final rule also makes other changes to the regulatory text set out in the NPRM.

First, the Departments have reorganized and made other edits to proposed 8 CFR 208.33(a) and 1208.33(a) to improve clarity for noncitizens, counsel appearing before the Departments, other members of the public, and adjudicators. For example, the Departments added the exception for unaccompanied children to 8 CFR 208.33(a)(2)(i) and 1208.33(a)(2)(i) rather than maintaining it as a standalone paragraph at 8 CFR 208.33(b) and 1208.33(b). Similarly, the Departments added headings and additional guideposts within 8 CFR 208.33(a) and 1208.33(a). Second, the Departments revised 8 CFR 208.33 and 1208.33 to move instructions from 8 CFR 208.33 to 8 CFR 1208.33 regarding IJ review that are better placed in EOIR's regulations. For example, the Departments removed the sentence at proposed 8 CFR 208.33(c)(2)(ii) stating that noncitizens may apply for asylum, withholding of removal, and protection under the CAT in removal proceedings and included that at new 8 CFR 1208.33(b)(4). These revisions do not change the meaning of those provisions.

*D. Rule Provisions*

The rule contains the following key provisions:

- The rule imposes a rebuttable presumption of ineligibility for asylum upon certain noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in INA 212(a)(7), 8 U.S.C. 1182(a)(7). *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). The rebuttable presumption applies to only those noncitizens whose entry was (1) between May 11, 2023 and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order; and (3) after the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention'') or 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 (''Refugee Protocol''). *See* 8 CFR 208.33(a)(1)(i) through (iii), 1208.33(a)(1)(i) through (iii).

• The rule excepts from the rebuttable presumption any noncitizen who is an unaccompanied child as defined in 6 U.S.C. 279(g)(2). *See* 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i).

• The rule also excepts from the rebuttable presumption a noncitizen if the noncitizen or a member of the noncitizen's family with whom the noncitizen is traveling (1) was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE, pursuant to a pre-scheduled time and place, or presented at a POE without a pre-scheduled time and place, if the noncitizen demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See id.* 208.33(a)(2)(ii), 1208.33(a)(2)(ii).

• The rule allows a noncitizen to rebut the presumption by demonstrating by a preponderance of the evidence that exceptionally compelling circumstances exist. A noncitizen necessarily rebuts the presumption if they demonstrate by a preponderance of the evidence that the noncitizen, or a member of the noncitizen's family with whom the noncitizen is traveling, (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11(a). *See id.* 208.33(a)(3), 1208.33(a)(3). In addition, as a measure to ensure family unity, the rule provides that in removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a (''section 240 removal proceedings''), where a principal asylum applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the rebuttable presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal or where the principal asylum applicant has a spouse or child who would be eligible to follow to join them if they are granted asylum, as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the presumption is deemed rebutted as an exceptionally compelling circumstance. *See* 8 CFR 1208.33(c).

• The rule establishes procedures, applicable in the expedited removal context, under which AOs will determine whether the noncitizen has made a sufficient showing that the rebuttable presumption does not apply or that they meet an exception to or can rebut the presumption. *See id.* 208.33(b). If the AO determines that the rebuttable presumption does not apply or the noncitizen falls within an exception or has rebutted the presumption, the general procedures in 8 CFR 208.30 apply. *See id.* 208.33(b)(1)(ii). On the other hand, if the AO determines that the rebuttable presumption does apply and no exception or rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See id.* 208.33(b)(1)(i), 208.33(b)(2).

• The rule provides that an AO's adverse determination as to the applicability of the rebuttable presumption, whether an exception applies or the presumption has been rebutted, and whether the noncitizen has established a reasonable possibility of persecution or torture, are all subject to de novo IJ review. *See id.* 208.33(b)(2)(iii) through (v), 1208.33(b). The noncitizen must request such review by so indicating on a Record of Negative Fear Finding and Request for Review by Immigration Judge. *See id.* 208.33(b)(2)(iv) and (v), 1208.33(b)(1).

• The rule establishes procedures for such IJ review. Specifically, if the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they meet an exception to or can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT withholding, the IJ issues a positive credible fear finding and the case proceeds under existing procedures at 8 CFR 1208.30(g)(2)(iv)(B). *See id.* 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the rebuttable presumption applies and has not been rebutted and no exception is applicable, but the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal, the IJ will issue a positive credible fear finding and DHS will issue a Form I–862, Notice to Appear, to commence section 240 removal proceedings. *See id.* 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See id.* 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that U.S. Citizenship and Immigration Services (''USCIS'') reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See id.* 208.33(b)(2)(v)(C).

• The rule provides that a noncitizen who is found to be subject to the lawful pathways condition during expedited removal proceedings may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible during those removal proceedings. *See id.* 1208.33(b)(4).

• The rule declines to adopt the Proclamation Bar IFR on a permanent basis and removes the language effectuating the Proclamation Bar. Specifically, the rule removes and reserves paragraphs 8 CFR 208.13(c)(3) and 1208.13(c)(3), which previously included the requirements for the bar's applicability.

• The rule removes regulatory provisions implementing the TCT Bar Final Rule. The rule removes and reserves paragraphs 8 CFR 208.13(c)(4) and 1208.13(c)(4), which previously included the requirements for the TCT Bar Final Rule's applicability. The rule also removes and reserves paragraphs 8 CFR 208.13(c)(5) and 1208.13(c)(5), which provided that determinations made with regard to whether an applicant met one of the exceptions to the TCT Bar Final Rule would not bind Federal departments or agencies with respect to certain later adjudications. Given the removal of the TCT Bar Final Rule and its implementing provisions, these provisions are no longer necessary.

• The rule also amends the CFR to remove provisions implementing the Proclamation Bar IFR and TCT Bar Final Rule during the credible fear process. The rule removes 8 CFR 208.30(e)(5)(ii) and (iii), which implemented the Proclamation Bar IFR and TCT Bar Final Rule, respectively. The rule also removes reference to (ii) though (iv) from what was previously (i) and redesignates (i) as (e)(5). Similarly, the rule also amends provisions relating to IJ standard of review for Proclamation Bar and TCT Bar determinations by removing 8 CFR 1003.42(d)(2) and (3), and redesignates 8 CFR 1003.42(d)(1) as paragraph (d). Finally, the rule removes and reserves 8 CFR 1208.30(g)(1), which provided instructions to IJs regarding the application of the Proclamation Bar

and the TCT Bar during credible fear reviews.

• The rule contains a special provision providing that the rebuttable presumption does not apply to an asylum application filed after May 11, 2025, if the noncitizen was under the age of 18 at the time of entry, and the noncitizen is applying for asylum as a principal applicant. *See id.* 208.33(c)(2), 1208.33(d)(2).

• The rule contains a severability clause reflecting the Departments' intention that the rule's provisions be severable from each other in the event that any aspect of the new provisions governing the rebuttable presumption is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance. *See id.* 208.33(d), 1208.33(e).

### III. Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning asylum, statutory withholding of removal, and CAT determinations. The Homeland Security Act of 2002 (''HSA''), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the administration and enforcement of Federal immigration law while maintaining many functions and authorities with the Attorney General, including concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary ''with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens,'' except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions ''necessary for carrying out'' the Secretary's authority under the immigration laws, INA 103(a)(1) and (3), 8 U.S.C. 1103(a)(1) and (3); *see also* 6 U.S.C. 202.

The HSA charges the Attorney General with ''such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to [EOIR].'' INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to ''establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out'' his authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings. These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521; INA 103(g), 8 U.S.C. 1103(g). With limited exceptions, IJs within DOJ adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (''BIA''), also within DOJ, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1) and (b)(3); *see also Garland* v. *Ming Dai,* 141 S. Ct. 1669, 1677–78 (2021) (describing appeals from IJ to BIA). In addition, the INA provides that the ''determination and ruling by the Attorney General with respect to all questions of law shall be controlling.'' INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities. Section 208 of the INA, 8 U.S.C. 1158, authorizes the ''Secretary of Homeland Security or the Attorney General'' to ''grant asylum'' to a noncitizen ''who has applied for asylum in accordance with the requirements and procedures established by'' the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a refugee. INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to ''establish[ ]'' ''requirements and procedures'' to govern asylum applications. *Id.* The statute further authorizes them to ''establish,'' ''by regulation,'' ''additional limitations and conditions, consistent with'' section 208, under which a noncitizen ''shall be ineligible for asylum.'' INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to ''provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]'').[46] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and to establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and USCIS AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning (''refouler'') ''a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.'' 120%

Congress codified these obligations in the Refugee Act of 1980, creating the precursor to what is now known as statutory withholding of removal.[47] The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the

[46] Under the HSA, the references to the ''Attorney General'' in the INA also encompass the Secretary, either solely or additionally, with respect to statutory authorities vested in the Secretary in the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 557.

[47] Public Law 96–212, 94 Stat. 102 (''Refugee Act'').

Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[48] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1) and (3), (g)(1) and (2), 8 U.S.C. 1103(a)(1) and (3), (g)(1) and (2).

The Departments also have authority to implement Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994). The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA'') provides the Departments with the authority to ''prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note). DHS and DOJ have implemented the United States' obligations under Article 3 of the CAT in the CFR, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c) through 208.18, 1208.16(c) through 1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

This rule does not change the eligibility requirements for statutory withholding of removal or CAT protection. As further discussed below, the rule applies a ''reasonable possibility'' standard in screenings for statutory withholding of removal and CAT protection in cases where the presumption of asylum ineligibility is applied and not rebutted. While the application of this standard is a change from the prior practice in the expedited removal context, it is the same standard used in protection screenings in other contexts and is consistent with both domestic and international law. *See* 8 CFR 208.31.

## IV. Public Comments and Responses

The Departments received 51,952 comments on the proposed rule, the majority of which expressed opposition to the proposal. A range of governmental and non-governmental entities, public officials, and private persons submitted comments. The Departments summarize and respond to the public comments below.

### *A. General Support*

#### 1. General Support

*Comment:* Many commenters stated their support for the rule overall. Commenters emphasized the importance of border security, stating that the Government must do what is necessary to both manage workloads at the border and stop migrants from entering the United States without permission.

*Response:* Promulgation of this rule is needed because, once the Title 42 public health Order is lifted, the number of migrants traveling to the United States without authorization is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. Such a surge would also place additional pressure on States, local communities, and non-governmental organization (''NGO'') partners both along the border and in the interior of the United States.

To address these issues, the rule imposes a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States outside of safe, orderly, and lawful pathways and without first seeking protection in a third country they have traveled through en route to the SWB, during a designated period of time. The rule (1) incentivizes the use of multiple existing lawful, safe, and orderly means for noncitizens to enter the United States to seek asylum and other forms of protection; (2) continues to provide core protections for noncitizens who would be threatened with persecution or torture in other countries; and (3) builds upon ongoing efforts to share the responsibility of providing asylum and other forms of protection to deserving migrants with the United States' regional partners.

The successful implementation of the CHNV parole processes has demonstrated that an increase in lawful pathways, when paired with consequences for migrants who do not avail themselves of such pathways, can incentivize the use of such pathways and undermine transnational criminal organizations, such as smuggling operations. The rule, which is fully consistent with domestic and international legal obligations, provides the necessary consequences to maintain this incentive under Title 8 authorities. In short, the Departments expect the rule, coupled with an expansion of lawful, safe, and orderly pathways, to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States.

The benefits of reducing the number of encounters include protecting against overcrowding in border facilities; allowing for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and helping to reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain. Even where the rule applies, the presumption against asylum eligibility may be rebutted in certain circumstances, such as where, at the time of the noncitizen's entry into the United States, they or a family member with whom they are traveling are experiencing an acute medical emergency or an extreme and imminent threat to life or safety, or are a victim of a severe form of trafficking. Moreover, DHS will still screen migrants who cannot overcome the rebuttable presumption to determine if the migrant has established a reasonable possibility of persecution for the purposes of statutory withholding of removal or a reasonable possibility of torture for the purposes of protection under the regulations implementing the CAT. *See* 8 CFR 208.33(b)(2)(i). Should a migrant receive a negative credible fear determination, they can also seek review of the determination by an IJ. *See* 8 CFR 208.33(b)(2)(iii) through (v). Those who are found to have credible fear due to a reasonable possibility of persecution or torture will then have the opportunity for further consideration of their protection claims via a section 240 removal proceeding. *See* 8 CFR 208.33(b)(2)(ii).

#### 2. Need, Effectiveness, and Rationale for the Rule

*Comment:* Commenters described the rule as a common-sense approach to managing migration at the border and

[48] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation and Article 34's call to ''facilitate the assimilation and naturalization of refugees,'' which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.'').

discouraging illegal migration, while others stated that the rule would contribute to the ''rule of law'' at the border. Other commenters noted that a change such as that made by this rule is necessary, as it is simply impossible to admit all migrants who want to enter the United States. Some commenters stated that the rule is a reasonable solution until Congress can take legislative action to address the issue. Other commenters supported the rule's encouragement for migrants to first seek protection in third countries they pass through before requesting asylum at the SWB and asserted that such a requirement is standard in international law; commenters further stated that the rule would discourage ''asylum shoppers.'' Commenters stated that allowing migrants to cross multiple countries en route to the United States before claiming asylum defeats the true purpose of asylum. Some commenters stated that migrants know that claiming asylum allows them entry into the United States, and thus take advantage of the process.

*Response:* As noted above, the Departments have designed this rule in response to the number of migrants expected to travel without authorization to the United States after the lifting of the Title 42 public health Order, absent a policy change such as this one. In that case, the circumstances likely to occur include the following: an additional number of migrants anticipated to arrive at the border; the severe strain on resources that this influx of migrants would cause DHS; and a substantial resulting impact on U.S. Government operations, as well as local communities. DHS's successful Uniting for Ukraine (''U4U'') and CHNV parole processes—under which DHS coupled a mechanism for noncitizens from these countries to seek entry to the United States in a lawful, safe, and orderly manner with the imposition of new consequences for those who cross the SWB without authorization—have demonstrated that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can incentivize the use of lawful pathways and undermine transnational criminal organizations, such as smuggling operations. The Departments expect similar benefits from this rule, especially a reduced number of encounters at the border, which will help to protect against overcrowding in border facilities; allow for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain.

The Departments designed the rule to strike a balance that maintains safe and humane processing of migrants while also including safeguards to protect especially vulnerable individuals. The rule provides exceptions to the rebuttable presumption and allows migrants to rebut the presumption in exceptionally compelling circumstances. These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT. In addition, to further aid migrants, the Departments plan to continue to work with foreign partners to expand lawful pathways for migration, as well as expand the Departments' mechanisms for lawful processing. Thus, the rule will disincentivize irregular migration and instead incentivize migrants—including those intending to seek asylum—to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel.

3. Mitigate Irregular Migration and the Associated Impacts

*Comment:* Many commenters expressed support for the rule for a variety of reasons. Commenters supported the change in policy, noting that this rule would result in a more efficient use of government resources at the border. Commenters also supported the proposed rule's use of a formal process for asylum applicants. Some commenters stated their support for the rule because the journey to the SWB is dangerous due to harsh conditions and smugglers, and this rule would weaken smugglers and transnational criminal enterprises and reduce their exploitation of migrants. Commenters also stated that incentivizing migrants to present themselves at POEs would reduce their risk of exploitation by human traffickers or other harm when attempting to cross between POEs. Commenters commended the Departments for prioritizing safe and orderly processing methods for those seeking refuge. Some commenters indicated that border security is critical and expressed concerns that malicious actors could enter the United States more easily during a surge in migration.

*Response:* The Departments recognize these commenters' support for the rule and agree that maintaining border security is critical. The Departments agree that irregular migration is dangerous and can lead to increased strain on SWB operations and resources, increased illegal smuggling activity, and increased pressure on communities along the SWB. The United States has taken several measures to meet the influx of migrants crossing the SWB and is taking new steps to address increased flows throughout the Western Hemisphere.[49]

However, the anticipated increase in the number of migrants following the lifting of the Title 42 public health Order threatens to exceed the Departments' capacity to safely and humanely process migrants. By coupling the rule with additional lawful pathways and allowing migrants to schedule their arrival at a SWB POE, currently via the CBP One app, the rule will reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States. This reduction will protect against overcrowding in border facilities; allow for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and help to reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain. The Departments expect that this rule will result in decreased strain on border states, local communities, and NGOs and, accordingly, allow them to better absorb releases from CBP border facilities and provide support to the migrant community. Ultimately, this rule will disincentivize irregular migration and instead incentivize migrants to use safe, orderly, and lawful pathways to the United States or to seek protection in third countries.

4. Positive Impacts on Operations and Resources

*Comment:* Commenters supported the rule, stating that allowing migrants to remain in the United States at the government's expense while waiting for their asylum claim to be adjudicated is a waste of government resources. Commenters said that the rule—specifically when coupled with the expanded use of the CBP One app and the ability for migrants to schedule appointments—would allow for more efficient processing at the SWB. Commenters stated that, by decreasing

[49] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

the number of migrants seeking asylum, the Departments would adjudicate asylum claims much faster and decrease the amount of time migrants must wait in the United States before receiving a final decision in their case.

*Response:* The Departments recognize these commenters' support and agree that the rule will have benefits for both those granted asylum and the U.S. immigration system. The rule encourages noncitizens to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule is designed to channel the high numbers of migrants expected to seek protection in the United States following the termination of the Title 42 public health Order into lawful, safe, and orderly pathways and ensure they can be processed in an effective, humane, and efficient manner. In addition, the Departments anticipate that the use of the CBP One app—the current scheduling mechanism that provides migrants with a means to schedule a time and place to present themselves at a SWB POE—will allow CBP to streamline the processing of noncitizens at POEs on the SWB and process significantly more individuals in a safe and orderly manner.

Adjudication on the merits of an asylum claim for those who establish credible fear and are placed into removal proceedings can be a long process. Thirty-eight percent of all noncitizens who entered along the SWB, received a positive credible fear determination, and were placed into proceedings before EOIR between FY 2014 and FY 2019 remained in EOIR proceedings as of December 31, 2022.[50] Further, almost half (47 percent) of those in EOIR cases who received positive credible fear determinations resulting from FY 2019 encounters (referrals to EOIR) remained in proceedings as of December 31, 2022.[51] Excluding *in absentia* orders, the mean completion time for EOIR cases in FY 2022 was 3.7 years.[52] Thus, those who have a valid claim to asylum in the United States often wait years for a final relief or protection decision; likewise, noncitizens who will ultimately be found ineligible for asylum or other protection—which occurs in the majority of cases—often have spent many years in the United States prior to being ordered removed.

[50] *See* OIS analysis of OIS Enforcement Lifecycle data based on data through December 31, 2022.

[51] *Id.*

[52] *See* OIS analysis of DOJ EOIR data based on data through March 31, 2023.

This lengthy adjudications process means that migrants who can establish credible fear can expect to remain in the United States for an extended period regardless of whether they will ultimately obtain asylum status at an EOIR hearing on the merits. Allowing a migrant to remain in the United States for years before ultimately determining the migrant is ineligible for asylum or other protection is inefficient, risks creating a pull factor for other intending migrants, and runs counter to principles of judicial fairness, including the swift adjudication of claims. As discussed in the NPRM, *see* 88 FR at 11737, and below at Section IV.B.2 of this preamble, the Departments have determined that this rule will lead to increased efficiencies in the asylum adjudications process so that claims can be adjudicated without a lengthy delay.

5. Other Support

*Comment:* Commenters agreed that the Departments have the legal authority to restrict asylum eligibility based on a migrant's failure to seek protection in a third country that they have traveled through on route to the SWB and that such a policy is consistent with both domestic and international law. Commenters stated that the rule was necessary because most migrants do not have legitimate asylum claims, noting low grant rates by EOIR, and are instead seeking economic opportunities in the United States. Other commenters expressed general support for the rule and stated a belief that asylum seekers do not have legitimate claims because they may be coached by NGOs or other organizations.At least one commenter stated that if a migrant traveled through a third country with a legitimate asylum process on their way to the United States, DHS should assume that the migrant is not really in fear for their life; otherwise, the U.S. asylum system would be used for economic migration, the demand for which should be addressed by other means. Another commenter said that the proposed rule encourages asylum-seekers to use the ''front door'' by presenting at POEs and fulfills domestic and international legal obligations by removing eligibility for asylum for those who fail to do so while maintaining access to statutory withholding of removal and protection under the CAT. The commenter noted that countries are within their rights to limit access to asylum. The commenter also stated that many individuals are barred from asylum eligibility for reasons such as fraud, criminal convictions, and illegal reentry, and that the proposed rule would add those who do not avail themselves of asylum in the nearest country and do not apply at a POE to this list, which should limit further unlawful entries and use of government resources. Some commenters supported the rule and suggested that the Government disseminate information about the rule in other countries to ensure migrants planning to seek asylum are aware of both the asylum process and the consequences of non-compliance.

*Response:* As discussed further below in Section IV.B.D, the Departments agree that the rule is consistent with U.S. obligations under both domestic and international law, including the INA; the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. While the Departments appreciate these commenters' support for the rule, the Departments emphasize that this rule is necessary to prevent the expected increase in the number of migrants who would otherwise seek to travel without authorization to the United States after the termination of the Title 42 public health Order, which would risk undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. In other words, the Departments do not rely on the alternative goals or bases of support for the rule expressed in the comments summarized above.

The Departments appreciate the importance of disseminating information about the rule to the public, including intending migrants, and are planning a robust communication effort in conjunction with and immediately following the publication of this rule.

### *B. General Opposition*

1. General Opposition

*Comment:* The Departments received many comments expressing general opposition to the rule. Some commenters expressed opposition to the rule and encouraged the Administration to withdraw it, without further explanation. Commenters also stated, without explanation, that the rule would allow future administrations the ability to decide which nationalities are afforded protections, instead of making protections available for everyone in need. Other commenters stated the rule creates barriers, not pathways, for asylum seekers.

*Response:* The Departments take seriously the concerns expressed by commenters who generally oppose the rule. Because some of these comments failed to articulate specific reasoning underlying the general opposition, the

Departments are unable to provide a more detailed response to those comments. In general, the Departments emphasize that this rule is necessary to ensure that, after the lifting of the Title 42 public health Order, protection claims made by noncitizens encountered at the SWB can be processed in a manner that is effective, humane, and efficient. The rule is also designed to reduce overcrowding at DHS facilities and reduce migrants' reliance on exploitive smuggling networks. The Departments intend this rule to work in conjunction with other initiatives that expand lawful pathways to enter the United States, and thereby incentivize safe, orderly, lawful migration over dangerous, irregular forms of migration. Although some lawful pathways, which exist separate from this rule, are available only to particular nationalities, this rule does not deny protection on the basis of nationality. A noncitizen of any nationality may avoid the rebuttable presumption by, for instance, presenting at a POE pursuant to a pre-scheduled time and place. As discussed in the NPRM and further below, the rule's presumption against asylum eligibility only applies to those who enter during a 2-year period, is rebuttable, and contains multiple exceptions to prevent undue harm to noncitizens with meritorious protection claims.

2. Need, Effectiveness, and Rationale for the Rule

*Comment:* Commenters asserted that the Departments' concerns about a future surge of migration after the end of the Title 42 public health Order are speculative and unsupported. One commenter said that the surge numbers were unreliable at best, that entries between POEs were higher two decades ago, and that the surge could in part be the result of attempted suppression of normal migration. Some commenters questioned the Departments' planning projection of the number of border encounters it expects when the Title 42 public health Order is lifted as a valid justification of the NPRM. Another commenter stated that the numbers of unauthorized unique individuals detained at the border are far from an all-time high or a record, and that attempts to enter the country undetected have plummeted. One commenter stated that the Title 42 public health Order increased the percentage of individuals attempting repeated crossings at the border, which has artificially inflated CBP's border apprehension statistics, and thereby overstated the scale of the problem at the border. Some commenters stated that the public is unable to properly evaluate the Departments' data used to justify the rule because the ''DHS SWB Encounter Planning Model generated January 6, 2023'' cited in the NPRM, *e.g.,* 88 FR at 11705 n.11, does not have a link to the model and it does not provide information on methodology, data sources, and alternative figures.

*Response:* The Departments strongly disagree that the concerns stated in the NPRM regarding an ongoing and potential further surge of migration are speculative or unsupported. As noted in the NPRM, for the 30 days ending December 24, 2022, total daily encounters along the SWB consistently fluctuated between approximately 7,100 and 9,700 per day, averaging approximately 8,500 per day, with encounters exceeding 9,000 per day on 12 different occasions during this 30-day stretch.[53] 88 FR at 11704–05. While commenters are correct that the Title 42 public health Order has increased the percentage of repeat crossing attempts relative to the 2010s, since 2022 over 97 percent of extra-regional migrants (*i.e.,* migrants not from Mexico or Northern Central America [54])—the people representing the greatest processing challenge—are unique encounters.[55] Encounter totals reached an all-time high in FY 2022, and they remain at historically high levels even as encounters of CHNV nationals have fallen in recent months.[56]

OIS leads an interagency working group that produces a roughly bi-weekly SWB encounter projection used for operational planning, policy development, and short-term budget planning. The model used to produce encounter projections every two to four weeks is a mixed-method approach that combines a statistical predictive model with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed methods approach blends multiple types of models through an ensemble approach of model averaging.[57] The model includes encounter data disaggregated by country and demographic characteristics going back to FY 2013, data on apprehensions of third country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, including ''moderately-high'' planning models that are based on the 68 percent upper bound of the forecast interval and ''high'' planning models based on the 95 percent upper bound of the forecast interval.

Encounter projections are, of course, subject to some degree of uncertainty. International migration is an exceedingly complex process shaped by family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks, among other factors. Recent unprecedented changes in migration flows have further complicated the task of predicting future migration flows with precision. As recently as the 2000s, unauthorized migration to the SWB consisted almost entirely of single adults from Mexico.[58] Families and UCs accounted for increasing shares of unauthorized migrants in the 2010s, as did migrants from Northern Central America; and ''extra-regional'' migrants have driven increased flows in the 2020s, accounting for an absolute majority of encounters in FY 2023

[53] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[54] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[55] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[56] Concrete data on unique versus repeat encounters are only available since 2010. During that period, for the years prior to the implementation of Title 42 expulsions, the percentage of encounters that were unique increased each year from 2010–2019. OIS analysis of OIS Persist Dataset based on data through March 31, 2023. While specific data on numbers of unique encounters are not available prior to 2010, it is widely accepted that the years before the 2010, and particularly the years before 2000, were characterized by much larger numbers of repeat encounters, as most encounters were of Mexican nationals who were permitted to return to Mexico without being subject to formal removal proceedings or other enforcement consequences. *See also* DHS, *FY 2021 Border Security Metrics Report* (Apr. 27, 2022), *https://www.dhs.gov/immigration-statistics/border-security/border-security-metrics-report.*

[57] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.,* Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art,* 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has ''stood the test of time [that] combining forecasts improves [forecast] accuracy''); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change,* Nat. Hum. Behaviour, Feb. 9, 2023, *https://doi.org/10.1038/s41562-022-01517-1* (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and multidisciplinary team members).

[58] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 97 percent of all administrative arrests by the legacy Immigration and Nationality Service from 1981–1999. According to OIS Production data, Mexican nationals also accounted for 97 percent of SWB encounters from 2000–2003. Mexico's share of SWB border encounters fell to 94 percent in 2004, an all-time low, then averaged 91 percent for the remainder of the 2000s. OIS analysis of OIS Yearbook on Immigration Statistics, 1981–1999; OIS Production Data, 2000–2009.

YTD.[59] The OIS working group takes these recent changes in migration flows into account in preparing its roughly bi-weekly encounter projection models.

Demographic changes in migration flows have introduced new challenges in the field of border enforcement. For decades the challenge was to detect and interdict Mexican nationals seeking to evade detection and to return them to Mexico, which generally was cooperative in accepting back its nationals across the land border. Today's set of challenges is broader; the United States Government must humanely process family units and UCs and consider tens of thousands of asylum claims, granting relief or protection where appropriate and imposing enforcement consequences (such as removal or return, and in some cases criminal charges), all with limited processing resources and challenges relating to barriers to repatriations for nationals from certain countries. These changes have significant implications, requiring substantial resources from CBP, ICE, USCIS, EOIR, and HHS.

An additional consideration in how the Departments utilize encounter projections for operational planning and budgeting is that it takes weeks or months to put new enforcement resources in place, while removing such resources takes much less time. For this reason, DHS generally must be conservative in its enforcement planning because the failure to have adequate resources in place at the start of a migration surge risks vicious cycles in which inadequate capacity to implement critically needed tools to disincentivize irregular migration, coupled with persistent and strong ''push factors,'' contribute to cascading adverse effects as the enforcement system becomes overwhelmed. Such effects include overcrowding in DHS facilities (which can endanger both migrants and DHS personnel), more noncitizens being released into the interior pending immigration proceedings, and additional flows of migrants. In the current context of added uncertainty in the encounter projection and evolving enforcement challenges, DHS focuses its operational planning efforts on the high and moderately-high planning models rather than planning for an optimistic scenario that could leave enforcement efforts badly under-resourced. As for this policymaking effort, the Departments believe the policies in this rule are justified ''in light of the migration patterns witnessed in late November and December of 2022, and the concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order.'' 88 FR at 11708.

With respect to the suggestion that the Departments should have subjected the OIS planning model to more detailed review by commenters, the Departments respectfully disagree. In addition to the Departments' description of the planning model in the NPRM, *see* 88 FR at 11705 n.11, the Departments presented a range of the underlying data clearly demonstrating the scope of the problem the Departments face. *See, e.g.*, 88 FR at 11704–05 (''For the 30 days ending December 24, 2022, total daily encounters along the SWB consistently fluctuated between approximately 7,100 and 9,700 per day, averaging approximately 8,500 per day, with encounters exceeding 9,000 per day on 12 different occasions during this 30-day stretch''); *id.* at 11708–14 (describing the historically unique nature of current migratory trends and the role of shifting demographics and other factors on these trends). Although the Departments did not describe the planning models in minute detail, the data make clear the basis for the proposed rule and no commenters submitted data suggesting that the Departments do not currently face, and will not imminently face, an urgent circumstance requiring a policy response.

*Comment:* One commenter stated that concerns that NGOs and shelter networks have or are close to reaching their ''outer limit'' of capacity are unfounded, because according to the commenter, none of the $800 million newly allocated for humanitarian reception had been distributed as of the NPRM's publication in late February of this year. The commenter wrote that there are numerous ways that the Administration can work with Congress and NGO partners to continue to build shelter capacity and effectively respond to the needs of arriving migrants and asylum seekers. Similarly, a commenter noted that the Government pays private, for-profit detention facilities $320/day to detain noncitizens, but only pays shelters $25 for a single bed. The commenter wrote that they had been asking the Government for more than two years to provide more funding to shelters and increase cooperation with NGOs, to no avail.

*Response:* The Departments acknowledge commenters' concerns about funds dedicated for NGOs and shelter networks as they work to respond to migratory flows and note that one expected effect of this rule is to disincentivize irregular migration, which may in turn result in reduced demand for certain NGO and shelter services. With respect to grant funding generally, as noted in the NPRM, the Federal Emergency Management Agency (''FEMA'') spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the Emergency Food and Shelter Program—Humanitarian (''EFSP–H'') to assist migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 11714. In November 2022, FEMA released $75 million through the program, consistent with the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023.[60] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[61] On February 28, 2023, DHS announced a $350 million funding opportunity for EFSP–H.[62] This is the first major portion of funding that is being allocated for humanitarian assistance under the Omnibus funding

[59] Families and unaccompanied children accounted for an estimated 11 percent of SWB encounters in 2013, rising to 62 percent in 2019, and have averaged 30 percent from 2020 through March 2023. Data on unaccompanied children were first collected in 2008 and data on other family statuses were first collected in 2013, but not universally collected until 2016. Mexican nationals accounted for an average of 57 percent of SWB encounters from 2013–2015, fell to an all-time low of 24 percent in 2019 (when Northern Central Americans accounted for 64 percent of the total), and have averaged 35 percent of encounters from 2021 through March 2023. Extra regional nationals accounted for an average of 9 percent of SWB encounters from 2013–2018, 12 percent from 2019–2020, and account for 52 percent in the first six months of FY 2023. OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[60] Public Law 117–180, Division A, Sec. 101(6), Continuing Appropriations Act, 2023.

[61] Public Law 117–328, Division F, Title II, Security Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support.

[62] *See* DHS, Press Release, *The Department of Homeland Security Awards $350 Million for Humanitarian Assistance Through the Emergency Food and Shelter Program* (Feb. 28, 2023), *https://www.dhs.gov/news/2023/02/28/department-homeland-security-awards-350-million-humanitarian-assistance-through;* DHS Grant Opportunity DHS–23–DAD–024–00–03, Fiscal Year 2023 Emergency Food and Shelter National Board Program—Humanitarian (EFSP) ($350M) (Feb. 28, 2023), *https://www.grants.gov/web/grants/view-opportunity.html?oppId=346460.*

approved in December.[63] For the new Shelter and Services Program, FEMA and CBP have held several public listening sessions and are developing plans to release a Notice of Funding Opportunity prior to September 2023 for the second major portion of funding allocated by Omnibus to assist migrants encountered by DHS.

The Departments emphasize that the reference to an ''outer limit'' in the NPRM was a prediction that the expected increase in migration at the border following the end of the Title 42 public health Order, without any other policy changes, could exceed the capacity of the Department of State, local governments, and NGOs to provide assistance to migrants. 88 FR at 11715. While commenters are correct that the $800 million in funding approved in the recent Omnibus is still being distributed and allocated, the Departments disagree that this ongoing funding conflicts with the statement in the NPRM. In other words, funding allocated to date, and funding slated for further allocation under the Omnibus funding approved in December, is insufficient to address the impending further surge of migration expected after the termination of the Title 42 public health Order.

*Comment:* Multiple commenters stated their opposition to ''deterrence-oriented'' rules. At least one commenter stated the NPRM makes clear the Administration wants to make the asylum system ''cumbersome and difficult to navigate'' to deter potential asylum seekers from coming to the United States, stating Vice President Harris' comment of ''do not come'' in 2021 was a message that those fleeing danger should not seek protection in the United States. Another commenter stated the proposed rule would not be an effective deterrent because of its similarity to the Migrant Protection Protocols (''MPP'') and the Title 42 public health Order in the past, which the commenter claimed ''outsourced and exacerbated the situation'' by leaving thousands of individuals in dangerous conditions in Mexican border cities waiting to see if, or when, they will get into the United States. Another commenter stated the rule does not serve as a deterrent, as evidenced by the growing numbers of asylum seekers at the border.

Some commenters disagreed that the rule would reduce arrivals at the SWB. Commenters disagreed with the premise underlying the proposed rule—that the rebuttable presumption would disincentivize migrants from entering the United States except through a lawful and orderly pathway and lead to a reduction in encounters at the SWB. Another commenter argued that the rule is providing an opportunity to smuggling organizations and also providing an additional tool for extortion for noncitizens seeking to enter the United States. Another commenter stated that there is no evidence that the NPRM will deter asylum seekers from crossing the border and suggested that arrivals at the border would increase due to suppression of entries at POEs.

*Response:* The Departments disagree that the rule generally seeks to discourage asylum seekers from coming to the United States. Rather, the rule seeks to strike a balance: It is intended to reduce the level of irregular migration to the United States, but also to preserve sufficient avenues for migrants with valid claims to apply for asylum or other protection, either in the United States or in third countries through which they travel. This rule is also intended to disincentivize the use of smugglers. To those ends, the rule encourages those with meritorious claims to either apply for asylum or other protection in the first safe country they reach or pursue available lawful pathways to the United States as set forth in the rule.

The Departments also disagree with the comparison some commenters made between this rule and certain past policies, including MPP and application of the Title 42 public health Order. The rule's operation as a rebuttable presumption, and the rule's operation in conjunction with multiple available lawful pathways, are two of the multiple ways in which this rule differs from certain past policies, including MPP or expulsions under the Title 42 public health Order. As it relates to MPP in particular, the purpose and effect of this rule is not to return noncitizens to Mexico pending their removal proceedings. *See* INA 235(b)(2)(C), 8 U.S.C. 1225(b)(2)(C). Instead, it is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. Although some migrants may wait for some period of time in Mexico before obtaining a CBP One app appointment and before attending that appointment, the purpose and duration of such a stay would be different than under MPP. Absent this rule, DHS anticipates that its ability to process noncitizens at POEs, as well as continue to facilitate regular travel and trade, would be adversely impacted by the shifting of resources and personnel from POEs to help process individuals encountered between POEs.

The Departments disagree with commenters' claim that this rule will not reduce entries and that it will incentivize irregular migration. The Departments have shown that an increase in the availability of lawful pathways, paired with immediate consequences for irregular migration, can incentivize the use of lawful pathways and thus reduce irregular migration. *See* 88 FR at 11705–06. Furthermore, the Departments disagree with commenters' assertion that the rule will push individuals away from POEs to cross between POEs. The rule incentivizes noncitizens who might otherwise attempt to enter without inspection between POEs to take advantage of expanded lawful pathways. The availability of lawful pathways, such as the ability to schedule an appointment through the CBP One app and the DHS-approved parole processes, and the rule's operation as a rebuttable presumption are two of the multiple ways in which this rule differs from certain efforts of the past Administration.

*Comment:* Commenters raised concerns with Departmental data cited in the NPRM. For example, commenters referred to two of the Departments' statements in the NPRM: (1) that 83 percent of the people who were subject to expedited removal and claimed to have a credible fear of persecution or torture from 2014 to 2019 were referred to an IJ for section 240 proceedings, but only 15 percent of those cases that were completed were granted asylum or some other form of protection, *see* 88 FR at 11716; and (2) while only 15 percent of all case completions result in relief or protection, OIS estimates that 28 percent of cases decided on their merits are grants of relief, 88 FR at 11716 n.97. Commenters stated that the 15 percent figure is misleading, because it is based on the total percentage of completed removal cases, and not the total percentage of cases decided on the merits of the asylum claim. Commenters claim that this method artificially deflates the asylum grant rate and creates the false impression that many asylum seekers were ineligible for asylum even where there was no decision on their asylum claim. Commenters also stated that the 28 percent figure itself was too low because, as described by the Departments, this figure excludes

[63] DHS, Press Release, *The Department of Homeland Security Awards $350 Million for Humanitarian Assistance Through the Emergency Food and Shelter Program* (Feb. 28, 2023), *https://www.dhs.gov/news/2023/02/28/department-homeland-security-awards-350-million-humanitarian-assistance-through.*

withholding of removal, deferral of removal, cancellation of removal, and claimed status reviews.

Commenters also claimed that asylum policies of the previous Administration artificially deflated asylum grant rates. Other commenters stated that it is logical that the percentage of cases passing the credible fear interview stage is far higher than the cases that eventually qualify for asylum, given that the credible fear process is supposed to have a low bar for passage. Another commenter stated that, by the Departments' logic, no asylum applicant should be entitled to an initial credible fear determination and full asylum merits hearing because their claims will probably be denied given the low approval rating of asylum.

*Response:* The Departments cited relevant Departmental statistics—which date back to 2014, prior to the implementation of any policies of the prior Administration—to demonstrate the general point that there is a significant disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings. *See* 88 FR at 11716. Whether one uses the 15-percent figure or the 28-percent figure, ultimately, the number of individuals who are referred to an IJ at the beginning of the expedited removal process greatly exceeds the number who are granted asylum or some other form of relief or protection.

*Comment:* A commenter stated that numerous factors beyond merit impact whether an asylum seeker's case is ultimately granted (*e.g.,* access to counsel, availability of experts, changing regulations and procedures, and backlogs that affect the availability of evidence). Another commenter noted that many who seek asylum in the United States ultimately lose their cases not due to a lack of merit but instead because of ''our convoluted and dysfunctional'' immigration system, which the commenter claimed is difficult for asylum seekers to navigate and results in denial of many asylum claims on bases unrelated to the merits of the claim. One commenter asserted that modifying the legal requirements for asylum will not stop migrants from fleeing armed conflict, poverty or other dangers, because many are unaware of their right to apply for asylum. Another commenter stated that the number of migrants arriving is irrelevant to the merits of their asylum claims; the commenter also argued that the rule would screen out asylum seekers regardless of the merit of their case.

*Response:* The Departments acknowledge commenters' concerns that factors unrelated to the merits of the claim, such as access to counsel and unfamiliarity with the asylum process, could affect the ultimate determination of an asylum claim, but disagree that these potential issues are exacerbated by the rule. As discussed in more detail later in Section IV.B.5 of this preamble, this rule does not deprive noncitizens of access to counsel during credible fear proceedings. Additionally, all AOs are trained to conduct interviews in a non-adversarial manner and elicit relevant testimony from noncitizens. Specific training for implementation of this rule will include training on eliciting testimony related to whether a noncitizen can establish an exception or rebut the presumption of asylum ineligibility; therefore, noncitizens are not required to be familiar with the rule to remain eligible for asylum. The Departments emphasize that in all credible fear determinations, a noncitizen's credible testimony may be sufficient to overcome or establish an exception to the presumption against asylum ineligibility in this rule. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). As discussed later in Section IV.D.1.iii of this preamble, the Departments note that the overall standard of proof for rebutting or establishing an exception to the presumption of asylum ineligibility during credible fear proceedings remains the ''significant possibility'' standard; that standard must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that an exception applies or that the presumption has been rebutted).

As discussed throughout the NPRM, the lawful pathways condition, and the related modification of the withholding and CAT screening standard applied to noncitizens subject to the condition, would improve overall asylum processing efficiency by increasing the speed with which asylum claims are considered. *See* 88 FR at 11737. By encouraging noncitizens seeking to travel to the United States, including those seeking asylum, to pursue lawful pathways and processes, the rule promotes orderly processing and reduces the number of individuals who would be placed in lengthy section 240 removal proceedings and released into the United States pending such proceedings. *Id.* at 11736. Moreover, by reducing the number of noncitizens permitted to remain in the United States despite failing to avail themselves of a safe and lawful pathway to seek protection, the rule reduces incentives for noncitizens to cross the SWB, thus reducing the anticipated further surge that is expected to strain DHS resources. The Departments reiterate that the rule is not being promulgated to generally prevent noncitizens from seeking asylum in the United States but to strike a balance—reducing the level of irregular migration to the United States while providing sufficient avenues for migrants with valid claims to apply for asylum or other protection. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system.

*Comment:* One commenter asserted that the real purpose of the rule is to incentivize an increasing number of migrants to use the CBP One app to make fraudulent asylum claims. The same commenter also stated ''that the proposed rule and the CBP One app will incentivize increased rates of illegal immigration into the United States.'' The commenter further stated that because there is insufficient capacity to process all of the asylum claims of those using the CBP One app, the rule will simply increase the number of individuals who are paroled into the United States, incentivizing further illegal immigration. Another commenter argued that current migration levels result from the current Administration's actions to ''weaken border security, promote the influx of illegal immigration, and to remove integrity from the administration of both the legal immigration process (including asylum and credible fear measures) and overall enforcement of the laws.'' Similarly, another commenter stated that the root cause of this crisis was ''the Administration's reckless open borders policies.''

*Response:* While the Departments acknowledge the commenters' concerns about increased rates of unauthorized immigration into the United States, the Departments disagree that the rule and use of the CBP One app will incentivize noncitizens to enter the United States to make fraudulent asylum claims. If anything, by adding a rebuttable presumption of ineligibility, this rule creates a strong disincentive for irregular migration relative to the status quo. The Departments note that no commenter submitted data suggesting that the rule will result in an increase in fraud or misrepresentation. As explained in Section IV.B.5.iii of this

preamble, the Departments are confident that AOs have the training, skills, and experience needed to assess credibility and appropriately determine whether a noncitizen has met an exception to or rebutted the presumption of ineligibility for asylum codified in the rule. Regarding commenters' concerns that use of the CBP One app will increase the number of individuals who are paroled into the United States and thus incentivize irregular migration, the Departments note that the rule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app. Even so, as outlined in the NPRM and later in Section IV.E.3.ii of this preamble, the expanded use of the CBP One app is expected to create efficiencies that will enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Notably, the rule, coupled with an expansion of lawful, safe, and orderly pathways, is expected to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States. Additionally, the United States is undertaking a range of efforts to address irregular migration, including, for instance, working with partner countries to address the causes of migration, significantly increasing the availability of H–2 temporary worker visas and refugee processing in the Western Hemisphere, successfully implementing the CHNV parole processes, and addressing the pernicious role of human smugglers. *See* 88 FR at 11718–21.

The Departments strongly disagree with commenters who assert that the current migration levels are a result of any action by the Departments to ''weaken'' security at the border. Rather, as noted in the NPRM, economic and political instability around the world is fueling the highest levels of migration since World War II, including in the Western Hemisphere. *See* 88 FR 11704. Additionally, even while the Title 42 public health Order has been in place, the total number of encounters at the SWB reached an all-time high in FY 2022, and they remain at historically high levels even as encounters of CHNV nationals have fallen in recent months.[64] *See id.* at 11704–05. During this time, the United States has been working to build on a multi-pronged, long-term strategy with countries throughout the region to support conditions that would decrease irregular migration while continuing efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. *See* 88 FR at 11720–23. This rule ensures that the United States meets its obligations under both U.S. and international law while ensuring that vulnerable populations are able to seek asylum or other protection through lawful, safe, and orderly pathways.

*Comment:* Commenters stated that the rule is unnecessary because the goals of discouraging migrants from seeking asylum and swiftly removing migrants are invalid. These commenters further stated that immigration is good; there is no need to quickly remove asylum seekers, regardless of backlogs; and that overwhelmed immigration facilities are problems created by the Government that would be solved by welcoming migrants rather than treating them as a problem or as dangerous. A few commenters critiqued the need for the rule, writing that the proposed rule is unnecessary and the Administration should take responsibility for actions that have created an overloaded immigration system. Other commenters questioned whether restrictive border measures and quickly removing individuals actually reduce migratory flows. At least one commenter did not understand how this rule was a ''good thing'' that would change immigration policy in the United States, which the commenter described as a ''disaster.'' A commenter stated that the proposed rule is not needed and instead recommended implementing practical and humane solutions, including funding and coordinating with civil society organizations on the border and throughout the country. Another commenter stated that she lives within 100 miles of the border and does not feel threatened by the influx of migrants to her community, and thus the rule is unnecessary.

One commenter stated that the U.S. immigration system is not broken but the current laws need to be strictly enforced, while another commenter stated that DHS should be strengthened so it can address each case instead of lumping people into categories. At least one commenter stated that there is no reason why DHS cannot process applicants more quickly, noting that the United States received a significant number of migrants in the early 1900s with far less technology, so the government should be able to do so much more efficiently now with the sophisticated technology, medical equipment, fingerprinting, and other means available now. Another commenter stated that the rule would not fix backlogs in immigration court, while a number of commenters suggested that it would actually increase the backlogs.

A commenter questioned the need for the rule because the Departments had not demonstrated that they had considered other options. Another commenter requested that the Departments expressly consider a range of factors, such as the U.S. economic outlook and the role of other external variables (such as climate change) in driving migration. The commenter suggested that such factors may influence migration patterns to such a degree that the rule is unnecessary or likely to be ineffective.

*Response:* The Departments disagree that the rule is unnecessary. The Departments reiterate that the goal of the rule is not to generally discourage migrants with valid claims from applying for asylum or other protection, but rather to encourage the use of lawful, safe, and orderly pathways into the United States. The Departments agree that the United States' historical openness to immigration has enriched our culture, expanded economic opportunities, and enhanced our influence in the world. However, the U.S. immigration system has experienced extreme strain with a dramatic increase of noncitizens attempting to cross the SWB in between POEs without authorization, reaching an all-time high of 2.2 million encounters in FY 2022.[65] The Departments believe that without a meaningful policy change, border encounters could dramatically rise to as high as 11,000 per day after the Title 42 public health Order is lifted.[66] As described in the NPRM, DHS does not currently have the resources to manage and sustain the processing of migratory flows of this scale in a safe and orderly manner, even with the assistance of modern technology. *See* 88 FR at 11712–13. In response to this urgent situation, the rule will establish a rebuttable presumption of asylum ineligibility for certain noncitizens who fail to take advantage of the existing and expanded lawful pathways to enter the United States, including the opportunity to schedule a time and place to present at a SWB POE, where they may seek asylum or other forms of protection, in a lawful, safe, and orderly manner, or to seek asylum or other protection in one of the countries through which they

[64] OIS analysis of OIS Persist Dataset based on data through March 31, 2023; OIS analysis of historic USBP data.

[65] OIS analysis of historic USBP data.

[66] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023.

travel on their way to the United States. *See id* at 11706. The Departments believe that this rule is necessary to address the anticipated surge in irregular migration.

The Departments also believe the rule is necessary to improve the overall functioning and efficiency of the immigration system. *See* INA 208(b)(2)(C) and (d)(5)(B), 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B). Specifically, the rule would efficiently and fairly provide relief to noncitizens who are in the United States and are eligible for relief, while also efficiently denying relief and ultimately removing those noncitizens who are determined to be ineligible for asylum and do not qualify for statutory withholding of removal or protection under the regulations implementing the CAT. The Departments acknowledge that despite the protections preserved by the rule and the availability of lawful pathways, the rebuttable presumption adopted in the rule will result in the denial of some asylum claims that otherwise may have been granted, but the Departments believe that the rule will generally offer opportunities for those with valid claims to seek protection. Moreover, the Departments have determined that the benefits to the overall functioning of the system, including deterrence of dangerous irregular migration and smuggling, justify the rule. In sum, the rule permissibly pursues efficient asylum processing while preserving core protections, which is within the Departments' authority conferred by section 208 of the INA, 8 U.S.C. 1158.

The Departments acknowledge commenters' support for enforcing existing immigration laws. However, the Departments do not believe that current laws and regulations are sufficient to address the current levels of migratory flows and the anticipated increase in the number of migrants who will attempt to enter the United States following the lifting of the Title 42 public health Order. Likewise, a policy is necessary to ensure lawful, safe, and orderly processing of those migrants. Absent further action, POEs will be congested, migrants will be forced to wait in long lines for unknown periods of time, and once processed they will be released into local communities that are already at or near their capacity to absorb them. *See* 88 FR at 11715. By incentivizing noncitizens to use lawful pathways, this rule aims to encourage migrants to either pursue options that would allow them to avoid making the journey to the SWB, or to schedule in advance a time for arrival at a POE, which will alleviate additional strain on DHS resources. The Departments believe it would be inappropriate to elect inaction on the basis of conjecture regarding U.S. economic outlook and similar factors and the potential effects of such factors on the impending surge of irregular migration.

In response to comments asserting that the Departments did not consider other options before promulgating this final rule, the Departments note that alternative approaches for managing the expected surge in migration were discussed in the NPRM and the Departments ultimately assessed, and continue to assess, that the rule is the best option for responding to the current situation at the border and the expected surge in migration after the lifting of the Title 42 public health Order. *See* 88 FR at 11730–32. Concerns regarding backlogs, government resources and funding are addressed in Sections IV.B.5.iv and IV.C.2 of this preamble.

The Departments acknowledge commenters' suggestion that DHS ''strengthen'' its resources to respond to the anticipated surge in migrants to the SWB. The Departments note that they have already deployed additional personnel, technology, infrastructure, and resources to the SWB and that continuing this ''strengthening'' of the SWB would require additional congressional actions, including significant additional appropriations, which are outside of the scope of this rulemaking.

i. Concerns Regarding the Sufficiency of the Lawful Pathways

*Comment:* Commenters stated that in general, the available lawful pathways are insufficient to meet the significant demand for migration to the United States. Commenters stated that increasing legal pathways for some should not come at the expense of restricting access for asylum seekers seeking protection. Commenters stated that the existing lawful pathways are ''extremely narrow and unavailable to many people,'' and that it is fundamentally unjust to fault individuals for seeking safety and stability in the only way possible. Commenters stated that migrants who seek asylum in the United States rather than another country are doing so rationally and intentionally and they would seek asylum in a closer country if it was truly safe.

Multiple commenters stated that H–2 temporary worker visas are insufficient substitutes for asylum. One commenter stated that the Administration is ''misguided'' in touting its efforts in the proposed rule to expand two of the most ''exploitative and troubled U.S. work visa programs—H–2A and H–2B'' because these programs are ''deeply flawed and in desperate need of reform.'' The same commenter stated that expanding temporary work visa programs like H–2B and H–2A makes little sense for those seeking asylum because they do not provide a permanent pathway to remain in the United States and would put migrants in danger by returning them to dangerous situations after the visa certification expires. Similarly, other commenters stated that the H–2 programs do not provide or guarantee safety for migrants because they are not permanent or durable solutions and they do not allow for family unity in the United States.

*Response:* The United States is both a nation of immigrants and a nation of laws. The Departments are charged with enforcing those laws and endeavor to do so humanely. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. The rule, coupled with an expansion of lawful, safe, and orderly pathways, is expected to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States.

Though the Departments acknowledge that existing lawful pathways may not be available to every migrant, the Departments disagree with comments stating that the existing lawful pathways are extremely narrow. The United States Government has been working to significantly expand access to lawful pathways and processes for migrants since January 2021. In addition to the new processes DHS has implemented for CHNV nationals, which are discussed at length in the NPRM, DHS has been working with other Federal departments and agencies to increase access to labor pathways; restart, streamline, and expand family reunification parole programs; and significantly rebuild and expand refugee processing in the region. *See* 88 FR at 11718–23.[67]

For example, DHS has worked with the Department of State and the Department of Labor (''DOL'') to significantly expand access to the H–2A and H–2B temporary agricultural and nonagricultural worker visas in order to

[67] *See also* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

help address labor shortages and provide safe and orderly pathways for migrants seeking economic opportunity in the United States. On December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the total number of noncitizens who may receive an H–2B nonimmigrant visa by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). In particular, the number of H–2 visas issued to nationals of El Salvador, Honduras, and Guatemala has increased by 250 percent between FYs 2020 and 2022: in FY 2022, the Department of State issued 19,295 H–2 visas to those three countries, compared to just 5,439 in FY 2020.[68] The Departments disagree that expanding use of these programs is misguided; although improvements are possible, these programs are established features of the immigration system and an appropriate mechanism to support lawful, safe, and orderly travel to the United States. Moreover, these programs represent two of several available lawful pathways, some of which provide protection that is not temporary and does allow for derivative protection for family members. For example, the United States Government has restarted the Central American Minors Refugee and Parole Program, which provides certain qualified children who are nationals of El Salvador, Guatemala, and Honduras, as well as certain family members of those children, an opportunity to apply for refugee status and possible resettlement in the United States.[69]

The United States Government also provides durable solutions for humanitarian protection through the U.S. Refugee Admissions Program for qualifying applicants. In 2022, concurrent with the announcement of the L.A. Declaration, the United States announced that it intends to refer for resettlement at least 20,000 refugees from Latin America and the Caribbean in FY 2023 and FY 2024, which would put the United States on pace to more than triple refugee admissions from the Western Hemisphere this fiscal year alone.[70] On April 27, 2023, DHS announced that it would commit to welcoming thousands of additional refugees per month from the Western Hemisphere—with the goal of doubling the number of refugees the United States committed to welcome as part of the L.A. Declaration.[71] The United States Government also continues to work with our partners to expand access to refugee resettlement more broadly throughout the Western Hemisphere. For instance, Canada recently announced that it will take significant steps to expand safe and orderly pathways for migrants from the Western Hemisphere to enter Canada lawfully. Building on prior commitments, Canada will provide an additional 15,000 migrants from Latin America and the Caribbean with access to legal pathways to Canada; and enter into arrangements with the United States and like-minded countries to promote lawful labor mobility pathways.[72]

Comments asserting insufficiencies associated with the CHNV parole processes and other lawful pathways identified in the rule are further addressed in Section IV.3 of this preamble.

The rule will not impact those who use these lawful pathways that the United States is offering for migrants to obtain entry into the United States. Additionally, the rule will not apply to noncitizens who enter the United States with documents sufficient for admission. Instead, the rule is meant to promote the use of these lawful pathways and disincentivize irregular migration.

ii. Similarity to Actions of Past Administration

*Comment:* Many commenters stated that the proposed rule is functionally indistinguishable from prior asylum-related rules that were issued by the prior Administration, particularly the TCT Bar IFR and Final Rule, which have been enjoined, or would cause similar harm to asylum seekers. At least one commenter criticized that the addition of the ''rebuttable presumption'' in this rule is not enough to distinguish it from previous rules. For example, commenters described the rule as ''resurrect[ing] Trump-era categorical bans on groups of asylum seekers.'' Similarly, some commenters stated that this rule is similar to the ''asylum bans'' the past Administration attempted to advance. Another commenter asserted that this rule operates similarly to rules from the prior Administration because it would operate as a ban for asylum seekers based on factors that do not relate to their fear of return and would result in asylum denials for all who are unable to establish that they qualify for exceptions the commenter characterized as extremely limited. A commenter claimed that while the Departments repeatedly assert throughout the NPRM that the rebuttable presumption is distinguishable from the TCT Bar, the opportunity to rebut the presumption would occur only under the most extreme scenarios and in excess of what would ordinarily be sufficient to claim asylum. Another commenter predicted that the proposed rule would revive attempts to ''rig the credible fear process.'' While comparing the rebuttable presumption standards to the non-refoulement screening standard used under MPP, the commenter argued that the proposed rule would impose a ''more likely than not'' screening standard that far exceeds the standard for an asylum grant. The commenter further stated that the ''deficient'' non-refoulement screenings carried out during MPP foreshadow the dangers asylum seekers would face under the proposed rule if finalized.

In comparing this rule to those issued by the prior Administration, commenters stated that the previous rules led to asylum denials, prolonged detention for many with bona fide claims, and family separations. At least one commenter stated that a recent congressional investigation found that not one person sent to Guatemala under the prior Administration's Asylum Cooperative Agreements received asylum; instead, migrants were forced to return to their originating country. A commenter also stated that the rule attempts to differentiate itself from prior policies via exceptions and alternative pathways to asylum but that the exceptions are insufficient because they would fail to protect the most vulnerable. Several commenters stated that asylum bans have been proven to be ineffective at deterring noncitizens from seeking safety. One commenter stated that calling the rule a ''rebuttable presumption'' was merely a semantic difference from prior asylum bans, which had narrow exceptions.

*Response:* The Departments acknowledge these commenters'

---

[68] *See* Department of State, *H–2 Visa Data for El Salvador, Guatemala, and Honduras, FY 2015–FY2023 Mid-Year* (last reviewed Feb. 24, 2023).

[69] *See* USCIS, Central American Minors (CAM) Refugee and Parole Program, *https://www.uscis.gov/CAM* (last visited Apr. 5, 2023).

[70] *See* The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables* (June 10, 2022) (''L.A. Declaration Fact Sheet''), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/*.

[71] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[72] *See* DHS, Press Release, *United States and Canada Announce Efforts to Expand Lawful Migration Processes and Reduce Irregular Migration* (Mar. 24, 2023), *https://www.dhs.gov/news/2023/03/24/united-states-and-canada-announce-efforts-expand-lawful-migration-processes-and*.

concerns but disagree that the final rule is indistinguishable from asylum-related rulemakings and policies issued by the prior Administration. The TCT Bar IFR and Final Rule and the Proclamation Bar IFR, for instance, categorically barred covered individuals from certain types of relief. While the TCT Bar Final Rule only allowed limited exceptions to its eligibility bar, including for trafficking victims and other grounds, this rule includes a number of broader exceptions and means for rebutting the presumption. A noncitizen can rebut the presumption by, for example, demonstrating exceptionally compelling circumstances by a preponderance of the evidence during a full merits hearing. *See* 8 CFR 208.33(a)(3); 8 CFR 1208.33(a)(3). A noncitizen can rebut the presumption if they establish that they or a member of their family with whom the noncitizen is traveling meet any of the three per se grounds for rebuttal, which provide that, at the time of entry: (1) they faced an acute medical emergency; (2) they faced an imminent and extreme threat to their life or safety; or (3) they were a ''victim of a severe form of trafficking in persons'' as defined in 8 CFR 214.11. In addition to the per se grounds for rebuttal, a noncitizen could also rebut the presumption in other exceptionally compelling circumstances. One exceptionally compelling circumstance recognized by the rule is included specifically to avoid family separations. *See* 8 CFR 1208.33(c). Protecting against family separation is one example of how this rule includes appropriate safeguards for vulnerable populations. Depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the exceptionally compelling circumstances standard.

The Departments acknowledge concerns about opportunities to rebut the presumption but disagree that the rule would impose a higher standard for rebutting the presumption than the standard to establish asylum eligibility. The ''significant possibility'' standard is the overall assessment applied during credible fear screenings; that standard must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that the presumption has been rebutted or an exception established). As discussed below in Section IV.E.1 of this preamble, a noncitizen can satisfy their burden of proof through credible testimony alone; the rule does not require any particular evidence to rebut or establish an exception to the presumption under 8 CFR 208.33(a)(3), 1208.33(a)(3). *See* INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii); INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Accordingly, the Departments believe that the means of rebutting or establishing an exception to the presumption are not unduly burdensome.

The Departments have considered the approaches taken in multiple rulemaking efforts of the last few years and now believe that the more tailored, time-limited approach in this final rule is better suited to address the increased migrant flows into the United States expected after the Title 42 public health Order terminates. *See* 88 FR at 11728. This rule encourages use of lawful, safe, and orderly pathways to enter the United States and, unlike those prior rulemakings, retains a noncitizen's ability to be found eligible for asylum should they enter through an enumerated lawful pathway or otherwise overcome the condition imposed by this rule. The Departments believe that the rule's more balanced approach renders the TCT Bar Final Rule and the Proclamation Bar IFR unnecessary, and that those rules conflict with the approach taken in this rule.[73] As proposed in the NPRM and discussed at Sections IV.E.9 and IV.E.10 of this preamble, the Departments have decided to remove those prior rules from the CFR. *See* 88 FR at 11728.

The Departments disagree with some commenters that this final rule will cause harms similar to those attributed to the TCT Bar Final Rule and the Proclamation Bar IFR, which commenters allege include asylum denials, prolonged detention, and family separation. This rule's scope and effect are significantly different from the TCT Bar Final Rule. Unlike the TCT Bar Final Rule, the presumption would not completely bar asylum eligibility based on the availability of protection in a third country. First, while this rule takes into account whether individuals sought asylum or other forms of protection in third countries while traveling to the United States, the rule would not require that all noncitizens make such an application to be eligible for asylum, unlike the TCT Bar Final Rule. For example, if the noncitizen received authorization to travel to the United States to seek parole or scheduled an appointment through the CBP One app to present themselves at a POE, then the condition on asylum eligibility would not apply to that noncitizen regardless of whether the noncitizen sought protection in a third country. Second, while the TCT Bar Final Rule only allowed limited exceptions to its eligibility bar, including for trafficking victims and other grounds, this rule includes a number of exceptions and means for rebutting the presumption, including an exception for trafficking victims. This rule encourages noncitizens to use orderly, lawful pathways to enter the United States, and it will only become relevant whether the noncitizens applied for protection in a third country through which they traveled in cases in which noncitizens do not avail themselves of one of the pathways.

The Departments acknowledge commenters' concerns with the effectiveness of Safe Third Country Agreements (''STCA'') or asylum cooperative agreements. The Departments acknowledge that negotiating such agreements is a lengthy and complicated process that depends on the agreement of other nations. *See* 88 FR at 11732. The Departments note that the only such agreement in effect is the Canada-U.S. STCA. *See generally* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023). The rule does not implement or change the framework for negotiating STCAs, which involves extensive diplomatic negotiations. As discussed more in Section IV.E.3.iv of this preamble, the safe-third-country provision in section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), indicates that a noncitizen may be removed, pursuant to ''a safe-third-country agreement,'' and the noncitizen may not apply for asylum ''unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.'' This rule operates differently. Under this rule, noncitizens may apply for asylum and other protection in the United States. While the rule would create a rebuttable presumption, it specifies circumstances in which that presumption is necessarily rebutted as well as other exceptions. By encouraging noncitizens seeking to travel to the United States, including those intending to seek asylum, to use lawful pathways and processes, the Departments expect the rule to promote orderly processing, reduce the anticipated surge that is expected to strain DHS resources, reduce the number of individuals who would be placed in lengthy removal proceedings pursuant to section 240 of

[73] Both the TCT Bar Final Rule and the Proclamation Bar IFR are discussed further in Sections IV.E.9 and IV.E.10 of this preamble.

the INA and released into the United States pending such proceedings, allow for the expeditious removal of noncitizens who failed to avail themselves of a safe and lawful pathway to seek protection, and reduce incentives for noncitizens to cross the border using dangerous smuggling networks. *See* 88 FR at 11736. Regarding comments about the ineffectiveness of the rule to deter migrants from seeking safety, the rule does not discourage migrants with valid claims from applying for asylum or other protection. The rule encourages those with meritorious claims to either apply for asylum or other protection in the first safe country they find or pursue available lawful pathways, such as the U4U and CHNV parole processes—which early data indicate are deterring irregular migration from those countries, *see* 88 FR at 11706—or presenting at a POE at a pre-scheduled time and place.

*Comment:* Some commenters noted the rise in recidivist encounters following the end of the prior Administration despite many efforts to restrict asylum access and stated that removals under this rule would increase rates of recidivism.

*Response:* The Departments disagree that removals under this rule will increase the rate of recidivism. The Departments note that a range of external considerations (such as the COVID–19 pandemic, litigation resulting in injunctions or vacatur of those rules prior to or during initial stages of their implementation,[74] and differences in the operation of the Title 42 public health Order and this rule) prevent the Departments from drawing any firm conclusions applicable to this rulemaking based solely on recidivism numbers following the end of the prior Administration. The application of the Title 42 public health Order at the border has had unpredictable impacts on migration. Because Title 42 expulsions have no consequence, aside from the expulsion itself, DHS has seen a substantial increase in recidivism for individuals processed under Title 42 as compared to those processed under Title 8 authorities. In March 2023, for example, 26 percent of encounters at the SWB involved individuals who had at least one prior encounter during the previous 12 months, compared to an average 1-year re-encounter rate of 14 percent for FYs 2014–2019.[75]

Overall, since the start of the pandemic and the initiation of Title 42 expulsions, 39 percent of all Title 42 expulsions have been followed by a re-encounter of the same individual within 30 days versus a 9 percent 30-day re-encounter rate for Title 8 repatriations.[76] Similarly, the 12-month re-encounter rates are 51 percent for Title 42 expulsions versus 20 percent for Title 8 repatriations.[77] While a portion of the overall gap between Title 42 and Title 8 re-encounter rates is likely explained by the fact that many Title 42 expulsions are to Mexico and almost all Title 8 repatriations are to individuals' countries of citizenship, it is notable that a large gap between Title 42 and Title 8 re-encounter rates is also observed in the case of Mexican nationals, all of whom are repatriated to Mexico.[78]

This gap is likely, in part, because a removal under Title 8 carries with it at least a five-year bar to admission, among other legal consequences. As a result, it is the Departments' assessment that a return to Title 8 processing of all noncitizens will likely reduce recidivism at the border. Moreover, the Departments believe it would be unwarranted to conclude that, based on recidivist apprehensions while the Title 42 public health Order has been in place, conditions on asylum eligibility do not discourage attempts to enter the United States unlawfully. This rule, which will take effect upon the lifting of the Title 42 public health Order, anticipates that those who receive negative credible fear determinations will be removed upon issuance of final orders of removal and be subject to at least a five-year bar on admission in addition to having the rebuttable presumption apply to any subsequent asylum application the noncitizen may file in the future.

iii. Unnecessary Given the Asylum Processing IFR

*Comment:* Some commenters questioned why this proposed rule is necessary given that the Asylum Processing IFR was adopted less than one year ago. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) (''Asylum Processing IFR''). In referencing the Asylum Processing IFR, one commenter noted that this rule is an ''abrupt change in reasoning from less than a year ago,'' which, according to the commenter, indicates that the rule is ''political'' rather than based on reasoned decision making. Some commenters noted that in the Asylum Processing IFR, the Departments explained that applying the TCT Bar Final Rule at the credible fear stage as proposed by the past Administration was inefficient and consumed considerable resources so there is ''no basis to suddenly reverse course again.'' A commenter argued that the proposal would depart from conclusions DHS reached within the last year in the Asylum Processing IFR recommitting agencies to the statutory ''significant possibility'' standard for asylum claims. One commenter asserted that while the proposed rule is premised on the idea that applying a higher ''reasonable possibility'' standard can weed out non-meritorious asylum cases, the Departments recently acknowledged in the Asylum Processing IFR that the higher standard is not effective at screening out such claims. The same commenter expressed concern that the Government's ''abrupt about-face'' is not based on new data, but rather on the lack of evidence that the reasonable possibility standard is not effective in the context in which it is currently used. Another commenter similarly wrote that the application of the reasonable possibility standard at the credible fear screening stage represents a ''stark reversal'' from DHS's position in the Asylum Processing IFR that asylum eligibility bars should not be applied at the initial screening stage and

[74] Federal courts have either vacated or enjoined the Departments from implementing the TCT Bar IFR and Final Rule, Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) (''Criminal Asylum Bars Rule''), and Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020) (''Global Asylum Rule''). *See, e.g., Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25 (D.D.C. 2020) (vacating the TCT Bar IFR); *E. Bay Sanctuary Covenant* v. *Garland,* 994 F.3d 962 (9th Cir. 2020) (''*East Bay I*'') (affirming injunction of the TCT Bar IFR); *E. Bay Sanctuary Covenant* v. *Barr,* 519 F. Supp. 3d 663 (N.D. Cal. 2021) (''*East Bay II*'') (enjoining the TCT Bar Final Rule); *Pangea Legal Servs.* v. *DHS,* 501 F. Supp. 3d 792 (N.D. Cal. 2020) (enjoining the Criminal Asylum Bars Rule) (''*Pangea I*''); *Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) (''*Pangea II*'') (preliminarily enjoined the Departments ''from implementing, enforcing, or applying the [Global Asylum Rule] . . . or any related policies or procedures.''); *E. Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640, 681 (9th Cir. 2021) *(''East Bay III''); see O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (recounting the history of the litigation over the Proclamation Bar IFR and vacating it).

[75] Including CBP enforcement encounters at or between ports of entry. OIS Persist based on data through March 31, 2023.

[76] Title 8 repatriation, as used here, refers to both removals (noncitizen required to depart based on a removal order) and returns (noncitizen required to depart leaves without a formal order of removal).

[77] OIS analysis of OIS Enforcement Lifecycle based on data through December 31, 2022.

[78] For Mexican nationals, since the start of the pandemic, the 30-day re-encounter rates are 44 percent for Title 42 expulsions versus 15 percent for Title 8 repatriations, and the 12-month re-encounter rates are 55 percent for Title 42 expulsions versus 26 percent for Title 8 repatriations. OIS analysis of OIS Enforcement Lifecycle based on data through December 31, 2022.

that the ''significant possibility'' standard should be applied when screening for all protection claims (*i.e.,* asylum, withholding of removal, and CAT protection). A commenter stated that the proposed rule introduces conflict with the Asylum Processing IFR and expressed concern that implementation of the new rule would be difficult for AOs. One commenter stated that the Departments should make greater use of the recent 2022 asylum merits interview process, which would provide a solution to the problems the Departments asserted in the NPRM.

*Response:* The Departments recognize that under the Asylum Processing IFR issued in March 2022, certain noncitizens determined to have a credible fear are referred to an AO, in the first instance, for further review of the noncitizen's asylum application. *See* 87 FR at 18078. For noncitizens subject to that IFR, following a positive credible fear determination, AOs conduct an initial asylum merits interview instead of referring the case directly for removal proceedings pursuant to section 240 of the INA. If USCIS does not grant asylum, the individual is referred to EOIR for streamlined removal proceedings pursuant to section 240. In issuing the Asylum Processing IFR, the Departments concluded that protection determinations during the expedited removal process could be made more efficient. *See* 87 FR at 18085. The purpose of the Asylum Processing IFR was to simultaneously increase the promptness, efficiency, and fairness of the process by which noncitizens who enter the United States without appropriate documentation are either removed or, if eligible, granted relief or protection. *Id.* at 18089. Additionally, the Asylum Processing IFR enables meritorious cases to be resolved more quickly, reducing the overall asylum system backlog, and using limited AO and IJ resources more efficiently. *Id.* at 18090. The entire process is designed to take substantially less time than the average of over four years it takes to adjudicate asylum claims otherwise. *See* 88 FR at 11716. This final rule builds upon this existing system while implementing changes, namely that AOs will apply the lawful pathways rebuttable presumption during credible fear screenings.

The Departments disagree with commenters' suggestion that the proposed rule was political and not based on reasoned decisions. Rather, the rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule establishes procedures for AOs and IJs to follow when determining whether the rebuttable presumption applies to a noncitizen and, if it does, whether the noncitizen has established any exceptions to or rebutted the presumption. *See* 8 CFR 208.33(b). In addition, for noncitizens found to be ineligible for asylum under 8 CFR 208.33, the rule establishes procedures for AOs to further consider a noncitizen's eligibility for statutory withholding of removal or protection under the regulations implementing the CAT. *See* 8 CFR 208.33(c)(2). Individuals subject to the lawful pathways condition will still be placed into removal proceedings under section 240 if they meet the ''reasonable possibility'' of persecution or torture standard. One of the goals of the Asylum Processing IFR is to streamline the expedited removal process, and this rule is complementary to that goal, but is also necessary to incentivize lawful, safe, and orderly migratory flows. This rule does not foreclose processing noncitizens through the process established by the Asylum Processing IFR.

The Departments acknowledge that the approach in this rule is different in certain respects from that articulated in the Asylum Processing IFR issued in March 2022. However, the Departments believe the current and impending situation on the ground along the SWB warrants departing in some respects from the approach generally applied in credible fear screenings. *See* 88 FR at 11742. The Asylum Processing IFR was designed for non-exigent circumstances. However, as noted in the NPRM, encounters of non-Mexican nationals at the SWB between POEs have reached a 10-year high of 1.5 million in FY 2022,[79] driven by smuggling networks that enable and exploit this unprecedented movement of people. This heightened migratory flow has overburdened the current asylum system, resulting in a growing backlog of cases awaiting review by AOs and IJs. *See* 88 FR at 11705. The exigent circumstances giving rise to this rule arose after the Asylum Processing IFR was issued and require departing from the general approach in the Asylum Processing IFR in specific ways—*i.e.,* applying the condition on eligibility during credible fear screenings, applying the ''reasonable possibility'' standards to individuals who cannot show a ''significant possibility'' of eligibility for asylum based on the presumption established in the rule, requiring an affirmative request for IJ review of a negative credible fear determination, and limiting requests for reconsideration after IJ review and instead providing for reconsideration based only on USCIS's discretion.

The Departments believe that the condition on eligibility and this rule's departures from the Asylum Processing IFR are reasonable and necessary for the reasons discussed in the NPRM. *See* 88 FR at 11744–47. The rule will help achieve many of the goals outlined in the Asylum Processing IFR, including improving efficiency; streamlining the adjudication of asylum, statutory withholding of removal, and CAT protection claims; and reducing the strain on the immigration courts by screening out and removing those with non-meritorious claims more quickly. *See* 87 FR 18078.

The Departments note that the rule does not apply a higher ''reasonable possibility'' standard to asylum claims; rather, the rule applies the statutory ''significant possibility'' standard to asylum claims, as explained elsewhere in this preamble. The rule only applies the ''reasonable possibility'' standard to statutory withholding and CAT claims, and only if a noncitizen is subject to and has not established an exception to or rebutted the presumption at the credible fear screening. Additionally, the Asylum Processing IFR did not conclude that the higher standard was ''not effective'' at screening out non-meritorious statutory withholding and CAT claims, but rather made a policy determination that the higher standard was inefficient given the circumstances of that particular rule. *See* 87 FR at 18092. The Departments reached a different policy conclusion after the Asylum Processing IFR was issued and believe that this rule is necessary to address the current and exigent circumstances described throughout the NPRM. *See* 88 FR at 11744–47.

The Departments appreciate commenters' support for the asylum merits interview process, but the Departments reiterate the discussion from the NPRM that the asylum merits interview process should not be used for noncitizens subject to the presumption. *See* 88 FR at 11725–26. This is because each such proceeding, in which the noncitizen would only be eligible for forms of protection that the AO cannot grant (withholding of removal or CAT protection), would have to ultimately be adjudicated by an IJ. Further, the Departments note that the processes relating to management of those who have already established a credible fear

[79] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

are different from the processes for migrants seeking entry into the United States who are making an initial claim of fear.

iv. Unnecessary Given Parole Processes

*Comment:* Some commenters objected that although the Departments stated that they anticipate a surge in CHNV individuals claiming fear at the SWB after the termination of the Title 42 public health Order, the proposed rule also claims that the parole processes for these populations are working to limit irregular migration from these countries.

*Response:* In an effort to address the significant increase in CHNV migrants at the SWB, the United States has taken significant steps to expand safe and orderly processes for migrants from these countries to lawfully come to the United States. Specifically, these processes provide a lawful and streamlined way for eligible CHNV nationals and their family members to apply to come to the United States without having to make the dangerous journey to the SWB.[80] Individuals can request an advance authorization to travel to the United States to be considered on a case-by-case basis for a grant of temporary parole by CBP. Noting the success of the CHNV parole processes coupled with enforcement measures in limiting irregular migration of CHNV nationals, the Departments also recognize that there are a number of factors that could prevent the same level of success after the lifting of the Title 42 public health Order absent additional policy changes. *See* 88 FR at 11706. These factors include the presence of large CHNV populations already in Mexico and elsewhere in the hemisphere as a result of past migratory flows and the already large number of migrants from these countries in the proximity of the SWB after they were expelled to Mexico under the Title 42 public health Order. *See id.* In addition, as the Departments noted in the NPRM, the incentive structure created by the CHNV parole processes relies on the availability of an immediate consequence, such as the application of expedited removal under this rule, for those who do not have a valid protection claim or lawful basis to stay in the United States. *See* 88 FR at 11731. The parole processes thus work with this rule in a complementary manner to address the expected surge in migration after the Title 42 public health Order is lifted.

v. Unnecessary Given Lack of Access to Asylum

*Comment:* Some commenters stated that the rule would not succeed at meeting its goal of deterring irregular immigration since migrants are already aware, even without the rule, that there is a low chance of actually receiving asylum in the United States.

*Response:* The Departments reiterate that the rule's primary goal is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule is intended to reduce the level of irregular migration to the United States without discouraging migrants with valid claims from applying for asylum or other protection. Even assuming migrants are aware of the relative likelihood of success of their asylum claims, the Departments do not believe the low ultimate approval rate for asylum and other forms of protection, which has long been the status quo, has served as a strong disincentive against making protection claims given the comparatively high chance of receiving a positive credible fear determination (83 percent for FYs 2014–19, *see* 88 FR at 11716) after which migrants are able to wait in the United States to present their claims, the multi-year backlog of immigration court cases,[81] and the fact that many migrants who are denied asylum are not ultimately removed, *see id.* Additionally, many noncitizens who are encountered at the border and released pending their immigration proceedings will spend years in the United States, regardless of the outcome of their cases. *See id.* Indeed, most noncitizens who receive a positive credible fear determination will be able to live and work in the United States for the duration of their removal proceedings—which, on average, take almost 4 years.[82] This reality provides a powerful incentive for noncitizens to make protection claims. Therefore, a low approval rate for asylum applications does not necessarily offer much disincentive against making protection claims.

vi. Ineffective Without Changes to Withholding of Removal or CAT Adjudications

*Comment:* Some commenters stated that if the process for applying for statutory withholding of removal or CAT protection stays the same, the rule would not be an effective deterrent for people who do not have a meritorious claim for asylum who are seeking to delay their removal from the United States. One commenter suggested that because those subject to the rule can seek protection through statutory withholding of removal and CAT, even with this rule in place, they will likely continue to arrive without using a lawful pathway. The commenter further stated that people fleeing unlivable conditions at home, the overwhelmingly majority of whom have no real knowledge of U.S. immigration law, are unlikely to carefully dissect the rule's subtle changes to eligibility standards. And as long as migrants know there is the possibility of protection in the United States—no matter whether through asylum or another form of relief—they will likely continue to make the dangerous trek to the border, where they will then cross.

*Response:* The Departments note that the rule would implement changes to the existing credible fear screening process. Specifically, if noncitizens cannot make a sufficient showing that the lawful pathways condition on eligibility for asylum is inapplicable or that they are subject to an exception or rebuttal ground, then the AO will screen the noncitizen for statutory withholding of removal and protection under the CAT using the higher "reasonable possibility" standard. *See* 8 CFR 208.33(b)(2)(i). This "reasonable possibility" standard is a change from the practice currently applied for statutory withholding of removal and CAT protection in the credible fear process. As explained in the NPRM, the Departments have long applied—and continue to apply—the higher "reasonable possibility" of persecution or torture standard in reasonable-fear screenings because this standard better predicts the likelihood of succeeding on the ultimate statutory withholding of removal or CAT protection application than does the "significant possibility" of establishing eligibility for the underlying protection standard, given the higher burden of proof for statutory withholding of removal and CAT protection. *See* 88 FR at 11746–47. The Departments also assess that applying the "reasonable possibility" of persecution or torture standard where the lawful pathways condition renders

[80] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[81] *See* TRAC, *Immigration Court Asylum Backlog through February 2023, https://trac.syr.edu/phptools/immigration/asylumbl/* (last visited Mar. 14, 2023) (average 1,535 days from I–589 filing to merits hearing).

[82] OIS analysis of DOJ EOIR data based on data through March 31, 2023.

the noncitizen ineligible for asylum will result in fewer individuals with non-meritorious claims being placed into removal proceedings under section 240 of the INA, and more such individuals being quickly removed. The Departments believe that using the ''reasonable possibility'' standard to screen for statutory withholding and CAT protection in this context, and quickly removing individuals who do not have a legal basis to remain in the United States, may serve as a disincentive for migrants who would otherwise make the perilous journey to the United States without first attempting to use a lawful pathway or seeking protection in a country through which they travel.

vii. Ineffective Because Exceptions Will Swallow the Rule

*Comment:* Some commenters raised concerns that the rebuttable presumption of ineligibility could be too easily overcome or perceived as easy to overcome, due to the number of exceptions and means of rebuttal. One commenter referred to the proposed rule as ''a facially stricter threshold'' than under current practice and said that the rebuttable presumption was ''a tougher standard in name only.'' Another commenter opined that the proposed rule would be largely ineffective and urged the Departments to eliminate exceptions to the presumption against asylum eligibility, which they said are overbroad, easy to exploit, and threaten to swallow the rule. Similarly, other commenters stated that there should be no exceptions to the condition on asylum. Commenters stated that migrants would quickly learn the various exceptions to the presumption and how to fraudulently claim them to obtain asylum. One commenter alleged, without evidence, that various NGOs and legal organizations coach people on which ''magic words'' they must utter to gain entry into the United States. One commenter stated that noncitizens may falsely claim to be Mexican nationals to circumvent the rule.

One commenter proposed that the rule's exceptions be limited to (1) those who received a final judgment denying them protection in at least one country through which they transited; (2) victims of a severe form of trafficking; (3) those who have transited only through countries that are not parties to the Refugee Convention, the Refugee Protocol, or CAT; and (4) UCs. Another commenter proposed that the Departments should eliminate the CBP One app exception and should apply the presumption to UCs. One commenter stated that the rule should require, not encourage, migrants to use lawful, safe, and orderly pathways.

*Response:* The Departments acknowledge these concerns but believe it is necessary to maintain the exceptions to and means of rebutting the presumption of ineligibility for asylum to prevent undue hardship. The Departments have limited the means of rebutting the presumption to ''exceptionally compelling circumstances,'' where it would be unreasonable to require use of the DHS appointment scheduling system or pursuit of another lawful pathway. The rule lists three examples of exceptionally compelling circumstances that would be considered at both the credible fear and merits stages: acute medical emergencies, imminent and extreme threats to life or safety, and victims of severe forms of human trafficking. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). AOs and IJs will assess the noncitizen's testimony, along with any other evidence in the record, to determine whether the noncitizen meets an exception to or rebuts the presumption against asylum eligibility. INA 208(b)(1)(B), 8 U.S.C. 1158(b)(1)(B); INA 240(c)(4)(B), 8 U.S.C. 1229a(c)(4)(B); 8 CFR 208.30.

The Departments do not believe that the rule creates significant incentive for migrants to falsely pose as Mexican nationals. Even if successful, this would only be a plausible strategy for migrants who are hoping to voluntarily return to Mexico instead of being placed in expedited removal. Once in expedited removal, any incentive to pose as a Mexican national dissipates quickly. It will likely be difficult for the noncitizen to establish a credible fear of persecution or torture in Mexico, a country with which they are less familiar than their actual country of nationality. The noncitizen will not be able to seek any assistance from their consulate without disclosing their true country of nationality. And it will become very difficult for the noncitizen to qualify for asylum or other protection before an IJ, where they will need to prove identity.[83] Noncitizens who falsify their nationality could face serious consequences, as any such false pretenses would be likely to have an adverse effect on their credibility and could result in a permanent bar from all future immigration benefits.[84]

3. Concerns Related to Impacts on Asylum Seekers or Conflicts With Humanitarian Values

i. Belief That the Rule Is Motivated by Unlawful Intent and Inconsistent With U.S. Values

*Comment:* Some commenters generally asserted that the rule targets certain nationalities, groups, or types of claims and that it was motivated by racial animus; that it has discriminatory effects; and that it was intended to address political issues or to mollify those harboring racial animus. Commenters stated that issuing this rule would advance the agendas of anti-immigration groups. At least one commenter stated that the proposed rule could fuel existing anti-immigrant and anti-Latinx sentiments in the United States by sensationalizing immigration. Another commenter expressed opposition to the proposed rule stating that it would continue to uphold an ''ableist, xenophobic, and white supremacist'' notion of accessibility into the United States. One commenter urged DHS to consider the impact that previous white supremacist and race-based policies have had on the U.S. immigration system. Furthermore, a commenter opposed the rule concluding that it continues a ''legacy of structural racism'' in U.S. immigration policy.

Commenters compared the rule to race-based historical immigration laws in the United States, such as the Chinese Exclusion Act and other past immigration actions, including actions of the prior Administration. Another commenter compared the rule to nationality-based quotas instituted by the Immigration Act of 1924 and stated that the rule serves a similar purpose of excluding ''undesirable'' migrant populations, while others compared the rule to limits on migration before, during, and after World War II, including turning away Jewish refugees seeking protection on the ship the St. Louis. At least one commenter stated that asylum seekers from countries located geographically further away would have a higher burden for no reason beyond their national origin. Further, commenters stated that differentiating between the ''types'' of people admitted to the United States or

[83] *See Matter of O–D–*, 21 I&N Dec. 1079, 1081 (BIA 1998) (''A concomitant to such claim is the burden of establishing identity, nationality, and citizenship.''); INA 208(d)(5)(A)(i), 8 U.S.C. 208(d)(5)(A)(i) (''[A]sylum cannot be granted until the identity of the applicant has been checked.''); 8 CFR 1003.47 (Identity, law enforcement, or security investigations or examinations relating to applications for immigration relief, protection, or restriction on removal).

[84] *See* INA 208(b)(1)(B)(iii), 8 U.S.C. 1158(b)(1)(B)(iii) (credibility determinations in asylum proceedings); INA 208(d)(6), 8 U.S.C. 1158(d)(6) (frivolous asylum applications); 8 CFR 1003.47(g) (preventing IJs from granting asylum applications until they can consider complete and current identity, law enforcement, and security investigations).

detained at the border is akin to authoritarian regime policies that have prohibited entry to ''undesirables'' and ''other inconvenient group[s].''

Some commenters stated that the proposed rule is inhumane, xenophobic, and against everything the current Administration is supposed to stand for. Other commenters noted that the rule would only affect migrants seeking to enter at the SWB, but that migrants crossing the northern border from Canada are excluded, which the commenter called ''inequitable'' and evidence of racism. Some commenters stated that limiting who to help in the time of a ''global crisis'' is ''shameful'' because the United States is one of the richest countries in the world. Some commenters stated that with all the terrible things happening in the world we should be making it easier and not harder to seek asylum. An advocacy group expressed further concern that the rule may instead reinforce a notion that immigrants are unwelcome or otherwise do not belong in the United States. Another advocacy group expressed disappointment that words like ''surge'' in the NPRM could frame asylum seekers as a problem that needs to be mitigated or reduced. Some commenters stated that the rule was only written in response to political pressure by political opponents to address the situation at the SWB, thus placing migrants in danger for the sake of a political agenda. One commenter stated that they expected the United States to ''treat migrants as human beings rather than playing pieces that could affect political outcomes.''

*Response:* The Departments reject these commenters' claims concerning the Departments' basis for promulgating the rule. As explained in the NPRM, 88 FR at 11704, the Departments are promulgating the rule to address the following considerations. First, the reality of large numbers of migrants crossing the SWB has placed a substantial burden on the resources of Federal, State, and local governments. *See* 88 FR 11715. While the United States Government has taken extraordinary steps to address this burden, the current level of migratory movements and the anticipated increase in the numbers of individuals seeking entry into the United States following the lifting of the Title 42 public health Order, without policy changes, threaten to exceed the capacity to maintain the safe and humane processing of noncitizens who cross the SWB without authorization. *See id* at 11704. Second, this reality allows pernicious smuggling networks to exploit migrants—putting migrants' lives at risk for the smugglers' financial gain. Finally, the unprecedented migratory flow of non-Mexican migrants, who are far more likely to apply for protection,[85] has contributed to a growing backlog of cases awaiting review by AOs and IJs. As a result, those who have a valid claim to asylum may have to wait years for their claims to be granted, while individuals who will ultimately be found ineligible for protection may spend years in the United States before being ordered removed. None of these considerations are racially motivated, inhumane, or xenophobic.

The Departments reiterate that the United States Government has implemented, and will continue to implement, a number of measures designed to enhance and expand lawful pathways and processes for noncitizens who may wish to apply for asylum to come to the United States. DHS has recently created new processes for up to 30,000 CHNV nationals per month to apply for advance authorization to seek parole into the United States, enabling them to travel by air to the United States.[86] DHS and its interagency partners have also increased H–2B nonimmigrant visa availability and refugee processing for countries within the Western Hemisphere. *See* 88 FR at 11718. Noncitizens who are not eligible for these pathways can schedule an appointment to present at a southwest land border POE through the CBP One app and be exempted from the rule. Finally, the rule does not apply to migrants crossing into the United States from Canada because, as discussed in more detail below, the STCA between the United States and Canada, along with the Additional Protocol of 2022, announced March 24, 2023, already enable sufficient management of migration from Canada.[87] The Additional Protocol expands the STCA to apply to migrants who claim asylum or other protection after crossing the U.S.-Canada border between POEs, thus providing another disincentive for irregular migration.[88]

*Comment:* Other commenters stated that there is a disconnect between President Biden's remarks in Poland in February 2023 regarding accepting and welcoming refugees and this rule. Some commenters stated that the proposed rule is not in line with the American value of welcoming refugees and asylum seekers. Many commenters referenced the Statue of Liberty and the American tradition of welcoming the poor and other vulnerable immigrants and quoted Emma Lazarus' poem. Commenters stated that the ability to seek asylum is a legally recognized right and that the proposed rule would effectively deny that right to many asylum seekers, as well as that the United States should instead live up to its legal responsibilities and ideals. Commenters stated that the need to reduce strain at the border is an insufficient reason to support the reduction in asylum access that would result from the rule.

*Response:* The Departments acknowledge that the United States has a long tradition of accepting and welcoming refugees and note that in the past two years, the United States Government has taken steps to significantly expand refugee admissions from Latin America and the Caribbean. However, simply welcoming migrants into the United States without a policy in place to ensure lawful, safe, and orderly processing of those migrants would exceed DHS's already limited resources and facilities—especially given the anticipated increase in the numbers of migrants who will attempt to enter the United States following the lifting of the Title 42 public health Order.

The Departments underscore that the rebuttable presumption will not apply to noncitizens who availed themselves of safe, orderly, and lawful pathways to enter the United States or sought asylum or other protection in a third country and were denied. The rule lists three per se grounds for rebuttal: if a noncitizen demonstrates that, at the time of entry, they or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen is traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or were a ''victim of a severe form of trafficking in persons'' as defined in 8 CFR 214.11. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). The rule also

[85] For noncitizens encountered at the SWB in FYs 2014–2019 who were placed in expedited removal, 6 percent of Mexican nationals made fear claims that were referred to USCIS for adjudication compared to 57 percent of people from Northern Central America and 90 percent of all other nationalities. OIS analysis of Enforcement Lifecycle data as of December 31, 2022.

[86] *See* 87 FR 63507 (Oct. 19, 2022); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023).

[87] *See* DHS, Press Release, *United States and Canada Announce Efforts to Expand Lawful Migration Processes and Reduce Irregular Migration* (Mar. 24, 2023), *https://www.dhs.gov/news/2023/03/24/united-states-and-canada-announce-efforts-expand-lawful-migration-processes-and.*

[88] *See* 8 CFR 208.30(e)(6); 8 CFR 1003.42(h); Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 25, 2023).

contains a specific exception to the rebuttable presumption for unaccompanied children. *See* 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). Noncitizens who are subject to the lawful pathways condition on eligibility for asylum and who do not qualify for an exception or rebut the presumption of the condition's applicability, remain eligible to apply for CAT protection or for statutory withholding of removal, which implements U.S. non-refoulement obligations under the 1967 Protocol. *See, e.g., Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017).

Exceptionally compelling circumstances will also be found if, during section 240 removal proceedings, the noncitizen is found eligible for statutory withholding of removal or CAT withholding, they would be granted asylum but for the presumption against asylum, and their accompanying spouse or child does not independently qualify for asylum or other protection against removal or the noncitizen has a spouse or child who would be eligible to follow to join them as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if they were granted asylum. *See* 8 CFR 1208.33(c). As discussed in the NPRM, the Departments have determined that applying the lawful pathways condition on eligibility for asylum is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws and to reduce the role of exploitative and dangerous smuggling and human trafficking networks.

*Comment:* Many commenters stated that if the United States cannot be a safe place for people being persecuted, then it is not living up to constitutional and moral values. A commenter stated that anyone not of Native American ancestry is here because our relatives came here for a better life for themselves and their family. Some commenters stated that America is a nation of immigrants, while others stated that we should remember our ancestors, as many were immigrants too, and invoked their family's migration to the United States as examples. A commenter stated that it is inherently evil to ignore, mistreat, or in any way harm desperate people fleeing their homes because they would likely suffer or even die if they stay. Commenters described the rule as inhumane, not in alignment with Christian or Judeo-Christian morals, and immoral and contrary to American values. A commenter stated that the use of the term "humane" in connection with the proposed rule was cynical and cruel. Another commenter stated that the rule would inevitably lead to unnecessary harm and death. One commenter stated that the rule would cause survivors and victims of crime to distrust systems.

Many commenters cited the harms resulting from the United States' failure to provide protection for those fleeing Nazi persecution, which commenters said led to the development of the modern asylum system. Multiple commenters stated that, as a wealthy country that claims to be a leader in democracy, the United States has a special obligation to make it easy to seek asylum here, and that the proposed rule would put barriers in the way of desperate people. Commenters stated that the Departments should not forget the contributions of immigrants to the United States' workforce and diversity and should not deny protection to people in need. Some commenters stated that the asylum seekers who would be denied under the rule would be contributing members of society that the country needs. One commenter stated the rule conflicts with the American tradition of "innocent until proven guilty," another protested "the presumption of guilt of undocumented immigrants which underlies this proposed rule," and others stated that refugees should not be treated as criminals. At least one commenter stated that the rule would amount to "cruel and unusual punishment" and other commenters described it as "cruel" or "wrong" and "un-American." One commenter stated that the rule imposes an arbitrary punishment on the very individuals whom the asylum laws were intended to protect. At least one commenter stated that the rule should have a presumption in favor of applicants. Another commenter said that one of America's principles is that "all men are created equal," noting that it says "men" and does not refer to U.S. citizens only.

*Response:* The Departments disagree that this rule is inhumane or contrary to morals and values. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. The Departments note that the rule is designed to safely, effectively, and humanely process migrants seeking to enter the United States, and to reduce the influence and role of the lawless and pernicious human smuggling organizations that put migrants' lives in peril for profit. *See* 88 FR at 11713–14. The Departments considered the dangerous journeys made by migrants who put their lives at risk trying to enter the United States without authorization. The rule is designed to disempower criminal enterprises that seek to take advantage of desperate migrants, leading to untold human suffering and far too many tragedies. *See id.* The rule pursues this goal by encouraging migrants to seek protection in other countries in the region and to use lawful pathways and processes to access the U.S. asylum system, including pathways and processes that do not require them to take a dangerous journey. In order to ensure that particularly vulnerable migrants are not unduly affected by the rule, the Departments have included exceptions and multiple ways that migrants may rebut the presumption and thereby remain eligible for asylum, as well as access to other protection. A noncitizen who seeks to apply for asylum can also schedule their arrival at a land border POE through the CBP One app and be exempted from the rule.

Regarding comments stating that the rule conflicts with "innocent until proven guilty," or that the rule attaches a presumption of guilt to migrants, or that the rule amounts to "cruel and inhumane treatment," the Departments note that this rule is not intended to ascribe guilt or innocence or punishment to anyone but rather to encourage the use of lawful, safe, and orderly pathways to enter the United States. The rule also does not subject anyone to "cruel and inhumane treatment," and indeed ensures that individuals who fear torture or persecution can seek statutory withholding of removal or CAT protection. Similarly, the Departments disagree with comments recommending a presumption in the rule that favors eligibility for asylum. The Departments note that asylum eligibility requirements set forth in section 208(b)(1) of the INA place the burden on the noncitizen. Creating a presumption in the rule to favor eligibility for asylum would remove that burden from the noncitizen and would not achieve the Departments' goals of disincentivizing migrants from crossing the SWB without authorization. Finally, as explained in Section IV.D.1.ii of this preamble, the rule is fully consistent with the Departments' legal authority and obligations on asylum eligibility pursuant to section 208 of the INA, 8 U.S.C. 1158.

*Comment:* Commenters described this rule as a "broken promise" to fix the asylum system and stated that President Biden had criticized the Title 42 public health Order and indicated that he would pursue policies that reflect the United States' commitment to asylum seekers and refugees. A commenter urged the Departments to withdraw the

rule, reasoning that it would contravene the Biden Administration's values by putting vulnerable migrants at greater risk for violence without shelter or protection. Another commenter expressed concern that the proposed rule would be antithetical to President Biden's prior promises to reduce migrants' reliance on smuggling networks, to reduce overcrowding in migrant detention facilities, and to provide effective humane processing for migrants seeking protections in the United States. Other commenters stated that the rule would contravene President Biden's promise to uphold U.S. laws humanely and to preserve the dignity of ''immigrant families, refugees, and asylum seekers.'' One commenter stated that during the presidential election, President Biden campaigned to ''restore the soul of America'' and cutting off asylum seekers is not part of that promise. Another commenter urged that President Biden be held accountable for the ''promises he made before his election.'' A commenter likewise stated that the proposed rule would fail to uphold the Biden Administration's commitments to promote regional cooperation and shared migration management.

*Response:* Political and economic instability, coupled with the lingering adverse effects of the COVID–19 global pandemic, have fueled a substantial increase in migration throughout the world. This global increase is reflected in the trends on the SWB, where the United States has experienced a sharp increase in encounters of non-Mexican nationals over the past two years, and particularly in the final months of 2022. *See* 88 FR at 11708. DHS was encountering an average of approximately 8,800 noncitizens per day during the first ten days of December 2022—a new record—and expects that encounter numbers could increase to 11,000 per day following the termination of the Title 42 public health Order.[89] The rule is a response to the even more urgent situation that the Departments could face after the lifting of the Title 42 public health Order. The Departments believe that these circumstances warrant this policy, which will encourage those migrants who wish to seek asylum to avail themselves of lawful, safe, and orderly pathways into the United States.

Consistent with the principle of establishing a fair, orderly, and humane asylum system, the United States Government has implemented a multi-pronged approach to managing migration throughout North and Central America. The United States Government is working closely with international organizations and the governments in the region to establish a comprehensive strategy for addressing the causes of migration in the region; build, strengthen, and expand Central and North American countries' asylum systems and resettlement capacity; and increase opportunities for vulnerable populations to apply for protection closer to home. *See* E.O. 14010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 FR 8267, 8270 (Feb. 2, 2021). These commitments were further enshrined and expanded beyond Central and North America in the June 2022 L.A. Declaration endorsed by the United States and 19 nations in the Western Hemisphere.[90] Indeed, the L.A. Declaration specifically outlines ''the need to promote the political, economic, security, social, and environmental conditions for people to lead peaceful, productive, and dignified lives in their countries of origin'' and states that ''addressing irregular international migration requires a regional approach.'' [91] At the same time, the United States is expanding efforts to protect refugees by increasing refugee admissions and expanding refugee processing within the Western Hemisphere. In fact, on April 27, 2023, DHS announced that it would commit to welcoming thousands of additional refugees each month from the Western Hemisphere—with the goal of doubling the number of refugees the United States committed to welcome as part of the L.A. Declaration.[92] Therefore, the United States is enhancing lawful pathways for migration to this country while improving efficiencies within the U.S. asylum system.

*Comment:* Commenters stated that the United States should welcome and not punish asylum seekers because the United States is responsible for creating the conditions and other problems that have caused many of the migrants seeking asylum to leave their countries, such as through American military, intelligence, political, or economic actions. Commenters also stated that the United States should not limit access to asylum for migrants coming from countries where the United States Government supported a regime change that created the circumstances that the migrants are fleeing. For example, one commenter referenced the United States' support in prior conflicts in Guatemala and El Salvador and the current support for the controversial leadership in El Salvador as reasons the commenter believed the United States was the cause of migration. One commenter stated that the United States has played a role in creating the political instability that cause many Central American refugees to flee and seek asylum in the United States. Other commenters expressed a belief that many migrants are fleeing because of climate change, to which the United States has greatly contributed, or because of challenging conditions in some countries, including Haiti. Another commenter argued that the U.S. war on drugs has contributed to the circumstances from which migrants are fleeing to seek asylum at the SWB.

*Response:* The Departments recognize commenters' concerns that numerous factors may have contributed to migrants seeking asylum. As noted in the preceding comment response, political and economic instability, coupled with the lingering adverse effects of the COVID–19 global pandemic, have fueled a substantial increase in migration throughout the world. This global increase is reflected in the trends on the SWB, where the United States has experienced a sharp increase in encounters of non-Mexican nationals over the past two years, and particularly in the final months of 2022. *See* 88 FR at 11708. This rule addresses the Departments' continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system, in anticipation of a potential further surge of migration at the SWB, regardless of any factors that may have contributed to migration flows. The Departments have sought to address this situation by increasing lawful pathways while also imposing consequences for not using those pathways. The Departments further note that the United States has worked closely with its regional partners to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including taking measures to address the root causes of migration, expand access to lawful pathways, improve the U.S. asylum system, and address the pernicious role of smugglers. For

[89] *See* DHS Post-Title 42 Planning Model generated April 18, 2023; *see also* OIS analysis of CBP UIP data downloaded January 13, 2023.

[90] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[91] *Id.*

[92] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

instance, the United States Government has implemented new parole processes for CHNV nationals that have created a strong incentive for these individuals to wait where they are to access an orderly process to come to the United States.[93] Additionally, the United States has expanded refugee processing in the region which provides another orderly option for refugees to lawfully enter the United States. *See* 88 FR at 11719. Consistent with these processes, this rule would further incentivize noncitizens to avail themselves of other lawful, safe, and orderly means for seeking protection in the United States or elsewhere.

*Comment:* Some commenters stated that the United States is applying inconsistent policy by ending expulsions of noncitizens under the Title 42 public health Order while simultaneously creating new restrictions on asylum. Commenters stated that the United States Government should not use the end of the Title 42 public health Order as an excuse to resurrect asylum restrictions. Commenters stated that the United States has expelled individuals from ''Central America, Haiti, and . . . Venezuela,'' nearly 2.5 million times while the Title 42 public health Order has been in place, which, according to commenters, has led to increasing numbers of deaths along the border. One commenter stated that it is ''ludicrous'' that the Government has acted as if the pandemic is over except in the context of welcoming asylum seekers. Conversely, some commenters stated that the ending of Title 42 is within the Administration's control and is not a necessary justification for the rule, and further critiqued the recent actions of the Departments to prepare for the termination as causative of the recent border crisis.

*Response:* The Departments respectfully disagree that this action is inconsistent with the lifting of the Title 42 public health Order. It is important to note that the CDC's April 2022 decision to terminate the Title 42 public health Order and HHS's separate decision to not renew the public health emergency after May 11, 2023, resulting in the impending termination of the Title 42 public health Order, were based on considerations of public health, not immigration policy. HHS and CDC exercise authority under Title 42 of the U.S. Code to make public health determinations for a range of purposes. *See* 42 U.S.C. 265, 268; section 319 of the Public Health Service Act; 42 CFR 71.40. Throughout the COVID–19 pandemic, DHS and DOJ have relied and will continue to rely on the public health expertise of CDC and HHS, and DHS will implement relevant CDC orders to the extent that they remain in effect.

After the Title 42 public health Order is lifted, migrants will be subject to Title 8 processing. The Departments anticipate that in the absence of this rulemaking, a significant further surge in irregular migration would then occur. Such a surge would risk (1) overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered; and (2) placing additional pressure on States, local communities, and NGO partners both along the border and in the interior of the United States. This rule will disincentivize irregular migration and instead incentivize migrants to take safe, orderly, and lawful pathways to the United States or to seek protection in a third country.

ii. Ports of Entry Should Be Open to Anyone To Make an Asylum Claim

*Comment:* Commenters stated that everyone escaping persecution should be able to seek safety in the United States by presenting at a POE, and that migrants should not be required to make appointments to present themselves or to seek asylum in third countries where they may face harm. Another commenter stated that the rule would limit asylum to the ''privileged and connected'' despite longstanding legal precedent holding that individuals should be able to access asylum regardless of manner of entry. One commenter stated that even if migrants have a relatively low chance of approval, they have a right to enter the United States and apply for asylum, because some claims will be successful. Commenters stated that the United States denies visas to many people who face persecution, so those same people should not be denied asylum for failing to travel with a visa. For example, at least one commenter stated that an average person from Central America would struggle to get a tourist, student, or other visa. Another commenter stated that everyone, regardless of manner of entry, manner of transit, nationality, or other arbitrary restriction, should have the right to seek asylum in the United States.

*Response:* As discussed in more detail in Section IV.D.1 of this preamble, this rule does not deny anyone the ability to apply for asylum or other protection in the United States; instead, the Departments have exercised their authority to adopt additional conditions for asylum eligibility by adopting a rebuttable presumption of ineligibility for asylum in certain circumstances. The Departments acknowledge and agree that any noncitizen who is physically present in the United States may apply for asylum, but note that there is no freestanding right to enter or to be processed in a particular manner. *See U.S. ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 357, 452 (1950) (''At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government''). Importantly, under this rule, any noncitizen will be able to present at a POE, and no individual—regardless of manner of entry into the United States—will be turned away or denied the opportunity to seek protection in the United States under this rule. Noncitizens who lack documents appropriate for admission to the United States are encouraged and incentivized, but not required, to make an appointment using the CBP One app to present themselves at a POE for inspection.

The use of the CBP One app will contribute to CBP's efforts to expand its SWB POE migrant processing capacity well beyond the 2010–2016 daily POE average,[94] resulting in increased access for noncitizens to POEs. Those who arrive at a POE without an appointment via the CBP One app may be subject to longer wait times for processing at the POE depending on daily operational constraints and circumstances. And this rule does not preclude such noncitizens, or other noncitizens who cross the southwest land border or adjacent coastal borders, from filing an asylum application. Indeed, in all cases, any noncitizen who is being processed for expedited removal may express or indicate a fear of return during the expedited removal process, and will be referred to USCIS for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). Also, noncitizens in section 240 removal proceedings have the opportunity to present information asserting fear or concern of potential removal. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4). Although such individuals

[93] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[94] *See* CBP STAT Division, *U.S. Customs and Border Protection (CBP) Enforcement Encounters—Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved Apr. 13, 2023).

may be presumptively ineligible for asylum under this rule, they may seek to establish that they are subject to an exception or to rebut that presumption, and they may also still seek statutory withholding of removal and CAT protection in the United States, as outlined in Section IV.E.8 of this preamble. The Departments also note that a purpose of this rule is to facilitate safe and orderly travel to the United States. Individuals who lack a visa are generally inadmissible to the United States, *see* INA 212(a)(7), 8 U.S.C. 1182(a)(7), and will remain so under this rule.

iii. Belief That the Rule Will Result in Denial of Valid Asylum Claims

*Comment:* Commenters stated that the rule would result in the denial of valid asylum claims and described the right to seek asylum as a human right. One commenter emphasized that, when Congress created the credible screening process, the premise of the screening was for adjudicators to err on the side of protection. Multiple commenters expressed concern that implementing the proposed rule would increase the likelihood that asylum seekers would be refouled or migrants returned to harmful conditions. One commenter said that denying a bona fide asylum claim and putting a would-be applicant at risk of danger is a greater mistake than making a positive credible fear determination that does not result in asylum. At least one commenter disagreed with the proposed rule's assertion that noncitizens who forgo certain lawful or orderly procedures are less likely to have a well-founded fear than those who do and stated that this assertion is unsupported.

Commenters stated that the rule imposes conditions on noncitizens' access to asylum that have nothing to do with the merits of their asylum claims and merely puts up bureaucratic hurdles. One commenter stated that people often have no control or choice in how they get to the United States, which is a matter of survival. Another commenter stated that rushed procedure created by this rule would result in what the commenter describes as false negatives, as asylum seekers subjected to this process would be disoriented from their days in CBP's holding facilities, especially after undergoing a harrowing journey to the United States that likely included violence, persecution, and trauma. Commenters stated that instead of filtering out migrants with weak asylum claims, the rule would stop the most vulnerable from being able to apply for asylum. One commenter stated that it may be necessary for asylum seekers to cross the border by unscrupulous means to escape their persecutors and that this bolsters their case for asylum rather than detracts. Commenters stated that the exceptions to the proposed rule do little to provide meaningful safeguards for asylum seekers and would result in erroneous denials and forced return to countries where the noncitizen would face danger. Commenters stated that asylum seekers who are otherwise eligible for asylum but banned by the rule would likely be deported to danger. Other commenters stated that the framework of the rebuttable presumption would have negative effects and de facto be dispositive of asylum eligibility before noncitizens have a ''fair shot at making their case.'' One commenter wrote that, concerning the one-year asylum filing deadline, numerous reports have shown the impact of such bars on returning individuals to harm.

*Response:* The Departments disagree that the rule creates an unwarranted risk of denial of valid asylum claims. The U.S. asylum system is governed by statute and implementing regulations. To receive asylum, noncitizens must establish that (1) they meet the definition of a ''refugee,'' under section 101(a)(42) of the INA, 8 U.S.C. 1101(a)(42), (2) they are not subject to a bar to applying for asylum or a bar to the granting of asylum, and (3) they merit a favorable exercise of discretion. *See* INA 208(a)(2), 8 U.S.C. 1158(a)(2); INA 208(b)(1), 8 U.S.C. 1158(b)(1); INA 240(c)(4)(A), 8 U.S.C. 1229a(c)(4)(A); 8 CFR 1240.8(d); *see also Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of ''discretionary relief from removal''); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) (''Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum.''). Because asylum is a discretionary form of relief from removal, the assumption that this rule will result in the risk of denial of valid asylum claims is incorrect because the noncitizen bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise the discretion to grant relief. *See* INA 208(b)(1), 8 U.S.C. 1158(b)(1); INA 240(c)(4)(A), 8 U.S.C. 1229a(c)(4)(A)(ii); 8 CFR 1240.8(d); *Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

The Departments acknowledge that despite the protections preserved by the rule and the availability of lawful pathways, the rebuttable presumption adopted in the rule will result in the denial of some asylum claims that otherwise may have been granted, but the Departments believe that the rule will generally offer opportunities for those with valid claims to seek protection through asylum, statutory withholding of removal, or protection under the CAT. Moreover, the Departments have determined that the benefits to the overall functioning of the system, including deterrence of dangerous irregular migration and smuggling, justify the rule.

The rule encourages those with meritorious claims to either apply for asylum or other protection in the first safe country they reach or pursue available lawful pathways as set forth in the rule. Noncitizens who apply for and are denied protection in a third country are not barred from asylum eligibility under this rule. The rule will preserve core asylum protections by permitting noncitizens subject to the presumption of asylum ineligibility to rebut it by showing exceptionally compelling circumstances that excuse their failure to pursue lawful pathways or processes. Furthermore, under the rule, noncitizens who are ineligible for asylum due to the lawful pathways condition remain eligible for protections from persecution and torture. Indeed, noncitizens who establish a reasonable possibility of persecution or torture are placed in section 240 removal proceedings where they can apply for asylum, statutory withholding of removal, and protection under CAT. 8 CFR 1208.33(b)(2)(ii), (b)(4). Thus, the rule does not prevent noncitizens from pursuing asylum nor does the rule create an unwarranted risk of denial of valid asylum claims.

iv. Belief That the Rule Will Increase Smuggling or Trafficking

*Comment:* Commenters agreed that human trafficking is a serious concern, but asserted that this rule would make the problem worse. Commenters stated the proposed rule will not result in asylum seekers relying less on smuggling networks, but will actually increase their reliance on smugglers and increase their vulnerability to trafficking. One stated that desperate people turn to traffickers because they fear being turned away by authorities, and that the most effective way to remove traffickers' leverage is to open safe and legal pathways for immigration. Another commenter stated that the United States should make it easier to legally enter for work as a way to discourage trafficking by smugglers rather than implement the proposed rule. Some commenters stated human smuggling and trafficking were

problems of the Government's own making, and by discouraging migrants from coming to the border in a legal manner, the rule would increase the interactions between migrants and smugglers, as well as increasing the number of noncitizens without lawful immigration status in the United States. Commenters also stated that closing off the SWB and trapping migrants in dangerous parts of Mexico for a prolonged time exposes them to greater violence, exploitation, and other dangers, and heightens their risk of being trafficked. One commenter stated that in the event that people are unable to get an appointment through the CBP One app and are blocked from access to asylum, smuggling operations and organized crime in Mexico will only gain more power, take individuals on more treacherous routes to evade detection, and cause USBP to invest more resources to detain individuals. Another commenter stated that the rule would further embolden organized crime, corrupt state actors, and criminals, making migrants even more of a target and placing them at greater risk of being trafficked. One commenter stated, without evidence, that the TCT Bar Final Rule advantaged drug cartels and criminal organizations that target vulnerable populations, and asserted that this rule would have the same result.

Commenters said that technical difficulties associated with the CBP One app have opened new avenues for exploitation; for example, traffickers claiming an ability to obtain appointments, or scams charging fees for completing a CBP One app registration. Similarly, one commenter said that individuals who lack access to stable Wi-Fi may seek Wi-Fi in dangerous places, including cities controlled by cartels. Another commenter wrote that the need for migrants to borrow a smartphone from a third party could create an opportunity to take advantage of migrants trapped at the U.S.-Mexico border to target them for extortion, sexual violence, or other harm. In contrast, based on its field monitoring, a different commenter stated that the CBP One app has led to a reduction in instances of fraud and abuse of migrants who previously relied on local actors to get on lists to request an exception to the Title 42 public health Order.

Another commenter expressed concern that the proposed rule may discourage migrants from contacting U.S. law enforcement for fear of deportation, increasing the likelihood of trafficking and smuggling. One comment stated that the rule would continue the Administration's shameful legacy of facilitating mass trafficking and smuggling of vulnerable noncitizens because it is ''all bark and no bite'' due to its ''numerous loopholes and exceptions,'' unlike the TCT Bar rulemaking, which the commenter described as part of a multi-pronged strategy to secure the border.

*Response:* The Departments acknowledge the commenters' concerns about smuggling and trafficking, but disagree with the either/or approach urged by some commenters. To prevent migrants from falling victim to smugglers and traffickers, the Departments believe it is necessary to both increase the availability of lawful pathways for migration and discourage attempts to enter the United States without inspection. The Departments anticipate that the newly expanded lawful pathways to enter the United States, in conjunction with the rule's condition on asylum eligibility for those who fail to exercise those pathways, will ultimately decrease attempts to enter the United States without authorization, and thereby reduce reliance on smugglers and human traffickers.

DHS has recently created alternative means for migrants to travel to the United States via air through the CHNV parole processes, increased refugee processing in the Western hemisphere, and increased admissions of nonimmigrant H–2 workers from the region. 88 FR at 11718–20. DHS also recently announced that it plans to create new family reunification parole processes for nationals of El Salvador, Guatemala, Honduras, and Colombia, and to modernize the existing Haitian Family Reunification Parole process and the Cuban Family Reunification Parole process.[95] In addition, noncitizens' use of the CBP One app to schedule appointments to present at land border POEs is expected to enhance DHS's ability to process such individuals in a safe, orderly manner. As discussed later in Section IV.E.3.ii.a of this preamble, CBP anticipates processing several times more migrants each day at SWB POEs than the 2010–16 daily average,[96] including through the use of the CBP One app. While the CBP One app provides noncitizens access to schedule arrivals at a POE, no CBP officer will dissuade or prevent any noncitizen who lacks a scheduled appointment from applying for admission to the United States. *See* INA 235(a)(4), U.S.C. 1225(a)(4); 8 CFR 235.1, 235.4 (decision to withdraw application for admission must be made voluntarily).

The Departments disagree that the CBP One app or accessibility issues associated with the CBP One app will increase reliance on smugglers and traffickers. The CBP One app is a free, public-facing application that can be downloaded on a mobile phone. 88 FR at 11717. As noted in the received comments, the International Organization for Migration (''IOM'') has, during its recent field monitoring, observed that the CBP One app has led to a reduction in instances of fraud and abuse of migrants who previously relied on local actors to get on lists to request an exception to the Title 42 public health Order, and recommended that CBP further develop the CBP One app to prevent glitches and incorporate improvements suggested by IOM and other stakeholders. CBP is continuing to improve the CBP One app and engage with stakeholders on potential improvements. The rule also contains an exception for situations where it was not possible to access or use the app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. 8 CFR 208.33(a)(2)(B), 1208.33(a)(2)(B).

The Departments also disagree with the assertion that, due to its exceptions and means of rebuttal, the rule will facilitate mass trafficking and smuggling of vulnerable noncitizens. The recently expanded lawful pathways are designed to allow migrants to travel directly to the United States without having to travel through Central America, where they might rely on smugglers or traffickers. In addition, some of the specific examples of exceptionally compelling circumstances are designed to protect victims or those at risk of trafficking. *See* 8 CFR 208.33(a)(3)(i)(B) and (C), 1208.33(a)(3)(i)(B) and (C).

Finally, the Departments do not believe that the rule will discourage migrants from contacting U.S. law enforcement due to fear of deportation, and thereby place them at further risk of trafficking and smuggling. Migrants who enter the United States without inspection or apprehension by CBP are already subject to removal, *see* INA 212(a)(6)(A), 8 U.S.C. 1182(a)(6)(A), and victims of severe forms of trafficking or other crimes may be eligible to apply for

[95] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[96] *See* CBP STAT Division, *U.S. Customs and Border Protection (CBP) Enforcement Encounters—Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved Apr. 13, 2023); Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

T or U nonimmigrant status, *see* INA 101(a)(15)(T) and (U), 8 U.S.C. 1101(a)(15)(T) and (U).

4. Negative Impacts and Discrimination Against Particular Groups

i. General Comments on Discrimination

*Comment:* Commenters raised concerns that the proposed rule could have a disproportionate impact on certain populations that may be vulnerable, including those without legal representation, those with limited English proficiency (''LEP''), families and children, victims of domestic and gender-based violence, victims of human trafficking, women, the LGBT community, those with mental impairments and associated competency issues, elderly individuals, those with limited technological literacy, those with physical disabilities, those with health problems or who are otherwise in need of medical attention, people of color, indigenous groups, survivors of persecution or torture, and those with post-traumatic stress disorder (''PTSD''), among others.

For example, commenters stated that those without legal representation or with limited English proficiency may have difficulty understanding and complying with the process proposed by the rule, which commenters claimed requires access to technology, technological proficiency, and an understanding of the requirements prior to attempting entry at the SWB. Likewise, commenters suggested that groups including survivors of persecution or torture, the LGBT community, victims of domestic and gender-based violence, women, and noncitizens with mental impairments and associated competency issues may have difficulty applying for relief in a third country, as those countries may not have sufficiently robust humanitarian-relief systems to accommodate the particular issues faced by these and similar groups. For instance, many such individuals may have difficulty recounting the harms they suffered in their home countries without specialized procedures, and some third countries may not recognize their harms as qualifying for asylum in the same way that U.S. asylum law does. Similarly, commenters stated, some groups may also face particular discrimination or violence in third countries based on the same immutable characteristics for which they were persecuted in their home countries. Other commenters highlighted anecdotally that membership in one group has often intersected with membership in another, compounding the harm noncitizens have experienced in transit.

*Response:* The Departments are committed to the equal treatment of all persons. This rule is intended to promote lawful, safe, and orderly pathways to the United States and is intended to benefit particularly vulnerable groups by removing the incentive to make a dangerous irregular migration journey and reducing the role of exploitative transnational criminal organizations and smugglers. *See* 88 FR at 11707. As detailed in the NPRM, irregular migration journeys can be particularly fraught for vulnerable groups, including those discussed in the following sections. *See* 88 FR at 11713 (explaining that women and children are ''particularly vulnerable to attack and injury'' as well as illness along an important migratory route). The incentivizing of the lawful pathways described in the NPRM is intended in part to encourage vulnerable groups to avoid such journeys while simultaneously preserving their ability to apply for asylum consistent with existing law and regulations. *See, e.g.,* 88 FR at 11718 (explaining that the United States has taken ''meaningful steps'' to enhance lawful pathways for migrants to access protection). In addition, depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the exceptionally compelling circumstances standard.

ii. Children and Families

*Comment:* Commenters raised concerns about the proposed rule's impact on children and families. In general, commenters stated that the United States has a legal and moral obligation to act in the best interest of children by preserving family unity and should be doing whatever it can to protect children seeking asylum, especially after prior family separation policies at the border. Commenters generally asserted that the proposed rule would expose children and families to continued violence and danger, limit their right to seek asylum, and deny children the opportunity to be safe and protected. Commenters provided anecdotal examples of migrant families and children who had been harmed or killed while waiting at the border to secure an appointment through the CBP One app or while attempting to travel to POEs with available appointments. Commenters asserted that the proposed rule would prevent accompanied children from presenting their own asylum claims independent of a claim presented by their parent or guardian. Commenters were concerned that the asylum ineligibility presumption would encourage families to separate at the SWB and prevent noncitizens from petitioning for their eligible derivatives, which commenters claimed would be a form of family separation, and described potential attendant negative consequences for children and families, such as trauma, familial instability, developmental delays, vulnerability to harm and exploitation, detention, placement in orphanages, and detention in inhumane conditions.

Further, commenters asserted that all children, because of their unique needs and challenges, deserve additional procedural protections and child-sensitive considerations not included in the proposed rule. Commenters highlighted the vulnerability of children, the fact that children process trauma differently than adults do, and children's varied ability to understand complex immigration requirements, stating that the law recognizes the need for additional protections for children and to account for their best interests. Commenters also suggested that the proposed rule and any detention that it may require would re-traumatize children who have already experienced trauma, including trauma from their journey to the SWB. Other commenters suggested that any required detention may have serious ramifications on a child's well-being, mental health, and development.

Additionally, commenters posited that the proposed rule could incentivize entire families to make a potentially dangerous journey to the United States together. Commenters stated that prior to the proposed rule, one family member might have journeyed alone to the United States to seek asylum with the understanding that they would be able to petition for family members upon being granted asylum. But under the proposed rule, those commenters stated, many families may be incentivized by what commenters consider a lack of asylum availability to undertake an unsafe journey to the SWB together rather than risk permanent family separation. Relatedly, commenters indicated that children compelled to wait at the SWB with a member of their family, so as not to be subject to the NPRM's condition on eligibility, may be deprived of access to other forms of status for which they may be eligible in the United States, such as Special Immigrant Juvenile classification. Commenters urged the Departments to prioritize processing family unit applications to keep families together and expressed that families deserve a chance to live together in the

United States to escape violence in their home countries.

One commenter stated that children have little control over whether their parents can pre-schedule their arrival at a POE or choose to apply for protection in transit countries, but the proposed rule would condition asylum eligibility for the child on whether their parent did so. Similarly, other commenters stated that the proposed rule failed to consider or make an exception for the fact that children and young people generally have less control and choice with respect to their movement and may depend on the assistance of a parent, who may have been jailed or killed by persecutors, or who may themselves have harmed the child or young person, to apply and be approved for a visa.

*Response:* The Departments share commenters' concerns about the vulnerability of children and note that UCs are entitled to special protections under the law. *See* 88 FR at 11724 (citing INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E) (providing that safe-third-country bar does not apply to UCs); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (stating that an AO has initial jurisdiction over the asylum claims of UCs); and 8 U.S.C. 1232(d)(8) (''Applications for asylum and other forms of relief from removal in which an unaccompanied alien child is the principal applicant shall be governed by regulations which take into account the specialized needs of unaccompanied alien children and which address both procedural and substantive aspects of handling unaccompanied alien children's cases.'')). The Departments also recognize commenters' concerns that children may be at risk for exploitation by criminal actors at and around the SWB, and the Departments note that UCs are of particular concern.

Because of UCs' unique vulnerability and the special protections granted to them by law, the rule contains a provision categorically excepting UCs from the rebuttable presumption of ineligibility for asylum. 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). Accordingly, because UCs will not be subject to the rebuttable presumption of ineligibility for asylum created by this rule, the Departments emphasize that UCs do not need to wait, potentially vulnerable, in Mexico before seeking entry to the United States or rely on smugglers to undertake a potentially dangerous journey across the SWB. Further, the Departments expect that the rule, by creating efficiencies and freeing up resources due to non-UC migrants pre-scheduling their arrival at SWB POEs, will allow for faster, smoother processing of UCs presenting at the SWB. *See* 88 FR at 11719–20 (describing anticipated efficiencies from implementation of pre-scheduling through the CBP One app). The Departments believe that the rule sufficiently recognizes the unique situation of UCs and provides appropriate safeguards. For discussion of the exception to the condition on asylum eligibility for UCs, and comments suggesting a similar exception for accompanied children, please see Section IV.E.3.v of this preamble.

The Departments acknowledge commenter concerns that children may not have the autonomy to make decisions about their transit or manner of entry into the United States. With those important realities in mind, the Departments have amended the language proposed in the NPRM to ensure that the presumption of asylum ineligibility will not apply to certain noncitizens who entered as children and who file asylum applications after the date range set forth in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i)—specifically, those who are applying as principal applicants. *See* 8 CFR 1208.33(d)(2). Further, the Departments recognize that some children could be traveling with an adult but still meet the definition of UC at 6 U.S.C. 279(g)(2), for example, where the adult is not the child's parent or legal guardian. Such children would also be excepted from the presumption against asylum eligibility as UCs. *See* 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). The Departments believe that the aforementioned provisions of the rule prevent those who entered as children from facing a continuing impact on asylum eligibility based upon decisions that others likely made for them.

As discussed in more detail in Section IV.E.3.ii.b of this preamble, the Departments emphasize that family units traveling together should schedule their appointments together through the CBP One app. Families or groups traveling together who do not register together on one CBP One app account may not be accommodated at the same POE or date. Further, as stated in the NPRM, when family units are subject to a credible fear screening, USCIS will find that the entire family passes the screening if one family member establishes a credible fear. 88 FR at 11724; *see* 8 CFR 208.30(c). Likewise, when the reasonable possibility standard applies, USCIS will continue to process claims from family units in this way. 88 FR at 11724 (''USCIS will continue to process family claims in this manner even when applying the reasonable possibility standard.'').

The Departments also acknowledge commenter concerns related to the impact that any potential detention may have on children and families, as well as the effects of trauma on children. However, this rule neither addresses nor expands detention policies, and therefore specific concerns related to detention are outside the scope of this rule. Further, with respect to the effects of trauma on children and concerns about re-traumatization, the Departments are confident in the ability of AOs and IJs to follow appropriate safeguards available for children in processing with USCIS and the immigration courts and note that adjudicators receive training and guidance related to special considerations in cases involving children.[97]

However, the Departments disagree with commenters' contention that children waiting for an appointment to present at a POE together with their family unit will be deprived of Special Immigrant Juvenile classification. Whether a noncitizen enters alone or with a family unit is not dispositive to the statutory definition of a ''special immigrant.'' *See* INA 101(a)(27)(J), 8 U.S.C. 1101(a)(27)(J) (defining ''special immigrant,'' in part, as an immigrant who is present in the United States ''who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States,'' and whose reunification with one or both of the immigrant's parents ''is not viable due to abuse, neglect, abandonment, or a similar basis found under State law''). Further, the Departments highlight that nothing in this rulemaking prevents a noncitizen child from obtaining Special Immigrant Juvenile classification after entering the United States, provided that they are otherwise eligible for such status.

Moreover, the Departments disagree with the characterization of this rule as contributing to family separation rather

[97] *See, e.g.,* Department of Justice, EOIR, *OPPM 17–03: Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children* (Dec. 20, 2017), *https://www.justice.gov/eoir/file/oppm17-03/download* (recognizing unique circumstances presented by immigration cases involving children and providing guidance for those cases); USCIS, RAIO Directorate—Officer Training: Children's Claims (last revised Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Childrens_Claims_LP_RAIO.pdf* [hereinafter USCIS, *Children's Claims*] (providing guidelines for adjudicating children's claims).

than focusing on family unity. The Departments drafted this rule with the goal of eliminating the risk of separating families. As explained above, the rule has several provisions to ensure that family units are processed together. For example, if any noncitizen in a family unit traveling together meets an exception to, or is able to rebut, the asylum ineligibility presumption, the presumption will not apply to anyone in the family unit traveling together. 8 CFR 1208.33(a). Similarly, the rule contains an explicit family unity provision applicable in removal proceedings. *Id.* 1208.33(c). The provision states that if a principal applicant for asylum is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption created by this rule, the presumption ''shall be deemed rebutted as an exceptionally compelling circumstance'' where an accompanying spouse or child does not independently qualify for asylum or other protection or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if the applicant were granted asylum. *Id.* This provision is intended to prevent the separation of families. Additionally, this provision is intended to avoid incentivizing families to engage in irregular migration together, so as not to risk that the principal applicant be prevented from later applying for their family members to join them. This may involve making a dangerous journey with vulnerable family members such as children.

Further, the rule incentivizes families, as well as individuals traveling without their families, to take advantage of the lawful pathways outlined in this rule, rather than rely on smugglers or criminal organizations to facilitate a potentially dangerous journey. The rebuttable presumption is intended to disincentivize making such irregular journeys. *See, e.g.,* 88 FR at 11730 (''The proposed rule aims to achieve that shift in incentives by imposing a rebuttable presumption of asylum ineligibility.''). The Departments believe that the meaningful pathways detailed in the rule, combined with the exceptions and rebuttals to the presumption, provide sufficient opportunities for individuals to meet an exception to or rebut the presumption, which could preclude asylee status and the ability to later petition for eligible derivatives. Finally, commenter concerns related to placing separated children in orphanages are outside the scope of this rulemaking, but the Departments emphasize that nothing in this rule would authorize such a process.

For additional discussion of concerns related to due process, see Section IV.B.5 of this preamble. For more discussion of the family unity provision applicable in removal proceedings, please see Section IV.E.7.ii of this preamble.

iii. Individuals With LEP

*Comment:* Commenters expressed the belief that the proposed rule would function as a complete ban on asylum for noncitizens who are not sufficiently proficient or literate in the languages they would need to use to successfully navigate available lawful pathway options. As a foundational issue, commenters voiced the opinion that due to language and literacy barriers, many noncitizens, particularly those who speak rare languages and those with limited literacy in their native languages, would not be able to understand what lawful pathways are available to them or the consequences that may result from not pursuing a lawful pathway under the proposed rule. For example, some commenters stated that many asylum seekers who are unfamiliar with U.S. immigration law may not know what steps to take to preserve their eligibility for asylum. Commenters also indicated that many noncitizens would be unable to meaningfully access the CBP One app due to inadequate proficiency or literacy in the app's supported languages and therefore would be unable to pre-schedule their appearance at a POE, making them subject to the rule's presumption of asylum ineligibility. Commenters provided examples of individuals who they asserted would be disproportionately impacted by the rule and face particular challenges, including those who speak an Afghan dialect of the Persian language, monolingual speakers of indigenous languages, and members of the Asian-Pacific Islander community whose primary languages do not utilize the Latin script.

*Response:* Due to the safeguards crafted into the rule and the success of similar, recently implemented parole processes, the Departments disagree with commenters' contentions that language and literacy barriers will prevent many noncitizens from foundationally understanding what lawful pathway options are available to them.

The Departments acknowledge commenters' concerns that some noncitizens who wish to use the lawful pathway of pre-scheduling their arrival may have language and literacy-related difficulty with accessing and using the CBP One app. Accordingly, the rule provides an exception to application of the rebuttable presumption of asylum ineligibility for noncitizens who present at a POE without a pre-scheduled appointment who can demonstrate through a preponderance of the evidence that, because of a language barrier or illiteracy, it was not possible for them to access or use the DHS scheduling system to pre-schedule an appointment. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). AOs will follow established procedures for interviewing individuals to determine applicability of this exception. Similarly, IJs will follow established procedures for soliciting testimony and developing the record, as appropriate.

The Departments also believe the processes highlighted in this rulemaking will be navigable for noncitizens—regardless of language spoken—as evidenced by the success of the recent, similar U4U and CHNV parole processes, both of which are offered to noncitizens from countries where the primary language is one other than English. *See, e.g.,* 88 FR at 11706–07 (noting that the U4U and CHNV parole processes resulted in vastly fewer irregular border crossings, demonstrating that noncitizens from Ukraine, Cuba, Haiti, Nicaragua, and Venezuela were able to take advantage of the U4U and CHNV parole processes). The success of the U4U and CHNV parole processes suggests that these noncitizens are broadly aware of changes to U.S. immigration processes, that such information is being communicated to noncitizens outside the United States, and that noncitizens are changing migration behaviors in response. In addition, the Departments intend to engage in robust regional public awareness campaigns to promote understanding of the rule, building on ongoing efforts to encourage intending migrants to avail themselves of lawful pathways and publicize the perils of irregular migration. Therefore, the Departments believe that, irrespective of language spoken, noncitizens outside of the United States will become apprised of the lawful pathway options laid out in this rule.

iv. Individuals With Mental Impairments and Associated Mental Competency Issues

*Comment:* Commenters raised concerns about the proposed rule's effect on noncitizens who have mental impairments and associated mental competency issues. Commenters stated

that some mental impairments result in symptoms that would impact an individual's ability to apply for asylum under any circumstances, especially if access to medical services is unavailable. Moreover, commenters stated that downloading, registering for, and using the CBP One app may be too difficult for some noncitizens with mental impairments and associated mental competency issues. Thus, commenters recommended exempting such persons from the rule.

*Response:* The Departments recognize the difficulties faced by noncitizens with mental impairments and associated competency issues. Under this rule, AOs and IJs may consider, on a case-by-case basis, whether a noncitizen's or accompanying family member's mental impairments or associated competency issues presented an ''ongoing and serious obstacle'' to accessing the DHS scheduling system. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). In addition, depending on the noncitizen's or accompanying family member's particular circumstances, any serious mental impairments or associated competency issues may qualify as an ''exceptionally compelling circumstance'' sufficient to rebut the presumption of ineligibility for asylum. 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Notably, the ''acute medical emergency'' ground for rebutting the presumption of asylum ineligibility is not limited to physical medical ailments but could include mental health emergencies. 8 CFR 208.33(a)(3)(i)(A), 1208.33(a)(3)(i)(A).

Procedurally, DHS has discretion to place noncitizens in expedited removal proceedings or refer noncitizens to EOIR for section 240 removal proceedings. *Matter of E–R–M- & L–R–M,* 25 I&N Dec. 520 (BIA 2011). Therefore, DHS may choose to refer noncitizens who exhibit indicia of mental incompetency to EOIR for removal proceedings under section 240 of the INA, where an IJ may more fully consider whether the noncitizen shows indicia of incompetency and, if so, which safeguards are appropriate. *See, e.g., Matter of M–A–M-,* 25 I&N Dec. 474 (BIA 2011).

v. Low-Income Individuals

*Comment:* Commenters asserted that the proposed rule discriminates against noncitizens who cannot afford to arrive in the United States by air or sea and favors individuals with more financial resources. In general, commenters stressed that a noncitizen's method of arrival in the United States—whether by land, air, or sea—should not dictate their eligibility for asylum and stated that asylum laws should not have a ''wealth test'' for access to protection from persecution. Pointing to the fact that the proposed rule would only apply to noncitizens arriving by land at the SWB, commenters said that the proposed rule would have a disparate impact on individuals, particularly working-class, non-white migrants, who do not have the economic means to purchase a plane ticket or obtain a visitor visa or passport and may not have existing supportive relationships within the United States. Commenters stated that the lawful pathways identified in the proposed rule—including parole programs and use of DHS scheduling technology—prioritize individuals with financial means over those who are indigent.

At least one commenter stated that the proposed rule would cause migrants financial hardship, as not all migrants have the financial resources to travel to a third country to seek asylum before attempting to cross the SWB. Commenters also suggested that the proposed rule would privilege migrants with the economic means to maintain a working smartphone capable of operating the CBP One app and either pay for data roaming capability or remain in an area with internet access. Commenters also stated that the proposed rule unfairly benefits wealthier noncitizens who are more likely to be able to use an approved parole process because such noncitizens may be immediately eligible for employment authorization while low-income noncitizens who are not able to use such a parole process remain without immediate employment authorization. Commenters concluded that the proposed rule would amount to a de facto ban on asylum that targets economically disadvantaged noncitizens without options other than arriving at the SWB.

*Response:* As explained in the NPRM, the Departments are issuing this rule specifically to address an anticipated surge of migration at the SWB following the lifting of the CDC's Title 42 public health Order. 88 FR at 11704. Through this rule, the Departments have decided to address such a surge one step at a time, beginning with the SWB, where the Departments expect a surge to focus most intensely and immediately. So, tailoring the rule to apply exclusively to migrants arriving from Mexico at the southwest land border or adjacent coastal borders [98] who meet certain conditions but not to migrants arriving via other means is appropriate based on existing and anticipated conditions at the SWB, many of which the Departments outlined in the NPRM. *See id.* at 11705–07. Where conditions necessitate, the Departments can reevaluate the scope of the rule. *Cf. FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 522, 129 S. Ct. 1800, 1815 (2009) (stating that ''[n]othing prohibits federal agencies from moving in an incremental manner''); *City of Las Vegas* v. *Lujan,* 891 F.2d 927, 935 (D.C. Cir. 1989) (explaining that ''agencies have great discretion to treat a problem partially'' including through a ''step toward a complete solution''). Indeed, as stated above, the Departments intend that the rule will be subject to review to determine whether the entry dates provided in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i) should be extended, modified, or remain as provided in the rule.

Commenters who expressed concerns that this rule would cause financial hardship to migrants by requiring them to travel to a third country to seek asylum before arriving at the SWB misunderstand the terms of this rule. The rule does not require any migrant to travel to a third country to overcome the rebuttable presumption—indeed, the rebuttable presumption does not apply to those who did not travel through a third country—and seeking protection in a third country is merely one of several means to qualify for an exception to or rebut the presumption. Moreover, this rule is intended in part to address existing conditions impacting low-income individuals by reducing opportunities for smugglers to recruit migrants to participate in ''expensive and dangerous human smuggling schemes.'' 88 FR at 11705.

Further, except for those for whom Mexico is their country of nationality or last habitual residence, individuals arriving at the southwest land border or adjacent coastal borders, whether they have traveled by land, air, or sea, to arrive there, necessarily travel through another country—and, often, more than one other country—en route to the United States. Also, while individuals traveling from their country of nationality or last habitual residence to the United States may arrive directly in the United States without transiting another country, they generally are not permitted to board an aircraft or vessel to a U.S. location without first demonstrating that they have the travel documents required for entry into the United States. *See, e.g.,* INA 211, 8 U.S.C. 1181 (setting forth requirements for immigrant admission); *see also* INA

[98] As explained in Section II.C.3 of this preamble, the Departments have decided to apply this rule to migrants arriving from Mexico not only at the southwest land border but also at ''adjacent coastal borders,'' which matches the geographic scope of the CDC's Title 42 public health Order.

217, 8 U.S.C. 1187 (visa waiver requirements); INA 221 through 224, 8 U.S.C. 1201 through 1204 (visas); INA 231, 8 U.S.C. 1221 (establishing air and vessel manifest requirements including mandating the collection of passport numbers); *see also* 8 CFR 212.5(f) (providing that DHS may issue ''an appropriate document authorizing travel'' for those seeking to travel to the United States without a visa).

This rule does not intend to penalize migrants based on economic status, a lack of travel documents, lack of phone or internet access, or exigent circumstances, nor does it do so in effect. Indeed, the Departments recognize that many individuals are only able to enter the United States via the SWB due to just such circumstances and, in recognition of this reality, have identified several pathways and processes through which such individuals may travel to the SWB in a safe and orderly fashion and, once present, seek asylum or other protection. One such pathway or process includes pre-scheduling their arrival, which at this time can be accomplished via the CBP One app. Without a pre-scheduling system, migrants seeking to travel to the SWB may have to wait for an indeterminate amount of time for CBP to have resources available to process them. *See* 88 FR at 11720. Pre-scheduling provides noncitizens seeking to present at a SWB POE with a clear understanding of when CBP expects to process them, which allows them to plan for safer transit and reduces opportunities for smugglers and criminal organizations. *See id.* at 11707. Moreover, the rule excepts from application of the condition on asylum eligibility those noncitizens who presented at a POE and can establish, based on the preponderance of the evidence, that it was not possible for them to access or use the DHS scheduling system, including because they had insufficient phone or internet access. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B) (providing the presumption does not apply ''if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to . . . significant technical failure, or other ongoing and serious obstacle'').

In response to commenters' concerns about differences in eligibility for employment authorization depending on whether a migrant entered the United States following use of the CBP One app, a DHS-approved parole process, or some other means, the Departments acknowledge that the employment authorization rules may vary depending on the pathway that a noncitizen uses to enter the United States and how the noncitizen is processed. This has always been the case, and although this rule recognizes certain lawful pathways as a basis to avoid the rebuttable presumption, such pathways would exist irrespective of this rulemaking. The Departments also note that individuals in expedited removal proceedings, including those determined to have a credible fear who are then paroled from custody, remain ineligible to apply for employment authorization on the basis of this exercise of parole. 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). The NPRM did not propose to revise any regulations governing employment authorization eligibility, and the final rule does not make any such changes either.

vi. Allegations of Discrimination on Race, Ethnicity, or Nationality Grounds

*Comment:* Commenters raised concerns that the proposed rule would have a discriminatory impact based on nationality and effectively deny protection to migrants from certain countries. For example, commenters alleged that the proposed rule would have a disproportionately negative impact on noncitizens from countries in Africa, the Caribbean, Central America, and Latin America who do not currently fall under any large-scale parole initiatives and are more likely to seek asylum via arrival at the SWB, with some commenters describing the rule as a de facto ban for these populations. Commenters also stated that noncitizens from China specifically, and Asia more generally, would be disproportionately impacted by the rule as a result of lasting effects from reduced refugee admissions under the prior Administration, which, commenters said, increased the number of individuals from these countries seeking entry to the United States at the SWB. Likewise, commenters noted that noncitizens from Afghanistan would be disproportionately impacted by the rule due to potential danger in third countries.

Further, commenters noted that the Administration has created special immigration programs for citizens of certain countries—including Cuba, Haiti, Nicaragua, Ukraine, and Venezuela—in response to various political and humanitarian conditions in those countries, but has not done so for citizens of certain other countries. Commenters questioned why citizens from these countries are offered special programs to enter the United States while citizens from other countries do not have the same opportunities, which commenters claimed was discriminatory and raised equal protection concerns.

Commenters also raised equal protection concerns because noncitizens subject to the rule's rebuttable presumption would be treated differently from those not subject to the rule based on the date, location, and manner of their entry into the United States. As a result, commenters argued that the rule would have a disparate impact on asylum applicants from less affluent countries, who do not have easy access to air travel or nonimmigrant visas.

Additionally, commenters asserted that the rule discriminates based on race and ethnicity and would have a disproportionate impact on persons of certain races and ethnicities for equal protection purposes. Commenters pointed to the Government's response to Ukrainian refugees as evidence that the United States is capable of accepting asylum seekers and refugees and stated that the difference in treatment between Ukraine and other countries was racially motivated.

Lastly, commenters suggested that it was facially discriminatory to require migrants from countries other than Mexico to first apply for asylum in transit countries, as it would result in their quick removal and force them to wait for a number of years before they could reapply for asylum in the United States.

*Response:* The rule does not classify noncitizens based on race, ethnicity, nationality, or any other protected trait. Nor, as elaborated below, are the Departments issuing the rule with discriminatory intent or animus. As the Departments explained in the NPRM, the rule is intended to address an anticipated increase in migrants arriving at the SWB following the lifting of the Title 42 public health Order and the resultant strain the anticipated surge would put on DHS and DOJ resources. *See* 88 FR at 11728. As such, the rule's scope and applicability are intended to address this anticipated migration surge. *See generally id.*

Additionally, although the rule imposes a rebuttable presumption of ineligibility if noncitizens seek to enter the United States at the SWB outside of an established lawful pathway and do not seek protection in a third country through which they travel en route to the United States, that presumption does not constitute a ''de facto ban'' on asylum for noncitizens of any race, ethnicity, or nationality, given the opportunities to avoid the presumption and, for those unable to do so, to establish an exception to or rebut it. Irrespective of race, ethnicity, or

nationality, noncitizens will not be subject to the presumption if they apply for and are denied asylum or other protection in a third country they transit while en route to the United States, but no noncitizen is required to do so. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). Likewise, regardless of race, ethnicity, or nationality, noncitizens will not be subject to the presumption if they schedule an appointment to present at a POE using the CBP One app. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). In addition, irrespective of race, ethnicity, or nationality, noncitizens who are subject to the rule's presumption will have the opportunity to rebut it in certain circumstances, including if at the time of their entry they or a family member with whom they traveled was experiencing an acute medical emergency, an imminent and extreme threat to life or safety, a severe form of trafficking, or another exceptionally compelling circumstance. 8 CFR 208.33(a)(3), 1208.33(a)(3). Further, noncitizens of every race, ethnicity, and nationality may apply for other relevant immigration processes that are applicable to them. The rule's approach balances the needs to address current and expected circumstances at the SWB, to avoid unduly negative consequences for noncitizens, to avoid unduly negative consequences for the U.S. immigration system, and to provide ways for individuals to seek protection in the United States and other countries in the region. 88 FR at 11730.

The Departments disagree that the rule violates the Equal Protection Clause [99] to the extent that the rule applies to noncitizens who arrive in the United States at a particular location, by a particular method, or after a particular date. Noncitizens who utilize a lawful pathway, meet an exception to the rule's presumption, or rebut the presumption will not be subject to the rule's condition on eligibility, irrespective of their country of origin or the method by which they arrive. The ability to afford a plane ticket or qualify for a visa is not a requirement to meet an exception to or rebut the presumption of ineligibility under the rule. And with respect to concerns about dates of entry, the Departments note that Federal immigration laws, including regulations that impose conditions on asylum, routinely apply to migrants who arrive or file their application for relief after, but not before, a particular effective date. *See, e.g.,* INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B); 8 CFR 208.4(a) (imposing filing deadline on asylum applications filed after April 1, 1997, and tying that deadline to the applicant's date of arrival in the United States); 8 CFR 208.13(b)(3), 1208.13(b)(3) (2020) (imposing conditions related to internal relocation, applied per 8 CFR 208.1(a) to applications filed after the regulatory effective date of April 1, 1997).[100]

Further, as detailed in the NPRM, the United States previously has, and is still, committed to taking significant steps to expand pathways and processes for migrants to enter the country in a safe and lawful way. 88 FR at 11718–20. In addition to creating parole processes for citizens of certain countries, the United States has announced ''significant increases to H–2 temporary worker visas and refugee processing in the Western Hemisphere'' and worked closely with other countries in the region ''to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including access to international protection for those in need, throughout the Western Hemisphere.'' *Id.* at 11718, 11720. Moreover, the Departments remain committed to continuing to work with foreign partners on expanding their legal options for migrants and expanding the Departments' own mechanisms for processing migrants who lawfully arrive in the United States. *Id.* at 11720, 11722, 11729.

As to certain commenters' concerns that the rule discriminates among noncitizens based on whether their country of nationality has a parole process, the Departments did not promulgate the rule, or design its applicability and scope, with a discriminatory purpose or intent. Instead, the rule is designed to ''encourage migrants to avail themselves of lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in countries through which they travel, thereby reducing reliance on human smuggling networks that exploit migrants for financial gain.'' *Id.* at 11704. As elaborated on later in this preamble, lawful pathways are available to noncitizens from all countries, and country-specific processes are available without regard to race or ethnicity. *See, e.g., id.* at 11704, 11706 (listing and explaining processes and programs). Thus, the existence of special processes and programs for qualifying noncitizens from certain countries does not demonstrate that the rule was promulgated ''for a discriminatory purpose or intent,'' as required to show a violation of the Equal Protection Clause. *United States* v. *Barcenas-Rumualdo,* 53 F.4th 859, 864 (5th Cir. 2022) (citing *Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265–66 (1977)). Moreover, Congress regularly makes laws that distinguish among individuals on the basis of nationality; indeed, the ''whole of Title 8 of the United States Code, regulating aliens and nationality, is founded on'' such distinctions. *Mathews* v. *Diaz,* 426 U.S. 67, 78 n.12, 80 (1976). Yet, ''such disparate treatment'' is not by itself '''invidious.''' *Id.* at 80.

vii. Other Underserved or Vulnerable Populations

a. Women, Domestic Violence Survivors, and LGBT Individuals

*Comment:* Commenters raised concerns that the rule would have a disproportionate impact on certain particularly vulnerable populations, such as women, including domestic violence and sexual assault survivors and younger, pregnant, and indigenous women, as well as the LGBT community, and those noncitizens who are disabled, elderly, or HIV positive, among others. Commenters stated that these populations would face discrimination, violence, extortion, and persecution in transit countries. Commenters also asserted that applying for a parole process and waiting for approval in one's home country may not be a viable option for such groups who need to leave a dangerous situation immediately. As a result, commenters stated that such groups should be exempted from the rule.

Commenters asserted, for example, that women and girls would be at high risk for sexual and gender-based violence in transit countries or if forced to wait in Mexico for their scheduled SWB POE appointments. Similarly, commenters raised concerns that the LGBT community would face persecution, violence, and inadequate

[99] Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the United States Government, the Supreme Court in *Bolling* v. *Sharpe,* 347 U.S. 497, 499 (1954), held that while '' 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . discrimination may be so unjustifiable as to be violative of due process.'' The Court concluded that ''[i]n view of [its] decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government.'' *Id.* at 500.

[100] This provision was amended by a prior rulemaking, Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274, 80281 (Dec. 11, 2020), which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea II,* 512 F. Supp. 3d at 969–70 (preliminarily enjoining the rule). The district court's order remains in effect, and thus the 2020 version of this provision—the version immediately preceding the enjoined amendment—is currently effective.

access to medical care, among other harms, in transit countries, particularly if required to wait to schedule an SWB POE appointment through the CBP One app or apply for asylum in those countries. Commenters also noted that it is unclear if claims related to persecution based on sexual orientation and gender identity would be recognized in many common transit countries. Additionally, commenters stated that the rule, particularly the family unity provision, would exclude LGBT families, as legal protections such as marriage or LGBT-inclusive family protections are unavailable or inaccessible to LGBT individuals and families in many countries.

Further, commenters noted that many of these groups, including domestic violence survivors, torture survivors, and those with PTSD, may, as a result of psychological trauma, have difficulty recounting traumatic events underlying their claims during credible fear screenings—a difficulty that commenters said would be exacerbated if members of such groups must also present evidence about the rebuttable presumption of asylum ineligibility. As a result, commenters stated that traumatized noncitizens would not have sufficient time to gather their thoughts or collect relevant evidence. Moreover, commenters stated that recounting such incidents may risk retraumatizing such individuals. Similarly, commenters asserted that such groups are often reluctant to speak about what happened to them and may not express their fear of return to someone in a third country who could inform them of their right to apply for asylum.

*Response:* The Departments recognize that certain populations may be particularly vulnerable during transit to the United States. Accordingly, the purpose of the rule is to encourage migrants, including those who may be seeking asylum, to pursue safe, orderly, and lawful pathways to the United States rather than attempt irregular migration journeys, which often subject migrants to dangerous human smuggling networks. *See, e.g.,* 88 FR at 11713–14 (noting that women face particular vulnerabilities along certain portions of the irregular migration route to the SWB). The rule details multiple potential pathways and processes available to many migrants, including those who seek protection, that do not involve a dangerous journey to the United States. *See id.* at 11718–23. Notably, amongst those options, the rule does not require noncitizens to apply for asylum in third countries where they may also face persecution or other harm. Moreover, applying for asylum in a third country is only one of multiple options migrants may pursue. For a more in-depth examination of third-country safety for migrants, please see the further discussion of specific third countries later in this preamble in Section IV.E.3.iv (''Third Countries''). *See also* 88 FR at 11720–23 (NPRM discussing ''Increased Access to Protection and Other Pathways in the Region''). Additionally, the Departments note that the rule provides that its presumption of asylum ineligibility can be rebutted by noncitizens, including those with particular vulnerabilities, who do not utilize a lawful pathway but who face imminent and extreme threats to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder, or who were victims of a severe form of trafficking in persons. *See* 8 CFR 208.33(a)(3)(i)(B) and (C), 1208.33(a)(3)(i)(B) and (C).

The Departments also recognize that migrants' protection claims may be premised on past traumatic events in their home countries, which can be difficult to recount. However, the rule does not change the credible fear process that Congress has instituted, which involves detailing these events to a DHS officer so that the officer can make a credible fear determination. *See generally* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); 8 CFR 208.30(d) and (e). The rule merely adds a condition on asylum eligibility in the form of a rebuttable presumption. During the credible fear screening, noncitizens may demonstrate why they believe that the presumption is inapplicable or an exception or rebuttal ground exists. The rule does not impose an infeasible requirement for noncitizens with meritorious claims to show that the presumption does not apply, or that they qualify for an exception or rebuttal to the presumption, during the credible fear screening process. *See* 8 CFR 208.30(d)(4). In addition, AOs and IJs have conducted credible fear assessments for many years and are well-trained in accounting for any potential trauma that may be relevant.

b. Unrepresented Individuals

*Comment:* Commenters raised concerns that unrepresented noncitizens would not understand the rule's requirements, particularly the need to take affirmative steps outside of the United States, such as through applying for protection in a third country or scheduling an SWB POE appointment through the CBP One app. Commenters also expressed that the proposed rule did not explain how information about the rule's requirements would be disseminated. Similarly, commenters stated that unrepresented noncitizens may have received little or no information during the screening process and may not understand their rights during the process or the consequences of failing to assert them. Commenters also asserted that unrepresented individuals may not understand the burdens of proof in the rule and may be unable to present a legal argument sufficient to overcome its presumption of ineligibility. Additionally, commenters were concerned that the rule would dramatically increase the likelihood of denials for relief for unrepresented noncitizens who are subject to the asylum ineligibility presumption and stated that individuals with meritorious claims are no less deserving of asylum because they do not have counsel. Further, commenters pointed to various statutory provisions that they claimed showed a recognition by Congress that unrepresented noncitizens need assistance to present their claims. As a result, commenters suggested that unrepresented noncitizens should be exempted from the rule or be provided more resources to navigate the immigration system.

*Response:* The Departments recognize that unrepresented noncitizens can have additional difficulties navigating the U.S. immigration system, as compared to those with counsel. This is to be expected with respect to any unrepresented individuals in a legal setting. As a general matter, the Departments strongly support efforts for noncitizens to obtain or confer with counsel in immigration proceedings.[101]

However, for those noncitizens who do not retain counsel, the Departments do not believe that the rule presents an overly complicated process for migrants seeking protection, including asylum. The rule does not change the right to confer with a person or persons of the noncitizen's choosing in the existing expedited removal and credible fear screening processes. *See* 8 CFR 208.30(d)(4). Rather, the rule simply adds a determination about the asylum ineligibility presumption to the credible fear screening. As such, the Departments decline to create a wholesale exception from the rule for unrepresented noncitizens, which would significantly reduce the incentives for using the lawful pathways described in the rule, as well as disincentivize obtaining counsel as needed.

[101] *See, e.g.,* EOIR Director's Memorandum (''DM'') 22–01, *Encouraging and Facilitating Pro Bono Legal Services* (Nov. 5, 2021), *https://www.justice.gov/eoir/book/file/1446651/download.*

The rule is intended to provide clear options for migrants, including asylum seekers, to follow, such as applying for asylum in a third country or presenting at an SWB POE at a pre-scheduled time and place. *See generally* 8 CFR 208.33(a)(2), 1208.33(a)(2). Noncitizens may also be able to pursue other pathways to the United States that would not trigger the rule's presumption, such as an employment-based visa or refugee admission through the United States Refugee Admissions Program (''USRAP''). 88 FR at 11719 (describing expansions of labor pathways and increases in USRAP processing). If unrepresented noncitizens choose to forgo such options and instead unlawfully enter the United States, they will be subject to the rule's rebuttable presumption of asylum ineligibility, with an opportunity to establish an exception to or rebut the presumption, including for exceptionally compelling circumstances. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). For instance, such noncitizens who present at a POE without a pre-scheduled appointment may be excepted from the presumption if they can demonstrate that they were unable to access or use the DHS scheduling system due to ongoing and serious obstacles, such as a language barrier, illiteracy, or a significant technical failure. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

The Departments believe these processes will be navigable for unrepresented noncitizens based on the significant usage and success of other recent processes for Cuban, Haitian, Nicaraguan, Ukrainian, and Venezuelan nationals. *See, e.g.,* 88 FR at 11706, 11711–12 (explaining, for example, that the Venezuela process has had a ''profound impact'' and that, in one measured period, there was an over 95 percent decrease in SWB unlawful encounters with Venezuelan migrants). These statistics, along with the success of the U4U and CNHV parole processes, show that noncitizens outside the United States are broadly aware of information about changes to U.S. immigration processes and that noncitizens alter migration behaviors accordingly, regardless of their representation status. As for commenters' desire for additional information about how the rule's requirements will be communicated, the Departments note that they have numerous, non-regulatory tools at their disposal that they may use to disseminate information to the public, as appropriate, including press releases,[102] policy memoranda, web-based tools,[103] and other statements in public fora, among others. The Departments further describe their efforts to communicate the rule's requirements to the public in Section IV.B.5.iv of this preamble.

c. Climate Migration

*Comment:* Commenters noted that global migration is increasingly driven in part by the effects of climate change and that governments of many migrants' home countries are unable to stop or redress such effects. As such, commenters expressed concerns that the proposed rule would unlawfully deny noncitizens from countries disproportionately affected by climate change the right to be meaningfully heard on their asylum claims. Commenters also asserted that ecological disasters resulting from climate change, such as famine and flooding, would prevent noncitizens from countries experiencing such disasters from being able to pursue a lawful pathway so as not to be subject to the rule's rebuttable presumption. As a result, commenters recommended expanding asylum eligibility to account for displacement caused by climate change.

*Response:* Comments related to climate change are generally outside the scope of this rulemaking, which focuses on incentivizing migrants to use lawful pathways to pursue their claims. To the extent that commenters raised concerns about the effects of climate change—such as a severe environmental disaster—creating a necessity for noncitizens to enter the United States outside of the lawful pathways described in the rule, the Departments note that the rule includes an exception to its asylum ineligibility presumption for ''exceptionally compelling circumstances.'' *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Evidence of exceptionally compelling circumstances will be considered on a case-by-case basis.[104]

To the extent that commenters argued that the rule's application in the context of the alleged exigencies of climate change migration would violate the due process rights of noncitizens, the Supreme Court has held that the rights of noncitizens applying for admission at the U.S. border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *DHS* v. *Thuraissigiam,* 140 S. Ct. 1959, 1983 (2020).

d. Indigenous People and People of Color

*Comment:* Commenters raised concerns that the rule would have a particularly detrimental impact on members of indigenous communities and people of color. As a result, commenters recommended exempting these groups from the rule and for the Departments to articulate actions taken to mitigate any disparate impacts on such groups.

Commenters stated that such populations would face discrimination, racism, persecution, prolonged detention, medical neglect, homelessness, erasure of indigenous identity, and other harms in transit countries. Commenters also believed that these groups would face difficulty applying for asylum or related protection in a third country, due to discrimination and insufficiently robust asylum systems, among other reasons. Additionally, commenters asserted that persons from predominantly Black countries had higher rates of visa denials, which limit their lawful pathways when compared to other groups. In support of these contentions, commenters stated that immigration court asylum denial rates increased for these groups while the TCT Bar Final Rule was in effect.

Further, commenters maintained that the proposed rule would disproportionately impact indigenous migrants and people of color because such groups often lack the means or ability to enter the United States other than by land through the SWB and, therefore, would be more likely to be subject to the rule's rebuttable presumption of ineligibility. Relatedly,

[102] *See* EOIR, *Communications and Legislative Affairs Division, https://www.justice.gov/eoir/communications-and-legislative-affairs-division* (last visited Apr. 25, 2023) (''The Communications and Legislative Affairs Division (CLAD) serves as the Executive Office for Immigration Review's liaison with Congress, the news media, and other interested parties by communicating accurate and timely information about the agency's activities and programs.'').

[103] *See, e.g.,* EOIR, *Immigration Court Online Resource, https://icor.eoir.justice.gov/en/* (last visited Apr. 25, 2023) (providing information about immigration processes in Chinese, Haitian Creole, Portuguese, Punjabi, and Spanish).

[104] The Departments note that, to the extent commenters have substantive comments related to the interaction of climate change and immigration or asylum law, such as how adjudicators should consider the effects of climate change in making asylum determinations, commenters may raise those concerns as relevant in response to future potential Departmental rulemakings that address other substantive asylum provisions. *See, e.g.,* Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions—Fall 2022, 88 FR 10966, 11054, 11088–89 (Feb. 22, 2023) (including a future rulemaking addressing particular social groups and related definitions and interpretations for asylum and withholding of removal).

commenters maintained that these populations have disproportionately low access to the technology commenters stated is mandated by the rule, thereby precluding such groups from taking advantage of the available lawful pathways. Similarly, commenters raised a number of concerns with the CBP One app and its use by indigenous migrants and people of color, including language barriers and difficulties experienced by those with darker skin tones in taking valid pictures.

*Response:* As previously stated, the rule includes various exceptions to the rebuttable presumption—including for instances where noncitizens have been denied asylum or other protection in a third country or show, by a preponderance of the evidence, that it was not possible to access or use the CBP One app—and the rule allows noncitizens to rebut the presumption where they face certain safety issues. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). For additional material addressing commenter concerns about the CBP One app and indigenous migrants and people of color, please see Section IV.E.3.ii.a of this preamble.

Further, if any noncitizens, including members of indigenous communities and people of color, do not believe that they will be able to meaningfully access protection in a third country, then those noncitizens may be excepted from the presumption of ineligibility by availing themselves of other lawful pathways to enter the United States, such as by pre-scheduling an appointment to present themselves at a POE, or by obtaining appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process. *See* 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Such noncitizens may also be able to pursue other pathways to entering the United States that would not trigger the rule's application, such as an employment-based visa or refugee admission through USRAP. 88 FR at 11719 (describing expansions of labor pathways and increases in USRAP processing). Accordingly, the Departments believe that the rule provides sufficient flexibility to account for issues identified by commenters as related to indigenous communities and people of color.

5. Due Process and Procedural Concerns

i. General Due Process and Procedural Concerns

*Comment:* Commenters voiced general concerns that the rule violates due process and is thus unconstitutional or arbitrary. One commenter argued that due process standards for asylum cases should be consistent with criminal procedure in the United States. At least one commenter said that the proposed rule would violate due process in that it would separate families, restrict access to asylum, and prohibit the granting of asylum to those who travel by land through a safe third country. Specifically, one commenter argued that for family members whose asylum cases are connected, separation obstructs family members' opportunities to present necessary corroborating witness testimony or access critical evidence in presenting their claims for relief, which may violate their constitutional and statutory rights to present evidence and can result in inconsistent case timelines and outcomes that permanently sever family relationships. Another commenter said that the rule would make it easier for the United States Government to simply deny entry to asylum seekers and deport migrants without due process. Other commenters stated that no asylum seekers should be prevented from presenting their case to a judge. Further, commenters said that the rule would violate due process by requiring asylum seekers to affirmatively request IJ review of negative credible fear findings and eliminating USCIS reconsideration of such findings. Commenters also stated that due process concerns would be magnified because of the plan to conduct credible fear interviews within days or hours of an asylum seeker's arrival in custody in what commenters characterized as notoriously difficult conditions, such as where they lack food, water, showers, sleep, and access to counsel. Another commenter echoed these concerns regarding conditions for individuals in CBP custody and stated that poor conditions were not conducive to asylum seekers being able to clearly articulate their claims. Commenters asserted that these obstacles are so high as to render success unachievable for most noncitizens, regardless of the merits of their claims. Finally, one commenter stated that the rule would raise the standard from ''credible'' to ''reasonable'' fear and would thereby give rise to a procedural due process violation, as it would alter the intended purpose of the screening interview.

*Response:* The Departments disagree that the rule would violate the Due Process Clause of the Fifth Amendment or impermissibly restrict access to asylum. With respect to application of the rule in the expedited removal process, the Departments note that the rule does not have any impact on where noncitizens may be detained pending credible fear interviews. Additionally, noncitizens who are encountered in close vicinity to and immediately after crossing the border and are placed in expedited removal proceedings, including those in the credible fear screening process, have ''only those rights regarding admission that Congress has provided by statute.'' [105] *Thuraissigiam,* 140 S. Ct. at 1983; *see also Mendoza-Linares* v. *Garland,* 51 F.4th 1146, 1148 (9th Cir. 2022) (concluding that ''an arriving immigrant caught at the border . . . 'has no constitutional rights regarding his application' for asylum'' (quoting *Thuraissigiam,* 140 S. Ct. at 1982)). Regarding arguments by commenters that the due process standards that apply in criminal proceedings should also apply in the context of asylum and credible fear interviews, the Departments first note that Congress has created, by statute, a process applicable to individuals in expedited removal that is significantly different from the process that applies in criminal cases. The Departments decline to use this rule to change the due process rights of noncitizens, and the rule ensures that noncitizens receive a fair process consistent with the law.

As to the allegation that the rule raises the standard in expedited removal proceedings from ''credible'' fear to ''reasonable'' fear, the Departments note that the rule does not change the standard except to the extent that a noncitizen cannot show a significant possibility of establishing eligibility for asylum due to operation of the rule's condition on asylum eligibility. In that circumstance, the AO or IJ will determine whether the noncitizen has a reasonable fear of persecution or torture in the country or countries of removal, as has long been the process for other

[105] Courts also have held that noncitizens do not have an independently cognizable substantive due process interest in the receipt of asylum because asylum is a discretionary form of relief. *See, e.g., Jin* v. *Mukasey,* 538 F.3d 143, 157 (2d Cir. 2008) (holding that ''an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum''); *Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) (''Due process rights do not accrue to discretionary forms of relief, . . . and asylum is a discretionary form of relief.''); *Mudric* v. *Att'y Gen.,* 469 F.3d 94, 99 (3d Cir. 2006) (holding that an eight-year delay in processing the petitioner's asylum application was not a constitutional violation because the petitioner ''had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived''); *cf. Munoz* v. *Ashcroft,* 339 F.3d 950, 954 (9th Cir. 2003) (''Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause.'').

noncitizens who are screened for eligibility for statutory withholding of removal and CAT protection and who are not eligible for asylum, as discussed in more detail in Section IV.D.1.iii of this preamble.

Moreover, although the rule changes some procedures, as discussed throughout the rule, it leaves much of the process unaltered. Individuals in the credible fear process maintain the right to consult with an attorney or other person or persons of their choosing prior to their interview, and such persons may be present for the interview itself. 8 CFR 208.30(d)(4). Asylum seekers also may present evidence relevant to their claim during the interview. *Id.* Additionally, USCIS provides interpreter services to noncitizens who are unable to proceed effectively in English at the agency's expense. 8 CFR 208.30(d)(5). And noncitizens may request review of a negative fear determination before an IJ. *Compare* 8 CFR 208.30(g)(1) (providing the standard process for requesting IJ review in credible fear proceedings), *with* 8 CFR 208.33(b)(2)(iii) through (v) (explaining the process for requesting IJ review for those subject to and unable to rebut the rule's presumption). Although the rule amends the standard process so that noncitizens must affirmatively request such review when asked, rather than the review being granted upon a failure to respond, IJ review remains available in all cases with a negative credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g)(2). These procedural safeguards are therefore not undermined by the rule, which is fully consistent with the Departments' legal authority and obligations.

Furthermore, the rule does not violate any procedural due process rights noncitizens may have in section 240 removal proceedings. The rule's condition on eligibility will be litigated in those proceedings before an IJ with all the attendant procedural rights that apply in section 240 removal proceedings. In addition, the rule provides several procedural protections to ensure that asylum applicants receive a full and fair hearing before an IJ and that the condition on eligibility applies only to noncitizens properly within the scope of 8 CFR 208.33(a) and 1208.33(a). If an AO finds a noncitizen is subject to the rule's condition on eligibility, the noncitizen may request review of that determination, and an IJ will evaluate de novo whether the noncitizen is subject to the presumption and, if so, whether the noncitizen has established any exceptions to or rebutted the presumption. 8 CFR 208.33(b)(2)(iii) through (v), 1208.33(b). Furthermore, even where an IJ denies asylum because the presumption applies and has not been rebutted and no exception applies, if the noncitizen has demonstrated a reasonable possibility of persecution or torture in the country or countries of removal, they will have an opportunity to apply for statutory withholding of removal, protection under the CAT regulations, or any other form of relief or protection for which the noncitizen is eligible in section 240 removal proceedings. 8 CFR 208.33(b)(2)(ii) and (v)(B), 1208.33(b)(4). These standards help to ensure—in contrast to commenters' concerns—that the outcome of the process delineated in the rule is not predetermined and that noncitizens potentially subject to the condition on eligibility receive a full and fair hearing that satisfies any due process rights they may have.

To the extent commenters raised due process concerns related to arguments that the rule would result in separation of families, these arguments are addressed above in Section IV.B.4.ii of this preamble. As elaborated there, for example, the rule includes provisions designed to prevent the separation of families. Moreover, to the extent that commenters argued that the rule would separate families and thereby raise due process concerns by preventing individuals from presenting evidence, the Departments note that the rule does not change the provision on the treatment of family units with respect to credible fear screenings, found at 8 CFR 208.30(c), which provides that when family units are subject to a credible fear screening, USCIS will find that the entire family passes the screening if one family member establishes a credible fear. Further, the rule contains provisions to promote family unity both by making exceptions and providing rebuttal grounds applicable to family units traveling together, and by providing a family unity provision for those in removal proceedings. *See* 8 CFR 208.33(a)(2)(ii) and (3)(i), 1208.33(c).

To the extent commenters argued that these concerns implicate the constitutional rights of specific groups of noncitizens, the rule does not deprive any group of the rights that Congress provided by statute, and the rule is one of equal application that does not bar any particular classes of noncitizens from seeking asylum or other protection due to the nature of the harm the noncitizen has suffered or their race, religion, nationality, political opinion, or membership in a particular social group. *See* 8 CFR 208.33(a)(1) through (3), 1208.33(a)(1) through (3) (defining scope of rule's application and creating condition on eligibility and a rebuttable presumption rather than a bar). Additionally, to the extent that commenters claimed there would be due process implications because of the language and certain technical limitations of the CBP One app, the same commenters acknowledged that due process rights are limited to individuals located on U.S. soil. Because users of the CBP One app will, by definition, be located outside of the United States, the commenters' CBP-One-app-related due process concerns are misplaced. Moreover, these commenters provided no specific citations to show that the CBP One app's limited set of foreign languages or technical limitations violate any other Federal law. For instance, the Departments note that Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency, 65 FR 50121 (Aug. 11, 2000), ''does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers or employees, or any person.'' *Id.* at 50121–22.

In addition, notwithstanding the above, the rule contains multiple means for particularly vulnerable noncitizens to potentially overcome the presumption against eligibility for asylum where applicable, depending on the individual's circumstances. To the extent that commenters are concerned about the ability of noncitizens who have a language barrier, disability, mental incompetence, or past trauma to pre-schedule a time and location to appear at a POE, these noncitizens may be able to establish an exception to the presumption if they present at a POE and establish that ''it was not possible to access or use the DHS scheduling system due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle.'' *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). And among the ''exceptionally compelling circumstances'' that may rebut the presumption against eligibility, the rule includes acute medical emergencies and other situations where the noncitizen faces an imminent and extreme threat to life or safety at the time of entry. *See* 8 CFR 208.33(a)(3)(i)(A) and (B), 1208.33(a)(3)(i)(A) and (B). Furthermore, the Departments note that even if a noncitizen is found ineligible for asylum, if they fear persecution on account of a protected ground, or torture in another country that has been

designated as a country of removal, they may seek statutory withholding of removal or CAT protection to avoid being returned to that country.

Finally, to the extent that commenters expressed concerns about how the fact of noncitizens' detention, the conditions in DHS facilities, and the timing of credible fear screenings allegedly impact such screenings and the ability of noncitizens to meet their burden to show a credible fear, those concerns are predominantly addressed below in Section IV.D.1.iii of this preamble, where the Departments discuss the nature of the evidence that may be available to the AO during credible fear interviews. As to commenters' concerns about the timing of the credible fear process and where noncitizens are detained pending credible fear interviews, these concerns are misplaced, as the rule does not have any impact on the steps in the credible fear process or where noncitizens may be detained pending credible fear interviews. To the extent that commenters have concerns about detention and conditions in CBP custody, such concerns are beyond the scope of this rule, as discussed further in Section IV.B.5.v of this preamble.

*Comment:* Commenters expressed a range of other concerns that the rule does not establish sufficient procedural protections for noncitizens subject to the presumption against eligibility for asylum. Some commenters expressed concern that AOs are likely to make errors in assessing whether applicants are subject to the rule's condition on asylum eligibility. Commenters likewise asserted that credible fear interviews are quick screenings, during which individuals usually lack documentary evidence for their claims, and that migrants would not be able to present evidence of country conditions in connection with such interviews. Further, one commenter stated that expedited removal denies children the opportunity to make a claim for protection independent of their parent or legal guardian, and specifically raised concerns about CBP agents questioning children.

*Response:* The Departments acknowledge the commenters' concerns but disagree that there are insufficient procedural protections for individuals subject to the rule. All AOs are trained in non-adversarial interview techniques to elicit relevant and useful information. 8 CFR 208.1(b). A noncitizen's testimony and evidence available to the AO may be sufficient to establish an exception to or rebut the condition on asylum. AOs are trained to consult country conditions information. *Id.* All credible fear determinations are reviewed by a Supervisory AO. 8 CFR 208.30(e)(8). Those who receive negative determinations may request review from an IJ. *See* 8 CFR 208.33(b)(2)(iii) through (v). If the IJ affirms a negative credible fear determination, USCIS may also reconsider the determination at its own discretion. *See* 8 CFR 208.33(b)(2)(v)(C). For those who are initially found subject to the rule's condition on asylum eligibility but who establish a reasonable possibility of persecution or torture upon removal, the IJ will make a de novo determination of whether the noncitizen is subject to the condition on asylum eligibility during removal proceedings. *See* 8 CFR 208.33(b)(2)(v).

The Departments disagree that the rule denies children the opportunity to make a claim for protection independent of their parent or legal guardian. As explained above, the rule does not change the provision on treatment of family units with respect to credible fear evaluations, found at 8 CFR 208.30(c). The rule further provides at 8 CFR 208.33(c)(2) and 1208.33(d)(2) that its ineligibility presumption does not apply to an asylum application filed by a noncitizen after the two-year period in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i), if the noncitizen was under the age of 18 at the time of the entry referenced in 8 CFR 208.33(a)(1) and 1208.33(a)(1), respectively, and the noncitizen is applying as a principal applicant.

ii. Concerns Regarding Access to Counsel, Unrepresented Applicants, and the Ability or Time To Obtain Evidence and Prepare

*Comment:* Some commenters stated that the rule raises serious questions about access to counsel during the credible fear process. In addition to the general comments regarding due process described and addressed above, commenters also expressed specific concerns that the rule violates the Fifth Amendment's Due Process Clause because it allegedly deprives noncitizens of access to counsel or decreases their already limited access to counsel. For instance, some commenters expressed concern that individuals in CBP detention facilities lack meaningful access to counsel to prepare for their credible fear interviews because it takes time to find counsel and the rule will amplify the problems of a fast-tracked removal process, and because there is a lack of free or low-cost attorneys in border areas where credible fear interviews take place. Other commenters stated that individuals awaiting their CBP One app appointments abroad lack meaningful access to counsel to prepare for their credible fear interviews. These commenters stated that attorneys located in the United States face obstacles to representing individuals outside the United States due to ethics concerns and liability insurance coverage, while asylum seekers awaiting appointments would be unable to meet with counsel in person prior to their appointments, allegedly leading to representation deficiencies and difficulty obtaining assistance in navigating the CBP One app. For example, citing data from the Human Trafficking Institute, one commenter wrote that 80 percent of migrants awaiting their asylum hearings in the United States can find representation, compared to 7.6 percent of migrants waiting in Mexico.

Other commenters characterized the rule's provisions as complicated and punitive, making access to counsel even more important and exacerbating the access-to-counsel issues commenters identified above. Commenters who are legal services providers said that the rule would increase the time and resources needed to provide adequate legal advice and representation to asylum seekers, leading to diversion of limited resources and increased pressure on staff. Some commenters recommended that the United States Government increase funding for representation of asylum seekers or provide migrants with legal counsel and release them swiftly rather than detain them, stating that it would assist with backlogs and protect due process rights.

Multiple commenters remarked that a person who could retain an attorney is far more likely to succeed in immigration court. Commenters said concerns relating to fast-tracked immigration proceedings, known as the ''Dedicated Docket,'' would be amplified by the addition of a new evaluation of a rebuttable presumption against asylum eligibility. Commenters claimed that those individuals subject to the rebuttable presumption who pass the heightened ''significant possibility'' screening standard applied under the rule and are placed on the Dedicated Docket during the resulting section 240 removal proceeding would find it even more difficult to obtain counsel because of its accelerated timelines.

Finally, some commenters alleged that the United States Government currently restricts access to counsel for noncitizens in credible fear proceedings. Commenters similarly claimed that EOIR's Immigration Court Practice Manual (''ICPM'') denies asylum seekers

the right to counsel in credible fear review hearings before IJs.

*Response:* The rule does not deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause. As explained above, the Supreme Court has held that the rights of individuals seeking asylum at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 140 S. Ct. at 1983. And the INA provides only that a noncitizen ''may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General,'' and the statute specifies that ''[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process.'' INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). Thus, due process and the INA do not guarantee that every noncitizen in expedited removal proceedings will have counsel, for example, if a noncitizen involved in such proceedings cannot find an attorney who is willing and able to provide representation. The rule does not bar noncitizens in expedited removal proceedings from exercising their statutory rights under the INA, and therefore cannot violate such noncitizens' rights to due process. *See Guerrier* v. *Garland,* 18 F.4th 304, 313 (9th Cir. 2021) (*Thuraissigiam* clarified that ''the due process rights of noncitizens who have not 'effected an entry' into the [United States] are coextensive with the statutory rights Congress provides'').

Nor does the rule deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause insofar as it allegedly creates additional matters for attorneys and noncitizens to discuss prior to a noncitizen's credible fear interview, including when the noncitizen is outside the United States. The statutory right to consult, described above, does not attach until a noncitizen becomes eligible for a credible fear interview. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv) (''An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General.''). And the regulations that implement expedited removal elaborate that ''[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained[.]'' 8 CFR 235.3(b)(4)(ii). ''Read together, the text of these provisions provides noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained.'' *Las Americas Immigrant Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 25 (D.D.C. 2020) (Jackson, J.). Thus, the INA does not guarantee, and the Constitution does not require, that noncitizens who have not entered the United States must have an opportunity to consult with any other individual concerning an anticipated asylum application.

The Departments decline to amend existing practices with respect to credible fear proceedings around a noncitizen's ability to obtain and consult with counsel, including with regard to the availability of counsel or time it takes to secure counsel in areas near the SWB. The Departments disagree with any implication by commenters that the Departments have control over where free or low-cost immigration attorneys choose to locate their practices within the United States. In any event, nothing in the rule alters a noncitizen's existing ability to consult with persons of their choosing prior to the credible fear interview, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), or prior to IJ review of a negative credible fear determination, *see* 8 CFR 1003.42(c). The Departments acknowledge commenters' concerns but do not believe that the rule makes it more challenging for detained noncitizens to access legal representation. To the extent that commenters seek improved access to counsel during the credible fear process in general, that issue lies outside the scope of this rulemaking. Commenters' concerns regarding the Dedicated Docket similarly fall beyond the scope of the rulemaking. As discussed later in Section IV.B.5.iv of this preamble, the Departments do not believe that the rule greatly adds to the complexity of U.S. asylum law or that noncitizens in the credible fear process will require the assistance of an attorney to establish an exception to or rebut the rule's presumption against asylum eligibility. During the credible fear process, AOs will elicit relevant testimony in a non-adversarial manner to determine whether the rebuttable presumption against asylum eligibility applies and, if so, whether the presumption is rebutted or any exception exists.[106] Therefore, noncitizens will not need to be familiar with every aspect of the rule to overcome the presumption.

With regard to commenter claims that EOIR's ICPM restricts the right to counsel during credible fear review, the Departments first note that the contents of the ICPM are outside of the scope of this rulemaking. In any event, the ICPM is consistent with the INA and regulations, all of which make clear that noncitizens have the right to consult with a person or persons of their choosing prior to a credible fear interview and any subsequent review. *See* ICPM, Chapter 7.4(d)(4)(C) (Nov. 14, 2022); INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42(c). Beyond such consultation, any ability of such persons to attend or participate in a credible fear proceeding is fully within the discretion of the IJ. *See* 8 CFR 1003.10(b) (describing IJs' discretion to take any action consistent with their authorities under the INA and regulations that is appropriate and necessary for the disposition of a case).

*Comment:* Commenters said that represented individuals receive relief more frequently than non-represented individuals, and expressed concern that many asylum seekers who lack counsel would not be able to pass their credible fear screenings. One commenter claimed, without specific evidence, that AOs are less thorough when adjudicating credible fear cases of unrepresented noncitizens. Commenters argued that unrepresented individuals may not receive meaningful notice about the CBP One app, asylum procedures, or the exceptions to the rule's condition on eligibility that may apply in their cases. One commenter wrote that the rule's preponderance of the evidence standard for rebutting the presumption against asylum eligibility would create another hurdle for asylum seekers who lack counsel.

*Response:* To the extent that commenters expressed concern that unrepresented individuals might face difficulty understanding the credible

[106] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing: Eliciting Testimony* 12 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Eliciting_Testimony_LP_RAIO.pdf* [hereinafter USCIS, *Eliciting Testimony*] (''In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.''); USCIS, *RAIO Directorate—Officer Training: Interviewing: Introduction to the Non-Adversarial Interview* 13 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Intro_to_the_NonAdversarial_Interview_LP_RAIO.pdf* [hereinafter USCIS, *Non-Adversarial Interview*] (''You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.''); Comment Submitted by National Citizenship and Immigration Services Council 119 at 16 (Mar. 27, 2023), *https://www.regulations.gov/comment/USCIS-2022-0016-12267.*

fear process, the INA provides that ''[t]he Attorney General shall provide information concerning the asylum interview . . . to aliens who may be eligible.'' INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 235.3(b)(4)(i). The rule does not change that obligation. As for commenters' concerns that noncitizens may not receive adequate notice regarding the CBP One app or other aspects of the rule, ''the general rules concerning adequacy of notice through publication in the **Federal Register** apply in the immigration context.'' *Williams* v. *Mukasey,* 531 F.3d 1040, 1042 (9th Cir. 2008) (holding that publication of CAT regulations in the **Federal Register** provided notice that due process required).

As discussed earlier and in Section IV.B.5.iv of this preamble, the rule does not affect noncitizens' current access to counsel during credible fear proceedings or significantly increase the complexity of U.S. asylum law, and noncitizens should not require the assistance of an attorney to establish an exception to or rebut the presumption against asylum eligibility. Prior to conducting a credible fear interview, an AO must verify that the noncitizen ''has received in writing the relevant information regarding the fear determination process'' and ''has an understanding of'' that process. 8 CFR 208.30(d)(2); *see also* USCIS, Form M–444, *Information About Credible Fear Interview* (May 31, 2022). AOs are trained to conduct interviews in a non-adversarial manner and elicit relevant testimony,[107] and they will ask relevant questions to determine whether the rebuttable presumption against asylum eligibility applies, so noncitizens need not be familiar with the rule to remain eligible for asylum. Regarding the standard of proof for rebutting the presumption against asylum eligibility during credible fear proceedings, as discussed later in Section IV.D.1.iii of this preamble, the overall standard remains the significant possibility standard, but that standard must be applied in conjunction with the standard of proof required for the ultimate determination on eligibility for asylum (*i.e.,* preponderance of the evidence that an exception to the presumption applies or that the presumption has been rebutted). Other concerns about rebutting the rule's presumption of ineligibility are addressed in Section IV.E.1 of this preamble.

iii. CBP Official, AO, and IJ Conduct and Training

a. CBP Official Conduct and Training

*Comment:* Some commenters expressed concerns about the actions of CBP officials, including with respect to the use of the CBP One app. Regarding the CBP One app generally, one commenter stated that migrants are often unable to seek asylum at a POE due to metering policies and that migrants have no other option to access safety than to cross the SWB without permission. Another commenter stated that the requirement to use the CBP One app would effectively cap the number of people who may seek asylum based on the number of appointments available. Commenters also stated that the CBP One app equates to another metering system imposed by CBP officials, including causing turnbacks of children, which Federal courts have found to be illegal. In particular, one commenter stated that, even with appointments, some families are not able to cross the border, or they receive appointments at a POE far from their current location, requiring them to travel long distances within Mexico. Various commenters alleged that requiring use of the CBP One app raises concerns that access to the system will be based not on wait time but on luck, technological skills, or resources to secure an appointment. Other commenters similarly stated that the CBP One app has very limited appointment slots and turns asylum access into a lottery. And at least one commenter expressed concern that the CBP One app does not ask if a migrant is seeking asylum in the United States, nor are migrants interviewed by CBP officials upon arrival to determine if they have any vulnerabilities that may show eligibility for asylum.

As for alleged misconduct by CBP officials, one commenter expressed concern that CBP officials at POEs have turned away many asylum seekers without cause, been affirmatively hostile to claims of protection, or only allowed a handful of individuals per day to present themselves for processing. The commenter also suggested that there would not be a meaningful opportunity under the rule for asylum seekers to present themselves and demonstrate that they were unable to use the CBP One app to request an appointment. Similarly, another commenter stated that the rule would allow CBP officers to turn away individuals without a smartphone.

Additionally, commenters alleged that CBP officials regularly fail to protect the rights of individuals in expedited removal proceedings, including through failing to ask questions related to fear claims, failing to refer individuals for credible fear interviews, and subjecting individuals to harassment, directly or indirectly.

Other commenters raised concerns that there are inadequate protections against rogue CBP officer behavior more generally, noting that individuals with appointments in February 2023 were rejected at POEs, including those with Title 42 exception appointments being rejected even though they had valid appointments. One commenter asserted that when families expressed concern about the Title 42 exception process, CBP officials threatened to call Mexican police and urged people to depart. Another commenter noted that CBP officers use abuse, threats and intimidation, coercion, and misrepresentations, make unfounded claims about capacity restrictions, use waitlists, and illegally deny access to the asylum process. Some commenters alleged that CBP officers harassed and physically and sexually abused noncitizens at POEs, stole their documents, and failed to record statements by noncitizens expressing a fear of return. Another commenter expressed concerns that Mexican officials, at the request of the United States Government, improperly intercepted individuals at its own southern border so that those individuals would not come to the United States.

*Response:* As an initial matter, the Departments note that migrants do not apply for asylum with CBP at a POE. At POEs, CBP is responsible for the inspection and processing of all applicants for admission, including individuals who may intend to seek asylum in the United States. 8 CFR 235.1(a) (concerning all applicants for admission at POEs), 235.3(b)(4) (concerning individuals processed for expedited removal and claiming fear of persecution or torture). CBP's ability to process undocumented noncitizens in a timely manner at land border POEs is dependent on CBP resources, including infrastructure and personnel; CBP is committed to continuing to increase its capacity to process undocumented noncitizens at SWB POEs.[108] The CBP

[107] *See* USCIS, *Non-Adversarial Interview;* USCIS, *Eliciting Testimony;* Comment Submitted by National Citizenship and Immigration Services Council 119 at 16 (Mar. 27, 2023), *https://www.regulations.gov/comment/USCIS-2022-0016-12267.*

[108] Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/*

Continued

One app is one key way that CBP is streamlining and increasing its capacity to process undocumented noncitizens.[109] Noncitizens are able to schedule appointments through the CBP One app at one of eight POEs along the SWB, providing noncitizens with options to choose the POE that works best for them geographically. The app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection. Noncitizens are not required to make an appointment in the CBP One app to present at a POE, and CBP policy provides that in no instance will an individual be turned away from a POE. All noncitizens who arrive at a POE will be inspected for admission into the United States. *See* 8 CFR 235.1(a). That said, those noncitizens who arrive at a POE without a pre-scheduled appointment will be subject to the rule's presumption of asylum ineligibility unless they establish the applicability of an exception to or a ground for rebutting the presumption.

The Departments disagree that the CBP One app is a "metering system," and CBP and DHS have rescinded all previous metering policies. Following the termination of the Title 42 public health Order, CBP will process noncitizens without documents sufficient for admission who present at an SWB land POE in accordance with its November 2021 memorandum "Guidance for Management and Processing of Undocumented Noncitizens." Moreover, as noted, CBP remains committed to processing as many noncitizens at POEs as is operationally feasible.[110]

To the extent that commenters' reference to metering policies relates to any allegation of misconduct by CBP officers, and with respect to any other commenter concerns about such alleged misconduct, the Departments note that CBP takes allegations of employee misconduct very seriously. Under a uniform system, allegations of misconduct are documented and referred to the DHS Office of Inspector General ("OIG") for independent review and assessment.[111] Cases are either retained by the DHS OIG for investigation or referred to CBP's Office of Professional Responsibility ("OPR") for further handling. Allegations of misconduct by a CBP employee or contractor can be sent to CBP OPR's Joint Intake Center via email at *JointIntake@cbp.dhs.gov* or via phone at 1–877–2INTAKE (246–8253) Option 5.[112] Such allegations can also be sent to the DHS OIG Hotline via OIG's website, *https://www.oig.dhs.gov/hotline,* or via phone at 1–800–323–8603. Upon completion of an investigation, CBP management reviews all evidence, the CBP Standards of Conduct, the CBP Table of Offenses and Penalties, and how the agency has handled similar misconduct in the past, in order to determine what, if any, disciplinary action is appropriate.[113]

Commenter concerns about the processing of individuals seeking exceptions to the Title 42 public health Order at POEs are misplaced. As an initial matter, the rule will take effect only once the Title 42 public health Order is lifted, at which time CBP will inspect and process all noncitizens who arrive at a POE under Title 8. Title 42 is a statutory scheme that operates separate from Title 8. Thus, concerns about the Title 42 exception process in and of itself are not relevant to this rulemaking. While noncitizens seeking to enter a POE under Title 8 may experience some wait times, those wait times are not equivalent to rejections; CBP policy provides that in no instance will an individual be turned away or "rejected" from a POE.

*Comment:* One commenter stated that the use of the CBP One app to schedule an appointment to present at a POE conflicts with the inspection requirement in 8 U.S.C. 1225(a)(3), requiring that all applicants for admission be inspected by CBP officers. The commenter specifically referred to the district court's order in *Al Otro Lado, Inc.* v. *McAleenan,* 394 F. Supp. 3d 1168 (S.D. Cal. 2019), holding that this provision applies to migrants who are approaching a POE but have not yet entered the United States. The commenter stated that, because the number of appointments provided does not approach the demand, the CBP One app is functionally a system of metering. Another commenter also asserted that it was not clear whether noncitizens without an appointment who approach a POE would, in fact, be inspected and processed, or whether they would be turned away in violation of CBP's mandatory duty to inspect and process noncitizens at POEs.

*Response:* The Departments respectfully disagree that the use of the CBP One app to schedule an appointment to present at a POE conflicts with CBP's duties under 8 U.S.C. 1225(a)(3), unlawfully withholds access to the asylum process, or operates as a form of metering (though the Departments maintain that DHS's prior metering policies are lawful). The Departments acknowledge the district court's holding in *Al Otro Lado*—which the Government has appealed—but the use of CBP One app appointments as contemplated by this rule does not implicate that holding. CBP's policy is to inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app. In other words, the use of the CBP One app is not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed under 8 U.S.C. 1225(a)(3). Individuals without appointments will not be turned away. CBP is committed to increasing the number of noncitizens processed at POEs and to processing noncitizens in an expeditious manner.[114]

In addition, any noncitizen who is inspected and processed for expedited removal upon arrival at a POE and who expresses a fear of return, whether or not they use the CBP One app, will be referred to USCIS for a credible fear interview with an AO. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). The AO will determine whether the presumption applies or whether the individual can rebut or establish an exception to the presumption. CBP officers do not determine or evaluate the merits of any claim of fear, nor do they make determinations on whether the rule's presumption applies. *See id.* (providing that credible fear interviews are conducted by AOs).

---

*default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[109] *See id.*

[110] *See id.*

[111] *See, e.g.,* DHS OIG, Hotline Poster, *https://www.oig.dhs.gov/sites/default/files/DHS_OIG_Hotline-optimized_without_fax.jpg* (last visited Apr. 17, 2023); CBP, DHS/CBP/PIA–044, *Privacy Impact Assessment for the Joint Integrity Case Management System (JICMS)* at 1–2 (July 18, 2017), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp044-jicms-july2017.pdf;* CBP, CBP Pub. No. 1686–0322, *Report on Internal Investigations and Employee Accountability—Fiscal Year 2021* at 11–12 (Mar. 2022), *https://www.cbp.gov/sites/default/files/assets/documents/2022-May/fy21-cbp-opr-internal-investigation-accountability_1.pdf.*

[112] CBP, *How to Make a Report, https://www.cbp.gov/about/care-and-custody/how-make-report* (last visited Apr. 17, 2023).

[113] *See* CBP, CBP Pub. No. 1686–0322, *Report on Internal Investigations and Employee Accountability Fiscal Year 2021* at 17 (2022), *https://www.cbp.gov/sites/default/files/assets/documents/2022-May/fy21-cbp-opr-internal-investigation-accountability_1.pdf.*

[114] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

b. AO Conduct and Training

*Comment:* Several commenters expressed concern that the rule would lead to erroneous asylum decisions made by AOs, given alleged deficiencies in AO conduct and training. Commenters asserted that the rule would lead to asylum decisions that are too swift. Multiple commenters also expressed concern that AOs have conducted inadequate credible fear screenings and made erroneous decisions in such screenings, resulting in errors in adjudicating asylum claims. For instance, citing an investigation by the DHS Office for Civil Rights and Civil Liberties, one commenter alleged that AOs have misapplied or failed to apply existing asylum law, ignored relevant portions of asylum seekers' testimony, failed to perform pattern and practice analysis and consider country conditions, failed to ask relevant follow-up questions and develop the record, and failed to take accurate notes. In addition, the same commenter said some AOs can be hostile and belligerent, and even the best trained and most effective AOs have limited time for credible fear interviews. Another commenter stated that AOs are ill-equipped to conduct the additional analysis required by the rule, given alleged deficiencies in the credible fear lesson plan, failure of AOs to apply current legal standards, failure to provide appropriate language interpretation, failure to interview vulnerable populations within agency guidelines, and interference with access to counsel.

Some commenters also stated that AOs are not medical experts and lack the required expertise to evaluate whether something is or is not an acute medical emergency. Another commenter stated that DHS should train all staff who interact with LGBT asylum seekers. Some commenters likewise stated that the rule should explicitly instruct AOs to affirmatively elicit information about whether a person could qualify for an exception to the rule or rebut its ineligibility presumption, such as details about any family or personal medical emergencies, threats of violence, difficulties using the CBP One app, and other matters that bear on the exceptions and grounds for rebuttal.

One commenter expressed concerns that noncitizens who are subject to the rule's rebuttable presumption of asylum ineligibility would be deprived of the right to be meaningfully heard on their claims because adjudicators applying the presumption would understand the rule to favor overall deterrence of asylum seeking, such that decisionmakers would allegedly err on the side of denying asylum or making negative credible fear determinations. This commenter also argued that the expedited removal system leads to a systemic, unjustified skepticism amongst adjudicators toward meritorious claims.

*Response:* The Departments acknowledge these commenter concerns but disagree that AOs lack the competence, expertise, or training to make determinations on whether the presumption of ineligibility for asylum applies or an exception or rebuttal ground has been established. AOs frequently assess physical and psychological harm when adjudicating asylum applications and are trained to do so in a sensitive manner.[115] AOs already evaluate harm resulting from the unavailability of necessary medical care or specific medications when assessing ''other serious harm'' under 8 CFR 208.13(b)(1)(iii)(B).[116] Additionally, all AOs receive specific training on adjudicating asylum claims of LGBT individuals.[117] As for commenters' requests that the rule explicitly instruct AOs to affirmatively elicit information about the presumption, such an instruction is unnecessary, as AOs conducting credible fear interviews are already required to specifically ask questions to elicit all relevant testimony in a non-adversarial manner.[118] This will necessarily include information related to whether the rule's presumption applies or an exception or rebuttal ground has been established, regardless of whether the noncitizen affirmatively raises these issues.

USCIS takes any allegations of AO misconduct seriously and is aware of the ongoing investigation by the DHS Office of Civil Rights and Civil Liberties cited by commenters. However, the Departments strongly disagree with any claims that AOs systematically exhibit an unjustified skepticism or insensitivity toward asylum claims, that they routinely fail to follow law or procedure, or that they would do so when applying this rule. AOs are career government employees and are selected based on merit. They undergo special training on non-adversarial interview techniques, cross-cultural communication, interviewing children, and interviewing survivors of torture and other severe trauma.[119] While the Departments disagree with the commenters' premise, the Departments also note that government officials are entitled to the presumption of official regularity in the way they conduct their duties. *See United States* v. *Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926). Commenters failed to provide persuasive evidence of systematic bias or misapplication of the law or procedure by AOs.

c. IJ Conduct and Training

*Comment:* Several commenters expressed concern with IJ conduct and their training *vis-à-vis* application of the rule's condition on asylum eligibility. One commenter expressed concerns that noncitizens who are subject to the rule's rebuttable presumption of asylum ineligibility would be deprived of the right to be meaningfully heard on their claims because adjudicators applying the presumption would understand the proposed rule to favor overall deterrence, such that IJs would allegedly err on the side of denial or negative credible fear findings. The commenter argued that the expedited removal system and prior hiring practices within EOIR lead to a systemic inclination toward unjustified skepticism among IJs with respect to meritorious claims.

Commenters also averred that IJs are not medical experts with the required expertise to evaluate medical issues implicated by the rebuttable presumption. Commenters stated that a significant number of IJs hired in the past several years lacked prior immigration law experience, yet, as IJs, they make complex legal determinations in brief credible fear proceedings. Commenters also asserted that some IJs have engaged in unprofessional and

[115] For example, AOs adjudicate cases involving forms of persecution like female genital mutilation, forced abortion, or forced sterilization. *See Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); INA 101(a)(42)(B), 8 U.S.C. 1101(a)(42)(B); *see also* USCIS, *RAIO Directorate—Officer Training, Gender-Related Claims* at 24–28 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Gender_Related_Claims_LP_RAIO.pdf.*

[116] *See* USCIS, *RAIO Directorate—Officer Training: Definition of Persecution and Eligibility Based on Past Persecution,* Supp. B at 60 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Persecution_LP_RAIO.pdf.*

[117] *See generally* USCIS, *RAIO Directorate—Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/LGBTI_Claims_LP_RAIO.pdf.*

[118] *See generally* USCIS, *Non-Adversarial Interview;* USCIS, *Eliciting Testimony.*

[119] *See* 8 CFR 208.1(b); *see also* USCIS, *Non-Adversarial Interview;* USCIS, *Eliciting Testimony;* USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors that May Impede Communication at an Interview* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/CrossCultural_Communication_LP_RAIO.pdf;* USCIS, *Children's Claims;* USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Survivors_of_Torture_LP_RAIO.pdf* [hereinafter USCIS, *Interviewing Survivors of Torture*].

hostile behavior toward asylum seekers and noted that some IJs have asylum denial rates of 90 percent or higher. Additionally, commenters expressed concern about potential IJ bias or lack of sufficient training for IJs related to, in particular, asylum claims of LGBT individuals.

*Response:* The Departments respectfully disagree with commenters' concerns about IJs' conduct and training. IJs, like AOs, are career employees who are selected through a competitive process. Likewise, IJs receive "comprehensive, continuing training and support" directed at "promot[ing] the quality and consistency of adjudications." 8 CFR 1003.0(b)(1)(vii). Relatedly, the Chief Immigration Judge has the authority to "[p]rovide for appropriate training of the immigration judges and other OCIJ staff on the conduct of their powers and duties." 8 CFR 1003.9(b)(2). Regulations also require IJs to "resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." 8 CFR 1003.10(b).

The Departments likewise do not share commenters' concerns regarding newly hired IJs' professional experience or ability to make appropriate legal determinations in the context of credible fear reviews or section 240 removal proceedings. The Departments believe that IJs' diverse professional backgrounds contribute to their ability to address complex legal issues in all cases arising before them. Notably, IJs are selected on merit with baseline qualifications, including possession of a J.D., LL.M., or LL.B. degree; active membership in a State bar; and seven years of experience as a licensed attorney working in litigation or administrative law. Upon entry on duty, new IJs receive extensive training, and throughout their tenure, all IJs receive both annual and periodic training on specialized topics as necessary. IJs are also expected to maintain professionalism and competence in the law.[120]

Moreover, the Departments disagree with commenter concerns about IJs' ability to assess medical records. Nothing in the rule requires adjudicators to make a formal medical diagnosis to determine whether a noncitizen is exempt from or has rebutted the rule's condition on eligibility. Rather, adjudicators will make a factual determination regarding whether certain exigencies, such as an acute medical emergency, caused a noncitizen to enter the United States outside of an available lawful pathway. 8 CFR 208.33(a)(2), 1208.33(a)(2). Given the IJ's role as the finder of fact in proceedings before EOIR, IJs are well-equipped to make such fact-based determinations.

Further, to the extent that commenters' concerns amount to allegations that IJs are biased or fail to comport themselves in a manner consistent with their duties, the Departments note that IJs are attorneys, 8 CFR 1003.10(a), and must comply with all ethical conduct and training requirements for DOJ attorneys. *See, e.g.,* 5 CFR 2635.101.[121] Additionally, as evidenced by the existence and work of EOIR's Judicial Conduct and Professionalism Unit ("JCPU"), "[a]lleged misconduct by [IJs] is taken seriously by [DOJ] and [EOIR]."[122] EOIR strives to adjudicate every case in a fair manner and to treat all parties involved with respect. Individuals or groups who believe that an IJ or other EOIR adjudicator has engaged in misconduct may submit a complaint to EOIR's JCPU via mail at Executive Office for Immigration Review, attn.: Judicial Conduct and Professionalism Unit, 5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041 or via email at *judicial.conduct@usdoj.gov.* Additionally, JCPU may launch its own investigation if information related to potential misconduct comes to JCPU's attention by other means, including through news reports, Federal court decisions, and routine reviews of agency proceedings.[123] JCPU will review all complaints, docket cases alleging judicial misconduct, gather relevant materials, and forward the complaint, relevant documents, and a summary of JCPU's preliminary fact-gathering to the IJ's supervisor for investigation and resolution.[124] Complaints can be resolved by dismissal, conclusion, corrective action, or disciplinary action, and JCPU will provide written notice to the complainant when the matter is closed.[125]

While the Departments disagree with the commenters' premise, moreover, the Departments also note that government officials are entitled to the presumption of official regularity in the way they conduct their duties, *Chem. Found.,* 272 U.S. at 14–15, and commenters failed to provide persuasive evidence of systematic bias amongst IJs.

iv. Concerns Regarding Confusion, Delays, Backlog, and Inefficiencies

*Comment:* Commenters described the rule as "convoluted," "elaborate," or "unclear," and expressed concerns that it would be confusing to migrants and make it difficult for legal services organizations to advise clients, partner organizations, and the communities that they serve. Commenters said that the proposed rule would impose a two-tier approach and additional fact-intensive queries for credible fear interviews, thereby increasing interview times and complexity of credible fear cases and adding to the burden and confusion of AOs. Additionally, commenters stated that prior asylum policy changes have led to confusion amongst attorneys and migrants and resulted in erroneous deportations. Moreover, one commenter stated that a confusing legal framework does not prevent and sometimes promotes an increase of irregular migration. Another commenter recommended that the Government provide guidance or an FAQ document to accompany and explain the rule's exceptions and means of rebuttal.

In addition, commenters expressed concern that, by adding to the evidentiary requirements, complexity, and length of asylum adjudications, the rule would exacerbate delays and backlogs, inefficiently prolong the asylum process for legitimate asylum seekers, increase erroneous denials, decrease the number of attorneys available to help clear backlogs, and strain limited government resources. Commenters also pointed to previous instances where changes in procedure led to an increased backlog, citing the Citizenship and Immigrant Services Ombudsman 2022 annual report to highlight this dynamic. Another commenter stated that cases wrongly referred to the immigration court by the Asylum Office due to erroneous applications of the rule would unnecessarily add to immigration court backlogs. And commenters stated that the NPRM failed to provide any evidence or explanation that the proposed rule would mitigate backlogs. In response to these efficiency concerns, one commenter suggested that the Departments should pursue alternate solutions for addressing the USCIS and

[120] *See* EOIR, *Ethics and Professionalism Guide for Immigration Judges* 2 (Jan. 31, 2011), *https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf.*

[121] *See also* ICPM, Chapter 1.3(c) (Nov. 14, 2022) ("Immigration judges strive to act honorably, fairly, and in accordance with the highest ethical standards, thereby ensuring public confidence in the integrity and impartiality of immigration court proceedings.").

[122] *See id.*

[123] *See* EOIR, *Judicial Complaint Process* (Feb. 2023), *https://www.justice.gov/eoir/page/file/1100946/download* (explaining the steps of the judicial complaint process).

[124] *Id.*

[125] *Id.; see also* EOIR, *Statistics and Reports, https://www.justice.gov/eoir/statistics-and-reports* (last visited Apr. 19, 2023) (providing IJ complaint statistics).

EOIR backlogs, such as more dedicated dockets, smarter prioritization of cases, expanded use of administrative closure or deferred action, or establishing an independent immigration court. One commenter likewise maintained that the Departments, in their efforts to help the immigration court system function more efficiently and effectively must still respect the due process rights of asylum seekers.

*Response:* The Departments do not believe that the rule's provisions are unduly confusing or complex. However, as described in Section II.C.7 of this preamble, the Departments have streamlined the regulatory text significantly to improve clarity, and the Departments believe this final rule publication should provide much of the guidance sought by commenters. Substantively, the rule simply outlines a circumstance in which a noncitizen will be presumed ineligible for asylum, and includes a list of exceptions to and means of rebutting the presumption. As explained in Section IV.B.5.iii.a of this preamble, AOs conducting credible fear interviews will specifically ask questions to elicit all relevant testimony in a non-adversarial manner, including with respect to whether the presumption applies or any exception or rebuttal ground is applicable in a given case, regardless of whether the noncitizen affirmatively raises these issues. Furthermore, noncitizens who are found by an AO to be subject to the condition on eligibility may request review of that determination, and an IJ will evaluate de novo whether the noncitizen is subject to the presumption, and if so, whether the noncitizen has established an exception to or rebutted the presumption. 8 CFR 208.33(b)(1), (2). And even where the presumption applies and no exception or rebuttal ground has been established at the credible fear stage, if the noncitizen has demonstrated a reasonable possibility of persecution or torture, they will have an opportunity to apply for asylum, statutory withholding of removal, CAT protection, or any other form of relief or protection for which the noncitizen is eligible in removal proceedings under section 240 of the INA. *See* 8 CFR 208.33(b)(2)(ii), (b)(2)(v)(B); *id.* 1208.33(b)(4).

In relation to the concern that the rule's provisions are unclear or that additional public-facing materials may be necessary to clarify and raise awareness about provisions of the rule, the Departments intend to execute a robust communications plan to notify and inform the public of the rule's requirements. This plan entails engagement with stakeholders, including NGOs, international organizations, legal services organizations, and others. The Departments also plan to mount communications campaigns as appropriate throughout the Western Hemisphere in coordination with interagency partners and partner governments in order to educate potential migrants about the rule's requirements, including consequences of failing to use available lawful pathways.

These efforts are in addition to preexisting and ongoing communications efforts, including publicization of removal and enforcement statistics, English-, Spanish-, Portuguese-, and Haitian Creole-language interviews with media outlets in the region, and regularly updated Web resources on which the Departments can provide additional information in response to demand from the public.

The Departments acknowledge concerns regarding delays, backlogs, and limited government resources, but believe that these concerns are outweighed by the anticipated benefits of the rule. The rule is expected to ultimately reduce the number of cases pending before the immigration courts and reduce ancillary benefit requests to USCIS. *See* 8 CFR 208.7 (employment authorization for pending asylum applicants). This would also alleviate the burden on ICE of removing non-detained noncitizens who receive final orders of removal at the conclusion of removal proceedings under section 240 of the INA but who do not comply with their orders. *See, e.g.,* 8 CFR 241.4(f)(7) (in considering whether to recommend further detention or release of a noncitizen, an adjudicator must consider ''[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal''). The Departments also anticipate that the rule will redirect migratory flows towards lawful, safe, orderly pathways in ways that make it easier to process their requests for admission. 88 FR at 11729. The Departments believe that this will ultimately result in fewer credible fear cases than would otherwise be processed, and that these improvements in efficiency would outweigh a potential increase in credible fear interview times. The Departments do not anticipate that the rule will be applied frequently in affirmative asylum cases decided by the Asylum Office, since only a small percentage of these applicants enter the United States from Mexico across the southwest land border or adjacent coastal borders, apart from UCs who are not subject to the rule.[126] When all the effects are considered on balance, this rule will serve one of the key goals of the U.S. asylum system, which is to efficiently and fairly provide protection to noncitizens who are in the United States and have meritorious claims, while also efficiently denying and ultimately removing those who are not deemed eligible for discretionary forms of protection and do not qualify for statutory withholding of removal or protection under the CAT. *See* 88 FR at 11729.

Comments advocating for other immigration policy changes or statutory reforms that could potentially create efficiencies in immigration proceedings are outside the scope of this rulemaking. However, as stated in the NPRM, the Departments note that EOIR has created efficiencies by reducing barriers to access immigration courts. *See* 88 FR at 11717. In that regard, EOIR has expanded the Immigration Court Helpdesk program to several additional courts, issued guidance on using the Friend of the Court model to assist unrepresented respondents, and reconstituted its pro bono liaison program at each immigration court. The above measures promote efficiency as, where a noncitizen is represented, the IJ is less likely to have to engage in time-consuming discussions at hearings to ascertain whether the noncitizen is subject to removal and potentially eligible for any relief. In addition, a noncitizen's counsel can assist the noncitizen in gathering evidence, can prepare the noncitizen to testify, and can work with DHS counsel to narrow the issues the IJ must decide. While critically important, these process improvements are not, on their own, sufficient to respond to the significant resource needs associated with the increase in migrants anticipated following the lifting of the Title 42 public health Order.

To the extent commenters argued that adjudication timeline concerns implicate the due process rights of noncitizens, as explained above, the Supreme Court has held that the due process rights of noncitizens applying for admission at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 140 S. Ct. at 1983. However, upon referral of a fear

[126] The annual percentage of affirmative asylum applicats who entered between POEs and were not UCs has steadily declined over the past two decades. The percentage for 2020-22 have been 16.00 percent, 14.85 percent, and 13.92 percent, respectively. So far in fiscal year 2023, the percentage has been 9.06 percent. USCIS Data Collection, Apr. 13, 2023.

claim, USCIS seeks to issue credible fear determinations for detained noncitizens in a timely manner. Furthermore, the statute that governs expedited removal provides that upon a noncitizen's request for review of an AO's negative credible fear determination, an IJ will review the determination ''in no case later than 7 days after the date of the determination.'' INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). In any event, because there is no statute guaranteeing any noncitizen that their expedited removal or credible fear process will be completed in a given amount of time, any failure to meet this obligation is not in the nature of a due process violation. *See Thuraissigiam,* 140 S. Ct. at 1983.

*Comment:* Commenters expressed concerns that a lack of notice about the rule for asylum seekers could lead to confusion and due process violations. Some expressed concern that noncitizens who are traveling to the United States when the rule becomes effective would not have sufficient notice about the CBP One app or the need to schedule an appointment in order to seek asylum without being subject to a rebuttable presumption of ineligibility. Commenters expressed concern that individuals who had contracted with smugglers in transit would receive disinformation from the smugglers about lawful pathways, thereby preventing them from using a lawful pathway to enter the United States. Other commenters said that noncitizens should receive notice of the rebuttable presumption prior to their credible fear interviews.

*Response:* The Departments believe that comments about lack of notice are misguided for several reasons. First, as just discussed, the rule's requirements are not unduly confusing or complex, and the Departments intend to implement a robust communications plan to notify and inform the public of requirements under the rule, minimizing any potential confusion. Second, the Departments provided advance notice of the potential issuance of this policy by issuing the NPRM on February 23 of this year, and by announcing the impending issuance of such proposed rule in January.[127] Third, any lack of notice would not constitute a violation of the Fifth Amendment's Due Process Clause. As explained above, the Supreme Court has held that the rights of noncitizens applying for admission at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 140 S. Ct. at 1983. The Departments are aware of no statutory requirement that notice regarding any of the INA's provisions be provided to individuals outside the United States, including those who may be subject to expedited removal provisions or conditions on asylum eligibility upon arrival. Finally, courts have long held that ''ignorance of the legal requirements for filing an asylum application'' is ''no excuse'' for failing to comply with such requirements, particularly where, as here, the enactment of such requirements is published in the **Federal Register**. *Alquijay* v. *Garland,* 40 F.4th 1099, 1103 (9th Cir. 2022) (quotation marks omitted) (citing, *e.g., Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 559 U.S. 573, 581 (2010)); *see Williams* v. *Mukasey,* 531 F.3d 1040, 1042 (9th Cir. 2008).

v. Other Procedural Concerns

*Comment:* Commenters stated that it would be extremely challenging or impossible for many asylum seekers to show that the rule does not apply to them or to establish an exception to or rebut the presumption of ineligibility, despite having bona fide claims. According to these commenters, the expedited removal process is extremely flawed and rife with erroneous removals due to a number of factors. Asylum seekers are detained in remote areas (in abusive and dangerous conditions of confinement), where attorney access is limited and they have no chance to gather evidence. Credible fear screenings typically occur over the phone (often with poor call quality and sporadic connection, with little or no privacy). The commenters also stated that the lack of privacy during these screenings makes it more difficult and potentially retraumatizing for applicants to share their stories and make their cases. One commenter stated that, although the noncitizen may be in a private room, there is often a lot of noise and commotion in the passageways that can be distracting. One commenter wrote that trauma severely impacts a survivor's ability to coherently and compellingly present an asylum claim by negatively affecting memory and emotional state and causing them to behave in ways that untrained people may read as indicating a lack of credibility. Another commenter stated that credible fear screenings can trigger increased traumatic response, rather than increased disclosure about the circumstances of persecution or torture. The presence of noncitizens' children during the interview can be distracting or deter the person from disclosing sensitive elements of their persecution story. Commenters also stated that language barriers, including English-only availability for written notices, make the process more difficult. One commenter also stated that translators may be unfamiliar with certain dialects and slang. Commenters stated that these alleged factors would worsen if the Administration were to pursue its reported plan to conduct credible fear interviews within days of asylum seekers' arrival in CBP custody, based on the conditions in CBP custody and lack of access to counsel, as shown by the increase in negative credible fear determinations during the Prompt Asylum Case Review (''PACR'') program and the Humanitarian Asylum Review Program (''HARP'').

*Response:* To the extent commenters argued that conditions in which credible fear interviews take place, such as location, interview procedures, and surrounding circumstances, implicate the due process rights of noncitizens, as explained above, the Supreme Court has held that the due process rights of noncitizens applying for admission at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 140 S. Ct. at 1983. As further explained above, the statute that governs expedited removal provides only that the noncitizen may ''consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process.'' INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).

In any event, the Departments disagree with these characterizations of credible fear interviews. With regard to commenter concerns about lack of privacy during credible fear interviews, the Departments note that these interviews are conducted ''separate and apart from the general public.'' 8 CFR 208.30(d). The Departments are mindful of their duties under 8 CFR 208.6 and 1208.6 to prevent unauthorized disclosure of records pertaining to any credible fear determination, and AOs are required to explain these confidentiality requirements to noncitizens prior to credible fear interviews.[128] Noncitizens in credible

[127] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[128] *See* USCIS, *Non-Adversarial Interview; see also* Form M–444, Information About Credible Fear

fear proceedings are also informed that interpreters are sworn to keep their testimony confidential.[129] All AOs receive training on working with interpreters, which includes assessing competency and recognizing other factors that may affect the accuracy of interpretation.[130] Credible fear interviews are conducted ''in a nonadversarial manner, separate and apart from the general public.'' 8 CFR 208.30(d). AOs are trained to elicit all relevant testimony during credible fear interviews,[131] and will not preemptively issue negative credible fear determinations due to phone connectivity issues. All AOs receive training on interviewing survivors of torture and other severe trauma.[132]

Finally, commenters' concerns related to the potential for conducting credible fear interviews while noncitizens are in CBP custody are outside the scope of this rule. This rule does not specify where noncitizens may be held in custody during credible fear proceedings. Any decision to conduct credible fear interviews while the noncitizen is in CBP custody will take into account a range of factors, including operational limitations associated with the facility, staffing, and throughput. Additionally, to the extent that commenters have concerns about conditions in CBP custody, such comments are outside the scope of this rule. DHS notes, however, that it is committed to providing safe, sanitary, and humane conditions to all individuals in custody, and that it is committed to transferring individuals out of CBP custody in an expeditious manner. The Departments further note that one anticipated effect of this rule is to alleviate overcrowding in DHS detention facilities. *See* 88 FR at 11704.

6. Recent Regional Migration Initiatives

*Comment:* Commenters stated that the rule conflicts with several migration declarations and other compacts into which the United States has recently entered. For example, at least one commenter stated that the rule conflicts with the L.A. Declaration, in which the United States committed ''to promote access to protection and complementary pathways for asylum seekers, refugees, and stateless persons in accordance with national legislation and with respect for the principle of non-refoulement.'' [133] One commenter stated the former presidents of Colombia and Costa Rica object to the proposed rule on the basis that it is not in line with the L.A. Declaration.

*Response:* The Departments disagree that the rule conflicts with any recent regional migration initiatives. The Departments' rule is fully consistent with the United States' commitments under the L.A. Declaration, including our responsibility as a signatory country to ''manage mixed movements across international borders in a secure, humane, orderly, and regular manner.'' [134] As described in the NPRM, political and economic instability, coupled with the lingering adverse effects of the COVID–19 global pandemic, have fueled a substantial increase in migration throughout the world. *See, e.g.,* 88 FR at 11708–14.

Current DHS encounter projections and planning models suggest that encounters at the SWB could rise to 11,000 encounters per day after the lifting of the Title 42 public health Order.[135] Absent policy changes, most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future despite the fact that many of them will not ultimately be granted asylum, a scenario that would likely incentivize an increasing number of migrants to the United States and further increase the likelihood of sustained high encounter rates.

The Departments' promulgation of this rule is an attempt to avert this scenario in line with the United States and other signatory nations' responsibility to manage migration responsibly and humanely as described in the L.A. Declaration. Contrary to commenters' assertion, the rule is consistent with the Collaborative Migration Management Strategy (''CMMS'') [136] and the L.A. Declaration's support for a collaborative and regional approach to migration and forced displacement, pursuant to which countries in the hemisphere commit to implementing programs to stabilize communities hosting migrants and asylum seekers, providing increased regular pathways and protections for migrants and asylum seekers who reside in or traveled through their countries, and humanely enforcing existing immigration laws.

The rule works in combination with several other policy actions to secure the SWB while upholding the principles enshrined in the L.A. Declaration. These policy actions include resumption of the Cuban and Haitian Family Reunification Parole Programs, the plans to streamline those programs and extend them to nationals of certain other countries, the establishment of regional processing centers, expansion of refugee resettlement commitments globally and in the region, expansion of labor pathways, including expanded access in the region to H–2B temporary nonagricultural worker visas, creation of the parole processes for CHNV nationals, the Asylum Processing IFR, and other processing improvements geared toward expanding access to lawful pathways. 88 FR at 11716–19.[137] These actions are consistent with the specific goal laid out in the L.A. Declaration to collectively ''[e]xpand access to regular pathways for migrants and refugees.'' Together with the rule, these policy actions will help address unprecedented migratory flows, the systemic costs those flows impose on the immigration system, and the ways in which a network of increasingly sophisticated human smuggling networks cruelly exploit the system for financial gain.

7. Negative Impacts on the Workforce and Economy

*Comment:* Some commenters stated that the Departments should not enact restrictions on immigration due to current labor shortages and the general benefits of immigration. Commenters stated that the rule will stifle the flow of immigration to American communities, which will suffer because immigrants are central to community development, economic prosperity, and maintaining a strong workforce. A commenter stated that U.S. history has shown that immigrants, even those who

Interview 1 (May 31, 2022) (''U.S. law has strict rules to prevent the government from telling others about what you say in your credible fear interview.'').

[129] Form M–444, Information About Credible Fear Interview 2 (May 31, 2022) (''The interpreter will be sworn to keep the information you discuss confidential.'').

[130] USCIS, RAIO Directorate—*Officer Training, Interviewing—Working with an Interpreter* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Working_with_an_Interpreter_LP_RAIO.pdf.*

[131] USCIS, *Eliciting Testimony* 12 (''In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.''); USCIS, *Non-Adversarial Interview* 13 (''You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.'').

[132] USCIS, *Interviewing Survivors of Torture.*

[133] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[134] *Los Angeles Declaration.*

[135] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023.

[136] *See* The White House, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[137] *See also* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

arrive here in the weakest of circumstances, strengthen our country in the long run. Commenters said that the U.S. population is stagnating or shrinking, so the United States should welcome migrants—especially young migrants—who can support the economy, fill jobs, and contribute to Social Security. A commenter stated that beginning in 2019, levels of immigration to the United States dropped significantly, and that by the end of 2021 there were close to 2 million fewer working-age immigrants in the United States than there would have been if pre-pandemic immigration continued unchanged, according to researchers from the University of California, Davis.

Some commenters opposed the proposed rule on the ground that immigrants are willing to work difficult jobs that many already in the United States are not willing to take. Commenters stated that there is currently a severe shortage of certain workers in the United States, such as in the health care, agriculture, and service industries, and that migrants who undertake an arduous overland journey to the United States are likely to work hard and become productive members of U.S. society. One commenter noted that immigrant-owned businesses account for over 8 million jobs and 1.3 trillion dollars in the U.S. economy. Another commenter stated that individuals in the asylum process who are working with work authorization contribute about $11 billion to the economy each year. Commenters also stated that migrants do not have a significant negative impact on the wages of local-born residents and that migrants contribute more to the U.S. economy than the cost of community and government services they use. One commenter stated that the proposed rule improperly restricts asylum seekers being integrated into the workforces of the States and that State-funded services for asylum seekers would be put under strain as a result.

*Response:* The Departments agree that immigrants make important contributions to the U.S. economy. However, the Departments disagree that the benefits of immigration render this rule unnecessary or invalid. The Departments emphasize that the U.S. immigration system has experienced extreme strain with a dramatic increase of noncitizens attempting to cross the SWB in between POEs without authorization, reaching an all-time high of 2.2 million encounters in FY 2022. Without a meaningful policy change, border encounters could dramatically rise to as high as 11,000 per day after the Title 42 public health Order is lifted,[138] and DHS does not currently have the resources to manage and sustain the processing of migratory flows of this scale in a safe and orderly manner. *See* 88 FR at 11712–13. This rule is therefore designed to incentivize migrants to choose lawful, safe, and orderly pathways to entering the United States over dangerous, irregular pathways.

Over the last several months, DHS has endeavored to promote and expand lawful, safe, and orderly pathways. For instance, in January 2023, DHS implemented new parole processes for CHN nationals that built on the successful process for Venezuelans and created an accessible, streamlined way for eligible individuals to travel to and enter the United States via a lawful and safe pathway. Through a fully online process, individuals can seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years. Individuals who are paroled through these processes can apply for employment authorization immediately following their arrival to the United States.[139]

Furthermore, the United States Government has significantly expanded access to the H–2 labor visa programs to address labor shortages and provide safe and orderly pathways for migrants seeking to work in the United States. For example, on December 15, 2022, DHS and the Department of Labor (''DOL'') jointly published a temporary final rule increasing the total number of noncitizens who may receive an H–2B nonimmigrant visa by up to 64,716 for the entirety of FY 2023. 87 FR 76816 (Dec. 15, 2022). In 2022, concurrent with the announcement of the L.A. Declaration, the United States announced that it intends to welcome at least 20,000 refugees from Latin America and the Caribbean in FY 2023 and FY 2024, which would put the United States on pace to more than triple the number of refugee admissions from the Western Hemisphere this fiscal year alone.[140] On April 27, 2023, DHS announced that it would commit to referring for resettlement thousands of additional refugees per month from the Western Hemisphere—with the goal of doubling the number of refugees the United States committed to welcome as part of the L.A. Declaration.[141] The Departments also note that the United States admitted significantly more noncitizens in nonimmigrant status in fiscal year 2022 (96,700,000) than in previous years.[142]

The Departments believe that these new or expanded lawful pathways, and particularly employment-based pathways, are effective ways to address labor shortages and encourage lawful migration. The Departments also believe that, by reducing migrants' incentives to use human smugglers and traffickers to enter the United States, this final rule will reduce the likelihood that newly arrived migrants will be subjected to labor trafficking. The Departments further reiterate that noncitizens who avail themselves of any of the lawful, safe, and orderly pathways recognized in this rule will not be subject to the rebuttable presumption.

8. Other Opposition

i. Encourages Migration by Sea or Other Dangerous Means

*Comment:* A commenter predicted that the proposed rule may increase the number of migrants seeking to travel to the United States by sea, which is dangerous and could lead to an increase in migrant deaths and drownings, and another suggested that attempted immigration directly by sea would pose a significant burden on Coast Guard and other resources. One commenter expressed concern that the rule would incentivize migrants to avoid detection by CBP, remarking that migrants may attempt to enter the United States by crossing the Rio Grande River or along the Pacific coast, where they face a high risk of drowning.

Commenters stated that the proposed rule would do nothing to stem the flow of migrants to the United States but would instead force people to seek out other means of coming to the United States and leave people with few choices, including the very choices the rule purports to wish to avoid. Some commenters stated that the rule will result in migrants, who are in a desperate humanitarian situations or

[138] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023.

[139] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 22, 2023), *https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[140] *See* L.A. Declaration Fact Sheet.

[141] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[142] *Compare* OIS, Legal Immigration and Adjustment of Status Report Fiscal Year 2022, Quarter 4, *https://www.dhs.gov/immigration-statistics/special-reports/legal-immigration,* with OIS, Annual Flow Report: U.S. Nonimmigrant Admissions: 2021 (July 2022), *https://www.dhs.gov/sites/default/files/2022-07/2022_0722_plcy_nonimmigrant_fy2021.pdf,* and OIS, Annual Flow Report: U.S. Nonimmigrant Admissions: 2018 (Oct. 2018), *https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/nonimmigrant_admissions_2018.pdf.*

fear for their lives, resorting to more dangerous routes between POEs to enter the United States. One commenter stated that these dangerous border crossings can result in severe injuries, dehydration, starvation, and drownings as well as kidnappings and other violent attacks by cartels and other organized criminal groups that exert influence at the U.S.-Mexico border. Another commenter claimed that data shows that CBP's ''prior metering program'' increased border apprehensions by 36 percent, which suggests that making the CBP One app mandatory may in fact increase border crossings and make them riskier.

*Response:* First, the Departments share commenters' concerns that noncitizens seeking to avoid the rebuttable presumption may take dangerous sea routes, leading to migrant deaths and drownings. Because applying the rule only to those who enter the United States from Mexico across the southwest land border would inadvertently incentivize noncitizens without documents sufficient for lawful admission to circumvent that land border by making a hazardous attempt to reach the United States from Mexico by sea, the Departments have determined that it is appropriate to apply the rebuttable presumption to those who enter the United States from Mexico at both the southwest land border and adjacent coastal borders. Similar considerations that led the Departments to pursue this rulemaking with respect to land arrivals at the SWB apply in this specific maritime context, as the anticipated increase in migration by land could lead migrants attempting to avoid the rebuttable presumption to make the final portion of their journey from Mexico by sea. In light of the inherent dangers such attempts could create for migrants and DHS personnel, and to avoid a significant further increase in maritime interdictions and landfall by noncitizens along the adjacent coastal borders as compared to the already significant surge that the Departments have seen in recent years, the Departments have extended the rebuttable presumption to apply to noncitizens who enter the United States from Mexico at adjacent coastal borders. 8 CFR 208.33(a)(1), 1208.33(a)(1).

Extension of the rebuttable presumption to noncitizens who enter the United States from Mexico at adjacent coastal borders is supported by the growing number of migrants taking to sea under dangerous conditions, which puts lives at risk and stresses DHS's resources. The IOM Missing Migrants Project reported at least 321 documented deaths and disappearances of migrants throughout the Caribbean in 2022, signaling the highest recorded number since it began tracking such events in 2014 and a 78 percent overall increase over the 180 documented cases in 2021.[143] Total migrants interdicted at sea by the U.S. Coast Guard (''USCG'') increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521).[144] Interdictions continued to rise in FY 2023 with 8,822 migrants interdicted at sea through March, almost 70 percent of the total in FY 2022 within six months.[145] Interdictions occurred primarily in the South Florida Straits and the Caribbean Sea.[146] The USCG views its migrant interdiction mission as a humanitarian effort to rescue those taking to the sea and to encourage noncitizens to pursue lawful pathways to enter the United States. By allocating additional assets to migrant interdiction operations and to prevent conditions that could lead to a maritime mass migration, the USCG assumes certain operational risk to other statutory missions. Recently, some USCG assets have been reallocated from other key mission areas, including counter-drug operations, protection of living marine resources, and support for shipping navigation. The Departments expect that the strategy of coupling expanded lawful, safe, and orderly pathways into the United States with this rule's application of the rebuttable presumption to noncitizens who make landfall at adjacent coastal borders after traveling through Mexico, would lead to a reduction in the numbers of migrants who would otherwise undertake a dangerous journey to the United States by sea. By avoiding a further increase in maritime migration, USCG can in turn avoid incurring greater risk to its other statutory missions.

Second, the Departments disagree with commenters' concerns that this rule will incentivize more migrants to use other dangerous means of entering the United States, such as concealment in a vehicle crossing a SWB POE or crossing between POEs at remote locations. As noted in Section IV.B.3.iv of this preamble, the Departments anticipate that the newly expanded lawful pathways to enter to the United States, in conjunction with the rule's condition on asylum eligibility for those who fail to exercise those pathways, will ultimately decrease attempts to enter the United States without authorization, and thereby reduce reliance on smugglers and human traffickers.

The Departments further disagree with the commenter's claims that the use of the CBP One app to schedule an appointment to present at a POE is a ''metering program'' or that use of the CBP One app will increase irregular migration or incentivize riskier irregular migration routes. CBP will inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app. In other words, the use of the CBP One app is not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed under the INA. CBP will not turn away individuals without appointments. CBP is committed to increasing the number of noncitizens processed at POEs and is committed to processing noncitizens in an expeditious manner.[147]

Moreover, the Departments intend for this rule to work in conjunction with other initiatives that expand lawful pathways to enter the United States, and thereby incentivize safe, orderly, lawful migration over dangerous, irregular forms of migration. Noncitizens who enter the United States in vehicles without scheduling an appointment to present at a POE and who are inadmissible under section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), are subject to the rebuttable presumption. Similarly, noncitizens who attempt to cross the southwest land border between POEs are subject to the rebuttable presumption. Likewise, noncitizens who attempt to enter the United States from Mexico at adjacent coastal borders are subject to the rebuttable presumption. Additionally, DHS has changed the respective parole processes for Cubans and Haitians, such that Cubans and Haitians who are interdicted at sea after April 27, 2023, are ineligible for such parole processes. *See* Implementation of a Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023). The Departments anticipate that these

[143] Int'l Org. for Migration, *Missing Migrants in the Caribbean Reached a Record High in 2022* (Jan. 24, 2023), *https://www.iom.int/news/missing-migrants-caribbean-reached-record-high-2022.*

[144] OIS analysis of USCG data through March 31, 2023.

[145] *Id.*

[146] Testimony of Jonathan Miller, ''Securing America's Maritime Border: Challenges and Solutions for U.S. National Security'' at 4 (Mar. 23, 2023), *https://homeland.house.gov/media/2023/03/3.23.23-TMS-Testimony.pdf.*

[147] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

disincentives, coupled with the newly expanded pathways for lawful migration and the rule's exceptions and means of rebuttal, will ultimately lead fewer noncitizens to attempt to enter the United States in an unsafe manner.

ii. Inconsistent With Actions of Other Countries and Harmful to Foreign Relations

*Comment:* Commenters stated that the proposed rule would almost completely abandon the United States' commitment to work with other countries to meet growing refugee and asylum seeker protection needs, instead placing the burden on transit countries. Commenters stated that many European countries have opened their borders to millions of immigrants, and that the United States should do the same to help people who are facing desperate situations at home. Commenters observed that other countries in Latin America or the Western hemisphere have taken in many more migrants and taken on a greater burden than the United States. One commenter expressed concern that other countries may seek to follow in the United States' footsteps and enact similar restrictive asylum measures. Another commenter stated the rule will not improve foreign relations with hemispheric partner nations.

*Response:* The Departments acknowledge the comments and reiterate that the purpose of this rule is to encourage migrants to choose safe, orderly, and lawful pathways of entering the United States, while preserving the opportunity for individuals fleeing persecution to pursue protection-based claims consistent with the INA and international law. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. This rule is one policy within a broad range of actions being implemented to ensure that there is a regional framework for addressing and responding to historic levels of migration within the hemisphere.[148]

The United States Government is expanding its efforts to protect refugees, those seeking asylum, and those fleeing civil conflict. Since FY 2020, the United States has increased its annual refugee admissions ceiling eightfold and expanded refugee processing within the Western hemisphere.[149] On April 27, 2023, DHS and the Department of State announced that they would commit to referring for resettlement thousands of additional refugees per month from the Western Hemisphere—with the goal of doubling the number of refugees the United States committed to welcome as part of the L.A. Declaration.[150] Similarly, DHS and the Department of State recently announced enhancements to the Central American Minors Refugee and Parole Program, which expands eligibility criteria for those who may request USRAP access for qualifying children.[151] DHS has also implemented comprehensive processes to facilitate the lawful, safe, and orderly migration of CHNV nationals by introducing the CHNV parole processes.[152] Additionally, DHS has recently implemented special lawful processes for nationals of Ukraine.[153]

iii. Other

*Comment:* A commenter stated that the rule would allow noncitizens who entered the United States after lying on a visa petition to remain eligible for asylum while barring those who never submitted false information and objected to this outcome as ''absurd.''

*Response:* The Departments acknowledge the commenter's concern but reiterate that the purpose of this rulemaking is to address an anticipated further surge of migration at the SWB following the expiration of the CDC's Title 42 public health Order, which may compromise the Departments' ability to process claims for asylum and related forms of protection in a manner that is effective, humane, and efficient. The Departments do not anticipate that noncitizens who attempt to enter on nonimmigrant visas obtained through misrepresentation will contribute to this surge in any substantial way.

In addition, the Departments disagree with the premise of this comment. Willful misrepresentations in connection with a nonimmigrant visa application may affect an applicant's eligibility for asylum or adjustment of status. Prior misrepresentations to immigration officials can affect credibility determinations, *see* INA 208(b)(1)(B)(iii), 8 U.S.C. 1158(b)(1)(B)(iii), and may be negative discretionary factors in asylum and adjustment of status determinations.[154] Applicants for adjustment of status under section 209(b) of the INA, 8 U.S.C. 1159(b), who have previously sought to obtain immigration benefits through fraud or willful misrepresentation of material fact are inadmissible under section 212(a)(6)(C)(i) of the INA, 8 U.S.C. 1182(a)(6)(C)(i), unless they obtain a discretionary waiver of inadmissibility under section 209(c) of the INA, 8 U.S.C. 1159(c).

*Comment:* One commenter stated that the application of the presumption against asylum eligibility at the credible fear stage would lead to absurd and irrational results. As an example, the commenter stated a noncitizen may admit to terrorism in their home country and still receive a positive credible fear determination, whereas a noncitizen subject to the rule who fails to rebut the presumption would receive a negative determination.

*Response:* The Departments strongly dispute the commenter's suggestion that noncitizens who admit to terrorism would receive superior treatment than noncitizens who are subject to the rule. Noncitizens subject to the INA's terrorism-related inadmissibility grounds (''TRIG''), *see* INA 212(a)(3)(B), 8 U.S.C. 1182(a)(3)(B), may not be ordered released by an IJ during removal proceedings irrespective of any relief

[148] *See* The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/;* The White House, FACT SHEET: Update on the Collaborative Migration Management Strategy (Apr. 20, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/20/fact-sheet-update-on-the-collaborative-migration-management-strategy/;* L.A. Declaration Fact Sheet.

[149] *Compare* Presidential Determination on Refugee Admissions for Fiscal Year 2021, 85 FR 71219 (Nov. 6, 2020) (15,000), *with* White House, Memorandum on Presidential Determination on Refugee Admissions for Fiscal Year 2023 (Sept. 27, 2022), *https://www.whitehouse.gov/briefing-room/presidential-actions/2022/09/27/memorandum-on-presidential-determination-on-refugee-admissions-for-fiscal-year-2023/* (125,000).

[150] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[151] Notice of Enhancements to the Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[152] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 22, 2023), *https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[153] *See* DHS, Uniting for Ukraine (Mar. 21, 2023), *https://www.dhs.gov/ukraine;* DHS, Operation Allies Welcome (Mar. 13, 2023), *https://www.dhs.gov/allieswelcomes.*

[154] *See Matter of Pula,* 19 I&N Dec. 467, 473 (BIA 1987) (finding that the circumvention of immigration laws can be considered as a negative discretionary factor in asylum adjudications); USCIS Policy Manual, Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS–PM A.10] (Apr. 21, 2023), *https://www.uscis.gov/policy-manual/volume-7-part-a-chapter-10#footnote-31.*

from removal for which they may be eligible. INA 236(c), 8 U.S.C. 1226(c); 8 CFR 1003.19(h)(2)(i)(C); INA 241(a)(2), 8 U.S.C. 1231(a)(2); INA 236A(a), 8 U.S.C. 1226a(a). Noncitizens subject to TRIG are ineligible for asylum, statutory withholding of removal, or withholding of removal under the CAT, absent a discretionary exemption from DHS, INA 208(b)(2)(v), 8 U.S.C. 1158(b)(2)(v); INA 241(b)(3)(B)(iv), 8 U.S.C. 1231(b)(3)(B)(iv); 8 CFR 208.16(d)(2); INA 212(d)(3)(B)(i), 8 U.S.C. 1182(d)(3)(B)(i), as are noncitizens for whom there are reasonable grounds to regard as dangers to the security of the United States, INA 208(b)(2)(iv), 8 U.S.C. 1158(b)(2)(iv); INA 241(b)(3)(B)(iv), 8 U.S.C. 1231(b)(3)(B)(iv); 8 CFR 208.16(d)(2).

*Comment:* A local government voiced concern that the five-year re-entry ban if the asylum seeker violates the rule creates additional roadblocks for the most vulnerable individuals.

*Response:* The five-year ground of inadmissibility for those ordered removed following expedited removal proceedings is based on statute, INA 212(a)(9)(A)(i), 8 U.S.C. 1182(a)(9)(A)(i), and cannot be changed through administrative rulemaking. This statute applies equally to noncitizens who are not subject to this rule. Despite prior removal, noncitizens can still seek statutory withholding of removal or protection under the CAT within the five-year period. *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 1208.16.

### *C. Alternatives and Other General or Mixed Feedback*

#### 1. Address Root Causes of Migration

*Comment:* A number of commenters requested additional information on the Administration's ongoing efforts to address the root causes of migration, and suggested that, instead of implementing this rule, the United States should focus on providing economic, social, and political support to the countries from which the migrants are fleeing. Another commenter stated that long-term solutions are needed, such as investing in regional stability and humanitarian aid that contribute to human security, addressing the precursors of forced migration, and diminishing the threats that put vulnerable communities at risk. Some commenters suggested that there should be a comprehensive plan to both improve the conditions in Latin American and Caribbean countries by eliminating U.S. sanctions, as well as ''offering asylum to large groups of refugees'' in the United States. Commenters also stated that we should devote more resources to helping people from countries such as Haiti, Venezuela, and other Central American countries. Similarly, commenters stated that the United States should provide additional aid to the region and promote democratic values and good governance with an eye towards creating meaningful reforms, particularly in areas that drive irregular migration such as corruption and lack of opportunity. Other commenters stated that in determining eligibility for asylum, the proposed rule would fail to consider significant dangers such as gang violence, starvation, and natural disasters. A commenter expressed further concern that the proposed rule attempts to control the border by reducing the number of USBP encounters with migrants, reasoning that this approach would not address the root cause of increased migration.

One commenter stated that, while deterrence programs may result in temporary dips in the number of people presenting or apprehended at the border, they have no long-term effect because they do not address the root causes forcing people from their homes. Another commenter stated that for many individuals, fleeing their countries in haste and without resources is not optional and they will continue to do so unless the situation in their countries changes. Another commenter stated that the United States should support Latin and Central American governments' capacity to strengthen humanitarian protections and migration management systems by investing in technical assistance and institutional capacity and investing in sustainable infrastructural needs and social safety nets (including education, stable employment, public safety, and economic support) in Mexico and Central America.

*Response:* The Departments agree that the United States must consistently engage with partners throughout the Western Hemisphere to address the hardships that cause people to leave their homes and come to our border. The migratory trends at the SWB today will persist long into the future if the root causes of migration are not addressed. The United States has been engaging with regional partners to address the root causes of migration, but this rule is nonetheless necessary to address a potential surge of migrants at the SWB in the near term.

In June 2022, the United States partnered with 19 other countries in the Western Hemisphere in endorsing the L.A. Declaration, which asserts ''the need to promote the political, economic, security, social, and environmental conditions for people to lead peaceful, productive, and dignified lives in their countries of origin. Migration should be a voluntary, informed choice and not a necessity.'' [155] In addition, nations including the United States committed to implementing programs to stabilize communities hosting migrants and asylum seekers, providing increased lawful pathways and protections for migrants and asylum seekers residing in or traveling through their countries, and humanely enforcing existing immigration laws.[156]

Earlier, in July 2021, the United States began working closely with countries in Central America to prioritize and implement a strategy that addresses the root causes of irregular migration with the desired end-state being ''a democratic, prosperous, and safe Central America, where people advance economically, live, work, and learn in safety and dignity, contribute to and benefit from the democratic process, have confidence in public institutions, and enjoy opportunities to create futures for themselves and their families at home.'' [157] At the same time, the United States also presented the CMMS, which aims to advance safe, orderly, legal, and humane migration, including access to international protection for those in need throughout North and Central America.[158] On April 27, 2023, DHS and the Department of State announced plans to establish regional processing centers and expand refugee resettlement commitments in the region.[159] Existing high levels of irregular migration, however, make clear that such efforts are, on their own, insufficient in the near term to fundamentally influence migrants' decision-making, to reduce the risks associated with current levels of irregular migration and the anticipated further surge of migrants to the border after the Title 42 public health Order is terminated, or to protect migrants from human smugglers that profit from their vulnerability. *See* 88 FR at 11716. The United States will continue to work with our regional

[155] The White House, Los Angeles Declaration on Migration and Protection (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[156] *Id.*

[157] *See, e.g.,* National Security Council, U.S. Strategy for Addressing the Root Causes of Migration in Central America 5 (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[158] *See, e.g.,* The White House, Fact Sheet: The Collaborative Migration Management Strategy (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-the-collaborative-migration-management-strategy/.*

[159] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

partners to manage migration across the Hemisphere.

2. Prioritize Funding and Other Resources

*Comment:* Many commenters urged the Government to prioritize funding, other resources, or alternative policies, reasoning that these would make border processing and asylum adjudications more effective and efficient. Some commenters focused on funding, suggesting that the Government should request additional funding from Congress, that the Departments should be prioritizing funding and staffing for the HHS, Office of Refugee Resettlement, USCIS, and U.S. immigration courts, or that the Government should prioritize investing in community-based alternatives, including robust funding and expansion of asylum processing at POEs and investment in NGOs and civil society organizations.

Other commenters suggested more generally that the Government devote other resources to immigrant arrivals. For example, one commenter said that DHS should focus on ''increasing the number of resources at the SWB to safely and fairly process the influx of migration at the border itself,'' including creating shelters near the southern border for noncitizens without family and friends to support them while they await processing of their claim. Another commenter, however, instead suggested that asylum seekers be transferred to communities throughout the United States, along with resources to ensure that asylum seekers and receiving communities are supported. One commenter stated that, instead of the proposed rule, DHS should train border officials to identify asylum claims or assess credible fear. Conversely, another commenter stated that more AOs, not CBP officers, are needed to interview asylum seekers. Commenters also stated the Departments should address significant failures in structure, functioning, and processing through staffing, budget review, training for AOs and judges to reduce appeals, training for DHS attorneys about docket management, and other means.

Another commenter requested that DHS consider ''improving border infrastructure for high volume facilities,'' and noted that DHS did not explain why it lacked the infrastructure, personnel, and funding to sustain processing levels of high numbers of migrants. One commenter expressed concern that CBP does not have sufficient resources in sectors along the SWB to patrol the border and detain migrants and expressed concern about the number of migrants who successfully evade USBP and enter the country.

Some commenters suggested alternative policy proposals to pursue instead of the proposed rule. For example, commenters recommended that DHS widely advertise the need for sponsors for asylum seekers and facilitate their applications for sponsorship. One commenter suggested providing additional resources to Mexico and other transit countries to improve their asylum-processing capacities.

*Response:* The Departments acknowledge commenters' suggestions for increasing resources, both financial and otherwise, to account for migrant arrivals at the SWB. The Departments first note that they have already deployed additional personnel, technology, infrastructure, and resources to the SWB and that additional financial support would require additional congressional actions, including significant additional appropriations, which are outside of the scope of this rulemaking. The Departments agree with commenters that additional resources would provide benefits for managing the border. The Departments have, for example, significantly increased hiring of AOs and IJs over the past decade.[160] AOs and IJs possess experience in handling asylum and related adjudications; receive regular trainings on asylum-related country conditions and legal issues, as well as non-adversarial interviewing techniques; and have ready access to country-conditions experts.[161] However, it is not feasible for the Departments to quickly hire sufficient qualified personnel or increase other resources to efficiently, effectively, and fairly handle the volume of encounters projected by May 2023, when a further surge of migrants to the SWB is expected following the lifting of the Title 42 public health Order.

Furthermore, the Departments note that they are leading ongoing Federal Government efforts to support NGOs and local and state governments as they work to respond to migratory flows impacting their communities. As noted in the NPRM, FEMA spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the EFSP–H to assist migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 11714. In November 2022, FEMA released $75 million through the program, consistent with the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023.[162] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[163] On February 28, 2023, DHS announced a $350 million funding opportunity for EFSP–H.[164] This is the first major portion of funding that is being allocated for humanitarian assistance under the Omnibus funding approved in December.[165] For the new Shelter and Services Program, FEMA and CBP have held several public listening sessions and are developing plans to release a Notice of Funding Opportunity prior to September 2023 for the second major portion of funding allocated by Omnibus to assist migrants encountered by DHS.

Additionally, on April 27, 2023, DHS announced that it has awarded more than $135 million to communities to date this fiscal year and will award an additional $290 million in the coming weeks.[166] The Departments are also ramping up coordination between state and local officials and other Federal agencies to provide resources, technical assistance, and support, including through regular information sessions with stakeholders to ensure that the program is broadly understood and the funds are accessible.[167] The Departments will continue to mobilize

[160] EOIR, Adjudication Statistics: Immigration Judge Hiring (Jan. 2023), *https://www.justice.gov/eoir/page/file/1242156/download;* Citizenship and Immigration Services Ombudsman, Annual Report 2020 at 45 (June 30, 2020), *https://www.dhs.gov/sites/default/files/publications/20_0630_cisomb-2020-annual-report-to-congress.pdf.*

[161] *See* 8 CFR 208.1(b).

[162] Public Law 117–180, Division A, sec. 101(6), 131 Stat. 2114, 2115.

[163] Public Law 117–328, Division F, Title II, Security Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support.

[164] *See* DHS, Press Release, *The Department of Homeland Security Awards $350 Million for Humanitarian Assistance Through the Emergency Food and Shelter Program* (Feb. 28, 2023), *https://www.dhs.gov/news/2023/02/28/department-homeland-security-awards-350-million-humanitarian-assistance-through;* DHS Grant Opportunity DHS–23–DAD–024–00–03, Fiscal Year 2023 Emergency Food and Shelter National Board Program—Humanitarian (EFSP) ($350M) (Feb. 28, 2023), *https://www.grants.gov/web/grants/view-opportunity.html?oppId=346460.*

[165] *Id.*

[166] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[167] *See id.*

faith-based and non-profit organizations supporting migrants, including those providing temporary shelter, food, transportation, and humanitarian assistance as individuals await the outcome of their immigration proceedings.[168]

With regard to CBP resources at the border, CBP continues to increase facility capacity and to look to new facilities to further expand capacity. *See* 88 FR at 11714. In addition, CBP continues to take steps to facilitate more efficient processing of encountered migrants so that agents are able to remain in the field and patrol the border. For example, USBP has deployed non-uniformed Border Patrol Processing Coordinators (''BPPCs''), who can provide crucial support to USBP facilities, including humanitarian care to individuals in custody, transportation, and processing assistance.[169] As of March 15, 2023, USBP had hired 961 BPPCs, with more individuals in the hiring process.[170] Additionally, CBP has invested in virtual and mobile processing technologies, which enables USBP agents and officers to assist SWB sectors without needing to be physically present in these locations.[171] All of these steps enable USBP agents to return to the field to conduct their law enforcement duties, while ensuring safe conditions for individuals in custody. However, as noted in the NPRM, the increased numbers of migrants entering the United States—and the anticipated surge following the lifting of the Title 42 public health Order—will continue to strain CBP resources. *See* 88 FR at 11706. Thus, the Departments believe that this rule is necessary to disincentivize migrants from attempting to enter the United States without authorization.

The Departments do not agree with commenters' suggestions that alternative policies should be pursued in place of this rule. For example, advertising the need for asylum sponsors would not sufficiently address the anticipated influx of migration at the SWB. The Departments have created, and continue to expand, lawful pathways to enter the United States, which will be available alongside this rule to encourage the use of all lawful pathways and discourage irregular migration to the United States. In contrast, were the Departments to take a hiring-only approach that does not expand lawful pathways or consequences for unlawful entry, the Departments estimate that irregular arrivals would likely increase after the expiration of the Title 42 public health Order, adding to the current backlog of asylum cases. Such a policy would likely have no immediate effect on arrivals at the SWB, necessitating continued surges of DHS resources to POEs and the SWB to support processing.

The Departments note that the rule requires collaboration across the Departments. CBP, USCIS, and DOJ are all part of the whole-of-government approach necessary to address irregular migration and ensure that the U.S. asylum system is fair, orderly, and humane. The Departments acknowledge comments suggesting that CBP officials should be trained to conduct credible fear screenings. The Asylum Processing IFR clarified that a ''USCIS asylum officer'' will conduct the credible fear interview. 8 CFR 208.30(d). This is consistent with the INA, which specifies that only AOs (as opposed to immigration officers) conduct credible fear interviews, *see* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i); 8 CFR 208.30(d), and make those determinations, *see* INA 236(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii); *see also* 8 CFR 208.30(c) through (e); 87 FR at 18136. AOs receive training and possess experience in handling asylum and related adjudications; receive regular trainings on asylum-related country conditions and legal issues, as well as non-adversarial interviewing techniques; and have ready access to country conditions experts. *See* 87 FR at 18136. As noted above, hiring of additional AOs is ongoing, and DHS recently announced that it is surging AOs to complete credible fear interviews at the SWB more quickly.[172]

*Comment:* Some commenters suggested that DHS should better utilize or increase its detention capacity to account for the anticipated migratory flow, as an alternative to the approach adopted in this rule. One commenter suggested that DHS increase its detention capacity to account for the mandatory detention requirements at section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), and to better use the capacity it has, citing unused detention space in the summer of 2021. The same commenter noted that section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), allows DHS to parole noncitizens into the United States in limited circumstances, but claimed that the proposed rule makes parole the default and detention the exception, contrary to statute. The commenter argued that expanded use of detention would serve as a greater deterrent than this rule and objected to a reduction in detention capacity it identified in the Administration's FY 2024 budget. Similarly, another commenter stated that the Departments should request from Congress the resources necessary to expand detention centers' capacity to handle the current migratory flow.

*Response:* To the extent that the commenters are contending that DHS is capable of obtaining bedspace sufficient for detaining all inadmissible noncitizens predicted to enter the United States who could potentially be subject to detention pursuant to section 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), following the lifting of the Title 42 public health Order, the Departments strongly disagree. DHS's ability to detain an individual on any given day is determined by many different factors, including the availability of appropriated funds; the number and demographic characteristics of individuals in custody, as well as those encountered at or near the border or within the interior of the United States; and the types of facilities with available bedspace. In addition, there are capacity restrictions at individual facilities imposed for a variety of reasons ranging from public health requirements to court-ordered limitations that also constrain the availability of detention space.

The Departments also disagree with the commenter's assertion that this rule makes parole the default. This rule does not address parole or change DHS's detention practices. Rather, this rule creates a rebuttable presumption regarding eligibility for asylum.

3. Further Expand Refugee Processing or Other Lawful Pathways

*Comment:* Several commenters suggested increasing access to protection and improving processes to encourage noncitizens to seek asylum in lawful and orderly ways, but without imposing a condition on eligibility for asylum for noncitizens who fail to do so. Commenters suggested that the United States should expand regional refugee processing, increase asylum processing and humanitarian programs, and expand and create new lawful pathways, in lieu of pursuing the proposed rule. One commenter said the Administration should use Temporary Protected Status broadly, including for the countries focused on in the proposed rule and other countries

[168] *See id.*

[169] Testimony of Raul Ortiz, ''Failure by Design: Examining Sec'y Mayorkas' Border Crisis'' (Mar. 15, 2023), *https://www.cbp.gov/about/congressional-resources/testimony/Ortiz-CHS-15MAR23.*

[170] *Id.*

[171] *Id.*

[172] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

where safe return is impossible. Others recommended creating viable alternatives to asylum for lawful admission to the United States, including decreasing waits for family-based immigration or increasing and streamlining migration opportunities based on skilled labor, citing the Canadian Federal Skilled Worker Express Entry policy as a successful example. Another commenter stated that the Departments should consider policies facilitating fast-track arrival in the United States, including quickly approved in-country visas and widely available humanitarian parole, and streamlining asylum regulations to more broadly encompass the types of dangers and persecution migrants are fleeing today.

*Response:* The United States has made and will continue to make extensive efforts to expand refugee processing and lawful pathways generally. *See* Section IV.B.2.i of this preamble. For example, on April 27, 2023, DHS and the Department of State announced they will establish regional processing centers in several countries in the Western Hemisphere, including Guatemala and Colombia, ''to reduce irregular migration and facilitate safe, orderly, humane, and lawful pathways from the Americas.'' [173] Individuals from the region will be able to make an appointment to visit the nearest regional processing center before traveling, receive an interview with immigration specialists, and if eligible, be processed rapidly for lawful pathways to the United States, Canada, and Spain, including USRAP.[174] Existing levels of unlawful migration, however, make clear that such efforts are, on their own, insufficient in the near term to change the incentives of migrants, reduce the risks associated with current levels of irregular migration and the anticipated surge of migrants to the border, and protect migrants from human smugglers that profit from their vulnerability. *See* 88 FR at 11716. The Departments' recent experience has shown that an increase in lawful pathways coupled with consequences for not using such pathways can significantly—and positively—affect behavior and undermine smuggling networks, as described in Section II.A of this preamble. The Departments also note that while they will consider the commenters' specific suggestions for other lawful pathways or alternatives for entry to the United States, this rule does not create, expand, or otherwise constitute the basis for any lawful pathways.

4. Require Migrants To Wait in Mexico or Other Countries

*Comment:* Some commenters stated that the United States should reimplement the MPP, with one stating that MPP caused a drop in border crossings. A commenter argued that reinstating MPP would have all the benefits that the Departments are seeking to achieve via the proposed rule, but without the rule's downsides, which the commenter argued include increasing incentives for irregular migration. The commenter also stated that the Departments' justifications for ending MPP, including a lack of infrastructure and cooperation from Mexico, are insufficient, arguing that if attempted border crossings are deterred by MPP then many fewer resources will be required, and that the Administration has not sufficiently explained why Mexico would not be willing to cooperate with a reimposition of MPP when it agreed to do so in the recent past. Another commenter suggested that MPP should be restarted and the United States pay for safe housing and food for migrants who are waiting in Mexico during their legal proceedings.

*Response:* The Departments disagree with commenters' contentions that the explanation given in the NPRM regarding why the Departments are not reinstituting MPP is insufficient. *See* 88 FR at 11731. The Secretary of Homeland Security weighed the full range of MPP's costs and benefits, explaining, among other things, that MPP is not the best tool for deterring unlawful migration; that MPP exposes migrants to unacceptable risks to their physical safety; and that MPP detracts from the Executive's efforts to manage regional migration. Moreover, given the Departments' knowledge and understanding of their own resources and infrastructure constraints, as well as the Government of Mexico's statement on February 6, 2023, affirming its willingness to cooperate in international agreements relating to refugees (including the L.A. Declaration) and endorsing lawful pathways, including the CHNV processes,[175] the Departments continue to believe that promulgation of this rule is the appropriate response to manage and avoid a significant further surge in irregular migration after the Title 42 public health Order is lifted.

As explained in the NPRM, programmatic implementation of the contiguous-territory return authority requires Mexico's concurrence and ongoing support and collaboration. *See* 88 FR at 11731. When DHS was previously under an injunction requiring it to re-implement MPP, the Government of Mexico would only accept the return of MPP enrollees consistent with available shelter capacity in specific regions, and indeed had to pause the process at times due to shelter constraints. Notably, Mexico's shelter network is already strained from the high volume of northbound irregular migration happening today. In February 2023, the Government of Mexico publicly announced its independent decision that it would not accept the return of individuals pursuant to section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[176]

Additionally, the resources and infrastructure necessary to use contiguous-territory return authority at the scale that would be required given current and anticipated flows are not currently available. To employ the contiguous-territory return authority at a scale sufficient to meaningfully address the anticipated migrant flows, the United States would need to rebuild, redevelop, and significantly expand infrastructure for noncitizens to be processed in and out of the United States and attend immigration court hearings throughout the duration of their removal proceedings. This would require, among other things, the construction of substantial additional court capacity along the border. It would also require the reassignment of IJs and ICE attorneys to conduct the hearings and CBP personnel to receive and process those who are corning into and out of the country to attend hearings.

*Comment:* Other commenters suggested numerous ideas that would require migrants to wait for cases to be heard outside the United States or to create additional opportunities to apply for asylum from outside of the United States. One commenter suggested that the United States allow asylum seekers to present themselves at embassies, refugee camps, or U.S. military bases to make their claims without the need to undertake the dangerous journey to the U.S. border. A commenter suggested setting up a controlled process to allow a fixed number of migrants into the United States this year, managed through embassies abroad, and stated

[173] DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[174] *See id.*

[175] Government of Mexico, *SRE rechaza reimplementación de estancias migratorias en México bajo la sección 235(b)(2)(C) de la Ley de EE.UU.* (Feb. 6, 2023), *https://www.gob.mx/sre/prensa/sre-rechaza-reimplementacion-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-eeuu.*

[176] *Id.*

that it is inhumane to allow migrants to travel to the border only to turn them down. The same commenter also stated that such a controlled process would stop trafficking, drugs, and criminals from entering the country.

Commenters suggested implementing remote teleconferencing technology so that credible fear interviews could be conducted over Zoom or another platform from outside the United States in lieu of using the CBP One app to make appointments, with at least one suggesting that if the migrant's credible fear claim is accepted, they be sent an email stating that the migrant can be granted humanitarian parole into the United States for a final asylum hearing. Another commenter suggested that, instead of implementing this rule, DHS should create a virtual application and video hearing system that would allow migrants to apply and be processed for asylum while still abroad. At least one commenter suggested that migrants be given a temporary work card and ID and be required to pay a penalty tax and U.S. taxes to cover the expenses of managing immigration services. At least one commenter suggested creating a single border crossing dedicated to processing asylum claims, similar to the historical practice at Ellis Island.

*Response:* Pursuant to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), only noncitizens who are ''physically present in the United States or who arrive[] in the United States'' can apply for asylum. Similarly, the expedited removal provisions in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), apply only to noncitizens within the United States. Thus, while credible fear interviews may be conducted remotely (*i.e.,* telephonically), such interviews cannot be conducted for those who are abroad and have not—as required for such interviews—entered the United States, been processed for expedited removal, and asserted a fear of persecution or torture or of return to their country or an intention to apply for asylum.[177] In any event, the intent of this rule is to address the expected surge of migration following the lifting of the Title 42 public health Order on May 11, 2023. Commenters' suggestion that the Departments should create opportunities for noncitizens who have not entered the United States to apply for asylum at U.S. embassies, military bases, a virtual application abroad, or other locations, even if legally available, would not be available in the short-term or at the scale that would be required given current and anticipated flows. Similarly, creating a single border crossing dedicated to processing asylum claims, even if legally permissible, would not be operationally feasible, particularly in the short term.

However, as noted elsewhere in this document, USRAP is expanding its operations in the Western Hemisphere, which is the appropriate pathway for noncitizens outside the United States to seek admission as a refugee. *See* INA 207, 8 U.S.C. 1157. On April 27, 2023, DHS and the Department of State announced that the United States Government in cooperation with other countries of the L.A. Declaration will establish regional processing centers in several locations throughout the Western Hemisphere to reduce irregular migration.[178] The United States Government will commit to welcoming thousands of additional refugees per month from the Western Hemisphere—with the goal of doubling the number of refugees the United States as part of the L.A. Declaration.[179] The Departments also note that Congress has provided that asylum applicants may receive employment authorization no less than 180 days subsequent to the filing of their asylum application. *See* INA 208(d)(2), 8 U.S.C. 1158(d)(2). Additionally, it is not within the Departments' authority to impose taxes.

5. Additional Measures

*Comment:* Commenters suggested that the United States adopt more restrictive measures instead of this rule, such as requiring all SWB arrivals to seek asylum in Mexico first; requiring all migrants to be returned to their country of origin for two years to wait for their cases to be heard; or creating a bar to asylum for those who are denied asylum in other countries. Another commenter recommended that the rule require that a migrant must seek and be denied protection in each country through which they travel, rather than just one country.

One commenter suggested that the President should use the authority provided by section 212(f) of the INA, 8 U.S.C. 1182(f), to suspend the entry of migrants in order to address the border crisis. This commenter also suggested that DHS make efforts to enforce all deportation orders, expand the use of expedited removal to the fullest extent authorized by Congress, and post ICE agents in courtrooms to immediately enforce removal orders.

Another commenter suggested the rule should also apply to the Northern border and the maritime borders of the United States.

*Response:* The Departments acknowledge the commenters' suggestions but do not believe the alternatives proposed by the commenters are suitable to address operational concerns or meet the Departments' policy objectives.

As an initial matter, a categorical requirement that all individuals arriving at the SWB seek asylum in Mexico first would be inconsistent with the United States' ongoing efforts to share the responsibility of providing asylum and other forms of protection with the United States' regional partners. The United States Government remains committed to working with regional partners to jointly address historic levels of migration in the hemisphere and will continue to engage with the governments of Mexico and other regional partners to identify and implement solutions. Furthermore, there may be individuals for whom Mexico is not a safe alternative.

The Departments disagree with the commenter's suggestion that noncitizens be required to seek and be denied protection in each country through which they travel. Mexico or other countries through which certain individuals travel en route to the United States may not be a safe alternative for particular individuals, as discussed elsewhere in this preamble, *see* Sections IV.B.4.vii and IV.E.3.iv.d–(e). The rule therefore strikes a balance: It provides an exception from its presumption of ineligibility for individuals who seek and are denied protection in a third country, but it recognizes that for some individuals, particular third countries—or even all third countries—may not be a viable option. The rule therefore provides additional exceptions and rebuttal grounds for the presumption of ineligibility it creates.

Additionally, U.S. obligations under international and domestic law prohibit returning noncitizens to a country where their life or freedom would be threatened because of a protected ground, or where they would be subject to torture.[180] DHS cannot remove a

[177] *See* INA 235(b)(1), 8 U.S.C. 1225(b)(1).

[178] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[179] *See id.*

[180] INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.16, 1208.17. The Departments note that 8 CFR 208.16(b)(3), 1208.16(b)(3) were amended by the by Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020), which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 969–70 (N.D. Cal. 2021) (''*Pangea II*'') (preliminarily enjoining the rule). Similarly, 8 CFR 208.16(e), 1208.16(e) were removed by the Criminal Asylum Bars Rule, Procedures for Asylum and Bars

Continued

noncitizen without first obtaining a removal order and cannot remove a noncitizen to a country about which the noncitizen has expressed fear of return without first determining whether they are entitled to protection pursuant to the withholding of removal statute and the regulations implementing the CAT.

The Departments disagree with the recommendation to establish a bar to asylum for those who are denied asylum in other countries. Those denials may be due to a variety of factors unrelated to the applicant's underlying claim, such as the foreign country's unique restrictions on asylum. Furthermore, such a proposal could discourage asylum seekers from applying for asylum in other countries, since a denial from other countries would result in the harsher consequence of also being ineligible for asylum in the United States.

Regarding the suggestion to suspend entry pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), the Departments note that suspension of entry requires a presidential proclamation, which is beyond the Departments' authorities. With this rule, which is fully consistent with domestic and international legal obligations, the Departments are exercising their authorities to address current and expected circumstances at the SWB, to avoid unduly negative consequences for noncitizens, to avoid unduly negative consequences for the U.S. immigration system, and to provide ways for individuals to seek protection in the United States and other countries in the region. 88 FR at 11730.

Separate from this rulemaking, DHS has been increasing and enhancing the use of expedited removal for those noncitizens who cannot be processed under the Title 42 public health Order.[181] The Departments have been dedicating additional resources, optimizing processes, and working with the Department of State and countries in the region to increase repatriations.[182] On April 27, 2023, DHS announced that the United States, in coordination with regional partners, has dramatically scaled up the number of removal flights per week, which will double or triple for some countries.[183] With this increase in removal flights, migrants who cross the U.S. border without authorization and who fail to qualify for protection should expect to be swiftly removed and subject to at least a five-year bar to returning to the United States.[184] Regarding the suggestion to expand the use of expedited removal, the Departments note that this rule works in conjunction with expedited removal, as the rebuttable presumption will be applied during credible fear interviews for noncitizens placed in expedited removal after claiming a fear. To the extent that the commenter is suggesting that the Secretary should exercise his ''sole and unreviewable discretion'' to extend expedited removal proceedings to certain other categories of noncitizens who have not shown that they have been physically present in the United States for two years, that suggestion lies outside the scope of this rulemaking. *See* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii).[185] Finally, the Departments note the process for taking noncitizens into custody for the execution of removal orders also is beyond the scope of this rule.

With respect to a commenter's suggestion that the rule apply to the Northern border, the Departments do not currently assess that application of the rebuttable presumption to such entries is necessary at the U.S.-Canada land border. With limited exceptions, these noncitizens are ineligible to apply for asylum in the United States due to the safe-third-country agreement with Canada, *see* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A); 8 CFR 208.30(e)(6), and the United States is implementing other measures to address irregular migration at that border, such as the Additional Protocol of 2022 to the STCA between the United States and Canada. The Additional Protocol expands the STCA to apply to migrants who claim asylum or other protection after crossing the U.S.-Canada border between POEs. Under the STCA, migrants who cross from Canada to the United States, with limited exceptions, cannot pursue an asylum or other protection claim in the United States and are instead returned to Canada to pursue their claim.[186]

With respect to a commenter's suggestion that the rule apply to maritime borders, the Departments have determined it is appropriate to extend the application of the rebuttable presumption not only to the U.S.-Mexico southwest land border, but also to adjacent coastal borders. The term ''adjacent coastal borders'' refers to any coastal border at or near the U.S.-Mexico border. This modification therefore means that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States at such a border after traveling from Mexico and who have circumvented the U.S.-Mexico land border. Moreover, the Departments are also considering and requesting comment on whether to apply the rebuttable presumption to noncitizens who enter the United States at a maritime border without documents sufficient for lawful admission during the same temporary time period, whether or not they traveled through a third country, *see* Section V of this preamble.

*Comment:* A commenter also suggested pursuing STCAs with transit countries as an alternative to the rule, stating that the proposed rule's reasoning on that point was insufficient. The commenter noted that the proposed rule stated that STCAs require long negotiations, but that the proposed rule itself is time-limited to noncitizens who enter within a two-year period. The commenter also stated that the proposed rule's claim that STCAs would provide lesser protection to noncitizens failed to account for the costs to states of allowing such noncitizens to have their claims adjudicated in the United States.

*Response:* The Departments agree that STCAs can be an important tool for managing the border. For example, on March 28, 2023, the Departments announced an update to the preexisting STCA between the United States and Canada. *See* 88 FR at 18227. That rule implemented a supplement to the U.S.-Canada STCA to extend its application to individuals who cross between the POEs along the U.S.-Canada shared border, including certain bodies of water as determined by the United States and Canada, and make an asylum or other protection claim relating to fear

to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020), which was also preliminarily enjoined. *Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020). These orders remain in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendments—are currently effective. The current version of 8 CFR 208.16 is effective with regard to all other provisions of that section.

[181] DHS, Press Release, *DHS Continue to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[182] *See id.*

[183] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[184] *See id.*

[185] Section 235 of the INA continues to refer to the Attorney General, but the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, transferred immigration enforcement authorities to the Secretary of Homeland Security and provided that any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other Department of Justice officials to DHS by the HSA ''shall be deemed to refer to the Secretary'' of Homeland Security. 6 U.S.C. 557 (codifying HSA sec. 1517); *see also* 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[186] *See* 8 CFR 208.30(e)(6); 8 CFR 1003.42(h); 88 FR 18227; Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 69480 (Dec. 29, 2004).

of persecution or torture within 14 days after such crossing. *Id.*

However, as noted in the NPRM, development of an STCA is a lengthy process. 88 FR at 11731. The recent supplement to the U.S.-Canada STCA aptly demonstrates this point; the negotiations that led to the supplement began in early 2021, over two years prior to its eventual publication. *Id.* at 18232. For this reason, the Departments find that the enactment of this rule is preferable to pursuing additional STCAs at this time because the Departments need a solution in the immediate short-term to manage the significant increase in the number of migrants expected to travel without authorization to the United States after the termination of the Title 42 public health Order.

Regarding commenters' belief that an STCA could be preferable to this rule because a STCA would prevent affected noncitizens from having their claims adjudicated in the United States, the Departments reiterate that the goal of this rule is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel, and they expect it to reduce the number of noncitizens seeking to cross the SWB without authorization.

*Comment:* A commenter suggested amending the rule to prioritize the cases of noncitizens who follow the lawful pathways outlined in the NPRM, rather than implementing the rebuttable presumption against those who do not. This commenter argued that doing so would encourage use of lawful pathways but not risk returning noncitizens to countries where they may be persecuted or tortured.

*Response:* The Departments agree that prioritizing the cases of those noncitizens who follow lawful, safe, and orderly pathways to entering the United States may result in some noncitizens with valid claims to asylum more quickly being granted asylum. However, noncitizens who do not follow such lawful, safe, and orderly pathways, including those noncitizens ultimately found ineligible for asylum or other protection, would continue to wait years for a decision on their claim for asylum or other protection. As previously noted in this preamble, the expectation that noncitizens will remain in the United States for a lengthy period during the adjudication of their claims for asylum or other protection may drive even more migration to the United States. Under this rule, such noncitizens, however, will remain in the United States for less time before a final order is entered in their case. Furthermore, prioritization alone will not address the need for quick processing of those who arrive at the SWB and the lack of resources to do so safely and efficiently. Moreover, the success of the CHNV parole processes demonstrates that the United States can effectively discourage irregular migration by coupling incentives for use of lawful pathways with disincentives to cross the SWB irregularly.

*Comment:* One commenter recommended the United States advance dissuasive messaging, including announcements of legal action, against relatives, friends, and criminal organizations that may promote and finance migration to the United States. Another commenter recommended that an education and awareness campaign across the Western Hemisphere and a clearer definition of the ''significant possibility'' standard could prove a potent combination of policies to restore the integrity and manageability of the U.S. asylum system at the SWB, while also preserving the country's long-standing commitment to humanitarian values.

*Response:* The Departments understand and agree with the need for robust messaging relating to the dangers of irregularly migrating to the United States SWB. Strengthening regional public messaging on migration is one of the eight lines of effort outlined in the CMMS.[187] In addition, the Departments regularly publicize law enforcement action and efforts against human trafficking, smuggling, and transnational criminal organizations that profit from irregular migration, often in conjunction with partners in the region.[188] The Departments intend to continue these efforts once the rule is in place.

The Departments acknowledge the commenter's concern regarding the ''significant possibility'' standard but disagree that there is a need for clarifying regulations on the statutory standard at section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v). In the context of the condition established by this rule, however, the Departments have provided additional clarification regarding the ''significant possibility'' standard in Section IV.D.1.iii of this preamble.

[187] The White House, *FACT SHEET: The Collaborative Migration Management Strategy* (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-the-collaborative-migration-management-strategy/.*

[188] *See, e.g.,* L.A. Declaration Fact Sheet (''The United States will announce a multilateral 'Sting Operation' to disrupt human smuggling networks across the Hemisphere.'').

*D. Legal Authority and Background*

1. Immigration and Nationality Act

i. Section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)

*Comment:* Commenters claim that the proposed rule would violate both the Refugee Act and the INA. Specifically, commenters cited the Refugee Act, which they say both contains principles of non-refoulement and bars any distinction, including based on nationality, for noncitizens who are ''physically present in the United States or at a land border or port of entry.'' Refugee Act of 1980, 94 Stat. at 105. Additionally, commenters stated this proposed rule goes further by adding additional requirements that did not exist in the Refugee Act and do not exist in the INA. While some commenters acknowledge and agree that the proposed rule is within the scope of the Departments' authority and is consistent with the INA, other commenters expressed concern that the proposed rule would be contrary to the plain language of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), which states, ''Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.'' Commenters asserted that the INA does not require those seeking protection to apply before entering or at a POE or to schedule an appointment through a website or app in order to make an application, but instead allows applications from anywhere along the border. Some commenters described a fundamental right to apply for asylum for anyone inside the United States. Commenters asserted that entering the United States either through a POE or across the SWB and asking for asylum constitutes a ''lawful pathway.'' Another asserted that the proposed rule effectively creates a new legal framework by which to evaluate asylum claims in conflict with the statutory process provided by Congress, while another commenter stated that the proposed rule will cause confusion among asylum seekers. Commenters stated that the proposed rule would result in migrants who seek refuge at the SWB being turned away. At least one commenter asserted that the proposed rule violates the Refugee Act because it violates the right to uniform treatment.

Another commenter described the proposed rule as disparate treatment based on manner of entry, with particular concern for those who entered between POEs. Commenters stated that Congress clearly intended to allow noncitizens to apply for asylum regardless of manner of entry without requiring that a noncitizen first apply for asylum elsewhere while in transit. Commenters further asserted that analyzing an asylum application should focus on the applicant's reasonable fear of persecution rather than their manner of entry. Commenters similarly stated that the Departments should not and cannot categorically deny asylum for reasons unrelated to the merits of the claim itself. Commenters also asserted that, under *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), manner of entry may not be the dispositive factor in deciding whether a noncitizen is eligible for asylum. Similarly, commenters argued that *Matter of Pula* is binding precedent and precludes consideration of manner of entry over all other factors.

*Response:* This rule is consistent with U.S. law. As a threshold response, the rule does not require the Departments to turn away migrants at the SWB or to categorically deny all asylum applications filed by migrants who enter the United States from Mexico at the southwest land border or adjacent coastal borders. Nor does the rule prohibit any noncitizen from seeking protection solely because of the manner or location of entry into the United States. Rather, the rule is a lawful condition on eligibility for asylum, as authorized by section 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B).

In response to comments that the rule violates the non-refoulement provision of the Refugee Act, as stated elsewhere in this preamble, the United States has implemented its non-refoulement obligations through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and the regulations implementing CAT protections at 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18, and the conditions provided by this rule are not a penalty in violation of international law.

Regarding comments that the Refugee Act and subsequent amendments to the INA provide access to applying for asylum for any noncitizen ''physically present in'' or arriving in the United States, ''whether or not at a designated port of arrival'' and regardless of status, the Departments respond that this rule is not inconsistent. INA 208(a)(1), 8 U.S.C. 1158(a)(1); *see* Refugee Act of 1980, 94 Stat. at 105 (providing that the Attorney General establish ''a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum''); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (''IIRIRA''), Public Law 104–208, 110 Stat. 3009, 3009–690 (amending INA 208(a)(1), 8 U.S.C. 1158(a)(1), to permit any noncitizen ''who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .)'' to apply for asylum ''irrespective of'' the noncitizen's immigration status). Critically, the rule does not prevent anyone from applying for asylum. IIRIRA separated and distinguished the ability to apply for asylum from the conditions for granting asylum. *Compare* INA 208(a)(1), 8 U.S.C. 1158(a)(1), *with* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); *see also* INA 208(d)(5)(A), 8 U.S.C. 1158(d)(5)(A) (establishing procedures for consideration of asylum applications). Section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1) retains the ability for most noncitizens who are physically present in the United States to apply for asylum irrespective of whether they arrived in the United States at a POE, except that Congress created three categories of noncitizens who are barred from making an application. INA 208(a)(2)(A) through (C), 8 U.S.C. 1158(a)(2)(A) through (C).[189] Separately, Congress provided ''[c]onditions for granting asylum,'' which include six statutory exceptions to demonstrating eligibility for asylum as well as authority for the Departments to promulgate additional conditions and limitations on eligibility for asylum. INA 208(b)(2)(A)(i) through (vi), (C), 8 U.S.C. 1158(b)(2)(A)(i) through (vi), (C).[190] As some commenters noted, by creating exceptions to who is eligible to receive asylum and by authorizing the Departments to create new exceptions to eligibility, Congress saw nothing inconsistent in barring some individuals who may apply for asylum from receiving that relief.[191] *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 (10th Cir. 2017).

Additionally, under this rule and contrary to commenter assertions, manner of entry, standing alone, is never dispositive. *Cf. E. Bay Sanctuary Covenant* v. *Biden* (''*East Bay III*''), 993 F.3d 640, 669–70 (9th Cir. 2021) (enjoining the Proclamation Bar IFR as ''effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress in section 1158(a)''). Rather, the rule provides that a subset of noncitizens seeking asylum—*i.e.,* those who travel through a specified third country, enter the United States during a two-year period after the effective date of the rule, and are not subject to one of four enumerated categories of excepted individuals, including those who use an identified lawful pathway to enter the United States—are subject to a rebuttable presumption of ineligibility. 8 CFR 208.33(a)(1) through (3), 1208.33(a)(1) through (3); 88 FR at 11707. This presumption is not categorical, but rather involves a case-by-case consideration of facts and factors. Indeed, as discussed in Sections IV.B.2.ii and IV.D.2 of this preamble, the narrower application and numerous exceptions and methods of rebutting the presumption demonstrate the differences between the prior, categorical bars that are now enjoined, and one of which is vacated. *See also* Sections IV.E.9 and IV.E.10 of this preamble (removing the TCT Bar Final Rule and the Proclamation Bar IFR from the CFR).

Furthermore, the rule is within the scope of the Departments' authority because it adds a condition on eligibility for asylum permitted under section 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B), not a sweeping categorical bar that would preclude a grant of asylum solely based

[189] *See* INA 208(a)(2)(A) through (C), 8 U.S.C. 1158(a)(2)(A) through (C) (enumerating: (A) noncitizens who may be removed to a safe third country pursuant to a bilateral or multilateral agreement; (B) noncitizens who did not file for asylum within one year after arriving in the United States unless they demonstrate the existence of extraordinary or materially changed circumstances; and (C) noncitizens who previously applied for asylum and had that application denied unless they demonstrate the existence of extraordinary or materially changed circumstances).

[190] *See* INA 208(b)(2)(A)(i) through (vi), 8 U.S.C. 1158(b)(2)(A)(i) through (vi) (barring asylum for individuals who: participate in the persecution of others, have been convicted of a particularly serious crime, have committed a serious nonpolitical crime outside the United States, are regarded as a danger to the security of the United States, have engaged in certain terrorism-related activities, or were firmly resettled in another country prior to arriving in the United States).

[191] One important distinction between the exceptions enumerated in subsection 208(a)(2) of the INA, 8 U.S.C. 1158(a)(2), and those enumerated in 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), is that noncitizens who may apply for asylum but may be ineligible due to a (b)(2)(A) bar on eligibility may seek work authorization while their application is being adjudicated. 8 CFR 208.7(a)(1). A noncitizen who is barred from applying, *i.e.,* someone subject to a subsection (a)(2) bar, cannot obtain work authorization during this time. Because this rule does not create a bar on applying for asylum under section 208(a)(2) of the INA, 8 U.S.C. 1158(a)(2), there is no inconsistency with the provision of immediate work authorization to noncitizens who use one of the provided lawful parole processes to enter the United States and apply for asylum. 88 FR at 11707 n.26.

on manner of entry, which some courts have found to conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). 88 FR at 11735, 11740. *Cf. East Bay III,* 993 F.3d at 669–70 (concluding that the Proclamation Bar was ''effectively a categorical ban'' on migrants based on their method of entering the United States, and that such a categorical bar is in conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)). Section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), provides that the Attorney General and Secretary ''may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum.'' Similarly, section 208(d)(5)(B) of the INA, 8 U.S.C. 1158(d)(5)(B), specifies that the Attorney General and Secretary ''may provide by regulation for any other conditions or limitations on the consideration of an application for asylum,'' so long as those conditions or limitations are ''not inconsistent with this chapter.'' *See* INA 208(d)(5), 8 U.S.C. 1158(d)(5) (establishing certain procedures for consideration of asylum applications). As the Tenth Circuit explained, ''carving out a subset of'' noncitizens seeking asylum and placing a condition or limitation on their asylum applications falls within the limitations allowed by section 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B), and is not inconsistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). *R–S–C,* 869 F.3d at 1187 n.9. Precluding such a regulation would ''render 1158(b)(2)(C) [and (d)(5)(B)] meaningless, disabling the Attorney General from adopting further limitations while the statute clearly empowers him to do so.'' *Id.*

Consistent with this authority, the Departments have promulgated other limitations or conditions on asylum eligibility, including some provisions that Congress later adopted and codified in the INA. *See* Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) (imposing firm resettlement bar); Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990) (promulgating 8 CFR 208.14(c) (1990), which provided for mandatory regulatory bars to asylum for those who have been convicted in the United States of a particularly serious crime and who constitute a danger to the security of the United States while retaining a prior regulatory bar to asylum for noncitizens who have been firmly resettled); Asylum Procedures, 65 FR 76121, 76127 (Dec. 6, 2000) (including internal relocation); *see also, e.g., Afriyie* v. *Holder,* 613 F.3d 924, 934–36 (9th Cir. 2010) (discussing internal relocation). Restraining the Departments' authority to promulgate additional limitations and conditions on the ability to establish eligibility for asylum would be contrary to congressional intent. *See Thuraissigiam,* 140 S. Ct. at 1966 (recognizing that the ''theme'' of IIRIRA ''was to protect the Executive's discretion from undue interference by the courts'') (alteration and quotation marks omitted); *R–S–C,* 869 F.3d at 1187 (reasoning that the ''delegation of authority'' in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), ''means that Congress was prepared to accept administrative dilution'' of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 444–45 (1987); 88 FR at 11740.

Regarding comments that the condition created by the rule is inconsistent with the statute because it does not relate to whether a noncitizen qualifies as a refugee, the Departments respond that bars, limitations, and conditions on asylum do not necessarily and need not directly relate to whether a noncitizen satisfies the definition of a ''refugee'' within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A), but instead can embrace policy considerations that justify a finding of ineligibility. *See, e.g., Zheng* v. *Mukasey,* 509 F.3d 869, 871 (7th Cir. 2007) (noting that IIRIRA enacted several provisions, including the one-year bar, ''intended to reduce delays and curb perceived abuses in removal proceedings''); *Ali* v. *Reno,* 237 F.3d 591, 594 (6th Cir. 2001) (recognizing that asylum law ''was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives'') (internal marks and quotation omitted); *Matter of Negusie,* 28 I&N Dec. 120, 125 (A.G. 2020) (discussing the history of the persecutor bar, and noting that Congress intended to make ''certain forms of immigration relief,'' including asylum, ''unavailable to persecutors'').

This rule also does not, contrary to commenter concerns, violate the Refugee Act by establishing a non-uniform procedure for applying for asylum. The rule, consistent with the Refugee Act's objective to provide systematic and comprehensive procedures, establishes procedures and conditions to support the lawful, orderly processing of asylum applications. 88 FR at 11704, 11728; *see* Refugee Act, sec. 101(b), 94 Stat. at 102 (''The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.''). To be sure, the rule will not lead to the same result for each noncitizen: For example, the rebuttable presumption will not apply to noncitizens who enter the United States using a lawful pathway but will apply to noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders and do not establish an exception to the presumption or otherwise rebut the presumption. But the rule will apply in a uniform way to all asylum applications filed by noncitizens who are subject to its terms during the applicable time period.

The rule is likewise within the Departments' broad authority, within existing statutory bounds, to establish procedures that are tailored to different situations. INA 208(d)(1), 8 U.S.C. 1158(d)(1) (requiring the Attorney General to ''establish a procedure for the consideration of asylum applications''). Notably, asylum applicants navigate several procedurally different paths depending on their arrival in the United States and timing of their applications; some noncitizens file affirmative applications with USCIS after arriving in the United States, and others file defensive applications after being placed in expedited removal proceedings and found to have a credible fear of persecution. Others submit defensive applications while in section 240 removal proceedings. Contrary to commenter concerns, the lawful pathways to enter the United States outlined in this rule do not eliminate any of these existing procedures or categorically bar any of these applications for asylum.

Furthermore, it is not inconsistent with the INA to provide a lawful pathway that relies on use of the CBP One app. The Departments note that it is not uncommon to implement policies that encourage the use of new technologies as they become available to create efficiencies in processing, including with respect to asylum applications, such as new forms, e-filing, the use of video teleconference hearings, and digital audio recording of hearings.[192] *See, e.g.,* Executive Office

[192] In 1998, Congress passed the Government Paperwork Elimination Act, which requires federal agencies to provide the public with the ability to conduct business electronically, when practicable, with the Federal government. *See* Public Law 105–277, 1701–10, 112 Stat. 2681, 2681–749 to –751

Continued

for Immigration Review Electronic Case Access and Filing System, 86 FR 70708 (Dec. 13, 2021) (implementing EOIR's electronic case management system); Immigration Court Practice Manual, Chapter 4.7 (Apr. 10, 2022) (providing guidance for video teleconference hearings); *id.* at Chapter 4.10(a) (providing for electronic recording of hearings). In this rule, the Departments are implementing a rebuttable presumption of ineligibility that will encourage the use of lawful pathways, including use of the CBP One app, which the Departments expect will enable POEs to manage migratory flows in a safe and efficient manner. Importantly, those who present at a POE without a CBP One appointment and demonstrate that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle will not be subject to the presumption. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Further, using the app is not required in order to qualify for an exception from or to rebut the presumption, such as where a noncitizen applied for asylum or other protection in a third country and received a final decision denying that application or where the noncitizen shows exceptionally compelling circumstances. Thus, although the rule encourages increased use of the CBP One app, which is expected to facilitate more efficient and streamlined processing along the SWB, use of the app is not required.

In response to commenters' assertions that crossing the SWB and applying for asylum is in itself a ''lawful pathway,'' the Departments reiterate that this rule does not bar a noncitizen from entering the United States from Mexico at the southwest land border or adjacent coastal borders and subsequently seeking asylum. 88 FR at 11707. However, crossing the southwest land border or adjacent coastal borders without authorization is not one of the lawful pathways provided to encourage and increase safe, orderly transit to the United States. Thus, noncitizens who choose to cross the southwest land border or adjacent coastal borders without making an appointment to present at a POE during the period covered by this rule, and who do not otherwise qualify for an exception enumerated in 8 CFR 208.33(a)(2), 1208.33(a)(2), will have to address the rebuttable presumption as part of establishing eligibility for relief, but they will nevertheless be able to apply for asylum.

As to commenters' statements that the Departments' reliance on *Matter of Pula* is misplaced, the Departments respond that the rule is consistent with historical consideration of manner of entry as a relevant factor in considering an asylum application. In *Matter of Pula,* the BIA identified—as relevant factors as to whether a noncitizen warrants the favorable exercise of discretion in granting asylum—the noncitizen's ''circumvention of orderly refugee procedures,'' including their ''manner of entry or attempted entry''; whether they ''passed through any other countries or arrived in the United States directly''; ''whether orderly refugee procedures were in fact available to help'' in any transit countries; and whether they ''made any attempts to seek asylum before coming to the United States.'' *Matter of Pula,* 19 I&N Dec. at 473–74. The BIA explained that section 208(a) of the INA, 8 U.S.C. 1158(a), required the Attorney General to establish procedures for adjudicating applications filed by any noncitizen, ''irrespective of such alien's status,'' but the BIA did not preclude consideration of the manner of entry in assessing whether to grant asylum. *Id.* at 472. The BIA also stated that while the manner of entry could ''be a serious adverse factor, it should not be considered in such a way that the practical effect is to deny relief in virtually all cases.'' *Id.* at 473. The BIA cautioned against placing ''too much emphasis on the circumvention of orderly refugee procedures'' because ''the danger of persecution should generally outweigh all but the most egregious of adverse factors.'' *Id.* at 473–74.

The Departments acknowledge that this rule places more weight on manner of entry than the Board did in *Matter of Pula.* 88 FR at 11736. But in line with *Matter of Pula,* the rule also considers factors other than manner of entry, including providing a categorical rebuttal ground for noncitizens who faced an imminent and extreme threat to life or safety at the time of entry. *Id.;* 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). And like *Matter of Pula,* this rule provides for consideration of manner of entry in assessing eligibility for some asylum seekers, but this factor is not considered in ''a way that the practical effect is to deny relief in virtually all cases.'' 19 I&N Dec. at 473. Rather, the manner of entry is only impactful for individuals who do not enter the United States using a lawful pathway, do not establish an exception to the rebuttable presumption, and do not rebut the presumption. 88 FR at 11707, 11735–36.

The Departments also recognize that the specific analysis discussed in *Matter of Pula* (considering manner of entry in the discretionary decision of whether to grant asylum) is distinct from how the rule considers manner of entry (as part of provisions governing eligibility for asylum). *See Matter of Pula,* 19 I&N Dec. at 472. Nevertheless, *Matter of Pula* supports the proposition that it is lawful to consider, and in some cases rely on, manner of entry for asylum applicants. Moreover, adjudicators are not precluded from considering the same facts when evaluating both eligibility and discretion. Indeed, it is possible for a single fact to be relevant to both determinations but dispositive as to only one. *See Kankamalage* v. *INS,* 335 F.3d 858, 864 (9th Cir. 2003) (concluding that a conviction did not render a noncitizen ineligible for asylum, but stating that the Board was ''not prohibited from taking into account Kankamalage's robbery conviction when it decides whether or not to grant asylum as a matter of discretion''); *Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (concluding that even a noncitizen who ''qualifies as a 'refugee' '' and whose criminal conviction did ''not preclude her eligibility'' for asylum could nevertheless be ''manifestly unfit for a *discretionary* grant of relief'').

Moreover, the Departments, in exercising their broad discretion to issue regulations adopting additional limitations and conditions on asylum eligibility, are not bound to consider manner of entry only as a factor contributing to whether a particular noncitizen warrants a favorable exercise of discretion. The Departments similarly disagree with the commenter who stated that the Departments are seeking to ''excuse themselves from complying with long-established Board precedent simply because the 'regulatory regime' in place today is different than the regime at the time the Board decided *Matter of Pula.*'' This rule is not in conflict with *Matter of Pula,* which remains the applicable standard for discretionary determinations. And the rule takes *Matter of Pula* as providing support for the proposition that it is lawful to consider, and in some cases rely on, manner of entry for asylum applicants. 88 FR at 11735–36.

In sum, as with other conditions and limitations imposed by section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those

(1998). Similarly, in 2002, Congress passed the E-Government Act of 2002, which promotes electronic government services and requires agencies to use internet-based technology to increase the public's access to government information and services. *See* Public Law 107–347, 116 Stat. 2899 (2002).

with valid asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the SWB that will overwhelm DHS's ability to provide safe and orderly processing, and reducing the role of exploitative transnational criminal organizations and smugglers. 88 FR at 11704. In seeking to enhance the overall functioning of the immigration system and to improve processing of asylum applications, the Departments are, in the exercise of the authority to promulgate conditions and limitations on eligibility for asylum, placing greater weight on manner of entry to encourage migrants to seek protection in other countries in the region and to use lawful pathways and processes to enter the United States and access the U.S. asylum system.

ii. Statutory Bars to Asylum

*Comment:* Commenters stated that the proposed rule would be inconsistent with the statutory firm-resettlement and safe-third-country bars. *See* INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). Commenters argued that Congress intended for these two bars to be the sole means by which a noncitizen may be denied asylum based on a relationship with a third country. Commenters disagreed with the proposed rule, asserting it would bar asylum for anyone who travels through what the United States deems a ''safe third country.'' Similarly, another commenter stated that the proposed rule would penalize migrants who do not live adjacent to a safe third country to which they could travel directly in order to seek protection.

*Response:* This rule is within the Departments' broad authority to create new conditions on eligibility for asylum, and the Departments disagree that the rule conflicts with any of the exceptions to a noncitizen's ability to apply for asylum or a noncitizen's eligibility for asylum under sections 208(a)(2) or (b)(2) of the INA, 8 U.S.C. 1158(a)(2) or (b)(2). The INA's safe-third-country provision prohibits a noncitizen from applying for asylum if the noncitizen ''may be removed, pursuant to a bilateral or multilateral agreement'' to a safe third country in which the noncitizen would not be subject to persecution and ''would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). The firm-resettlement provision precludes a noncitizen who ''was firmly resettled in another country prior to arriving in the United States'' from demonstrating eligibility for asylum. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *see also* 8 CFR 208.15 (2020), 1208.15 (2020).[193] The two provisions provide categorical bars to asylum for noncitizens who have available, sustained protection in another country, and help protect against forum shopping. *Sall* v. *Gonzales,* 437 F.3d 229, 233 (2d Cir. 2006) (per curiam) (noting that the policy behind the safe-third-country statutory bar includes the principle that ''[t]he United States offers asylum to refugees not to provide them with a broader choice of safe homelands, but rather, to protect those arrivals with nowhere else to turn.''); *Rosenberg* v. *Yee Chien Woo,* 402 U.S. 49, 55, 56 (1971) (noting that the concept of firm resettlement is historically rooted in the notion of providing ''a haven for the world's homeless people'' while encouraging ''other nations to do likewise.''); *see also Maharaj* v. *Gonzales,* 450 F.3d 961, 988–89 (9th Cir. 2006) (en banc) (O'Scannlain, J., concurring, in part) (recognizing that the firm-resettlement bar protects against forum shopping, an issue ''that our immigration laws have long sought to avoid.''); *United States* v. *Malenge,* 294 F. App'x 642, 645 (2d Cir. 2008) (noting that a purpose of the safe-third-country agreement with Canada was to prevent forum shopping).

The Departments disagree with commenters because the INA permits the Attorney General and Secretary to create new eligibility conditions and does not limit this authority based on the content of the existing statutory conditions. *See Trump,* 138 S. Ct. at 2411–12 (recognizing that the INA ''did not implicitly foreclose the Executive from imposing tighter restrictions'' in ''similar'' areas); *E. Bay Sanctuary Covenant* v. *Garland,* 994 F.3d 962, 979 (9th Cir. 2020) (''*East Bay I*'') (acknowledging that the INA does not limit the Departments' ''authority to the literal terms of the two safe-place statutory bars''); *R–S–C,* 869 F.3d at 1187 (noting that Congress's delegation of authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C) ''means that Congress was prepared to accept administrative dilution'' of the right to seek asylum). Indeed, section 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B), provides no subject-matter limit, other than requiring any regulation be ''consistent with'' section 208 of the INA, 8 U.S.C. 1158. *See R–S–C,* 869 F.3d at 1187 n.9. The condition created by this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a whole, and it is consistent with the safe-third-country and firm-resettlement bars in particular. 88 FR at 11736.

Critically, unlike the safe-third-country bar, the rule does not consider whether the noncitizen could now safely relocate to a third country, and unlike the firm-resettlement bar, this rule does not categorically preclude a noncitizen from demonstrating eligibility for asylum because they are no longer in flight from persecution. *Cf. Ali,* 237 F.3d at 594 (noting that the firm-resettlement bar does not conflict with Congress's intent in providing for asylum relief ''[b]ecause firmly resettled aliens are by definition no longer subject to persecution'') (marks and citation omitted). Rather, as discussed in the NPRM, the rule encourages use of lawful pathways for migrants seeking to come to the United States, including noncitizens wishing to seek asylum in the United States. 88 FR at 11707. The rule is designed to improve processing of such asylum applications. *Id.* at 11704, 11706–07. Noncitizens will not be subject to the rebuttable presumption if they travel through a third country and seek entry into the United States through a lawful, safe, and orderly pathway. *Id.* at 11707; 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). They also will not be subject to the rebuttable presumption if they seek and are denied asylum or other protection in a third country. 88 FR at 11707; 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). And unaccompanied children are excepted from the presumption. 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). Moreover, even if a noncitizen is subject to the presumption of ineligibility under 8 CFR 208.33(a)(1), 1208.33(a)(1), the noncitizen may rebut that presumption in any of several ways that account for protecting the safety of those fleeing imminent harm. 88 FR at 11707; 8 CFR 208.33(a)(3), 1208.33(a)(3). Accordingly, the rule encourages noncitizens seeking to enter the United States, including those seeking asylum who have transited through a third country before arriving in the United States, to enter through lawful, safe, and orderly pathways by imposing an additional condition on the asylum eligibility of individuals who did not avail

[193] These provisions were amended by Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020), which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea Legal Services* v. *U.S. Dep't of Homeland Security* (*Pangea II*), 512 F. Supp. 3d 966, 969–70 (N.D. Cal. 2021). This order remains in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment—is currently effective.

themselves of such pathways. 88 FR at 11706–07. The rule does not preclude noncitizens who have transited through third countries without applying for protection in those countries from obtaining asylum in the United States. *Id.* at 11706–07. In addition, the rule expressly accounts for migrants who have been denied a safe haven elsewhere; if an applicant seeks asylum in a third country and is denied, the rebuttable presumption does not apply. 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C).

*Comment:* Commenters stated that the proposed rule would conflict with the firm-resettlement bar to asylum eligibility or render the firm-resettlement bar superfluous because it would negate the need to determine whether the noncitizen has firmly resettled or whether any potential or obtained status in a third country would not be reasonably available or reasonably retained due to issues such as processing backlogs in the third country. Commenters were also concerned that the proposed rule would not account for the risk of harm that the noncitizen might face in the third country. Commenters stated that the proposed rule would ignore congressional intent that the noncitizen have a more significant relationship with the third country—*i.e.,* be firmly resettled in that country rather than be merely transiting through the country—to be effectively rendered ineligible for asylum. Commenters asserted that requiring individuals to apply for protection in a third transit country would create a new hurdle for them because it could subject them to the firm-resettlement bar.

*Response:* As discussed above, the INA does not limit the Departments' authority regarding eligibility conditions relating to a noncitizen's conduct in third countries to the boundaries of the firm-resettlement statutory bar. *Trump,* 138 S. Ct. at 2411–12 (recognizing that the INA ''did not implicitly foreclose the Executive from imposing tighter restrictions'' in ''similar'' areas); *see also East Bay I,* 994 F.3d at 979 (noting that the INA does not limit the Departments' ''authority to the literal terms of the two safe-place statutory bars''). The Departments disagree that the rule conflicts with the firm-resettlement bar, which focuses on protecting against forum shopping when a migrant has already found a safe refuge. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *Bonilla* v. *Mukasey,* 539 F.3d 72, 80 (1st Cir. 2008); *Ali,* 237 F.3d at 594. This rule focuses on encouraging migrants to use safe, orderly, and lawful pathways to enter the United States. 88 FR at 11707, 11736. Accordingly, the relevant facts and analysis for considering firm resettlement and the application of the rebuttable presumption are materially different.

Additionally, the rule does not overlook commenter concerns about the accessibility to or processing times of applications in third countries. Even if noncitizens determine that protection in a third country is inaccessible or would take more time than the noncitizens believe they can wait, the rule provides other ways that the noncitizen can seek protection. Seeking protection in a third country and receiving a denial excepts a noncitizen from the presumption but is not a requirement—the noncitizen may still either enter using a lawful pathway, pre-schedule an appointment to present themselves at a POE, or show one of several other circumstances that allow an individual to be excepted from the rule's rebuttable presumption. 8 CFR 208.33(a)(2), 1208.33(a)(2). The rule also explicitly protects family unity by providing that if one member of a family traveling together is excepted from the presumption of asylum ineligibility or has rebutted the presumption then the other members of the family are similarly treated as excepted from the presumption or having rebutted the presumption. 8 CFR 208.33(a)(2)(ii), (3), 1208.33(a)(2)(ii), (3); 88 FR at 11730. And if during removal proceedings a principal applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the presumption and has either an accompanying spouse or child who would not qualify for asylum or protection from removal or a spouse or child who would be eligible to follow to join them as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if the principal applicant were granted asylum, the applicant will be deemed to have established an exceptional circumstance that rebuts the presumption. 8 CFR 1208.33(c). Additionally, any principal asylum applicants who enter the United States during the two-year period of the rebuttable presumption while under the age of eighteen and apply for asylum after the two-year period are not subject to the presumption. 8 CFR 208.33(c)(2), 1208.33(d)(2). Furthermore, the rule does not affect a noncitizen's ability to apply for statutory withholding of removal and CAT protection. 88 FR at 11730.

The rule also does not render the firm-resettlement bar superfluous; instead, this rule and the firm-resettlement bar apply independently. The operative firm-resettlement regulations provide that a noncitizen is barred from receiving asylum in the United States if they have received an offer of safe, established permanent resettlement that is not substantially and consciously restricted. 8 CFR 208.15, 1208.15 (2020). The firm-resettlement bar is divorced from any inquiry into how or when a noncitizen enters the United States. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); 8 CFR 208.15, 1208.15 (2020). Put differently, the firm-resettlement bar applies with equal force to noncitizens who enter the United States using an identified lawful pathway and those who do not. *Abdalla* v. *INS,* 43 F.3d 1397, 1400 (10th Cir. 1994) (''The pertinent regulations specifically focus on resettlement status prior to the alien's entry into this country . . . .''). Conversely, this rule does not turn exclusively on whether the noncitizen received an offer of permanent resettlement in a third country. 88 FR at 11723. Under the rule, a migrant's time in a third country is primarily relevant in two circumstances: (1) when a noncitizen travels through a third country and does not enter the United States through established lawful pathways, or (2) if the noncitizen applied for protection in the third country and was denied. 8 CFR 208.33(a)(1)(iii), (2)(ii)(C), 1208.33(a)(1)(iii), (2)(ii)(C). In the first circumstance, the noncitizen is subject to the rule's condition on asylum eligibility unless they can demonstrate an applicable exception or successfully rebut the presumption. 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). In the second circumstance, the noncitizen is categorically not subject to the rebuttable presumption of asylum ineligibility regardless of whether they entered the United States through established lawful pathways. 8 CFR 208.33(a)(2)(ii)(C),1208.33(a)(2)(ii)(C). But neither circumstance involves determining whether the noncitizen was firmly resettled, as defined in 8 CFR 208.15, 1208.15 (2020), before traveling to the United States.[194] Thus, the firm-resettlement bar and this rule are simply different conditions with different scopes.

In addition, the rule properly accounts for the risk of harm a noncitizen might face in the third country. As at least one commenter in favor of the rule noted, not all migrants

[194] Indeed, the firm-resettlement bar, if applicable to a particular noncitizen, would not be applied by an AO in credible fear proceedings and would be applied only if the noncitizen's application is considered by an IJ in section 240 removal proceedings or an AO during an asylum merits interview. 8 CFR 208.30(e)(5)(i).

who travel through third countries are actively fleeing persecution and some choose to come to the United States for other reasons. But should the noncitizen be fleeing harm, one of the enumerated grounds that will necessarily rebut the presumption of asylum ineligibility is that the noncitizen faced an imminent and extreme threat to life or safety at the time of entry into the United States. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B); 88 FR at 11704, 11707, 11736. In response to the comment that requiring a noncitizen to seek protection in a transit country would add a hurdle to obtaining asylum in the United States insofar as that noncitizen may need to address the firm-resettlement bar, the Departments note that noncitizens subject to the firm-resettlement bar are not in need of protection in the United States. *See Ali,* 237 F.3d at 594 (recognizing that asylum law ''was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives'' (quoting *Rosenberg* v. *Yee Chien Woo,* 402 U.S. 49, 56 (1971)); *East Bay I,* 994 F.3d at 977 (recognizing ''the 'core regulatory purpose of asylum,' which is 'to protect [refugees] with nowhere else to turn,' because 'by definition' an applicant barred by a safe-place provision has somewhere else to turn'' (quoting *Matter of B–R-,* 26 I&N Dec. 119, 122 (BIA 2013), overruled on other grounds by *Zepeda-Lopez* v. *Garland,* 38 F.4th 315, 326 (2d Cir. 2022)); Constitution of the International Refugee Organization, ch. V, sec. (D)(c), Dec. 15, 1946, 18 U.N.T.S. 20 (determining that a refugee or displaced person ''will cease to be the concern of the Organization . . . when they have . . . become otherwise firmly established''). Likewise, the rule does not deny asylum to a noncitizen who obtained asylum in a third country (and therefore presumably has a cognizable claim to refugee status) but thereafter comes to the United States and seeks asylum. That person may seek to enter through a lawful pathway and file an asylum application like any other migrant, at which point they would likely need to address the firm-resettlement bar. Should they enter the United States from Mexico at the southwest land border or adjacent coastal borders without authorization or at a POE without an appointment and not otherwise be covered by an exception, they, like any other noncitizen in that situation, will be able to address the rebuttable presumption.

Finally, the Departments disagree that the rule ignores congressional intent underlying the firm-resettlement bar. As explained above, this rule has the policy objective of encouraging the use of safe, orderly, and lawful pathways by noncitizens, including those seeking asylum, to enter the United States to present their claims, 88 FR at 11704, 11707, and is distinct from the firm-resettlement bar, which is grounded in the policy objective of protecting against forum shopping by migrants who have already found a safe refuge, *East Bay I,* 994 F.3d at 977; *Bonilla,* 539 F.3d at 80; *Ali,* 237 F.3d at 595.

*Comment:* Commenters stated that the proposed rule would be inconsistent with or would circumvent the safe-third-country bar to applying for asylum because the safe-third-country bar was intended to ensure that any third country was safe and had a fair procedure for asylum or temporary protection before requiring that a noncitizen avail themselves of protection in that country. Commenters asserted that the proposed rule essentially or implicitly declares Mexico, Guatemala, or other transit countries to be safe third countries without obtaining the requisite bilateral or multilateral agreements. Commenters also claimed that this proposed rule, which would apply regardless of whether the United States has an agreement with the transit country, would not adequately consider or require an individualized determination as to whether a third country is ''safe'' for asylum seekers or has an adequate system for granting protection against persecution and torture. Instead, commenters explained that this proposed rule relies on a third country being a party to specified international accords, which commenters stated are not sufficient to ensure the noncitizen's safety and, therefore, would result in refugees being returned to the countries where they will be persecuted—in conflict with the non-refoulement principles of the Refugee Act. One commenter specified that the asylum structures in Mexico, El Salvador, Honduras, and Guatemala do not meet the international standard for refugee protection and thus cannot constitute a safe third country.

*Response:* As a threshold matter, the Departments distinguish the categorical safe-third-country bar found in section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), from this rule because this rule, unlike the safe-third-country bar, is neither a categorical bar on the ability to apply for asylum nor does it hinge exclusively on the availability of protection in a third country. 88 FR at 11723, 11736. While the Departments believe that protection is available for many noncitizens in third countries through which they transit before arriving in the United States from Mexico at the southwest land borders or adjacent coastal borders, the Departments have carefully refrained from making asylum eligibility in the United States turn exclusively on whether the noncitizen could have sought protection in any third country. Nor does this rule act as or constitute a third-country agreement for purposes of section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A). 88 FR at 11732. Critically, the purpose behind this rule is to encourage noncitizens to take advantage of existing and expanded safe, orderly, and lawful pathways for noncitizens to enter the United States to present asylum claims. 88 FR at 11704, 11719. And the rule does not, contrary to commenters' suggestions, require a noncitizen to return to or go to a third country without evaluating the safety of that country simply because of their method of entering the United States. *Cf. East Bay I,* 994 F.3d at 977. Rather, the rule is more limited. The rule provides that noncitizens who have traveled through a third country and enter the United States through a provided lawful pathway may seek asylum through an orderly and directed process. 88 FR at 11707, 11723; *see* 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Noncitizens who travel through a third country that is a party to the Refugee Convention or Protocol and do not enter the United States through a provided lawful pathway, and who do not first seek (and are denied) protection in that third country, may still present a claim for relief and protection based on fear of persecution—but, in order to be eligible for asylum, they must first establish an exception to or rebut a presumption of ineligibility for asylum. 88 FR at 11707, 11723; *see* 8 CFR 208.33(a)(3), 1208.33(a)(3). And even if the noncitizen is subject to the presumption of ineligibility for asylum, the noncitizen may still seek and be eligible for statutory withholding of removal or CAT protection. 88 FR at 11737; *see* 8 CFR 208.33(b)(2)(i) and (ii), 1208.33(b)(2)(i) and (ii). Simply put, the rule imposes a condition on asylum (and only asylum) eligibility relating to whether the noncitizen availed themselves of a lawful pathway, but the rule does not direct an inquiry as to whether the noncitizen can or should return to a third country. 88 FR at 11737–38.

iii. Expedited Removal

*Comment:* Some commenters stated that the proposed rule creates a higher standard of proof (preponderance of the evidence) for rebutting the presumption

against asylum, as compared to the ''significant possibility'' standard for establishing a credible fear. Commenters expressed a belief that the rule requires noncitizens ''to actually establish, at their credible fear interview, that they *are* eligible for asylum'' (emphasis in original), not simply that they have a significant possibility of demonstrating eligibility. These commenters expressed concern that the rule could be read to require AOs to make a finding that a noncitizen is ineligible for asylum without assessing the presumption under the ''significant possibility'' standard. These commenters further argued that the touchstone of the ''significant possibility'' standard was whether a noncitizen ''*could* show, after a full hearing with factual development,'' that the presumption does not apply.

*Response:* The ''significant possibility'' standard is required by statute, and the rule does not impose a different standard during the credible fear process.[195] The INA mandates that, when determining whether a noncitizen has a ''credible fear,'' the AO must determine whether there is a ''significant possibility . . . that the alien could establish eligibility for asylum.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). When it comes to the rebuttable presumption, the AO will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption. 8 CFR 208.33(a)(2), (3)(i), 1208.33(a)(2), (3)(i). In other words, the ''significant possibility'' standard is the overall assessment applied at the credible fear stage, but that standard must be applied in conjunction with the standard of proof required for the ultimate merits determination. Although the ''significant possibility'' standard applies when determining the presumption's applicability and whether it has been rebutted, the Departments expect that noncitizens rarely would be found exempt from or to have rebutted the presumption for credible fear purposes and subsequently be found not to be exempt from or to have rebutted the presumption at the merits stage. The ''significant possibility'' standard asks a predictive question: whether there is a ''significant possibility'' that the noncitizen ''could establish'' asylum eligibility at a merits hearing. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). And given the nature of the inquiry under this rule's presumption, the Departments expect that AOs or IJs will almost always be able to determine based on the evidence before them at the credible fear stage whether a noncitizen would be unable to establish asylum eligibility at the merits stage.

First, the evidence necessary to determine whether a person is excepted from or can rebut the presumption should generally be available to the AO at the time of the credible fear interview, whether from the noncitizen or otherwise. Unlike some of the more complex factual inquiries required for other elements of asylum eligibility, such as nexus or particular social group, which often require evidence about country conditions or other evidence, and often regard events that did not happen recently, AOs will—except in exceptional circumstances—be able to assess eligibility for such exceptions or rebuttal circumstances at the credible fear interview through consideration of the noncitizen's credible testimony and available evidence, including government records relating to their circumstances at the time of their entry into the United States.

For instance, a noncitizen should not generally need testimony from a witness in their home country or evidence of country conditions to show that they faced an acute medical emergency at the time of entry or that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See* 8 CFR 208.33(a)(2)(ii)(B), (3)(i)(A), 1208.33(a)(2)(ii)(B), (3)(i)(A). In some cases, the absence of documentation and DHS records—such as a record that a noncitizen was provided appropriate authorization to travel to the United States to seek parole—may make it unlikely that the noncitizen could make the requisite showing at a full merits hearing. In other situations, the noncitizen's credible testimony may be sufficient to prove the noncitizen's claims, although AOs also may consider any evidence noncitizens have with them at the time they entered the United States from Mexico at the southwest land border or adjacent coastal borders, and evidence regarding the State in which they were encountered at or near the border. Thus, AOs should have all the necessary evidence before them during the credible fear interview to determine whether a noncitizen will be exempt from or able to rebut the presumption, and additional evidence is not likely to change whether an exception to or rebuttal of the presumption applies.

Second, as with factual determinations, the legal analysis for determining whether a person is exempt from or can rebut the presumption is straightforward because most of the enumerated grounds for those determinations are narrow and clearly defined. There is little gray area in determining whether a noncitizen transited through a third country, and the rule provides clear examples of the types of threats that constitute an imminent and extreme threat to life or safety—that is, an imminent threat of rape, kidnapping, torture, or murder. *See* 8 CFR 208.33(a)(1)(iii), (3)(i)(B), 1208.33(a)(1)(iii), (3)(i)(B). As a result, the question of whether a noncitizen has a ''significant possibility'' of meeting these standards should not require much legal analysis after the AO has considered the evidence before them. That again differs from other questions that may arise during a credible fear inquiry—such as whether the noncitizen is a member of a cognizable particular social group—which can be quite complex; AOs or IJs may reasonably defer such difficult questions by finding credible fear. *See* 8 CFR 208.30(e)(4) (''In determining whether the alien has a credible fear of persecution . . . or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit a positive credible fear finding . . . in order to receive further consideration of the application for asylum and withholding of removal.''). Hence, in this unique context, applying the ''significant possibility'' standard will almost always

[195] Previous limitations on asylum eligibility have used similar regulatory language that does not explicitly include the phrase ''significant possibility'' while also stating in the rules' preambles that the ''significant possibility'' standard applied to those limitations. *See, e.g.,* Security Bars and Processing, 85 FR 84160, 84175 (Dec. 23, 2020) (''Security Bars Rule'') (explaining that ''[t]he rule does not, and could not, alter the standard for demonstrating a credible fear of persecution, which is set by statute''); Asylum Eligibility and Procedural Modifications, 84 FR 33829, 33837 (July 16, 2019) (''TCT Bar IFR'') (providing that ''[t]he asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to the third-country-transit bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear.''); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55943 (Nov. 9, 2018) (''Proclamation Bar'') (providing that ''[t]he asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to a proclamation entry bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.'').

lead to a similar conclusion as applying the ultimate eligibility standard.

However, the Departments acknowledge that in some rare cases the outcome from applying the ''significant possibility'' standard may differ from application of the ultimate merits standard, such that a noncitizen who is found to have met the ''significant possibility'' standard may ultimately be found after a merits hearing to be subject to the presumption of ineligibility. It is the Departments' expectation that such cases will be rare, and that applying the ''significant possibility'' standard will not differ meaningfully from application of the ultimate merits standard in this context.

*Comment:* Commenters stated that Congress intended to set a low screening standard for the credible fear process and alleged that the proposed rule raised the screening standard for statutory withholding of removal and CAT protection during this process without providing a justification for doing so. Commenters argued that Congress intended the plain language of the statute, which uses a ''significant possibility'' standard for asylum, to also apply to related fear claims, such as statutory withholding of removal and CAT protection.

*Response:* As a preliminary matter, this rule does not change the screening standard for asylum claims. Instead, it imposes an additional condition on asylum eligibility: a rebuttable presumption of asylum ineligibility for certain noncitizens who neither avail themselves of a lawful, safe, and orderly pathway to the United States nor seek asylum or other protection in a country through which they travel. 88 FR at 11750; INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). AOs will continue to apply the statutory ''significant possibility'' standard to determine credible fear. *Id.* In considering whether a noncitizen can establish a significant possibility of eligibility for asylum, the AO will be required to consider whether the noncitizen has shown a significant possibility that they could establish that the presumption does not apply or that they meet an exception to or can rebut the presumption. 88 FR at 11750. Only after determining that a noncitizen could not demonstrate a ''significant possibility'' of eligibility for asylum would the AO apply the long-established ''reasonable possibility'' standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. *Id.* at 11746, 11750.

In contrast to the establishment of a statutory ''significant possibility'' standard to screen for asylum, Congress did not specify a statutory standard for screening statutory withholding of removal or CAT protection claims in expedited removal proceedings. *See* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (referencing only ''asylum''). Since 1999, AOs have applied the ''reasonable possibility'' standard to statutory withholding of removal and CAT protection claims in streamlined proceedings for reinstatement and administrative removal where noncitizens are statutorily ineligible for asylum. *See* 8 CFR 208.31, 1208.31 (2020)[196] (implementing the reasonable fear process for noncitizens subject to administrative removal orders); 8 CFR 241.8(e) (implementing the reasonable fear process for noncitizens subject to reinstatement of a prior order of removal). While the ''reasonable possibility'' standard is lower than the ''clear probability'' standard required to demonstrate eligibility for statutory withholding or CAT protection, it is a more demanding standard than the ''significant possibility'' standard used in credible fear proceedings to screen for asylum. Regulations Concerning the Convention Against Torture, 64 FR 8474, 8485 (Feb. 19, 1999). At the time the CAT regulations were implemented, the goal of the reasonable fear process was to ensure that the United States complied with its non-refoulement obligations under the CAT ''without unduly disrupting the streamlined removal processes applicable.'' *Id.* at 8479. The justification for using the reasonable possibility standard was also explained at the time the reasonable fear proceedings were created: ''[b]ecause the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.'' *Id.* at 8485.

For the purpose of this rule, the Departments have judged that, in those cases where an applicant cannot establish a significant possibility of eligibility for asylum due to the lawful pathways condition, the use of the ''reasonable possibility'' standard to assess statutory withholding of removal and CAT claims better reflects the goals of the rule as a whole. As explained in the NPRM, while this is a different judgment than what was made by the Asylum Processing IFR, the application of the heightened standard is in line with the goal of identifying non-meritorious claims at the screening stage, allowing the heavily burdened immigration courts to focus on those claims most likely to warrant protection. 88 FR at 11742. The Departments believe that applying the ''reasonable possibility'' standard, which is tailored to statutory withholding of removal and CAT claims, ''better predicts the likelihood of succeeding'' on an application for statutory withholding of removal or CAT protection because it appropriately accounts for the higher burden of proof. 88 FR at 11746–47. The use of the standard specific to statutory withholding and CAT claims, since its inception, has allowed the United States to meet its obligations under international law while simultaneously balancing the need to expeditiously identify non-meritorious claims. Moreover, as stated in the NPRM, the Departments seek to protect those who have viable claims while also considering the ''downstream effects'' on immigration courts. 88 FR at 11746. The application of standards tailored to the type of relief for which the noncitizen is eligible is designed to accomplish that goal.

2. TCT Bar and Proclamation Bar Litigation

*Comment:* Several commenters argued that the proposed rule is no different than the TCT Bar Final Rule and the Proclamation Bar IFR. Many commenters submitted only a general reference to precedent issued in litigation regarding the Proclamation Bar IFR and the TCT Bar rules, without any discussion or consideration of the distinctions provided in the proposed rule. Some asserted that the proposed rule conflicts with or violates the injunctions issued regarding those rules, or that the existing injunction should apply to the proposed rule. Commenters also asserted that the proposed rule is similar to the TCT Bar rules and Proclamation Bar IFR and will cause confusion. An organization expressed concern that members of a certified class for purposes of injunctive relief, *see Al Otro Lado, Inc.* v. *McAleenan,* No. 17–CV–02366–BAS–KSC, 2022 WL 3142610 (S.D. Cal. Aug. 5, 2022), would be subject to the rebuttable presumption. The commenter stated that application of the rebuttable presumption to such class members would likely violate the injunction in that case because that injunction

[196] These provisions were amended by the Global Asylum Rule, which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea II,* 512 F. Supp. 3d at 969–70. This order remains in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendments is currently effective.

requires that the Departments apply ''pre-Asylum Ban practices for processing the asylum applications'' of class members. *See id.*

*Response:* The Departments reiterate that this rule is materially different from the TCT Bar IFR and Final Rule and Proclamation Bar IFR. 88 FR at 11738–39; *see also* Section IV.B.2.ii of this preamble. And contrary to commenter concerns, there is no risk of confusion because neither the TCT Bar nor the Proclamation Bar is in effect. *Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25 (D.D.C. 2020) (vacating the TCT Bar IFR); *East Bay Sanctuary Covenant* v. *Barr,* 964 F.3d 832 (9th Cir. 2020) (enjoining the TCT Bar IFR); *E. Bay Sanctuary Covenant* v. *Barr* (''*East Bay II*''), 519 F. Supp. 3d 663, 668 (N.D. Cal. 2021) (enjoining the TCT Bar Final Rule); *East Bay III,* 993 F.3d at 681; *see O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (recounting the history of the litigation over the Proclamation Bar IFR and vacating it).[197] As discussed later in Sections IV.E.9 and IV.E.10 of this preamble, removal of provisions implementing the TCT Bar Final Rule and the Proclamation Bar IFR is warranted. But even separate from the removal of provisions implementing those rules, the Departments respond that the litigation surrounding those rules does not mean that this distinct rule is invalid, unenforceable, or arbitrary and capricious.

The Departments also disagree with the generalized comparisons between this rule and the Proclamation Bar IFR and the TCT Bar rules. 88 FR at 11736. As stated in the NPRM, this rule is substantively distinct from the eligibility bars in those rules. The TCT Bar rules focused exclusively on the noncitizen's travel prior to entering the United States, *see* 85 FR at 82261–62, and the Proclamation Bar IFR imposed a strict eligibility bar for anyone entering outside a POE, *see* 83 FR at 55935. In comparison, this rule is not a categorical bar on asylum eligibility, but instead is a rebuttable presumption, including several exceptions that are adjudicated on a case-by-case basis, for certain noncitizens who enter the United States without availing themselves of any of numerous lawful pathways during a temporary period of time. 88 FR at 11707, 11739–40; 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). Notably, and contrary to claims by some commenters, the rule does not block access to asylum for those who need it most. *Cf. East Bay I,* 994 F.3d at 980. The rule contains exceptions to and ways to rebut the presumption, including several ways to avoid the presumption that account for protecting the safety of those fleeing imminent harm. In addition, the rule is intended to better manage already-strained resources, thereby protecting against overcrowding in border facilities and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. 88 FR at 11704, 11713–16, 11730. In that vein, as discussed in Sections IV.E.9 and IV.E.10 of this rule, the TCT Bar IFR and Final Rule and Proclamation Bar IFR pursued approaches and policies that differ in important respects from this rule. *Compare* TCT Bar IFR, 84 FR at 33831, *and* Proclamation Bar IFR, 83 FR at 55935, *with* 88 FR at 11706–07. Moreover, this rule is designed to address a specific exigency that did not exist when the TCT Bar rules and Proclamation Bar IFR were promulgated. 88 FR at 11705–06.

Second, this rule is not in conflict with or precluded by existing injunctions and court precedent relating to litigation surrounding those rules. *See United States* v. *Cardales-Luna,* 632 F.3d 731, 735 (1st Cir. 2011) (recognizing that ''a decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record'') (marks and citation omitted); *Overseas Shipholding Group, Inc.* v. *Skinner,* 767 F. Supp. 287, 296 (D.D.C. 1991) (noting that neither the law of the case nor stare decisis doctrines applied in ''an entirely separate rulemaking process''); *cf. Associated Builders and Contractors, Inc.* v. *Brock,* 862 F.2d 63, 67 (3d Cir. 1988) (considering the adequacy of notice of proposed rulemaking and concluding that an argument was foreclosed because a prior panel ''applied the law'' to facts that had ''not changed''). Procedurally, the injunctions issued against the TCT Bar rules and Proclamation Bar IFR were limited to the specific facts and specific rules at issue in those cases and do not bar the issuance of this materially distinct rule. *See E. Bay Sanctuary Covenant* v. *Barr,* 385 F. Supp. 3d 922, 960 (N.D. Cal. 2019) (enjoining the Departments ''from taking any action continuing to implement'' the TCT Bar IFR), *affirmed by East Bay I,* 994 F.3d at 988; *East Bay II,* 519 F. Supp. 3d at 668 (enjoining the Departments ''from taking any action continuing to implement the [TCT Bar] Final Rule''); *E. Bay Sanctuary Covenant* v. *Trump,* 349 F. Supp. 3d 838, 868 (N.D. Cal. 2018), *affirmed by East Bay III,* 993 F.3d at 680–81; *see also California* v. *Texas,* 141 S. Ct. 2104, 2115 (2021) (noting that remedies ''do not simply operate on legal rules in the abstract'') (quotation marks and citation omitted). Substantively, the opinions in those cases were limited to categorical eligibility bars premised on manner of entry or whether a noncitizen first sought asylum in another country, and this rule creates no such categorical bar. The more nuanced approach in this rule will have different effects and is premised on different factual circumstances and new reasoning, including an increased focus on available lawful pathways. 88 FR at 11739.

Regarding the application of the proposed rule to *Al Otro Lado* injunction class members, as noted in the NPRM, the Departments do not view the permanent injunction in the *Al Otro Lado* litigation—*see Al Otro Lado, Inc.* v. *Mayorkas,* No. 17–CV–02366–BAS–KSC, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022)—which they have appealed to the Ninth Circuit,[198] as limiting the Departments' discretionary authority to apply new asylum limitations conditions consistent with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to the injunction class. *See, e.g., Milliken* v. *Bradley,* 433 U.S. 267, 281–82 (1977) (''The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the [alleged wrongful conduct] itself.''); *Meinhold* v. *U.S. Dep't of Def.,* 34 F.3d 1469, 1480 (9th Cir. 1994); *see also, e.g., Thomas* v. *Cty. of Los Angeles,* 978 F.2d 504, 509 (9th Cir. 1992) (reversing injunction that ''fail[ed] to specify the act or acts sought to be restrained as required by'' Federal Rule of Civil Procedure 65(d)).[199] In any

[197] The district court in *O.A.* vacated the Proclamation Bar IFR for similar substantive reasons to those articulated in *East Bay III. O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019). *O.A.* v. *Trump* is subject to a pending appeal that is presently held in abeyance. *O.A.* v. *Biden,* No. 19–5272 (D.C. Cir. Oct. 11, 2019). Similarly, in *Al Otro Lado, Inc.* v. *Mayorkas,* No. 17–cv–2366, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022), a different district court issued an injunction relating to application of the TCT Bar rules that the Departments disagree with and have appealed. *Al Otro Lado, Inc.* v. *Mayorkas,* Nos. 22–55988, 22–56036 (9th Cir. Nov. 7, 2022).

[198] *See Al Otro Lado, Inc.* v. *Mayorkas,* Nos. 22–55988, 22–56036 (9th Cir. Oct. 25, 2022)

[199] Further, the commenter's position that the *Al Otro Lado* injunction applies to this rule is inconsistent with *Al Otro Lado* Class Counsel's website: ''[T]he Biden Administration proposed a similar rule in February 2023, but the *Al Otro Lado* v. *Mayorkas court order does not cover the new rule. The court order only applies to the rule*

event, certain injunction class members whose cases are reopened or reconsidered under the *Al Otro Lado* injunction because they were removed following application of the TCT Bar may follow a DHS-established process to request ''appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process,'' as outlined in 8 CFR 208.33(a)(2)(ii)(A), 1208.33(a)(2)(ii)(A), to participate in renewed removal proceedings. Injunction class members who follow those procedures would thus not be subject to the rebuttable presumption.

*Comment:* Many commenters noted that the courts, in addressing the TCT Bar rules and the Proclamation Bar IFR, held that the Departments could not promulgate a regulation that restricts access to asylum based on manner or location of entry into the United States or transit through a third country. Commenters similarly asserted, citing the Ninth Circuit's decision in *East Bay III,* that the proposed rule is not ''consistent with'' section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), and also violates international law.

*Response:* The holdings relating to the TCT Bar rules and the Proclamation Bar IFR do not undermine this rule. As discussed in Section IV.D.1.ii of this preamble, this rule does not conflict with the INA's safe-third-country and firm-resettlement bars. 88 FR at 11736; *see R–S–C,* 869 F.3d at 1187 n.9. While the applicability of the rebuttable presumption of ineligibility turns in part on transit through a third country, 8 CFR 208.33(a)(1)(iii), 1208(a)(1)(iii), the ultimate eligibility decision requires case-by-case evaluation of whether an exception applies and whether the noncitizen rebutted the presumption. 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3); *cf. East Bay I,* 994 F.3d at 982–83 (indicating that the Departments cannot rely ''solely'' on a noncitizen's decision not to seek asylum in a third country in denying their asylum application in the United States).

Regarding the Proclamation Bar, *East Bay III* enjoined a categorical entry bar as inconsistent with the statutory provision allowing ''migrants arriving anywhere along the United States's border'' to apply for asylum. 993 F.3d at 669. Unlike the Proclamation Bar IFR, this rule involves a rebuttable presumption that includes consideration of numerous factors unrelated to the manner of entry, including transit through a third country. 88 FR at 11707; 8 CFR 208.33(a)(1)(iii), (2) and (3), 1208.33(a)(1)(iii), (2) and (3). And, as discussed in Section IV.D.1.i of this preamble, the rule is consistent with INA section 208, 8 U.S.C. 1158. *See* 88 FR at 11707, 11740; 8 CFR 208.33(a)(2), 1208.33(a)(2) (providing for exceptions to applicability of the rebuttable presumption); 8 CFR 208.33(a)(3), 1208.33(a)(3) (providing ways to rebut the presumption of ineligibility). The provided lawful pathways, third country transit components, exceptions to the presumption, and the fact-intensive, case-by-case analysis for rebutting the presumption demonstrate that the condition imposed by this rule is distinct from the ''categorical ban'' enjoined in *East Bay III,* 993 F.3d at 669–70. Notwithstanding this distinction, the Departments reiterate that they disagree with the holding in *East Bay III* that the Proclamation Bar IFR was inconsistent with section 208(a) of the INA, 8 U.S.C. 1158(a). 88 FR at 11739; *see E. Bay III,* 993 F.3d at 670; *see also* Section IV.D.1.i of this preamble.

The rule also does not violate the United States' obligations under international treaties. As discussed in Section IV.D.3 of this preamble, the rule is not a penalty based on manner of entry and does not violate treaty commitments regarding non-refoulement. The Departments also disagree with the decision in *East Bay III* on this point as applied to the Proclamation Bar IFR. 88 FR at 11739; *see East Bay III,* 993 F.3d at 672–75. In any event, *East Bay III* does not render this rule unlawful. In *East Bay III,* the Ninth Circuit determined that the Proclamation Bar IFR ''ensure[d] neither'' ''the safety of those already in the United States'' nor ''the safety of refugees,'' which were the purposes behind the asylum bars in the INA and in the Refugee Convention. 993 F.3d at 673. Conversely, as explained in the NPRM, a purpose of this rule is to reduce reliance on dangerous routes to enter the United States used by criminal organizations and smugglers, thus protecting the safety of refugees. 88 FR at 11707. Furthermore, one of the enumerated categories for rebutting the presumption in the rule is demonstrating that the noncitizen faced an imminent and extreme threat to life or safety at the time of entry into the United States. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). The Ninth Circuit's concerns are therefore not present in this rule.

*Comment:* Relying on cases enjoining the TCT Bar rules and the Proclamation Bar IFR, commenters asserted that the proposed rule is invalid because the condition in the proposed rule is unrelated to the merits of the asylum claim.

*Response:* The Departments disagree that the cases involving the TCT Bar rules demonstrate that this rule is invalid. As discussed in Section IV.D.1.i of this preamble, the INA provides the Departments with the authority to impose limitations or conditions on asylum eligibility. INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). But the statute neither qualifies what types of limitations or conditions may be imposed—except insofar as such limitations or conditions must be consistent with the INA—nor states that any such limitations or conditions must relate to whether the noncitizen has demonstrated or can demonstrate that they meet the definition of a refugee under section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). Indeed, several of the statutory restrictions on asylum eligibility are unrelated to whether the noncitizen has established that they are a refugee within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). *See, e.g.,* INA 208(b)(2)(A)(i), 8 U.S.C. 1158(b)(2)(A)(i) (participating in the persecution of others); INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv) (reasonable grounds for considering the noncitizen a danger to the security of the United States). And section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), provides for the promulgation of ''*additional limitations and conditions.*'' (emphasis added). The existence of exceptions and conditions that are unrelated to the refugee definition both demonstrates that it is lawful for the Departments to promulgate this condition on asylum eligibility and undermines the Ninth Circuit's limitation on scope of any regulatory condition. *E. Bay I,* 994 F.3d at 979. There is no basis to assume that Congress intended to circumscribe the scope of limitations or conditions that the Departments can promulgate when the statute does not do so and Congress itself provided for exceptions unrelated to the meaning of ''refugee'' in section 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). *R–S–C,* 869 F.3d at 1187 n.9 (rejecting a statutory construction that would circumscribe the type of limitations or conditions promulgated under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), because such restrictions ''would render [section] 1158(b)(2)(C) meaningless, disabling the Attorney General from adopting further

---

*implemented on July 16, 2019. See* American Immigration Council, *Your Rights Under Al Otro Lado* v. *Mayorkas, https://www.americanimmigrationcouncil.org/al-otro-lado-mayorkas* (last visited Apr. 21, 2023).

limitations while the statute clearly empowers him to do so.'').

In addition, the rule is not precluded by either *East Bay I* or *East Bay III*. Neither of these decisions require that a condition on asylum eligibility relate to the definition of refugee under section 101(a)(42)(A), 8 U.S.C. 1158(a)(42)(a). Accordingly, the injunctions and vacatur decisions relating to the TCT Bar rules and the Proclamation Bar do not render this rule unlawful.

3. International Law

*Comment:* Commenters expressed concern that the NPRM, if finalized, would violate the United States' non-refoulement obligations under international law, including Article 33 of the Refugee Convention, which the commenters generally explained as prohibiting the return of asylum seekers to a country where their lives or freedom would be threatened on account of a protected ground. Specifically, commenters voiced apprehension that the NPRM would ''bar'' most protection-seeking noncitizens from being eligible for asylum, leaving them able to apply only for statutory withholding of removal or CAT protection. Commenters predicted that many noncitizens would not be able to satisfy the comparatively higher standards of proof for statutory withholding and CAT claims and that, in turn, would lead to the refoulement of persons who, if not for the NPRM's ''bar'' to asylum eligibility, would have been granted asylum.

Applying similar reasoning, some commenters raised that the proposed rule may violate Article 3 of the CAT, which prohibits state parties from returning people to a country where there is sufficient likelihood that they would be tortured. One commenter stated that conditioning asylum based on manner of entry would be in violation of the CAT.

Commenters also argued the rule conflicted with other provisions of the Refugee Convention and Protocol. Commenters noted that Article 31 of the Refugee Convention prohibits states from imposing improper penalties for irregular entry, which commenters argued included administrative penalties and limits on access to asylum. Commenters also stated the proposed rule would violate Article 3, which prohibits non-discrimination, and Article 16, which protects refugees' access to the courts. One commenter stated that the proposed rule is more expansive than the Refugee Convention's exclusion for migrants who secured residency or status in another country.

Relatedly, several commenters pointed to United Nations High Commissioner for Refugees (''UNHCR'') statements and guidance interpreting the Refugee Convention and the Refugee Protocol. Specifically, commenters pointed to UNHCR guidance interpreting those documents as providing that asylum seekers are not required to apply for protection in the first country where protection is available. Further, commenters noted that UNHCR interprets those documents as not requiring refugees to be returned to a country through which they transited. Commenters further noted UNHCR's positions that asylum should not be refused only on the basis that it could have been sought in another country and that asylum seekers should not be required to seek protection in a country to which they have no established links. A commenter also noted that UNHCR has repeatedly denounced attempts to impose similar bans, and that such rules undermine international human rights and refugee law, because the right to seek asylum is a human right regardless of the person's origin, immigration status, or manner of arrival at the border.

Several commenters also argued that the rule violated the United States' obligations under other international documents. Some commenters simply made a general assertion that the rule would violate international treaties and degrade the United States' international standing. Several commenters stated that the proposed rule is contrary to the Universal Declaration of Human Rights (''UDHR''). Commenters argued that the UDHR protects the right to seek asylum, and that any restriction or limitation to access asylum is a violation of the letter and spirit of the UDHR. Other commenters stated that the rule violated the United Nations Convention on the Rights of the Child (''CRC'') because it did not provide for a robust, individualized assessment of a child's asylum claim. One commenter stated that the rule would place migrant children and their families at a higher risk of exploitation and trafficking, in contravention of obligations pursuant to the Optional Protocol on the Sale of Children and the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (''The Palermo Protocol''). Another commenter contended the rule violates Article 7 of the International Covenant on Civil and Political Rights (''ICCPR''), which forbids subjecting individuals to ''torture or to cruel, inhuman or degrading treatment or punishment,'' and violates Article 12, which confirms the rights of individuals to leave any country. Several commenters claimed that the rule would violate anti-discrimination principles in a variety of agreements and declarations including the ICCPR, International Convention on the Elimination of All Forms of Racial Discrimination (''ICERD''), the American Declaration on the Rights and Duties of Man, Vienna Declaration, and San Jose Action Statement. Another commenter stated the proposed rule violates the right to life, human dignity, and equality before the law in the ICCPR because the proposed rule was ''discriminatory'' and establishes ''great inequality.'' Commenters also claimed conflicts with treaties including Article 6 of the Rome Statute of International Criminal Court, which prohibits genocide, and Article 32 of the Geneva Convention.

*Response:* This rule is consistent with the United States' obligations under international law. Three primary documents govern the rights of refugees and corresponding obligations of states in international law: the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. Together, these documents provide a framework for states to provide protection to migrants fleeing persecution or torture and establish the principle of non-refoulement, which prohibits states from returning refugees to territories in specific circumstances. While the United States is a party to the Refugee Protocol and the CAT, these treaties are not directly enforceable in U.S. law. *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.''). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations, and the Protocol ''serves only as a useful guide in determining congressional intent in enacting the Refugee Act.'' *Barapind* v. *Reno,* 225 F.3d 1100, 1107 (9th Cir. 2000). The Refugee Convention's non-refoulement obligation is contained in Article 33.1, which prohibits contracting states from returning a refugee to a territory ''where his life or freedom would be threatened'' on account of an enumerated ground. The United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the

asylum provisions at section 208 of the INA, 8 U.S.C. 1158. *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. The CAT's non-refoulement provision is in Article 3, which prohibits the return of a person to a country where there are ''substantial grounds for believing'' the person will be tortured. The United States implemented its obligations under the CAT through regulations. *See* Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA''), Public Law 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18. The rule does not change or limit eligibility for statutory withholding of removal or CAT protection. Instead, applicants subject to the rule's rebuttable presumption will be screened for eligibility for statutory withholding of removal and CAT protection under a reasonable possibility standard. As explained earlier in Section IV.D.1.iii of this preamble, the reasonable possibility standard is the same standard that has been used to ensure the United States complies with its non-refoulement obligations under international law in withholding-only proceedings for decades.

The rule's rebuttable presumption will limit asylum eligibility for some noncitizens. But as the Supreme Court has explained, asylum ''does not correspond to Article 33 of the Convention, but instead corresponds to Article 34,'' which provides that contracting countries ''shall as far as possible facilitate the assimilation and naturalization of refugees.'' *Cardoza-Fonseca,* 480 U.S. at 441 (quotation marks omitted). Article 34 ''is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible.'' *Id.* Because application of the presumption does not affect eligibility for statutory withholding of removal or protection under the CAT regulations, the rule is consistent with U.S. non-refoulement obligations under the Refugee Protocol (incorporating, inter alia, Article 33 of the Refugee Convention) and the CAT. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that ''the Refugee Convention's non-refoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

The Departments agree that asylum is an important protection in international law and acknowledge that the right to seek asylum has been recognized under the UDHR, Art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). The UDHR is a non-binding human rights resolution of the UN General Assembly, and thus it does not impose legal obligations on the United States. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004) (''[T]he [UDHR] does not of its own force impose obligations as a matter of international law.''). Instead, the right enshrined in the UDHR—''to seek and to enjoy in other countries asylum from persecution,'' UDHR, Art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948)—is also reflected in the non-refoulement provisions of the Refugee Protocol and the CAT. As previously explained, the rule does not impact eligibility for statutory withholding of removal or CAT protection, and accordingly does not implicate the United States' non-refoulement obligations. Moreover, the rebuttable presumption in the rule does not prohibit any person from seeking asylum, statutory withholding of removal, or CAT protection. Instead, the rule creates a condition on eligibility for asylum by creating a rebuttable presumption of ineligibility for those who neither avail themselves of a lawful pathway to the United States nor apply for asylum or seek other protection, and await a decision thereon, in a country they travel through. The rule similarly does not bar those seeking asylum from procedures that protect them from refoulement. All noncitizens processed for expedited removal who express a fear of return are entitled to a credible fear interview. As with any eligibility criteria, the presumption will apply in some cases to limit eligibility for noncitizens based on the individual circumstances presented, including at the credible fear stage. Even in those cases where the AO determines that the noncitizen cannot demonstrate a significant possibility of being granted asylum because the presumption has not been rebutted, the noncitizen may still demonstrate credible fear by showing a reasonable possibility of persecution or torture. Similarly, after applying for asylum before an IJ, if the presumption has not been rebutted, noncitizens may still demonstrate eligibility for statutory withholding of removal or CAT protection.

The rule is also consistent with the Refugee Convention and the corresponding obligations under international law, including specific provisions cited by commenters. The rule does not violate the non-discrimination requirement in Article 3 of the Refugee Convention. Article 3 prohibits discrimination on the basis of ''race, religion or country of origin.'' The rule does not discriminate on the basis of any of these protected characteristics. Instead, it is a rule of equal application based on the actions of the noncitizen. The application of the rule is limited to those circumstances where the noncitizen who is not excepted from its coverage has neither utilized an available lawful pathway nor sought protection and received a decision denying protection in a country traveled through, and cannot demonstrate that the failure to do was excusable under the rule or otherwise rebut the presumptive ineligibility. For the same reason, the rule does not violate other anti-discrimination requirements in international law, including the ICERD, Dec. 21, 1965, 660 U.N.T.S. 195, 212, and the ICCPR, Dec. 16, 1966, 999 U.N.T.S. 171.

Neither is the rule inconsistent with Article 16 of the Refugee Convention. Article 16 establishes that refugees should be given ''free access to the courts,'' and in the country of a refugee's habitual residence, access should be equivalent to that of a national. This enshrines the right of the refugee to sue and be sued in practice—not merely in name—by removing barriers to participating in court such as access to government-provided counsel (where the government otherwise provides it), ensuring court fees are not higher for refugees than nationals, and prohibiting *cautio judicatum solvi,* the practice of requiring a bond for the costs of litigation as a pre-requisite to filing a complaint. *See* Refugee Convention, Art. 16, Travaux Préparatoires & Commentaries. These rights are not implicated by the rule.

Similarly, the rule is not inconsistent with Article 31 of the Refugee Convention, which prohibits states from ''impos[ing] penalties'' on refugees based on ''illegal entry or presence.'' As the commentary to the Refugee Convention explains, the term ''penalties'' in Article 31 refers ''to administrative or judicial convictions on account of illegal entry or presence, not to expulsion.'' Refugee Convention Art. 31, commentary; *see Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017) (rejecting argument that the reinstatement bar to asylum was a ''penalty'' within the meaning of Article 31). The rule does not change any rules or policies relating to detention or convictions for unlawful entry or presence. The Departments acknowledge that the Ninth Circuit concluded in *East Bay III,* 993 F.3d at 674, that the bar to asylum at issue in that case violated Article 31 of the

Refugee Convention because it imposed a ''penalty.'' As described in the NPRM, the rule here does not create a categorical bar to asylum, but instead a rebuttable presumption, and *East Bay III* accordingly does not address the lawfulness of this rule. 88 FR at 11739. Moreover, the Ninth Circuit's conclusion was erroneous because the denial of discretionary relief is not a penalty within the meaning of Article 31. *Id.*

Some commenters correctly observed that the Refugee Convention does not require refugees to apply for asylum in the first country they pass through. This rule, however, does not require noncitizens to apply for asylum in the first—or any—country through which they travel. Instead, the rule applies a rebuttable presumption to certain noncitizens who failed to avail themselves of a lawful pathway. One such pathway is to apply for asylum and receive a final denial in a transit country, but it is not the sole lawful pathway available. Noncitizens who fail to avail themselves of a lawful pathway may still rebut the presumption of ineligibility for asylum. Regardless, the Convention does not require the United States to grant asylum to every person who qualifies as a ''refugee'' under the INA; instead, the United States implements the Convention's prohibitions on refoulement through statutory withholding of removal. UNHCR has stated that ''the primary responsibility to provide protection rests with the State where asylum is sought.'' [200] But UNHCR also acknowledges that ''refugees do not have an unfettered right to choose their 'asylum country.' '' [201]

In any event, UNHCR's interpretations of or recommendations regarding the Refugee Convention and Refugee Protocol are ''not binding on the Attorney General, the BIA, or United States courts.'' *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). ''Indeed, [UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status] itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.' '' *Id.* at 427–28 (quoting *Cardoza-Fonseca,* 480 U.S. at 439 n. 22). Such guidance ''may be a useful interpretative aid,'' *id.* at 427, but it does not create obligations for the United States.

The rule similarly does not violate the United States' obligations under other international laws and treaties, including the Geneva Conventions, the Rome Statute, the ICCPR, the CRC, or customary international law. First, the Geneva Conventions, a series of treaties that regulate the conduct of armed conflict, have no bearing on the rule. Commenters pointed to Articles 32 and 33 of the Fourth Geneva Convention, which prohibit corporal punishment or mass punishment against protected persons. Geneva Convention Relative to the Protection of Civilian Persons in Time of War (''Fourth Geneva Convention''), 12 Aug. 1949, 75 UNTS 287. Under Article 4, ''protected persons'' are limited to those who, during a conflict or occupation, are ''in the hands of a Party to the conflict or Occupying Power.'' As the rule does not implicate a conflict or occupation, there is no conflict with the Geneva Conventions. While at least one commenter pointed to the definition of genocide in Article 6 of the Rome Statute, the United States is not a party to and has no obligations pursuant to the Rome Statute. In any event, the rule plainly does not constitute or involve genocide in any way. *See* Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF.183/9 (1998). Similarly, the United States has not ratified the CRC and thus has no obligations under that instrument, 1577 U.N.T.S. 3, reprinted in 28 I.L.M. 1448, 1456 (Nov. 20, 1989).[202] Again, even if considered customary international law—although the United States maintains that it is not—the CRC requires only that States take appropriate measures to protect children who are refugees. *See* CRC, Article 22. The rule accounts for the interests of children through creating robust screening procedures, exempting unaccompanied children from the application of the rule, having a family unity exception, and exempting certain noncitizens who enter as children from ongoing application of the presumption after the two-year period. Additionally, the adjudicator may consider on a case-by-case basis whether the child's situation presents exceptionally compelling circumstances, including considering the circumstances surrounding the child's manner of entry, thus rebutting the presumption.

4. Recent Executive Orders

*Comment:* Some commenters stated without explanation that the rule is contrary to Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 2, 2021). Other commenters stated that to restore faith in the U.S. asylum system as the Executive Order aims to do, the ''government'' should take various steps, including ''adequately fund[ing] a fair asylum system'' rather than ''wast[e] money on immigration enforcement that separates families, traumatizes children, and tears our communities apart.'' Commenters further stated that the Administration should end the use of expedited removal, increase the scale and pace of refugee admissions, and expand lawful pathways for people ''fleeing from countries with failed government and uncontrolled violence.'' On the other hand, some commenters were critical of the rule because they believed it was not strict enough and, accordingly, averred that the rule is consistent with the Executive Order because it will ''remov[e] barriers to immigration.''

*Response:* As a threshold matter, Executive Order 14012 does not require DOJ or DHS to adopt any specific policies but rather to (1) identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers; (2) identify any agency actions that fail to promote access to the legal immigration system and recommend steps, as appropriate and consistent with applicable law, to revise or rescind those agency actions; (3) submit a plan describing the steps they will take to advance these policies; and (4) submit reports regarding implementation of those plans. 86 FR 8277. Because Executive Order 14012 does not require the adoption of specific policies, the actions taken here do not violate that Executive Order.

To the extent commenters believe that the rule is inconsistent with Executive Order 14012, the Departments disagree. Consistent with Executive Order 14012's promotion of removing barriers to accessing immigration benefits and access to the legal immigration system, DHS has created multiple parole processes to provide certain migrants with pathways to temporarily enter and remain in the United States. During

[200] UNHCR, Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers, para. 3(i) (May 2013), *http://www.refworld.org/docid/51af82794.html.*

[201] UNHCR, Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries, at 1 (Apr. 2018), *https://www.refworld.org/pdfid/5acb33ad4.pdf.*

[202] *See* Status of Ratification, Office of the High Commissioner for Human Rights, *https://indicators.ohchr.org/.*

those periods of stay, those noncitizens may seek asylum and related protection or other benefits for which they may be eligible. The rule furthers the policy discussed in the Executive Order by encouraging noncitizens to use those parole processes, as well as the CBP One app to enter the United States through a safe, orderly process. This rule also discourages unlawful border crossings that overwhelm limited government resources along the SWB. The Departments believe that there will be efficiency gains from having noncitizens pre-register for appointments—saving considerable processing time—and from decreased encounters between POEs with persons who claim a fear of persecution or torture, the processing of whom requires more resources than processing noncitizens who pursue a lawful pathway. It is correct that implementing the rule will increase the duration of some credible fear screenings. However, the Departments expect that fewer individuals with non-meritorious claims will receive positive screening determinations, which will result in a more efficient asylum system overall.

The Departments acknowledge commenters' recommendations to provide additional funding for the asylum system and end expedited removal. Both of those actions are outside the Departments' authority and would require congressional action. Ending the use of expedited removal in the absence of congressional action is outside the scope of this rulemaking. The Departments have considered commenters' recommendation of adding lawful pathways for people leaving countries with failed governments. This rule does not create any lawful pathways and thus the comment is outside the scope of this rulemaking.

*Comment:* Commenters expressed concern that the rule is inconsistent with Executive Order 14010, 86 FR 8267, because they believe it contradicts the instruction to develop policies and procedures for the safe and orderly processing of asylum claims at the U.S. land borders. Commenters stated that rather than developing policies for the safe and orderly processing of asylum claims, the rule instead would restrict the availability of asylum in a way that would make it impossible for most asylum seekers to access the asylum system. Commenters further asserted that rather than restoring faith in the U.S. asylum system, the rule attempts to ''deport refugees to danger based on manner of entry and transit in circumvention of existing refugee law and treaty obligations.'' Commenters also suggested that the rule resurrects the PACR and HARP programs that the Executive Order ended.

Commenters also criticized the Departments for not following ''the collaborative process called for in'' the Executive Order. Specifically, commenters stated that Departments have failed to ''follow Executive Order 14010's mandate to consult with affected organizations'' as they are unaware of any ''consultation or planning'' that has occurred between when the Executive Order was issued and the publication of the NPRM.

*Response:* The Departments disagree with these commenters because the rule, as directed by Executive Order 14010, encourages use of lawful pathways to enter the United States, which will foster safe, orderly, and more efficient processing of asylum claims for those individuals seeking asylum, while discouraging unlawful border crossings that overwhelm limited resources and unfairly delay the adjudication of meritorious claims for asylum and other forms of protection. The rule is designed to incentivize noncitizens to avail themselves of a lawful pathway to enter the United States, which allows for more efficient use of DHS resources. By incentivizing the pursuit of lawful pathways, the Departments are promoting safe and orderly processing along the SWB as Executive Order 14010 instructs—processing that seeks to minimize the role of criminal organizations that prioritize profits over migrants' lives.

The Departments disagree with commenters that the rule resurrects PACR and HARP. Those programs were developed by DHS to promptly address credible fear claims of single adults and family units while the noncitizens remained in CBP custody.[203] This rule, in contrast, does not change the timeline for credible fear screenings. Nor does it affect where noncitizens are located during such screenings. Thus, commenters' comparisons to PACR and HARP are misplaced.

Commenters are similarly mistaken regarding DHS's responsibilities under the Executive Order. Commenters are correct that the Executive Order instructed the Secretary and Director of the CDC, ''in coordination with the Secretary of State, . . . [to] promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United States land borders, consistent with public health and safety and capacity constraints.'' 86 FR at 8269. DHS has worked with NGOs to implement the exceptions to the Title 42 public health Order and continues to seek collaboration through seeking comment on this rule.

*Comment:* Some commenters stated that the rule violates Executive Order 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 2, 2021), and amounts to the legalization of family separation, in contravention of that Executive Order.

*Response:* In Executive Order 14011, President Biden announced the creation of a task force to identify children who were separated from their families between January 20, 2017, and January 20, 2021, and, among other things, to the greatest extent possible, facilitate and enable the reunification of those children with their families. 86 FR at 8273. In doing so, President Biden stated that his Administration ''will protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law.'' *Id.* The rule is consistent with this policy statement. The rule includes multiple provisions aimed at ensuring that families who enter the United States from Mexico at the SWB or adjacent coastal borders are not inadvertently separated. For example, where an exception or rebuttal circumstance applies to one member of a family, it is applied to all members of the family. *See* 8 CFR 208.33(a)(2)(ii), (3)(i), 1208.33(a)(2)(ii), (3)(i). And where asylum is denied to a noncitizen because of the presumption of ineligibility but one member of the noncitizen's family who traveled with the noncitizen obtains protection from removal through statutory withholding of removal or CAT, the circumstance will be deemed exceptionally compelling for the noncitizen denied such relief, allowing the family to remain together. *See* 8 CFR 1208.33(c). Finally, as described in Section IV.E.7.ii of this preamble, the Departments have expanded the family unity provision to cover spouses and children who would be eligible to follow to join the applicant if that applicant were granted asylum, as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A). 8 CFR 1208.33(c). Such measures were adopted in accordance with Executive Order 14011 to ensure that family units will not be separated as a result of this rule.

[203] *See* Mem. of Law in Opp'n to Pls.'s Mot. for Summ. J. & in Supp. of Defs.' Cross-Mot. for Summ. J. at 8–11, *Las Ams. Immigrant Advoc. Ctr.* v. *Wolf,* No. 19-cv-3640 (D.D.C. Feb. 6, 2020).

*Comment:* Commenters stated that the Departments should take into account Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 86 FR 7009 (Jan. 20, 2021), and the more recent Executive Order 14091, Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 88 FR 10825 (Feb. 16, 2023), and stated that the agencies have not considered these underserved populations and that this rule is evidence that these Executive Orders were not considered in the rule-making process. Commenters more broadly criticized the rule as ''betraying promises'' made in the Executive Orders because they believe the rule will have a disproportionate effect on certain groups of noncitizens and argued that the rule is generally out of line with the Executive Orders. Commenters also suggested that ''[o]verly relying on the [CBP One] app . . . will significantly thwart the Biden administration's stated commitment to racial justice and equity.'' Commenters further stated that the rule undermines the commitment in the Executive Orders and ''will endanger Black, Brown, and Indigenous asylum seekers.'' Commenters asserted that the rule ''will perpetuate systemic and institutional racism and injustice,'' noting concerns about the accessibility of the CBP One app for those who speak languages other than English, Spanish, and Haitian Creole; ''the app's widely reported misidentification of people of color''; the exacerbation of ''existing discrepancies in outcome[s] for individuals without legal representation''; and the ''further solidif[ication of] inequities and injustice in our immigration system.''

*Response:* On President Biden's first day in office, January 20, 2021, he issued Executive Order 13985. On February 16, 2023, he issued Executive Order 14091, which reiterated the policy goals detailed in Executive Order 13985 and discussed the ways in which those policy goals had been furthered since that Executive Order. Both Executive Orders describe President Biden's policy of ''advancing equity for all, including communities that have long been underserved, and addressing systemic racism in our Nation's policies and programs.'' 88 FR at 10825. As discussed throughout this preamble, the Departments have designed the rule to include a tailored rebuttable presumption in order to address a specific problem along the SWB. As discussed in Section IV.B.4.vi of this preamble, the Departments do not have any discriminatory purpose in adopting the rule. The Departments have addressed concerns about the disparate impact of the rule on various communities in Section IV.B.4 of this preamble, the concerns relating to the CBP One app's liveness software are addressed in Section IV.E.3.ii of this preamble, and concerns about pro se individuals are discussed in Section IV.B.5.ii of this preamble. Finally, as discussed in Section IV.E.3 of this preamble, the rule provides an exception to the application of the rebuttable presumption for those who appear at a POE without a pre-scheduled appointment and for whom scheduling an appointment was impossible due to a language barrier. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

5. Other Comments on Legal Authority

*Comment:* One commenter noted that the proposed rule ''is not a legislative act'' and is instead subject to the Administrative Procedure Act, but ''the persons to whom the rule applies are excluded from appearing within the USA to challenge the administrative requirement for exhaustion of remedies.''

*Response:* The Departments agree that this rule is not a legislative act but instead the promulgation of agency regulations pursuant to the APA. The Departments disagree that the rule implicates or changes the exhaustion requirements in administrative law. The Departments note that the rule does not apply to noncitizens in other countries; the rule only applies to noncitizens who enter the United States and thereafter file applications for asylum. Put differently, it will only apply to noncitizens within the United States, who are not precluded from filing an APA challenge by virtue of being outside of the United States, but who may be limited in the types of challenges they can bring to its application during the credible fear process under section 242(e) of the INA, 8 U.S.C. 1252(e). The Departments further note that noncitizens who avail themselves of a lawful pathway to enter the United States will not otherwise need to address the provisions of this rule, as any subsequently filed asylum application will not be subject to the rebuttable presumption. Any noncitizen subject to the rebuttable presumption will be able to address its application to them and any applicable exceptions or rebuttal grounds before an AO or IJ, and in any available administrative appeal. Thus, the commenter's concern about being able to bring an APA challenge from a foreign jurisdiction are unfounded.

*Comment:* Commenters stated that litigation over and injunctions against the rule would only exacerbate the confusion at the SWB.

*Response:* As explained previously in Section IV.D of this preamble, the Departments believe this rule is lawful and that it should not be subject to an injunction or otherwise halted in litigation. To the extent it is possible that the rule will be halted or enjoined, the Departments believe the risks are outweighed by the need to ensure safe and orderly processing at the SWB.

*Comment:* Commenters stated that the proposed rule was silent as to retroactive applicability and urged the Departments to ''make an affirmative pronouncement'' that the rule will not apply retroactively. Commenters were specifically concerned about the rule applying to ''anyone whose latest entry into the United States was prior to the effective date(s) of the rule,'' which commenters stated is required by section 551(4) of the APA, 5 U.S.C. 551(4). Commenters further raised concerns that application of the rule to those who enter before its effective date would ''infringe upon due process rights.''

*Response:* As written, the rule will not apply to anyone who enters the United States before the rule is effective. The Departments believe the NPRM's proposed language and the final language in this rule clearly provide that the rebuttable presumption may only be applied to those who enter the United States between the rule's effective date and a date 24 months later. *See* 8 CFR 208.13(f), 208.33(a)(1)(i), 1208.13(f), 1208.33(a)(1)(i). The Departments decline to address the applicability or requirements of due process or the APA in this regard because the rule is explicit that it is only potentially triggered by entries that take place after its effective date.

*Comment:* A commenter argued that the proposal fails to account for ''refugees''' reliance interests. The commenter wrote that refugees have an interest and right against refoulement and in the United States upholding domestic and international refugee law generally. The commenter argued that the Departments only have ''circumscribed'' discretion in administering asylum, citing INA 208, 8 U.S.C. 1158, and case law on establishing refugee status, and thus that refugees have a cognizable reliance interest in asylum.

*Response:* As described earlier in Section IV.D.3 of this preamble, the United States implements its non-

refoulement obligations through statutory withholding of removal, not asylum. Thus, it is incorrect to suggest that the non-refoulement obligations can raise a reliance interest in asylum. Additionally, asylum is a discretionary form of relief to which no applicant is entitled. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (''The Secretary of Homeland Security or the Attorney General may grant asylum . . . .''). Although ''longstanding policies may have 'engendered serious reliance interests that must be taken into account,''' *Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 222 (2016) (quoting *Fox Television,* 556 U.S. at 515), the commenter does not explain in what way noncitizens who are outside the United States have relied upon U.S. asylum law. To the extent noncitizens outside the United States have any cognizable reliance interests in the current rules governing asylum, the Departments believe those interests would be outweighed by the interest in incentivizing noncitizens to pursue safe, orderly, and lawful pathways to seek protection, and preventing a potential surge of migration at the southern border that threatens to overwhelm the Departments' ability to process asylum claims in a safe and orderly manner.

*Comment:* Commenters stated that the rule would violate the *Pangea* injunction. *See Pangea Legal Servs.* v. *DHS,* 512 F. Supp. 3d 966 (N.D. Cal. 2021).

*Response:* The court's order preliminarily enjoining the implementation of Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020) (''Global Asylum Rule'') and related policies in *Pangea II,* 512 F. Supp. 3d 966, does not prohibit the Departments from issuing this rule or otherwise limit the Departments' discretionary authority to adopt new asylum limitations consistent with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *See, e.g., Milliken* v. *Bradley,* 433 U.S. 267, 281–82 (1974) (''The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the [alleged wrongful conduct] itself.''); *Meinhold* v. *U.S. Dep't of Def.,* 34 F.3d 1469, 1480 (9th Cir. 1994); *see also Thomas* v. *Cty. of Los Angeles,* 978 F.2d 504, 509 (9th Cir. 1992) (reversing injunction that ''fail[ed] to specify the act or acts sought to be restrained as required by'' Federal Rule of Civil Procedure 65(d)).

### *E. Comments on the Rule Provisions*

#### 1. General Feedback on the Rebuttable Presumption of Ineligibility

*Comment:* Commenters expressed concern that the requirements to overcome the presumption would deprive asylum seekers of a meaningful opportunity to seek protection, subject them to removal if they could not meet the elevated standard for statutory withholding of removal, and put them at risk of violence or other harmful conditions. Commenters said that the proposed rule would require noncitizens to gather evidence and present arguments to rebut the presumption against asylum eligibility, establish an exception, or prove that they are not subject to the rule. Some said it would be difficult or impossible for noncitizens arriving at the SWB to do so, given that most are detained during credible fear proceedings; that they may lack access to supporting documentation; that CBP officers may confiscate their property; and that the determination is made in a single interview. Therefore, commenters stated, the rule would categorically deny relief, bar asylum, or result in ''automatic ineligibility'' for most or all noncitizens who would be subject to it. Commenters stated that noncitizens would be at the mercy of the AOs' credibility assessment and discretion. Some commenters said there was no indication that AOs would have to elicit relevant testimony and suggested this requirement should be included in the rule. One commenter wrote that individuals who have previously experienced any of the per se exemptions for rebuttal may still be experiencing long-lasting effects that limit their ability to rebut the presumption in the present. A commenter stated that children and families would be unable to rebut the presumption due to limited language access, absence of legal counsel, and having their belongings confiscated.

Some commenters said that the grounds for rebutting the presumption against asylum eligibility were too narrow, limited, or extreme and did not relate to the merits of an asylum claim; they recommended that the grounds be expanded. One commenter stated that the current examples of exceptionally compelling circumstances would not protect the vast majority of refugees who would qualify for asylum under U.S. law, including many who enter the United States without an appointment due to safety risks, medical issues, and other protection needs. Some stated that narrow terms like ''exceptionally compelling,'' ''imminent and extreme,'' and ''severe'' made the presumption too difficult to rebut, while others expressed concern about the perceived vagueness of these terms and said the rule provided inadequate guidance on them. One commenter wrote that the nature of the grounds and exceptions make them inherently difficult to corroborate with physical evidence. One commenter expressed concerns that the proposed means of rebuttal do not reference a subjective component, such as where the asylum seeker believed they faced an acute medical emergency or imminent and extreme threat. A legal services provider compared the proposed rule to the one-year deadline to apply for asylum and stated that the one-year deadline allows for even greater opportunities for rebuttal by allowing an individual to show a number of exceptional circumstances beyond those in the NPRM. Some commenters expressed concern about possible lack of clarity in the evidentiary requirements to rebut the presumption against asylum eligibility. Some stated that the lack of definitions and documentary evidence requirements in the NPRM would leave the adjudicator with an inordinate amount of discretion to decide whether the presumption had been rebutted. Some commenters urged the Departments to reverse the presumption or apply a rebuttable presumption of eligibility for torture survivors.

*Response:* The Departments acknowledge these concerns but disagree with them. As discussed throughout Section IV.B.5 of this preamble, AOs conducting credible fear interviews have an affirmative duty to elicit all testimony relevant to assessing eligibility for protection, which will necessarily include testimony relevant to the rebuttable presumption.[204] Similarly, credible fear review by an IJ ''include[s] an opportunity for the alien to be heard and questioned by the [IJ].'' INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). In section 240 proceedings, IJs have a duty to develop the record, which again will necessarily include facts and testimony relevant to the rebuttable presumption. 8 CFR 1003.10(b) (''[IJs] shall administer oaths, receive evidence, and interrogate, examine, and cross-examine aliens and any witnesses.''); *Quintero* v. *Garland,* 998 F.3d 612, 626 (4th Cir. 2021). A noncitizen may be able to satisfy their burden of proof through credible testimony alone, INA 208(b)(1)(B)(ii), 8

[204] USCIS, *Eliciting Testimony;* USCIS, *Non-Adversarial Interview* 13 (''You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.'').

U.S.C. 1158(b)(1)(B)(ii), and the rule does not require any particular evidence, including documentary evidence, to rebut or establish an exception to the presumption under 8 CFR 208.33(a) and 1208.33(a).

The Departments believe that the exceptions to and means of rebutting the presumption are appropriate in scope and detail and that they need not be expanded by, for example, incorporating means of rebuttal similar to the exceptions to the one-year deadline for applying for asylum. To the extent that, at the time of entry, a noncitizen reasonably believed that they faced an acute medical emergency or imminent and extreme threat to life or safety, the rule permits adjudicators to consider whether this situation may constitute an ‘‘exceptionally compelling circumstance[.]’’ 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). As to concerns about disparate application amongst AOs, all credible fear determinations undergo supervisory review to ensure consistency, 8 CFR 208.30(e)(8), and noncitizens can request IJ review of a negative determination, 8 CFR 208.33(b), 1208.33(b). Determinations made by IJs in section 240 proceedings, including determinations about the presumption, are subject to review by the BIA. *See* 8 CFR 1003.1(b). Comments regarding AO and IJ conduct and training are further addressed in Section IV.B.5.iii of this preamble. The Departments decline to ‘‘reverse’’ the presumption of ineligibility for certain cases, which would function as an additional exception to the rule and undermine the rule's goal of incentivizing migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States or seek asylum or other protection in another country through which they travel. However, even if ineligible for asylum due to the presumption against asylum eligibility, noncitizens who establish a reasonable possibility of persecution or torture, 8 CFR 208.33(b)(2)(i), 1208.33(b)(2)(ii), remain eligible to apply for statutory withholding of removal and protection under the CAT. 8 CFR 208.16.

*Comment:* Commenters expressed opposition to the proposed requirement that noncitizens satisfy the preponderance of the evidence standard to rebut the presumption of ineligibility. Commenters stated that using the preponderance of the evidence standard violates section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v), by imposing a different, higher standard than the ‘‘significant possibility’’ standard. Citing a 1996 statement from U.S. Senator Orrin Hatch, one commenter stated that the application of the ‘‘preponderance of the evidence’’ standard during the credible fear stage was considered and rejected by Congress and that the Departments lack the authority to resurrect and implement that standard through regulation. Some commenters emphasized that the ‘‘significant possibility’’ standard is an intentionally low screening standard for credible fear interviews established by Congress. Some commenters stated that the ‘‘preponderance of the evidence’’ standard is even higher than the ‘‘reasonable possibility’’ standard to show a well-founded fear, which in turn is higher than the ‘‘significant possibility’’ standard. Some commenters stated that the ‘‘preponderance of the evidence’’ standard imposes too high a burden on noncitizens in credible fear proceedings. Commenters said it would be particularly difficult for detained, unrepresented individuals to satisfy this burden or that the rule would be hardest on disadvantaged noncitizens. One commenter recommended that this heightened standard of proof not be implemented and that the existing standard of proof be revised for consistency with international norms to exclude only cases that are ‘‘manifestly unfounded or clearly abusive.’’

*Response:* Commenters' concerns are based on an incorrect premise. At the credible fear stage, AOs will apply the ‘‘significant possibility’’ standard in assessing whether a noncitizen may ultimately rebut the presumption of asylum ineligibility by a preponderance of the evidence during a full merits adjudication. Because the ‘‘significant possibility’’ standard is set by statute, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the Departments lack the authority to alter it through rulemaking. For further discussion of this issue, see Section IV.D.1.iii of this preamble.

*Comment:* Commenters stated that applying the rule's presumption of ineligibility at the credible fear stage is different from how other eligibility bars function in credible fear determinations. Some commenters stated that the complex means of rebuttal would require a lengthy, fact-based interview and ‘‘intensive factual analysis,’’ which they claimed are not appropriate for credible fear interviews because those interviews offer insufficient procedural protections. Another commenter stated that the Departments recently recognized due process problems with this approach when they rescinded the requirement that certain mandatory bars to asylum be considered at the credible fear screening stage.

One commenter expressed concern with the perceived discretion of border officials during the proposed rebuttable presumption process, asserting that the NPRM gave no clear indication of how, when, or in front of whom the asylum seeker will have to present their evidence. One commenter stated that DHS has a poor track record of making similar determinations in the past, citing instances where noncitizens were erroneously enrolled in the MPP, and stated that DHS has historically failed to effectively screen asylum seekers for certain characteristics and processes. One commenter stated that, under the NPRM, AOs would determine whether individuals presented at the SWB without documents sufficient for lawful admission pursuant to section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), but that AOs do not receive the same training as CBP officers regarding that section.

*Response:* The Departments acknowledge that statutory bars to asylum eligibility have not historically applied at the credible fear stage. However, the Departments have authority to apply conditions on asylum eligibility at that stage. The INA authorizes AOs to assess whether there is a significant possibility that the noncitizen could establish eligibility for asylum, INA 235(b)(1)(v), 8 U.S.C. 1225(b)(1)(v), which may include additional eligibility conditions that the Departments establish by regulation, *see* 88 FR at 11742. Moreover, the Departments believe that the rebuttable presumption of ineligibility under this rule is less complex than the mandatory bars provided in section 208(b)(2)(A) of the INA, 8 U.S.C. 1158(b)(2)(A) (barring from asylum eligibility noncitizens (1) who have participated in persecution; (2) who have been convicted of a particularly serious crime; (3) for whom there are serious reasons to believe committed a serious nonpolitical crime; (4) for whom there are reasonable grounds to regard as a danger to the United States; (5) who are described under certain provisions relating to terrorist activity; or (6) who were firmly resettled before coming to the United States). Also, most of the facts relevant to the applicability of, exceptions to, and means of rebutting the presumption involve circumstances at or near the time of the noncitizen's entry. Because credible fear interviews occur near the time of entry when the events and circumstances giving rise to the presumption's exceptions and rebuttal grounds occur, the Departments believe noncitizens will have a sufficient opportunity to provide testimony regarding such events and

circumstances while they are fresh in noncitizens' minds. Furthermore, delaying application of the presumption against asylum eligibility until the final merits stage would undermine the Departments' goals of incentivizing migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States or seek asylum or other protection in another country through which they travel.

This rule provides that AOs and IJs, not CBP officers, will assess whether noncitizens are subject to the rule's presumption of asylum ineligibility and can rebut the presumption. 8 CFR 208.33(b), 1208.33(b). Also, the Departments note that the ''significant possibility'' standard applied at the credible fear stage is lower than the ''more likely than not'' standard that was used by DHS to assess whether a noncitizen could be returned to Mexico pursuant to the MPP.[205] The Departments disagree that the rule requires AOs to assess whether noncitizens are inadmissible under section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), and subject to expedited removal. CBP officers will continue to determine whether a noncitizen is subject to, and will be placed in, expedited removal.

*Comment:* Commenters stated that the term ''rebuttable presumption'' as used in the rule is misleading and inaccurate and that the rule instead creates an outright bar with exceptions.

*Response:* The Departments believe that the description of the rule's main provision as a rebuttable presumption accurately reflects the operation of that provision, including the availability of exceptions and bases to rebut the presumption. Unlike the TCT Bar Final Rule, which included only narrow, categorical exceptions to its application, under this rule, if the noncitizen is not exempted from this rule's application, the lawful pathways condition may be rebutted where the noncitizen demonstrates to the adjudicator's satisfaction that exceptionally compelling circumstances are present. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). Because a noncitizen to whom the condition applies and for whom an exception is not available under 8 CFR 208.33(a)(2), 1208.33(a)(2), may nevertheless avoid its effect in certain non-categorical circumstances, the Departments believe that referring to it as a ''rebuttable presumption'' is accurate.

2. Grounds for Rebutting the Presumption

i. Acute Medical Emergency

*Comment:* Commenters expressed concerns regarding the acute medical emergency means of rebuttal. One commenter asserted that this was a novel concept under immigration law and that the NPRM's description of this ground of rebuttal made clear that this standard is designed to be impossible to meet. Some commenters stated that the proposed rule failed to provide definitions or guidance to inform assessments of what constitutes an acute medical emergency. Some commenters wrote that this means of rebuttal should include non-life-threatening and other non-medical needs. One commenter, who is a doctor, stated that the definition of ''medical emergency'' should include curable conditions that would be fatal in the short term and conditions that could be commonly treated in the United States to restore health and function, assuming that sufficient care would not be available in the originating country. Commenters expressed concern regarding how people living with HIV will be assessed under this provision, given that their condition could lead to a life-threatening emergency without treatment. Commenters also expressed concern that the proposed rule gave inadequate consideration to the unique attributes of children's physical and mental health and noted that signs differentiating a child with illness from one with severe illness are quite subtle. Some commenters also expressed concern that the proposed rule would not require that children be assessed by trauma-informed physicians. Another commenter expressed concerns that the rule would not account for potential emergencies for pregnant women.

Some commenters stated that the ''preponderance of the evidence'' standard for establishing an acute medical emergency is too high. Commenters said that the rule did not explain how an individual would prove that their medical issue was ''acute,'' and one stated that this determination is possible only after medical care is already being provided. Some commenters stated that noncitizens may lack medical documentation or knowledge of the severity of their condition and that AOs and IJs are not medical experts with the required expertise to evaluate these types of medical issues. Other commenters stated that the proposed rule does not specify which officials will be making this determination or whether any medical training or expertise would be required. Commenters expressed concerns that asking immigration officials to make medical assessments would yield inconsistent application of the rebuttable presumption and undermine the welfare of asylum seekers. Commenters expressed concern that this means of rebutting the presumption would require noncitizens to share private details about their medical histories and bodies with a stranger on the phone. One commenter said that an individual may not know that they are suffering an acute medical emergency, while another stated that a noncitizen's medical condition could worsen by the time that the AO decides whether the presumption has been rebutted. Some commenters added that the rule should specify what would occur in scenarios where families rebut the presumption based on the acute medical emergency ground and the individual with the medical emergency subsequently dies or the individual lacks access to medical care to address their medical emergency.

Commenters said that CBP had denied Title 42 health exceptions to those with acute medical needs, despite extensive documentation of their conditions, which raised the concern that the term ''acute medical emergency'' would also be applied stringently under the rule. Another commenter stated that the rule would ''restrict access to medical care and humanitarian aid if asylum seekers are denied by CBP,'' which would impede the gathering of evidence needed to rebut the presumption of asylum ineligibility.

Another commenter expressed concern that an acute medical emergency may also be easy to feign or fabricate, though the commenter did not provide any example of how that could be done.

*Response:* The Departments believe the acute medical emergency means of rebuttal at 8 CFR 208.33(a)(3)(i)(A) and 1208.33(a)(3)(i)(A), is drafted so that those noncitizens with acute medical emergencies can rebut the condition on asylum eligibility. In general, as stated in the NPRM, acute medical emergencies include situations in which someone faces a life-threatening medical emergency or faces acute and grave medical needs that they cannot adequately address outside of the United States. *See* 88 FR at 11723. If a noncitizen rebuts the presumption based on the acute medical emergency of a family member with whom they were traveling, the noncitizen's

[205] USCIS, *PM 602–0169, Policy Memorandum: Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (Jan. 28, 2019), *https://www.uscis.gov/sites/default/files/document/memos/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf.*

eligibility for asylum will not change if the family member who faced the medical emergency subsequently passes away; this is because the language of the rebuttal circumstance focuses on whether the family member faced an acute medical emergency "at the time of entry." 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i).

The Departments believe that, in general, broadening this means of rebuttal would undermine the purpose of the rule, which is to incentivize noncitizens to utilize lawful, safe, and orderly pathways of migration. A medical condition that is not an acute emergency would not ordinarily or necessarily justify failing to pursue a lawful pathway. However, while an acute medical emergency is a per se example of an exceptionally compelling circumstance to rebut the presumption of ineligibility, AOs and IJs may determine, on a case-by-case basis, whether less severe health-related situations also qualify as "exceptionally compelling circumstances." *See* 8 CFR 208.33(a)(3), 1208.33(a)(3).

The Departments also disagree with comments concerning the ability of AOs and IJs to properly assess this rebuttal ground and the ability of noncitizens to establish it. As discussed in Section IV.D.1.iii of this preamble, AOs will apply the "significant possibility" standard during credible fear interviews to determine whether a noncitizen would be able to rebut the presumption because they faced an acute medical emergency at the time of entry. Again, the Departments emphasize that noncitizens may be able to rebut the presumption of asylum ineligibility through testimony alone, and the rule does not require any particular evidence to rebut the presumption under 8 CFR 208.33(a)(3) and 1208.33(a)(3). AOs are trained to elicit all relevant testimony in a non-adversarial manner, which will necessarily include testimony related to this ground for rebuttal.[206] As discussed earlier in Section IV.B.5.iii.a of this preamble, AOs frequently assess physical and psychological harm when adjudicating asylum applications and are trained to do so in a sensitive manner. As discussed in Section IV.B.5.iii.c of this preamble, the rule does not require adjudicators to make a formal medical diagnosis or analyze whether a noncitizen meets specific medical criteria to determine whether a noncitizen has rebutted the rule's condition on eligibility. Instead, adjudicators will make a factual determination of whether an acute medical emergency existed at the time of entry. 8 CFR 208.33(a)(3)(i)(A), 1208.33(a)(3)(i)(A). To the extent that a noncitizen experienced such a medical emergency during their time in CBP custody, AOs may be able to consult CBP records. Specifically, if a noncitizen experiences a medical issue during their time in CBP custody, CBP medical staff will evaluate the noncitizen, and, if appropriate based on the severity of the issue, refer them to a local medical facility. This treatment would be documented.[207] Regarding the concerns raised about sharing private medical details, noncitizens in credible fear proceedings, as discussed in Section IV.B.5.v of this preamble, are advised of the confidential nature of the interview. As noted earlier in Sections IV.B.5.i and IV.E.1 of this preamble, credible fear determinations undergo multiple levels of review to ensure consistency, and decisions made in section 240 proceedings are subject to administrative appeal.

The Departments note that, like all exceptionally compelling circumstances, AOs in credible fear proceedings or IJs in immigration court, not CBP officers at POEs, will determine whether a noncitizen faced an acute medical emergency. Accordingly, to the extent commenters are concerned by how CBP officers have considered medical issues in the context of the application of the Title 42 public health Order, such concerns are inapplicable to this rule. Additionally, CBP will process all noncitizens who arrive and seek admission at a POE without regard to whether the presumption may ultimately be found to apply.

Regarding concerns of fraud, the commenter did not provide any explanation or example of how an acute medical emergency would be easy to fabricate, and AOs and IJs will assess the credibility of any claims that the noncitizen faced an acute medical emergency. INA 208(b)(1)(B)(2), 8 U.S.C. 1158(b)(1)(B)(2); INA 240(c)(4)(B), 8 U.S.C. 1229a(c)(4)(B); 8 CFR 208.30(e)(2).

ii. Imminent and Extreme Threat to Life and Safety

*Comments:* Commenters expressed concern over the high level of risk required to rebut the presumption based on an imminent and extreme threat to life and safety. Some commenters stated this means of rebuttal requires a higher degree of risk than is required for eligibility for asylum or statutory withholding of removal. One commenter stated that it would require migrants to "predict the future" in deciding whether to wait for an appointment at the border, which can be dangerous because violence happens randomly and unexpectedly. Some said that, if an asylum seeker is forced to remain in Mexico until a threat is imminent, it may well be too late to avoid such harm, thus putting the person in a "catch-22." A commenter stated that the rule appears to exclude anyone who has already been gravely harmed while in Mexico but who cannot prove that another harm is "imminent," while others recommended that if an individual circumvents other pathways to cross the U.S.-Mexico border due to the severity of past threats or harms, the "imminent and extreme threat" ground should automatically apply. Another commenter stated that, due to the complicated and lengthy regulatory definition of torture, that term should be replaced with "severe pain or suffering."

Commenters also expressed concern about the ability for specific populations to meet this rebuttal ground. Commenters stated that the rule forces LGBT and HIV-positive people, who already face significant hostility in Mexico, to put themselves in even worse danger to satisfy the imminence requirement of the "imminent and extreme" ground for rebuttal. Commenters wrote that this rebuttal ground should be broadened so that adjudicators may favorably consider circumstances involving threats to life or safety that might not necessarily be considered imminent or extreme. For example, one commenter noted that there are many forms of gender-based harm that are unlikely to meet the requirement that the threat to life or safety is "imminent and extreme" because such forms of harm are not always highly violent acts. One commenter wrote that pervasive discrimination or physical abuse—as, for example, experienced by LGBT individuals in Mexico, where discrimination against such persons is still commonplace—would not meet the threshold of "imminent and extreme threat to life and safety" if experienced in either a transit country or their home country. The commenter also stated that individuals forced to hide their identity

[206] USCIS, *Eliciting Testimony* 12 ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information."); USCIS, *Non-Adversarial Interview* 13 ("You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.")

[207] CBP, *Directive 2210–004, Enhanced Medical Support Efforts* (Dec. 31, 2019), *https://www.cbp.gov/document/directives/directive-2210-004-cbp-enhanced-medical-efforts.*

to avoid discrimination would be hindered in their ability to meet this ground for rebuttal.

Commenters expressed concern that noncitizens would not have sufficient evidence to show an ''imminent and extreme'' threat to rebut the presumption. Similar to their comment regarding the ''acute medical emergency'' means of rebuttal, one commenter asserted that the ''imminent and extreme'' threat means of rebuttal is a novel concept under immigration law and that the description of this ground of rebuttal in the NPRM made clear that this standard is designed to be impossible to meet. One commenter stated that proving a specific threat may be near impossible because individualized threats are frequently made orally and in person, not in writing, and hence are not amenable to proof in a formalized setting. The commenter also stated that such threats are usually directly followed by the harm itself. One commenter wrote that the most deserving individuals in the asylum process will be hard-pressed to produce evidence of an ''imminent threat'' because persecution frequently does not leave documentary evidence. A few commenters emphasized that survivors of sexual assault would face extreme difficulty in obtaining documentation to meet the evidentiary burden from another country unless they had others assisting them; some survivors, for example, may have only their own account of the assault. A legal services provider expressed concern that survivors of violence would not necessarily have the proof, language, or support needed to explain what imminent danger they faced, leading to the denial of bona fide asylum claims and the refoulment of individuals facing extreme persecution.

Commenters expressed concerns that the lack of definition of an ''extreme and imminent threat to life or safety'' left adjudicators with an inordinate amount of discretion. One commenter stated that asylum seekers in Mexican border regions so often face a serious risk to their safety that it is unclear what an asylum seeker would need to show to establish an ''imminent and extreme'' threat to life. Commenters expressed concern that this ground of rebuttal calls for a subjective assessment of the temporality and qualitative extremity of the threats faced by asylum seekers, which may exclude many genuine refugees.

Other commenters stated concerns that this means of rebuttal was overly broad or would lead to fraud. One commenter said that AOs and IJs would have difficulty determining whether someone has fabricated evidence to support a claim that they faced an imminent threat to life or safety, especially when strong evidence exists that migrants who travel to the U.S.-Mexico border by way of smuggling networks are frequently subject to such violence. Another commenter stated that the journey to the southwest border of the United States is inherently a journey where migrants will face extreme threats to life and safety from beginning to end; adding this means of rebuttal would thus exempt the entire population of migrants who have traveled with the assistance of smugglers and other criminal enterprises.

*Response:* The Departments acknowledge these concerns but believe that only imminent and extreme threats to life or safety should constitute a per se ground to rebut the presumption of asylum ineligibility. For threats that are less imminent or extreme, noncitizens may attempt to demonstrate on a case-by-case basis that they otherwise present ''exceptionally compelling circumstances'' that overcome the presumption of ineligibility. Including lesser threats in the per se grounds for rebuttal would undermine the Departments' goal of incentivizing migrants to use lawful, safe, and orderly pathways to enter the United States or seek asylum or other protection in another country through which they travel.

As noted in the NPRM, threats cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer posed an immediate threat at the time of entry. 88 FR at 11707 n.27. The term ''extreme'' refers to the seriousness of the threat; the threat needs to be sufficiently grave, such as a threat of rape, kidnapping, torture, or murder, to trigger this ground for rebuttal. *Id.* Where the noncitizen is a member of a particularly vulnerable group (*e.g.,* LGBT or HIV-positive people), their membership in such a group may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry. In response to the recommendation that the word ''torture'' be replaced with ''severe pain and suffering,'' the Departments note that the imminent and extreme threats to life and safety listed in the rule are not exhaustive and that this means of rebuttal may in certain circumstances encompass imminent and extreme threats of severe pain and suffering.

The Departments disagree that noncitizens will have to ''predict the future'' to rebut the presumption against asylum in this manner. For this per se rebuttal ground to apply, the noncitizen must demonstrate there was an imminent and extreme threat to life or safety, not that the feared harm was actively taking place or certain to occur. *See* 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). The Departments also note that ''imminent'' and ''extreme'' are standards that are commonly used in asylum adjudications. *See, e.g., Fon* v. *Garland,* 34 F.4th 810, 813 (9th Cir. 2022) (''[P]ersecution is an extreme concept'' (quoting *Ghaly* v. *INS,* 58 F.3d 1425, 1431 (9th Cir. 1995))); *Li* v. *Att'y Gen. of U.S.,* 400 F.3d 157, 164 (3d Cir. 2005) (''[U]nfulfilled threats must be of a highly imminent and menacing nature in order to constitute persecution'' (citing *Boykov* v. *INS,* 109 F.3d 413, 416–17 (7th Cir. 1997))). As already discussed in Section IV.E.1 of this preamble, noncitizens may be able to rebut the presumption against asylum eligibility through credible testimony alone. In response to commenter concerns about inconsistent application of the rule, the Departments note that an AO's decision is subject to supervisory and potentially IJ review, and determinations made in section 240 proceedings may be administratively appealed.

The Departments acknowledge commenters' concern about fraud, but during credible fear screenings, AOs will assess the credibility of a noncitizen's testimony regarding dangers faced at the time of entry, which will necessarily include an evaluation of the whether a claimed threat is fraudulent. As discussed earlier in Section IV.D.1.iii of this preamble, whether a noncitizen is able to establish an exception to the rule or rebut the presumption will generally involve a straightforward analysis, and the Departments expect that, except in rare cases, application of the ''significant possibility'' standard will not meaningfully differ from application of the ultimate merits standard. The Departments believe that this ground of rebuttal is sufficiently narrow to prevent broad application to all citizens who attempt to enter the United States from Mexico across the SWB or adjacent coastal borders.

iii. Other Exceptionally Compelling Circumstances

*Comment:* Some commenters stated that the provision allowing a noncitizen to show ''exceptionally compelling circumstances'' to rebut the presumption was not sufficiently defined and hence that applying it would lead to disparate results amongst adjudicators. One commenter stated that

the rule does not clarify whether the exceptionally compelling circumstance must be one that prevented the asylum seeker from scheduling an appointment or whether it may be an equitable factor that mitigates in favor of granting humanitarian protection. Another commenter expressed concerns that the adverb ''exceptionally'' is redundant or excessive and would result in different interpretations by adjudicators. The same commenter stated that applying the term ''exceptionally compelling circumstances'' would also be difficult because the term is rarely used in immigration law and is restrictively defined by the Departments.

While some commenters expressed concern that requiring noncitizens to show ''exceptionally compelling circumstances'' by a preponderance of the evidence would be too demanding of a standard, which they asserted renders the provision inaccessible to many asylum seekers and will result in unfair denials, other commenters claimed that the standard would, in practice, allow for any official to create an exemption for any reason.

*Response:* The Departments respectfully disagree with commenters' concerns about the ''exceptionally compelling circumstances'' standard being insufficiently defined or not amenable to consistent determinations. The rule provides that a noncitizen necessarily demonstrates exceptionally compelling circumstances if, at the time of entry, they or a family member with whom they were traveling (1) had an acute medical emergency; (2) faced an imminent and extreme threat to life or safety; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). The non-exhaustive nature of this list preserves flexibility and ensures that the rule does not foreclose adjudicators from considering facts giving rise to exceptionally compelling circumstances.

The Departments emphasize that exceptionally compelling circumstances are not limited to the examples enumerated in 8 CFR 208.33(a)(3)(i) and 1208.33(a)(3)(i). In fact, the rule recognizes additional per se exceptionally compelling circumstances in section 240 removal proceedings to, along with other provisions in the rule, eliminate the possibility that this rule will cause separation of family members who traveled together or long-term separation that would result by preventing family members from following to join principal applicants who would be granted asylum but for the presumption. 8 CFR 1208.33(c).

The Departments also note that AOs and IJs regularly apply various standards in the course of their adjudications, such as the ''extraordinary circumstances'' standard to determine whether an asylum applicant qualifies for an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), and the discretionary ''compelling reasons'' standard to determine whether an applicant who has suffered past persecution but lacks a well-founded fear of future persecution should be granted asylum in the exercise of discretion, *see* 8 CFR 208.13(b)(1)(iii)(A); 1208.13(b)(1)(iii)(A). Hence, although the Departments acknowledge the concerns of some commenters about noncitizens' ability to demonstrate ''exceptionally compelling circumstances,'' the Departments believe that the best way to assess the variety of fact patterns presented by noncitizens is to use a fact-specific approach on a case-by-case basis. Using this fact-specific approach on a case-by-case basis is consistent with other aspects of asylum adjudication, such as establishing an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), determining whether harm rises to the level of persecution, *see Stevic,* 467 U.S. at 423 n.18, or determining whether an individual was harmed on account of a protected ground, *see* 8 CFR 208.13(b)(1).

AOs receive extensive training that is designed to enable them to conduct non-adversarial interviews, assess testimony, and exercise their judgment in a fair and impartial manner.[208] Likewise, IJs have extensive experience and training in applying such concepts to individual cases.[209] Accordingly, the Departments strongly believe that IJs and AOs will fairly and competently examine the facts and circumstances of an individual's case to determine whether they demonstrated exceptionally compelling circumstances to rebut the lawful pathways presumption of asylum ineligibility. In response to commenter concerns about consistency of determinations, credible fear determinations, as noted above, are subject to review by a Supervisory AO, and determinations made in section 240 proceedings are subject to administrative appeal.

iv. Victim of Severe Form of Trafficking in Persons

*Comment:* A number of commenters stated concern about noncitizens' ability to rebut the presumption by satisfying the definition of a ''victim of a severe form of trafficking in persons.'' Some commenters stated that trafficking victims cannot be expected to have evidence prepared to demonstrate, by a preponderance of the evidence, that they were trafficked. A few commenters expressed concern that it would be very difficult for the population that is vulnerable to trafficking to rebut the presumption due to lack of evidence and the exemption being narrowly applied. Others stated that the NPRM's reference to 8 CFR 214.11, which defines victims of severe forms of trafficking, was not sufficiently specific. Some commenters wrote that this ground of rebuttal should be broadened to apply to circumstances in which individuals may be at risk of trafficking and to apply regardless of severity. One commenter stated that the victims of trafficking rebuttal ground is very narrow and fails to take into account the many other forms of gender-based persecution, including domestic violence, sexual assault, stalking, female genital cutting, and forced marriage. A few other commenters expressed concerns that officials may retraumatize individuals in the process of validating a claim for rebutting the presumption and may end up returning them to their traffickers if they find that the noncitizen did not rebut the presumption of asylum ineligibility. One commenter wrote that, because the severity of human trafficking is hard to ''grade,'' it is important to apply the broadest understanding of new trends and definitions provided under the universal human rights instruments to prevent underreporting and insufficient identification of victims of this human rights violation.

One commenter wrote that the definition of ''victim of a severe form of trafficking'' is highly technical and requires a thorough analysis of several components usually (in the T nonimmigrant status context, from

[208] *See* USCIS, *Non-Adversarial Interview.*

[209] *See* 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to ''[p]rovide for comprehensive, continuing training and support'' for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief Immigration Judge's authority to issue ''procedural instructions regarding the implementation of new statutory or regulatory authorities'' and ''[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties''); DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

which the definition derives) completed after review of a complete application package, including extensive supporting evidence and briefing prepared by legal counsel. The same commenter added that a survivor presenting at the border under the circumstances described above is unlikely to be able to meet this standard. Some commenters stated that the rule would force trafficking victims to rebut the presumption at a higher legal standard—preponderance of the evidence—rather than ''any credible evidence'' as would be required if they were already in the United States and applying for T nonimmigrant status.

One commenter stated that the Departments should remove the trafficking rebuttal ground because migrants who voluntarily utilized smugglers would falsely claim to have been trafficked to qualify for the exception.

*Response:* The Departments acknowledge commenters' concerns about victims of human trafficking but disagree that the existing rebuttal ground should be revised or expanded.

As described in the NPRM, *see* 88 FR at 11730, the presumption in this rule is necessarily rebuttable in certain circumstances, including if, at the time of entering the United States, the noncitizen satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11. *See* 8 CFR 208.33(a)(3)(i)(C), 1208.33(a)(3)(i)(C). The Departments disagree with the premise that this rule's reference to the definition of ''victim of a severe form of trafficking in persons'' found in 8 CFR 214.11 is insufficiently specific. This final rule relies upon, and is consistent with, the definition used in the T nonimmigrant status context, which itself is consistent with the applicable statutory definition.[210]

The Departments also emphasize that they are not applying the ''preponderance of the evidence'' standard to trafficking victims who are initially seeking to rebut the lawful pathways presumption during credible fear screenings. The standard of proof applied in credible fear screening is a ''significant possibility . . . that the alien could establish eligibility for asylum,'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), which also applies to ''exceptionally compelling circumstances.'' During credible fear screenings, then, a noncitizen would have to show a significant possibility that they could satisfy the definition of victim of a severe form of trafficking by a preponderance of the evidence in a full hearing. The Departments recognize that many victims of trafficking are unlikely to possess written evidence of their trafficking; however, the credible fear screening process involves eliciting testimony from individuals seeking protection and does not require noncitizens to provide written statements or other documentation. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); 8 CFR 208.30(d). Moreover, the Departments note that, in addition to receiving extensive training in substantive law and procedure, AOs are also trained to identify and interview vulnerable individuals, including victims of trafficking.[211] For merits adjudications, both AOs[212] and IJs[213] receive training and have experience assessing evidence and the credibility of noncitizens who appear before them for interviews or hearings, even in the absence of other documentation. Indeed, the INA explicitly provides that ''testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration.'' INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii).

With respect to the commenter's suggestion that the Departments should remove the trafficking-victims ground for rebuttal because the commenter believed that noncitizens who are smuggled will falsely claim they are trafficked, the Departments strongly believe it is important to treat trafficking as an exceptionally compelling circumstance. The Departments included this provision to allow this vulnerable population to rebut the lawful pathways presumption and seek protection in the United States. The Departments note that the commenter did not include any reliable evidence or data to support their allegation that individuals who are smuggled will falsely claim to be trafficked. In addition, the TCT Bar IFR also included a limited exception for victims of severe forms of trafficking, and the Departments are unaware of evidence that it was abused while that IFR was in effect.

Commenters' suggestions regarding broadening the grounds to rebut the presumption are addressed below in Section IV.E.3 of this preamble.

### 3. Exceptions to the Presumption

#### i. Proposed Exceptions for Migrants Facing Danger in Third Countries

*Comment:* Commenters expressed concern that the rule contains no exceptions for asylum seekers who would face danger in transit countries even though many asylum seekers are at serious risk in common transit countries. Multiple commenters suggested that the exemption for imminent threat of rape, kidnapping, torture, or murder should be expanded to include general threats of violence, as many individuals within the asylum process would be forced to stay in Mexico or other countries where general threats of violence are much more common and put their lives or safety at risk. Another commenter stated that, when asylum seekers are waiting in some of the most dangerous towns and cities in the world, they face real threats that the rule should recognize as an exception to the presumption.

Several commenters noted that the members of one family, when using the Title 42 exception process, tried to travel more than 1200 miles across Mexico and were kidnapped and taken hostage during that travel, only to be expelled from the United States when they sought help from the USBP. Another commenter noted that movement along the U.S.-Mexico border is notoriously difficult and unsafe. In contrast, one commenter stated that reports of localized violence in certain areas of Mexico are not indicative of the conditions in Mexico as a whole.

*Response:* The Departments acknowledge the concerns raised by commenters and reiterate that noncitizens who face an extreme and imminent threat to life or safety in Mexico at the time of entry can rebut the presumption of asylum ineligibility, *see* 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B), without needing to

---

[210] *See* 8 CFR 214.11(b) (cross-referencing INA 101(a)(15)(T)(i), 8 U.S.C. 1101(a)(15)(T)(i)).

[211] *See* USCIS, *RAIO Directorate—Detecting Possible Victims of Trafficking Lesson Plan* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Trafficking_LP_RAIO.pdf; see also* USCIS, *Asylum Division Training Programs* (Dec. 19, 2016), *https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/asylum-division-training-programs.*

[212] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Decision_Making_LP_RAIO.pdf.*

[213] *See* 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to ''[p]rovide for comprehensive, continuing training and support'' for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief Immigration Judge's authority to issue ''procedural instructions regarding the implementation of new statutory or regulatory authorities'' and ''[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties''); DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''[LERS] develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

qualify for any additional exception. In addition, the rule provides that they may rebut the presumption by showing that, at the time of entry, they faced an acute medical emergency or were victims of a severe form of trafficking. *See* 8 CFR 208.33(a)(3)(i)(A) and (C), 1208.33(a)(3)(i)(A) and (C). However, the Departments decline to enumerate additional, broader ways to rebut the presumption, such as a ground based on general threats of violence; and the Departments likewise believe that they need not enumerate additional exceptions to the presumption. In the absence of other exceptionally compelling circumstances, *see* 8 CFR 208.33(a)(3)(i), 1208(a)(3)(i), the Departments believe that danger in Mexico generally would justify failing to pre-schedule a time and place to appear at a POE and eschewing lawful and orderly pathways for entering the United States only when it amounts to an extreme and imminent threat to life or safety. For noncitizens who face dangers in other countries besides Mexico, or who face less imminent and extreme threats in Mexico, there ordinarily remain reasonable opportunities to take advantage of other lawful pathways contemplated by the rule. To the extent a noncitizen's individual circumstances make lawful pathways unavailable, or otherwise warrant rebuttal of the presumption, noncitizens may attempt to demonstrate as much on a case-by-case basis under the ''exceptionally compelling circumstances'' means of rebuttal. Noncitizens may choose to apply for asylum or other protection in a different country where they do not face dangers or schedule appointments to appear at a SWB POE using the CBP One app. CHNV nationals may also apply for advanced authorization for parole while outside their country of nationality. With regard to concerns about traveling along the U.S.-Mexico border to access available CBP One app appointments, CBP intends to increase the number of available appointments when the Title 42 public health Order is lifted, as detailed in Section IV.E.3.ii.a of this preamble. As detailed in Section IV.E.3.ii.b of this preamble, CBP is implementing updates to the CBP One app process that will enable noncitizens to request a preferred POE to schedule an appointment, thus helping noncitizens avoid unpredictable travel along the U.S.-Mexico border.

ii. Concerns About the Exception for Scheduled Arrivals at Ports of Entry

a. General Comments Regarding the CBP One App

*Comment:* One commenter, a legal services provider, expressed concern about the future impact of the CBP One app based on their experiences with the use of the app in the context of seeking Title 42 exceptions. Specifically, the commenter stated that the use of the app had barred ''thousands'' from seeking exceptions to the Title 42 public health Order. This commenter stated that, before January 2023, it was able to schedule appointments for its clients with POEs directly, without using the app. The organization said that this process was ''orderly and calm'' and that clients rarely waited more than four to six weeks for an appointment. The organization stated that, following the implementation of the scheduling capability, many of their clients had been unable to secure appointments, and the process takes longer. The organization stated that CBP did not provide notice that the CBP One app would be the sole way to seek exceptions to Title 42.

*Response:* To the extent that commenters have concerns about the processing of individuals seeking exceptions to the Title 42 public health Order at POEs, including concerns about the number of appointments available under the Title 42 exception process, these concerns are outside the scope of this rule. This rule is designed to manage the anticipated increase in the number of individuals expected to travel to the United States without documents sufficient for lawful admission following the termination of the Title 42 public health Order and will take effect once the Title 42 public health Order is lifted. At that time, CBP will inspect and process all noncitizens who arrive at a POE under Title 8 authorities, which include the INA, as required by statute. Title 42 is a separate statutory scheme that operates separately from Title 8.

Additionally, following the termination of the Title 42 public health Order, CBP intends to increase the number of available appointments in the CBP One app and is committed to processing as many noncitizens as is operationally feasible. Further, in no instance will CBP turn a noncitizen away from a POE, regardless of whether they utilize the CBP One app.

*Comment:* Commenters expressed concern about the security of the personally identifiable information (''PII'') that users submit through the CBP One app. A commenter asserted that the CBP One app poses serious privacy concerns regarding the collection, storage, and use of private personal information and alleged that requiring use of the CBP One app is ''another means of enlarging what is an already expansive surveillance infrastructure that relentlessly targets immigrant communities.'' A commenter also stated that, while the Departments have previously indicated that use of the CBP One app is voluntary, the rule will significantly expand use of the app, with the result that it will be the only way for certain noncitizens to seek asylum in the United States and thus that ''many people do not have a genuine choice in whether to consent.'' Commenters questioned the wisdom of encouraging migrants to disclose personal details while in transit in temporary shelters and non-secure settings.

Particularly in light of a recent ICE data breach, commenters expressed concern about what measures CBP and DHS will take to secure the PII that applicants will have to provide in order to secure an appointment through the CBP One app. The commenters expressed concern that a similar breach regarding CBP One app data could place applicants waiting for appointments outside the United States at a greater risk than individuals affected by the recent breach, who were primarily in the United States. Commenters alleged that this risk could have a chilling effect on otherwise meritorious applications.

Commenters expressed a range of PII-related concerns regarding the use of the CBP One app in the context of asylum seekers and asylum applications. For example, a commenter expressed concern that use of the CBP One app and the need to rely on publicly accessible internet connections may violate 8 CFR 208.6, which establishes limits on the disclosure to third parties of information contained in or pertaining to records related to credible fear determinations, asylum applications, and similar records. Another commenter similarly noted that use of the app may be tracked by government officials or persecutors, placing migrants in further danger.

A commenter also expressed concern that the lack of privacy may be particularly harmful for those fleeing domestic violence and that use of a smart device to access the CBP One app may permit GPS tracking and put the noncitizen at heightened risk of being located by their abuser, as well as put them at risk of financial abuse. A commenter expressed concern that information provided by migrants through the CBP One app could be

shared with law enforcement agencies beyond CBP, which are not bound by CBP privacy and information-sharing policies. A few commenters expressed concern with requiring the use of a *Login.gov* account because the underlying provider for that site has a history of data breaches.

*Response:* The Departments disagree with the statement that migrants must use, or are unable to meaningfully consent to using, the CBP One app. While noncitizens who present at a POE without scheduling an appointment using the CBP One app will be subject to the rebuttable presumption unless otherwise excepted, noncitizens are not required to use the app in order to be processed at a POE.[214] The Departments note that the rebuttable presumption does not apply to noncitizens who either were provided authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process or who sought asylum or other protection in a country through which they traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii)(A) and (C), 1208.33(a)(2)(ii)(A) and (C). The presumption also does not apply to noncitizens who arrive at a port of entry without scheduling an appointment if the scheduling system was not possible to access or use due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

For those who choose to utilize the CBP One app to schedule an appointment, CBP has taken steps to protect users' information. First, in accordance with DHS policy, apps developed by DHS—including the CBP One app—must meet certain baseline privacy and security requirements.[215] These requirements include app-specific privacy and notice policies; limitations on the collection of sensitive content, including PII; and appropriate encryption for the transmission of data.[216] The app was reviewed for compliance prior to development and is reviewed again every time a change is made that impacts the collection and use of PII.[217] All CBP systems have undergone comprehensive testing and evaluation to assess the respective security features and have been granted an Authority to Operate (''ATO'').[218] In particular, the app serves only as a tool for the collection of information.[219] Once the information is received, CBP temporarily retains the submitted CBP One app photographs of undocumented individuals within the Automated Targeting System (''ATS''). Upon an individual's arrival at a POE, the advance information is imported into a Unified Secondary (''USEC'') event.[220] The information is then verified by an officer and stored as part of standard CBP processes.[221] All data in ATS and USEC is treated and retained in accordance with the relevant retention schedules.[222] These systems are subject to continuous evaluation of security protocols so that CBP may quickly respond if there is a change in the risk posture in any of the systems. The information CBP collects via the CBP One app and transmits to downstream systems is the same information CBP already collects when a noncitizen encounters a CBP officer at a POE—it is simply collected earlier to make processing at the POE more orderly and efficient.[223] CBP has published a Privacy Impact Assessment (''PIA'') for the CBP One app generally and a standalone, function-specific PIA for the collection of advance information from certain undocumented noncitizens.[224]

With regard to the commenters' concerns regarding privacy notices related to biometrics and facial recognition technology, CBP takes such concerns seriously. In the referenced GAO audit, GAO–20–568, GAO made five recommendations to CBP, with which CBP concurred. Three of the recommendations were related to privacy considerations, including (1) ensuring privacy notices are complete and current, (2) ensuring notices are available at all locations using facial recognition technology, and (3) developing and implementing a plan to audit its program partners for privacy compliance.[225] At the time of the publication of the NPRM, all of these privacy-related recommendations had been implemented, and the recommendations were closed by GAO.[226] CBP has since created a new website that outlines the locations (air, land, and seaports) where CBP uses facial comparison technology, and CBP continues to take steps to ensure that appropriate notice is provided to travelers.[227]

With regard to commenters' concerns about *Login.gov*, the Departments note that *Login.gov* is owned and operated by the General Services Administration (''GSA''),[228] and thus the Departments have no control over the data privacy or data security considerations of that platform. However, the Departments note that GSA has a system security plan for *Login.gov*, and *Login.gov* has an ATO.[229]

*Comment:* At least one commenter raised a concern that the CBP One app is an untested pilot program.

*Response:* The Departments respectfully disagree. The CBP One app was initially launched in October 2020 to serve as a single portal to access CBP services.[230] In May 2021, CBP updated the app to provide the ability for certain NGOs to submit information to CBP on

---

[214] *See, e.g.,* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 18 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[215] *See* DHS, *Instruction 047–01–003 (Rev. 00.1), Privacy Policy for DHS Mobile Applications* 7–10 (Dec. 14, 2018), *https://www.dhs.gov/publication/privacy-policy-dhs-mobile-applications.*

[216] *Id.*

[217] *See id.* at 10.

[218] *See* DHS, *DHS 4300A Sensitive Systems Handbook* 47 (Nov. 15, 2015), *https://www.dhs.gov/publication/dhs-4300a-sensitive-systems-handbook.*

[219] *See* CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* 4 (Feb. 19, 2021), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf.* CBP has updated this impact assessment multiple times since February 19, 2021.

[220] *See id.* at 15.

[221] *See* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 11–12, 21 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[222] *See* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 10, 13 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[223] *See id.* at 17–18.

[224] CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* (Feb. 19, 2021), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf;* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[225] *See* GAO, *Facial Recognition: CBP and TSA are Taking Steps to Implement Programs, but CBP Should Address Privacy and System Performance Issues* 72–73 (Sept. 2020), *https://www.gao.gov/assets/gao-20-568.pdf.*

[226] GAO, *Facial Recognition: CBP and TSA are Taking Steps to Implement Programs, but CBP Should Address Privacy and System Performance Issues, https://www.gao.gov/products/gao-20-568* (reporting on the changes that CBP made that resulted in closure of the recommendations).

[227] CBP, *Say Hello to the New Face of Speed, Security and Safety: Introducing Biometric Facial Comparison, https://biometrics.cbp.gov/* (last visited May 1, 2023).

[228] *See* GSA, *Privacy Impact Assessment for Login.gov* 1, 5 (Mar. 17, 2023), *https://www.gsa.gov/cdnstatic/Logingov_PIA_March2023.pdf.*

[229] *See id.* at 27.

[230] CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

behalf of an undocumented noncitizen and schedule a time for such undocumented noncitizens to present at a POE to be considered for an exception from the Title 42 public health Order.[231] This functionality included submitting individuals' information in advance, including a photo, and scheduling a date and time to present at a POE.[232] In April 2022, CBP expanded the ability for noncitizens to directly submit information and schedule appointments to present at a land border POE to noncitizens seeking to enter the United States under the U4U process.[233] To further expand the accessibility of the CBP One Title 42 exception process, in January 2023, the advance information submission and scheduling process was made publicly available to all undocumented noncitizens seeking to travel to a land POE to be considered for an exception to the Title 42 public health Order.[234] Significant enhancements and changes to the CBP One app have been and will continue to be made in response to user and stakeholder feedback.[235]

*Comment:* Commenters stated that the CBP One app is not workable. For example, commenters stated that there are more migrants seeking asylum than there are appointments available, that the number of appointments was entirely too limited, that the rule does not provide for a minimum number of appointments, and that after a final rule is issued, demand for appointments would only increase. Another commenter noted that the INA does not limit the number of people who may arrive at a POE, nor does the rule provide information about how the government will apportion daily appointments. This commenter also noted that the number of appointments at the border is currently ''capped,'' but that this limitation is not legally binding and could be increased. At least one commenter said it would be ''inherently unjust to demand'' that individuals use an information system that cannot handle the number of people expected to use it. Commenters argued that requiring use of this system will create a backlog and require people to wait for their appointments for a significant period of time in Mexico.

Other commenters raised concerns about flaws in the CBP One app and suggested it would empower smugglers. Commenters noted that the CBP One app was created for other purposes and not as an appointment system for asylum seekers. A commenter noted that some individuals have to create a new account every day because of flaws in the app. Another commenter asserted that there is a significant risk that appointments will be resold, pointing to a lack of security within the app that would permit such resale. Commenters also stated that CBP indicated that criminal groups were creating fraudulent appointments to obtain information and funds from asylum seekers seeking entry to the United States. A commenter stated that requiring use of the CBP One app has already led to increased exploitation by criminal groups and others who seek to take advantage of migrants and is likely to push individuals to travel by more dangerous routes. Another commenter noted that the availability of appointments only at certain POEs had led to migrants traversing dangerous parts of Mexico to travel to a POE for their appointment. The commenter stated that traversing Mexico was particularly difficult because transportation companies and Mexican authorities impede migrants' ability to travel through Mexico. Another commenter recommended the creation of a process parallel to the CBP One app process for highly vulnerable migrants to be considered for entry into the United States in an expedited manner. At least one commenter stated that the CBP One app should allow for prioritization based on vulnerability. Another commenter stated that smugglers will have more power because of the limited number of appointments, as people will pay smugglers to find alternate routes into the United States.

*Response:* The Departments acknowledge that there are currently many migrants waiting to present at a POE and that demand for CBP One app appointments may exceed the number of appointments that can reasonably be made available on a given day. However, CBP is committed to processing as many individuals at POEs as operationally feasible, based on available resources and capacity, while executing CBP's mission to protect national security and facilitate lawful trade and travel.[236] While the Title 42 public health Order remains in effect, the CBP One app is being used to schedule appointments for individuals who are seeking to present at a land POE to be considered for an exception from the Title 42 public health Order. During this time, the number of appointments available has been limited. However, when the Title 42 public health Order is lifted, CBP intends to increase the number of available appointments and anticipates processing several times more migrants each day at SWB POEs than the 2010 through 2016 daily average, including through use of the CBP One app.[237] While CBP recognizes and acknowledges that demand for appointments may exceed the number of appointments that can reasonably be made available on a given date, there has been a large number of migrants waiting in Mexico to enter the United States since long before the introduction of the app, and CBP expects that use of the app will help facilitate the processing of such individuals. The CBP One app is a scheduling tool that provides efficiencies and streamlines processing at POEs. Additionally, while CBP acknowledges that some noncitizens who are unable to schedule an appointment might conceivably turn to smuggling or more dangerous routes, CBP is implementing changes to the CBP One app to permit noncitizens to select a preferred arrival POE in an effort to mitigate any perceived need to travel to another location. Additionally, CBP is transitioning scheduling in the CBP One app to a daily appointment allocation process to allow noncitizens additional time to complete the process. This process change will allow noncitizens to submit a request for an appointment, and available appointments will then be allocated to those who made such a request, and the app will now provide a 23-hour period

---

[231] CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 4 (Jan. 19, 2023), *https://www.dhs.gov/publication/dhscbppia-076-collection-advance-information-certain-undocumented-individuals-land.*

[232] *Id.*

[233] CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* 16–17 (Feb. 19, 2021), *https://www.dhs.gov/publication/dhscbppia-068-cbp-one-mobile-application.*

[234] *Id.* at 17–18.

[235] CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[236] Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[237] *See* CBP STAT Division, *U.S. Customs and Border Protection (CBP) Enforcement Encounters—Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved Apr. 13, 2023); Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

for individuals allotted appointments to complete the scheduling process and confirm their appointments. In addition to the increased number of appointments made available after the end of the Title 42 public health Order, it is anticipated that these changes will reduce the likelihood of noncitizens seeking to travel by alternate routes.

The capacity to process migrants at POEs and the utilization of the CBP One app to secure appointments are separate and distinct issues. Officers will process all individuals who present at a POE regardless of a CBP One app appointment. Although a noncitizen who presents at a POE without an appointment may be subject to the rebuttable presumption under this rule, they will be able to present any protection claims, as well as any evidence to rebut the presumption or establish an exception to its application—including evidence related to their inability to access the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle—during either expedited removal or section 240 removal proceedings, with an AO or IJ, as applicable. Processing times will vary based on capacity and available resources, and those without a CBP One app appointment may be subject to longer wait times before being processed by a CBP officer.

With regard to commenters' suggestions regarding the prioritization of vulnerable individuals, the Departments decline to adopt such a process. As an initial matter, the Departments reiterate that the CBP One app is a method of facilitating entry into the United States. Once individuals are present in the United States at a POE, CBP must inspect and process all noncitizens, regardless of vulnerability. *See, e.g.,* INA 235(a)(3), 8 U.S.C. 1225(a)(3); 8 CFR 235.1(a). While in some cases an individual who is particularly vulnerable may warrant more expeditious processing, such prioritization and processing does not occur until the individual is physically present in the United States. In other words, while an individual's vulnerability may, in some cases, be a factor in the noncitizen's processing disposition at the time of processing, this vulnerability is not validated or taken into account prior to a migrant's arrival in the United States in the context of the CBP One app.

*Comment:* Commenters raised concerns about limitations on where and when an appointment can be made using the CBP One app. One commenter noted that the geofencing portion of the app does not perform accurately, as indicated by individuals who are present in Mexico receiving error messages saying they are not. Another commenter noted that, since the geofencing limits where people can be to make appointments, they have no option but to make a dangerous journey before they even begin a lawful process; the commenter urged instead that individuals be permitted to schedule appointments prior to embarking on their journey to ensure that appointments are provided in a fair manner. At least one commenter expressed concern that individuals would use Virtual Private Networks to do an end run around the geofencing. Another commenter stated that the app allows for scheduling appointments up to 13 days in advance, but that individuals accessing the app from their home countries may not be able to make it to the United States in 13 days. Similarly, a commenter stated that, although the rule contemplated expanding CBP One access to locations beyond the SWB, such an expansion would not alleviate the risk of harm that migrants face, as it would not be possible for the migrant to schedule a date and time to present at a POE before leaving their home country, and migrants seeking to access the app from their home countries would lack access to NGOs and other entities at the SWB that could provide assistance.

*Response:* At this time, the ability to schedule an appointment through the CBP One app is available only to migrants located in central and northern Mexico.[238] The geofenced area allows migrants to remain in shelters and other support networks instead of congregating at the border in unsafe conditions, facilitating a safe and orderly presentation at POEs. The app does not facilitate travel to Mexico in order to schedule an appointment to present at a POE. Individuals outside northern and central Mexico are encouraged to use various pathways available to lawfully travel to the United States, and they will be able to use the app once they are in the geofenced area and thus closer to the United States.

CBP is aware of reports of users attempting to circumvent the geofenced area and has taken steps to prevent this from occurring. CBP has also received reports of users who were in Mexico in close proximity to the SWB, but whose phones were showing that they were within the United States, thus generating error messages. To address this issue, CBP adjusted the geofencing to accommodate individuals located in Mexico in close proximity to the SWB.

*Comment:* Some commenters stated that requiring people to wait in Mexico until their appointment date is dangerous, as indicated, for example, by the number of violent attacks on migrants who have been turned back under the Title 42 public health Order since President Biden took office and the dangers that individuals faced in Mexico during MPP. One commenter expressed concern that the rule included no exception to the rebuttable presumption for asylum seekers' inability to secure a timely opportunity to present themselves, even though CBP One appointments have been "extremely difficult to access" and have taken weeks or months to secure. Another commenter noted that the first-come, first-served scheduling design is haphazard, and that there is no priority for migrants who have been waiting for longer periods of time.

Another commenter cited a Human Rights First study that found that there were 1,544 reported cases of violence against asylum seekers—including two murders—during the first two years of MPP. One commenter stated that the delays caused by the CBP One app increase the dangers for those waiting for a POE appointment in Mexico. Commenters stated that asylum seekers who are unable to secure appointments through the CBP One app will be forced to remain indefinitely at the border in dangerous conditions, including conditions where they have no access to or must rely on third parties for safe housing, food, electricity, internet, or stable income, all while continuing to try to make an appointment. One commenter noted that this was particularly problematic for those with chronic or serious health problems because access to health care in areas where individuals must wait is limited. Commenters expressed concern that criminal organizations, including cartels, could exploit individuals during the period that they must remain in northern Mexico waiting for an appointment. Another commenter expressed concern that those individuals in Mexico awaiting an appointment are at risk of deportation to their home countries, where they could experience persecution.

A commenter also stated that the United States Government should engage with the Government of Mexico to ensure that noncitizens waiting in Mexico for a CBP One app appointment have documents authorizing a

[238] *See* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 6 n.24 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

temporary stay in Mexico for that purpose and that the lack of official documents regarding status in Mexico leaves noncitizens at risk of fraud and abuse. Another commenter recommended that CBP provide instruction on the use of the app to personnel in Mexico.

*Response:* The Departments acknowledge that individuals seeking to make an appointment to present at a POE will generally need to wait in Mexico prior to their appointment. The Departments also acknowledge that, in some cases, the conditions in which such individuals wait may be dangerous. However, noncitizens are currently waiting in northern Mexico, and, as addressed in the NPRM, the Departments anticipate that larger numbers of individuals will seek to enter the United States after the lifting of the Title 42 public health Order. *See* 88 FR at 11705. Therefore, as noted in the NPRM, the Departments have concluded that this anticipated influx warrants the implementation of a more transparent and efficient system for facilitating orderly processing into the United States. Although the use of the CBP One app may, as commenters noted, sometimes cause delays, the Departments believe that, on balance, the benefits of the more transparent and efficient system created by use of the app outweigh the drawbacks and that use of the app will ultimately inure to noncitizens' benefit by allowing the Departments to more expeditiously resolve their claims. CBP has conducted extensive outreach and communication with stakeholders who may be able to assist noncitizens in accessing the CBP One app to register and schedule an appointment, including shelters and other entities in Mexico.

The Departments also note that migrants are not categorically required to preschedule an appointment to present at a POE, and all migrants who arrive at a POE, regardless of whether they have an appointment, will be inspected and processed. Migrants who present without an appointment may be subject to the presumption, but, among other exceptions, the presumption will not apply for those for whom it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Additionally, migrants who demonstrate ''exceptionally compelling circumstances,'' such as an imminent and extreme threat to their life or safety, an acute medical emergency, or status as a victim of a severe form of trafficking, may rebut the presumption, in accordance with 8 CFR 208.33(a)(3)(i)(A) through (C), 1208.33(a)(3)(i)(A) through (C).

b. CBP One App Accessibility

*Comment:* Commenters expressed a range of concerns regarding the accessibility of the CBP One app for migrants seeking to enter the United States.

Many commenters stated the CBP One app is not available to all migrants, especially those who do not have smartphones, reliable internet access, or passports, and that all appointments are claimed almost immediately because the supply is insufficient. Multiple commenters suggested that many low-income individuals do not have access to a working phone or the internet in their home country, making use of the CBP One app infeasible. Commenters stated that many oppressive regimes limit access to the internet and asked how the Departments planned to provide access to the CBP One app to migrants in such countries. Relatedly, at least one commenter conveyed, anecdotally, that some migrants with limited economic means are forgoing food so that they can purchase enough data to attempt to make an appointment on the CBP One app to cross the SWB and seek asylum in the United States. Some commenters noted that many migrants become victims of crime while traveling to the United States, and their phones may be stolen, lost, or broken. Another commenter pointed out that some individuals may have phones but cannot afford to pay for telephone services for the phone. A commenter stated that it was unreasonable to place the burden on migrants to obtain internet and broadband access, as some migrants must choose between ''sustenance and digital access.'' The commenter stated that this requirement perpetuated the crisis of unequal access to justice. At least one commenter noted that individuals may dispose of their cell phones out of concern that those they fear could track them using that phone and so no longer have a smartphone to use the CBP One app. One commenter suggested finding donors to provide phones for families to schedule appointments.

Others stated concerns with relying on a web and mobile application because technology can fail. At least one commenter stated that the Departments should not rely only on the CBP One app because cellular signals along the SWB are inconsistent and Wi-Fi options are limited, and some migrants, such as Afghans who travel through South and Central America, do not have local connectivity. At least one commenter asked how having a cell phone with good coverage so a migrant can obtain an appointment relates to the merits of their asylum claim, while another stated that migrants without internet access would effectively be held to a higher standard than those with internet access, which many would not be able to overcome due to the lack of legal representation in initial screenings.

Another commenter stated that the rule did not provide sufficient information on how the Government conducted a study of the number of migrants who may have smartphones. Another asserted that the study had a sampling bias since it only surveyed individuals seeking a Title 42 exception, which they claimed required the use of the CBP One app. A commenter provided data comparing the percentages of smartphone ownership in Mexico, Cuba, Haiti, Nicaragua, and Venezuela, which, they stated, showed that while Mexico and Haiti had a high percentage of users, Nicaragua and Venezuela did not. On the other hand, at least one commenter noted that cell phones, including smartphones, are very common and that as a result people should be able to apply for CBP One app appointments.

Other commenters noted that people who cannot use the application would be at a serious risk of being turned away at the border and disagreed with the Departments' statements to the contrary.

A commenter claimed that CBP has yet to implement a desktop version of the app and has provided little clarity on whether and when such a version would be available. The commenter also stated that many migrants lack regular access to desktop computers.

*Response:* The Departments disagree that the CBP One app is a barrier to seeking asylum. The Departments also disagree with the contention that this rule sets up a linkage between access to an adequate cell phone or internet and the merits of an individual's asylum claim. Rather, the CBP One app is a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in an orderly and efficient fashion. CBP intends to increase the number of available appointments when the Title 42 public health Order is lifted and anticipates processing several times more migrants each day at the SWB POEs than the 2010–2016 daily average, including through use of the CBP One app.[239] Further, noncitizens who

[239] *See* CBP, CBP STAT, *U.S. Customs and Border Protection (CBP) Enforcement Encounters—Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved

present at a POE without using the CBP One app are not automatically barred from asylum.[240] The determination of whether the rebuttable presumption applies will be determined by an AO during the credible fear process or by an IJ in section 240 removal proceedings, at which time the noncitizen can demonstrate it was not possible to use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. CBP officers will not be making determinations about whether the rebuttable presumption is applicable.

The CBP One app is free to use and publicly available. As noted in the NPRM, a limited study conducted at two POEs in December 2022 found that individuals had a smartphone in 93 out of 95 Title 42 exception cases. At the time of this survey, migrants were not required to utilize the CBP One app to schedule an appointment to be considered for a Title 42 exception; that requirement was implemented in January 2023.[241] Additionally, independent studies demonstrate that approximately two-thirds of individuals worldwide had smartphones by 2020.[242] The Departments acknowledge that other studies provided by commenters show varying rates of smartphone access among migrants, that not all migrants may have access to a smartphone or be able to easily use the CBP One app, and that lack of smartphone access may hinder a migrant's ability to use the CBP One app. However, individuals who do not have a smartphone or who have other phone-related problems can seek assistance from trusted partners, who may be able to share their phones or provide translation or technical assistance if needed to submit information in advance. In addition, CBP has conducted extensive engagement with NGOs and stakeholders and has received feedback and information about the challenges associated with the use of the CBP One app. Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals. CBP is aware that NGOs provide support and assistance with access to mobile devices and internet connectivity. CBP notes that from January 12, 2023, when appointment scheduling launched, through the end of March 2023, over 74,000 noncitizens have scheduled an appointment via the CBP One app.[243]

Nevertheless, CBP acknowledges there can be connectivity gaps and unreliable Wi-Fi in central and northern Mexico. CBP reiterates that the use of the app to schedule an appointment to present at a POE is geofenced to only those migrants who are present in central and northern Mexico, and so commenters' concerns regarding internet censorship in other countries are misplaced. However, in response to feedback about connectivity issues, on February 18 and 23, 2023, CBP released updates to the CBP One app to improve the submission and scheduling process for individuals with lower bandwidth. In addition, based on user and stakeholder feedback, CBP will transition CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. This process change will allow noncitizens to submit a request for an appointment, and then available appointments will be allocated to those who made such a request. Individuals who are issued an appointment will have a 23-hour period to complete the scheduling process and confirm their appointment. Each day, unconfirmed appointments will be reallocated among the current pool of registrations. This change will reduce the burden on the noncitizen to have connectivity at the precise moment of the daily appointment release, as is currently the case. This process will also enable noncitizens to request a preferred POE at which to schedule an appointment. Future and ongoing enhancements to the app are expected based on user and stakeholder feedback to ensure equity in the scheduling process.

The Departments acknowledge concerns about the availability of a desktop app for scheduling appointments. There is currently a desktop version of the CBP One app,[244] but it is not currently available for noncitizens to submit advance information. CBP is updating the desktop capability to provide the ability for undocumented noncitizens to register via the desktop version. This update is expected to be available in summer 2023. However, CBP does not have plans to enable users to schedule an appointment using the desktop version of the CBP One app because the desktop version does not allow for specific requirements that CBP has determined are needed such as geofencing and a live photo. This scheduling functionality will only be available via a mobile device.

CBP notes that commenters' concerns about access to the CBP One app are misplaced. Noncitizens seeking to schedule an appointment to present at a land POE are not required to have a passport.[245] Other functions of the CBP One app, including the Advance Travel Authorization (''ATA'') functionality used as part of the CHNV parole processes, require an individual to provide their passport information.[246]

*Comment:* One commenter expressed concerns that the Departments relied on use of the CBP One app among the Venezuelan population as part of the CHNV parole processes to justify use of the CBP One exception in this rule. In particular, the commenter asserted that the use of the app among the Venezuelan population seeking to travel to the United States to seek parole was not a good indicator of the app's use among other populations of migrants, many of whom were less technically savvy and required more assistance with the app.

*Response:* This commenter's concern is misplaced because the Departments have not relied on any data regarding Venezuelan migrants' access to CBP One in this rule. The Departments acknowledge and agree that use of the CBP One app in the ATA context is not comparable to the use of the app to seek an appointment to present at a POE and note that the ATA process is separate and distinct from the use of the CBP One app to schedule an appointment to present at a POE.

*Comment:* Commenters also stated that use of the CBP One app is particularly difficult for families who

---

Apr. 13, 2023); Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off of Field Operations, CBP, from Troy A. Miller, Acting Comm'r, CBP, *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[240] In addition, under this rule, any noncitizen will be able to present at a POE, and CBP will not turn away any individuals—regardless of manner of entry into the United States—or deny them the opportunity to seek admission to the United States. However, those who arrive at a POE without an appointment via the CBP One app may be subject to longer wait times for processing depending on daily operational constraints and circumstances.

[241] *See* CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[242] Allan Jay, *Number of Smartphone and Mobile Phone Users Worldwide in 2022/2023: Demographics, Statistics, Predictions* (Mar. 16, 2023), *https://financesonline.com/number-of-smartphone-users-worldwide/.*

[243] CBP, *CBP Releases March 2023 Monthly Operational Update* (Apr. 17, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-march-2023-monthly-operational-update.*

[244] *See* CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* 15 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf.*

[245] *See id.* at 15 n.18.

[246] *See id.* at 21–22.

may be unable to make appointments together. Another commenter stated that families may not have time to register together before all of the appointments are taken. Other commenters noted that family separation may occur because of both stress and confusion. Another commenter noted that CBP officers told individuals that they had the option of leaving children behind, trying to get another appointment, or sending children alone, underscoring that the CBP One app increases the likelihood that families will separate themselves in order to get appointments or to enter the United States. At least one commenter noted that there should be an adequate number of appointments set aside for families. Commenters also stated that the CBP One app is insufficient as a lawful pathway because it does not allow families to register together. One commenter, a legal services provider, stated that it had raised concerns to CBP about the length of time that families were waiting to seek an appointment. The commenter stated that CBP told the entity that the delay for families was likely a result of criminal groups making fraudulent appointments, which the commenter concluded was evidence that expansion of the CBP One app would increase exploitation of migrants. One legal services clinic stated that it had been informed by a CBP Field Office on the SWB in March 2023 that officers had not interviewed any families with more than six members, which was concerning given the number of larger families waiting to enter. A commenter stated that children should not be held responsible, through their eligibility for asylum, for whether their parents used the CBP One app to enter. One commenter noted that in February 2023 a family was not permitted to enter because the appointment did not list the children's names.

*Response:* CBP acknowledges the concerns regarding the ability of families to submit appointments together and has been working to address such concerns. Following the initial implementation, CBP received feedback that the app was timing out during the registration process of families with babies or young children and determined that this was caused by delays in the third-party liveness verification (that is, the process to verify that each person listed is, in fact, a live person). In February 2023, CBP updated the workflow in the app to address this issue by removing liveness detection as part of the registration process. Users are now only required to take a still photo of each traveler at the time of registration, the same action as if taking any photo from a mobile device, which only takes a few seconds. Following this update to remove liveness detection from the registration process, CBP has received feedback from NGOs that there are fewer reported errors.

CBP has also consolidated appointment slots to increase the number of available appointments at the same time, where feasible, making it easier for family units to get an appointment together. For example, if a POE previously had two separate appointment times with 10 appointments each, they might have been combined to create one appointment time with 20 slots, making it easier to accommodate larger groups.

CBP continues to advise users and NGOs that one member of the family should create a registration on behalf of the entire family. While each member of a family must have a unique appointment, one member of a family can create the submission on behalf of the entire family group and complete the scheduling process, including the photo capture, to secure appointments for all registered family members. Functionally, this is similar to buying airline tickets. A designated person accesses the website, the website ensures there are seats for the indicated number of people, and the designated person provides the details for each individual to complete the purchase. At this stage, only the individual submitting the registration on the family's behalf is required to provide a live photograph.

Following the rollout of these enhancements, as of April 18, 2023, CBP data show that, for appointments scheduled from March 8, 2023, through May 1, 2023, groups make up an average of 83 percent of the CBP One scheduled appointments. Families or groups who do not register together on one CBP One account may not be accommodated at the same POE or on the same date. The Departments acknowledge that challenges remain for larger families, but the Departments believe that these changes have significantly ameliorated the concerns raised by commenters that family groups have been unable to obtain appointments.

CBP shares commenters' concerns about fraud and exploitation and has taken several steps to try to mitigate such issues. Specifically, the app uses 1-to-1 facial matching, meaning that it compares still photos submitted by users during the registration process to subsequent photos submitted by the same users while scheduling an appointment. This photo matching helps to ensure that the individual making an appointment is the same person who registered for the appointment. Additionally, the app's liveness detection verifies that a person submitting an appointment is, in fact, a live person. Finally, users have a limited number of submissions per *Login.gov* authenticated identity, helping to prevent one individual from submitting bulk appointment requests.

With respect to the comment stating that children should not be held responsible for whether their parents used the CBP One app to enter, the Departments note that they have exempted from this ongoing application of the rebuttable presumption noncitizens who entered the United States during the two-year period while under the age of 18 and who later seek asylum as principal applicants after the two-year period. 8 CFR 208.33(c)(2), 1208.33(d)(2).

*Comment:* Commenters noted that the app is only available in English, Spanish, and Haitian Creole, which limits accessibility for many, such as speakers of indigenous languages or other languages outside this limited list. A commenter referred to a study that, in January 2021, identified more than forty different languages spoken by individuals with pending MPP proceedings, which, according to the commenter, rendered it "alarming" that the app was available in only three. One commenter stated that, as of January 2023, the app was not available in Creole. Other commenters expressed concern about those who may be illiterate who are still seeking to access the app, including those who may not be literate in one of the languages available on the app. At least one commenter noted that *Login.gov* is also only available in English, Spanish, and French, noting that based on at least one report these are not the most common languages and that third party assistance does not adequately address this concern. Another commenter stated that due to limited resources and high demand, it is not clear whether non-profit service providers will be able to help asylum seekers overcome the CBP One app's language barriers.

Commenters also expressed concern about specific portions of the CBP One app that they stated are only available in English. Specifically, commenters stated that the CBP One app's advisals regarding the terms and conditions of use and the repercussions of fraud or willful misrepresentation are presented exclusively in English. Other commenters said that all answers entered into the app must be in English, resulting in many individuals requiring assistance, including Spanish and Haitian Creole speakers, even though

the CBP One app is available in their native language. Other commenters noted that the app's error messages are only in English, even if the user selects a different language, which makes using the app difficult for asylum seekers who cannot understand English. Commenters expressed that the limited availability of interpreters and the time required to enter information using interpreters added to difficulties in obtaining appointments through the CBP One app for non-English speakers. Commenters maintained that translating the CBP One app into additional languages would not resolve access issues for individuals with no or limited literacy.

Commenters also expressed concern about migrants' ability to meet the language barrier exception. One commenter stated that asylum seekers will struggle to meet the language barrier exception because the rule does not provide a clear process for how they can demonstrate that they were unable to use the CBP One app due to language issues. The commenter stated it is unclear whether the asylum seekers must show that they sought help from a third party before presenting themselves at a POE. One commenter stated that the rule does not explain how noncitizens with language, literacy, or technology issues can access this exception.

*Response:* As commenters noted, the CBP One app is currently available in English, Spanish, and Haitian Creole. The addition of Haitian Creole, on February 1, 2023, was based on stakeholder feedback. The translation of terms and conditions into all three languages was added on April 6, 2023. Initial analysis conducted in March 2023 indicated the current three languages account for 82 percent of the application users, with the next most common language being Russian, at 9 percent. Currently, CBP has not received any requests to make the app available in Russian. However, CBP will continue to consider the inclusion of additional primary languages, which will be made available based on analysis of populations encountered at the border and user feedback. Additionally, outside entities, including NGOs, or other persons may provide assistance with the appointment scheduling process in the CBP One app.

CBP is also implementing the translation of all drop-down menus as well as allowing for special characters, which is expected to be complete by May 11, 2023. This update will also allow users to input answers in the three available languages. While most of the error messages are translated, CBP acknowledges that not all messages are translated, as a few system errors stem from different sources that do not have translation capabilities. However, CBP also has detailed user guides—which are available in English and Spanish (and Haitian Creole by the end of May 2023)—fact sheets—which are available in English, Spanish, Haitian Creole, Portuguese, and Russian—and video introductions available for free on the *CBP.gov* website, which provide visual overviews on how to submit information in advance.[247]

With regard to *Login.gov*, that website is an independent authentication service for government mobile applications, and therefore CBP has no authority to make changes to it. However, CBP has submitted a request to GSA to consider adding Haitian Creole as an additional language.

The Departments acknowledge commenters' concerns about application of the exception to the rebuttable presumption of asylum ineligibility for those who can demonstrate that it was not possible to access or use the CBP One app due to language barrier, illiteracy, or another serious and ongoing obstacle, 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B), and such concerns are discussed further in Section IV.E.3.ii.d of this preamble.

*Comment:* Commenters stated that the CBP One app is inaccessible for many migrants, particularly the most vulnerable. A commenter stated that they had done volunteer work with asylum seekers from a few African countries and from many Spanish-speaking countries, and that reliance on the CBP One app is unfair because it assumes that migrants have a level of literacy, electricity, and time that are often unavailable to those desperately seeking safety. Another commenter noted that those with mental impairments or physical impairments, including arthritis, may not be able to use the CBP One app. One commenter stated that there is no rebuttal available for people with educational, mental, or psychological disabilities or who are unable to secure a timely appointment. One commenter stated that the proposed rule does not provide reasonable accommodations related to difficulties of using the CBP One app for people with disabilities, which the commenter asserted violated section 504 of the Rehabilitation Act, 29 U.S.C. 701 *et seq.*

*Response:* CBP acknowledges that certain individuals may have difficulty accessing the CBP One app. However, CBP has taken several steps to facilitate awareness of and access to the app. In particular, CBP has conducted extensive engagement with NGOs and stakeholders and has provided several opportunities to non-profit and advocacy organizations to provide feedback and receive information about the use of the CBP One app. Such entities may also serve as a resource for technological, humanitarian, and other assistance to migrants accessing the app. Management at POEs where the app is being utilized are also in regular contact with these support organizations to address any issues and concerns in real time.

Additionally, the CBP One app is undergoing a compliance review under section 508 of the Rehabilitation Act of 1973, which is expected to be completed by the end of May 2023. CBP expects a final certification by the end of August 2023. There are also several assistive technologies that can be utilized to translate the app independently, such as free apps that provide screen readers, magnification, and translation.

c. CBP One Technological Issues and Functionality

*Comment:* Commenters expressed concerns that the CBP One app has multiple glitches and problems, most notably that it allegedly does not capture or register darker skin tones and does not allow some individuals to upload their photos, instead displaying error messages. Some commenters referred to studies that demonstrated racial bias in facial recognition technology. One commenter stated that certain disabilities or conditions, including blindness and autism, prevented users from effectively capturing a live photograph for the app. A commenter expressed concern that transgender individuals may present differently at the border than they did at the time their photograph was taken.

*Response:* The Departments are committed to equal access to the CBP One app for individuals of all races and ethnicities. At this time, CBP has not found any indication of meaningful discrepancies in app functionality based on skin tone. The predominant reason for error messages during the photo process was the volume of submissions at one time with low connectivity and bandwidth of other technological platforms that supported the app. To ensure equity for all nationalities in the photo process, CBP is continuing to assess and study the software's performance.

For additional context, there are two photo capture technologies utilized in the CBP One process: the Traveler Verification Service ("TVS") and

[247] CBP, *CBP One™ Mobile Application, https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

''liveness detection.'' TVS is a facial recognition technology that allows a CBP One submitter's photo to be compared against subsequent submitted photos to ensure it is the same individual each time a photo is submitted.[248] This system is utilized at two different points in the process: (1) during the process of scheduling an appointment, to verify that the photo submitted matches the photo previously provided during registration; and (2) upon a noncitizen's arrival at a POE, where officers take another photo of the individual as part of the inspection process and verify that that photo matches the photograph submitted at the time of scheduling. However, there are alternative methods to verify that the individual presenting at the POE matches the individual who scheduled through CBP One if facial matching is not possible. For example, an officer can enter the unique confirmation number provided by the CBP One application or biographic data.[249] Additionally, CBP has partnered with the National Institute of Standards and Technology, the DHS Science and Technology Directorate, and the DHS Office of Biometric Identity Management to assess and test facial recognition technology and algorithms as part of efforts to improve the effectiveness of the process.[250] Additional information is publicly available in the TVS Privacy Impact Assessment.[251]

CBP One also relies on ''liveness detection.'' The vast majority of feedback CBP has received regarding issues identifying people of color were identified as related to liveness detection during the registration process. As explained in more detail below, CBP One previously utilized liveness detection during both the registration and scheduling processes. For context, the CBP One app utilizes third-party software to verify ''genuine presence'' or ''liveness'' during registration and scheduling an appointment.[252] The liveness verification confirms the user is a live person and is not taking a photo of a photo or video.[253] Such verification ensures that appointments are given to bona fide individuals and family groups, rather than brokers or middlemen who might seek to book appointments in bulk and then sell them to migrants.

When the scheduling capability was initially implemented in January 2023, CBP originally required users to take a live photograph at the time they input their biographic information to register for the app, and, if they were unable to schedule an appointment at the same time, they were required to take a live photograph again at the time they scheduled an appointment. This requirement took significant bandwidth, which resulted in many users experiencing difficulty. However, based on feedback from users and stakeholders, and consistent with its security protocols, CBP has determined the liveness check is no longer required during the registration process and implemented this change in February 2023. Therefore, while users are required to submit a photo at the time of registration, this photo does not need to be a live photo. Rather, the user is only required to submit a live photo at the time of scheduling an appointment, so that the liveness check and facial matching only occur during the scheduling of the appointment. When scheduling an appointment on behalf of a family or group, only one member of that family group is required to submit a live photograph. At that time, the CBP One app utilizes the live photo and facial matching technology to match the photo submitted during scheduling to the original photo submitted upon initial registration to verify that both photos are of the same person. Thus, an individual must only present similarly in photographs at the time of registration and the time of submission. Following this change, as well as others made during February 2023 to increase bandwidth, CBP has received feedback that there are fewer errors.

In addition, with regard to concerns about disparities based on skin tone, the third-party vendor has conducted their own equality study, which was provided to CBP, and concluded that across their global platform, differences in performance between ethnicities are on the order of tenths of a percent. As of the end of March 2023, Haitians are one of the top three nationalities using the CBP One app.[254] Regarding concerns about the ability of the app to capture a live photograph from individuals with certain disabilities or conditions, including blindness and autism, such individuals are not required to submit a live photograph if they are part of a family or group, as another member of that family or group can submit the live photograph on their behalf. In the event that an individual is unable to submit a live photograph as part of the submission process, they are encouraged to seek assistance from another person to take the photo for them. In addition, CBP consistently evaluates the registration and scheduling process, including the use of live photographs, and will continue to make enhancements and adjust the process based on feedback and operations.

*Comment:* Commenters noted a range of technology-related concerns with the CBP One app. Commenters described the CBP One app as very difficult to use, stating that it often crashes or is prone to glitches. Another commenter stated that there have been reports of the CBP One app freezing when noncitizens try to send confirmation of their interview dates. Some commenters noted that those seeking to enter the United States may not have the technical ability to navigate the app. A commenter noted that, although the Departments stated in the NPRM that CBP had conducted ''extensive testing'' of the app's technical capabilities, such statement was not supported by any publicly available studies or information. Commenters also recommended that CBP develop timely and effective mechanisms to receive and address reports of errors in the CBP One app.

*Response:* The Departments recognize commenters' frustration with the CBP One app. As noted above in Section IV.E.3.ii.a of this preamble, CBP systems

[248] *See* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 10 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf;* CBP, *DHS/CBP/PIA–056, Privacy Impact Assessment for the Traveler Verification Service* (2018), *https://www.dhs.gov/publication/dhscbppia-056-traveler-verification-service.*

[249] See CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 10–11 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[250] *See* CBP, *DHS/CBP/PIA–056, Privacy Impact Assessment for the Traveler Verification Service* 15–16 (2018), *https://www.dhs.gov/publication/dhscbppia-056-traveler-verification-service.*

[251] *See generally id.*

[252] *See, e.g.,* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 23 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf; see also* DHS, *News Release: DHS S&T Awards IPROOV $198K to Pilot Genuine Presence Detection and Anti-Spoofing Capability* (Nov. 6, 2020), *https://www.dhs.gov/science-and-technology/news/2020/11/06/news-release-st-award-genuine-presence-detection-and-anti-spoofing.*

[253] DHS, *News Release: DHS S&T Awards IPROOV $198K to Pilot Genuine Presence Detection and Anti-Spoofing Capability* (Nov. 6, 2020), *https://www.dhs.gov/science-and-technology/news/2020/11/06/news-release-st-award-genuine-presence-detection-and-anti-spoofing.*

[254] *See* CBP, *CBP Releases March 2023 Monthly Operational Update* (Apr. 17, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-march-2023-monthly-operational-update.*

undergo comprehensive testing and evaluation to assess the respective security features as part of the process of being granted an ATO.[255] The advanced information and scheduling capabilities addressed in this rule in particular have undergone various rounds of testing prior to and post deployment. CBP also conducted limited user testing both internally and in partnership with an NGO partner. The primary issues identified by users since the app's implementation have been caused by issues that cannot be fully identified in a testing environment.

CBP continues to make improvements to the app based on stakeholder feedback, including updates to enhance usability in low bandwidth and connectivity scenarios, and to streamline the submission and scheduling process. CBP primarily receives reports of errors or other concerns through three mechanisms. The first and primary mechanism is the CBP One email inbox,[256] to which users may send an inquiry or concern about any capability within the CBP One app. Since CBP One has many capabilities and functionalities, and is available to a diverse audience, the inbox initially responds by asking the author to select the appropriate topic pertaining to their specific issue. Emails related to the ability to schedule appointments at POEs are addressed by one of three teams: CBP Customer Service, CBP's Office of Information Technology, or the CBP One team within CBP's Office of Field Operations. CBP also receives reports of errors or issues through recurrent briefings and sessions with NGOs. Third, CBP personnel both at local POEs and within CBP Headquarters receive direct email communications from NGOs.

The reported issues are a result of the volume of activity and the strain this may put on local bandwidth and connectivity. In an effort to improve app performance in low or limited bandwidth and connectivity situations, CBP determined the live photo could be removed as part of the registration process. This change was implemented in February 2023, and based on feedback from NGOs and stakeholders, it has reduced the number of reported errors users experienced. CBP is actively working to improve application hang-up-error logging and reporting to better inform on user complaints and application improvements.

d. Exception for Certain Failures To Pre-Schedule a Time and Place To Present at a POE[257]

*Comment:* Commenters provided comments on the proposed exception to the presumption for individuals who present at a POE and demonstrate that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or another serious and ongoing obstacle.

Regarding the ''illiteracy'' and ''language barrier'' provisions, commenters questioned how noncitizens would prove that they cannot understand any of the languages offered by the CBP One app, and whether testimony about their language proficiency would suffice as evidence for an exemption. One commenter said the proposed rule does not provide a standard for how officials will determine asylum seekers' language proficiency, which could lead to erroneous denials. Another commenter said it is unclear whether asylum seekers with language barriers must show that they sought help from a third party before presenting themselves at a POE. A commenter expressed concern that refugees who have basic communication skills in English or Spanish, but who cannot read or write proficiently in either of those languages, would wrongly be found to not have a language barrier that would exempt them from the requirement to use the app. Another commenter wrote that the exemptions based on illiteracy and language barriers are reasonably clear but the rule should clarify that literacy in the dominant language of a country should not be presumed for citizens of that country because, for example, many indigenous people in Guatemala do not speak Spanish. One commenter expressed concern that individuals with limited English proficiency would face difficulty establishing this exception due to the unavailability of qualified interpreters and recommended that if the Government cannot obtain interpreters for individuals, they should be placed directly in section 240 removal proceedings.

Multiple commenters said the proposed rule fails to clearly define what constitutes a ''significant technical failure.'' Several commenters said the proposed rule did not outline how individuals could document technical difficulties such as app malfunctions or inaccessibility. A commenter said it may not be possible to screenshot the app to document a glitch if the app is frozen and producing this evidence would be hard for migrants in detention where they may not have access to their phones. Another commenter asked if this exception would include inability to afford a smartphone, having a phone stolen or broken, or inability to access stable Wi-Fi. Another commenter stated that additional usage of the CBP One app after the Title 42 public health Order is terminated would likely exacerbate technical problems, leading migrants to irregularly cross the border and claim that the rebuttable presumption does not apply due to technical difficulties.

One commenter stated that the Departments should update the regulatory text to specify that ''significant technical failure'' refers to an inability of the DHS scheduling system to provide, on the date that the noncitizen attempted to use it, an appointment for entry within the two weeks after such attempt, together with the failure of that system, when access to it is sought at the POE at which the noncitizen has presented, to provide an appointment at that POE within the following two weeks. A commenter similarly recommended that, for the first 12–18 months after the lifting of the Title 42 public health Order, the Departments should assess the application of the exception based on a ''more liberal'' standard than the preponderance of the evidence, based on an assumption that the CBP One app is likely to have numerous technical failures.

Commenters stated that the proposed rule failed to clearly define what constitutes an ''ongoing and serious obstacle.'' Commenters questioned whether a failed attempt to make an appointment using the CBP One app is likely to be considered sufficient. A commenter also stated that the Departments should specify certain foreseeable obstacles in the regulations as ongoing and serious obstacles, such as mental impairments or physical conditions that affect one's ability to use a smartphone. One commenter questioned whether the dangers that marginalized asylum seekers face in parts of central and northern Mexico

[255] *See* DHS, *DHS 4300A Sensitive Systems Handbook* 47 (2015), *https://www.dhs.gov/publication/dhs-4300a-sensitive-systems-handbook.*

[256] *See* CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[257] This section describes comments and responses related to the exception to the rebuttable presumption for noncitizens who present at a POE without having pre-scheduled a time and place for an appointment. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Currently, as explained in the NPRM, the only available system for scheduling such an appointment is the CBP One app. 88 FR at 11723. Accordingly, this section's comments and responses are focused on the use of the CBP One app for this exception, although the exception would apply similarly to any other scheduling system developed for this purpose.

would be deemed an ongoing and serious obstacle. Another commenter said the Departments should provide a list of anticipated obstacles to prevent arbitrary and inconsistent determinations and recommended that the list ''include, for example, mental impairments; physical impairments such as severe arthritis of the hands that prevent the use of a cell phone or other device to access the CBP One app; lack of access to such a device coupled with poverty such that the noncitizen could not reasonably purchase such a device; and a continuing lack of appointments in the near future to enter at the POE at which the noncitizen has presented.''

One commenter recommended that if the app is crashing or the available appointments are so limited near where the asylum seeker is located that they cannot promptly obtain an appointment, then the affected asylum seeker should not have the burden of proving the impossibility of accessing the system. That commenter proposed that USCIS should assign an official to monitor the app and capacity of processing facilities and post on a public website whether the app was functioning and the availability of appointments. According to that commenter, this public information, showing that the app was functioning and that prompt entry appointments were available, would create a presumption that no significant failure had occurred. Similarly, another commenter suggested that the exception should also take into account the potential for human error, specifically referring to a situation in which a migrant believes they have an appointment, the app failed to register that appointment, and a CBP officer permits the individual to enter the POE. The commenter stated that, in such a case, the migrant ''should not be punished when they are following the rules'' and should not be required to show that there were significant technical failures. The commenter suggested amending the regulatory text so that the rebuttable presumption would not apply if the noncitizen shows ''that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or human error.'' The commenter also recommended amending the regulatory text to include a statement that ''such evidence may include data on the performance of the CBP One app which DHS will make publicly available as well as records of problems reported by users.''

Commenters also noted potential procedural concerns with application of this exception. Some commenters stated that it will be difficult for noncitizens to meet the burden of demonstrating this exception, since the issue will arise in credible fear interviews when people are not likely to be represented. One commenter said it was impossible for asylum seekers to show they meet this exception because it would require them to prove a negative. Another commenter stated that CBP often confiscates people's phones while they are in CBP custody or people may have borrowed phones to access the app, meaning that they would not have access to the evidence they need to prove they encountered obstacles using the CBP One app.

Commenters said it is unclear who will determine if this exception applies and expressed concern that some individuals would be turned away without the chance to seek asylum. One commenter wrote that it was unclear if the failure of an individual to indicate that they qualify for an exemption would be counted against them when an AO reviews their case. Another commenter recommended the creation of a standardized form of questions for officials to use when determining whether individuals should be exempted from the CBP One appointment requirement. One commenter wrote that the NPRM failed to consider the practicality of conducting the analysis for this exception at the credible fear interview stage.

Some commenters expressed concern that the exception is too broad or easy to exploit. One commenter stated that applying the significant possibility standard for this exception could result in ''carte blanche'' acceptance of testimony that such an obstacle was present and thereby undermine the intent of the rulemaking. Others said that this exception was broad and easy to exploit because it could encompass a wide variety of difficult-to-verify claims, such as losing one's mobile phone, losing access to cell service, and being unable to pay for a new mobile phone or data plan. One commenter also said that the CBP One app's publicized technical issues would make it easy to claim the exception. Another commenter stated that, based on the app's rating in the app store, the app almost appeared to be ''designed to fail,'' to permit noncitizens to take advantage of the exception. Another commenter expressed general support for the inclusion of exceptions but predicted confusion and that migrants would prefer to present at a POE with an exception given the frequency of instances where it is not possible to access or use the DHS scheduling system. One commenter disagreed with the proposed exception relating to language barriers to accessing the CBP One app, asserting that migrants would take advantage of this exception to appear at a POE without an appointment. Another commenter stated that the rule ''impermissibly'' shifts the burden onto DHS to refute a noncitizen's assertion that it was not possible to use the app and therefore expressed concern about ''exploitation'' of the standard.

Some commenters recommended that the Departments should expand the exception for failure to use the CBP One app when it is not possible to do so to include noncitizens who enter the United States without inspection, rather than only applying to noncitizens who present at a POE.

*Response:* The rule provides the same exception set forth in the NPRM to the applicability of the rebuttable presumption if the noncitizen presented at a POE and demonstrates by a preponderance of the evidence that it was not possible to access or use the CBP One app due to language barriers, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This exception captures a narrow set of circumstances in which it was truly not possible for the noncitizen to access or use the CBP One app. *See* 88 FR at 11723 n.173.

The Departments appreciate the commenters' suggestions about the scope of the exceptions in 8 CFR 208.33(a)(2)(ii)(B) and 1208.33(a)(2)(ii)(B). With regard to the ''illiteracy'' exception, the Departments acknowledge and agree that citizenship is not necessarily a proxy for literacy in a particular language, and there is no presumption in the CBP One app or in this rule regarding a particular migrant's language. The Departments note, however, that individuals may seek assistance, including translation assistance, in using the app. And, to the extent that an individual is unable to access the app due to their language barriers, they may be excepted from the presumption, as discussed earlier in this preamble. The Departments decline to specify precise ways by which a noncitizen must prove, or particular language standards by which an AO or IJ must assess, that the noncitizen qualifies for a language barrier or illiteracy exception. This is to preserve flexibility and account for the unique circumstances of certain noncitizens who are illiterate or who face language barriers. Exceptions under this part of the rule will be assessed on a case-by-case basis.

The Departments also acknowledge that the parameters of the exception do not include a specific definition of ''significant technical failure'' and thank the commenter for their suggested definition. However, the Departments decline to add this definition to the regulatory text, as the Departments believe that there may be any number of ways that an individual could show a ''significant technical failure.'' The Departments also note that this exception is intended to cover technical failures of the app itself—*e.g.,* the app is not available due to a CBP network or server issue causing it to crash—rather than a situation in which a migrant is unable to schedule an appointment due to high demand or one where there is a fleeting, temporary technical error. In such a situation, the Departments encourage noncitizens to continue seeking to schedule an appointment, but, to the extent that they are prevented from doing so because of exigent circumstances, they may be able to show that they have experienced another ''ongoing and serious obstacle,'' such that they are excepted from the presumption. The Departments likewise decline to amend the regulatory text to take into account human error or specific data on the performance of the CBP One app. As noted above, there may be any of number of ways to show a significant technical issue, or, as described in more detail below, an ''ongoing and serious obstacle,'' which may be specific to the individual user. As noted below, the determination of whether the presumption applies will be made on a case-by-case basis.

The Departments appreciate commenters' concerns about what constitutes an ''ongoing and serious obstacle.'' The Departments agree that an individual with a mental or physical impairment may have difficulty accessing the app but decline to add a new categorical exception to the regulatory text for individuals with mental or physical impairment. This is in part because the Departments do not intend to limit the exception to a specified category or group of conditions, and AOs and IJs will determine the application of the exception on an individualized basis. The Departments also decline to create further rules regarding which situations will generally or categorically qualify for this exception, including on the basis of failed attempts to make an appointment through the CBP One app. This will preserve flexibility and account for the unique circumstances that noncitizens may face while attempting to schedule an appointment to appear at different POEs at different times. Exceptions under this part of the rule will be assessed on a case-by-case basis.

The Departments respectfully disagree with commenters' concerns as to noncitizens' ability to establish this exception. First, with regard to the commenters' concerns about access to counsel in credible fear interviews, that issue is discussed earlier in Section IV.B.5.ii of this preamble. The Departments decline to alter the burden of proof required for a migrant to show that it truly was not possible for them to access the CBP One app. As an initial matter, the Departments note that noncitizens outside of the United States have no freestanding right to enter, and no right to enter in a particular manner or at a particular time. *See, e.g., Shaughnessy,* 338 U.S. at 542. The CBP One app does not alter this longstanding principle, but rather is intended to incentivize and facilitate an orderly flow of travel into the United States. Thus, the Departments decline to change the burden of proof from the noncitizen to the Government or adopt a more liberal standard for noncitizens who enter the United States during the initial months after the rule takes effect.

Concerns about who will assess whether the exception applies are misguided. The rule tasks AOs and IJs, not CBP officers, with determining whether a noncitizen meets this exception to the rule. 8 CFR 208.33(b)(1) (''The asylum officer shall first determine whether the alien is covered by the presumption . . . .''); *id.* 1208.33(b)(2) (''The immigration judge shall first determine whether the alien is covered by the presumption . . . .''). So too are concerns as to an inability to access physical evidence to prove the exception while in custody. Noncitizens may be able to establish that they meet the exception through testimony so long as it is credible, persuasive, and refers to specific facts to establish the exception. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). A noncitizen also does not need to affirmatively raise this issue to qualify for the exception; adjudicators are trained to elicit testimony relevant to establishing a credible fear, as described in Section IV.B.5 of this preamble. However, if a noncitizen fails to disclose a technical failure or other obstacle when questioned about their failure to schedule an appointment using the CBP One app, this could potentially affect the credibility of their testimony if they later claim an exception in subsequent proceedings.

The Departments also disagree with commenters who claimed this exception is too broad or easy to exploit. The Departments disagree with the assertion that this exception will cause noncitizens to appear at a POE without an appointment. Noncitizens are not required to make an appointment in the CBP One app to present at a POE, and in no instance will an individual be turned away from a POE. All noncitizens who arrive at a POE will be inspected for admission into the United States. 8 CFR 235.1(a). Those, however, who present at a POE without making an appointment in the CBP One app, and do not meet another exception, will be subject to the presumption. For the exception to apply, the noncitizen must do more than merely assert that they could not access the scheduling system for one of the identified reasons, without further explanation. Rather, AOs and IJs will assess whether the noncitizen has demonstrated that they meet the exception on a case-by-case basis as part of the credible fear process or in section 240 removal proceedings. Additionally, the Departments note the app is not intended or designed to ''fail,'' and that AOs and IJs will evaluate on a case-by-case basis whether a noncitizen has shown that it was not possible to access the app due to language barriers, illiteracy, significant technical failure, or other ongoing serious obstacle.

Finally, the Departments decline to expand this exception to noncitizens to enter the United States without inspection instead of presenting at a POE. The Departments believe this would undermine the rule's purpose of incentivizing migrants to use lawful, safe, and orderly pathways to enter the United States. In cases where it was truly not possible for a noncitizen to access or use the CBP One app due to one of the rule's enumerated reasons, the Departments believe it would be preferrable to incentivize that noncitizen to seek admission at a POE rather than attempt a potentially dangerous entry between POEs. The latter could require the assistance of smugglers or traffickers and could place further strain on DHS resources in apprehending the noncitizen and commencing removal proceedings.

iii. Adequacy of Parole

*Comment:* While many commenters expressed support for the parole processes referenced in the NPRM, many also expressed a range of concerns about the role of the parole processes in the rule's rebuttable presumption. A commenter stated that the parole processes only account for small numbers of potential asylum seekers. One commenter stated that the parole programs have little bearing on asylum

access at the SWB or the Departments' stated goal to reduce border apprehensions. The commenter also stated that those who have the time and means to use these parole programs are not the same people who flee and approach the SWB. Another stated that the parole processes should not be the only way for migrants to come to the United States and petition for asylum. Another commenter stated that while Afghan migrants might be able to apply for humanitarian parole, the wait for the applications to be processed is too long for those who are living in danger in their country, and alleged that nearly 90 percent of humanitarian parole applications filed from outside the United States in the last year were denied.

Commenters stated that the CHNV parole processes are flawed because (1) they are limited to CHNV nationals; (2) they have a monthly cap, limiting the number of people who may enter the United States each month; (3) they require applicants to hold unexpired passports, which is uncommon for most citizens of Latin America and the Caribbean because of financial constraints; (4) they require a U.S.-based contact with the financial wherewithal to sponsor the applicant, which favors wealthy applicants and those with a broader network of support in the United States; (5) the applicant will need additional financial resources to afford a plane ticket and to meet vaccination and other requirements; and (6) humanitarian parole is not a substitute for asylum. Commenters stated that government officials may confiscate passports or target passport applicants at government offices, and noncitizens may not be able to wait for a passport or for receipt of advanced authorization due to the risk of harm or death. One commenter stated that huge backlogs related to the parole program have overwhelmed Haiti's passport system.

One commenter stated that the rule's impact on those who have been pre-approved by CBP to present for parole at POEs under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), due to urgent humanitarian reasons or significant public benefit is unknown because the rule does not clarify whether those pre-approved to present for parole by port officials will face the presumption of asylum ineligibility.

Another commenter expressed concern that the CHNV parole processes would simply add to the population of migrants present in the United States without status, which according to the commenter would impose a burden on American taxpayers, and that the parole processes simply ''kicks the can down the road.''

*Response:* The parole processes established for CHNV nationals are available lawful pathways—though not the only available lawful pathways—for qualifying individuals seeking to come to the United States. Each month, DHS issues advance travel authorizations for up to 30,000 CHNV nationals to travel to the United States to be considered by CBP on a case-by-case basis for a temporary grant of parole for a period of up to two years. Once the individuals have arrived in the United States, they may apply for immigration benefits for which they may be eligible, including asylum and other humanitarian protections. The Departments recognize that the parole processes are not universally available, even to the covered populations; in addition, the parole processes established for CHNV nationals and Ukrainians are distinct from applying for asylum and are not a substitute for applying for asylum. Although noncitizens who are eligible for these processes may apply for asylum after being paroled into the United States, there is no requirement that they do so. These processes do, however, represent one lawful, safe, and orderly pathway available to certain CHNV nationals seeking to enter the United States.

Similarly, while DHS recognizes that several commenters have raised concerns about the adequacy of the parole processes, this rule's reference to the parole processes is not intended to suggest that the parole processes are an alternative to or replacement for asylum. Rather, the parole processes are lawful, safe, and orderly pathways that the Departments wish to encourage in light of the urgent circumstances presented. Eligible noncitizens may use these processes to seek entry into the United States, and, thereafter, apply for asylum if desired. Moreover, with respect to the commenters' concern about the ongoing status of CHNV parolees—including obstacles they face in seeking parole and the impact that allowing parolees into the country will have on taxpayers—such concerns are outside the scope of this rulemaking because the parole processes exist separate and apart from this rule. To the extent that this rulemaking encourages noncitizens to use those parole processes and thereafter apply for asylum, rather than migrating irregularly, parolees who do so may remain in the United States to await the adjudication of any pending asylum application, and during that time may be eligible for employment authorization. *See* 8 CFR 274a.12(c)(11) (employment authorization available for duration of parole); *id.* 274a.12(c)(8) (employment authorization available for asylum applicants).

With respect to the commenter's suggestion that the CHNV parole processes have little bearing on the Departments' goal of reducing irregular migration, the Departments note that these processes have substantially reduced the number of encounters between POEs. For instance, between the announcement of the CHN processes on January 5, 2023, and January 21, 2023, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.[258] CHN encounters between POEs continued to decline to an average of fewer than 17 per day in March 2023.[259] The Departments offer further metrics in support of these processes' efficacy in Section II of this preamble.

While CHNV and Ukrainian nationals who lack a supporter cannot take advantage of these parole processes, such individuals can present at a POE by using a DHS scheduling mechanism to schedule a time to arrive at POEs at the SWB and not be subject to the presumption of ineligibility. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). If the noncitizen can establish that the scheduling mechanism is not possible to access or use due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle, then the noncitizen can present at a POE to seek asylum without a pre-scheduled appointment, and not be subject to the presumption of ineligibility. *Id.* This process is available to all noncitizens seeking protection, regardless of their nationality.

With respect to the commenters' concern about individuals ''pre-approved'' by CBP to present at the SWB, the Departments note that the rebuttable presumption does not apply to any noncitizen who presents at a land POE, pursuant to a pre-scheduled time and place. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33 (a)(2)(ii)(B). This is not limited to those who schedule a time through the CBP One app. Therefore, in the rare circumstance that noncitizens have scheduled a time to present at such a POE through another means, they would not be subject to the rebuttable presumption. Additionally, the Departments reiterate that the presumption does not apply to a noncitizen who has been provided appropriate authorization to travel to seek parole pursuant to a DHS-approved parole process, including the CHNV

[258] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[259] *Id.*

processes. *See* 8 CFR 208.33(a)(2)(ii)(A), 1208.33 (a)(2)(ii)(A).

*Comment:* Commenters recognized that the parole processes had positive results in the decrease of CHNV nationals encountered at the SWB, but predicted that the deterrence would decrease as more applicants are denied.

Commenters also stated that the requirement to travel directly to the United States by air may for some noncitizens be more challenging than traveling to the SWB, and raised the concern that the rebuttable presumption would apply to individuals who have received advance travel authorization under the CHNV processes, if those individuals arrive at the SWB rather than traveling directly by air. A commenter asserted that such a ''disqualification'' would be based on a ''technicality,'' not on any material facts.

Commenters cited statistics stating that since January 2023, Haitian nationals had 11,300 approved paroles, but only 5,100 of those traveled to the United States. Commenters noted that parolees would add to the backlog of asylum applicants.

*Response:* With respect to commenters' caution that the magnitude of the CHNV processes' impact on unauthorized arrivals at the SWB may change over time, as discussed in Section II of this preamble, the CHNV parole processes have remained effective since the rollout of the Venezuela process in October. The Departments disagree that this will necessarily change as more applicants are denied, because any intending migrant who cannot access the CHNV parole processes may still be dissuaded from migrating irregularly because even those applicants who are denied authorization to travel under those processes may respond to the disincentives to irregular migration made possible by those processes and this rule. The Departments acknowledge, however, that since mid-April, there has been an increase in Venezuelan migrants crossing between POEs at the SWB, while others continue making the treacherous journey through the Darién Gap to reach the United States—even as encounters of Cubans, Nicaraguans, and Haitians remain near their lowest levels this year.[260] The Departments believe that this increase in Venezuelan migration has been driven in part by the current limited availability of CBP One appointments and misinformation campaigns by smugglers, in the aftermath of the fire in a Mexican government facility that killed a number of Venezuelan migrants in March.[261] Although the number of CBP One app appointments available has been limited while the Title 42 public health Order has been in place, as detailed in Section IV.E.3.ii.a of this preamble, when the Title 42 public health Order is lifted, CBP intends to increase the number of available appointments. In addition, as discussed in more detail in Section II.A of this preamble, DHS and the Department of State announced new measures on April 27, 2023, that are expected to significantly expand lawful pathways, which, along with the expanded ability to present at a land POE pursuant to a pre-scheduled time and place, are expected to further reduce the overall volume of irregular migration. The Departments also note that there has not been a similar rise in encounters of CHN nationals, and believe that the rule's approach of incentivizing the use of safe, orderly, and lawful pathways while imposing a meaningful consequence for those who fail to do so and cannot otherwise rebut the presumption against asylum eligibility will reduce the number of noncitizens seeking to cross the SWB without authorization.

With respect to commenters' objection regarding the CHNV parole processes' stated requirements with respect to air travel to an interior POE, the Departments are aware that some noncitizens may have trouble securing air travel, but also note the potentially significant costs associated with irregular migration, including substantial fees that some migrants pay to smugglers and cartels to facilitate such travel.[262] The specific requirements for participation in the CHNV parole processes are outside the scope of this rulemaking, but DHS is actively monitoring the effects of the processes and may make adjustments as necessary.

The Departments also acknowledge that parolees who apply for asylum will add to the number of pending asylum applications; however, as discussed in Section II of this preamble, the net effect of the CHNV parole processes has been to significantly reduce rates of irregular migration and avoid a corresponding increase in the immigration court backlog.

*Comment:* A commenter stated that the Departments must consider how they would ensure that those migrants who use a parole program to enter the United States, such as Venezuelans or Nicaraguans, are not falling prey to scams. The commenter stated that there is reporting that those who do not have friends or relatives in the United States are going online to try to find sponsors, and stated that ''there are posts online demanding up to $10,000.00 USD for financial sponsorship.'' The commenter stated that if the Departments require use of the parole processes, the Departments should make efforts to ''end the financial abuse of potential parolees,'' similar to efforts to end human smuggling.

*Response:* As an initial matter, the specific requirements for participation in the CHNV parole processes are outside the scope of this rulemaking. In any event, the Departments recognize that immigration processes can be complex and that applicants, petitioners, and requestors are at risk of becoming victims of scams or fraud. The United States Government takes immigration scams and fraud seriously and is engaged in regular efforts to combat such behavior.[263] Additionally, the Departments conduct public-facing communications to advise all applicants to ensure that they only accept legal advice on immigration matters from an attorney or an accredited representative working for a DOJ-recognized organization.[264] The Departments also provide information to help applicants avoid immigration scams.[265]

DHS notes in public communications that access to the parole processes is free; neither the U.S.-based supporter nor the beneficiary is required to pay the United States Government a fee to

[260] *See* Reyes Mata III & Nick Miroff, *Surge of Migrants Strains U.S. Capacity Ahead of May 11 Deadline,* Wash. Post. Apr. 28, 2023, *https://www.washingtonpost.com/nation/2023/04/28/border-migrants-biden-title-42/.*

[261] *See, e.g., id.;* Nicole Acevedo & Albinson Linares, *Misinformation Fuels False Hopes Among Migrants after Deadly Fire in Mexico,* NBC News, Mar. 30, 2023, *https://www.nbcnews.com/news/latino/misinformation-fuels-false-hopes-migrants-mexico-fire-rcna77398* (''Over 1,000 migrants lined up outside international bridges to El Paso, Texas, on Wednesday afternoon [March 29, 2023] after false information spread on social media and by word of mouth that the U.S. would allow them to enter the country.'').

[262] *See, e.g.,* Ariel G. Ruiz Soto et al., *Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration* (Nov. 2021), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-wfp-mit_migration-motivations-costs_final.pdf.*

[263] *See, e.g.,* USCIS, *Fraud Detection and National Security Directorate* (last updated June 15, 2022), *https://www.uscis.gov/about-us/organization/directorates-and-program-offices/fraud-detection-and-national-security-directorate.*

[264] *See, e.g.,* USCIS, *Find Legal Services* (last updated Mar. 27, 2023), *https://www.uscis.gov/scams-fraud-and-misconduct/avoid-scams/find-legal-services.*

[265] *See, e.g.,* USCIS, *Avoid Scams* (last updated Feb. 17, 2023), *http://www.uscis.gov/scams-fraud-and-misconduct/avoid-scams.*

file the Form I–134A or to be considered for travel authorization, or parole.[266] DHS also provides a list of resources for victims of abuse, violence, or exploitation, as well as advice for protecting against immigration scams.[267]

*Comment:* One commenter noted the pending litigation regarding the CHNV parole processes and stated that the proposed rule presumes that the processes will continue to exist. If the parole processes are ultimately found to be unlawful, the commenter asserted that an injunction would nullify a central premise of the rule. The commenter also noted that the rule extends into the first several months of the next administration, which may end the parole processes. Another commenter argued that the parole processes are overbroad and contrary to statute, and that it is ''improper'' for the Departments to cite the parole processes as effective tools in support of the rule.

*Response:* The parole processes that DHS established in 2022 and 2023 for Ukrainian and CHNV nationals provide lawful pathways for individuals seeking to enter the United States. The Departments recognize that there is currently litigation over the CHNV parole processes. *See Texas* v. *DHS,* No. 6:23–cv–00007 (S.D. TX filed Jan. 24, 2023). The Departments are vigorously defending the processes as permitted under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), and believe that the CHNV parole processes are permitted under the statute, for the reasons described in the **Federal Register** notices announcing each process. Should this litigation result in an injunction or other hold on any parole process, the Departments do not believe that such an injunction or hold would affect the application of this rule.

The parole processes established for CHNV nationals do not represent the only available options for noncitizens seeking entry to the United States. If these parole processes are enjoined, Ukrainian and CHNV nationals would still be able to avoid the rebuttable presumption if they present at a POE pursuant to a pre-scheduled time and place. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Moreover, if the noncitizen establishes that the mechanism for scheduling was not possible to access or use due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle, then the noncitizen can present at a POE without a pre-scheduled appointment and would not be subject to the presumption of ineligibility for asylum. *Id.* Similarly, these noncitizens would also be excepted from the presumption of ineligibility if they sought asylum or other protection in a country through which they traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments believe that these alternative pathways for a noncitizen to be excepted from or rebut the presumption against asylum eligibility are sufficient, such that the rule would be justified even if the CHNV parole processes were to end. The rule incentivizes migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways, not simply the CHNV parole processes, to enter the United States, or seek asylum or other protection in another country through which they travel and thus reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States.

As stated at 8 CFR 208.33(d) and 1208.33(e), the Departments intend for the provisions of this rule to be severable from each other such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the presumption will remain in effect as to any other person or circumstance. *See also* 88 FR 11726–27. This intention for maximum severability extends to the parole processes themselves, which are authorized separate from this rulemaking and would exist even in the absence of 8 CFR 208.33(a)(2)(ii)(A), 1208.33(a)(2)(ii)(A).

iv. Third Countries

a. 1951 Convention and 1967 Protocol Signatories Alone Insufficient

*Comment:* A commenter stated that migrants may not be able to apply for protection in third countries if such countries do not have functioning asylum systems. A commenter suggested that the Departments revise the rule to except noncitizens who demonstrate that the country or countries through which the noncitizen traveled, that are party to the 1951 Convention or 1967 Protocol, did not provide a minimally safe, orderly, expeditious, and effective protection process in the noncitizen's circumstances. Another noted that while many countries in South and Central America are taking on a significant portion of the burden of migration in the Western Hemisphere, many of these countries cannot be considered ''safe'' for asylum seekers. Numerous commenters expressed a belief that the conditions and options in most or all third countries are insufficient to provide true or reasonable alternatives to seeking protection in the United States. Commenters stated that government records and NGO reports both make it clear that ''these countries have not developed working asylum systems and that, for many migrants, it would be pointless and life-threatening to stay and apply.'' Commenters noted that these conditions are the reason many migrants are fleeing and seeking to come to the United States in the first place. Further, some commenters noted that while Costa Rica has a successful asylum system, Costa Rica has significantly more asylum seekers per capita than the United States, and expressed a belief that Costa Rica is unlikely to be able to absorb more.

*Response:* The Departments do not agree with the commenter's suggestion to add an exception for noncitizens who demonstrate that a country did not provide an adequate protection process in that noncitizen's circumstances. First, the rule provides for several exceptions to, and means to rebut, the condition on asylum eligibility beyond having sought and been denied asylum or other protection in a third country. Second, the rule does not require that a noncitizen seek protection in any particular country. Finally, a noncitizen who seeks protection in a country through which they traveled, believes that the protection process was unfair in that country, and receives a final decision denying asylum or other protection from that country would still qualify for an exception to the presumption against asylum ineligibility.

The Departments do not agree with the generalizations that the nations through which a noncitizen might transit, including Mexico and countries in South and Central America, lack functioning asylum systems and invariably cannot be considered safe for those who apply for asylum in those countries. Many of these countries have taken substantial and meaningful steps in recent years that demonstrate their willingness to provide protection to those who need it, which is reflected in their international commitments and their efforts as described later in this response. To be relevant for the rebuttable presumption analysis, the country through which the noncitizen transited must be a party to the Refugee Convention or Protocol. Noncitizens traveling through the Western

[266] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Mar. 22, 2023), *https://www.uscis.gov/CHNV.*

[267] *Id.*

Hemisphere have many options in this regard; of the countries in North, Central, and South America, only one is not party to the Convention or the Protocol.[268] Several countries through which noncitizens may transit have also joined the non-binding Cartagena Declaration on Refugees (''Cartagena Declaration'').[269] Delegations from Belize, Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, and Venezuela joined the Declaration on November 22, 1984.[270] Among other things, the Cartagena Declaration includes a pledge to promote the adoption of national laws and regulations facilitating the application of the 1951 Convention and the 1967 Protocol.[271] The Cartagena Declaration also expands the definition of ''refugee'' to include those fleeing ''generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order.'' [272] This ''refugee'' definition is more expansive than that in U.S. law, *see* 8 U.S.C. 1101(a)(42)(A), thus providing some who may apply for protection, such as asylum, with more grounds on which to make their claim than they would have in the United States.

Nations throughout the Hemisphere are continuously demonstrating their commitment to providing protection to refugees, migrants, and asylum seekers. Colombia, Belize, and Mexico have made significant strides in developing their asylum systems and expanding protections for migrants. In 2021, Colombia adopted legislation that allows Venezuelans to apply for temporary protection status, which grants Venezuelans 10-year residency and allows them to access public education, health care, and employment.[273] By February 2022, about 2.4 million Venezuelans had applied for that status, and Colombian migration authorities had approved nearly 1.4 million by July 2022.[274] Belize offers an amnesty program for registered asylum seekers and certain irregular migrants that provides permanent residence and a path to citizenship.[275] The Government of Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders. Mexico's Federal Public Defender's Office offers legal counseling and support to asylum seekers and migrants who have filed claims with Mexico's Commission for Refugee Assistance (''COMAR'') and has increased both its specialized staff and visits to migration stations.[276] Mexico has also committed to integrating 20,000 refugees into the Mexican labor market over the next three years and is expanding labor opportunities for Central American workers.[277]

*Comment:* Commenters stated that it is inhumane to require asylum seekers to first seek protection in third countries because they are particularly vulnerable in those countries to harms like exploitation, kidnapping, assault, rape, robbery, or extortion. Commenters noted that many transit countries struggle with high levels of violence, corruption, and ineffective judicial or political systems, citing a range of facts to illustrate political and other concerns in many transit countries, including the trial of Mexican officials for conspiracy with cartels and the extradition of the former Honduran president to face charges in the United States. One commenter asserted that requiring victims of persecution to expose their personal information to possibly corrupt or hostile governments is ''an extension of the persecution they fled in the first place,'' while another stated that the act of applying for asylum in a third country would make migrants targets of the governments they are fleeing. Commenters also noted that most immigrants to the United States only travel through countries that also have a large number of emigrants seeking to enter the United States, which the commenter believes demonstrates that those countries are not safe.

*Response:* The Departments recognize that certain noncitizens may feel unsafe seeking protection in certain nations through which they might transit, including Mexico and countries in South and Central America, due to the concerns commenters describe. However, as discussed above, the Departments do not agree with generalizations that these countries are universally unsafe and cannot provide protection to asylum seekers. The Departments also note that the rule does not require any noncitizen to seek protection in a country where they do not feel safe. Applying for, and being denied, asylum or other protection in a third country is one exception to the rebuttable presumption, but noncitizens who choose not to pursue this path may instead seek authorization to travel to the United States to seek parole pursuant to a DHS-approved process, or present at a POE at a pre-scheduled time or place (or demonstrate that it was not possible to do so for a reason covered by the rule). *See* 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii).

Noncitizens may also rebut the presumption by showing that exceptionally compelling circumstances exist, including an acute medical emergency or an imminent and extreme threat to life or safety at the time of entry. 8 CFR 208.33(a)(3), 1208.33(a)(3). Although the Departments expect that many migrants seeking protection will be able to access asylum or other protection in at least one transit country, they recognize that not every country will be safe for every migrant and have provided other exceptions and means for rebutting the presumption to account for those circumstances. Although noncitizens may prefer to apply for asylum in the United States, it is not unreasonable to expect that they would pursue other safe options.[278]

b. Concerns About Length of Process and Documentation Provided by Third Countries

*Comment:* Several commenters stated that third countries are not efficient in providing proper documentation for asylum seekers, thus increasing wait times and creating additional issues in overcoming the presumption at the SWB. Another raised concerns that

[268] *See* Maja Janmyr, *The 1951 Refugee Convention and Non-Signatory States: Charting a Research Agenda,* 33 Int'l J. Refugee L. 188, 189 (2021); UNHCR, *States Parties, Including Reservations and Declarations, to the 1951 Refugee Convention, https://www.unhcr.org/us/media/38230* (last visited Apr. 25, 2023).

[269] *See* Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, Nov. 19–22, 1984, *https://www.oas.org/dil/1984_cartagena_declaration_on_refugees.pdf.*

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] Int'l Crisis Group, *Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia* (Aug. 2022), *https://www.crisisgroup.org/latin-america-caribbean/andes/colombia-venezuela/hard-times-safe-haven-protecting-venezuelan.*

[274] *Id.*

[275] Government of Belize, *Amnesty Background Information* (Dec. 7, 2022), *https://immigration.gov.bz/amnesty-background-information.*

[276] Comprehensive Regional Protection and Solutions Framework, *MIRPS in Mexico* (Aug. 2022), *https://mirps-platform.org/en/mirps-by-country/mirps-in-mexico.*

[277] Government of Mexico, Secretary of External Relations, *Mexico to Expand Labor Mobility Programs and Integrate Refugees into its Labor Market* (June 10, 2022), *https://www.gob.mx/sre/prensa/mexico-to-expand-labor-mobility-programs-and-integrate-refugees-into-its-labor-market?idiom=en.*

[278] *See* UNHCR, *Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries* 1 (Apr. 2018), *https://www.refworld.org/pdfid/5acb33ad4.pdf* (''[R]efugees do not have an unfettered right to choose their 'asylum country.' '').

requiring migrants to first apply and be rejected for asylum in a third country could force them to wait for that third country's asylum adjudication for months before they can continue their journey to the SWB. One commenter stated that the proposed regulations require a noncitizen to produce documentation (paper or electronic) to show denial of asylum in a third country, which the commenter stated is contrary to the INA's specification that noncitizens may establish asylum eligibility though testimony alone. One commenter expressed concern that the Departments have given no assurances that a denial of asylum in another country will not be used against an asylum applicant here in the United States, where our asylum eligibility guidelines are many times more stringent.

*Response:* To determine if an applicant has met their burden to demonstrate that they sought asylum or protection in a third county and were denied, adjudicators may weigh an applicant's credible testimony with other evidence. *See* INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Even when an applicant's testimony is credible, an adjudicator may, where appropriate, request evidence to corroborate this credible testimony, including documentation of the final denial. In that case, the applicant is not required to provide the evidence if they do not have the evidence and cannot reasonably obtain it. *Id.*

Regarding commenters' statements that requiring migrants to seek asylum in third countries will increase wait times, the Departments believe that wait times would likely be significantly longer in the absence of this rulemaking. For those who are unwilling or unable to seek asylum or other protection in a third country and wait for a final decision, the Departments note that there are multiple ways to avoid or rebut the rule's presumption of ineligibility, only one of which involves seeking asylum or other protection in a third country. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). Noncitizens who do not feel comfortable or safe applying for asylum outside the United States may avoid the rebuttable presumption by seeking parole under one of the authorized parole processes or using the CBP One app to present themselves at a pre-scheduled time at a POE. *See id.* 208.33(a)(2)(ii)(A) and (B), 1208.33(a)(2)(ii)(A) and (B). Additionally, noncitizens may rebut the presumption in exceptionally compelling circumstances, including where they faced an immediate and extreme threat to life and safety at the time of their entry into the United States. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.

With respect to the comment the Departments have given no assurances that a denial of asylum in another country will not be used against an asylum applicant here in the United States, the Departments note that AOs and IJs will consider the noncitizen's fear of returning to their country of origin on a case-by-case basis through the noncitizen's credible testimony and other relevant evidence demonstrating a fear of persecution.

c. Concerns About Differential Treatment of Migrants

*Comment:* Commenters raised concerns about unintended inequitable treatment of migrants under the rule. For example, commenters raised concerns that the rule arbitrarily disfavors migrants who live farther away, stating that it would be unfair to penalize those who do not have the good fortune of living in a nation close enough to the United States that they do not have to pass through a third country in their journey to the SWB. Another commenter noted that migrants who travel through third countries en route to the United States have necessarily traveled a lengthy distance, which may suggest that their claims are in fact more likely than others' to be meritorious. Similarly, commenters noted that a migrant who does not live close to a country that provides strong protections may not realize until after they passed through a third country that they should have applied for asylum in that country, and that many migrants cannot afford what may be a months-long process of applying for protection in a third country.

Some commenters stated that the United States should not summarily deny asylum claims based on whether migrants have passed through another ''safe third country,'' as the third country may not have been safe for each individual migrant, especially for vulnerable populations. At least one commenter stated that requiring migrants to seek asylum in third countries on their journey to the SWB is counterintuitive if the migrant has relatives or another support system in the United States. One commenter also noted that individuals with conditions that may cause cognitive difficulties or deficits, such as post-traumatic stress disorder, depression, or head trauma, may not be able to find the medical services that would allow them to participate in the asylum process of a country through which they transited, even if those countries had a functioning asylum system.

*Response:* The rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. Migrants who do not avail themselves of such a lawful pathway or seek protection in a country through which they travel will be subject to a rebuttable presumption of ineligibility for asylum. That said, the Departments recognize that many migrants face challenging circumstances in their home countries and en route to the United States, and appreciate that not every country will be viable for every migrant, including those who may apply for asylum or other protection, depending upon their individual circumstances. With regards to concerns that migrants may not receive sufficient notice of the exception to seek and be denied asylum or other protection in a transit country, the Departments note that this is only one of multiple exceptions and means of rebuttal that the rule allows. As discussed in Section IV.B.5.iv of this preamble, the rule does not deprive noncitizens of notice in violation of the Fifth Amendment Due Process Clause.

With respect to concerns about ''requiring'' migrants to seek protection in a third country when they have relatives already in the United States, the Departments reiterate that the rule does not require any migrant to seek protection elsewhere; there are multiple ways to avoid or rebut that presumption of ineligibility, only one of which involves seeking asylum or other protection in a third country. Eligible noncitizens who cannot safely apply for asylum outside the United States may (while residing in any country) seek parole under an authorized parole process. Alternatively, they may use the CBP One app to present themselves at a pre-scheduled time at a POE. Additionally, the presumption may be rebutted in exceptionally compelling circumstances, such as by demonstrating that one faces an acute medical emergency or imminent and extreme threat to life or safety at the time of entry, or by satisfying the definition of a victim of a severe form of trafficking in persons under 8 CFR 214.11(a). 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of

removal and protection under the CAT. The Departments are not aware, however, of any evidence establishing a direct link between distance traveled and validity of protection claims.

Finally, the Departments note that a location that may be unsafe for one person may not only be safe for, but may offer a much-needed refuge to, others. For example, some countries in the region may have a larger number of individuals who leave the country to seek protection elsewhere than who seek protection in the country, perhaps because those specific individuals experience a targeted threat of violence or fear of persecution in that country. At the same time, such a country may demonstrably provide protection for other individuals or groups of individuals, particularly those originating from third countries, who consider the country to be a safe option where they can be free from persecution or torture. To the extent commenters raise concerns about the ability of certain individuals to participate in the asylum processes of third countries, the Departments note that, as discussed above, many regional partners have protection frameworks that are in some respects more expansive than those of the United States. As detailed in the preamble to the NPRM, *see* 88 FR at 11720–23, many countries in the region have significantly increased protection options to address the unprecedented movement of migrants throughout the hemisphere. Finally, humanitarian protection is not the only available lawful pathway to intending migrants. In some instances, employment-based migration may be the best option for migrants for whom economic issues are a key factor motivating them (which studies have shown are a high percentage of those moving through the region).[279]

Further discussion of the potential effects of this rule with respect to specific groups is contained in Section IV.B.4 of this preamble.

d. Concerns About Conditions and Asylum Process in Third Countries Generally

*Comment:* Commenters stated that lawful pathways in third countries do not necessarily promote family unity, and that opportunities for family unity depend on the specific pathway.

*Response:* The Departments acknowledge that countries in the region have differing asylum systems and requirements. However, this rule does not require that noncitizens apply for asylum or other protection in a specific third country in order to preserve family unity. Rather, such an application is one of multiple options for noncitizens under the rule. DHS-approved parole processes represent another set of options available to some noncitizens. Additionally, any noncitizen may present at a POE via an appointment that includes a pre-scheduled time and place or may present at a POE without a pre-scheduled time and place and be excepted from the presumption if the noncitizen demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. The Departments also note the discussion in Section IV.E.3.ii.b of this preamble of CBP's ongoing efforts to improve CBP One app functionality for families.

*Comment:* Numerous commenters stated that the third country exception would cause serious bodily harm to noncitizens, lengthening the amount of time noncitizens spend in unsafe transit countries, and exposing them to further risks of persecution, torture, and death in third countries. Multiple commenters expressed concern that the rule ignores the realities asylum seekers face, including violence, persecution, and inadequacy of asylum systems in third countries, and reflects a misunderstanding of the conditions of noncitizens fleeing persecution. Multiple other commenters stated that applying for asylum and awaiting a subsequent denial in a third country is nearly impossible for noncitizens. Several commenters argued that requiring noncitizens to apply for asylum in third countries and wait for a decision would prolong their journey to safety. Another commenter stated that it was unreasonable to require noncitizens to wait for extended periods of time in third countries and suggested that the Departments revise the rule to except noncitizens who waited for six months or more without a decision. Similarly, a commenter stated that the third country exception was a way to delay the safety and stability of noncitizens. A commenter also stated that prior ''safe third country'' policies relating to Guatemala, among other places, forced asylum seekers into dangerous situations in third countries. A commenter said that although the NPRM states that preventing human trafficking is a consideration for the rule, the third country exception would drive people further into traffickers' hands. Numerous commenters provided narrative examples of noncitizens who had successfully gained asylum in the United States, and added that it would not have been possible for them to gain asylum if the third country exception was enacted.

*Response:* Regarding comments stating that ''safe third country'' and similar policies force those who might otherwise apply for asylum in the United States into dangerous situations in third countries, the Departments recognize that not all third countries will be safe for all noncitizens seeking asylum and acknowledge that some migrants may feel that the dangers noted by commenters, or the risk that a particular country's asylum system would be unduly delayed or leave them vulnerable to refoulement, make applying for protection in that country untenable. However, the rule does not require any noncitizen to seek protection in any particular country and therefore the Departments likewise decline to add an exception for noncitizens who waited for a certain period of time in a third country without a final decision.

The Departments also strongly disagree that the third country exception will heighten risks of human trafficking. Rather, the Departments expect that the rule will reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain, including via human trafficking. If a noncitizen does not believe it would be safe to apply for asylum or related protection in any third country, they may avoid the presumption against asylum eligibility by availing themselves of any of the other available lawful pathways, or, if applicable, they may be able to rebut the presumption of ineligibility by demonstrating exceptionally compelling circumstances.

*Comment:* Some commenters oppose the rule because they believe it encourages individuals to remain in countries where they may not be safe and are closer to their feared persecutor(s) to avoid being disqualified from asylum should they try to enter at the SWB. For example, one commenter cited the experiences of individuals who are being imminently threatened by gangs and have to flee and therefore are unable to remain in their country to apply for a lawful pathway to the United States. Similarly, many

[279] *See, e.g.,* Ariel G. Ruiz Soto et al, *Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration,* 18 (Nov. 2021), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-wfp-mit_migration-motivations-costs_final.pdf* (reporting that 92 percent of respondents to a UN World Food Programme household survey ''cited economic reasons related to their livelihoods as being key motivating factors'' for migration).

commenters stated that it was unfair and unrealistic to expect noncitizens to seek asylum in areas that are unsafe and do not have meaningful protections for refugees.

*Response:* The Departments disagree that the rule encourages noncitizens to remain in dangerous conditions or remain close to their feared persecutors so as to preserve their chance to be eligible for asylum in the United States. The Departments understand that in some cases it would be dangerous for a noncitizen to remain in their home country while they seek a safe, orderly, and lawful pathway into the United States, but note that eligible migrants who have already left their country of origin may apply for the CHNV processes, and all migrants may, if within the appropriate area in Mexico, schedule an appointment to present at a POE. Moreover, the Departments note that lawful pathways such as applying for asylum in a country they transited through or scheduling an appointment through the CBP One app to present at a POE are recognized by the rule and are available to migrants who have already left their country of origin. The Departments do not agree that this rule creates a strong incentive for those facing danger to remain in their home countries.

e. Concerns About Conditions and Asylum Process in Mexico Specifically

*Comment:* Several commenters expressed concerns about the adequacy of the asylum process in Mexico in particular. For example, one commenter stated that they had worked as a lawyer with migrants in Mexico for a year, and that COMAR is extremely overwhelmed and lacks the staff and funds to process the hundreds of thousands of asylum applications they have received from people in Mexico in the past few years. The commenter stated that they had personally witnessed the inability to receive a timely decision, or even to get access to COMAR in order to file an application in many parts of Mexico. The commenter also stated that Mexican civil society cannot meet the legal and social service needs of hundreds of thousands of asylum seekers, because such organizations are underfunded and under-resourced and cannot begin to meet the basic humanitarian and legal needs of the many people in need of protection who transit through Mexico. Other commenters stated that COMAR is underfunded and that immigration advocates have documented mismanagement and instances of denials of meritorious claims.

One commenter stated that Mexico's asylum system is not prepared to actually grant asylum to refugees from South and Central American countries, stating that conditions for refugees in Mexico are "harsh" and that Mexico does not provide refugees with "legal residence or adequate legal rights to keep them free of exploitation."

A commenter stated that unless an applicant is granted a transfer request by COMAR, they cannot leave the geographical area where they applied for asylum. The commenter added that many applicants move due to safety or economic concerns, and as a result, their cases are considered abandoned. The commenter stated that an abandoned case would not be considered a denial under Mexican law, and that a person who abandoned their application would not qualify under the NPRM. A commenter stated that they have not seen evidence that the Departments have reviewed the ability of asylum seekers to obtain protection in Mexico and that failure to do so would lead to arbitrary and capricious rulemaking.

*Response:* The Departments recognize that managing migration is a collective responsibility and, as part of a whole-of-government approach, requires working closely with countries throughout the region to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration throughout the Western Hemisphere. With regard to Mexico's ability to handle asylum claims, as stated in the NPRM, 88 FR at 11721, Mexico is the third highest recipient of asylum claims in the world; in 2022, COMAR reported receiving 118,478 applicants for refugee status.[280] Of applications completed in 2021, COMAR granted asylum in 72 percent of cases; an additional two percent of applicants were granted complementary protection (a form of protection available to those who are not eligible for refugee status).[281] Of applications completed in 2022, COMAR granted asylum in 61 percent of cases; an additional two percent of applicants were granted complementary protection.[282] The average case takes 8–12 months to adjudicate.[283] With United States Government funding and the support of international organizations, Mexico has also substantially increased its Local Integration Program, which relocates individuals granted asylum to safe areas of Mexico's industrial corridor and integrates them into such areas. These individuals are then matched with jobs and provided apartments, and their children are enrolled in local schools. In May 2022, the program reached the milestone of reintegrating 20,000 asylum seekers in Mexico.[284] And in June 2022, Mexico committed to support local labor integration for an additional 20,000 asylees over the next three years.[285] The Government of Mexico has announced substantial increases to its labor visa programs over the past two years to help those seeking protection enter the labor market.[286] The Departments acknowledge that, like the United States, Mexico has a significant asylum backlog. Nonetheless, it remains a viable option for many seeking protection in Mexico.[287]

As it relates to the comment regarding abandoned claims, the Departments note that, as discussed in Section IV.E.3.iv.f of this preamble, under this rule, a final decision does not include a determination by a foreign government that the noncitizen abandoned the claim. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). A noncitizen who has abandoned their asylum claim in Mexico would not qualify, on that basis, for an exception to the rebuttable presumption. Such noncitizens may nonetheless qualify for another exception to the rebuttable presumption or be able to rebut the presumption. For these reasons, the Departments have declined to revise the rule in response to this comment.

*Comment:* Other commenters stated that towns along Mexico's northern border are not equipped to provide food, shelter, health care, and sanitation services to migrants waiting for an

[280] Government of Mexico, La COMAR en Números, Diciembre 2022 (Jan. 16, 2023), *https://www.gob.mx/cms/uploads/attachment/file/792337/Cierre_Diciembre-2022__31-Dic.__1.pdf.*

[281] *See id.;* UNHCR, *Asylum Capacity Support Group, Mexico: Granting Complementary Protection, https://acsg-portal.org/tools/mexico-granting-complementary-protection/* (last visited Apr. 26, 2023).

[282] Government of Mexico, La COMAR en Números, Diciembre 2022 (Jan. 16, 2023), *https://www.gob.mx/cms/uploads/attachment/file/792337/Cierre_Diciembre-2022__31-Dic.__1.pdf.*

[283] Refugees Int'l, *Mexico's Use of Differentiated Asylum Procedures: An Innovative Approach to Asylum Processing* (July 20, 2021), *https://www.refugeesinternational.org/reports/use-of-differentiated-asylum-procedures-an-innovative-approach-to-asylum-processing-#_ftn5.*

[284] UNHCR, *Más de 20.000 Reubicaciones como Parte de los Esfuerzos de Integración de Personas Refugiadas en México* (May 25, 2022), *https://www.acnur.org/noticias/press/2022/5/628e4b524/mas-de-20000-reubicaciones-como-parte-de-los-esfuerzos-de-integracion-de.html.*

[285] *See* L.A. Declaration Fact Sheet.

[286] *See id.*

[287] *See* Global Compact on Refugees, *Mexico, https://globalcompactrefugees.org/gcr-action/countries/mexico* (last visited Mar. 9, 2023); Government of Mexico, Law on Refugees, Complementary Protection, and Political Asylum, Article 28, January 27, 2011, *https://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP.pdf.*

asylum hearing. Commenters also stated that migrant camps in Mexico are dangerous, unsanitary, and negatively impact migrants' mental health. A commenter stated that organized crime operates across Central America and Mexico with impunity, and that a target of organized crime fleeing one location would likely be found and targeted in Mexico as well. Another commenter stated that persecutors have followed asylum seekers into Mexico and harmed them there.

Commenters also stated conditions in Mexico are unsafe, especially for asylum seekers. Specifically, commenters stated that the proposed rule would cause additional harm for migrants forced to wait in Mexico before applying for asylum in the United States due to the risk of rape, murder, kidnapping, extortion, robbery, and other violence; violent detention by Mexican government officials; denial of medical care for serious illnesses; displacement and homelessness; discrimination or harassment due to race, gender, and sexual orientation; abusive employment arrangements; and denial of access to basic services and protections due to language barriers. One commenter expressed concern that migrants in Mexico face discrimination from drug cartels and other criminals as well as from Mexican authorities, including police and immigration officials. Some commenters pointed to advisories issued by the U.S. Department of State warning U.S. citizens not to travel to areas in Mexico, and stated that there are many examples of migrants being seriously harmed while waiting for asylum in Mexico or for the chance to enter the United States.

Commenters also stated that these risks were further heightened for members of vulnerable groups, such as women and children, Black, brown, and indigenous persons, and LGBT persons.

*Response:* The Departments recognize commenters' concerns about potential harm to migrants in Mexico, particularly for members of vulnerable groups, but again note that more than 100,000 individuals felt safe enough to apply for asylum in Mexico in 2022. The Departments also emphasize that the rule does not require any noncitizen to apply for asylum or other protection in Mexico or any other country. Applying for and being denied protection in Mexico is only one of multiple ways to be excepted from or rebut the presumption of ineligibility for asylum. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). The rule also provides that the presumption of asylum ineligibility can be rebutted by noncitizens who do not utilize a lawful pathway but who face an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder or who were victims of a severe form of trafficking in persons. *See* 8 CFR 208.33(a)(3)(i)(A) through (C), 1208.33(a)(3)(i)(A) through (C).

For further discussion of this rule and vulnerable populations, please see Section IV.B.4 of this preamble.

*Comment:* A commenter expressed concern that Mexican asylum seekers would have to wait for an appointment with CBP in the same country where they are experiencing persecution.

*Response:* This concern is based on a misunderstanding of the rule. The rebuttable presumption only applies to noncitizens who travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, and that is a party to the Refugee Convention or Protocol, and thereafter enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission. *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). Mexican nationals would not have traveled through a country other than Mexico en route to the SWB, and therefore are not subject to the rebuttable presumption. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii).

f. Final Decision of Foreign Government is Undefined

*Comment:* Commenters asked how U.S. officials would know the adjudication and appeal processes of third countries, such that they could confirm that a noncitizen's application for asylum or other protection in a third country had been denied in a final decision. Commenters stated that a requirement for a final decision could introduce years of uncertainty depending on the backlogs and resources of third countries. One commenter stated that proving the denial of protection in a third country may be entirely impossible in the context of a credible fear interview.

*Response:* The Departments agree that further clarity on the meaning of the term ''final decision'' will help noncitizens understand, and IJs and AOs apply, this provision. The Departments are therefore revising 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C) to except from the rebuttable presumption noncitizens who ''[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. A final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim. A final decision does not include a determination by a foreign government that the noncitizen abandoned the claim.''

The Departments also acknowledge that, like the United States, many countries have asylum backlogs that contribute to significant wait times for applicants. However, this rule does not require noncitizens to apply for asylum in a third country and wait for a final decision before applying for asylum in the United States; rather, that is simply one of the lawful pathways recognized by the rule. As an alternative to applying for asylum in a third country and seeking a final decision before migrating to the United States, noncitizens can utilize the CBP One app to pre-schedule an appointment to present at a POE or seek parole pursuant to a lawful parole process (such as the CHNV parole processes). *See* 8 CFR 208.33(a)(2)(ii)(A) and (B), 1208.33(a)(2)(ii)(A) and (B). The rule also allows noncitizens to whom the presumption applies to rebut it in exceptionally compelling circumstances. 8 CFR 208.33(a)(3), 1208.33(a)(3).

The Departments acknowledge that each of the lawful pathways outlined in the rule is subject to limitations, including, *e.g.,* capacity constraints, limitations on eligibility, and geographic availability. The Departments further acknowledge that the pathways' combined limitations could constrain some individuals' ability to access pathways at a given time or place, and that some of those individuals may also not be able to establish an exception to, or rebut, the presumption. However, the Departments have concluded that the interests of migrants and the immigration system as a whole, including the asylum system, are best promoted by incentivizing noncitizens to pursue safe, orderly, and lawful pathways to enter the United States rather than failing to take adequate actions to respond to a potential further surge of irregular migrations at the SWB that threatens to overwhelm the immigration system and prevent orderly processing of claims for protection.

*Comment:* Commenters stated that the proposed exception for those who sought and were denied asylum or ''other protection'' was unduly vague, because the term ''other protection'' is undefined. Commenters stated that if a migrant applied for and was denied an immigration status other than asylum, they would not necessarily know such

denial would qualify them for an exception to the rebuttable presumption. Commenters further stated that the absence of a definition would result in inconsistent application of the exception.

*Response:* The preamble of the NPRM described the United States' efforts throughout the region to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including access to international protection. Such efforts are put forward in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America;[288] the CMMS;[289] and the L.A. Declaration. The NPRM provided a detailed discussion of increased access to protection and other pathways in the region, specifically identifying available programs and processes in Mexico, Guatemala, Belize, Costa Rica, Colombia, Ecuador, and Canada. *See* 88 FR at 11720–23. While these countries provide an opportunity for individuals to apply for asylum or refugee status, they also offer other protection that is not dependent on the applicant meeting the definition of a refugee as provided by the Refugee Convention. For example, Mexico offers protection to individuals whose lives are in danger or where there are well-founded reasons to believe that they would be in danger of being subjected to torture or other cruel, inhuman, or degrading treatment or punishment.[290] Colombia, Costa Rica, and Ecuador have also offered other protection via regularization programs for individuals of specific nationalities.[291]

Because such protection and other pathways in the region are country-specific and, as exemplified by the increased access to protection in the region as a result of the CMMS and L.A. Declaration, are subject to change, the Departments have determined that appropriate pathways and other protections are best determined on a case-by-case basis, considering the evidence presented relating to the nature and basis of the noncitizen's application for protection in the third country. Nevertheless, the Departments note that the "final decision denying asylum or other protection" is intended to include denials of asylum and other forms of humanitarian protection related to fear of returning to one's home country as well as other temporary protections akin to that of temporary protected status under section 244 of the INA, 8 U.S.C. 1254a.

*Comment:* Commenters stated that the proposed rule gives preference to applicants who were denied asylum by another country over those who did not apply or who did apply and received asylum. Commenters stated that the proposed rule would not filter out people with weak asylum claims, as commenters believe the Departments intend, but would rather prevent the most vulnerable people from seeking asylum altogether.

*Response:* The Departments disagree with the assertions that this rule necessarily gives preference to applicants who were denied asylum by another country over those who do not apply and disagree that the rule would prevent the most vulnerable people from seeking asylum altogether. The rule imposes consequences on certain noncitizens who enter the United States without availing themselves of a lawful pathway for entering the United States. Seeking protection and receiving a final decision in a country through which a noncitizen traveled is one of the lawful pathways recognized by the rule, but it is not the only lawful pathway available. A noncitizen who does not seek protection in a third country may nonetheless establish an exception to the presumption—just as a noncitizen who has sought and been denied such protection would—by presenting at a POE at a pre-scheduled time, or by pursuing a DHS-approved parole process.

The rule incentivizes intending migrants to pursue lawful pathways as part of a regional approach to migration management, including by incentivizing migrants to seek protection in countries through which they travel. With respect to any concern that noncitizens denied protections in a third country are less deserving of protection here, the Departments do not agree that a denial in a third country necessarily means that the applying individual would not merit protection under U.S. law.

In addition, the Departments do not agree that the rule necessarily gives preference to applicants who have been denied asylum in another country. Rather, the rule incentivizes migrants to avail themselves of lawful alternatives to irregular migration and see them through to completion (*e.g.,* receiving a final decision in another country). Those noncitizens meeting that requirement who are ultimately granted asylum or other protections in other countries would have no need to continue on to the United States and may, in many cases, be subject to the firm resettlement bar to asylum, and thus, in the Departments' view, such noncitizens need not be excepted from the rebuttable presumption. However, those who have been denied may still have a need for protection in the United States. Therefore, the Departments believe that maintaining asylum eligibility in the United States for those who have been denied asylum in third countries is appropriate and supports the larger goal of incentivizing noncitizens to pursue available lawful pathways, as part of an effort to build a regional approach to migration management.

Moreover, as noted above, there are additional lawful pathways to which noncitizens could avail themselves to avoid application of the rebuttable presumption as well as multiple circumstances in which the presumption of asylum ineligibility could be rebutted. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). The Departments acknowledge that each of the lawful pathways outlined in the rule is subject to limitations and that the pathways' combined limitations could constrain any individual's ability to access them at a given time or place. However, the Departments have concluded as a matter of policy that the interests of migrants and the immigration system as a whole are best promoted by incentivizing noncitizens to pursue safe, orderly, and lawful pathways to enter the United States rather than failing to take adequate actions to respond to a potential further surge of irregular migration at the SWB that threatens to overwhelm the immigration system and prevent orderly processing of claims for protection.

g. Pursuit of Lawful Pathways May be Improperly Used as Evidence

*Comment:* Some commenters expressed concern that taking time to

[288] The White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[289] The White House, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[290] Government of Mexico, Law on Refugees, Complementary Protection, and Political Asylum, Article 28, January 27, 2011, *https://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP.pdf.*

[291] UNHCR, *Temporary Protection Status in Colombia (November 2021)* (Dec. 3, 2021), *https://reliefweb.int/report/colombia/temporary-protection-status-colombia-november-2021-0;* Costa Rica, *Special Temporary Category for Nationals of Cuba, Costa Rica and Nicaragua with Pending or Denied Refugee Claims* (Apr. 17, 2023), *https://www.migracion.go.cr/Paginas/Categor%C3%ADa%20Migratorias%20(Extranjer%C3%ADa)/Categor%C3%ADa-Especial-Temporal.aspx;* Reuters, *Ecuador Begins Regularization Process for Thousands of Venezuelan Migrants* Sept. 1, 2022, *https://www.reuters.com/world/americas/ecuador-begins-regularization-process-thousands-venezuelan-migrants-2022-09-01/.*

pursue lawful pathways may be used as evidence that noncitizens who do not flee their country immediately do not have a legitimate well-founded fear of persecution.

*Response:* The Departments disagree that the rule will increase the likelihood of adverse determinations against those noncitizens who choose to remain in their home countries while seeking access to one of the enumerated lawful pathways. As noted elsewhere in this section, this rule does not discourage any person from fleeing a dangerous circumstance, and in fact highlights the options potentially available to persons who do so. Moreover, such migrants may still provide relevant evidence to support their eligibility for asylum, including a well-founded fear of future persecution, notwithstanding their decision to remain in their country to seek a lawful pathway to the United States. *See* 88 FR at 11737; *see also* 8 CFR 208.13. In short, despite assertions made by some commenters, this rule will not result in the elimination of claims for asylum based on a well-founded fear of future persecution, even for applicants who spend some amount of time in their country of origin attempting to access an orderly and lawful pathway to the United States. AOs and IJs will still consider the noncitizen's fear of returning to their country of origin on a case-by-case basis through the noncitizen's credible testimony and other relevant evidence demonstrating a fear of persecution.

v. Unaccompanied Children

*Comment:* Commenters disagreed with the exception for UCs, stating that children need their parents to keep them safe during their journey to the SWB and that the proposed rule would discourage whole families from seeking asylum together. Some commenters stated that the UC exception would encourage family separation, arguing that families often separate as a perceived means to obtain protection for their children. Specifically, commenters stated that excepting UCs from the rebuttable presumption would incentivize families to send their children on a dangerous journey to the SWB unaccompanied, leading to a surge in the number of UCs arriving at the SWB. Similarly, commenters expressed that in lieu of waiting together in Mexico, many families may choose, or be ''forced'' by the lack of sufficient appointment slots for family members or concerns related to their children's safety, to send their children unaccompanied to the SWB while waiting to schedule their own appointment through the CBP One app. Commenters pointed to reports of such voluntary separations under MPP and the Title 42 public health Order and said that the proposed rule would lead to similar outcomes, and that implementing a policy that would foment such separations would be inhumane and unacceptable. Commenters stated that family separations can cause severe emotional trauma to children and may increase the risk that a child will be exploited or trafficked.

Some commenters suggest that the Departments should remove the UC exception and instead award a higher priority to family unit applications, as this would keep family units together, grant asylum to those that qualify, and disincentivize sending UCs to the SWB. Other commenters asserted that accompanied children should also qualify for an exception, since the exception for UCs creates a perverse incentive to send children alone to the border if families are not first successful together. Another noted that children arriving with their families do not choose where to cross the border or whether to first obtain an appointment, nor do they choose whether to first apply for asylum in another country, especially when fleeing danger.

*Response:* The Departments fully agree with commenters that keeping families unified and avoiding family separation and the associated trauma is an important goal, but disagree that the rule, including the exception for UCs, will increase separations of families and result in more UCs arriving in the United States. *See, e.g.,* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 5, 2021). As noted in the preamble of the NPRM, applicability of the rebuttable presumption will be considered during the credible fear process for those noncitizens processed for expedited removal, as well as applied to merits adjudications. 88 FR at 11707. Pursuant to section 235 of the Trafficking Victims Protection Reauthorization Act of 2003 (''TVPRA''), UCs whom DHS seeks to remove cannot be processed for expedited removal and, thus, are never subject to the credible fear process. 8 U.S.C. 1232(a)(5)(D). As UCs are already excluded from expedited removal, the Departments do not expect—based on their experience implementing current law concerning expedited removal and asylum—that this exclusion of UCs from the rebuttable presumption would serve as a significant incentive for families to send their children unaccompanied to the United States.

In addition, under this rule, families may avail themselves of lawful pathways and processes to enter the United States to avoid application of the rebuttable presumption. The rule also states that if one member of a family travelling together, including both parents and children, is excepted from the presumption or has rebutted the presumption, all members of the family are treated as excepted from or as having rebutted the presumption. 8 CFR 208.33(a)(2)(ii) and (3)(i), 1208.33(a)(2)(ii) and (3)(i); 88 FR at 11730 (providing that ''if one member of a family traveling together is excepted from the presumption that the condition applies or has rebutted the presumption, then the other members of the family as described in 8 CFR 208.30(c) are similarly treated as excepted from the presumption or as having rebutted the presumption''); *see* 8 CFR 208.30(c)(2) (''The asylum officer in the officer's discretion may also include other accompanying family members who arrived in the United States concurrently with a principal [applicant] in that [applicant's] positive fear evaluation and determination for purposes of family unity.'').

To the extent commenters suggest that all children, including those traveling with a parent or legal guardian, be excluded from applicability of the rule, the Departments agree that children may have limited agency in their manner of arrival in the United States. The Departments have therefore added a provision to the rule that allows principal asylum applicants who were under the age of 18 at the time of entry to avoid the condition on asylum eligibility for applications if they file as principal applicants after May 11, 2025, as discussed in more detail at Section II.C.2 of this preamble. 8 CFR 208.33(c)(2), 1208.33(d)(2). However, the Departments do not wish to create an incentive for adults to arrive at the border with children falsely claiming to be a family unit in order to be excepted from the rule or for parents or legal guardians to bring their children with them on the dangerous journey to the United States when they otherwise would not do so, and therefore decline to add an exception for all accompanied minors. The Departments seek to encourage families that may choose to travel to the United States together to travel via a lawful pathway rather than by entrusting smugglers or criminal organizations to facilitate a potentially dangerous journey.

vi. Other General Comments on Exceptions

*Comment:* Several commenters stated that the exceptions to the rebuttable presumption are too narrow and, therefore, would preclude many noncitizens from obtaining asylum. One commenter suggested creating a broad fourth exception that would exempt particularly vulnerable demographics from the rebuttable presumption, much like the proposed rule already exempts unaccompanied children. Another commenter suggested creating an exception for the elderly, who are significantly less likely to be repeat unauthorized crossers.

*Response:* The Departments believe that the rule will generally offer opportunities for those with valid claims to seek protection, and decline to add additional exceptions to the rule. The Departments believe that the existing exceptions to application of the rebuttable presumption against asylum eligibility at 8 CFR 208.33(a)(2) and 1208.33(a)(2) provide the desired incentive for noncitizens seeking to enter the United States do so via safe, orderly, and lawful pathways, and that additional exceptions, particularly broad exceptions such as those suggested by commenters, would be contrary to the purpose of the rule. Regardless of whether certain populations may be more or less likely to be repeat, unauthorized border crossers, the Departments believe that all noncitizens seeking to enter the United States should do so via safe, orderly, and lawful pathways if possible.

The Departments also note that in addition to the enumerated exceptions, the rule includes means of rebutting the presumption against asylum eligibility at 8 CFR 208.33(a)(3) and 1208.33(a)(3) where exceptionally compelling circumstances exist, including where at the time of entry the noncitizen or a member of their family with whom they are traveling faced an acute medical emergency, faced an imminent and extreme threat to life or safety, or were a victim of a severe form of trafficking in persons. The Departments believe that together, the exceptions and grounds for rebuttal strike the correct balance between incentivizing use of safe, orderly, and lawful pathways for entry into the United States while also recognizing that in certain limited circumstances use of these pathways may not be feasible.

4. Other General Comments on the Rebuttable Presumption

*Comment:* At least one commenter suggested that the Departments should permit an applicant to override the lawful pathways condition if they establish a reasonable possibility of persecution or torture.

*Response:* To best effectuate the policy aims underpinning this rulemaking, the Departments believe that even those noncitizens who establish a reasonable fear of persecution or torture generally should remain subject to this asylum eligibility condition. Such noncitizens remain eligible for statutory withholding of removal or for CAT protection, consistent with U.S. non-refoulement obligations under the Refugee Convention and Protocol and Article 3 of the CAT. *See Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017). Additionally, as discussed in Section IV.E.7.ii of this preamble, the Departments have included protections for family members of principal asylum applicants who are eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the lawful pathways rebuttable presumption, where an accompanying spouse or child would not qualify for asylum or other protection from removal on their own or where the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if the applicant were granted asylum. In that context, the Departments have determined that the possibility of separating the family would constitute an exceptionally compelling circumstance that rebuts the lawful pathways presumption of ineligibility for asylum. *See* 8 CFR 1208.33(c).

*Comment:* One commenter stated that the United States and Mexico should establish certain parameters for non-Mexicans waiting in Mexico for an appointment or for entry by other means, which must take into account safety, security, and humanitarian conditions in the locations where asylum seekers may be forced to wait. The commenter suggested that those parameters should include permission to remain lawfully in Mexico while awaiting appointments and ensuring relevant standards of protection and treatment under the Refugee Convention and international human rights standards.

*Response:* It would be the Government of Mexico's prerogative to establish any such parameters. The Departments remain committed to continuing to work with foreign partners on expanding their legal options for migrants and expanding the Departments' mechanisms for processing migrants who lawfully arrive in the United States. *See* 88 FR at 11720.

5. Screening Procedures and Review

i. Requests for Reconsideration

*Comment:* Some commenters opposed eliminating noncitizens' ability to seek reconsideration of a negative fear determination by USCIS and contended that the proposed rule would eliminate AO reconsideration of negative credible fear determinations. Commenters stated that the use of reconsiderations is needed to safeguard the rights of and due process for asylum seekers where the AO in the first instance issues an erroneous decision. Commenters stated that reconsideration has shielded asylum seekers from deportation to persecution and torture for decades, and observed that between FYs 2019–21 requests for reconsideration resulted in 569 reversals of negative credible fear determinations. One commenter stated that even one reversal in the request for reconsideration process is significant enough. One commenter wrote that, contrary to the proposed rule's ''theory that'' requests for reconsideration ''are a waste of resources because so few are granted,'' their experience was that so few are granted because migrants cannot adequately state their fear in the initial interview nor access assistance with the process. Another commenter said the elimination of the possibility of reconsideration leaves an applicant's fate entirely to the quality and circumstances of the initial interview. Another commenter stated that the Departments should not use USCIS's ''abysmal grant rate to justify eliminating this critical opportunity for justice and to right a wrong in an asylum seeker's application for protection.'' Another commenter expressed concern that this proposed rule would apply only to people who receive negative credible fear determinations due to this proposed rule, thereby creating different sets of procedural rules for asylum seekers denied under this proposed rule and those denied for other reasons.

*Response:* At the outset, the Departments note that contrary to some commenters' assertions, the rule does not eliminate reconsideration of negative credible fear determinations. If the IJ upholds the AO's negative

determination, USCIS can still exercise its discretion to reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C). The rule does eliminate the ability to request such reconsideration for noncitizens deemed ineligible for asylum by operation of the rebuttable presumption. While the Departments acknowledge concerns about eliminating a noncitizen's ability to request reconsideration in this context, they believe it is important to efficiently resolve credible fear cases that are subject to the rebuttable presumption against asylum eligibility. The rule's effectiveness in channeling migration into safe and orderly pathways depends in part on the efficient resolution of credible fear cases, and the inclusion of further review procedures in this context would unnecessarily prolong the credible fear process.

In response to concerns about fairness, the Departments note that there remain multiple safeguards to ensure that the process is fair and to guard against inadvertent error for those subject to the rule. All credible fear determinations undergo initial review by a Supervisory AO. 8 CFR 208.30(e)(8). If the supervisor concurs with the negative determination, the noncitizen can request review of that determination by an IJ. *See* 8 CFR 208.33(b)(2)(iii) through (v). Those who are found subject to the presumption against asylum eligibility but who are still placed in section 240 removal proceedings can seek a de novo decision regarding the presumption. *See* 8 CFR 1208.33(b)(4). Furthermore, the Departments note that few requests for review of negative credible fear determinations ultimately result in the reversal of those determinations. *See* 87 FR at 18132; 88 FR at 11747. The Departments assess that, in light of the safeguards in place and the low rate of reversal, efficiency interests outweigh the interest in providing further opportunity to request reconsideration; the Departments therefore respectfully disagree with the commenter stating that even one reversal would be significant enough to warrant the ability to request reconsideration. Regarding the claim that few requests for reconsideration are granted due to noncitizens' lack of opportunity to state their fear during the initial interview and lack of assistance with the process, the commenter offered only anecdotal evidence for this. Moreover, this assertion does not change the Departments' assessment that providing further opportunity to request reconsideration carries insufficient benefits to justify its costs. To the extent that commenters argued that these limits on reconsideration implicate the due process rights of noncitizens, as explained previously in Section IV.B.5.i of this preamble, the Supreme Court has held that the due process rights of noncitizens applying for admission at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 140 S. Ct. at 1983 (citing INA 235(b)(1)(B)(ii) and (v), 8 U.S.C. 1225(b)(1)(B)(ii) and (v)). The INA provides no statutory right to reconsideration of an AO's negative credible fear determination. *See* INA 235(b)(1), 8 U.S.C. 1225(b)(1).

The Departments acknowledge that noncitizens who are not subject to the presumption are subject to different rules for reconsideration. *See* 8 CFR 208.30(g)(1)(i). However, the Departments note that the decision to reconsider a negative credible fear determination under that rule is still subject to USCIS discretion and is also time limited. *Id.* By contrast, there are no time limits for USCIS to reconsider negative determinations in cases subject to this rule. 8 CFR 208.33(b)(2)(v)(C). And due to the exigent circumstances discussed throughout this rule, including in Sections II.A and IV.B.2 of this preamble, the Departments believe it necessary to limit requests for reconsideration in cases subject to this rule.

ii. ''Significant Possibility'' Standard and Mechanisms for Evaluating Asylum and Withholding of Removal

*Comment:* Some commenters alleged that the rule would elevate the ''significant possibility'' standard established by Congress to the ''reasonable possibility'' standard, which is much harder for asylum seekers to meet. One commenter stated that the complexity of the presumption of ineligibility will require ''intensive factual analysis'' during credible fear interviews and stated that application of the reasonable possibility standard for screenings for withholding of removal or CAT protection violates the Global Asylum Rule injunction. Other commenters suggest that it will be ''an extremely onerous undertaking'' for the Departments to apply a ''reasonable fear'' standard in cases where the lawful pathways condition applies, which could lead to more complex and resource-intensive credible fear screening interviews with a ''high risk of error that would send bona fide refugees back to danger.'' Another commenter stated that, by applying the ''reasonable possibility'' standard to cases subject to the rule, the rule would essentially turn the credible fear interview, which is intended to be a low-bar screening, into an asylum merits hearing for these individuals. One commenter said that procedural and judicial errors are likely to increase as AOs are asked to apply the more onerous ''reasonable possibility'' standard.

A commenter stated that the rule may not be necessary as long as statutory withholding of removal and protection under CAT are available, as migrants would not distinguish between asylum, withholding, and CAT protection and instead would arrive at the SWB with the intention of seeking whatever relief is available to them. Other commenters expressed concern that those who cannot rebut the presumption would then be forced to meet a more difficult standard to be able to present a claim to lesser protections in the form of statutory withholding of removal or CAT protection. One commenter stated that the fact that the Departments have long applied the higher standard in reasonable fear screenings is ''inapposite,'' reasoning that the rule is not about reasonable fear screenings, which impact those who were previously ordered removed and then re-entered without inspection.

*Response:* To the extent commenters suggest that the ''reasonable possibility'' standard will apply at the credible fear stage to asylum claims under this rule, they are incorrect. The statutory ''significant possibility'' standard will continue to apply to such asylum claims. *See* Section IV.D.1.iii of this preamble. The rule would apply a ''reasonable possibility'' standard only to screen for claims of withholding of removal and CAT protection, and only where a noncitizen has failed to establish a significant possibility that they would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption of ineligibility. *See* 88 FR at 11724.

That said, the Departments acknowledge commenters' concerns that certain noncitizens will be subject to a higher burden of proof for statutory withholding of removal and CAT protection. The Departments acknowledge that use of the ''reasonable possibility'' standard is a change from the practice currently applied in the expedited removal context as articulated in the Asylum Processing IFR; however, it is the same standard used in other protection screening contexts. *See* 8 CFR 208.31; *see also* 88 FR 11742–44. Notably, this higher screening standard

accords with the higher standard a noncitizen must meet for statutory withholding of removal and protection under CAT in section 240 removal proceedings, 8 U.S.C. 1229a. *See INS.* v. *Cardoza-Fonseca,* 480 U.S. 421 (1987). As explained in the NPRM, the Departments therefore believe that the ''reasonable possibility'' standard ''better predicts the likelihood of succeeding on the ultimate statutory withholding or CAT protection application than the 'significant possibility' of establishing eligibility for the underlying protection standard, given the higher burden of proof.'' 88 FR at 11746–47. The application of standards tailored to the type of relief or protection that the noncitizen is eligible for will not foreclose an opportunity for those with meritorious claims to seek protection.

While the INA specifies the ''significant possibility'' standard for the purpose of screening for potential asylum eligibility in credible fear proceedings, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the INA does not specify a standard to be used in screening for potential eligibility for statutory withholding of removal or CAT protection. Congress did not require the same eligibility standards for asylum, statutory withholding of removal, and protection under the CAT in the ''credible fear'' screening process. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA''), Public Law 105–277, 112 Stat. 2681–822. Thus, the Departments have determined that, where the rebuttable presumption of asylum ineligibility applies and has not been rebutted, applying the ''reasonable possibility'' of persecution or torture standard to screen claims for statutory withholding of removal and CAT protection would better advance the Departments' systemic goal of processing protection claims in a manner that is efficient, orderly, and safe.

The Departments acknowledge that in multiple rulemaking efforts in recent years, the Departments promulgated divergent standards for screening for potential eligibility for asylum as compared with statutory withholding of removal and CAT protection, along with variable standards for individuals barred from certain types of protection, which are currently not in effect.[292] In June 2020, the Departments published the Global Asylum Rule, which amended provisions relating to the expedited removal and credible fear screening process, including raising the standards of proof for screening all claims for statutory withholding of removal and CAT protection to a ''reasonable possibility'' of persecution or torture and applying all mandatory bars to asylum and statutory withholding of removal during the credible fear screening. *See* Global Asylum Rule, 85 FR at 80277–78. The Global Asylum Rule continues to be the subject of lawsuits challenging the rule on multiple grounds.[293] Most of the changes to the credible fear process in expedited removal made by the Global Asylum Rule were superseded by the Asylum Processing IFR. As explained in the NPRM, the considerations that led to those decisions do not apply here. *See* 88 FR at 11744. This rule implements the new condition on eligibility in credible fear screenings through a stand-alone provision rather than a catch-all as the Departments sought to do through the Global Asylum Rule. Moreover, the Departments have determined that it would be appropriate to apply the lawful pathways condition on asylum eligibility during the credible fear screening stage such that the ''reasonable possibility'' of persecution or torture standard would then be used to screen the remaining applications for statutory withholding of removal and CAT protection. *See id.*

The Departments disagree with commenters' assertions that applying a higher burden of proof to screen for statutory withholding of removal and CAT protection where the presumption of asylum ineligibility applies and is not rebutted will result in errors. AOs and IJs have long applied, and continue to apply, the ''reasonable possibility'' of persecution or torture standard successfully to noncitizens who are subject to administrative removal orders under section 238(b) of the INA, 8 U.S.C. 1228(b), or reinstated orders under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5). *See generally* 8 CFR 208.31 and 1208.31. There is therefore no reason to conclude that AOs and IJs will not be able to appropriately apply that standard successfully in the context of this rule.

The Departments disagree with commenters' suggestion that the rule will increase irregular migration because noncitizens will still travel to the United States to pursue any avenue of relief available to them. The rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule, coupled with an expansion of lawful, safe, and orderly pathways, is expected to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States. The rule is intended to reduce the level of irregular migration to the United States without discouraging migrants with valid claims from applying for asylum or other protection. The Departments believe the rule will generally offer opportunities for those with valid claims to seek protection.

The Departments' application of a higher standard for statutory withholding and CAT protection in ''reasonable fear'' screenings, *see* 8 CFR 208.31 and 1208.31, is not inapposite in the context of this rule, where a noncitizen does not meet an exception to or rebut the presumption of asylum ineligibility. As in the ''reasonable fear'' context, this standard would be applied only where noncitizens are ineligible for asylum—and because the standard for showing entitlement to statutory withholding and CAT protection (a probability of persecution or torture) is significantly higher than the standard for asylum (well-founded fear of persecution), the Departments have determined that the screening standard adopted for initial consideration of withholding and deferral requests in these contexts should also be higher.

In promulgating this rule, the Departments considered and drew upon the established framework for considering the likelihood of a grant of statutory withholding of removal or CAT protection in the reasonable-fear context. *See* 88 FR at 11743. The Departments have authority to establish screening procedures and standards for statutory withholding of removal and CAT protection. *See* INA 103(a)(1), 8 U.S.C. 1103(a)(1). The Departments have frequently invoked these authorities to

[292] *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55939, 55943 (Nov. 9, 2018) (''Proclamation Bar IFR''); Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019) (''Third Country Transit (TCT) Bar IFR''); Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) (''TCT Bar Final Rule''); Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264 (June 15, 2020) (''Global Asylum NPRM''); Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (Dec. 11, 2020) (''Global Asylum Rule''); Security Bars and Processing, 85 FR 84160 (Dec. 23, 2020) (''Security Bars Rule'').

[293] *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792 (N.D. Cal. 2020); *Immigration Equality* v. *U.S. Dep't of Homeland Sec.,* No. 3:20–cv–09258 (N.D. Cal. filed Dec. 21, 2020); *Human Rights First* v. *Mayorkas,* No. 1:20-cv-3764 (D.D.C. filed Dec. 21, 2020); *Tahirih Justice Ctr.* v. *Mayorkas,* No. 1:21–cv–00124 (D.D.C. filed Jan. 14, 2021).

establish or modify procedures in expedited removal proceedings. *See id.* Noncitizens who establish a reasonable fear of persecution or torture would still be able to seek protection in proceedings before IJs. *See* CFR 1208.33(b)(2)(ii).

*Comment:* One commenter supported the Departments' assessment that applying the higher standard would lead to fewer noncitizens with non-meritorious claims being placed in section 240 removal proceedings, and that using this standard would further systemic goals without violating statutory or international obligations. However, the commenter recommended that DHS raise the screening standard from ''significant possibility'' to ''reasonable possibility'' for statutory withholding of removal and CAT protection during all credible fear interviews. The commenter reasoned that such an approach would be consistent with the INA, the FARRA, and U.S. non-refoulement obligations, and would reduce ''historic and unsustainable strains'' on the U.S. asylum system by deterring unauthorized immigration into the United States.

*Response:* The Departments decline to apply the ''reasonable possibility'' standard to screen all withholding of removal and CAT claims. The Departments believe that continuing to use the ''significant possibility'' standard to screen for all three types of claims—asylum, statutory withholding of removal, and CAT protection—when the noncitizen is excepted from or has overcome the presumption would avoid AOs and IJs applying divergent standards to the same sets of facts in a credible fear interview, thus simplifying the screening process for those noncitizens.

The commenter did not provide any explanation or evidence regarding how applying a higher standard during the credible fear screening to all claims for protection will reduce fraudulent claims. While the Departments acknowledge the commenter's concern, the Departments emphasize that the rule's primary intent is not to identify fraudulent asylum claims, but rather to reduce the level of irregular migration to the United States without discouraging migrants with valid claims from applying for asylum or other protection.

6. Effective Date, Temporary Period, and Further Action

*Comments:* Commenters raised concerns regarding the effective date of the rule and the two-year temporary duration of the rule. Several commenters expressed a concern that the two-year period is unexplained. Some commenters argued that two years was too short of a time period to assess the effectiveness of the program. Another commenter stated that the two-year temporary duration of the rule allowed for sufficient time to assess the effects of the rule and to deter migrants. Some commenters questioned why the rule would expire after two years and requested further explanation, stating that if the Departments believe it is sound policy, it is not clear why the changes are not permanent. Others stated that the two-year period was too long for a ''temporary'' program designed to address ''exigent circumstances,'' and stated that the Departments should have considered a much shorter duration, such as 30 days or 90 days, reconsideration every 6 months, or a sunset before the end of 2025. Another commenter stated that the Departments should specify conditions that would trigger the expiration of the rule. Commenters also expressed concern that the rule does not sufficiently lay out the criteria for determining whether the rule should be extended at the end of the 24-month period, or that the criteria are highly subjective. Commenters also noted that previous immigration policies, including MPP and those stemming from the Title 42 public health Order, have been difficult to sunset.

*Response:* The Departments intend for the rule to address the surge in migration that is anticipated to follow the lifting of the Title 42 public health Order. For that reason, and consistent with the Departments' initial assessment as stated in the NPRM, *see* 88 FR at 11727, the rule will only cover those who enter during a specific time period, applying to those who enter the United States at the SWB during the 24-month period following the rule's effective date. The Departments believe that a 24-month period provides sufficient time to implement and assess the effects of the policy contained in this rule. In addition, the Departments believe that a 24-month period is sufficiently long to impact the decision-making process for noncitizens who might otherwise pursue irregular migration and make the dangerous journey to the United States, while a shorter duration, or one based on specified conditions, would likely not have such an effect.

During this time, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and implement other measures as appropriate, including continued efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. Recognizing, however, that there is not a specific event or demarcation that would occur at the 24-month mark, the Departments will closely monitor conditions during this period in order to review and make a decision, consistent with the requirements of the APA, whether additional rulemaking is appropriate to modify, terminate, or extend the rebuttable presumption and the other provisions of this rule. Such review and decision would consider all relevant factors, including the following: current and projected migration patterns, including the number of migrants seeking to enter the United States or being encountered at the SWB; resource limitations, including whether the number of noncitizens seeking or expected to seek to enter the United States at the SWB exceeds or is likely to exceed the Departments' capacity to safely, humanely, and efficiently administer the immigration system, including the asylum system; the availability of lawful, safe, and orderly pathways to seek protection in the United States and partner nations; and foreign policy considerations. The Departments expect to consider their experience under the rule to that point, including the effects of the rebuttable presumption on those pursuing asylum claims. In addition, the Departments expect to consider changes in policy views and imperatives, including foreign policy objectives, in making any decision regarding the future of the rule. The Departments do not believe that establishment of specific metrics for renewal ex ante would be appropriate, given the dynamic nature of the circumstances at the SWB and the multifaceted domestic and foreign policy challenges facing the Departments.

*Comment:* Commenters expressed concern about the rationale for adopting the two-year duration and potential extensions of the rule in subsequent administrations. Some commenters stated that the Departments' rationale for the two-year temporary duration was pretextual, with the true motivations being political and partisan in nature. One commenter disagreed with allowing the rule to be effective after the end of the current presidential term because it could be indefinitely extended, and another similarly stated that the fact that the rule is ''temporary'' does not mean that a subsequent presidential administration could not renew it.

Commenters stated that, by sunsetting the rule after the end of the current presidential term, the Departments were inviting such a result.

*Response:* The Departments disagree that the rationale for the 24-month duration of the rule is political, partisan, or pretextual in nature. The rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. The 24-month duration of the rule is discussed in more detail in Section IV.E.6 of this preamble.

*Comment:* Commenters questioned how the temporary nature of the rule would practically work, noting the range of new procedures, training, and other Notices required to start and stop such a large program. These commenters hypothesized that the time spent training and making other updates for implementation would directly cut into the limited time the rule would be in effect, reducing its effectiveness.

*Response:* The Departments agree that implementation of the rule requires training and guidance, and are taking steps to ensure that it can be implemented in a timely, fair, and efficient manner after it goes into effect. The Departments are confident that the new procedures required can be put into effect with minimal disruption or delay in both merits adjudications and credible fear screenings.

*Comment:* Commenters stated that although the rule proposed a two-year effective period, it would have a permanent impact. A few commenters expressed concern about the potential for two identical asylum seekers to be treated differently based on whether they seek asylum before or after the sunset date of the rule. One commenter urged the Departments to provide clarity regarding adjudications that take place after the rule's sunset date for individuals that entered prior to the sunset date.

*Response:* The Departments appreciate commenters' concerns that the rule, which would only apply to those entering during a specified, time-limited date range, could lead to confusion, and appreciate the opportunity to clarify how it will be implemented. The Departments also recognize that due to the nature of the rule, noncitizens who enter during the specified date range will be subject to its terms while those who enter before or after the period will not. However, the Departments disagree that the effects of the condition should be time-limited in duration. The rule was designed to apply to anyone who entered during the specified time period in order to avoid the possibility of individuals entering without documents sufficient for lawful admission during the time period covered by the rule, then waiting out the condition imposed by the rule before applying for asylum, thereby contributing to the existing immigration court backlog and rendering the rule ineffective in its aims of reducing unauthorized arrivals to the SWB and encouraging utilization of available lawful pathways. To clarify to noncitizens and adjudicators that the rebuttable presumption has continuing effect, the Departments added language to the regulations stating that the rebuttable presumption will continue to apply to all asylum applications filed by people who enter in the specified manner during the 24-month period regardless of when the application is filed and adjudicated. *See* 8 CFR 208.33(c)(1), 1208.33(d)(1). To further clarify, and in response to commenters' concerns in relation to individuals who enter as minors in a family unit who may have entered during the rule's effective period through no fault or agency of their own, the Departments have added language to the rule to ensure children brought to the United States during the 24-month effective period are not subject to the lawful pathways rebuttable presumption of asylum ineligibility in the rule if they file an application for asylum as a principal applicant after expiration of the 24-month period. 8 CFR 208.33(c)(2), 1208.33(d)(2).

*Comment:* Several commenters stated that the rule is contrary to international law, and that its temporary nature, or the emergency rationale behind it, do not justify or excuse such a violation.

*Response:* For discussion of the rule's compliance with international law and U.S. treaty obligations, please see Section IV.D.3 of this preamble.

7. EOIR Proceedings

i. EOIR IJ Credible Fear Review Procedures

*Comment:* Commenters objected to the provision in the proposed rule that would require noncitizens to affirmatively request IJ review of negative credible fear determinations, which differs from existing procedures where review is given to those who do not affirmatively decline review. Commenters stated that IJ review of negative credible fear determinations is an important safeguard that is guaranteed by statute, pointing to data detailing how many negative credible fear determinations were overturned by IJs. Commenters stated that this change favors expedience over access to protection in the United States and would inevitably result in an increase in deportations to countries where asylum seekers have a credible fear of return. Commenters stated that negative credible fear determinations should automatically receive IJ review unless the noncitizen affirmatively declines it, as expecting a noncitizen to know to affirmatively ask for an IJ's review is unrealistic and effectively denies the noncitizen the opportunity for a judicial review. Commenters explained that many individuals may not request review, or know to request review, even if asked whether they wish to seek further review before an IJ, for a variety of reasons. The provided reasons included unfamiliarity with the immigration system; lack of counsel or education; inability to identify legal errors by the AO; language issues; time in custody; mental health conditions; confusion; trauma; and deference to authority; among others. Further, commenters also stated that changing the explanations of the right to IJ review would not serve as a sufficient safeguard.

Commenters also stated that the Departments did not give a reasoned justification for this policy change and that the rationale in the NPRM for requiring noncitizens to affirmatively request IJ review contradicts the Asylum Processing IFR, which, after the Global Asylum Final Rule implemented a requirement that noncitizens affirmatively request review, reinstated the default rule that negative determinations would be automatically referred for IJ review absent explicit declination by the noncitizen. Moreover, commenters asserted that this rule change would cause confusion as DHS officers would be required to apply the automatic credible fear review provision differently for asylum seekers with negative credible fear determinations based on the rebuttable presumption in this rule, as compared to determinations made on another basis. Commenters also expressed concern that the NPRM did not include statistics regarding automatic IJ credible

fear review, including how many asylum seekers succeeded in their review without having articulated a desire for IJ review to the AO, or how many IJ credible fear reviews were expeditiously resolved after the IJ explained the asylum seeker's rights and the asylum seeker chose to not pursue further review.

Separately, regarding credible fear reviews more generally, commenters stated that it was unclear whether an IJ could review the asylum ineligibility presumption during a credible fear review. Commenters also stated that the proposed rule would cause a significant increase in negative credible fear reviews at EOIR, and that such reviews would require more adjudication time due to application of the rebuttable presumption. Moreover, commenters stated that the proposed rule would allow IJs to engage in speculation by looking outside of the record of proceedings during the credible fear review.

Commenters also proposed an additional hearing, prior to or concurrent with the IJ review, assessing whether a noncitizen's documents were sufficient for lawful admission pursuant to section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7). In contrast, other commenters proposed generally eliminating IJ review of credible fear determinations, asserting this would reduce the backlog of cases within the immigration system and would reduce the pull factor created by lengthy adjudications. Similarly, other commenters stated that IJ review is not necessary if a noncitizen knowingly declines review, so long as the Departments provide expanded rights advisals and explain the consequences of declining such review.

*Response:* As stated in the NPRM, the Departments acknowledge that the procedure for IJ review of negative credible fear determinations established by this rule differs from the credible fear review procedures implemented by the Asylum Processing IFR. *See* 88 FR at 11744 (''[U]nlike the process adopted by the Asylum Processing IFR, noncitizens must affirmatively elect immigration judge review of a negative credible fear determination when that choice is presented to them; noncitizens who fail or refuse to indicate a request for immigration judge review will not be considered to have requested such review.''). While the Departments believe that ''the need for expedition under the current and anticipated exigent circumstances'' weighs in favor of requiring noncitizens to affirmatively request IJ review of a negative credible fear determination, they will also ''seek to ensure noncitizens are aware of the right to review and the consequences of failure to affirmatively request such review.'' *Id.* at 11747.[294]

In particular, if a noncitizen receives a negative credible fear determination after failing to rebut the presumption or to establish a ''reasonable possibility'' of persecution or torture, the rule requires AOs to provide noncitizens ''with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.'' 8 CFR 208.33(b)(2)(iii). The Departments believe that such notice sufficiently ensures that noncitizens who desire IJ review have the opportunity to elect it under this rule. Currently, USCIS explains to noncitizens that they may request review of a negative credible fear determination with an IJ, and that failure to do so may result in removal from the United States. USCIS also explains to noncitizens their right to consultation during the credible fear process, and provides noncitizens with a list of free or low-cost legal services providers whom they may wish to contact.[295] To ensure that noncitizens—including, among others, noncitizens who are unfamiliar with the immigration system, have suffered trauma, are without counsel, or are unable to read or speak English—understand what review is available to them, DHS ''intends to change the explanations it provides to noncitizens subject to the . . . rule to make clear to noncitizens that the failure to affirmatively request review will be deemed a waiver of the right to seek such review.'' 88 FR at 11747. These explanations will be provided by trained asylum office staff through an interpreter in a language understood by the noncitizen. *See* 8 CFR 208.30(d)(5). As a result, the Departments believe that it is reasonable to conclude that noncitizens who do not request IJ review after receiving sufficient notice, *see* 8 CFR 208.30(d)(5), and the enhanced explanations described above do not wish for additional review. *See* 88 FR at 11747. The Departments note that, at the time that the Asylum Processing IFR was being considered, the Departments were assessing procedures that would require affirmative requests for IJ review through the lens of the Global Asylum Final Rule, which did not include a planned rollout of enhanced explanations for noncitizens. Under this rule, DHS is now planning different protocols for implementing the requirement that noncitizens affirmatively request review by providing the above-described explanations coupled with enhanced notice procedures. The Departments also do not believe this change will cause unnecessary confusion for DHS officers and staff, as they are well trained in expedited removal and credible fear procedures. *See, e.g.,* 8 CFR 208.1(b) (''Training of asylum officers'').

Separately, in response to more general comments about the IJ credible fear review process, the Departments clarify that IJs apply a de novo standard during credible fear reviews, including on the question whether the asylum ineligibility presumption applies. *See* 8 CFR 1208.33(b)(1) (stating that ''the immigration judge shall evaluate the case de novo''). More generally, the Departments do not believe that the application of the rebuttable presumption presents a risk of creating significant inefficiencies during the IJ credible fear review process that would warrant amending the rule, as IJs have significant experience conducting credible fear reviews and applying asylum-related standards. Additionally, IJs will be able to review relevant evidence provided at the initial credible fear interview before the AO in making any determinations regarding the rebuttable presumption. As discussed above, the Departments anticipate that any increases in the time that it takes to review a negative credible fear decision will be outweighed by other efficiencies created by this rule. The Departments disagree with commenters that the rule allows IJs to engage in ''speculation'' during credible fear reviews, as the relevant evidentiary standards in credible fear reviews predate this regulation. *See* 8 CFR 1003.42(d)(1) (explaining that the IJ may take into account ''such other facts as are known to the immigration judge'').

In response to other commenters, the Departments also decline to completely eliminate IJ credible fear review, which is provided by statute and acts as an important safeguard during the expedited removal process. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III) (''The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination . . . that the alien does not have a credible fear of persecution.''). Similarly, the Departments decline to add additional

[294] Regarding commenters' data requests, the Departments note that EOIR does not maintain data regarding how many IJ credible fear reviews were initiated after a noncitizen failed to request such review.

[295] *See* USCIS Form M–444, Information About Credible Fear Interview.

hearings regarding inadmissibility determinations, which are properly determined within existing procedures. *See* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (requiring DHS officer to determine document-related inadmissibility during the expedited removal process).

*Comment:* Commenters raised a number of concerns about IJ credible fear review proceedings generally, including the sufficiency and reliability of the evidentiary record before the AO, the abbreviated nature of IJ credible fear reviews in light of the complexity of the issues presented, the lack of counsel or limited participation of counsel in IJ credible fear reviews, the level of deference IJs demonstrate towards to the AO's determination, and the lack of appeal of an IJ negative credible fear determination, among others.

*Response:* As an initial matter, the Departments note that this rule does not alter the existing IJ credible fear review process, and comments regarding unaltered existing processes are outside the scope of this rule. Regardless, with respect to commenters who characterized the existing credible fear screening and review process as deficient or contrary to due process, the Departments note that Congress has established an expedited removal process that includes neither BIA review nor judicial review and requires any IJ review of credible fear determinations to be prompt. *See* INA 235(b)(1)(B)(iii)(III), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (C). Additionally, existing regulations outline a robust process for IJ review of credible fear determinations. *See* 8 CFR 1003.42, 1208.30 (describing IJ review of credible fear determinations). Please also see discussion in Section IV.B.5 of this preamble responding to comments on the effects of the rule on due process.

As to the sufficiency and reliability of the record of determination, the Departments disagree with commenter contentions that this document does not provide a sufficient record for IJ review. The INA sets forth that the record of determination ''shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in light of such facts, the [noncitizen] has not established a credible fear of persecution.'' INA 235(b)(1)(B)(iii)(II), 8 U.S.C. 1225(b)(1)(B)(iii)(II). Further, as the record of determination is a government-created document, it is generally presumed to be reliable in the absence of evidence to the contrary. *See Matter of J–C–H–F–,* 27 I&N Dec. 211, 212 (BIA 2018) (citing *Espinoza* v. *INS,* 45 F.3d 308, 310 (9th Cir. 1995)). Should the reliability of a record of determination be challenged before the IJ, the IJ will consider the arguments raised as to its reliability. *Cf. id.* at 215–16 (setting forth the framework for IJ review when the reliability of a border interview is challenged); *see also Ye* v. *Lynch,* 845 F.3d 38, 45 (1st Cir. 2017) (requiring a totality-of-the-circumstances-based inquiry as to reliability of a DHS document); *Zhang* v. *Holder,* 585 F.3d 715, 725–26 (2d Cir. 2009) (requiring a factor-based inquiry as to reliability of a DHS document).

Moreover, during review of a negative credible fear determination, IJs are authorized to ''receive into evidence any oral or written statement which is material and relevant to any issue in the review.'' 8 CFR 1003.42(c). Accordingly, noncitizens who believe that their credible fear interview is inaccurately described or who wish to provide additional testimony, context, or explanation have the opportunity to do so before an IJ. Furthermore, as an additional procedural precaution for noncitizens, the IJ review of a negative credible fear determination itself is subject to preservation-of-records requirements, as the IJ must create a Record of Proceeding in which to memorialize their review. *See* 8 CFR 1003.42(b).

As stated in the NPRM and consistent with existing practice, IJs will continue to evaluate such credible fear determinations using a de novo standard of review. *See* 8 CFR 1003.42(d)(1), 1208.33(b)(1) (''[T]he immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section.''); 88 FR at 11726. This includes reviewing an AO's determinations about the applicability of the presumption of asylum ineligibility and whether the presumption was rebutted. *See* 8 CFR 1208.33(b). Under 8 CFR 1208.33(b)(1), the IJ shall review de novo ''[w]here an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.33(b), and the alien has requested immigration judge review of that credible fear determination.'' 8 CFR 208.33(b)(2)(v) (''Immigration judges will evaluate the case as provided in 8 CFR 1208.33(b).''). In such an instance, de novo review serves to protect noncitizens from incorrect or unwarranted negative credible fear determinations that may have in part relied upon the rebuttable presumption.

Further, with respect to commenter concerns about timelines in credible fear review proceedings, the expedited removal statute requires ''prompt review.'' INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). Additionally, the statute states that ''[r]eview shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the [negative credible fear] determination.'' *Id.*

Moreover, the Departments will not depart from existing procedures regarding IJ review of credible fear determinations to allow appeals from the IJs' review of such determinations. Prior to this rule, IJ decisions at the credible fear review stage were not reviewable, and this rule maintains that posture. *See* 8 CFR 1003.42(f) (2020) [296] (''No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.''); 208.33(b)(2)(v)(C) (''No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS.''). Such processes are in accordance with the INA. *See* INA 235(b)(1)(C), 8 U.S.C. 1225(b)(1)(C) (providing that removal orders issued under this section are not subject to administrative appeal other than review by an IJ). However, the Departments note that per the rule, USCIS retains the discretion to reconsider negative determinations. *See* 8 CFR 208.33(b)(2)(v)(C) (''Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.''). Because noncitizens can request IJ review of a negative credible fear determination, and USCIS retains discretion to reconsider negative determinations, the Departments continue to believe, as explained in the NPRM, that the rule appropriately balances the availability of review and the efficient use of limited agency resources. *See* 88 FR at 11747.

In sum, the Departments believe that the established process for IJ review of credible fear determinations provides sufficient opportunity for noncitizens to present the necessary evidence, including testimony, relevant for evaluating the applicability of the presumption of asylum ineligibility created by this rule.

ii. Section 240 Removal Proceedings

*Comment:* Commenters stated that the rule would create confusion in section 240 removal proceedings, as the rule states that a noncitizen who is subject

[296] This provision was amended by the Global Asylum Rule, which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea II,* 512 F. Supp. 3d at 969–70. This order remains in effect, and thus the 2020 version of this provision—the version immediately preceding the enjoined amendment—is currently effective.

to the presumption but demonstrates a ''reasonable possibility'' of persecution or torture may apply for asylum during subsequent removal proceedings. Commenters also expressed concern that under the proposed rule, an IJ might re-adjudicate the condition on eligibility in section 240 removal proceedings despite an AO initial determination during the credible fear process that the presumption of ineligibility was not applicable or was rebutted. Commenters stated that it would be unfair to require asylum applicants to repeatedly demonstrate that they are able to rebut the presumption before different adjudicators, suggesting an AO's determination that the presumption is inapplicable should be final for all future proceedings.

*Response:* The Departments reiterate that noncitizens who are subject to the presumption of asylum ineligibility during a credible fear determination, but who demonstrate a ''reasonable possibility'' of persecution or torture, can apply for asylum during any subsequent removal proceedings. *See* 8 CFR 1208.33(b)(4). However, the provisions of this rule governing the presumption of asylum ineligibility will still apply, and an IJ will apply the relevant provisions de novo during removal proceedings. *See generally* 8 CFR 1208.33.

The Departments do not believe that it is unfair for IJs to consider the presumption of asylum ineligibility de novo where the AO already determined that the presumption did not apply or was rebutted. The IJ's determination would be based on all available evidence after the noncitizen is given the opportunity to present and examine such evidence. *See* INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B) (explaining a noncitizen's evidentiary rights in section 240 removal proceedings). The Departments thus decline to deviate from existing practice in section 240 removal proceedings requiring IJs to determine asylum eligibility de novo once a matter is referred to EOIR after a positive credible fear determination. *See, e.g.,* 8 CFR 1208.13(a) (''The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.'').

*Comment:* Commenters provided generally positive feedback on the inclusion of a family unity provision but raised concerns about the operation of the provision itself. Commenters were concerned that the family unity provision was insufficient because it would not apply to asylum applicants traveling without their families, including cases where family members are unable to travel together due to immediate danger, among other factors. Commenters stated that individual asylum applicants would be subject to the asylum ineligibility presumption and, as a result, would be unable to petition for eligible derivatives outside the United States if they are only able to receive statutory withholding of removal or CAT protection, providing anecdotal examples. In turn, commenters stated, this would result in family separation with spouses and children left in dangerous situations in their home country, unable to join their family members in the United States. Therefore, commenters suggested that the family unity provision should be expanded to individual asylum applicants who meet the provision's requirements if they have eligible derivatives abroad. Commenters also proposed that the rule include ''families'' as a general exception to application of the rebuttable presumption of ineligibility for asylum.

Commenters explained that, for the provision as currently drafted to apply, the noncitizen would have to first qualify for statutory withholding of removal or CAT withholding, which have higher standards of proof than asylum. Commenters stated that this would result in families with legitimate asylum claims being denied relief because they may be unable to meet the higher standards required for statutory withholding of removal or CAT withholding. Additionally, commenters claimed that this provision would create an inefficient and costly process, where noncitizens would be required to gather and present a significant amount of evidence on statutory withholding of removal and CAT withholding to meet their higher standards and IJs would have to adjudicate those forms of relief or protection separately before applying the exception, rather than potentially granting asylum in the first instance. Commenters noted that in removal proceedings, the family unity exception requires a determination that the noncitizen is eligible for withholding of removal or CAT withholding and that they would be granted asylum but for the presumption. Commenters also raised concerns that many applicants will face harm while those issues are adjudicated. Commenters raised further concerns that the family unity provision would only apply where no members of a family qualify for withholding of removal or CAT withholding, thus resulting in removal orders for entire families who qualified for those forms of protection. Lastly, commenters expressed concern that the provision does not address family unity concerns where family members traveling together may not qualify as derivatives due to their relationship status. Commenters explained that this would result in the rebuttable presumption of asylum ineligibility applying and, assuming certain non-derivative family members cannot meet the standards for statutory withholding of removal or CAT withholding, de facto separation.

Commenters also expressed confusion about whether the family unity provision could work retroactively to grant asylum to individuals with statutory withholding of removal if their spouse or child subsequently journeyed to the United States and underwent adjudication. Further, commenters stated that the proposed rule leaves outstanding questions about what independent relief would disqualify families from availing themselves of the family unity provision.

One commenter claimed that the family unity provision would incentivize the smuggling of children and suggested eliminating it entirely. Separately, some commenters claimed that the provision would increase the incentives for family migration.

*Response:* The Departments fully agree with commenters that keeping families unified and avoiding family separation is an important goal. *See, e.g.,* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 5, 2021). This rule has been designed to eliminate the possibility that the rule's presumption will result in the separation of families.

With respect to family units traveling together, if any noncitizen in that family unit traveling together meets an exception to or is able to rebut the asylum ineligibility presumption, the presumption will not apply to anybody in the family traveling together. 8 CFR 208.33(a)(2)(ii), 208.33(a)(3)(i); *see also* 88 FR at 11749. Additionally, even where no family members that are traveling together meet an exception or are able to rebut the presumption, the rule includes a family unity provision that sets forth a unity-based ''exceptionally compelling circumstance'' to rebut the asylum ineligibility presumption for certain noncitizens in order to avoid separating asylum applicants from potential derivative beneficiaries. 8 CFR 1208.33(c). More specifically, under this family unity provision, where a principal asylum applicant is subject to the presumption but is eligible for

FRP-FRN-00132

statutory withholding of removal or CAT withholding,[297] and would be granted asylum but for the presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. *See* 8 CFR 1208.33(c). Such principal applicants and their accompanying derivatives can then proceed with their asylum claims consistent with general asylum procedures. *See* INA 208(b)(3), 8 U.S.C. 1158(b)(3).

Additionally, in light of commenters' concerns, the Departments have expanded this provision to also cover principal applicants who have a spouse or children who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A). 8 CFR 1208.33(c). As commenters noted, excluding asylum applicants who travel without their families may inadvertently incentivize families to engage in irregular migration together so as not to risk that the principal applicant would be prevented from later applying for their family members to join them. This may involve making a dangerous journey with vulnerable family members, such as children. The expansion to the provision would apply only to migrants who are subject to the presumption, who are ultimately found eligible for statutory withholding of removal or CAT withholding, and who have spouses or children who would be eligible to follow to join them in the United States.

However, the Departments decline to modify the rule to categorically exempt families from the rebuttable presumption of asylum eligibility. Given the existing and expanded protections in the rule, such a change is not necessary to ensure family unity. And the Departments have determined that making such a change would significantly diminish the effectiveness of the rule and incentivize families to migrate irregularly. *See* 88 FR at 11708–09 (describing the significant increase in families seeking asylum in the United States). Further, the Departments do not want to create an incentive for adults to present at the SWB with children fraudulently claiming to be a family unit.[298]

Overall, the Departments have designed the family unity provision at 8 CFR 1208.33(c) and the other protections against family separation to ensure that the rule does not cause the separation of families. With regard to the family unity provision, the Departments believe that requiring the lead asylum applicant to first establish eligibility for protection under the higher standards of proof for statutory withholding of removal or CAT withholding before qualifying for the family unity provision serves as an incentive to choose a lawful pathway. Choosing a lawful pathway would enable applicants to remain eligible for asylum, which requires a lower burden of proof and includes the ability to include derivatives on their application or utilize follow-to-join procedures set forth in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A).

To the extent that commenters claim that some family members who traveled together may have, but for the presumption, qualified for asylum but not statutory withholding of removal, and therefore would not qualify for the family unity exception if subject to the rebuttable presumption of asylum ineligibility, the Departments reiterate that the family unity provision in 8 CFR 1208.33(c) is but one protection for family units included in this rule. For example, the rule includes options for families to stay together if any member of a family traveling together: uses an available lawful pathway (8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii)); establishes an exception from or rebuts the presumption of ineligibility (8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3)); or, if they do not pursue a lawful pathway and are unable to establish an exception from or rebut the presumption, meets the higher standard required for statutory withholding of removal or CAT withholding. Notably, exceptions from and rebuttals to the presumption consider circumstances involving both the noncitizen and members of the noncitizen's family with whom they are traveling, for example, whether the noncitizen or a member of the noncitizen's family faced an acute medical emergency at the time of entry. *See* 8 CFR 1208.33(a)(2) and (3), 208.33(a)(2) and (3). To reiterate, the rule also includes options for family members who do not pursue a lawful pathway and are unable to rebut the presumption to stay together or reunite if a principal asylum applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the presumption, if either (1) an accompanying spouse or child does not also independently qualify for asylum or other protection from removal, or (2) if the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant if granted asylum. These protections together ensure that the rule does not lead to the separation of families. The Departments strongly encourage noncitizens, including asylum-seeking families, to choose lawful pathways.

However, to the extent that some families may not use a lawful pathway, and are unable to rebut the presumption, the Departments believe that many noncitizens with approvable asylum claims would present claims for statutory withholding of removal or CAT protection on the same set of underlying facts, although the standards that apply to asylum, statutory withholding of removal, and CAT protection each differ from one another in some respects. *See* Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999) (''Additionally, use of the Form I–589 will obviate the need for two separate forms that, in many cases, will elicit similar information. In many cases in which the alien applies both for asylum and withholding of removal under the Act and for withholding under the Convention Against Torture, the underlying facts supporting these claims will be the same.''); *Yousif* v. *Lynch,* 796 F.3d 622, 629 (6th Cir. 2015) (''An asylum claim and a withholding claim require consideration of 'the same factors' and proof of the same underlying facts about an applicant's probable persecution.'').

Separately, the Departments disagree with commenters that the family unity provision would encourage family

[297] The family unity provision at 8 CFR 1208.33(c) is not triggered by eligibility for deferral of removal under the CAT because a noncitizen only eligible for that form of CAT must be subject to a bar to CAT withholding, which would also bar the noncitizen from asylum. *See* 8 CFR 1208.17(a) (providing that someone who is eligible for CAT withholding but who is subject to the mandatory bars to statutory withholding of removal at 8 CFR 1208.16(d)(2) and (3) shall be granted CAT deferral); 8 CFR 1208.16(d)(2) (providing that an application for CAT withholding will be denied if the noncitizen is subject to a bar to statutory withholding of removal under section 241(b)(3)(B) of the INA, 8 U.S.C. 1231(b)(3)(B)). Compare INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B) (providing mandatory bars to statutory withholding of removal), with INA 208(b)(2), 8 U.S.C. 1158(b)(2) (providing mandatory bars to asylum). Thus, such a noncitizen would never be ineligible for asylum solely due to the rebuttable presumption.

[298] *See* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media (July 26, 2022), *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media* (''A review of social media groups and pages identified by migrants showed . . . dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules, and baseless rumors about changes to immigration law.''); ICE, Press Release, *ICE HSI El Paso, USBP Identify More than 200 'Fraudulent Families' in Last 6 Months* (Oct. 17, 2019), *https://www.ice.gov/news/releases/ice-hsi-el-paso-usbp-identify-more-200-fraudulent-families-last-6-months.*

migration or child smuggling. The strong incentives of the lawful pathways described in the rule, coupled with the disincentive of the rebuttable presumption of asylum ineligibility, are designed to encourage noncitizens, including families, to pursue lawful pathways. For example, after implementation of the Venezuelan parole process for eligible Venezuelan nationals and their families, migratory flows with respect to this group fell dramatically. *See* 88 FR at 11712, 11718. Based on this trend and the implementation of other initial parole processes implementations discussed in the NPRM, the Departments believe that the rule will reduce irregular family migration as well as child smuggling as part of an overall reduction in irregular migration.

To the extent that commenters raised concerns that the family unity provision is inefficient in operation, the Departments believe that the benefits from inclusion of the provision outweigh any potential inefficiencies. The Departments also note that asylum, statutory withholding of removal, and CAT withholding are forms of relief and protection that generally rely on the same set of underlying facts. *See Yousif,* 796 F.3d at 629. Therefore, IJs who determine that a noncitizen is eligible for statutory withholding of removal or CAT withholding will be able to apply the family unity provision and efficiently consider whether to exercise their discretion to grant asylum on the same facts. Additionally, in response to commenter concerns about noncitizens facing harm while the family unity exception is being adjudicated, the Departments note that this rule does not amend existing follow-to-join procedures.

8. Adequacy of Withholding of Removal and CAT

*Comment:* Commenters stated that statutory withholding of removal and CAT protection are insufficient alternative forms of protection for individuals who would be ineligible for asylum pursuant to the proposed rule, asserting that these forms of protection are more difficult to obtain and provide fewer benefits than asylum.

For example, commenters stated that such forms of protection are not sufficiently available to all those who require protection. Specifically, commenters stated that statutory withholding of removal and CAT protection require applicants to meet a higher burden of proof than asylum, as they would need to demonstrate that it is ''more likely than not'' that they would face persecution or torture. Commenters stated that, because of this higher burden of proof, an applicant may be otherwise eligible for asylum, but be removed because they are unable to meet the burden for statutory withholding of removal or CAT protection. As a result, commenters alleged that an individual may be returned to a country where they would face persecution or death.

Commenters also stated that, even if an applicant were able to meet the higher burden of proof for statutory withholding of removal or CAT protection, the individual would not then be accorded the same benefits as asylees. For example, commenters expressed concern regarding the prohibition on international travel for recipients of statutory withholding of removal and CAT protection. Commenters noted that, unlike recipients of asylum, these individuals do not have access to travel documents and are unable to travel abroad.

Commenters also noted that recipients of statutory withholding of removal and CAT protection remain in a tenuous position because they are not granted lawful status, or any path to citizenship, to remain in the United States indefinitely. Commenters explained that recipients of statutory withholding of removal or CAT protection remain permanently subject to a removal order and may have their status terminated at any time. Commenters stated that the constant prospect of deportation or removal creates uncertainty for recipients of statutory withholding of removal or CAT protection, which can lead to community instability in the United States. Commenters stated that this uncertainty would prevent such noncitizens from processing the trauma that predicated their migration to the United States.

Similarly, commenters stated that recipients of statutory withholding of removal or CAT protection may be limited from fully participating in U.S. society. Commenters raised specific concerns about statutory withholding and CAT protection recipients' lack of access to public benefits, services, and healthcare. Commenters were also concerned about such individuals' need to apply annually and pay for work authorization and the impact that this requirement may have on related benefits, such as the ability to obtain a driver's license.

Commenters also claimed that granting statutory withholding of removal or CAT protection instead of asylum under the proposed rule would fail to ensure family unity. Commenters alleged that individuals who are granted statutory withholding of removal or CAT protection would be unable to reunite with family in the United States because these forms of relief do not allow the recipient to petition for derivative beneficiaries. Due to this, commenters stated that the proposed rule would institute another policy of family separation that permanently separates noncitizens from their family members. Commenters also stated that family members applying for statutory withholding of removal are not able to request that their cases be consolidated and adjudicated together like asylum applicants can and stated that moving separately through the legal system makes them more likely to have uneven results for different family members, which may result in some members being ordered removed while others remain protected in the United States. Some commenters stated that they have experience with clients who have been permanently separated from family members, including young children, because they were granted statutory withholding of removal or CAT protection instead of asylum.

Commenters further raised concerns about the effect the proposed rule would have on availability of bond to those subject to the presumption of asylum ineligibility. Commenters asserted that adjudicators are less likely to grant bond to those who are eligible only for statutory withholding of removal or CAT protection as overly high flight risks due to the comparatively higher standards of proof. Commenters also expressed confusion over whether, under the proposed rule, individuals subject to the presumption of ineligibility will be treated as having entered without inspection, leaving them eligible for bond, or as arriving aliens, leaving them ineligible for bond.

*Response:* As described in the NPRM, the purpose of this rule is to discourage irregular migration by encouraging migrants, including those who may seek asylum, to use lawful, safe, and orderly pathways to the United States. *See generally* 88 FR at 11706–07. To do so, the rule includes a number of exceptions to the rebuttable presumption of ineligibility for asylum for prospective asylum applicants outside the United States, including whether they or a member of their family with whom they traveled (1) sought asylum or other protection in third countries through which they first transit, to avoid the need to continue an often-perilous journey to the United States in pursuit of protection unless absolutely necessary; (2) obtained appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole

process; or (3) presented at a POE pursuant to a pre-scheduled date and time or presented at the POE without an appointment but established that it was not possible to access or use the DHS scheduling system for a specified reason. *See* 8 CFR 208.33(a)(2), 1208.33(a)(2). In other words, this rule provides numerous ways in which noncitizens covered by this rule may pursue asylum. And to the extent that a noncitizen may not be able to pursue a lawful pathway due to exceptionally compelling circumstances, they may be able to rebut the presumption. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3).

With respect to noncitizens, or family members with whom they traveled, who do not avail themselves of a lawful pathway or otherwise rebut the presumption, the Departments recognize that the standards for eligibility for statutory withholding of removal and CAT protection are each higher than that for asylum, as they require demonstrating it is more likely than not that noncitizens will be persecuted or tortured in another country, whereas asylum requires a lesser well-founded fear.[299] *See* 64 FR at 8485. Indeed, that difference in standards aligns with several objectives of this rule: to encourage noncitizens to avail themselves of the lawful pathways described above, where possible, as well as to discourage irregular migration, promote orderly processing at POEs, and ensure that protection from removal is still available for those who satisfy the applicable standards for mandatory protection under statutory withholding of removal or the regulations implementing CAT. *See, e.g.,* 88 FR at 11729 (''The Departments assess that the Government can reduce and redirect such migratory flows by coupling an incentive for migrants to pursue lawful pathways with a substantial disincentive for migrants to cross the land border unlawfully.''). The higher ultimate standards of proof for statutory withholding of removal and CAT protection therefore serve as a disincentive for noncitizens to forgo the lawful pathways detailed in this rule, as noncitizens would risk having to satisfy those comparatively higher standards in the first instance if the presumption applied to their case and were unrebutted.[300]

Similarly, the Departments recognize the comparatively fewer benefits of statutory withholding of removal and CAT protection as compared to asylum, including the following: (1) no permanent right to remain in the United States; (2) the inability to adjust status to become a lawful permanent resident and, relatedly, later naturalize as a U.S. citizen; (3) the inability to travel abroad; and (4) the need to affirmatively apply for, and annually renew, work authorization documents.[301] However, as explained above, the Departments promulgated this rule with the intention to encourage noncitizens to utilize a lawful pathway rather than a pathway that may limit them to statutory withholding of removal or CAT protection and their more limited benefits. The Departments also note the lack of derivative protection for statutory withholding of removal and CAT protection recipients.[302] *Compare* INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (providing for derivative asylum status for spouses and children), *with* INA 241(b)(3), 8 U.S.C. 1231(b)(3) (no derivative status for spouses and children under statutory withholding of removal), *and* 8 CFR 1208.16(c)(2) (no derivative status for spouses and children under the CAT).[303] The Departments are cognizant of these limitations and acknowledge the importance of family unity. *See, e.g.,* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 5, 2021) (''It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.''). To that end, as discussed in further detail at Section IV.E.7.ii in this preamble, this rule contains numerous measures to avoid the separation of family members, including applying any exceptions or rebuttals to the presumption to the entire family unit traveling together, as well as a ''family unity'' provision applicable in removal proceedings to ensure that the rule does not result in family separations when granting relief in the United States. *See* 8 CFR 1208.33(c) (''Family unity and removal proceedings.'').

Separately, because this rule does not impact procedures for bond eligibility or consideration, commenter concerns with respect to these issues are outside of the scope of this rulemaking. Nevertheless, the Departments note that bond determinations will continue to be made on a case-by-case basis in accordance with the governing statutes and regulations. Similarly, this rulemaking does not impact determinations of whether to consolidate cases, although the Departments note that consolidation of cases is not limited to those who are pursuing or are eligible for asylum, and that such determinations are made at the IJ's discretion. *See* ICPM, Chapter 4.21(a) and (b) (Nov. 14, 2022) (''The immigration court may consolidate cases at its discretion or upon motion of one or both of the parties, where appropriate. For example, the immigration court may grant consolidation when spouses or siblings have separate but overlapping circumstances or claims for relief.'').

9. Removal of Provisions Implementing the TCT Bar Final Rule

i. Support for Removal of Provisions Implementing the TCT Bar Final Rule

*Comment:* The Departments received several comments expressing opposition to the TCT Bar Final Rule and supporting removal of regulatory provisions implementing that rule. Some commenters expressed opposition to the TCT Bar Final Rule without explanation, while others asserted that the TCT Bar Final Rule conflicts with the INA and that the Departments lacked authority to promulgate the TCT Bar Final Rule. Commenters also objected to the TCT Bar as inconsistent with fundamental protections of refugee law, including the right to seek asylum, the principle of non-refoulement, and the prohibition against penalties for irregular entry. Commenters supporting the removal of provisions implementing

[299] As a general matter, the Departments note that this rule does not change any of the long-time standards relating to statutory withholding of removal and CAT protection outside of the initial credible fear screening stage.

[300] In response to commenters, the Departments note that they cannot quantify how many noncitizens subject to the asylum ineligibility presumption can qualify for statutory withholding of removal or CAT protection, as those are case-by-case, fact-specific determinations.

[301] *See, e.g.,* American Immigration Council, The Difference Between Asylum and Withholding of Removal at 2 (Oct. 2020), *https://www.americanimmigrationcouncil.org/sites/default/files/research/the_difference_between_asylum_and_withholding_of_removal.pdf;* 8 CFR 274a.12(a) (explaining need for withholding recipients to affirmatively apply for work authorization).

[302] The Departments note that, although there is no derivative protection under statutory withholding of removal or CAT, certain U.S.-based qualifying parents or legal guardians, including those granted withholding of removal, may petition for qualifying children and eligible family members to be considered for refugee status and possible resettlement in the United States. *See* USCIS, Central American Minors (CAM) Refugee and Parole Program, *https://www.uscis.gov/CAM* (last visited Apr. 5, 2023).

[303] The Departments note that applicants will not be prevented from petitioning for family members because of this rule. Under the expanded family unity provision at 8 CFR 1208.33(c), any applicant who is found eligible for statutory withholding of removal or CAT withholding and who would be granted asylum but for the presumption will be deemed to have rebutted the presumption if they have a spouse or child who would be eligible to follow to join them, as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), and may pursue follow-to-join procedures if granted asylum.

that rule also faulted the Departments for not including proposed regulatory text removing the TCT Bar from the CFR. Many commenters who urged the Departments to withdraw the proposed rule did so while requesting that the Departments rescind the TCT Bar Final Rule.

Commenters suggested that the TCT Bar Final Rule is inconsistent with the INA because it conflicts with the safe-third-country exception to applying for asylum under section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), and noted that courts have enjoined the rule, finding it inconsistent with the INA. Commenters further noted that the court in *East Bay Sanctuary Covenant* v. *Barr,* 385 F. Supp. 3d 922, 945 (N.D. Cal. 2019), concluded that ''Congress requires reasonable assurances that any so-called 'safe' third country is actually safe, in line with the long-held understanding that categorical bars on asylum must be limited to people who have somewhere else to turn.''

Commenters also objected to the TCT Bar as inconsistent with fundamental protections of refugee law, including the right to seek asylum, the principle of non-refoulement, and the prohibition against penalties for irregular entry. Commenters agreed with removal of provisions implementing that rule and expressed concern that the TCT Bar Final Rule imposes a sweeping, categorical ban on asylum. Commenters further raised concerns that, while in effect, the TCT Bar disproportionately impacted people of color and Black and brown migrants. At least one commenter claimed that the TCT Bar Final Rule discourages noncitizens from reporting crimes. Many commenters expressed concern over the TCT Bar Final Rule's effect on children, both accompanied and unaccompanied, and some commenters stated that the TCT Bar Final Rule does not adequately explain why the Departments omitted an exemption for UCs.

*Response:* The Departments acknowledge these commenters' support. Although the Departments did not include proposed regulatory text in the NPRM, the Departments have included amendatory text in this final rule, which will result in the TCT Bar's removal from 8 CFR 208 and 1208.

Since the TCT Bar Final Rule was promulgated and then enjoined, the Departments have reconsidered its approach and have determined that they prefer the tailored approach of the rebuttable presumption enacted by this rule to the categorical bar that the TCT Bar IFR and Final Rule adopted. Even if the rebuttable presumption had not been adopted, the Departments would seek to remove provisions implementing the TCT Bar Final Rule as the Departments no longer agree with the approach taken in that rule. Additionally, in order to use the TCT Bar Final Rule, the Departments would have to continue litigating various appeals defending the policy, which the Departments now disagree with. Thus, the Departments consider the removal of provisions implementing that rule to be severable from the provisions of 8 CFR 208.13(f), 208.33, 1208.13(f), and 1208.33.

As discussed in Section IV.D.2 of this preamble, the TCT Bar IFR and Final Rule were enacted to address circumstances along the SWB. In the TCT Bar IFR, the Departments stated that increases in the number of noncitizens encountered along or near the SWB corresponds with an increase in the number of noncitizens claiming fear of persecution or torture, and that the processing of credible fear and asylum applications in turn ''consumes an inordinate amount of the limited resources of the Departments.'' 84 FR at 33831. The Departments also stated that the increase in credible fear claims has been complicated by a demographic shift in the noncitizen population crossing the southwest border from Mexican single adult males to predominantly Central American family units and UCs. *See id.* at 33838. The Departments explained that while Mexican single adults who are not eligible to remain in the United States can be immediately repatriated to Mexico, often without requiring detention or lengthy court proceedings, it is more difficult to expeditiously repatriate family units and UCs who are not from Mexico or Canada. *See id.* The Departments also explained that, over the past decade, the overall percentage of noncitizens subject to expedited removal who, as part of the initial screening process, were referred for a credible fear interview on claims of a fear of return has jumped from approximately 5 percent to more than 40 percent, and that the number of cases referred to DOJ for proceedings before an IJ also rose sharply, more than tripling between 2013 and 2018. *See id.* at 33831. In the TCT Bar IFR, the Departments further stated that the growing number of noncitizens seeking protection in the United States and changing demographics created an untenable strain on agency resources. *See id.* at 33838–39. The TCT Bar IFR stated that in FY 2018, USCIS received 99,035 credible fear claims, a 175 percent increase from five years earlier and an 1,883 percent increase from ten years earlier. *See id.* at 33838. In an attempt to address these increases in fear claims, the TCT Bar IFR reduced the availability of asylum to non-Mexicans entering or attempting to enter at the SWB by requiring most asylum seekers who transited through a third country to first seek protection in that transit country, subject to limited exceptions, and without recognizing other avenues for allowing migrants to access the U.S. asylum system.

In response to the TCT Bar IFR, the Departments received 1,847 comments. The commenters who expressed support for that rule indicated that it was an appropriate tool for processing noncitizens arriving at the SWB and would help close ''loopholes'' they asserted exist in the asylum process. *See* TCT Bar Final Rule, 85 FR at 82262. Those who expressed opposition to that rule raised concerns that the rule (1) was in conflict with the INA and U.S. obligations under international law; (2) imposed a sweeping and categorical ban on asylum; and (3) effectively denied asylum seekers the right to be meaningfully heard with respect to their asylum claims. *See id.* at 82263, 82270, 82275.

The Departments subsequently issued the TCT Bar Final Rule to address the comments received on the TCT Bar IFR. *See id.* at 82260. In the TCT Bar Final Rule, the Departments affirmed that they promulgated the IFR based on several policy objectives, including the following: (1) directing prompt relief to noncitizens who are unable to obtain protection from persecution elsewhere and noncitizens who are victims of a severe form of trafficking in persons; (2) the need to reduce the incentive for noncitizens with ''meritless or non-urgent asylum claims'' to seek entry to the United States; (3) relieving stress on immigration enforcement and adjudicatory authorities; (4) curtailing human smuggling; (5) strengthening the negotiating power of the United States regarding migration issues, including the flow of noncitizens into the United States; and (6) addressing humanitarian and security concerns along the SWB. *See id.* at 82285.

As also discussed in Section IV.D.2 of this preamble, a Federal district court vacated the TCT Bar IFR on June 30, 2020, in *Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25 (D.D.C. 2020). Additionally, in parallel litigation, on July 6, 2020, the Ninth Circuit Court of Appeals upheld an order enjoining the IFR. *See E. Bay Sanctuary Covenant* v. *Barr,* 964 F.3d 832 (9th Cir. 2020). After the TCT Bar Final Rule was issued, in February 2021, the U.S. District Court for the

Northern District of California also enjoined the Departments from implementing the TCT Bar Final Rule in its entirety. *See East Bay II,* 519 F. Supp. 3d at 668 (''Defendants are hereby *ordered and enjoined* . . . from taking any action continuing to implement the Final Rule and *ordered* to return to the pre-Final Rule practices for processing asylum applications.''). Thus, the TCT Bar Final Rule is not in effect. As discussed in Section IV.D.2 of this preamble, the injunction rested on a finding that the final rule is inconsistent with both the safe-third-country and firm-resettlement provisions of section 208 of the INA. *See id.* at 667–68; INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A); INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi). The court also stated that the TCT Bar Final Rule exacerbated the risk that asylum seekers and migrants would suffer violence and deprived asylum seekers of procedural safeguards meant to protect them from arbitrary denials of their asylum claims. *See East Bay II,* 519 F. Supp. 3d at 664.

The Departments have removed regulatory text implementing the TCT Bar Final Rule from the CFR because the Departments no longer support the TCT Bar Final Rule as a means of addressing capacity and other issues at the SWB. Throughout the NPRM and this rule, the Departments have explained that, absent this rule, the lifting of the Title 42 public health Order is expected to lead to a surge of migration at the SWB. At the same time, the Departments recognize the opportunity afforded to migrants via the provided lawful pathways, as well as the unique vulnerabilities of asylum applicants, the high stakes involved in the adjudication of applications for asylum, and the fundamental importance of ensuring that noncitizens with a fear of return have access to the U.S. asylum system, subject to certain exceptions. *See, e.g., INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 449 (1987) (explaining that removing a noncitizen to their home country ''is all the more replete with danger when the [noncitizen] makes a claim that [the noncitizen] will be subject to death or persecution if forced to return. . . .''); *Quintero,* 998 F.3d at 632 (''[N]eedless to say, these cases per se implicate extremely weighty interests in life and liberty, as they involve [noncitizens] seeking protection from persecution, torture, or even death.''); *Matter of O–M–O–,* 28 I&N Dec. 191, 197 (BIA 2021) (''The immigration court system has no more solemn duty than to provide refuge to those facing persecution or torture in their home countries, consistent with the immigration laws.''). These concerns are echoed in E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border. *See, e.g.,* E.O. 14010, 86 FR at 8267 (Feb. 5, 2021) (''Securing our borders does not require us to ignore the humanity of those who seek to cross them.''). Accordingly, the Departments believe that when evaluating changes to the asylum system, as well as processing at the POEs, the potential adverse impacts to legitimate asylum seekers should be carefully considered, as they have been in this rule. The Departments believe that this rule is better suited to address current circumstances than the TCT Bar Final Rule's categorical ban on asylum for nearly anyone who traveled through a third country without applying for asylum in that third country.

The Departments recognize that the TCT Bar was in effect for nine months, and although multiple factors influence migration trends over time, the Departments' review does not indicate that the bar had a dramatic effect on the number of noncitizens seeking to cross the SWB between POEs.[304] Given the success of the CHNV parole processes, which paired lawful pathways with consequences for not pursuing such pathways, in decreasing encounters, the Departments believe that the TCT Bar's lack of such alternative pathways may have contributed to its failure to dramatically decrease encounters between POEs. This informs the Departments' reasoning for adopting the more tailored approach in this rule—that is, pairing safe, orderly, and lawful pathways for entering the United States with negative consequences for forgoing those pathways, along with exceptions and means of rebutting the presumption against asylum eligibility where certain circumstances are present. Additionally, the fact that the TCT Bar has not been in effect for approximately three years undermines any assertion of reliance interests on the bar.

ii. Opposition To Removal of Provisions Implementing the TCT Bar Final Rule

*Comment:* Some commenters expressed general opposition to the removal of provisions implementing the TCT Bar Final Rule. Commenters stated that ''the concepts of limiting eligibility for asylum based on means of entry and criteria surrounding that entry are appropriate methods of controlling migrant flows at the southwest border'' and that the TCT Bar achieved this without including ''myriad of exceptions to effectively render it meaningless.'' Some commenters maintained the TCT Bar Final Rule was legally permissible and politically warranted based on factual conditions at the SWB. Commenters similarly urged the Departments to adopt on a permanent basis an amended version of the rule that would mirror the TCT Bar Final Rule's provisions, stating that this would better serve the NPRM's stated goal of ''distribut[ing] the asylum burden to countries that are able to provide protection against persecution within the Western Hemisphere.'' Commenters averred that this would limit asylum eligibility to those with the greatest need for protection and that the ''maintenance of effective deterrence policies is essential to stemming the flow of illegal immigration into the United States.''

*Response:* The Departments note these commenters' general opposition to rescinding the TCT Bar and their support for enforcing the Nation's immigration laws. The Departments believe that this rule results in the right incentives to avoid a significant further surge in irregular migration after the Title 42 public health Order is lifted, and that the approach taken in this rule is substantially more likely to succeed than the approach taken in the TCT Bar Final Rule. Specifically, the successful implementation of the CHNV parole processes has demonstrated that an increase in lawful pathways, when paired with consequences for migrants who do not avail themselves of such

[304] The Departments note that apprehensions along the SWB did not dramatically decrease while the TCT Bar IFR was in effect between September 11, 2019, and June 30, 2020. *See* CBP, *Southwest Border Migration FY 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019* (last visited Mar. 22, 2023); CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited Mar. 22, 2023). Encounters along the SWB increased dramatically starting in January 2019 until early May 2019, when they began to fall significantly. CBP, *Southwest Border Migration FY 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019* (last visited Mar. 22, 2023). The TCT Bar IFR, although issued on July 16, 2019, did not go into full effect until September 11, 2019, after encounters had already dropped from a high of 144,116 in May to 52,546 in September. *Id.* Encounters continued to trend downward more slowly from October 2019 to March 2020 when concerns over COVID–19 led to the suspension of MPP and the Title 42 public health Order and a steep decline of encounters to a low in April 2020. CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited Mar. 22, 2023). Thereafter, encounters increased steadily for the rest of the FY with no noticeable change after the TCT Bar IFR was enjoined and stopped being applied on June 30, 2020. Given this data, the Departments have no reason to believe that the TCT Bar IFR had any noticeable impact on encounters along the SWB while it was in effect.

pathways, can positively affect migrant behavior and undermine transnational criminal organizations, such as smuggling operations. This rule, which is fully consistent with domestic and international legal obligations, provides the necessary consequences to maintain this incentive under Title 8 authorities. In short, the rule aims to disincentivize irregular migration and instead incentivize migrants to take safe, orderly, and lawful pathways to the United States or to seek protection in a third country.

As compared to the TCT Bar Final Rule, this rule has been more carefully tailored to mitigate the potential for negative impact of the rule on migrants to the extent feasible while also recognizing the reality of unprecedented migratory flows, the systemic costs that those flows impose on the immigration system, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. The Departments remain committed to ensuring that those who apply for asylum or seek protection who most urgently need protection from persecution are able to have their claims adjudicated in a fair, impartial, and timely manner and believe that this rule, including the removal of provisions implementing the TCT Bar Final Rule, will be a more effective and efficient means of doing so.

*Comment:* Commenters averred that the rule would be too lenient in comparison to the TCT Bar Final Rule and would lead to ''open borders.'' They claimed that the presumption of asylum ineligibility is not sufficiently stringent and therefore would be far less effective at disincentivizing unlawful migration.

*Response:* The Departments believe that the rule strikes the right balance in terms of incentivizing the use of lawful, safe, and orderly pathways to enter the United States while imposing negative consequences on a failure to do so. As has been shown with the CHNV parole processes, pairing such policies together can lead to meaningful decreases in the flow of irregular migration to the SWB.

10. Declining to Permanently Adopt the Proclamation Bar IFR

In addition to the 51,952 comments on this NPRM, the Departments received a total of 3,032 comments on the Proclamation Bar IFR and posted 3,000 of those comments. Of the 32 comments not posted, 30 were commenters' duplicates, one was untimely and did not address substantive or novel issues not already covered by other timely comments, and one was an internal test comment. Most of the comments came from one of three mass-mail campaigns, containing the same or closely related variations of the same standard language. While 18 comments supported the IFR specifically or the prior Administration's efforts generally, the vast majority of the comments opposed the IFR. Below, the Departments address these comments in addition to the comments relating to removal of provisions implementing the Proclamation Bar IFR received in response to the NPRM.

i. Support for Not Permanently Adopting the Proclamation Bar

*Comment:* Many commenters expressed general opposition to the Proclamation Bar IFR or support for removing provisions implementing that rule without providing any reasoning. Some commenters simply stated that their comments ''express [their] strong opposition to the new Interim Final Rule.'' Some commenters, in stating their general opposition to the Proclamation Bar IFR, also made unrelated, general criticisms regarding the prior administration's immigration policies. Commenters supporting the removal of provisions implementing the Proclamation Bar IFR also faulted the Departments for not including proposed regulatory text removing that rule from the CFR. Many commenters who urged the Departments to withdraw the proposed rule did so while requesting that the Departments rescind the Proclamation Bar IFR.

Commenters expressed concern that the Proclamation Bar IFR violates multiple laws. Specifically, commenters stated that the Proclamation Bar IFR violates multiple sections of the Act: INA 208(a), 8 U.S.C. 1158(a) (eligibility to apply for asylum); INA 235(b)(1), 8 U.S.C. 1225(b)(1) (inspection of noncitizens arriving in the United States and certain other noncitizens who have not been admitted or paroled); INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C) (additional limitations on granting asylum); INA 208(a)(2)(C), 8 U.S.C. 1158(a)(2)(C) (previous asylum exception to authority to apply for asylum); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (codifying the TVPRA). Some commenters asserted that only Congress may act to amend the law and that the prior administration circumvented the legislative process by issuing the Proclamation Bar IFR. Commenters also argued that the Proclamation Bar IFR violates 5 U.S.C. 706(2)(A) in that it was promulgated in a manner inconsistent with the APA, and that it violates multiple provisions of the U.S. Constitution. In particular, commenters argued that the Proclamation Bar IFR violates due process rights, equal protection, and separation of powers; exceeds Executive authority; was promulgated with discriminatory intent; is similar to deterrence-focused policies that have been held unconstitutional; and is unlawful on the basis that the appointment of the then-Acting Attorney General violated the Appointments Clause. Commenters contended that the Proclamation Bar IFR also violates the APA by being arbitrary and capricious, in that it conditions asylum on a factor unrelated to persecution. Numerous commenters claimed that the Proclamation Bar IFR violates the APA's notice-and-comment requirements and that the good cause and foreign affairs exceptions do not apply. One commenter claimed that the Proclamation Bar IFR would, in fact, have federalism impacts, contrary to the Departments' federalism impact assessment, and some commenters disagreed with the Departments' position that it is not subject to the Congressional Review Act because its effect is less than $100 million. Commenters also expressed concern that the Proclamation Bar IFR violates international law, customary international law, and the Refugee Act.

Commenters noted that the court in *East Bay III* held that the Proclamation Bar directly conflicts with section 208(a) of the INA, 8 U.S.C. 1158(a), because ''[i]t is effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress.'' Commenters further noted the Ninth Circuit's holding in *East Bay III* that the fact ''[t]hat a refugee crosses a land border instead of a port-of-entry says little about the ultimate merits of her asylum application.'' They further cited *East Bay I* as holding that there is ''no basis to support 'categorically disbelieving' non-citizens, or declaring them 'not credible,' simply because of their manner of entry'' when applying the ''reasonable possibility'' standard to those who are determined ineligible for asylum.

Commenters voiced numerous policy concerns about the Proclamation Bar IFR. Specifically, commenters criticized the Proclamation Bar IFR as they believe that it relies on insufficient data or improperly interpreted data; exacerbates trauma by forcing migrants to remain indefinitely outside of the U.S. border in inhumane conditions; punishes those who lack the means to access designated POEs and the luxury to choose how and when they enter the United States; potentially increases risk of harm to children by narrowing safe options; forecloses legitimate asylum claims by

imposing an initial higher standard of proof on individuals who enter between POEs; fails to address the root causes of migration, for which some commenters believe the United States is at least in part responsible; violates religious and moral obligations; and is a ''shameful abdication of the United States' obligation to serve as a haven for those individuals who meet the internationally agreed upon definition of a refugee.'' Further, commenters stated that, contrary to its purpose, the Proclamation Bar IFR would not encourage admission at POEs due to safety and procedural concerns at the SWB and would impede state and local services and non-governmental organizations by undermining policies and programs, imposing substantial additional costs, and discouraging engagement. Commenters also voiced concern that the Proclamation Bar IFR would harm U.S. diplomatic efforts and undermine the United States' international credibility by inflaming tensions and hindering diplomatic relations with Mexico and other nations, as well as encouraging other nations to abandon their humanitarian protection practices. Commenters expressed their belief that the Proclamation Bar IFR is cruel, unnecessary, and overly harsh and was issued ''under the guise of streamlining the asylum process'' but was actually intended to intimidate asylum seekers from entering the United States ''out of fear that their presence in the United States guarantees inadmissibility.'' Additionally, commenters indicated that statutory withholding of removal and CAT protection are insufficient forms of relief.

*Response:* The Departments appreciate the commenters' submissions and agree that removal of provisions implementing the Proclamation Bar IFR is sound policy and accords with this Administration's priorities. Although the Departments did not include proposed regulatory text in the NPRM, the Departments have included amendatory text in this final rule, which will result in the Proclamation Bar's removal from 8 CFR 208 and 1208.

Since the Proclamation Bar IFR was promulgated, the Departments have reconsidered their approach and have determined that they prefer the tailored approach of the rebuttable presumption enacted by this rule to the categorical bar that the Proclamation Bar IFR adopted. Even if the rebuttable presumption were not paired with the decision not to adopt the Proclamation Bar permanently, the Departments would decline to permanently adopt the Proclamation Bar IFR and would remove the bar's language from the regulatory text as the Departments no longer view it as their preferred policy choice and are not inclined to continue defending the Proclamation Bar IFR in court in order to be able to implement it at some indeterminate point in the future. Thus, the Departments consider the decision not to adopt the Proclamation Bar on a permanent basis and to remove the bar's language from the CFR to be severable from the provisions of 8 CFR 208.13(f), 208.33, 1208.13(f), and 1208.33.

The Proclamation Bar IFR was promulgated to address circumstances along the SWB. In the Proclamation Bar IFR, the Departments stated that ''[i]n recent weeks, United States officials have each day encountered an average of approximately 2,000 inadmissible aliens at the southern border.'' 83 FR at 55935. They further noted ''large caravans'' of noncitizens, primarily from Central America, attempting to make their way to the United States, ''with the apparent intent of seeking asylum after entering the United States unlawfully or without proper documentation.'' *Id.* The Departments noted that nationals of Central American countries were more likely to enter between POEs rather than present at a POE. *Id.* The Departments enacted the Proclamation Bar IFR to ''channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner.'' *Id.* The Departments also stated that the Proclamation Bar IFR would ''facilitate the likelihood of success in future negotiations'' with Mexico. *Id.* at 55951.

Rather than barring entry on its own, the Proclamation Bar IFR only barred entry between POEs when a presidential proclamation or other presidential order under section 212(f) or 215(a)(1) of the INA, 8 U.S.C. 1182(f) or 1185(a)(1), suspended entry along the SWB. 83 FR at 55952–53. Any exceptions to the operation of the bar would be set out in the presidential proclamation or order and were not within the Departments' control. *Id.* at 5934 (''It would not apply to a proclamation that specifically includes an exception for aliens applying for asylum, nor would it apply to aliens subject to a waiver or exception provided by the proclamation.'').

The Proclamation Bar IFR was preliminarily enjoined soon after it became effective and was eventually vacated. *See generally O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (recounting the history of the litigation over the Proclamation Bar IFR and vacating it). The Departments appealed the vacatur, and that case has been stayed since February 24, 2021, to allow for rulemaking by the agencies. *O.A.* v. *Biden,* No. 19–5272 (DC Cir. filed Oct. 11, 2019).

As stated in the NPRM, the Departments have reconsidered the Proclamation Bar IFR and decline to adopt it permanently. *See* 88 FR at 11728. As an initial matter, the Proclamation Bar IFR conflicts with the tailored approach taken in this rule because, in combination with the proclamation the President issued, the Proclamation Bar IFR barred from asylum all individuals who entered the United States along the SWB unless they presented themselves at a POE. *See* 83 FR at 55935 (''The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner.''). The Departments do not believe barring all noncitizens who enter between POEs along the SWB is the proper approach in the current circumstances and have instead decided to pair safe, orderly, and lawful pathways for entry into the United States with negative consequences for not taking those pathways, with exceptions and means of rebutting the presumption against asylum eligibility.

Even if the rule's rebuttable presumption were not finalized and given effect, the Departments would nevertheless remove provisions implementing the Proclamation Bar IFR. The bar's categorical nature did not allow for case-by-case judgments to determine whether it should apply, which the Departments consider important to ensure that such bars are applied fairly. The Departments believe that this consideration further supports removing the regulatory language implementing the Proclamation Bar IFR. Finally, U.S. negotiations with Mexico have changed, and the Departments no longer believe that the Proclamation Bar IFR is necessary for those negotiations.

ii. Opposition to Not Adopting the Proclamation Bar IFR Permanently

*Comment:* Some commenters expressed general support for the Proclamation Bar IFR. Commenters stated that the prior Administration had not done enough to deter irregular migration, resulting in the undermining of compliance with U.S. laws, the rule of law, and national security and safety.

*Response:* The Departments acknowledge commenters' concerns regarding national security and safety

and note the commenters' support for the Proclamation bar IFR. Nevertheless, the Departments, after due consideration, believe this rule to be more appropriate as a matter of policy and law. This rule serves to encourage the safe and orderly processing of migrants at the SWB and is consistent with the United States' legal obligations under the INA, international treaties, and all relevant legal sources. Because these particular comments failed to articulate specific reasoning underlying expressions of general support for the Proclamation Bar IFR, the Departments are unable to provide a more detailed response.

*F. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

i. Length of Comment Period

*Comment:* Commenters raised concerns that this rule violated the APA's requirements, as set forth in 5 U.S.C. 553(b) through (d). Commentors stated that the 30-day comment period was not sufficient, arguing that the Departments should extend the comment period to at least 60 days or should reissue the rule with a new 60-day comment period. Numerous commenters requested additional time to comment, citing the complex nature of the NPRM, its length, and the impact of the rule on asylum-seekers and commenters. Other commenters, such as legal services organizations, noted that they have a busy workload and that 30 days was not a sufficient period to prepare the fulsome comment they would have prepared had the comment period provided more time. For example, a legal services organization indicated that it would have provided additional information about asylum seekers the organization has assisted in the past and data about the population the organization serves but that it did not have time to do so. Other organizations stated they also would have included information on issues such as their clients' experiences with the CBP One app and experiences in third countries en route to the United States and would have consulted with experts. Another organization stated that it had to choose between providing comments on the rule and helping migrants prepare for the rule's implementation, and another organization stated that it was unable to provide fulsome comments because the comment period coincided with the implementation of the CBP One app as a means by which its clients could seek exceptions to the Title 42 public health Order. Commenters argued that the Departments selected a 30-day comment period to reduce the volume of negative comments that will be filed in order to justify disregarding national sentiment against the rule.

Commenters asserted that the 30-day comment period is ''risking that public comments will not be seriously considered before the rule is implemented,'' and additional time is needed to meet APA requirements that agencies provide the public with a ''meaningful opportunity'' to comment. These comments referenced Executive Orders 12866, Regulatory Planning and Review, 58 FR 51735 (Sept. 30, 1993) and 13563, Improving Regulation and Regulatory Review, 76 FR 3821 (Jan. 18, 2011), which recommend a comment period of not less than 60 days ''in most cases,'' and case law, such as *Prometheus Radio Project* v. *FCC,* 652 F.3d 431 (3d. Cir. 2011), and *Centro Legal de la Raza* v. *EOIR,* 524 F. Supp. 3d 919 (N.D. Cal. 2021).

Commenters disagreed with the Departments' reliance on the impending termination of the Title 42 public health Order in May 2023 and the expected potential surge in migration that would result as justification for the 30-day comment period. These commenters emphasized that the Administration itself sought to formally end the Title 42 public health Order nearly a year ago and stated that the Departments have had sufficient time to prepare for the policy's end. For example, commenters cited to the December 13, 2022, statement issued by Secretary Mayorkas regarding the planning for the end of the Title 42 public health Order.[305]

Some commenters requested extension of the comment period due to reported technical difficulties with submitting comments and stated that technical problems had effectively shortened the comment period to less than 30 days or reduced the public's ability to fully participate in the rulemaking process. For example, one commenter stated that they had learned that there was a technical outage or other error in the application programming interface (''API'') technology used to allow third-party organizations to submit comments through *regulations.gov*. This commenter expressed a belief that an unknown number of comments had been ''discarded'' without the commenters' knowledge. Another commenter referenced an individual who had technical errors when trying to submit a comment online.[306] This commenter also noted that there was an alert banner on *regulations.gov* at 9:30 a.m. eastern time on March 27, 2023, that stated ''*Regulations.gov* is experiencing delays in website loading. We apologize for the inconvenience. While we are working on a fix, please try to refresh when you encounter slow responses or error messages.'' Overall, these commenters referenced possible technical errors with the submission of comments from as early as March 20, 2023, through the close of the comment period on March 27, 2023.

Finally, commenters further stated that the comment period for the USCIS fee schedule NPRM[307] (from January 4, 2023, through March 13, 2023) overlapped with the comment period for the NPRM in this rulemaking, which caused challenges for commenting on this rule in the 30-day comment period. In addition, commenters stated that the 30-day comment period did not provide commenters who do not regularly work in immigration law with sufficient time to fully analyze the effects of the rule, and that the Departments should extend the 30-day comment period to provide sufficient time for respectful observance of Ramadan, which began during the comment period.[308]

*Response:* The Departments believe the comment period was sufficient to allow for meaningful public input, as evidenced by the almost 52,000 public comments received, including numerous detailed comments from interested organizations.

The comment period spanned 33 days, from February 23, 2023, through March 27, 2023. The January 5, 2023, announcement of the impending

[305] DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), *https://www.dhs.gov/news/2022/12/13/statement-secretary-mayorkas-planning-end-title-42#:~:text=%E2%80%9CNonetheless%2C%20we%20know%20that%20smugglers,United%20States%20will%20be%20removed.*

[306] This commenter also referenced a second individual who was able to eventually submit a timely comment but who posted a photo on twitter that the commenter described as a screenshot of an error screen from *regulations.gov. https://twitter.com/argrenier/status/1639989637413490689/photo/1.* The Departments note that this photo is actually a screenshot from a different website (*federalregister.gov*) and not *regulations.gov*, which is the website the instructions in the NPRM told the public to use to submit a comment. *Id.*

[307] *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 FR 402 (Jan. 4, 2023); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Extension of Comment Period, 88 FR 11825 (Feb. 24, 2023) (extending the comment period until March 13, 2023).

[308] This commenter also stated the Departments should extend the comment period due to the holidays of Passover and Easter, but both Passover (April 5 through April 13, 2023) and Easter (April 9, 2023 or later) do not occur in whole or in part during the rule's comment period.

issuance of the proposed rule[309] also provided an opportunity for public discussion of the general contours of the policy.[310] In addition, commenters could begin to familiarize themselves with the rule before the rule was published during the period before the comment period opened when the rule was on public inspection.

The APA does not require a specific comment period length, *see* 5 U.S.C. 553(b), (c), and although Executive Orders 12866 and 13563 recommend a comment period of at least 60 days, a 60-day period is not required. Much of the litigation on this issue has focused on the reasonableness of comment periods shorter than 30 days, often in the face of exigent circumstances. *See, e.g., N. Carolina Growers' Ass'n, Inc.* v. *United Farm Workers,* 702 F.3d 755, 770 (4th Cir. 2012) (analyzing the sufficiency of a 10-day comment period); *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 629–30 (D.C. Cir. 1996) (concluding 15 days for comments was sufficient); *NW. Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (finding 7-day comment period sufficient).

The Departments are not aware of any case law holding that a 30-day comment period is categorically insufficient. Indeed, some courts have found 30 days to be a reasonable comment period length. For example, the D.C. Circuit has stated that, although a 30-day period is often the ''shortest'' period that will satisfy the APA, such a period is generally ''sufficient for interested persons to meaningfully review a proposed rule and provide informed comment,'' even when ''substantial rule changes are proposed.'' *Nat'l Lifeline Ass'n* v. *FCC,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)). The Departments recognize, however, that some courts have held that a 30-day comment period was likely insufficient in certain circumstances. *See, e.g., Centro Legal de la Raza* v. *EOIR,* 524 F. Supp. 3d 919, 955 (N.D. Cal. 2021) (holding that DOJ's 30-day notice-and-comment period was likely insufficient for a rule that implemented extensive changes to the immigration court system and noting, inter alia, the arguments by commenters that they could not fully respond during the comment period, the effect of the COVID–19 pandemic, and allegations of ''staggered rulemaking''); *Pangea Legal Servs.* v. *DHS,* 501 F. Supp. 3d 792, 818–22 (N.D. Cal. 2020) (holding that the plaintiffs had at a minimum shown ''serious questions going to the merits'' of whether the 30-day comment period for a different asylum-related rulemaking was insufficient and noting, inter alia, the ''magnitude'' of the rule, that the comment period ''spanned the year-end holidays,'' the comment periods of other rules by DHS, the number of comments received, and allegations of ''staggered rulemaking'').

Here, even assuming these cases were correctly decided, the Departments have concluded that the concerns raised in those circumstances are not borne out. First, the significant number of detailed and thorough public comments is evidence that the comment period here was sufficient for the public to meaningfully review and provide informed comment. *See, e.g., Little Sisters of the Poor Saints Peter & Paul Home* v. *Penn.,* 140 S. Ct. 2367, 2385 (2020) (''The object [of notice and comment], in short, is one of fair notice.'' (citation and quotation marks omitted)). Second, the 30-day comment period did not span any Federal holidays, and while commenters noted that the Muslim month of Ramadan began during the comment period, the Departments find that there is no evidence that the occurrence of the month of Ramadan during the comment period would substantively impact the ability of Ramadan observants to submit a timely comment. Third, because the Departments had not recently published other related rules on this topic or that affect the same portions of the CFR that would affect commenters' ability to comment, this rule does not present staggered rulemaking concerns. The last asylum-related rulemaking, the Asylum Processing IFR, was published on March 27, 2022, and was effective on May 31, 2022. 87 FR 18078.[311] Accordingly, commenters did not have to contend with the interplay of intersecting rules and related policy changes when drafting their comments. And though the Departments recognize that the USCIS fee rule's comment period partially overlapped with this rule's comment period, this overlap does not render this rule's comment period unreasonable. The comment period for that rule—which addresses different subjects and portions of the CFR than this rule—opened on January 4, 2023, 50 days before opening of this rule's comment period, and ended on March 13, 2023, 14 days prior to the close of this comment period.

Finally, the Departments also believe that the 30-day comment period was preferable to a longer comment period since this rule involves concerns about the Departments' ability to safely, effectively, and humanely enforce and administer the asylum system and immigration laws given the surge of migrants that is expected to occur upon the lifting of the Title 42 public health Order if this rule were not in place. *Cf., e.g., Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (noting that the agency had good cause to not engage in notice and comment rulemaking at all because the rule was needed to protect public safety as demonstrated by numerous then-recent helicopter crashes). By proceeding with a comment period shorter than 60 days, the Departments were able to receive comments, review comments, and prepare a final rule to be promulgated in time for the May 11, 2023, expiration of the public health emergency and the corresponding expiration of the Title 42 public health Order. A 60-day comment period, on the other hand, would have run until April 24, 2023, and a final rule would have been impossible to prepare in the 17 days from April 24 to May 11, 2023. Having this rule in place for the expiration of the Title 42 public health Order will disincentivize the expected surge of irregular migration and instead incentivize migrants to take safe, orderly, and lawful pathways to the United States or to seek protection in third countries in the region. The rule will thus prevent a severe strain on the immigration system, as well as protect migrants from the dangerous journey to the SWB and the human smugglers that profit on their vulnerability. Contrary to some commenters' allegations, the Departments did not select a 30-day comment period to limit public involvement on the rule.

The Departments disagree with commenters' statements that the Departments' reliance on the end of the Title 42 public health Order is inapt because ending Title 42 was a government choice, and the Departments should have had time to prepare without a 30-day comment period. First, the Departments note that the Title 42 public health Order is ending based on factual developments,

[309] DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[310] *See, e.g.,* Al Jazeera, *US Rights Groups Slam Bidens 'Unacceptable' Asylum Restrictions,* Jan. 6, 2023, *https://www.aljazeera.com/news/2023/1/6/us-rights-groups-slam-bidens-unacceptable-asylum-restrictions;* UN, *New US Border Measures 'Not in Line with International Standards', Warns UNHCR,* Jan. 6, 2023, *https://news.un.org/en/story/2023/01/1132247.*

[311] In addition, the Departments published a final rule extending the U.S.-Canada STCA on March 28, 2023, but that rule did not have any impact on the subject of this rule as it applies to the U.S.-Canada land border. 88 FR 18227.

and the Departments do not control either those factual developments or the decision to recognize those factual developments by terminating the public health Order. Second, litigation and the resulting injunctions over ending the Title 42 public health Order have made it difficult for the Departments to predict an exact end date. *See, e.g., Arizona* v. *Mayorkas,* 143 S. Ct. 478 (2022) (granting States' application for stay pending certiorari and preventing the District Court for the District of Columbia from giving effect to its order setting aside and vacating the Title 42 public health Order); *Louisiana* v. *CDC,* 603 F. Supp. 3d 406 (W.D. La. 2022) (granting States' motion for a preliminary injunction prohibiting enforcement of the CDC's order terminating Title 42). Accordingly, it was not until the Administration announced [312] its plan to have the public health emergency that underpins the Title 42 public health Order extend until May 11, 2023, and then expire that the end of the Title 42 public health Order changed from speculative to more concrete. The Departments then published the NPRM in short order, 24 days after the Administration's statement of intent. Finally, as discussed in the NPRM and elsewhere in this preamble, the CHNV parole processes that the Departments developed in October 2022 (Venezuela) and January 2023 (Cuba, Haiti, and Nicaragua) have shown significant success in reducing encounters and encouraging noncitizens to seek lawful pathways to enter the United States. This rule adopts a similar design as these programs—coupling the incentives of lawful pathways with disincentives for failing to pursue those pathways—based, in part, on the successes of those programs in decreasing irregular migration. Because those successes were not seen until as late as January 2023, commenters are incorrect that the Departments could have published it long before February 2023. Once the NPRM was published, it was reasonable to include a 30-day comment period in light of the impending end of Title 42 public health Order.

Finally, the Departments have investigated commenters' allegations of technical errors that led to comments being ''discarded'' or not submitted with the eRulemaking Program at the GSA. A GSA representative explained the following:

- The API, which allows the electronic submission of comments to regulations.gov by third-party software, was operating normally from March 20, 2023, to March 28, 2023.
- Commenters are incorrect that any submitted comments were ''discarded'' as comments that are received are not discarded.
- While some users reported errors on the submission of API comments, all unsuccessful transactions were successfully resubmitted within a maximum of 30 minutes.
- In addition, the eRulemaking Program accommodated one commenting organization with a temporary increase to the API posting rate limit so that the organization could submit approximately 26,000 comments by the close of the comment period.
- None of the help desk call logs reflect a call related to this rule nor a discussion indicating an unresolved error when posting comments.

Accordingly, the Departments do not believe that any technical errors prevented commenters from submitting comments within the 30-day comment period.

Overall, the Departments find that the time afforded by a 30-day comment period to prepare a final rule prior to the expiration of the Title 42 public health Order, which would not have been possible with a longer comment period, outweighs the arguments raised in support of a longer comment period by commenters. Commenters have provided numerous and detailed comments regarding the NPRM, and the Departments appreciate their effort to provide thorough commentary for the Departments' consideration during the preparation of this final rule.

ii. Insufficient Consideration of Public Comments

*Comments:* Commenters stated that the timeline for the rule risks that the Departments will not seriously consider public comments before implementing a final rule and gives the appearance that the Departments have predetermined the outcome of the NPRM. Many commenters stated that the short time span between the scheduled close of the comment period (at the end of March 27, 2023) and the anticipated issuance of the final rule (no later than May 12, 2023) suggested that the Departments would not meaningfully consider public comments. Commenters stated that the Departments should have issued a proposed rule earlier than February 2023 to give the Departments more time to carefully consider comments received and revise policy plans prior to the issuance of a final rule.

*Response:* The Departments have included an extensive discussion of comments received as part of this preamble. The Departments strongly disagree with the commenters' assertions that the Departments failed to meaningfully consider public comments in issuing this final rule. The Departments' receptivity to public comments is demonstrated by, for instance:

- The extensive and substantive discussion of public comments in this preamble;
- Multiple revisions made by the Departments to the policy contained in the NPRM, including clarifications of policy requested by commenters, a reorganization of the regulatory text for clarity, and other policy changes that are responsive to public comments; and
- The Departments' choice to seek public comment in the first instance, notwithstanding that this rulemaking involves a foreign affairs function of the United States and addresses an emergency situation for which the Departments would have good cause to bypass notice and comment.[313]

iii. Delayed Effective Date

*Comments:* Commenters stated that they anticipated that the Departments would issue the final rule in violation of the APA's requirement of a 30-day delayed effective date for substantive rules.[314] Commenters stated that by delaying so long in issuing the NPRM, the Departments had forfeited any argument for ''good cause'' to make the final rule effective immediately. Commenters noted that there has been litigation for years over the ongoing viability of Title 42 public health Order—itself an inherently temporary measure—and the April 2022 Title 42 termination Order. Commenters stated that the Departments could have conducted a notice-and-comment rulemaking with a 30-day delayed effective date had they begun this rulemaking sooner.

*Response:* As discussed in Section V.A. of this preamble, the Departments are invoking the foreign affairs and good cause exceptions for bypassing a 30-day delayed effective date. *See* 5 U.S.C. 553(a)(1) and (d). The Departments have determined that immediate implementation of this rule is necessary to fortify bilateral relationships and avoid exacerbating a projected surge in migration across the region following the lifting of the Title 42 public health Order.

---

[312] Office of Mgmt. & Budget, Exec. Office of the President, *Statement of Administration Policy* (Jan. 30, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf.*

[313] *See* 5 U.S.C. 553(a)(1), (b)(B); *see also* Section VI.A. of this preamble.

[314] *See* 5 U.S.C. 553(d).

Case law suggesting that an agency's delay can effectively forfeit the agency's ''good cause'' relates primarily to the separate good cause exception applicable to notice-and-comment rulemaking requirements under 5 U.S.C. 553(b)(B).[315] Such case law has no bearing on the foreign affairs exemption under 5 U.S.C. 553(a)(1). In addition, it is not dispositive as to the good cause exception at 5 U.S.C. 553(d), which serves ''different policies'' and ''can be invoked for different reasons.''[316] Specifically, the 30-day delayed-effective-date requirement ''is intended to give affected parties time to adjust their behavior before the final rule takes effect,''[317] but in this context, affected parties have been subject to the Title 42 public health Order for years, and cannot reasonably argue that they require an additional 30 days to adjust their behavior to the new approach taken in this rule.

Even if the forfeiture doctrine is applied in this context, however, the Departments have pursued this rulemaking without delay, and in fact have proceeded as rapidly as possible under the circumstances. As discussed at length in the NPRM, this rulemaking addresses a range of dynamic circumstances, including major recent shifts in migration patterns across the hemisphere, altered incentives at the SWB created by the application of the Title 42 public health Order (which has carried no immigration consequences and resulted in many migrants trying repeatedly to enter the United States), and ongoing litigation regarding the Title 42 public health Order.[318] The Departments have sought to address these circumstances in a variety of ways, including the six-pillar strategy outlined in the April 2022 DHS Plan for Southwest Border Security and Preparedness; the issuance of the Asylum Processing IFR, 87 FR 18078; the expansion of lawful pathways throughout the region and via the CHNV processes; and the introduction of the CBP One app, among other measures. The Departments' issuance of the proposed rule while the litigation over the Title 42 public health Order was ongoing, and within weeks of the Administration's announcement regarding the impending termination of that Order, reflects the high priority that the Departments have placed on issuing this rulemaking promptly via a notice and comment process.

2. Paperwork Reduction Act (''PRA'')

*Comment:* A commenter stated that the Departments had not posted to the public docket any proposed revisions to the collection of information under Office of Management and Budget (''OMB'') Control Number 1651–0140, *Collection of Advance Information from Certain Undocumented Individuals on the Land Border.* The commenter stated that such revision appeared particularly important given the NPRM's proposed codification of the required use of the CBP One app to access regular Title 8 asylum processing. The commenter stated that, as a consequence of the failure to post the proposed revisions, they were unable to comment on the proposed changes to the collection of information. A commenter expressed concern that CBP sought emergency approval to collect advance information on undocumented noncitizens and bypassed the standard notice and comment process.

*Response:* With respect to commenters' stated concerns about the public docket, the Departments note that like all proposed revisions to collections of information, the proposed revisions described in the NPRM were available for review throughout the comment period on OMB's website at *https://www.reginfo.gov,* under the Information Collection Review tab.[319] The Departments did not also post these comments to the public docket, but are unaware of any attempt by the commenter to request a copy of the proposed changes by using the contact information listed in the NPRM.

The Departments maintain that the nature of the proposed change to the collection of information was clear to commenters, as the proposed change was described at length in the NPRM and was the subject of many comments. The Supporting Statement that was available on OMB's website (and was the only document related to the information collection for which the Departments had proposed revisions) described an NPRM that, if finalized, ''would change the consequences, for some noncitizens and for a temporary period of time, of not using CBP One to schedule an appointment to present themselves at a POE.''[320] The Supporting Statement explained that such noncitizens would ''be subject to a rebuttable presumption of asylum ineligibility, unless the noncitizen demonstrates by a preponderance of the evidence that it was not possible to access or use CBP One due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or that the noncitizen is otherwise not subject to the rebuttable presumption.''[321] The Supporting Statement further clarified that ''[t]here is no change to the information being collected under this collection or the use of the information by CBP, but this change would alter the consequences of not using the collection, and thus increases the estimated annual number of responses in the collection.''[322]

Regarding the concern with using the emergency PRA approval process for the collection of information via the CBP One app, CBP notes that, although the initial collection was approved on an emergency basis,[323] the relevant PRA approval for the collection that is being used for this rule (OMB Control Number 1651–0140) was subsequently done using the normal PRA process, which included two **Federal Register** notices and an opportunity for public comment.[324] Further, this collection is being revised again through this rule, and the public was given additional opportunity to comment on the information collection in this rulemaking. *See* 88 FR at 11749–50.

Members of the public are welcome to submit comments to OMB on the collection of information via *https://www.reginfo.gov* for a period of 30 days following issuance of this final rule.

*Comment:* A commenter expressed that the NPRM is not in compliance with the APA because the CBP One app

[315] *See, e.g., Envt'l. Def. Fund* v. *EPA,* 716 F.2d 915, 921–22 (D.C. Cir. 1983) (holding that because the agency ''failed to demonstrate that outside time pressures forced the agency to dispense with APA notice and comment procedures . . . the agency's action . . . [fell] outside the scope of the good cause exception''); *Nat'l Ass'n of Farmworkers Org.* v. *Marshall,* 628 F.2d 604, 622 (D.C. Cir. 1980) (rejecting a good cause argument for bypassing notice and comment because the time pressure cited by the agency ''was due in large part to the [agency's] own delays'').

[316] *Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992) (The ''30-day waiting period in no way relates to the notice and comment requirement, but the federal courts have not always been careful to maintain the distinction'' (internal citation and quotation omitted)).

[317] *Id.*

[318] *See* 88 FR at 11708–14.

[319] *See* OMB, *ICR Documents: CLEAN Supporting Statement 1651–0140 Advance Information Collection NPRM Changes, https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202302-1651-001* (last visited Mar. 29, 2023).

[320] *Id.*

[321] *Id.*

[322] *Id.*

[323] *See* OIRA, *OIRA Conclusion, OMB Control No. 1651–0140, Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (May 3, 2021), *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202104-1651-001.*

[324] *See* 86 FR 73304 (Dec. 27, 2021); 87 FR 53667 (Sept. 28, 2021). *See also* OIRA, *OIRA Conclusion, OMB Control No. 1651–0140, Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (Dec. 18, 2022), *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202112-1651-001.* The OIRA *Conclusion* includes citations and links to the notices published in the **Federal Register**, as well as the comments received in response.

has not gone through the normal notice-and-comment period required by the APA. The commenter stated that the Departments had not clearly described the app in a way that would provide the public with the necessary information to understand how the app works and that a noncitizen's failure to use the app when presenting themselves at a port of entry has serious implications on immigration relief.

*Response:* The Departments disagree with the contention that the use of the CBP One app, whether separate from or as described in this rule, fails to comply with the APA. The CBP One app serves as a single portal to a variety of CBP services.[325] Because there is not an overarching CBP One information collection, CBP has sought OMB approval under the PRA of each information collection contained in the CBP One app, pursuant to standard procedures. Regarding the particular use of the CBP One app that is described in this rulemaking—*i.e.,* the use of the app as the current ''DHS scheduling system'' described in 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B), to collect information from certain undocumented individuals on the land border—the PRA information referenced above, and available to the public, provided information sufficient to understand how the app works, and how it would work in connection with this rulemaking. Similarly, the Departments provided a description of the presumption and its application, including to those who do not utilize CBP One, in the NPRM and invited comment thereon.

3. Impacts, Costs, and Benefits (Executive Orders 12866 and 13563)

*Comment:* A few commenters expressed that the Departments have not met their obligations under Executive Order 12866 and Executive Order 13563. A commenter requested that the Departments investigate and develop quantitative estimates regarding a range of potential regulatory effects, such as estimates of the rule's potential impact on family unity, the lifetime cost of work permit renewals for those who are granted withholding of removal instead of asylum under the rule; the impact of life-long inability to travel internationally for those granted withholding of removal rather than asylum; and the potential costs on States and localities of vastly increasing the class of individuals ineligible for public benefits, services, and healthcare. Another commenter requested that the Departments consider the downstream impacts of the rule on other noncitizens and their U.S. citizen family members who might be affected by additional backlogs in immigration court. A legal services provider expressed concern with the Departments' ''evident implication'' that the rebuttable presumption will not impact asylum seekers beyond their loss of a path to citizenship and inability to petition for family members to join them in the United States; the commenter cited challenges with retaining counsel and lost opportunities to collect evidence or consult family before an asylum decision is made. Some commenters stated that the rule's analysis of its costs and benefits is deficient because the rule lacked detailed estimates or further specifics with respect to costs for the Departments, the States, and other parties. Commenters stated that for this reason, the regulatory analysis in Section VI.A. of the NPRM's preamble failed to satisfy the requirements of Executive Order 12866.

*Response:* The Departments respectfully maintain that the regulatory analysis accompanying the NPRM adequately described the costs and benefits associated with this rulemaking. The concerns raised by the commenters have been addressed qualitatively in the preambles to the NPRM and this final rule. The Departments recognize that the rule will result in costs and benefits for the individual noncitizens who are subject to it, as well as a range of potential indirect effects on other persons and entities.[326] The Departments have further described these costs and benefits throughout this preamble. The Departments have also further revised the Executive Order 12866 discussion in Section VI.B. of this preamble to address some of the concerns described by the commenters, including concerns related to work permit renewal.[327]

Although the Departments have discussed the relevant policy considerations associated with this rulemaking at length, the Departments note that neither Executive Order 12866, nor any other executive order or law, requires more detailed quantitative analysis in these circumstances. The fact that preparation of a regulatory impact analysis under Executive Order 12866 is a matter of Executive Branch discretion is underscored by the terms of Executive Order 12866, section 10:

> Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

Courts have recognized the internal, managerial nature of this and other similarly worded executive orders, and have concluded that actions taken by an agency to comply with such executive orders are not subject to judicial review. *See Cal-Almond, Inc.* v. *USDA,* 14 F.3d 429, 445 (9th Cir. 1993) (citing *State of Mich.* v. *Thomas,* 805 F.2d 176, 187 (6th Cir. 1986)).

i. Quantitative Impacts on Federal and State Governments

*Comment:* A group of State Attorneys General stated that the proposed rule ''completely ignores the increased costs to the States of higher levels of unlawful aliens precipitated by'' the NPRM. Quoting the proposed rule, the commenters stated that the Departments ''falsely claim[ed] that '[t]he costs of the proposed rule primarily are borne by migrants and the Departments.' '' *See* 88 FR at 11748. Commenters further stated that States have significant reliance interests in the Federal Government's enforcement of the immigration laws and that the Departments should withdraw the rule because the Departments did not consider this reliance in the proposed rule. Commenters stated that the rule would cause additional noncitizens to enter the United States where they would cause the States to expend additional funds on law enforcement, education, and healthcare than the States otherwise would have spent.

In support of this assertion, commenters stated that irregular migration imposes significant costs on States. Commenters cited a study that stated ''the net cost of illegal immigration to U.S. taxpayers is now $150.7 billion.'' Commenters provided specific examples of costs that the State of Indiana has incurred or could incur to provide services to noncitizens, including costs to provide English Language Learner Services and other education services. Commenters stated that as many as 5,000 family units that had been encountered and granted parole pursuant to the parole + ATD

[325] *See* CBP, *CBP One™ Mobile Application, https://www.cbp.gov/about/mobile-apps-directory/cbpone* (last visited Apr. 26, 2023).

[326] *See* Section VI.B of this preamble for a further discussion of the rule's costs and benefits.

[327] The Departments note that some, but not all, of the commenters that pressed for additional quantitative analysis expressed strong support for the TCT Bar IFR and Final Rule, which did not contain an Executive Order 12866 analysis due to their nexus to a foreign affairs function of the United States. *See* 84 FR at 33843 (IFR); 85 FR at 82289 (final rule).

policy settled in Indiana between July 2021 and February 2022. On the other hand, a state administrative agency wrote that immigrants and refugees are integral to that State's economy and generate $2.8 billion of business income and contribute over $21.4 billion in Federal, State, and local taxes, annually. The commenter wrote that immigrants and refugees have successfully rebuilt their lives and made positive social and economic contributions to the State by revitalizing neighborhoods and adding to the cultural vitality of the State and its communities.

*Response:* The Departments respectfully disagree with the characterization of the rule as precipitating higher levels of irregular migration. As discussed in the preamble to the proposed rule, *see, e.g.,* 88 FR at 11705–06, and in Section I of this preamble, in the absence of this rule, the Departments would anticipate a significant further surge in irregular migration after the Title 42 public health Order is lifted. This rule is expected to reduce irregular migration, not increase it.

This rule imposes a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States at the southwest land border or adjacent coastal borders after traveling through a third country during a designated period. This rule excepts from its rebuttable presumption noncitizens who enter the United States pursuant to a lawful pathway, but the rule does not newly introduce or authorize any lawful pathways to enter the United States. While it is true that the rule excepts from the rebuttable presumption those who use some lawful pathways, such pathways would exist irrespective of this rule. Indeed, as stated in the NPRM, the term ''lawful pathways'' refers to the ''range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner and seek asylum and other forms of protection.'' 88 FR at 11706 n.15. One such lawful pathway is entry pursuant to the CHNV parole processes; such processes were established prior to and separate from the publication of the NPRM. In other words, the commenters have conflated the lawful pathways accounted for in this rule with the rule itself.

The Departments further note the evidence that the introduction of lawful pathways, particularly when coupled with a consequence for failing to use such processes, has significantly reduced levels of irregular migration. For instance, as noted in the proposed rule, in the week prior to the announcement of the Venezuela parole process on October 12, 2022, encounters of Venezuelan nationals between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, encounters of Venezuelan nationals averaged under 200 per day between October 18 and 24.[328] The low trend continued with a daily average of 106 in March 2023.[329] Similarly, the number of CHN nationals encountered dropped significantly in the wake of the January 2023 announcement of new processes for those countries. Between the announcement of the new processes on January 5, 2023, and January 21, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.[330] Encounters between POEs of CHN nationals continued to decline to a daily average of fewer than 17 per day in March 2023.[331] These reductions in encounters have been sustained for months while the Title 42 public health Order has remained in effect.

With respect to commenters' statement that States have significant reliance interests in the Federal Government's enforcement of the immigration laws, this rule does not set any policy against enforcement of the immigrations laws. Commenters' objections to other enforcement policies, or any lack thereof, have little relationship to this rule, which, as previously stated, creates a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States at the southwest land border or adjacent coastal borders after traveling through a third country during a designated period. The Departments are unaware of any existing policies altered by this rule in which States have a substantial reliance interest. For example, States cannot have substantial reliance interests in the Proclamation Bar IFR or TCT Bar Final Rule because neither rule is being enforced.

Ultimately, the commenters' objections are not to the proposed rule, but to the lawful pathways themselves, as well as to other aspects of the immigration system. The Departments believe that withdrawing the proposed rule would not achieve the Departments' or the commenters' goals.

[328] USBP encountered an average of 225 Venezuelans per day in November 2022 and 199 per day in December 2022. OIS analysis of OIS Persist Dataset based on data through March 31, 2023. Data are limited to USBP encounters to exclude those being paroled in through POEs.

[329] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[330] *Id.*

[331] *Id.*

*Comment:* Another group of State Attorneys General stated that if, as a consequence of the rule, noncitizens endure additional trauma seeking asylum in a third country or waiting at the SWB in potentially dangerous conditions for a CBP One appointment, such noncitizens will require more State-funded services, such as services related to healthcare, education, and legal assistance.

*Response:* The Departments acknowledge that various levels of government provide services to noncitizens for a range of purposes. The Departments have further revised the Executive Order 12866 discussion in Section VI.B of this preamble to note the potential effects on such entities.

*Comment:* Commenters stated that while the Departments acknowledge the cost and other impact that irregular migration has had on DHS operations, States and border communities, and NGOs, the Departments did not adequately consider the costs borne by other Federal agencies not directly associated with immigration enforcement. For example, commenters stated that some health programs (Medicaid; the Children's Health Insurance Program; the Supplemental Nutrition Assistance Program; and the Women, Infants, and Children program) and tax credits are available to noncitizens without employment authorization. Commenters also stated that UCs are eligible for a large number of Federal benefits immediately upon their entry. Commenters also stated that the expanded usage of humanitarian parole results in costs associated with providing parolees Federal benefits.

*Response:* The Departments agree that a high volume of irregular migration can have significant implications for other Federal agencies that provide services or assistance to migrants. For the reasons stated in the first comment response in Section IV.F.3.i of this preamble, however, the Departments do not believe it is reasonable to expect that the rule would result in an increase in irregular migration. This rule is designed to reduce levels of irregular migration, and to channel migrants into lawful, safe, and orderly pathways. In the absence of this rule, the Departments would anticipate a significant further surge in irregular migration after the Title 42 public health Order is lifted. This rule will reduce irregular migration and any costs associated with such migration, rather than increasing such migration and costs.

*Comment:* Some commenters also stated that the rule fails to adequately consider and address the administrative

costs that the Departments would incur in order to implement the rule. Regarding USCIS, these commenters stated that the Departments failed to consider, for instance, the following costs: new trainings, possible future hiring needs that could result from the rule, and possible collateral costs to petitioners before USCIS who could have adjudications delayed due to downstream delays. Some commenters expressed concern that USCIS, as a fee-funded agency, might have insufficient resources to implement the rule, and hypothesized that USCIS might seek to ask Congress for an appropriation to cover implementation costs, which would shift the burden of the cost to U.S. taxpayers. These commenters cited the requirements of the Anti-Deficiency Act and past reductions in USCIS fee revenues in support of the commenters' prediction of an appropriations request.

Regarding CBP, commenters stated that the Departments failed to consider, for instance, costs for training staff on the CBP One app and for app maintenance and updates.

Regarding ICE, commenters stated that if, as a result of the rule, more noncitizens receive negative credible fear determinations and request IJ review, there is a risk of overcrowding and other operational complications as bed space runs out for new arrivals. The commenters stated that this could increase the money paid by the U.S. taxpayer unnecessarily.

Regarding EOIR, these commenters stated that the Departments failed to consider, for instance, the following costs: training of IJs and staff; form updates; and an increase to the court backlog if adjudications take longer.

*Response:* The Departments agree that various agencies will expend resources to implement this rule. The discussion in Section VI.B of this preamble explains that the rule will require additional time for AOs and IJs, during fear screenings and reviews, respectively, to inquire into the applicability of the presumption and whether the presumption has been rebutted. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed in the proposed rule and elsewhere in this preamble, in the absence of this rule, the Departments would anticipate a significant further surge in irregular migration after the Title 42 public health Order is lifted, which would require the expenditure of significant resources. This rule is therefore anticipated to substantially reduce net burdens on the Departments, including at the agencies referenced by the commenters.

4. Regulatory Flexibility Act (''RFA'')

*Comment:* At least one commenter disagreed with the certification in the NPRM that the proposed rule would not have a significant economic impact on a substantial number of small entities. *See* 88 FR at 11748. Some legal services providers gave examples of how the rule would impact their organization and workloads, without objecting to the RFA certification. But at least one commenter disputed the certification and wrote that as a nonprofit organization that helps asylum seekers prepare for credible fear interviews, IJ reviews, and merits hearings, the commenter would experience a significant time and cost burden associated with the new rule, such as the additional time spent gathering evidence from foreign countries, appearing at interviews and hearings, and explaining the law and outcome to clients and pro se respondents. The commenter stated that, as a consequence of the rule, the commenter would therefore be forced to serve fewer individuals, significantly reducing the number of people who would have access to legal services. The commenter further stated that due to the increased time burden, individuals would have to pay the commenter increased fees or donors would have to chip in more for each person.

*Response:* Consistent with longstanding case law, a regulatory flexibility analysis is not required when a rule has only indirect effects on small entities, rather than directly regulating those entities. *See, e.g., Mid-Tex Elec. Co-op., Inc.* v. *FERC,* 773 F.2d 327, 342–43 (D.C. Cir. 1985) (''[A]n agency may properly certify that no regulatory flexibility analysis is necessary when it determines that the rule will not have a significant economic impact on a substantial number of small entities that are subject to the requirements of the rule . . . . Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy.'').[332] This rule does not directly regulate any organizations; the rule imposes a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States at the southwest land border or adjacent coastal borders after traveling through a third country during a designated period. The RFA does not require the Departments to estimate the rule's potential indirect effects on legal service organizations, law firms, and other service providers whose clients may be subject to the rule. Because this rule does not regulate small entities themselves, the Departments reaffirm their conclusion that no regulatory flexibility analysis is necessary.

5. Other Regulatory Requirements

*Comment:* A group of State Attorneys General disputed the statement in the proposed rule, made pursuant to Executive Order 13132, Federalism, 64 FR 43255 (Aug. 4, 1999), that the proposed rule would not have a substantial direct effect on the States, the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. *See* 88 FR at 11749.

*Response:* The Departments maintain that this rule will not have a substantial direct effect on the States, the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. This rule's only direct effects relate to asylum applicants and those being processed at the SWB. For the same reason, this final rule will not impose substantial direct compliance costs (indeed, any direct compliance costs) on State and local governments, or preempt State law. Accordingly, in accordance with section 6 of Executive Order 13132, this rule requires no further agency action or analysis.

*Comment:* A group of State Attorneys General stated that the Departments should withdraw the rule because it would impose significant unfunded mandates on the States but the Departments did not assess the impact on the States or their constituent local governments under the Unfunded Mandates Reform Act of 1995 (''UMRA''). Commenters disagreed with the Department's statement in the proposed rule that the rule would not

[332] *See also Cement Kiln Recycling Coal.* v. *EPA,* 255 F.3d 855, 869 (D.C. Cir. 2001) (''The statute requires that the agency conduct the relevant analysis or certify 'no impact' for those small businesses that are 'subject to' the regulation, that is, those to which the regulation 'will apply'. . . . The rule will doubtless have economic impacts in many sectors of the economy. But to require an agency to assess the impact on all of the nation's small businesses possibly affected by a rule would be to convert every rulemaking process into a massive exercise in economic modeling, an approach we have already rejected.'' (citing *Mid-Tex,* 773 F.2d at 343)); *White Eagle Co-op. Ass'n* v. *Conner,* 553 F.3d 467, 480 (7th Cir. 2009) (''[S]mall entities directly regulated by the proposed [rulemaking]—whose conduct is circumscribed or mandated—may bring a challenge to the RFA analysis or certification of an agency. . . . However, when the regulation reaches small entities only indirectly, they do not have standing to bring an RFA challenge.'').

impose an unfunded mandate because ''[a]ny downstream effects on such entities would arise solely due to their voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed'' by the rule. 88 FR 11748. Commenters cited cases regarding standing to sue in Federal court, such as *Department of Commerce* v. *New York,* 139 S. Ct. 2551 (2019) and *City & County of San Francisco* v. *USCIS,* 944 F.3d 773, 787 (9th Cir. 2019), arguing that if the fact patterns in those cases were sufficient to establish standing, they are sufficient to trigger the UMRA's requirements. Quoting 2 U.S.C. 1534(a), commenters stated that UMRA also requires that ''[e]ach agency . . . develop an effective process to permit elected officers of State, local, and tribal governments . . . to provide meaningful and timely input in the development of regulatory proposals containing significant Federal intergovernmental mandates.'' The comments stated that the Departments never allowed elected leaders in their States to provide any such input.

*Response:* Case law on standing does not dictate UMRA's scope. The Departments maintain that the NPRM preamble's discussion of UMRA was correct. This rule does not contain a Federal mandate, or a significant Federal intergovernmental mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to their voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by the rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate contained in this rule, as that term is defined under UMRA.

*G. Out of Scope*

*Comment:* Commenters submitted a number of comments that were outside the scope of the rulemaking. For instance, some commenters stated that the United States should create a path to citizenship for undocumented immigrants; that the Government should otherwise engage in legislative immigration reform; that all noncitizens with disabilities should be eligible for asylum; that minors should not be released to individuals without lawful status; that the Government should focus on disparities among IJs in asylum grant rates; that the United States should expand resources focused on the development of civil society and governments in the Northern Triangle; that countries from which asylum applicants flee should help fund humanitarian aid for their citizens who resettle in the United States; that POEs are already overwhelmed so asylum-seekers should be allowed to enter in other places; that the Government needs to focus on granting ''Dreamers'' citizenship; that the Government should call on the military to forcibly repel migrants from the border; that the United States should end birthright citizenship; that the American workforce is becoming automated, putting American citizens out of work; that the United States should subsidize the implementation of machinery that would fill the jobs that normally ''attract'' migrants (*e.g.,* agricultural work); that migrant children are being forced into child labor; that the U.S. birthrate is low and we need more workers to maintain Social Security and Medicare; that the United States is selling land to China, and India is buying oil from Russia; that the United States should systematically fund research that evaluates the racial disparities that exist in the efficiency with which Ukrainian humanitarian parole applications have been reviewed and evaluated versus those of Afghan applicants; that American taxpayers are suffering the effects of the border crisis, particularly in schools; that the United States should expand legal immigration; that asylum seekers will receive in absentia removal orders due to difficulties in contacting asylum seekers for court hearings; that they objected to the number of noncitizens present in the United States without lawful status.

*Response:* Such comments address matters well beyond the scope of the proposed rule and do not require further response.

*Comment:* Several commenters made statements related to CBP custody conditions, noting for instance that they are overcrowded, lack adequate access to hygiene, lack adequate space so that families are separated by gender, are cold, lack adequate bedding, have lights on at night, and do not have adequate showers. At least one commentor noted that CBP facilities should have more child friendly reception areas.

*Response:* The Department acknowledges the commenters' concerns. However, this rule does not have any impact on whether or how individuals are in custody or detained, and these comments are outside the scope of the rulemaking.

**V. Request for Comments on Proposed Extension of Applicability to All Maritime Arrivals**

In addition to the changes made in this final rule described in Section IV.B.8.i of this preamble, the Departments are considering and request comment on whether to apply the rebuttable presumption to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at a maritime border,[333] whether or not they traveled through a third country. Such a modification would expand the scope of the rule's rebuttable presumption in two ways: both geographically (covering all entries by sea, not just those entering the United States from Mexico at coastal borders adjacent to the SWB) and with regard to the class of persons potentially subject to the rebuttable presumption (by covering persons who enter the United States by sea even if they did not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees). In addition, the Departments are also considering and request comment on whether to expand the scope of the rule's rebuttable presumption geographically to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at any maritime border, while continuing to limit the presumption's applicability to those who traveled through another country before reaching the United States. Finally, the Departments are considering and request comment on whether to expand the scope of the presumption to noncitizens who enter the United States by sea, but to limit the scope of that expansion to noncitizens who departed from the Caribbean or other regions that present a heightened risk of maritime crossings.

The Departments are considering extending the rule's rebuttable presumption to maritime arrivals to encourage any migrants intending to reach the United States by sea to instead avail themselves of lawful, safe, and orderly pathways into the United States,

[333] The STCA and Additional Protocol controls and applies as to individuals who cross the U.S.-Canada land border between POEs, including certain bodies of water along or across the U.S.-Canada land border, as described in 88 FR 18227, 18234. The Departments' use of ''at a maritime border'' includes individuals who enter the United States by sea, as in the Atlantic and Pacific coasts of the United States.

or otherwise to seek asylum or other protection in another country. As discussed in more detail below, DHS has recently experienced high levels of maritime interdictions, primarily of Cuban and Haitian nationals in the Caribbean, and is concerned that rates of attempted entries to the United States by sea may soon increase to levels that would greatly stress DHS's available resources and may lead to devastating loss of life and other consequences. The Departments expect that extending the strategy of coupling an expansion of lawful, safe, and orderly pathways into the United States with this rule's consequence for noncitizens who do not avail themselves of one of those options would lead to a reduction in the numbers of migrants who would otherwise undertake a dangerous sea journey to the United States.

*A. Maritime Migration Continues To Increase, With Devastating Consequences for Migrants*

Total migrants interdicted at sea by the U.S. Coast Guard (''USCG'') increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521).[334] Interdictions continued to rise in FY 2023 with 8,822 migrants interdicted at sea through March, almost 70 percent of the total in FY 2022 within six months.[335] Interdictions occurred primarily in the South Florida Straits and the Caribbean Sea.[336]

Individuals departing from Cuba and Haiti make up the vast majority of maritime interdictions. Maritime migration from Cuba increased by nearly 600 percent in FY 2022, with 5,740 Cuban nationals interdicted at sea, compared to 827 in FY 2021.[337] Similarly, maritime migration from Haiti more than tripled in FY 2022, with 4,025 Haitian nationals interdicted at sea, compared to 1,205 in FY 2021 and 398 in FY 2020.[338] In the first six months of FY 2023, Cuban interdictions were nearly equal to the Cuban FY 2022 total, comprising 62 percent of all FY 2023 interdictions at sea; Haitian interdictions were over 60 percent of the Haitian FY 2022 total, comprising around 30 percent of all FY 2023 interdictions at sea.[339]

Meanwhile, USBP apprehensions of noncitizens who made landfall in southeast coastal sectors have also been increasing rapidly.[340] There were 5,978 such apprehensions in FY 2022, nearly triple the number of apprehensions in FY 2021 (2,045). And in FY 2023 to date, there have already been 6,364 USBP apprehensions of noncitizens who made landfall in southeast coastal sectors, more than the total for all of FY 2022.[341] Cuban and Haitian nationals made up 76 percent of these apprehensions in FY 2022 and 84 percent of apprehensions so far in FY 2023.

Several large group interdictions of Cubans and Haitians have caused challenges for the USCG in recent months. On January 22, 2023, the USCG interdicted a sail freighter suspected of illegally transporting migrants with nearly 400 Haitians aboard, necessitating repatriations of eligible individuals back to the Bahamas.[342] Days later, on January 25, the USCG interdicted and repatriated another 309 Haitians to Haiti.[343] USCG interdicted yet another large group of Haitians on February 15, resulting in the repatriation of all 311 Haitian migrants in that group,[344] and another group of 206 Haitians were repatriated on March 2 following two successive, separate interdictions on February 22 and 28.[345] On January 12, 2023, USCG repatriated 177 Cubans from 7 separate interdictions.[346] USCG repatriated an additional 67 Cubans between February 23–24 following prior interdictions.[347]

Interdictions in the maritime environment can pose unique hazards to life and safety. On March 23, 2023, Rear Admiral Jo-Ann Burdian, Assistant Commandant for Response Policy, testified before a Congressional panel, stating: ''Over the last year and a half, the Coast Guard observed an increase in irregular maritime migration, above historical norms, across our southern maritime border. This is a difficult mission for our crews. . . . For example, patrolling the waters of the South Florida Straits can be compared to patrolling a land area the size of Maryland with seven police cars limited to traveling at 15 miles per hour. It requires exceptional tactical coordination between aircraft, ships, boats, and supporting partners ashore.'' [348] Rear Admiral Burdian further stated that it is not uncommon for migrants encountered at sea to be non-compliant, threatening their own lives and those of other migrants on board to deter a Coast Guard rescue.[349] Additional challenges of maritime migration operations include ensuring adequate sanitation, security, and providing for food, medical, and shelter needs of migrants.[350]

Interdicting Haitian sail freighters poses unique challenges to DHS crews and migrants. *See* 88 FR at 26328. These types of vessels are often overloaded with more than 150 migrants onboard, including small children. *Id.* Because these vessels do not have sufficient safety equipment, including life jackets, emergency locator beacons, or life rafts in the event of an emergency, there is a great risk to human life if these vessels overturn or sink because such an overturning or sinking would create a situation where there could be hundreds of noncitizens in the water, many of whom may not know how to swim. *Id.* Often, noncitizens interdicted on these vessels have been at sea for several days, are dehydrated, need medical attention, or are otherwise experiencing elevated levels of stress. *Id.* These factors increase the risk to DHS personnel who rescue these migrants from these vessels because the number of migrants outnumber DHS crews. *Id.* DHS encounters with sail freighters are not uncommon, and because of sail freighter capacity to carry several hundred migrants, they can exceed the holding capacity of USCG cutters patrolling

[334] OIS analysis of USCG data through March 31, 2023.

[335] *Id.*

[336] Testimony of Jonathan Miller, ''Securing America's Maritime Border: Challenges and Solutions for U.S. National Security'' at 4 (Mar. 23, 2023), *https://homeland.house.gov/media/2023/03/3.23.23-TMS-Testimony.pdf.*

[337] OIS analysis of USCG data through March 31, 2023.

[338] *Id.*

[339] *Id.*

[340] Includes Miami, Florida; New Orleans, Louisiana; and Ramey, Puerto Rico sectors.

[341] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[342] David Goodhue and Jacqueline Charles, *Coast Guard stops boat with 400 Haitians off the Bahamas and likely headed to Florida,* Miami Herald, Jan. 23, 2023, *https://www.miamiherald.com/news/nation-world/world/americas/haiti/article271514157.html.*

[343] USCG, *Coast Guard Repatriates 309 People to Haiti* (Jan. 31, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3281802/coast-guard-repatriates-309-people-to-haiti.*

[344] USCG, *Coast Guard Repatriates 311 People to Haiti* (February 20, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3302743/coast-guard-repatriates-311-people-to-haiti/.*

[345] USCG, *Coast Guard Repatriates 206 People to Haiti* (March 2, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3314530/coast-guard-repatriates-206-people-to-haiti/.*

[346] USCG, *Coast Guard Repatriates 177 People to Cuba* (Jan. 12, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3265898/coast-guard-repatriates-177-people-to-cuba/.*

[347] USCG, *Coast Guard Repatriates 29 People to Cuba* (Feb. 23, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3306722/coast-guard-repatriates-29-people-to-cuba/*; USCG, *Coast Guard Repatriates 38 People to Cuba* (Feb. 24, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3306850/coast-guard-repatriates-38-people-to-cuba/.*

[348] Testimony of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, ''Securing America's Maritime Border: Challenges and Solutions for U.S. National Security'' (Mar. 23, 2023), *https://homeland.house.gov/media/2023/03/2023-03-23-TMS-Testimony.pdf.*

[349] *Id.*

[350] *Id.*

southeastern maritime smuggling vectors, increasing the risk not only to the migrants, but to cutter crews as well. *Id.* While maritime interdictions declined somewhat in February 2023, DHS assesses that the weather played a significant role in this reduced maritime movement in the Caribbean. *Id.* Through much of February, weather conditions were unfavorable for maritime ventures, particularly on smaller vessels. *Id.* However, DHS assesses that this was only temporary. Increasing levels of maritime interdictions put lives at risk and stress DHS's resources, and the increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences.

Human smugglers and irregular migrant populations continue to use unseaworthy, overly crowded vessels, piloted by inexperienced mariners, without any safety equipment—including, but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. In FY 2022, the USCG recorded 107 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull.[351] USCG crews interviewed the survivor, who indicated there were 34 others on the vessel who were not in the vicinity of the capsized vessel and the survivor.[352] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[353] In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became disabled off of the Florida Keys.[354] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[355]

IOM's Missing Migrants Project reported at least 321 documented deaths and disappearances of migrants throughout the Caribbean in 2022, signaling the highest recorded number since they began tracking such events in 2014.[356] Most of those who perished or went missing in the Caribbean were from Haiti and Cuba.[357] This data represents a tragic 78 percent overall increase over the 180 deaths in the Caribbean documented in 2021, underscoring the perils of the journey.[358]

### *B. A Further Increase in Maritime Migration is Reasonably Foreseeable*

The Departments assess that maritime migration is likely to increase absent policy changes such as those being considered. For instance, Haiti continues to experience security and humanitarian crises caused by rampant gang violence, food and fuel shortages, a resurgence of cholera, and an August 2021 earthquake that killed 2,000 people.[359] And Cuba is undergoing its worst economic crisis since the 1990s[360] due to the lingering impact of the COVID–19 pandemic, reduced foreign aid from Venezuela because of that country's own economic crisis, high food prices, and U.S. economic sanctions.[361] These crises will likely continue to fuel irregular maritime migration.

Although the establishment of the CHNV parole processes has significantly reduced SWB encounters with Cuban and Haitian nationals as described above in Section II.A, maritime interdictions of Cuban and Haitian nationals in the Caribbean have increased in recent years and persist at high levels, as just described. Unlike noncitizens encountered at the SWB, noncitizens who reach the United States directly by sea without traveling from Mexico or Canada have not been subject to the CDC's Title 42 public health Order.[362] Instead, they are (and will continue to be) processed under Title 8, which as described above may entail years spent in the United States before a final order of removal is issued. DHS recently announced that in response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, individuals who have been interdicted at sea after April 27, 2023, are ineligible for the parole processes for Cubans and Haitians. 88 FR 26327; 88 FR 26329. The Departments expect that this step will help but that, in light of the complicated mix of factors driving maritime migration, more is needed to discourage maritime migration and encourage the use of safe, lawful, orderly processes.

### *C. Effects on Resources and Operations*

USCG and its partners have surged assets to address the recent increase in maritime migration, but the increased flow of migrants overall led to a lower interdiction effectiveness rate (that is, the percentage of detected undocumented migrants of all nationalities who were interdicted by USCG and partners via maritime routes).[363] Between FY 2018 and FY 2020, USCG approached or exceeded its 75 percent effectiveness target.[364] In FY 2021 and FY 2022, effectiveness dropped to 47.2 percent and 56.6 percent, respectively, despite a surge response that resulted in 17 percent more interdictions in FY 2022 than in FY 2021.[365] That is, even though the USCG interdicted more migrants overall, those interdictions were a smaller percentage of total detected migrants on maritime routes than the USCG had interdicted between FY 2018 and 2019. A further surge in maritime migration risks further decreasing effectiveness (and thereby reducing deterrence of dangerous journeys by sea) and, as described below, would exacerbate USCG's overall capacity challenges and increase the risk to other key mission areas, such as counter-drug operations.

The United States Government's response to maritime migration in the Caribbean region is governed by executive orders, presidential directives, and resulting framework and plans that outline interagency roles and responsibilities. Homeland Security Task Force–Southeast ("HSTF–SE") is primarily responsible for DHS's response to maritime migration in the Caribbean Sea and the Straits of Florida. Operation Vigilant Sentry is the DHS interagency operational plan for responding to maritime migration in the Caribbean Sea and the Straits of

---

[351] Adriana Gomez Licon, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Associated Press, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[352] *Id.*

[353] Adriana Gomez Licon, Coast Guard suspends search for migrants off Florida, Associated Press, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[354] Ashley Cox, More than 180 people rescued from overloaded vessel in Florida Keys, CBS News CW44 Tampa, Nov. 22, 2022, *https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.*

[355] *Id.*

[356] IOM, Missing Migrants in the Caribbean Reached a Record High in 2022 (Jan. 24, 2023), *https://www.iom.int/news/missing-migrants-caribbean-reached-record-high-2022.*

[357] *Id.*

[358] *Id.*

[359] *See, e.g.,* CRS, Haiti: Recent Developments and U.S. Policy, R47394 (Jan. 23, 2023), *https://crsreports.congress.gov/product/pdf/R/R47394.*

[360] The Economist, Cuba is Facing Its Worst Shortage of Food Since 1990s (July 1, 2021), *https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s.*

[361] CRS, Cuba: U.S. Policy in the 117th Congress (Sept. 22, 2022), *https://crsreports.congress.gov/product/pdf/R/R47246.*

[362] *See* 86 FR at 42841 (Order applies only to certain persons "traveling from Canada or Mexico").

[363] DHS, U.S. Coast Guard Budge Overview, Fiscal Year 2024 Congressional Justification, at USCG–3.

[364] *Id.*

[365] *Id.*

Florida.[366] The primary objectives of HSTF–SE are to protect the safety and security of the United States, deter and dissuade noncitizens from attempting the dangerous journey to the United States by sea, achieve U.S. humanitarian objectives, maintain the integrity of the U.S. immigration system, and prevent loss of life at sea through mobilizing DHS resources, reinforced by other Federal, State, and local assets and capabilities.

The USCG supports HSTF–SE and views its migrant interdiction mission as a humanitarian effort to rescue those taking to the sea and to encourage noncitizens to pursue lawful pathways to enter the United States. By allocating additional assets to migrant interdiction operations and to prevent conditions that could lead to maritime mass migration, the USCG assumes certain operational risk to other statutory missions. Some USCG assets were diverted from other key mission areas, including counter-drug operations, protection of living marine resources, and support for shipping navigation. *See* 88 FR at 26329. A reduction in maritime migration would reduce the operational risk to USCG's other statutory missions.

Maritime encounters also strain other DHS resources. For instance, during times of increased encounters in the maritime environment, the U.S. Border Patrol executes lateral decompression flights for processing. Once the Title 42 public health Order is lifted, based on DHS encounter projections and throughput models, southwest border sectors will likely lose the ability to accept decompression flights from coastal border sectors. This in turn would result in overcrowding in coastal border sectors' short-term holding facilities and impact local communities not prepared to receive migrants.

### *D. Lawful, Safe, and Orderly Pathways*

As discussed in detail earlier in this preamble, the United States has taken significant steps to expand safe and orderly options for migrants, including migrants from the Caribbean region, to lawfully enter the United States. The United States has, for example, increased and will continue to increase refugee processing in the Western Hemisphere; country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit, including the Cuba, Haiti, Nicaragua, and Venezuela parole processes; and opportunities to lawfully enter the United States for the purpose of seasonal employment. In addition, the United States has resumed the Cuban Family Reunification Program and resumed and increased participation in the Haitian Family Reunification Program.

The Departments are also aware that many individuals migrating out of island nations, such as Cuba and Haiti, do so via air travel.[367] For many individuals, travel by air to a third country may be an additional option for obtaining asylum or other protection. The Departments acknowledge, however, that there may be individuals for whom air travel is not an option. The Departments welcome data, other information, or comments on access to air travel and whether any aspect of this rule's presumption should be adjusted to account for differences among individuals in access to air travel.

### *E. Alternatives Under Consideration*

The Departments are considering whether the rebuttable presumption should apply to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at any maritime border, whether or not they traveled through a third country. Under this approach, the presumption would apply to any covered noncitizen who reached the United States by sea, including Cuban or Haitian nationals traveling directly to the United States from Cuba or Haiti. The Departments acknowledge, however, that eliminating the third-country travel component for those arriving by sea would be a departure from the rest of the rule. The Departments are therefore considering whether this departure may be independently justified. The Departments believe that this additional measure could be warranted in light of the extreme hazard to both migrants and DHS personnel associated with maritime migration; the deterrence it would afford migrants who might undertake this dangerous journey to enter the United States irregularly and thus supplement interdiction efforts; the availability of lawful, safe, and orderly pathways for the primary populations at issue; and the safeguards incorporated into the rule. Applying the rule's rebuttable presumption of asylum ineligibility to persons who reach the United States by sea would not impose a categorical bar to asylum. To the contrary, the rule would still exempt noncitizens from the presumption if, instead of making a dangerous journey by sea, they arrived at the United States through a lawful pathway. It would also exempt certain noncitizens who arrive by sea, including unaccompanied children, and provide multiple ways for noncitizens to rebut the presumption, including in circumstances where—at the time the noncitizen entered the United States—the noncitizen or a member of their family with whom they were traveling faced an imminent and extreme threat to life or safety. The Departments request comment on how the various means of rebutting the presumption—including facing an ''acute medical emergency,'' ''imminent and extreme threat to life and safety,'' and ''especially compelling circumstances''—should apply to noncitizens who reach the United States by sea. *See* 8 CFR 208.33(a)(3)(i); 8 CFR 1208.33(a)(3)(i).

The Departments are also considering whether to extend the geographic scope of the rule to certain noncitizens who enter the United States by sea, without regard to whether they departed from Mexico, while retaining the requirement that a noncitizen have traveled through another country on their way to the United States. This narrower application of the rule would limit covered noncitizens to those who, by and large, could have sought asylum or other protection in that other country. However, this alternative would mean that Cuban and Haitian nationals who reach the United States by sea directly from their country of origin would not fall within the rule's compass.

As another alternative, the Departments are considering whether to extend the scope of the presumption to certain noncitizens who enter the

[366] Homeland Security Task Force–Southeast, published through the U.S. Embassy in Cuba, *Homeland Security Task Force Southeast partners increase illegal migration enforcement patrols in Florida Straits, Caribbean* (Sept. 6, 2022), *https://cu.usembassy.gov/homeland-security-task-force-southeast-partners-increase-illegal-migration-enforcement-patrols-in-florida-straits-caribbean/.*

[367] *See, e.g.,* Reuters, *Nicaragua eliminates visa requirement for Cubans,* Nov. 23, 2021, *https://www.reuters.com/world/americas/nicaragua-eliminates-visa-requirement-cubans-2021-11-23/;* Ed Augustin, *Stars align for Cuban migrants as record numbers seek better life in US,* Guardian, June 12, 2022, *https://www.theguardian.com/world/2022/jun/12/cuban-migrants-us-record-numbers-migration* (''The U.S. Coast Guard has intercepted nearly 2,000 Cubans since October [2021]. But far more are flying to the Latin American mainland before journeying up to the U.S.-Mexico border: 114,000 have crossed into the U.S. since October [2021], according to U.S. Customs and Border Protection—1% of the island's entire population.''); Julie Watson et al., *Charter business thrives as US-expelled Haitians flee Haiti,* AP, June 14, 2022, *https://apnews.com/article/covid-health-travel-caribbean-2e5f32f8781a06e74ef7ea7ec639785f;* Julie Watson et al., *Haitian trip to Texas border often starts in South America,* AP, Sept. 21, 2021, *https://apnews.com/article/technology-mexico-texas-caribbean-united-states-ac7f598bafd44b3f95b786d2d800f3ce* (''Nearly all Haitians reach the U.S. on a well-worn route: Fly to Brazil, Chile or elsewhere in South America [then] move through Central America and Mexico.'').

United States by sea, but only if they departed from the Caribbean or another region that presents a heightened risk of maritime crossings. This alternative may be more tailored to the specific geographic regions that have caused the increase in maritime interdictions in recent months, but it would not expand the rule to other regions that could be a source of maritime crossings in the future.

Finally, if rates of maritime migration rise substantially prior to the end of this comment period or prior to the issuance of a final rule that responds to these comments, the Departments intend to take appropriate action, consistent with the APA, which may include issuance of a temporary or interim final rule that implements one of the proposed modifications.

## VI. Regulatory Requirements

### *A. Administrative Procedure Act*

This final rule is consistent with the notice-and-comment rulemaking requirements described at 5 U.S.C. 553(b) and (c). For the reasons explained below, the Departments have determined that this rule is exempt from the 30-day delayed-effective-date requirement at 5 U.S.C. 553(d).

#### 1. Foreign Affairs Exemption

This rule is exempt from the APA's delayed-effective-date requirement because it involves a ''foreign affairs function of the United States.'' [368] 5 U.S.C. 553(a)(1). Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [369] In addition, although the text of the APA does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[370] This rule satisfies both standards.

The United States must work with foreign partners to address migration in the Western Hemisphere region, and this rule is clearly and directly related to, and responsive to, ongoing discussions with and requests by key foreign partners in the Western Hemisphere region in two ways. First, such partners have encouraged the United States to take action to address unlawful migration to the SWB, which is particularly necessary now in light of the anticipated lifting of the Title 42 public health Order.[371] And by responding to these requests, the rule facilitates a key foreign policy goal—fostering a hemisphere-wide approach of addressing migration on a regionwide basis. Though the specific details of these discussions are not appropriate for extensive elaboration here due to the sensitive nature of government-to-government discussions, such partners have expressed concern that the lifting of the Title 42 public health Order—which provided an immediate consequence for many of those attempting to cross the SWB irregularly—may be misperceived by migrants as an indication that the U.S. border is open, which, in turn, could spur a surge of irregular migrant flows through their countries as migrants seek to enter the United States. One foreign partner opined that the formation of caravans in the spring of 2022 were spurred by rumors of the United States Government terminating the Title 42 public health Order and then the officially announced plans to do so. Such increases in irregular migration would further strain limited governmental and nongovernmental resources in partner nations. Already, partner nations have expressed significant concerns about the ways in which recent flows are challenging their own local communities and immigration infrastructure; they have expressed serious concerns that a dramatic increase in migrant flows could be overwhelming.

Some partner countries also have emphasized the possibility that criminal human smuggling organizations may seek to intentionally misrepresent the end of the Title 42 public health Order as leading to the opening of the U.S.-Mexico border in order to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. Such activity would put migrants' lives in danger and also contribute to the above-referenced adverse consequences associated with increased irregular migratory flows.

In connection with such discussions, a number of countries have lauded the sharp reductions in irregular migration associated with the aforementioned CHNV processes—which, like this rule, imposed consequences for irregular migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States. Following the implementation of the Venezuela process in October 2022, some countries requested that the United States implement similar policies for other nationalities, which DHS did in January 2023. At the same time, however, partner nations have raised concerns that any changes to these processes or the circumstances in which they operate—including the perception that there will be no consequences for irregular entry once the Title 42 public health Order is no longer in place—will undermine their success.[372]

Implementation of this rule will therefore advance top foreign policy priorities of the United States, by responding to the aforementioned discussions with and feedback from foreign partners and demonstrating U.S. partnership and commitment to the shared goals of stabilizing migratory populations and addressing migration collectively as a region, both of which are essential to maintaining strong bilateral and multilateral relationships.[373] As noted earlier in this preamble and in the proposed rule, recent surges in irregular migration, including overland migration through the Darién Gap, have affected a range of regional neighbors, including Mexico, Colombia, Costa Rica, Peru, Ecuador, and Panama. *See, e.g.,* 88 FR 11710–11. A further spike in migration following the lifting of the Title 42 public health Order risks severely straining relations with the countries in the region, as each would be compelled to turn away from more sustainable policy goals, and employ its limited resources to address the humanitarian needs of a significant influx of irregular migrants.

Further, as described above, the United States faces constraints in removing nationals of certain countries—including Venezuela, Nicaragua, Cuba, and Haiti—to their home countries. With limited exceptions, such nationals can only be removed to a third country as a result. International partners have conveyed that their willingness to receive increased returns of migrants was contingent on expanding the model provided by the Venezuela process, which decreased irregular migration throughout the hemisphere by

[368] Although the Departments have voluntarily complied with the APA's notice and comment requirements, this rule is exempt from such requirements pursuant to the foreign affairs exception as well, for the same reasons that are described in this section.

[369] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[370] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[371] *See, e.g., Am. Ass'n of Exps. & Imps.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (exemption applies where a rule is ''linked intimately with the Government's overall political agenda concerning relations with another country'').

[372] *See, e.g.,* Alfredo Corchado, *Ahead of Title 42's end, U.S.-Mexico Negotiations called 'intense,' 'round-the-clock,'* Dallas Morning News, Dec. 13, 2022, *https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotations-called-intense-round-the-clock/.*

[373] *See* L.A. Declaration Fact Sheet.

increasing options for lawful pathways and adding consequences for noncitizens who bypass those opportunities to travel irregularly to the United States.[374]

In short, delaying issuance and implementation of this rule, including for purposes of incorporating a 30-day delayed effective date, would be inconsistent with the foreign policy imperative to act now. Such delay would not only forfeit an opportunity to fortify bilateral relationships, but would fail to address, and potentially exacerbate, DHS's projections of a surge in migration across the region following the lifting of the Title 42 public health Order. From a U.S. foreign policy perspective, such outcomes would have undesirable international consequences.

The Departments' invocation of the foreign affairs exemption here is consistent with recent precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[375] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[376]

2. Good Cause

This rule is also exempt from the APA's delayed-effective-date requirement because the Departments have for good cause found that a delay associated with that requirement would be impracticable and contrary to the public interest.[377] The Title 42 public health Order is ending due to developments over which the Departments do not exercise any direct control. It would be impossible to incorporate a 30-day delayed effective date and issue a rule prior to the expiration of the Title 42 public health Order in that abbreviated time frame. As described above, such a delay would greatly exacerbate an urgent border and national security challenge that DHS has already taken multiple additional measures to address, and would miss a critical opportunity to reduce and divert the additional flow of irregular migration that is expected following lifting of the Title 42 public health Order.[378]

First, a 30-day delay of the effective date would be impracticable and contrary to the public interest because it would likely result in a significant further increase in irregular migration. As noted above, in recent years, the Departments, in coordination with other Executive Branch agencies and regional neighbors, have undertaken numerous measures to address such increases, which have been implemented via rulemakings,[379] voluntary processes paired with incentives against irregular migration,[380] and a wide range of significant resource surges and operational changes. A significant further increase in irregular migration, exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions.

Such challenges were evident in the days following the November 15, 2022, court decision vacating the Title 42 public health Order.[381] Within two days of the court's decision, total encounters at the SWB reached 9,583 in a single day on November 17, 2022, a 17 percent increase from the day before.[382] The baseline number of encounters decreased in March 2023, from April 2022, and also consisted of a much lower share of nationals from countries that have stopped or limited returns of their own nationals.[383] A delayed effective date could result in a substantial increase in irregular migration across multiple national borders, including our own.[384] As detailed above, these levels of irregular migration risk overwhelming DHS's ability to effectively process, detain, and remove, as appropriate, the migrants encountered. This, in turn, would result in potentially dangerous overcrowding at CBP facilities. The attendant risks to public safety, health, and welfare provide good cause to issue this rule without delay.[385]

The Departments expect that this effect would be particularly pronounced if noncitizens know that there is a specific 30-day period between the termination of the Title 42 public health Order and the effective date of this rule. That gap would incentivize even more irregular migration by those seeking to enter the United States before the process would take effect. It has long been recognized that agencies may use the good cause exception where significant public harm would result from using standard APA procedures.[386]

---

[374] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023) (committing to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration).

[375] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[376] *See* 88 FR 1266 (Jan. 9, 2023); 88 FR 1243 (Jan. 9, 2023); 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 188 FR 1282 (Jan. 9, 2023); 87 FR 63507 (Oct. 19, 2022).

[377] 5 U.S.C. 553(d)(3). Although the Departments have voluntarily complied with the APA's notice and comment requirements, this rule is exempt from such requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) as well, for reasons that are described in this section.

[378] The good cause exception to the 30-day effective date requirement is easier to meet than the good cause exception for forgoing notice and comment rulemaking. *See Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992) (noting "good cause [is] more easily found as to [the] 30-day waiting period" than the exception to notice and comment procedures)); *Am. Fed'n of Gov't Emps., AFL–CIO* v. *Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981); *U.S. Steel Corp.* v. *EPA,* 605 F.2d 283, 289–90 (7th Cir. 1979). An agency can show good cause for eliminating the 30-day delayed effective date when it demonstrates either urgent conditions the rule seeks to correct or unavoidable time limitations. *U.S. Steel Corp.,* 605 F.2d at 290; *United States* v. *Gavrilovic,* 511 F.2d 1099, 1104 (8th Cir. 1977).

[379] *See, e.g.,* 87 FR 18078 (Mar. 29, 2022) (amending regulations to allow U.S. immigration officials to more promptly consider the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process); 87 FR 30334 (May 18, 2022) (authorizing an additional 35,000 supplemental H–2B visas for the second half of FY 2022, of which 11,500 were reserved for nationals of Central American countries and Haiti); 87 FR 4722 (Jan. 28, 2022) (authorizing an additional 20,000 H–2B visas for FY 2022, of which 6,500 were reserved for nationals of Central American countries, with the addition of Haiti); 87 FR 76818 (Dec. 15, 2022) (authorizing nearly 65,000 additional visas, of which 20,000 are reserved for nationals of Central American countries and Haiti).

[380] *See, e.g.,* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022) (parole process for certain Venezuelan nationals and their immediate family members); DHS, Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022) (parole process for certain Ukrainian nationals and their immediate family members).

[381] *See Huisha-Huisha* v. *Mayorkas,* --- F. Supp. 3d ----, 2022 WL 16948610 (D.D.C. Nov. 15, 2022).

[382] OIS analysis of Persist Dataset based on data through March 31, 2023.

[383] *Id.*

[384] DHS SWB Encounter Planning Model generated April 18, 2023.

[385] *See, e.g., Hawaii Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (concluding agency's "concern about the threat to public safety" justified notice and comment waiver).

[386] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the

Continued

If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice (and comment) need not be given.[387] A number of cases follow this logic in the context of economic regulation.[388]

The same logic applies here, where the Departments are responding to exceedingly serious challenges at the border, and a gap between the termination of the Title 42 public health Order and the implementation of this rule would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. The Departments' experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants using perceived changes in domestic immigration law.[389] And those sudden influxes overload scarce government resources dedicated to border security.[390]

For instance, on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of MPP, a program implementing the Secretary's contiguous return authority under 8 U.S.C. 1225(b)(2)(C).[391] Almost immediately, hundreds of migrants began massing at POEs across the SWB attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.[392] Many others requested immediate entry into the country through their counsel, while others overwhelmed Border Patrol agents by attempting to illegally cross the SWB, with only some being apprehended successfully.[393] Absent the immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico that could have become aware of CBP's operational limitations and sought to exploit them.[394] And while CBP officers took action to resolve the sudden influx of migrants at multiple ports and prevent further deterioration of the situation at the border, they were diverted away from other critical missions, including detecting and confiscating illicit materials, and guarding efficient trade and travel.[395]

By contrast, as detailed above, immediate implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process, and the consequence that accompanied it (*i.e.,* the return to Mexico of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs) been announced weeks prior to its implementation, it likely would have had the opposite effect, resulting in many hundreds and thousands of Venezuelan nationals attempting to cross the border between the POEs before the process went into effect. *See* 87 FR at 63516.

The Departments' determination here is consistent with past practice. For example, in addition to the parole process for Venezuelans described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because ''[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region.'' [396] DHS cited the prospect that ''publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [397] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [398] DHS concluded that ''a surge could result in significant loss of human life.'' [399] Here, the Departments announced the proposed rule while a prior restrictive policy remained in place, but given the impending termination of the Title 42 public health Order, there is insufficient time for a delayed effective date.

Second, a delayed effective date is contrary to the public interest given that the anticipated termination of the Title 42 public health Order has drastically altered the framework governing processing of migrants. Courts find good cause satisfied where the immediate issuance of a rule is necessary to prevent public harm where a previously existing regulatory structure has been set aside by the courts.[400] A similar

public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.'' (cleaned up)).

[387] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) (''[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.'').

[388] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) (''The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare.'' (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) (''On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.'').

[389] *See* Nick Miroff and Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018); *See* Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media* (''A review of social media groups and pages identified by migrants showed . . . dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules, and baseless rumors about changes to immigration law.'').

[390] Declaration of Enrique Lucero ¶¶ 6–8, Dkt. 95–3, *Innovation Law Lab* v. *Wolf,* No. 19–15716 (9th Cir. Mar. 3, 2020); Declaration of Robert E. Perez, ¶ 15, Dkt. 95–2, *Innovation Law Lab,* No. 19–15716.

[391] *See Innovation Law Lab* v. *Wolf,* 951 F.3d 1073, 1095 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab* v. *Mayorkas,* 5 F.4th 1099 (9th Cir. 2021).

[392] *See* Declaration of Robert E. Perez, ¶¶ 4–15, Dkt. 95–2, *Innovation Law Lab,* No. 19–15716.

[393] *Id.* ¶¶ 4, 8.

[394] *Id.* ¶ 14.

[395] *Id.* ¶ 15.

[396] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[397] *Id.*

[398] *Id.*

[399] *Id.; accord, e.g.,* Department of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

[400] *See, e.g., United States* v. *Dean,* 604 F.3d 1275, 1277–80 (11th Cir. 2010); *Mid-Tex Elec. Coop., Inc.* v. *FERC,* 822 F.2d 1123, 1124 (D.C. Cir.

circumstance exists here: the Title 42 public health Order is ending based on factual developments, and the Departments do not control either those factual developments or the decision to recognize those factual developments by terminating the public health Order. Until May 11, 2023, the Title 42 public health Order requires DHS to expel hundreds of thousands of migrants without processing them under Title 8. Once the Title 42 public health Order is lifted, however, the Government must pivot, quickly, to process all migrants under its Title 8 authorities, at a time when the number of migrants seeking to cross the SWB without lawful authorization to do so is expected to surge significantly. The Departments therefore find good cause to forgo a delayed effective date in order to prevent the adverse consequences resulting from the termination of the Title 42 public health Order.

The Departments reiterate that they have only invoked the foreign affairs and good cause exceptions for the delayed-effective-date requirement. The Departments have solicited public comments and have given careful attention to comments that were received during the comment period, as reflected in Section III of this preamble.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Order 12866, Executive Order 13563, and Executive Order 14094, Modernizing Regulatory Review, 88 FR 21879 (Apr. 6, 2023) direct agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs of OMB reviewed the rule as a significant regulatory action under section 3(f)(4) of Executive Order 12866, as amended.

The expected effects of this rule are discussed above. The rule is expected to result in significantly reduced incentives for irregular migration and illegal smuggling activity, and will help avert a significant further surge in irregular migration after the Title 42 public health Order is lifted. The rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable fear of persecution or torture would be present in the United States. Noncitizens who establish a reasonable fear of persecution or torture would still be able to seek protection in proceedings before IJs.

The benefits of the rule are expected to include large-scale reductions in strains on limited national resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; a reduction in the role of exploitative transnational criminal organizations and smugglers; and improved relationships with, and enhanced opportunities to coordinate with and benefit from the migration policies of, regional neighbors. Some of these benefits accrue to migrants who wish to pursue safe, orderly, lawful pathways and processes, such as the ability to schedule a time to apply for admission at a POE. These migrants' ability to present their claims might otherwise be hampered by the severe strain that a further surge in irregular migration would impose on the Departments.

The direct costs of the rule are borne by migrants and the Departments. To the extent that any migrants are made ineligible for asylum under the presumptive condition established by the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States.[401] Such migrants may also be required to apply for work authorization more frequently than an asylee would. Migrants who choose to wait in Mexico for a CBP One appointment, rather than migrating irregularly across the southwest land border or adjacent coastal borders, also may incur some costs that are discussed earlier in this preamble, including potential safety risks for some migrants. The Departments note, in this regard, that noncitizens who establish "exceptionally compelling circumstances," including an imminent and extreme threat to life or safety or an acute medical emergency, can rebut the presumption against asylum eligibility. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). The Departments further note that there are also potential benefits for migrants who choose to wait in Mexico for a CBP One appointment (for instance, avoiding a dangerous cross-border journey and interactions with smugglers).

The rule will also require additional time for AOs and IJs, during fear screenings and reviews, respectively, to inquire into the applicability of the presumption and whether the presumption has been rebutted. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on the rebuttable presumption to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities, such as legal service organizations and private attorneys, will also incur some indirect costs as a result of the rule, such as familiarization costs and costs associated with assisting noncitizens who may be subject to the rule. There are other potential downstream effects of the rule, including effects on NGOs and state and local entities that interact with noncitizens, such as by providing services to such persons or receiving tax revenues from them. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule. As compared to the baseline condition, this rule is expected to reduce irregular migration.

The lawful, safe, and orderly pathways described earlier in this preamble are authorized separately from this rule but are expected to yield significant benefits for noncitizens who might otherwise seek to migrate irregularly to the United States. For instance, the ability to schedule a time to arrive to apply for admission at POEs

1987), *Nat'l Fed'n of Fed. Emps.* v. *Devine,* 671 F.2d 607, 608 (D.C. Cir. 1982), *Block,* 655 F.2d at 1154; *Bayou Lawn & Landscape Servs.* v. *Johnson,* 173 F. Supp. 3d 1271, 1284 (N.D. Fla. 2016) (collecting cases).

[401] As discussed previously in Section IV.E.7.ii of this preamble, the rule includes a specific provision to ensure that applicants who in section 240 removal proceedings who have a spouse or child who would be eligible to follow to join them under section 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A), will be able to rebut the presumption if the presumption is the only reason for denying their asylum application.

is expected to significantly improve CBP's ability to process noncitizens at POEs, and available parole processes allow prospective irregular migrants to avoid a dangerous and expensive overland journey in favor of an arrival by air to the United States. To the extent that such pathways and this rule result in a substantial reduction in irregular migration, the benefits of such pathways may also accrue to the various entities that incur costs as a consequence of irregular migration.

*C. Regulatory Flexibility Act*

The RFA requires Federal agencies to consider the potential impact of regulations on small entities during the development of their rules. *See* 5 U.S.C. 601 *et seq.* ''Small entities'' are small businesses, not-for-profit organizations that are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. *Id.* 601(6). This rule does not directly regulate small entities and is not expected to have a direct effect on small entities. Rather, the rule regulates individuals, and individuals are not defined as ''small entities'' by the RFA. *Id.* While some employers could experience costs or transfer effects, these impacts would be indirect. In the proposed rule, the Departments certified that the proposed rule would not have a significant economic impact on a substantial number of small entities. The Departments nonetheless welcomed comments regarding potential impacts on small entities. The Departments discuss comments from small entities earlier in the preamble, including in connection with the RFA. No such comments identified small entities that are subject to the rule within the meaning of the RFA. Accordingly, and for the same reasons stated in the proposed rule, the Departments certify that this rule will not have a significant economic impact on a substantial number of small entities.

*D. Unfunded Mandates Reform Act of 1995*

UMRA is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The inflation-adjusted value of $100 million in 1995 was approximately $177.8 million in 2021 based on the Consumer Price Index for All Urban Consumers (CPI–U).[402]

The term ''Federal mandate'' means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). A ''Federal intergovernmental mandate'' in turn is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term ''Federal private sector mandate'' refers to a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to the entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this proposed rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of UMRA, therefore, do not apply, and the Departments have not prepared a statement under UMRA.

*E. Congressional Review Act*

OMB has determined that this rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. The rule will be submitted to Congress and GAO consistent with the Congressional Review Act's requirements no later than its effective date.

*F. Executive Order 13132 (Federalism)*

This proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, the Departments believe that this proposed rule would not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, 61 FR 4729 (Feb. 5, 1996).

*H. Family Assessment*

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution. Under the rule, adjudicators would consider the circumstances of family members traveling together when determining whether noncitizens are not subject to the presumption in §§ 208.33(a)(1) and 1208.33(a). The presumption will not apply to a noncitizen if the noncitizen or a member of the noncitizen's family who is traveling with the noncitizen establishes one of the conditions in § 208.33(a)(1)(i) through (iii). Similarly, the presumption in paragraph (a)(1) of those sections would be rebutted if the noncitizen demonstrates that, at the

[402] *See* BLS, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items by Month* (Dec. 2021), *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202112.pdf.*

time of entry, the noncitizen or a member of the noncitizen's family who is traveling with the noncitizen was subject to one of the circumstances enumerated in paragraph (a)(3).

Additionally, to protect against family separation, the Departments have determined that a principal applicant establishes an exceptionally compelling circumstance that rebuts the presumption of ineligibility for asylum where the principal asylum applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the lawful pathways rebuttable presumption, and where denial of asylum on that ground alone would lead to the applicant's family being or remaining separated because an accompanying spouse or child would not qualify for asylum or other protection from removal on their own, or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant if the applicant were not subject to the presumption. *See* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 5, 2021) (''It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.'').

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule does not have ''tribal implications'' because it does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. E.O. 13175, Consultation and Coordination With Indian Tribal Governments, 65 FR 67249 (Nov. 6, 2000). Accordingly, Executive Order 13175 requires no further agency action or analysis.

*J. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.* the Departments must submit to OMB, for review and approval, any collection of information contained in a rule, unless otherwise exempt. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). The proposed rule proposed a revision to a collection of information under OMB Control Number 1651–0140, *Collection of Advance Information from Certain Undocumented Individuals on the Land Border.* Comments pertinent to the collection of information are discussed earlier in this preamble.

As discussed in Section IV.E.3.ii.b of this preamble, CBP will transition CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. CBP has revised the burden estimate for this collection consistent with this change. CBP continues to make improvements to the app based on stakeholder feedback.

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Collection of Advance Information from Certain Undocumented Individuals on the Land Border.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* CBP.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:*

*Primary:* Individual undocumented noncitizens. Under this collection, CBP collects certain biographic and biometric information from undocumented noncitizens prior to their arrival at a POE, to streamline their processing at the POE. The requested information is that which CBP would otherwise collect from these individuals during primary and/or secondary processing. This information is provided by undocumented noncitizens, directly or through NGOs and International Organizations. Providing this information reduces the amount of data entered by CBP officers and the corresponding time required to process an undocumented noncitizen.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* This information collection is divided into three parts. The estimated annual number of respondents for the registration in the CBP One app is 500,000 and the estimated time burden per response is 12 minutes. The estimated annual number of respondents for the daily opt-in for appointments is 500,000 and the estimated time burden per response is 1 minutes. The estimated annual number of respondents for the confirmation of appointment in the app is 456,250 and the estimated time burden per response is 3 minutes.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 372,813 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $7,605,385.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## Regulatory Amendments

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by removing and reserving paragraphs (c)(3), (4), and (5); adding and reserving paragraph (e); and adding paragraph (f), to read as follows:

### § 208.13 Establishing asylum eligibility.

* * * * *

(c) * * *

(3)–(5) [Reserved]

* * * * *

(e) [Reserved]

(f) *Lawful pathways condition.* For applications filed by aliens who entered the United States between May 11, 2023, and May 11, 2025, also refer to the provisions on asylum eligibility described in § 208.33.

### § 208.30 [Amended]

■ 3. Amend § 208.30(e)(5) by:

■ a. Amending paragraph (e)(5)(i) by removing the phrase ''paragraphs (e)(5)(ii) through (iv), or'' from the first sentence;

■ b. Removing paragraphs (e)(5)(ii) and (iii); and

■ c. Redesignating paragraph (e)(5)(i) as (e)(5).

■ 4. Add subpart C, consisting of § 208.33, to read as follows:

## Subpart C—Lawful Pathways and Asylum Eligibility for Certain Aliens Who Entered Between May 11, 2023, and May 11, 2025

### § 208.33 Lawful pathways condition on asylum eligibility.

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, and 208.30—

(a) *Condition on eligibility.* (1) *Applicability.* A rebuttable presumption of ineligibility for asylum applies to an alien who enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in section 212(a)(7) of the Act and whose entry was:

(i) Between May 11, 2023, and May 11, 2025,

(ii) Subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40, and

(iii) After the alien traveled through a country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees.

(2) *Exceptions to applicability of the rebuttable presumption.* The rebuttable presumption described in paragraph (a)(1) of this section does not apply if:

(i) The alien was, at the time of entry, an unaccompanied alien child as defined in 6 U.S.C. 279(g)(2); or

(ii) The alien, or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process;

(B) Presented at a port of entry, pursuant to a pre-scheduled time and place, or presented at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or

(C) Sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. A final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim. A final decision does not include a determination by a foreign government that the alien abandoned the claim.

(3) *Rebuttal of the presumption.* (i) An alien subject to the presumption described in paragraph (a)(1) of this section can rebut the presumption by demonstrating by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien demonstrates that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in § 214.11(a) of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(3)(i) of this section shall necessarily rebut the presumption in paragraph (a)(1) of this section.

(b) *Application in credible fear determinations*—(1) *Initial determination.* The asylum officer shall first determine whether the alien is covered by the presumption in paragraph (a)(1) of this section and, if so, whether the alien has rebutted the presumption in accordance with paragraph (a)(3) of this section.

(i) If the alien is covered by the presumption in paragraph (a)(1) of this section and fails to rebut the presumption in accordance with paragraph (a)(3) of this section, then the asylum officer shall enter a negative credible fear determination with respect to the alien's asylum claim and continue to consider the alien's claim under paragraph (b)(2) of this section.

(ii) If the alien is not covered by the presumption in paragraph (a)(1) of this section or has rebutted the presumption in accordance with paragraph (a)(3) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Additional procedures.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) of this section, the asylum officer will assess whether the alien has established a reasonable possibility of persecution (meaning a reasonable possibility of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the identified country or countries of removal identified pursuant to section 241(b) of the Act.

(ii) In cases described in paragraph (b)(2)(i) of this section, if the alien establishes a reasonable possibility of persecution or torture with respect to the identified country or countries of removal, the Department will issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) of this section, if an alien fails to establish a reasonable possibility of persecution or torture with respect to the identified country or countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Immigration judges will evaluate the case as provided in 8 CFR 1208.33(b). The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) through (C) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.33(b)(2)(i), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.33(b)(2)(ii), DHS shall issue a Form I–862, Notice to Appear, to commence removal proceedings under section 240 of the Act.

(C) Where the immigration judge issues a negative credible fear determination, the case shall be returned to DHS for removal of the alien. No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(c) *Continuing applicability of condition on eligibility.* (1) Subject to

paragraph (c)(2) of this section, the condition on asylum eligibility in paragraph (a)(1) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner specified in paragraph (a)(1) of this section and who is not covered by an exception in paragraph (a)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The conditions on asylum eligibility in paragraph (a)(1) of this section shall not apply to an asylum application filed by an alien described in paragraph (c)(1) of this section if the asylum application is filed after May 11, 2025, the alien was under the age of 18 at the time of the entry referenced in paragraph (c)(1) of this section, and the alien is applying for asylum as a principal applicant.

(d) *Severability.* The Department intends that any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, should be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 5. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

### § 1003.42 [Amended]

■ 6. Amend § 1003.42 by removing paragraphs (d)(2) and (3) and redesignating paragraph (d)(1) as paragraph (d).

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 7. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 8. Amend § 1208.13 by removing and reserving paragraphs (c)(3), (4), and (5), and by adding paragraph (f), to read as follows:

### § 1208.13 Establishing asylum eligibility.

* * * * *

(c) * * *

(3)–(5) [Reserved]

* * * * *

(f) *Lawful pathways condition.* For applications filed by aliens who entered the United States between May 11, 2023, and May 11, 2025, also refer to the provisions on asylum eligibility described in § 1208.33.

### § 1208.30 [Amended]

■ 9. Amend § 1208.30 by removing and reserving paragraph (g)(1).

■ 10. Add subpart C, consisting of § 1208.33, to read as follows:

## Subpart C—Lawful Pathways and Asylum Eligibility for Certain Aliens Who Entered Between May 11, 2023, and May 11, 2025

### § 1208.33 Lawful pathways condition on asylum eligibility.

Notwithstanding any contrary section of this part, including §§ 1208.2, 1208.13, and 1208.30—

(a) *Condition on eligibility.* (1) *Applicability.* A rebuttable presumption of ineligibility for asylum applies to an alien who enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in section 212(a)(7) of the Act and whose entry was:

(i) Between May 11, 2023, and May 11, 2025,

(ii) Subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40, and

(iii) After the alien traveled through a country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees.

(2) *Exceptions to applicability of the rebuttable presumption.* The rebuttable presumption described in paragraph (a)(1) of this section does not apply if:

(i) The alien was, at the time of entry, an unaccompanied alien child as defined in 6 U.S.C. 279(g)(2); or

(ii) The alien, or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process;

(B) Presented at a port of entry, pursuant to a pre-scheduled time and place, or presented at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or

(C) Sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. A final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim. A final decision does not include a determination by a foreign government that the alien abandoned the claim.

(3) *Rebuttal of the presumption.* (i) The presumption in paragraph (a)(1) of this section can be rebutted if an alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien demonstrates that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11(a).

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(3)(i) of this section shall necessarily rebut the presumption in paragraph (a)(1) of this section.

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.33(b), and the alien has requested

immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is covered by the presumption at 8 CFR 208.33(a)(1) and 1208.33(a)(1) and, if so, whether the alien has rebutted the presumption in accordance with 8 CFR 208.33(a)(3) and 1208.33(a)(3).

(i) Where the immigration judge determines that the alien is not covered by the presumption, or that the presumption has been rebutted, the immigration judge shall further determine, consistent with § 1208.30, whether the alien has established a significant possibility of eligibility for asylum under section 208 of the Act, withholding of removal under section 241(b)(3) of the Act, or withholding of removal under the Convention Against Torture. Where the immigration judge determines that the alien has established a significant possibility of eligibility for one of those forms of relief or protection, the immigration judge shall issue a positive credible fear finding. Where the immigration judge determines that the alien has not established a significant possibility of eligibility for any of those forms of relief or protection, the immigration judge shall issue a negative credible fear finding.

(ii) Where the immigration judge determines that the alien is covered by the presumption and that the presumption has not been rebutted, the immigration judge shall further determine whether the alien has established a reasonable possibility of persecution (meaning a reasonable possibility of being persecuted because of their race, religion, nationality, political opinion, or membership in a particular social group) or torture. Where the immigration judge determines that the alien has established a reasonable possibility of persecution or torture, the immigration judge shall issue a positive credible fear finding. Where the immigration judge determines that the alien has not established a reasonable possibility of persecution or torture, the immigration judge shall issue a negative credible fear finding.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.33(b)(2)(v)(A) through (C).

(4) If, under 8 CFR 208.33(b)(2), DHS issues a Form I–862, Notice to Appear, to commence removal proceedings under section 240 of the Act, the alien may apply for asylum, withholding of removal under section 241(b)(3) of the Act, withholding of removal under the Convention Against Torture, or any other form of relief or protection for which the alien is eligible during those removal proceedings.

(c) *Family unity and removal proceedings.* In removal proceedings under section 240 of the Act, where a principal asylum applicant is eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the presumption in paragraph (a)(1) of this section, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the presumption shall be deemed rebutted as an exceptionally compelling circumstance in accordance with paragraph (a)(3) of this section.

(d) *Continuing applicability of condition on eligibility.* (1) Subject to paragraph (d)(2) of this section, the condition on asylum eligibility in paragraph (a)(1) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner specified in paragraph (a)(1) of this section and who is not covered by an exception in paragraph (a)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The conditions on asylum eligibility in paragraph (a)(1) of this section shall not apply to an asylum application filed by an alien described in paragraph (d)(1) of this section if the asylum application is filed after May 11, 2025, the alien was under the age of 18 at the time of the entry referenced in paragraph (d)(1) of this section, and the alien is applying for asylum as a principal applicant.

(e) *Severability.* The Department intends that any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, should be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

Dated: May 8, 2023.

**Merrick B. Garland,**

*Attorney General, U.S. Department of Justice.*

[FR Doc. 2023–10146 Filed 5–10–23; 8:45 am]

BILLING CODE 9111–97–P; 4410–30–P

Dated: November 16, 2007.

**Richard A. Sloan,**

*Chief, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. E7–22771 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2426–07; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZA61**

## Cuban Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This Notice announces U.S. Citizenship and Immigration Services' Cuban Family Reunification Parole Program. Under this program, U.S. Citizenship and Immigration Services is offering beneficiaries of approved family-based immigrant visa petitions an opportunity to receive a discretionary grant of parole to come to the United States rather than remain in Cuba to apply for lawful permanent resident status. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.

**DATES:** This Notice is effective November 21, 2007.

**FOR FURTHER INFORMATION CONTACT:** Manpreet S. Dhanjal, Refugee Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 8th Floor, Washington, DC 20529, Telephone (202) 272–1613.

**SUPPLEMENTARY INFORMATION:**

### I. Background

In furtherance of the U.S.-Cuba Migration Accords, the United States endeavors to provide a minimum of 20,000 travel documents annually to aspiring Cuban emigrants. *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter ''Migration Accords'')). In so doing, the United States offers a safe, legal, and orderly means of coming to the United States. To date, the majority of travel documents issued under the Migration Accords fall into one of three programs: family-based immigrant visas; refugee resettlement; and parole under the Special Cuban Migration Program, also referred to as the Cuban Lottery. For information on the Cuban Lottery, see *http://havana.usinterestsection.gov/diversity_program.html.*

Two aspects of the existing array of migration programs limit the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to maritime crossings. First, with the exception of ''immediate relatives'' (*e.g.,* spouse, unmarried child) of U.S. citizens (USCs), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* Immigration and Nationality Act (INA) sections 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. The statutory caps have resulted in long waiting periods before family members remaining in Cuba may rejoin the USCs and lawful permanent residents (LPRs) residing in the United States who petitioned for them. Second, the United States has not been permitted to hold a new registration period since 1998 due to constraints placed on the Cuban Lottery program by the Cuban Government. This greatly reduces the pool of individuals to whom the United States may issue travel documents.

For these reasons, this Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords.

### II. The CFRP Program

Under the CFRP Program, USCIS may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole). Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

### III. Participation in the CFRP Program

USCIS will offer participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries (including any accompanying or following to join spouse and children (see INA section 203(d), 8 U.S.C. 1153(d)) of a properly filed Form I–130, ''Petition for Alien Relative,'' that has been approved, but for which an immigrant visa is not yet immediately available.

Under the CFRP Program, USCIS or the Department of State's National Visa Center (NVC) will mail written notice to U.S.-based USC and LPR petitioners whose Forms I–130 have been approved regarding their beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole. However, participation in the CFRP is voluntary. If USCIS exercises its discretion to grant parole, it will issue the necessary U.S. travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States to rejoin his or her family members.

Participation in the CFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). The extraordinary benefit of parole is not needed for these aliens, since they may seek visas for travel to the United States immediately upon the approval of Form I–130.

Additional information about the CFRP Program will be posted at *http://www.uscis.gov.*

Dated: November 15, 2007.

**Emilio T. Gonzalez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. E7–22679 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–5123–N–16]**

## Notice of Proposed Information Collection for Public Comment: Notice of Funding Availability for the Tribal Colleges and University Programs

**AGENCY:** Office of the Assistant Secretary for Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

### Designating Aliens for Expedited Removal

**AGENCY:** Office of the Secretary, Department of Homeland Security

**ACTION:** Notice.

**SUMMARY:** This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designation for Expedited Removal.* This Notice also restores the scope of expedited removal to the fullest extent authorized by Congress.

**DATES:** This designation is effective on 6:00 p.m. EST on Tuesday January 21, 2025.

**FOR FURTHER INFORMATION CONTACT:** Joseph Mazarra, Office of the General Counsel, Department of Homeland Security, 202–282–9256.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal,*[1] which limited the application of expedited removal procedures to certain aliens under the Immigration and Nationality Act (INA), to the extent the March 21, 2022 Notice is inconsistent with this Notice. This Notice enables the U.S. Department of Homeland Security (DHS) to exercise the full scope of its statutory authority to place in expedited removal, with limited exceptions, aliens[2] determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the INA who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility. Presently, immigration officers may apply expedited removal to aliens apprehended anywhere in the United States for up to two years after the alien arrived in the United States, provided that the alien arrived by sea and the other conditions for expedited removal were satisfied. For aliens who entered the United States by crossing a land border other than at a port of entry, with the March 21, 2022 Notice, the Secretary of DHS effectively exercised his discretion under the INA to limit the use of expedited removal to aliens apprehended by an immigration officer within 100 air miles of the United States international land border and who were continuously present in the United States for less than 14 days immediately prior to the date of encounter.

The INA grants the Secretary of Homeland Security the ''sole and unreviewable discretion'' to modify at any time the discretionary limits on the scope of the expedited removal designation. The Secretary is exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not currently designated: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Therefore, the designation in this Notice restores the scope of expedited removal to the fullest extent authorized by Congress, as was previously established in the July 23, 2019 Notice, *Designating Aliens for Expedited Removal.* To the extent there is an ambiguity in this Notice, the intended effect of this notice is to apply expedited removal to the fullest extent authorized by statute.

The effect of this change will be to enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations. In particular, the full application of expedited removal authority will enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully, without having been admitted or paroled into the United States, and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection from removal.

## II. This Notice Is Immediately Effective

In keeping with the practice followed in announcing the previous designations, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii),[3] this designation is effective without prior notice and comment or a delayed effective date. *See, e.g.,* 67 FR 68923, 68925 (2002 Notice); 69 FR 48877, 48880 (2004 Notice); 82 FR 4769, 4769 (2017 elimination of exception for Cuban nationals arriving by air); 82 FR. 4902, 4902 (2017 elimination of exception for Cuban nationals encountered in the United States or arriving by sea); 84 FR 35409, 35413 (2019 Notice); 87 FR 16022, 16024 (2022 Notice).

Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal procedures may be applied. It also made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time.'' *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I)(emphasis added). Therefore, the Secretary's designation, within statutory bounds, is ''committed to agency discretion by law and . . . there is no cause of action to evaluate the merits of the Secretary's judgment under APA standards.'' *Make the Road N.Y.* v. *Wolf,* 962 F.3d 612, 633–634 (D.C. Cir. 2020). Furthermore, as the D.C. Circuit held, based on the statutory language allowing for modification of the designation ''at any time'' and in his ''sole and unreviewable discretion,'' the Department does not have to undertake the notice-and-comment rulemaking process. *Id.* at 635. As discussed above, the rulemaking procedures of the APA do not apply to this Notice and the expansion or contraction of a designation may be made ''at any time.'' *Id.* at 634–635 (internal quotation marks omitted).

## III. Notice of Designation of Aliens Subject to Expedited Removal

Pursuant to INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), and 8 CFR 253.3(b)(1)(ii), I order, in my sole and unreviewable discretion, as follows:

(A) The Notice titled *Designating for Expedited Removal,* 87 FR 16022 (March 21, 2022), is hereby rescinded, effective immediately.

(B) I designate for expedited removal the following categories of aliens not

---

[1] The 2022 notice was published at 87 FR 16022. The 2019 notice was published at 84 FR 35409.

[2] The term ''alien'' is defined in statute as ''any person not a citizen or national of the United States.'' 8 U.S.C. 1101(a)(3). Going forward, DHS will adhere to statutory language and use the proper terminology.

[3] 8 CFR 235.3(b)(1)(ii) (providing that ''[t]he Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, *at any time,* to any class of aliens described in this section'' and that this ''designation shall become effective upon publication of a notice in the **Federal Register**'' as well as that, ''if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter'' (emphasis added)).

currently designated: (1) Aliens who did not arrive by sea, who are apprehended anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are apprehended within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Each alien placed in expedited removal under this designation bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for the relevant period. This designation does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal. Nor does this designation apply to or otherwise affect aliens who satisfy the expedited removal criteria set forth in any of the previous designations. *See* 82 FR 4902, 69 FR 48877; 67 FR 68923.

(C) With the exception of the March 21, 2022 Notice rescinded above, this Notice does not supersede, abrogate, or amend or modify any of the Pre-2019 Designations,[4] which shall remain in full force and effect in accordance with their respective terms.

Signed at Washington, DC.

**Benjamine C. Huffman,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2025–01720 Filed 1–21–25; 4:45 pm]

**BILLING CODE 9110–9M–P**

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 701–TA–606 and 731–TA–1416 (Review)]**

### Quartz Surface Products From China

**Determinations**

On the basis of the record[1] developed in the subject five-year reviews, the United States International Trade Commission (''Commission'') determines, pursuant to the Tariff Act of 1930 (''the Act''), that revocation of the countervailing duty and antidumping duty orders on quartz surface products from China would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

**Background**

The Commission instituted these reviews on June 3, 2024 (89 FR 47614) and determined on September 6, 2024 that it would conduct expedited reviews (89 FR 97653, December 9, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 17, 2025. The views of the Commission are contained in USITC Publication 5578 (January 2025), entitled *Quartz Surface Products from China: Investigation Nos. 701–TA–606 and 731–TA–1416 (Review).*

By order of the Commission.

Issued: January 17, 2025.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2025–01632 Filed 1–23–25; 8:45 am]

**BILLING CODE 7020–02–P**

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. 337–TA–1433]**

### Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same; Notice of Institution of Investigation

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on December 18, 2024, under section 337 of the Tariff Act of 1930, as amended, on behalf of Corning Incorporated, Corning, New York. A supplement to the Complaint was filed on January 7, 2025. The complaint, as supplemented, alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same by reason of the infringement of certain claims of U.S. Patent No. 7,851,394 (''the '394 patent''); U.S. Patent No. 8,627,684 (''the '684 patent''); and U.S. Patent No. 9,512,025 (''the '025 patent''). The complainant, as supplemented, also alleges violations of section 337 based upon the importation and sale of certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same by reason of misappropriation of trade secrets the threat or effect of which is to destroy or substantially injure a domestic industry. The complaint, as supplemented, further alleges that an industry in the United States exists as required by the applicable Federal Statute. The complainant requests that the Commission institute an investigation and, after the investigation, issue a general exclusion order, or in the alternative a limited exclusion order, and cease and desist orders.

**ADDRESSES:** The complaint, except for any confidential information contained therein, may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.* Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at (202) 205–2000. General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Pathenia M. Proctor, The Office of Unfair Import Investigations, U.S. International Trade Commission, telephone (202) 205–2560.

**SUPPLEMENTARY INFORMATION:**

*Authority:* The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 CFR 210.10 (2024).

*Scope of Investigation:* Having considered the complaint, the U.S. International Trade Commission, on January 17, 2025, *ordered that*—

(1) Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine:

(a) whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1, 5, 6, and 8–10 of '394 patent; claims 1, 2, 4, 7, and 10–12 of the '684 patent; and claims 15–20 of the '025 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337;

[4] *See, e.g.,* 82 FR 4902 (Jan. 17, 2017); 69 FR 48877 (Aug. 11, 2004); 67 FR 68924 (Nov. 13, 2002).

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

substantially prepared by the Exchange. The Exchange has designated this proposal for immediate effectiveness pursuant to Section 19(b)(3)(A) of the Act[4] and Rule 19b–4(f) thereunder.[5] The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The Exchange proposes to amend its Price List to adopt fees for Directed Orders routed by the Exchange to an algorithm, effective March 3, 2025.

The proposed rule change, including the Exchange's statement of the purpose of, and statutory basis for, the proposed rule change, is available on the Exchange's website at *https://www.nyse.com* and on the Commission's website at *https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking/national-securities-exchanges?file_number=SR-NYSE-2025-04.*

### II. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act.[6] Comments may be submitted electronically by using the Commission's internet comment form (*https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking/national-securities-exchanges?file_number=SR-NYSE-2025-04*) or by sending an email to *rule-comments@sec.gov.* Please include file number SR–NYSE–2025–04 on the subject line. Alternatively, paper comments may be sent to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090. All submissions should refer to file number SR–NYSE–2025–04. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking/national-securities-exchanges?file_number=NYSE-2025-04*). Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–NYSE–2025–04 and should be submitted on or before April 4, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[7]

**J. Matthew DeLesDernier,**

*Deputy Secretary.*

[FR Doc. 2025–04073 Filed 3–13–25; 8:45 am]

BILLING CODE 8011–01–P

[4] 15 U.S.C. 78s(b)(3)(A).

[5] 17 CFR 240.19b–4(f). At any time within 60 days of the filing of the proposed rule change, the Commission summarily may temporarily suspend such rule change if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Act. If the Commission takes such action, the Commission will institute proceedings to determine whether the proposed rule change should be approved or disapproved.

[6] Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange.

[7] 17 CFR 200.30–3(a)(12).

## DEPARTMENT OF STATE

**[Public Notice: 12682]**

## Determination: Foreign Affairs Functions of the United States

1. Serving as America's 72nd Secretary of State is the highest honor of my professional life. In Executive Order 14150, President Trump has given me a clear direction to place our core national interests as the guiding mission of American foreign policy, and always put America and American citizens first.

2. Securing America's borders and protecting its citizens from external threats is the first priority foreign affairs function of the United States. This effort requires the United States to marshal all available resources and authorities. These resources and authorities also include, but are not limited to, those of the Department of State, the Department of Defense, the Department of Homeland Security, the Department of Justice, and many other federal agencies. See, *e.g.,* Executive Orders 14150, 14157, 14160, 14161, 14165.

3. The threats to U.S. citizens from an unsecured border can include foreign spies, contraband, and harmful materials that flow across the border, as well as unchecked mass migration, narcotics trafficking, human smuggling and trafficking, and other destabilizing or unlawful activities, including the flow of dangerous drugs, weapons, and technology. Eliminating or mitigating these threats involves visa policies, export control enforcement policies and practices, and other foreign affairs functions entrusted to me, as Secretary of State, under the Constitution, at the direction of the President, and by statute.

4. The Department of State enjoys primacy among federal agencies in the conduct of our foreign policy. When he appointed me as Secretary of State, the President entrusted me with all matters respecting the conduct of foreign affairs, including my primary foreign affairs duty: the duty to protect the people of the United States from any threats originating from foreign actors or from foreign soil. For the Department of State, that includes all policy related to the protection and travel of U.S. citizens overseas, visa operations and visa issuance, implementation of the Arms Export Control Act, and implementation of the Mutual Educational and Cultural Exchange Act of 1961, as amended, among other authorities. But the scope of a foreign affairs function of the United States is much broader.

5. For these reasons, I hereby determine that all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States under the Administrative Procedure Act, 5 U.S.C. 553, 554.

Dated: February 21, 2025.

**Marco Rubio,**

*Secretary of State.*

[FR Doc. 2025–04116 Filed 3–13–25; 8:45 am]

BILLING CODE 4710–10–P

## SURFACE TRANSPORTATION BOARD

**[Docket No. FD 36842]**

## Mingus Mountain Railroad, LLC—Acquisition and Operation Exemption—Line of Clarkdale Arizona Central Railroad, L.C.

Mingus Mountain Railroad, LLC (MMRL), a noncarrier, has filed a verified notice of exemption under 49 CFR 1150.31 to acquire from Clarkdale Arizona Central Railroad, L.C. (CACR), and operate approximately 38.74 miles of rail line between milepost 0 + 15 feet

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

*Administration of Donald J. Trump, 2025*

**Executive Order 14150—America First Policy Directive to the Secretary of State**
*January 20, 2025*

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

*Section 1. Purpose*. From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

*Sec. 2. Policy*. As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

*Sec. 3. General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

The White House,
January 20, 2025.

[Filed with the Office of the Federal Register, 8:45 a.m., January 28, 2025]

NOTE: This Executive order was published in the *Federal Register* on January 29.

*Categories:* Executive Orders : Secretary of State, America-first policy directive.

*Subjects:* Foreign policy, U.S.; Secretary of State.

*DCPD Number:* DCPD202500117.

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents 8467

# Presidential Documents

**Executive Order 14165 of January 20, 2025**

## Securing Our Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Deadly narcotics and other illicit materials have flowed across the border while agents and officers spend their limited resources processing illegal aliens for release into the United States. These catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States.

We have limited information on the precise whereabouts of a great number of these illegal aliens who have entered the United States over the last 4 years.

This cannot stand. A nation without borders is not a nation, and the Federal Government must act with urgency and strength to end the threats posed by an unsecured border.

One of my most important obligations is to protect the American people from the disastrous effects of unlawful mass migration and resettlement.

My Administration will marshal all available resources and authorities to stop this unprecedented flood of illegal aliens into the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to take all appropriate action to secure the borders of our Nation through the following means:

(a) Establishing a physical wall and other barriers monitored and supported by adequate personnel and technology;

(b) Deterring and preventing the entry of illegal aliens into the United States;

(c) Detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States;

(d) Removing promptly all aliens who enter or remain in violation of Federal law;

(e) Pursuing criminal charges against illegal aliens who violate the immigration laws, and against those who facilitate their unlawful presence in the United States;

(f) Cooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities; and

(g) Obtaining complete operational control of the borders of the United States.

**Sec. 3**. *Physical Barriers.* The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States.

**Sec. 4**. *Deployment of Personnel.* (a) The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate and lawful action to deploy sufficient personnel along the southern border of the United States to ensure complete operational control; and

(b) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to supplement available personnel to secure the southern border and enforce the immigration laws of the United States through the use of sections 1103(a)(2) and (4)–(6) of the INA (8 U.S.C. 1103(a)(2) and (4)–(6)).

**Sec. 5**. *Detention.* The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as ''catch-and-release,'' whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

**Sec. 6**. *Resumption of Migrant Protection Protocols.* As soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

**Sec. 7**. *Adjusting Parole Policies.* The Secretary of Homeland Security shall, consistent with applicable law, take all appropriate action to:

(a) Cease using the ''CBP One'' application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States;

(b) Terminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the ''Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.''

(c) Align all policies and operations at the southern border of the United States to be consistent with the policy of Section 2 of this order and ensure that all future parole determinations fully comply with this order and with applicable law.

**Sec. 8**. *Additional International Cooperation.* The Secretary of State, in coordination with the Attorney General and the Secretary of Homeland Security, shall take all appropriate action to facilitate additional international cooperation and agreements, consistent with the policy of Section 2, including entering into agreements based upon the provisions of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)) or any other applicable provision of law.

**Sec. 9**. *DNA and Identification Requirements.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to fulfill the requirements of the DNA Fingerprint Act of 2005, title X of Public Law 109–162, for all aliens detained under the authority of the United States; and

(b) The Secretary of Homeland Security shall take all appropriate action to use any available technologies and procedures to determine the validity of any claimed familial relationship between aliens encountered or apprehended by the Department of Homeland Security.

**Sec. 10**. *Prosecution of Offenses.* The Attorney General and the Secretary of Homeland Security shall take all appropriate action to prioritize the

prosecution of offenses that relate to the borders of the United States, including the investigation and prosecution of offenses that involve human smuggling, human trafficking, child trafficking, and sex trafficking in the United States.

**Sec. 11**. *Additional Measures.* Within 14 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall provide recommendations to the President regarding the use of any other authority to protect the United States from foreign threats and secure the southern border.

**Sec. 12**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02015
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

**Executive Order 14194 of February 1, 2025**

## Imposing Duties To Address the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of illegal aliens and illicit opioids and other drugs has profound consequences on our Nation, endangering lives and putting a severe strain on our healthcare system, public services, communities, and schools. Since the end of my first term, U.S. Customs and Border Protection (CBP) within the Department of Homeland Security has recorded more than three times as many inadmissible encounters nationwide as during my first term.

These challenges threaten the fabric of our society. Gang members, smugglers, human traffickers, and illicit drugs of all kinds have poured across our borders and into our communities. Mexico has played a central role in these challenges, including by failing to devote sufficient attention and resources to meaningfully stem the tide of unlawful migration and illicit drugs.

Mexican drug trafficking organizations (DTOs) are the world's leading traffickers of fentanyl, methamphetamine, cocaine, and other illicit drugs, and they cultivate, process, and distribute massive quantities of narcotics that fuel addiction and violence in communities across the United States. These DTOs collaborate and conspire with transnational cartels and other global partners to smuggle drugs into the United States, utilizing clandestine airstrips, maritime routes, tunnels, and overland corridors, and both willing and unwilling human couriers.

The Mexican DTOs have an intolerable alliance with the government of Mexico. This alliance endangers the national security of the United States, and we must eradicate the influence of these dangerous cartels from the bilateral environment. The government of Mexico has afforded safe havens for the cartels to engage in the manufacturing and transportation of illicit drugs, which collectively have led to the overdose deaths of hundreds of thousands of American victims.

Mexican cartels are also implicated in human trafficking and smuggling operations, enabling the illegal migration of millions across our borders. These operations are often tied to organized crime, and they create pathways for cartel activities to expand into the United States. Furthermore, violent criminals originating from Central and South America easily transit into and through Mexico, and into the United States, where they cause irreparable harm to our citizens. These dangerous criminals are involved in drug-related violence, gang activity, and other crimes that endanger the safety of American communities.

Immediate action is required to address the national emergency I declared in Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border of the United States), and to finally end the public

health crisis caused by opioid use and addiction, which will not happen unless the compliance and cooperation of the government of Mexico is assured.

I hereby determine and order:

**Section 1.** (a) As President of the United States, my highest duty is the defense of the country and its citizens. A Nation without borders is not a Nation at all. I will not stand by and allow our sovereignty to be eroded, our laws to be trampled, our citizens to be endangered, or our borders to be disrespected anymore.

I previously declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States in Proclamation 10886. Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that proclamation to cover the failure of Mexico to arrest, seize, detain, or otherwise intercept DTOs, other drug and human traffickers, criminals at large, and illicit drugs. In addition, this failure to act on the part of the government of Mexico constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat. This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Mexico as set forth in this order. In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

**Sec. 2.** (a) All articles that are products of Mexico, as defined by the *Federal Register* notice described in section 2(d) of this order (the *Federal Register* notice), shall be, consistent with law, subject to an additional 25 percent ad valorem rate of duty. Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(b) The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(c) Should the government of Mexico retaliate against the United States in response to this action through import duties on United States exports to Mexico or similar measures, the President may increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action.

(d) In order to establish the duty rate on imports of articles that are products of Mexico, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*. The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(e) Articles that are products of Mexico, except those that are eligible for admission under ''domestic status'' as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a

United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, must be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41. Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(f) No drawback shall be available with respect to the duties imposed pursuant to this order.

(g) For avoidance of doubt, duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) of this section.

(h) Any prior Presidential Proclamation, Executive Order, or other presidential directive or guidance related to trade with Mexico that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(i) The articles described in subsection (a) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).

**Sec. 3**. (a) The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security on the situation at our southern border. The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the government of Mexico has taken adequate steps to alleviate the illegal migration and illicit drug crisis through cooperative actions. Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order will be removed.

(b) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security shall recommend additional action, if necessary, should the government of Mexico fail to take adequate steps to alleviate the illegal migration and illicit drug crises through cooperative enforcement actions.

**Sec. 4**. The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order. The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security. All agencies shall take all appropriate measures within their authority to implement this order.

**Sec. 5**. The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

Case: 26-1304 Document: 00118535451 Page: 246 Date Filed: 01/13/2026 Entry ID: 6858896
Case 1:25-cv-10495-IT Document 246-1 Filed 01/13/26 Page 177 of 1448



(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*February 1, 2025.*

[FR Doc. 2025–02407
Filed 2–6–25; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

**Executive Order 14159 of January 20, 2025**

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9**. *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10**. *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11**. *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12**. *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13**. *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14**. *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15**. *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16**. *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17**. *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanctuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18**. *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19**. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20**. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# Presidential Documents

**Executive Order 14198 of February 3, 2025**

## Progress on the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Background.* On February 1, 2025, I determined that the failure of Mexico to arrest, seize, detain, or otherwise intercept Mexican drug trafficking organizations, other drug and human traffickers, criminals at large, and illicit drugs constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To address that threat, I invoked my authority under section 1702(a)(1)(B) of IEEPA to impose ad valorem tariffs on articles that are products of Mexico.

**Sec. 2**. *Immediate Steps.* Pursuant to section 3 of my Executive Order of February 1, 2025, titled ''Imposing Duties to Address the Situation at Our Southern Border'' (''the Executive Order of February 1, 2025''), I have determined that the Government of Mexico has taken immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions. Further time is needed, however, to assess whether these steps constitute sufficient action to alleviate the crisis and resolve the unusual and extraordinary threat beyond our southern border.

**Sec. 3**. *Pause.* (a) In recognition of the steps taken by the Government of Mexico, and in order to assess whether the threat described in section 1 of this order has abated, the additional 25 percent ad valorem rate of duty shall be paused and will not take effect until March 4, 2025, at 12:01 a.m. eastern time. Accordingly, sections 2(a), section 2(d), and section 2(e) of the Executive Order of February 1, 2025, are amended by striking the term ''February 4, 2025,'' where it appears in those sections and inserting in lieu thereof the term ''March, 4, 2025.'' The exceptions set forth in section 2(a) of the Executive Order of February 1, 2025, related to covered goods loaded onto a vessel at a port of entry or in transit on the final mode of transport prior to entry into the United States are, hereby, withdrawn.

(b) During this pause, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, shall continue to assess the situation at our southern border, as provided in section 3 of the Executive Order of February 1, 2025.

(c) If the illegal migration and illicit drug crises worsen, and if the Government of Mexico fails to take sufficient steps to alleviate these crises, the President shall take necessary steps to address the situation, including by immediate implementation of the tariffs described in the Executive Order of February 1, 2025.

**Sec. 4**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*February 3, 2025.*

[FR Doc. 2025–02479
Filed 2–7–25; 8:45 am]
Billing code 3395–F4–P

Case 26-1304 Case 1:25-cv-10495-IT Document 246-1 Page 246-880 Filed 01/16/26 Page 186 of 1448 Entry ID: 6858896



# Presidential Documents

**Executive Order 14227 of March 2, 2025**

## Amendment to Duties To Address the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, I hereby determine and order:

**Section 1**. *Amendment.* Executive Order 14194 of February 1, 2025 (Imposing Duties to Address the Situation at Our Southern Border), as amended by Executive Order 14198 of February 3, 2025 (Progress on the Situation at Our Southern Border), is further amended by revising section 2(g) to read as follows:

''(g) Duty-free *de minimis* treatment under 19 U.S.C. 1321 is available for otherwise eligible covered articles described in subsection (a) of this section. Such duty-free *de minimis* treatment shall cease to be available for such otherwise eligible covered articles upon notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expeditiously process and collect tariff revenue applicable pursuant to subsection (a) of this section for covered articles otherwise eligible for *de minimis* treatment.''

**Sec. 2**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*March 2, 2025.*

[FR Doc. 2025–03729
Filed 3–5–25; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

**Executive Order 14157 of January 20, 2025**

## Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1701 *et seq.* it is hereby ordered:

**Section 1**. *Purpose.* This order creates a process by which certain international cartels (the Cartels) and other organizations will be designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

(a) International cartels constitute a national-security threat beyond that posed by traditional organized crime, with activities encompassing:

(i) convergence between themselves and a range of extra-hemispheric actors, from designated foreign-terror organizations to antagonistic foreign governments;

(ii) complex adaptive systems, characteristic of entities engaged in insurgency and asymmetric warfare; and

(iii) infiltration into foreign governments across the Western Hemisphere.

The Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.

The Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States. In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society. The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere. Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

(b) Other transnational organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS–13) pose similar threats to the United States. Their campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere.

(c) The Cartels and other transnational organizations, such as TdA and MS–13, operate both within and outside the United States. They present an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency, under IEEPA, to deal with those threats.

**Sec. 2**. *Policy.* It is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States

through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States.

**Sec. 3**. *Implementation.* (a) Within 14 days of the date of this order, the Secretary of State shall take all appropriate action, in consultation with the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to make a recommendation regarding the designation of any cartel or other organization described in section 1 of this order as a Foreign Terrorist Organization consistent with 8 U.S.C. 1189 and/or a Specially Designated Global Terrorist consistent with 50 U.S.C. 1702 and Executive Order 13224.

(b) Within 14 days of the date of this order, the Attorney General and the Secretary of Homeland Security shall take all appropriate action, in consultation with the Secretary of State, to make operational preparations regarding the implementation of any decision I make to invoke the Alien Enemies Act, 50 U.S.C. 21 *et seq.,* in relation to the existence of any qualifying invasion or predatory incursion against the territory of the United States by a qualifying actor, and to prepare such facilities as necessary to expedite the removal of those who may be designated under this order.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02004
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 257–1 of December 11, 2015.

**Rafik K. Mansour,**

*Deputy Assistant Secretary for Policy, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2025–02861 Filed 2–19–25; 8:45 am]

BILLING CODE 4710–05–P

## DEPARTMENT OF STATE

**[Public Notice: 12670]**

### Notice of Determinations; Culturally Significant Objects Being Imported for Exhibition—Determinations: ''Rashid Johnson: A Poem for Deep Thinkers'' Exhibition

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that certain objects being imported from abroad pursuant to agreements with their foreign owners or custodians for temporary display in the exhibition ''Rashid Johnson: A Poem for Deep Thinkers'' at the Solomon R. Guggenheim Museum, New York, New York; the Modern Art Museum of Fort Worth, in Fort Worth, Texas; and at possible additional exhibitions or venues yet to be determined, are of cultural significance, and, further, that their temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 257–1 of December 11, 2015.

**Rafik K. Mansour,**

*Deputy Assistant Secretary for Policy, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2025–02859 Filed 2–19–25; 8:45 am]

BILLING CODE 4710–05–P

## DEPARTMENT OF STATE

**[Public Notice: 12671]**

### Specially Designated Global Terrorist Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana

Acting under the authority of and in accordance with section 1(a)(ii)(A) of Executive Order 13224, as amended (''E.O. 13224'' or ''Order''), I have determined that the persons known as Tren de Aragua (also known as Aragua Train); Mara Salvatrucha (also known as MS–13); Cartel de Sinaloa (also known as Sinaloa Cartel, Mexican Federation, Guadalajara Cartel); Cartel de Jalisco Nueva Generacion (also known as New Generation Cartel of Jalisco, CJNG, Jalisco New Generation Cartel); Carteles Unidos (also known as United Cartels, Tepalcatepec Cartel, Cartel de Tepalcatepec, The Grandfather Cartel, Cartel del Abuelo, Cartel de Los Reyes); Cartel del Noreste (also known as CDN, Northeast Cartel, Los Zetas); Cartel del Golfo (also known as CDG, Gulf Cartel, Osiel Cardenas-Guillen Organization); and La Nueva Familia Michoacana (also known as LNFM) are foreign persons that have committed or have attempted to commit, pose a significant risk of committing, or have participated in training to commit acts of terrorism that threaten the security of United States nationals or the national security, foreign policy, or economy of the United States.

Consistent with the determination in section 10 of E.O. 13224 that prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized in the Order because of the ability to transfer funds instantaneously, I have determined that no prior notice needs to be provided to any person subject to this determination who might have a constitutional presence in the United States, because to do so would render ineffectual the measures authorized in the Order.

This determination shall be published in the **Federal Register**.

Dated: February 6, 2025.

**Marco Rubio,**

*Secretary of State.*

[FR Doc. 2025–02870 Filed 2–19–25; 8:45 am]

BILLING CODE 4710–05–P

## DEPARTMENT OF STATE

**[Public Notice: 12672]**

### Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana

Based upon a review of the Administrative Records assembled in this matter, and in consultation with the Attorney General and the Secretary of the Treasury, I have concluded that there is a sufficient factual basis to find that the relevant circumstances described in section 219 of the Immigration and Nationality Act, as amended (hereinafter ''INA'') (8 U.S.C. 1189), exist with respect to: Tren de Aragua (also known as Aragua Train); Mara Salvatrucha (also known as MS–13); Cartel de Sinaloa (also known as Sinaloa Cartel, Mexican Federation, Guadalajara Cartel); Cartel de Jalisco Nueva Generacion (also known as New Generation Cartel of Jalisco, CJNG, Jalisco New Generation Cartel); Carteles Unidos (also known as United Cartels, Tepalcatepec Cartel, Cartel de Tepalcatepec, The Grandfather Cartel, Cartel del Abuelo, Cartel de Los Reyes); Cartel del Noreste (also known as CDN, Northeast Cartel, Los Zetas); Cartel del Golfo (also known as CDG, Gulf Cartel, Osiel Cardenas-Guillen Organization); and La Nueva Familia Michoacana (also known as LNFM).

foreign persons who have committed or have attempted to commit, pose a significant risk of committing, or have participated in training to commit acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States.

Consistent with the determination in section 10 of E.O. 13224 that prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized in the Order because of the ability to transfer funds instantaneously, I determine that no prior notice needs to be provided to any person subject to this determination who might have a constitutional presence in the United States, because to do so would render ineffectual the measures authorized in the Order.

This determination shall be published in the **Federal Register**.

Dated: April 22, 2025.

**Marco Rubio,**

*Secretary of State.*

[FR Doc. 2025–07468 Filed 5–2–25; 8:45 am]

BILLING CODE 4710–AD–P

## DEPARTMENT OF STATE

**[Public Notice: 12720]**

### Plenary Meeting of the Binational Bridges and Border Crossings Group in Mexico City

**SUMMARY:** Delegates from the U.S. and Mexican governments, the states of California, Arizona, New Mexico, and Texas, and the Mexican states of Baja California, Sonora, Chihuahua, Coahuila, Nuevo Laredo, and Tamaulipas will participate in an in-person plenary meeting of the U.S.-Mexico Binational Bridges and Border Crossings Group.

**DATES:** Tuesday, June 10, 2025, and Wednesday, June 11, 2025, in Mexico City.

**FOR FURTHER INFORMATION CONTACT:** For further information on the meeting and/or to attend the public session, please contact Beney Lee, Border Affairs Officer, via email at *WHA-BorderAffairs@state.gov,* by phone at 771–204–0192, or by mail at the Office of Mexican Affairs, Room 3924, Department of State, 2201 C Street NW, Washington, DC 20520.

**SUPPLEMENTARY INFORMATION:** The purpose of this meeting is to discuss operational matters involving existing and proposed international bridges and border crossings and their related infrastructure and to exchange technical information as well as views on policy. This meeting will include a public session on Tuesday, June 10, 2025, from 9 a.m. until 12 p.m. This session will allow interested parties with views on proposed bridges and border crossings and related projects to make presentations to the delegations and members of the public.

**Beney J. Lee,**

*Border Affairs Officer, Office of Mexican Affairs, Department of State.*

[FR Doc. 2025–07758 Filed 5–2–25; 8:45 am]

BILLING CODE 4710–29–P

## DEPARTMENT OF STATE

**[Public Notice: 12717]**

### Notice of Determinations; Culturally Significant Object Being Imported for Exhibition—Determinations: "Noah Davis" Exhibition

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that a certain object being imported from abroad pursuant to an agreement with its foreign owner or custodian for temporary display in the exhibition "Noah Davis" at the Armand Hammer Museum of Art and Cultural Center, Los Angeles, California; the Philadelphia Museum of Art, Philadelphia, Pennsylvania; and at possible additional exhibitions or venues yet to be determined, are of cultural significance, and, further, that its temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 574 of March 4, 2025.

**Mary C. Miner,**

*Managing Director for Professional and Cultural Exchanges, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2025–07735 Filed 5–2–25; 8:45 am]

BILLING CODE 4710–05–P

## DEPARTMENT OF STATE

**[Public Notice: 12710]**

### Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif

Based upon a review of the Administrative Records assembled in this matter, and in consultation with the Attorney General and the Secretary of the Treasury, I have concluded that there is a sufficient factual basis to find that the relevant circumstances described in section 219 of the Immigration and Nationality Act, as amended (hereinafter "INA") (8 U.S.C. 1189), exist with respect to: Viv Ansanm (also known as Living Together, G–9, G9 Family and Allies, G9 Fanmi e Alye, The Revolutionary Forces of the G9 Family and Allies, Fòs Revolisyoné G9 an Fanmi e Alye, G-Pèp, G-People); and Gran Grif (also known as Gran Grif gang, Gran Grif de Savien, Savien gang, Baz Gran Grif).

Therefore, I hereby designate the aforementioned organizations and their respective aliases as Foreign Terrorist Organizations pursuant to section 219 of the INA.

This determination shall be published in the **Federal Register**. The designations go into effect upon publication.

Dated: April 22, 2025.

**Marco Rubio,**

*Secretary of State.*

[FR Doc. 2025–07464 Filed 5–2–25; 8:45 am]

BILLING CODE P

## SURFACE TRANSPORTATION BOARD

**[Docket No. FD 36831]**

### Marquette Rail, LLC—Lease and Operation Exemption Including Interchange Commitment—CSX Transportation, Inc.

Marquette Rail, LLC (MQT), a Class III railroad, has filed a verified notice of exemption pursuant to 49 CFR 1150.41 to continue to lease from CSX Transportation, Inc. (CSXT), and operate the following several segments of rail line in Michigan totaling approximately

*ACH Credit*

*Estimated Number of Respondents:* 144.

*Estimated Number of Total Annual Responses:* 144.

*Estimated Time per Response:* 5 minutes.

*Estimated Total Annual Burden Hours:* 12.

## VIII. Suspension of Regulations

For purposes of this test, any provision in title 19 of the CFR including, but not limited to, the provisions found in parts 24, 141, 142, and 143 thereof relating to entry summary filing and processing that are inconsistent with the requirements set forth in this notice are waived for the duration of the test. *See* 19 CFR 101.9(b). This document does not waive any recordkeeping requirements found in 19 CFR part 163 and the Appendix to part 163 (commonly known as the ''(a)(1)(A) list'').

**Susan S. Thomas,**

*Acting Executive Assistant Commissioner, Office of Trade.*

[FR Doc. 2025–19572 Filed 10–15–25; 8:45 am]

BILLING CODE 9111–14–P

## DEPARTMENT OF HOMELAND SECURITY

### Immigration Parole Fee Required by HR–1 Reconciliation Bill

**AGENCY:** U.S. Department of Homeland Security.

**ACTION:** Notice of immigration fee.

**SUMMARY:** The Department of Homeland Security (DHS) is announcing the implementation of the parole fee established in HR–1. Specifically, this notice announces the new immigration parole fee of $1,000 for any alien who is paroled into the United States who does not meet an exception. Through this notice, DHS notifies the public that DHS will begin assessing and collecting this fee as required by HR–1.

**DATES:** This action is effective on October 16, 2025. The parole fee will apply for any alien that has a request for parole filed or pending prior to the effective date of this notice because the fee attaches when an alien is paroled into the United States.

**FOR FURTHER INFORMATION CONTACT:** Contacts for each component:

Office of Regulatory Affairs and Policy, U.S. Immigration and Customs Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536; telephone (202) 732–6960 (not a toll-free call).

Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746, telephone (240) 721–3000 (not a toll-free number).

Office of Field Operations, U.S. Customs and Border Protection, Department of Homeland Security, 1300 Pennsylvania Avenue NW, Suite 1500N, Washington, DC 20229, email address: *parolenotification@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background and Authority

On July 4, 2025, the President signed into law the One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (HR–1). HR–1 was a comprehensive legislative package that changed many laws and added new laws that touch many areas of the United States Government. Among those changes, the law established several new fees related to immigration enforcement and lawful immigration programs.[1] The new immigration fees codified in HR–1 will be imposed on aliens in addition to any other fees authorized by law and by the Secretary of Homeland Security.[2] The fees are set for Fiscal Year (FY) 2025 and are, as established by statute, subject to annual increases based on the Consumer Price Index for All Urban Consumers.[3]

DHS has already issued three notices implementing the new fees.[4] The U.S. Citizenship and Immigration Services (USCIS) notice issued on July 22, 2025, noted that DHS was not announcing the immigration parole fee at that time because the multiple exceptions needed additional consideration.[5] DHS reviewed the exceptions and now believes that the fee can be implemented without further delay. This notice, therefore, implements the immigration parole fee. U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and USCIS will issue appropriate guidance and create or update forms, if necessary.

## II. Parole

The Immigration and Nationality Act (''INA'') confers upon the Secretary of Homeland Security (''Secretary'') the discretionary authority to parole an applicant for admission into the United States ''temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [6] Moreover, an applicant for admission in DHS custody may be released pursuant to a parole under INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), for urgent humanitarian reasons or significant public benefit as long as the alien presents ''neither a security risk nor a risk of absconding.'' [7] When the purpose of the temporary, discretionary parole has been served, the alien is required to ''return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'' [8]

DHS may authorize parole for aliens outside the United States who must travel to a U.S. port of entry to seek parole.[9] However, CBP has final discretionary authority to grant parole to aliens who appear for inspection at a U.S. port of entry.[10] USCIS and ICE have final discretionary authority to grant parole to any alien applicant for admission within their responsibility who is physically present in the United States.[11]

## III. New Immigration Parole Fee

This notice announces the imposition and collection of the new immigration parole fee of $1,000 for FY 2025 pursuant to HR–1. The fee must be paid by ''any alien who is paroled into the United States.'' [12] DHS interprets this to

[1] *See* HR–1, Title X, Subtitle A, Part I, sections 100001 through 100018.

[2] *See id.*

[3] *See id.*

[4] USCIS Immigration Fees Required by HR–1 Reconciliation Bill, 90 FR 34511 (July 22, 2025) (USCIS Notice); CBP Immigration Fees Required by HR–1 for Fiscal Year 2025, 90 FR 42025 (Aug. 28, 2025); and Certain DHS Immigration Enforcement-Related Fees Required by HR–1 Reconciliation Bill, 90 FR 43223 (Sept. 8, 2025).

[5] *See* 90 FR 34511 at 34516.

[6] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole).

[7] 8 CFR 212.5(b).

[8] INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[9] 8 CFR 212.5(f).

[10] *See Memorandum of Agreement Between United States Citizenship and Immigration Services (USCIS), United States Immigration and Customs Enforcement (ICE), and United States Customs and Border Protection (CBP) for the Purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA sec. 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States,* dated Sept. 29, 2008 (relating to USCIS's, ICE's, and CBP's concurrent exercise of parole authority and the framework governing which DHS component is to exercise jurisdiction over parole requests).

[11] *See id.*

[12] See Public Law 119–21 sec. 100004. See Markup of legislative proposals to comply with the reconciliation directive included in section 2001 of the Concurrent Resolution on the Budget for Fiscal Year 2025, H. Con. Res. 14, April 30, 2025, at *https://www.congress.gov/event/119th-congress/house-event/118180* (last visited Sept. 12, 2025) (noting that the legislation is ''a mandate to restore immigration integrity, security, and enforcement'').

mean that each time an alien is granted parole under INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), including initial parole from outside the United States, Congressionally-authorized ''parole in place,'' re-parole, or parole from DHS custody, the fee will be required. The fee will not be due when an application is merely submitted or when a travel document is issued, but rather, DHS will collect the $1,000 fee after it determines that the alien merits a grant of parole as a matter of discretion and the alien either appears for inspection at a port of entry or is already physically present in the United States.

The operative event that triggers the statutory obligation to pay the fee is the actual grant and effectuation of parole at or into the United States—not the filing of an application or request. The timing of the fee attaches when parole is effectuated, regardless of when the underlying application or request was submitted. This means that any parole granted on or after the effective date of this notice must be conditioned on payment of the fee unless an exception applies, even if the request for parole was filed or remained pending prior to October 16, 2025.

HR–1 provides ten exceptions to the $1,000 fee provided the alien establishes to the satisfaction of the Secretary of Homeland Security that the alien is being paroled because of one of the enumerated exceptions:

(1) The alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing; or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted to the United States through the normal visa process;

(2) The alien is the parent or legal guardian of an alien described in paragraph (1) and the alien described in paragraph (1) is a minor;

(3) The alien is needed in the United States to donate an organ or other tissue for transplant; and there is insufficient time for the alien to be admitted to the United States through the normal visa process;

(4) The alien has a close family member in the United States whose death is imminent; and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted to the United States through the normal visa process;

(5) The alien is seeking to attend the funeral of a close family member; and the alien could not arrive in the United States in time to attend such funeral if the alien were to be admitted to the United States through the normal visa process;

(6) The alien is an adopted child who has an urgent medical condition; who is in the legal custody of the petitioner for a final adoption-related visa; and whose medical treatment is required before the expected award of a final adoption-related visa;

(7) The alien is a lawful applicant for adjustment of status under section 245 of the INA (8 U.S.C. 1255); and is returning to the United States after temporary travel abroad;

(8) The alien has been returned to a contiguous country pursuant to section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)); and is being paroled into the United States to allow the alien to attend the alien's immigration hearing;

(9) The alien has been granted the status of Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980 (Pub. L. 96–422; 8 U.S.C. 1522 note); or

(10) The Secretary of Homeland Security determines that a significant public benefit has resulted or will result from the parole of an alien who has assisted or will assist the United States Government in a law enforcement matter; whose presence is required by the United States Government in furtherance of such law enforcement matter; and who is inadmissible or does not satisfy the eligibility requirements for admission as a nonimmigrant or for which there is insufficient time for the alien to be admitted to the United States through the normal visa process.[13]

The HR–1 fee will not be assessed if DHS finds, in its discretion, that the alien has established that the alien is being paroled under one of the ten enumerated exceptions.

## IV. Collection

CBP will collect the parole fee described in this notice for aliens who apply for admission to the United States if (1) the alien requests parole by presenting themselves for inspection at a U.S. port of entry (including aliens who have been authorized by another DHS agency to travel to the port of entry and seek parole); (2) CBP, in its discretion, determines that the alien should be granted parole under INA sec. 212(d)(5)(A); and (3) the alien does not demonstrate, in CBP's discretion, they are eligible for a fee exception pursuant to H.R. 1, Public Law 119–21, 139 Stat. 367–68 (8 U.S.C. 1804). If CBP determines that an alien should be granted parole and the alien is subject to the parole fee described in this notice, CBP will notify the alien of the applicability of the parole fee and provide instructions on how to pay the fee required as of October 16, 2025.

ICE will collect the fee when it grants parole under INA sec. 212(d)(5)(A) to aliens within its responsibility who are physically present in the United States. ICE will individually notify aliens to whom the $1,000 fee applies and, upon notification, provide instructions on how to pay the fee required as of October 16, 2025.

USCIS will collect the HR–1 fee when it grants parole under INA sec. 212(d)(5)(A) to aliens within its responsibility who are physically present in the United States. Beginning on October 16, 2025, when USCIS decides to favorably adjudicate a Form I–131 for parole in place or re-parole for aliens physically present in the United States, USCIS will issue a notice prior to final adjudication stating that the parole approval is conditioned upon payment of the HR–1 parole fee. This notice will contain payment instructions and a deadline. Parole will only be granted after the fee has been paid. Failure to pay within the time period provided in the conditional approval notice would result in denial of the request.

## V. Paperwork Reduction Act

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to be submitted to the Office of Management and Budget (OMB), for review and approval, of any new reporting requirements they impose. The process announced by this notice requires the use of USCIS Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, (OMB control number 1615–0013) but does not require any edits to the form or instructions.

**Kristi Noem,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–19564 Filed 10–15–25; 8:45 am]

BILLING CODE 9112–FP–P

[13] Public Law 119–21 sec. 100004(b).

## POSTAL SERVICE

## International Product Change—Priority Mail Express International, Priority Mail International & First-Class Package International Service Agreements

**AGENCY:** Postal Service.

**ACTION:** Notice.

**SUMMARY:** The Postal Service gives notice of filing requests with the Postal Regulatory Commission to add certain Priority Mail Express International, Priority Mail International & First-Class

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]**

**RIN 1615–ZB99**

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

*https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Colombians

As in the CFRP and HFRP processes, this FRP process for Colombians will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Colombia who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Colombian principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Colombians, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Colombia in the United

---

additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

States. Currently, nationals of Colombia with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

[26] For example, under the May 2023 Department of State Visa Bulletin, a Colombian married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Colombian married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing ''concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### *C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2022 (FY22), migration from Colombia significantly increased, with border enforcement encounters at the SWB more than 20 times greater in FY22 than in the prior year (6,202 in FY21 compared to 125,172 in FY22).[44] Encounters in FY23, through April 2023, were already at more than 107,000.[45] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Colombia to the United States.[46]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[47] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Colombia and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

### *D. Reducing Strain on Limited U.S. Resources*

The increase in monthly encounters of Colombians, from approximately 7,500 per month in the first seven months of Fiscal Year (FY) 2022 to more than 15,300 per month in the first seven months of FY 2023 has contributed to the strain on DHS's reception and processing capacity at the SWB.[48] By establishing a lawful pathway for some of these migrants from Colombia, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[49] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[50]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated

---

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 8, 2023).

[45] *Id.*

[46] U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: Colombia (Apr. 2023) *https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/colombia/;* World Report 2023, Events of 2022 Colombia, Human Rights Watch (Jan. 2023) *https://www.hrw.org/world-report/2023/country-chapters/colombia;* ACAPS, Colombia Humanitarian overview: protection concerns and community protection responses (Nov. 17, 2022), *https://www.acaps.org/sites/acaps/files/products/files/20221117_acaps_colombia_analysis_hub_protection.pdf;* Reuters, More than 15 mln Colombians suffer food insecurity—UN (Feb. 16, 2023) *https://www.reuters.com/world/americas/more-than-15-mln-colombians-suffer-food-insecurity-un-2023-02-16/; see also* Paulina Villegas & Samantha Schmidt, *Two siblings tried reaching the U.S. by sea to reunite with their mother. Only one of them made it,* Wash. Post, Jan. 28. 2022, *https://www.washingtonpost.com/world/2022/01/28/siblings-bahamas-colombia/.*

[47] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[48] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 9, 2023).

[49] As of late May 2023, there are currently an estimated 17,400 Colombian nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Colombian nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[50] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

with irregular migration.[51] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[52] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[53] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic concerns in Colombia, which may be a factor driving the increasing numbers of Colombians crossing the Darién Gap.[54] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[55] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[56]

Additional remittances sent back to Colombia, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[57] Remittances from Colombian migrants already play an important role in the Colombian economy.[58] For the first nine months of 2022, remittances to Colombia increased 9 percent.[59] Additionally, Colombia receives the highest income from remittances in South America.[60] Overall, remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Colombia, potentially impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Colombian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved [61] Form I–130 filed on behalf of a Colombian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Colombian principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Colombia (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United

---

[51] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[52] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[53] *Id.*

[54] The number of Colombians crossing from Colombia into Panama has increased from approximately 300 in January 2023 to over 1,600 in April 2023. Servicio Nacional de Migración de Panamá, Tránsito Irregular por Darién 2023 (last visited June 9, 2023), *https://www.migracion.gob.pa/images/img2023/pdf/IRREGULARES_%20POR_%20DARI%C3%89N_ABRIL_2023.pdf.*

[55] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/*the-economic-and-fiscal-consequences-of-immigration; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[56] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[57] *See* Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf;* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020), *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[58] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[59] The World Bank, *Remittances Grow 5% in 2022, Despite Global Headwinds* (Nov. 30, 2022), *https://www.worldbank.org/en/news/press-release/2022/11/30/remittances-grow-5-percent-2022.*

[60] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[61] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child) [62] of an approved Form I–130, Petition for Alien Relative;

• be a national of Colombia or be a non-Colombian derivative beneficiary spouse or child [63] of a Colombian principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea [64] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[65]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Colombia. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[66]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[67] expedited removal proceedings,[68] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [69] or for an immigrant visa [70] as a result of entering without inspection and not having been admitted or paroled.[71]

### *C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online,

---

[62] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[63] Certain non-Colombians may use this process if they are a derivative beneficiary of a Colombian principal beneficiary and traveling with that Colombian beneficiary.

[64] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[65] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[66] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[67] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[68] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[69] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[70] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[71] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[72] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[73]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

[72] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[73] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[74]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Colombia still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Colombian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### *A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[75] *i.e.,* ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [76] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[77] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [78] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[79] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[80]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[81] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

[74] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[75] 5 U.S.C. 553(b)(A).

[76] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[77] 5 U.S.C. 553(a)(1).

[78] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[79] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[80] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[81] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways which will continue to remain a central topic of bilateral relations.[82] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[83] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[85] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[86]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[87] The goal is to prevent irregular migration to the United States or other places in the hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[88] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[89]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[90] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[91] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[92]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful

[82] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[83] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[84] *Id*

[85] *Id.*

[86] *Id.*

[87] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[88] *Id*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[91] *Id.*

[92] *Id.*

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]**

**RIN 1615–ZC02**

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

## DEPARTMENT OF HOMELAND SECURITY

**[Docket No. CISA–2023–0012]**

## Notice of President's National Infrastructure Advisory Council Meeting

**AGENCY:** Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS).

**ACTION:** Notice of open *Federal Advisory Committee Act* (FACA) meeting; request for comments.

**SUMMARY:** CISA is publishing this notice to announce the following President's National Infrastructure Advisory Council (NIAC) meeting.

**DATES:** *Meeting Registration:* Registration is required to attend the meeting and must be received no later than 5 p.m. eastern standard time (EST) on December 6, 2023. For more information on how to participate, please contact *NIAC@cisa.dhs.gov.*

*Speaker Registration:* Registration to speak during the meeting's public comment period must be received no later than 5 p.m. EST on December 6, 2023.

*Written Comments:* Written comments must be received no later than 5 p.m. EST on December 6, 2023.

*Meeting Date:* The NIAC will meet on December 12, 2023, from 1 p.m. to 4 p.m. EST. The meeting may close early if the council has completed its business.

**ADDRESSES:** The National Infrastructure Advisory Council's open session will be held in-person at 1650 Pennsylvania Ave. NW, Washington, DC; however, members of the public may participate via teleconference only. Requests to participate will be accepted and processed in the order in which they are received. For access to the conference call bridge, information on services for individuals with disabilities, or to request special assistance, please email *NIAC@cisa.dhs.gov* by 5 p.m. EST on December 6, 2023. The NIAC is committed to ensuring all participants have equal access regardless of disability status. If you require a reasonable accommodation due to a disability to fully participate, please contact Celinda Moening at *NIAC@cisa.dhs.gov* as soon as possible.

*Comments:* The council will consider public comments on issues as listed in the **SUPPLEMENTARY INFORMATION** section below. Associated materials for potential discussions during the meeting will be available for review at *https://www.cisa.gov/niac* by December 5, 2023. Comments should be submitted by 5:00 p.m. EST on December 6, 2023 and must be identified by Docket Number CISA–2023–0012. Comments may be submitted by one of the following methods:

• *Federal eRulemaking Portal: www.regulations.gov.* Please follow the instructions for submitting written comments.

• *Email: NIAC@cisa.dhs.gov.* Include the Docket Number CISA–2023–0012 in the subject line of the email.

*Instructions:* All submissions received must include the words ''Department of Homeland Security'' and the Docket Number for this action. Comments received will be posted without alteration to *www.regulations.gov,* including any personal information provided. You may wish to read the Privacy & Security Notice which is available via a link on the homepage of *www.regulations.gov.*

*Docket:* For access to the docket and comments received by the National Infrastructure Advisory Council, please go to *www.regulations.gov* and enter docket number CISA–2023–0012.

A public comment period will take place from 2:30 p.m. to 2:40 p.m. Speakers who wish to participate in the public comment period must email *NIAC@cisa.dhs.gov* to register. Speakers should limit their comments to 3 minutes and will speak in order of registration. Please note that the public comment period may end before the time indicated, depending on the number of speakers who register to participate.

**FOR FURTHER INFORMATION CONTACT:** Celinda Moening, 571–532–4119, *NIAC@cisa.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The NIAC is established under section 10 of E.O. 13231 issued on October 16, 2001, as amended and continued under the authority of E.O. 14109, dated September 30, 2023. Notice of this meeting is given under the Federal Advisory Committee Act (FACA), 5 U.S.C. Ch. 10 (Pub. L. 117–286). The NIAC provides the President, through the Secretary of Homeland Security, advice on the security and resilience of the Nation's critical infrastructure sectors.

*Agenda:* The National Infrastructure Advisory Council will meet in an open session on Tuesday, December 12, 2023, from 1 p.m. to 4 p.m. EST to discuss NIAC activities. The open session will include: (1) a period for public comment; (2) a keynote address on critical infrastructure security and resilience; (3) a report to the Council from the NIAC's Electrification Subcommittee; (4) deliberation and vote on Electrification Subcommittee recommendations; and (5) Additional Topics Discussion.

Dated: November 13, 2023.

**Celinda E. Moening,**

*Alternate Designated Federal Officer, National Infrastructure Advisory Council, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–25348 Filed 11–15–23; 8:45 am]

**BILLING CODE 9110–9P–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2758–23; DHS Docket No. USCIS–2023–0014]**

**RIN 1615–ZC07**

## Implementation of a Family Reunification Parole Process for Ecuadorians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Ecuadorians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole (FRP) process for Ecuadorians. Under this process, certain Ecuadorian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Ecuador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and to reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a

Supporter and Declaration of Financial Support, for this process on November 16, 2023.

**FOR FURTHER INFORMATION CONTACT:**

Dhpp René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Ecuadorian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing an avenue for certain Ecuadorians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to collaboratively manage migration with its partners in the Western Hemisphere.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of noncitizens encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of access to lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. On October 12, 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[8] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[9] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, would be subject to expulsion or removal.[10] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the existing parole process for Venezuelans to allow for its continued operation.[11]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[12] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[13]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program [14] and

---

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order (E.O.) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021) *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2, 4.

[4] *See* National Security Council (NSC), *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[9] *See id.*

[10] *Id.*

[11] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[12] 88 FR 31314 (May 16, 2023).

[13] *See id.* at 31325.

[14] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. *See* U.S. Department of State, Restarting the Central American Minors Program, March 10, 2021, *https://www.state.gov/restarting-the-central-american-minors-program/* (last visited Aug. 3, 2023). In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). *See* U.S. Department. of State, Joint

Continued

expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[15] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for noncitizens in the region while enhancing worker protections.[16]

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to noncitizens who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Secretary of Homeland Security (the Secretary) has the discretionary authority under the Immigration and Nationality Act (INA) to parole an applicant for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [17] Parole is not an admission of the noncitizen to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[18] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[19] DHS may terminate parole upon notice in its discretion at any time.[20] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[21]

Past Secretaries have similarly exercised parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, Cuban Family Reunification Parole (CFRP) as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Forms I–130.[22] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[23] Similarly, in 2014, Haitian Family Reunification Parole (HFRP) was established, which allows USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[24] On July 10, 2023, DHS announced the implementation of four new FRP processes for certain nationals from Colombia, El Salvador, Guatemala, and Honduras, and their immediate family members, who have approved family-based petitions filed on their behalf by a U.S.C. or LPR.[25] On August 11, 2023, DHS announced updates to modernize the CFRP and HFRP processes by adopting the new, mostly

Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central America Minors Program, June 15, 2021, *https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/* (last visited Aug. 3, 2023). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[15] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration;* U.S Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/*.

[16] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were reserved for nationals of the NCA countries and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[17] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[18] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[19] *See* 8 CFR 212.5(c).

[20] *See* 8 CFR 212.5(e).

[21] *See* 8 CFR 274a.12(c)(11).

[22] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[23] *Id.*

[24] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

[25] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

Case 1:25-cv-10495-IT Document 246-1 Filed 01/16/26 Page 208 of 1448



online, processing steps implemented for the four new FRP processes.[26]

**III. The FRP Process for Ecuadorians**

As in all other FRP processes, the FRP process for Ecuadorians will allow U.S.C. and LPR petitioners who have been invited to file a request and initiate this process for certain eligible family members to receive advance authorization to travel to the United States to seek parole at an interior POE (*i.e.,* an airport). Individuals who are eligible to be considered for parole under this process include nationals of Ecuador who are principal beneficiaries of approved Form I–130 family-based immigrant petitions, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. This process requires that the Form I–130 petitioner first receive an invitation to be able to initiate the process on behalf of the Form I–130 principal beneficiary and their immediate family members. As in other FRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If U.S. Customs and Border Protection (CBP) issues an advance authorization to travel to a beneficiary, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the other FRP processes. If paroled into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with all parole requests, under this FRP process for Ecuadorians, parole will be authorized only on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

**IV. Justification for the Process—Significant Public Benefit**

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens who are beneficiaries of approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

*A. Promoting Family Unity*

The case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite in the United States with their family members from Ecuador. Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[27] While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to choose irregular migration in the absence of an alternative, near-term path to come to the United States for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the expeditious reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

[26] *See* Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).

[27] For example, under the October 2023 Department of State Visa Bulletin, an Ecuadorian unmarried son or daughter of a U.S.C.—F1 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 8 years ago. *See* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.* However, these dates are not predictive. Due to increases in volume of Form I–130 filings, an Ecuadorian unmarried son or daughter of a U.S.C. for whom a Form I–130 is filed today will likely have an even longer wait before an immigrant visa becomes available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[28] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[29] establishing SMOs in key locations throughout the Western Hemisphere,[30] joining Mexico to announce and develop a humanitarian plan on migration,[31] issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America,[32] and, most recently, announcing full support for an initiative that the Government of Mexico plans to start in southern Mexico to offer new refugee and labor pathways.[33] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively, at great financial, staffing, and domestic political costs, to: (1) create and expand access to lawful pathways in their respective countries, (2) increase enforcement measures along the migratory routes, and (3) introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Implementation of this FRP process is one response to such requests and, thereby, will build goodwill with regional partners and secure cooperation and strengthen bilateral relations in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger foreign policy objectives of this Administration and fits within a framework of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[34] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[35] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[36] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in Spring 2023 as the date on which the CDC Title 42 public health Order[37] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[38] For instance, on April 11, 2023, consistent with the spirit of the L.A. Declaration, in anticipation of the end of the Title 42 public health Order, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[39] Implementing this process fulfills one of the commitments the United States made with its regional partners to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.''[40]

The United States also continues to encourage regional governments to continue to expand lawful pathways for migrants, including providing legal status to migrants residing in their countries, as well as to establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[41] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.

[28] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[29] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[30] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/;* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/;* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[31] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[32] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[33] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/.*

[34] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[35] *Id.*

[36] *Id.*

[37] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[38] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing ''concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[39] *Trilateral Joint Statement,* Apr. 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[40] *See id.*

[41] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—U.S. Department of State (''Blinken-Mayorkas Joint Press Availability''), Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43]

Expanding cooperation with Ecuador can help achieve migration goals within Ecuador, regionally, and around the globe.[44] Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities,[45] providing life-saving assistance to Venezuelan and Colombian refugees and migrants within its borders, and strengthening its border security and controls.[46] Ecuador, along with Costa Rica, Belize, and Peru, is undertaking efforts to regularize migrants from Venezuela and Nicaragua.[47] Ecuador's program for Venezuelans in the country has provided an opportunity for stability and integration for more than 500,000 displaced Venezuelans.[48] Furthermore, establishing an FRP process for certain nationals of Ecuador furthers the USG's efforts to set up SMOs in Ecuador. As part of ongoing negotiations over the establishment of SMOs in Ecuador, the Government of Ecuador has repeatedly emphasized the critical importance of lawful pathways to the United States for nationals of Ecuador, including labor and family reunification pathways.[49] After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador to guide migrants and refugees towards lawful migration pathways.[50]

### *C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2023 (FY23), CBP encounters with Ecuadorians totaled 117,487 as compared to 24,936 encounters in FY22, a 371% increase.[51] In FY21, CBP encountered a total of 97,074 Ecuadorian nationals, and in all of FY20, CBP encountered 12,892 Ecuadorian nationals.[52] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Ecuador to the United States.[53]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[54] While beneficiaries of this FRP process will still need to wait to apply to become an LPR, it will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Ecuador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration.

### *D. Reducing Strain on Limited U.S. Resources*

Increases in irregular migration from Ecuador have strained DHS's reception and processing capacity at the SWB. From FY20 to FY23, encounters of Ecuadorians at the SWB totaled approximately 252,389.[55] By establishing a lawful pathway for some nationals of Ecuador and their immediate family members, on a case-by-case basis, to be paroled into the United States before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB. This would thereby provide a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of noncitizens to interior POEs.

Paroling noncitizens through this process will be significantly less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, preserving space and resources for managing irregular migration.

Furthermore, by establishing a meaningful, near-term lawful pathway that certain noncitizens, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to

---

[42] *See id.*

[43] *See id.*

[44] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf.*

[45] Ministry of Foreign Affairs of Ecuador, LISTA DE PAÍSES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023). Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan. The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.

[46] *Id.*

[47] *See supra* note 41.

[48] The White House, Readout of Los Angeles Declaration Implementation Launch, Sept. 27, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/27/readout-of-los-angeles-declaration-implementation-launch/.*

[49] *See, e.g.,* The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023. Gustavo Manrique: ''Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar'' (Gustavo Manrique: ''We are in dialogue with the U.S. so that migrants can have family reunification''), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[50] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[51] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

[52] *Id.*

[53] Genevieve Glatsky and José María León Cabrera, *Security is the Main Worry as Ecuador Votes on Sunday. Here's What to Know,* New York Times, Aug. 20, 2023, *https://www.nytimes.com/2023/08/20/world/americas/ecuador-election-assassination-explainer.html;* Genevieve Glatsky and José María León Cabrera, *How Narco Traffickers Unleashed Violence and Chaos in Ecuador,* New York Times, Aug 17, 2023, *https://www.nytimes.com/2023/08/17/world/americas/ecuador-drug-trafficking-election.html?searchResultPosition=16;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sep. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[54] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.*

[55] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

enter the United States irregularly, the process could redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the Northern Central America region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[56] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[57] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[58] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and non-governmental organizations along the SWB. Beneficiaries will be required to fly at their own expense to an interior POE, rather than arriving at the SWB and transiting through border communities. Beneficiaries will only be authorized to come to the United States if they have a U.S.-based supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries will also be immediately eligible to apply for employment authorization, enabling them to support themselves.

### *E. Addressing Root Causes of Migration Through Remittances*

The case-by-case parole into the United States of noncitizens under this FRP process will also serve a significant public benefit by aiding U.S. efforts to address economic insecurity in Ecuador, which is a key factor that drives out-migration.[59] Unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that, if granted, they may maintain throughout the duration of their parole period, allowing them to support themselves and to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[60] Noncitizens with employment authorization also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[61]

Additional remittances sent back to Ecuador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[62] In total, remittances sent to Ecuador amounted to $603.97 million in 2021, a significant contribution to development in communities in Ecuador.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Ecuador, impacting individual decisions on whether to leave the country. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, noncitizens are more likely to turn to irregular migration in the short-term.

## V. Eligibility

### *A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of an Ecuadorian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of an Ecuadorian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf

[56] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019), *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[57] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[58] *Id.*

[59] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sept. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[60] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[61] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[62] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf;* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[63] Statista, Personal remittances paid in Ecuador from 1999 to 2021, *https://www.statista.com/statistics/1390805/personal-remittances-paid-ecuador/#:~:text=The%20personal%20remittances%20paid%20in,have%20been%20subject%20to%20fluctuation* (last visited July 6, 2023). *See also* The World Bank, Data, GDP (current US$)—Ecuador, *https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?end=2021&locations=EC&start=2019* (last visited July 31, 2023), which indicates that the 2021 GDP for Ecuador was 106.17 billion US dollars.

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

of an Ecuadorian principal beneficiary of an approved Form I–130, and separate requests for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of their parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationships between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Ecuador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE under this process, a beneficiary must:

• Be outside the United States;

• Be the principal beneficiary (or a derivative beneficiary spouse or child)[65] of an approved Form I–130, Petition for Alien Relative;

• Be a national of Ecuador or be a non-Ecuadorian derivative beneficiary spouse or child[66] of an Ecuadorian principal beneficiary;

• Have a petitioning relative in the United States who received an invitation to initiate this FRP process on the beneficiary's behalf by filing a Form I–134A;

• Have a U.S.-based petitioning relative who filed a Form I–134A on the beneficiary's behalf that USCIS has vetted and confirmed;

• Have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• Have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting by CBP prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting and collection of additional biometrics at the POE by CBP upon inspection, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary approvals of advance authorization to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary has:

• Crossed irregularly into the United States, between POEs, after November 16, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• Been interdicted at sea[67] after November 16, 2023; or

• Been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on urgent humanitarian reasons or significant public benefit, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Ecuador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after November 16, 2023, rather than being considered for parole under this process, will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs may become ineligible for adjustment of status[72] or for an immigrant visa[73] as a result of

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Ecuadorians may use this process if they are a derivative beneficiary of an Ecuadorian principal beneficiary and traveling with that Ecuadorian beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] INA secs. 275 and 276, 8 U.S.C. 1325 and 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c)(2), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

entering without inspection and not having been admitted or paroled.[74]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned from the original CFRP and HFRP programs and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except certain medical requirements, and the ultimate parole determination made in person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner be permitted to file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134a Online To Initiate This Process

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries may submit a Form I–134A for each beneficiary with USCIS through the USCIS online system to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, then the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, then the beneficiary named on the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through USCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole under this process and will be processed consistent with established policy and procedure. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis in the exercise of discretion for urgent humanitarian reasons or significant public benefit, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions of parole or other derogatory information emerges during the parole period.

### *D. Termination and No Private Rights*

As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This process is being implemented as a matter of the Secretary's discretion, and the Secretary retains the sole discretion to terminate this FRP process at any point. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, benefits, substantive or procedural, enforceable by any party in any matter, civil or criminal, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## VI. Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes or forms such as parole-related employment authorization applications. Beneficiaries who are paroled into the United States under this FRP process may have to wait before being authorized to work in the United States, depending on the amount of time it takes USCIS to process beneficiaries' requests for employment authorization.[77] However, the impact of that waiting period is to some extent mitigated by the requirements of this process. Beneficiaries may not be paroled under this process unless their Form I–130 petitioner has filed on their behalf to initiate the FRP process, requesting to be a supporter and declaring their ability to financially support the beneficiary. As noted above, the petitioner must provide evidence to demonstrate their ability to support the beneficiary or must include similar evidence establishing that with the help of a co-supporter, they have the financial means to support the beneficiary.

Although personnel and resources may be diverted from other similar processes and programs or for the adjudication of forms such as parole-related employment authorization applications, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure as resource limitations require. Therefore, for the processing of employment authorization applications, for example, the adjudication burden on USCIS can be controlled and limited as needed under this FRP process. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. As explained in detail above, DHS has determined that there are significant public benefits of the case-by-case parole of noncitizens under this process. DHS also recognizes there are costs that may be incurred, such as for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants). Ultimately, DHS has determined that the significant public benefits of the case-by-case parole of noncitizens under this FRP process to the United States, and to other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, justify the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence.[78]

Alternatively, as discussed below, a decision to forego establishing this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation from foreign partners with respect to removals and ensure continued collaboration on migration management. In addition, certain nationals of Ecuador still waiting for their immigrant visas to become available would remain separated from their family members for an extended period of time and could resort to irregular migration without this process. For any such Ecuadorian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of noncitizens living in the United States without authorization, unable to legally seek employment. The states in which they settle may be less likely to benefit from additional tax revenues and other positive economic contributions these noncitizens would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### *A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

[76] 8 CFR 274a.12(c)(11).

[77] USCIS, Check Case Processing Times, *https://egov.uscis.gov/processing-times/* (last visited Oct. 25, 2023). This website provides the approximate processing time a parolee can expect when filing Form I–765, Application for Employment Authorization.

[78] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

First, DHS is merely adopting a general statement of policy,[79] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [80] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

Second, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[81] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [82] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[83]

This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure our partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] Since the April 27, 2023 announcement,[85] the United States has engaged in ongoing negotiations to implement the announced initiatives in close coordination with regional partners including establishing SMOs in Colombia, Guatemala, and Costa Rica as part of its strategy to manage migration collaboratively in the Western Hemisphere.

As with the four recently implemented FRP processes and the modernization of the CFRP and HFRP processes, delaying issuance and implementation of this process to undertake rulemaking would complicate broader discussions and ongoing negotiations with key foreign partners about migration management. Ongoing negotiations with regional partners involve the implementation of a range of new measures, including establishing SMOs in key locations throughout the Western Hemisphere to manage and reduce irregular migration and improve qualified noncitizens' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including FRP processes that will benefit nationals in countries identified to host SMOs.

Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities. To that end, Ecuador unilaterally has taken two very critical actions to prevent certain nationalities from abusing Ecuador's visa regime to irregularly travel to the Western Hemisphere. Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan.[86] The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.[87] While Ecuador is taking this action unilaterally, representatives of the Government of Ecuador have emphasized the critical importance of availability of lawful pathways for Ecuadorian nationals, including labor pathways and processes for nationals of Ecuador to reunify with their family members in the United States.[88] Similarly, Foreign Minister Gustavo Manrique shared with local press that Ecuador is negotiating with the United States on hosting SMOs and noted their position on family reunification and labor pathways for Ecuadorians.[89] After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador.[90] In DHS's judgment, the delay associated with a public rulemaking process involving notice and comment and a delayed effective date would negatively impact ongoing efforts to operationalize SMOs in Ecuador to channel migrants to lawful pathways.

Such a delay would also be inconsistent with the dispatch with which DHS has appropriately implemented other FRP processes. Such processes support a series of efforts that the United States has been pursuing in the hemisphere to increase the availability of lawful pathways for migration and involve additional countries with destination pathways and as host countries for certain processing initiatives. The ability to implement such processes rapidly is critical for supporting the Administration's overall goals as part of these efforts, which include multi-faceted negotiations with a range of regional partners.

For instance, on May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that

[79] 5 U.S.C. 553(b)(A).

[80] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[81] 5 U.S.C. 553(a)(1).

[82] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[83] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[85] *Id.*

[86] Ministry of Foreign Affairs of Ecuador, LISTA DE PAÍSES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023).

[87] *Id.*

[88] The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023.

[89] Gustavo Manrique: "Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar" (Gustavo Manrique: "We are in dialogue with the US so that migrants can have family reunification"), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[90] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, which will continue to remain a central topic of bilateral relations.[91] Specifically, the United States stated its intention to welcome as many as 100,000 noncitizens from El Salvador, Guatemala, and Honduras under the FRP processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success.[92] Mexico concurrently agreed to continue to implement the joint initiative whereby the United States provides a lawful pathway through parole for nationals of Cuba, Haiti, Nicaragua, and Venezuela, while Mexico would accept the return of certain third-country migrants on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.[93]

Similarly, on July 28, 2023, building on a series of successful lawful pathway initiatives the United States and the Government of Mexico agreed to launch last year,[94] the United States announced additional steps to expand access to safe, orderly, and lawful pathways for migration.[95] On July 28, the United States noted its full support to the Government of Mexico of efforts to establish international multipurpose space in Mexico to offer protection and labor pathways, including accepting refugee resettlement referrals to the U.S. Refugee Admissions Program from qualified noncitizens from Cuba, Haiti, Nicaragua, and Venezuela.[96] The United States and the Government of Mexico are working to implement this new commitment to expand access to lawful pathways. As stated in the **Federal Register** Notices implementing family reunification processes for certain nationals of Colombia,[97] El Salvador,[98] Guatemala,[99] and Honduras,[100] a delay in implementation of the U.S. commitment on family reunification pathways risks undermining Mexico's commitments, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[101] As the first step of a comprehensive program to manage irregular migration, both countries are implementing a six-month pilot phase of SMOs.[102] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[103] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[104]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[105] The Safe Mobility initiative launched in Colombia on June 28, 2023, with SMOs currently operational in three cities throughout the country. SMOs in Colombia serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[106] The U.S. government also reaffirmed its commitment to expand lawful pathways for Colombians with temporary work visas and expanded family reunification.[107]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, launched an exploratory six-month implementation of SMOs.[108] SMOs in Costa Rica serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[109] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[110]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate ongoing negotiations with the Government of Ecuador, specifically, and overall U.S. efforts to manage migration together with foreign partners. Because this FRP process is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining partner countries' multilateral and unilateral efforts, and in the case of Ecuador, putting at risk multiple efforts, including the United States' ability to continue SMO operations in Ecuador and Ecuador's willingness to unilaterally impose certain visa restrictions, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would

---

[91] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[92] *Id.*

[93] *Id.*

[94] *See* The White House, Remarks by President Biden and President López Obrador of Mexico Before Bilateral Meeting, July 12, 2022, *https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/12/remarks-by-president-biden-and-president-lopez-obrador-of-mexico-before-bilateral-meeting-2/.*

[95] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/.*

[96] *Id.*

[97] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023).

[98] *See* Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[99] *See* Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

[100] *See* Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[101] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[106] *Id.*

[107] *Id.*

[108] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[109] *Id.*

[110] *Id.*

adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals. In diplomatic engagements, regional partner countries have repeatedly requested additional lawful pathways in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. As encounters of Ecuadorians along the SWB have remained high compared to the same months last year, maintaining and expanding their cooperation on removals is necessary to effectively manage irregular migration. Demographics and dynamics are evolving and difficult to predict, requiring flexibility in the responses of all governments involved. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption here is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[111] DHS similarly invoked the foreign affairs exemption more recently in connection with the CHNV parole processes[112] and family reunification parole processes for certain nationals of Colombia, El Salvador, Guatemala, and Honduras announced on July 10, 2023.[113]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Ecuadorians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143); the revision to the ATA collection will add Ecuador to the list of countries authorized to utilize ATA. USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization for OMB approval of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. USCIS and CBP will issue respective **Federal Register** notices seeking comment on these changes.[114]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–25313 Filed 11–15–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7075–N–14]**

## 60-Day Notice of Proposed Information Collection: Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion OMB Control No.: 2528–0328

**AGENCY:** Office of Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* January 16, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal.

Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting, ''Currently under 60-day Review—Open for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Anna Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email; *Anna.P.Guido@hud.gov;* telephone (202) 402–5535 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

### A. Overview of Information Collection

*Title of Information Collection:* Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion.

*OMB Approval Number:* 2528–0328.

*Type of Request:* Extension of currently approved collection.

*Form Number:* N/A.

*Description of the need for the information and proposed use:* The Office of Policy Development and Research (PD&R), at the U.S. Department of Housing and Urban Development (HUD), is proposing this collection of information for the

[111] *See* Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[112] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[113] *See* DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras, July 17, 2023, *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala;* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); and Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[114] Per the normal clearance procedures at 5 CFR 1320.10(e).

changes to their current operations and will remain in effect through July 31, 2024.

CDC has further determined that good cause exists for a one-year extension of the temporary suspension through July 31, 2024, to address public health concerns regarding importation of dogs infected with rabies. Moreover, in parallel to this notice announcing the extension of the temporary suspension, CDC is proposing a rule revising entry requirements to address these concerns regarding importation of rabid dogs and fraudulent vaccination documentation. The proposed rule outlines a framework and set of operations that would mitigate the need for further extensions of the temporary suspension, should these procedures be adopted. In consideration of both the anticipated needs for global rabies vaccine campaigns to return to pre-pandemic levels and to avoid disruption to importers' and the travel industry's operations, CDC has determined that a one-year extension of the temporary suspension through July 31, 2024, is required to protect the public's health and is therefore in the public's interest. In the absence of further extension of the temporary suspension, dog importation requirements would return to procedures that proved inadequate to prevent the import of rabid dogs into the United States. A one-year extension provides time for CDC to continue to build a robust dog importation system while global rabies vaccination efforts continue to rebound. It will also avoid potential public confusion regarding changing dog importation requirements and better address the needs of importers, the animal care and transport industry, and Federal partners who have indicated they would need time to adequately prepare for any changes to their current operations. The proposed rule published in parallel with this extension provides an opportunity for public comment and input on any new procedures.

This temporary suspension will enter into effect on August 1, 2023, and remain in effect through July 31, 2024, unless modified or rescinded by the CDC Director based on public health or other considerations.

**Kathryn Wolff,**

*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2023–14342 Filed 7–6–23; 4:15 pm]

**BILLING CODE 4163–18–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2751–23; DHS Docket No. USCIS–2023–0008]**

**RIN 1615–ZC01**

## Implementation of a Family Reunification Parole Process for Guatemalans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Guatemalans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Guatemalans. Under this process, certain Guatemalan principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Guatemala to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Guatemalan nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Guatemalans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program; [15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Guatemalans

As in the CFRP and HFRP processes, this FRP process for Guatemalans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Guatemala who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Guatemalan principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Guatemalans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Guatemala in the United States. Currently, nationals of Guatemala with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26]

DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

[26] For example, under the May 2023 Department of State Visa Bulletin, a Guatemalan married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for

Continued

While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process

May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Guatemalan married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing ''concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order''''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Guatemalans at the SWB increased by about 112 percent as compared to FY18, and 4.8 percent as compared to FY19, with encounters totaling approximately 283,000 in FY21 as compared to 133,200 and 270,100 in FY18 and FY19, respectively.[44] Encounters with Guatemalans dropped in FY22, but still remained high with 231,500 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Guatemalans accounting for approximately 11.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Guatemala, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Guatemala and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from Guatemala, has strained DHS's reception and processing capacity at the SWB.[49] By establishing a lawful pathway for some of these migrants from Guatemala, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit

---

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] *See* Migration Policy Institute, Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story, (Oct. 2022) *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[50] As of late May 2023, there are currently an estimated 12,800 Guatemalan nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Guatemalan nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022)

Continued

irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Guatemala, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Guatemala, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Guatemala already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 12 percent of Gross Domestic Product (GDP) in Guatemala.[60] Remittances remained stable in 2019, at 13.8 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Guatemala specifically, remittances were equivalent to 18 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Guatemala, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Guatemalan principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Guatemalan principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Guatemalan principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Guatemala (or their immediate family member of any nationality) who is outside the United States and who may

*https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Guatemala, Apr. 29, 2022, *https://www.state.gov/wp-content/uploads/2022/08/ICS_WHA_Guatemala_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration*; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, U.S. Strategy for Engagement in Central America: Policy Issues for Congress (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—Guatemala (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=GT.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or USC), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
- be a national of Guatemala or be a non-Guatemalan derivative beneficiary spouse or child [66] of a Guatemalan principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea [67] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Guatemala. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

### *C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process,

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Guatemalans may use this process if they are a derivative beneficiary of a Guatemalan principal beneficiary and traveling with that Guatemalan beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the USC or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the individual is a discretionary, case-by-case determination made by CBP at the time the individual arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Guatemala still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Guatemalan nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### *A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]**

**RIN 1615–ZB99**

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]**

**RIN 1615–ZC02**

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Hondurans

As in the CFRP and HFRP processes, this FRP process for Hondurans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Honduras who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Honduran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Hondurans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Honduras in the United States. Currently, nationals of Honduras with approved family-based petitions often wait many years before their immigrant visas can be issued and they

---

for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased

[26] For example, under the May 2023 Department of State Visa Bulletin, a Honduran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Honduran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Hondurans at the SWB were 262 percent of the FY18 level and over 22 percent as compared to FY19, with encounters totaling approximately 319,200 in FY21 as compared to approximately 88,100 and 261,000 in FY18 and FY19, respectively.[44] Encounters of Hondurans dropped in FY22, but still remained high with about 212,900 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Hondurans accounting for approximately 11.4 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, gang violence, corruption, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Honduras, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Honduras and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from Honduras, has strained DHS's reception and processing capacity at the SWB. Between FY20 and May 2023, encounters of Hondurans at the SWB exceeded half a million.[49] By establishing a lawful pathway for some of these migrants from Honduras, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] CBP, Nationwide Encounters (last visited June 9, 2023); *https://www.cbp.gov/newsroom/stats/nationwide-encounters.* Total SWB encounters between FY20 and May 2023 sum to 662,470 as of date accessed.

[50] As of late May 2023, there are currently an estimated 10,700 Honduran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Honduran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Honduras, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Honduras, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Honduras already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 20 percent of Gross Domestic Product (GDP) in Honduras.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Honduras specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Honduras, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Honduran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved [64] Form I–130 filed on behalf of a Honduran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Honduran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Honduras, April 4, 2022, *https://www.state.gov/wp-content/uploads/2022/06/ICS_WHA_Honduras_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] USAID, Economic Analysis of the Honduras Remittances Ecosystem: An Assessment of the Role Remittances have on Financial Inclusion and Development Outcomes (2022) *https://pdf.usaid.gov/pdf_docs/PA00Z69J.pdf.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Honduras (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
- be a national of Honduras or be a non-Honduran derivative beneficiary spouse or child [66] of a Honduran principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process.

CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea [67] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Honduras. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Hondurans may use this process if they are a derivative beneficiary of a Honduran principal beneficiary and traveling with that Honduran beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP.All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case by case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Honduras still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Honduran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[86] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration.* See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

BILLING CODE P

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]**

**RIN 1615–ZC00**

## Implementation of a Family Reunification Parole Process for Salvadorans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

BILLING CODE P

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]**

**RIN 1615–ZC00**

## Implementation of a Family Reunification Parole Process for Salvadorans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

[1] Throughout this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age'').

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

*of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022)

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Salvadorans

As in the CFRP and HFRP processes, this FRP process for Salvadorans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of El Salvador who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Salvadoran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Salvadorans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### *A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family

(authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

members from El Salvador in the United States. Currently, nationals of El Salvador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

[26] For example, under the May 2023 Department of State Visa Bulletin, a Salvadoran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Salvadoran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing ''concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Salvadorans at the SWB increased by about 168 percent as compared to FY18, and about 7.0 percent as compared to FY19, with encounters totaling approximately 98,600 in FY21 as compared to 36,800 and 92,200 in FY18 and FY19, respectively.[44] In FY22, the encounters remained at the high levels of the previous fiscal year, with 97,000 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Salvadorans accounting for approximately 4.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including El Salvador, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of El Salvador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from El Salvador, has strained DHS's reception and processing capacity at the SWB. Between FY20 and April 2023, encounters of Salvadorans at the SWB totaled approximately a quarter million.[49] By establishing a lawful pathway for some of these migrants from El Salvador, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] CBP, Nationwide Encounters (last visited June 9, 2023) *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[50] As of late May 2023, there are currently an estimated 32,600 Salvadoran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Salvadoran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in El Salvador, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to El Salvador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including El Salvador already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to nearly 21 percent of Gross Domestic Product (GDP) in El Salvador.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In El Salvador specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in El Salvador, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Salvadoran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Salvadoran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Salvadoran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review

---

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—El Salvador, Apr. 21, 2023, *https://www.state.gov/wp-content/uploads/2023/04/ICS_WHA_El-Salvador_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—El Salvador (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=SV.*

[62] *Id.; also see* Bloomberg Línea, *Remittances to Central America on Track to Break Records* (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of El Salvador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
- be a national of El Salvador or be a non-Salvadoran derivative beneficiary spouse or child [66] of a Salvadoran principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea [67] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in El Salvador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child,'' in general, as meaning ''an unmarried person under twenty-one years of age''). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such ''add-on derivatives'' are included within the term ''derivative'' in this notice.

[66] Certain non-Salvadorans may use this process if they are a derivative beneficiary of a Salvadoran principal beneficiary and traveling with that Salvadoran beneficiary.

[67] For purposes of this notice, ''interdicted at sea'' refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP.All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the Poe

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

---

periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of El Salvador still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Salvadoran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question ''is clearly and directly involved in a foreign affairs function.'' [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in ''definitely undesirable international consequences,'' some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/* the-economic-and-fiscal-consequences-of-immigration.

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Salvadorans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14475 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–R7–ES–2023–0008; FF07CAMM00–FX–ES111607MRG01]**

### Marine Mammals; Letters of Authorization To Take Pacific Walruses and Polar Bears in the Beaufort Sea, Alaska, in 2022

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of issuance.

**SUMMARY:** In accordance with the Marine Mammal Protection Act of 1972, as amended, the U.S. Fish and Wildlife Service issued letters of authorization (LOA) for the nonlethal take of polar bears and Pacific walruses incidental to oil and gas industry exploration, development, and production activities in the Beaufort Sea and the adjacent northern coast of Alaska in 2022. This notice announces the LOAs issued in calendar year 2022. The LOAs stipulate conditions and methods that minimize impacts to polar bears and Pacific walruses from these activities.

**ADDRESSES:** *Document availability:* You may view the letters of authorization at *https://www.regulations.gov* under Docket No. FWS–R7–ES–2023–0008, or you may request them from the contact in **FOR FURTHER INFORMATION CONTACT.**

**FOR FURTHER INFORMATION CONTACT:** Charles Hamilton, via U.S. mail at Marine Mammals Management, U.S. Fish and Wildlife Service, MS 341, 1011 East Tudor Road, Anchorage, AK 99503; by email at *R7mmmRegulatory@fws.gov,* or by telephone at 1–800–362–5148. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On August 5, 2021, the U.S. Fish and Wildlife Service (Service) published in the **Federal Register** a final rule (86 FR 42982) establishing regulations that allow us to authorize the nonlethal, incidental, unintentional take of small numbers of polar bears (*Ursus maritimus*) and Pacific walruses (*Odobenus rosmarus divergens*) during year-round oil and gas industry exploration, development, and production activities in the Beaufort Sea and adjacent northern coast of Alaska. These incidental take regulations are located in subpart J in part 18 of title 50 of the Code of Federal Regulations (CFR) and are effective through August 5, 2026. The rule prescribed a process under which we issue letters of authorization (LOA) to applicants conducting activities as described under the provisions of the regulations.

Each LOA stipulates conditions or methods that are specific to the activity and location. Holders of the LOAs must use methods and conduct activities in a manner that minimizes to the greatest extent practicable adverse impacts on Pacific walruses and polar bears and their habitat, and on the availability of these marine mammals for subsistence purposes. No intentional take or lethal incidental take is authorized under these regulations.

In accordance with section 101(a)(5)(A) of the Marine Mammal Protection Act (16 U.S.C. 1361 *et seq.*) and our regulations at 50 CFR part 18, subpart J, in 2022, we issued LOAs to the companies in the Beaufort Sea and adjacent northern coast of Alaska shown in the table. The Service includes in the table all LOAs issued in 2022.

procedural updates announced in this notice.

**III. Regulatory Requirements**

*A. Administrative Procedure Act*

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

BILLING CODE 9111–97–P ; 9111–14–P

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release ''DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras'' (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In 2007, U.S. Citizenship and Immigration Services (USCIS) launched CFRP in furtherance of the United States' commitment under the U.S.-Cuba Migration Accords[1] to direct Cuban migration into lawful, safe, and orderly channels and to continue regular review of the migration situation and proper implementation of the Accords.[2] Under CFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Cuba who are the beneficiaries of an approved Form I–130, Petition for Alien Relative.[3]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[4] If granted parole into the United States, CFRP parolees may apply for employment authorization while they wait to apply to adjust to LPR status.[5] Unlike parolees under similar family reunification parole (FRP) processes, CFRP beneficiaries may apply for adjustment one year after their parole into the United States under the Cuban Adjustment Act.[6] They do not need to wait for their immigrant visas to become available to apply for adjustment.[7]

Beneficiaries must have a petitioner who filed a Form I–130 on behalf of a principal beneficiary and has been invited to participate in the CFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's Form I–130 must be a Cuban national. Consistent with a **Federal Register** notice updating the CFRP process in 2014, beginning February 17, 2015, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary.[8] Also consistent with that notice, USCIS required that USCIS officers or U.S. Department of State (State) consular officers interview beneficiaries in Havana, Cuba, to verify their eligibility for the program.[9] If USCIS issued a travel document to a given beneficiary, that individual could then travel to the United States to seek parole.

In May 2022, the United States announced the resumption of CFRP operations following suspension of CFRP interviews in September 2017[10] and closure of the USCIS Havana Field Office on December 10, 2018.[11] In August 2022, USCIS began mailing CFRP interview notices to petitioners with instructions for the beneficiary interview. On August 18, 2022, USCIS restarted interviews at the U.S. Embassy in Cuba. However, USCIS has had limited capacity to conduct interviews due to operational constraints in Cuba. Specifically, while both State and USCIS are working to fully resume operations in Havana, these efforts are taking time to fully realize, which is one reason DHS is implementing these operational changes. Furthermore, the economic and political crisis in Cuba, which has been marked by food shortages, rolling blackouts, and countrywide internet outages,[12] impacts the USG capacity to process parole requests in Cuba for Cuban nationals and their immediate family members[13] under CFRP.

In short, interview capacity limitations in Cuba, resource constraints within DHS and State, and the pending application caseload have made the process inefficient and inaccessible to many beneficiaries in Cuba. Many applications are pending, and no new invitations to access CFRP have been sent since August 23, 2016.

In the meantime, technology has evolved since the launch of the CFRP process in 2007. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for CFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to CFRP but that follow different procedures that utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 CFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented FRP processes for certain Colombians,[14] Guatemalans,[15]

---

[1] *See generally* U.S. Department of State archived website on Cuban migration, *https://1997-2001.state.gov/regions/wha/cuba/migration.html.* Under the Accords, the United States committed itself to total legal migration to the United States from Cuba of a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens (USCs). *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) as the U.S.-Cuba Migration Accords).

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 15, 2007). Note that, consistent with other processes described in this notice, DHS now refers to CFRP as a process rather than a program.

[3] *Id.; see also* USCIS, The Cuban Family Reunification Parole Program (Sept. 1, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program.*

[4] *Id.*

[5] *See* 8 CFR 274a.12(c)(11).

[6] *See* Public Law 89–732, 80 Stat. 1161 (Nov. 2, 1966), as amended (Immigration and Nationality Act (INA), sec. 245, Note 1, 8 U.S.C. 1255, Note 1).

[7] *Id.*

[8] *Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program,* 79 FR 75579 (Dec. 18, 2014).

[9] 79 FR 75581.

[10] *See* U.S. Department of State, Biden Administration Measures to Support the Cuban People (May 16, 2022), *https://www.state.gov/biden-administration-measures-to-support-the-cuban-people/. See also* U.S. Embassy in Cuba, USCIS Resumes Cuban Family Reunification Parole Program Operations (September 1, 2022), *https://cu.usembassy.gov/uscis-resumes-cuban-family-reunification-parole-program-operations/#:~:text=CFRP%20processing%20was%20suspended%20due,office%20in%20Havana%20in%202018.*

[11] *See* USCIS, USCIS Closes Havana Field Office on December 10, 2018 (December 10, 2018), *https://www.uscis.gov/archive/uscis-closes-havana-field-office-on-dec-10-2018.*

[12] New York Times, 'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future, Dec. 10, 2022, *https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html;* Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian blackouts. *https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/*; The Economist, Cuba is Facing Its Worst Shortage of Food Since the 1990s (July 1, 2021), *https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s.*

[13] Within this notice, ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child'', in general, as meaning ''an unmarried person under twenty-one years of age'').

[14] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[15] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

Hondurans,[16] and Salvadorans [17] along these lines. DHS is now conforming the CFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

As done under the 2007 process and the revised process in 2014, invitations to participate in the CFRP process will issue to certain petitioners who have an approved Form I–130 filed on behalf of a Cuban principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved [18] Form I–130 filed on behalf of a Cuban principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Cuban principal beneficiary of an approved Form I–130, and how to file separate requests for any immediate family members of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

The threshold eligibility criteria for participation in the CFRP continue to apply. Principal beneficiaries must be Cuban nationals who have a petitioner who has been invited to participate. However, DHS is implementing an update for the petitioner to initiate this process so the beneficiary can be considered for issuance of advance authorization to travel to the United States where the beneficiary can seek a discretionary grant of parole at an interior POE.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (*e.g.,* international passport) to an interior POE.

In addition, as with the 2007 process and the revised 2014 process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States. For consistency with other FRP processes, parole will generally be granted for a period of up to three years, rather than the two years under the previous CFRP process.

Participation in this process is not limited to beneficiaries currently living in Cuba.[19] However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Cuban nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[20] expedited removal proceedings,[21] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be or may become ineligible for adjustment of status [22] or for an immigrant visa [23] as a result of entering without inspection and not having been admitted or paroled.[24]

---

[16] *See Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[17] *See Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[18] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[19] DHS recognizes that permitting Cubans to be processed under the CFRP process when not physically present in Cuba means that not all Cubans who are paroled under the CFRP process would count towards the U.S. Government's annual obligation under the U.S.-Cuba Migration Accords.

[20] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[21] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[22] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[23] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[24] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

*C. Description of Updated Process for CFRP*

DHS announces these updates to the CFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since CFRP's inception in 2007. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated CFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this CFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[25]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[26]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and

[25] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[26] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[27]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this CFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2007 decision to implement this process remains unchanged and is severable from the procedural updates announced in this notice.

## III. Regulatory Requirements

*A. Administrative Procedure Act*

The changes to the CFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the CFRP process, and these updates to that process, constitute a general statement of policy,[28] *i.e.,* "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [29] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [30] because it sets forth updates to how agencies will implement the CFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[31] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[32] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[33] Improving the efficiency and accessibility of CFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[34] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Cuban nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the CFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this CFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[35]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17376 Filed 8–10–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

[27] 8 CFR 274a.12(c)(11).

[28] 5 U.S.C. 553(b)(A).

[29] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[30] 5 U.S.C. 553(b)(A).

[31] 5 U.S.C. 553(a)(1).

[32] *See* footnotes 14, 15, 16, and 17; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[33] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[34] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries.

[35] Per the normal clearance procedures at 5 CFR 1320.10(e).

Specialist, Marketing & Outreach, Federal Insurance, Federal Insurance and Mitigation Administration, 202–322–6215, *joshua.heath@fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** E.O. 12862 directs Federal Agencies to provide service to the public that matches or exceeds the best service available. Section 1(b) of E.O. 12862 requires government agencies to ''survey customers to determine the kind and quality of services they want.'' In addition, the Foundations for Evidence-Based Policymaking Act of 2018 (''Evidence Act'') enables agencies to collect and analyze data to use as evidence in policymaking, as well as assess the effectiveness and efficiency of current programs. To work continuously to ensure that our programs are effective and meet our customers' needs, FEMA seeks to obtain the Office of Management and Budget's (OMB) approval of a generic clearance to collect information through mixed methods (quantitative and qualitative) to improve marketing, outreach, and other promotional activities of services, programs, and opportunities offered by FEMA.

This proposed information collection previously published in the **Federal Register** on May 5, 2023, at 88 FR 29143 with a 60-day public comment period. No comments were received. The purpose of this notice is to notify the public that FEMA will submit the information collection abstracted below to the Office of Management and Budget for review and clearance.

## Collection of Information

*Title:* Generic Clearance for the Multi-Modal Mixed Methods Collection of Information to Inform Agency Marketing and Outreach.

*Type of Information Collection:* New information collection.

*OMB Number:* 1660–NW131.

*FEMA Forms:* Not applicable.

*Abstract:* In accordance with the Evidence Act, the collected information will equip FEMA with vital feedback from the general public and stakeholders that will allow for evidence-based improvements to FEMA's programs and services. FEMA will collect, analyze, and interpret information to identify strengths and weaknesses of programs based on current stakeholder experience and make improvements in the marketing and other promotional activities based on feedback.

*Affected Public:* Individuals and households, business or other for-profit, Federal Government, State, local or Tribal government, non-profit institutions.

*Estimated Number of Respondents:* 45,600.

*Estimated Number of Responses:* 45,600.

*Estimated Total Annual Burden Hours:* 7,861.

*Estimated Total Annual Respondent Cost:* $374,020.

*Estimated Respondents' Operation and Maintenance Costs:* $0.

*Estimated Respondents' Capital and Start-Up Costs:* $0.

*Estimated Total Annual Cost to the Federal Government:* $748,830.

## Comments

Comments may be submitted as indicated in the **ADDRESSES** caption above. Comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the Agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Millicent Brown Wilson,**

*Records Management Branch Chief, Office of the Chief Administrative Officer, Mission Support, Federal Emergency Management Agency, Department of Homeland Security.*

[FR Doc. 2023–17281 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–52–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2754–23; DHS Docket No. USCIS–2014–0013]**

**RIN 1615–ZC03**

## Implementation of Changes to the Haitian Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Haitian Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Haitian Family Reunification Parole (HFRP). HFRP provides a lawful, safe, and orderly pathway for certain Haitians to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to HFRP in light of technological advancements and process efficiencies created since the HFRP's inception in 2014. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In 2014, U.S. Citizenship and Immigration Services (USCIS) launched HFRP to expedite family reunification through lawful, safe, and orderly channels of migration to the United States, increase existing avenues for lawful migration from Haiti, and help Haiti in its recovery from the long-term impacts of the January 12, 2010 earthquake that devastated the country.[1] Under HFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Haiti who are the beneficiaries of an approved Form I–130, Petition for Alien Relative. Since it was established in 2014, HFRP has allowed certain beneficiaries of family-based immigrant petitions that were approved on or before December 18, 2014 to request a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available,

[1] *Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). Note that, consistent with other processes described in this notice, DHS now refers to HFRP as a process rather than a program.

rather than remain in Haiti awaiting availability of their immigrant visas.[2]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[3] If granted parole into the United States, HFRP parolees may apply for employment authorization while they wait for their immigrant visas to become available so they may apply to adjust to LPR status.[4]

As launched in 2014, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary. USCIS also required that USCIS officers interview beneficiaries in Port-au-Prince, Haiti, to verify their eligibility for HFRP. The National Visa Center (NVC) at the U.S. Department of State (State) first issued invitations to eligible petitioners to apply for HFRP in March 2015. Due to several factors, including anticipated policy changes,[5] a change in Administrations, the permanent closure of USCIS's field office in Port-au-Prince, Haiti, on December 20, 2019, extremely limited visa processing due to COVID–19,[6] and severe insecurity in the country,[7] new invitations to the HFRP process have not issued since June 2016 and interviews have not taken place since December 2019.

In the meantime, technology has evolved since the launch of HFRP in 2014. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for HFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to HFRP but that follow different procedures, which utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 HFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented family reunification parole (FRP) processes for certain Colombians,[8] Guatemalans,[9] Hondurans,[10] and Salvadorans[11] along these lines. DHS is now conforming the HFRP process to these recently announced processes.

## II. Modernized Process

### *A. Petitioners*

Invitations to participate in the HFRP process will continue to issue to certain petitioners who have an approved Form I–130 filed on behalf of a Haitian principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved[12] Form I–130 filed on behalf of a Haitian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's NVC as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Haitian principal beneficiary of an approved Form I–130 and how to file separate requests for any immediate family members[13] of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As

---

[2] *Id.; see also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.* To participate in HFRP, beneficiaries must have a petitioner who filed a Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary, and was invited to participate in the HFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's approved Form I–130 must be a Haitian national.

[3] *See Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). *See also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[4] 8 CFR 274a.12(c)(11).

[5] In August 2019, USCIS announced an intention to terminate HFRP, although USCIS never formally terminated the process. *See* USCIS to End Certain Categorical Parole Programs (Aug. 2, 2019), *https://www.uscis.gov/archive/uscis-to-end-certain-categorical-parole-programs.* In June 2022, USCIS reversed its 2019 announcement. *See also* The Haitian Family Reunification Parole (HFRP) Program: Alert (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[6] On March 19, 2020, the U.S. Embassy Port-au-Prince, Haiti, issued a Health Alert and suspended all non-emergency consular services. *See* Health Alert—U.S. Embassy Port-au-Prince, Haiti (March 19, 2020), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-january-8-2020-4-3-2-2-3-2-2-2-3-3-2-2-2-2-2-2-2-2-3-2-2-4-3-2-2-2-2-5-2-2-2/.*

[7] The assassination of Haiti's late President Jovenel Moïse exacerbated political and economic instability in Haiti, undermining state institutions and generating a power vacuum that has since been occupied by gangs. *See Implementation of a Parole Process for Haitians,* 88 FR 1243, 1246–47 (Jan. 9, 2023) (discussing conditions in Haiti). Due to the lawlessness in the country, the U.S. Embassy in Haiti temporarily suspended visa processing and continues to operate at a limited capacity. *See* Security Alert: U.S. Embassy Port-au-Prince, Haiti (Feb. 5, 2023), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-80.* To further complicate matters, on August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure. *See* UNICEF, Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families (Oct. 4, 2021), *https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti.*

[8] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[9] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

[10] *See Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[11] See *Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[12] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[13] Throughout this notice "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* the Immigration and Nationality Act (INA), sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child" in general, as meaning "an unmarried person under twenty-one years of age").

part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

Previously, the HFRP process limited eligibility to Haitian principal beneficiaries of Forms I–130 and their immediate family members that were approved by USCIS on or before December 18, 2014 and for whom an immigrant visa was not currently available. The volume of invitations issued was limited based on operational capacity and other factors, as described above. The revised process is open to all Haitian principal beneficiaries of an approved Form I–130 and their immediate family members who have not yet received an immigrant visa regardless of the date on which USCIS approved the Form I–130. However, as mentioned above, the process will still be available on an invitation-only basis.

In addition, individuals whose immigrant visas were not available but were expected to become available within a specific time range were previously sent invitations to participate in the HFRP process. USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I–130.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (*e.g.,* international passport) to an interior POE.

In addition, as with the 2014 HFRP process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States.

Participation in this process is not limited to beneficiaries currently living in Haiti. However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Haitian nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[14] expedited removal proceedings,[15] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be, or may become, ineligible for adjustment of status[16] or for an immigrant visa[17] as a result of entering without inspection and not having been admitted or paroled.[18]

*C. Description of Updated Process for HFRP*

DHS announces these updates to the HFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since HFRP's inception in 2014. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated HFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this HFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S. citizen

[14] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[15] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[16] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[17] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

[18] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

(U.S.C.) or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[19]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[20]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[21]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and make the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this HFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2014 decision to implement this process remains unchanged and is severable from the

[19] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[20] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

[21] 8 CFR 274a.12(c)(11).

procedural updates announced in this notice.

**III. Regulatory Requirements**

*A. Administrative Procedure Act*

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a ''statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'' [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary ''in his discretion.'' This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

BILLING CODE 9111–97–P ; 9111–14–P

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release ''DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras'' (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

and file the Form I–131 in effect at the time of filing—and follow any additional instructions included in the program eligibility notice they receive from either USCIS or the NVC in submitting their application. A completed Form I–131 and fee or fee waiver request must be filed for each individual on whose behalf parole is being requested.

### III. Participation in the CFRP Program and Application Process

USCIS offers participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries—including any eligible spouse and child accompanying or following-to-join the principal beneficiaries (*see* INA sec. 203(d), 8 U.S.C. 1153(d))—of an approved Form I–130, Petition for Alien Relative, but for whom an immigrant visa is not immediately available. Participation in the CFRP Program is voluntary.

Prior to the date of this notice, the NVC mailed written notice to eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 indicating their beneficiaries' eligibility to participate in the CFRP Program. The notice invited an interested petitioner to submit to the NVC a copy of their approved Form I–130 and other supporting documents to opt in to the CFRP Program and begin the process of requesting parole. No formal application form or fee was required to apply. As of the date of this notice, the NVC will no longer issue CFRP Program eligibility notices that do not require a form and fee to apply. Petitioners with CFRP Program eligibility notices dated prior to December 18, 2014 must submit to the NVC the complete required documentation to opt in to the CFRP Program prior to February 17, 2015 in order to be grandfathered and considered for processing without a form and fee.

On or after February 17, 2015, participation in the CFRP Program will be predicated on submission of a Form I–131 and the requisite fee(s) or request for fee waiver that has been approved by USCIS. A U.S.C. or LPR petitioner in the United States with an approved Form I–130 that was filed on behalf of a beneficiary relative residing in Cuba, for whom a visa is not anticipated to be available during the CFRP processing time, will receive a written invitation from the NVC regarding the beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131 and submit the required fee(s) or fee waiver request to apply for the program. USCIS will reject a request for parole under the CFRP Program submitted without the required form and fee(s) or a request for a fee waiver.

USCIS officers or Department of State consular officers will interview qualified beneficiaries in Havana to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to authorize parole under the CFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States and seek parole by U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family member. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident after he or she has been physically present in the United States for one year as provided by the Cuban Adjustment Act, Pub. L. 89–732, 80 Stat. 1161 (8 U.S.C. 1255 note), or once the beneficiary's visa becomes available, whichever comes first.

Participation in the CFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of the immigrant visa petitions filed on their behalf.

For eligible beneficiaries who are not ''immediate relatives,'' if an immigrant visa becomes available while the Form I–131 is pending, the beneficiary will be able to proceed with the parole process to completion, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

### IV. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The Application for Travel Document, Form I–131, has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to the Form in connection with the CFRP Program and this notice; however, USCIS estimates that this notice will result in an annual average of 13,000–15,000 Form I–131 filings per year. The current OMB-approved estimate of the number of annual respondents filing a Form I–131 is 940,671. USCIS has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file for the CFRP Program will be covered within the 940,671 estimated. USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice. Therefore, USCIS is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the CFRP Program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29486 Filed 12–17–14; 8:45 am]

BILLING CODE 9111–97–P

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2548–14; DHS Docket No. USCIS–2014–0013]**

### Implementation of Haitian Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Haitian Family Reunification Parole (HFRP) Program. Under this program, USCIS offers certain Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014 an opportunity to receive a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available, rather than remain in Haiti awaiting availability of their immigrant visas. The program is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake.

**DATES:**

• The HFRP Program will only be available to Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014.

• On or after February 2, 2015, the Department of State's National Visa Center (NVC) will begin sending to eligible petitioners written invitations to apply to the HFRP Program.

**FOR FURTHER INFORMATION CONTACT:** Maura Nicholson, Deputy Chief, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 3300, Washington, DC 20529, Telephone (202) 272–1892.

**SUPPLEMENTARY INFORMATION:**

## I. Background of the HFRP Program

The rebuilding and development of a safe and economically strong Haiti is a priority for the United States. While progress has been made since the 2010 earthquake that devastated parts of the country, Haiti continues to face significant development challenges. Reconstruction and development in Haiti will continue for many years.[1]

With the exception of ''immediate relatives'' of U.S. citizens (USCs) (*i.e.,* parent, spouse and unmarried child(ren) under 21 years of age), *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* INA secs. 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. These statutory limits have resulted in long waiting periods before family members remaining in Haiti may join the U.S.C. and lawful permanent resident (LPR) family members in the United States who petitioned for them.

Under the HFRP Program, USCIS will exercise its discretionary parole authority[2] to permit certain eligible Haitians in Haiti to join their family members in the United States up to approximately two years before their immigrant visas become available, thereby promoting family unity. By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development. Once paroled into the United States, HFRP Program beneficiaries will be eligible to apply for employment authorization, and those who are able to work may contribute to Haiti's post-earthquake reconstruction and development through remittances. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

## II. Participation in the HFRP Program and Application Process

USCIS offers participation in the HFRP Program to eligible Haitians: (1) In Haiti; (2) who are the beneficiaries (including any accompanying or following-to-join spouse and children[3]) of Forms I–130, Petition for Alien Relative, that were approved on or before the date of publication of this notice; (3) whose immigrant visas are not available, but are expected to become available within approximately 18 to 30 months; and (4) whose petitioning relatives in the United States have received a written invitation to apply for the HFRP Program on their behalf from the Department of State's National Visa Center (NVC).

The NVC will issue a written invitation to petitioners of approved Forms I–130 based upon the date when the immigrant visas for their beneficiary relatives are expected to become available. Each year the NVC will identify approved Forms I–130 whose filing dates (priority dates) are expected to become current in approximately the next 18 to 30 months, meaning that the immigrant visas for those cases are expected to become available within that timeframe. The NVC will prioritize the issuance of invitations to petitioners within that group, beginning with the oldest Form I–130 filing date and working forward to the most recent filing date. The number of HFRP Program invitations may be limited annually based on U.S. Government operational capacity in Haiti and the availability of U.S. Government resources to aid program beneficiaries. Initially, the U.S. Government will seek to interview approximately 5,000 HFRP Program beneficiaries in Haiti per year. Petitioners will be given a deadline by which they must apply to have their beneficiary relatives considered for parole under the program. Participation in the HFRP Program is voluntary.

On or after February 2, 2015, eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 filed on behalf of a beneficiary relative in Haiti for whom a visa is not available but expected to become available within approximately 18 to 30 months, will receive a written notice from the NVC regarding the beneficiary's eligibility to participate in the HFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request to apply for parole under the HFRP Program on behalf of each beneficiary. USCIS will reject a request for parole under the HFRP Program that is not submitted as instructed, without the required completed form, or without the fee(s) or a request for a fee waiver.

USCIS or Department of State consular officers will interview qualified beneficiaries in Port au Prince, Haiti, to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to grant parole under the HFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Haiti. These travel documents will enable the beneficiary to travel to the United States and seek parole from U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident once the beneficiary's immigrant visa becomes available.

Participation in the HFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of immigrant visa petitions filed on their behalf. If, however, an immigrant visa becomes available for a beneficiary who is not an ''immediate relative'' while the Form I–131 is pending, the beneficiary will still be able to complete the parole process, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees, but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

## III. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they

[1] *http://www.state.gov/s/hsc/factsheets/2014/219539.htm.*

[2] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for establishing conditions of parole and for terminating parole).

[3] *See* INA sec. 203(d), 8 U.S.C. 1153(d).

impose. The USCIS, Application for Travel Document, (Form I–131), has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to this form in connection with the implementation of the HFRP Program and this notice. USCIS estimates that the HFRP Program will result in an average of 5,000 Form I–131 filings per year. The current OMB-approved estimated number of annual respondents filing Form I–131 is 940,671. USCIS believes it has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file a HFRP Program-related request will be covered within the 940,671 estimated. Because USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice, it is publishing no notice under the PRA and making no revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the HFRP program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29533 Filed 12–17–14; 8:45 am]

BILLING CODE 9111–97–P

## DEPARTMENT OF THE INTERIOR

**[Docket No. ONRR–2014–0002; DS63610000 DR2PS0000.CH7000 145D0102R2]**

### Office of Natural Resources Revenue; Agency Information Collection Activities: Proposed Collection–United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection, Comment Request

**AGENCY:** Office of Natural Resources Revenue (ONRR), Interior.

**ACTION:** Notice of a new information collection.

**SUMMARY:** To comply with the Paperwork Reduction Act of 1995 (PRA), we are inviting comments on an information request that we will submit to the Office of Management and Budget (OMB) for review and approval. This Information Collection Request (ICR) covers the voluntary paperwork requirements for participation in the United States' implementation of the Extractive Industries Transparency Initiative (EITI). It encompasses upcoming requests that certain companies voluntarily provide information on the amount of revenue which they have paid to the Federal government for extracting Federally-owned natural resources.

**DATES:** Submit written comments on or before February 17, 2015.

**ADDRESSES:** You may submit comments on this ICR to ONRR by using one of the following three methods (please use ONRR 2014–0002 as an identifier in your comment):

1. Electronically, go to *http://www.regulations.gov.* In the entry titled ''Enter Keyword or ID,'' enter ONRR–2014–0002 and then click ''Search.'' Follow the instructions to submit public comments. ONRR will post all comments.

2. Mail comments to Mr. Luis Aguilar, Regulatory Specialist, ONRR, P.O. Box 25165, MS 61030A, Denver, Colorado 80225–0165.

3. Hand-carry or mail comments, using an overnight courier service, to ONRR. Our courier address is Building 85, Room A–614, Denver Federal Center, West 6th Ave. and Kipling St., Denver, Colorado 80225.

**FOR FURTHER INFORMATION CONTACT:** For questions on technical issues, contact Mr. Jon Swedin, Program Analyst, at (303) 231–3028, or email *Jonathan.Swedin@onrr.gov.* For other questions, contact Mr. Luis Aguilar, telephone (303) 231–3418, or email *Luis.Aguilar@onrr.gov.* You may also contact Mr. Aguilar to obtain copies, at no cost, of (1) the ICR, (2) any associated form, and (3) the regulations that require us to collect the information.

**SUPPLEMENTARY INFORMATION:**

*Title:* United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection.

*OMB Control Number:* 1012—0NEW.

*Bureau Form Number:* United States Extractive Industries Transparency Initiative (USEITI) Company Payment Reporting Template.

*Abstract:* The Secretary of the U.S. Department of the Interior is responsible for mineral resource development on Federal and Indian lands and the Outer Continental Shelf (OCS). Under various laws, the Secretary's responsibility is to manage mineral resources production on Federal and Indian lands and the OCS, collect the royalties and other mineral revenues due, and distribute the funds collected under those laws. ONRR performs the royalty management functions and assists the Secretary in carrying out the Department's responsibility. We have posted those laws pertaining to mineral leases on Federal and Indian lands and the OCS at *http://www.onrr.gov/Laws_R_D/PubLaws/default.htm.*

In September 2011, President Obama announced the U.S. commitment to domestic implementation of EITI, a key element of the President's Open Government Partnership commitments. President Obama appointed the Secretary of the Interior as the senior U.S. official to lead USEITI implementation. EITI is a voluntary global effort designed to strengthen transparency, accountability, and public trust for the revenues paid and received for a country's oil, gas, and mineral resources. The Administration renewed its commitment to implement EITI in the December 2013 U.S. Open Government National Action Plan. By signing onto the global EITI standard, the U.S. Government will help ensure that American taxpayers are receiving every dollar due for the extraction of these valuable public resources. The EITI Standard contains the set of requirements that countries need to meet in order to be recognized first as an EITI Candidate and, ultimately, an EITI-Compliant Country. In March 2014, the U.S. became the first G7 country to achieve Candidate Country status. When fully implemented, EITI will ensure more transparency in how the country's natural resources are governed and also will provide full disclosure of government revenues from its extractive sector.

The following laws and executive initiative are applicable to USEITI, including the Secretary's and ONRR's management of mineral resource production, revenue, and information disclosure obligations:

- U.S. Open Government National Action Plan
- Freedom of Information Act, as amended (5 U.S.C. 552)
- Outer Continental Shelf Lands Act, as amended (43 U.S.C. 1331–56b), including provisions of the Energy Policy Act of 2005 (42 U.S.C. 15801 *et seq.*)
- Federal Oil and Gas Royalty Management Act of 1982 as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (30 U.S.C. 1701–1759).
- Geothermal Steam Act of 1970 (30 U.S.C. 1001–28)
- Mineral Leasing Act (30 U.S.C. 181–287)
- Mineral Leasing Act for Acquired Lands (30 U.S.C. 351–60)

### General Information

International EITI requirements direct participating governments to publish annual reports to help citizens

DEPARTMENT OF HOMELAND SECURITY

U.S. Immigration and Customs Enforcement

[OMB Control Number 1653–0022]

## Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Form No. I–352; Immigration Bond

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act (PRA) of 1995 the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) will submit the following Information Collection Request (ICR) to the Office of Management and Budget (OMB) for review and clearance. This information collection was previously published in the **Federal Register** on September 3, 2025, allowing for a 60-day comment period. ICE received no comments. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** Comments are encouraged and will be accepted until December 22, 2025.

**ADDRESSES:** Written comments and recommendations for the proposed information collection should be sent within 30 days of the publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** If you have questions related to this collection, call or email Carl Albritton, ERO Bond Management Unit, (202) 732–5918, *carl.a.albritton@ice.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

### Comments

Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

### Overview of This Information Collection

(1) *Type of Information Collection:* Extension, Without Change, of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Immigration Bond.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* I–352; U.S. Immigration and Customs Enforcement.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individual or Households; Business or other for-profit. The data collected on this collection instrument is used by ICE to ensure that the person or company posting the bond is aware of the duties and responsibilities associated with the bond. The collection instrument serves the purpose of instruction in the completion of the form, together with an explanation of the terms and conditions of the bond. Sureties have the capability of accessing, completing, and submitting delivery, voluntary departure, and order of supervision bonds electronically through ICE's eBonds system which encompasses the I–352, while individuals are still required to complete the bond form manually and sureties will be required to submit maintenance of status and departure bonds manually.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 16,505 responses at 30 minutes (.50 hours) per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden is 8,253 hours.

Dated: November 18, 2025.

**Scott Elmore,**

*PRA Clearance Officer.*

[FR Doc. 2025–20481 Filed 11–20–25; 8:45 am]

BILLING CODE 9111–28–P

DEPARTMENT OF HOMELAND SECURITY

U.S. Citizenship and Immigration Services

[CIS No. 2838–25]

## Inflation Adjustment to HR–1 Immigration Fees

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice of inflationary fee adjustment.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS), is announcing inflationary adjustments to immigration-related fees administered by USCIS under the One Big Beautiful Bill Act (HR–1) for Fiscal Year (FY) 2026. HR–1 mandates that USCIS adjust the HR–1 fees. This notice outlines the adjusted fees and their effective date.

**DATES:** The fees announced in this notice are effective on or after January 1, 2026. Any immigration benefit request postmarked on or after January 1, 2026 without the proper filing fee will be rejected.

**FOR FURTHER INFORMATION CONTACT:** Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone number above via TTY by calling the toll-free Federal Information Relay Service at 1–877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BLS—U.S. Bureau of Labor Statistics
CPI–U—Consumer Price Index for All Urban Consumers
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FY—Fiscal Year
HR–1—One Big Beautiful Bill Act
INA—Immigration and Nationality Act
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services

### I. Background and Authority

*H.R.1—One Big Beautiful Bill Act*

On July 4, 2025, the President signed into law H.R.1—One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (HR–1), a comprehensive legislative package that amended various laws, including the Immigration and Nationality Act (INA). Among its changes, HR–1 introduced new

immigration fees as minimum amounts for Fiscal Year (FY) 2025, authorized agencies to adjust them through rulemaking, and mandated annual updates based on the Consumer Price Index for All Urban Consumers (CPI–U). *See* HR–1, Title X, Subtitle A, Part I, Sections 100001 through 100018.

On July 22, 2025, USCIS published a **Federal Register** Notice announcing the implementation of these fees. *See* 90 FR 34511 (July 22, 2025).

- $100 fee for any alien who files an application for asylum under section 208 (8 U.S.C. 1158) at the time such application is filed. Sec. 100002.
- $550 fee for individuals filing an initial application for employment authorization based on a pending asylum application under section 208(d)(2) (8 U.S.C. 1158(d)(2)). Sec. 10003(a).
- $275 fee for renewals and extensions of employment authorization for asylum applicants. Sec. 100011.
- $550 fee for any alien paroled into the United States for any initial application for employment authorization at the time such initial application is filed. Sec. 100003(b).
- $275 fee for renewals and extensions of employment authorization based on a grant of parole. Sec. 100010.
- $550 fee for an alien who files an initial employment authorization application under Temporary Protected Status (TPS). Sec. 100003(c).
- $275 fee for renewals and extensions of employment authorization for aliens granted TPS. Sec. 100012.
- $500 fee for first-time applicants filing Form I–821, Application for Temporary Protected Status, not including the $30 biometric services fee. Sec. 100006.
- $250 fee for any alien who files Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant for Special Immigrant Juvenile (SIJ) status under section 101(a)(27)(J), 8 U.S.C. 1101(a)(27)(J). Sec. 100005.
- $100 annual fee for all aliens with a pending asylum application for each calendar year the application remains pending. Sec. 100009.[1]

HR–1 requires that DHS, beginning in FY 2026 and continuing for each subsequent fiscal year, adjust the immigration-related fees for inflation. HR–1 prescribes that DHS use the percentage change to the CPI–U for the month of July in the current year compared to the preceding calendar year, and round each fee to the next lowest multiple of $10 or down to the nearest dollar as authorized by HR–1. *See e.g.* Sec. 100002(c) or Sec. 100007(a)(3).

## II. Basis for Adjustment

In accordance with the provisions outlined in HR–1, most fees established for various immigration-related applications and benefit requests are subject to annual inflation adjustments. USCIS calculated these adjustments using the percentage change in the CPI–U from July 2024 to July 2025, with most fees ''rounded to the next lowest multiple of $10'' as required by HR–1. *See e.g.,* sec 100002(c). Section 100009 specifies that the Annual Asylum Fee is adjusted for inflation and rounded down to the nearest ''dollar.'' *See* sec 100009(b)(2)(B). This approach aligns with HR–1 requirements to use the percentage change in CPI–U from the ''month of July preceding the date on which such adjustment takes effect . . . for the same month of the preceding calendar year.'' *Id.* In July 2024, the CPI–U was 314.540 and in July 2025 it was 323.048.[2] Therefore, between July 2024 and July 2025, the CPI–U increased by approximately 2.70 percent.[3] When this percentage increase is applied to the current (FY 2025) HR–1 fees and rounded to the next lowest $10 increment, some fees increase by $5, $10, or $20. Some fees will not change because the inflation adjusted amount is equal to the current fee when rounded to the next lowest $10 increment. Table 1 summarizes the HR–1 fees for FY 2026 which USCIS collects.

TABLE 1—HR–1 INFLATION ADJUSTMENTS FOR FY 2026

| Immigration fee type | Current fee | CPI–U change (%) | Inflation adjustment | Fee plus inflation | Round down to $10 | Round down to nearest dollar | Fee increase | FY 2026 fee |
|---|---|---|---|---|---|---|---|---|
| I–589 Asylum Fee (Initial fee for aliens filing an application for asylum). | $100 | 2.70 | $2.70 | $102.70 | $100 | N/A | $0 | $100 |
| I–589 Annual Pending Asylum Application Fee | 100 | 2.70 | 2.70 | 102.70 | N/A | 102 | $2 | 102 |
| I–765 Initial Asylum Applicant Employment Authorization Document (EAD). | 550 | 2.70 | 14.88 | 564.88 | 560 | N/A | $10 | 560 |
| I–765 Renewal or Extension of Asylum Applicant EAD | 275 | N/A | N/A | N/A | N/A | N/A | HR–1 does not provide for adjustment[4]. | 275 |
| I–765 Initial Parole EAD—Valid for 1 year | 550 | 2.70 | 14.88 | 564.88 | 560 | N/A | $10 | 560 |
| I–765 Renewal or Extension of Parole EAD—Valid for 1 year | 275 | 2.70 | 7.44 | 282.44 | 280 | N/A | $5 | 280 |
| I–765 Initial Temporary Protected Status (TPS) EAD—Valid for 1 year or the duration of the TPS designation whichever is shorter. | 550 | 2.70 | 14.88 | 564.88 | 560 | N/A | $10 | 560 |
| I–765 Renewal or Extension of TPS EAD—Valid for 1 year | 275 | 2.70 | 7.44 | 282.44 | 280 | N/A | $5 | 280 |
| I–131 EAD upon new period of Parole (Re-parole) | 275 | 2.70 | 7.44 | 282.44 | 280 | N/A | $5 | 280 |
| I–821 TPS Fee | 500 | 2.70 | 13.52 | 513.52 | 510 | N/A | $10 | 510 |
| I–360 Special Immigrant Juvenile (SIJ) Fee | 250 | 2.70 | 6.76 | 256.76 | 250 | N/A | $0 | 250 |

[1] On October 30, 2025, as required by an order issued in in *Asylum Seeker Advocacy Project* v. *United States Citizenship and Immigration Services, et al.,* SAG–25–03299 (D. Md.), USCIS paused the implementation of the July 22, 2025 notice as it relates to annual asylum fee notices. Any applicant who has received a notice from USCIS may disregard that notice pending updated instructions. That order does not affect the adjustment of the amount of the AAF as required by the law and announced in this notice.

[2] *See* U.S. Bureau of Labor Statistics (BLS), CPI–U Series Id CUUR0000SA0, *https://data.bls.gov/timeseries/CUUR0000SA0* (last visited Sep. 24, 2025).

[3] DHS calculated this by subtracting the July 2024 CPI–U (314.540) from the July 2025 CPI–U (323.048), then dividing the result (8.508) by the July 2024 CPI–U (314.540). Calculation: $(323.048 - 314.540)/314.540 = 0.0270 \times 100 = 2.705$ percent.

[4] Public Law 119–21 section 100011, which governs fees for Renewal or Extension of Employment Authorization for Asylum Applicants, does not provide for inflationary adjustments.

For the fees outlined in this notice, the statute clearly states that agencies should round inflation adjustments down to the nearest dollar or, in most cases, to the ''next lowest multiple of $10.'' Consistent with the statute, when applicable, USCIS is rounding down to the next lowest multiple of $10 increment rather than rounding to the nearest $10 increment.

The methodology USCIS used ensures that fees keep pace with inflation as enacted by Congress in HR–1.[5]

### III. Effective Date and Implementation

USCIS will require the filing fees for FY 2026 established in this notice for any immigration benefit requests postmarked on or after January 1, 2026. Because of the time needed by DHS and USCIS to issue guidance on and operationalize the change in the required fees, and for the public to adapt their immigration benefit requests that are in process to the changes, requests postmarked on or after January 1, 2026 without the proper filing fee will be rejected. DHS has determined that the policy required by this Notice is the most equitable path forward to effectuate collection of HR–1 fees for FY 2026 as expeditiously as practicable for the fees administered by USCIS.[6] The initial HR–1 fees and subsequent inflation adjustments are required by law, but for additional clarity, DHS may codify the fees covered by this notice and annual adjustments in 8 CFR part 106 in a future rule.

**Joseph B. Edlow,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2025–20622 Filed 11–20–25; 8:45 am]

**BILLING CODE 9111–97–P**

[5] *See e.g.,* sec 100002(c).

[6] The fee required by section 100004 of HR–1 from any alien who is paroled into the United States, and by section 100008 from any alien who submits an application for a Form I–94 Arrival/Departure Record, will be adjusted for inflation as required by the law in a subsequent notice in the **Federal Register**. DHS or the relevant component of DHS will explain the effective dates for implementation of the changes that are announced in each notice, rule, or guidance document.

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 731–TA–1435–1436 and 1438–1440 (Review)]**

## Acetone From Belgium, Singapore, South Africa, South Korea, and Spain; Revised Schedule for the Subject Proceeding

**AGENCY:** United States International Trade Commission.

**ACTION:** Notice.

**DATES:** November 18, 2025.

**FOR FURTHER INFORMATION CONTACT:** Stamen Borisson (202–205–3125), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may also be obtained by accessing its internet server (*https://www.usitc.gov*). The public record for this proceeding may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.*

**SUPPLEMENTARY INFORMATION:** Effective May 20, 2025, the Commission established a schedule for the conduct of the subject proceeding (90 FR 22323, May 27, 2025). Due to the lapse in appropriations and ensuing cessation of Commission operations, the Commission is revising its schedule as follows: the deadline for filing posthearing briefs and for written statements from any person who has not entered an appearance as a party is December 3, 2025; the Commission will make its final release of information on December 22, 2025; and final party comments are due on December 30, 2025.

On September 30, 2025, counsel for the Coalition for Acetone Fair Trade filed a request to appear at the hearing. No other parties submitted a request to appear at the hearing. On November 17, 2025, counsel for the Coalition for Acetone Fair Trade withdrew its request to appear at the hearing, filed a request that the Commission cancel the scheduled hearing for this proceeding and indicated a willingness to respond to any Commission questions in lieu of an actual hearing. Consequently, the public hearing in connection with this proceeding, originally scheduled to begin at 9:30 a.m. on October 7, 2025, is cancelled. Parties to this proceeding should respond to any written questions posed by the Commission in their posthearing briefs.

For further information concerning this proceeding, see the Commission's notice cited above and the Commission's Rules of Practice and Procedure, part 201, subparts A and B (19 CFR part 201), and part 207, subparts A, D, E, and F (19 CFR part 207).

*Authority:* This proceeding is being conducted under authority of title VII of the Tariff Act of 1930; this notice is published pursuant to section 207.62 of the Commission's rules.

By order of the Commission.

Issued: November 18, 2025.

**Sharon Bellamy,**

*Supervisory Hearings and Information Officer.*

[FR Doc. 2025–20518 Filed 11–20–25; 8:45 am]

**BILLING CODE 7020–02–P**

## INTERNATIONAL TRADE COMMISSION

## Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has received a complaint entitled *Certain Low-Profile Microwave-Hood Combination Products, DN 3857;* the Commission is soliciting comments on any public interest issues raised by the complaint or complainant's filing pursuant to the Commission's Rules of Practice and Procedure.

**FOR FURTHER INFORMATION CONTACT:** Lisa R. Barton, Secretary to the Commission, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 205–2000. The public version of the complaint can be accessed on the Commission's Electronic Document Information System (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.*

General information concerning the Commission may also be obtained by accessing its internet server at United States International Trade Commission (USITC) at *https://www.usitc.gov.* The public record for this investigation may be viewed on the Commission's Electronic Document Information System (EDIS) at *https://edis.usitc.gov.* Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810.

**SUPPLEMENTARY INFORMATION:** The Commission has received a complaint and a submission pursuant to § 210.8(b) of the Commission's Rules of Practice and Procedure filed on behalf of Whirlpool Corporation on November 18, 2025. The complaint alleges violations of section 337 of the Tariff Act of 1930

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[OMB Control Number 1615–0017]**

## Agency Information Collection Activities: Application for Advance Permission To Enter as Nonimmigrant [Pursuant to Section 212(d)(3)(A)(ii) of the INA, Section 212(d)(13) of the INA, or Section 212(d)(14) of the INA, Form I–192; Revision of a Currently Approved Collection

**ACTION:** 60-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) invites the general public and other Federal agencies to comment upon this proposed revision of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.*, the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until February 17, 2015.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0017 in the subject box, the agency name and Docket ID USCIS–2008–0009. To avoid duplicate submissions, please use only one of the following methods to submit comments:

(1) *Online.* Submit comments via the Federal eRulemaking Portal Web site at *www.regulations.gov* under e-Docket ID number USCIS–2008–0009;

(2) *Email.* Submit comments to *USCISFRComment@uscis.dhs.gov*;

(3) *Mail.* Submit written comments to DHS, USCIS, Office of Policy and Strategy, Chief, Regulatory Coordination Division, 20 Massachusetts Avenue NW., Washington, DC 20529–2140.

**SUPPLEMENTARY INFORMATION:**

### Comments

Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov*, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov*.

**Note:** The address listed in this notice should only be used to submit comments concerning this information collection. Please do not submit requests for individual case status inquiries to this address. If you are seeking information about the status of your individual case, please check ''My Case Status'' online at: *https://egov.uscis.gov/cris/Dashboard.do*, or call the USCIS National Customer Service Center at 1–800–375–5283.

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

### Overview of This Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Advance Permission to Enter as Nonimmigrant [Pursuant to Section 212(d)(3)(A)(ii) of the INA, Section 212(d)(13) of the INA, or Section 212(d)(14) of the INA.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–192; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. This form is provided by the U.S. Citizenship and Immigration Services (USCIS) as a means for certain inadmissible nonimmigrant aliens to apply for permission to enter the United States.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–192 is 10,448 and the estimated hour burden per response is .5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 5,224 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* There is no estimated annual cost burden associated with this collection of information.

If you need a copy of the information collection instrument with instructions, or additional information, please visit the Federal eRulemaking Portal site at: *http://www.regulations.gov*. We may also be contacted at: USCIS, Office of Policy and Strategy, Regulatory Coordination Division, 20 Massachusetts Avenue NW., Washington, DC 20529–2140, Telephone number 202–272–8377.

Dated: December 12, 2014.

**Laura Dawkins,**

*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2014–29588 Filed 12–17–14; 8:45 am]

BILLING CODE 9111–97–P

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2547–14; DHS Docket No. USCIS–2007–0043]**

## Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS) announces that as of February 17, 2015, USCIS will begin requiring the filing of an Application for Travel Document (Form I–131) and payment of its associated fee or approval of a fee waiver request from individuals who are applying for the Cuban Family

Reunification Parole (CFRP) Program on behalf of a beneficiary in Cuba. No form or fee is currently required for the CFRP Program. Under the CFRP Program, USCIS offers certain beneficiaries of approved family-based immigrant petitions the opportunity to be paroled into the United States to apply for lawful permanent resident status, rather than remain in Cuba waiting for their immigrant visas to become available. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration. This notice is intended to: Make the CFRP Program application and adjudication processes consistent with those for most other requests for parole filed on behalf of individuals outside the United States; facilitate centralized filing and more standardized processing of parole applications; and, recover costs incurred by USCIS to adjudicate and provide CFRP Program travel documents. This notice will affect only those individuals who receive a written invitation to apply to the CFRP Program from the Department of State's National Visa Center (NVC) which is dated on or after February 17, 2015. This notice will not affect existing CFRP Program beneficiaries or individuals who received a notice of program eligibility from the NVC predating the publication of this notice and who submitted to the NVC the complete documentation required to apply for the program prior to February 17, 2015 (referred to as 'grandfathered' cases). Grandfathered cases will continue to be processed without form or fee.

**DATES:**

- As of December 18, 2014, the NVC will no longer issue CFRP Program eligibility notices inviting eligible petitioners to opt in to the program without the required form and fee.
- On or after February 17, 2015, the NVC will begin sending to eligible petitioners a written invitation to apply to the CFRP Program using the required form and fee or request for fee waiver.
- A petitioner who received a CFRP Program eligibility notice dated prior to December 18, 2014 must submit to the NVC the complete required documentation to apply for the CFRP Program before February 17, 2015 to be grandfathered and eligible for processing without a form and fee.
- A petitioner who received a CFRP Program eligibility notice before December 18, 2014 who fails to submit to the NVC the complete required documentation to apply for the CFRP Program before February 17, 2015 cannot apply for the program until the petitioner receives a written invitation to apply to the CFRP Program using a required form and fee.
- Any person who applies for the CFRP Program after February 17, 2015 must submit a form and fee as prescribed in this notice and after receipt of a written invitation to apply from the NVC.

**FOR FURTHER INFORMATION CONTACT:** Pilar Peralta Mihalko, Chief, International Adjudications Support Branch, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 1585 S. Manchester Avenue, Anaheim, CA 92802, Telephone (714) 808–8133.

**SUPPLEMENTARY INFORMATION:**

## I. Background on CFRP Program

The CFRP Program was announced on November 15, 2007, via **Federal Register** notice (72 FR 65588). The notice explained that, in accordance with the U.S.-Cuba Migration Accords, the United States committed to ensuring that total legal migration to the United States from Cuba would be a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens (USC). *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter "Migration Accords")). Through the CFRP the United States offers a safe, legal, and orderly means of migrating to the United States.

The CFRP Program addressed two constraints posed by the array of migration programs that existed at the time of the program's creation, which had limited the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to inherently dangerous maritime crossings. First, with the exception of immediate relatives of USCs (*i.e.,* spouse, unmarried child(ren) under 21 years of age, and parents), *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-based immigrant visas that are available in any given year is limited by statute, *see* INA secs. 201(c), 202(a), 203, 8 U.S.C. 1151(c), 1152(a), 1153. These statutory limits have resulted in long waiting periods before family members remaining in Cuba may join the USC and lawful permanent resident (LPR) family members who petitioned for them. Since 1998, the Cuban Government has not permitted a new registration for the Special Program for Cuban Migration, the parole lottery initiated by the United States in support of the Migration Accords. Without this pool of individuals, there was a deficiency in the number of Cubans potentially eligible for travel to the United States.

Under the CFRP Program, USCIS exercises its discretionary parole authority to permit eligible Cuban nationals to come to the United States to join their family members.[1] Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords. It also lessens the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

## II. Background on Requiring a Form and a Fee

USCIS has not previously required a form or collected a fee for parole requests under the CFRP Program. As a result, USCIS has not used a standardized USCIS form, and has not required family members or beneficiaries to cover any of the costs associated with the benefit provided to them under the CFRP Program. The INA provides that USCIS may collect fees at a level that will ensure recovery of the full costs of adjudication and naturalization services, including services provided without charge to asylum applicants and certain other immigration applicants. INA sec. 286(m), 8 U.S.C. 1356(m). Operating expenses for the CFRP Program have been fully funded through use of fee revenue from other immigration benefit applicants. To bring CFRP Program parole requests in line with the majority of other parole requests filed on behalf of individuals outside of the United States, USCIS will now require the submission of a completed Form I–131, Application for Travel Document, and the fee required by USCIS fee regulations at 8 CFR 103.7(b)(1)(i)(M) for any CFRP Program application filed on or after February 17, 2015. Applicants for the CFRP Program must complete

[1] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for establishing conditions of parole and for terminating parole).

and file the Form I–131 in effect at the time of filing—and follow any additional instructions included in the program eligibility notice they receive from either USCIS or the NVC in submitting their application. A completed Form I–131 and fee or fee waiver request must be filed for each individual on whose behalf parole is being requested.

### III. Participation in the CFRP Program and Application Process

USCIS offers participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries—including any eligible spouse and child accompanying or following-to-join the principal beneficiaries (*see* INA sec. 203(d), 8 U.S.C. 1153(d))—of an approved Form I–130, Petition for Alien Relative, but for whom an immigrant visa is not immediately available. Participation in the CFRP Program is voluntary.

Prior to the date of this notice, the NVC mailed written notice to eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 indicating their beneficiaries' eligibility to participate in the CFRP Program. The notice invited an interested petitioner to submit to the NVC a copy of their approved Form I–130 and other supporting documents to opt in to the CFRP Program and begin the process of requesting parole. No formal application form or fee was required to apply. As of the date of this notice, the NVC will no longer issue CFRP Program eligibility notices that do not require a form and fee to apply. Petitioners with CFRP Program eligibility notices dated prior to December 18, 2014 must submit to the NVC the complete required documentation to opt in to the CFRP Program prior to February 17, 2015 in order to be grandfathered and considered for processing without a form and fee.

On or after February 17, 2015, participation in the CFRP Program will be predicated on submission of a Form I–131 and the requisite fee(s) or request for fee waiver that has been approved by USCIS. A U.S.C. or LPR petitioner in the United States with an approved Form I–130 that was filed on behalf of a beneficiary relative residing in Cuba, for whom a visa is not anticipated to be available during the CFRP processing time, will receive a written invitation from the NVC regarding the beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131 and submit the required fee(s) or fee waiver request to apply for the program. USCIS will reject a request for parole under the CFRP Program submitted without the required form and fee(s) or a request for a fee waiver.

USCIS officers or Department of State consular officers will interview qualified beneficiaries in Havana to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to authorize parole under the CFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States and seek parole by U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family member. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident after he or she has been physically present in the United States for one year as provided by the Cuban Adjustment Act, Pub. L. 89–732, 80 Stat. 1161 (8 U.S.C. 1255 note), or once the beneficiary's visa becomes available, whichever comes first.

Participation in the CFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of the immigrant visa petitions filed on their behalf.

For eligible beneficiaries who are not ''immediate relatives,'' if an immigrant visa becomes available while the Form I–131 is pending, the beneficiary will be able to proceed with the parole process to completion, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

### IV. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The Application for Travel Document, Form I–131, has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to the Form in connection with the CFRP Program and this notice; however, USCIS estimates that this notice will result in an annual average of 13,000–15,000 Form I–131 filings per year. The current OMB-approved estimate of the number of annual respondents filing a Form I–131 is 940,671. USCIS has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file for the CFRP Program will be covered within the 940,671 estimated. USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice. Therefore, USCIS is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the CFRP Program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29486 Filed 12–17–14; 8:45 am]

BILLING CODE 9111–97–P

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2548–14; DHS Docket No. USCIS–2014–0013]**

### Implementation of Haitian Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Haitian Family Reunification Parole (HFRP) Program. Under this program, USCIS offers certain Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014 an opportunity to receive a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available, rather than remain in Haiti awaiting availability of their immigrant visas. The program is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake.

**DATES:**

Federal Register
Vol. 89, No. 111
Friday, June 7, 2024

# Presidential Documents

**Proclamation 10773 of June 3, 2024**

## Securing the Border

**By the President of the United States of America**

**A Proclamation**

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID–19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID–19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken—and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS

to manage conditions on the southern border, as well as funding for critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

(a) over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

(b) over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

(c) 100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

(d) shelter and critical services for newcomers in our cities and States; and

(e) 1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.

While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118–47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final

decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity. The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility. However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system—the result of outdated laws and inadequate resources—has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the

United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1.** *Suspension and Limitation on Entry.* The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**Sec. 2.** *Applicability of Suspension and Limitation on Entry.* (a) The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

(b) Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

(c) For purposes of subsection (a) and subsection (b) of this section, unaccompanied children (as defined in section 279(g)(2) of title 6, United States Code) from non-contiguous countries shall not be included in calculating the number of encounters.

**Sec. 3**. *Scope and Implementation of Suspension and Limitation on Entry.* (a) The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

(b) The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c) An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d) The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e) Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**Sec. 4.** *Definitions.* (a) The term ''encounter'' refers to a noncitizen who:

(i) is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

(ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

(iii) is determined to be inadmissible at a southwest land border port of entry.

(b) The term ''southern coastal borders'' means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c) The term ''southwest land border'' means the entirety of the United States land border with Mexico.

(d) The term ''southern border'' means the southwest land border and the southern coastal borders.

**Sec. 5.** *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held

to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 6.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.



[FR Doc. 2024–12647
Filed 6–6–24; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

## Proclamation 10817 of September 27, 2024

## Amending Proclamation 10773

**By the President of the United States of America**

**A Proclamation**

On June 3, 2024, I signed Proclamation 10773 (Securing the Border). That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted. Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results. Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect. July and August 2024 were the lowest 2 months of encounters between ports of entry since September 2020. While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments. Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the

border circumstances in which Proclamation 10773 and the IFR are designed to apply. The Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border. This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity. Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters. Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Amendment to Section 2(a) of Proclamation 10773.* Section 2(a) of Proclamation 10773 is amended to read as follows:

''The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.''

**Sec. 2**. *Revocation of Section 2(c) of Proclamation 10773.* Section 2(c) of Proclamation 10773 is revoked.

**Sec. 3**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 4**. *Effectiveness.* The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final